**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF MARYLAND**

**UNITED STATES OF AMERICA,**        )
                                     )
              Plaintiff,             )
         vs.                         )
                                     )   **CRIMINAL NO.:** GJH-17-0667
**DAVON CARTER** and **CLIFTON**     )   **JURY TRIAL:**  Day two
**MOSLEY,**                          )
              Defendants.            )
_____)


                    **Transcript of Proceedings**
            **Before the Honorable George J. Hazel**
                  **Tuesday, January 7th, 2020**
                    **Baltimore, Maryland**


**For the Plaintiff:**

       Sandra Wilkinson, AUSA

       Kim Oldham, AUSA

**For Defendant Davon Carter:**

       Gerald T. Zerkin, Esquire

       Christopher M. Davis, Esquire

**For Defendant Clifton Mosley:**

       Harry J. Trainor, Jr., Esquire

       Stephen B. Mercer, Esquire


_____

                    Christine T. Asif, RPR, FCRR
                    Federal Official Court Reporter
                   101 W. Lombard Street, 4th Floor
                     Baltimore, Maryland 21201

1              **P R O C E E D I N G S**

2              THE COURT:  Good morning, all.  You may be seated.

3              Couple things before we get the jury out.  All

4      right.  So there were just at least two things that I wanted

5      to address briefly.  First, I know I received the response

6      from Mr. -- how do we pronounce his last name, Bardos?

7              MS. WILKINSON:  Bardos.

8              THE COURT:  Okay.  Him.  I received Mr. Bardos's

9      response.  I don't know if he was planning to be present this

10     morning.  At some point, I guess, we need to hear argument on

11     it.

12             MS. WILKINSON:  Yes, sir.

13             THE COURT:  I will -- I mean, I'm open to ideas on

14     when we address that.  I will say for the purposes of your

15     opening, because I know you indicated you're going to include

16     it in your opening, you know, having read both sides, I'm

17     comfortable that at least the fact that this information had

18     been provided to defense counsel and that that information was

19     provided to Mr. Carter, I can't see as I sit here how that's

20     covered by privilege.

21             MS. WILKINSON:  Mr. Hightower you mean, provided to

22     Mr. Hightower not --

23             THE COURT:  Correct.  Thank you.  I can't see how

24     that's covered by privilege.  I just -- as I sit here, having

25     done some basic research on it, I can't see that.  And so, to

1    the extent you want to open on that, I'm certainly not going

2    to instruct you not to.

3          MS. WILKINSON:  I'm not going farther than that,

4    Your Honor.

5          THE COURT:  That was going to be my next sentence

6    was that if I were you I would be careful about going too far,

7    because I can't say yet how much leeway I'll give you.  But at

8    least as to that point, I can't imagine how you won't at least

9    get that.  But I don't know if you've had a chance to talk to

10   counsel about when he might want to come by so we can discuss

11   the issue.

12         MS. WILKINSON:  I haven't, Your Honor.  We briefly

13   talked about it last night and are still trying to negotiate

14   the issues that relate to him.  We have a free day on Friday,

15   Your Honor, I don't know what the Court's calendar is like.

16         THE COURT:  I plan on being in Greenbelt on Friday.

17   I have cases in Greenbelt on Friday.

18         MS. WILKINSON:  Right.  So whatever the Court's

19   pleasure is, I can contact Mr. Bardos.  I can work with

20   counsel.  We did not intend to call him until next week any

21   way.  So we're not getting to that part of the case this week.

22   So we do have a little bit of leeway.

23         THE COURT:  All right.  The other thing to cross off

24   the list, the alibi issue.  I mean, I went back and I read the

25   statement.  It's not an alibi.  It's not an alibi.  I read it

```
 1   over and over again.  I don't even -- I don't think it's close
 2   to being an alibi.  And so the rules don't require the notice.
 3   If you just look at what the -- what Mr. Carter is being
 4   asked, he's being asked how the car got there.  Not where he
 5   was.  He's being asked how the car got there.  And he says he
 6   gave it to this guy Tony.  The clear suggestion being that,
 7   you know, maybe Tony drove the car there.  I don't know how
 8   the car got there.  Someone else drove the car.  So, yeah,
 9   it's part of a defense, but it's just it's not an alibi
10   defense.  And so the notice required by the rule doesn't apply
11   to that.  So that's -- we spent a lot of time on that
12   yesterday.  That's my final word on that.
13            MS. WILKINSON:  Your Honor, can I just add one
14   thing.  And it was never a notice issue, as I told Mr. Davis
15   yesterday and reminded him this morning, we provided that
16   document to him back in discovery back in 2018.  Just for the
17   record.
18            THE COURT:  No, I understood that.  But then you
19   were asking for additional information.
20            MS. WILKINSON:  Of course, and I'm not revisiting
21   that issue at all.  I hear Your Honor.
22            THE COURT:  So that's my ruling on that.  It
23   occurred to me as I was putting my notes together to address
24   that, that we never did get to the issue of Mr. Mosley's
25   supposed alibi.
```

1             MS. WILKINSON:  I believe Mr. Trainor indicated in

2       open court yesterday that they're not going there at all and

3       we're fine on that issue.

4             MR. TRAINOR:  That's accurate, Your Honor.

5             THE COURT:  All right.  Anything else then before we

6       get the jury out?

7             MS. WILKINSON:  No, sir.

8             THE COURT:  All right.  So we'll swear in the jury.

9       I've give them instructions, which shouldn't take too long and

10      then I assume without a break we'll go straight into

11      openings.

12            MS. WILKINSON:  Certainly, Your Honor.

13            (Jury entered the courtroom.)

14            THE COURT:  You may all be seated.

15            MS. WILKINSON:  Yes, Your Honor.

16            THE COURT:  All right.  Good morning, ladies and

17      gentlemen.  How's everyone doing today?

18            JURORS:  Good.

19            THE COURT:  All right.  That's good.  I hope

20      everyone had a good night's rest.  First thing, as you were

21      walking in you probably noticed that everybody was standing

22      and waiting for you to sit.  That is because they respect your

23      role now as the judges of the facts.  Just like they all stand

24      up when I walk in to respect my role as the judge of the law.

25            You should know, though, that you can take your seat

1    as you come in.  You don't have to stand and wait for everyone

2    else to come in.  So as you come in, feel free to take your

3    seats.

4           As I indicated yesterday, we are going to start the

5    trial today.  First, I'm going to give you some instructions

6    on the law, which shouldn't take too long.  But if at any

7    point you're having trouble hearing me or I'm speaking too

8    quickly, which I do sometimes do, feel free to flag me and

9    I'll slow down and try to speak up.  And then when I finish

10   that, we'll go right into the opening statements of the

11   attorneys.

12          Actually, I'm sorry, first we need to swear the jury

13   before I do that.  We didn't swear the jury yesterday.

14          THE CLERK:  Members of the jury selected in the

15   present case, will you all please stand and raise your right

16   hand.

17          (Jury sworn.)

18          THE CLERK:  Thank you.  You may be seated.  Jury

19   sworn.

20          THE COURT:  Thank you.

21          THE CLERK:  You're welcome.

22          THE COURT:  All right, ladies and gentlemen, now

23   that you have been sworn, I will give you some preliminary

24   instructions to guide you in your participation in the trial.

25   It will be your duty to find from the evidence what the facts

1   are.  You and you alone will be the judges of the facts.  You

2   will then have to apply to those facts the law as I will

3   instruct you.  You must follow that law, whether you agree

4   with it or not.  Nothing that I may say or do during the

5   course of the trial is intended to indicate, nor should be

6   taken by you as indicating, what your verdict should be.

7           The evidence from which you will find the facts will

8   consist of the testimony of witnesses, documents, and other

9   things received into the record as exhibits.  And any facts

10  that the lawyers agree to stipulate to or that I may instruct

11  you to find.

12          Certain things are not evidence and must not be

13  considered by you.  I will list them for you now.  Statements,

14  arguments and questions by lawyers are not evidence.

15  Objections to questions are not evidence.  Lawyers have an

16  obligation to their clients to make objections when they

17  believe evidence being offered is improper under the rules of

18  evidence.  You should not be influenced by the objection or by

19  the Court's ruling on it.  If the objection is sustained,

20  ignore the question.  If it's overruled, treat the answer like

21  any other.  If you are instructed that some item of evidence

22  is received for a limited purpose only, you must follow that

23  instruction.

24          Testimony that I have excluded or told you to

25  disregard is not evidence and should not be considered.

1    Anything that you may have seen or heard outside the courtroom

2    is not evidence and must be disregarded.  You are to decide

3    the case solely on the evidence that's presented in this

4    courtroom.

5            There are two kinds of evidence, direct and

6    circumstantial.  Direct evidence is as the name suggests,

7    direct proof of a fact, such as testimony of an eyewitness --

8    excuse me, such as testimony of an eyewitness.  Circumstantial

9    evidence is proof of facts from which you may infer or

10   conclude that other facts exist.  I'll give you further

11   instructions on these as well as other matters of the case.

12   But keep in mind that you may consider both kinds of evidence.

13           It will be up to you to decide which witnesses to

14   believe, which witnesses not to believe, and how much of a

15   witness's testimony to accept or reject.  I will give you some

16   guidelines for determining the credibility of the witnesses at

17   the end of the case.

18           As you know, this is a criminal case.  There are

19   three basic rules about a criminal case that you must keep in

20   mind.  First, each defendant is presumed innocent until proven

21   guilty.  The indictment brought by the government against the

22   defendant is only an accusation, it's nothing more than that.

23   It is not proof of guilt or proof of anything.  The

24   defendants, therefore, start out here with a clean slate.

25           Second, the burden of proof is on the government

1    until the very end of the case.  The defendant's have no

2    burden to prove their innocence or to present any evidence or

3    to testify.  Since the defendants have the right to remain

4    silent, the law prohibits you from arriving at your verdict by

5    considering that the defendants may not testify.

6            Third, the government must prove the defendants'

7    guilt beyond a reasonable doubt.  Bear in mind that in this

8    respect, a criminal case is different from a civil case.

9            Now, a few words about your conduct as jurors.  You

10   as jurors must decide the case based solely on the evidence

11   presented here within the four walls of this courtroom.  This

12   means that during the trial you must not conduct any

13   independent research about this case, the matter in the case,

14   and the individuals involved in the case.  In other words, you

15   should not consult dictionaries or reference materials, search

16   the internet, social media, websites, blogs, or use any

17   electronic tools to obtain information about this case or to

18   help you decide the case.  You're going to get tired of

19   hearing me say this, but please do not try to find out

20   information from any source outside of this courtroom.

21           Until you retire to deliberate, you may not discuss

22   this case with anyone, not even your fellow jurors.  After you

23   retire to deliberate, you may begin discussing the case with

24   your fellow jurors, but even then you cannot discuss the case

25   with anyone else until you have returned a verdict and the

1    case is at an end.

2            I know that many of you use cell phones, smart

3    phones, iPhones, or other personal data devices, use the

4    internet and social media sites frequently, and take advantage

5    of the many tools of technology.  You simply may not use them

6    during the trial in any way that relates to this case.  You

7    must not talk to anyone at any time about this case or use

8    these tools to communicate electronically with anyone about

9    this case.  This includes, as I said yesterday, even your

10   family and friends.

11           You may not communicate with anyone about the case

12   on your cell phone, through e-mail, Blackberry, iPhone, text

13   messaging, Twitter, through any blog or website, including

14   Facebook, Google, MySpace, LinkedIn, YouTube.  You may not use

15   any similar technology or social media.  So if there's

16   something out there I haven't learned about yet, you can't use

17   that either.  I expect you to inform me as soon as you become

18   aware of any other juror's violation of these instructions.  A

19   juror who violates these restrictions jeopardizes the fairness

20   of these proceedings.  A mistrial could result, and that would

21   require this entire process to start over.

22           Finally, do not form any opinion until all of the

23   evidence is in.  Keep an open mind until you start your

24   deliberations at the end of the case.

25           Now, if you want to take notes during the course of

1    the trial, you may do so on the note pads that have been

2    provided in the folder provided to you by our courtroom

3    deputy.  However, for some it may be difficult to take

4    detailed notes and pay attention to what the witnesses are

5    saying at the same time.  If you do take notes, be sure that

6    your note taking does not interfere with your listening to and

7    considering all of the evidence.  Also, if you do take notes,

8    do not discuss them with anyone before you begin your

9    deliberations.  You may not take your notes with you at the

10   end of the day, or at the end of the trial.  You must leave

11   them on the chair at the end of each day and you'll leave them

12   in the jury room at the end of the trial.

13          If you choose not to take notes, remember that it is

14   your own individual responsibility to listen carefully to the

15   evidence.  You cannot give this responsibility to someone else

16   who is taking notes.  Our system depends on the judgment of

17   all the members of the jury.  And you all must remember the

18   evidence in the case.

19          The trial will now begin.  First, the government's

20   going to make an opening statement, which is simply an outline

21   to help you understand the evidence as it's expected to come

22   in.  Next, the defendant's attorneys may, but they're not

23   required to, make opening statements.  Opening statements are

24   not evidence, and they are not permitted to be argument

25   either.  The government will then present its witnesses.  And

1     counsel for the defendants may try or may decide to

2     cross-examine them.  Following the government's case, the

3     defendants, if they choose, can present witnesses, whom the

4     government may then choose to cross-examine.  After all the

5     evidence is in, I'll instruct you on the law.  Then the

6     attorneys will present their closing arguments to summarize

7     and interpret the evidence for you.  And after that you will

8     deliberate on your verdict.

9             With that, we will have the opening statement of the

10    government, which I understand is being given by Ms.

11    Wilkinson.

12            MS. WILKINSON:  Thank you, Your Honor.

13            THE COURT:  Whenever you're ready.

14            MS. WILKINSON:  May it please the Court, counsel.

15    Good morning.

16            Is everybody's screens showing up there for them.

17            On May 27th, 2016, at about 7:15 in the morning,

18    Latrina Ashburne left the house that she stayed in and lived

19    with her mother.  She was going to work that morning.  She

20    took the short walk out of her door, shown here up on the

21    screen, headed down the curb to her car, where a man walked up

22    and shot her.  Happened in seconds.  She fell to the ground.

23    She later died at the hospital.

24            The quiet street of Rosalind Avenue was shattered by

25    that gunshot that morning.  They heard the gunshot.  911

1    caller called in, they heard two.  A neighbor, you're going to

2    hear from her, today in fact I think we'll get to her

3    testimony, reported having witnessed this heinous event.  And

4    the police arrived, ambulance, you name it.  You'll see video.

5    They arrived on the scene a little bit later.

6            As the police got there, the homicide detectives at

7    the Baltimore Police Department arrived too.  And took a look

8    at the crime scene.  But because it is just as I told you, and

9    the evidence will show you, there wasn't any physical evidence

10   left at the scene.  Ms. Ashburne's body even had been taken

11   away by the ambulance and just a blood stain was there.  The

12   evidence will show that the shooter didn't touch Ms. Ashburne.

13   There's no fingerprints.  There's no DNA.  He didn't drop the

14   gun there next to where he shot her.  He simply left, in the

15   seconds that it took to murder her.

16           So when the police get there -- and you'll see

17   pictures of the crime scene throughout the course of the

18   trial -- that's what they have.  It wasn't a robbery.  It

19   wasn't a carjacking.  It was just a murder.  Just a shooting.

20   A woman coming out of her house to go to work that morning,

21   lived with her mother, 41 years old, walking up to her car,

22   just shot.  And the man took off.

23           But there was one very important piece of forensic

24   direct evidence that you will see multiple times throughout

25   this trial.  And that is as the police began canvassing the

1   area, and lucky for us here today so that we can solve this

2   murder, there were cameras in a nearby apartment complex that

3   captures certain very important events that you will see

4   throughout the course of this trial.

5          This is an aerial photograph of where Ms. Ashburne's

6   home was on Rosalind Avenue.  We see to the right there, it's

7   my right, your right, several red circles.  Those would be the

8   cameras that the police identified in those important minutes,

9   hours, after the shooting of Ms. Ashburne, canvassing around,

10  looking in the area for those clues, clues of what happened to

11  this woman on this day in May of 2016.

12         Camera No. 8 captured a man running behind that row

13  home I just showed you on the first screen, and coming through

14  to that parking lot that's indicated in the blue circle there.

15  This would be called clue No. 1.  And snips, I'm putting up

16  here on the screen, you'll see the whole video in the course

17  of the trial, you can see there in the middle the man who had

18  just shot and murdered Ms. Ashburne.  There's a closer version

19  of him as he's running, wearing that hat with the hood over

20  it, craddling his right arm, taking off in the lower parking

21  lot past the one that you just looked at.

22         And then the police notice something else.

23  Literally, literally seconds as the shooter ran by, a car

24  pulls up in that same blue circle parking lot that I just

25  showed you and it is, I submit from the evidence and we will

1    show and prove to you, was there to pick up the shooter, but

2    missed him by seconds.  And because the shooter cannot stop

3    there and wait, he took off.  But it is almost like this

4    (Indicating).

5         And as the car is sitting there, waiting for the

6    shooter in those brief seconds after the shooter had already

7    passed by, you'll see the car pulls up, looks, car comes over,

8    looks, sits there and waits and then decides, oh, I better

9    take off.  But lucky for us, as that car pulls in, we get a

10   tag number off of it.  And I'm going to talk about that in a

11   moment, because that, ladies and gentlemen, is the first piece

12   of evidence that comes to the police as they set about trying

13   to solve this heinous crime.

14        Then a second clue, a second clue came to their

15   attention in that day on May 27th of 2016.  There's a close up

16   of those two doors I showed you on the first screen.  I didn't

17   show you at the time, but Ms. Ashburne came out of the one on

18   the right, 2919 Rosalind Avenue.  There's a picture of her,

19   obviously, when she was living, there on the right.  And to

20   the left of that door is her neighbor.  And it turns out her

21   neighbor contacted the police at 7:35 a.m., called a federal

22   agent, and told them, I think that that man was there for me.

23   Because as you see, that neighbor, that witness, was a whistle

24   blower in another case, at another time, was scared, and

25   articulated that belief to federal law enforcement officers.

So on that day, that horrible day of May 27th, those two clues merged.  And the one on the left, the whistleblower, telling federal agents that the person that she had provided information about was a man by the name of Matthew Hightower, also known as Fats.  Mr. Hightower's name will be prevalent in the course of this trial.

You'll hear evidence about Mr. Hightower.  But as we were getting that information, and I say we in the collective sense of law enforcement, it's obviously homicide who's working this case at the time, on the right there, as the police are looking at that other first clue, the car, the tag, they trace it ultimately to the defendant in this case, Davon Carter.  And then, without the two not knowing each other, the car and the tag and the whistleblower, we find out that Davon Carter is Mr. Hightower's closest associate.  And we know that on May 27th of 2016, or that weekend, as the police are investigating.

Now, I like to say that juries often see eyes -- see the case in the eyes of an investigator, because this is your first hearing about the case.  And, of course, myself, my name is Sandy Wilkinson, I'm one of the prosecutors.  I have the honor of representing the United States in this case, together with my colleague Ms. Oldham, and the case agents here, Agent Holiday and Agent Fuchs, and our paralegal Ms. Lesser, we've been working this case for a long time.  But you're seeing it

anew, with fresh eyes, as if it was the day on May 27th.

And so the story will unfold sometimes, in the course of this trial, I hope, in the ways that it did for the investigators.  As you fit together those two important clues of the whistleblower and the belief that this was meant for her and the car that was there to pick up, so clearly, to pick up the shooter after killing Ms. Ashburne.  And so I ask you, as you sit here and listen to the evidence, you too will follow the leads that became available to the police to help us solve this heinous crime, and to get the evidence where we have it and where it took us, and the story that it will tell.

And you -- I will say, you know, this is not TV and we all sometimes take what we get from what we learn on TV, but the evidence in this case in some ways is a cliche, about motive and opportunity and the physical evidence and the witness testimony that supports that.  Because that is what happened in this case.

And as we think about that day on May 27th, 2016, and the evidence that you will hear, some of that evidence will start going back in time.  I like to say, this murder happened on May 27th, but the story only ended on that day, it didn't start on that day.  It started with a plan, and a desire, and a motive, and an intent to kill somebody.  And the evidence that you will hear will be, in large part, about that motive and about that opportunity from those two very

1     important leads at the beginning of the case.

2            So as I told you, May 27th, back in 2016, it was a

3     Friday.  It's going to be easy to remember because it was

4     Memorial Day weekend, it was the beginning of Memorial Day

5     weekend.  So the 28th, the 29th, and the 30th, and some part

6     of the trial you'll actually see a map of some of the

7     witnesses, it helps people to remember, to put things in

8     context when they know what a particular date is.  One witness

9     will testify during the course of this trial that that was his

10    birthday, so he has specific memories about it.  And I know

11    that you will bring your own experience about that, how

12    sometimes if you can just see things it will help you remember

13    things.  And I ask you to do that in connection with this

14    case.

15           So Friday, murder happens, Memorial Day weekend.

16    And those detectives are hard at work trying to find that car,

17    that tag, that guy from the purported getaway driver.  And as

18    they do, they find it.  And they find it at an apartment on a

19    street called Arbor Station Way, and you'll hear testimony

20    about that.  Once they find that car, that Pontiac, that

21    Pontiac Grand Am that is sitting there in the parking lot

22    waiting for the shooter to arrive, the police set up there and

23    they make a traffic stop at that point of a man that was

24    coming out of the apartment, eventually getting into a black

25    BMW, and that man would be Davon Carter.

1          The police had seen the Pontiac at the same place.

2     Mr. Carter gets in the BMW.  He proceeds out of the parking

3     lot.  And the evidence will show that the police make a

4     decision to pull it over, because they know it's associated

5     with the Pontiac in the same parking lot and Mr. Carter.  And

6     they with have a warrant for that car.

7          And once they pull it over, and you'll hear about

8     this, Detective Taylor will come here and testify that as he

9     opens the -- as he introduces himself to the driver,

10    Mr. Carter, of that BMW, he gets the immediate smell of

11    marijuana in the car.  Immediate, powerful, strong smell of

12    marijuana in the car.  And from that a number of events

13    happen, from that smell of the marijuana.  They recover

14    ultimately in that BMW a pound of marijuana, weed I put up

15    here, large amount of cash.  And they take Mr. Carter at that

16    point into custody to interview him.  And that's what the

17    Baltimore Police were doing the morning of June 1st of 2016,

18    as they worked to solve the murder of Ms. Ashburne.

19          Now, remember that's clue No. 1.  Clue No. 2 was the

20    connection to Matthew Hightower.  So at that point, at that

21    scene at Arbor Station Way, where you'll learn and certainly

22    will hear many times throughout the course of this trial,

23    where Mr. Carter lived with his girlfriend, the federal agents

24    arrived to assist, to help, to work together.  If this was, in

25    fact, as the charges are in this case show, a murder to kill

1    the witness with the accidental killing of Ms. Ashburne.

2          And Detective Sekou Hinton arrives with Agent Fuchs

3    and Agent Holiday and other people.  And they are going to do

4    more investigation of that black BMW that Mr. Carter was

5    driving in.  And I know it won't surprise you at the end of

6    this case when you're able to deliberate and the evidence

7    shows that that black BMW also belongs to Matthew Hightower.

8    Car's registered in his name and Mr. Carter is driving it that

9    day.

10         There's another important clue that is found in that

11   black BMW when the agents do a search warrant on the BMW.  The

12   weed is taken out, obviously, it's contraband and they search

13   it.  And inside that car they find a license plate.  And I'm

14   going to talk a little bit more about that license plate in a

15   moment, but just remember that, because now we're going to

16   have clue No. 3.

17         Back at the Baltimore police homicide, Sergeant Sean

18   Jones, who will testify in connection with this case, sets

19   about interviewing Mr. Carter, who is at this point a person

20   of interest, someone that's connected to that Pontiac, that

21   car that arrived at the scene of the shooting.  It's audio

22   taped.  It's videotaped.  You'll see portions of the video

23   played here in court.  And he gets those critical first

24   statements of Mr. Carter three or four days after the murder,

25   or four days after the murder occurred.

1          And those statements, ladies and gentlemen, even

2     knowing that this was a murder investigation, that a woman had

3     been killed outside of her home that she shared with her

4     mother, Mr. Carter is on the video laughing and not telling

5     the truth.  And that will be abundantly clear throughout the

6     evidence in this case.  And some of the things that he tells

7     the police who are so anxious to work this case right now, in

8     these critical days after this murder, Mr. Carter tells them

9     that he went to get the car fixed, he dropped it off and he

10    went to Myrtle Beach.  I'll talk about that in a moment.

11         So there's a guy that was fixing cars down in that

12    area, his name was Tony.  There's going to be no evidence of

13    any man named Tony fixing cars for Mr. Carter.  He dropped the

14    car off and he left.  I took it up to Tony and I left to go to

15    Myrtle Beach.  And then looking at the video of the car in

16    there, he laughs and he says, that's not me in the car.  And

17    you know what, ladies and gentlemen, he's right.  That's not

18    him in the car.  Because it's him running to meet that guy in

19    the car, because he is the shooter.  And the evidence will

20    show that he is the man that was running.  And he is the man

21    that shot Ms. Ashburne.

22         And then the police ask him, who did you go to

23    Myrtle Beach with?  Who is this guy named Andre?  Because at

24    this point the police know that he told his girlfriend he went

25    down there with a guy named Andre.  And he says, Who's Andre?

1     That's who you told your girl you're going to Myrtle Beach

2     with, Andre and his brother.  Kind of laughs it off.  Andre

3     was already in Myrtle Beach, ladies and gentlemen.  You'll see

4     that from the evidence in the course of this case.  He didn't

5     go to Myrtle Beach with Andre.

6             These are false statements that Mr. Carter made,

7     three or four days after that murder to the police.  In the

8     most serious and somber of investigations, when they're trying

9     to get to the truth of what happened that day and what that

10    car was doing -- his car, his car, there will be no doubt

11    about that -- was doing in that parking lot.

12            So I told you that's June 1st, right.  The police

13    are there.  They're having their initial interactions with

14    Mr. Carter.  They also interview his girlfriend.  You'll hear

15    from her in the course of this trial too.  Establish even more

16    than ever that the statements made by Mr. Carter were not

17    true.  They were not true.  Federal agents are thinking about

18    that case involving Mr. Hightower.  And that story that is

19    going to unfold in the course of this trial that was unfolding

20    to the investigators in these critical days after this murder.

21            And they learned, and they remembered, and they were

22    thinking about it, and they related this information to the

23    police that the case against Mr. Hightower was a health care

24    fraud case originally, involved a small company called RX

25    Resources.  Mr. Hightower worked there in 2013.  And he worked

there with the whistleblower, who I put over here with a
little black icon to the right of the sentence.

In February of 2014, two years before this murder,
search warrants were executed in connection with that health
care fraud case.  Mr. Hightower at the time was just a driver
in the company.  The owners were two people by the name of
Elma Myles, who will testify in the course of this trial, and
Harry Crawford, who was the owner of RXRS.  Very small
company, six or seven people.

And essentially their schtick, their fraud, what
they did, what Ms. Myles was convicted of and Mr. Crawford was
convicted of, was to pretend that they were providing
incontinence supplies to Medicaid patients and billing
Medicaid, you know, couple thousand -- $100,000 worth of
fraud, couple million dollars worth of fraud.  And that was
what that investigation was about.

And federal agents are relating to the Baltimore
police, the detectives trying to solve this murder, that as
part of that health care fraud investigation, they had in fact
learned about the fraud from that whistle blower,
Ms. Ashburne's neighbor, the one that had reported it.  She
had worked there with Mr. Hightower.  And she had let the
government know, some ways you're supposed to do, that a fraud
was being perpetrated by the company.

And you know what that did, ladies and gentlemen?

1    You know what you're going to hear in the course of this trial

2    that did, that set in motion an investigation into

3    Mr. Hightower that eventually proceeded into another murder

4    investigation.  Because you see, Mr. Hightower had been

5    involved with Mr. Crawford in another scheme, a much more

6    nefarious violent one involving a man by the name of David

7    Wutoh.  Mr. Wutoh was murdered by Mr. Hightower during the

8    course of that scheme.

9            The reason I'm relating this information to you,

10    because the evidence will show that that was what was coming

11    down on Mr. Hightower when that investigation started with

12    Ms. Ashburne's neighbor picking up the phone and relating

13    information about that fraud to federal agents, who eventually

14    did that search warrant and started into motion this

15    investigation on Mr. Hightower, which resulted ultimately in

16    his conviction for the murder and extortion of Mr. Wutoh.

17            And the seeds of discontent growing in

18    Mr. Hightower's heart and in his mind over those two years,

19    you will hear why that happened, how that investigation took

20    place, and how it resulted in his intent, desire to have

21    Ms. -- the whistleblower, Ms. Ashburne's neighbor, not

22    available to testify.

23            You will hear that the health care fraud case was

24    actually charged first before the Wutoh murder.  And that is

25    important evidence to know, because at first it was just a

1    fraud case and became another murder investigation, because

2    you take the leads where they follow you, when you learn about

3    an investigation.  And you will find out during the course of

4    that discovery process of that health care fraud case, where

5    information has to be provided from the government to the

6    defendant, to be able to defend himself against the health

7    care fraud charges, he learned and knew and found out and

8    inferred that it was in fact Ms. Ashburne's neighbor, the

9    whistleblower, who had started this whole thing rolling.

10           As Mr. Hightower faced those health care fraud

11   charges in 2015, and leading up until May of 2016, when he was

12   indicted for the extortion and murder of Mr. Wutoh, he

13   remained on release, what's called an ankle bracelet,

14   electronic home monitoring, it was a fraud case at the time.

15   And you'll hear evidence that in that time a person he spoke

16   to, many, many, many, many boring phone records that we're

17   going to put before you, with this man Davon Carter, his very

18   close associate.  I don't know, 600, 700, 800 phone

19   connections, probably more than we all talk to our mothers.

20   In that time frame when he was on electronic home monitoring,

21   leading up to May when Mr. Hightower is indicted for the

22   murder of Mr. Wutoh.

23           An important date for you to remember is May 4th of

24   2016, which, okay, we can all do the calculation, it's just a

25   little over three weeks before Ms. Ashburne is murdered,

1    Mr. Hightower is finally taken into detention where he would

2    remain in jail until his trial on the Wutoh murder, because

3    now he has been charged with a crime of violence.  He had been

4    detained, that means put in jail.  You're going to know that,

5    because you're going to hear him talking on several jail calls

6    with Mr. Carter at the time Mr. Hightower was in jail in that

7    May time frame.

8           So that's what federal agents were thinking and

9    doing and providing information to the Baltimore Police

10   homicide detectives, who had Mr. Carter in there for an

11   interview, to hear what he had to say about his -- what

12   happened on May 27 or 2016.

13          The next important lead that you're going to hear

14   about in the course of this case, and sometimes I know it's

15   going to feel tedious as we put these phone records before

16   you, but they are so important.  And the most important thing

17   for you to know and remember right now is that as Mr. Carter

18   was taken down to the Baltimore police to be interviewed in

19   connection with that car showing up, is they recover three

20   cell phones.  Mr. Carter's three cell phones.

21          We like to refer to them as the last four digits,

22   because it's an easy way to talk about it.  And they're up

23   here.  But he had an iPhone.  That one was in the name of his

24   girlfriend, Ms. Lawson.  We'll call that the 2399 number.

25   You'll come to hear that a lot through the course of this

trial.  On the left was his burner phone, which through the course of this trial you're going to learn that was his drug phone.  It was once Mr. Hightower's, but it became Mr. Carter's when Mr. Hightower is locked up.  And that's his source of supply for his marijuana.

And then the one on the right, what we'll call the 7626 number.  A number, ladies and gentlemen, again, when you think about the leads and they tell the story of what happened leading up to the death of Ms. Ashburne on May 27th, is a burner phone that is a phone that is hard to detect who owns it, it's in nobody's name, you just get minutes on it, was actually put into service by Mr. Carter two days before Ms. Ashburne was murdered.  Two days.  And it is that phone, ladies and gentlemen, that will become immediately apparent to you, in the course of hearing throughout this trial, that he used to contact, that would help him in connection with this horrible crime.

Let me go back to Mr. Carter's statement for a moment.  Because as I told you when you hear Mr. Carter's interview, it will become very clear to you that he was leading the detectives to believe that he had dropped his car off to get some part fixed on it, some brakes, and then he headed to Myrtle Beach.  Okay.  He doesn't know at this point that we're going to go into his phones, we're going to do this big investigation.  And he tells them, then I went off to

1    Myrtle Beach.

2           And yes, ladies and gentlemen, he did go to Myrtle

3    Beach.  But he did not go to Myrtle Beach that morning.  And

4    you'll hear through the testimony of a what's called a CAST

5    expert, a Cellular Analysis Site Expert from the FBI, who's

6    going to come in here and tell you about the analysis on

7    Mr. Carter's phones that we got off him that day.  That he

8    headed to Myrtle Beach much later that day, around noon.  And

9    you'll hear the course of it.  And there just won't be any

10   doubt in your mind that that false statement, that false --

11   that belief that Mr. Carter wanted the police to think that he

12   already left for Myrtle Beach was another false statement.

13   Because it was abundantly clear that he did not go to Myrtle

14   Beach until about noon that day.

15          And that trip, ladies and gentlemen, that you're

16   going to hear about to Myrtle Beach, was an abrupt departure

17   to get out of town.  And there will be evidence that will show

18   you what was in Mr. Carter's mind as he headed to Myrtle

19   Beach.  How he changed his appearance.  How he went alone.

20   How he made the arrangements that day.

21          Let's go back to Mr. Hightower.  Weekend, after

22   Ms. Ashburne was murdered, get the connection from the hero

23   whistleblower, and we go and we search Mr. Hightower's jail

24   cell.  Because remember he's locked up on May 27th, 2016.  And

25   we find his phone list in there.  And there on the top right

1    we find two numbers that become very important.  The second

2    one is the other defendant in this case, Mr. Mosley, also

3    known as Cliff.  And the two of those phone numbers, the 2399

4    number, Mr. Carter's iPhone that I showed you in the middle,

5    and then a phone number for Cliff, the 2650 number we'll call

6    it.

7          Talked to you about the search of that BMW,

8    belonging to Mr. Hightower, this is the next important clue.

9    In that BMW, the tag that I mentioned before that I told you I

10   would get back to, was a tag for another car.  You'll come to

11   know it as the silver Audi.  And guess who owns that silver

12   Audi?  Mr. Hightower.  And again, there won't be any doubt

13   about that in the course of this trial, but guess who was

14   driving that silver Audi?  And that would be the defendant,

15   Clifton Mosley.  More importantly, Clifton Mosley was driving

16   that silver Audi on May 27th, 2016, as he headed from his home

17   to Rosalind Avenue to meet up with Davon Carter.

18          Talked to you before about the jail calls that

19   you're going to hear with Mr. Mr. Hightower.  I'm going to

20   tell you now, you're not going to hear a smoking gun on those

21   jail calls.  Mr. Hightower didn't say, oh, go kill Ms. -- the

22   whistleblower, a witness against me, because Mr. Hightower is

23   not dumb.  More importantly, you're going to hear right on the

24   jail call himself, as his girlfriend is talking to him, and

25   she warns him, you know this prosecutor listens to everything

1    you are saying.  Your calls are being recorded.  And

2    Mr. Hightower says, yeah, you're absolutely right.

3            So the jail calls you are going to hear in the

4    course of the trial are, I'll call them nuggets.  Little

5    pieces of corroboration about relationships and motives and

6    who's helping him and cryptic coded conversations.  And yes,

7    he talks to Mr. Carter, and on one of those conversations he's

8    with Mr. -- he talks to Mr. Mosley.  In that critical three

9    weeks before Ms. Ashburne's murder.

10            Let's go back to that 7626 number and what the

11   evidence will show about that.  Because remember you guys are

12   the investigators, like BPD was that weekend, that time frame,

13   the days the weeks leading after Ms. Ashburne's murder, as

14   they're working with federal law enforcement and we get into

15   that 7626 phone.  And when I say that, I mean we're able to

16   forensically exam it afterwards by an expert who will pull up

17   what's called a Cellebrite, an ability to look at a phone and

18   the contents of that phone.  And you'll hear about that a lot

19   during the course of this trial.  In fact, there's so much

20   different phone evidence that the FBI agent has prepared a

21   summary for you, so you can all see it in the context, into a

22   time line.  So you can put it all together and see what

23   communications with were happening at the same time.

24            But we'll start right now with that critical 7626

25   number that was found on Mr. Carter when we -- the police

1      interviewed him on June 1st.  And in that phone, remember, the

2      evidence will show had only been in service for two days, he

3      had seven -- eight contacts that were listed here.  And this

4      is how they were listed in the phone.  And one of those

5      contacts of that eight is Mr. Mosley.

6              And then you will look down below that this isn't

7      that 2650 number that was in Mr. Hightower's jail cell,

8      because Mr. Mosley, who also sells marijuana, also has two

9      phones.  He has an iPhone, the 2650 number that I just showed

10     you.  That number that was found in Mr. Hightower's jail cell.

11     But he also has another number 1533.  And why the is that

12     important?  Because it is those two numbers that were in

13     communication 10:00 p.m. the night before Ms. Ashburne's

14     murder and in the morning of Ms. Ashburne's murder.

15             And then you will see the cell site, as both men

16     leave their house.  Eventually their cars being captured, not

17     them, their cars, I'll be clear about that.  You can't see the

18     driver.  You will look a million times to see if you can see

19     who the driver is, but it's the cars, arriving in that little

20     quiet niche of a neighborhood, where Ms. Ashburne and her

21     neighbor lived.

22             And this was the route that he took, right?  So

23     you're going to see where Mr. Carter lived up there in Arbor

24     Station Way.  The 7626 number starts taking off around 6:00 or

25     so in the morning.  Same with Mr. Mosley.  Now he has both of

1    his phones with him.  And they start heading towards where the

2    murder scene is.

3            There's another important piece of evidence that

4    you'll know in connection with this, that will come out

5    through Agent Wilde, who is the CAST expert, the cellular site

6    expert who will testify, probably pretty much at length in the

7    course of this trial.  And he's going to tell you that that

8    iPhone that Mr. Carter had, that 2399 number, Mr. Carter

9    decided to leave that one at home when he left to do his

10   business down on Rosalind Avenue that morning.

11           And I submit to you, ladies and gentlemen, that the

12   evidence will show, because he knew that that's exactly how

13   Mr. Hightower got caught in the Wutoh murder, when his phone

14   pinged off the area where Mr. Wutoh lived before he was

15   murdered.  So Mr. Carter, who now has his burner phone,

16   doesn't have his iPhone, leaves it at his house.  Happily

17   ringing off the hook because his girlfriend is trying to find

18   him.  He doesn't turn it on and go pick it up until about 9:20

19   that morning, after he did his dirty work and left for Myrtle

20   Beach.  And the cell site will confirm that.

21           Now let's go back to that clue that was found in the

22   silver -- in the black BMW that you'll hear about.  That black

23   BMW that they searched on June 1st, that Mr. Carter was

24   driving, that was parked near the Pontiac.  And when they get

25   that tag number and they go find that tag, they determine that

1    that Maryland license plate tag -- which looks like probably

2    all the ones that you guys have, a regular Maryland license

3    tag that's found in that BMW -- there's a silver Audi that is

4    circling Rosalind Avenue and Woodland Avenue that morning,

5    where Ms. Ashburne and the whistleblower lived, in this teeny

6    tiny little niche neighborhood that you have no business going

7    down unless you live there, that kind of street.

8         And you see a silver Audi on that video.  Those

9    cameras that I showed you earlier on.  And here I'm pointing

10   at the cameras that pick it up.  But the regular tag isn't on

11   it, the one found in the BMW.  It's this unique, long European

12   type tag.  And there will be a lot of evidence in the course

13   of this trial that you will hear through witnesses and

14   otherwise, that that was Mr. Hightower's car.  He liked having

15   that long European-type tag on his silver Audi, not his black

16   BMW or the other cars that he had, but on that silver Audi.

17   And you'll hear that that was the car that Mr. Mosley drove in

18   May of 2016, that silver Audi with the long tag that

19   Mr. Hightower owns.

20        And you'll see it pulling up, as I indicated here on

21   my screen, in that security camera video.  So let's stop and

22   think about what the evidence is showing at this point, with

23   those two critical first leads, right?  Those two critical

24   first leads.  The one from the whistleblower saying I think

25   they're here for me.  Mr. Hightower.  And then we have the

1    lead that is the tag that -- clearly the picking up the

2    shooter as he's running by.

3         And now we have another lead, okay, Mr. Carter was

4    in contact with this man named Cliff on this 1533 number.  And

5    oh, by the way, he drives a silver Audi.  And then we find it

6    on the video cameras.  Like how -- it's right there, as the

7    cell site is coming up you see those two cars, in that area,

8    both before and after the murder of Ms. Ashburne.  All from

9    those two original leads.

10        And then Mr. Mosley, we identify him, track down

11   those phone numbers that belong to him, and he gets

12   interviewed by the police in a very lengthy interview.  And

13   parts of it you'll hear in the course of this trial.  And he

14   admits to the police freely that Matt, Matt Hightower was my

15   man.  I'm not lying to you.  He took care of me, like the

16   times I was broke he was taking care of me.  We was just

17   close.  And for that there will just be no dispute in this

18   trial, that Mr. Hightower, his friends, his closest

19   associates, were the two men who were in contact with one

20   another the night before Ms. Ashburne's murder, the morning of

21   Ms. Ashburne's murder, the cars were seen on that surveillance

22   video.  And that's what the evidence will show.

23        Now, did either Mr. Carter or Mr. Mosley confess

24   their involvement in this can crime?  Absolutely not.  You're

25   not going to hear that in the course of this trial.  But the

1    statements they made are nonetheless critical and you will

2    have a chance to weigh them and to listen to them.  And watch

3    their mannerisms, what they're saying and what they say they

4    remember, and what they say they don't remember.  When they're

5    talking to the police, in this most serious of investigations,

6    involving the murder of a woman who lived at home with her

7    mother.

8            And I submit to you ladies and gentlemen, that the

9    evidence will then show a very important time line.  And we

10   won't go through it in detail here.  I probably wrote it up

11   too small, and for purposes of Power Point it's hard to see

12   here.  But I want to go through it with you, just so you

13   understand and can start to put the evidence that you're going

14   to hear in context, because sometimes, in the course of the

15   trial we can't always put things in order, witnesses coming

16   out of town, that sort of thing.  And you won't always hear it

17   in the chronology that I'm telling you.  And this will help

18   you put it in context, I submit.

19           But the time line, I think you will learn in the

20   course of the evidence in this case, is that on May 4th, that

21   day where Mr. Hightower has to come to court and essentially

22   turn himself in to the charges for the Wutoh murder, he's with

23   Mr. Carter.  And then on May 6th, a judge formally detains

24   him, but he had been locked up since May 4th.  And that night

25   you're going to see a contact between Mr. Mosley and

1    Mr. Carter, fairly -- shows fairly good contact, in terms of

2    length and duration of the call.

3             Then you're going to hear about an event on May

4    16th, when both men are in that silver Audi.  In fact,

5    Mr. Carter is driving it and gets a traffic ticket.  You're

6    going to hear about the police that pulled them over in that

7    Audi.  Mr. Hightower actually calls from jail when they're

8    together.  And you're going to hear that conversation.  Then

9    you're going to hear about the burner phone that Mr. Carter,

10   of course, got on May 25th and the contacts.  And you're going

11   to see here the different events that led up to the murder of

12   Ms. Ashburne.

13            Now, what kind of evidence are you going to hear.

14   The judge talked about direct and circumstantial evidence.

15   Direct evidence is like the video and the 911 caller,

16   Ms. Murray, she's going to testify this morning.  She saw what

17   happened and identified a shooter.  But she can tell what

18   happened.  She knows this was just a shooting, nothing else.

19   A man walked up and shot her and left.  There was no robbery.

20   There was no carjacking.  No yelling and screaming like a

21   domestic disturbance.  Just walked up, boom, and left.  An

22   execution.

23            And you're going to hear a lot of testimony about

24   Mr. Hightower's motivation, the witnesses, the physical

25   evidence.  You're going to hear about the connection and their

1    loyalty and their friendship with Mr. Hightower.  And some of

2    the evidence will be offered for that important part.  You're

3    going to hear about their different explanations of where they

4    were on May 27th and how they're not true.  When they're

5    talking to the police in this most serious of cases.  You're

6    going to see the cell site records of where they actually were

7    and the other people they said were with them and weren't with

8    them.

9          You're going to look at that video time and time

10   again.  There's a compilation that will actually probably be

11   in evidence today or tomorrow.  And you'll get to see the

12   various angles from the security cameras at the apartment that

13   you're going to look at.  You're going to know that both of

14   them lied to their girlfriends, both of their girlfriends will

15   testify in connection with this case.  You're going to hear

16   about evidence of their opportunity in this critical time of

17   Ms. Ashburne's murder that leads up to it, how they're both

18   unaccounted for.  They both provided false exculpatory

19   statements to investigators, provably false.

20         You're going to hear about the corroboration of

21   witnesses, the records.  For example, Mr. Carter's trip to

22   Myrtle Beach, when he made it, how he went there, how he got

23   there, who he was with.  You're going to hear about all that.

24   And how it was no explanation, as he wanted the police to

25   believe, for where he was that morning.  And you're going to

1    hear about Mr. Mosley and Mr. Carter's own relationship

2    together in May of 2016.

3            Now, let me talk to you a little bit about jury

4    duty.  And Judge Hazel touched on this for a moment, of

5    course, in his opening instructions to you.  And for this

6    process, this process, this criminal justice system that we

7    have, this is the most important part, right?  This is truly

8    duty.  It truly is.  And we call it jury duty.  And we kind of

9    say it, I got jury duty.  But it is, jury duty, it's a duty.

10   You are the judges of the facts.  You are here to listen and

11   to apply your reason and your common sense.  That's why you

12   are here.  That's why you were selected.  Working knowledge,

13   your life, your life experience that brings you here, to put

14   in context a whole series of events that leads up to that day

15   on May 27th.

16           And I implore you to listen carefully to the

17   evidence, observe the witnesses.  A lot of them don't want to

18   be here.  They're friends of theirs.  They don't want to be

19   here.  They don't want to testify.  Some of them we had to

20   arrest to be here.  Serve them a subpoena, they don't show up.

21   Might be hostile here.  Meanwhile, can you weigh that bias and

22   that prejudice when you listen to their testimony, and their

23   connection and relationship to these men.  That's part of the

24   evidence in this case.  That's part of your duty as you put

25   this all into context.

1          Talk about what the charges are in the case.  Judge

2    Hazel, of course, is the judge of the law.  And he's going to

3    tell you all about this when the trial is over.  He's going to

4    instruct you on the elements of the crime.  But they're really

5    quite simple.  They're divided into two types of crimes.  One

6    related to Ms. Ashburne's murder and one related to their drug

7    trafficking.

8          There's groups of charges that are here.  The first

9    one, Counts 1 to Count 4 are related to the murder of

10   Ms. Ashburne.  And they're charged with conspiracy, an

11   informal agreement, two or more people to do something

12   unlawful.  That's all a conspiracy is.  The object of that

13   conspiracy, that plan, is to murder a witness, either to

14   retaliate against her for being the whistleblower and putting

15   this all in motion, or to prevent her from testifying at

16   Mr. Hightower's trial, which was eventually scheduled and held

17   in September of 2016.

18         In addition to the conspiracy charges and the

19   substantive charges, which I'll talk to in a moment relating

20   to the murder, there's charges related to the drug trafficking

21   here.  Obviously, Mr. Carter's drugs that were found on him on

22   June 1st.  The testimony about his source of supply and who he

23   was selling to.  You'll hear some of his customers.  Same

24   thing with Mr. Mosley.  Although, Mr. Mosley wasn't with

25   Mr. Carter on June 1st.  He tells investigators that's what he

did.  He hustles.  That's what he does for a living, he

hustles.  He sells marijuana.  You'll hear it during the

course of his interview.  And then we corroborate that with

some of -- at least one of his customers that will come in and

testify.

          The basic principles of the murder charges in this

indictment are that Mr. Carter, together with Mr. Mosley and

maybe even others, murdered a person with the intent to

retaliate against any person.  It doesn't have to be to

retaliate against Ms. Ashburne because that's not what this

is, right, this is a mistaken crime.  Ms. Ashburne was not the

intended victim here.  And that's why the statute is written

the way it is.  They intended to kill somebody, they just

killed the wrong person.  But it was with the intent to kill

the whistleblower, the neighbor, Ms. Ashburne's neighbor.  And

I submit to you the evidence is going to show both, it was

both with retaliation for what she had done, and done to

Mr. Hightower, why he's locked up, why the murder was solved

and why he's in jail now, and also to prevent her testimony.

          Explain a little difference between the conspiracy

charges and what we call the substantive charges, the actual

shooting of Ms. Ashburne.  And these are just legal concepts

that Judge Hazel will explain to you.  One is the plan to do

it and the other is the actual act of doing it.  And the

reason why Mr. Mosley is charged in connection with that,

1   because he aided and abetted.  He helped.  And he also is part

2   of the conspiracy and, therefore, you're a part of the

3   substantive crime too.  The substantive crime being the actual

4   murder and the conspiracy being the plan to murder.  So it's

5   really not that difficult, but you know, lawyers we make

6   things more difficult than they are when we have to describe

7   things.

8          And then the drug charges against Mr. Carter pretty

9   much derive from his activities in May and June of 2016.  Mr.

10  Mosley's from his statement and the corroboration of that

11  statement, how he was a hustler, that's what he did for a

12  living.

13         This -- I'm going to wrap up now.  I've given you

14  kind of an overview where the evidence I believe will submit

15  and show, in the course of this trial, I submit.  Back to this

16  picture that you will look at many, many times in the course

17  of this trial.  You see as you blow it up, as you do when you

18  blow up your own pictured it gets kind of pixilated and

19  distorted.  And as much as police try, and you'll hear from

20  evidence trying to sharpen and brighten those pictures to make

21  them even more clearer for you -- what will make it clearer

22  for you -- what will make it clearer for you is the evidence

23  in this case that the man that is depicted on this screen is

24  Davon Carter.

25         And that evidence will sharpen it.  And that

1    evidence of motive and opportunity, and other distinguishing

2    factors about the shooter and where he was and where he went,

3    and how he ran, and how he carried himself, and what he looked

4    like then and what he looked like hours later, will sharpen

5    this picture for you, will take this direct forensic evidence

6    and convince you beyond a reasonable doubt that these two men

7    were involved.

8            And that two victims are at the heart of this story;

9    Latrina Ashburne, who lived there at 2919 Rosalind Avenue, and

10   the whistleblower, who out of respect for her privacy, who

11   will testify in connection with this case, because she is

12   still being -- strike that.  Because the events of that day --

13   because the events of that day still make her a victim.  When

14   she placed that call back in 2013, reporting a fraud, and here

15   we are.

16           So, thank you for your time this morning.  I hope

17   that I provided a helpful overview of how you'll hear the

18   evidence in connection with this case.  I hope that you harken

19   to your duty as jurors to apply your common sense and your

20   reason and put together, as the investigators did, the story

21   of the murder of Latrina Ashburne and you will return a guilty

22   on all counts.  Thank you.

23           THE COURT:  Thank you, Ms. Wilkinson.

24           If defendant Carter wishes to have his counsel

25   provide an opening statement, I will hear from you now.

1          Mr. Zerkin take your time, when you're ready.

2          MS. WILKINSON:  May I close this?

3          THE COURT:  Sure.  And make sure you have a

4    microphone as well.  I know Ms. Wilkinson has one.

5          MS. WILKINSON:  Would you like mine?

6          THE COURT:  You can use that, or if you stay

7    stationary, there's one at the podium.

8          MR. ZERKIN:  I'll be stationary.

9          THE COURT:  Whichever works for you.

10         MR. ZERKIN:  That may be the nicest thing you see

11   happen between the lawyers during the course of the trial.

12         I'm Jerry Zerkin, and along with Chris Davis, seated

13   over there with the red and blue tie, we are appointed to

14   represent Mr. Davon Carter.  I'm going to be very brief, I'm

15   not going to have a Power Point for you.  No fancy toys to

16   show you.

17         The killing of Ms. Ashburne was a tragedy.  Whether

18   it was a mistake, as the government says, or not, her death is

19   tragic.  But the burden is on the government, as you've been

20   told, to prove each and every element of each count beyond a

21   reasonable doubt.  And to prove that Mr. Carter committed that

22   crime.  We don't have to prove anything.  Mr. Mosley's

23   counsel, don't have to prove anything.  The burden is entirely

24   on the government.

25         And because of that, I'm not going to predict for

you what all the evidence is.  I will tell you that I don't
think it will come in as clearly and cleanly as maybe the
government's opening statement suggests.  There will be issues
with some of those witnesses.  I think one of the witnesses
they will put on you will hear was a heroin addict.  And you
may hear other issues about their witnesses, which will bring
into doubt the accuracy of their testimony.

          What you just heard, of course, was not evidence.
Some of that will be evidence.  You know, text messages are
text messages.  Photos are photos.  They are what they are.
But of course what their meaning is and what the
interpretation is is something that you will have to decide.
And that is not always clear.

          The credit -- it is for you, as Ms. Wilkinson told
you, to determine what the credibility of those witnesses is.
And you will have to judge that based upon whether they've
made prior statements before that are inconsistent, or whether
they have problems like drug addiction, or whether they have
motives for their testimony.

          Let me talk about the marijuana first.  So June 1,
this is five days after Ms. Ashburne was killed, Mr. Carter
exits his house and he gets into a car.  It's parked there in
Baltimore County.  He drives a short distance.  Now counsel
described this as a traffic stop.  I think of a traffic stop
as you run a stop sign, you're speeding, whatever you're doing

1    something wrong with your driving, there's something

2    suspicious about your activity.  That's not what happened

3    here.  He wasn't speeding.  He didn't run any stop signs.  He

4    didn't do anything wrong while he was driving.

5          And, in fact, he's stopped because they had

6    predetermined to stop him.  And you will hear that from

7    Detective Taylor, who made the stop, that there was a

8    predetermined plan to stop him.  So nothing to do with what he

9    was doing.  And you'll also hear from Detective Taylor that

10   they did not have any suspicion that he was doing anything

11   wrong.

12         He is, as you heard -- he rolls down his window,

13   they smell marijuana.  They have him get out of the car.  They

14   put him in handcuffs.  They ask him about the marijuana.  He

15   says it's in the back of the vehicle in a duffel bag.  He

16   takes them back there.  They look in there, the marijuana is

17   there.  There's no denying he had the possession of the

18   marijuana.  That is uncontested.  And the amount that he had

19   will not be contested.

20         They search him and they search the car, and they

21   find nothing.  They find no weapons.  They take him back to

22   the house from which he had exited and other officers are

23   there.  These are -- it's in the county, these are Baltimore

24   City Police that do this stop.  County police show up and they

25   then, with him still in handcuffs and with his being in the

1   police car, they then transport him down to Baltimore City to

2   police headquarters to question him.

3           They leave him in a jail cell for five hours,

4   stewing by himself.  They don't tell him why they've arrested

5   him.  He, of course, assumes he's been stopped -- in fact,

6   they don't say you're under arrest.  They say -- they don't

7   tell him anything.  They didn't arrest him.  They detained

8   him.  They leave him in the cell for hours, five hours

9   approximately.  He waives his rights and he agrees to speak to

10  them when they finally take him out.  And they put him in a

11  small interrogation room.  And they then interrogate him for

12  seven hours.  You will not hear all seven hours, fortunately,

13  for all of us.  But you will see part of that.

14          And counsel refers to the fact that he's laughing.

15  And I give you this story in part to make you think about the

16  circumstances, to put things in a context, that this isn't

17  just walking up to somebody on the street and asking them a

18  few questions.  And for you the try to put yourselves in that

19  position of being seized under those circumstances.  You've

20  done nothing wrong.  You're cuffed.  You're hauled down to the

21  city, to police headquarters.  You're allowed to stew in a

22  cell, by yourself, for five hours.  You're then brought out

23  and you're interrogated for seven hours.

24          And that laughing may not be the way counsel would

25  portray it as somehow being a-ha, ha, ha, she was killed.

That this is all a joke.  That I don't have any concerns for
this person, that I am cynical and this is all a big laugh.
Put yourself in that position and think do you know how you
would respond if you were questioned under those
circumstances.  And let you bring your feelings, put
yourselves in that place, bring your common experience and
knowledge to consider what you see in him when you see the
interrogation.

And when those seven hours are over, is he arrested
for the murder of Ms. Ashburne?  Is he arrested for the
marijuana that was in the car?  No.  They let him go.  He's
gone.  He's not indicted for -- not charged, indicted for
about a year and a half.

Now, you heard much about Michael Hightower (sic).
And Michael Hightower looms large over these proceedings.  You
will not hear him testify.  You'll hear him on telephone
calls.  Davon Carter and Michael Hightower were good friends.
Mr. Hightower worked for the medical supply company, RXRS.
Lisa Edmonds worked for that company.  Davon Carter did not
work for that company.  Davon Carter was not an owner of that
company.  He was not a subcontractor of that company.  He was
not attached to that company.  He had nothing to do with it.

Mr. Hightower and Harry Crawford, whom you heard
counsel mention, and others, were involved in that.  They were
involved in the Medicaid fraud.  Mr. Carter was not.  They

1    were convicted of the Medicaid fraud.  Of course, Mr. Carter

2    was not charged, was not.  And I think you'll see he was not

3    implicated in any way in that.  He had nothing to do with it.

4           Mr. Crawford was, and Mr. Hightower were implicated

5    in and charged with extortion, murder of David Wutoh,

6    Mr. Carter was not.  He was not involved in that.  They were

7    convicted and, of course, Mr. Carter was not.

8           Now Ms. Ashburne was killed by -- with a Ruger 9mm

9    pistol.  Weapon has not been recovered.  Mr. Carter, there

10   will be no evidence of Mr. Carter owning a Ruger or a Ruger

11   like gun.  I doubt that there will be evidence of Mr. Carter

12   being in possession of a gun.  There is no DNA.  There is no

13   serology.  There is no hair comparison evidence.  All the

14   things that you've seen on TV.  There's none of that to tie

15   him to it.

16          So you will have to judge the credibility of the

17   government witnesses.  I'm not going to go into the details of

18   what issues that they have.  I mentioned one of them.  But you

19   will have to do that, you will have to pay attention to all

20   that testimony, and keep an open mind until all the evidence

21   is in.  And when it's over, we will ask you to find Mr. Carter

22   not guilty of the murder of Ms. Ashburne.  Thank you.

23          THE COURT:  Thank you, Mr. Zerkin.

24          Does counsel for Mr. Mosley wish to give an opening?

25   Take a moment to set up Mr. Trainor and when you're ready.

1          MR. TRAINOR:  Thank you, Your Honor.  Let me see if

2     I can do it from here.  May it please the Court, fellow

3     counsel --

4          THE COURT:  Is that mike on?  Well, if the hand held

5     is on, that can work too.

6          THE CLERK:  It is.

7          THE COURT:  Just remove that one then.

8          MR. TRAINOR:  Thank you.  Fellow counsel.  Good

9     morning.

10         I am Harry Trainor.  Together with Stephen Mercer,

11    we represent Clifton Mosley, who is the gentleman sitting at

12    counsel table with us.  As is obvious to you now, the

13    government has elected to try these two men together.  They've

14    joined it into a single proceeding, but the offenses are

15    separate.  They're not coordinating and they're in no way

16    joined.  In fact, they may be at odds with each other at some

17    point in this proceeding.  So I ask you to be careful in your

18    evaluation of the evidence as it applies to Mr. Mosley.  And

19    remember that he is entitled to your individual consideration,

20    just as if he was the only person on trial.

21         Sorry, my voice is slipping away.

22         During your voir dire yesterday, and earlier this

23    morning, Judge Hazel gave you some preliminary instructions.

24    And he mentioned yesterday some really important principles

25    that I ask you keep in mind as you listen to the testimony and

1   view the evidence in this case.

2          First, as you're going to hear again and again,

3   Cliff Mosley is presumed to be innocent.  The presumption of

4   innocence stays with him throughout this proceeding.  And I

5   submit to you that it's fair and reasonable to view all of the

6   evidence, all of the testimony, with the presumption of

7   innocence in mind.

8          The second principle, obviously, is the government

9   has the burden of proof.  They will call the witnesses to the

10  witness stand, for the most part.  They will present evidence.

11  And we will cross-examine witnesses.  And burden of proof

12  means that they have to carry the case to a level called

13  beyond a reasonable doubt.  So I ask you to keep that in mind.

14  You're going to hear about it again and again at the end of

15  the trial.

16          As you hear the testimony in this case, you will

17  observe the witnesses, you will consider their demeanor,

18  you'll consider certainly the background that they tell you

19  about.  And you'll see that some of the witnesses have issues.

20  Some of the witnesses have credibility issues.  As Judge Hazel

21  told you earlier this morning, it will be up to you to decide

22  who to believe and how much to believe.  And you're able to

23  decide to believe all of what a witness says, some of it, or

24  none.  So that's probably one of the most important tasks that

25  you have in this trial.

1              Certainly, you're going to find some witnesses who

2       mention Mr. Mosley, who have something in their personal

3       history or background that makes it questionable whether you

4       can rely on their word, whether there's a problem that might

5       interfere with their ability to be completely truthful.  So I

6       ask you to be alert to that as well.  But in deciding the

7       credibility of the witnesses who mention Mr. Mosley, I ask you

8       to apply your common sense and every day good judgment.

9              The government's telling you what their theory is.

10      You've seen it in a Power Point.  You listened to the

11      Government for about an hour.  I want to just tell you what I

12      expect, some additional thoughts about what I expect the

13      evidence to show.  I expect the evidence will show that

14      Clifton Mosley had friends and family in the area around

15      Rosalind Avenue.  He actually would hang out in that area,

16      which was in the Park Heights near Wylie Avenue.  There will

17      be testimony indicating that he was there every day on Wylie

18      Avenue.

19              Now, how close is Wylie Avenue to where the shooting

20      took place?  I think you'll see that it's about a half mile by

21      road, and much shorter as the crow flies.  I expect that there

22      will be a large map that you'll see during trial, you can

23      figure out the scale of that.  There may be another

24      opportunity for you to observe how close these things are.  He

25      was in -- he hung out on Wylie Avenue just about every day.

1    Some people will testify if you're looking for Cliff Mosley,

2    the first place you look is Wylie Avenue.

3         He did that because he did hustle down there.  When

4    I say he hustled, he sold marijuana on a relatively small

5    basis.  You're going to see that Cliff Mosley did not have all

6    the trappings of a person who was a major drug dealer.  He

7    didn't have assets.  He didn't have reliable cars that he

8    could drive that he owned.  Didn't have any -- he just lived

9    with his girlfriend.

10        So it's clear that Ms. Ashburne lived on Rosalind.

11   That she was shot and killed by someone other than Cliff

12   Mosley.  And that the theory is that -- the prosecution is of

13   the theory that the shooting was a mistake, that it was

14   intended for the woman who lived next door to her.  We

15   weren't -- we will not dispute that.  That may be completely

16   accurate.  We'll not dispute that point.  But what we will

17   dispute is that Cliff Mosley had anything to do, knowingly,

18   with a plot to kill anybody.  He was not there to kill anyone.

19        This is -- at the center of all this is

20   Mr. Hightower.  He's a person that you'll probably not hear

21   from directly at this trial.  And Cliff Mosley was a friend of

22   his.  Mr. Hightower had a lot of friends.  And Mr. Mosley was

23   not friendly with some of Hightower's friends, he wasn't

24   particularly -- excuse me, wasn't particularly friendly with

25   Davon Carter.

1            Mr. Hightower got locked up and has been locked up

2    since May the 4th of 2016.  When he was arrested and locked

3    up, he was into a lot of different things.  One of those

4    things was marijuana distribution on a higher level.  He would

5    get up to, say, five pounds at a time from New York and

6    distribute it in the Baltimore area.  What he did with his

7    money is he would invest in automobiles, mostly that he got

8    from the impound lot.  He bought Audis.  He bought a BMW.  A

9    Lincoln.  And some other cars.

10           So when he got locked up on May 4th, his cars were

11   all on the street.  He called upon his friends to take care of

12   them.  They had insurance to pay.  They had, you know, to

13   protect the automobile from the repo man or just being stolen.

14           Cliff Mosley was driving the silver Audi in May of

15   2016, after Hightower got locked up.  At some point Mr. Mosley

16   was asked to get the car to another of Hightower's friends so

17   that that person could drive it to Myrtle Beach for someone to

18   have like a bike weekend.  He did that.  He turned it over.

19   But turning over the car isn't -- does not make him a part of

20   a plot to kill Ms. Ashburne or anybody else.

21           Now, in order to really understand this case, you're

22   going to have to understand something about forensic science

23   and the strengths, weaknesses, and limitations of cell site

24   location, telephones.  You're going to have to listen to some

25   testimony about what DNA swabbing should show, and the absence

of DNA on some evidence.  There's going to be testimony from FBI employees comparing still photos taken from video, and trying to identify automobiles from those by their class, characteristics.

Listen carefully to that.  And you will hear about those limitations and what it really shows.  The comparison of the automobiles is not a science.  It is -- it really only says that some of the cars might be the same.  You know, this might be the same as a car I see in another picture, it has all the class characteristics.  So maybe it is, maybe it isn't.

But what I submit is, after this evidence is all in, you're going to find that the evidence does not support a fair and reasonable conclusion, beyond a reasonable doubt, that Cliff Mosley played a part, knowingly, in any plot to murder anybody.  He could have been used, but he didn't knowingly try to kill anybody or be a part of that.

You're going to have a count regarding distribution of marijuana.  Well, I told you, he hustled.  He hustled on Wylie Avenue.  He wasn't a large scale hustler.  That's part of what he did to pay the rent and put food on the table.  He was regularly in that area because that's where he hustled.

Now, finally, I think, just a way to look at this case is that proof should mean that you're not left with unanswered questions in this case.  So I ask you, as you go

1    through this evidence, listen to the testimony over the next

2    few weeks, to consider whether you still have unanswered

3    questions.  Can you look at -- from the evidence is there a

4    question about who key people were, which automobile had which

5    driver in it, whether the Pontiac was driven by anybody you

6    can identify from the evidence.  Whether the Audi at a

7    particular time at had a particular person behind the wheel.

8    Can you do that without speculation?  Can you do it without

9    guessing?  If you have to guess or if you have to speculate,

10   then you don't have the kind of proof as needed.

11          It's a long trial, so I encourage you to take notes,

12   because they might be helpful to you in deliberating weeks

13   from now.  I ask you to remember, again, the presumption of

14   innocence.  Apply it at all times.  And please withhold your

15   judgment on any important issue until the very end and you

16   have Judge Hazel's instructions on the law.  And if you'll

17   approach it that way, I'm convinced that Mr. Mosley will have

18   a fair trial.  And that's really we can ask from you at the

19   beginning.  I apologize for my voice.

20          THE COURT:  Thank you, Mr. Trainor.

21          All right.  Ladies and gentlemen, at this point

22   let's take our morning break.  And then when we come back

23   we'll start with the government's first witness.  Our breaks

24   will typically be 15 minutes.  And that will be true today.

25   So I ask that you be back in the jury room in 15 minutes,

```
 1    which should be a little bit before 11:30.  I'll see you then.

 2    Please remember my instructions, which you'll hear over and

 3    over again, not to discuss the case with anyone including even

 4    among yourselves.  Thank you.

 5              (Jury left the courtroom.)

 6              THE COURT:  See you all in 15 minutes.

 7              MR. ZERKIN:  Your Honor, I have one question for

 8    you.

 9              THE COURT:  Let's wait until we get the door closed

10    then.  You can be seated, unless addressing the Court.

11              MR. ZERKIN:  Thank you.  I have one question, in

12    terms of who goes first on cross-examining witnesses.  Does it

13    have to be the same order every time or can we switch off

14    between us?

15              THE COURT:  You can switch off.  I will look over in

16    that direction and whoever is rustling and moving about, I'll

17    call on that person.

18              MR. ZERKIN:  Thank you.

19              THE COURT:  Sure.  Anything else?

20              MR. ZERKIN:  No, sir.

21              THE COURT:  See you in 15 minutes.

22              (A recess was taken.)

23              THE COURT:  You may be seated.  Government work

24    through their technical issues?

25              MS. WILKINSON:  Yes.  Thank you, sir, for the
```

1    leeway.

2              THE COURT:  I see one of your experts in the back

3    there.  Good to see you, sir.

4              MS. WILKINSON:  He is our guru, as we call him.

5              THE COURT:  As I recall.

6              All right.  Are we ready for the jury?

7              MS. WILKINSON:  Yes, would you like me to bring the

8    witness in before the jury comes, or how would you like to do

9    it?

10             THE COURT:  Doesn't matter.

11             MS. WILKINSON:  Okay.  I'm going to wait for the

12   jury.

13             (Jury entered the courtroom.)

14             THE COURT:  You may all be seated.  Good morning

15   again, ladies and gentlemen.  Hopefully everyone enjoyed your

16   brief break.  I think we're ready for the first government

17   witness.

18             MS. WILKINSON:  Yes, Your Honor.  Before we call our

19   first witness, the government is moving into evidence four

20   exhibits, they are stipulations that are agreed upon.  We have

21   them marked as S1, S2, S3, and S4.  We will read them at the

22   appropriate time, however, we are moving them into evidence.

23             THE COURT:  All right.  Ladies and gentlemen, a

24   stipulation is a fact or facts agreed to between the parties,

25   and so you can accept them as true.

1           MS. WILKINSON:  Thank you, Your Honor.  The

2   government would call Ms. Aquana Murray.

3           THE CLERK:  Good morning.  Please raise your right

4   hand.

5                       AQUANA Q. MURRAY,

6   called as a witness, being first duly sworn, was examined and

7   testified as follows:

8           THE WITNESS:  I do.

9           THE CLERK:  Thank you, you may have a seat.  You may

10  pull your chair up to the microphone, please state and spell

11  your full name for the Court.  You can adjust that microphone

12  if you need to.  Thank you.

13          THE WITNESS:  Aquana Qualene Murray, A-q-u-a-n-a,

14  middle name is Qualene, Q-u-a-l-e-n-e, M-u-r-r-a-y.

15                      DIRECT EXAMINATION

16  BY MS. WILKINSON:

17  Q.  Good morning, Ms. Murray.

18  A.  Good morning.

19  Q.  Can you tell the ladies and gentlemen of the jury what you

20  do for a living?

21  A.  I'm a paraprofessional for Baltimore City schools.

22  Q.  How long have you been working as a paraprofessional for

23  Baltimore City schools?

24  A.  About four or five years.

25  Q.  Okay.  And do you live in the Baltimore area?

Direct Examination - Murray (By Ms. Wilkinson)

1    A.   Yes.

2    Q.   And were you always from the Baltimore area?

3    A.   No.

4    Q.   When did you come down to Baltimore?

5    A.   2009.

6    Q.   Thereabouts?

7    A.   Yeah.

8    Q.   And where are you from originally?

9    A.   I'm from New Jersey.

10   Q.   Okay.  And are you married?

11   A.   Yes.

12   Q.   And do you have children?

13   A.   I have one daughter.

14   Q.   Okay.  And I'm going to direct your attention now to May

15   of 2016, which I think is inclusive of the time you lived in

16   Baltimore, where were you living in May of 2016?

17   A.   On Rosalind Avenue.

18   Q.   And at that time, do you recall the actual street address

19   where you were living back in May of 2016?

20   A.   Yes, 2922.

21   Q.   Okay.  And who did you live there with?

22   A.   My husband and daughter.

23   Q.   And did -- can you just generally describe your home and

24   the little neighborhood that you lived in?

25   A.   Yes, it's a very calm neighborhood, nothing goes on.  Just

Direct Examination - Murray (By Ms. Wilkinson)

1    small little town.  Just not much going on.

2    Q.  And what type of home do you live in, is it a standalone

3    home, an apartment, or what kind of home?

4    A.  It's a townhouse.

5    Q.  It's a townhouse.  And are all of the homes that are on

6    Rosalind Avenue townhomes?

7    A.  Yes, Rosalind Townhomes.

8    Q.  Okay.  And in the time that you've lived there, have you

9    generally gotten to know some of your neighbors?

10   A.  Yes.

11   Q.  Okay.  And did you know Latrina Ashburne?

12   A.  Yes.

13   Q.  Okay.  And tell the jury how you knew Ms. Ashburne.

14   A.  She was my neighbor, she was my neighbor.  We didn't know

15   each other personally, but we see each other, you know, every

16   morning when we go to work, we would just speak, you know.

17   Q.  And just using your words, if you could, describe in terms

18   of, she being your neighbor, where she lived in connection to

19   your house.

20   A.  She lived right across the street from me.

21   Q.  And how -- do you live on a major thoroughfare?

22   A.  I'm sorry?

23   Q.  Do you live on a major road?

24   A.  No, it's not a major road.

25   Q.  What type of -- give us an idea of what type of road it

1    is.

2    A.  It's just a small -- small road.

3    Q.  And back in May of 2016, were you working as a

4    paraprofessional for Baltimore City schools?

5    A.  Yes.

6    Q.  And did you have a routine for each work morning of what

7    you kind of did?

8    A.  Yes.

9    Q.  Okay.  What was your general routine?

10   A.  I would take my daughter -- get up, take my daughter to

11   school, but that particular day I didn't, I was --

12   Q.  Okay.  The day of May 27th you mean?

13   A.  Yes.

14   Q.  Okay.  What did you typically do, not on May 27th, what

15   was your routine?

16   A.  I just get up and take my daughter to school and then off

17   to work.

18   Q.  Okay.  And then off to work?

19   A.  Yeah.

20   Q.  And did you work in the Baltimore area, or somewhere

21   else?

22   A.  Yes, in the Baltimore area.

23   Q.  Okay.  Did you have a long commute?

24   A.  No, it's about ten minutes, ten, 15 minutes.

25   Q.  And you don't have to say where your daughter goes to

1    school, but where generally would you drive her to go to

2    school, how far away was it?

3    A.   Oh, it's about maybe six or seven minutes.

4    Q.   Is that why you're able to go and come back?

5    A.   Yes.

6    Q.   And now I'm going to direct your attention to the morning

7    of May 27th, 2016, and again, were you living at the home on

8    Rosalind on that day?

9    A.   Yes.

10   Q.   And directing your attention to the early morning hours,

11   did you follow your routine and take your daughter to

12   school?

13   A.   Yes, I did.

14   Q.   Okay.  And did you go just the two of you, or did your

15   husband go or anybody else?

16   A.   No, my husband was at work.

17   Q.   Okay.  Where would you park your car to drive her there,

18   where would you park your car from -- at your house, where did

19   you park it?

20   A.   Oh, right in front of my house.

21   Q.   Get in your car and go take her off to school?

22   A.   Yes.

23   Q.   Okay.  And at some point, returned that morning to get

24   ready for work?

25   A.   Yes.

1    Q.   Okay.  And on that particular morning of May 26, do you

2    recall approximately what time all of this would have

3    happened?

4    A.   Well, my daughter was in a before-care at the time, so it

5    was about 7:10 -- it was 7:00-ish, early 7:00-ish.

6    Q.   And at some point, you returned home?

7    A.   Yes.

8    Q.   And did you observe anything that was out of the

9    ordinary?

10   A.   Yes.

11   Q.   And tell the ladies and gentlemen of the jury what you saw

12   when you came back to your house.

13   A.   I dropped my daughter off to before-care, it was an awards

14   ceremony that she had.  It was Memorial Day weekend, she

15   was -- she had an awards ceremony, so I figured I would take

16   her, drop her off to before-care, and come home to get

17   dressed.  And as I was pulling up home, I noticed like some

18   strange activity.  I noticed my neighbor and a guy as I was

19   getting ready to park the car and get out.

20        And he was just trying to get her, you know, just

21   chasing -- I thought it was like a joke, to me it looked like

22   a joke.  So I just stood still and just paid attention what

23   was going on, just trying not to draw so much attention to

24   myself.  And he pulled out a gun and he shot her.

25   Q.   Did you hear the gunshot?

1    A.   Yes.

2    Q.   Did you see the gun?

3    A.   No.

4    Q.   As you pulled up that morning, can you tell the ladies and

5    gentlemen of the jury where you actually were physically

6    sitting when you made these observations.

7    A.   I was pulling up right in front of my house.  And they

8    were right -- I don't want to say exactly across the street,

9    maybe like kind of diagonal, it was very close.

10   Q.   And when you pulled up at first, did anybody appear to

11   notice you?

12   A.   No.  No.  He didn't see -- nobody saw me.  I was just

13   trying not to draw so much attention to myself anyway, nobody

14   saw me.

15   Q.   Now, when you pulled up in your car, did you get out of

16   the car before you heard the gunshots?

17   A.   No.  I was on my way out of the car, but once I noticed

18   that something strange was -- something funny looking was

19   going on, I just sat and I didn't move.  And I didn't move

20   until he left the scene.

21   Q.   Now, can you give us an idea -- I mean, we're having you

22   describe kind of in slow motion what happened, but how

23   quickly -- or how long did you sit there watching before you

24   heard the gunshots, what are we talking about?

25   A.   It was -- it was quick.  It seemed like slow motion to me,

1   but it was actually pretty quick.  I sat, I would say about

2   just a few minutes of him trying to get her and it just

3   happened.

4   Q.  And when you say "trying to get her," can you describe a

5   little bit more in detail what you mean by that?

6   A.  Sure.  They -- he was like trying to chase her around the

7   car.  They were just -- to me it kind of looked like tag, like

8   playing, it looked like a game to me.  It looked like he was

9   just trying to -- they were like trying to -- he was trying to

10  get her.  I don't know how to explain it.  But she was just

11  trying to get away from him, and he was trying to get her.

12  And before I knew it, I just heard the gunshot.

13  Q.  Now, did they go fully around the car?

14  A.  No.

15  Q.  So what do you mean by get around the car?

16  A.  It wasn't -- it wasn't fully around the car.  It was just

17  like they were just going back and forth in the same spot,

18  like she was trying to dodge him, and you know, but it wasn't

19  fully around the car, that I remember.

20  Q.  Now, at some point having heard the gunshot, did you do

21  anything as a result of the events that you witnessed?

22  A.  No, I just -- no, I didn't do anything, I just sat

23  there.

24  Q.  Did you call 911?

25  A.  Yes, I did, after he left.

1    Q.   So what do you mean "after he left," what did you mean by

2    that?

3    A.   Once I saw him run off the scene, that's when I got out of

4    the car, and her mom was screaming and yelling for help.

5    Q.   And at that point, did you call 911?

6    A.   Yes.

7    Q.   And when you made that 911 call, did you use your own

8    personal cell phone?

9    A.   Yes.  Uh-huh.

10   Q.   And did you speak to the operator?

11   A.   Yes.

12   Q.   And in preparation for your testimony here today, did you

13   have occasion to listen to that call?

14   A.   Yes.

15   Q.   Okay.  And did you listen to it and hear the words that

16   you were saying and see a transcript that appeared on the

17   screen of your words?

18   A.   Yes.

19        MS. WILKINSON:  And at this time, I would ask the

20   Court if I might play Government's Exhibit A2.

21        THE COURT:  Very well.

22        (Audio played.)

23        MS. WILKINSON:  I'm going to stop --

24        THE COURT:  Before you go forward, can I just give

25   one instruction.  Ladies and gentlemen, as you can see,

Direct Examination - Murray (By Ms. Wilkinson)

 1    there's a -- what appears to be a running transcript on the

 2    screen.  I want to be clear, the transcript itself is not

 3    evidence, the evidence is the recording as you hear it.  So if

 4    you hear something different than what you see on the

 5    transcript, please know that what you hear is the evidence.

 6                MS. WILKINSON:  Thank you, Your Honor.

 7    Q.  (By Ms. Wilkinson)  Ms. Ashburne -- please forgive me,

 8    Ms. Murray, having heard the tape where I stopped, do you hear

 9    the background voice there?

10    A.  Yeah.

11    Q.  Can you tell us whose background voice that was?

12    A.  That was her mother.

13    Q.  When did you first observe Ms. Ashburne's mother?

14    A.  That day, actually, was the first time I've seen her.

15    Q.  Okay.  And when did you first see her that morning in

16    context of when you heard the shots and you saw the man

17    shooting at Ms. Ashburne?

18    A.  After, after he had left the scene and she was knocking on

19    people's doors asking for help.

20    Q.  And there's a part on the call where you are asked whether

21    or not she's breathing, had you made your way over to where

22    she was at that point?

23    A.  Yeah, but I wasn't close, it was like a crowd of people

24    around her, so I was just -- I stood away a little bit.

25    Q.  The crowd of people that were around her at this point,

1    were they there before --

2    A.  No.

3    Q.  And let me just finish my question real quick so I make

4    sure it's clear for the record, at the time you heard the

5    shot, were the crowd of people there?

6    A.  No.

7    Q.  At the time you heard the shot, who was out there, to your

8    observations?

9    A.  Just me.

10   Q.  And Ms. Ashburne and the man?

11   A.  Yes, yes, me, Ms. Ashburne, and the man.

12   Q.  Those are the only people that you saw?

13   A.  Yes.

14            (Audio played.)

15   Q.  (BY MS. WILKINSON)  Ms. Murray, did you talk to the police

16   when they arrived?

17   A.  Yes.

18   Q.  Did you talk to them on scene?

19   A.  Yeah, they asked me a few questions, asked me to come

20   to --

21   Q.  And I'm sorry I interrupted you.

22   A.  And asked me to come to the station.

23   Q.  Did you do that as well?

24   A.  Yes.

25   Q.  At that point, did you also tell them what you had seen

1    and observed?

2    A.   Yes.

3    Q.   Now, you were saying earlier that when you heard the

4    gunshot but you didn't see the gun, did you make any other

5    observations in terms of the shooting itself, in terms of did

6    you see -- how did you know it was a gunshot?

7    A.   Just by me hearing it and I saw the smoke.

8    Q.   The smoke, and where did you see the smoke?

9    A.   When he shot it -- when he shot it, I just saw the

10   smoke.

11   Q.   Now, but you didn't see the gun and you didn't see the

12   actual shooting?

13   A.   No.

14   Q.   Your observations were the smoke and the sound?

15   A.   Yes.

16   Q.   So when -- after you heard the smoke and the sound, where

17   did your eyes then observe, what were you watching at this

18   point?

19   A.   I was just watching him.

20   Q.   And which direction did you see him go?

21   A.   He ran off into the -- into like a cut, like of the woods,

22   like in an alleyway -- not exactly an alleyway, it was just

23   like a little cut, an extra exit on a block.

24   Q.   Is that a place, having lived in the neighborhood, that

25   little cut, that was familiar to you?

1    A.  Yes.

2    Q.  Now, once you saw him go through the cut, is that when you

3    called 911?

4    A.  Yes.

5    Q.  Now, you spoke -- in your testimony and on the tape you

6    used the word "running," can you describe to the jury what you

7    mean by running, what did you see, how did the man carry

8    himself?

9    A.  One thing that I noticed was that he wasn't running very

10   fast.  I remember that he was just kind of like trotting, like

11   he wasn't running very fast at all.  I remember that.

12   Q.  There's a phrase that you had used at some point in

13   your --

14          MR. DAVIS:  Objection.

15          THE COURT:  Overruled.

16   Q.  (BY MS. WILKINSON)  Is there a phrase that you used in

17   connection with what you observed and the type of way that he

18   was running?

19   A.  Yeah, like he was galloping, like he just wasn't very

20   fast, he was just --

21          MS. WILKINSON:  At this time, Your Honor, would it

22   be all right if I have the witness come down and show briefly

23   the jury what she means by "galloping"?

24          THE COURT:  Sure.

25          MS. WILKINSON:  Thank you.  If you would.

1          THE COURT:  If she's going to speak while she's

2     doing it, she needs to have a microphone.

3          MS. WILKINSON:  She won't speak, it will be very

4     brief.  If you could do it.

5     A.  (Indicating.)

6     Q.  (BY MS. WILKINSON)  Okay.  Thank you.

7          For the record, about three feet demonstrative to show

8     what she observed, how the man left the scene.

9          Now, Ms. Murray, did you make any observations about the

10    man other than his skin color in terms of, for example, were

11    you asked about his height?

12    A.  Yeah, he seemed tall.

13    Q.  Okay.

14    A.  He was tall.

15    Q.  How tall are you?

16    A.  I'm 5'3".

17    Q.  What's tall to you?

18    A.  Anything over 5'3", about 5'9", 6 feet, that seems tall to

19    me.

20    Q.  And is that your estimate?

21    A.  Yes, between 5'9" and 6 feet.

22    Q.  And again, is that your estimate, from your vantage

23    point?

24    A.  Yes.

25    Q.  Now, when you were talking about once you pulled up and

Direct Examination - Murray (By Ms. Wilkinson)

1    you looked and made the observation of your neighbor, did --

2    in preparation for your testimony, did you see some

3    photographs that were of the area taken at that time?

4    A.  Yes.

5    Q.  And were you able to describe in your words, using the

6    photographs, your vantage point?

7    A.  Yes.

8              MS. WILKINSON:  And I'm going to first put up

9    Government's Exhibit -- if I might, Your Honor --

10             THE COURT:  Actually, before you do that, though, I

11   have some news, and counsel and the jury will hear this at the

12   same time, but we're apparently closing at 1:00 o'clock today

13   because of weather.

14             MS. WILKINSON:  Oh, my goodness.

15             THE COURT:  Yes, that's the risk of trial in

16   January.  But yes, we're closing today at 1:00 o'clock.  So --

17             MS. WILKINSON:  What are we at, 12:00 right now?

18             THE COURT:  It's 12:05.

19             MS. WILKINSON:  Okay.  Thank you, Your Honor.

20             THE COURT:  Not my decision.

21             MS. WILKINSON:  No, I understand.  Thank you,

22   Judge.

23             THE COURT:  Sure.

24             MS. WILKINSON:  Your Honor, may Ms. Oldham be

25   excused and deal with some other witness issues as a result of

1    that news?

2              THE COURT:  Sure.  That's why I told you.

3              MS. WILKINSON:  Thank you, I appreciate that.  Sorry

4    for the interruption.

5              Okay.  Would you put up Government's Exhibit A-41,

6    please.

7    Q.  (BY MS. WILKINSON)  Okay.  Looking at this photograph,

8    you can see to the side of you, I'm not sure you can move the

9    terminal -- can we move the terminal -- I'm going to give you

10   the hard copy so you don't have to turn your head.

11        And the jury has them in front of them, I presume.

12        So Government's Exhibit A-41, is that photograph or that

13   area depicted in that photograph familiar to you,

14   Ms. Murray?

15   A.  Yes.

16   Q.  And what are we looking at here?

17   A.  That's where I live, and that's Latrina's car, the beige

18   one right here.

19   Q.  Okay.  And when you're pointing -- can you describe it, is

20   it the picture to -- the car to the left, or the car to the

21   right, when we're looking at the photograph?

22   A.  The car to the right.

23   Q.  Okay.  So I'm going to circle the screen.  If you turn to

24   the right, is this the car you're referring to?

25   A.  Yes.

1    Q.   And so is that the car that you referred to as

2    Ms. Latrina -- Ms. Ashburne's car?

3    A.   Yes.

4    Q.   Okay.  And again, using your words and looking at this

5    photograph, tell us approximately where you were when you made

6    the observations.

7    A.   My car is to the left, right across the street.

8    Q.   Okay.  Is your car actually in this photograph?

9    A.   Yes.

10   Q.   There you go, perfect, thank you.  We're able to see when

11   you touch it, we can see actually where it is.

12       And is that where you were actually sitting when you made

13   the observations that you did?

14   A.   Yes.

15   Q.   So you were on the left side of the street, and looking at

16   the picture, Ms. Ashburne's car was parked on the right?

17   A.   Yes.

18   Q.   Okay.  And were you in the driver's seat or the passenger

19   seat when you made these observations?

20   A.   I was in the driver's seat.

21   Q.   And obviously you were sitting down -- seated in the car;

22   correct?

23   A.   Yes.

24   Q.   Now, as you're looking down the street, can you tell us

25   the angle that you saw the man and Ms. Ashburne, using the car

1    on the right as your -- kind of your descriptor, where -- on

2    what side did you see them?

3    A.   I saw -- I was right here, I saw him on this side, he

4    was --

5    Q.   Okay.  So the right side of the car?

6    A.   Yes.

7    Q.   Would that be the passenger side of the car?

8    A.   No, on the driver's side of the car was where he was, and

9    she was on the other side of the car, the passenger side.

10   Q.   And was he facing you, or was his back to you?

11   A.   No, his back was --

12   Q.   And when -- so let me go to Government's Exhibit A-42,

13   which I think is the same angle, and I'm going to go ahead and

14   ask you to clear by touching the bottom left-hand screen -- I

15   think I can actually do it.  There, I can do it.

16        Now, this is a similar photograph, but I want to draw your

17   attention to a sign that's in front of there, and it talks

18   about some street work that was being done at the time.

19   A.   Yes.

20   Q.   Do you recall that sign being there at the time?

21   A.   Yes.

22   Q.   Okay.  And some of the photographs -- and I had asked you,

23   Ms. Murray, was the streets closed that morning, or were you

24   able to drive on Rosalind Avenue straight through when you

25   came home -- when you came back from dropping your daughter

1   off?

2   A.   The streets were closed.  At the time when I left, it

3   wasn't, honestly.

4   Q.   Okay.  There were open --

5   A.   It wasn't.  By the time I came back, I believe they were

6   getting ready to start working on the road.

7   Q.   They were getting ready to start?

8   A.   Yes.

9   Q.   So if you had come home and you wanted to go down Rosalind

10  Avenue, could you have gone down Rosalind Avenue?

11  A.   No.

12  Q.   Why is that?

13  A.   Because they were -- no, when I came home, they were -- it

14  was open.

15  Q.   They were just getting started?

16  A.   Yes.

17  Q.   Okay.  And that's the point I wanted to clarify, so if you

18  wanted to, you could have gone right down Rosalind Avenue?

19  A.   Yes, yes.

20  Q.   Okay.  If I could go to A-43.

21       Okay.  And again, if you could first show us the -- where

22  your car was on this photograph.

23  A.   (Indicating.)

24  Q.   Okay.  And there's a -- good, that's all you need right

25  there.  Sometimes if you circle it, it might be easier.  I

Direct Examination - Murray (By Ms. Wilkinson)

1    don't know if that will work.

2        And then you see that sign there, the road closed ahead,

3    but it wasn't when you came home?

4    A.  No.

5    Q.  Okay.  And again, the car that's in the forefront, the one

6    that we're looking at with the license plate ending in 6796,

7    whose car was that?

8    A.  That was Ms. Ashburne's.

9    Q.  So when we look at this photograph, Government's

10   Exhibit -- I think I said A-45, but it's A-43, what side did

11   you see the man on, and what side did you see Ms. Ashburne

12   on?

13   A.  I was here, and she was here.  The guy was on the

14   passenger side -- I mean, I'm sorry, the driver's side, and

15   she was on the passenger side.

16   Q.  And with his back to you?

17   A.  Yes.

18   Q.  Now, at some point -- if I could go to Government's

19   Exhibit A-44, and again, I'm going to clear the bottom.

20       And is this just another view of Ms. Ashburne's car?

21   A.  Yes.

22   Q.  Okay.  And we don't see your car in this photograph?

23   A.  No.

24   Q.  Now, down to the right there, in front of the tree, do you

25   see the blood stain, right here?

1    A.  Yes.

2    Q.  Do you see that there, Ms. Murray?

3    A.  Yes.

4    Q.  Now, my question to you is, when you were -- when you

5    heard the gunshot and you made the observations of the man

6    galloping away, did your attention draw back to

7    Ms. Ashburne?

8    A.  Yes, after he was gone.

9    Q.  Okay.  And at some point, do you know how her body -- her

10   body got from the car to where the blood stain is?

11   A.  That's what -- that's what I don't -- I don't know if she

12   like stumbled because I was just so totally focused on him.

13   By the time I looked back to her, she was on the ground.

14   Q.  Okay.  So you didn't see that part of it?

15   A.  No.

16   Q.  Now, you talked about your focus that morning, and I asked

17   you previously, did Ms. -- I don't think I asked you

18   previously, did Ms. Ashburne appear to notice that you had

19   pulled up?

20   A.  No.

21   Q.  Did the shooter appear to notice that you had pulled up?

22   A.  No.

23   Q.  To your observations, what was the shooter focused on?

24   A.  Her, it was as if he was on a mission for her.  He didn't

25   look around or anything, it was just directed to her.

Direct Examination - Murray (By Ms. Wilkinson)

1    Q.   And when he galloped through the cut, is that when you

2    called 911?

3    A.   After he left completely.

4    Q.   Now, I have a map, I just wanted to kind of go through it

5    one more time.

6              MS. WILKINSON:   I'm going to put it up here, if I

7    might, Your Honor, and we have another small version of it.

8              Ms. Lesser, if you're able to pull it up, I think

9    it's V-3, so that the jury can see it too.  Trying to think of

10   the best way to do it.

11             And if you need to step down, that's okay too.  If I

12   might stand over here.

13   Q.   (BY MS. WILKINSON)  Government's Exhibit V-3A, are you

14   generally familiar with the area I have here?

15   A.   Yes.

16   Q.   Okay.  And can you just, using your fingers -- if you need

17   to step down, you can, but hopefully I have it close enough to

18   you, Ms. Murray, can you show where you lived back in May of

19   2016 when you made this observation?

20   A.   Right here.

21   Q.   And there's like a little parking lot in front of you --

22   A.   Yes.

23   Q.   -- is that a point of reference for you?

24   A.   Yes, this is the parking lot that's right across the

25   street from my house.

Direct Examination - Murray (By Ms. Wilkinson)

1    Q.   Okay.  And then obviously we have the crime seen here

2    noted, is that in the place where you made the observations

3    that morning?

4    A.   Yes.

5    Q.   Now, what I'm most particular -- and if you could point

6    out to the jury where the cut is.

7    A.   Okay.

8    Q.   Sometimes aerials are hard, and if you need to step down,

9    you can.

10       So this is Rosalind Avenue.  And if you can't do it, don't

11   worry about it.

12   A.   It's hard for me to do it here.

13   Q.   Sure.

14   A.   I can't show you where the cut is.

15   Q.   So when -- in using your words, as you're looking down

16   Rosalind Avenue, how far down is it from where you made the

17   observations?

18   A.   It's just a few doors down from where even Ms. Ashburne

19   lives, just a few doors -- couple doors.

20   Q.   Meaning a few doors of other townhomes down?

21   A.   Yes.

22   Q.   Okay.  Now, in -- after you were interviewed by the

23   Baltimore City detectives that morning, did you have to leave

24   town?

25   A.   Yes, I was on my way to New Jersey.

Direct Examination - Murray (By Ms. Wilkinson)

1    Q.   Okay.  And so did you see any news coverage about the

2    murder that day?

3    A.   I didn't.

4    Q.   At some point in preparation for your testimony, did we

5    ask you to look at some security footage from a nearby

6    apartment building?

7    A.   Yes.

8              MS. WILKINSON:   Okay.  And I'm going to ask

9    Ms. Lesser -- and I've forgotten the exhibit number -- oh,

10   V-1.  Queue it up at about 7:20 a.m.

11             (Video played.)

12   Q.   (BY MS. WILKINSON)  Could you see that there,

13   Ms. Murray?

14   A.   Yes.

15   Q.   Okay.  Do you recognize the individual on that screen in

16   terms of the observations you made that morning?

17   A.   Yes.

18   Q.   And can you tell the jury what your observation is?

19   A.   That was the guy that did it, that was him.

20   Q.   Can you speak into the microphone just so we have it and

21   repeat what you said.

22   A.   That was the guy that I saw, he's just covered, the guy.

23   Q.   That's the man you saw?

24   A.   Yeah.

25   Q.   Is that the man you saw shoot Ms. Ashburne?

Direct Examination - Murray (By Ms. Wilkinson)

1    A.   Yes.

2    Q.   Now, you spoke generally, Ms. Murray, about living in that

3    neighborhood for about four or five years or living in the

4    Baltimore area.  In addition to the street, obviously, where

5    you live on, were you generally familiar with the

6    neighborhood?

7    A.   Yes.

8    Q.   And does the neighborhood have a name to it?

9    A.   Yeah, Park Heights community.

10   Q.   Park Heights community?

11   A.   Yeah.

12   Q.   And as part of the community, are you familiar with an

13   area known as Wylie Avenue?

14   A.   Yes.

15   Q.   Okay.  And how close is Wylie Street to where you live?

16   A.   It's like right around the corner, it's not far at all.

17   Q.   Do you go to Wylie Street?

18   A.   I don't.

19   Q.   Why not?

20   A.   It's -- I don't -- I have no reason to go to Wylie

21   Street.

22   Q.   Why not?

23   A.   It's really dangerous, it's a dangerous -- the community

24   Park Heights is just -- it's rough.

25   Q.   Is it a commercial area?

Direct Examination - Murray (By Ms. Wilkinson)

1   A.   No.

2   Q.   Is there a gas station there?

3   A.   Yes, there is a gas station.  I don't go to that gas

4   station.

5          MS. WILKINSON:  I was just checking my notes, Your

6   Honor.  I think that's all I have.

7          THE COURT:  All right.  Cross-examination.

8          MR. DAVIS:  Yes, Your Honor.

9          THE COURT:  Mr. Davis.

10         MR. DAVIS:  Thank you.  Your Honor, may we approach

11  for one moment?

12         THE COURT:  Of course.

13         (Bench conference on the record.)

14         THE COURT:  Hold on, let me wait for Mr. Mosley's

15  counsel.

16         All right.  What's on your mind?

17         MR. DAVIS:  I have a timer on my phone, and I would

18  like to have her -- I'd like to set the timer and ask her how

19  long she was observing the events, and I didn't want to do it

20  until I alerted the Court to it.

21         THE COURT:  So you're going to ask her --

22         MR. DAVIS:  I'm going to ask her -- I'm going to

23  say, this happened very quick, and I'm going to ask her to --

24  I'm going to say start, ask her how long she actually observed

25  these events, and then I'll stop the timer when I get to a

Cross-examination - Murray  (By Mr. Davis)

1    number and put on the record what the time is.

2              THE COURT:  Any objection?

3              MS. WILKINSON:  (No verbal response.)

4              THE COURT:  It's fine.

5              MS. WILKINSON:  If she can, obviously.

6              THE COURT:  Right.

7              (The following proceedings were had in open court.)

8                        CROSS-EXAMINATION

9    BY MR. DAVIS:

10   Q.  Good afternoon, Ms. Murray.  How are you?

11   A.  I'm good.  Thank you.

12   Q.  Ms. Murray, you've been interviewed several times about

13   the events that occurred on May 27th, would that be

14   accurate?

15   A.  Yes.

16   Q.  You've never testified before, have you?

17   A.  No.

18   Q.  So it's kind of scary, isn't it?

19   A.  Yeah.

20   Q.  I'll try to make this as easy as possible.  When you were

21   interviewed at the scene, you were talking to detectives;

22   correct?

23   A.  Yes.

24   Q.  And they were jotting the notes down in their files or on

25   notepads; correct?

Cross-examination - Murray  (By Mr. Davis)

1    A.  Yes.

2    Q.  And they asked you how tall the suspect was, and you told

3    them 6 foot, do you recall that?

4    A.  Yeah.

5    Q.  Now, during the course of these several interviews, you

6    also indicated that the events that you observed on May 27th

7    that morning were very quick, very fast.

8    A.  Yes.

9    Q.  I have a timer on my phone, and what I'd like you to do,

10   if you could, for us, I'm going to say start, and if you could

11   tell me when -- if you could tell me when to stop, giving us

12   an idea of how long your observation was, okay.

13       I'm going to start right now, and when the amount of

14   time --

15            THE COURT:  Mr. Davis, maybe you were about to do

16   exactly what I was going to suggest, I'll let you say it

17   first.

18   Q.  (BY MR. DAVIS)  And I'm going to start a timer, and what

19   I'd like you to do is, is from the moment you saw the suspect

20   out there with your neighbor, I'm going to hit the start

21   button, and then when he is out of your sight, I'm going to

22   stop.

23   A.  Okay.

24   Q.  Okay.  So I'm going to start now, okay?

25   A.  Okay.  Stop.

Cross-examination - Murray  (By Mr. Davis)

1   Q.  Ms. Ashburne, that's about 20 seconds, does that seem

2   accurate?  Was it that quick?

3   A.  It doesn't seem like it was that quick.

4   Q.  Do you recall, during the course of the interviews, you

5   indicated to the investigators and to the prosecutor that

6   you -- the events that occurred on that morning happened very

7   quickly, less than a minute?

8   A.  It -- yeah, it was really fast, but it seemed like it was

9   probably more than 20 seconds, but it all happened so fast.

10  Q.  Now, Ms. Murray, I would like you to take a look at

11  Government Exhibit A-43.

12  A.  Okay.

13  Q.  Now, this is where your neighbor was, and this is where

14  the man that shot her was, at that vehicle; correct?

15  A.  Yes.

16  Q.  And then this is your car back here; correct?

17  A.  Yes.

18  Q.  And you indicated that the person that did the shooting,

19  his back was to you, and your neighbor was facing you;

20  correct?

21  A.  Yes.  It's --

22  Q.  So you didn't see his face?

23  A.  I didn't see his face, I think I might have even saw a

24  side, but no, I didn't see his face.

25  Q.  And you didn't see a gun?

Cross-examination - Murray  (By Mr. Davis)

1  A.  No.

2  Q.  And you didn't see which hand the individual used to shoot

3  your neighbor?

4  A.  No.

5  Q.  Now, do you know for a fact that it was a man?

6  A.  It -- yes, based off of what he had on, yeah.

7  Q.  Based on the way the person was dressed?

8  A.  Yes.

9  Q.  But you didn't -- you couldn't tell if it was a male or

10  female from any other thing you observed, just based on the

11  dress; correct?

12  A.  Yes.

13  Q.  And the dress was a hoodie?

14  A.  Uh-huh.

15  Q.  And blue jeans?

16  A.  Yes.

17  Q.  About 6 feet tall?

18  A.  Yeah.

19  Q.  And what type of weight do you think this individual

20  clocked in at?

21  A.  About 200, he was a fit guy.  He wasn't thin.

22  Q.  Now, Ms. Ashburne --

23  A.  Murray.

24  Q.  Oh, Ms. Murray, I'm sorry.  Okay.  Great.  Thank you.

25      Now, Ms. Ashburne --

1    A.   Murray.

2    Q.   I really apologize for that, Ms. Murray, my focus was on

3    speaking of that.

4        Do you recall telling the investigators that when your

5    neighbor was shot, from that point on, your focus was on your

6    neighbor?

7    A.   My focus was on the --

8    Q.   On your neighbor, Ms. Ashburne, after she was shot.

9    A.   After she was shot, yes.

10   Q.   And that's what you told the investigators back then;

11   correct?

12   A.   Yes.  And --

13   Q.   Matter of fact, you spoke to Clarence Holiday, the agent

14   in the case last summer, and that's exactly what you told him.

15   You said after your neighbor was shot, your focus shifted to

16   your neighbor, because you saw she was injured; correct?

17   A.   Yeah, but it was after he left.  I made sure -- I made

18   sure I paid attention that he was gone before I got out of the

19   car.

20   Q.   Before you got out of the car.  But I'm talking about your

21   focus.

22   A.   It was on him.

23   Q.   It was on him?  It wasn't --

24   A.   No, I was making sure -- I made sure that I paid attention

25   to him, because I didn't want to be seen until he left.

Cross-examination - Murray  (By Mr. Davis)

1    Q.  So what you told Agent Holiday --

2    A.  And then after he left, that's when I focused -- that's

3    when I noticed that she was on the ground.

4    Q.  So Agent Holiday's characterization that Murray's

5    attention was on Ashburne after she was shot -- oh, and the

6    shooter left the scene, that's what you're saying; correct?

7    A.  Yes, he left the scene.

8    Q.  So you're correct.

9    A.  Thank you.

10   Q.  Now, looking at Government's Exhibit A-41, you're

11   approximately five car lengths behind where this occurred,

12   give or take a car length, would you agree?

13   A.  Yeah.

14   Q.  And how long did it take -- if the whole event took less

15   than a minute, how long did it take the individual who did the

16   shooting to leave after you heard the pop?

17   A.  He was -- right away, he ran off right away.

18   Q.  Okay.  Now, again, you say "he," but you've told us you

19   can't tell -- you didn't see the face; correct?

20   A.  That's correct.

21   Q.  And when the individual -- you indicated the individual

22   ran by your car?

23   A.  No, he didn't run by my car, no.

24   Q.  He didn't.  Where did he run?  Looking at Government's

25   Exhibit 41, just touch on the screen where he ran, and it will

 1  mark up when you touch the screen.

 2  A.  Where he ran off?

 3  Q.  Uh-huh.

 4  A.  It's not even on the screen.

 5  Q.  Well, I mean, he's up -- she, he, your neighbor,

 6  everybody's up here, when the shooter runs, which way does the

 7  shooter go?

 8  A.  This way, he ran off, that's where the cut is, in that

 9  direction.

10  Q.  To the right on the picture, or to the left?

11  A.  To the right.

12  Q.  All right.  So when the person runs off, again, you only

13  see the back; correct?

14  A.  Yes.

15  Q.  Now, do you see anything in the person's hands?

16  A.  No.

17  Q.  As you were focusing, other than the hoodie and the blue

18  jeans, what else did you -- what else do you recall from your

19  watching that person?

20  A.  Just how he was running, that's it.  I paid attention to

21  the fact that it wasn't very fast.  That's what I remember.

22  Q.  The gallop?

23  A.  Yeah, it just -- it just wasn't very fast.  That's what I

24  remember.

25  Q.  Did you see the person's hands as the person left?

Cross-examination - Murray  (By Mr. Davis)

1    A.   No.

2    Q.   And did you see the person's anything, you said something

3    about a side glance, did you see the person's face at all?

4    A.   No, I -- no, I just might have seen that he was like kind

5    of -- I don't know, no, I didn't.  I don't want to say

6    anything.

7              MR. DAVIS:  Thank you, Ms. Murray.

8              THE WITNESS:  You're welcome.

9              THE COURT:  Cross by Mr. Mosley's counsel,

10   Mr. Trainor.

11             MR. TRAINOR:  No questions, Your Honor.

12             THE COURT:  Very well.  Redirect from the

13   government.

14             MS. WILKINSON:  One second, Your Honor.

15             THE COURT:  Sure.

16             MS. WILKINSON:  That's all we have for Ms. Murray.

17             THE COURT:  Ma'am, thank you so much for your

18   testimony.  Please don't discuss your testimony with anyone

19   else until the trial has been completed.  Enjoy the rest of

20   your day.

21             THE WITNESS:  Thank you.

22             MS. WILKINSON:  So Ms. Murray may be excused from

23   the courthouse, Your Honor?

24             THE COURT:  You may be excused, yes.

25             THE WITNESS:  Thank you.

1          MS. WILKINSON:  Thank you.

2          THE COURT:  All right.  We've got another 30

3    minutes, if the government wants to call another witness.

4          MS. OLDHAM:  Yes, Your Honor the government would

5    call Officer Aaron Cain.

6          THE COURT:  Very well.

7          THE CLERK:  Good afternoon, sir, you can step up to

8    the witness stand, raise your right hand.

9                    OFFICER AARON M. CAIN,

10   called as a witness, being first duly sworn, was examined and

11   testified as follows:

12         THE WITNESS:  I do.

13         THE CLERK:  Thank you.  You may have a seat.

14         THE WITNESS:  Thank you.

15         THE CLERK:  You may adjust that microphone in front

16   of you, please state and spell your full name for the Court.

17         THE WITNESS:  Sure.  My first name is Aaron,

18   A-a-r-o-n, middle name is Michael, M-i-c-h-a-e-l, last name is

19   Cain, C-a-i-n.

20         THE CLERK:  Thank you.

21                    DIRECT EXAMINATION

22   BY MS. OLDHAM:

23   Q.  Good morning, Officer Cain.

24   A.  Good morning, ma'am.

25   Q.  Officer Cain, how are you employed?

Direct Examination - Cain (By Ms. Oldham)

1    A.   I'm employed with the Baltimore City Police Department.

2    Q.   How long have you been a police officer with the Baltimore

3    City Police Department?

4    A.   19 years.

5    Q.   And did you have any prior law enforcement experience

6    before starting with Baltimore City?

7    A.   No, ma'am.

8    Q.   And what is your current assignment with the Baltimore

9    City Police Department?

10   A.   My current assignment is I'm a patrol officer in the

11   Eastern District on the midnight shift.

12   Q.   What is the midnight shift, what hours?

13   A.   Midnight shift for us is 11:00 p.m. to 7:00 a.m.

14   Q.   Did you work last night?

15   A.   Yes, ma'am.

16   Q.   Okay.  And so directing your attention back to May of

17   2016, was that your assignment back then as well?

18   A.   No, ma'am, I was assigned to the Northern District

19   midnight shift in 2016.

20   Q.   Same hours?

21   A.   No, back then we worked a ten-hour shift, so it was from

22   10:00 a.m. to -- excuse me, from 10:00 p.m. to 8:00 a.m.

23   Q.   Okay.  Officer Cain, I'm going to direct your attention

24   specifically to Friday, May 27th, 2016.

25   A.   Yes.

Direct Examination - Cain (By Ms. Oldham)

1    Q.  In the early morning hours, before you finished your

2    shift, did you respond to the 2900 block of Rosalind Avenue in

3    Baltimore?

4    A.  Yes, I did, ma'am.

5    Q.  And why did you respond to that location?

6    A.  Right before a shift change, we received a call for a

7    shooting in the 2900 block of Rosalind Avenue.

8    Q.  And you were one of the officers that responded to that

9    location?

10   A.  Yes.

11   Q.  Is that an area that you became familiar with through the

12   course of your work as a patrol officer?

13   A.  Yes.

14   Q.  How would you describe the 2900 block of Rosalind

15   Avenue?

16   A.  Well, it's kind of out of the way, it's not like on a

17   major thoroughfare like Cold Spring Lane or Northern Parkway.

18   It kind of sits off in like a small part of the community up

19   near Sinai Hospital.

20   Q.  And actually, I'm going to ask that you take a look at the

21   exhibit that's right behind you.  And that is V-3, for the

22   record.

23       Officer Cain, can you take a look at V-3 and tell us

24   whether or not you are familiar with the area depicted?

25   A.  Yes, this is Rosalind Avenue right here where the incident

Direct Examination - Cain (By Ms. Oldham)

1    occurred.   This is what we -- what used to be known as

2    sector 3 of the Northern District.   I'm not sure if it still

3    is because we've had some changes in the post boundaries since

4    then.   But I'm familiar with this area because while I was in

5    the Northern, I was assigned to sector 2, but some nights I

6    had to work this area because of shift shortages or shift

7    allotment.

8    Q.   Do you recall where you were when the call came out to

9    respond to this area?

10   A.   Yes, I was actually working my regular post car, which is

11   22 post in the Northern, which generally covers the area from

12   Cold Spring and York, up to the 6300 block of York, the

13   shopping center that sits there.   And the time I received that

14   call I was actually on that side of the district still

15   patrolling because it was right before shift change.

16   Q.   And approximately how long did it take you to respond to

17   the 2900 block of Rosalind Avenue?

18   A.   Probably no more than five minutes.

19   Q.   I'm going to show you what we have marked as Exhibit A-33,

20   if you could just look on your screen there, can you tell us

21   what A-33 is?

22   A.   A-33 looks like a GPS coordination of the area where the

23   incident happened.

24   Q.   Just sort of a street map version --

25   A.   Yes.

Direct Examination - Cain (By Ms. Oldham)

1    Q.  -- of the aerial that you referenced earlier?

2    A.  Yes.

3    Q.  Can you -- do you recall what your path of travel was as

4    you responded to this area depicted on the map there, A-33?

5    A.  Yes.  I came across Cold Spring -- well, down York Road,

6    across Cold Spring Lane, all the way across Cold Spring Lane.

7    I actually have to pass the district station house, which sits

8    in the 2200 block of Cold Spring Lane.  You have to go up

9    towards Greenspring Avenue, make the right on Greenspring, go

10   up Greenspring, you turn left on Woodland, and then I forgot

11   the little -- I think it's Nurton Avenue, and then Rosalind

12   Avenue kind of sits -- it's like a little small --

13   Q.  Can you look right there on A-33 and see if your last path

14   of travel is depicted there on A-33?

15   A.  Yes.

16   Q.  Can you show us?

17   A.  Oh, I'm sorry.  May I stand up?

18          THE COURT:  You can mark it on -- I'm sorry, are you

19   asking him --

20   Q.  (BY MS. OLDHAM)  If you touch the screen, I think it will

21   actually trace your finger path.

22   A.  Okay.  So coming from this way, this is actually Woodland

23   Avenue, and coming -- I come off of Woodland, come down, then

24   you make the left turn -- I'm sorry, the right turn on

25   Rosalind, and this is where I ended up, where the actual

1    incident occurred.

2    Q.  Were you in an unmarked, or marked police vehicle?

3    A.  I was in a marked police vehicle.

4    Q.  Do you recall if you arrived there with lights and sirens

5    on?

6    A.  Yes.

7    Q.  Okay.  And what was your approximate time of arrival?

8    A.  I believe around 7:20 a.m. in the morning.

9    Q.  And Officer Cain, I'm going to show you, in preparation

10   for your testimony today, did you previously review footage

11   from closed-circuit television surveillance camera in the area

12   that actually depicted your vehicle arriving on scene?

13   A.  Yes.

14           MS. OLDHAM:  And Your Honor, at this time I would

15   ask to play for Officer Cain a portion of V-1, subject to

16   later testimony where we will link up the entire video

17   footage, but at this point, I'm just looking to play a portion

18   of the one for Officer Cain.

19           THE COURT:  All right.  Very well.

20   Q.  (BY MS. OLDHAM)  Officer Cain, if you can just indicate to

21   us as you see the video footage come up and it starts to play,

22   when it is that you see your vehicle arriving to that area.

23   A.  Uh-huh.

24           (Video played.)

25   A.  That's my car actually coming up to the scene.  This is

Direct Examination - Cain (By Ms. Oldham)

1    Nurton, still going up Nurton, and this is when you make the

2    right turn onto Rosalind Avenue, that's actually Rosalind.

3    Q.  (BY MS. OLDHAM)  And was that -- were you the first

4    officer to arrive on scene?

5    A.  Yes.

6    Q.  Were you considered to be the primary patrol officer on

7    scene?

8    A.  Yes, normally per policy, if you're the first unit on the

9    crime scene, you take the incident, and you basically give

10   direction as to what needs to happen while you're there.  And

11   you also write the primary incident report.

12   Q.  When you first arrived, give us an idea of where you

13   parked your police vehicle.

14   A.  I believe I parked -- I think I parked right in the middle

15   of the street, because as soon as I got there, I don't

16   remember if -- I think there was some people in the street,

17   and I kind of got out to see what was going on.  And when I

18   got up there, that's when I saw the victim laying in the

19   gutter, I believe it was in front of 1929 -- excuse me, 2919

20   Rosalind Avenue.

21   Q.  Let me pull up and show you what we have marked as

22   Government's Exhibit A-8.  Do you recognize the area depicted

23   in A-8?

24   A.  Yes.

25   Q.  Tell us what we're looking at in A-8.

Direct Examination - Cain (By Ms. Oldham)

1   A.  This is the 2900 block of Rosalind Avenue.  This is

2   actually the gold Honda -- excuse me, the gold Nissan Altima

3   that the young lady was laying behind -- I'm sorry, the victim

4   was laying behind.

5   Q.  If you touch the screen, then it will actually highlight

6   what you're pointing at.

7   A.  I'm actually pointing right here.

8   Q.  Okay.

9   A.  This is the area where the young lady -- excuse me, the

10  victim was laying.

11  Q.  And showing you A-9.

12  A.  This picture here, that's actually me standing in front of

13  the car.  I think this is my -- this here is the same 2900

14  block of Rosalind Avenue in the -- right here, behind here is

15  where the victim was laying.

16  Q.  Okay.  And you indicated that when you arrived she was

17  still laying there behind that vehicle?

18  A.  Yes.

19  Q.  Did you make contact with anyone?

20  A.  I believe I spoke with her mother, that's how I got the

21  name of the victim at this crime scene.

22  Q.  And do you recall her -- the victim's mother's demeanor?

23  A.  Not offhand.  Not offhand at the moment.

24  Q.  Okay.  Did you make contact with anyone else other than

25  the victim's mother?

Direct Examination - Cain (By Ms. Oldham)

1   A.  I don't recall at this moment if I made any other contact

2   with anybody but the victim's mother.

3   Q.  What was your primary task then?  As you responded, you

4   have contact with the victim's mother, the victim is lying

5   there, tell me what you do as the primary officer.

6   A.  First thing we do is render aid, which means we call for

7   the Baltimore City Fire Department to come and do what's

8   necessary to rush the victim to the hospital to get them there

9   to get immediate medical attention.  I also call other

10  responding units to the area to assist me with controlling the

11  crime scene, putting up crime scene tape, doing the

12  door-to-door canvass, trying to get any other evidence that we

13  can find in regards to the incident.

14  Q.  Tell me what specific observations you made of the victim

15  as you found her.

16  A.  Well, she was laying in a pool of blood.  And if I can

17  remember correctly, she was laying over some -- like a set of

18  car keys, I think there was some car keys that she was either

19  holding on to or either laying on top of.

20  Q.  Did she appear to still be breathing?

21  A.  She did appear to still be breathing at that time.

22  Q.  About how long did it take for the medics to arrive to

23  tend to --

24  A.  Not long, not even maybe two to three minutes.

25  Q.  Okay.  Now, in the photograph that's still depicted, A-9,

Direct Examination - Cain (By Ms. Oldham)

1    is that crime scene tape that's going across?

2    A.  Yes, the yellow tape that you see going here -- excuse me,

3    my Crayola -- it's the crime scene tape.

4    Q.  And who put up the crime scene tape to secure the area?

5    A.  I don't remember who put the crime scene tape up at the

6    time of the incident, I don't remember specifically what

7    officer.

8    Q.  Would it have been someone that you directed to secure the

9    scene?

10   A.  Yes.

11   Q.  In addition to the crime scene tape that we see going

12   across A-9, where else would you have directed officers to

13   place crime scene tape up?

14   A.  About maybe -- there's also crime scene tape here -- I'm

15   sorry, behind these trees, and a little bit further down

16   towards the other end of the block.

17   Q.  To go across Rosalind?

18   A.  Yes.

19   Q.  Okay.  I'm showing you what we have marked as A-10,

20   Government's Exhibit A-10.  And Officer Cain, is this another

21   close-up version of the Nissan that you referred to?

22   A.  Yes.

23   Q.  And then the area behind the Nissan where the victim was

24   laying?

25   A.  Yes.

1    Q.  And also, looking at A-12, Government's A-12, another view

2    of that particular area.  Now, other than securing the scene,

3    Officer Cain, and making contact with the mother, calling for

4    emergency assistance, what other task did you do as the

5    primary police officer on scene?

6    A.  Direct people to do door-to-door canvasses to see if

7    anyone heard or saw anything relative to the incident.

8    Q.  Were those patrol officers that you directed to do a

9    canvass of the neighborhood?

10   A.  Yes, I believe Officer Gilmore did a door-to-door canvass,

11   I think Officer Lester followed the victim to Sinai Hospital.

12   And Officer Fleming, I believe, transported her mother to

13   headquarters to speak with the homicide detectives.

14   Q.  And was Sinai Hospital where Ms. Ashburne was pronounced

15   dead?

16   A.  Yes.

17   Q.  In addition to the patrol officers that responded to

18   assist you, at some point did homicide detectives or

19   detectives from the Baltimore City Police Department arrive?

20   A.  Yes.

21   Q.  And would you have briefed them on the information that

22   was gathered --

23   A.  Yes.

24   Q.  -- at the time?

25   A.  Yes.

Direct Examination - Cain (By Ms. Oldham)

1    Q.  At some point, is the investigation passed off from the

2    primary patrol officer to the detectives?

3    A.  Yes, when the homicide detectives come to the scene, they

4    assume control of the entire investigation.  At this point, I

5    go down to the homicide office where I type the incident

6    report.

7    Q.  At some point while you were still on scene, did a crime

8    scene technician respond to photograph and process the area?

9    A.  Yes.

10   Q.  And so the photographs that we've shown you, the few that

11   I've shown you, those were not taken by you, they were taken

12   by a crime scene technician?

13   A.  Yes.

14   Q.  And do you brief the crime scene technician as well to

15   give him or her an idea of where to photograph and process?

16   A.  Yes.  And also while -- when the homicide detectives come

17   up too, they also brief them on where they need to, you know,

18   photograph or collect evidence.

19   Q.  Did you participate in the search of any physical evidence

20   in the area?

21   A.  No, ma'am.

22   Q.  Did you -- you mentioned seeing keys near the victim's

23   body --

24   A.  Yes.

25   Q.  -- as she was laying there, do you recall looking for

Direct Examination - Cain (By Ms. Oldham)

1    anything else in the immediate area?

2    A.  Yes, generally in the immediate area, we try to look for

3    any ballistics evidence, such as projectiles or shell casings,

4    which from my knowledge, none was present during my initial

5    look.

6    Q.  And anything that you did see, for example, like the keys,

7    would you have recovered that yourself?

8    A.  No, ma'am, we leave the keys right there.

9    Q.  For the crime scene technician?

10   A.  Yes.

11   Q.  Okay.  I don't think I've shown you yet A-12 -- lastly,

12   Officer Cain, during all of these times, from the time that

13   you hear the call and you start responding, are you

14   participating in police communications?

15   A.  Yes.

16   Q.  Is this over the official police radio?

17   A.  Yes.

18   Q.  And during those police communications, you're able to

19   communicate with a dispatcher?

20   A.  Yes.  Yes, ma'am.

21   Q.  How about with fellow officers?

22   A.  Yes, ma'am.

23   Q.  In preparation for today's testimony, did you have an

24   opportunity to review the recording of the police

25   communications starting from the time that you were responding

1    to the time that you concluded there?

2    A.  Yes, ma'am.

3              MS. OLDHAM:  Your Honor, at this time I would ask to

4    play A-3.

5              THE COURT:  All right.  Very well.

6              MS. OLDHAM:  While we're loading that, Officer Cain,

7    and also while it's playing, and for the record, Your Honor,

8    the government will be showing on the DOOR machine, A-3A,

9    which is a transcript to aid while listening to the actual

10   recording.

11             THE COURT:  All right.  Very well.  Weather and

12   technology are often the two things we can't control.

13             I'll just remind you again, the transcripts aren't

14   evidence, so make sure you're listening carefully.  You won't

15   have the transcripts with you when you go to deliberate, so

16   you need to listen carefully and take notes as necessary.

17             (Audio played.)

18             MS. WILKINSON:  We have all kinds of backups, Your

19   Honor, so hang in there with us.  I'm sorry.

20             MS. OLDHAM:  Your Honor, the government -- as far as

21   questions for Officer Cain, that's all the questions that we

22   had other than playing this exhibit, which we can certainly

23   fix our technical difficulties overnight and simply play it,

24   if that's okay with counsel, play it in the morning.

25             THE COURT:  That's fine.  Do you want to have

1   counsel -- are you asking to break now, or suggesting that we

2   go to cross, and then just play the --

3           MS. OLDHAM:  It's simply up to the Court and counsel

4   if you want to go ahead and work in the cross-examination

5   before we break, but I certainly don't want to hold up the

6   Court's time with --

7           THE COURT:  We only have ten minutes, I don't know

8   if counsel wants to cross now, or just wait until tomorrow

9   after we've been able to play the tape.

10          MR. ZERKIN:  I think after, Judge.

11          THE COURT:  That's fine.  We'll go ahead and break

12  now.  I did check the weather this morning, I don't think it's

13  snowing now.  I suspect we're just being really cautious, so

14  that's why I wasn't rushing us out of here.  But since it does

15  seem like a good breaking point, we'll break now.

16          Ladies and gentlemen, I will advise you again,

17  please don't discuss this case with anyone overnight.  And

18  we'll see you tomorrow, hopefully at 9:30.  Ms. Smith, if she

19  hasn't already, can give you information, a number to call

20  just to find out whether we're open tomorrow.

21          Again, I'm not a weatherman, I don't know how bad

22  it's supposed to be.  I know we usually make the decision

23  fairly early in the morning, because some people, including

24  myself, are commuting from a distance.  So if you call early

25  in the morning, you should know whether or not we're open.

1          So enjoy your evening, get home safe.  I'll see you

2    tomorrow at 9:30.

3          (Jury left the courtroom.)

4          THE COURT:  All right.  Be seated, unless you're

5    addressing the Court.

6          So yes, can't control weather.

7          MS. WILKINSON:  Your Honor, may we let Officer Cain

8    go?

9          THE COURT:  Yes, Officer, you may go.  I assume we

10   will see you back here -- not assume, I'm telling you, we will

11   see you back here tomorrow at 9:30.

12         THE WITNESS:  Yes, Your Honor.

13         THE COURT:  Look, can't control weather, I know it

14   throws things off.  So I'll give you the same instruction, I

15   know there's a number you can call.  The decision, I think, is

16   usually made by 6:30, whether or not we're going to open or

17   not.  Assuming we're open, I'll see you all at 9:30, unless

18   there are other things you need to discuss today.

19         All right.  Everyone get home safe.  I'll see you

20   tomorrow morning.

21         (The proceedings were concluded.)

22         I, Christine Asif, RPR, FCRR, do hereby certify that
     the foregoing is a correct transcript from the stenographic
23   record of proceedings in the above-entitled matter.

24         _____/s/_____
                   Christine T. Asif
25               Official Court Reporter

1                                    INDEX

2                                                                    Page

3        Opening Statement by Ms. Wilkinson ........................ 12

4        Opening Statement by Mr. Zerkin............................ 43

5        Opening Statement by Mr. Trainor ...................... 49

6    Witness Name

7    Aquana Q. Murray

8        Direct Examination By Ms. Wilkinson ...................... 58

9        Cross-examination By Mr. Davis ........................... 84

10   Officer Aaron M. Cain

11       Direct Examination By Ms. Oldham.......................... 92

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

< Dates >.
January 7th, 2020
  1:19.
June 1 44:20.
June 1st 19:17,
  22:12, 31:1,
  32:23, 39:22,
  39:25.
May 16th 36:3.
May 25th 36:10.
May 26 63:1.
May 27 26:12.
May 27th 15:15,
  16:1, 16:16, 17:1,
  17:21, 18:2, 27:9,
  37:4, 38:15,
  61:12, 61:14,
  84:13, 85:6.
May 27th, 2016
  12:17, 17:18,
  28:24, 29:16,
  62:7, 93:24.
May 4th 25:23,
  35:20, 35:24,
  53:10.
May 6th 35:23.
$100,000 23:14.
.
.
< 0 >.
00-ish 63:5.
.
.
< 1 >.
1 39:9.
1. 14:15, 19:19.
101 1:48.
10:00 31:13,
  93:22.
11:00 93:13.
11:30. 56:1.
12 108:5.
12:00 72:17.
12:05 72:18.
15 55:24, 55:25,
  56:6, 56:21,
  61:24.
1533 34:4.
1533. 31:11.
19 93:4.

1929 98:19.
1:00 72:12, 72:16.
.
.
< 2 >.
2 19:19, 95:5.
20 86:1, 86:9.
200 87:21.
2009 59:5.
2013 42:14.
2013. 22:25.
2014 23:3.
2015 25:11.
2016 16:16, 18:2,
  19:17, 25:11,
  25:24, 33:18,
  53:15, 59:15,
  59:16, 59:19,
  61:3, 79:19,
  93:17, 93:19.
2016. 14:11, 15:15,
  26:12, 38:2,
  39:17, 41:9,
  53:2.
2018. 4:16.
21201 1:49.
22 95:11.
2200 96:8.
2399 26:24, 29:3,
  32:8.
2650 29:5, 31:7,
  31:9.
28th 18:5.
2900 94:2, 94:7,
  94:14, 95:17,
  99:1, 99:13.
2919 15:18, 42:9,
  98:19.
2922 59:20.
29th 18:5.
.
.
< 3 >.
3 95:2.
3. 20:16.
30 92:2.
30th 18:5.
.
.
< 4 >.

4 39:9.
41 13:21, 89:25.
43 108:7.
49 108:9.
4th 1:48, 53:2.
.
.
< 5 >.
5'3" 71:16, 71:18.
5'9" 71:18, 71:21.
58 108:15.
.
.
< 6 >.
6 71:18, 71:21,
  85:3, 87:17.
600 25:18.
6300 95:12.
6796 77:6.
6:00 31:24.
6:30 107:16.
.
.
< 7 >.
700 25:18.
7626 27:7, 30:10,
  30:15, 30:24,
  31:24.
7: 63:5.
7:00 93:13.
7:10 63:5.
7:15 12:17.
7:20 81:10, 97:8.
7:35 15:21.
.
.
< 8 >.
8 14:12.
800 25:18.
84 108:17.
8:00 93:22.
.
.
< 9 >.
911 12:25, 36:15,
  65:24, 66:5, 66:7,
  70:3, 79:2.
92 108:21.
9:20 32:18.
9:30 107:11,

107:17.
9:30. 106:18,
  107:2.
9mm 48:8.
_____/s/_____
  _____ 107:26.
.
.
< A >.
A-10 101:19,
  101:20.
A-12 102:1,
  104:11.
A-3 105:4.
A-33 95:19, 95:21,
  95:22, 96:4,
  96:13, 96:14.
A-3A 105:8.
A-41 73:5, 73:12,
  89:10.
A-42 75:12.
A-43 76:20, 77:10,
  86:11.
A-44 77:19.
A-45 77:10.
A-8 98:22, 98:23,
  98:25.
A-9 99:11, 100:25,
  101:12.
A-a-r-o-n 92:18.
a-ha 46:25.
A-q-u-a-n-a 58:13.
a.m. 15:21, 81:10,
  93:13, 93:22,
  97:8.
A2 66:20.
Aaron 92:5, 92:9,
  92:17, 108:19.
abetted 41:1.
ability 30:17,
  51:5.
able 20:6, 25:6,
  30:15, 50:22,
  62:4, 72:5, 74:10,
  75:24, 79:8,
  104:18, 106:9.
above-entitled
  107:24.
abrupt 28:16.
absence 53:25.

Absolutely 30:2,
  34:24.
abundantly 21:5,
  28:13.
accept 8:15,
  57:25.
accidental 20:1.
accuracy 44:7.
accurate 5:4, 52:16,
  84:14, 86:2.
accusation 8:22.
across 60:20, 64:8,
  74:7, 79:24, 96:5,
  96:6, 101:1,
  101:12, 101:17.
act 40:24.
activities 41:9.
activity 45:2,
  63:18.
actual 40:21, 40:24,
  41:3, 59:18,
  69:12, 96:25,
  105:9.
add 4:13.
addict 44:5.
addiction 44:18.
addition 39:18,
  82:4, 101:11,
  102:17.
additional 4:19,
  51:12.
address 2:5, 2:14,
  4:23, 59:18.
addressing 56:10,
  107:5.
adjust 58:11,
  92:15.
admits 34:14.
advantage 10:4.
advise 106:16.
aerial 14:5, 96:1.
aerials 80:8.
afternoon 84:10,
  92:7.
afterwards 30:16.
Agent 15:22, 16:23,
  16:24, 20:2, 20:3,
  30:20, 32:5,
  88:13, 89:1,
  89:4.

agents 16:3, 16:23,
  19:23, 20:11,
  22:17, 23:17,
  24:13, 26:8.
agree 7:3, 7:10,
  89:12.
agreed 57:20,
  57:24.
agreement 39:11.
agrees 46:9.
ahead 75:13, 77:2,
  106:4, 106:11.
aid 100:6, 105:9.
aided 41:1.
alert 51:6.
alerted 83:20.
alibi 3:24, 3:25,
  4:2, 4:9, 4:25.
alleyway 69:22.
allotment 95:7.
allowed 46:21.
almost 15:3.
alone 7:1, 28:19.
already 15:6, 22:3,
  28:12, 106:19.
Although 39:24.
Altima 99:2.
ambulance 13:4,
  13:11.
AMERICA 1:5.
among 56:4.
amount 19:15, 45:18,
  85:13.
Analysis 28:5,
  28:6.
Andre 21:23, 21:25,
  22:2, 22:5.
anew 17:1.
angle 74:25,
  75:13.
angles 37:12.
ankle 25:13.
answer 7:20.
anxious 21:7.
anybody 52:18,
  53:20, 54:16,
  54:17, 55:5,
  62:15, 64:10,
  100:2.
anyway 64:13.

apartment 14:2,
   18:18, 18:24,
   37:12, 60:3,
   81:6.
apologize 55:19,
   88:2.
apparent 27:14.
apparently 72:12.
appear 64:10, 78:18,
   78:21, 100:20,
   100:21.
appearance 28:19.
appeared 66:16.
appears 67:1.
applies 49:18.
Apply 4:10, 7:2,
   38:11, 42:19,
   51:8, 55:14.
appointed 43:13.
appreciate 73:3.
approach 55:17,
   83:10.
appropriate 57:22.
approximate 97:7.
approximately 46:9,
   63:2, 74:5, 89:11,
   95:16.
Aquana 58:2, 58:5,
   58:13, 108:13.
Arbor 18:19, 19:21,
   31:23.
argument 2:10,
   11:24.
arguments 7:14,
   12:6.
arm 14:20.
around 14:9, 28:8,
   31:24, 51:14,
   65:6, 65:13,
   65:15, 65:16,
   65:19, 67:24,
   67:25, 78:25,
   82:16, 97:8.
arrangements
   28:20.
arrest 38:20, 46:6,
   46:7.
arrested 46:4, 47:9,
   47:10, 53:2.
arrival 97:7.

arrive 18:22, 98:4,
   100:22, 102:19.
arrived 13:4, 13:5,
   13:7, 19:24,
   20:21, 68:16,
   97:4, 98:12,
   99:16.
arrives 20:2.
arriving 9:4, 31:19,
   97:12, 97:22.
articulated 15:25.
Asif 1:46, 107:22,
   107:27.
assets 52:7.
assigned 93:18,
   95:5.
assignment 93:8,
   93:10, 93:17.
assist 19:24,
   100:10, 102:18.
assistance 102:4.
associate 16:15,
   25:18.
associated 19:4.
associates 34:19.
assume 5:10, 103:4,
   107:9, 107:10.
assumes 46:5.
Assuming 107:17.
attached 47:22.
attention 11:4,
   15:15, 48:19,
   59:14, 62:6,
   62:10, 63:22,
   63:23, 64:13,
   75:17, 78:6,
   88:18, 88:24,
   89:5, 90:20,
   93:16, 93:23,
   100:9.
attorneys 6:11,
   11:22, 12:6.
Audi 29:11, 29:12,
   29:14, 29:16,
   33:3, 33:8, 33:15,
   33:16, 33:18,
   34:5, 36:4, 36:7,
   53:14, 55:6.
Audio 20:21, 66:22,
   68:14, 105:17.

Audis 53:8.
AUSA 1:25, 1:27.
automobile 53:13,
   55:4.
automobiles 53:7,
   54:3, 54:7.
available 17:9,
   24:22.
awards 63:13,
   63:15.
aware 10:18.
away 13:11, 49:21,
   62:2, 65:11,
   67:24, 78:6,
   89:17.
.
.
< B >.
B. 1:39.
background 50:18,
   51:3, 67:9,
   67:11.
backups 105:18.
bad 106:21.
bag 45:15.
ballistics 104:3.
Bardos 2:6, 2:7,
   2:8, 3:19.
Based 9:10, 44:16,
   87:6, 87:7,
   87:10.
basic 2:25, 8:19,
   40:6.
basically 98:9.
basis 52:5.
Beach 21:10, 21:15,
   21:23, 22:1, 22:3,
   22:5, 27:23, 28:1,
   28:3, 28:8, 28:12,
   28:14, 28:16,
   28:19, 32:20,
   37:22, 53:17.
Bear 9:7.
became 17:9, 25:1,
   27:3, 94:11.
become 10:17, 27:14,
   27:20, 29:1.
before-care 63:4,
   63:13, 63:16.
began 13:25.

begin 9:23, 11:8, 11:19.
beginning 18:1, 18:4, 55:19.
behind 14:12, 55:7, 89:11, 94:21, 99:3, 99:4, 99:14, 99:17, 101:15, 101:23.
beige 73:17.
belief 15:25, 17:5, 28:11.
believe 5:1, 7:17, 8:14, 27:21, 37:25, 41:14, 50:22, 50:23, 76:5, 97:8, 98:14, 98:19, 99:20, 102:10, 102:12.
belong 34:11.
belonging 29:8.
belongs 20:7.
below 31:6.
Bench 83:13.
best 79:10.
better 15:8.
beyond 9:7, 42:6, 43:20, 50:13, 54:14.
bias 38:21.
big 27:25, 47:2.
bike 53:18.
billing 23:13.
birthday 18:10.
bit 3:22, 13:5, 20:14, 38:3, 56:1, 65:5, 67:24, 101:15.
black 18:24, 20:4, 20:7, 20:11, 23:2, 32:22, 33:15.
Blackberry 10:12.
block 69:23, 94:2, 94:7, 94:14, 95:12, 95:17, 96:8, 99:1, 99:14, 101:16.
blog 10:13.
blogs 9:16.
blood 13:11, 77:25,

78:10, 100:16.
blow 41:17, 41:18.
blower 15:24, 23:20.
blue 14:14, 14:24, 43:13, 87:15, 90:17.
BMW 18:25, 19:2, 19:10, 19:14, 20:4, 20:7, 20:11, 29:7, 29:9, 32:22, 32:23, 33:3, 33:11, 33:16, 53:8.
body 13:10, 78:9, 78:10, 103:23.
boom 36:21.
boring 25:16.
bottom 75:14, 77:19.
bought 53:8.
boundaries 95:3.
BPD 30:12.
bracelet 25:13.
brakes 27:22.
break 5:10, 55:22, 57:16, 106:1, 106:5, 106:11, 106:15.
breaking 106:15.
breaks 55:23.
breathing 67:21, 100:20, 100:21.
brief 15:6, 43:14, 57:16, 71:4, 103:14, 103:17.
briefed 102:21.
briefly 2:5, 3:12, 70:22.
brighten 41:20.
bring 18:11, 44:6, 47:5, 47:6, 57:7.
brings 38:13.
broke 34:16.
brother 22:2.
brought 8:21, 46:22.
building 81:6.
burden 8:25, 9:2,

43:19, 43:23, 50:9, 50:11.
burner 27:1, 27:10, 32:15, 36:9.
business 32:10, 33:6.
button 85:21.
.
.
< C >.
C-a-i-n 92:19.
Cain 92:5, 92:9, 92:19, 92:23, 92:25, 93:23, 94:23, 97:9, 97:15, 97:18, 97:20, 101:20, 102:3, 104:12, 105:6, 105:21, 107:7, 108:19.
calculation 25:24.
calendar 3:15.
called 13:1, 14:15, 15:21, 18:19, 22:24, 25:13, 28:4, 30:17, 50:12, 53:11, 58:6, 70:3, 79:2, 92:10.
caller 13:1, 36:15.
calling 102:3.
calls 26:5, 29:18, 29:21, 30:1, 30:3, 36:7, 47:17.
calm 59:25.
Camera 14:12, 33:21, 97:11.
cameras 14:2, 14:8, 33:9, 33:10, 34:6, 37:12.
canvass 100:12, 102:9, 102:10.
canvasses 102:6.
canvassing 13:25, 14:9.
captured 14:12, 31:16.
captures 14:3.
care 22:23, 23:5,

23:19, 24:23, 25:4, 25:7, 25:10, 34:15, 34:16, 53:11.
careful 3:6, 49:17.
carefully 11:14, 38:16, 54:5, 105:14, 105:16.
carjacking 13:19, 36:20.
carried 42:3.
carry 50:12, 70:7.
cars 21:11, 21:13, 31:16, 31:17, 31:19, 33:16, 34:7, 34:21, 52:7, 53:9, 53:10, 54:8.
cases 3:17, 37:5.
cash 19:15.
casings 104:3.
CAST 28:4, 32:5.
caught 32:13.
cautious 106:13.
cell 10:2, 10:12, 26:20, 28:24, 31:7, 31:10, 31:15, 32:20, 34:7, 37:6, 46:3, 46:8, 46:22, 53:23, 66:8.
Cellebrite 30:17.
Cellular 28:5, 32:5.
center 52:19, 95:13.
ceremony 63:14, 63:15.
Certain 7:12, 14:3.
Certainly 3:1, 5:12, 19:21, 50:18, 51:1, 105:22, 106:5.
certify 107:22.
chair 11:11, 58:10.
chance 3:9, 35:2.
change 94:6,

95:15.
changed 28:19.
changes 95:3.
characteristics 54:4, 54:10.
characterization 89:4.
charged 24:24, 26:3, 39:10, 40:25, 47:12, 48:2, 48:5.
charges 19:25, 25:7, 25:11, 35:22, 39:1, 39:8, 39:18, 39:19, 39:20, 40:6, 40:21, 41:8.
chase 65:6.
chasing 63:21.
check 106:12.
checking 83:5.
children 59:12.
choose 11:13, 12:3, 12:4.
Chris 43:12.
Christine 1:46, 107:22, 107:27.
Christopher 1:33.
chronology 35:17.
circle 14:14, 14:24, 73:23, 76:25.
circles 14:7.
circling 33:4.
circumstances 46:16, 46:19, 47:5.
Circumstantial 8:6, 8:8, 36:14.
City 45:24, 46:1, 46:21, 58:21, 58:23, 61:4, 80:23, 93:1, 93:3, 93:6, 93:9, 100:7, 102:19.
civil 9:8.
Clarence 88:13.
clarify 76:17.
class 54:3, 54:10.
clean 8:24.
cleanly 44:2.
clear 4:6, 21:5,

27:20, 28:13, 31:17, 44:13, 52:10, 67:2, 68:4, 75:14, 77:19.
clearer 41:21, 41:22.
clearly 17:6, 34:1, 44:2.
CLERK 6:14, 6:18, 6:21, 49:6, 58:3, 58:9, 92:7, 92:13, 92:15, 92:20.
cliche 17:14.
clients 7:16.
Cliff 29:3, 29:5, 34:4, 50:3, 52:1, 52:5, 52:11, 52:17, 52:21, 53:14, 54:15.
Clifton 1:10, 1:35, 29:15, 49:11, 51:14.
clocked 87:20.
close 4:1, 15:15, 25:18, 34:17, 43:2, 51:19, 51:24, 64:9, 67:23, 79:17, 82:15.
close-up 101:21.
closed 56:9, 75:23, 76:2, 77:2.
closed-circuit 97:11.
closer 14:18.
closest 16:15, 34:18.
closing 12:6, 72:12, 72:16.
Clue 14:15, 15:14, 16:11, 19:19, 20:10, 20:16, 29:8, 32:21.
clues 14:10, 16:2, 17:4.
coded 30:6.
Cold 94:17, 95:12, 96:5, 96:6, 96:8.
colleague 16:23.

collect 103:18.
collective 16:8.
color 71:10.
comes 15:7, 15:12,
 57:8.
comfortable 2:17.
coming 13:20, 14:13,
 18:24, 24:10,
 34:7, 35:15,
 96:22, 96:23,
 97:25.
commercial 82:25.
committed 43:21.
common 38:11, 42:19,
 47:6, 51:8.
communicate 10:8,
 10:11, 104:19.
communication
 31:13.
communications
 30:23, 104:14,
 104:18, 104:25.
community 82:9,
 82:10, 82:12,
 82:23, 94:18.
commute 61:23.
commuting 106:24.
company 22:24, 23:6,
 23:9, 23:24,
 47:18, 47:19,
 47:20, 47:21,
 47:22.
comparing 54:2.
comparison 48:13,
 54:6.
compilation 37:10.
completed 91:19.
completely 51:5,
 52:15, 79:3.
complex 14:2.
concepts 40:22.
concerns 47:1.
conclude 8:10.
concluded 105:1.
concluded. 107:21.
conclusion 54:14.
conduct 9:9, 9:12.
conference 83:13.
confess 34:23.
confirm 32:20.

connected 20:20.
connection 18:13,
 19:20, 20:18,
 23:4, 26:19,
 27:16, 28:22,
 32:4, 36:25,
 37:15, 38:23,
 40:25, 42:11,
 42:18, 60:18,
 70:17.
connections 25:19.
consider 8:12, 47:7,
 50:17, 50:18,
 55:2.
consideration
 49:19.
considered 7:13,
 7:25, 98:6.
considering 9:5,
 11:7.
consist 7:8.
conspiracy 39:10,
 39:12, 39:13,
 39:18, 40:20,
 41:2, 41:4.
consult 9:15.
contact 3:19, 27:16,
 34:4, 34:19,
 35:25, 36:1,
 99:19, 99:24,
 100:1, 100:4,
 102:3.
contacted 15:21.
contacts 31:3, 31:5,
 36:10.
contents 30:18.
contested 45:19.
context 18:8, 30:21,
 35:14, 35:18,
 38:14, 38:25,
 46:16, 67:16.
contraband 20:12.
control 103:4,
 105:12, 107:6,
 107:13.
controlling
 100:10.
conversation 36:8.
conversations 30:6,
 30:7.

convicted 23:11,
 23:12, 48:1,
 48:7.
conviction 24:16.
convince 42:6.
convinced 55:17.
coordinating
 49:15.
coordination
 95:22.
copy 73:10.
corner 82:16.
Correct 2:23, 74:22,
 84:22, 84:25,
 86:14, 86:16,
 86:20, 87:11,
 88:11, 88:16,
 89:6, 89:8, 89:19,
 89:20, 90:13,
 107:23.
correctly 100:17.
corroborate 40:3.
corroboration 30:5,
 37:20, 41:10.
counsel 2:18, 3:10,
 3:20, 12:1, 12:14,
 42:24, 43:23,
 44:23, 46:14,
 46:24, 47:24,
 48:24, 49:3, 49:8,
 49:12, 72:11,
 83:15, 91:9,
 105:24, 106:1,
 106:3, 106:8.
Count 39:9, 43:20,
 54:18.
Counts 39:9,
 42:22.
County 44:23, 45:23,
 45:24.
Couple 2:3, 23:14,
 23:15, 80:19.
court. 84:7.
courthouse 91:23.
courtroom 8:1, 8:4,
 9:11, 9:20,
 11:2.
courtroom. 5:13,
 56:5, 57:13,
 107:3.

coverage 81:1.
covered 2:20, 2:24,
   81:22.
covers 95:11.
craddling 14:20.
Crawford 23:8,
   23:11, 24:5,
   47:23, 48:4.
Crayola 101:3.
credibility 8:16,
   44:15, 48:16,
   50:20, 51:7.
credit 44:14.
crimes 39:5.
CRIMINAL 1:9, 8:18,
   8:19, 9:8, 38:6.
critical 20:23,
   21:8, 22:20, 30:8,
   30:24, 33:23,
   35:1, 37:16.
Cross 3:23, 91:9,
   106:2, 106:8.
Cross-examination
   83:7, 84:8, 106:4,
   108:17.
cross-examine 12:2,
   12:4, 50:11.
cross-examining
   56:12.
crow 51:21.
crowd 67:23, 67:25,
   68:5.
cryptic 30:6.
cuffed 46:20.
curb 12:21.
current 93:8,
   93:10.
custody 19:16.
customers 39:23,
   40:4.
cut 69:21, 69:23,
   69:25, 70:2, 79:1,
   80:6, 80:14,
   90:8.
cynical 47:2.
.
.
< D >.
dangerous 82:23.
data 10:3.

date 18:8, 25:23.
daughter 59:13,
   59:22, 61:10,
   61:16, 61:25,
   62:11, 63:4,
   63:13, 75:25.
David 24:6, 48:5.
Davis 1:33, 4:14,
   43:12, 70:14,
   83:8, 83:9, 83:10,
   83:17, 83:22,
   84:9, 85:15,
   85:18, 91:7,
   108:17.
Davon 1:10, 1:29,
   16:12, 16:14,
   18:25, 25:17,
   29:17, 41:24,
   43:14, 47:17,
   47:19, 47:20,
   52:25.
days 20:24, 20:25,
   21:8, 22:7, 22:20,
   27:12, 27:13,
   30:13, 31:2,
   44:21.
dead 102:15.
deal 72:25.
dealer 52:6.
death 27:9, 43:18.
decide 8:2, 8:13,
   9:10, 9:18, 12:1,
   44:12, 50:21,
   50:23.
decided 32:9.
decides 15:8.
deciding 51:6.
decision 19:4,
   72:20, 106:22,
   107:15.
defend 25:6.
Defendant 1:29,
   1:35, 8:20, 8:22,
   9:1, 11:22, 16:12,
   25:6, 29:2, 29:14,
   42:24.
Defendants 1:12,
   8:24, 9:3, 9:5,
   9:6, 12:1, 12:3.
defense 2:18, 4:9,

4:10.
deliberate 9:21,
   9:23, 12:8, 20:6,
   105:15.
deliberating
   55:12.
deliberations 10:24,
   11:9.
demeanor 50:17,
   99:22.
demonstrative
   71:7.
denying 45:17.
Department 13:7,
   93:1, 93:3, 93:9,
   100:7, 102:19.
departure 28:16.
depends 11:16.
depicted 41:23,
   73:13, 94:24,
   96:4, 96:14,
   97:12, 98:22,
   100:25.
deputy 11:3.
derive 41:9.
describe 41:6,
   59:23, 60:17,
   64:22, 65:4, 70:6,
   72:5, 73:19,
   94:14.
described 44:24.
descriptor 75:1.
desire 17:23,
   24:20.
detail 35:10,
   65:5.
detailed 11:4.
details 48:17.
detained 26:4,
   46:7.
detains 35:23.
detect 27:10.
Detective 19:8,
   20:2, 45:7,
   45:9.
detectives 13:6,
   18:16, 23:18,
   26:10, 27:21,
   80:23, 84:21,
   102:13, 102:18,

102:19, 103:2,
103:3, 103:16.
detention 26:1.
determine 32:25,
44:15.
determining 8:16.
devices 10:3.
diagonal 64:9.
dictionaries 9:15.
died 12:23.
difference 40:20.
different 9:8,
30:20, 36:11,
37:3, 53:3,
67:4.
difficult 11:3,
41:5, 41:6.
difficulties
105:23.
digits 26:21.
dire 49:22.
Direct 8:5, 8:6,
8:7, 13:24, 36:14,
36:15, 42:5,
58:15, 59:14,
62:6, 92:21,
93:23, 102:6,
108:15, 108:21.
directed 78:25,
101:8, 101:12,
102:8.
directing 62:10,
93:16.
direction 56:16,
69:20, 90:9,
98:10.
directly 52:21.
dirty 32:19.
discontent 24:17.
discovery 4:16,
25:4.
discuss 3:10, 9:21,
9:24, 11:8, 56:3,
91:18, 106:17,
107:18.
discussing 9:23.
dispatcher 104:19.
dispute 34:17,
52:15, 52:16,
52:17.

disregard 7:25.
disregarded 8:2.
distance 44:23,
106:24.
distinguishing
42:1.
distorted 41:19.
distribute 53:6.
distribution 53:4,
54:18.
District 1:1, 1:2,
93:11, 93:18,
95:2, 95:14,
96:7.
disturbance 36:21.
divided 39:5.
DNA 13:13, 48:12,
53:25, 54:1.
document 4:16.
documents 7:8.
dodge 65:18.
doing 5:17, 19:17,
22:10, 22:11,
26:9, 40:24,
44:25, 45:9,
45:10, 71:2,
100:11.
dollars 23:15.
domestic 36:21.
done 2:25, 40:17,
46:20, 75:18.
DOOR 12:20, 15:20,
52:14, 56:9,
105:8.
door-to-door 100:12,
102:6, 102:10.
doors 15:16, 67:19,
80:18, 80:19,
80:20.
doubt 9:7, 22:10,
28:10, 29:12,
42:6, 43:21, 44:7,
48:11, 50:13,
54:14.
draw 63:23, 64:13,
75:16, 78:6.
dress 87:11,
87:13.
dressed 63:17,
87:7.

drive 52:8, 53:17,
62:1, 62:17,
75:24.
driven 55:5.
driver 18:17, 19:9,
23:5, 31:18,
31:19, 55:5,
74:18, 74:20,
75:8, 77:14.
drives 34:5,
44:23.
driving 20:5, 20:8,
29:14, 29:15,
32:24, 36:5, 45:1,
45:4, 53:14.
drop 13:13, 63:16.
dropped 21:9, 21:13,
27:21, 63:13.
dropping 75:25.
drove 4:7, 4:8,
33:17.
drug 27:2, 39:6,
39:20, 41:8,
44:18, 52:6.
drugs 39:21.
duffel 45:15.
duly 58:6, 92:10.
dumb 29:23.
duration 36:2.
During 7:4, 9:12,
10:6, 10:25, 18:9,
24:7, 25:3, 30:19,
40:2, 43:11,
49:22, 51:22,
85:5, 86:4, 104:4,
104:12, 104:18.
duty 6:25, 38:4,
38:8, 38:9, 38:24,
42:19.
.
< E >.
e-mail 10:12.
earlier 33:9, 49:22,
50:21, 69:3,
96:1.
early 62:10, 63:5,
94:1, 106:23,
106:24.
easier 76:25.

Eastern 93:11.
easy 18:3, 26:22,
　84:20.
Edmonds 47:19.
eight 31:3, 31:5.
either 10:17, 11:25,
　34:23, 39:13,
　100:18, 100:19.
elected 49:13.
electronic 9:17,
　25:14, 25:20.
electronically
　10:8.
element 43:20.
elements 39:4.
Elma 23:7.
emergency 102:4.
employed 92:25,
　93:1.
employees 54:2.
encourage 55:11.
end 8:17, 9:1, 10:1,
　10:24, 11:10,
　11:11, 11:12,
　20:5, 50:14,
　55:15, 101:16.
ended 17:21,
　96:25.
ending 77:6.
enforcement 15:25,
　16:9, 30:14,
　93:5.
Enjoy 91:19,
　107:1.
enjoyed 57:15.
enough 79:17.
entered 5:13,
　57:13.
entire 10:21, 97:16,
　103:4.
entirely 43:23.
entitled 49:19.
Esquire 1:31, 1:33,
　1:37, 1:39.
essentially 23:10,
　35:21.
Establish 22:15.
estimate 71:20,
　71:22.
European 33:11.

European-type
　33:15.
evaluation 49:18.
evening 107:1.
event 13:3, 36:3,
　89:14.
events 14:3, 19:12,
　36:11, 38:14,
　42:12, 42:13,
　65:21, 83:19,
　83:25, 84:13,
　85:6, 86:6.
Eventually 18:24,
　24:3, 24:13,
　31:16, 39:16.
everybody 5:21,
　12:16, 90:6.
Everyone 5:17, 5:20,
　6:1, 57:15,
　107:19.
everything 29:25.
exactly 32:12, 64:8,
　69:22, 85:16,
　88:14.
exam 30:16.
Examination 58:15,
　92:21, 108:15,
　108:21.
examined 58:6,
　92:10.
example 37:21,
　71:10, 104:6.
excluded 7:24.
exculpatory 37:18.
excuse 8:8, 52:24,
　93:22, 98:19,
　99:2, 99:9,
　101:2.
excused 72:25,
　91:22, 91:24.
executed 23:4.
execution 36:22.
Exhibit 66:20, 72:9,
　73:5, 73:12,
　75:12, 77:10,
　77:19, 79:13,
　81:9, 86:11,
　89:10, 89:25,
　94:21, 95:19,
　98:22, 101:20,

　105:22.
exhibits 7:9,
　57:20.
exist 8:10.
exit 69:23.
exited 45:22.
exits 44:22.
expect 10:17, 51:12,
　51:13, 51:21.
expected 11:21.
experience 18:11,
　38:13, 47:6,
　93:5.
Expert 28:5, 30:16,
　32:5, 32:6.
experts 57:2.
Explain 40:20,
　40:23, 65:10.
explanation 37:24.
explanations 37:3.
extent 3:1.
extortion 24:16,
　25:12, 48:5.
extra 69:23.
eyes 16:18, 16:19,
　17:1, 69:17.
eyewitness 8:7,
　8:8.
.
.
< F >.
face 86:22, 86:23,
　86:24, 89:19,
　91:3.
Facebook 10:14.
faced 25:10.
facing 75:10,
　86:19.
fact 2:17, 8:7,
　13:2, 19:25,
　23:19, 25:8,
　30:19, 36:4, 45:5,
　46:5, 46:14,
　49:16, 57:24,
　87:5, 88:13,
　90:21.
factors 42:2.
facts 5:23, 6:25,
　7:1, 7:2, 7:7,
　7:9, 8:9, 8:10,

38:10, 57:24.
fair 50:5, 54:13,
   55:18.
fairly 36:1,
   106:23.
fairness 10:19.
false 22:6, 28:10,
   28:12, 37:18,
   37:19.
familiar 69:25,
   73:13, 79:14,
   82:5, 82:12,
   94:11, 94:24,
   95:4.
family 10:10,
   51:14.
fancy 43:15.
far 3:6, 62:2,
   80:16, 82:16,
   105:20.
farther 3:3.
fast 70:10, 70:11,
   70:20, 85:7, 86:8,
   86:9, 90:21,
   90:23.
Fats 16:5.
FBI 28:5, 30:20,
   54:2.
FCRR 1:46, 107:22.
February 23:3.
Federal 1:47, 15:21,
   15:25, 16:3,
   19:23, 22:17,
   23:17, 24:13,
   26:8, 30:14.
feel 6:2, 6:8,
   26:15.
feelings 47:5.
feet 71:7, 71:18,
   71:21, 87:17.
fell 12:22.
Fellow 9:22, 9:24,
   49:2, 49:8,
   104:21.
female 87:10.
few 9:9, 46:18,
   55:2, 65:2, 68:19,
   80:18, 80:19,
   80:20, 103:10.
figure 51:23.

figured 63:15.
files 84:24.
final 4:12.
Finally 10:22, 26:1,
   46:10, 54:23.
find 6:25, 7:7,
   7:11, 9:19, 16:14,
   18:16, 18:18,
   18:20, 20:13,
   25:3, 28:25, 29:1,
   32:17, 32:25,
   34:5, 45:21,
   48:21, 51:1,
   54:13, 100:13,
   106:20.
fine 5:3, 84:4,
   105:25, 106:11.
finger 96:21.
fingerprints
   13:13.
fingers 79:16.
finish 6:9, 68:3.
finished 94:1.
Fire 100:7.
fit 17:4, 87:21.
five 44:21, 46:3,
   46:8, 46:22, 53:5,
   58:24, 82:3,
   89:11, 95:18.
fix 105:23.
fixed 21:9, 27:22.
fixing 21:11,
   21:13.
flag 6:8.
Fleming 102:12.
flies 51:21.
Floor 1:48.
focus 78:16, 88:2,
   88:5, 88:7, 88:15,
   88:21.
focused 78:12,
   78:23, 89:2.
focusing 90:17.
folder 11:2.
follow 7:3, 7:22,
   17:9, 25:2,
   62:11.
followed 102:11.
Following 12:2,
   84:7.

follows 58:7,
   92:11.
food 54:21.
foot 85:3.
footage 81:5, 97:10,
   97:17, 97:21.
forefront 77:5.
foregoing 107:23.
forensic 13:23,
   42:5, 53:22.
forensically
   30:16.
forgive 67:7.
forgot 96:10.
forgotten 81:9.
form 10:22.
formally 35:23.
forth 65:17.
fortunately 46:12.
forward 66:24.
found 20:10, 25:7,
   30:25, 31:10,
   32:21, 33:3,
   33:11, 39:21,
   100:15.
four 9:11, 20:24,
   20:25, 22:7,
   26:21, 57:19,
   58:24, 82:3.
frame 25:20, 26:7,
   30:12.
fraud 22:24, 23:5,
   23:10, 23:15,
   23:19, 23:20,
   23:23, 24:13,
   24:23, 25:1, 25:4,
   25:7, 25:10,
   25:14, 42:14,
   47:25, 48:1.
free 3:14, 6:2,
   6:8.
freely 34:14.
frequently 10:4.
fresh 17:1.
Friday 3:14, 3:16,
   3:17, 18:3, 18:15,
   93:24.
friend 52:21.
friendly 52:23,
   52:24.

friends 10:10,
  34:18, 38:18,
  47:17, 51:14,
  52:22, 52:23,
  53:11, 53:16.
friendship 37:1.
front 62:20, 64:7,
  73:11, 75:17,
  77:24, 79:21,
  92:15, 98:19,
  99:12.
Fuchs 16:24, 20:2.
full 58:11, 92:16.
fully 65:13, 65:16,
  65:19.
funny 64:18.
.
.
< G >.
gallop 90:22.
galloped 79:1.
galloping 70:19,
  70:23, 78:6.
game 65:8.
gas 83:2, 83:3.
gathered 102:22.
gave 4:6, 49:23.
general 61:9.
generally 59:23,
  60:9, 62:1, 79:14,
  82:2, 82:5, 95:11,
  104:2.
gentleman 49:11.
gentlemen 5:17,
  6:22, 15:11, 21:1,
  21:17, 22:3,
  23:25, 27:7,
  27:14, 28:2,
  28:15, 32:11,
  35:8, 55:21,
  57:15, 57:23,
  58:19, 63:11,
  64:5, 66:25,
  106:16.
George 1:18.
Gerald 1:31.
getaway 18:17.
gets 19:2, 19:10,
  20:23, 34:11,
  36:5, 41:18,

44:22.
getting 3:21, 16:8,
  18:24, 63:19,
  76:6, 76:7,
  76:15.
Gilmore 102:10.
girl 22:1.
girlfriend 19:23,
  21:24, 22:14,
  26:24, 29:24,
  32:17, 52:9.
girlfriends 37:14.
give 3:7, 5:9, 6:5,
  6:23, 8:10, 8:15,
  11:15, 46:15,
  48:24, 60:25,
  64:21, 66:24,
  73:9, 89:12, 98:9,
  98:12, 103:15,
  106:19, 107:14.
given 12:10,
  41:13.
giving 85:11.
GJH-17-0667 1:9.
glance 91:3.
gold 99:2.
goodness 72:14.
Google 10:14.
gotten 60:9.
GPS 95:22.
Grand 18:21.
Great 87:24.
Greenbelt 3:16,
  3:17.
Greenspring 96:9,
  96:10.
ground 12:22, 78:13,
  89:3.
groups 39:8.
growing 24:17.
guess 2:10, 29:11,
  29:13, 55:9.
guessing 55:9.
guide 6:24.
guidelines 8:16.
guilt 8:23, 9:7.
guilty 8:21, 42:21,
  48:22.
gun 13:14, 29:20,
  48:11, 48:12,

63:24, 64:2, 69:4,
  69:11, 86:25.
gunshot 12:25,
  63:25, 65:12,
  65:20, 69:4, 69:6,
  78:5.
gunshots 64:16,
  64:24.
guru 57:4.
gutter 98:19.
guy 4:6, 18:17,
  21:11, 21:18,
  21:23, 21:25,
  63:18, 77:13,
  81:19, 81:22,
  87:21.
guys 30:11, 33:2.
.
.
< H >.
ha 46:25.
hair 48:13.
half 47:13, 51:20.
hand 6:16, 49:4,
  58:4, 87:2,
  92:8.
handcuffs 45:14,
  45:25.
hands 90:15,
  90:25.
hang 51:15,
  105:19.
happen 19:13, 43:11,
  98:10.
Happened 12:22,
  14:10, 17:17,
  17:21, 22:9,
  24:19, 26:12,
  27:8, 36:17,
  36:18, 45:2, 63:3,
  64:22, 65:3,
  83:23, 86:6, 86:9,
  95:23.
happening 30:23.
happens 18:15.
Happily 32:16.
hard 18:16, 27:10,
  35:11, 73:10,
  80:8, 80:12.
harken 42:18.

Harry 1:37, 23:8, 47:23, 49:10.
hat 14:19.
hauled 46:20.
Hazel 1:18, 38:4, 39:2, 40:23, 49:23, 50:20, 55:16.
head 73:10.
headed 12:21, 27:23, 28:8, 28:18, 29:16.
heading 32:1.
headquarters 46:2, 46:21, 102:13.
health 22:23, 23:4, 23:19, 24:23, 25:4, 25:6, 25:10.
heard 8:1, 12:25, 13:1, 44:8, 45:12, 47:14, 47:23, 64:16, 64:24, 65:12, 65:20, 67:8, 67:16, 68:4, 68:7, 69:3, 69:16, 78:5, 89:16, 102:7.
hearing 6:7, 9:19, 16:20, 27:15, 69:7.
heart 24:18, 42:8.
height 71:11.
Heights 51:16, 82:9, 82:10, 82:24.
heinous 13:3, 15:13, 17:10.
held 39:16, 49:4.
help 9:18, 11:21, 17:9, 18:12, 19:24, 27:16, 35:17, 66:4, 67:19.
helped 41:1.
helpful 42:17, 55:12.
helping 30:6.
helps 18:7.
hereby 107:22.
hero 28:22.

heroin 44:5.
higher 53:4.
highlight 99:5.
Hinton 20:2.
history 51:3.
hit 85:20.
Hold 83:14, 106:5.
holding 100:19.
Holiday 16:24, 20:3, 88:13, 89:1, 89:4.
home 14:6, 14:13, 21:3, 25:14, 25:20, 29:16, 32:9, 35:6, 59:23, 60:2, 60:3, 62:7, 63:6, 63:16, 63:17, 75:25, 76:9, 76:13, 77:3, 107:1, 107:19.
homes 60:5.
homicide 13:6, 16:9, 20:17, 26:10, 102:13, 102:18, 103:3, 103:5, 103:16.
Honda 99:2.
honestly 76:3.
Honorable 1:18.
hood 14:19.
hoodie 87:13, 90:17.
hook 32:17.
hope 5:19, 17:3, 42:16, 42:18.
Hopefully 57:15, 79:17, 106:18.
horrible 16:1, 27:17.
Hospital 12:23, 94:19, 100:8, 102:11, 102:14.
hostile 38:21.
hour 51:11.
hours 14:9, 42:4, 46:3, 46:8, 46:12, 46:22, 46:23, 47:9, 62:10, 93:12, 93:20, 94:1.

house 12:18, 13:20, 31:16, 32:16, 44:22, 45:22, 60:19, 62:18, 62:20, 63:12, 64:7, 79:25, 96:7.
hung 51:25.
husband 59:22, 62:15, 62:16.
hustle 52:3.
hustled 52:4, 54:19, 54:22.
hustler 41:11, 54:20.
hustles 40:1, 40:2.
.
.
< I >.
icon 23:2.
idea 60:25, 64:21, 85:12, 98:12, 103:15.
ideas 2:13.
identified 14:8, 36:17.
identify 34:10, 54:3, 55:6.
ignore 7:20.
imagine 3:8.
Immediate 19:10, 19:11, 100:9, 104:1, 104:2.
immediately 27:14.
implicated 48:3, 48:4.
implore 38:16.
important 13:23, 14:3, 14:8, 17:4, 18:1, 20:10, 24:25, 25:23, 26:13, 26:16, 29:1, 29:8, 31:12, 32:3, 35:9, 37:2, 38:7, 49:24, 50:24, 55:15.
importantly 29:15, 29:23.
impound 53:8.

improper 7:17.
in. 6:1, 6:2, 10:23,
   11:22, 20:5,
   48:21.
incident 94:25,
   95:23, 97:1, 98:9,
   98:11, 100:13,
   101:6, 102:7,
   103:5.
include 2:15.
includes 10:9.
including 10:13,
   56:3, 106:23.
inclusive 59:15.
inconsistent
   44:17.
incontinence
   23:13.
independent 9:13.
INDEX 108:1.
indicate 7:5,
   97:20.
indicated 2:15, 5:1,
   6:4, 14:14, 33:20,
   85:6, 86:5, 86:18,
   89:21, 99:16.
Indicating 7:6,
   15:4, 51:17.
Indicating. 71:5,
   76:23.
indicted 25:12,
   25:21, 47:12.
indictment 8:21,
   40:7.
individual 11:14,
   49:19, 81:15,
   87:2, 87:19,
   89:15, 89:21.
individuals 9:14.
infer 8:9.
inferred 25:8.
influenced 7:18.
inform 10:17.
informal 39:11.
information 2:17,
   2:18, 4:19, 9:17,
   9:20, 16:4, 16:8,
   22:22, 24:9,
   24:13, 25:5, 26:9,
   102:21, 106:19.

initial 22:13,
   104:4.
injured 88:16.
innocence 9:2, 50:4,
   50:7, 55:14.
innocent 8:20,
   50:3.
inside 20:13.
instruct 3:2, 7:3,
   7:10, 12:5,
   39:4.
instructed 7:21.
instruction 7:23,
   66:25, 107:14.
instructions 5:9,
   6:5, 6:24, 8:11,
   10:18, 38:5,
   49:23, 55:16,
   56:2.
insurance 53:12.
intend 3:20.
intended 7:5, 40:12,
   40:13, 52:14.
intent 17:23, 24:20,
   40:8, 40:14.
interactions
   22:13.
interest 20:20.
interfere 11:6,
   51:5.
internet 9:16,
   10:4.
interpret 12:7.
interpretation
   44:12.
interrogate 46:11.
interrogated
   46:23.
interrogation 46:11,
   47:8.
interrupted 68:21.
interruption 73:4.
interview 19:16,
   22:14, 26:11,
   27:20, 34:12,
   40:3.
interviewed 26:18,
   31:1, 34:12,
   80:22, 84:12,
   84:21.

interviewing
   20:19.
interviews 85:5,
   86:4.
introduces 19:9.
invest 53:7.
investigating
   16:17.
investigation 20:4,
   21:2, 23:16,
   23:19, 24:2, 24:4,
   24:11, 24:15,
   24:19, 25:1, 25:3,
   27:25, 103:1,
   103:4.
investigations 22:8,
   35:5.
investigator
   16:19.
investigators 17:4,
   22:20, 30:12,
   37:19, 39:25,
   42:20, 86:5, 88:4,
   88:10.
involved 9:14,
   22:24, 24:5, 42:7,
   47:24, 47:25,
   48:6.
involvement 34:24.
involving 22:18,
   24:6, 35:6.
iphone 10:12, 26:23,
   29:4, 31:9, 32:8,
   32:16.
iphones 10:3.
issue 3:11, 3:24,
   4:14, 4:21, 4:24,
   5:3, 55:15.
issues 3:14, 44:3,
   44:6, 48:18,
   50:19, 50:20,
   56:24, 72:25.
item 7:21.
itself 67:2, 69:5.
.
.
< J >.
J. 1:18, 1:37.
jail 26:2, 26:4,
   26:5, 26:6, 28:23,

29:18, 29:21,
29:24, 30:3, 31:7,
31:10, 36:7,
40:19, 46:3.
January 72:16.
jeans 87:15,
90:18.
jeopardizes 10:19.
Jerry 43:12.
Jersey 59:9,
80:25.
joined 49:14,
49:16.
joke 47:1, 63:21,
63:22.
Jones 20:18.
jotting 84:24.
Jr 1:37.
Judge 5:24, 35:23,
36:14, 38:4, 39:1,
39:2, 40:23,
44:16, 48:16,
49:23, 50:20,
55:16, 72:22,
106:10.
judges 5:23, 7:1,
38:10.
judgment 11:16,
51:8, 55:15.
June 41:9.
juries 16:18.
juror 10:18,
10:19.
JURORS 5:18, 9:9,
9:10, 9:22, 9:24,
42:19.
justice 38:6.
.
.
< K >.
Keep 8:12, 8:19,
10:23, 48:20,
49:25, 50:13.
key 55:4.
keys 100:18, 103:22,
104:6, 104:8.
kill 17:23, 19:25,
29:21, 40:13,
40:14, 52:18,
53:20, 54:17.

killed 21:3, 40:14,
44:21, 46:25,
48:8, 52:11.
killing 17:7, 20:1,
43:17.
Kim 1:27.
Kind 22:2, 33:7,
36:13, 38:8,
41:14, 41:18,
55:10, 60:3, 61:7,
64:9, 64:22, 65:7,
70:10, 75:1, 79:4,
84:18, 91:4,
94:16, 94:18,
96:12, 98:17.
kinds 8:5, 8:12,
105:18.
knocking 67:18.
knowing 16:13,
21:2.
knowingly 52:17,
54:15, 54:16.
knowledge 38:12,
47:7, 104:4.
known 16:5, 29:3,
82:13, 95:1.
knows 36:18.
.
.
< L >.
Ladies 5:16, 6:22,
15:11, 21:1,
21:17, 22:3,
23:25, 27:7,
27:14, 28:2,
28:15, 32:11,
35:8, 55:21,
57:15, 57:23,
58:19, 63:11,
64:4, 66:25,
106:16.
lady 99:3, 99:9.
Lane 94:17, 96:6,
96:8.
large 17:24, 19:15,
47:15, 51:22,
54:20.
last 2:6, 3:13,
26:21, 88:14,
92:18, 93:14,

96:13.
lastly 104:11.
later 12:23, 13:5,
28:8, 42:4,
97:16.
Latrina 12:18, 42:9,
42:21, 60:11,
73:17, 74:2.
laugh 47:2.
laughing 21:4,
46:14, 46:24.
laughs 21:16,
22:2.
law 5:24, 6:6, 7:2,
7:3, 9:4, 12:5,
15:25, 16:9,
30:14, 39:2,
55:16, 93:5.
Lawson 26:24.
Lawyers 7:10, 7:14,
7:15, 41:5,
43:11.
laying 98:18, 99:3,
99:4, 99:10,
99:15, 99:17,
100:16, 100:17,
100:19, 101:24,
103:25.
lead 26:13, 34:1,
34:3.
leading 25:11,
25:21, 27:9,
27:21, 30:13.
leads 17:9, 18:1,
25:2, 27:8, 33:23,
33:24, 34:9,
37:17, 38:14.
learn 17:13, 19:21,
25:2, 27:2,
35:19.
learned 10:16,
22:21, 23:20,
25:7.
least 2:4, 2:17,
3:8, 40:4.
leave 11:10, 11:11,
31:16, 32:9, 46:3,
46:8, 80:23,
89:16, 104:8.
leaves 32:16.

led 36:11.
leeway 3:7, 3:22,
  57:1.
left-hand 75:14.
legal 40:22.
length 32:6, 36:2,
  89:12.
lengths 89:11.
lengthy 34:12.
less 86:7, 89:14.
Lesser 16:24, 79:8,
  81:9.
Lester 102:11.
level 50:12, 53:4.
license 20:13,
  20:14, 33:1, 33:2,
  77:6.
lied 37:14.
life 38:13.
lights 97:4.
limitations 53:23,
  54:6.
limited 7:22.
Lincoln 53:9.
line 30:22, 35:9,
  35:19.
link 97:16.
Linkedin 10:14.
Lisa 47:19.
list 3:24, 7:13,
  28:25.
listed 31:3, 31:4.
Listen 11:14, 17:8,
  35:2, 38:10,
  38:16, 38:22,
  49:25, 53:24,
  54:5, 55:1, 66:13,
  66:15, 105:16.
listened 51:10.
listening 11:6,
  105:9, 105:14.
listens 29:25.
Literally 14:23.
Little 3:22, 13:5,
  20:14, 23:2,
  25:25, 30:4,
  31:19, 33:6, 38:3,
  40:20, 56:1,
  59:24, 60:1, 65:5,
  67:24, 69:23,

69:25, 79:21,
  96:11, 96:12,
  101:15.
live 33:7, 58:25,
  59:21, 60:2,
  60:21, 60:23,
  73:17, 82:5,
  82:15.
lived 12:18, 13:21,
  19:23, 31:21,
  31:23, 32:14,
  33:5, 35:6, 42:9,
  52:8, 52:10,
  52:14, 59:15,
  59:24, 60:8,
  60:18, 60:20,
  69:24, 79:18.
lives 80:19.
living 15:19, 40:1,
  41:12, 58:20,
  59:16, 59:19,
  62:7, 82:2,
  82:3.
loading 105:6.
location 53:24,
  94:5, 94:9.
locked 27:4, 28:24,
  35:24, 40:18,
  53:1, 53:2, 53:10,
  53:15.
Lombard 1:48.
long 5:9, 6:6,
  16:25, 33:11,
  33:15, 33:18,
  55:11, 58:22,
  61:23, 64:23,
  83:19, 83:24,
  85:12, 89:14,
  89:15, 93:2,
  95:16, 100:22,
  100:24.
Look 4:3, 13:7,
  30:17, 31:6,
  31:18, 37:9,
  37:13, 41:16,
  45:16, 52:2,
  54:23, 55:3,
  56:15, 77:9,
  78:25, 81:5,
  86:10, 94:20,

94:23, 95:20,
  96:13, 104:2,
  104:5, 107:13.
looked 14:21, 42:3,
  42:4, 63:21, 65:7,
  65:8, 72:1,
  78:13.
Looking 14:10,
  16:11, 21:15,
  52:1, 64:18, 73:7,
  73:16, 73:21,
  74:4, 74:15,
  74:24, 77:6,
  80:15, 89:10,
  89:24, 97:17,
  98:25, 102:1,
  103:25.
looks 15:7, 15:8,
  33:1, 95:22.
looms 47:15.
lot 4:11, 14:14,
  14:21, 14:24,
  18:21, 19:3, 19:5,
  22:11, 26:25,
  30:18, 33:12,
  36:23, 38:17,
  52:22, 53:3, 53:8,
  79:21, 79:24.
lower 14:20.
loyalty 37:1.
lucky 14:1, 15:9.
lying 34:15,
  100:4.
.
.
.
< M >.
M-i-c-h-a-e-l
  92:18.
M-u-r-r-a-y 58:14.
M. 1:33, 92:9,
  108:19.
Ma'am 91:17, 92:24,
  93:7, 93:15,
  93:18, 94:4,
  103:21, 104:8,
  104:20, 104:22,
  105:2.
machine 105:8.
major 52:6, 60:21,
  60:23, 60:24,

94:17.
male 87:9.
mannerisms 35:3.
map 18:6, 51:22,
 79:4, 95:24,
 96:4.
marijuana 19:11,
 19:12, 19:13,
 19:14, 27:5, 31:8,
 40:2, 44:20,
 45:13, 45:14,
 45:16, 45:18,
 47:11, 52:4, 53:4,
 54:19.
mark 90:1, 96:18.
marked 57:21, 95:19,
 97:2, 97:3, 98:21,
 101:19.
married 59:10.
Maryland 1:2, 1:20,
 1:49, 33:1,
 33:2.
materials 9:15.
Matt 34:14.
Matter 9:13, 57:10,
 88:13, 107:24.
matters 8:11.
Matthew 16:4, 19:20,
 20:7.
mean 2:13, 2:21,
 3:24, 30:15,
 54:24, 61:12,
 64:21, 65:5,
 65:15, 66:1, 70:7,
 77:14, 90:5.
Meaning 44:11,
 80:20.
means 9:12, 26:4,
 50:12, 70:23,
 100:6.
meant 17:5.
Meanwhile 38:21.
media 9:16, 10:4,
 10:15.
Medicaid 23:13,
 23:14, 47:25,
 48:1.
medical 47:18,
 100:9.
medics 100:22.

meet 21:18, 29:17.
Members 6:14,
 11:17.
Memorial 18:4,
 18:15, 63:14.
memories 18:10.
men 31:15, 34:19,
 36:4, 38:23, 42:6,
 49:13.
mention 47:24, 51:2,
 51:7.
mentioned 29:9,
 48:18, 49:24,
 103:22.
Mercer 1:39,
 49:10.
merged 16:2.
messages 44:9,
 44:10.
messaging 10:13.
Michael 47:14,
 47:15, 47:17,
 92:18.
microphone 43:4,
 58:10, 58:11,
 71:2, 81:20,
 92:15.
middle 14:17, 29:4,
 58:14, 92:18,
 98:14.
Midnight 93:11,
 93:12, 93:13,
 93:19.
mike 49:4.
mile 51:20.
million 23:15,
 31:18.
mind 8:12, 8:20,
 9:7, 10:23, 24:18,
 28:10, 28:18,
 48:20, 49:25,
 50:7, 50:13,
 83:16.
mine 43:5.
minute 86:7,
 89:15.
minutes 14:8, 27:11,
 55:24, 55:25,
 56:6, 56:21,
 61:24, 62:3, 65:2,

92:3, 95:18,
 100:24, 106:7.
missed 15:2.
mission 78:24.
mistake 43:18,
 52:13.
mistaken 40:11.
mistrial 10:20.
mom 66:4.
moment 15:11, 20:15,
 21:10, 27:19,
 38:4, 39:19,
 48:25, 83:11,
 85:19, 99:23,
 100:1.
money 53:7.
monitoring 25:14,
 25:20.
mostly 53:7.
mother 12:19, 13:21,
 21:4, 35:7, 67:12,
 67:13, 99:20,
 99:22, 99:25,
 100:2, 100:4,
 102:3, 102:12.
mothers 25:19.
motion 24:2, 24:14,
 39:15, 64:22,
 64:25.
motivation 36:24.
motive 17:15, 17:23,
 17:25, 42:1.
motives 30:5,
 44:19.
move 64:19, 73:8,
 73:9.
moving 56:16, 57:19,
 57:22.
MS. OLDHAM 92:22.
MS. WILKINSON 58:16,
 68:15, 70:16,
 71:6, 81:12.
multiple 13:24.
murdered 14:18,
 24:7, 25:25,
 27:13, 28:22,
 32:15, 40:8.
Myles 23:7, 23:11.
Myrtle 21:10, 21:15,
 21:23, 22:1, 22:3,

22:5, 27:23, 28:1,
28:2, 28:3, 28:8,
28:12, 28:13,
28:16, 28:18,
32:19, 37:22,
53:17.
myself 16:20, 63:24,
64:13, 106:24.
Myspace 10:14.
.
.
< N >.
Name 2:6, 8:6, 13:4,
16:4, 16:5, 16:20,
20:8, 21:12, 23:6,
24:6, 26:23,
27:11, 58:11,
58:14, 82:8,
92:16, 92:17,
92:18, 99:21,
108:11.
named 21:13, 21:23,
21:25, 34:4.
near 32:24, 51:16,
94:19, 103:22.
nearby 14:2, 81:5.
necessary 100:8,
105:16.
need 2:10, 6:12,
58:12, 76:24,
79:11, 79:16,
80:8, 103:17,
105:16, 107:18.
needed 55:10.
needs 71:2, 98:10.
nefarious 24:6.
negotiate 3:13.
neighbor 13:1,
15:20, 15:21,
15:23, 23:21,
24:12, 24:21,
25:8, 31:21,
40:15, 60:14,
60:18, 63:18,
72:1, 85:20,
86:13, 86:19,
87:3, 88:5, 88:6,
88:8, 88:15,
88:16, 90:5.
neighborhood 31:20,

33:6, 59:24,
59:25, 69:24,
82:3, 82:6, 82:8,
102:9.
neighbors 60:9.
New 53:5, 59:9,
80:25.
news 72:11, 73:1,
81:1.
Next 3:5, 3:20,
11:22, 13:14,
26:13, 29:8,
52:14, 55:1.
nicest 43:10.
niche 31:20, 33:6.
night 3:13, 5:20,
31:13, 34:20,
35:24, 93:14.
nights 95:5.
Nissan 99:2, 101:21,
101:23.
No. 1:9, 14:12,
14:15, 19:19,
20:16, 47:11,
64:12, 64:17.
nobody 27:11, 64:12,
64:13.
none 48:14, 50:24,
104:4.
nonetheless 35:1.
noon 28:8, 28:14.
nor 7:5.
normally 98:8.
Northern 1:2, 93:18,
94:17, 95:2, 95:5,
95:11.
note 11:1, 11:6.
noted 80:2.
notepads 84:25.
notes 4:23, 10:25,
11:4, 11:5, 11:7,
11:9, 11:13,
11:16, 55:11,
83:5, 84:24,
105:16.
Nothing 7:4, 8:22,
36:18, 45:8,
45:21, 46:20,
47:22, 48:3,
59:25.

notice 4:2, 4:10,
4:14, 14:22,
64:11, 78:18,
78:21.
noticed 5:21, 63:17,
63:18, 64:17,
70:9, 89:3.
nuggets 30:4.
number 15:10, 19:12,
26:24, 27:7, 29:4,
29:5, 30:10,
30:25, 31:7, 31:9,
31:10, 31:11,
31:24, 32:8,
32:25, 34:4, 81:9,
84:1, 106:19,
107:15.
numbers 29:1, 29:3,
31:12, 34:11.
Nurton 96:11,
98:1.
.
.
< O >.
o'clock 72:12,
72:16.
object 39:12.
Objection 7:18,
7:19, 70:14,
84:2.
Objections 7:15,
7:16.
obligation 7:16.
observation 72:1,
79:19, 81:18,
85:12.
observations 64:6,
68:8, 69:5, 69:14,
71:9, 74:6, 74:13,
74:19, 78:5,
78:23, 80:2,
80:17, 81:16,
100:14.
observe 38:17,
50:17, 51:24,
63:8, 67:13,
69:17.
observed 69:1,
70:17, 71:8,
83:24, 85:6,

87:10.
observing 83:19.
obtain 9:17.
obvious 49:12.
Obviously 15:19,
  16:9, 20:12,
  39:21, 50:8,
  74:21, 80:1, 82:4,
  84:5.
occasion 66:13.
occurred 4:23,
  20:25, 84:13,
  86:6, 89:11, 95:1,
  97:1.
odds 49:16.
offenses 49:14.
offered 7:17,
  37:2.
offhand 99:23.
office 103:5.
officers 15:25,
  45:22, 94:8,
  101:12, 102:8,
  102:17, 104:21.
Official 1:47,
  104:16, 107:28.
often 16:18,
  105:12.
old 13:21.
Oldham 1:27, 16:23,
  72:24, 92:4,
  96:20, 97:14,
  97:20, 98:3,
  105:3, 105:6,
  105:20, 106:3,
  108:21.
Once 18:20, 19:7,
  27:3, 64:17, 66:3,
  70:2, 71:25.
ones 33:2.
open 2:13, 3:1, 5:2,
  10:23, 48:20,
  76:4, 76:14, 84:7,
  106:20, 106:25,
  107:16, 107:17.
Opening 2:15, 2:16,
  6:10, 11:20,
  11:23, 12:9, 38:5,
  42:25, 44:3,
  48:24, 108:5,

108:7, 108:9.
openings 5:11.
opens 19:9.
operator 66:10.
opinion 10:22.
opportunity 17:15,
  17:25, 37:16,
  42:1, 51:24,
  104:24.
order 35:15, 53:21,
  56:13.
ordinary 63:9.
original 34:9.
originally 22:24,
  59:8.
others 40:8,
  47:24.
otherwise 33:14.
outline 11:20.
outside 8:1, 9:20,
  21:3.
overnight 105:23,
  106:17.
Overruled 7:20,
  70:15.
overview 41:14,
  42:17.
own 11:14, 18:11,
  38:1, 41:18,
  66:7.
owned 52:8.
owner 23:8, 47:20.
owners 23:6.
owning 48:10.
owns 27:10, 29:11,
  33:19.
.
.
< P >.
p.m. 31:13, 93:13,
  93:22.
pads 11:1.
Page 108:3.
paid 63:22, 88:18,
  88:24, 90:20.
paralegal 16:24.
paraprofessional
  58:21, 58:22,
  61:4.
Park 51:16, 62:17,

62:18, 62:19,
  63:19, 82:9,
  82:10, 82:24.
parked 32:24, 44:22,
  74:16, 98:13,
  98:14.
parking 14:14,
  14:20, 14:24,
  18:21, 19:2, 19:5,
  22:11, 79:21,
  79:24.
Parkway 94:17.
part 3:21, 4:9,
  17:24, 18:5,
  23:19, 27:22,
  37:2, 38:7, 38:23,
  38:24, 41:1, 41:2,
  46:13, 46:15,
  50:10, 53:19,
  54:15, 54:17,
  54:20, 67:20,
  78:14, 82:12,
  94:18.
participate
  103:19.
participating
  104:14.
participation
  6:24.
particular 18:8,
  55:7, 61:11, 63:1,
  80:5, 102:2.
particularly
  52:24.
parties 57:24.
parts 34:13.
pass 96:7.
passed 15:7,
  103:1.
passenger 74:18,
  75:7, 75:9, 77:14,
  77:15.
past 14:21.
path 96:3, 96:13,
  96:21.
patients 23:13.
patrol 93:10, 94:12,
  98:6, 102:8,
  102:17, 103:2.
patrolling 95:15.

pay 11:4, 48:19,
  53:12, 54:21.
people 18:7, 20:3,
  23:6, 23:9, 37:7,
  39:11, 52:1, 55:4,
  67:19, 67:23,
  67:25, 68:5,
  68:12, 98:16,
  102:6, 106:23.
per 98:8.
perfect 74:10.
permitted 11:24.
perpetrated 23:24.
person 16:3, 20:19,
  25:15, 40:8, 40:9,
  40:14, 47:2,
  49:20, 52:6,
  52:20, 53:17,
  55:7, 56:17,
  86:18, 87:7,
  90:12, 90:15,
  90:19, 90:25,
  91:2, 91:3.
personal 10:3, 51:2,
  66:8.
personally 60:15.
phone 10:12, 24:12,
  25:16, 25:18,
  26:15, 27:1, 27:3,
  27:10, 27:13,
  28:25, 29:3, 29:5,
  30:15, 30:17,
  30:18, 30:20,
  31:1, 31:4, 32:13,
  32:15, 34:11,
  36:9, 66:8, 83:17,
  85:9.
phones 10:2, 10:3,
  26:20, 27:24,
  28:7, 31:9,
  32:1.
photograph 14:5,
  73:7, 73:12,
  73:13, 73:21,
  74:5, 74:8, 75:16,
  76:22, 77:9,
  77:22, 100:25,
  103:8, 103:15,
  103:18.
photographs 72:3,

72:6, 75:22,
  103:10.
Photos 44:10,
  54:2.
phrase 70:12,
  70:16.
physical 13:9,
  17:15, 36:24,
  103:19.
physically 64:5.
pick 15:1, 17:6,
  32:18, 33:10.
picking 24:12,
  34:1.
picture 15:18,
  41:16, 42:5, 54:9,
  73:20, 74:16,
  90:10, 99:12.
pictured 41:18.
pictures 13:17,
  41:20.
piece 13:23, 15:11,
  32:3.
pieces 30:5.
pinged 32:14.
pistol 48:9.
pixilated 41:18.
place 19:1, 24:20,
  47:6, 51:20, 52:2,
  69:24, 80:2,
  101:13.
placed 42:14.
Plaintiff 1:7,
  1:23.
plan 3:16, 17:22,
  39:13, 40:23,
  41:4, 45:8.
planning 2:9.
plate 20:13, 20:14,
  33:1, 77:6.
play 66:20, 97:15,
  97:17, 97:21,
  105:4, 105:23,
  105:24, 106:2,
  106:9.
played 20:23,
  54:15.
played. 66:22,
  68:14, 81:11,
  97:24, 105:17.

playing 65:8, 105:7,
  105:22.
Please 6:15, 9:19,
  12:14, 49:2,
  55:14, 56:2, 58:3,
  58:10, 67:5, 67:7,
  73:6, 91:18,
  92:16, 106:17.
pleasure 3:19.
plot 52:18, 53:20,
  54:15.
podium 43:7.
Point. 51:10,
  52:16.
pointing 33:9,
  73:19, 99:6,
  99:7.
policy 98:8.
Pontiac 18:20,
  18:21, 19:1, 19:5,
  20:20, 32:24,
  55:5.
pool 100:16.
pop 89:16.
portion 97:15,
  97:17.
portions 20:22.
portray 46:25.
position 46:19,
  47:3.
possession 45:17,
  48:12.
possible 84:20.
post 95:3, 95:10,
  95:11.
pound 19:14.
pounds 53:5.
Power 35:11, 43:15,
  51:10.
powerful 19:11.
predetermined 45:6,
  45:8.
predict 43:25.
prejudice 38:22.
preliminary 6:23,
  49:23.
preparation 66:12,
  72:2, 81:4, 97:9,
  104:23.
prepared 30:20.

present 2:9, 6:15,
  9:2, 11:25, 12:3,
  12:6, 50:10,
  104:4.
presented 8:3,
  9:11.
presume 73:11.
presumed 8:20,
  50:3.
presumption 50:3,
  50:6, 55:13.
pretend 23:12.
pretty 32:6, 41:8,
  65:1.
prevalent 16:5.
prevent 39:15,
  40:19.
previously 78:17,
  78:18, 97:10.
primary 98:6, 98:11,
  100:3, 100:5,
  102:5, 103:2.
principle 50:8.
principles 40:6,
  49:24.
prior 44:17, 93:5.
privacy 42:10.
privilege 2:20,
  2:24.
Probably 5:21,
  25:19, 32:6, 33:1,
  35:10, 37:10,
  50:24, 52:20,
  86:9, 95:18.
problem 51:4.
problems 44:18.
proceeded 24:3.
proceeding 49:14,
  49:17, 50:4.
Proceedings 1:17,
  10:20, 47:15,
  84:7, 107:21,
  107:24.
proceeds 19:2.
process 10:21, 25:4,
  38:6, 103:8,
  103:15.
prohibits 9:4.
projectiles 104:3.
pronounce 2:6.

pronounced 102:14.
proof 8:7, 8:9,
  8:23, 8:25, 50:9,
  50:11, 54:24,
  55:10.
prosecution 52:12.
prosecutor 29:25,
  86:5.
prosecutors 16:21.
protect 53:13.
protect 53:13.
provably 37:19.
prove 9:2, 9:6,
  15:1, 43:20,
  43:21, 43:22,
  43:23.
proven 8:20.
provide 42:25.
provided 2:18, 2:19,
  2:21, 4:15, 11:2,
  16:3, 25:5, 37:18,
  42:17.
providing 23:12,
  26:9.
pull 19:4, 19:7,
  30:16, 58:10,
  79:8, 98:21.
pulled 36:6, 63:24,
  64:4, 64:10,
  64:15, 71:25,
  78:19, 78:21.
pulling 33:20,
  63:17, 64:7.
pulls 14:24, 15:7,
  15:9.
purported 18:17.
purpose 7:22.
purposes 2:14,
  35:11.
putting 4:23, 14:15,
  39:14, 100:11.
.
.
< Q >.
Q-u-a-l-e-n-e
  58:14.
Q. 58:5, 108:13.
Qualene 58:13,
  58:14.
question 7:20, 46:2,
  55:4, 56:7, 56:11,

68:3, 78:4.
questionable 51:3.
questioned 47:4.
questions 7:14,
  7:15, 46:18,
  54:25, 55:3,
  68:19, 91:11,
  105:21.
Queue 81:10.
quick 64:25, 65:1,
  68:3, 83:23, 85:7,
  86:2, 86:3.
quickly 6:8, 64:23,
  86:7.
quiet 12:24,
  31:20.
quite 39:5.
.
.
< R >.
radio 104:16.
raise 6:15, 58:3,
  92:8.
ran 14:23, 42:3,
  69:21, 89:17,
  89:22, 89:25,
  90:2, 90:8.
read 2:16, 3:24,
  3:25, 57:21.
ready 12:13, 43:1,
  48:25, 57:6,
  57:16, 62:24,
  63:19, 76:6,
  76:7.
real 68:3.
really 39:4, 41:5,
  49:24, 53:21,
  54:6, 54:7, 55:18,
  82:23, 86:8, 88:2,
  106:13.
reason 24:9, 38:11,
  40:25, 42:20,
  82:20.
reasonable 9:7,
  42:6, 43:21, 50:5,
  50:13, 54:14.
recall 57:5, 59:18,
  63:2, 75:20, 85:3,
  86:4, 88:4, 90:18,
  95:8, 96:3, 97:4,

99:22, 100:1,
103:25.
received 2:5, 2:8,
7:9, 7:22, 94:6,
95:13.
recess 56:22.
recognize 81:15,
98:22.
record 4:17, 7:9,
68:4, 71:7, 84:1,
94:22, 105:7,
107:24.
record. 83:13.
recorded 30:1.
recording 67:3,
104:24, 105:10.
records 25:16,
26:15, 37:6,
37:21.
recover 19:13,
26:19.
recovered 48:9,
104:7.
red 14:7, 43:13.
Redirect 91:12.
refer 26:21.
reference 9:15,
79:23.
referenced 96:1.
referred 74:1,
101:21.
referring 73:24.
refers 46:14.
regarding 54:18.
regards 100:13.
registered 20:8.
regular 33:2, 33:10,
95:10.
regularly 54:22.
reject 8:15.
relate 3:14.
related 22:22, 39:6,
39:9, 39:20.
relates 10:6.
relating 23:17,
24:9, 24:12,
39:19.
relationship 38:1,
38:23.
relationships

30:5.
relative 102:7.
relatively 52:4.
release 25:13.
reliable 52:7.
rely 51:4.
remain 9:3, 26:2.
remained 25:13.
remember 11:13,
11:17, 18:3, 18:7,
18:12, 19:19,
20:15, 25:23,
26:17, 28:24,
30:11, 31:1, 35:4,
49:19, 55:13,
56:2, 65:19,
70:10, 70:11,
90:21, 90:24,
98:16, 100:17,
101:5, 101:6.
remembered 22:21.
remind 105:13.
reminded 4:15.
remove 49:7.
render 100:6.
rent 54:21.
repeat 81:21.
repo 53:13.
report 98:11,
103:6.
reported 13:3,
23:21.
Reporter 1:47,
107:28.
reporting 42:14.
represent 43:14,
49:11.
representing
16:22.
require 4:2,
10:21.
required 4:10,
11:23.
research 2:25,
9:13.
Resources 22:25.
respect 5:22, 5:24,
9:8, 42:10.
respond 47:4, 94:2,
94:5, 95:9, 95:16,

103:8.
responded 94:8,
96:4, 100:3,
102:17.
responding 100:10,
104:13, 104:25.
response 2:5, 2:9.
response. 84:3.
responsibility
11:14, 11:15.
rest 5:20, 91:19.
restrictions
10:19.
result 10:20, 65:21,
72:25.
resulted 24:15,
24:20.
retaliate 39:14,
40:9, 40:10.
retaliation 40:17.
retire 9:21, 9:23.
return 42:21.
returned 9:25,
62:23, 63:6.
review 97:10,
104:24.
revisiting 4:20.
rights 46:9.
ringing 32:17.
risk 72:15.
Road 51:21, 60:23,
60:24, 60:25,
61:2, 76:6, 77:2,
96:5.
robbery 13:18,
36:19.
role 5:23, 5:24.
rolling 25:9.
rolls 45:12.
room 11:12, 46:11,
55:25.
rough 82:24.
route 31:22.
routine 61:6, 61:9,
61:15, 62:11.
row 14:12.
RPR 1:46, 107:22.
Ruger 48:8, 48:10.
rule 4:10.
rules 4:2, 7:17,

8:19.
ruling 4:22, 7:19.
run 44:25, 45:3,
    66:3, 89:23,
    89:24.
running 14:12,
    14:19, 21:18,
    21:20, 34:2, 67:1,
    70:6, 70:7, 70:9,
    70:11, 70:18,
    90:20.
runs 90:6, 90:12.
rush 100:8.
rushing 106:14.
rustling 56:16.
RX 22:24.
RXRS 23:8, 47:18.
.
.
< S >.
S1 57:21.
S2 57:21.
S3 57:21.
S4 57:21.
safe 107:1,
    107:19.
Sandra 1:25.
Sandy 16:21.
sat 64:19, 65:1,
    65:22.
saw 36:16, 63:11,
    64:12, 64:14,
    66:3, 67:16,
    68:12, 69:7, 69:9,
    70:2, 74:25, 75:3,
    81:22, 81:23,
    81:25, 85:19,
    86:23, 88:16,
    98:18, 102:7.
saying 11:5, 30:1,
    33:24, 35:3,
    66:16, 69:3,
    89:6.
says 4:5, 21:16,
    21:25, 30:2,
    43:18, 45:15,
    50:23, 54:8.
scale 51:23,
    54:20.
scared 15:24.

scary 84:18.
scheduled 39:16.
scheme 24:5, 24:8.
school 61:11, 61:16,
    62:1, 62:2, 62:12,
    62:21.
schools 58:21,
    58:23, 61:4.
schtick 23:10.
science 53:22,
    54:7.
screaming 36:20,
    66:4.
screen 12:21, 14:13,
    14:16, 15:16,
    33:21, 41:23,
    66:17, 67:2,
    73:23, 75:14,
    81:15, 89:25,
    90:1, 90:4, 95:20,
    96:20, 99:5.
screens 12:16.
Sean 20:17.
search 9:15, 20:11,
    20:12, 23:4,
    24:14, 28:23,
    29:7, 45:20,
    103:19.
searched 32:23.
seat 5:25, 58:9,
    74:18, 74:19,
    74:20, 92:13.
seated 2:2, 5:14,
    6:18, 43:12,
    56:10, 56:23,
    57:14, 74:21,
    107:4.
seats 6:3.
Second 8:25, 15:14,
    29:1, 50:8,
    91:14.
seconds 12:22,
    13:15, 14:23,
    15:2, 15:6, 86:1,
    86:9.
sector 95:2, 95:5.
secure 101:4,
    101:8.
securing 102:2.
security 33:21,

37:12, 81:5.
seeds 24:17.
seeing 16:25,
    103:22.
seem 86:1, 86:3,
    106:15.
seemed 64:25, 71:12,
    86:8.
seems 71:18.
seen 8:1, 19:1,
    34:21, 48:14,
    51:10, 67:14,
    68:25, 80:1,
    88:25, 91:4.
seized 46:19.
Sekou 20:2.
selected 6:14,
    38:12.
selling 39:23.
sells 31:8, 40:2.
sense 16:9, 38:11,
    42:19, 51:8.
sentence 3:5,
    23:2.
separate 49:15.
September 39:17.
Sergeant 20:17.
series 38:14.
serious 22:8, 35:5,
    37:5.
serology 48:13.
Serve 38:20.
service 27:12,
    31:2.
set 15:12, 18:22,
    24:2, 48:25,
    83:18, 100:17.
sets 20:18.
seven 23:9, 31:3,
    46:12, 46:23,
    47:9, 62:3.
several 14:7, 26:5,
    84:12, 85:5.
shared 21:3.
sharpen 41:20,
    41:25, 42:4.
shattered 12:24.
shell 104:3.
shift 93:11, 93:12,
    93:13, 93:19,

93:21, 94:2, 94:6,
95:6, 95:15.
shifted 88:15.
shoot 81:25, 87:2.
shooter 13:12,
14:23, 15:1, 15:2,
15:6, 17:7, 18:22,
21:19, 34:2,
36:17, 42:2,
78:21, 78:23,
89:6, 90:6,
90:7.
shooting 13:19,
14:9, 20:21,
36:18, 40:22,
51:19, 52:13,
67:17, 69:5,
69:12, 86:18,
89:16, 94:7.
shopping 95:13.
short 12:20,
44:23.
shortages 95:6.
shorter 51:21.
shot 12:22, 13:14,
13:22, 14:18,
21:21, 36:19,
52:11, 63:24,
68:5, 68:7, 69:9,
86:14, 88:5, 88:8,
88:9, 88:15,
89:5.
shots 67:16.
shouldn't 5:9,
6:6.
showed 14:13, 14:25,
15:16, 29:4, 31:9,
33:9.
showing 12:16,
26:19, 33:22,
99:11, 101:19,
105:8.
shown 12:20, 103:10,
103:11, 104:11.
shows 20:7, 36:1,
54:6.
sic 47:14.
side 73:8, 74:15,
75:2, 75:3, 75:5,
75:7, 75:8, 75:9,

77:10, 77:11,
77:14, 77:15,
86:24, 91:3,
95:14.
sides 2:16.
sight 85:21.
sign 44:25, 75:17,
75:20, 77:2.
signs 45:3.
silent 9:4.
silver 29:11, 29:14,
29:16, 32:22,
33:3, 33:8, 33:15,
33:16, 33:18,
34:5, 36:4,
53:14.
similar 10:15,
75:16.
simple 39:5.
simply 10:5, 11:20,
13:14, 105:23,
106:3.
Sinai 94:19, 102:11,
102:14.
single 49:14.
sir 2:12, 5:7,
56:20, 56:25,
57:3, 92:7.
sirens 97:4.
sit 2:19, 2:24,
5:22, 17:8,
64:23.
Site 28:5, 31:15,
32:5, 32:20, 34:7,
37:6, 53:23.
sites 10:4.
sits 15:8, 94:18,
95:13, 96:7,
96:12.
sitting 15:5, 18:21,
49:11, 64:6,
74:12, 74:21.
six 23:9, 62:3.
skin 71:10.
slate 8:24.
slipping 49:21.
slow 6:9, 64:22,
64:25.
small 22:24, 23:8,
35:11, 46:11,

52:4, 60:1, 61:2,
79:7, 94:18,
96:12.
smart 10:2.
smell 19:10, 19:11,
19:13, 45:13.
Smith 106:18.
smoke 69:7, 69:8,
69:10, 69:14,
69:16.
smoking 29:20.
snips 14:15.
snowing 106:13.
social 9:16, 10:4,
10:15.
sold 52:4.
solely 8:3, 9:10.
solve 14:1, 15:13,
17:10, 19:18,
23:18.
solved 40:18.
somber 22:8.
somebody 17:23,
40:13, 46:17.
somehow 46:25.
Someone 4:8, 11:15,
20:20, 52:11,
53:17, 101:8.
Sometimes 6:8, 17:2,
17:13, 18:12,
26:14, 35:14,
76:25, 80:8.
somewhere 61:20.
soon 10:17, 98:15.
Sorry 6:12, 49:21,
60:22, 68:21,
73:3, 77:14,
87:24, 96:17,
96:18, 96:24,
99:3, 101:15,
105:19.
sort 35:16, 95:24.
sound 69:14,
69:16.
source 9:20, 27:5,
39:22.
speaking 6:7,
88:3.
specific 18:10,
100:14.

specifically 93:24,
  101:6.
speculate 55:9.
speculation 55:8.
speeding 44:25,
  45:3.
spell 58:10,
  92:16.
spent 4:11.
spoke 25:15, 70:5,
  82:2, 88:13,
  99:20.
spot 65:17.
Spring 94:17, 95:12,
  96:5, 96:6,
  96:8.
stain 13:11, 77:25,
  78:10.
stand 5:23, 6:1,
  6:15, 50:10,
  79:12, 92:8,
  96:17.
standalone 60:2.
standing 5:21,
  99:12.
start 6:4, 8:24,
  10:21, 10:23,
  17:20, 17:22,
  30:24, 32:1,
  35:13, 55:23,
  76:6, 76:7, 83:24,
  85:10, 85:13,
  85:18, 85:20,
  85:24, 104:13.
started 17:22,
  24:11, 24:14,
  25:9, 76:15.
starting 93:6,
  104:25.
starts 31:24,
  97:21.
state 58:10,
  92:16.
Statement 3:25,
  11:20, 12:9,
  27:18, 28:10,
  28:12, 41:10,
  41:11, 42:25,
  44:3, 108:5,
  108:7, 108:9.

Statements 6:10,
  7:13, 11:23,
  20:24, 21:1, 22:6,
  22:16, 35:1,
  37:19, 44:17.
States 1:1, 1:5,
  16:22.
Station 18:19,
  19:21, 31:24,
  68:22, 83:2, 83:3,
  83:4, 96:7.
stationary 43:7,
  43:8.
statute 40:12.
stay 43:6.
stayed 12:18.
stays 50:4.
stenographic
  107:23.
step 79:11, 79:17,
  80:8, 92:7.
Stephen 1:39,
  49:10.
stew 46:21.
stewing 46:4.
stipulate 7:10.
stipulation 57:24.
stipulations
  57:20.
stolen 53:13.
stood 63:22,
  67:24.
Stop 15:2, 18:23,
  33:21, 44:24,
  44:25, 45:3, 45:6,
  45:7, 45:8, 45:24,
  66:23, 83:25,
  85:11, 85:22,
  85:25.
stopped 45:5, 46:5,
  67:8.
story 17:2, 17:11,
  17:21, 22:18,
  27:8, 42:8, 42:20,
  46:15.
straight 5:10,
  75:24.
strange 63:18,
  64:18.
Street 1:48, 12:24,

18:19, 33:7,
  46:17, 53:11,
  59:18, 60:20,
  64:8, 74:7, 74:15,
  74:24, 75:18,
  79:25, 82:4,
  82:15, 82:17,
  82:21, 95:24,
  98:15, 98:16.
streets 75:23,
  76:2.
strengths 53:23.
strike 42:12.
strong 19:11.
stumbled 78:12.
subcontractor
  47:21.
subject 97:15.
submit 14:25, 32:11,
  35:8, 35:18,
  40:16, 41:14,
  41:15, 50:5,
  54:12.
subpoena 38:20.
substantive 39:19,
  40:21, 41:3.
suggest 85:16.
suggesting 106:1.
suggestion 4:6.
suggests 8:6,
  44:3.
summarize 12:6.
summary 30:21.
summer 88:14.
supplies 23:13.
supply 27:5, 39:22,
  47:18.
support 54:13.
supports 17:16.
supposed 4:25,
  23:23, 106:22.
surprise 20:5.
surveillance 34:21,
  97:11.
suspect 85:2, 85:19,
  106:13.
suspicion 45:10.
suspicious 45:2.
sustained 7:19.
swabbing 53:25.

swear 5:8, 6:12,
  6:13.
switch 56:13,
  56:15.
sworn 6:19, 6:23,
  58:6, 92:10.
sworn. 6:17.
system 11:16,
  38:6.
.
.
< T >.
T. 1:31, 1:46,
  107:27.
table 49:12,
  54:21.
tag 15:10, 16:11,
  16:14, 18:17,
  29:9, 29:10,
  32:25, 33:1, 33:3,
  33:10, 33:12,
  33:15, 33:18,
  34:1, 65:7.
taken. 56:22.
Talked 3:13, 29:7,
  29:18, 36:14,
  78:16.
talks 30:7, 30:8,
  75:17.
tall 71:12, 71:14,
  71:15, 71:17,
  71:18, 85:2,
  87:17.
tape 67:8, 70:5,
  100:11, 101:1,
  101:2, 101:3,
  101:4, 101:5,
  101:11, 101:13,
  101:14, 106:9.
taped 20:22.
task 100:3, 102:4.
tasks 50:24.
Taylor 19:8, 45:7,
  45:9.
technical 56:24,
  105:23.
technician 103:8,
  103:12, 103:14,
  104:9.
technology 10:5,

10:15, 105:12.
tedious 26:15.
teeny 33:5.
telephone 47:16.
telephones 53:24.
television 97:11.
tells 21:6, 21:8,
  27:25, 39:25.
ten 61:24, 106:7.
ten-hour 93:21.
tend 100:23.
terminal 73:9.
terms 36:1, 56:12,
  60:17, 69:5,
  71:10, 81:16.
testified 58:7,
  84:16, 92:11.
testify 9:3, 9:5,
  18:9, 19:8, 20:18,
  23:7, 24:22, 32:6,
  36:16, 37:15,
  38:19, 40:5,
  42:11, 47:16,
  52:1.
testifying 39:15.
text 10:12, 44:9,
  44:10.
theirs 38:18.
theory 51:9, 52:12,
  52:13.
Thereabouts 59:6.
They've 44:16, 46:4,
  49:13.
thin 87:21.
thinking 22:17,
  22:22, 26:8.
Third 9:6.
thoroughfare 60:21,
  94:17.
though 5:25,
  72:10.
thoughts 51:12.
thousand 23:14.
three 8:19, 20:24,
  22:7, 25:25,
  26:19, 26:20,
  30:8, 71:7,
  100:24.
throughout 13:17,
  13:24, 14:4,

19:22, 21:5,
  27:15, 50:4.
throws 107:14.
ticket 36:5.
tie 43:13, 48:14.
timer 83:17, 83:18,
  83:25, 85:9,
  85:18.
tiny 33:6.
tired 9:18.
today 5:17, 6:5,
  13:2, 14:1, 37:11,
  55:24, 66:12,
  72:12, 72:16,
  97:10, 104:23,
  107:18.
Together 4:23,
  16:22, 17:4,
  19:24, 30:22,
  36:8, 38:2, 40:7,
  42:20, 49:10,
  49:13.
tomorrow 37:11,
  106:8, 106:18,
  106:20, 107:2,
  107:11, 107:20.
Tony 4:6, 4:7,
  21:12, 21:13,
  21:14.
took 12:20, 13:7,
  13:15, 13:22,
  15:3, 17:11,
  21:14, 24:19,
  31:22, 34:15,
  51:20, 89:14.
tools 9:17, 10:5,
  10:8.
top 28:25, 100:19.
totally 78:12.
touch 13:12, 74:11,
  89:25, 90:1,
  96:20, 99:5.
touched 38:4.
touching 75:14.
towards 32:1, 96:9,
  101:16.
town 28:17, 35:16,
  60:1, 80:24.
Townhomes 60:6,
  60:7, 80:20.

townhouse 60:4,
  60:5.
toys 43:15.
trace 16:12,
  96:21.
track 34:10.
traffic 18:23, 36:5,
  44:24.
trafficking 39:7,
  39:20.
tragedy 43:17.
tragic 43:19.
Trainor 1:37, 5:1,
  5:4, 48:25, 49:1,
  49:8, 49:10,
  55:20, 91:10,
  91:11, 108:9.
Transcript 1:17,
  66:16, 67:1, 67:2,
  67:5, 105:9,
  107:23.
transcripts 105:13,
  105:15.
transport 46:1.
transported
  102:12.
trappings 52:6.
travel 96:3,
  96:14.
treat 7:20.
tree 77:24.
trees 101:15.
trip 28:15, 37:21.
trotting 70:10.
trouble 6:7.
true 22:17, 37:4,
  55:24, 57:25.
truly 38:7, 38:8.
truth 21:5, 22:9.
truthful 51:5.
try 6:9, 9:19, 12:1,
  41:19, 46:18,
  49:13, 54:16,
  84:20, 104:2.
Trying 3:13, 15:12,
  18:16, 22:8,
  23:18, 32:17,
  41:20, 54:3,
  63:20, 63:23,
  64:13, 65:2, 65:4,

65:6, 65:9, 65:11,
  65:18, 79:9,
  100:12.
Tuesday 1:19.
turn 32:18, 35:22,
  73:10, 73:23,
  96:10, 96:24,
  98:2.
turned 53:18.
turning 53:19.
turns 15:20.
TV 17:12, 17:13,
  48:14.
Twitter 10:13.
two. 13:1.
type 33:12, 60:2,
  60:25, 70:17,
  87:19, 103:5.
types 39:5.
typically 55:24,
  61:14.
.
.
< U >.
ultimately 16:12,
  19:14, 24:15.
unaccounted 37:18.
unanswered 54:25,
  55:2.
uncontested 45:18.
understand 11:21,
  12:10, 35:13,
  53:21, 53:22,
  72:21.
understood 4:18.
unfold 17:2,
  22:19.
unfolding 22:19.
unique 33:11.
unit 98:8.
United 1:1, 1:5,
  16:22.
units 100:10.
unlawful 39:12.
unless 33:7, 56:10,
  107:4, 107:17.
unmarked 97:2.
Until 3:20, 8:20,
  9:1, 9:21, 9:25,
  10:22, 10:23,

25:11, 26:2,
  28:14, 32:18,
  48:20, 55:15,
  56:9, 64:20,
  83:20, 88:25,
  91:19, 106:8.
using 60:17, 72:5,
  74:4, 74:25,
  79:16, 80:15.
.
.
< V >.
V-1 81:10, 97:15.
V-3 79:9, 94:21,
  94:23.
V-3A 79:13.
vantage 71:22,
  72:6.
various 37:12.
vehicle 45:15,
  86:14, 97:2, 97:3,
  97:12, 97:22,
  98:13, 99:17.
verbal 84:3.
verdict 7:6, 9:4,
  9:25, 12:8.
version 14:18, 79:7,
  95:24, 101:21.
victim 40:12, 42:13,
  98:18, 99:3,
  99:10, 99:15,
  99:21, 99:22,
  99:25, 100:2,
  100:4, 100:8,
  100:14, 101:23,
  102:11, 103:22.
victims 42:8.
Video 13:4, 14:16,
  20:22, 21:4,
  21:15, 33:8,
  33:21, 34:6,
  34:22, 36:15,
  37:9, 54:2, 81:11,
  97:16, 97:21,
  97:24.
videotaped 20:22.
view 50:1, 50:5,
  77:20, 102:1.
violates 10:19.
violation 10:18.

violence 26:3.
violent 24:6.
voice 49:21, 55:19,
  67:9, 67:11.
voir 49:22.
vs 1:8.
.
.
< W >.
W. 1:48.
wait 6:1, 15:3,
  56:9, 57:11,
  83:14, 106:8.
waiting 5:22, 15:5,
  18:22.
waits 15:8.
waives 46:9.
walk 5:24, 12:20.
walked 12:21, 36:19,
  36:21.
walking 5:21, 13:21,
  46:17.
walls 9:11.
wanted 2:4, 28:11,
  37:24, 76:9,
  76:17, 76:18,
  79:4.
wants 92:3, 106:8.
warns 29:25.
warrant 19:6, 20:11,
  24:14.
warrants 23:4.
watch 35:2.
watching 64:23,
  69:17, 69:19,
  90:19.
ways 17:3, 17:14,
  23:23.
weaknesses 53:23.
Weapon 48:9.
weapons 45:21.
wearing 14:19.
Weather 72:13,
  105:11, 106:12,
  107:6, 107:13.
weatherman 106:21.
website 10:13.
websites 9:16.
weed 19:14, 20:12.
week 3:20, 3:21.

Weekend 16:16, 18:4,
  18:5, 18:15,
  28:21, 30:12,
  53:18, 63:14.
weeks 25:25, 30:9,
  30:13, 55:2,
  55:12.
weigh 35:2, 38:21.
weight 87:19.
welcome 6:21,
  91:8.
whatever 3:18,
  44:25.
wheel 55:7.
Whenever 12:13.
Whether 7:3, 43:17,
  44:16, 44:17,
  44:18, 51:3, 51:4,
  55:2, 55:5, 55:6,
  67:20, 94:24,
  106:20, 106:25,
  107:16.
Whichever 43:9.
whistle 15:23,
  23:20.
whistleblower 16:2,
  16:14, 17:5, 23:1,
  24:21, 25:9,
  28:23, 29:22,
  33:5, 33:24,
  39:14, 40:15,
  42:10.
whoever 56:16.
whole 14:16, 25:9,
  38:14, 89:14.
whom 12:3, 47:23.
Wilde 32:5.
window 45:12.
wish 48:24.
wishes 42:24.
withhold 55:14.
within 9:11.
without 5:10, 16:13,
  55:8.
witnessed 13:3,
  65:21.
witnesses 7:8, 8:13,
  8:14, 8:16, 11:4,
  11:25, 12:3, 18:7,
  33:13, 35:15,

36:24, 37:21,
  38:17, 44:4, 44:6,
  44:15, 48:17,
  50:9, 50:11,
  50:17, 50:19,
  50:20, 51:1, 51:7,
  56:12.
woman 13:20, 14:11,
  21:2, 35:6,
  52:14.
Woodland 33:4,
  96:10, 96:22,
  96:23.
woods 69:21.
word 4:12, 51:4,
  70:6.
words 9:9, 9:14,
  60:17, 66:15,
  66:17, 72:5, 74:4,
  80:15.
work 3:19, 12:19,
  13:20, 18:16,
  19:24, 21:7,
  32:19, 47:20,
  49:5, 56:23,
  60:16, 61:6,
  61:17, 61:18,
  61:20, 62:16,
  62:24, 75:18,
  77:1, 93:14,
  94:12, 95:6,
  106:4.
worked 19:18, 22:25,
  23:22, 47:18,
  47:19, 93:21.
Working 16:10,
  16:25, 30:14,
  38:12, 58:22,
  61:3, 76:6,
  95:10.
works 43:9.
worry 80:11.
worth 23:14,
  23:15.
wrap 41:13.
write 98:11.
written 40:12.
wrote 35:10.
Wutoh 24:7, 24:16,
  24:24, 25:12,

    25:22, 26:2,
    32:13, 32:14,
    35:22, 48:5.
Wylie 51:16, 51:17,
    51:19, 51:25,
    52:2, 54:20,
    82:13, 82:15,
    82:17, 82:20.
.
.
< Y >.
year 47:13.
years 13:21, 23:3,
    24:18, 58:24,
    82:3, 93:4.
yelling 36:20,
    66:4.
yellow 101:2.
yesterday 4:12,
    4:15, 5:2, 6:4,
    6:13, 10:9, 49:22,
    49:24.
York 53:5, 95:12,
    96:5.
young 99:3, 99:9.
yourself 46:22,
    47:3, 104:7.
yourselves 46:18,
    47:6, 56:4.
Youtube 10:14.
.
.
< Z >.
Zerkin 1:31, 43:1,
    43:8, 43:10,
    43:12, 48:23,
    56:7, 56:11,
    56:18, 56:20,
    106:10, 108:7.