**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF MARYLAND**

**UNITED STATES OF AMERICA,**        )
                                     )
            Plaintiff,               )
        vs.                          )
                                     )   **CRIMINAL NO.:** GJH-17-0667
**DAVON CARTER** and **CLIFTON**     )   **JURY TRIAL:** Day Three
**MOSLEY,**                          )
            Defendants.              )
                                     )
_____    )


**Transcript of Proceedings**
**Before the Honorable George J. Hazel**
**Wednesday, January 8th, 2020**
**Baltimore, Maryland**


**For the Plaintiff:**

        Sandra Wilkinson, AUSA

        Kim Oldham, AUSA

**For Defendant Davon Carter:**

        Gerald T. Zerkin, Esquire

        Christopher M. Davis, Esquire

**For Defendant Clifton Mosley:**

        Harry J. Trainor, Jr., Esquire

        Stephen B. Mercer, Esquire

_____

Christine T. Asif, RPR, FCRR
Federal Official Court Reporter
101 W. Lombard Street, 4th Floor
Baltimore, Maryland 21201

**P R O C E E D I N G S**

THE COURT:  Good morning, you may be seated.  I understand there's an issue about publicity we want to talk about.

MS. WILKINSON:  Your Honor, I haven't seen it, I alerted counsel to it.  This morning I heard that the report of the trial starting was on the front page of the Sun.  I haven't seen it, but I guess just an added caution to the jury to turn away from the newspaper.  I've talked about briefly with counsel, I just wanted to alert the Court to that.  Like I said, I haven't seen it yet, but that's what I heard.

THE COURT:  Sure.  I recognized Mr. Fenton in the courtroom yesterday, and I read his article just this morning. I did not know -- I mean, I didn't get the physical Baltimore Sun, so I didn't know it was on the front page.

MS. WILKINSON:  Me neither, but that's what I heard, so -- and I think Mr. Davis said he saw it or whatever.

MR. DAVIS:  I have someone monitoring this stuff. It was in the paper, and I think it was on two TV stations, but it was essentially the same thing.  It was in the paper.

THE COURT:  Okay.  All right.  So I did repeatedly tell them, as I do in every trial, that everything they learn about this case needs to be in this courtroom.  I will specify that they should turn away from anything they might see in the news.

```
 1              MS. WILKINSON:  Thank you, Your Honor.

 2              THE COURT:  Sure.  Anything else before we get the

 3    jury?

 4              MS. WILKINSON:  No, sir.  Thank you.

 5              THE COURT:  All right.  Bring the jury.

 6              (Jury entered the courtroom.)

 7              THE COURT:  All right.  You may all be seated.  Good

 8    morning, ladies and gentlemen.

 9              JURORS:  Good morning.

10              THE COURT:  How's everyone today?

11              JURORS:  Good.

12              THE COURT:  Glad you all survived the blizzard of

13    2020 from last night.  You know, I kid, but I'll say, in all

14    seriousness, the Court -- and I kid the folks sometimes who

15    make these decisions, but I wouldn't want to be in their

16    position.  It's a hard call to make.  Their main concern,

17    frankly, is for jurors who are traveling some distances, and

18    so we're always going to exercise caution.

19              And so yes, it doesn't look like there was much snow

20    yesterday, as it turned out, but we do try to be cautious to

21    make sure you all are able to get home safely.

22              So we are ready to go.  I believe we had a witness

23    on the stand, so we can get that witness back on.

24              MS. OLDHAM:  Yes, Your Honor.  Thank you.

25              THE COURT:  While we're doing that, ladies and
```

1    gentlemen, let me also give you one caution.  You've already

2    heard me say a number of times that everything you learn about

3    this case needs to be learned in this courtroom, like you

4    certainly shouldn't be looking for any other information, any

5    other news on this case.

6            You know, it has come to my attention that there has

7    been some news coverage of the case, and so I want to

8    specifically tell you that if you were to come across

9    something, see something flash across the news, you should

10   make an effort to divert yourself from it.  If you see

11   something -- you can take the stand, sir, while I'm talking,

12   that's fine -- if you were to see something on the news, I

13   don't know if you watch local news, you should change the

14   channel.  If you see a newspaper that seems to be covering it,

15   you should push it away.  You should make affirmative efforts

16   to make sure everything you're hearing about this case, you're

17   hearing in this courtroom.

18           All right.  With that, you may continue.

19           Sir, you're still under oath.

20           THE WITNESS:  Yes, sir, Your Honor.  Good morning.

21           THE COURT:  Good morning.

22                OFFICER AARON M. CAIN,

23   called as a witness, being previously duly sworn, was examined

24   and testified as follows:

25           THE WITNESS:  Yes, sir.  Good morning.

1                      DIRECT EXAMINATION

2      BY MS. OLDHAM:

3      Q.  Good morning again, Officer Cain.

4      A.  Good morning.

5      Q.  Officer Cain, when we left yesterday, we were attempting

6      to play, and we're going to play here this morning,

7      Exhibit A-3, which you indicated you had reviewed, they were

8      the police dispatch recordings of the call from Friday,

9      May 27th, 2016.

10     A.  Yes, ma'am.

11             MS. OLDHAM:  And, Your Honor, I have made copies for

12     the jurors of the transcripts.  If I may be able to pass them

13     out to them.  I can certainly retrieve them once the recording

14     is finished.

15             THE COURT:  That's fine.  And, again -- you can go

16     ahead and start doing that -- I just remind you, again, that

17     the transcripts are not themselves evidence, so you shouldn't

18     take notes on the transcripts, because you won't get to keep

19     them.  But they're certainly there to help you.

20             Do I have one in my binder?

21             MS. OLDHAM:  Yes, Your Honor, it should be A3-A.

22             (Audio played.)

23             MS. OLDHAM:  Thank you, Your Honor.  Shall I

24     retrieve the exhibits now?

25             THE COURT:  Sure.

1              MS. OLDHAM:   The transcripts.

2    Q.   (BY MS. OLDHAM)   Officer Cain, the information that you

3    provided over the dispatch about the victim's name and date of

4    birth, from whom did you receive that information?

5    A.   I believe it was -- excuse me, I believe it was the

6    victim's mother that I retrieved the information from.

7    Q.   And do you recall who is it in the background of that

8    recording that is crying?

9    A.   I think it's the same -- I think it's her mother is the

10   young lady that's crying.

11   Q.   When you were relaying information to the dispatcher,

12   suspect information, you used the code "No. 1 male," what is

13   that in police code?

14   A.   Black male.

15   Q.   And there were some references to "needing 2100 up here,"

16   what is that?

17   A.   2100 is the number to our homicide section, so for police

18   communication purposes, we just say notify 2100, and that

19   immediately let's the dispatcher know to call homicide, call

20   our homicide section, excuse me.

21   Q.   And I'm going to now show you and pull up Exhibit A-4.

22   Multiple pages, so if you need the hard copy, Officer Cain, I

23   have it.   But what is Exhibit A-4?

24   A.   This is a detailed description of the CAD report.   This is

25   a computer-assisted dispatch report that comes out.   When the

Direct Examination – Cain   (By Ms. Oldham)

1    dispatcher is relaying information, she's also typing it as

2    she's relaying it, and we can actually get this information

3    from the computer that -- we have some software that we have

4    on the computer, and normally that's done by the detective at

5    a later time.

6    Q.   And does this detailed CAD report indicate what time the

7    call for the shooting came in?

8    A.   Yes, it shows it came out at 7:19 and 9 seconds.

9    Q.   Thank you, Officer Cain.

10           MS. OLDHAM:  I have nothing further, Your Honor.

11           THE COURT:  All right.  Cross-examination.

12           MR. ZERKIN:  One moment, Your Honor.

13           THE COURT:  Sure.

14           MR. ZERKIN:  We have no questions, Your Honor.

15           THE COURT:  All right.  Cross-examination by

16   Mr. Mosley.

17           MR. MERCER:  We have no questions, Your Honor.

18           THE COURT:  All right.  Very well.  Sir, thank you

19   so much for your testimony, you are excused.  Don't discuss

20   your testimony with anyone until the trial has been completed.

21   Enjoy the rest of your day.

22           THE WITNESS:  Thank you, Your Honor.

23           THE COURT:  Government's next witness.

24           MS. OLDHAM:  Your Honor, the next witness is Crime

25   Scene Technician Travis Winder.

1              THE CLERK:  Good morning, sir, please raise your

2    right hand.

3                        TRAVIS WINDER,

4    called as a witness, being first duly sworn, was examined and

5    testified as follows:

6              THE WITNESS:  I do.

7              THE CLERK:  Thank you.  You may have a seat.  Please

8    state and spell your full name for the Court.

9              THE WITNESS:  Travis Winder, my name is T-r-a-v-i-s,

10   last name W-i-n-d-e-r.

11             THE CLERK:  Thank you.

12                     DIRECT EXAMINATION

13   BY MS. OLDHAM:

14   Q.  Good morning, Mr. Winder.

15   A.  Good morning.

16   Q.  Can you tell us what you do for a living, sir?

17   A.  Currently I'm a crime laboratory supervisor for the

18   Baltimore Police Department.

19   Q.  How long have you been a crime lab technician supervisor

20   for the Baltimore Police Department?

21   A.  Almost nine years.

22   Q.  And have you been a supervisor that entire time?

23   A.  No.

24   Q.  Was that a recent promotion?

25   A.  Yes, November of 2019.

Direct Examination – Winder  (By Ms. Oldham)

1    Q.  Okay.  So for nine years you've been a crime scene

2    technician with the Baltimore Police Department, can you tell

3    us what your duties are as a crime scene technician?

4    A.  Generally my duties are to respond to crime scenes,

5    investigate crime scenes, recover evidence from crime scenes,

6    as well as process, if necessary, recover biological samples,

7    as well as package evidence for further analysis, as well as

8    for court presentation.

9    Q.  Mr. Winder, I'm going to direct your attention to the

10   morning of Friday, May 27th, 2016, were you on duty that

11   morning as a crime scene technician?

12   A.  I was.

13   Q.  And were you called to respond to the 2900 block of

14   Rosalind Avenue in Baltimore City?

15   A.  Yes.

16   Q.  Do you recall approximately what time you were dispatched

17   to respond to that location?

18   A.  It was between the hours of 8:00 a.m. and 9:00 a.m.

19   Q.  And do you know, around what time did you respond and

20   actually arrive at Rosalind Avenue?

21   A.  My response time was -- do you mind if I reflect my report

22   to get the specific time?

23   Q.  Will it refresh your recollection to refer to your

24   report?

25   A.  Yes.

Direct Examination – Winder   (By Ms. Oldham)

1   Q.   Okay.

2   A.   My response time was 8:12 a.m.

3   Q.   When you arrived at the 2900 block of Rosalind Avenue, can

4   you tell us who was already present at the scene?

5   A.   There was several officers.  The scene was taped off with

6   crime scene tape.  So my protocol is to find out who the

7   primary officer of the scene is.  So when I responded, I

8   discovered that Officer Cain was the primary officer.  And --

9   did I answer your question?

10   Q.   Yes.  Thank you.  And when you determine who the primary

11   officer is, Officer Cain in this instance, does he brief you

12   on the situation at hand?

13   A.   Yes, he tells me as much information he knows.  In

14   reference to this situation, he told me that a person was shot

15   or injured, and he directed me to the location in which he

16   believed that the person was at when they were shot, which was

17   at 29 -- between addresses of 2919 and 2921 on Rosalind

18   Avenue.

19   Q.   Okay.  When you're saying that you were referred to a

20   particular location where somebody went, is that what you --

21   A.   No, not where someone went, but where the victim who was

22   injured may have been -- to the location where the injured

23   victim possibly was at when they were injured.

24   Q.   And was the victim still present when you arrived on

25   scene?

1    A.  No.

2    Q.  Okay.  Were you the crime scene technician who would have

3    photographed the entire scene?

4    A.  Yes.

5    Q.  And were you the only crime scene technician that

6    responded to process the scene?

7    A.  Yes.  To my knowledge, yes.

8    Q.  I'm going to then walk you through a series of your

9    photographs, Mr. Winder, I'm going to start first with

10   Government's Exhibit A-7.  And you can look to the screen

11   that's next to you to your right.

12   A.  Okay.

13   Q.  Can you first just tell us what A-7 is?

14   A.  All right.  This is the first photograph technicians

15   usually take, and it shows the unique identifier, which we

16   call a CC number, and it also has the offense as well as the

17   date of the location that we're photographing.

18   Q.  Now, the CC number, is that a case number that would stay

19   with the investigation?

20   A.  Yes.

21   Q.  Now, for offense up in the left-hand corner, it says

22   homicide.  At this point, have you learned that the victim has

23   passed?

24   A.  Yes.

25   Q.  Okay.  Now I'm going to show you A-7 -- I'm sorry, A-8,

Direct Examination - Winder  (By Ms. Oldham)

1    Government's Exhibit A-8, if you can tell us, A-8, what this
2    is depicting.
3    A.  Basically this is a driveway on scene, and I took this
4    photograph to try to like show a different perspective of the
5    scene.  So also, I didn't know if this was involved, so I took
6    a picture of it from this location just to gain a different
7    perspective.
8    Q.  And when you say you don't know if "this was involved,"
9    what are you referring to?  Is there a particular area of the
10   photograph that you're referring to?
11   A.  This driveway.
12   Q.  Okay.  And is it a driveway to a residence, or is it like
13   an alleyway, or an actual street that goes through?
14   A.  It was like an alleyway, not a street.
15   Q.  All right.  Moving on to Government's Exhibit A-9.
16   A.  Basically this is like an overall view of the location
17   where the -- Officer Cain directed me to when I initially
18   arrived.
19   Q.  And is that Officer Cain in the center of Government's
20   Exhibit A-9?
21   A.  Yes.
22   Q.  Okay.  Next showing you Government's Exhibit A-10.
23   A.  Basically this is Officer Cain on scene, and this is an
24   overall shot of how I discovered the scene when I arrived.
25   Q.  And the vehicle that's depicted in this, Government's

Direct Examination – Winder  (By Ms. Oldham)

1    Exhibit A-10, was that the vehicle that you were directed to

2    as belonging to the victim?

3    A.  Yes.

4    Q.  Moving on to Exhibit A-11.

5    A.  This is basically just an overall shot of the vehicle that

6    was said to belong to the victim.

7    Q.  And, to your knowledge, is the victim's residence or the

8    front door of her residence depicted in A-11?

9    A.  Yes, it is actually the address that has the wreath, like

10   the 4th of July wreath on the door.

11   Q.  A-12.

12   A.  This is another shot, just basically showing the victim's

13   car, the front door of -- with the wreath and the tree next to

14   it.

15   Q.  And is there anything else that's depicted in this

16   photograph, A-12, that was pertinent to this particular crime

17   scene?

18   A.  Yes, near this tree there was a set of keys as well as

19   suspected blood on the curb.  You really can't see it because

20   of shadows, but it's there.

21   Q.  Okay.  Just kind of zooming in, is that what you're

22   referring to, Mr. Winder?

23   A.  Yes, if you look at the bottom right-hand corner, you will

24   see the suspected blood stains on the ground at the base of

25   the tree where the curb is.

1  Q.  Thank you.  Moving on to A-13.  I should have also let you

2  know, Mr. Winder, that if there's anything that you did want

3  to point to or highlight on the photograph, if you touch it

4  with your finger, it will actually trace and highlight

5  whatever it is that you want to direct our attention to.

6  A.  Okay.

7  Q.  So moving on to Government's Exhibit A-13.

8  A.  Basically this is an overall shot of the suspected blood

9  as well as where the small cone is to the bottom right-hand

10  side, right there.

11  Q.  And did you place that cone there?

12  A.  No.

13  Q.  And is --

14  A.  Typically when officers arrive to scenes, if they feel

15  like something is important, they typically place cones near

16  the item, just to like help them out or help others who arrive

17  to the scene know that this is important, so stay away from

18  it.

19  Q.  So at some point you took a closer up photographs of what

20  that cone is --

21  A.  I did.

22  Q.  -- next to?  Okay.

23      And before we move on from A-13, can you also just

24  indicate for us where on this photograph depicts the victim's

25  front door?  You're referring to it as a 4th of July wreath of

Direct Examination – Winder   (By Ms. Oldham)

1    some sort.  I think you can even touch it and circle it.

2    A.  Yeah, if you look up to the upper left-hand side, this

3    area up here.

4    Q.  All right.  Thank you.  Moving on to A-14 -- oh, I'm

5    sorry, moving on to A-15.

6    A.  This is like a midrange shot showing the suspected blood

7    on the curb as well as a set of keys that were on scene near

8    that big tree that we saw in the previous photograph.

9    Q.  Okay.  A-16.

10   A.  This is an angle I wanted to show, like the suspected

11   blood in accordance to the vehicle that was initially

12   photographed.  And if you look on the bottom right, you will

13   see my marker and the blood is here.

14   Q.  Okay.  So that particular marker is just to indicate that

15   pool?

16   A.  Yes.

17   Q.  Okay.  Thank you.  A-17.

18   A.  This is a close-up shot of the set of keys that were on

19   scene near that big tree that we saw in two previous

20   photographs.

21   Q.  A-18.

22   A.  This is a frontline shot in accordance to the front of the

23   house that was said to be the victim's with the 4th of July

24   wreath.

25   Q.  Okay.  A-19.

Direct Examination - Winder   (By Ms. Oldham)

1    A.  This is just a shot showing the walkway from the location

2    that was said to be the victim's.

3    Q.  A-20.

4    A.  This is a perspective from the front door of the door that

5    had the wreath.

6    Q.  And just to give us perspective with some of the prior

7    photographs, that cone that showed us where the keys were,

8    that would be to our left in this photograph --

9    A.  Yes, so it would be --

10   Q.  -- near that tree?

11   A.  -- on the other side of this tree.

12   Q.  Okay.  A-21.

13   A.  Basically this is from the front door with the wreath, but

14   showing the other end of the block.

15   Q.  A-22.

16   A.  This is further down the block, and this is like a -- it's

17   like a -- like some sort of cut through.  So it looked like --

18   kind of sketchy to me, so I took a picture of it just in case

19   something -- it came up later in the investigation.

20   Q.  Okay.  When you say it looks "sketchy" to you, what are

21   you referring to?

22   A.  As in like, due to my experience with crime scenes, this

23   is like a -- like if someone shot someone, they would

24   typically either come from a way like this or maybe use this

25   type of route to escape, if they were on foot.

Direct Examination – Winder   (By Ms. Oldham)

 1    Q.  Okay.  And what side of -- in relation to the victim's

 2    front door, which we've seen in the photographs, what side of

 3    the street is this wooded cut through on?

 4    A.  Well, this is on a side where the victim's door is, but

 5    it's further down the block, like -- I didn't do a

 6    measurement, but it's to the left, so if I was facing the

 7    victim's door, it's to the left further down the block.

 8    Q.  At the end of those -- the row of townhouses?

 9    A.  Yes.

10    Q.  Okay.  A-23.

11    A.  This is just a closer shot of the walkway that we

12    previously saw.

13    Q.  And A-24.

14    A.  This is the other side of the walkway, just showing the

15    area -- once you walk up the walkway, this is the area on the

16    other side of that walkway from the previous photo.

17    Q.  So if I were to walk through that pathway that was

18    depicted in A-23, when I came out of that wooded part, this is

19    where I would be standing?

20    A.  Correct.

21    Q.  Okay.  A-25.

22    A.  This is a shot from the walkway showing up the block where

23    the victim's house was.

24    Q.  Is this taken from that pathway that was depicted earlier

25    in A-23?

Direct Examination - Winder   (By Ms. Oldham)

1    A.  Yes.

2    Q.  Okay.  So the -- in looking in the view of A-25, the

3    victim's front door is on which side of the photo?

4    A.  On the left.  (Indicating).  There's the Altima.

5    Q.  And then A-26.

6    A.  This is a shot from that side of the block where that

7    wooded walkway was, but just showing -- going in the direction

8    of the victim's car, the tree and the victim's location.

9    Q.  Did you happen to -- thank you, Mr. Winder.

10       Did you happen to take a measurement of the width of the

11   street?

12   A.  I did.

13   Q.  And how did you go about doing that?

14   A.  We have devices that we use for measurements.  So the

15   device I used for the width of the street, it's like a -- we

16   call it a rolling tape, and it has two wheels and it has also

17   a measuring device between the two wheels, so I used that

18   device.

19   Q.  And what was the width of the street using that device?

20   A.  Do you mind if I look at my report --

21   Q.  If that would refresh your recollection.

22   A.  All right.  The width of the street was 24 feet and 2

23   inches.

24   Q.  And did you, as part of your duties as a crime scene

25   technician, did you create a diagram, like a basic sketch

1   diagram of the area?

2   A.   I did.

3   Q.   Okay.   And I'm going to show you Government's Exhibit A-5.

4   Can you tell us what A-5 is?

5   A.   Basically this is the diagram that I created of the scene.

6   And I did this at an office, not on scene.   But on scene, I

7   created like a hand-drawn diagram, and this is a

8   computer-generated diagram that I created.   And it's basically

9   just created to place items on the scene in accordance to

10   measurements.

11   Q.   Okay.   So once you made your rough sketch on scene --

12   A.   Yes.

13   Q.   -- you then used a program to create A-5?

14   A.   Yes.

15   Q.   Can you just show us on A-35, the general area of where

16   that cut through pathway was that we talked about earlier that

17   was in A-23?

18   A.   It was here.   (Indicating.)

19   Q.   Okay.   Show us what areas, if any, where you looked for

20   physical evidence, Mr. Winder.

21   A.   Here, here, here, street, other side of the location,

22   basically the entire block.

23   Q.   And what sorts of things are you looking for?

24   A.   Firearms evidence, any type of items that don't appear to

25   be old, anything that could be relevant.

Direct Examination - Winder   (By Ms. Oldham)

1    Q.   Okay.   So anything that looks maybe out of place?

2    A.   Yes.

3    Q.   Okay.   Did you find any firearms evidence?

4    A.   No.

5    Q.   And are you using anything to assist as you're looking, or

6    are you simply doing a walkaround?

7    A.   Just a walkaround.

8    Q.   Was there anything that you did seize -- physically seize

9    from the area?

10   A.   Yes, the keys, the blood, and this -- it was like a --

11   like tobacco and cigarettes wrapped up in a piece of paper,

12   item C, so those are the three items I recovered.

13   Q.   Oh, the letter C on Exhibit A-5.   Okay.

14       Did you have any particular information about that, or

15   that was just something that you seized just because it was

16   there?

17   A.   It was there, and it just looked kind of, you know, funny,

18   so I took it.

19   Q.   Any swabs that you took from the scene?

20   A.   Yes.   I took swabs of the blood that was in the curb,

21   labeled as item A.

22   Q.   And was there any processing that you did or anything in

23   particular you did with respect to the victim's car, the

24   Nissan in the center of the photographs?

25   A.   Yes, there was a homicide detective on scene, and she

1   requested that I process the driver's side of the Altima on

2   scene, so I did that also, the exterior.

3   Q.   Okay.  When a detective asks you to process an area like

4   that, what exactly are you doing?

5   A.   So basically the detective thought it was the victim's

6   car, so they asked me to dust for fingerprints or to try to

7   find maybe latent fingerprints just as a precaution.

8   Q.   And were you able to actually lift or recover any

9   fingerprints from that area?

10  A.   No.

11  Q.   Does that happen on occasion that you are -- that you will

12  process a particular area, but you're unable to lift any

13  prints?

14  A.   Yes.

15  Q.   And what are some of the factors that determines whether

16  or not you can actually lift a print from an area?

17  A.   Well, it could be weather conditions, whether it rained on

18  the vehicle, if it's a vehicle that's outside.  It could be

19  how much oil is in the person's hand who touched the surface.

20  It could also be like what type of powder I'm using at the

21  time on the surface.

22       Sometimes prints get wiped away due to pressure from a

23  powder -- I mean, pressure from a brush when applying powder.

24  It's different factors that go into whether prints will come

25  out on the surface.  It's not like television, how people

1    think.

2    Q.  Okay.  And you didn't have any particular information from

3    the detective that anyone other than the victim had actually

4    touched the vehicle?

5    A.  No.

6            MS. OLDHAM:  No further questions, Your Honor.

7    Thank you.

8            THE COURT:  Cross.

9            MR. DAVIS:  Briefly, Your Honor.

10                        CROSS-EXAMINATION

11   BY MR. DAVIS:

12   Q.  Good morning, Officer.

13   A.  Hey, how are you doing?

14   Q.  We're bringing up Government's Exhibit No. A-11.

15   A.  Okay.

16   Q.  And this you identified as the car you would come to learn

17   to be the victim's car; correct?

18   A.  Yeah, the detective -- Detective Forsythe said that this

19   vehicle was possibly the victim's car.  Yes.

20   Q.  And you were directed to the vehicle by the detective;

21   correct?

22   A.  Correct.

23   Q.  And the detective asked you to process the driver's side

24   of the vehicle for --

25   A.  For latent fingerprints.

Cross-examination – Winder   (By Mr. Davis)

1    Q.   Latent fingerprints?

2    A.   Yes.

3    Q.   And what portion of the driver's side of the vehicle did

4    you process for latent fingerprints?

5    A.   From this portion to this portion.

6    Q.   And did you speak to any --

7              THE COURT:  I'm sorry, if I could ask, when -- and

8    this is for all counsel -- when a witness marks on the screen,

9    if you could identify for the record where they're marking.

10             MR. DAVIS:  Certainly.  And for the record, the

11   witness has drawn a line midway in the front of the vehicle,

12   literally directly diagonally to the front tire, and he's done

13   the same with respect to the rear tire on the vehicle.

14             THE COURT:  Thank you.

15             MR. DAVIS:  So between the rear vehicle tire and the

16   front vehicle tire, that is the area that he processed for

17   prints.

18   Q.   (BY MR. DAVIS)  Now, you don't talk to witnesses at the

19   scene; correct?

20   A.   Correct.

21   Q.   Nobody directed you -- nobody told you that anyone touched

22   the vehicle; correct?

23   A.   Correct.

24   Q.   Nobody told you that nobody didn't touch a vehicle;

25   correct?

1   A.  Correct.

2   Q.  Nobody told you anything, they just told you to process

3   that; correct?

4   A.  They asked me to, yes.

5   Q.  And it was your understanding you were to process the

6   vehicle for latent prints; correct?

7   A.  Correct.

8   Q.  Now, did you take any swabs from the vehicle?

9   A.  No.

10  Q.  Did you inspect the vehicle or vacuum the vehicle, the

11  outside of the vehicle, for any hair samples?

12  A.  No.

13  Q.  Were you directed to do any of this by anyone at the

14  scene?

15  A.  No.

16  Q.  And who was the homicide detective that was directing you

17  to process the scene for forensic evidence?

18  A.  Detective Forsythe.

19  Q.  And after you processed the vehicle, your duties are over,

20  you -- if you had recovered something, you have nothing else

21  to do with it, you just recover evidence, and it goes on to

22  the next phase; correct?

23  A.  Yes, I just know how analysis work.

24  Q.  Thank you, Officer.

25          MR. DAVIS:  Nothing further.

1              THE COURT:  Counsel for Mr. Mosley cross.

2              MR. MERCER:  No questions, Your Honor.

3              THE COURT:  All right.  Any redirect?

4              MS. OLDHAM:  No, Your Honor, thank you.

5              THE COURT:  All right.  Sir, thank you so much for

6    your testimony.  You're excused.  Don't discuss your testimony

7    with anyone until the trial has been completed, and enjoy the

8    rest of your day.

9              THE WITNESS:  Thank you.

10             THE COURT:  Next government witness.

11             MS. WILKINSON:  Yes, the government calls

12   Christopher Iber, I-b-e-r.

13             THE CLERK:  Good morning, sir, please raise your

14   right hand.

15                     CHRISTOPHER IBER,

16   called as a witness, being first duly sworn, was examined and

17   testified as follows:

18             THE WITNESS:  I do.

19             THE CLERK:  Thank you, you may have a seat.  Please

20   state and spell your full name for the record.

21             THE WITNESS:  My name is Christopher Iber, I, b as

22   in boy, e-r.

23             THE CLERK:  Thank you.

24                     DIRECT EXAMINATION

25   BY MS. WILKINSON:

Direct Examination - Iber   (By Ms. Wilkinson)

1  Q.  So first I should ask, Mr. Iber, who are you employed

2  with?

3  A.  I am currently with the Federal Bureau of Investigations.

4  Q.  And what is your duty station?

5  A.  In Quantico, Virginia.

6  Q.  And is that quite some distance from here?

7  A.  It's about a two-hour drive, at least.

8  Q.  And as a result of the snow delay, were you scheduled to

9  testify yesterday?

10  A.  Yes, ma'am, I was.

11  Q.  Well, thank you for staying, we all appreciate it.

12      And if I could ask you what your title is at the FBI.

13  A.  My official title is physical scientist, photographic

14  technologist.  I'm a forensic examiner of question

15  photographic evidence.

16  Q.  And just give us a background of your training and

17  experience for the profession you just told the jury about.

18  A.  I have a bachelor of science degree in biomedical

19  photographic communications from Rochester Institute of

20  Technology, RIT up in Rochester, New York.  I have been

21  working with the FBI for over 16 years.

22      When I started with the FBI, there was a two-year

23  training program, almost like a master's degree, where I took

24  classes, attended conferences and meetings, read journals,

25  textbooks, and was quizzed on new material that I was taught

Direct Examination - Iber   (By Ms. Wilkinson)

1   from senior examiners.  And most importantly, I actually

2   worked on case work during those two years under the tutelage

3   of a senior examiner.

4   Q.  And in your professional capacity, do you also go to

5   continuing education and also teach other students about your

6   work?

7   A.  Yes.  Part of my responsibilities is to -- there's not a

8   university that has a degree in image analysis.  So the

9   training is done through the Bureau, and we take classes in

10  different features that would assist in my analysis.  So

11  classes in anatomy, I've been to car manufacturing facilities,

12  clothing manufacturing facilities.

13       And I also train in software.  I work in a digital

14  evidence laboratory, so most of the things that I work on are

15  computers.  And so I take software, use different types of

16  software.  So I stay up to par with the different types of

17  software that I use.

18  Q.  And are there other physical scientists, photographic

19  technologists who work at the FBI, your colleagues there, or

20  are you the only one?

21  A.  No, there's -- currently there's four of us for the whole

22  Bureau.  We assist federal and local cases, as well as

23  international cases.

24  Q.  And then all over the United States, and of course as you

25  said, internationally as well?

Direct Examination - Iber   (By Ms. Wilkinson)

1   A.  Yes, ma'am.

2   Q.  Just four of you?

3   A.  Yes, ma'am.

4   Q.  In your time there, have -- as part of your job to testify

5   before juries like you're doing today?

6   A.  Yes, I have testified before.

7   Q.  And have you done that on other occasions before today?

8   A.  Yes, ma'am.

9   Q.  And on how many occasions have you testified?  Again, we

10  just need an approximate number.

11  A.  Approximately 15 times.

12  Q.  And does that include state and federal court?

13  A.  And military court as well.

14  Q.  And have you testified for both the government and for the

15  defense on occasion?

16  A.  Yes, ma'am.

17  Q.  Are you a member of any professional associations

18  associated with your job at the FBI?

19  A.  I am currently a member of the International Association

20  for Identification, known as IAI.  I'm also a member of OSAC,

21  which is the Organization of Scientific Area Committees.  That

22  is a group of scientists, lawyers, judges, psychiatrists, from

23  all different fields of forensic science, and the particular

24  group that I work with is with image analysis.  And we are

25  writing standards and guidelines for forensics.

Direct Examination – Iber   (By Ms. Wilkinson)

1      I'm also a member of the Scientific Working Group of

2   Digital Evidence.  Again, this is an organization that writes

3   guidelines to assist people who do video and image analysis.

4   Q.  And has -- when you've testified before, have the Courts

5   qualified you as an expert in questioned photographic

6   evidence?

7   A.  Yes, ma'am.

8   Q.  Have you ever not been qualified when you've been

9   proffered as an expert in that field?

10  A.  No, ma'am.

11          MS. WILKINSON:  At this time, Your Honor, I would

12  proffer Mr. Iber as an expert in question photographic

13  evidence.

14          THE COURT:  Any requested voir dire or objection?

15          MR. MERCER:  No, Your Honor, Mr. Mosley accepts

16  Mr. Iber as an expert in forensic digital examination.

17          MR. DAVIS:  Same for Mr. Carter, we accept.

18          THE COURT:  All right.  Ladies and gentlemen, I will

19  allow this witness to testify as an expert in this field.

20  Expert witnesses are allowed to provide you with their

21  opinions within their areas of expertise.

22          I do want to remind you, you remain the judges of

23  the facts, and so it is still your responsibility to determine

24  how much of the witness's testimony you decide to credit.

25          You may continue.

1        MS. WILKINSON:   Thank you, Your Honor.

2   Q.  (BY MS. WILKINSON)   Mr. Iber, as part of your job at the

3   FBI, are there different types of tasks you're asked to

4   perform with regard to question photographic evidence?

5   A.   Yes, I do four primary types of exams.  I do authenticity

6   exams, that's where I look at imagery to determine if it's

7   been manipulated or if it's come from a particular specific

8   camera.  I also do photogrammetry.  Photogrammetry is simply

9   the science of taking measurements from photographs.

10        So examples would be height analysis or it would be

11   recreating a crime scene by putting items back in place where

12   they were when they were captured by the surveillance video or

13   the velocity of a vehicle, how fast a vehicle was traveling

14   through a video, through a surveillance video.

15        I also do comparison analysis.  Comparison would be

16   anything that's depicted within photographs.  And that

17   includes videos, so digital or analog or your traditional

18   photography.  And that can be clothing, faces, it can be

19   hands, it can be vehicles, it can be anything that's depicted

20   within those images.

21        And then the fourth exam that I do is what we call

22   information extraction, which is simply just enhancements

23   where I try to bring out information that is in the

24   photograph, so that I can either assist the investigators or

25   so that I can make an opinion, a conclusion.

Direct Examination - Iber  (By Ms. Wilkinson)

1    Q.  And of those four types of kind of work or tasks that you

2    do as an examiner for the FBI, were you asked to perform

3    several of those tasks in connection with the matter that's

4    pending before the jury here today?

5    A.  Yes, ma'am, I was.

6    Q.  And when you get a request like that, knowing that you're

7    only one of four for the entire country, how is that request

8    received by you?

9    A.  All of our requests, even if they come from state or from

10   outside the federal system, have to go through an FBI office,

11   a local field office.  When we -- when I first started with

12   the Bureau, we would take in requests from anywhere, and we

13   got a very large back load of cases.

14       So it's required for them to go through local field

15   office.  So an agent will be assigned a case.  They will have

16   evidence that they need for us to do one of those four exams.

17   And it is submitted to us.  And then it's assigned to me by my

18   supervisor and then I work on the case.

19   Q.  And are you familiar with the term "EC" or electronic

20   communication?  I think that's what it stands for.

21   A.  Yes, ma'am.

22   Q.  What is that?

23   A.  That's simply the -- it's called an EC, an electronic

24   communication, it's the actual request.  It's from the agent,

25   and of course that goes through their supervisor to get

Direct Examination - Iber  (By Ms. Wilkinson)

1    approved to send to us to actually do the work.  If there's
2    evidence involved, that is sent to our evidence team, which of
3    course handles the evidence and takes it in and starts a chain
4    of custody.  And that evidence is then transferred to me, and
5    I work on that evidence and do my analysis.
6        And when I'm finished with my analysis, a report is
7    written and evidence or any derivative evidence or materials
8    that I create is sent back through our evidence team, back to
9    the original agent who requested.
10   Q.  So you talked about the four categories, the first one was
11   authenticity, and you weren't asked to do anything with regard
12   to assuring that any document or something was authentic in
13   this case, were you?
14   A.  That's correct.
15   Q.  Okay.  So we're going to deal with the other three
16   categories, starting first with reverse projection.  And did I
17   say it right, reverse projection --
18   A.  I refer to it as photogrammetry.  Reverse projection
19   photogrammetry is one of the types that we use for our
20   analysis.
21   Q.  I'm probably never going to be able to say that word
22   correctly, so bear with me if I just call it reverse
23   projection, and you can add the scientific term to it.
24       Were you asked to perform that type of analysis on a
25   still photograph or a video that included video of a person

Direct Examination - Iber  (By Ms. Wilkinson)

1   leaving the area of the crime scene in connection with this

2   case?

3   A.  Yes, ma'am, I was asked to do a height analysis.

4   Q.  Okay.  And explain to the jury what a height analysis is.

5   A.  So one of the methods of photogrammetry uses reverse

6   projection photogrammetry, and that requires for me to go back

7   to the scene where the video, the surveillance video, captured

8   the person of interest in this case.  And what they were

9   asking for is for a height analysis, how tall the person was

10  in that video.

11      So I go back to the scene -- well, before I go to the

12  scene, I look at the video to make sure that it has the --

13  it's conducive to a height analysis.  There are certain things

14  that are required for me to be able to do a height analysis.

15  One is resolution, is there sufficient resolution of where the

16  person is in the scene?

17      Another is that, are there items or features within the

18  scene that can't be moved that are in place so that I can use

19  that to align the camera?  Reverse projection works because of

20  the physics of how a camera captures an image.  Now, when a

21  camera takes a picture, even a video camera, because a video

22  is simply a sequence of still images -- so it's -- motion

23  pictures is kind of a magic that our brain sees when those

24  pictures are played back at a certain frame rate.

25      So even video is single images.  So I'm looking for a

Direct Examination - Iber   (By Ms. Wilkinson)

1   single image, and when I align that camera, I go back to the

2   scene and I use the live image at the time that I'm there, and

3   the captured image from at the time of the incident, and I

4   align -- make sure the camera's still aligned.  And if those

5   features are still aligned, then I know that I can then

6   place -- simply place a height chart right where the person

7   was standing, and I can measure how tall they are.

8        So that's the other requirement that I need, is that

9   those features are still there, and then I can see those and

10  the camera can be aligned.

11  Q.  And I am going to direct your attention to the terminal

12  right now, I might have to go over here with the assistance of

13  Ms. Lesser.  And I'm just going to show you briefly an excerpt

14  from Government's Exhibit V as in Victor, 1.  Just for the

15  record, at approximately 7:20 a.m.

16       Directing your attention to the moving figure in the

17  photograph.

18            MS. WILKINSON:  And then if you can stop it right

19  there.

20  Q.  (BY MS. WILKINSON)  Now, I don't know if I stopped it in

21  the exact correct place, but was this the different frames of

22  the video that you were asked to perform reverse projection

23  on?

24  A.  This was one of the camera angles that was given to me to

25  see if it was conducive for height analysis.

Direct Examination - Iber   (By Ms. Wilkinson)

1   Q.  I'm going to jump to the end of the story right now and

2   ask you, Mr. Iber, were you able to perform that type of

3   analysis on this person in connection with our

4   investigation?

5   A.  This is not the camera angle that I chose to try.  One of

6   the reasons --

7   Q.  I'm only showing this for demonstrative purposes.

8   A.  Sure.

9   Q.  But were you able to perform that type of reverse

10  projection on this individual in connection with our

11  investigation?

12  A.  No, ma'am, this image or this camera angle is not

13  conducive to a reverse projection.

14  Q.  Okay.  And explain the difficulty in being able to obtain

15  that in connection with this investigation.

16  A.  Again, as I said, resolution is one of the key factors,

17  and in this particular frame, the subject of interest is too

18  far away from the camera, so therefore, the amount of

19  pixels -- and pixels are simply the smallest element of a

20  digital image, so those are the small dots that make up the

21  image.

22      So where that person is in that frame, there's not enough

23  pixels, the resolution is not sufficient for me to be able to

24  do a height analysis through reverse projection.

25  Q.  I'm going to have Ms. Lesser go ahead and continue to play

1    it.

2                THE COURT:  I'm sorry, if we can please make sure

3    all cell phones are off.  All cell phones should be off.

4                JUROR NO. 6:  I apologize.

5                THE COURT:  Okay.

6    Q.  (BY MS. WILKINSON)  Okay.  We're just going to go ahead

7    and stop it again for demonstrative purposes.  At any time in

8    the connection with this individual, either in the earlier

9    footage or the one that we're seeing now from a different

10   camera, were you able to perform reverse projection -- I can't

11   say the word --

12   A.  Photogrammetry.

13   Q.  Yes, photogrammetry.

14   A.  So this camera angle I actually did choose as being

15   conducive to doing a reverse projection.  As I said earlier,

16   it requires that I go back to the scene and utilize the camera

17   that was involved in capturing the surveillance video, which I

18   did.  I believe there to be enough resolution and enough

19   features within the frame that we're -- haven't moved, such as

20   the curbs, the lines in the parking lot, trees, telephone

21   poles, and even the building and -- back in the background.

22   All of those things told me that this should be conducive to a

23   height.

24        Unfortunately, sometimes when I get to the location,

25   there can be other factors that can make it to where it

1    becomes nonconducive once I get to the scene.  In this case,

2    that is what happened.  So it requires for me to have access

3    to the camera so that I can make sure that the camera is

4    aligned, and if it's not aligned, then I have to attempt to

5    align the camera back into the original position so that I can

6    get an accurate height.

7        The camera not only had been moved, it also had been

8    changed.  So it was a different camera.  I attempted to align

9    the camera and was unsuccessful.  And I did not feel

10   comfortable enough with what alignment I could get that it was

11   sufficient enough to give me an accurate height.  So I wrote a

12   report saying that it was no longer conducive to a height

13   analysis.

14   Q.  Now, let me turn to the next type of task that you're

15   often asked to perform as an examiner at the FBI, and that is

16   with regard to comparative analysis.  Again, give us a little

17   additional information about what you can and cannot do with

18   regard to comparative analysis.

19   A.  So as I said earlier, I can compare anything that's

20   depicted within photographs.  Not only can I compare in

21   photographs, but I can also compare actual objects to things

22   that are depicted in photographs.  In this case I was

23   requested to do a comparison of a vehicle, and so I -- for

24   comparison analysis, I need to be able to see different

25   features to be able to compare them side to side, one to one.

1          And those features are broken down into two types,

2     there's class characteristics and then there's what we call

3     unique or individualized characteristics.  Class

4     characteristics, an example would be the difference between a

5     baseball hat and a cowboy hat.  So very obvious there are

6     class differences between those, and you would be able to say

7     that they're not the same hat.  So class characteristics put

8     things into a group.

9          So just because you have two cowboy hats next to each

10    other, you can't say that it's -- or in imagery, you can't say

11    that it's the exact same cowboy hat from class

12    characteristics.  Those characteristics would be general and

13    would show that they belong in the same group.  You are able

14    to eliminate things with class characteristics.  So if you're

15    looking at vehicles, for instance, if one imagery was of a

16    minivan and another was of a sports car, obviously those are

17    class characteristics differences, but there's no way they

18    could be the same vehicle, so you would be able to eliminate

19    with class characteristics.

20         Now, to be able to say two things are the same through

21    photo analysis, you have to be able to see some kind of

22    feature that would be unique to that item.  So in a vehicle,

23    typically that would be damage, rust, it would be a custom

24    paint job, or some kind of custom change that has been done to

25    the car, maybe arrangement of stickers, size, and color in the

1  windows or something you can see hanging from the rear-view

2  mirror.  It's going to be some kind of feature that you're

3  able to see in both the images that you're comparing to be

4  able to say that those two vehicles are the actual same

5  vehicle.

6  Q.  And I'm going to grab the microphone up here.  I thought I

7  had it down there.  Make sure that the court reporter can hear

8  me.

9      I'm going to always try to put things in laymen's terms

10  because that's the only way that I can do it, Mr. Iber, and go

11  up here on the -- if everybody can see.

12          MS. WILKINSON:  Your Honor, do you need to see it

13  too, if I put it over here?

14          THE COURT:  That would be good.

15          MS. WILKINSON:  Everybody can see it.

16  Q.  (BY MS. WILKINSON)  So there's two things you can do with

17  comparative analysis, the first is class characteristics?

18  A.  Yes, ma'am.

19  Q.  And the second one being individualized distinguishing

20  characteristics?

21  A.  Yes, ma'am.

22  Q.  So just so that we know the two that are up here so we can

23  do class and then individual.

24      And you were giving descriptions to the jury of the two

25  types of ways that you might be able to do those; correct?

1   A.  Yes, ma'am.

2   Q.  Now, in connection with the -- again, going back to the

3   video -- sounds like a phrase, "going back to the video" --

4   were you able to do both of these types of analysis, one or

5   the other?

6   A.  So I was requested to compare vehicles within the video

7   from different camera angles, to be able to isolate and say

8   that a vehicle was the same vehicle later in the video.  I was

9   able to see class characteristics.  So I was able to put it in

10  a class.  So a type of vehicle.

11      I did not see any individualizing characteristics, either

12  the camera -- there was not enough resolution, there was

13  motion blur, there were different factors that prevented me

14  from or there just weren't any features that were visible

15  within the video.  So I was not able to individualize the

16  vehicles.

17  Q.  And you gave the example with regard to a baseball hat and

18  a cowboy hat.  If you were to have individualized

19  characteristics in a car, and again, we're just doing a broad

20  example, not the one in this case, what would be an example of

21  an individual characteristic that would allow you to make that

22  determination?

23  A.  So as I just said before, so a custom paint job or damage

24  to the vehicle that would be unique from an accident or

25  stickers of some sort, color, location, size, shape, in the

Direct Examination - Iber   (By Ms. Wilkinson)

1    windows, would be assisting.  A license plate obviously would

2    be an individualizing characteristic if you can see the

3    numbers and letters on the license plate.

4    Q.  So in connection with the matter that's pending now before

5    the jury, did you actually prepare demonstrative exhibits for

6    the jury to see the first type of analysis you did with regard

7    to class characteristics?

8    A.  Yes, ma'am.

9    Q.  Okay.  And I'm going to bring them up for you, and

10   hopefully it will fit up on the easel here.  And hopefully --

11   if you can't see, please do let me know.  Maybe I'll actually

12   have you step down, that might be better, huh, let's do that.

13            MS. WILKINSON:  Is that all right, Your Honor?

14            THE COURT:  Sure.

15            MS. WILKINSON:  Does the witness need a microphone?

16            THE CLERK:  Yes.

17            MS. WILKINSON:  Let me go ahead and do that.  Thank

18   you.

19            Do you mind holding this?

20            THE WITNESS:  No.

21            MS. WILKINSON:  Go ahead and come over.  I'll hold

22   this.

23            THE COURT:  And if at any time defense counsel needs

24   to move in order to see something, you're welcome to.  You're

25   not required to, but welcome to.

1          MS. WILKINSON:  It might be easier for me just to

2    hold it.  This easel is not the best.

3          There's no way to put it so everybody can see it, so

4    thank you, Your Honor.

5    Q.  (BY MS. WILKINSON)  There we go.  Let's start with

6    Government's Exhibit V as in Victor, 6.  I'll have you come

7    around here.  Be sure everyone can see.

8          Okay.  So are you familiar with Government's

9    Exhibit V-6?

10   A.  Yes, these are images that were pulled from the video that

11   was submitted by Agent James.

12   Q.  Okay.  And Agent James is an FBI agent?

13   A.  He was the FBI agent who requested the analysis.

14   Q.  So that's how it was communicated to you?

15   A.  Yes, ma'am.

16   Q.  Okay.  And specifically, what did he send you and what did

17   you do?

18          MR. ZERKIN:  Your Honor, may we approach?

19          THE COURT:  Sure.

20          (Bench conference on the record.)

21          THE COURT:  What's on your mind, sir?

22          MR. ZERKIN:  Well, the defendants can't see what's

23   going on, can't see it.

24          THE COURT:  You're their representatives.  I mean,

25   if there's a copy of it -- I was just flipping through my book

1    to see if I had --

2              MS. WILKINSON:  I didn't put a copy of it in the

3    book.  I can move it back.  Yeah, I can move it back.

4              THE COURT:  That's fine.

5              (The following proceedings were had in open court.)

6              MS. WILKINSON:  Okay.  I know it's a little farther

7    away, and we'll do the best we can.  Maybe if we have to, we

8    can pull it up too.  Let's tilt it a little bit this way.

9    Q.  (BY MS. WILKINSON)  Okay.  So you were saying you prepared

10   Government's Exhibit V-6, and it was prepared through what?

11   A.  I'm sorry, I --

12   Q.  So you prepared Government's Exhibit V-6, and you did it

13   using what?

14   A.  Using general software, just off the shelf software, that

15   would have been Photoshop, Adobe Photoshop.

16   Q.  And where did these images come from?

17   A.  These images were retrieved from different camera angles

18   from the video at the apartment complex.

19   Q.  And I just showed you kind of an excerpt from Government's

20   Exhibit V-1, and unfortunately we're taking it a little bit

21   out of order because we had the officer who prepared the

22   compilation scheduled to be before you, but because of the

23   snow delay.

24       Is that compilation familiar to you, the whole width of

25   it?

Direct Examination - Iber   (By Ms. Wilkinson)

1    A.  Yes.

2    Q.  And do these images come from various places within that

3    compilation?

4    A.  They come from the same video that the compilation was

5    created.

6    Q.  Okay.  And here, can you tell the jury what class

7    characteristics caused you to put this on the same

8    demonstrative board for them to see?

9    A.  With only four examiners, we don't have the ability to go

10   through entire surveillance video to look for things of

11   interest.  So we ask that when they submit evidence that they

12   request and give us time frames to narrow the time down so

13   that we don't spend hours and hours looking through days and

14   days of video to find what is considered of interest.

15   Q.  That's a good point, because you're an examiner;

16   correct?

17   A.  Yes.

18   Q.  And they're the investigators?

19   A.  Yes, ma'am.

20   Q.  So they're sending you what they get from their

21   investigation for you to exam?

22   A.  Yes, ma'am.

23   Q.  And so you take it as you receive it?

24   A.  Yes, ma'am.

25   Q.  Okay.  Go ahead.

Direct Examination - Iber   (By Ms. Wilkinson)

1    A.  So these -- so Agent James did give us specific times or

2    time frames to look at.  And when we were looking at these, he

3    was interested in knowing if I was going to be able to

4    identify specifically a vehicle to another vehicle in

5    different camera angles.  And again, as I have said earlier,

6    there's insufficient information within the images to do that.

7    Q.  So did you see any custom painting?

8    A.  No, ma'am.

9    Q.  Did you see any damage from a car accident?

10   A.  Not that we could see.

11   Q.  On any of the images?

12   A.  No.

13   Q.  And you didn't see any bullet holes in a windshield, for

14   example?

15   A.  That's correct.

16   Q.  Or a different color wheel on one of them?

17   A.  Correct.

18   Q.  And are those kinds of types of individual characteristics

19   that would allow you to make that type of comparison?

20   A.  They would assist in me being able to have a conclusion

21   toward individualizing the vehicles.

22   Q.  So just to be clear, of all the images that you have put

23   up on Government's V-6, none of them have that individual

24   characteristic with one another?

25   A.  That is correct.  I reported that the vehicles were

1    similar in class characteristics, so I was not able to

2    identify or eliminate the vehicles.

3    Q.   One way or the other?

4    A.   Yes, ma'am.

5    Q.   Okay.  And what class characteristics do they share?

6    A.   So what we would call a make/model type of exam at this

7    point.  So any way -- any person would be able to recognize a

8    vehicle, especially if you're familiar with it.  With my

9    science, I break the vehicle down and look at different parts

10   of the vehicle to see the shape or if there's some type of

11   feature.

12       Now, these are all done on all the vehicles.  These are

13   manufactured, and there's thousands of them that are made.  So

14   these are just class characteristics.  So I'm looking at the

15   shape of taillights, I'm looking at where the third brake

16   light is located, I'm looking at where the license plate is

17   located; is it on the trunk, is it on the bumper?  I'm looking

18   at trim, I'm looking at headlight shape, I'm looking at side

19   window shape.

20       There's -- these all -- all these features are going to

21   be consistent across a particular manufactured vehicle.  And

22   those are class characteristics.

23   Q.   Okay.  And we have probably, what, 24 -- one, two, three,

24   four, five, six times four, 24 images up here, do each of

25   these images share the same class characteristics?

Direct Examination - Iber   (By Ms. Wilkinson)

1   A.  Yes, ma'am.  Now, obviously in some of the images you

2   can't see the front of the car, you can only see the back.

3   But those class characteristics are consistent with other

4   images of the same angle perspective.

5   Q.  And then let me go ahead and put up Government's

6   Exhibit V-7, and I'll put this one over here at the same time.

7   The jury can glance over.

8       Is this a second vehicle that you performed the same type

9   of -- attempted to perform the same type of comparative

10  analysis on?

11  A.  The request was for two different vehicles, so this was

12  the other vehicle of interest.  And again, there -- I could

13  not observe any individualizing characteristics to where I

14  would be able to identify that vehicle as being the same

15  vehicle in all the images, the actual same vehicle.

16  Q.  So they all shared the -- that they didn't have individual

17  characteristics, does that make sense?

18  A.  None that I could observe, yes.

19  Q.  And of the 24 images that are on here, do each of these

20  images capture the same class characteristics of this

21  particular vehicle?

22  A.  Again, like the other vehicle, not all of the frames show

23  the same perspective, but the perspective that is the same in

24  the different frames, I was -- it was consistent.

25  Q.  Okay.  I'm going to go ahead and put this down and have

1    you take a seat back in the witness stand.

2        Okay.  Then there's a third type of task that you were

3    asked to perform, and you explained earlier to the jury,

4    called -- where you do enhancements or just -- I think you

5    described it in a more formal way, but were you asked to --

6    A.  We call that information extraction, it's basically

7    enhancements.  Almost like old televisions or even newer

8    televisions, when you adjust the knobs to bring out more

9    information in the TV set, make it brighter or maybe change

10   color or -- it's kind of the same concept.  With digital

11   imagery, there's certain things we can do to help bring out

12   information that's there.

13   Q.  And I'm going to kind of group them into three here, and

14   put up on the screen first Government's Exhibit V-4A.

15            MS. WILKINSON:  Agent Holiday, may I have V-4A

16   through V-4M.  Perfect, thank you.

17   Q.  (BY MS. WILKINSON)  I'll bring your originals up to you,

18   but we'll look at them together on the screen.  It's kind of

19   weird to look in the back and be able to speak.

20       So we'll start with V-4A, and you can obviously take it

21   out of the sheet projector there if you need to.  Are we up on

22   the screen yet?  Are we showing it?  We're having difficulty.

23       Let's just do the DOAR.  Take a minute to look at those,

24   identify them as yours, and then we'll do it the old-fashioned

25   way.

1        Do you recognize your work product?

2   A.  Yes, ma'am.

3   Q.  Terrific.  Let's go ahead and put them up on our ELMO.

4        MS. WILKINSON:  Don't worry about it, Ms. Lesser,

5   it's all right.  That's the way I'm used to any way.

6   Q.  (BY MS. WILKINSON)  Okay.  So first of all, let me have

7   you identify, is that you there on the bottom right-hand

8   corner?

9   A.  Yes, ma'am, that's my initials.

10  Q.  Okay.  And just to give the jury an idea, is this the case

11  number?

12  A.  Yes.  And our digital evidence laboratory number.

13  Q.  So starting with Government's Exhibit V-4A, and up here on

14  the left we're looking with the little red square around it,

15  what did you do here?

16  A.  So with digital imagery sometimes it can be a little

17  confusing between the different ways that you observe images.

18  So obviously you can print an image, you can see an image on a

19  monitor as well.  And it's very different seeing a digital

20  image on a monitor than it is on a print.

21       So when you see a video on a monitor, you see -- it's

22  usually a larger screen, and the resolution of that monitor is

23  maybe 72 BPI or it can be an HD monitor where you're getting

24  1080, so you have that much resolution.  When you print

25  something, photographically, you're typically printing

1    something at a much higher resolution.  So my prints are at

2    360 pixels per inch, and so that's a much higher amount of

3    information.

4         So a lot of times when I'm printing something from

5    digital, I want to make sure that you have an idea of how big

6    that image is digitally in the print.  So my image in the

7    upper corner is that's the actual size of the image.  So

8    these -- the video was actually pretty good video, it was high

9    definition video.  And so that is the size printed.

10        Now, if you saw that on a monitor, it would seem larger.

11   Not necessarily more information or more, you know, clearer

12   resolution, but I just wanted to see that so you could see

13   what I was working with when I then enlarged the vehicle of

14   interest in the image.  And so the lower right-hand corner, I

15   cropped the area of interest, the vehicle, and then I actually

16   enlarged that digitally.

17   Q.  And do you call this series -- and I'll show you a couple

18   more in a minute, Mr. Iber -- is this your best work in

19   enhancing the photographs that came from the still images of

20   those security videos?

21   A.  That is correct.

22   Q.  Okay.  Let me go to Government's Exhibit V -- there's kind

23   of a series on this part.  That's V-4A and then here we are at

24   V-4B.

25        And then again, looking at the top -- I'll have you

1    identify your -- I'm not going to do this with all of them,

2    but just so the jury knows, your initials down there on the

3    bottom right-hand corner?

4    A.  Yes, ma'am.

5    Q.  Okay.  Then we'll go up here.  And are we in the same kind

6    of time frame as the picture you just saw that we just put up

7    on the screen as V-4A?

8    A.  Yes, ma'am.

9    Q.  So this is just another still from the video taken at that

10   point in time?

11   A.  Yes, ma'am.

12   Q.  Okay.  And again, did you make an effort to blow it up, in

13   the best enhancement that you could?

14   A.  Yes, ma'am, that's an enlargement that I performed.

15   Q.  Okay.  And down below here, the information that states

16   this comes from the Audi leasing office parking lot, where

17   does that information come from?

18   A.  So the request, when it was sent in from Agent James, he

19   referred to the vehicles of interest to him and labeled them

20   as Audi and Pontiac.

21   Q.  Okay.  Because you're not the investigator; correct?

22   A.  I was -- yes, I was not -- in doing the comparison,

23   obviously I have to look for those class characteristics to

24   see if they match.  But I was not requested to do a make and

25   model of the vehicle.  That's how he labeled them, and so we

1    stayed consistent with the requester.

2    Q.  Because you're a scientist and you stay to what you're

3    asked to do, and that's what you do; is that correct?

4    A.  Yes, ma'am.

5    Q.  Just to be clear, all of these come from the same images

6    that we've just looked at with regard to V-6 and V-7, and

7    that's the security camera footage that we'll put in through

8    Detective Brandt later; is that correct?

9    A.  Yes, ma'am.

10   Q.  Okay.  So let me go now to, again, in that same sequence,

11   V as in Victor, 4C.  Again, another up here in the left, what

12   is this?

13   A.  This is the vehicle of interest that was requested for

14   enhancements to be made.

15   Q.  In that same time frame of when the Audi was in the

16   leasing parking lot, or at least according to Agent James?

17   A.  Yes, ma'am.

18   Q.  And down below.

19   A.  That would be the enlargement.

20   Q.  Okay.  And V, again, as in Victor, 4D as in dog, and what

21   are we looking there on the top left-hand corner?

22   A.  The same vehicle of interest.

23   Q.  And down on the right.

24   A.  And that would be the enlargement.

25   Q.  And last in that -- not last, two more in that sequence,

1    V-4E on the left.

2    A.   The vehicle of interest again.

3    Q.   Sorry to be so repetitive, just to be clear for the

4    record, in the bottom right-hand corner.

5    A.   The enlargement of that vehicle.

6    Q.   Last in this sequence, V-4F.

7          MS. WILKINSON:  The last one was V-4E, I'm sorry,

8    Madame Court Reporter.

9    Q.   (BY MS. WILKINSON)  Go ahead.

10   A.   That would be the vehicle of interest again.

11   Q.   And then in the bottom right.

12   A.   The enlargement.

13   Q.   And that is the one sequence, and then there's two more,

14   so let me go to V-4G.  This looks -- is this taken from the

15   same sequence of the video clip V-1 that I just showed live a

16   moment ago?

17   A.   It appears to be, yes, ma'am.

18   Q.   Yes.  And then on the bottom -- I mean, on the top

19   left-hand corner, what are we looking at here?

20   A.   This is the other vehicle of interest that was requested

21   for me to enhance.

22   Q.   And then in the bottom right-hand corner?

23   A.   The enlargement.

24   Q.   And then V-4H.

25   A.   That would be the vehicle of interest in the sequence.

Direct Examination - Iber  (By Ms. Wilkinson)

1    Q.  And then --

2    A.  The enlargement.

3    Q.  This one now has the phrase Pontiac.  Again, where does

4    that come from?

5    A.  That was from Agent James, that's how he identified the

6    vehicles of interest.

7    Q.  That nomenclature, Pontiac and Audi, are those also in the

8    EC when you did Government's V-6 and V-7, one being the

9    Pontiac and one being the Audi?

10   A.  Yes, ma'am.

11   Q.  Okay.  And then V-4I.

12   A.  That same vehicle of interest.

13   Q.  And then down below.

14   A.  The enlargement.

15   Q.  And then the last sequence, beginning with V-4J, again, is

16   this still image familiar to you from the little clip from V-1

17   that we showed a moment ago?

18   A.  Yes, ma'am.

19   Q.  Okay.  And then the top left-hand image is what?

20   A.  That is the individual of interest.

21   Q.  And then in the bottom right-hand --

22   A.  The enlargement.

23   Q.  And then V-4M as in Mary, top left-hand corner.

24   A.  The same person of interest.

25   Q.  And this is M -- oh, are they out of order?  They're

1    slightly out of order, but that's okay.

2         And then over in the right-hand corner.

3    A.   The enlargement.

4    Q.   And then V-4L.   You're right, I took them out of

5    alphabetical order.   Top left-hand corner.

6    A.   It's the same individual of interest.

7    Q.   And then in the bottom right-hand corner.

8    A.   And the enlargement.

9    Q.   And then V as in Victor, 4K.

10   A.   The individual of interest, and the enlargement.

11             MS. WILKINSON:  That's all I have.

12             THE COURT:  Cross.

13             MR. MERCER:  Your Honor, I'm going to need a few

14   minutes to set up.

15             THE COURT:  We'll take our morning break.

16             MR. MERCER:  Thank you.

17             THE COURT:  Ladies and gentlemen, it does sound like

18   it's a good time to take our morning break, so we'll do that.

19   Please take 15 minutes and be back in the jury room at 11:20.

20   Remember not to discuss the case with anyone, even among

21   yourselves.  See you in 15 minutes.

22             (Jury left the courtroom.)

23             THE COURT:  You may be seated.  Counsel, I'll remind

24   you again, I can hear you, which means the jury can probably

25   hear you.  Like right now I can hear you talking into the

Cross-examination – Iber  (By Mr. Mercer)

 1   microphone, which means the jury, as they're leaving, can hear

 2   what you're saying.  I assume those are supposed to be

 3   privileged conversations, which is why I point that out.

 4          And sir, I just ask you not to speak to anyone

 5   during this break –– well, not to speak to anyone about this

 6   case during the break.

 7              (A recess was taken.)

 8              THE COURT:  Ready for the jury?

 9              MS. WILKINSON:  Yes, Your Honor.

10              (Jury entered the courtroom.)

11              THE COURT:  All right.  Everyone can be seated.

12              Sir, I just remind you that you're still under

13   oath.

14              THE WITNESS:  Yes, Your Honor.

15              THE COURT:  Mr. Mercer, when you're ready.

16              MR. MERCER:  Thank you, Your Honor.

17                        CROSS-EXAMINATION

18   BY MR. MERCER:

19   Q.  Good morning, Mr. Iber.

20   A.  Good morning.

21   Q.  I want to begin just by getting a clear understanding of

22   where the photographs in the poster which is marked

23   Government V-7 came from, okay?

24       So from your testimony, I understand that they were

25   pulled from the video compilation that's Government V-1; is

1    that --

2    A.  I believe that's correct, yes.

3    Q.  So let's focus first on the top two rows here.  So I just

4    put a sticky here so I'm not marking up the government's

5    exhibit.

6              THE COURT:  And sir, can you see it from where you

7    are?

8              THE WITNESS:  I can see part of it, yes, sir.

9    Q.  (BY MR. MERCER)  Let me bring it around.

10   A.  Okay.

11   Q.  Okay.  So I'm looking at these top two rows; right?

12   Okay?

13   A.  Okay.

14   Q.  On Government's V-1.  Now I'm going to play a clip for you

15   from Government V- -- from Government V-1, the video

16   compilation, okay?

17             (Video played.)

18   Q.  (BY MR. MERCER)  And I'll go to a different section too.

19   And let's watch this sequence here, which is approximately

20   10:21 in the video.

21             (Video played.)

22   Q.  (BY MR. MERCER)  So let me stop it there.  So these snips

23   that are in the first two rows are from this sort of -- that

24   first sequence I played for you, sort of a continuous sequence

25   of this vehicle in question?

1  A.  I believe so, yes, sir.

2  Q.  All right.  So the first two rows are from this one same

3  period of time on the video near the end?

4  A.  I don't know the exact time frame, but yes, sir.

5  Q.  And in your report you've referred to this as set 3; is

6  that right?

7  A.  I believe so, yes, sir.

8  Q.  So the first two rows were set 3.  And you were asked by

9  the requesting agent, you know, to assume that the vehicle in

10  set 3 was the same Audi?

11  A.  Not -- not amongst itself, but to the other -- to the

12  interested vehicles in the other camera --

13  Q.  I'm sorry, I wasn't clear.  In your report you referred to

14  set 3 and to set 4 photographs; right?

15  A.  Okay.

16  Q.  And I have your report if you need to refresh your

17  recollection.

18  A.  Actually I would like that, please.

19  Q.  Great.

20       THE COURT:  If we could mark it as an exhibit for

21  identification.

22       MR. MERCER:  Yes, Your Honor, it is premarked, and

23  the government has a copy.  This is Mosley 3.

24  Q.  (BY MR. MERCER)  So I'm showing you what's marked as

25  Defendant Mosley Exhibit 3.

1        THE COURT:  Just to be clear, is this for

2   identification, or is it actually being moved in?

3        MS. WILKINSON:  ID only, Your Honor.

4        THE COURT:  Okay.  That's what I thought.

5   A.  So this isn't my report, this is actually my notes.

6   Q.  (BY MR. MERCER)  I have your report too.  And we'll mark

7   this as Defendant Mosley No. 3A.

8        THE COURT:  Again, for ID purposes only.

9        MS. WILKINSON:  Thank you, sir.

10  Q.  (BY MR. MERCER)  And if you're looking at 3A, Mr. Iber, if

11  you go to page 3 of 4, under the paragraph Vehicle

12  Comparison 2.

13  A.  Yes, sir.

14  Q.  Okay.  So you had a set of images that were referred to as

15  image set 3; correct?

16  A.  Yes.

17  Q.  And you had a set of images that were referred to as image

18  set 4; correct?

19  A.  That is correct.

20  Q.  And I'm showing you what's marked as Defendant

21  Mosley No. 4, and could you just take a look at that document

22  and just confirm for me those are the photographs that were

23  grouped as image set 3 and image set 4.

24  A.  That is correct.

25  Q.  And there's actually two image set 4s; right?

Cross-examination – Iber   (By Mr. Mercer)

```
 1    A.  That's correct.

 2              MR. MERCER:  Your Honor, if I could publish this.

 3              THE COURT:  Very well.

 4    Q.  (BY MR. MERCER)  So --

 5              THE COURT:  You need to switch the screen back.

 6              MR. MERCER:  Yes.

 7    Q.  (BY MR. MERCER)  So optimal images of vehicle from set 3

 8    is what we're looking at on the document camera; right?

 9    A.  That is correct.

10    Q.  And so that would correspond to the first two rows on the

11    government's poster?

12    A.  Correct.

13    Q.  And when we played the clip at the beginning, there was

14    just this one sort of continuous sequence where this vehicle

15    was seen towards the end of the video?

16    A.  Correct.

17    Q.  And so what the requesting agent asked you -- and then let

18    me just clarify this --

19              MS. WILKINSON:  Can I just object for one moment, I

20    think he said he didn't know what the times were, just to be

21    clear.

22              MR. MERCER:  Well, I think he just answered the

23    question, so -- and we can go back and --

24              THE COURT:  Restate the question.

25    Q.  (BY MR. MERCER)  If I need to refresh your recollection,
```

Cross-examination - Iber   (By Mr. Mercer)

1    we can go back and watch the portion of the video clip that

2    set 3 came from, but would you agree with me that was near the

3    end of the video?

4    A.   I don't recall the time frame of the video.

5    Q.   Okay.  Well, so now on the screen is the video, and this

6    is the sequence here.  And it's -- you see where the start

7    button is at the bottom right, 11 minutes into the video?

8    A.   Yes, sir.

9    Q.   Right?

10   A.   So from that -- I thought you meant from the day, I

11   thought you were talking about a specific time of day or --

12   Q.   No, no, I'm just trying to keep it simple, plain.  Set 3

13   is just from the end of the compilation, that's all?

14   A.   It appears to be, yes, sir.

15   Q.   Yeah, and it's just two -- it's eight images from this

16   sort of continuous period near the end of the compilation?

17   A.   Correct.

18   Q.   Right.  And the requesting agent asked you to assume that

19   set 3 -- the Audi in set 3 is the same vehicle, and to compare

20   that Audi to the Audi in set 4?

21   A.   From the other camera angles, that's correct.

22   Q.   All right.  So now, set 4, which is what I was turning

23   to -- and this is from your report, I'm now referencing

24   Defendant's Mosley 4.

25        We see questioned images of vehicle from set 4.  And we

1   see questioned images –– another set of –– referred to as set

2   4; right?

3   A.   Correct.

4   Q.   And so that corresponds to the lower portions on this

5   poster, so the first set 4 is the middle two rows, and then we

6   have set 4 down on the bottom.

7   A.   It appears to be, yes, sir.

8   Q.   Is that right?   Okay.

9        So the agent also that requested this, also asked you to

10  assume that the Audi in set 4 is the same Audi?

11          THE COURT:   Same Audi as what?   Just to be clear.

12  Q.   (BY MR. MERCER)   That the images in set 4 are images or

13  different perspectives of the same Audi.

14  A.   He wasn't specifically asking me to assume that that set

15  was all of the same Audi, it was a comparison.   So the one set

16  at the top –– so set 3, image set 3, he wanted to know if the

17  other images of an Audi from different camera angles, if I was

18  going to be able to identify that as being the same vehicle as

19  the ones in set 3.

20  Q.   Well, let me just understand here, because in your report,

21  under your opinions, you say that, "Images identified as

22  optimal, image set 3 of an Audi, as defined by the request in

23  the EC," so that's electronic communication?

24  A.   That is correct.

25  Q.   So the requester, and I understand because you're busy,

Cross-examination - Iber   (By Mr. Mercer)

1    you have a small staff, you're relying on the requester to

2    identify the images of interest?

3    A.   That's correct, to isolate.

4    Q.   Right.  So the requester identifies image set 3, the

5    timestamp for those that turn into image set 3, as an Audi?

6    A.   That is correct.

7    Q.   And then the requester also, to help make your work more

8    efficient, is also identifying a set of images in 4, in set

9    4?

10   A.   I -- I don't know if he was identifying all of the images,

11   it was just a set of questioned images.  So I was not looking

12   at them as all being the same, I was looking at them as

13   individual images, questioned images.

14   Q.   Okay.  Well, but in your report, you're drawing a

15   conclusion about the vehicle -- an Audi in image set 3

16   compared to an Audi in image set 4.

17   A.   Okay.  Correct.

18   Q.   So -- and that is as, to use your words from the report,

19   "defined by the request in the electronic communication"?

20   A.   That is correct, they were identified -- or the

21   nomenclature used to identify the vehicle was an Audi.

22   Q.   Because if I understand your testimony, just looking at

23   the poster here, Government's V-7, some of these pictures show

24   the back of an Audi; right?

25   A.   Correct, the back of a vehicle, yes.

Cross-examination – Iber   (By Mr. Mercer)

1    Q.   And other images show the front of the Audi?

2    A.   Correct.

3    Q.   So you could not determine that those two photographs are

4    the same Audi?

5    A.   That is correct.

6    Q.   Right.  But the requester asked you to compare an Audi in

7    set 3 with an Audi in set 4?

8    A.   That is -- yes, that is correct.

9    Q.   Now, when you do -- I want to talk a little bit about your

10   process of comparison, you talked about class and individual

11   characteristics; right?

12   A.   Yes, sir.

13   Q.   So if we're looking at a -- I'm showing you what's been

14   marked as Mosley 1.  So now here, there's different class

15   features you can look at; right?

16   A.   Correct.

17   Q.   So for example, the headlight?

18   A.   The shape of the headlight, yes.

19   Q.   The shape of the headlight.  And the class characteristic

20   is sort of you're beginning wide and narrowing down, so you

21   might start off with manufacture, model, and then the year

22   range; correct?

23   A.   It doesn't necessarily have to go in that order, but class

24   characteristic is an overall, yes, of the features of the

25   vehicle.  So sometimes when I do a comparison, I'm not

Cross-examination – Iber   (By Mr. Mercer)

1    necessarily able to get a manufacturer.  If I'm doing

2    comparison between features, if those features are similar, I

3    can make a conclusion, I can report that there are similar

4    features.

5         That works with any type of comparison that I do.  Again,

6    class features are something that can say that two things are

7    similar, doesn't mean that they are the actual same object.

8    Q.  It can say they're similar, it can also say that they're

9    different too?

10   A.  Yes, sir.

11   Q.  Right?

12   A.  Of course.

13   Q.  So you don't have to go down to the individual level to

14   differentiate a vehicle; right?

15   A.  That is correct.

16   Q.  Okay.  So for example, if -- and I'm showing you Mosley 2,

17   now, if I was comparing the image in 2 to the image in 1, and

18   I was focused on the headlight, right, that would be a class

19   characteristic; right?

20   A.  Yes, sir.

21   Q.  And then that would then allow me to eliminate the two

22   images as being pictures of the same vehicle?

23   A.  That is correct.

24   Q.  And that's the power of a class characteristic, is really

25   to eliminate?

1   A.  Or include, yes, sir.

2   Q.  Or include, but only include in a very general sense;

3   right?

4   A.  That's correct.

5   Q.  Because as you said, there's thousands of the same make,

6   model, color vehicles that are out on the road.

7   A.  Correct.

8   Q.  It's hardly unique; right?

9   A.  Correct.

10  Q.  And you frequently are asked to do -- I mean, it's not an

11  uncommon request for you to receive a vehicle comparison?

12  A.  That is correct.

13  Q.  And so part of that process is when you're working with

14  class characteristics, this notion of make, model, and year

15  range; right?

16  A.  Correct.

17  Q.  And the year range can be important because features of a

18  vehicle, like the grill design or the headlights, will change

19  over time?

20  A.  That is correct, manufacturers tend to update vehicles on

21  a regular basis, yes.

22  Q.  And if just one of these class features is different, then

23  it would eliminate the possibility that two images with a

24  different class feature are of the same vehicle?

25  A.  That is correct.

Cross-examination – Iber   (By Mr. Mercer)

1    Q.  Now, the other thing I want to bring out with you is that

2    the set 4 images, these are from different time periods in the

3    video compilation; is that right?

4    A.  Yes, I believe that's correct.

5    Q.  So for example, one of the pictures that is of the rear of

6    this vehicle is from the very beginning of the video, very --

7    approximately around 6:14 a.m.

8    A.  Again, I don't recall actual time frames, but that is

9    possible, yes.

10   Q.  But if I understand your testimony, are you saying that --

11   and I'm pointing here -- and let me just bring it up on the

12   screen.

13       Okay.  So now I'm looking at a PDF of the government's

14   poster, and that will be marked as an Exhibit 4A.  So now

15   referencing a PDF that is Mosley 4A.

16       And I just want to circle here, for example, this image

17   on 4A, and that's a back and side view of that particular

18   vehicle?

19            THE COURT:  For the record, can you tell us which

20   one you circled?

21            MR. MERCER:  Yes, that is --

22            THE COURT:  I'm sorry, just literally describe it on

23   the screen, just for the record.

24            MR. MERCER:  I wanted to check the row here.  It's

25   fifth row down, first column, I believe, on the government's

1    poster, which is V-1, and on our PDF, which is an image of the

2    poster labeled Mosley 4A.

3    Q.  (BY MR. MERCER)  So now, I'm trying to understand your

4    opinion here, but are you saying that 4A has the same class

5    features -- and I'm going to circle this other vehicle, this

6    other picture, which is now in the fourth column over and four

7    down -- are you saying that those two vehicles are the same

8    vehicle?

9    A.  So as I said earlier when I was standing in front of the

10   posters, that I would compare like perspectives.  Obviously I

11   couldn't compare the front of the vehicle to the back of the

12   vehicle.  I'd have to be able to see the features to be able

13   to do a comparison.

14   Q.  But in your report, Mr. Iber, if I understand it, you were

15   making a comparison between an Audi in set 4 and an Audi in

16   set 3.  I mean, that's from your report.

17   A.  I see what you're saying, that the report is -- would be

18   vague on the sense that it was not saying that I was comparing

19   particular images to one another.

20   Q.  Right.  There's nothing in your report about an

21   intercomparison of the images in set 4; is that right?

22   A.  Yes, that is correct.

23   Q.  And in fact, the only way to understand your report is

24   that you assumed an Audi in set 3 was just that, an Audi as

25   defined in the electronic communication, and an Audi in set 4

Cross-examination – Iber  (By Mr. Mercer)

1    as defined in the electronic communication, and you were

2    comparing two Audis?

3    A.  I would not assume that they were Audis.  In the

4    comparison, I would look at the features and compare the

5    features to one another.  There are times when I do

6    comparisons of vehicles, and it is difficult to tell the make

7    and model or year, but there are features that are similar,

8    and I can provide a conclusion that those features are

9    similar.

10       I would not be able to come to a conclusion that the

11   vehicles are the same or even necessarily the same make and

12   model, but I can point out futures that are similar.  And if

13   there is anything that is dissimilar that I can't explain,

14   then that would be an elimination.

15   Q.  Okay.  Well –– but Mr. Iber, you talk about in your report

16   the –– you say, quote, "No distinguishing individual

17   characteristics could be observed on either vehicle."

18   A.  That is correct.

19   Q.  Right.  And when you say "either vehicle," you're talking

20   about the vehicle in set 3 and the vehicle in set 4.

21   A.  I see what you're saying, that my report is vague in the

22   sense that it's not individualizing each image, talking about

23   the comparison of each image.

24   Q.  I'm not suggesting that your report is vague, just the

25   contrary, it's quite precise.  You're assuming from the

Cross-examination – Iber   (By Mr. Zerkin)

1    electronic communication, from the requester, that there is

2    one Audi in set 4 and one Audi in set 3, and you're comparing

3    those two Audis.  That's what your report says; correct?

4    A.  When I -- that is correct, that is what my report says,

5    but when I write Audi in there with the explanation that

6    that's how it was described, I'm just using the terminology

7    that the agent used.

8    Q.  Right.  You didn't determine it was an Audi?

9    A.  I did not do a make and model, that is correct.

10   Q.  And all it would take is one difference in the class

11   characteristics of any of the pictures in set 4 to be

12   different than any of the images in set 3 to eliminate?

13   A.  That particular image, yes.

14          MR. MERCER:  On that point, I have no further

15   questions.

16          THE COURT:  Cross from Mr. Carter's counsel.

17                    CROSS-EXAMINATION

18   BY MR. ZERKIN:

19   Q.  Good morning, Mr. Iber.  Just hopefully one question, do I

20   understand it correctly that you did not make any height

21   determinations of the individuals in the pictures that you

22   analyzed?

23   A.  There were two individuals that were requested for height

24   analysis.  I did do a height analysis on one individual.

25   Q.  Very good.  Thank you.

Redirect Examination - Iber  (By Ms. Wilkinson)

1            MR. ZERKIN:  That's all.

2            THE COURT:  Redirect.

3                    REDIRECT EXAMINATION

4  BY MS. WILKINSON:

5  Q.  Just to clarify, Mr. Iber -- I have to remember to do

6  this -- the pictures that are in Government's Exhibit V-6 and

7  V-7 come from the same piece of evidence as that being the

8  videotapes that were recovered from the scene of the Ashburne

9  homicide, and you ultimately saw a compilation of those

10  videos; correct?

11  A.  That is correct.

12  Q.  So all of the pictures on V-6 and all of the pictures on

13  V-7 came from that same compilation that you reviewed in

14  connection with your analysis?

15  A.  That is correct.

16  Q.  And then as part of that, the government asked you to

17  prepare demonstratives of the clips from each of those still

18  images to show the jury.

19  A.  That is correct.

20  Q.  And when you look at pictures, and again, I know that you

21  have a very specific expertise, Mr. Iber, but as part of what

22  you do, pictures are -- they are what they are; correct?

23  A.  That is correct.

24  Q.  And you see what you see?

25  A.  That is correct.

Redirect Examination - Iber  (By Ms. Wilkinson)

1   Q.  Okay.  So if you're able to make individualized

2   determinations, you say that as a part of your opinion;

3   correct?

4   A.  That is correct.

5          MR. ZERKIN:  Objection.

6   Q.  (BY MS. WILKINSON)  Otherwise, pictures --

7          THE COURT:  Hold on, we've got an objection.

8          Basis.

9          MR. MERCER:  Leading.

10          THE COURT:  I'll overrule it.

11  Q.  (BY MS. WILKINSON)  Do the pictures speak for

12  themselves?

13  A.  Yes, ma'am.

14  Q.  I don't need to put in your report, is this a silver car?

15  Can we see that it's a silver car?

16  A.  A silver-toned car, yes, ma'am.

17  Q.  Just like the pictures that you put up on Government's V-6

18  and V-7, the government also asked you to do certain

19  enhancements; correct -- if I could switch this over -- like

20  the one I'm showing on Government's Exhibit V-4M; correct?

21  A.  Correct.

22  Q.  Whether it's V-6, V-7, or the series of images that are

23  the enhancements that I'm putting up in front of the screen

24  right there, are all of those still photographs part of that

25  same video that you were asked to review in three different

1    ways before you came in here to testify?

2    A.  Yes, ma'am.

3    Q.  Did you try to do a reverse projection?

4    A.  Yes, ma'am.

5    Q.  You tried to do image analysis comparison?

6    A.  That is correct.

7    Q.  And you did some enhancements for this jury?

8    A.  That is correct.

9    Q.  And each of them you did at the request of us for the

10   purposes of demonstrating the still photographs that came from

11   the video; correct?

12   A.  From Agent James, yes.  That's correct.

13          MS. WILKINSON:  Thank you.  I don't have any further

14   questions, Your Honor.

15          THE COURT:  All right.  Sir, thank you for your

16   testimony.  You are excused.  Please don't discuss the case

17   with anyone else until the trial has been completed, and do

18   enjoy the rest of your day.

19          THE WITNESS:  Thank you.

20          MS. WILKINSON:  Thank you, Mr. Iber.

21          The government would call Detective Brandt, Your

22   Honor.

23          THE COURT:  Very well.

24          THE CLERK:  Good morning, sir.  Please raise your

25   right hand.

1              DETECTIVE LEE ROBERT BRANDT, JR.,

2    called as a witness, being first duly sworn, was examined and

3    testified as follows:

4              THE WITNESS:  Yes, ma'am.

5              THE CLERK:  Thank you.  You may have a seat.  You

6    may adjust that microphone in front of you.  Please state and

7    spell your full name for the Court.

8              THE WITNESS:  My name is Lee Robert Brandt, Junior,

9    that's B-r-a-n-d-t.

10             THE CLERK:  Thank you.

11                     DIRECT EXAMINATION

12   BY MS. WILKINSON:

13   Q.  Okay.  One second to transition over.

14        Good morning, Detective Brandt, how are you?

15   A.  Good morning, ma'am.

16   Q.  How are you employed?

17   A.  I'm sorry?

18   Q.  How are you employed?

19   A.  I'm employed by the Baltimore City Police Department.

20   Q.  And how long have you worked for the Baltimore City Police

21   Department?

22   A.  Going on 13 years now.

23   Q.  And just detail briefly, but detail for the jury what

24   positions you have held within the Baltimore Police Department

25   in your time there.

Direct Examination – Brandt   (By Ms. Wilkinson)

1    A.  Yes, ma'am.  I started off patrol in the Southwest

2    District of Baltimore City.  From there I went to Southwest

3    District –– District Detective Unit investigating robberies,

4    aggravated assaults, then to Northeast District Detective Unit

5    doing the same.

6         I then went to homicide, providing technical assistance

7    and analytics to homicide detectives.  From there I went to

8    the Cyber Electronics Crime Unit, and I'm now currently

9    assigned to the Detention Facility Booking Liaison Unit.

10   Q.  In the course of your time at Baltimore City, have you

11   spent some time doing digital image storage and retrieval

12   work?

13   A.  Yes, ma'am.

14   Q.  And explain to the jury what that is.

15   A.  Basically, my time with homicide doing technical support

16   to the homicide detectives, I retrieve video im- –– videos

17   from CCTV, closed-circuit television systems from like

18   businesses and residences to assist in their investigation.

19   Q.  And how long have you been doing that type of work for the

20   City?

21   A.  Full time with homicide was like three and a half years.

22   Prior to that, when I was a detective, I would pull –– when I

23   was doing robberies, I would pull my own video to get it in a

24   timely manner.

25   Q.  And is it –– have you –– can you give the grand jury an

1    idea of volume, how many occasions have you been called out to

2    crime scenes either in your own cases or in a support role to

3    do digital image storage retrieval?

4    A.   In the course of being with the police department, I've

5    unfortunately been called out quite a number of times.  I've

6    probably conducted well over 500 video retrievals in my time

7    being a detective with the Homicide Unit.

8    Q.   And in your time as a Homicide Unit, knowing that is some

9    of the type of evidence that you retrieved, can you give the

10   jury an idea, at least in the time that your were there, the

11   volume of cases that you work as a homicide detective in any

12   particular year?

13   A.   As far as my cases, again, I was more of a supportive, so

14   I would assist not only homicides but also shootings.  So I

15   was called out quite regularly.  With the homicide rate of

16   over 270 to 300, a shooting rate of over, you know, 6- to 700

17   yearly, time after time, I was actually quite busy.

18   Q.   With regard to your experience working with digital image

19   storage and retrieval, is there anything particular in your

20   training and experience as a Baltimore City police officer

21   that allows you to do that, what have you done that helps you

22   do that particular task of your job?

23   A.   Yes, ma'am.  Back in November of 2015, I was sent to an

24   FBI training called DIVERT, it's digital image video retrieval

25   training.  It was a partnership that the FBI has with local

Direct Examination – Brandt  (By Ms. Wilkinson)

1  jurisdictions.  It goes through and teaches us how to properly

2  recover video from multiple types of DVR systems, PC-based

3  systems, to recover video, properly store it, and even do some

4  minor editing for like PIO, public information presentations

5  or report purposes.

6  Q.  And have you testified -- let me step back even before

7  your time as a Baltimore City police officer, do you have some

8  experience with regard to video imaging?

9  A.  Yes, ma'am, actually, prior to working for the police

10  department, I worked for the phone company, Bell Atlantic,

11  then it turned into Verizon.  I was a field technician, then I

12  was in the business wiring services.  Part of that I was

13  trained into installing business systems, like structured

14  cabling, being computer networks, and part of that being

15  intercom systems, video systems, security systems.

16  Q.  Now, I'm not going to go too much into the weeds of all

17  that kind of technical stuff here today, but were you asked to

18  perform some -- were you asked to do digital image storage

19  retrieval in connection with the murder of Latrina Ashburne

20  back in May of 2016?

21  A.  Yes, ma'am.

22  Q.  And what specifically were you asked to do?

23  A.  Detective Forsythe requested my presence to the Sinai

24  Ridge Apartments to recover video from their surveillance

25  system.

Direct Examination - Brandt  (By Ms. Wilkinson)

1    Q.  And I'm going to show you Government's Exhibit V-2A, V-2B,

2    V-2C, D, and E.  At some point did you retrieve, on different

3    occasions, video from the Sinai Ridge security complex --

4    A.  Yes, ma'am, I was out there --

5    Q.  -- I should say.

6        And just to give some context, did all those videos end

7    up on five CDs, that I believe the defense stipulates to,

8    which is all the video that you retrieved?

9    A.  Yes, ma'am.

10   Q.  From that, was a compilation prepared for purposes of your

11   testimony today?

12   A.  Yes, ma'am.

13   Q.  Okay.  So I'm going to go from the broad to the specific

14   at this point, Detective Brandt.  So let's start generally

15   with your work doing digital image storage retrieval.

16       And do you perform a list -- is there like a certain task

17   that you do that you know you have to do when you're called

18   upon to pull digital image storage from a particular business

19   or owner?

20   A.  Yes, it's a process I go through when I do all my video

21   pulls.  I'll go through -- I'll introduce myself, I'll ask for

22   the manager, property owner, whoever, advise them why I'm

23   there.  In most instances, the detective has already spoke to

24   them, so they're familiar with it.  I'm coming out to recover

25   video.  I'll ask to see their machine, like where it's located

Direct Examination - Brandt   (By Ms. Wilkinson)

1    and then how to access it.

2        And then I'll go through and I'll run through like a

3    little sheet that I have, and I'll document the date and time

4    that I'm there, I'll document the machine, the make and model,

5    the date and time stamp that is displayed on the machine in

6    accordance with real time.  And then some other things like

7    resolution, retention time, things like that that might help

8    me if needed in the future.

9    Q.  I'm just going to show you for -- show you Government's

10   Exhibit V-5, just one page of that now, just to give the jury

11   an example.

12       Are you familiar with this form here?

13   A.  Yes, ma'am, that's the form I use.

14   Q.  And in addition to using it, did you help create it?

15   A.  I actually created that form, yes, ma'am.

16   Q.  Tell the jury why you created it.

17   A.  Just to kind of capture the information because there was

18   no set standard of how we had to recover video, so to kind of

19   make sure that it -- to capture all the same things, all the

20   same time to keep a consistency with every video pull.  I

21   created this form so that way I make sure I capture all the

22   pertinent information from each time I do a video pull to kind

23   of keep a constant standard of information gathered.

24   Q.  So just walking us through, and again, I'll go to the

25   investigation on this particular case in a moment, but the

Direct Examination – Brandt  (By Ms. Wilkinson)

 1  type of information that you included on your surveillance
 2  video recovery, what would the case number, for example, be?
 3  A.  In this case it was 2016H109.
 4  Q.  And is that a number that's assigned by the Baltimore City
 5  Police Department?
 6  A.  It's a number assigned through our records management
 7  system that we use in investigations, 2016 being the year, H
 8  is a homicide, and then the number, the case number for that
 9  year.
10  Q.  And so what would 109 be, the 109th homicide?
11  A.  It was the 109th homicide case investigated that year.
12  Q.  In May of 2016?
13  A.  In the year of 2016, yes, ma'am.
14  Q.  And so again, just to give the jury an idea so they can
15  follow along with the numbers, if we look at V-2A, which we
16  just put in, does that number track itself on various
17  paperwork that the Baltimore City Police Department has?
18  A.  Yes, ma'am.
19  Q.  We see the homicide number 2016H109?
20  A.  Yes, ma'am.
21  Q.  That's a piece of information that you'll include on the
22  surveillance video recovery.
23      What is the CC number?
24  A.  CC number is our central complaint number.  That's the
25  number that the department as a whole uses any time there's a

1    report generated, whether it's a homicide or a destruction of

2    property, whatever, our CAD system or computed-aided dispatch

3    system generates a central complaint number and that's how

4    it's tracked through the rest of the department.

5    Q.   And over here on the left, location of occurrence, what

6    would that be?

7    A.   That's the location of the crime as given to me.

8    Q.   And below the assigned detective?

9    A.   That's the primary detective in this case, Detective

10   Forsythe.

11   Q.   In addition to Detective Forsythe and considering all the

12   work that you did in connection with this case, did you also

13   work with Sergeant Sean Jones?

14   A.   Yes, he's her reporting supervisor.

15   Q.   And he's also with homicide at the time back in 2016?

16   A.   Yes, ma'am.

17   Q.   Did you also receive instructions or direction from him in

18   connection with the case?

19   A.   Yes, ma'am.

20   Q.   And down below where it says date, probably self- -- well,

21   let me go to you, the recovering detective.

22   A.   Yes, ma'am.

23   Q.   And what does that mean, the recovering detective,

24   physically what does that mean?

25   A.   As recovering, I'm the physical detective that's out there

Direct Examination - Brandt  (By Ms. Wilkinson)

1    recovering.  What I was doing, as I learned, I was also

2    training other detectives how to do it, and I shared my form

3    with them.  So if it was -- so in computer crimes, there were

4    three of us that were doing video pulls, so it would be, you

5    know, they'd put their respective name on it.

6    Q.  And down below where it says the date, obviously, what's

7    over to the right, the time?

8    A.  That's the date and time that I'm on location.

9    Q.  Actually pulling the video?

10   A.  Yes, ma'am.

11   Q.  And down below the video location?

12   A.  Yes, ma'am, that's at that time, I put video location of

13   where I go to retrieve the video, business name.  If it's a

14   residence, I just put residence.

15   Q.  And again, to give the jury an idea, here we are in

16   Baltimore City, which is your jurisdiction, and you're going

17   to a private business, Sinai Ridge, where you're getting this

18   video, do you pull and get for retrieval and storage in other

19   cases, other types of video other than from businesses, like

20   an apartment complex or a store, that kind of thing?

21   A.  We do businesses, we do residential, facilities, anywhere

22   that has digital video.  I've pulled it from dash cams of

23   people's cars, you know, anything that has video on it,

24   cameras, computers.

25   Q.  Does that include, for example, street cameras that are

Direct Examination - Brandt   (By Ms. Wilkinson)

1   present at different locations throughout Baltimore City?

2   A.  As far as like the City Watch cameras, that's actually

3   administered by the City Watch themselves.  They're their own

4   group, so any request would go directly to them.

5   Q.  Right.  So yours is different from what they do?

6   A.  Yes, ma'am.

7   Q.  So what we're looking at and what you pulled in connection

8   with the murder of Ms. Ashburne is not CCTV cameras?

9   A.  No, it's -- well, it's -- CCTV is just a generic term.

10  Q.  I meant City Watch cameras.

11  A.  Yeah, the City Watch cameras, that's its own program with

12  its own people that administer that and control that.

13  Q.  And down below here where it says address, what would that

14  address be?

15  A.  That's the physical location of the address for the

16  residential office for the Sinai Ridge Apartments.

17  Q.  Okay.  And down below here you've written consent to

18  search in your form, what is that all about?

19  A.  Basically just to kind of avoid any legal complications.

20  Consent to search means that when go there, I introduce

21  myself, I advise them I'm there to recover video, I'm not

22  forcing them.  If they give me the video, they're giving me

23  their consent.  They're saying, yes, you can go retrieve the

24  video.

25       It's just a way of saying I have permission to retrieve

1    it without having an actual search and seizure warrant,

2    because that would be the only other option.  If someone did

3    refuse, the option would be to get a search and seizure, and

4    then that would be a whole different kind of category.

5    Q.  And in your training and experience, do business owners

6    often voluntarily provide this information to the police?

7    A.  Yes, ma'am.

8    Q.  And on the back of your form, we see additional

9    information that you include, and again, this one is with

10   regard to the Ashburne homicide, but more generally, what is

11   make, model, and serial number, what are we looking at here?

12   A.  What that -- I just want to capture the actual system

13   information.  In this case it was a IVMS was the manufacturer

14   of it.  As far as a specific model, this was a -- we

15   considered an NVR, it's a network-to-video recorder, so it was

16   a PC-based, so there was no true like model.  It was

17   integrated into a computer network.

18   Q.  Down below where you have user name and password, what

19   does that mean?

20   A.  If they provide me the user name and password, I'll

21   document it because there might be a time that I come back at

22   a later date.  Some of your businesses are a little hesitant

23   to provide that, so if they don't provide it to me, like in

24   this case, the property manager, she logged me on, and you

25   know, she'd sit down at the computer, log me on, and then was

Direct Examination – Brandt   (By Ms. Wilkinson)

1    like, there you go.  So I just, you know, draw a line through

2    it.

3    Q.  And there we go below the system video date and the

4    current real date, and just generally, we'll get to the

5    specifics of our case in a moment, what is that all about?

6    A.  Again, because DDRs are human input, it's whatever they

7    set the date and time to.  So in the instance where the DVR

8    date and time is different than what we consider real date and

9    time, I'll document the date and time of the DVR versus the

10   date and time of the current time that I'm there.

11   Q.  Okay.  I'm going to come back to that in a moment down,

12   but down below where it says retention time, what is that all

13   about?

14   A.  Again, most of your DVRs are built with a hard drive, so

15   what happens is most of them are set up to where once it

16   reaches that hard drive being full, it just automatically

17   starts to overwrite with new video.  So the retention time is

18   about 30 days, give or take the amount of data that's stored

19   and that goes into play of the video settings itself.

20   Q.  And the other information that's contained where you have

21   dashes on this particular form, just generally, what type of

22   information would you try to capture there if it was

23   applicable to a particular situation?

24   A.  With those it's the resolution of the cameras.  Higher

25   resolution of course give you better picture quality, frames

1    per second.  When you talk about frames per second, the higher

2    the number, the smoother the video is.  You can tell when it's

3    a lower, say, 15 versus a 30, you get that chopped movement

4    versus that smooth like real-time look.  Quality and the

5    compression, that's the -- there's many different formats of

6    video compression, so we'll note them so you know whether it's

7    a 264, MP4, things like that.

8         Software, firmware, that kind of more comes into like the

9    technical end of it, if there was issues with the video or

10   trying to get playback.  A lot of this is proprietary software

11   so you need specific viewers to view the video as recovered.

12        And then the IP addresses, again, this being a

13   networked -- on a handful of occasions I've actually had to

14   network into a DVR to actually recover the video using my

15   laptop and a portable hotspot.

16        And then I have like the number of cameras and the inputs

17   and then whether motion -- it's set to motion record.

18   Unfortunately, because the manager, she had -- they had their

19   system set up with varying uses of access levels.  She had

20   more of a user that allowed me to download video, but didn't

21   allow me to actually access the setup, so I didn't capture any

22   of that information, so I put dashes through to denote I was

23   unable to obtain it.

24   Q.  You answered my next question.  So generally, you provided

25   the information, and in this particular case, you didn't have

Direct Examination - Brandt   (By Ms. Wilkinson)

1    that information to include here?

2    A.  Yes, the user level that she was assigned did not allow me

3    to access the general settings.

4    Q.  But in terms of the quality of the video that you were

5    able to retrieve from the Ashburne homicide case, how would

6    you rate that in terms of your other cases that you have

7    going?

8    A.  It was actually very good video.  Fortunately in this

9    case, it was -- they actually just went through and upgraded

10   their camera system to a higher definition camera.  Higher

11   resolutions will get a better capacity.

12   Q.  And say, compare it to the street cameras that you were

13   referring to that are present in other types of cases, what is

14   the quality difference with this one and the ordinary street

15   camera that's out there in Baltimore City?

16   A.  It's about the same.  This system's probably like a 1080P,

17   which is your higher end.  Most of our City Watch cameras are

18   about ten, 15 years old, so they're probably 720, which is a

19   couple steps down.  You still get good resolution, but then of

20   course with the City Watch cameras, you got things like the

21   outside environment, the lenses, whether or not they've been,

22   you know, damaged through malicious acts or just natural

23   occurrences, things like that.

24   Q.  And then the next part of your form, as for time frame of

25   recovery, and what is that all about?

Direct Examination – Brandt   (By Ms. Wilkinson)

1    A.  Basically what I'll put is, when I talk to the detectives,

2    a lot of times, like in this case, I was contacted by

3    telephone, so I'll just write down the date and time frame

4    that they asked for.  In this case Detective Forsythe wanted

5    May 27th, 2016 from 7:20 to 7:30 a.m. for cameras, I believe,

6    6 and 8 -- yeah, 6 and 8.

7    Q.  So we talked about, generally, what your form is all

8    about.  I know it's kind of dovetailed into the case that we

9    have here in front of the jury.  Did you go to the Sinai Ridge

10   Apartment to retrieve digital images on one occasion, or more

11   than one occasion?

12   A.  On two occasions.

13   Q.  Okay.  And why did you go back?

14   A.  After going back the first time I did the original pull, I

15   provided information to Detective Forsythe, she then

16   approached me and said she needed some additional video from

17   additional camera angles for around that same time frame, so I

18   responded back out and did the exact same process.  I just --

19   instead of getting just camera 6 and 8, I got a bunch of other

20   camera angles.

21   Q.  I'm going to show you the second page of Government's

22   Exhibit V-5, and is this the video -- surveillance video

23   recovery form completed for the second visit you did at the

24   Sinai Ridge Apartments?

25   A.  Yes, ma'am.

Direct Examination - Brandt   (By Ms. Wilkinson)

1    Q.  And again, I won't have you go through all the

2    information, but with regard to the date that you went back

3    there, when was that?

4    A.  That was on the 31st of May.

5    Q.  And same information in terms of the case and the

6    detective and all that sort of thing?

7    A.  Yes, ma'am.

8    Q.  Okay.  And then turning on the back, at this point in

9    time, what was the time frame of recovery?

10   A.  She wanted from 06:00 to 07:30, and then pretty much every

11   camera, but I -- except, I believe, camera 4.

12   Q.  I'm going to move it up so we can all see it.

13   A.  Yes, I believe camera 4 is the only one they didn't

14   request.

15   Q.  Okay.  So the cameras that you noted were 1, 2, 3, 5, 6,

16   7, 8, 9, and 10?

17   A.  Yes, ma'am.

18   Q.  Okay.  Now, if I could ask you to look over to the left,

19   there's a big chart.  And can you just generally identify on

20   the right-hand -- here, let me have you actually hold it up so

21   we don't have to go back and forth.

22       Government's Exhibit V-3A are the actual locations of the

23   cameras denoted on this particular blowup for the jury?

24   A.  Yes, ma'am.

25   Q.  Okay.  And when you refer to camera 1, 2, 3, 4 -- not 4 --

Direct Examination - Brandt   (By Ms. Wilkinson)

 1    1, 2, 3, and so on, are they accurately noted on this

 2    particular photo?

 3    A.  Yes, ma'am.

 4    Q.  I'm going to go back and I'm going to show you more of

 5    a -- easier sometimes to look at a view of it.  And this is

 6    Government's Exhibit -- do I have my microphone?

 7              THE COURT:  It's on.

 8    Q.  (BY MS. WILKINSON)  V-3B, and again, is this just a street

 9    version of the same thing depicting the locations of the

10    cameras that you were able to recover?

11    A.  Yes, ma'am.

12    Q.  Now, we can look at it, because we're all looking at the

13    same poster right now.  Is it fair to say that all the cameras

14    that were covered were on the right side of the crime scene?

15    I guess -- I don't know what direction that is, whether it's

16    east or west.

17    A.  It would be east, ma'am.

18    Q.  So if we went over here to the left, did you have any

19    information that where there were any cameras that were able

20    to recover any information from that part of the crime scene

21    on?

22    A.  No, ma'am, I'm guided by the detective.  They do the

23    initial canvass and tell me where to respond.

24    Q.  Have that for frame of reference if we need to.

25    A.  Yes, ma'am.

Direct Examination – Brandt   (By Ms. Wilkinson)

1    Q.  Now, the five disks that I put up in the beginning of your

2    testimony, are all of those camera footages the ones that you

3    obtained from Sinai Ridge as depicted from the various camera

4    angles that are noted in the two posters that I just showed

5    you and the jury?

6    A.  Yes, ma'am.

7    Q.  Okay.  At this time I'm going to ask Ms. Lesser if she

8    will play the entirety of Government's Exhibit V-1, which is

9    the compilation.  Is it fair to say, Detective Brandt, have

10   you reviewed that compilation in preparation for your

11   testimony here today?

12   A.  Yes, ma'am.

13   Q.  Okay.  And if I am able to, I don't know if I can -- might

14   have to do it with the street map next to you.  Maybe I'll put

15   this back so you can look at it at the same time because it's

16   on the ground there.  I may stop at times and have you

17   describe the location that we're looking at --

18   A.  Yes, ma'am.

19   Q.  -- from the camera angles.  Hopefully everybody can see

20   it.  Put it in the best angle I can.  Please let me know if

21   you can't see it.  I wish we could do them both at the same

22   time.

23       Can you see that?

24   A.  Yes, ma'am.

25           MS. WILKINSON:  Everybody can see that?  Okay.

Direct Examination – Brandt   (By Ms. Wilkinson)

1   We're going to stop right here once it gets up.

2          (Video played.)

3   Q.  (BY MS. WILKINSON)  Okay.  And that time -- I'm sorry,

4   approximately 6:16 a.m., and I go back to your form -- where

5   did I just put V-5 -- and I can't -- do you recall the time

6   difference between the real time and the video time at the

7   time you retrieved the videos in connection with this case?

8   A.  There was a two-minute difference between real time and

9   the DVR time, being that the --

10  Q.  If you need to look at your log, I'll put it up here, but

11  it is recorded as the time difference between the video and

12  real time?

13  A.  Yes.

14          MR. MERCER:  Your Honor, I object.  Can we approach,

15  please?

16          THE COURT:  Of course.

17          (Bench conference on the record.)

18          MR. MERCER:  The video compilation we had, V-7,

19  begins at 6:14, this is saying 6:16.

20          MS. WILKINSON:  As I was saying, because I sent you

21  the new one that made the adjustments of time after we had him

22  in here last time, so he's made the two-minute adjustment in

23  the compilation now, because remember when we had our motions

24  hearing back there, and I told you that we made it and this is

25  the one we were looking at.  We made that two-minute

1    adjustment, so you have an old version 7, but I advised you

2    that --

3                MR. MERCER:  There's a new version 7?

4                MS. WILKINSON:  All's it did is change the screens

5    and made the adjustment for the minute times.

6                MR. TRAINOR:  You're referring to the exhibits we

7    were given on Monday.  You gave it to us Monday, and it said

8    6:14 on it.

9                MS. WILKINSON:  Which one are you talking about, a

10   snip?

11               MR. TRAINOR:  I actually didn't get it.  I'm going

12   to withdraw that.  I'm referring to one on my personal

13   computer -- in discovery --

14               MS. WILKINSON:  That's --

15               MR. TRAINOR:  -- it says approximately 6:14.

16               MS. WILKINSON:  Yes, because when we had our second

17   motions hearing and we were all there and Detective Brandt was

18   with us and we were all meeting in that conference room, I

19   told you that we were making the adjustment for the two-minute

20   time differential, it needed to be on the compilation, and so

21   we have done that.

22               MR. TRAINOR:  So it's done throughout the --

23               MS. WILKINSON:  Throughout the video it's going to

24   have that two-minute adjustment to it.  I mean, we were there

25   together when I had him there, and I told you that we needed

1    to make the adjustment to the videotape of the two-minute time

2    that we had.  I mean, we were there before he was going to

3    testify, and I showed you the snips, and I said we still

4    needed to make the two-minute approximate adjustment on it.

5              THE COURT:  At this point it sounds like an issue

6    you can cross on if you want, but I don't see what else we're

7    going to do about it.

8              MR. MERCER:  Very well.  I mean, but I kept

9    referring to a version 7, and you're saying it's still called

10   version 7 --

11             MS. WILKINSON:  It's still called version 7, it's

12   just --

13             THE COURT:  One at a time.  One at a time.

14             MR. MERCER:  -- but it's now a different version 7,

15   and what I understood the difference between version 6 and

16   version 7 to be, that the seconds were being eliminated, that

17   an approximate was being added.  But the business about the

18   two-minute differential, that was known before version 7 was

19   ever created, so I'm not sure --

20             MS. WILKINSON:  If you can -- well, I mean, I don't

21   know if that's correct, but what I'm telling you is that when

22   we were all there, I advised you that we still needed to make

23   the adjustment on to the video, and that's the only thing --

24   everything else is the same, it's just that cover sheet that

25   adjusts it for the two minutes for the log.

1           When we did all of those next to Detective Brandt

2     and we showed you how the times read, I said we still hadn't

3     done it with regard to this.  So this is just adjusting it for

4     those two minutes.  There's nothing else changed about version

5     7.  It's such a big file to recopy, but I did advise you

6     during that time when we went through all the snips and the

7     times of all the snips.

8           He showed you, you know, when I had him in the

9     meeting when we all went through that.  And I don't know what

10    else to say.  But I feel like we told you and that we weren't

11    going to recopy the whole video because it's such a huge big

12    thing, but we made the adjustment for the two minutes that is

13    contained on that.

14          THE COURT:  What are you asking for, if anything, at

15    this point?

16          MR. MERCER:  Well, I was making a foundation

17    objection for the simple reason that the information about the

18    two-minute adjustment was known before the version 7 video

19    that we received in discovery originally, which indicated

20    6:14 a.m. was generated.  And so I think if there's going to

21    be -- and this will become clearer, I think, when the

22    government's moving in the cell site location information and

23    the timing of certain calls, but this business about 6:16 as

24    opposed to 6:14, is a significant variable in the context of

25    this case.

1            And so I have a foundation objection to this

2   statement of 6:16 a.m., and I will just say I honestly

3   never -- I wasn't at that meeting with Detective Brandt, so

4   I'm not aware that there was going to be a further version 7.

5   I assumed that any new version would have a different

6   nomenclature, like version 8.  I've always been working with

7   version 7 and understood that to be the most current, so I'm

8   not trying to spring this on you.

9            I mean, I'm legitimately surprised by the 6:16 a.m.,

10  because the two-minute delay was known by Detective Brandt,

11  evidently, when he retrieved the video and started creating

12  the video clips, so I'm not sure that it wasn't already

13  factored into the times that were on version 7.  So this is a

14  long way of saying foundation for this assertion of time as

15  being accurate and reliable.

16            MS. WILKINSON:  Your Honor --

17            THE COURT:  And I understand all that.  I mean, we

18  don't need to spend a half hour on this.  I think I understand

19  the issues here.  I see this as an issue that you can cross

20  on, and if it -- you know, there's some issue about whether or

21  not, you know, these -- and I'm not suggesting this, I'm

22  saying, what you might suggest, that they sort of pushed it

23  back two minutes to fit something, then those are the kind of

24  issues you can cross on.

25            MS. WILKINSON:  Can I just add one thing for the

 1    record, Your Honor?

 2              THE COURT:  Sure.

 3              MS. WILKINSON:  Because maybe this will refresh

 4    Mr. Mercer.  I don't know whether it was Mr. Trainor that was

 5    there or not, but every one of these videos has a naming

 6    convention at the bottom where that is the time on the date

 7    stamp, then we know he has two minutes from his log, and you

 8    can tell from that what the time is.

 9              It just wasn't made on the little -- brief little

10    blank screens that we put into each one, but the evidence is

11    the original evidence, which I'm happy to clear up at lunch,

12    and I'll take a snip of the very first frame here, and he'll

13    go back and do the analysis, and you'll see what the actual

14    time was with the video.  And it will take away this issue,

15    which you have had from day one, which is, you have that

16    information of what time the video says it was from the

17    beginning of the case.

18              MR. MERCER:  The file name says 06:00, I agree.  And

19    then the elapsed time to the first so-called sighting of the

20    vehicle --

21              MS. WILKINSON:  Uh-huh.

22              MR. MERCER:  -- if my recollection serves me right,

23    is 6:14.

24              THE COURT:  And that's a video that you were

25    provided in discovery, it says 6:14.

1          MR. TRAINOR:  Yes, and that's elapsed time, so that

2     would then -- so the 06:00 naming convention -- well, we can

3     leave this for cross.

4          THE COURT:  I guess what I'm trying to understand

5     is, I mean, are you effectively telling me that you produced

6     one video that at one point said something happened at 6:14,

7     and now there's another video -- is that -- somebody's shaking

8     their head yes, somebody's shaking their head no.

9          MR. MERCER:  Yes, we -- I have not received a copy

10    of a video that says 6:16 a.m.

11         THE COURT:  She said -- she told you -- I mean,

12    we're just talking about --

13         MS. WILKINSON:  But the screen, that's it --

14         THE COURT:  -- the screen --

15         MS. WILKINSON:  But the actual --

16         MR. MERCER:  Yes.

17         THE COURT:  I'm just making sure I understand.  I'm

18    not saying you don't understand.

19         MR. MERCER:  I know we're talking about two minutes,

20    but it's --

21         THE COURT:  I know, I'm not --

22         MR. TRAINOR:  I walked in on time, we already

23    started.

24         THE COURT:  All right.  We have to do one at a time

25    here.  Remember, it's on the record.

1          MS. WILKINSON:  Yeah, we're just talking about the

2     discovery issues, just so I can make sure -- we'll have time

3     over lunch to see, because I -- I apologize if you weren't

4     part of that information, and it wasn't at the beginning of

5     it, but with regard to the snips themselves, if you went to

6     the -- just to make clear for the record, if you went to the

7     original video, not our little cover sheet.

8          THE COURT:  Right.  And that's -- let me say this,

9     the cover sheet, I assume is a creation of either

10    Ms. Wilkinson or someone working with Ms. Wilkinson.

11         MS. WILKINSON:  Exactly.

12         THE COURT:  We all agree with that; right?

13         Did you need me for something?

14         THE CLERK:  Excuse me.

15         THE COURT:  Someone needs a bathroom break, not a

16    bad time for it anyway.  We'll take a ten-minute break and

17    continue the conversation.  You can all step back.

18              (The following proceedings were had in open court.)

19         THE COURT:  All right.  Ladies and gentlemen, I've

20    been advised someone needs a bathroom break, and so we always

21    accommodate that.  So let's take a ten-minute break.  I'm

22    going to ask you to take a ten-minute break.  We're actually

23    going to continue this conversation.  Hopefully that will give

24    us enough time to finish it, and then we'll pick back up.

25              (Jury left the courtroom.)

1          THE COURT:  So let me make sure I understand, is the

2    only issue we're having --

3          THE CLERK:  Judge, the witness --

4          THE COURT:  Actually, if you could be excused, that

5    would be great.  Thank you.  We'll see you in ten minutes.

6          Thank you for that.

7          You can be seated unless addressing the Court.

8          Mr. Mercer, am I understanding correctly that your

9    objection is as it relates to this cover page?

10         MR. MERCER:  Right.  To the timestamp.

11         THE COURT:  And that's it.

12         MR. MERCER:  Yes, the -- as far as I understand, the

13   video content itself is the same as what has previously been

14   produced and labeled V-7.  What has changed is the timestamp

15   from --

16         THE COURT:  But this created sort of demonstrative

17   timestamp is the only thing that's changed.  Or has the

18   timestamp changed in the actual video?  That's what I'm trying

19   to understand.

20         MR. MERCER:  Well, I haven't -- maybe I should watch

21   this video, because I haven't actually -- yeah, maybe --

22         MS. WILKINSON:  Your Honor, can I just -- Ms. Oldham

23   reminded me -- she's a very good notetaker, but on

24   December 13, '19, her records reflect that I had a meeting

25   with Chris Davis, Mr. Zerkin, and Harry Trainor regarding

Direct Examination – Brandt   (By Ms. Wilkinson)

1    Detective Lee Brandt where he was present, and her notes read,

2    "Video time approximately" --

3                THE COURT:  Slow down, please.

4                MS. WILKINSON:  "Video time approximate two minutes

5    slower than real time, star.  We still need to fix in our

6    version 7."  I mean, I advised counsel, but I will answer the

7    Court's question, which is that, that time, not our

8    demonstrative that's up on the screen right now that says

9    approximately 6:16, that time is imprinted on the original

10   real videos that counsel has had that had the --

11               THE COURT:  That's what I'm trying to understand, so

12   has the actual video changed in any way?

13               MS. WILKINSON:  No.

14               THE COURT:  The only issue is this demonstrative --

15   what I assume is a demonstrative that you created, and I don't

16   know the technology, but inserted into the video.

17               MS. WILKINSON:  It's a slide that they put in for

18   demonstrative purposes so we know the time, but it's not

19   anything to do with the actual video.

20               THE COURT:  So I don't see why we need to do

21   anything more than to make it clear to the jury what this is,

22   that this is the government's approximation that you are free

23   to cross on and take issue with.  I'm looking at Mr. Mercer to

24   see what beyond that we need to do.

25               MR. MERCER:  I was sort of reacting because I was

1    surprised by the 6:16 --

2              THE COURT:  I get that.

3              MR. MERCER:  -- time frame and had understood from

4    Detective Brandt's notes that have been moved in as a

5    government's exhibit, that he was always aware of the

6    two-minute delay.  And so the naming convention for the file

7    would only make sense to include that two-minute delay.

8              So yes, it's foundational as to this demonstrative.

9    I think -- I think it makes me concerned about reliability of

10   that time estimate and that the -- the method that this

11   witness used to generate that time estimate.  So it's

12   foundational, but it also goes to the reliability of his

13   method.  And I think that needs to be established.

14             THE COURT:  All right.  I'll let Ms. Wilkinson

15   address those points, and then I'm ready to move on.  I don't

16   know if you have a response to that.

17             MS. WILKINSON:  Your Honor, what I was going to show

18   you so the Court -- what can be easily explained, is on all

19   the original video that is pulled from Detective Brandt, and

20   this was the lengthy meeting, and our notes show that

21   Mr. Mercer wasn't there, but Mr. Trainor was there.

22             THE COURT:  I'm less concerned about the meeting at

23   this point.

24             MS. WILKINSON:  Is -- what I was saying is, is this

25   naming convention comes right from the video itself and will

1    tell you, there's a formula for it, exactly what time any

2    particular clip is.  And that time will show you what the real

3    time was without the adjustment for the two minutes, which

4    Detective Brandt noted in his log.

5            And so when he noted that in his log, that's the

6    time that comes up on those little black clips, so we can show

7    the jury he's made that adjustment for the two minutes in the

8    clip we're about to see.  But the actual time, the two minutes

9    less, is in the video itself.  And the logs have long been

10   provided in discovery.  It's just that that demonstrative was

11   incorrect, and we hadn't made the adjustment for it yet.  I

12   hadn't made the adjustment for it yet, nothing to do with

13   Detective Brandt.  And I advised counsel about that at that

14   meeting on December 13th.

15           THE COURT:  All right.  I am comfortable that the

16   video is what the video purports to be for the purposes of

17   foundation and admissibility.  Certainly I would expect

18   government counsel to make it clear that that approximate

19   6:16 a.m. is in fact someone's estimate and to make it clear

20   how that was done.  And there can be certainly cross on

21   whether that's accurate or not.  But I don't think it goes to

22   admissibility of the actual --

23           MS. WILKINSON:  I'm happy to show Mr. Mercer it on

24   our break if he wants.  It's not a long video, if he wants to

25   come see it.  It's really just those slides that have been

1    adjusted for the two minutes.

2              THE COURT:  That's fine.  You have about three

3    minutes left, hopefully the jury will be back soon because

4    then we're breaking for lunch at 1:00.

5              MS. WILKINSON:  Right.

6              THE COURT:  But if you want to take the next few

7    minutes to look at it, that's fine, that's fine.  But again,

8    at least based on what I understand right now, you're showing

9    him the same video he has definitely seen before, the only

10   difference is the demonstrative slide that's been put in front

11   it.

12             MS. WILKINSON:  Yes.

13             THE COURT:  Again, as long as it's clear to the jury

14   that part of it is a demonstrative slide, then the video comes

15   in.  All right.  We can take three minutes while we wait for

16   the jury to come back.

17              MS. WILKINSON:  Thank you, Your Honor.

18             (A recess was taken.)

19             THE COURT:  Bring the jury.

20             (Jury entered the courtroom.)

21             THE COURT:  Sir, you can come take the witness

22   stand.

23             All right.  You may all be seated.

24             Sir, I remind you, you are still under oath.

25             THE WITNESS:  Yes, sir.

1          THE COURT:  And Ms. Wilkinson, you've got 15 minutes

2   before lunch.

3          MS. WILKINSON:  Okay.  Thank you, Your Honor.

4   Q.  (BY MS. WILKINSON)  Before we broke, I had put up on the

5   screen the beginning of Government's Exhibit V-1 and the time

6   that is showing up on the screen right there.

7          Was this black screen that says approximately 6:16 a.m.,

8   was that on the original videos that you pulled from Sinai

9   Ridge?

10  A.  As far as that, no, ma'am, that's added in.

11  Q.  Okay.  And are you able to calculate, based on the

12  original videos, the approximate time of any particular clip

13  within those videos that you retrieved?

14  A.  Yes, ma'am.

15  Q.  And I'm going to have you go into the specifics in a

16  moment, but just a general explanation to the jury, how do you

17  do that?

18  A.  In this case, because of, again, the way it was set up, it

19  doesn't have your traditional date and timestamp displayed on

20  the screen, so it went through a file format naming, where it

21  names each individual file of the video.  It has the date and

22  then the time frame from the beginning of time and the end of

23  time.

24         So say if it started at 07:00 and you're five minutes

25  into the video, then it would be 7:05 a.m., and that's how we

1   would calculate that convention.  It's kind of like a

2   workaround from the traditional where you would see it in the

3   corner saying date and time like you'd usually see.

4   Q.  And as part of your testimony and in preparation for your

5   testimony, did we prepare certain still screenshots to give

6   the jury an even better demonstrative of how you make that

7   time calculation?

8   A.  Yes, ma'am.

9   Q.  And I'll show you those in a moment when we get through

10  this, but with all of that, did you then have to make an

11  adjustment of the time because of your long recovery noting a

12  difference between the real time and the time on the videos?

13  A.  Yes, ma'am.

14  Q.  And just to remind the jury -- I don't want to go back and

15  forth, but what was that approximate time differential?

16  A.  The system is two minutes behind real time.

17  Q.  So with this added screen for the jury's viewing purposes,

18  to aid them, has that adjustment been made on the little

19  divider screens we have between clips?

20  A.  Yes, ma'am.

21  Q.  And I'll have you explain that more later, so if we're

22  looking at something that says approximately 6:16 a.m., what

23  would that make the original video approximate time be?

24  A.  As far as the video time, that would be approximately --

25  if it's 6:16, it would be 6:14.

1    Q.  Okay.  Like I said, we'll show examples of that in a

2    moment.  We're starting with the first clip that's part of the

3    compilation of Government's Exhibit V-1 at 6:16 a.m., and I'm

4    going to play it.

5         MS. WILKINSON:  And if you would, Ms. Lesser, stop

6    it right when we get to the next divider.

7         (Video played.)

8    Q.  (BY MS. WILKINSON)  And noting up on the top, do you see a

9    car moving?  Do you see that car moving, Detective Brandt?

10   A.  Yes, ma'am.

11        (Video played.)

12        MS. WILKINSON:  Right when it goes out of view, I'll

13   ask you to stop it.  Stop right there.

14   Q.  (BY MS. WILKINSON)  Okay.  Now, I'm going to kind of do

15   a -- turn your attention over here, having that video.  If you

16   need to look at it again, Detective Brandt, I know -- I want

17   you to show the jury -- if you have to stand up, that's okay

18   too.  You can put your -- stay as close to the microphone as

19   you can, but you have a nice loud and deep voice.

20        When we were looking at those two images from the

21   still -- from the video footage, what direction did we see

22   that car coming and driving up using the map?

23   A.  Well, looking at that one -- can everybody hear me?

24        MS. WILKINSON:  It's the court reporter that has to

25   hear you.

1              THE COURT:  Can we get handouts?

2              MS. WILKINSON:  It's kind of hard with everybody

3     situated to make sure --

4              THE WITNESS:  Can everybody hear me now?

5              MS. WILKINSON:  It's weird to have that.  If you

6     need me to hold it, I will.

7              THE WITNESS:  Now, if I remember it correctly, like,

8     where you can see he's coming off Neutron (sic), which would

9     be here, and turn on to Woodland by this view there.

10    Q.  (BY MS. WILKINSON)  So the car came out Rosalind?

11    A.  Yes, ma'am.

12    Q.  Up Nurton and onto Woodland?

13    A.  Yes, ma'am.

14    Q.  Okay.  Now, in the bottom right-hand corner, we saw

15    something that said camera 1, but is that the camera that it

16    was actually captured on?

17    A.  No, that's just the generic camera, because you'll notice

18    on some of them they'll have different camera names.  It's

19    just that person didn't name the camera, it just went to the

20    default of camera 1.  Every camera is camera 1 until you

21    change it.

22    Q.  Okay.  So that gives the jury that perspective.  I'm going

23    to come back to that in a second, and knowing that we're going

24    to make that transition between the video and the map, go

25    ahead and have a seat back.

1    A.  Yes, ma'am.

2              MS. WILKINSON:  And again, just because it is

3    complicated to look at two pieces of evidence at the same

4    time, go ahead and start at the beginning, it's only a second,

5    and let's just show it again.  And knowing that the map is up

6    there.

7              (Video played.)

8              MS. WILKINSON:  Okay.  Stop right there.

9    Q.  (BY MS. WILKINSON)  Okay.  Now, looking at the map over

10   there, can you tell the jury what camera angle is capturing

11   the view of the car, the top left-hand, as it goes up

12   Nurton?

13   A.  That would be camera 9, that's the one looking up

14   Neutron.

15   Q.  You can go ahead and point to it, if you want, so the jury

16   can see.

17   A.  This camera angle here that's looking up, northerly, up

18   Neutron.

19   Q.  So as we are looking at that vehicle, now at the top of

20   the screen, and you can look at it again, has it just come off

21   of Rosalind Avenue?

22   A.  Yes, ma'am.

23   Q.  And it's taking that left on Nurton?

24   A.  Yes, ma'am, it's going eastbound, going to make a left

25   turn to go northbound.

1   Q.  Okay.  Great.  So go ahead and we'll watch the end of it

2   as it goes up Nurton.

3                (Video played.)

4   Q.  (BY MS. WILKINSON)  And now, is it taking that left on

5   Woodland?

6   A.  Yes, ma'am.

7   Q.  Okay.

8                MS. WILKINSON:  Okay.  Stop it right there, please,

9   Ms. Lesser.

10  Q.  (BY MS. WILKINSON)  Now we have another one of those black

11  screens that says approximately 6:19 a.m.  Again, just to make

12  it abundantly clear, I try not to be too repetitive, but was

13  that black screen approximately 6:19 a.m. on the original

14  videos that you retrieved from Sinai Ridge?

15  A.  No, ma'am.

16  Q.  Did we create those, meaning we, the government team?

17  A.  Yes, ma'am.

18  Q.  Okay.  And does that time that's up there, has it been

19  adjusted for the two minutes that you noted when you went

20  there to retrieve the video?

21  A.  Yes, ma'am.

22  Q.  Is the real time of the clips we see noted on the original

23  videos in the naming convention you generally described for

24  the jury a moment ago?

25  A.  Yes, ma'am.

1    Q.  Okay.  We're going to go ahead and continue the play that.

2              (Video played.)

3              MS. WILKINSON:  Stop in a moment.  Not yet, but

4    right around here, as the car turns.  Stop right there.

5    Q.  (BY MS. WILKINSON)  Okay.  Now, you see that image that

6    we're looking at right now?

7    A.  Yes, ma'am.

8    Q.  Can you now turn to the street map that we have.  I've got

9    to get it into my head, for the record, what government

10   exhibit we're talking about, V-3B, and tell the jury what

11   we're seeing now with regard to that vehicle.

12   A.  Yes, it should be from what was -- okay, that one should

13   be camera 3 -- picking up -- I'm sorry --

14             MS. WILKINSON:  Thank you.  I'm so sorry.  Got to

15   make sure everyone can hear and see.  Is it on?

16             THE COURT:  It's on.

17             MS. WILKINSON:  Thank you, Your Honor.

18   A.  So when we see it come back through, you'll see it come

19   back down on camera 11.

20             MR. MERCER:  Your Honor, I'm going to object to "see

21   it come back through."  Assumes a fact not in evidence.

22             MS. WILKINSON:  I can rephrase the question, I'm not

23   sure how --

24   Q.  (BY MS. WILKINSON)  -- did you see the car turn right on

25   Nurton?

1    A.   Yes, ma'am.

2    Q.   Okay.  And you were describing the camera that was

3    capturing that image that the jury just saw?

4    A.   Yes, camera 11 picked up the vehicle making the turn and

5    then just transitioned to camera 3.

6    Q.   Okay.  I'm going to have you keep the microphone in front

7    of you, but just be aware that it's on and have a seat.

8    A.   Yes, ma'am.

9         MS. WILKINSON:  And again, I'm going to do this so

10   we can all get perspective, and go ahead and ask Ms. Lesser to

11   go ahead and let the car come down the street.

12        (Video played.)

13        MS. WILKINSON:  I'll have you stop it in just a

14   moment.  Let it -- go ahead.  Okay.  Stop it right there.

15   Q.   (BY MS. WILKINSON)  Okay.  What street, using Government's

16   Exhibit V-3A, is the car turning on now?

17   A.   Right now it's making a turn westbound on to Rosalind, as

18   seen through camera 9, it's looking northbound up Nurton.

19   Q.   When we see the various video compilations going from

20   different angles, is that from different camera footages that

21   it's being made?

22   A.   Yes, ma'am.

23   Q.   If that sentence makes sense.

24        And the ones that we're looking at, the cameras that

25   we're looking at, are which cameras as depicted on the poster

Direct Examination - Brandt   (By Ms. Wilkinson)

 1    from the clips that we just saw?

 2    A.  In this instance, through those videos, it's a compilation

 3    of between camera 9, camera 3, and camera 11.

 4    Q.  Thank you.

 5           MS. WILKINSON:  Okay.  Go ahead, Ms. Lesser.

 6    A.  And I'm sorry, camera 10 as well.

 7           MS. WILKINSON:  I'm sorry, go ahead and stop.

 8           Go ahead.

 9    A.  Camera 10 because it shows the Woodland.

10           (Video played.)

11           MS. WILKINSON:  Stop for a second there.

12    Q.  (BY MS. WILKINSON)  And so what time frame is depicted now

13    that we're about to see?

14    A.  Approximately 6:39.

15           (Video played.)

16           MS. WILKINSON:  Okay.  Stop it right there.

17    Q.  (BY MS. WILKINSON)  Now, again, using the map and using

18    your descriptors, for the record, where did we see the image

19    of this car coming and going, as depicted in the map?

20    A.  Again, we see it coming from the eastbound on Rosalind,

21    you'll see it through camera 9, and then when it makes the

22    left turn, right now it's picking up on camera 3.  It's

23    showing it traveling northbound.

24           (Video played.)

25           MS. WILKINSON:  Stop it right there.

1   Q.  (BY MS. WILKINSON)  What left-hand turn is this car

2   making?

3   A.  It should be making the westbound turn on to Woodland, as

4   seen on camera 11.

5           MS. WILKINSON:  Go ahead, Ms. Lesser, thank you.

6           (Video played.)

7           MS. WILKINSON:  Stop it right there.

8   Q.  (BY MS. WILKINSON)  So we've looked at clips that had

9   6:16, 6:19, and 6:39, and now what time frame are we looking

10  at?

11  A.  7:21 a.m., ma'am.

12  Q.  Do a quick calculation, about 42 minutes later?

13  A.  Give or take, yes, ma'am.

14          (Video played.)

15          MS. WILKINSON:  I'm going to actually have you stop

16  it right here.

17  Q.  (BY MS. WILKINSON)  And if you look over to our map over

18  here, Detective Brandt, can you tell the jury, for frame of

19  reference, what camera angle we're looking at?

20  A.  That would be camera No. 8.

21  Q.  I'm going to go ahead and point it out, camera 8, have I

22  got that right?

23  A.  Yes, ma'am.

24          MS. WILKINSON:  Counsel.  Okay.  Ms. Lesser, you can

25  continue to play from camera 8.

1          (Video played.)

2          MS. WILKINSON:  Stop it right there for a second.

3   Q.  (BY MS. WILKINSON)  Now, on the bottom right-hand corner

4   of this still image that we're looking at in the 7:21 clip of

5   Government's Exhibit V-1, it says Lanier, is there a Lanier

6   Avenue depicted on Government's Exhibits V-3B?

7   A.  Yes, that would be camera No. 6.

8   Q.  Okay.  And go ahead and point to it with your finger.

9   A.  Right here.  It's the parking lot located right there.

10  Q.  And I neglected to ask you, the one that was beforehand,

11  did it have Virginia on the bottom right-hand corner?

12  A.  Yes, ma'am.

13  Q.  Is that related to the Virginia Avenue notation on the

14  map?

15  A.  Yes, ma'am.

16          MS. WILKINSON:  Your Honor, you tell me when it's a

17  good stopping point, but I was going to try to get through the

18  video.

19          THE COURT:  How much longer would that be?

20          MS. WILKINSON:  It's probably two minutes more.

21  Maybe five minutes.  A lawyer two minutes.

22          We can continue to play.

23          (Video played.)

24  Q.  (BY MS. WILKINSON)  I'll draw your attention to the top of

25  the screen, do you see another car coming into play?

1    A.  Yes, ma'am.

2              (Video played.)

3              MS. WILKINSON:  Stop it there for a moment.

4              Your Honor, actually, this might be a good breaking

5    point because I don't want to ruin our lunch, your lunch, your

6    lunch.

7              THE COURT:  Thank you.  All of our lunches.

8              MS. WILKINSON:  Right.

9              THE COURT:  Ladies and gentlemen, we will take lunch

10   at this point.  I am going to ask that you be back in the jury

11   room, I guess we'll say 5 past 2:00.  And we will go from

12   there.  Please enjoy your lunch.  Remember not to discuss this

13   case with anyone, including even among yourselves.

14             (Jury left the courtroom.)

15             THE COURT:  All right.  So we'll see you in an hour.

16   During that time, please don't discuss this case with

17   anyone.

18             THE WITNESS:  Thank you.

19             THE COURT:  I'll see you in an hour.

20             (A recess was taken.)

21             THE COURT:  Get the jury.

22             (Jury entered the courtroom.)

23             THE COURT:  All right.  You may all be seated.  Good

24   afternoon, ladies and gentlemen.

25             JURORS:  Good afternoon.

1          THE COURT:  Hopefully everyone enjoyed lunch.

2          Sir, I'll remind you, you are still under oath.  And

3    I believe you were with Ms. Wilkinson.

4          MS. WILKINSON:  Before we begin, Judge -- would it

5    be all right if I provided smaller versions of Government's

6    Exhibit V-3B to the jury so I don't have the back and forth

7    kind of here, would that be all right?

8          THE COURT:  Which ones are those?

9          MS. WILKINSON:  That is the camera map that we've

10   been referring to.  I have smaller versions, if Agent Holiday

11   could pass them out.

12         THE COURT:  Or you can out it on the ELMO, if that's

13   easier.

14         MS. WILKINSON:  I can't do the --

15         THE COURT:  Got it.

16         MS. WILKINSON:  It's because we keep toggling back

17   and forth between the door and the video.  Thank you, Your

18   Honor.

19         Your Honor, since this is a government exhibit, may

20   the jury keep this map and put notes on it, as opposed to the

21   transcripts that were not the evidence?

22         THE COURT:  That's fine.  Unless, was there an

23   objection?

24         MR. ZERKIN:  No, sir.

25         THE COURT:  All right.  That's fine.

1        MS. WILKINSON:  Thank you, Your Honor.  I'll wait

2    till everybody has one.

3        THE COURT:  Do I have a small version of that in

4    here?

5        MS. WILKINSON:  No, but I have an extra.

6        THE COURT:  That would be great, if I could get one

7    of those.

8        MS. WILKINSON:  Actually, it might be in there, but

9    we might as well give it to you easily.  Thank you, Your

10    Honor.

11        If you have extras, Special Agent Holiday, feel free

12    to give them to counsel, although I'm certain it's in their

13    exhibit file.

14        Thank you for the curtesy, Your Honor.

15    Q.  (BY MS. WILKINSON)  Okay.  Detective Brandt, when we broke

16    for lunch, we were looking at excerpts from Government's

17    Exhibit V-1, the compilation, and we were just concluding with

18    the excerpt that began with 7:21 a.m., do you recall that?

19    A.  Yes, ma'am.

20        MS. WILKINSON:  I'm going to go ahead and ask

21    Ms. Lesser to continue playing where we left off at the lunch

22    break.

23        (Video played.)

24    Q.  (BY MS. WILKINSON)  Is that the same car we saw before the

25    lunch break, pulling into that Virginia Avenue lot?

1    A.  Yes, ma'am.

2                 (Video played.)

3                 MS. WILKINSON:  Stop there for a second, Ms. Lesser.

4    Q.  (BY MS. WILKINSON)  Looking at Government's Exhibit V-3B,

5    and the jury having a copy in front of them, can you tell the

6    jury which direction the car that's depicted on the snip that

7    we have here was coming out of that Virginia lot and what

8    street it was turning on to?

9    A.  Yes, ma'am, if you look, you'll see through camera No. 8,

10   you saw where Virginia Avenue southbound, and then it made the

11   right turn heading westbound on Virginia Avenue.

12                MS. WILKINSON:  You can continue playing.

13                (Video played.)

14   Q.  (BY MS. WILKINSON)  And is that Virginia Avenue that the

15   car is on?

16   A.  Yes, ma'am.

17                (Video played.)

18                MS. WILKINSON:  You can stop it right there.  You

19   can go back for two little seconds.  Thank you.

20   Q.  (BY MS. WILKINSON)  And the next snip that we're about to

21   see, what time, for the record?

22   A.  7:27 a.m.

23   Q.  Okay.  And is that with the accommodation for the

24   two-minute difference?

25   A.  Yes, ma'am.

1   Q.   Approximate two-minute difference.

2   A.   Yes, ma'am.

3            (Video played.)

4            MS. WILKINSON:   You can stop it right there.

5   Q.   (BY MS. WILKINSON)   The police car that you saw come into

6   view, just using the map again, can you tell the street that

7   the car arrived on, turned on, and eventually went out of view

8   on?

9   A.   Yes, ma'am, if you'll see, it came from Woodland, camera

10   10, made the left turn southbound on Neutron through camera

11   11, camera 3, and then made the right turn on Rosalind heading

12   westbound, and you also saw it through camera 9, through the

13   north -- northern --

14   Q.   Is that the -- and I don't mean to interrupt you, but is

15   that the same Nurton -- and I'm calling it "Nurton," you're

16   calling it "Neutron," I don't know which one it is, but

17   Nurton, when you're taking that right on Rosalind that we saw

18   from those very first snips, the same direction that we saw

19   the car coming in?

20   A.   Yes, ma'am.

21   Q.   Now we're at 7:28 a.m.; is that correct?

22   A.   Yes, ma'am.

23            MS. WILKINSON:   Would you play the snip there,

24   Ms. Lesser.

25            (Video played.)

1          MS. WILKINSON:  Okay.  Stop it right there.  Maybe a

2     little further.  Stop right there.

3     Q.  (BY MS. WILKINSON)  Okay.  You see the car that's moving

4     on the snip just after 7:28 a.m.?

5     A.  Yes, ma'am.

6     Q.  Okay.  And what camera angle are we looking at here?

7     A.  This one should be camera No. 10, and it should be

8     Woodland Avenue.

9          MS. WILKINSON:  You can keep playing.

10          (Video played.)

11          MS. WILKINSON:  Stop it right there.

12     Q.  (BY MS. WILKINSON)  What angle -- what time are we

13     referring to here?

14     A.  7:29 a.m.

15          MS. WILKINSON:  Keep going.

16          (Video played.)

17     Q.  (BY MS. WILKINSON)  Do you see the emergency response

18     vehicles coming down that same route?

19     A.  Yes, ma'am.

20     Q.  And they're turning left on Nurton?

21     A.  Yes, ma'am.

22     Q.  And then going up Rosalind?

23     A.  Yes, ma'am.

24     Q.  You see a vehicle that we're watching now?

25     A.  Yes, ma'am.

1  Q.  And what --

2           (Video played.)

3           MS. WILKINSON:  If you could stop it right there,

4  Ms. Lesser.

5  Q.  (BY MS. WILKINSON)  What road is this vehicle coming

6  down?

7  A.  Nurton, southbound.

8           (Video played.)

9           MS. WILKINSON:  Now, if you would stop it right

10  there, Ms. Lesser.

11  Q.  (BY MS. WILKINSON)  Do you see the moving vehicle again

12  there at the top?

13  A.  Yes, ma'am.

14  Q.  Did that vehicle, knowing the map and watching the video,

15  just pass the turn for Rosalind Avenue?

16  A.  Yes, ma'am.

17  Q.  And just again, indicating from the map, and I can let the

18  video go further, where is this vehicle now, what area?

19  A.  It would be in the view of camera 9, where it's facing

20  northbound up Nurton, so it would be kind of be like in

21  between the buildings.

22           MS. WILKINSON:  Okay.  You can continue.

23           (Video played.)

24           MS. WILKINSON:  Okay.  Stop there.

25  Q.  (BY MS. WILKINSON)  So what camera angle are we looking at

1    in the top right-hand corner?  Down below it says overlook,

2    and we're just at that snip around where it begins around

3    7:29 a.m., but it has been running for a little bit.  What

4    camera angle are we looking at now?

5    A.  On that one, that would be camera angle No. 5 that's

6    looking up Nurton as well.

7    Q.  And I don't have one of the small maps in front of me, but

8    just a frame of reference in terms of camera 5, would that be

9    at the very end of what is called Nurton Street?

10   A.  Yes, ma'am.

11   Q.  There on the right-hand?

12   A.  Yes, ma'am.

13           MS. WILKINSON:  Okay.  Ms. Lesser, you can continue

14   to play.

15           (Video played.)

16           MS. WILKINSON:  Stop right there.

17   Q.  (BY MS. WILKINSON)  Looking at this vehicle, does it

18   appear to have like a little spoiler on the back of the

19   vehicle?

20   A.  Yes, ma'am.

21           MS. WILKINSON:  Stop right there.

22           (Video played.)

23   Q.  (BY MS. WILKINSON)  At the image that we're looking at

24   now, with the vehicle stopped above it, do you see more

25   emergency vehicles now coming into view?

1   A.  Yes, ma'am.

2           MS. WILKINSON:  And continue.

3           (Video played.)

4   Q.  (BY MS. WILKINSON)  And are they taking that right on

5   Rosalind Avenue?

6   A.  Yes, ma'am.

7           (Video played.)

8   Q.  (BY MS. WILKINSON) The car with the spoiler moving up,

9   again, Nurton Avenue?

10  A.  Yes, ma'am.

11          (Video played.)

12          MS. WILKINSON:  Okay.  And stop right there.

13  Q.  (BY MS. WILKINSON)  Are we seeing that car with the little

14  spoiler now coming up Nurton in the same direction it had

15  originally come down in?

16  A.  Yes, ma'am, it's heading northbound.

17  Q.  Okay.  And are we getting to that intersection, I think

18  we're all getting familiar with now, at Nurton and Woodland

19  Avenue?

20  A.  Yes, ma'am.

21          MS. WILKINSON:  Okay.  You can continue, Ms. Lesser.

22          (Video played.)

23          MS. WILKINSON:  Stop right there for a second.

24  Q.  (BY MS. WILKINSON)  Do you see the car crossing into the

25  intersection?

1    A.  Yes, ma'am, behind the tree.

2    Q.  And this time, is the car taking a right on to Woodland,

3    or a left?

4    A.  It's making a right on Woodland towards Greenspring.

5              MS. WILKINSON:  You can continue, Ms. Lesser.

6              (Video played.)

7              MS. WILKINSON:  Stop right there.

8    Q.  (BY MS. WILKINSON)  So the last we looked, the beginning

9    of the last snip we did was about 7:29 a.m., and this is now

10   at 7:56 a.m.; is that correct, Detective Brandt?

11   A.  Yes, ma'am.

12   Q.  And so we're dealing with about 27 minutes after the last

13   one began?

14   A.  Yes, ma'am.

15   Q.  Obviously we were watching it run for some time.

16             MS. WILKINSON:  So at 7:56 a.m., would you continue

17   to play, Ms. Lesser.

18             (Video played.)

19             MS. WILKINSON:  Stop it right there.

20   Q.  (BY MS. WILKINSON)  Now, this car does not have that

21   little spoiler on it; is that fair to say, Detective Brandt?

22   A.  Yes, ma'am, it's a different make of car.

23             (Video played.)

24             MS. WILKINSON:  Stop it right there.

25   Q.  (BY MS. WILKINSON) Okay.  Down -- is this a different

1    angle than we have seen in the prior snips in Government's

2    Exhibit V-1?

3    A.  Yes, ma'am.

4    Q.  And what -- give the jury a frame of reference, what

5    camera angle and area are we looking at if you refer to the

6    map?

7    A.  This would be camera 1, it's the parking lot that's goes

8    off of Greenspring into like the leasing office.

9    Q.  Now, just as an aside, is this the same leasing office

10   where you went to pick up the video in connection with this

11   case, or did you go to another area within the Sinai Ridge?

12   A.  No, ma'am, it's the same location.

13   Q.  So you've been to this parking lot?

14   A.  Yes, ma'am.

15              MS. WILKINSON:  You can go ahead and continue.

16              (Video played.)

17              MS. WILKINSON:  You can stop it right there.

18   Q.  (BY MS. WILKINSON)  Now, where that car had come into that

19   parking lot and made that turn to come around, was there any

20   other way to go in and out of that parking lot, or is there

21   only one entrance?

22   A.  Only one entrance.  If you look at, actually, the

23   satellite map, it will give you a better depiction of the way

24   the parking lot is set up.

25   Q.  Then that is what we shall do.  Have you got your

1   microphone there?

2   A.  Yes, ma'am.

3   Q.  Let's make sure that we -- I don't know if I -- I might

4   have to hold it.  Can you get it up there?  Thank you, sir.

5        Can you hold it and do it at the same time?

6   A.  Yeah, so if you -- I don't think this is on.

7   Q.  I can actually hold it for you.

8   A.  So if you see here, this is Greenspring, you would come in

9   and the camera view where you saw is the parking lot, the

10  dumpster sits here, that's where he came in.  You saw him

11  right there, and that's pretty much just in and out, entrance

12  only.

13  Q.  Would you follow me down here, Detective Brandt, so the

14  jurors on the end can also see.

15  A.  Yes, ma'am.

16  Q.  Go ahead and --

17  A.  So again, where that view is, if you come up --

18           THE COURT:  Excuse me, can you hold on while defense

19  counsel --

20           MS. WILKINSON:  Thank you, Your Honor.  Sorry,

21  Mr. Mercer.

22  A.  So if you look at Greenspring, you come in off of

23  Greenspring and the camera angle shows right here, so you'll

24  see when you're looking at that car, it's right in this area

25  right here.

1    Q.  (BY MS. WILKINSON)  While I have you standing here and

2    because we're looking at kind of a different view, an aerial

3    view, would you say?

4    A.  Yes, ma'am.

5    Q.  Where we can actually see the detail of the community

6    there, can you just follow with the finger that Woodland

7    Avenue, Nurton Avenue address?

8    A.  So here's your Woodland Avenue, so we talked about coming

9    from the left, so this would be northbound, this is westbound,

10   here's Nurton.  So camera 10 looks this way, camera 11 looks

11   this is way, camera 3 looks that way, camera 9 looks up that

12   way, and camera 5 looks that way.  Camera 6 is this way, and

13   camera 8 is that way, to give you kind of a perspective of the

14   views.

15   Q.  That's a great segue into the next exhibit, and we'll be

16   able to explain it better.

17       Did you actually take snips or help prepare a

18   demonstrative of the angles of the cameras and the views that

19   they had?

20   A.  Yes, ma'am.

21   Q.  Okay.  And I'll show you that in a moment, but while we're

22   standing here on the aerial too, can you show the jury the

23   area of Nurton where we saw the car with the spoiler go down

24   Nurton and wait for the emergency to drive by?

25   A.  Yes, when you saw it come down Nurton, it came down, as

1    you can see, it passed through this turn here, and then

2    stopped right here.  It originally stopped here at first, when

3    she asked me where that was.  So they stopped, they came down,

4    pulled in like right here on this turn, and then came around

5    and sat, and then came back up as the emergency equipment was

6    coming by.

7    Q.  And let's go to those beginning snips, if we could, and

8    the one particularly that was when we saw the man running near

9    Virginia Avenue, just again, show the jury on the aerial where

10   that is.

11   A.  So when you first saw him coming down, he was coming down

12   this sidewalk right here where you saw from that camera angle

13   there, and then where Lanier pulls up, you see him as he's

14   coming down this embankment and through the parking lot here

15   and towards Dupont.

16   Q.  And again, with the frame of reference of the Rosalind

17   Avenue murder scene, you've been out there of course; right,

18   Detective Brandt?

19   A.  To the actual scene?

20   Q.  Yes.

21   A.  No, no, ma'am, my response was all to the apartments.

22   Q.  And my question really only is that, when we saw the car

23   at the very beginning of the snips coming down Rosalind

24   Avenue, would you just point that out and take the left on

25   Nurton?

Direct Examination – Brandt   (By Ms. Wilkinson)

1   A.  Here's Rosalind, so it would be coming eastbound to make

2   that northbound turn on to Nurton.

3   Q.  And we'll show this map again later, but go ahead and have

4   a seat.

5   A.  Yes, ma'am.

6   Q.  People see better with street scenes and others with

7   objects.

8        We were just finishing up with the prior snip that we saw

9   the car without the spoiler coming in and out of the leasing

10  parking lot.

11       And now we're looking at 7:57 a.m.; is that correct?

12  A.  Yes, ma'am.

13            (Video played.)

14            MS. WILKINSON:  You can stop right there.

15  Q.  (BY MS. WILKINSON)  Do you see the car that's moving?

16  A.  Yes, ma'am.

17  Q.  Okay.  And what direction is the car moving now?

18  A.  Now it's heading -- excuse me, southbound on Nurton.

19  Q.  Did it just come from the Woodland Avenue?

20  A.  Yes, ma'am, it came from westbound Woodland.

21            MS. WILKINSON:  You can continue.  Thank you.

22            (Video played.)

23  Q.  (BY MS. WILKINSON)  Again, this car does not have the

24  spoiler on it; is that right?

25  A.  Yes, ma'am, it's a different car.

1    Q.  And the one we had previously seen from the same camera

2    angle, that one had the spoiler on it?

3    A.  Yes, ma'am.

4    Q.  And from reviewing the video many times, Detective Brandt,

5    are you able to say what make of car this one is?

6    A.  It's an Audi.

7    Q.  Was it an Audi that was in the leasing parking lot?

8    A.  Yes, ma'am, you can tell by the front tag.

9    Q.  Again, is it coming up there past Rosalind and continuing

10   up Nurton?

11   A.  Yes, ma'am, it's traveling northbound.

12   Q.  And which direction did it go?

13   A.  Now it's going westbound on Woodland.

14   Q.  Now, throughout the course of us watching Government's

15   Exhibit V-1, I drew your attention, apart from the police cars

16   and the emergency cars, to different vehicles that are

17   depicted in that video; is that fair to say, Detective

18   Brandt?

19   A.  Yes, ma'am.

20   Q.  From looking at them, you said one of them was an Audi,

21   what was the other type of car that we were watching?

22   A.  The Pontiac.

23   Q.  Which one had the little spoiler on it?

24   A.  The Pontiac.

25   Q.  Is that a good way to distinguish the two?

Direct Examination - Brandt   (By Ms. Wilkinson)

1   A.  Yes, ma'am.

2   Q.  When you're watching the video, obviously I'm able to have

3   Ms. Lesser stop them and ask you questions, are you also able

4   to take still photo images of them so we can better look at in

5   a, you know, stationary way, a particular moment in time in

6   the course of this compilation?

7   A.  Yes, ma'am.

8   Q.  And in order to assist the jury in understanding the time

9   naming convention on the system that you described before

10  lunch, did I ask you to pull certain snips so that we could

11  understand better that naming convention?

12  A.  Yes, ma'am.

13  Q.  And I'm going to show you, and if you need to calculate, I

14  know we did it in advance and if you need to see our notes,

15  you can definitely do that, and I'm going to show you first

16  Government's Exhibit V-11, once Ms. Lesser -- and if you need

17  a way to do that, you can let me know.

18      So this particular snip up here, first of all, is this

19  the car with the spoiler, the Pontiac or the Audi?

20  A.  It's the Pontiac.

21  Q.  Okay.  And which camera angle are we looking at?

22  A.  This is would be camera, I believe No. 8, Virginia Avenue

23  parking lot.

24  Q.  And down below, this one actually has the right name on

25  it; correct?

1    A.  Yes.

2    Q.  And is this a snip from the video we just got finished

3    looking at?

4    A.  Yes, ma'am.

5    Q.  Okay.  And then I'm going to go down to the bottom here,

6    let's see if I can get it all on here.

7        Now, over -- are you familiar with the string of numbers

8    that I'm kind of circling here to the left?

9    A.  Yes, ma'am.

10   Q.  And then the numbers over here to the right?

11   A.  Yes, ma'am.

12   Q.  Okay.  And on the left, what are we reading here in terms

13   of the names that we're looking at?

14   A.  Okay.  With this naming convention, it will have Sinai

15   Ridge, that's the name of the DVR, kind of like how you have

16   your computer named "My PC," electronic device.  They gave it

17   a name, they gave it Sinai Ridge, then you have underscore,

18   Sinai Ridge, IP camera No. 8.  So that's saying it's Sinai

19   Ridge, Sinai Ridge camera No. 8.

20   Q.  Is that the same camera No. 8 that's noted on Government's

21   Exhibit V-3B and that the jury has their own copies of?

22   A.  Yes, ma'am.

23   Q.  Okay.  You can continue.

24   A.  All right.  And then you'll see the string of numbers that

25   follow, 2016, that's the year.

1    Q.  Am I pointing at the right place?

2    A.  Yes, ma'am.  Then it will be 05, the month, and then 27 is

3    the day.  And then with this one, it's 06 is 6:00 a.m., 52

4    minute -- I'm sorry, 53 minutes and then 52 seconds.

5    Q.  So I'm going to go ahead and write that down below here,

6    so it's 2016, 5, 27, and is that the date?

7    A.  Yes, ma'am.

8    Q.  And that's what we're looking at here.  Am I right?

9    A.  Yes, ma'am.

10   Q.  And then down below, you said the time of this particular

11   snip is --

12   A.  It starts at 6:53 a.m. and 52 seconds.

13   Q.  And what does that time mean to you?

14   A.  The way the video management system is set up is it writes

15   down the video.  It doesn't have it as one continuous stream

16   of data, it breaks it up into manageable chunks.  So when you

17   look at when I'm downloading the video, I'm presented with --

18   say I put in from, you know, 6:00 to 7:30, I'll get maybe 100,

19   200 data files back, because what it is, is the video

20   management software takes each camera footage and just breaks

21   it up into little chunks and then stores it accordingly.

22        So with this naming convention, that first part is --

23   denotes the date and time that that clip starts.  So we know

24   that this clip is starting at 6:53 and 52 seconds on May 27th,

25   2016.  And then you have the underscore, is the following date

1   and time of when that clip ends.

2   Q.  Okay.  So I'm going to go over there, and tell us what

3   we're looking at.

4   A.  So for that one, you have the underscore, then it goes

5   2016, the year; 05, the month; 27, the day.  And that one is

6   08 a.m. and 59 seconds.

7   Q.  Did I write that right -- no, 59 seconds, so it would be

8   08:00.

9   A.  So 8:00 a.m. and 59 seconds, so just past 8:00 a.m.

10  Q.  I'm going to actually write it so we can all remember

11  because you can see that I'm challenged by it too.

12  A.  Then you have that following underscore and the last

13  numeric is just like a check numbering system that helps

14  organize it.

15  Q.  Does this have anything to do with the date and time?

16  A.  No, ma'am, that's just -- that's for file management.

17  Q.  So again, the time, 6:53 to 8:59, is what?

18  A.  That is the time frame of this clip that we are watching

19  right now.

20  Q.  The chunk of the clip, or the clip?

21  A.  The chunk of the clip for that data file.  So when you

22  click on that data file, when you open up that file, it's only

23  going to show from 6:53 and 52 seconds to 8:00 a.m. and

24  seconds.

25  Q.  So that whole -- those five videos that I put in at the

1   very beginning of your testimony, somewhere in there there's a

2   file that's just 6:53 to 8:59, that entire time frame?

3   A.   Yes, ma'am.

4   Q.   So now let's talk about this particular clip.

5           THE COURT:   I'm sorry, 8:59, or 8:00 a.m.?

6           MS. WILKINSON:   8:00 a.m. and 59 seconds.

7           THE WITNESS:   8:00 a.m. and 59 seconds.

8           MS. WILKINSON:   Thank you, Your Honor.   8:00 a.m.

9   and 59 seconds.   That's why I wrote it in words, to try to

10  remember.   Thank you, sir.

11  Q.   (BY MS. WILKINSON)   8:00 a.m. and 59, so that is the chunk

12  of time on that entire video clip for which this is -- the

13  video clip on V-1 is just a snip of that, and this is a still

14  photograph of that?

15  A.   This is a still photograph from the video file, that MP4

16  video file, for this time frame.

17  Q.   Okay.   So now we're going to go over to the right, and

18  what does this information tell you?

19  A.   Okay.   When you're looking at 52,938/120,825, this is the

20  52,938th frame of that video clip.   Some software that we use

21  we can take it frame by frame.   So for these purposes, it

22  gives you a frame count, and it tells you where you're at in

23  that frame count.

24  Q.   That's because if there was an old-fashioned way and we

25  just had a million frames and we kind of fanned it like a deck

Direct Examination - Brandt   (By Ms. Wilkinson)

1    of cards, it would show movement.

2    A.   Old school flip book.

3    Q.   Right.   Exactly.   And then if we go over here to the

4    right, what is this information?

5    A.   Okay.   The 00.29 -- the 24 tells you where that cursor is

6    in that video, is that it's been playing for 29 minutes and 24

7    seconds.   Out of the next section is the total time of that

8    clip, is 1 hour, 7 minutes, and 7 seconds.   So out of that,

9    that's the total run playing time out of which you've been

10   watching, where the cursor is below, is at the 29 and

11   24-second mark.

12   Q.   Okay.   And is it this information that helps you get to

13   that time that is on the actual original video?

14   A.   Yes, ma'am.

15   Q.   Okay.   So how do we do the calculation to know what time,

16   let me back up here, this particular frame in the video is in

17   our real everyday life, what time is it?

18   A.   So again, in a perfect world, we'd have a date and

19   timestamp up there, and it would tell you, but for this, so

20   what you'd have to do is, you take -- we know the start time

21   is 6:53 and 52 seconds, you add on the 29 minutes and 24

22   seconds, and then you also add the two-second variation for

23   real time.

24   Q.   Second or minute?

25   A.   I'm sorry, two minutes, I apologize, two minutes.

1    Q.  And is it exactly two minutes?

2    A.  It's approximate because the -- I used my

3    department-issued cell phone as the constant for time measure,

4    it doesn't do seconds, so I always approximate to the

5    minute.

6    Q.  So again, if we were to add 6:53 plus 29 and 24 seconds,

7    are you able to do the math?  Do you need a piece of paper?

8    I'm going to actually have you do it, because I think --

9    A.  That's why I'm not a math teacher.

10   Q.  -- it's important, and I won't have you do it to any other

11   one, then I'll mark it as an exhibit.

12   A.  Yes, ma'am.

13   Q.  Just to make sure.

14   A.  I got a pen.  Thank you.

15   Q.  Got it.  Great.  I'll wait for you, not to put you under

16   any pressure.

17   A.  All right.  Should be about 7:23, and then add on two

18   minutes.

19   Q.  Plus two.  Okay.

20   A.  Plus two.  Basically 7:25, give or take.

21   Q.  I'm going to go ahead and I'll mark this as Government's

22   Exhibit V-3C.

23   A.  If it's a little off, I apologize.

24   Q.  Put it on the screen.  Do you see that there, is that the

25   notes that you just took?

Direct Examination - Brandt   (By Ms. Wilkinson)

1    A.   Yes, ma'am.

2    Q.   Okay.  So if I go down below or write it up here at the

3    top, the approximate time of this clip is 7:23:16 plus

4    approximately two minutes.

5    A.   Yes, ma'am.

6    Q.   Is that right?

7    A.   Yes, ma'am.

8    Q.   And that would give us 7:25:16.

9    A.   Yes, ma'am.

10   Q.   Approximately.

11   A.   Approximately.

12   Q.   I'm not going to have you do that whole math thing next

13   time again, but at least we know with regard to this one.

14   A.   Common core math.

15   Q.   Now, let me turn to Government's Exhibit V-12.  That was

16   V-11, let's go to V-12.

17        Again, is this a snip from the video compilation we just

18   looked at?

19   A.   Yes, ma'am.

20   Q.   And which car are we looking at here?

21   A.   That looks like the Audi, that's the Audi.

22   Q.   Okay.  So now I'm going to go below, and again, I'm not

23   going to have you do the math too much on this because I think

24   we did it before, but --

25   A.   Thank you.

1    Q.  -- what is the time over here from which we must calculate

2    the actual time?

3    A.  So in this instance, we're 14 minutes and 13 seconds into

4    the video that started at 6:00 a.m.

5    Q.  So we would do 6:00 a.m. is when the video started, and we

6    would add 14:13 minutes into it?

7    A.  14 minutes, 13 seconds.

8    Q.  13 seconds into it, yes, thank you for correcting me, and

9    that would give us 6:14 and 13 seconds?

10   A.  Yeah, and then the two minutes for the time

11   differential.

12   Q.  Plus two, so that would be 6:16?

13   A.  Yes, ma'am.

14   Q.  Did I do that accurately and quicker?

15   A.  Yes, ma'am.

16   Q.  The snip that we're looking at here is approximately

17   6:16 a.m.?

18   A.  Yes, ma'am.

19   Q.  And then the last one I was going to do for demonstrative

20   purposes is V-13.  And again, what camera angle are we looking

21   at here?

22   A.  This would be camera No. 9, it's the northbound of

23   Nurton.

24   Q.  And then if we go below on Government's Exhibit V-13, how

25   do we get to the actual time for this one?

1   A.  So the start time is 6:29 and 54 seconds.  And the play

2   time is 58 minutes and 13 seconds.

3   Q.  Over here?

4   A.  Yes, ma'am.

5   Q.  58 -- how do I write that -- 58 minutes and 13 seconds,

6   and that would give us our time of approximately 7:28:07, and

7   then we would add two?

8   A.  Yes, ma'am.

9   Q.  Is that correct?

10  A.  Yes, ma'am.

11  Q.  Okay.  So when we're looking at this particular snip, and

12  if we were to match it up with video compilation 1, we would

13  know this is approximately around 7:30 a.m.?

14  A.  7:30.

15  Q.  Is that correct?

16  A.  Yes, ma'am.

17  Q.  Okay.  And again, those three, V-11, V-12, and V-13, to

18  give us an idea of the times that these particular snips

19  actually happened.  Okay.

20      Now, with reference to two more snips that I want to kind

21  of go through, and I know it's a little tedious here, but one

22  of them, did I ask you to identify the last time on the

23  videotape where we saw the man running from Virginia down to

24  Lainier Avenue and last see him leave the frame of view?

25  A.  Yes, ma'am.

1   Q.  And showing you Government's Exhibit V-14, what are we

2   looking at here on the far left-hand side?

3   A.  That's pretty much the last frame that you see him in.

4   Q.  And did I ask you to calculate an approximate time when

5   that image last leaves the scene of the Lanier Avenue

6   camera?

7   A.  Yes, ma'am.

8   Q.  Okay.  I'll put it up here just to go easier.  And you can

9   go ahead and check, do we have the start time of 7- --

10  A.  7:10 a.m.

11  Q.  7:10 a.m.?

12  A.  Yes, ma'am.

13  Q.  And then we add to it the --

14  A.  10 minutes and 57 seconds.

15  Q.  And then we add the --

16  A.  Two-minute variation.

17  Q.  So approximately what time do we see the man leave the

18  view after the Virginia Avenue, Lanier Avenue clips?

19  A.  Approximately 7:23 a.m., give or take a few seconds.

20  Q.  I'm going to go ahead and just write that up on the top

21  here, 7:23 a.m., give or take a few seconds; is that

22  correct?

23  A.  Yes, ma'am.

24  Q.  Now, the last one is -- that's the last time we saw the

25  man running, did I also ask you to approximate the time when

1  you see the car arriving before it turns into the Virginia

2  Avenue parking lot where it stays there?

3  A.  Yes, ma'am.

4  Q.  And showing you Government's Exhibit V-15, is that a clip

5  of when that car first comes into view?

6  A.  Yes, ma'am.

7  Q.  And was this the car with the spoiler?

8  A.  The Pontiac, yes, ma'am.

9  Q.  Okay.  And it's getting ready to go which direction?

10  A.  That would be Lanier, so that would be eastbound, up

11  Virginia.

12  Q.  And then turn up here on to Virginia --

13  A.  It would be northbound on to the Virginia parking lot.

14  Q.  Okay.  And again, if we were to calculate the time when

15  that Pontiac first comes into view down below, and I know we

16  did it ahead of time here, the clip starts at what time?

17  A.  7:10 a.m.

18  Q.  So we go down into our 2016, May 27; correct?

19  A.  Yes, ma'am.

20  Q.  Okay.  And then do we add --

21  A.  11 minutes and 5 seconds.

22  Q.  Have I done it correctly here?

23  A.  Yes, ma'am.

24  Q.  Then have we added the two-minute --

25  A.  Two-minute variable.

1    Q.   Okay.  Which is an approximation?

2    A.   Yes, ma'am.

3    Q.   And then what time do we approximately see --

4    A.   Approximately 7 -- just after 7 -- 7:23 a.m.

5    Q.   So if we go back to B-14, the approximate time

6    differential from the man leaving to the car arriving, is

7    approximately how many seconds?

8    A.   It's within, what, probably eight seconds.

9    Q.   Again, approximation?

10   A.   Approximation, give or take.

11   Q.   Now, you were telling the jury about the -- explain to

12   them the different angles, the views of the cameras that are

13   depicted in Government's Exhibit V-3B, what area were you able

14   to capture by those cameras; correct?

15   A.   Yes, ma'am.

16   Q.   I'm going to show you Government's Exhibit V-16, and what

17   are we looking at here?

18   A.   These are still shots of all the camera views, they're all

19   fix-mounted cameras.

20   Q.   And so what is the -- what is being depicted in these 16

21   in terms of how you were explaining on your map, is this what

22   the camera is looking at?

23   A.   Yes, like I said, each of these cameras has a fixed view,

24   some have pan tilt zoom.  This one is a fixed view, so once

25   they set it up, it just always looks at that camera angle.

Cross-examination – Brandt  (By Mr. Mercer)

1    Q.  So it's not moving at all times, it's just fixed on a

2    particular area?

3    A.  Not unless they move the actual physical camera itself,

4    but that's where they stay.

5    Q.  And looking at Government's Exhibit V-16, are these just

6    the general view?  If you were to come into view on any of

7    those cameras, this would be where you would be standing?

8    A.  Yes, ma'am.

9    Q.  And are they -- do these numbers associate with

10   Government's Exhibit V-3B, if you wanted to know the angle of

11   any particular camera?

12   A.  Yes, ma'am.

13           MS. WILKINSON:  Just checking my notes, Your Honor.

14   If I might consult with counsel.

15           I think that's all I have, Your Honor.  Thank you.

16           THE COURT:  Cross, Mr. Mercer.

17                        CROSS-EXAMINATION

18   BY MR. MERCER:

19   Q.  Good afternoon, Detective.

20           THE COURT:  Before you start, I don't know if you

21   two are using the same lapel mike, I don't know if you need

22   to -- Mr. Mercer also likes to walk around.

23   Q.  (BY MR. MERCER)  Good afternoon, Detective.

24   A.  Good afternoon, sir.

25   Q.  So I'd like to start -- just get some of the technical

1    stuff out of the way about the two-minute issue.  And I want

2    to just go to -- and I'm going to refer to this as Defendant's

3    Exhibit Mosley No. 5.

4         And what I'm showing you on the screen, it says

5    approximately 6:14 a.m.; right?

6    A.   Yes, sir.

7    Q.   And this was how the video compilation that you've been

8    discussing with the government appeared as of, I guess

9    December of this --

10             MS. WILKINSON:  Objection, Your Honor.

11   Q.   (BY MR. MERCER)  -- 2019?

12             MS. WILKINSON:  May we approach?

13             THE COURT:  Approach.

14             (Bench conference on the record.)

15             THE COURT:  Make sure everyone's lapel mike is off

16   as you approach.

17             Just so I understand, I obviously don't know the

18   issue at this point, I mean, was he aware that a new video

19   with a new time was created recently?

20             MS. WILKINSON:  My memory is that he was there when

21   we were all talking about it and --

22             THE COURT:  Not he him, the witness.

23             MS. WILKINSON:  He, Mr. Trainor.

24             THE COURT:  I'm talking about the witness.

25             MS. WILKINSON:  Oh, yes, because I had them meeting

1    all together on December 13th.

2         THE COURT:  So the witness knows about the two

3    different --

4         MS. WILKINSON:  I haven't talked to him on direct

5    since he's been here in terms of -- I didn't realize

6    Mr. Mercer didn't know from Mr. Trainor that we had discussed

7    this issue.  I just feel like this is very confusing to the

8    jury because this is literally an issue about the fact that

9    the demonstrative -- he might have been the one that corrected

10   it for us, told us about it, that we forgot to make the

11   adjustment.

12        This is an attorney error, and the fact that he's

13   putting it up there after I told defense counsel on

14   December 13th, very apparent from our notes that we were going

15   to make this adjustment, it's going to confuse this jury, and

16   it's not a fair way to present this witness.

17        THE COURT:  It's confusing that you had to do some

18   calculation to figure this out, and he gets to delve into

19   that.

20        MS. WILKINSON:  I agree with that, Your Honor, but

21   he's not going to know the different versions that I provided

22   as drafts as a courtesy to counsel throughout the course of

23   all this, keeping that personal --

24        THE COURT:  That was my first question, that was

25   what I was trying -- I didn't phrase it well.  What I was

1    trying to phrase was my first question, which is, does this

2    detective know that there are these two versions that he was

3    provided?

4              MS. WILKINSON:  I think he knows at least -- I don't

5    know the answer to that.  I honestly --

6              THE COURT:  Was he involved in creating the version

7    that he got?

8              MR. MERCER:  Yeah, I thought he created the

9    version.

10             MS. WILKINSON:  As counsel knows, this was a joint

11   effort between our IT people at our office, Agent Fuchs, and

12   Detective Brandt at a time.  So we would take the snips, have

13   him review it, and put them up there.  And then when we had to

14   fix the two-minute differential, he told us because we didn't

15   have it in there -- this is like an attorney thing.

16             THE COURT:  Okay.  Well, not really because the

17   witness -- one of the people who did it is on the witness

18   stand, though.

19             MS. WILKINSON:  Okay.  Very well, Your Honor.

20             THE COURT:  So he can explain it.

21             MS. WILKINSON:  It seems incredibly unfair when I

22   provided drafts to counsel with the agreement that drafts

23   aren't to be used in the way that they're being used because I

24   provide discovery over the course of time way sooner than

25   ordinarily, when things weren't finalized, but whatever.

1          MR. MERCER:  I'm certainly not trying to violate the

2     letter or spirit of any discovery agreement.  I think there is

3     a convoluted way the time was calculated here, that is all

4     anchored back to this file naming system and this witness's

5     estimation of time.  I don't really intend to spend a lot of

6     time on it, it's -- I mean, I have a couple of questions, and

7     I'm going to move through it.  But it is what it is, I mean,

8     it's --

9          THE COURT:  I'm going to allow it.

10          (The following proceedings were had in open court.)

11    Q.  (BY MR. MERCER)  Okay.  And just -- Detective, just to be

12    fair, my understanding is, you created the video compilation.

13    A.  No, sir.

14    Q.  You did not put together the different video clips?

15    A.  I provided the video, the technician they have, he put it

16    together.  When we talked about it, he used the same methods,

17    and I actually saw for -- just like I would have done, so

18    that's when we sat down and looked at it together.  He did

19    exactly the same thing I would have done had I created this,

20    because I do the same thing for court testimony and PI

21    releases.

22    Q.  Okay.  Fair enough.  So just, if I can understand your

23    testimony about the file extraction, when you actually went to

24    download the file from the leasing office, okay?

25    A.  Yes, sir.

1    Q.  And so you went to the leasing office to collect the video

2    from the surveillance system; right?

3    A.  Yes, sir.

4    Q.  And you testified that it was -- the make was a IVMS

5    4200?

6    A.  Yes, sir.

7    Q.  A PC-based system?

8    A.  Yes, sir.

9    Q.  Pretty high quality video, you said?

10   A.  They upgraded their system recently, so yes, a very good

11   system.

12   Q.  Fairly sophisticated system too, right?

13   A.  It's a decent system.

14   Q.  And you were explaining the information on this worksheet,

15   which is Government's V-5 I'm pointing to on the document

16   camera.  And the one that I didn't hear you give any testimony

17   about was number of inputs, cameras, and motion-activated

18   recording.  Could you explain the motion-activated recording?

19   A.  Sure.  We denote that because, say, again, like in this

20   instance where you have a high-resolution camera,

21   unfortunately the downside of a high resolution is more data

22   consumption.  So a lot of times what businesses will do is

23   they'll go to motion detection.

24        Say you have a business that's watching the storeroom

25   door, you're not going to have 24 hours of a closed door in

1    high definition.  So they'll put it to motion, so if it

2    detects motion, then they'll -- it will record.  Now, with

3    that, we denote it because sometimes what will happen is

4    you'll see where it will have the frame, it will freeze it,

5    and it won't advance a time, won't advance anything, and it

6    will just hold tight until it gets that motion, and then it

7    just kind of skips ahead.

8         And depending on the setting, if it's a motion camera,

9    say it's set for a three- or four-second delay, you might have

10   it to where you're seeing nothing, and then all the sudden,

11   boom, somebody's just standing, because it's that little bit

12   of delay of motion to pick up, then start the camera to

13   record.

14        So to explain that, if it shows that it's set to motion,

15   I will denote that, yes, it's set to motion, this camera, this

16   camera, and with them, that's why you'll see someone may have

17   set the motion, but again, the way that it records is it just

18   keeps running the time, it just doesn't really update the

19   picture until it picks something up.

20   Q.  But here, just so I'm clear, there was no date or

21   timestamp on the video itself?

22   A.  No -- as far as a display?

23   Q.  Right.

24   A.  Yeah, that's an option, and they didn't -- whoever set it

25   up chose not to have that option displayed on the screen, they

Cross-examination – Brandt   (By Mr. Mercer)

1    just had the name.

2    Q.   Okay.  So when you extracted, say, 90 minutes of video,

3    you extracted 90 minutes of motion?

4    A.   It's 90 minutes of recorded video from that time frame to

5    that time frame.  That's why if you look at the data size of

6    the file, that's why they're different size files.  That's why

7    you have one that went from like 6:53 to 8:00 o'clock, and

8    then one that went from 7:10 to 7:53, because as it's

9    capturing that, it creates that file, and it says, okay, it's

10   idle, so we can go ahead -- nothing going on, we can move

11   that.  That's why if you look at the actual file sizes on the

12   disk, you'll see they're varying sizes.

13   Q.   Now, you were talking before about the setup of the

14   system, the security camera system.  And I believe you said

15   that there were certain defaults that were applying, for

16   example, the camera number.

17        So for example, in V-12, which I have on the document

18   camera now, the default says camera 01.

19   A.   Yes, sir.  Camera 11 has camera 1.

20   Q.   Right.  That's actually camera 11?

21   A.   It's camera 11.  It's just on the naming convention on the

22   screen they never changed it.

23   Q.   All right.  Now, the naming convention for the file

24   system, that is -- you used that to denote the time, the

25   bookends, the beginning and the ending time?

1     A.   Yes, sir.

2     Q.   And so you correctly noted that the camera was camera

3     11?

4     A.   Yes, sir.

5     Q.   And then you noted that -- the bookends for the time, the

6     beginning and the ending time?

7     A.   Yes, sir.

8     Q.   And if I understand your testimony, when you were at the

9     leasing office, you -- well, when you were at the leasing

10    office, did you determine if the PC-based system was

11    connected -- it was connected to a PC; right, a personal

12    computer?

13    A.   It was connected to the property manager's desktop that's

14    located in the same room.  The equipment was in the closet, I

15    had to access it through the desktop that was on her desk.

16    Q.   Right.  And I assume her desktop had an internet

17    connection.

18    A.   Yes.

19    Q.   All Right.  And you're saying that the time on that

20    desktop was not automatically determined?

21    A.   The time on the desktop of the computer was different from

22    the time on the MVR.  I log into the MVR, the IVMS, I logged

23    directly into that and took that system time, not the time

24    that's on her computer.

25    Q.   And you're saying you remember comparing the two?

1    A.  As far as looking at, I don't even take the PC into

2    consideration, because I look at the equipment of the MVR.

3    Q.  Okay.  And so you're saying that you concluded that the

4    software that runs all these cameras required a manual time

5    input?

6    A.  When you originally set it up -- you have to set it up.

7    It's like setting up your VCR at home, you have to go in and

8    set everything up.  So they had a vendor come in, install the

9    cameras, set up the MVR, do whatever naming convention, do

10   whatever options they wanted to do, and then when he's done,

11   he turns it over to them, and then they use it accordingly.

12   Q.  You're talking in general terms, I mean --

13   A.  Yes, sir.

14   Q.  -- did you investigate that and determine that's what --

15   A.  No, but in general terms, most -- in my usual dealings

16   with properties and businesses, outside of your little corner

17   stores that had either their brother-in-law -- most of them

18   get vendors that come in and do it because they don't have the

19   expertise to do that or the equipment.

20   Q.  All right.  So -- and as I understand your testimony, with

21   your department-issued cell phone that doesn't keep track of

22   seconds, you compared the time before you started doing the

23   extractions to the time on the security system?

24   A.  Yes, when I go through and check to make sure that the

25   system's operating properly, when I denote the time, I just

1   use my departmental-issued cell phone, which is Verizon

2   carrier, so it keeps a constant -- since it uses --

3   Q.  And you knew from the detective that they want a certain

4   time frame from the security system; right?

5   A.  Yes, sir.

6   Q.  Like I think your instructions were, you know, 6:00 a.m.

7   to whatever it was, 7:30?

8   A.  That was the second time.

9   Q.  Okay.  The second time.  All right.

10      And so you know when you're doing this that there's a

11  two-minute differential; right?

12  A.  Yes, sir.

13  Q.  And you want to give the detective the most accurate

14  information; right?

15  A.  Yes, sir.

16  Q.  And so isn't it true, Detective, that when you're on

17  scene, you actually build in to the extraction that you're

18  doing the two minutes?

19  A.  Yes, I always do a few minutes before and a few minutes

20  after.

21  Q.  Right.  And so when you named it 06:00, that was including

22  the two minutes delay that you had determined existed between

23  what you're calling real time and the security system time?

24  A.  Named what?

25  Q.  I'm sorry?

1    A.  You said when I named it, what did I name?

2    Q.  Well, that is what I understood from your testimony.  For

3    example, this says -- and I'm looking at V-12, Government V-12

4    on the screen, and it has camera 11.

5    A.  Are you talking about that MP4 file name?

6    Q.  Yeah, the MP4 file name.

7    A.  The system does that, I do not do that.  I have no control

8    over that.

9    Q.  Okay.  Because I asked you earlier, and you said the

10   default for this was camera 01.

11   A.  That's the display name.

12   Q.  Right.  So --

13   A.  Okay.

14   Q.  So I thought your testimony had been that you had named

15   the file camera 11 because it is in fact camera 11.

16   A.  No, sir, that's the video management software that does

17   that.

18   Q.  Okay.  Now, you've testified some about the vehicles in

19   the compilation?

20   A.  Yes, sir.

21   Q.  I think you described one as an Audi and one as a Pontiac;

22   is that right?

23   A.  Yes, sir.

24   Q.  And so it's your testimony that you're able to determine

25   the make, model, year range of the vehicle in each segment of

1    the video compilation?

2    A.  I don't know about the year and the model, but I can tell

3    that the gray with the spoiler is a Pontiac and the other one

4    was an Audi.

5    Q.  Okay.  So you're talking about --

6    A.  Generalized --

7    Q.  -- manufacturer?

8    A.  Yes, sir.

9    Q.  All right.  Now, so for example, if we -- now, in this --

10   and I'm playing the video compilation here, and you had

11   testified -- and this is at the beginning, and you see the

12   vehicle going northbound on Nurton.

13        Now, at no time while this vehicle is going northbound on

14   Nurton do you see the front end of this vehicle?

15   A.  That's correct.

16   Q.  And so what features, when you're determining the

17   manufacturer, did you rely on?

18   A.  The Audi logo on the trunk lid and the taillights.

19   Q.  Okay.  So you're looking at the Audi logo, and there's

20   enough detail here for you to see that Audi logo, not

21   distortion; right?

22   A.  It's the general rings of an Audi, plus I have a program

23   that I got from the FBI that's a digital image audio that

24   lists make and model cars from the '80s all the way up to

25   2017.

1    Q.  Oh, great.

2    A.  So I verify it through there as a generalized yes, this is

3    an Audi.

4    Q.  All right.  So then you should -- I'm showing you what's

5    marked as Mosley 6, so you looked into the different features

6    or design changes of the Audi over a period of time?

7    A.  Yes, sir, it's a newer Audi, and just pulled up a picture

8    and said that's consistent with a newer Audi.

9    Q.  Right.  So a 2008 Audi S6 and C6, because you know Audis

10   are in generations; right?

11   A.  Yes, sir, I would assume such.

12   Q.  Right.  And so there's more recent generations than the

13   2008 generation, for example, like the C7 is a more recent

14   generation than the C6; right?

15   A.  I would assume such.

16   Q.  Okay.  Now -- and so I'm going to put Mosley 6 up on the

17   screen here.

18          MS. WILKINSON:  Objection, Your Honor.  I have no

19   information where this comes from.

20          THE COURT:  Sustained.

21          MR. MERCER:  Well, Your Honor, if I can approach.

22          THE COURT:  Of course.  You can approach.

23          (Bench conference on the record.)

24          THE COURT:  You haven't established the document --

25   he didn't establish what that is in your hand.  He's saying

1    that he recognizes Audis.  I don't know what --

2         MR. MERCER:  I think he said more than that, Your

3    Honor.  I think what he indicated was that he had looked into

4    a program that had the different design features of the Audi,

5    and I showed him this document, which is Mosley 6, which he

6    agreed shows a transition of design features.  And I pointed

7    him that this was a 2008 S6 and that's C6 and there's more

8    recent versions, which he agreed to.

9         I think this is a sufficient foundation to ask him

10   questions about what he was looking at.  And there's no

11   question that there are different design features of the

12   earlier, you know, the more recent versions of the Audi.  So I

13   mean, he opened the door to this, I wasn't going to use this,

14   but he said that he researched this, and the government had

15   him identify it as an Audi.

16        So it's fair game for me to cross about this to

17   determine how he made that determination, how he investigated

18   this, and he's already testified to that.  So I think it's

19   fair cross.  I did not just bring this --

20        THE COURT:  But for what purpose?  I mean, he -- are

21   you going to cross him on whether it's a C8 or a C3 of a

22   certain year?  He said he identified it by the little rings,

23   which most people probably identify Audis by.

24        MR. MERCER:  Right.  But the government walked him

25   through all the other parts of the compilation and had him say

Cross-examination – Brandt   (By Mr. Mercer)

1    that was an Audi and that was the Audi.  And so it's fair for

2    me to be able to cross about whether there's different

3    features on those portions of the clips of the Audi.

4              THE COURT:  That makes it not an Audi?

5              MR. MERCER:  That makes it not the same Audi and how

6    he arrived at a determination that it is the same Audi, such

7    that it's being included in this compilation, I thought --

8              THE COURT:  I'm just trying to understand.

9              MR. MERCER:  Right.

10             THE COURT:  Did he determine -- refresh my

11   recollection, did he make the determination that it's the same

12   Audi, or did the prior witness make that determination?

13             MR. MERCER:  The prior witness didn't make that

14   determination.

15             THE COURT:  I thought the prior witness had, what

16   was it, set 3 and set 4?

17             MR. MERCER:  He did not say that was the same Audi

18   whatsoever, not at all.  And also, Your Honor, I thought

19   this --

20             THE COURT:  Same class, I apologize, same class of

21   Audi.

22             MR. MERCER:  He didn't even say same class.  You

23   know, he was saying similar class characteristics, but I think

24   on cross-examination he was making an assumption about -- that

25   the Audis in set 4 were the same Audi based on what the

1    requesting agent had given him as the requesting question.

2         THE COURT:  All right.  So what's your end game

3    here, just so I understand?

4         MR. MERCER:  Well, my end game is to rebut what the

5    government did on direct with this witness because I thought

6    they were just bringing in the video compilation with him, but

7    then they had him start identifying the car in that video

8    compilation, and they start having him identify it as an Audi,

9    and not only an Audi, but the Audi going across the different

10   video compilations.

11        THE COURT:  I guess what I'm trying to get at, are

12   you going to use that to try to show that it wasn't an Audi?

13   I'm trying to -- what are you trying to --

14        MR. MERCER:  I'm just trying to show that there's a

15   lot of traffic out there, and what they have -- what this

16   witness may have determined to be the same Audi, is not

17   necessarily the same Audi.

18        I mean, this goes to the weight of his opinion

19   testimony that the government elicited.  I'm just responding

20   to what the government did.  I was not going to go down this

21   path with this witness until the government had him start

22   testifying about this being the Audi.

23        THE COURT:  And I've probably taken this down a bit

24   of a rabbit hole because I think the original objection,

25   though, was like, what is this document?

1           MS. WILKINSON:  Showing --

2           MR. MERCER:  Well, Your Honor, and I think the

3    reason -- I've laid enough of a foundation with this witness

4    because what he said is he looked at a program that had all

5    the different design features of the Audi, and so I'm just

6    going to ask him --

7           THE COURT:  He doesn't know where this document came

8    from.  Are you going to have someone from Audi come in and --

9           MR. MERCER:  No, and I don't need to because he's

10   investigated and he's looked into it and I want to be able to

11   cross him about the features that he relied on and what he

12   looked at that the government --

13          THE COURT:  Unless you have someone else coming in

14   to lay foundation as to what this document is, I'm not going

15   to allow you to cross him with this document.

16          MR. MERCER:  Your Honor, he agreed --

17          THE COURT:  He doesn't know where that document came

18   from.  I didn't hear him say he knows where that document

19   comes from.

20          MR. MERCER:  I don't think he needs to agree where

21   this document -- or know where this document came from.

22          THE COURT:  If you want to admit this document into

23   evidence, he does.

24          MR. MERCER:  Well, Your Honor, if he investigated

25   the Audi design history and looked at the features, and that's

1    the basis for his opinion about this being the Audi that the

2    government elicited, then this is absolutely fair for me to

3    cross him about.

4              THE COURT:  I'm sustaining the objection.  I'm

5    sustaining the objection.  The topic area is fine, but that

6    document doesn't come into evidence if it's not authenticated

7    or something.  And there's -- I don't know who's going to

8    authenticate that, but that's my ruling.  We've gone back and

9    forth, I'm moving on.

10              (The following proceedings were had in open court.)

11   Q.  (BY MR. MERCER)  So back up one minute, please.

12         All right.  So Detective, on this initial series of

13   clips, which covers this vehicle going from Rosalind, left on

14   to Nurton, northbound on Nurton, and then left on Woodland --

15   A.  Yes, sir.

16   Q.  -- at no time can you see the front of this vehicle;

17   right?

18   A.  If I remember correctly, no, sir.

19   Q.  Right.  And so you can't see any front license tag;

20   right?

21   A.  No, sir, not from these angles.

22   Q.  Okay.  And now, I'm going to jump ahead on the clip to

23   6:29.  6:29 minutes into the clip, that's not the time.

24              (Video played.)

25   Q.  (BY MR. MERCER)  And now, the view here, the initial very

1    fast clip was from the camera that is looking over the

2    dumpster; right?

3    A.   That's camera No. 3.

4    Q.   Camera No. 3.

5    A.   That's what we're looking at right now.

6    Q.   Right.  And then it switches -- well, no, actually, it's

7    camera No. 9 that it starts at.

8    A.   Not what you have right here, it's camera No. 3.

9    Q.   This is camera 3, but where this series of short clips

10   began was with camera No. 9; right?

11   A.   That's camera 9.

12   Q.   So that's camera 9; correct?

13   A.   Yes, sir.

14           MS. WILKINSON:  Your Honor --

15   Q.   (BY MR. MERCER)  And I'm sorry, that's supposed to be

16   7:28.

17           THE COURT:  Sorry, did I hear an objection?

18           MS. WILKINSON:  No, it's just that Mr. Mercer isn't

19   playing off the compilation that's in evidence.

20           THE COURT:  I thought you introduced this one into

21   evidence as well, that was my understanding.

22           MR. MERCER:  Yes, I did.

23           THE COURT:  If not, we need to discuss it at the

24   bench, but my understanding is -- he should make that

25   distinction, but --

1          MS. WILKINSON:  Right.  I don't think the

2     distinction was made.  And I obviously have no objection, Your

3     Honor, but this was a draft before the final that was --

4          THE COURT:  We don't need to discuss that openly

5     here.  But you need to make the distinction, but this is a

6     different --

7          MR. MERCER:  This is Mosley 5, this is the -- I

8     don't have the government's computer, so if there's some

9     difference in the video content --

10          MS. WILKINSON:  Your Honor --

11          THE COURT:  Approach.  Approach. Approach.

12          (Bench conference on the record.)

13          THE COURT:  I have no doubt that Ms. Lesser would

14     let you use their computer, if the only issue is the computer

15     difference.  You're doing this and I'm allowing you to do it,

16     for better or worse, but you're doing it because it shows a

17     different time.

18          MR. MERCER:  No, I'm really not.

19          THE COURT:  Well, then use the original.

20          MR. MERCER:  This is in evidence, and just really

21     for the flow of the cross, I'm just trying to get to this

22     point, but now I have to set up another computer.

23          THE COURT:  No, look, my point is, that little

24     comment, like I'm doing this just because it's a different

25     computer, you should just make the distinction for the jury.

1          MR. MERCER:  I'm happy to make that distinction.

2     I'm not trying to --

3          THE COURT:  Then we're fine.

4          MR. MERCER:  That's why I was just asking him if

5     this was -- this is the same video content, it's just a

6     two-minute difference in the time approximations.

7          (The following proceedings were had in open court.)

8          MR. MERCER:  Okay.  I think, Your Honor, the way

9     we're handling this is there's a stipulation that Mosley 5,

10    which is the video I'm playing, is the same video content

11    other than the slides with the time approximation, and on

12    Mosley 5, the time approximation is two minutes earlier than

13    what the government played.

14         MS. WILKINSON:  Yes, because it did not account for

15    the two-minute differential that Detective Brandt already told

16    the jury about.

17         THE COURT:  Very well.  We understand where we are.

18         MR. MERCER:  Thank you.

19         MS. WILKINSON:  Thank you, Your Honor.

20    Q.  (BY MR. MERCER)  Detective, so the camera angle we're

21    looking at right now on Mosley 5, this is camera 3?

22    A.  This is camera 11.

23    Q.  Camera 11.  Right.

24    A.  Yes, sir.

25    Q.  So it's camera 11.  So we started off with a quick shot

1    from camera 9, then to camera 3, then to camera 11; right?

2    A.  Yes, sir.

3    Q.  And of course you can't -- well -- and then let's go to

4    the next part, which is camera 10, I believe; right?  So now

5    we see this vehicle going eastbound on Woodland; right?

6    A.  Yes, sir.

7    Q.  And it's continuing forward.

8         Okay.  So now I stopped it at 6:37.  Now, I want you

9    to -- I want to draw your attention to the front end of this

10   vehicle, because you testified this was an Audi; right?

11   A.  Yes, sir, it looks like an Audi.

12   Q.  I'm sorry?

13   A.  I said yes, sir, it looks like an Audi.

14   Q.  Yeah, looks like an Audi, and it looks like it has the

15   rings on the front grill?

16   A.  Yes, sir.

17   Q.  But you don't see a narrow European tag on this; right?

18   A.  No, sir, it looks like a Chesapeake Bay tag.

19   Q.  Right.  And look, for example, at the front right

20   headlight.  Okay.  And I want to show you Mosley 1 and 2.

21        And that front right headlight, can you tell me which

22   exhibit, Mosley 1 or 2, that headlight looks like?

23   A.  It's more similar to the 2.

24   Q.  So I'm going to put up on the document camera, this is

25   Mosley 1; right?

1   A.  Yes, sir.

2   Q.  And that has a more rectangular headlight; right?

3   A.  Yes, sir.

4   Q.  And then what you just looked at was Mosley 2, and that

5   has more -- I don't know, I guess I would call it a

6   tear-shaped headlight.

7   A.  Yes, sir.

8   Q.  And that's what you said the vehicle in Mosley 5, 6

9   minutes and 37 seconds into the video, that's what its front

10  headlight looks more similar to?

11  A.  Yes, sir.

12  Q.  And I believe you also said that the front license plate

13  that we're looking at in Mosley 5 appears to be like a

14  Chesapeake Bay --

15  A.  The softer blue, which is consistent with a Bay tag.

16  Q.  And you had also -- and as I understand it, the vehicle of

17  interest, and now we're looking at Mosley 5, about 10 minutes

18  and 27 seconds elapsed time into, has the European-style front

19  tag and has the rectangular headlight; right?

20  A.  Yes, sir.

21  Q.  And then the vehicle that you've testified to near the end

22  of the video, okay, and just to go back to the beginning --

23  and this vehicle at 16 seconds into the Mosley 5 video, again,

24  that's one you said also looks like an Audi, but you can't see

25  the front end?

1    A.   Yeah, the rear end looks like an Audi, it's consistent

2    with an Audi.

3    Q.   The rear looks like an Audi?

4              THE COURT:  Let me know when we get to a convenient

5    point for our afternoon break.

6              MR. MERCER:  We're at a convenient point.

7              THE COURT:  We're at a convenient point.  Very well.

8    We'll take our afternoon break now then.

9              Ladies and gentlemen, I ask that you be back in 15

10   minutes, which would be just a little bit before 3:45.

11   Remember not to discuss the case with anyone, including among

12   yourselves.

13             (Jury left the courtroom.)

14             THE COURT:  All right.  Sir, please don't discuss

15   the case with anyone during the break.

16             See you all in 15 minutes.

17             (A recess was taken.)

18             THE COURT:  Bring the jury in.

19             (Jury entered the courtroom.)

20             THE COURT:  All right.  You may all be seated.

21             Sir, I'll remind you, you're still under oath.

22             THE WITNESS:  Yes, sir.

23             THE COURT:  And was it Mr. Mercer?

24             MR. MERCER:  No further questions, Your Honor.

25             THE COURT:  All right.  Counsel for Mr. Carter.

1          MR. DAVIS:  Thank you, Your Honor.  A few questions.

2                    CROSS-EXAMINATION

3    BY MR. DAVIS:

4    Q.  Detective, may I direct your attention to Exhibit V-3,

5    which is up on the screen now, were you directed to pull all

6    the cameras from the Sinai Ridge apartment complex?

7    A.  Yes, sir, well, I pulled the ones that I put on my note as

8    being requested.

9    Q.  Oh, so specific cameras were requested from specific

10   locations?

11   A.  Yes, sir.

12   Q.  Were there other cameras for Sinai Ridge out there?

13   A.  Yes, sir.

14   Q.  And if you could touch the screen, just to give us -- it

15   doesn't have to be exact, but if you could circle or touch,

16   just give us an idea where the other cameras were.

17   A.  They were in the office.

18   Q.  Oh, so they --

19   A.  There weren't exterior cameras.

20   Q.  There weren't any other exterior cameras --

21   A.  The only other cameras were inside.

22   Q.  -- for Sinai Ridge.

23        And did you -- did anyone check for any other cameras out

24   there, did anyone check doorbell cameras, CCTVs, to your

25   knowledge?

1    A.   Not to my knowledge, but that would be the responsibility

2    of the investigating detective and her squad.

3    Q.   And if there were CCTV video footage, you wouldn't do

4    anything with it because that's not what your job is;

5    correct?

6    A.   If it's City Watch --

7    Q.   Yes.

8    A.   -- cameras, no, they would go directly to City Watch.

9    Q.   So the short answer to my very long question is, is you

10   didn't review any CCTV video footage either?

11             THE COURT:  You mean City Watch?

12   Q.   (BY MR. DAVIS)  City Watch -- well, CCTV.  Is that the

13   same, or are they different?

14   A.   Different.  CCTV is a generic term for closed-circuit

15   television.

16   Q.   Okay.

17   A.   It's just a generic term for all video surveillance

18   systems.

19   Q.   I'm talking about the ones you see out on the street.

20   A.   That's City Watch.

21   Q.   City Watch.

22   A.   The specific program is called City Watch, the blue light

23   cameras.

24   Q.   And you didn't review any of those then?

25   A.   No, sir.

1           MR. DAVIS:  Thank you.

2           THE WITNESS:  Yes, sir.

3           THE COURT:  Redirect.

4           MS. WILKINSON:  One second, Your Honor.  May I have

5     V-11?

6                     REDIRECT EXAMINATION

7     BY MS. WILKINSON:

8     Q.  Mr. Mercer asked you some questions about the --

9           MS. WILKINSON:  Thank you, Ms. Lesser.

10    Q.  (BY MS. WILKINSON)  -- about the naming convention on the

11    bottom of each of the snips that I showed you, V-11 being

12    among them, do you recall those questions?

13    A.  Yes, ma'am.

14    Q.  And just to be clear because I'm getting a little

15    confused, this information right here that we see at the

16    bottom of the camera --

17    A.  Uh-huh.

18    Q.  -- beginning with Sinai Ridge IP camera 82016 and so on,

19    did you put that information when you pulled the video off of

20    the Sinai Ridge system?

21    A.  No, ma'am.

22    Q.  How did that information get on there?

23    A.  That -- again, that is put in by the software, the

24    proprietary software that manages the system.  What I do is I

25    go in, I go to -- whether -- I think it's called the archives

1    screen, I put in a date that I need and a time frame, a

2    beginning to end time, and then I click the cameras that I

3    need.  It then will pop up and it will give me a list of those

4    files, do you want to download it, yes, and then I download

5    them to a USB flash drive, and then I return to my office and

6    put them on a secure server and make disks for the detectives

7    to use.

8    Q.  And to be clear --

9         THE COURT:  Ms. Wilkinson, you have to speak into

10   the mike if you don't have a lapel mike on.

11        MS. WILKINSON:  Thank you, Your Honor.

12   Q.  (BY MS. WILKINSON)  And to be clear, the video that

13   Mr. Mercer showed you during direct that he called Mosley

14   Exhibit 5, those snips that were on -- time frames on the

15   black screens that were in there, did they account for or not

16   account for the two-minute differential that you testified to

17   on direct?

18   A.  They did not account for them, that's why we redid

19   those.

20   Q.  So that draft of the video is different than the

21   compilation that you played for the jury through Government's

22   Exhibit V-1?

23   A.  Yes, ma'am.

24        MS. WILKINSON:  I think that's all I have, Your

25   Honor, thank you.

1           THE COURT:  All right.  Sir, thank you so much for
2      your testimony.
3      Q.  (BY MS. WILKINSON)  I do have one question, you're not
4      a -- well, no, I don't have any questions.
5           MS. WILKINSON:  I'm sorry, Your Honor.
6           THE COURT:  It's okay.
7           MS. WILKINSON:  Excuse me, I didn't mean to
8      interrupt.
9           THE COURT:  All right.  I'm going to do this more
10     quickly now, just to make sure.  You are excused.  Please
11     don't discuss your testimony with anyone until the trial has
12     been completed.  Enjoy your day.
13          THE WITNESS:  Thank you very much, sir.
14          MS. WILKINSON:  Thank you, Judge Hazel.
15          THE WITNESS:  Thank you.  Your microphone.
16          THE COURT:  You can return that on your way out.
17          Next witness.
18          MS. OLDHAM:  Yes, Your Honor, the government's next
19     witness is Antoinette King.
20          THE CLERK:  Good afternoon, ma'am, please raise your
21     right hand.
22                   ANTOINETTE KING,
23     called as a witness, being first duly sworn, was examined and
24     testified as follows:
25          THE WITNESS:  Yes.

1          THE CLERK:  Thank you, you may have a seat.  You may

2   adjust that microphone down in front of you, scoot up a little

3   bit, state and spell your full name for the Court.

4          MR. DAVIS:  Antoinette King.

5          THE CLERK:  Spell it, please.

6          THE WITNESS:  A-n-t-o-i-n-e-t-t-e, last name

7   K-i-n-g.

8          THE CLERK:  Thank you.

9                    DIRECT EXAMINATION

10  BY MS. OLDHAM:

11  Q.  Good afternoon, Ms. King.  Ms. King, how old are you?

12  A.  56.

13  Q.  And are you from Maryland originally?

14  A.  Yes.

15  Q.  Have you lived here all your life?

16  A.  Yes.

17  Q.  And do you have any children?

18  A.  Yes.

19  Q.  How many children do you have?

20  A.  Two.

21  Q.  And is one of them Deanna Lawson?

22  A.  Yes.

23  Q.  How old is Deanna?

24  A.  35.

25  Q.  And do you have a close relationship with Ms. Lawson?

1    A.  Yes.

2    Q.  Ms. King, did you previously own a Pontiac Grand Am 2005,

3    gray in color?

4    A.  No, that's my daughter's car.

5    Q.  Were you one of the registered owners of that vehicle?

6    A.  Yes.

7    Q.  I'm going to ask if we could show you C-8, Government's

8    Exhibit C-8.  If you could just look to the screen or the

9    monitor to your right, showing you Government's Exhibit C-8,

10   that vehicle with tag 4BXC31, do you recognize that as the

11   Pontiac Grand Am?

12   A.  Yes.

13   Q.  Also showing you Government's Exhibit C-9, C-10, and C-11.

14   Ms. King, do you recognize those photos as the Pontiac that

15   was at least registered in your name?

16   A.  Yes.

17   Q.  And was your daughter also registered as well as an owner

18   of the vehicle?

19   A.  Yes.

20   Q.  And which daughter?

21   A.  I only have one, Deanna.

22   Q.  Ms. Lawson?

23   A.  Yes.

24   Q.  And was she the regular driver of the vehicle?

25   A.  Yes.

Direct Examination – King  (By Ms. Oldham)

1  Q.  I'm going to show you Government's Exhibit R-14.  Is

2  R-14 --

3           THE COURT:  If you could you hold on a second.

4           Ma'am, I'm going to ask if you just turn your cell

5  phone off.

6           THE WITNESS:  That's mine.

7           THE COURT:  I know.  Thank you.

8  Q.  (BY MS. OLDHAM)  Thank you.  If you could just take a look

9  at Exhibit R-14, is that the registration for the vehicle that

10  we're talking about?

11  A.  Put it up again, please.  Yes.

12  Q.  Okay.  Thank you.  Ms. King, do you know an individual by

13  the name of Davon Carter?

14  A.  Yes.

15  Q.  And how do you know Mr. Carter?

16  A.  He's -- used to be my girl -- my daughter's girlfriend --

17  they was boyfriend and girlfriend.

18  Q.  Do you know approximately how long they were boyfriend and

19  girlfriend?

20  A.  No, I don't.

21  Q.  Do you know what he did for a living?

22  A.  No.

23  Q.  Did there come a point in time where your daughter

24  Ms. Lawson and Davon Carter were living together?

25  A.  Yes.

Direct Examination – King   (By Ms. Oldham)

1    Q.  And did you have occasions to go to their residence?

2    A.  I went to her house sometimes.

3    Q.  Is this the one on Arbor Station Way?

4    A.  Yes.

5    Q.  Was it an apartment or a house?

6    A.  Townhouse, I believe.

7    Q.  Okay.  And in addition to your daughter Ms. Lawson, was

8    Davon Carter a driver of that vehicle as well?

9    A.  I believe so.

10   Q.  Now, I'm going to direct your attention, Ms. King, to May

11   of 2016.  To your knowledge, was your daughter Ms. Lawson

12   dating Mr. Carter at that time?

13   A.  I guess, I don't know the date, but they were together.

14   Yes, I believe so.

15   Q.  And did you ever know your daughter to travel anywhere

16   with Davon Carter?

17   A.  No, I don't.

18   Q.  And to your knowledge, did your daughter have any travel

19   restrictions around that time?

20   A.  No.

21   Q.  Did you know whether or not Mr. Carter tattooed as part of

22   his employment?

23   A.  No, I didn't know that.  I know he did tattoos, but I

24   didn't know if it was his employment or not.

25   Q.  Okay.  But you were aware that he sometimes did tattoos

1    for people?

2    A.  No, he did tattoo on me, but I didn't know whether he did

3    it for a living or not.

4    Q.  Okay.  He did do one for you?

5    A.  Yes.

6    Q.  Where is that tattoo he did for you?

7    A.  On my left arm, on my wrist.  It just says "family."

8    Q.  All right.  Thank you, Ms. King, that's all I have.

9            THE COURT:  Cross-examination, Mr. Davis.

10            MR. DAVIS:  Very quickly, Your Honor -- well,

11    actually, no, I have no questions.

12            THE COURT:  Okay.  Mr. Trainor.

13            MR. TRAINOR:  Thank you.

14                    CROSS-EXAMINATION

15    BY MR. TRAINOR:

16    Q.  Ms. King, you don't know Clifton Mosley, do you?

17    A.  No.

18            MR. TRAINOR:  Thank you.

19            THE COURT:  Redirect.

20            MS. OLDHAM:  No, Your Honor, thank you.

21            THE COURT:  Thank you, ma'am, for you testimony.

22    You are excused.  Please enjoy the rest of your day.  Don't

23    discuss your testimony with anyone until the trial is

24    complete, and feel free to turn your cell phone back on.

25            THE CLERK:  Thank you.

1          THE COURT:  You're welcome.

2          All right.  Next government witness.

3          MS. OLDHAM:  The next witness is Deanna Lawson.

4          THE CLERK:  Ma'am, you may step forward, please, and

5    raise your right hand.

6                        DEANNA LAWSON,

7    called as a witness, being first duly sworn, was examined and

8    testified as follows:

9          THE WITNESS:  Yes.

10          THE CLERK:  Thank you.  You may have a seat.  Please

11   slide your chair up to the microphone.  Keep your voice up for

12   the Court, state and spell your full name for the record.

13          THE WITNESS:  D-e-a-n-n-a.

14          THE CLERK:  Last name.

15          THE WITNESS:  L-a-w-s-o-n.

16          THE CLERK:  I'm going to ask, since your voice is

17   light, please keep your voice up.  Thank you.

18                     DIRECT EXAMINATION

19   BY MS. OLDHAM:

20   Q.  Good afternoon, Ms. Lawson.  Ms. Lawson, how old are

21   you?

22   A.  About 35.

23   Q.  And can I ask generally, what do you do for a living?

24   A.  Coding.

25   Q.  I'm sorry?

Direct Examination - Lawson  (By Ms. Oldham)

1   A.  Coding.

2   Q.  Coding.  And what do you mean by "coding," what is that?

3   A.  Medical billing.

4   Q.  I'm sorry, I didn't hear you because of the binder, can

5   you explain that again?

6   A.  Medical coding.

7   Q.  Medical coding, okay.  Thank you.

8       Are you married?

9   A.  No.

10  Q.  Can I ask you how you know an individual by the name of

11  Davon Carter?

12  A.  He's my ex-boyfriend.

13  Q.  You're going to have to keep your voice up.

14  A.  He's my ex-boyfriend.

15  Q.  Do you see Mr. Carter in the courtroom today?

16  A.  Yes.

17  Q.  Can you please identify him by where he's seated and

18  describe what he's wearing?

19  A.  A blue sweater.

20  Q.  Okay.  Can you point to him, please?

21  A.  (Indicating.)

22      MS. OLDHAM:  Your Honor, for the record, the witness

23  has identified the defendant, Mr. Carter.

24      MR. DAVIS:  No objection.

25      THE COURT:  The record will reflect that.

1    Q.   (BY MS. OLDHAM)   Overall, how long have you known Davon
2    Carter, Ms. Lawson?
3    A.   Since I was about 12.
4    Q.   Were you born and raised in Maryland?
5    A.   Yes.
6    Q.   And what neighborhood did you grow up in?
7    A.   Greenmount.
8    Q.   And did Davon Carter grow up in Greenmount as well?
9    A.   I mean, that's where I know him from.
10   Q.   Okay.  You just know him from that area?
11   A.   Yes.
12   Q.   Okay.  When did you begin dating Mr. Carter?
13   A.   I don't recall the years.
14   Q.   Okay.  Do you recall whether or not you were in your
15   teenage years, or was it later than that?
16   A.   Later.
17   Q.   Approximately how long did you date Mr. Carter?
18   A.   A few years.
19   Q.   For a few years, and was it a few years consistently, or
20   were there breaks in between?
21   A.   There were breaks in between.
22   Q.   Okay.  When was the last time that you communicated with
23   Mr. Carter?
24   A.   Not sure the exact day.
25   Q.   Can you give me a general time frame?

1   A.  Maybe a week or two maybe.

2   Q.  A week or two ago?

3   A.  Yes.

4   Q.  Okay.  And in what manner did you communicate with

5   Mr. Carter?

6   A.  What do you mean by "what manner"?

7   Q.  How did you talk to him, was it over the telephone, did

8   you --

9   A.  Yes.

10  Q.  Did you reach out to him, or did he reach out to you?

11  A.  He reached out to me.

12  Q.  And how often do you speak to Mr. Carter?

13  A.  I'm not sure.

14  Q.  I mean, was that phone call from him out of the blue, or

15  do you have regular communications with him over the

16  telephone?

17  A.  Sometimes he calls.

18  Q.  Did you discuss with Mr. Carter your testimony for this

19  trial?

20  A.  No.

21  Q.  It didn't come up at all?

22  A.  I don't recall, no.

23  Q.  You don't recall?

24  A.  No.

25  Q.  Did you discuss with Mr. Carter the fact that you were

1    subpoenaed as a witness at all for this trial?

2    A.  I'm not sure if I mentioned it to him.

3    Q.  What was the purpose of the phone call that was -- the

4    very last one you had a week or two ago, what was the purpose

5    of his phone call to you?

6    A.  I don't know, I don't remember the conversation.

7    Q.  You don't remember anything about the conversations?

8    A.  We just normally have regular conversations.

9    Q.  You don't remember any topics at all that were covered

10   during the conversation?

11   A.  No, not of a particular phone call, no.

12   Q.  Well, I'm talking about the very last one that you would

13   have had, the most recent.

14   A.  No, I don't remember.

15   Q.  When you described how you know him, you indicated that he

16   was your ex-boyfriend?

17   A.  Yes.

18   Q.  So no longer in any sort of romantic relationship?

19   A.  No.

20   Q.  Are you in a relationship with anyone else right now?

21   A.  Yes.

22   Q.  But you still accept phone calls from Mr. Carter?

23   A.  Yes.

24   Q.  Have you ever talked to him about your testimony for this

25   trial?

Direct Examination - Lawson  (By Ms. Oldham)

1   A.  I don't recall ever talking to him about my testimony for

2   the trial.

3   Q.  You don't think you've ever talked to him about it?

4   A.  I don't think so.

5   Q.  When did you -- did there come a point in time when you

6   moved in with Mr. Carter?

7   A.  Yes.

8   Q.  Do you recall approximately when that occurred?

9   A.  Maybe about January, December, January -- December 2015 or

10  January '16 maybe, around that time.

11  Q.  Okay.  Do you remember what your address was when you

12  lived with Mr. Carter?

13  A.  8480 -- 84 something Arbor Station Way.

14  Q.  Okay.  And what type of residence was that?

15  A.  Apartment.

16  Q.  If I could ask you to look at Government's Exhibit C-21A

17  and C-21B and tell me if those photographs depicted in C-21A

18  and C-21B look familiar to you.

19  A.  Yes.

20  Q.  And what do you recognize is depicted in those

21  photographs?

22  A.  That's where we lived.

23  Q.  I'm sorry?

24  A.  That's where we lived.

25  Q.  That's where you lived.  Okay.  Did anyone else live in

Direct Examination - Lawson   (By Ms. Oldham)

1    that apartment with you and Mr. Carter?

2    A.  Not when we initially moved in.

3    Q.  Did there come a point in time where someone else lived

4    with you and Mr. Carter?

5    A.  Yes.

6    Q.  And who was that?

7    A.  My mom.

8    Q.  Do you recall approximately when your mom moved in with

9    you both?

10   A.  He wasn't there when my mom moved in.

11   Q.  Oh, he was no longer there when your mom moved in?

12   A.  No, he was incarcerated.

13   Q.  Okay.  I'm going to direct your attention specifically to

14   that apartment that you lived in with Mr. Carter, how many

15   bedrooms was in that apartment?

16   A.  Two.

17   Q.  And when you lived there with Mr. Carter, did you both

18   share the same bedroom?

19   A.  Yes.

20   Q.  Who took care of the rent and the utility bills for that

21   apartment?

22   A.  Mainly he took care of the rent, and I did the

23   utilities.

24   Q.  And how did he make a living at the time when you were

25   living together?

Direct Examination - Lawson   (By Ms. Oldham)

1    A.   He was a supervisor, a warehouse supervisor.

2    Q.   Do you remember what the name of the company was?

3    A.   No, I don't recall the name of the company, I just know

4    it's a warehouse.

5    Q.   And was it steady employment for him?

6    A.   Yes.

7    Q.   When you lived at that Arbor Station Way address with

8    Mr. Carter, what type of vehicles did you and he drive?

9    A.   A Pontiac, Corolla, and a Honda Accord.

10   Q.   Were those three different cars you just listed, a

11   Pontiac, a Corolla, and a Honda Accord?

12   A.   Yes.

13   Q.   I'm going to show you Government's Exhibit C-8, see if you

14   could look to the right at the monitor, Ms. Lawson.  C-8, C-9,

15   and C-10, do you recognize the vehicle depicted in those three

16   exhibits?

17   A.   Yes.

18   Q.   And which vehicle is that?

19   A.   Mine.

20   Q.   Okay.  And is that one of the vehicles that you owned when

21   you lived with Mr. Carter at Arbor Station Way?

22   A.   Yes.

23   Q.   Did you drive that vehicle?

24   A.   Yes.

25   Q.   Did Mr. Carter drive that vehicle?

Direct Examination - Lawson   (By Ms. Oldham)

1   A.  Yes.

2   Q.  I'm going to direct your attention specifically to May of

3   2016, Ms. Lawson, was Mr. Carter working at that time in May

4   of 2016?

5   A.  No, he was out on workers' comp.

6   Q.  Okay.  And do you know why he was out on workers'

7   compensation?

8   A.  He fell, had an injury at work.

9   Q.  It was a fall at work?

10  A.  Yes.

11  Q.  Okay.  Do you know approximately when that injury

12  occurred?

13  A.  In the winter, I think.

14  Q.  In when?

15  A.  I think in the winter.

16  Q.  In the wintertime, okay.

17      Do you know what part of him was injured?

18  A.  His back.

19  Q.  How about your employment in May of 2016, where were you

20  employed?

21  A.  Johns Hopkins.

22  Q.  And what did you do for Johns Hopkins back in May of

23  2016?

24  A.  Billing.

25  Q.  And was it a full-time position?

Direct Examination - Lawson  (By Ms. Oldham)

1  A.  Yes.

2  Q.  Monday through Friday?

3  A.  Yes.

4  Q.  Okay.  I'm going to ask you to take a look at what we've

5  marked as Government's Exhibit R-12 on your screen.  See if we

6  can zoom in, Ms. Lawson.

7      What were your -- okay.  So do you see here where we've

8  highlighted May and June?

9  A.  Yes.

10  Q.  Now, it says -- it would say 8.0, 8.0, 8.0 in each column,

11  did you work eight-hour days?

12  A.  Yes.

13  Q.  And what time did your eight-hour shift start with Johns

14  Hopkins?

15  A.  We worked flex time, but I normally start around 7:00,

16  7:30.

17  Q.  A.m.?

18  A.  Yes.

19  Q.  Okay.  And at the time, you were living at Arbor Station

20  Way?

21  A.  Yes.

22  Q.  So what time would you typically leave your apartment at

23  Arbor Station Way to head into work to be there either between

24  7:00 and 7:30 a.m.?

25  A.  Around 6:45, 7:00 maybe, sometimes a little later,

1    depends.

2    Q.   And I should have asked you, do you remember what town

3    your apartment was in, the one on Arbor Station Way?

4    A.   Baltimore.

5    Q.   Was it Baltimore City?

6    A.   Baltimore County.

7    Q.   Baltimore County, was that Parkville?

8    A.   Yes.

9    Q.   Okay.  So if you left your residence around 6:45 a.m.,

10   that would get you to work at approximately what time?

11   A.   Maybe about 7:00.

12   Q.   Okay.  Now, just to assist us with dates, Ms. Lawson, I'm

13   going to ask you to take a look at Government's Exhibit R-20.

14   And I'm going to ask you specifically about Friday, May 27th.

15        So looking at the calendar, that's Friday of Memorial Day

16   weekend 2016, were you working that day?

17   A.   Yes.

18   Q.   Now, do you remember if the night before, Thursday night,

19   did you sleep at home at your apartment?

20   A.   Yes.

21   Q.   And how about Davon Carter, did he sleep Thursday night at

22   home with you at the apartment?

23   A.   Yeah.

24   Q.   When you woke up on Friday morning to get ready to go to

25   work, was Mr. Carter home?

1    A.  Um, I don't recall, that was a long time ago.

2    Q.  I'm sorry?

3    A.  I don't recall, that was a long time ago.

4    Q.  Would it --

5    A.  I would assume that he was.

6    Q.  I'm sorry?

7    A.  I would assume that he was.

8    Q.  Would it refresh your recollection if I showed you a

9    transcript of a prior interview that you did with Sergeant

10   Jones of the Baltimore City Police Department, would that

11   refresh your recollection?

12   A.  (No verbal response.)

13         MS. OLDHAM:  Your Honor, may I approach the witness?

14   Q.  (BY MS. OLDHAM)  Ms. Lawson, showing you what I've marked

15   as Government's Exhibit S-1 --

16         MR. DAVIS:  Your Honor, this is marked for

17   identification purposes only, I assume.

18         MS. OLDHAM:  Yes.  Thank you.

19         MS. WILKINSON:  Ms. Oldham, you might have to wear

20   this.

21   Q.  (BY MS. OLDHAM)  Okay.  Ms. Lawson, I'm going to ask you

22   to take a look at the bottom of page 27, and just ask you to

23   read here to the top of the next page.

24         THE COURT:  To herself?

25         MS. OLDHAM:  Yes, I'm sorry, to yourself.

1    A.  Okay.  Where?

2    Q.  (BY MS. OLDHAM)  Starting here, to the next page, just to

3    yourself.

4         Does that refresh your recollection as to whether or not

5    Mr. Carter was home when you woke up that morning?

6    A.  Yes.

7    Q.  Yes, it refreshes your recollection?

8    A.  Yeah.

9    Q.  Okay.  And do you now have a memory as to whether or not

10   he was home when you woke up that morning?

11   A.  Yes.

12   Q.  Okay.  And when you woke up that morning, did you begin

13   going to work?

14   A.  Yes.

15   Q.  At some point, did Mr. Carter leave the apartment?

16   A.  Yeah, I guess, yes.

17   Q.  Do you have a recollection as to whether or not at some

18   point when you were getting ready for work, he left the

19   apartment?

20   A.  Yes.

21   Q.  Did he leave the apartment while you were still there

22   getting ready?

23   A.  I'm not quite -- I don't recall exactly what time he left

24   the apartment while I was getting ready.

25   Q.  Right.  And I'm not asking a specific time, I'm just

1   asking you, do you remember that he left the apartment while

2   you were still getting ready for work?

3   A.   I think so.

4   Q.   Okay.  Did there come a point in time where you began

5   trying to call and text Mr. Carter?

6   A.   Yes.

7   Q.   Now, I'm going to ask you, do you happen to remember what

8   your phone number was at the time in May 2016?

9   A.   Yes.

10  Q.   What was -- what phone number did you have in May of

11  2016?

12  A.   The same one that I have now.

13  Q.   Okay.  Can I ask what that is?

14  A.   (443) 683-5670.

15  Q.   Okay.  What kind of phone did you know Mr. Carter to have

16  in May of 2016?

17  A.   An iPhone.

18  Q.   And do you recall what the phone number was?

19  A.   No.

20  Q.   Did you know him to have any other phones at that time

21  other than that iPhone?

22  A.   No.

23  Q.   If I recited a phone number to you, would it -- would you

24  recognize it as his prior phone number?

25  A.   Maybe.

Direct Examination – Lawson  (By Ms. Oldham)

1    Q.  Or if I showed you a phone record, would that refresh your

2    recollection as to his phone number at the time?

3    A.  Maybe.

4    Q.  Okay.

5            MS. OLDHAM:  Your Honor, at this time I would like

6    permission to show a portion of Government's Exhibit P-2 to

7    Ms. Lawson.  This is an exhibit that subject to later

8    testimony we would be moving into evidence.  It's a summary

9    exhibit of phone records.

10           THE COURT:  For now, it's for ID only, later to come

11   in?

12           MS. OLDHAM:  Yes.

13           THE COURT:  That's fine.

14           MS. OLDHAM:  Thank you.

15   Q.  (BY MS. OLDHAM)  Ms. Lawson, I'm going to direct you to

16   page 112 of this exhibit and ask you to take a look at the

17   phone number in this column here.

18   A.  Uh-huh.

19   Q.  Do you recognize that as your phone number at the time,

20   the one you just recited, the one ending in 5670?

21   A.  Yes.

22   Q.  Okay.  Now, can take a look at the number in the next

23   column and tell me if you recognize that phone number.

24   A.  It may have been his number, yes.

25   Q.  The one ending in 2399?

1    A.  Yes.

2    Q.  Did you know him to have the same phone number during your

3    entire relationship with Mr. Carter?

4    A.  I can't remember if we changed it or not.

5    Q.  Okay.  Do you see on page 112 that there are successive

6    phone calls and text messages between your phone number and

7    that phone number, the 2399?

8    A.  Yes.

9    Q.  Okay.  Now showing you the first one that's indicated, is

10   at 6:06 a.m., do you recall trying to reach out to Mr. Carter

11   at 6:06 a.m. on Friday, May 27th, 2016?

12   A.  It's there, I don't remember an exact time.

13   Q.  Okay.

14   A.  It's reflected there.

15   Q.  Okay.  Is it safe to assume that he's not in the apartment

16   at the time that you first start trying to reach him?

17   A.  Yes.

18   Q.  Okay.  So next to the 6:06 a.m. contact, do you recall

19   sending him a text message that says, "I need names and

20   pictures of people you're going with just in case anything

21   happens," do you remember sending him that text message?

22   A.  Yes.

23   Q.  Okay.  Why did you send him that?

24   A.  Because he was going out of town.

25   Q.  And did you know who he was going with?

1    A.  Some guys to bike week.

2    Q.  Okay.  When was the first time that you spoke to him about

3    him leaving that morning before 6:06 a.m. about him going out

4    of town?

5    A.  I don't remember.

6    Q.  You don't remember?

7    A.  No, because originally it was supposed to be a family

8    vacation.

9    Q.  Did you have any discussion with him when you woke up that

10   morning and he was still in the apartment about the fact that

11   he was leaving to go out of town?

12   A.  I don't recall.

13   Q.  You don't recall?

14   A.  No.

15   Q.  Do you remember physically seeing him leave the apartment

16   that morning?

17   A.  I don't recall.

18   Q.  So you don't know if he had anything with him?

19   A.  No, I don't know.

20   Q.  Is this your phone number reaching out, trying to get in

21   touch with him again at 6:08 a.m.?

22   A.  Yes.

23   Q.  Is this you texting, "Car make, model, tag number, and

24   hotel you're all staying at"?

25   A.  Yes.

Direct Examination - Lawson   (By Ms. Oldham)

1    Q.  Now, so far you've not gotten a response; is that correct,

2    between 6:06 a.m. and 6:08 a.m. there's no response?

3    A.  Yes.

4    Q.  6:11 a.m., is this your phone number calling the 2399

5    number?

6    A.  Yes.

7    Q.  And another call attempt made at 6:11 a.m., your phone

8    number to the 2399 number?

9    A.  Yes.

10   Q.  And he has not answered the phone at this point?

11   A.  Um, no.

12   Q.  6:19 a.m., your 2399 -- I'm sorry, your 5670 number to the

13   2399 number, do you see you're again attempting to call?

14   A.  Yes.

15   Q.  And again, you still have not heard anything back from

16   him?

17   A.  No, I don't think so, it's not there.

18   Q.  Okay.  Do you see your next text message at 6:20 a.m.,

19   "Now, this is what we not going to do, you better answer this

20   damn phone," that's to the 2399?

21   A.  Yes.

22   Q.  Fair to assume then your efforts to reach him at this

23   point have failed?

24   A.  Yes.

25   Q.  Okay.  That's at 6:20.  How about 6:23, do you see your

Direct Examination - Lawson   (By Ms. Oldham)

1    phone call here from your phone number to the 2399?

2    A.  Yes.

3    Q.  And then another phone call, 6:24 a.m., your phone number

4    to the 2399, again, these calls are going unanswered?

5    A.  Yes.

6    Q.  So given the time right now as we're looking at these

7    records is 6:24 a.m., do you recall whether or not you were

8    trying to reach him while you were still at Arbor Station Way

9    at the apartment?

10   A.  According to the time, I would have been.

11   Q.  Okay.  Do you -- is it possible that when you woke up that

12   morning he had already left?

13   A.  I don't recall, I'm not sure.

14   Q.  Okay.  Then your next communication is at 6:25 a.m., this

15   is your number, 5670 texting 2399, do you recall sending this

16   one, "Now you're pissing me off.  Did you leave the money for

17   your car payment?  It's scheduled to come out of my account

18   tomorrow, and I don't have enough in there to cover it"?

19        Fair to assume you're getting more angry at this point

20   because you haven't heard from him?

21   A.  Yes.

22   Q.  Okay.  Which car are you referring to when you're

23   demanding the car payment?

24   A.  That was in May, maybe the Corolla.

25   Q.  The Corolla, whose name was the Corolla in?

Direct Examination – Lawson   (By Ms. Oldham)

1   A.   His.

2   Q.   Here's one at 6:26, from your number ending in 5670 to the

3   2399, "Did you clear this with your PO?"  Again, so far

4   there's been no response from him?

5   A.   Uh-huh.

6   Q.   Did you typically speak every day to Mr. Carter?

7   A.   Yes.

8   Q.   Even on days when he went to work, you talked to him

9   regularly?

10   A.   Yes.

11   Q.   Is it unusual at this point that he is not responding to

12   you?

13   A.   Um -- yeah, he normally calls back.

14   Q.   Okay.  7:03 a.m., your 5670 number to the 2399, another

15   attempt to call, no response; correct?

16   A.   Uh-huh.

17        THE COURT:  Sorry, you have to say yes or no.

18   A.   Oh, yes.

19   Q.   (BY MS. OLDHAM)  Then the next one is at 7:17 a.m., your

20   5670 number to 2399, instant message, "I know you saw me

21   calling you.  SMH.  Why make things go left when everything's

22   going right?"

23        What does that mean, what does SMH mean?

24   A.   Shaking my head.

25   Q.   Okay.  And so what are you telling him when you say that,

Direct Examination – Lawson   (By Ms. Oldham)

1    "Why make things go left when everything's going right?"

2    A.   Because I was calling and he didn't answer the phone.

3    Q.   I'm sorry, you have to speak up.

4    A.   Oh, because I was calling and he didn't answer the

5    phone.

6    Q.   And you're getting pretty mad?

7    A.   Yeah.

8    Q.   Okay.  Now, just looking at this together, we're on page

9    113, Ms. Lawson.

10   A.   Uh-huh.

11   Q.   Correct me if I'm wrong, I don't see any more contacts or

12   attempt to contact until 8:19 a.m., is that your number, 5670

13   to the 2399 number?

14   A.   Yes.

15   Q.   A call is attempted.  Would you have been at work at this

16   point?

17   A.   At what time?

18   Q.   8:19 a.m.

19   A.   Yes.

20   Q.   And no answer?

21   A.   No.

22   Q.   Okay.  Again at 8:41 a.m., your phone number to the 2399,

23   no answer?

24   A.   No.

25   Q.   And again, 8:44 a.m., now you're messaging the 2399

1  number.  Tell me what's happening in this message to him.

2  "There's a right way to do things and a wrong and right.  Now

3  you are going them all wrong.  Why can't you let things go

4  smoothly?  I'm not trying to be a bitch.  All I did was ask a

5  simple question.  All you have to do is answer it.  SMH."

6       Is that "shaking my head"?

7  A.  Yes.

8  Q.  Okay.  "Learn how to be an adult and be in a relationship.

9  IDK."  Is that "I don't know"?

10 A.  Yes.

11 Q.  "IDK how many times I have to tell you this, but

12 communication is the key.  So if you don't respond to me by

13 3:00 p.m., I'm stopping payment on my account for your car

14 payment because I'm not letting my account go into," and then

15 it cuts off.

16      So still no response to that from Mr. Carter?

17 A.  No.

18 Q.  And it looks like at 9:34 a.m. you message him, "Are you

19 going to respond?"  So far no answer; correct?

20      Are you recalling this, do you have a recollection of

21 this happening that morning as you're getting upset with

22 him?

23 A.  By that time I was working, at work, so -- I remember

24 this.

25 Q.  Okay.  Now, by 9:40, this is your number messaging to the

1   2399, "Don't worry about responding.  I really need to learn

2   to mind my business and worry about me.  I'm going to let you

3   handle it when you return.  Have fun, be safe.  I love you

4   with everything in me."

5        Your tone sounds different, why the change?

6   A.  I don't know.

7   Q.  You still haven't heard from him at this point; correct,

8   this is at 9:40?

9   A.  I don't see any call, I don't think.

10  Q.  Okay.  Now, 9:46, your number -- I'm sorry, the number

11  2399 to your number, 5670, do you remember receiving this

12  message from him for the first time, "Calm down, babe.  I was

13  asleep, for one, in his couch waiting for people to come.  I

14  was sleepy."

15       Do you remember receiving that from him for the first

16  time that Friday morning?

17  A.  It's there.

18  Q.  Do you remember that?

19            THE COURT:  I'm sorry, did she answer that question?

20  Q.  (BY MS. OLDHAM)  Do you remember that?

21  A.  Yes, I'm reading it here.

22  Q.  Do you remember receiving that from him, that

23  explanation?

24  A.  Um --

25  Q.  That he fell asleep on someone's couch?

1    A.  I don't recall actually receiving it.

2    Q.  You don't recall?

3    A.  But I'm reading it.

4    Q.  Okay.  What about the next one, you at 9:48 message back

5    to him, "Davon, I texted you and called you right after you

6    left out of the house at 6:06 a.m., so miss me with that.  I

7    don't want to fuss.  I love you."

8        Do you remember saying that to -- explaining to him why

9    you've been calling repeatedly and texting repeatedly, do you

10   remember saying that to him?

11   A.  I see that.

12            THE COURT:  I'm sorry, you see it, or you remember

13   it?

14   A.  I see it.  I don't really recall, I mean, sending messages

15   that was years ago.

16   Q.  (BY MS. OLDHAM)  Well, now, looking back --

17   A.  Yeah.

18   Q.  -- at the events that, you know, happened and things that

19   you've been questioned about, does this morning stand out to

20   you, were you -- you're unusually trying to reach him for so

21   long and you're not getting a response, does it stand out to

22   you more so than any other regular day that you would have

23   gone to work?

24   A.  Yes, because I knew he was going out of town that day.

25   Q.  Okay.  That day, is that when you found out he was going

Direct Examination - Lawson   (By Ms. Oldham)

1   out of town?

2   A.   Could you say your question --

3   Q.   Did you find out he was going out of town that day?

4   A.   No.

5   Q.   When did you learn that he was going out of town with

6   other people?

7   A.   I don't recall the exact day.

8   Q.   Did you believe that he actually had left that morning to

9   go to Myrtle Beach?

10   A.   Yes.

11   Q.   Did you have suspicions that he went to visit another

12   woman?

13   A.   Yes.

14   Q.   Is that why you immediately started to contact him,

15   because he left so early in the morning?

16   A.   No.

17   Q.   Well, why did you think he went to see another woman, why

18   were you suspicious of that?

19   A.   Because from reading the messages, I didn't get a

20   response, and there was another woman that was pregnant the

21   same time that I was.

22   Q.   Okay.  So did you have concerns then that when he left the

23   apartment that morning he was going to see that other woman?

24   A.   No.

25   Q.   Do you remember testifying before a federal grand jury,

1    Ms. Lawson?

2    A.   Yes.

3    Q.   And being questioned about the morning of Friday,

4    May 27th?

5    A.   Yes.

6    Q.   And do you recall being questioned about the fact that you

7    had suspicions about why he wasn't picking up the phone when

8    he left that morning, do you remember these similar questions

9    that I'm asking you being asked of you when you testified

10   before the grand jury back in July of 2016?

11   A.   Some of it sounds familiar.

12   Q.   Okay.  For example, you were asked, "What was your other

13   reason for concern?"  Your response was, "He would have gone

14   to another young lady's house before he left to go to Myrtle

15   Beach."

16        Do you remember testifying to the grand jury about

17   that?

18   A.   Yes.

19   Q.   Okay.  So you did think that there was some place else

20   that Mr. Carter was going that morning, because he wasn't

21   answering his phone?

22   A.   Yes.

23   Q.   And the more time that passed, did your concerns grow the

24   longer he went without responding to you?

25   A.   Yes.

Direct Examination - Lawson  (By Ms. Oldham)

1    Q.  When Mr. Carter left that morning, and at some point, it's

2    your testimony that you thought that he was going to Myrtle

3    Beach, did you know who he was going with?

4    A.  I don't recall the people that he was going with.

5    Q.  I'm sorry?

6    A.  I don't recall the people that he was going with.

7    Q.  And would that explain why one of your first text messages

8    to him that morning was, "I need names"?

9    A.  Yes.

10   Q.  And tag numbers?

11   A.  Yes.

12   Q.  What vehicle did Mr. Carter take when he left the Arbor

13   Station Way apartment that Friday morning?

14   A.  The Pontiac.

15   Q.  And was it your understanding that he was going to take

16   the Pontiac to Myrtle Beach?

17   A.  No.

18   Q.  And is that why you requested tag numbers?

19   A.  I requested tag numbers --

20   Q.  In the text message.

21   A.  -- to know who he was going -- the information of where he

22   was going in prevent of an accident or anything occurring.

23   Q.  So at the time that he left that Friday morning, you had

24   no idea who he was traveling to Myrtle Beach with for a

25   vacation?

Direct Examination - Lawson   (By Ms. Oldham)

1    A.  I don't recall his name.  I want to say one of their names

2    was Dre or something, but I don't recall who the other people

3    were.

4    Q.  Okay.  But at the time he left, you did not know; correct,

5    that's why --

6    A.  Yes.

7    Q.  Yes?  So at what point did you learn it was someone named

8    Dre?

9    A.  I want to say when they were planning it, planning on

10   going.

11   Q.  When who was planning on going?

12   A.  Davon and the other guys.

13   Q.  This person named Dre?

14   A.  Yes.

15   Q.  Okay.  And what other guys was there that was planning

16   this trip with Mr. Carter?

17   A.  I don't know them.  I don't know.  I've never seen them,

18   they were planning it over the phone.

19   Q.  Do you know the person Dre?

20   A.  No.

21   Q.  Do you know his last name?

22   A.  No.

23   Q.  Was it someone that you had ever met before?

24   A.  I don't think so.

25   Q.  But that Friday morning, were you suspicious that that's

1    who he was actually going with?

2    A.  I had no reason to think otherwise.

3    Q.  But you had a growing concern, an obsession with getting

4    in touch with him as the morning went on; right?

5    A.  Yes.

6    Q.  Okay.  When he left that Friday morning, did you have any

7    idea where he was going to be staying?

8    A.  No.

9    Q.  Around what time did you get home from work that Friday,

10   May 27th?

11   A.  I don't recall that.

12   Q.  What time do you typically get -- would you then have

13   typically gotten home from work?

14   A.  I would have gotten off at 3:30, if it was a 7:30 day.

15   Q.  Okay.  And then what time would that typically get you

16   home?

17   A.  If I go straight home, it shouldn't take no more than

18   maybe about 15 minutes, 15, 20 minutes.

19   Q.  And when you arrived home that evening, was the Pontiac

20   back at your apartment?

21   A.  I don't recall.

22   Q.  Would it refresh your recollection if I showed you your

23   prior testimony before the grand jury?

24   A.  Yes, I'll read it.

25   Q.  Okay.  Ms. Lawson, so I'm referring to your testimony that

1    was in January of 2018, January 30th, do you recall being

2    questioned, "And you come home from work on Friday and the

3    Pontiac is there at your apartment?"  Answer, yes.

4         "Question, do you have any information for this grand

5    jury about how the Pontiac came back to your apartment by the

6    time you got off work on Friday, May 27th, any information

7    whatsoever?  Answer, no, I was at work."

8         Do you recall that testimony?

9    A.  Yes.

10   Q.  You do.  So now --

11        MR. DAVIS:  Objection, Your Honor.  May we approach

12   just for a moment?

13        THE COURT:  Of course.

14        (Bench conference on the record.)

15        THE COURT:  Yes, sir.

16        MR. DAVIS:  I hate to be a stickler about this, but

17   that's really not the proper way to do this.

18        THE COURT:  I agree.

19        MR. DAVIS:  Either she's refreshing the witness's

20   recollection, in which case she --

21        THE COURT:  I agree.  You didn't object.  She's

22   already done it now.

23        MR. DAVIS:  I'm objecting now.

24        THE COURT:  It's already done.

25        MR. DAVIS:  I know it's done, it doesn't really

1    matter, but it's just not the proper way to do it.  I think in

2    the future, if you're going to refresh someone's recollection,

3    you show it to them, you ask them if that refreshes, then the

4    witness answers.  If you're impeaching them, you do question,

5    answer, then bam, you ask which is true.

6              THE COURT:  I certainly recognize the difference and

7    recognize she didn't do it right, but you didn't object and

8    it's already done.  But going forward --

9              MS. OLDHAM:  Since it was a prior statement that was

10   under oath, I was actually not just trying to refresh her

11   recollection, I was actually --

12             THE COURT:  But she said she didn't recall, but

13   before you can impeach, you have to see if that refreshes her

14   recollection.  So going forward.

15             MS. OLDHAM:  All right.  Thank you.

16             (The following proceedings were had in open court.)

17   Q.  (BY MS. OLDHAM)  Do you recall today, Ms. Lawson, whether

18   or not when you got back from work that evening, whether or

19   not the Pontiac was in the parking lot?

20   A.  You just read the testimony, I mean, what I said.

21   Q.  But do you remember whether or not the Pontiac was in the

22   parking lot?

23   A.  No, I don't recall.

24   Q.  Okay.  Do you recall being interviewed by Sergeant Jones

25   of the Baltimore City Police Department on June 1st, 2016?

1   A.   I don't recall who Detective Jones is.

2   Q.   Do you recall at some point being questioned by a homicide

3   detective about a homicide that occurred on May 27th, 2016 at

4   the Baltimore Police headquarters?

5   A.   Yes.

6   Q.   Okay.  And do you recall these same topics being covered

7   during that interview the morning of May 27th, your movements,

8   Mr. Carter's movements, the vehicles, do you recall all of

9   those subjects being questioned of you?

10   A.   Yes.

11   Q.   And then subsequent to that, do you recall that you

12   testified multiple times before a federal grand jury on those

13   same topics?

14   A.   Yes.

15   Q.   And every time you testified, you're essentially being

16   questioned about the same subject matter; correct, Friday,

17   May 27th, the morning of a homicide?

18   A.   Yes, about the Friday morning, but some -- it's -- I don't

19   think that they were like the same questions, I don't think --

20   Q.   Same subject matter, though, was covered?

21   A.   Yes.

22   Q.   Okay.  And in particular, there was footage and photos

23   that were shown to you by Sergeant Jones of your vehicle, do

24   you remember that?

25   A.   Yeah -- I don't remember -- honestly, I don't remember

1    Detective Jones, I remember Detective Forsythe.

2    Q.  Forsythe.  Okay.  Do you remember a point in time where

3    one of the detectives showed you surveillance footage of your

4    vehicle?

5    A.  Yes.

6    Q.  And do you recall identifying it as your vehicle when they

7    showed it to you?

8    A.  Yes.

9    Q.  Did you keep in touch with Mr. Carter throughout that

10   weekend, while he was in Myrtle Beach?

11   A.  I would think so.

12   Q.  Do you recall how long he was away in Myrtle Beach?

13   A.  It should have been for the weekend.

14   Q.  Do you have a recollection as to when he returned home?

15   A.  Maybe Sunday or Monday.

16   Q.  Sunday, May 29th --

17            MS. OLDHAM:  Ms. Lesser, can you replace 20 back,

18   that's the calendar.

19   Q.  (BY MS. OLDHAM)  Ms. Lawson, I'm just going to put back up

20   R-20, the calendar, and we're going to go to Sunday, May 29th,

21   do you recall what plans you had for Sunday, May 29th?

22   A.  No, I don't recall.  It was a holiday weekend, so maybe

23   cooking with my family.

24   Q.  Okay.  Do you recall having dinner with your family Sunday

25   night?

1   A.  That is possible because we normally do Sunday dinners

2   together.

3   Q.  And do you recall whether or not Mr. Carter came home at

4   that point, Sunday night?

5   A.  If -- he did come when we were having dinner.

6   Q.  Okay.  So you do have a specific recollection of him

7   arriving back into town Sunday night, May 29th, during family

8   dinner with your mom?

9   A.  I'm not -- I don't know if it was that day.  Normally

10   that's when, but it could have been Monday.  I'm not 100

11   percent sure because it was the holiday.

12   Q.  Where was the family dinner with your mom?

13   A.  That was at my aunt's house.

14   Q.  Oh, it was at your aunt's house.  Okay.  And what town, is

15   that in Baltimore City?

16   A.  Yes.

17   Q.  And did you actually see him arrive at that family dinner

18   at your aunt's house?

19   A.  Yes, I was there.

20   Q.  I'm sorry?

21   A.  I said yes, I was there.

22   Q.  But did you see him arrive, like physically arrive, how he

23   got there?

24   A.  I don't understand what you mean.

25   Q.  Did you see what car he arrived in?

1    A.   I don't recall what car he arrived in.

2                MS. OLDHAM:   Court's indulgence.

3                THE COURT:   Sure.

4    Q.   (BY MS. OLDHAM)   Had you ever seen him drive, Ms. Lawson,

5    a silver Audi?

6    A.   I don't recall him driving a silver Audi.

7    Q.   You don't recall him ever driving a silver Audi?

8    A.   I don't think so.

9    Q.   Okay.   Would it refresh your recollection if I showed you

10   a copy of your prior grand jury testimony from July of 2016?

11   Would that refresh your recollection?

12   A.   I can --

13   Q.   I'm going to ask you to read the top of page 18 --

14   A.   Uh-huh.

15   Q.   -- to 19 to yourself.

16   A.   (Complying.)

17   Q.   Have you finished reading it?

18   A.   Yes.

19   Q.   Does that refresh your recollection as to whether or not

20   you've ever seen him driving an Audi?

21   A.   Yes.

22   Q.   And had you ever seen him driving an Audi?

23   A.   Um, yes.

24   Q.   And whose Audi did you see him driving?

25   A.   Matt's.

1   Q.   Who's Matt?

2   A.   Matthew.

3   Q.   Matthew, what's his last name?

4   A.   Hightower.

5   Q.   And who is Matthew Hightower?

6   A.   One of my friend's baby fathers.

7   Q.   One of your friend's baby's father, whose friends?

8   A.   One of mine.

9   Q.   But which one?

10  A.   Latrice.

11  Q.   Latrice, and what's Latrice's last name?

12  A.   Wells.

13  Q.   What is Matthew Hightower's relationship to Davon

14  Carter?

15  A.   Friend.

16  Q.   Close friends?

17  A.   Yes.

18  Q.   Now, did you see Mr. Carter driving that Audi when he

19  returned from Myrtle Beach?

20  A.   Yeah, just that's when I saw him -- when he pulled up to

21  the house, that's what he was driving.

22  Q.   When he pulled up to your aunt's house?

23  A.   Yes.

24  Q.   And did you ask him where he had gotten the car from?

25  A.   Yes.

Direct Examination - Lawson  (By Ms. Oldham)

1   Q.  And what did he say?

2   A.  He said it was Matt's.

3   Q.  And you knew that he was referring to Matthew Hightower?

4   A.  Yes.  Um, I don't know any other Matts.

5   Q.  Okay.  Now, when you left the family dinner from your

6   aunt's house -- well, first of all, how did you get there?

7   A.  I would have driven.

8   Q.  Okay.  And what vehicle would you have driven to your

9   aunt's house that night for dinner?

10  A.  More than likely the Corolla.

11  Q.  And when you left your aunt's house that night, did you

12  leave in the Corolla?

13  A.  If I drove it there, yes, I would have.

14  Q.  And how -- did you leave separately from Mr. Carter?

15  A.  I would assume that we did, because we didn't arrive

16  together.

17  Q.  Okay.  So did he leave in the Audi?

18  A.  Yes.

19  Q.  Did you go straight back to your apartment?

20  A.  I don't recall.

21  Q.  You don't recall?

22  A.  No.

23  Q.  What about Mr. Carter, did he go back to the apartment?

24  A.  I don't recall.

25  Q.  Do you recall whether or not the Audi ended up back at

Direct Examination - Lawson   (By Ms. Oldham)

1    your apartment?

2    A.  No, I don't recall.  I would assume.  I don't know.

3    Q.  Well, was that a vehicle that he regularly drove, the

4    Audi?

5    A.  No.

6    Q.  So would you notice it if it was in the parking lot at

7    your apartment?

8    A.  No, it wouldn't be familiar to me.

9    Q.  It would not be familiar to you?

10   A.  No.

11   Q.  But you knew that it was Mr. Hightower's car?

12   A.  Yeah, I just read that he told me.

13   Q.  Have we met prior to today, Ms. Lawson?

14   A.  I don't think so.

15   Q.  Were there requests to sit down and meet with me prior to

16   today?  Did I request to meet with you before today?

17   A.  I don't know.  I don't know your name, I don't know who

18   you are.

19   Q.  Did you indicate through an attorney that you did not want

20   to meet with anyone from the U.S. Attorney's Office prior to

21   your testimony here today?

22   A.  Yes.

23   Q.  And that is the reason why this is the first time that

24   we're meeting; correct?

25   A.  I don't know, because I've met with someone else that's

1    sitting in here from the prosecutor's office.

2    Q.  But did you or did you not refuse through your attorney to

3    meet prior to trial today?

4    A.  Yes.

5    Q.  Now, you testified earlier when I asked you when he

6    returned from Myrtle Beach in that Audi, which day it was, and

7    you said you couldn't remember if it was Sunday or Monday?

8    A.  Yes.

9    Q.  Would it refresh your recollection if I referred you to

10   prior grand jury testimony where you specifically testified to

11   that date?

12           MR. DAVIS:  Objection.

13           THE COURT:  Overruled.

14   Q.  (BY MS. OLDHAM)  Do you think that would refresh your

15   recollection?

16   A.  I can read it.

17   Q.  This is page 32 of your testimony from January 30th, 2018.

18   If you could just read to yourself starting at line 6.

19   A.  (Complying.)

20   Q.  After having read that, Ms. Lawson, does that refresh your

21   recollection as to which day it was that you saw Mr. Carter

22   return from Myrtle Beach?

23   A.  Yes.

24   Q.  Which day?

25   A.  Sunday.

1   Q.   Okay.   Now, going back to that weekend when Mr. Carter was

2   away, you indicated that you think you would have kept in

3   touch with him while he was away?

4   A.   Yes.

5   Q.   Did there come a point in time where he did inform you

6   where he was staying?

7   A.   I don't recall, I would assume, yes.

8   Q.   You don't remember whether or not he told you where he was

9   staying?

10  A.   I would assume, yes.

11  Q.   Did he text you any pictures from Myrtle Beach?

12  A.   I think he did.

13  Q.   At the time, was Mr. Carter's e-mail address

14  DDCarter0707@gmail.com?

15  A.   Yes.

16  Q.   Ms. Lawson, I'm showing you what we have marked as C-26,

17  do you recall receiving this instant message or text image

18  from Mr. Carter while he was in Myrtle Beach?

19  A.   No, I don't recall.

20  Q.   Does it ring a bell that he ultimately stayed at the Best

21  Western in Myrtle Beach?

22  A.   I don't recall what hotel he stayed at.

23  Q.   Okay.   I'm showing you what is marked as Government's

24  Exhibit C-18.   This is dated May 28th, 2016, so that would be

25  Saturday, is that your number there on the left ending 5670?

Direct Examination - Lawson  (By Ms. Oldham)

1   A.  Yes.

2   Q.  Is that a text message from you to Mr. Carter, "Send me a

3   picture"?

4   A.  Yes.

5   Q.  And then at 18:38, from your 5670 number, "Really, jerk?"

6   with three emojis, is that you sending that to Mr. Carter?

7   A.  Yes.

8   Q.  And then ending 5670, the next one at 18:52, "I was

9   talking about you."  Did he send you a picture in between?

10  A.  I don't know.

11  Q.  I'm having trouble hearing you.

12  A.  Oh, I don't know.

13  Q.  Okay.  Well, let's look at the next one at 19:53 from your

14  5670 number, "Who told you to cut the hair off your face?"  Is

15  that you sending that to Mr. Carter?

16  A.  Yeah.

17  Q.  I'm showing you what is marked as C-16, do you recognize

18  this photo?

19  A.  Yes.

20  Q.  I'm sorry?

21  A.  Yes.

22  Q.  And that's Mr. Carter in the photo?

23  A.  Yes.

24  Q.  Do you recall Mr. Carter sending you this selfie of

25  himself in response to you requesting a picture?

1    A.  Um, yeah, he could have.

2    Q.  I'm sorry?

3    A.  I said yeah, he could have.

4    Q.  Do you recall see receiving that picture, which then

5    prompted you to say, "Who told you to cut the hair off your

6    face?"

7    A.  I don't actually recall what picture he sent, but reading

8    the text message.

9    Q.  Well, looking at C-16, in light of what you texted, "who

10   told you to cut the hair off your face," is this the facial

11   hair as depicted in C-16, is that lighter than how Mr. Carter

12   normally wore it?

13   A.  Yes, a little lighter.

14   Q.  I'm showing you what is marked as C-19, who's depicted in

15   this photo?

16   A.  Davon.

17   Q.  Mr. Carter?

18   A.  Yes.

19   Q.  And would you say that his facial hair as depicted in C-19

20   is more consistent with how he typically wore his facial

21   hair?

22   A.  Yes, it was a little lighter, not as bushy.

23   Q.  Okay.  But when he sent you the selfie depicted in

24   Exhibit C-16, you texted him back, "Who told you to cut the

25   hair off your face?"

1    A.  Yes.

2            MS. OLDHAM:  Your Honor, do you wish me to proceed?

3    I'm sorry, Ms. Wilkinson is just notifying me of the time.

4            THE COURT:  How much more do you have?

5            MS. OLDHAM:  About 15 minutes, Your Honor.

6            THE COURT:  How much cross, if you know at this

7    point?

8            MR. DAVIS:  At least that.

9            THE COURT:  At least 15 more.  Okay.  All right.

10   Why don't you go another ten minutes.  If we could get through

11   direct at least, that would be great.  Assuming that's 15

12   minutes real time, not lawyer time.  You have 15 minutes real

13   time.

14           MS. OLDHAM:  Okay.

15   Q.  (BY MS. OLDHAM)  Ms. Lawson, when you previously testified

16   before the grand jury, do you recall being shown this

17   photograph and asked whether or not you recognized the person

18   depicted?

19   A.  Yes.

20   Q.  Sorry?

21   A.  Yes.

22   Q.  And what was your response when asked before the grand

23   jury?

24   A.  I don't recall.

25   Q.  You don't recall what your answer was?

1    A.   No.

2    Q.   Would it refresh your recollection if I showed you your

3    prior grand jury testimony?

4    A.   Yes, I can read it.

5            MS. OLDHAM:   And just for counsel's reference, this

6    is testimony from August 23rd, 2016.

7    Q.   (BY MS. OLDHAM)   And I'm showing you page 11.   Starting

8    here at line 13, if you can just read to yourself.   And tell

9    me when I can turn the page.

10   A.   (Complying.)

11   Q.   Now we're on page 12, just to yourself.

12   A.   (Complying.)

13   Q.   Okay.   Are you done reading?

14   A.   Yes.

15   Q.   Okay.   Does that refresh your recollection as to how you

16   answered that question when shown that image?

17   A.   Yes.

18   Q.   Okay.   And what was your initial reaction?

19   A.   Um, that no, I didn't know who it was.

20   Q.   That's what you just read here from your grand jury

21   testimony?

22   A.   Yes.

23   Q.   Ms. Lawson, I'm going to direct you back to page 11.   Just

24   read page 11 from 13 down.

25           THE COURT:   I'm sorry, counsel, right now you're the

1    loudest voices in the room.

2            MR. ZERKIN:  Sorry.

3    Q.  (BY MS. OLDHAM)  Does that refresh your recollection as to

4    what your initial reaction was in seeing that photograph?

5    A.  Yes.

6    Q.  Okay.  And what was your initial reaction?

7    A.  The same thing I just told you.

8    Q.  (BY MS. OLDHAM)  Ms. Lawson, did you --

9            MR. DAVIS:  Objection, Your Honor.  Asked and

10   answered.

11           THE COURT:  If she's going to ask literally the same

12   question again, then I'll sustain it, but I haven't heard the

13   question yet.

14   Q.  (BY MS. OLDHAM)  Ms. Lawson, did you remain silent for a

15   period of time?

16           MR. DAVIS:  Objection.  This is just reading from

17   the grand jury.

18           THE COURT:  Let's approach.  Bring the transcript.

19           (Bench conference on the record.)

20           THE COURT:  I mean, at least from Ms. Oldham's tone,

21   I assume we're past the point of refreshing recollection, and

22   we're actually having a disagreement on what the transcript

23   says.

24           MR. DAVIS:  Well, in fairness, and I'm putting up --

25   this one on for pages.  This is what she initially came in

1    with, and this is exactly what she's testifying to.

2        THE COURT:  I mean, she said she's not sure, she

3    said in the grand jury she's not sure.

4        MS. OLDHAM:  Her initial reaction is that she was

5    silent for a period of time and then requested to speak to her

6    attorney.

7        MR. DAVIS:  That's --

8        THE COURT:  Make sure you're speaking into the

9    microphone.

10       MS. OLDHAM:  Oh, I'm sorry.  She was silent for a

11   period of time and then requested to speak to her attorney.

12       THE COURT:  That's not an answer, that's not her --

13   I don't see that as being inconsistent.  She's saying no, she

14   doesn't know.

15       MS. OLDHAM:  My question to her was what her initial

16   reaction was, and then on the following page that she just

17   read as well, she came back and testified that she wasn't 100

18   percent sure.

19       THE COURT:  So what the substance you're trying to

20   get in is that she requested an attorney when you asked her

21   about whether or not she recognized this picture.

22       MS. OLDHAM:  That she first requested to speak to

23   her attorney.

24       THE COURT:  All right.  Well, can you just ask her

25   that question, did you ask to speak to an attorney when I

1    asked you that question?

2              MS. OLDHAM:  Yes, that's what I was --

3              MR. DAVIS:  I think that opens up a whole --

4              THE COURT:  Opens up what?

5              MR. DAVIS:  That's kind of a side issue.  I mean,

6    she's entitled to have representation.

7              THE COURT:  It goes to bias, it goes to bias.  It --

8    you can ask the specific question, when I asked you that

9    question, did you ask for an attorney?

10             MR. DAVIS:  This was in August, she could have --

11   she was Mirandized when she was first questioned.  She was

12   actually a suspect, I don't think the fact -- I mean, she

13   could have been part of this.

14             THE COURT:  And that could be your argument.  Their

15   argument is going to be that that shows bias, that you're

16   trying to protect them.

17             MR. DAVIS:  But you're not allowed to bring out that

18   someone sought the advice of their attorney to -- to make it

19   look -- make them look bad, that's not appropriate.

20             THE COURT:  I disagree.  You can ask that, just ask

21   that specific question.

22             MR. DAVIS:  And Your Honor, also, could we get that

23   photo identified?  I don't know what it is, but I don't think

24   it was identified for the record what exhibit it was.

25             THE COURT:  If it wasn't, then if you could do that,

 1    that would be great.

 2         MS. OLDHAM:  Yes, Your Honor, I'm just going to let

 3    the Court know now that I don't think I will be completely

 4    wrapped up with direct.

 5         THE COURT:  That's fine.  Ask that one question, and

 6    then we'll stop for the day.

 7         (The following proceedings were had in open court.)

 8    Q.  (BY MS. OLDHAM)  Just so the record is clear, Ms. Lawson,

 9    the exhibit that has been showing is V-4, Government's

10    Exhibit V-4.

11        And the last question I have before we break today,

12    Ms. Lawson, that I started to ask you was, do you recall that

13    when you were asked that question in the grand jury, you

14    paused and asked if you could step out and speak to your

15    attorney?

16    A.  I just read it, yes.

17    Q.  Okay.  And do you recall that happening?

18    A.  I don't recall, but I just read it, so --

19    Q.  Okay.

20         MS. OLDHAM:  Nothing further at this time, Your

21    Honor, just for purposes of today.

22         THE COURT:  I understand, I understand.

23         All right.  Ladies and gentlemen, we're going to

24    break for the evening at this point.  I'll ask that you be

25    back tomorrow at 9:30 ready to go.  Please remember again not

1   to discuss this case with anyone, including among yourselves.

2   And remember my instruction from this morning, I don't know if

3   there will be news coverage again today, but if there is, you

4   should affirmatively try to avoid anything that's discussing

5   this case.  All that you learn about this case needs to be

6   learned in this courtroom.  Enjoy your evening, and I will see

7   you tomorrow at 9:30.

8              (Jury left the courtroom.)

9              THE COURT:  All right.  Ma'am, I am instructing you

10  to be back here tomorrow at 9:30 to continue your testimony.

11  In the meantime, you are not to discuss this case with anyone.

12  Understand?

13             THE WITNESS:  Yeah.

14             THE COURT:  All right.  I'll see you tomorrow.

15             All right.  Monday, the 13th is the day that we're

16  taking off because somebody had a -- right.

17             MR. DAVIS:  I was, Your Honor.

18             THE COURT:  Okay.  That's fine, I just wanted to

19  make sure.  This is for the government, I'm just counting the

20  days.  I think there in voir dire at some point you suggested

21  that you had ten days worth of case.  Obviously we lost half a

22  day, if I count.  That takes it to the 28th.  Does that seem

23  about right?

24             MS. WILKINSON:  Yes, we're still on track for that

25  day, Your Honor.

1          THE COURT:  To rest on the 28th.

2          MS. WILKINSON:  Yeah, perhaps earlier, it's just

3   hard to say when witnesses will take a little longer than

4   other ones, but yes.

5          THE COURT:  Roughly on track as we sit here today.

6          MS. WILKINSON:  We're still on track even with the

7   delay.

8          THE COURT:  Okay.  Very well.  Anything else before

9   we break for the evening?

10          MR. DAVIS:  Nothing further on behalf of

11   Mr. Carter.

12          THE COURT:  All right.  Everyone have a good

13   evening.  I'll see you tomorrow.

14          (The proceedings were concluded.)

15

16          I, Christine Asif, RPR, FCRR, do hereby certify that
    the foregoing is a correct transcript from the stenographic
17   record of proceedings in the above-entitled matter.

                    _____/s/_____
18                     Christine T. Asif
                    Official Court Reporter
19

20

21

22

23

24

25

1                                    INDEX

2    Witness Name                                                    Page

3    Officer Aaron M. Cain

4        Direct Examination By Ms. Oldham...........................5

5    Travis Winder

6        Direct Examination By Ms. Oldham...........................8

7        Cross-examination By Mr. Davis ...........................22

8    Christopher Iber

9        Direct Examination By Ms. Wilkinson ......................25

10       Cross-examination By Mr. Mercer...........................56

11       Cross-examination By Mr. Zerkin ..........................70

12       Redirect Examination By Ms. Wilkinson.....................71

13   Detective Lee Robert Brandt, Jr.

14       Direct Examination By Ms. Wilkinson ......................74

15       Cross-examination By Mr. Mercer...........................145

16       Cross-examination By Mr. Davis ...........................170

17       Redirect Examination By Ms. Wilkinson.....................172

18   Antoinette King

19       Direct Examination By Ms. Oldham..........................175

20       Cross-examination By Mr. Trainor..........................179

21   Deanna Lawson

22       Direct Examination By Ms. Oldham..........................180

23

24

25

```
 1  < Dates >.              1 6:12, 65:17,          55:21, 86:3,
    2016, May 27              89:15, 89:25,          87:18, 105:1,
 2    143:18.                 90:1, 108:15,          169:9, 169:16,
    2018, January             108:20, 126:7,         208:18, 222:5,
 3    209:1.                  137:8, 141:12,         222:9, 222:11,
    August 23rd, 2016         152:19, 167:20,        222:12.
 4    223:6.                  167:22, 167:25.       16 26:21, 144:20,
    December 13, '19        1. 34:14, 64:14,         168:23.
 5    100:24.                 108:20.               170 230:31.
    December 2015           10 89:16, 113:6,        172 230:33.
 6    185:9.                  113:9, 120:10,        175 230:37.
    January '16               121:7, 128:10,        179 230:39.
 7    185:10.                 142:14, 167:4,        18 214:13.
    January 8th, 2020         168:17.               180 230:43.
 8    1:19.                  100 134:18, 213:10,    18:38 220:5.
    January, december,        225:17.               18:52 220:8.
 9    january 185:9.         101 1:48.              19 214:15.
    June 1st, 2016          1080 49:24.             19:53 220:13.
10    210:25.                1080P 87:16.           1:00 104:4.
    May 2016 193:8.          109 80:10.             .
11  May 27th 190:14,         109th 80:10,           .
      205:4, 208:10,           80:11.               < 2 >.
12    209:6, 211:7,          10:21 57:20.           2 18:22, 65:16,
      211:17.                11 61:7, 111:19,         65:17, 89:15,
13  May 27th, 2016 5:9,        112:4, 113:3,          89:25, 90:1,
      9:10, 88:5,             114:4, 120:11,         167:22, 168:4.
14    134:24, 195:11,        128:10, 143:21,       2. 59:12, 167:20,
      211:3.                  152:19, 152:20,         167:23.
15  May 28th, 2016           153:3, 156:15,        20 208:18, 212:17.
      219:24.                 166:22, 167:1,        200 134:19.
16  May 29th 212:16,         223:24.               2005 176:2.
      212:20, 212:21,       11. 152:21, 156:4,      2008 158:9, 158:13,
17    213:7.                  156:15, 166:23,         159:7.
    .                        166:25, 223:7,        2015 76:23.
18  .                        223:23.               2016 77:20, 80:7,
    < 0 >.                   112 194:16, 195:5.       80:12, 80:13,
19  00.29 137:5.            113 200:9.               81:15, 133:25,
    01. 152:18,             11:20. 55:19.            134:6, 135:5,
20    156:10.               12 182:3, 223:11.        143:18, 188:3,
    05 134:2, 135:5.        13 74:22, 140:3,         188:4, 188:19,
21  06 134:3.                 140:7, 140:8,          188:23, 190:16,
    06:00 89:10, 97:18,       140:9, 141:2,          193:11, 193:16,
22    98:2, 155:21.          141:5, 223:8,           205:10, 214:10.
    07:00 105:24.            223:24.                2016. 178:11.
23  07:30 89:10.            13th 103:14, 147:1,     2016H109 80:3,
    08 135:6.                 147:14, 228:15.         80:19.
24  08:00. 135:8.           14 140:3, 140:7.       2017 157:25.
    .                       145 230:29.            2018 209:1.
25  .                       14:13 140:6.           2018. 218:17.
    < 1 >.                   15 28:11, 55:19,       2019 8:25, 146:11.
```

```
1    2020 3:13.              37 168:9.               52 134:3, 134:4,
     2100 6:15, 6:17,        3:00 201:13.              134:12, 134:24,
2      6:18.                 3:30 208:14.              135:23, 136:20,
     21201 1:49.             3:45. 169:10.             137:21.
3    22 230:13.              3A 59:7, 59:10.         52,938/120,825
     2399 194:25, 195:7,     .                         136:19.
4      197:4, 197:8,         .                       53 134:4.
       197:12, 197:13,       < 4 >.                  54 141:1.
5      197:20, 198:1,        4 58:14, 59:11,         56 175:12, 230:19.
       198:4, 198:15,          59:18, 59:21,         5670 194:20, 197:12,
6      199:3, 199:14,          61:20, 61:22,           198:15, 199:2,
       199:20, 200:13,         62:2, 62:5, 62:6,       199:14, 199:20,
7      200:22, 200:25,         62:10, 62:12,           200:12, 202:11,
       202:1, 202:11.          63:8, 63:9, 64:7,       219:25, 220:5,
8    24 18:22, 46:23,          67:2, 68:15,            220:8, 220:14.
       46:24, 47:19,           68:21, 68:25,         57 142:14.
9      137:5, 137:6,           70:2, 70:11,          58 141:2, 141:5.
       137:21, 138:6,          89:11, 89:13,         59 135:6, 135:7,
10     150:25.                 89:25, 160:16,           135:9, 135:23,
     24-second 137:11.         160:25.                 136:6, 136:7,
11   25 230:17.              4. 59:23, 61:24,          136:9, 136:11.
     264 86:7.                 61:25, 63:16,         .
12   27 125:12, 134:2,         69:20.                .
       134:6, 135:5,         42 114:12.             < 6 >.
13     168:18, 191:22.       4200 150:5.            6 88:6, 88:19,
     270 76:16.              443 193:14.              89:15, 94:15,
14   28th 228:22,            4A 67:14, 67:15,         115:7, 128:12,
       229:1.                  67:17, 68:2,           158:5, 158:16,
15   29 10:17, 137:6,          68:4.                  159:5, 168:8.
       137:10, 137:21,       4BXC31 176:10.         6- 76:16.
16     138:6.                4C 52:11.              6. 42:6, 218:18.
     2900 9:13, 10:3.        4D 52:20.              683-5670 193:14.
17   2919 10:17.             4K 55:9.               6: 36:4.
     2921 10:17.             4s 59:25.              6:00 134:3, 134:18,
18   2:00. 116:11.           4th 1:48, 13:10,         140:4, 140:5,
     .                         14:25, 15:23.          155:6.
19   .                       .                      6:06 195:10, 195:11,
     < 3 >.                  .                         195:18, 196:3,
20   3. 58:8, 58:23,         < 5 >.                    197:2, 203:6.
       58:25, 68:16,         5 89:15, 116:11,       6:08 196:21,
21     113:22, 164:4,          123:5, 123:8,           197:2.
       164:8.                  128:12, 134:6,       6:11 197:4, 197:7.
22   30 85:18, 86:3.           143:21, 165:7,       6:14 67:7, 92:19,
     300 76:16.                166:9, 166:12,         93:8, 93:15,
23   30th 209:1,               166:21, 168:8,         95:20, 95:24,
       218:17.                 168:13, 168:17,        97:23, 98:6,
24   31st 89:4.                168:23, 173:14,        106:25, 140:9,
     32 218:17.                230:7.                  146:5.
25   35 175:24, 180:22.      5. 146:3.              6:14. 97:25.
     360 50:2.               500 76:6.              6:16 92:4, 92:19,
```

95:23, 96:2, 96:9,
98:10, 101:9,
102:1, 103:19,
105:7, 106:22,
106:25, 107:3,
114:9, 140:12,
140:17.
6:19 110:11, 110:13,
114:9, 197:12.
6:20 197:18.
6:20. 197:25.
6:23 197:25.
6:24 198:3, 198:7.
6:25 198:14.
6:26 199:2.
6:29 141:1,
163:23.
6:29. 163:23.
6:37. 167:8.
6:39 113:14,
114:9.
6:45 189:25,
190:9.
6:53 134:12, 134:24,
135:17, 135:23,
136:2, 137:21,
138:6, 152:7.
.
.
< 7 >.
7 89:16, 93:1, 93:3,
94:9, 94:10,
94:11, 94:14,
94:16, 94:18,
95:18, 96:7,
137:8, 144:4.
7- 142:9.
7. 95:5, 96:4,
96:13, 101:6.
70 230:21.
700 76:16.
71 230:23.
72 49:23.
720 87:18.
74 230:27.
7:00 189:15, 189:24,
189:25.
7:00. 190:11.
7:03 199:14.
7:05 105:25.

7:10 142:10, 142:11,
143:17, 152:8.
7:17 199:19.
7:19 7:8.
7:20 34:15, 88:5.
7:21 114:11, 115:4,
118:18.
7:23 138:17, 142:19,
142:21, 144:4.
7:23:16 139:3.
7:25 138:20.
7:25:16. 139:8.
7:27 119:22.
7:28 120:21,
121:4.
7:28. 164:16.
7:28:07 141:6.
7:29 121:14, 123:3,
125:9.
7:30 88:5, 134:18,
141:13, 141:14,
155:7, 189:16,
189:24, 208:14.
7:53 152:8.
7:56 125:10,
125:16.
7:57 130:11.
.
.
< 8 >.
8 88:6, 88:19,
89:16, 114:20,
114:21, 119:9,
128:13, 132:22,
133:19, 133:20,
230:11.
8. 96:6, 114:25,
133:18.
8.0 189:10.
80s 157:24.
82016 172:18.
84 185:13.
8480 185:13.
8:00 9:18, 135:9,
135:23, 136:5,
136:6, 136:7,
136:8, 136:11,
152:7.
8:12 10:2.
8:19 200:12,

200:18.
8:41 200:22.
8:44 200:25.
8:59 135:17, 136:2,
136:5.
.
.
< 9 >.
9 7:8, 89:16,
109:13, 112:18,
113:3, 113:21,
120:12, 122:19,
128:11, 140:22,
164:7, 164:10,
164:11, 164:12,
167:1.
90 152:2, 152:3,
152:4.
938th 136:20.
9:00 9:18.
9:30 227:25,
228:10.
9:30. 228:7.
9:34 201:18.
9:40 201:25,
202:8.
9:46 202:10.
9:48 203:4.
.
.
< A >.
A-10 12:22, 13:1.
A-11 13:4, 13:8,
22:14.
A-12 13:11, 13:16.
A-13 14:1, 14:7,
14:23.
A-14 15:4.
A-15 15:5.
A-16 15:9.
A-17 15:17.
A-18 15:21.
A-19 15:25.
A-20 16:3.
A-21 16:12.
A-22 16:15.
A-23 17:10, 17:18,
17:25, 19:17.
A-24 17:13.
A-25 17:21, 18:2.

A-26 18:5.
A-3 5:7.
A-35 19:15.
A-4 6:21, 6:23.
A-5 19:3, 19:4,
  19:13, 20:13.
A-7 11:10, 11:13,
  11:25.
A-8 11:25, 12:1.
A-9 12:15, 12:20.
A-n-t-o-i-n-e-t-t-e
  175:6.
A. 20:21.
A3-A 5:21.
Aaron 4:22, 230:5.
ability 44:9.
above 123:24.
absolutely 163:2.
abundantly 110:12.
accept 29:17,
  184:22.
accepts 29:15.
access 37:2, 79:1,
  86:19, 86:21,
  87:3, 153:15.
accident 40:24,
  45:9, 206:22.
accommodate 99:21.
accommodation
  119:23.
Accord 187:9,
  187:11.
accordance 15:11,
  15:22, 19:9,
  79:6.
According 52:16,
  198:10.
accordingly 134:21,
  154:11.
account 166:14,
  173:15, 173:16,
  173:18, 198:17,
  201:13, 201:14.
accurate 37:6,
  37:11, 96:15,
  103:21, 155:13.
accurately 90:1,
  140:14.
across 4:8, 4:9,
  46:21, 161:9.

acts 87:22.
actual 12:13, 31:24,
  37:21, 39:4,
  47:15, 50:7, 65:7,
  67:8, 84:1, 84:12,
  89:22, 97:13,
  98:15, 100:18,
  101:12, 101:19,
  103:8, 103:22,
  129:19, 137:13,
  140:2, 140:25,
  145:3, 152:11.
add 32:23, 96:25,
  137:21, 137:22,
  138:6, 138:17,
  140:6, 141:7,
  142:13, 142:15,
  143:20.
added 2:8, 94:17,
  105:10, 106:17,
  143:24.
addition 79:14,
  81:11, 178:7.
additional 37:17,
  84:8, 88:16,
  88:17.
address 13:9, 83:13,
  83:14, 83:15,
  102:15, 128:7,
  185:11, 187:7,
  219:13.
addresses 10:17,
  86:12.
addressing 100:7.
adjust 48:8, 74:6,
  175:2.
adjusted 104:1,
  110:19.
adjusting 95:3.
adjustment 92:22,
  93:1, 93:5, 93:19,
  93:24, 94:1, 94:4,
  94:23, 95:12,
  95:18, 103:3,
  103:7, 103:11,
  103:12, 106:11,
  106:18, 147:11,
  147:15.
adjustments 92:21.
adjusts 94:25.

administer 83:12.
administered 83:3.
admissibility
  103:17, 103:22.
admit 162:22.
Adobe 43:15.
adult 201:8.
advance 132:14,
  151:5.
advice 226:18.
advise 78:22, 83:21,
  95:5.
advised 93:1, 94:22,
  99:20, 101:6,
  103:13.
aerial 128:2,
  128:22, 129:9.
affirmative 4:15.
affirmatively
  228:4.
afternoon 116:24,
  116:25, 145:19,
  145:23, 145:24,
  169:5, 169:8,
  174:20, 175:11,
  180:20.
Agent 31:15, 31:24,
  32:9, 42:11,
  42:12, 42:13,
  45:1, 48:15,
  51:18, 52:16,
  54:5, 58:9, 60:17,
  61:18, 62:9, 70:7,
  73:12, 117:10,
  118:11, 148:11,
  161:1.
aggravated 75:4.
ago 53:16, 54:17,
  110:24, 183:2,
  184:4, 191:1,
  191:3, 203:15.
agree 61:2, 97:18,
  99:12, 147:20,
  162:20, 209:18,
  209:21.
agreed 159:6, 159:8,
  162:16.
agreement 148:22,
  149:2.
aid 106:18.

1    alert 2:10.
     alerted 2:6.
2    align 33:19, 34:1,
       34:4, 37:5,
3      37:8.
     aligned 34:4, 34:5,
4      34:10, 37:4.
     alignment 37:10.
5    alleyway 12:13,
       12:14.
6    allow 29:19, 40:21,
       45:19, 65:21,
7      86:21, 87:2,
       149:9, 162:15.
8    allowed 29:20,
       86:20, 226:17.
9    allowing 165:15.
     allows 76:21.
10   Almost 8:21, 26:23,
       48:7.
11   alphabetical 55:5.
     already 4:1, 10:4,
12     78:23, 96:12,
       98:22, 159:18,
13     166:15, 198:12,
       209:22, 209:24,
14     210:8.
     although 118:12.
15   Altima 18:4, 21:1.
     AMERICA 1:5.
16   among 55:20, 116:13,
       169:11, 172:12,
17     228:1.
     amongst 58:11.
18   amount 35:18, 50:2,
       85:18.
19   analog 30:17.
     analytics 75:7.
20   analyzed 70:22.
     anatomy 27:11.
21   anchored 149:4.
     angle 15:10, 35:5,
22     35:12, 36:14,
       47:4, 91:20,
23     109:10, 109:17,
       114:19, 121:6,
24     121:12, 122:25,
       123:4, 123:5,
25     126:1, 126:5,
       127:23, 129:12,

     131:2, 132:21,
     140:20, 144:25,
     145:10, 166:20.
angles 34:24, 40:7,
     43:17, 45:5,
     61:21, 62:17,
     88:17, 88:20,
     91:4, 91:19,
     112:20, 128:18,
     144:12, 163:21.
angry 198:19.
Answer 10:9, 101:6,
     148:5, 171:9,
     197:19, 200:2,
     200:4, 200:20,
     200:23, 201:5,
     201:19, 202:19,
     209:3, 209:7,
     210:5, 222:25,
     225:12.
answered 60:22,
     86:24, 197:10,
     223:16, 224:10.
answering 205:21.
answers 210:4.
Antoinette 174:19,
     174:22, 175:4,
     230:35.
anyway 99:16.
apart 131:15.
Apartments 77:24,
     83:16, 88:24,
     129:21.
apologize 36:4,
     99:3, 137:25,
     138:23, 160:20.
apparent 147:14.
appear 19:24,
     123:18.
appeared 146:8.
appears 53:17,
     61:14, 62:7,
     168:13.
applicable 85:23.
applying 21:23,
     152:15.
appreciate 26:11.
Approach 42:18,
     92:14, 146:12,
     146:13, 146:16,

     158:21, 158:22,
     165:11, 191:13,
     209:11, 224:18.
approached 88:16.
appropriate
     226:19.
approved 32:1.
Approximate 28:10,
     94:4, 94:17,
     101:4, 103:18,
     105:12, 106:15,
     106:23, 120:1,
     138:2, 138:4,
     139:3, 142:4,
     142:25, 144:5.
Approximation
     101:22, 144:1,
     144:9, 144:10,
     166:11, 166:12.
approximations
     166:6.
Arbor 178:3, 185:13,
     187:7, 187:21,
     189:19, 189:23,
     190:3, 198:8,
     206:12.
archives 172:25.
Area 12:9, 15:3,
     17:15, 19:1,
     19:15, 20:9, 21:3,
     21:9, 21:12,
     21:16, 23:16,
     28:21, 33:1,
     50:15, 122:18,
     126:5, 126:11,
     127:24, 128:23,
     144:13, 145:2,
     163:5, 182:10.
areas 19:19,
     29:21.
argument 226:14,
     226:15.
arm 179:7.
Around 9:19, 42:7,
     49:14, 57:9, 67:7,
     88:17, 111:4,
     123:2, 126:19,
     129:4, 141:13,
     145:22, 178:19,
     185:10, 189:15,

189:25, 190:9, 208:9.
arrangement 38:25.
arrive 9:20, 14:14, 14:16, 213:17, 213:22, 216:15.
arrived 10:3, 10:24, 12:18, 12:24, 120:7, 160:6, 208:19, 213:25, 214:1.
arriving 143:1, 144:6, 213:7.
article 2:13.
Ashburne 71:8, 77:19, 83:8, 84:10, 87:5.
aside 126:9.
Asif 1:46.
asks 21:3.
asleep 202:13, 202:25.
assaults 75:4.
assertion 96:14.
assigned 31:15, 31:17, 75:9, 80:4, 80:6, 81:8, 87:2.
assist 20:5, 27:10, 27:22, 29:3, 30:24, 45:20, 75:18, 76:14, 132:8, 190:12.
assistance 34:12, 75:6.
assisting 41:1.
associate 145:9.
associated 28:18.
Association 28:19.
associations 28:17.
assume 56:2, 58:9, 61:18, 62:10, 62:14, 69:3, 99:9, 101:15, 153:16, 158:11, 158:15, 191:5, 191:7, 191:17, 195:15, 197:22, 198:19, 216:15, 217:2,

219:7, 219:10, 224:21.
assumed 68:24, 96:5.
Assumes 111:21.
Assuming 69:25, 222:11.
assumption 160:24.
assuring 32:12.
Atlantic 77:10.
attempt 37:4, 197:7, 199:15, 200:12.
attempted 37:8, 47:9, 200:15.
attempting 5:5, 197:13.
attended 26:24.
attention 4:6, 9:9, 14:5, 34:11, 34:16, 107:15, 115:24, 131:15, 167:9, 170:4, 178:10, 186:13, 188:2.
Attorney 147:12, 148:15, 217:19, 217:20, 218:2, 225:6, 225:11, 225:20, 225:23, 225:25, 226:9, 226:18, 227:15.
Audio 5:22, 157:23.
Audis 69:2, 69:3, 70:3, 158:9, 159:1, 159:23, 160:25.
August 226:10.
aunt 213:13, 213:14, 213:18, 215:22, 216:6, 216:9, 216:11.
AUSA 1:25, 1:27.
authentic 32:12.
authenticate 163:8.
authenticated 163:6.
authenticity 30:5, 32:11.

automatically 85:16, 153:20.
Avenue 9:14, 9:20, 10:3, 10:18, 109:21, 115:6, 115:13, 118:25, 119:10, 119:11, 119:14, 121:8, 122:15, 124:5, 124:9, 124:19, 128:7, 128:8, 129:9, 129:17, 129:24, 130:19, 132:22, 141:24, 142:5, 142:18, 143:2.
avoid 83:19, 228:4.
aware 96:4, 102:5, 112:7, 146:18, 178:25.
away 2:9, 2:24, 4:15, 14:17, 21:22, 35:18, 43:7, 97:14, 212:12, 219:2, 219:3.
.
.
< B >.
B-14 144:5.
B-r-a-n-d-t 74:9.
B. 1:39.
babe 202:12.
baby 215:6, 215:7.
bachelor 26:18.
background 6:7, 26:16, 36:21.
bad 99:16, 226:19.
Baltimore 1:20, 1:49, 2:14, 8:18, 8:20, 9:2, 9:14, 74:19, 74:20, 74:24, 75:2, 75:10, 76:20, 77:7, 80:4, 80:17, 82:16, 83:1, 87:15, 190:4, 190:5, 190:6, 190:7, 191:10,

210:25, 211:4, 213:15.
bam 210:5.
base 13:24.
baseball 38:5, 40:17.
based 104:8, 105:11, 160:25.
basic 18:25.
Basically 12:3, 12:16, 12:23, 13:5, 13:12, 14:8, 16:13, 19:5, 19:8, 19:22, 21:5, 48:6, 75:15, 83:19, 88:1, 138:20.
Basis 66:21, 72:8, 163:1.
bathroom 99:15, 99:20.
Bay 167:18, 168:14, 168:15.
Beach 204:9, 206:3, 206:16, 206:24, 212:10, 212:12, 215:19, 218:6, 218:22, 219:11, 219:18, 219:21.
Beach. 205:15.
bear 32:22.
become 95:21.
becomes 37:1.
bedroom 186:18.
bedrooms 186:15.
beforehand 115:10.
began 118:18, 125:13, 164:10, 193:4.
begin 56:21, 117:4, 182:12, 192:12.
beginning 54:15, 60:13, 64:20, 67:6, 91:1, 97:17, 99:4, 105:5, 105:22, 109:4, 125:8, 129:7, 129:23, 136:1, 152:25, 153:6, 157:11, 168:22, 172:18, 173:2.
begins 92:19, 123:2.
behalf 229:10.
behind 106:16, 125:1.
believe 3:22, 6:5, 36:18, 57:2, 58:1, 58:7, 67:4, 67:25, 78:7, 88:5, 89:11, 89:13, 117:3, 132:22, 152:14, 167:4, 168:12, 178:6, 178:9, 178:14, 204:8.
believed 10:16.
Bell 77:10, 219:20.
belong 13:6, 38:13.
belonging 13:2.
below 51:15, 52:18, 54:13, 81:8, 81:20, 82:6, 82:11, 83:13, 83:17, 84:18, 85:3, 85:12, 123:1, 132:24, 134:5, 134:10, 137:10, 139:2, 139:22, 140:24, 143:15.
Bench 42:20, 92:17, 146:14, 158:23, 164:24, 165:12, 209:14, 224:19.
Best 42:2, 43:7, 50:18, 51:13, 91:20, 219:20.
better 41:12, 85:25, 87:11, 106:6, 126:23, 128:16, 130:6, 132:4, 132:11, 165:16, 197:19.
beyond 101:24.
bias 226:7, 226:15.
big 15:8, 15:19, 50:5, 89:19, 95:5, 95:11.
bike 196:1.
Billing 181:3, 188:24.
bills 186:20.
binder 5:20, 181:4.
biological 9:6.
biomedical 26:18.
birth 6:4.
bit 43:8, 43:20, 64:9, 123:3, 151:11, 161:23, 169:10, 175:3.
bitch 201:4.
Black 6:14, 103:6, 105:7, 110:10, 110:13, 173:15.
blank 97:10.
blizzard 3:12.
block 9:13, 10:3, 16:14, 16:16, 17:5, 17:7, 17:22, 18:6, 19:22.
blood 13:19, 13:24, 14:8, 15:6, 15:11, 15:13, 20:10, 20:20.
blow 51:12.
blowup 89:23.
blue 168:15, 171:22, 181:19, 183:14.
blur 40:13.
board 44:8.
book 42:25, 43:3, 137:2.
bookends 152:25, 153:5.
Booking 75:9.
boom 151:11.
born 182:4.
bottom 13:23, 14:9, 15:12, 49:7, 51:3, 53:4, 53:11, 53:18, 53:22, 54:21, 55:7, 61:7, 62:6, 97:6, 108:14, 115:3, 115:11, 133:5, 172:11, 172:16, 191:22.

boy 25:22.
boyfriend 177:17,
    177:18.
BPI 49:23.
brain 33:23.
brake 46:15.
Brandt 52:8, 73:21,
    74:1, 74:8, 74:14,
    78:14, 91:9,
    93:17, 95:1, 96:3,
    96:10, 101:1,
    102:4, 102:19,
    103:4, 103:13,
    107:9, 107:16,
    114:18, 118:15,
    125:10, 125:21,
    127:13, 129:18,
    131:4, 131:18,
    148:12, 166:15,
    230:25.
break 46:9, 55:15,
    55:18, 56:5, 56:6,
    99:15, 99:16,
    99:20, 99:21,
    99:22, 103:24,
    118:22, 118:25,
    169:5, 169:8,
    169:15, 227:11,
    227:24, 229:9.
breaking 104:4,
    116:4.
breaks 134:16,
    134:20, 182:20,
    182:21.
brief 10:11, 97:9.
Briefly 2:9, 22:9,
    34:13, 74:23.
brighter 48:9.
Bring 3:5, 30:23,
    41:9, 48:8, 48:11,
    48:17, 57:9, 67:1,
    67:11, 104:19,
    159:19, 169:18,
    224:18, 226:17.
bringing 22:14,
    161:6.
broad 40:19,
    78:13.
broke 105:4,
    118:15.

broken 38:1.
brother-in-law
    154:17.
brush 21:23.
build 155:17.
building 36:21.
buildings 122:21.
built 85:14.
bullet 45:13.
bumper 46:17.
bunch 88:19.
Bureau 26:3, 27:9,
    27:22, 31:12.
bushy 221:22.
business 77:12,
    77:13, 78:18,
    82:13, 82:17,
    84:5, 94:17,
    95:23, 150:24,
    202:2.
businesses 75:18,
    82:19, 82:21,
    84:22, 150:22,
    154:16.
busy 62:25, 76:17.
button 61:7.
.
.
< C >.
C-10 176:13,
    187:15.
C-11 176:13.
C-16 220:17, 221:9,
    221:11, 221:24.
C-18 219:24.
C-19 221:14,
    221:19.
C-21A 185:16,
    185:17.
C-21B 185:17,
    185:18.
C-26 219:16.
C-8 176:7, 176:8,
    176:9, 187:13,
    187:14.
C-9 176:13,
    187:14.
C3 159:21.
C6 158:9, 158:14,
    159:7.

C7 158:13.
C8 159:21.
cabling 77:14.
CAD 6:24, 7:6,
    81:2.
Cain 4:22, 5:3, 5:5,
    6:2, 6:22, 7:9,
    10:8, 10:11,
    12:17, 12:19,
    12:23, 230:5.
calculate 105:11,
    106:1, 132:13,
    140:1, 142:4,
    143:14.
calculated 149:3.
calculation 106:7,
    114:12, 137:15,
    147:18.
calendar 190:15,
    212:18, 212:20.
call 3:16, 5:8,
    6:19, 7:7, 11:16,
    18:16, 30:21,
    32:22, 38:2, 46:6,
    48:6, 50:17,
    73:21, 168:5,
    183:14, 184:3,
    184:5, 184:11,
    193:5, 197:7,
    197:13, 198:1,
    198:3, 199:15,
    200:15, 202:9.
called 4:23, 8:4,
    9:13, 25:16,
    31:23, 48:4, 74:2,
    76:1, 76:5, 76:15,
    76:24, 78:17,
    94:9, 94:11,
    123:9, 171:22,
    172:25, 173:13,
    174:23, 180:7,
    203:5.
calling 120:15,
    120:16, 155:23,
    197:4, 199:21,
    200:2, 200:4,
    203:9.
calls 25:11, 95:23,
    183:17, 184:22,
    195:6, 198:4,

199:13.
Calm 202:12.
cams 82:22.
canvass 90:23.
capacity 27:4,
  87:11.
capture 47:20,
  79:17, 79:19,
  79:21, 84:12,
  85:22, 86:21,
  144:14.
captured 30:12,
  33:7, 34:3,
  108:16.
captures 33:20.
capturing 36:17,
  109:10, 112:3,
  152:9.
cards 137:1.
care 186:20,
  186:22.
carrier 155:2.
cars 82:23, 131:15,
  131:16, 157:24,
  187:10.
cases 27:22, 27:23,
  31:13, 76:2,
  76:11, 76:13,
  82:19, 87:6,
  87:13.
categories 32:10,
  32:16.
category 84:4.
caused 44:7.
caution 2:8, 3:18,
  4:1.
cautious 3:20.
CC 11:16, 11:18,
  80:23, 80:24.
CCTV 75:17, 83:8,
  83:9, 171:3,
  171:10, 171:12,
  171:14.
Cctvs 170:24.
Cds 78:7.
cell 36:3, 95:22,
  138:3, 154:21,
  155:1, 177:4,
  179:24.
center 12:19,

20:24.
central 80:24,
  81:3.
certain 33:13,
  33:24, 48:11,
  72:18, 78:16,
  95:23, 106:5,
  118:12, 132:10,
  152:15, 155:3,
  159:22.
Certainly 4:4, 5:13,
  5:19, 23:10,
  103:17, 103:20,
  149:1, 210:6.
chain 32:3.
chair 180:11.
challenged 135:11.
change 4:13, 38:24,
  48:9, 66:18, 93:4,
  108:21, 202:5.
changed 37:8, 95:4,
  100:14, 100:17,
  100:18, 101:12,
  152:22, 195:4.
changes 158:6.
channel 4:14.
characteristic
  40:21, 41:2,
  45:24, 64:19,
  64:24, 65:19,
  65:24.
chart 34:6, 89:19.
check 67:24, 135:13,
  142:9, 154:24,
  170:23, 170:24.
checking 145:13.
Chesapeake 167:18,
  168:14.
children 175:17,
  175:19.
choose 36:14.
chopped 86:3.
chose 35:5,
  151:25.
Chris 100:25.
Christine 1:46.
Christopher 1:33,
  25:12, 25:15,
  25:21, 230:15.
chunk 135:20,

135:21, 136:11.
chunks 134:16,
  134:21.
cigarettes 20:11.
circle 15:1, 67:16,
  68:5, 170:15.
circled 67:20.
circling 133:8.
City 9:14, 74:19,
  74:20, 75:2,
  75:10, 75:20,
  76:20, 77:7, 80:4,
  80:17, 82:16,
  83:1, 83:2, 83:3,
  83:10, 83:11,
  87:15, 87:17,
  87:20, 171:6,
  171:8, 171:11,
  171:12, 171:20,
  171:21, 171:22,
  190:5, 191:10,
  210:25, 213:15.
clarify 60:18,
  71:5.
classes 26:24, 27:9,
  27:11.
clear 45:22, 52:5,
  53:3, 56:21,
  58:13, 59:1,
  60:21, 62:11,
  97:11, 99:6,
  101:21, 103:18,
  103:19, 104:13,
  110:12, 151:20,
  172:14, 173:8,
  173:12, 199:3,
  227:8.
clearer 50:11,
  95:21.
CLERK 8:1, 8:7,
  8:11, 25:13,
  25:19, 25:23,
  41:16, 73:24,
  74:5, 74:10,
  99:14, 100:3,
  174:20, 175:1,
  175:5, 175:8,
  179:25, 180:4,
  180:10, 180:14,
  180:16.

click 135:22,
173:2.
Clifton 1:10, 1:35,
179:16.
clip 53:15, 54:16,
57:14, 60:13,
61:1, 103:2,
103:8, 105:12,
107:2, 115:4,
134:23, 134:24,
135:1, 135:18,
135:20, 135:21,
136:4, 136:12,
136:13, 136:20,
137:8, 139:3,
143:4, 143:16,
163:22, 163:23,
164:1.
clips 71:17, 96:12,
103:6, 106:19,
110:22, 113:1,
114:8, 142:18,
149:14, 160:3,
163:13, 164:9.
Close 107:18,
175:25, 215:16.
close-up 15:18.
closed 150:25.
closed-circuit
75:17, 171:14.
closer 14:19,
17:11.
closet 153:14.
clothing 27:12,
30:18.
code 6:12, 6:13.
Coding 180:24,
181:1, 181:2,
181:6, 181:7.
colleagues 27:19.
collect 150:1.
color 38:25, 40:25,
45:16, 48:10,
66:6, 176:3.
column 67:25, 68:6,
189:10, 194:17,
194:23.
comes 6:25, 51:16,
86:8, 102:25,
103:6, 104:14,

143:5, 143:15,
158:19, 162:19.
comfortable 37:10,
103:15.
coming 78:24,
107:22, 108:8,
113:19, 113:20,
115:25, 119:7,
120:19, 121:18,
122:5, 123:25,
124:14, 128:8,
129:6, 129:11,
129:14, 129:23,
130:1, 130:9,
131:9, 162:13.
comment 165:24.
Committees 28:21.
Common 139:14.
communicate 183:4.
communicated 42:14,
182:22.
communication 6:18,
31:20, 31:24,
62:23, 63:19,
68:25, 69:1, 70:1,
198:14, 201:12.
communications
26:19, 183:15.
community 128:5.
comp 188:5.
company 77:10,
187:2, 187:3.
comparative 37:16,
37:18, 39:17,
47:9.
compare 37:19,
37:20, 37:21,
37:25, 40:6,
61:19, 64:6,
68:10, 68:11,
69:4, 87:12.
compared 63:16,
154:22.
comparing 39:3,
65:17, 68:18,
69:2, 70:2,
153:25.
Comparison 30:15,
37:23, 37:24,
45:19, 51:22,

59:12, 62:15,
64:10, 64:25,
65:2, 65:5, 66:11,
68:13, 68:15,
69:4, 69:23,
73:5.
comparisons 69:6.
compensation
188:7.
compilations 112:19,
161:10.
complaint 80:24,
81:3.
complete 179:24.
completed 7:20,
25:7, 73:17,
88:23, 174:12.
completely 227:3.
complex 43:18, 78:3,
82:20, 170:6.
complicated 109:3.
complications
83:19.
Complying. 214:16,
218:19, 223:10,
223:12.
compression 86:5,
86:6.
computed-aided
81:2.
computer 7:3, 7:4,
77:14, 82:3,
84:17, 84:25,
93:13, 133:16,
153:12, 153:21,
153:24, 165:8,
165:14, 165:22,
165:25.
computer-assisted
6:25.
computer-generated
19:8.
computers 27:15,
82:24.
concept 48:10.
concern 3:16,
205:13, 208:3.
concerned 102:9,
102:22.
concerns 204:22,

205:23.
concluded 154:3.
concluding 118:17.
conclusion 30:25,
 45:20, 63:15,
 65:3, 69:8,
 69:10.
conditions 21:17.
conducive 33:13,
 34:25, 35:13,
 36:15, 36:22,
 37:12.
conducted 76:6.
cone 14:9, 14:11,
 14:20, 16:7.
cones 14:15.
conference 42:20,
 92:17, 93:18,
 146:14, 158:23,
 165:12, 209:14,
 224:19.
conferences 26:24.
confirm 59:22.
confuse 147:15.
confused 172:15.
confusing 49:17,
 147:7, 147:17.
connected 153:11,
 153:13.
connection 31:3,
 33:1, 35:3, 35:10,
 35:15, 36:8, 40:2,
 41:4, 71:14,
 77:19, 81:12,
 81:18, 83:7, 92:7,
 126:10, 153:17.
Consent 83:17,
 83:20, 83:23.
consider 85:8.
consideration
 154:2.
considered 44:14,
 84:15.
considering 81:11.
consistency 79:20.
consistent 46:21,
 47:3, 47:24, 52:1,
 158:8, 168:15,
 169:1, 221:20.
consistently

182:19.
constant 79:23,
 138:3, 155:2.
consult 145:14.
consumption
 150:22.
contact 195:18,
 200:12, 204:14.
contacted 88:2.
contacts 200:11.
contained 85:20,
 95:13.
content 100:13,
 165:9, 166:5,
 166:10.
context 78:6,
 95:24.
continue 4:18,
 29:25, 35:25,
 99:17, 99:23,
 111:1, 114:25,
 115:22, 118:21,
 119:12, 122:22,
 123:13, 124:2,
 124:21, 125:5,
 125:16, 126:15,
 130:21, 133:23,
 228:10.
continuing 27:5,
 131:9, 167:7.
continuous 57:24,
 60:14, 61:16,
 134:15.
contrary 69:25.
control 83:12,
 156:7.
convenient 169:4,
 169:6, 169:7.
convention 97:6,
 98:2, 102:6,
 102:25, 106:1,
 110:23, 132:9,
 132:11, 133:14,
 134:22, 152:21,
 152:23, 154:9,
 172:10.
conversation 99:17,
 99:23, 184:6,
 184:10.
conversations 56:3,

184:7, 184:8.
convoluted 149:3.
cooking 212:23.
copies 5:11,
 133:21.
copy 6:22, 42:25,
 43:2, 58:23, 98:9,
 119:5, 214:10.
core 139:14.
corner 11:21, 13:23,
 49:8, 50:7, 50:14,
 51:3, 52:21, 53:4,
 53:19, 53:22,
 54:23, 55:2, 55:5,
 55:7, 106:3,
 108:14, 115:3,
 115:11, 123:1,
 154:16.
Corolla 187:9,
 187:11, 198:24,
 198:25, 216:10,
 216:12.
corrected 147:9.
correcting 140:8.
correctly 32:22,
 70:20, 100:8,
 108:7, 143:22,
 153:2, 163:18.
correspond 60:10.
corresponds 62:4.
couch 202:13,
 202:25.
Counsel 2:6, 2:10,
 23:8, 25:1, 41:23,
 55:23, 70:16,
 101:6, 101:10,
 103:13, 103:18,
 114:24, 118:12,
 127:19, 145:14,
 147:13, 147:22,
 148:10, 148:22,
 169:25, 223:5,
 223:25.
count 136:22,
 136:23, 228:22.
counting 228:19.
country 31:7.
County 190:6,
 190:7.
couple 50:17, 87:19,

149:6.
course 27:24, 31:25,
  32:3, 65:12,
  75:10, 76:4,
  85:25, 87:20,
  92:16, 129:17,
  131:14, 132:6,
  147:22, 148:24,
  158:22, 167:3,
  209:13.
court. 43:5, 99:18,
  149:10, 163:10,
  166:7, 210:16,
  227:7.
courtesy 147:22.
courtroom 2:13,
  2:23, 4:3, 4:17,
  181:15, 228:6.
courtroom. 3:6,
  55:22, 56:10,
  99:25, 104:20,
  116:14, 116:22,
  169:13, 169:19,
  228:8.
Courts 29:4.
cover 94:24, 99:7,
  99:9, 100:9,
  198:18.
coverage 4:7,
  228:3.
covered 90:14,
  184:9, 211:6,
  211:20.
covering 4:14.
covers 163:13.
cowboy 38:5, 38:9,
  38:11, 40:18.
create 18:25, 19:13,
  32:8, 79:14,
  110:16.
created 19:5, 19:7,
  19:8, 19:9, 44:5,
  79:15, 79:16,
  79:21, 94:19,
  100:16, 101:15,
  146:19, 148:8,
  149:12, 149:19.
creates 152:9.
creating 96:11,
  148:6.

creation 99:9.
credit 29:24.
Crime 7:24, 8:17,
  8:19, 9:1, 9:3,
  9:4, 9:5, 9:11,
  10:6, 11:2, 11:5,
  13:16, 16:22,
  18:24, 30:11,
  33:1, 75:8, 76:2,
  81:7, 90:14,
  90:20.
crimes 82:3.
CRIMINAL 1:9.
cropped 50:15.
Cross 22:8, 25:1,
  55:12, 70:16,
  94:6, 96:19,
  96:24, 98:3,
  101:23, 103:20,
  145:16, 159:16,
  159:19, 159:21,
  160:2, 162:11,
  162:15, 163:3,
  165:21, 222:6.
Cross-examination
  7:11, 7:15, 22:10,
  56:17, 70:17,
  145:17, 160:24,
  170:2, 179:9,
  179:14, 230:13,
  230:19, 230:21,
  230:29, 230:31,
  230:39.
crossing 124:24.
crying 6:8, 6:10.
curb 13:19, 13:25,
  15:7, 20:20.
curbs 36:20.
current 85:4, 85:10,
  96:7.
Currently 8:17,
  26:3, 27:21,
  28:19, 75:8.
cursor 137:5,
  137:10.
curtesy 118:14.
custody 32:4.
custom 38:23, 38:24,
  40:23, 45:7.
cut 16:17, 17:3,

19:16, 220:14,
  221:5, 221:10,
  221:24.
cuts 201:15.
Cyber 75:8.
.
.
< D >.
D-e-a-n-n-a
  180:13.
damage 38:23, 40:23,
  45:9.
damaged 87:22.
damn 197:20.
dash 82:22.
dashes 85:21,
  86:22.
data 85:18, 134:16,
  134:19, 135:21,
  135:22, 150:21,
  152:5.
date 6:3, 11:17,
  79:3, 79:5, 81:20,
  82:6, 82:8, 84:22,
  85:3, 85:4, 85:7,
  85:8, 85:9, 85:10,
  88:3, 89:2, 97:6,
  105:19, 105:21,
  106:3, 134:6,
  134:23, 134:25,
  135:15, 137:18,
  151:20, 173:1,
  178:13, 182:17,
  218:11.
dated 219:24.
dates 190:12.
dating 178:12,
  182:12.
daughter 176:4,
  176:17, 176:20,
  177:16, 177:23,
  178:7, 178:11,
  178:15, 178:18.
Davon 1:10, 1:29,
  177:13, 177:24,
  178:8, 178:16,
  181:11, 182:1,
  182:8, 190:21,
  203:5, 207:12,
  215:13, 221:16.

```
 1   Day 1:10, 7:21,           63:19, 68:25,            30:16, 30:19,
        25:8, 61:10,              69:1.                    37:20, 37:22,
 2      61:11, 73:18,         definitely 104:9,           91:3, 112:25,
        97:15, 134:3,            132:15.                   113:12, 113:19,
 3      135:5, 174:12,        definition 50:9,            115:6, 119:6,
        179:22, 182:24,          87:10, 151:1.             131:17, 144:13,
 4      190:15, 190:16,       degree 26:18, 26:23,        144:20, 185:17,
        199:6, 203:22,           27:8.                     185:20, 187:15,
 5      203:24, 203:25,       delay 26:8, 43:23,          221:11, 221:14,
        204:3, 204:7,            96:10, 102:6,             221:19, 221:23,
 6      208:14, 213:9,           102:7, 151:9,             222:18.
        218:6, 218:21,           151:12, 155:22,       depicting 12:2,
 7      218:24, 227:6,           229:7.                    90:9.
        228:15, 228:22,       delve 147:18.           depiction 126:23.
 8      228:25.               demanding 198:23.       depicts 14:24.
     days 44:13, 44:14,       demonstrating          derivative 32:7.
 9      85:18, 189:11,           73:10.               describe 67:22,
        199:8, 228:20,        demonstrative 35:7,        91:17, 181:18.
10      228:21.                  36:7, 41:5, 44:8,    described 48:5,
     Ddcarter0707@gmail.c        100:16, 101:8,          70:6, 110:23,
11      om 219:14.               101:14, 101:15,         132:9, 156:21,
     Ddrs 85:6.                  101:18, 102:8,          184:15.
12   deal 32:15.                 103:10, 104:10,     describing 112:2.
     dealing 125:12.             104:14, 106:6,      description 6:24.
13   dealings 154:15.            128:18, 140:19,     descriptions
     Deanna 175:21,              147:9.                  39:24.
14      175:23, 176:21,       demonstratives         descriptors
        180:3, 180:6,            71:17.                  113:18.
15      230:41.               denote 86:22,          design 66:18, 158:6,
     December 103:14,            150:19, 151:3,          159:4, 159:6,
16      146:9, 147:1,            151:15, 152:24,         159:11, 162:5,
        147:14.                  154:25.                 162:25.
17   decent 150:13.           denoted 89:23.         desk 153:15.
     decide 29:24.            denotes 134:23.        desktop 153:13,
18   decisions 3:15.          Department 8:18,           153:15, 153:16,
     deck 136:25.                8:20, 9:2, 74:19,       153:20, 153:21.
19   deep 107:19.                74:21, 74:24,       destruction 81:1.
     default 108:20,             76:4, 77:10, 80:5,  detail 74:23, 128:5,
20      152:18, 156:10.          80:17, 80:25,           157:20.
     defaults 152:15.            81:4, 191:10,       detailed 6:24,
21   Defendant 1:29,             210:25.                 7:6.
        1:35, 58:25, 59:7,    department-issued      detection 150:23.
22      59:20, 61:24,            138:3, 154:21.      detectives 75:7,
        146:2, 181:23.        departmental-issued        75:16, 82:2, 88:1,
23   Defendants 1:12,            155:1.                  173:6, 212:3.
        42:22.                depending 151:8.       detects 151:2.
24   defense 28:15,           depends 190:1.         Detention 75:9.
        41:23, 78:7,          depicted 12:25,        determination 40:22,
25      127:18, 147:13.          13:8, 13:15,            159:17, 160:6,
     defined 62:22,              17:18, 17:24,           160:11, 160:12,
```

160:14.
determinations
70:21, 72:2.
determine 10:10,
29:23, 30:6, 64:3,
70:8, 153:10,
154:14, 156:24,
159:17, 160:10.
determined 153:20,
155:22, 161:16.
determines 21:15.
determining
157:16.
device 18:15, 18:17,
18:18, 18:19,
133:16.
devices 18:14.
diagonally 23:12.
diagram 18:25, 19:1,
19:5, 19:7,
19:8.
difference 38:4,
70:10, 87:14,
92:6, 92:8, 92:11,
94:15, 104:10,
106:12, 119:24,
120:1, 165:9,
165:15, 166:6,
210:6.
differences 38:6,
38:17.
differential 93:20,
94:18, 106:15,
140:11, 144:6,
148:14, 155:11,
166:15, 173:16.
differentiate
65:14.
difficult 69:6.
difficulty 35:14,
48:22.
Digital 27:13, 29:2,
29:16, 30:17,
35:20, 48:10,
49:12, 49:16,
49:19, 50:5,
75:11, 76:3,
76:18, 76:24,
77:18, 78:15,
78:18, 82:22,

88:10, 157:23.
digitally 50:6,
50:16.
dinner 212:24,
213:5, 213:8,
213:12, 213:17,
216:5, 216:9.
dinners 213:1.
dire 29:14,
228:20.
Direct 5:1, 8:12,
9:9, 14:5, 25:24,
34:11, 74:11,
147:4, 161:5,
170:4, 173:13,
173:17, 175:9,
178:10, 180:18,
186:13, 188:2,
194:15, 222:11,
223:23, 227:4,
230:7, 230:11,
230:17, 230:27,
230:37, 230:43.
directed 10:15,
12:17, 13:1,
22:20, 23:21,
24:13, 170:5.
Directing 24:16,
34:16.
direction 18:7,
81:17, 90:15,
107:21, 119:6,
120:18, 124:14,
130:17, 131:12,
143:9.
directly 23:12,
83:4, 153:23,
171:8.
disagree 226:20.
disagreement
224:2.
discovered 10:8,
12:24.
discovery 93:13,
95:19, 97:25,
99:2, 103:10,
148:24, 149:2.
discuss 7:19, 25:6,
55:20, 73:16,
116:12, 116:16,

164:23, 165:4,
169:11, 169:14,
174:11, 179:23,
183:18, 183:25,
228:1, 228:11.
discussed 147:6.
discussing 146:8,
228:4.
discussion 196:9.
disk 152:12.
disks 91:1, 173:6.
dispatch 5:8, 6:3,
6:25, 81:2.
dispatched 9:16.
dispatcher 6:11,
6:19, 7:1.
display 151:22,
156:11.
displayed 79:5,
105:19, 151:25.
dissimilar 69:13.
distance 26:6.
distances 3:17.
distinction 164:25,
165:2, 165:5,
165:25, 166:1.
distinguish
131:25.
distinguishing
39:19, 69:16.
distortion 157:21.
District 1:1, 1:2,
75:2, 75:3,
75:4.
DIVERT 4:10,
76:24.
divider 106:19,
107:6.
DOAR 48:23.
document 32:12,
59:21, 60:8, 79:3,
79:4, 84:21, 85:9,
150:15, 152:17,
158:24, 159:5,
161:25, 162:7,
162:14, 162:15,
162:17, 162:18,
162:21, 162:22,
163:6, 167:24.
dog 52:20.

doing 3:25, 5:16,
    18:13, 20:6, 21:4,
    22:13, 28:5,
    36:15, 40:19,
    51:22, 65:1, 75:5,
    75:11, 75:15,
    75:19, 75:23,
    78:15, 82:1, 82:4,
    154:22, 155:10,
    155:18, 165:15,
    165:16, 165:24.
done 7:4, 23:12,
    27:9, 28:7, 38:24,
    46:12, 76:21,
    93:21, 93:22,
    95:3, 103:20,
    143:22, 149:17,
    149:19, 154:10,
    209:22, 209:24,
    209:25, 210:8,
    223:13.
door 13:8, 13:10,
    13:13, 14:25,
    16:4, 16:13, 17:2,
    17:4, 17:7, 18:3,
    117:17, 150:25,
    159:13.
doorbell 170:24.
dots 35:20.
doubt 165:13.
dovetailed 88:8.
download 86:20,
    149:24, 173:4.
downloading
    134:17.
downside 150:21.
draft 165:3,
    173:20.
drafts 147:22,
    148:22.
draw 85:1, 115:24,
    167:9.
drawing 63:14.
drawn 23:11.
Dre 207:2, 207:8,
    207:13, 207:19.
drew 131:15.
drive 26:7, 85:14,
    85:16, 128:24,
    173:5, 187:8,

187:23, 187:25,
    214:4.
driven 216:7,
    216:8.
driver 21:1, 22:23,
    23:3, 176:24,
    178:8.
driveway 12:3,
    12:11, 12:12.
driving 107:22,
    214:6, 214:7,
    214:20, 214:22,
    214:24, 215:18,
    215:21.
drove 216:13,
    217:3.
due 16:22, 21:22.
duly 4:23, 8:4,
    25:16, 74:2,
    174:23, 180:7.
dumpster 127:10,
    164:2.
Dupont 129:15.
During 27:2, 56:5,
    56:6, 95:6,
    116:16, 169:15,
    173:13, 184:10,
    195:2, 211:7,
    213:7.
dust 21:6.
duties 9:3, 9:4,
    18:24, 24:19.
duty 9:10, 26:4.
DVR 77:2, 85:7,
    85:9, 86:14, 92:9,
    133:15.
Dvrs 85:14.
.
.
< E >.
e-mail 219:13.
e-r 25:22.
E. 78:2.
earlier 17:24,
    19:16, 36:8,
    36:15, 37:19,
    45:5, 48:3, 68:9,
    156:9, 159:12,
    166:12, 218:5,
    229:2.

early 204:15.
easel 41:10, 42:2.
easier 42:1, 90:5,
    117:13, 142:8.
easily 102:18,
    118:9.
east 90:16, 90:17.
eastbound 109:24,
    113:20, 130:1,
    143:10, 167:5.
EC 31:19, 31:23,
    54:8, 62:23.
editing 77:4.
education 27:5.
effectively 98:5.
efficient 63:8.
effort 4:10, 51:12,
    148:11.
efforts 4:15,
    197:22.
eight 61:15,
    144:8.
eight-hour 189:11,
    189:13.
Either 16:24, 30:24,
    36:8, 40:11,
    69:17, 69:19,
    76:2, 99:9,
    154:17, 171:10,
    189:23, 209:19.
elapsed 97:19, 98:1,
    168:18.
electronic 31:19,
    31:23, 62:23,
    63:19, 68:25,
    69:1, 70:1,
    133:16.
Electronics 75:8.
element 35:19.
elicited 161:19,
    163:2.
eliminate 38:14,
    38:18, 46:2,
    65:21, 65:25,
    66:23, 70:12.
eliminated 94:16.
elimination 69:14.
ELMO 49:3, 117:12.
embankment 129:14.
emergency 121:17,

1   123:25, 128:24,
    129:5, 131:16.
2   emojis 220:6.
    employed 26:1,
3     74:16, 74:18,
      74:19, 188:20.
4   employment 178:22,
      178:24, 187:5,
5     188:19.
    end 16:14, 17:8,
6     35:1, 58:3, 60:15,
      61:3, 61:13,
7     61:16, 78:6, 86:9,
      87:17, 105:22,
8     110:1, 123:9,
      127:14, 157:14,
9     161:2, 161:4,
      167:9, 168:21,
10    168:25, 169:1,
      173:2.
11  ended 216:25.
    ending 152:25,
12    153:6, 194:20,
      194:25, 199:2,
13    219:25, 220:8.
    ends 135:1.
14  enhance 53:21.
    enhancement 51:13.
15  enhancements 30:22,
      48:4, 48:7, 52:14,
16    72:19, 72:23,
      73:7.
17  enhancing 50:19.
    Enjoy 7:21, 25:7,
18    73:18, 116:12,
      174:12, 179:22,
19    228:6.
    enjoyed 117:1.
20  enlarged 50:13,
      50:16.
21  enlargement 51:14,
      52:19, 52:24,
22    53:5, 53:12,
      53:23, 54:2,
23    54:14, 54:22,
      55:3, 55:8,
24    55:10.
    enough 35:22, 36:18,
25    37:10, 37:11,
      40:12, 99:24,

    149:22, 157:20,
    162:3, 198:18.
entered 3:6, 56:10,
    104:20, 116:22,
    169:19.
entire 8:22, 11:3,
    19:22, 31:7,
    44:10, 136:2,
    136:12, 195:3.
entirety 91:8.
entitled 226:6.
entrance 126:21,
    126:22, 127:11.
environment 87:21.
equipment 129:5,
    153:14, 154:2,
    154:19.
error 147:12.
escape 16:25.
especially 46:8.
Esquire 1:31, 1:33,
    1:37, 1:39.
essentially 2:20,
    211:15.
establish 158:25.
established 102:13,
    158:24.
estimate 102:10,
    102:11, 103:19.
estimation 149:5.
European 167:17.
European-style
    168:18.
evening 208:19,
    210:18, 227:24,
    228:6, 229:9,
    229:13.
events 203:18.
eventually 120:7.
Everybody 39:11,
    39:15, 42:3,
    91:19, 91:25,
    107:23, 108:2,
    108:4, 118:2.
everyday 137:17.
Everyone 3:10, 42:7,
    56:11, 111:15,
    117:1, 146:15,
    229:12.
everything 2:22,

    4:2, 4:16, 94:24,
    154:8, 199:21,
    200:1, 202:4.
evidently 96:11.
ex-boyfriend 181:12,
    181:14, 184:16.
exact 34:21, 38:11,
    58:4, 88:18,
    170:15, 182:24,
    195:12, 204:7.
Exactly 21:4, 99:11,
    103:1, 137:3,
    138:1, 149:19,
    192:23, 225:1.
exam 30:21, 44:21,
    46:6.
Examination 5:1,
    8:12, 25:24,
    29:16, 71:3,
    74:11, 172:6,
    175:9, 180:18,
    230:7, 230:11,
    230:17, 230:23,
    230:27, 230:33,
    230:37, 230:43.
examined 4:23, 8:4,
    25:16, 74:2,
    174:23, 180:7.
examiner 26:14,
    27:3, 31:2, 37:15,
    44:15.
examiners 27:1,
    44:9.
example 38:4, 40:17,
    40:20, 45:14,
    64:17, 65:16,
    67:5, 67:16,
    79:11, 80:2,
    82:25, 152:16,
    152:17, 156:3,
    157:9, 158:13,
    167:19, 205:12.
examples 30:10,
    107:1.
exams 30:5, 30:6,
    31:16.
except 89:11.
excerpt 34:13,
    43:19, 118:18.
excerpts 118:16.

```
 1    Excuse 6:5, 6:20,            facial 221:10,            father 215:7.
         99:14, 127:18,               221:19, 221:20.        fathers 215:6.
 2       130:18, 174:7.            facilities 27:11,         FBI 26:12, 26:21,
      excused 7:19, 25:6,            27:12, 82:21.             26:22, 27:19,
 3       73:16, 100:4,            Facility 75:9.               28:18, 30:3, 31:2,
         174:10, 179:22.          facing 17:6,                 31:10, 37:15,
 4    exercise 3:18.                 122:19.                   42:12, 42:13,
      Exhibits 5:24, 41:5,        fact 68:23, 103:19,         76:24, 76:25,
 5       93:6, 115:6,                111:21, 147:8,            157:23.
         187:16.                     147:12, 156:15,        FCRR 1:46.
 6    existed 155:22.                183:25, 196:10,         feature 38:22, 39:2,
      expect 103:17.                 205:6, 226:12.            46:11, 66:24.
 7    experience 16:22,           factored 96:13.           Federal 1:47, 26:3,
         26:17, 76:18,            factors 21:15,               27:22, 28:12,
 8       76:20, 77:8,                21:24, 35:16,             31:10, 204:25,
         84:5.                       36:25, 40:13.            211:12.
 9    Expert 29:5, 29:9,          facts 29:23.              feel 14:14, 37:9,
         29:12, 29:16,            failed 197:23.               95:10, 118:11,
10       29:19, 29:20.            Fair 90:13, 91:9,           147:7, 179:24.
      expertise 29:21,               125:21, 131:17,        feet 18:22.
11       71:21, 154:19.              147:16, 149:12,        fell 188:8,
      explain 33:4, 35:14,           149:22, 159:16,          202:25.
12       69:13, 75:14,               159:19, 160:1,         Fenton 2:12.
         106:21, 128:16,             163:2, 197:22,         few 55:13, 104:6,
13       144:11, 148:20,             198:19.                   142:19, 142:21,
         150:18, 151:14,          Fairly 150:12.              155:19, 170:1,
14       181:5, 206:7.            fairness 224:24.            182:18, 182:19.
      explained 48:3,             fall 188:9.               field 29:9, 29:19,
15       102:18.                  familiar 31:19,             31:11, 31:14,
      explaining 144:21,             42:8, 43:24, 46:8,        77:11.
16       150:14, 203:8.              54:16, 78:24,          fields 28:23.
      explanation 70:5,              79:12, 124:18,         fifth 67:25.
17       105:16, 202:23.             133:7, 185:18,         figure 34:16,
      exterior 21:2,                 205:11, 217:8,           147:18.
18       170:19, 170:20.             217:9.                 file 95:5, 97:18,
      extra 118:5.                family 196:7,               102:6, 105:20,
19    extracted 152:2,               212:23, 212:24,          105:21, 118:13,
         152:3.                      213:7, 213:12,           135:16, 135:21,
20    extraction 30:22,              213:17, 216:5.          135:22, 136:2,
         48:6, 149:23,            family. 179:7.             136:15, 136:16,
21       155:17.                  fanned 136:25.              149:4, 149:23,
      extractions                 far 35:18, 76:13,          149:24, 152:6,
22       154:23.                     83:2, 84:14,             152:9, 152:11,
      extras 118:11.                 100:12, 105:10,          152:23, 156:5,
23    .                              106:24, 142:2,           156:6, 156:15.
      .                              151:22, 154:1,         files 134:19, 152:6,
24    < F >.                         197:1, 199:3,            173:4.
      face 220:14, 221:6,            201:19.               final 165:3.
25       221:10, 221:25.          farther 43:6.            finalized 148:25.
      faces 30:18.                fast 30:13, 164:1.       find 10:6, 20:3,
```

```
1    21:7, 44:14,           foot 16:25.            frames 34:21, 44:12,
     204:3.                 footage 36:9, 52:7,      45:2, 47:22,
2    fine 4:12, 5:15,         107:21, 134:20,        47:24, 67:8,
     43:4, 104:2,            171:3, 171:10,          85:25, 86:1,
3    104:7, 117:22,          211:22, 212:3.          136:25, 173:14.
     117:25, 163:5,        footages 91:2,          frankly 3:17.
4    166:3, 194:13,          112:20.                free 101:22, 118:11,
     227:5, 228:18.        forcing 83:22.           179:24.
5    finger 14:4, 115:8,   forensic 24:17,         freeze 151:4.
     128:6.                  26:14, 28:23,         frequently 66:10.
6    fingerprints 21:6,      29:16.                Friday 5:8, 9:10,
     21:7, 21:9, 22:25,    forensics 28:25.         189:2, 190:14,
7    23:1, 23:4.           forgot 147:10.           190:15, 190:24,
     finish 99:24.         form 79:12, 79:13,       195:11, 202:16,
8    finished 5:14, 32:6,    79:15, 79:21,          205:3, 206:13,
     133:2, 214:17.          82:2, 83:18, 84:8,     206:23, 207:25,
9    finishing 130:8.        85:21, 87:24,          208:6, 208:9,
     Firearms 19:24,         88:7, 88:23,           209:2, 209:6,
10   20:3.                   92:4.                  211:16, 211:18.
     firmware 86:8.        formal 48:5.           Friend 215:6, 215:7,
11   fit 41:10, 96:23.     format 105:20.           215:15.
     five 46:24, 78:7,     formats 86:5.          friends 215:7,
12   91:1, 105:24,         formula 103:1.           215:16.
     115:21, 135:25.       Forsythe 22:18,        frontline 15:22.
13   fix 101:5, 148:14.      24:18, 77:23,         Fuchs 148:11.
     fix-mounted             81:10, 81:11,         Full 8:8, 25:20,
14   144:19.                 88:4, 88:15,           74:7, 75:21,
     fixed 144:23,           212:1, 212:2.          85:16, 175:3,
15   144:24, 145:1.        forth 89:21, 106:15,     180:12.
     flash 4:9, 173:5.       117:6, 117:17,       full-time 188:25.
16   flex 189:15.            163:9.                fun 202:3.
     flip 137:2.           Fortunately 87:8.      funny 20:17.
17   flipping 42:25.       forward 167:7,         fuss 203:7.
     Floor 1:48.             180:4, 210:8,         future 79:8,
18   flow 165:21.            210:14.                210:2.
     focus 57:3.           found 203:25.          futures 69:12.
19   focused 65:18.        foundation 95:16,      .
     folks 3:14.             96:1, 96:14,         .
20   follow 80:15,           103:17, 159:9,       < G >.
     127:13, 128:6,          162:3, 162:14.       gain 12:6.
21   133:25.               foundational 102:8,    game 159:16, 161:2,
     following 43:5,         102:12.                161:4.
22   99:18, 134:25,        four 27:21, 28:2,      gathered 79:23.
     135:12, 149:10,         30:5, 31:1, 31:7,    gave 40:17, 93:7,
23   163:10, 166:7,          31:16, 32:10,         133:16, 133:17.
     210:16, 225:16,         44:9, 46:24,         general 19:15,
24   227:7.                  68:6.                  38:12, 43:14,
     follows 4:24, 8:5,    four-second 151:9.      66:2, 87:3,
25   25:17, 74:3,          fourth 30:21,           105:16, 145:6,
     174:24, 180:8.          68:6.                  154:12, 154:15,
```

```
1    157:22, 182:25.
     Generalized 157:6,
2      158:2.
     Generally 9:4,
3      78:14, 84:10,
       85:4, 85:21,
4      86:24, 88:7,
       89:19, 110:23,
5      180:23.
     generate 102:11.
6    generated 81:1,
       95:20.
7    generates 81:3.
     generation 158:13,
8      158:14.
     generations 158:10,
9      158:12.
     generic 83:9,
10     108:17, 171:14,
       171:17.
11   gentlemen 3:8, 4:1,
       29:18, 55:17,
12     99:19, 116:9,
       116:24, 169:9,
13     227:23.
     George 1:18.
14   Gerald 1:31.
     gets 92:1, 147:18,
15     151:6.
     getting 49:23,
16     56:21, 82:17,
       88:19, 124:17,
17     124:18, 143:9,
       172:14, 192:18,
18     192:22, 192:24,
       193:2, 198:19,
19     200:6, 201:21,
       203:21, 208:3.
20   girl 177:16.
     girlfriend 177:16,
21     177:17, 177:19.
     given 34:24, 81:7,
22     93:7, 161:1,
       198:6.
23   gives 108:22,
       136:22.
24   giving 39:24,
       83:22.
25   GJH-17-0667 1:9.
     Glad 3:12.
```

```
glance 47:7.
gotten 197:1,
  208:13, 208:14,
  215:24.
grab 39:6.
Grand 75:25, 176:2,
  176:11, 204:25,
  205:10, 205:16,
  208:23, 209:4,
  211:12, 214:10,
  218:10, 222:16,
  222:22, 223:3,
  223:20, 224:17,
  225:3, 227:13.
gray 157:3, 176:3.
Great 58:19, 100:5,
  110:1, 118:6,
  128:15, 138:15,
  158:1, 222:11,
  227:1.
Greenmount 182:7,
  182:8.
Greenspring 125:4,
  126:8, 127:8,
  127:22, 127:23.
grill 66:18,
  167:15.
ground 13:24,
  91:16.
Group 28:22, 28:24,
  29:1, 38:8, 38:13,
  48:13, 83:4.
grouped 59:23.
grow 182:6, 182:8,
  205:23.
growing 208:3.
guess 2:8, 90:15,
  98:4, 116:11,
  146:8, 161:11,
  168:5, 178:13,
  192:16.
guided 90:22.
guidelines 28:25,
  29:3.
guys 196:1, 207:12,
  207:15.
.
.
< H >.
hair 24:11, 220:14,
```

```
221:5, 221:10,
  221:11, 221:19,
  221:21, 221:25.
half 75:21, 96:18,
  228:21.
hand 8:2, 10:12,
  21:19, 25:14,
  73:25, 158:25,
  174:21, 180:5.
hand-drawn 19:7.
handful 86:13.
handle 202:3.
handles 32:3.
handling 166:9.
handouts 108:1.
hands 30:19.
hanging 39:1.
happen 18:9, 18:10,
  21:11, 151:3,
  193:7.
happened 37:2, 98:6,
  141:19, 203:18.
happening 201:1,
  201:21, 227:17.
happens 85:15,
  195:21.
happy 97:11, 103:23,
  166:1.
hard 3:16, 6:22,
  85:14, 85:16,
  108:2, 229:3.
hardly 66:8.
Harry 1:37,
  100:25.
hat 38:5, 38:7,
  38:11, 40:17,
  40:18.
hate 209:16.
hats 38:9.
Hazel 1:18,
  174:14.
HD 49:23.
he'll 97:12.
head 98:8, 111:9,
  189:23, 199:24,
  201:6.
heading 119:11,
  120:11, 124:16,
  130:18.
headlight 46:18,
```

64:17, 64:18,
64:19, 65:18,
167:20, 167:21,
167:22, 168:2,
168:6, 168:10,
168:19.
headlights 66:18.
headquarters
211:4.
hear 39:7, 55:24,
55:25, 56:1,
107:23, 107:25,
108:4, 111:15,
150:16, 162:18,
164:17, 181:4.
heard 2:6, 2:11,
2:16, 4:2, 197:15,
198:20, 202:7,
224:12.
hearing 4:16, 4:17,
92:24, 93:17,
220:11.
height 30:10, 33:3,
33:4, 33:9, 33:13,
33:14, 34:6,
34:25, 35:24,
36:23, 37:6,
37:11, 37:12,
70:20, 70:23,
70:24.
held 74:24.
help 5:19, 14:16,
48:11, 63:7, 79:7,
79:14, 128:17.
helps 76:21, 135:13,
137:12.
herself 191:24.
hesitant 84:22.
high 50:8, 150:9,
150:21, 151:1.
high-resolution
150:20.
Higher 50:1, 50:2,
85:24, 86:1,
87:10, 87:17.
highlight 14:3,
14:4.
highlighted 189:8.
Hightower 215:4,
215:5, 215:13,

216:3, 217:11.
history 162:25.
Hold 41:21, 42:2,
72:7, 89:20,
108:6, 127:4,
127:5, 127:7,
127:18, 151:6,
177:3.
holding 41:19.
hole 161:24.
holes 45:13.
Holiday 48:15,
117:10, 118:11,
212:22, 213:11.
home 3:21, 154:7,
190:19, 190:22,
190:25, 192:5,
192:10, 208:9,
208:13, 208:16,
208:17, 208:19,
209:2, 212:14,
213:3.
Homicide 6:17, 6:19,
6:20, 11:22,
20:25, 24:16,
71:9, 75:6, 75:7,
75:15, 75:16,
75:21, 76:7, 76:8,
76:11, 76:15,
80:8, 80:10,
80:11, 80:19,
81:1, 81:15,
84:10, 87:5,
211:2, 211:3,
211:17.
homicides 76:14.
Honda 187:9,
187:11.
honestly 96:2,
148:5, 211:25.
Honorable 1:18.
Hopefully 41:10,
70:19, 91:19,
99:23, 104:3,
117:1.
Hopkins 188:21,
188:22, 189:14.
hotel 196:24,
219:22.
hotspot 86:15.

hour 96:18, 116:15,
116:19, 137:8.
hours 9:18, 44:13,
150:25.
house 15:23, 17:23,
178:2, 178:5,
203:6, 205:14,
213:13, 213:14,
213:18, 215:21,
215:22, 216:6,
216:9, 216:11.
huge 95:11.
human 85:6.
.
.
.
< I >.
I-b-e-r 25:12.
IAI 28:20.
Iber 25:12, 25:15,
25:21, 26:1,
29:12, 29:16,
30:2, 35:2, 39:10,
50:18, 56:19,
59:10, 68:14,
69:15, 70:19,
71:5, 71:21,
73:20, 230:15.
ID 59:3, 59:8,
194:10.
idea 49:10, 50:5,
76:1, 76:10,
80:14, 82:15,
141:18, 170:16,
206:24, 208:7.
Identification
28:20, 58:21,
59:2, 191:17.
identified 22:16,
54:5, 62:21,
63:20, 159:22,
181:23, 226:23,
226:24.
identifier 11:15.
identifies 63:4.
identify 23:9, 45:4,
46:2, 47:14,
48:24, 49:7, 51:1,
62:18, 63:2,
63:21, 89:19,
141:22, 159:15,

159:23, 161:8, 181:17.
identifying 63:8, 63:10, 161:7, 212:6.
IDK 201:11.
IDK. 201:9.
idle 152:10.
im- 75:16.
imagery 30:6, 38:10, 38:15, 48:11, 49:16.
imaging 77:8.
immediately 6:19, 204:14.
impeach 210:13.
impeaching 210:4.
important 14:15, 14:17, 66:17, 138:10.
importantly 27:1.
imprinted 101:9.
in. 104:15, 127:10.
incarcerated 186:12.
inch 50:2.
inches 18:23.
incident 34:3.
include 28:12, 66:1, 66:2, 80:21, 82:25, 84:9, 87:1, 102:7.
included 32:25, 80:1, 160:7.
includes 30:17.
including 116:13, 155:21, 169:11, 228:1.
inconsistent 225:13.
incorrect 103:11.
incredibly 148:21.
INDEX 230:1.
indicate 7:6, 14:24, 15:14, 217:19.
indicated 5:7, 95:19, 159:3, 184:15, 195:9, 219:2.

Indicating 18:4, 122:17.
Indicating. 19:18, 181:21.
individual 35:10, 36:8, 39:23, 40:21, 45:18, 45:23, 47:16, 54:20, 55:6, 55:10, 63:13, 64:10, 65:13, 69:16, 70:24, 105:21, 177:12, 181:10.
individualize 40:15.
individualized 38:3, 39:19, 40:18, 72:1.
individualizing 40:11, 41:2, 45:21, 47:13, 69:22.
individuals 70:21, 70:23.
indulgence 214:2.
inform 219:5.
initial 90:23, 163:12, 163:25, 223:18, 224:4, 224:6, 225:4, 225:15.
initially 12:17, 15:11, 186:2, 224:25.
initials 49:9, 51:2.
injured 10:15, 10:22, 10:23, 188:17.
injury 188:8, 188:11.
input 85:6, 154:5.
inputs 86:16, 150:17.
inserted 101:16.
inside 170:21.
inspect 24:10.
install 154:8.
installing 77:13.

instance 10:11, 38:15, 85:7, 113:2, 140:3, 150:20.
instances 78:23.
instant 199:20, 219:17.
instead 88:19.
Institute 26:19.
instructing 228:9.
instruction 228:2.
instructions 81:17, 155:6.
insufficient 45:6.
integrated 84:17.
intend 149:5.
intercom 77:15.
intercomparison 68:21.
interest 33:8, 35:17, 44:11, 44:14, 47:12, 50:14, 50:15, 51:19, 52:13, 52:22, 53:2, 53:10, 53:20, 53:25, 54:6, 54:12, 54:20, 54:24, 55:6, 55:10, 63:2, 168:17.
interested 45:3, 58:12.
International 27:23, 28:19.
internationally 27:25.
internet 153:16.
interrupt 120:14, 174:8.
intersection 124:17, 124:25.
interview 191:9, 211:7.
interviewed 210:24.
introduce 78:21, 83:20.
introduced 164:20.
investigate 9:5,

154:14.
investigated 80:11,
159:17, 162:10,
162:24.
investigating 75:3,
171:2.
investigation 11:19,
16:19, 35:4,
35:11, 35:15,
44:21, 75:18,
79:25.
Investigations 26:3,
80:7.
investigator
51:21.
investigators 30:24,
44:18.
involved 12:5, 12:8,
32:2, 36:17,
148:6.
IP 86:12, 133:18,
172:18.
iphone 193:17,
193:21.
isolate 40:7,
63:3.
issue 2:3, 94:5,
96:19, 96:20,
97:14, 100:2,
101:14, 101:23,
146:1, 146:18,
147:7, 147:8,
165:14, 226:5.
issues 86:9, 96:19,
96:24, 99:2.
item 14:16, 20:12,
20:21, 38:22.
items 19:9, 19:24,
20:12, 30:11,
33:17.
itself 58:11, 80:16,
85:19, 100:13,
102:25, 103:9,
145:3, 151:21.
IVMS 84:13, 150:4,
153:22.
.
.
< J >.
J. 1:18, 1:37.

James 42:11, 42:12,
45:1, 51:18,
52:16, 54:5,
73:12.
January 209:1,
218:17.
jerk 220:5.
job 28:4, 28:18,
30:2, 38:24,
40:23, 76:22,
171:4.
Johns 188:21,
188:22, 189:13.
joint 148:10.
Jones 81:13, 191:10,
210:24, 211:1,
211:23, 212:1.
journals 26:24.
Jr 1:37, 74:1,
230:25.
Judge 100:3, 117:4,
174:14.
judges 28:22,
29:22.
July 13:10, 14:25,
15:23, 205:10,
214:10.
jump 35:1, 163:22.
June 189:8.
Junior 74:8.
juries 28:5.
jurisdiction
82:16.
jurisdictions
77:1.
JUROR 36:4.
JURORS 3:9, 3:11,
3:17, 5:12,
116:25, 127:14.
.
.
< K >.
K-i-n-g 175:7.
Keep 5:18, 61:12,
79:20, 79:23,
112:6, 117:16,
117:20, 121:9,
121:15, 154:21,
180:11, 180:17,
181:13, 212:9.

keeping 147:23.
keeps 151:18,
155:2.
kept 94:8, 219:2.
key 35:16, 201:12.
keys 13:18, 15:7,
15:18, 16:7,
20:10.
kid 3:13, 3:14.
Kim 1:27.
kinds 45:18.
King 174:19, 174:22,
175:4, 175:11,
176:2, 176:14,
177:12, 178:10,
179:8, 179:16,
230:35.
knobs 48:8.
knowing 31:6, 45:3,
76:8, 108:23,
109:5, 122:14.
knowledge 11:7,
13:7, 170:25,
171:1, 178:11,
178:18.
known 28:20, 94:18,
95:18, 96:10,
182:1.
knows 10:13, 51:2,
147:2, 148:4,
148:10, 162:18.
.
.
< L >.
L-a-w-s-o-n
180:15.
lab 8:19.
labeled 20:21,
51:19, 51:25,
68:2, 100:14.
laboratory 8:17,
27:14, 49:12.
Ladies 3:8, 3:25,
29:18, 55:17,
99:19, 116:9,
116:24, 169:9,
227:23.
lady 6:10, 205:14.
laid 162:3.
Lainier 141:24.

Lanier 115:5,
   129:13, 142:5,
   142:18, 143:10.
lapel 145:21,
   146:15, 173:10.
laptop 86:15.
large 31:13.
larger 49:22,
   50:10.
Last 3:13, 8:10,
   52:25, 53:6, 53:7,
   54:15, 92:22,
   125:8, 125:9,
   125:12, 135:12,
   140:19, 141:22,
   141:24, 142:3,
   142:5, 142:24,
   175:6, 180:14,
   182:22, 184:4,
   184:12, 207:21,
   215:3, 215:11,
   227:11.
Latent 21:7, 22:25,
   23:1, 23:4,
   24:6.
Later 7:5, 16:19,
   40:8, 52:8, 84:22,
   106:21, 114:12,
   130:3, 182:15,
   182:16, 189:25,
   194:7, 194:10.
Latrice 215:10,
   215:11.
Latrina 77:19.
lawyer 115:21,
   222:12.
lawyers 28:22.
lay 162:14.
laymen 39:9.
Leading 72:9.
Learn 2:22, 4:2,
   22:16, 201:8,
   202:1, 204:5,
   207:7, 228:5.
learned 4:3, 11:22,
   82:1, 228:6.
leasing 51:16,
   52:16, 126:8,
   126:9, 130:9,
   131:7, 149:24,

150:1, 153:9.
least 26:7, 52:16,
   76:10, 104:8,
   139:13, 148:4,
   176:15, 222:8,
   222:9, 222:11,
   224:20.
leave 98:3, 141:24,
   142:17, 189:22,
   192:15, 192:21,
   196:15, 198:16,
   216:12, 216:14,
   216:17.
leaves 142:5.
leaving 33:1, 56:1,
   144:6, 196:3,
   196:11.
Lee 74:1, 74:8,
   101:1, 230:25.
left-hand 11:21,
   15:2, 53:21,
   53:19, 54:19,
   54:23, 55:5,
   109:11, 114:1,
   142:2.
legal 83:19.
legitimately 96:9.
lengthy 102:20.
lenses 87:21.
less 102:22,
   103:9.
Lesser 34:13, 35:25,
   49:4, 91:7, 107:5,
   110:9, 112:10,
   113:5, 114:5,
   114:24, 118:21,
   119:3, 120:24,
   122:4, 122:10,
   123:13, 124:21,
   125:5, 125:17,
   132:3, 132:16,
   165:13, 172:9,
   212:17.
letter 20:13,
   149:2.
letters 41:3.
letting 201:14.
level 65:13, 87:2.
levels 86:19.
Liaison 75:9.

license 41:1, 41:3,
   46:16, 163:19,
   168:12.
lid 157:18.
life 137:17,
   175:15.
lift 21:8, 21:12,
   21:16.
light 46:16, 171:22,
   180:17, 221:9.
lighter 221:11,
   221:13, 221:22.
likely 216:10.
likes 145:22.
line 23:11, 85:1,
   218:18, 223:8.
lines 36:20.
list 78:16, 173:3.
listed 187:10.
lists 157:24.
literally 23:12,
   67:22, 147:8,
   224:11.
live 34:2, 53:15,
   185:25.
lived 175:15,
   185:12, 185:22,
   185:24, 185:25,
   186:3, 186:14,
   186:17, 187:7,
   187:21.
living 8:16, 177:21,
   177:24, 179:3,
   180:23, 186:24,
   186:25, 189:19.
load 31:13.
local 4:13, 27:22,
   31:11, 31:14,
   76:25.
located 46:16,
   46:17, 78:25,
   115:9, 153:14.
location 9:17,
   10:15, 10:20,
   10:22, 11:17,
   12:6, 12:16, 16:1,
   18:8, 19:21,
   36:24, 40:25,
   81:5, 81:7, 82:8,
   82:11, 82:12,

```
 1    83:15, 91:17,
      95:22, 126:12.
 2   locations 83:1,
      89:22, 90:9,
 3    170:10.
     log 84:25, 92:10,
 4    94:25, 97:7,
      103:4, 103:5,
 5    153:22.
     logged 84:24,
 6    153:22.
     logo 157:18, 157:19,
 7    157:20.
     logs 103:9.
 8   Lombard 1:48.
     long 8:19, 74:20,
 9    75:19, 96:14,
      103:9, 103:24,
10    104:13, 106:11,
      171:9, 177:18,
11    182:1, 182:17,
      191:1, 191:3,
12    203:21, 212:12.
     longer 37:12,
13    115:19, 184:18,
      186:11, 205:24,
14    229:3.
     looked 16:17, 19:19,
15    20:17, 52:6,
      114:8, 125:8,
16    139:18, 149:18,
      158:5, 159:3,
17    162:4, 162:10,
      162:12, 162:25,
18    168:4.
     looks 16:20, 20:1,
19    53:14, 128:10,
      128:11, 128:12,
20    139:21, 144:25,
      167:11, 167:13,
21    167:14, 167:18,
      167:22, 168:10,
22    168:24, 169:1,
      169:3, 201:18.
23   lost 228:21.
     lot 36:20, 50:4,
24    51:16, 52:16,
      86:10, 88:2,
25    115:9, 118:25,
      119:7, 126:7,
```

```
      126:13, 126:19,
      126:20, 126:24,
      127:9, 129:14,
      130:10, 131:7,
      132:23, 143:2,
      143:13, 149:5,
      150:22, 161:15,
      210:19, 210:22,
      217:6.
     loud 107:19.
     loudest 224:1.
     love 202:3, 203:7.
     lower 50:14, 62:4,
      86:3.
     lunch 97:11, 99:3,
      104:4, 105:2,
      116:5, 116:6,
      116:9, 116:12,
      117:1, 118:16,
      118:21, 118:25,
      132:10.
     lunches 116:7.
     .
     .
     < M >.
     M. 1:33, 4:22,
      230:5.
     machine 78:25, 79:4,
      79:5.
     mad 200:6.
     Madame 53:8.
     magic 33:23.
     main 3:16.
     Mainly 186:22.
     make/model 46:6.
     male 6:12, 6:14.
     malicious 87:22.
     man 129:8, 141:23,
      142:17, 142:25,
      144:6.
     manageable 134:16.
     management 80:6,
      134:14, 134:20,
      135:16, 156:16.
     manager 78:22,
      84:24, 86:18,
      153:13.
     manages 172:24.
     manipulated 30:7.
     manner 75:24, 183:4,
```

```
      183:6.
     manual 154:4.
     manufacture 64:21.
     manufactured 46:13,
      46:21.
     manufacturer 65:1,
      84:13, 157:7,
      157:17.
     manufacturers
      66:20.
     manufacturing 27:11,
      27:12.
     map 91:14, 107:22,
      108:24, 109:5,
      109:9, 111:8,
      113:17, 113:19,
      114:17, 115:14,
      117:9, 117:20,
      120:6, 122:14,
      122:17, 126:6,
      126:23, 130:3,
      144:21.
     maps 123:7.
     mark 58:20, 59:6,
      137:11, 138:11,
      138:21.
     marked 56:22, 58:24,
      59:20, 64:14,
      67:14, 158:5,
      189:5, 191:14,
      191:16, 219:16,
      219:23, 220:17,
      221:14.
     marker 15:13,
      15:14.
     marking 23:9,
      57:4.
     marks 23:8.
     married 181:8.
     Mary 54:23.
     Maryland 1:2, 1:20,
      1:49, 175:13,
      182:4.
     master 26:23.
     match 51:24,
      141:12.
     material 26:25.
     materials 32:7.
     math 138:7, 138:9,
      139:12, 139:14,
```

1  139:23.
Matt 214:25, 215:1,
2  216:2.
matter 31:3, 41:4,
3  210:1, 211:16,
211:20.
4  Matthew 215:2,
215:3, 215:5,
5  215:13, 216:3.
Matts 216:4.
6  me. 202:4.
meaning 110:16.
7  means 55:24, 56:1,
83:20.
8  meant 61:10,
83:10.
9  meantime 228:11.
measure 34:7,
10  138:3.
measurement 17:6,
11  18:10.
measurements 18:14,
12  19:10, 30:9.
measuring 18:17.
13  Medical 181:3,
181:6, 181:7.
14  meet 217:15, 217:16,
217:20, 218:3.
15  meeting 93:18, 95:9,
96:3, 100:24,
16  102:20, 102:22,
103:14, 146:25,
17  217:24.
meetings 26:24.
18  member 28:17, 28:19,
28:20, 29:1.
19  Memorial 190:15.
memory 146:20,
20  192:9.
mentioned 184:2.
21  message 195:19,
195:21, 197:18,
22  199:20, 201:1,
201:18, 202:12,
23  203:4, 206:20,
219:17, 220:2,
24  221:8.
messages 195:6,
25  203:14, 204:19,
206:7.

messaging 200:25,
201:25.
met 207:23, 217:13,
217:25.
method 102:10,
102:13.
methods 33:5,
149:16.
microphone 39:6,
41:15, 56:1, 74:6,
90:6, 107:18,
112:6, 127:1,
174:15, 175:2,
180:11, 225:9.
middle 62:5.
midrange 15:6.
midway 23:11.
mike 145:21, 146:15,
173:10.
military 28:13.
million 136:25.
mind 9:21, 18:20,
41:19, 42:21,
202:2.
Mine 177:6, 187:19,
215:8.
minivan 38:16.
minor 77:4.
minute 48:23, 50:18,
93:5, 134:4,
137:24, 138:5,
163:11.
Mirandized 226:11.
mirror 39:2.
model 51:25, 64:21,
66:6, 66:14, 69:7,
69:12, 70:9, 79:4,
84:11, 84:14,
84:16, 156:25,
157:2, 157:24,
196:23.
mom 186:7, 186:8,
186:10, 186:11,
213:8, 213:12.
moment 7:12, 53:16,
54:17, 60:19,
79:25, 85:5,
85:11, 105:16,
106:9, 107:2,
110:24, 111:3,

112:14, 116:3,
128:21, 132:5,
209:12.
Monday 93:7, 189:2,
212:15, 213:10,
218:7, 228:15.
money 198:16.
monitor 49:19,
49:20, 49:21,
49:22, 49:23,
50:10, 176:9,
187:14.
monitoring 2:18.
month 134:2,
135:5.
mother 6:6, 6:9.
motion 33:22, 40:13,
86:17, 150:23,
151:1, 151:2,
151:6, 151:8,
151:12, 151:14,
151:15, 151:17,
152:3.
motion-activated
150:17, 150:18.
motions 92:23,
93:17.
move 14:23, 41:24,
43:3, 89:12,
102:15, 145:3,
149:7, 152:10.
moved 33:18, 36:19,
37:7, 59:2, 102:4,
185:6, 186:2,
186:8, 186:10,
186:11.
movement 86:3,
137:1.
movements 211:7,
211:8.
Moving 12:15, 13:4,
14:1, 14:7, 15:4,
15:5, 34:16,
95:22, 107:9,
121:3, 122:11,
124:8, 130:15,
130:17, 145:1,
163:9, 194:8.
MP4 86:7, 136:15,
156:5, 156:6.

Multiple 6:22, 77:2,
    211:12.
murder 77:19, 83:8,
    129:17.
MVR 153:22, 154:2,
    154:9.
Myrtle 204:9,
    205:14, 206:2,
    206:16, 206:24,
    212:10, 212:12,
    215:19, 218:6,
    218:22, 219:11,
    219:18, 219:21.
myself 78:21,
    83:21.
.
.
< N >.
Named 133:16,
    155:21, 155:24,
    156:1, 156:14,
    207:7, 207:13.
names 105:21,
    108:18, 133:13,
    195:19, 206:8,
    207:1.
naming 97:5, 98:2,
    102:6, 102:25,
    105:20, 110:23,
    132:9, 132:11,
    133:14, 134:22,
    149:4, 152:21,
    152:23, 154:9,
    172:10.
narrow 44:12,
    167:17.
narrowing 64:20.
natural 87:22.
near 13:18, 14:15,
    15:7, 15:19,
    16:10, 58:3, 61:2,
    61:16, 129:8,
    168:21.
necessarily 50:11,
    64:23, 65:1,
    69:11, 161:17.
necessary 9:6.
needed 79:8, 88:16,
    93:20, 93:25,
    94:4, 94:22.

needing 6:15.
needs 2:23, 4:3,
    41:23, 99:15,
    99:20, 102:13,
    162:20, 228:5.
neglected 115:10.
neighborhood
    182:6.
neither 2:16.
network 84:17,
    86:14.
network-to-video
    84:15.
networked 86:13.
networks 77:14.
Neutron 108:8,
    109:14, 109:18,
    120:10, 120:16.
New 26:20, 26:25,
    85:17, 92:21,
    93:3, 96:5,
    146:18, 146:19.
newer 48:7, 158:7,
    158:8.
news 2:25, 4:5, 4:7,
    4:9, 4:12, 4:13,
    228:3.
newspaper 2:9,
    4:14.
nice 107:19.
night 3:13, 190:18,
    190:21, 212:25,
    213:4, 213:7,
    216:9, 216:11.
nine 8:21, 9:1.
Nissan 20:24.
No. 1:9, 22:14,
    36:4, 59:7, 59:21,
    114:20, 115:7,
    119:9, 121:7,
    123:5, 132:22,
    133:18, 133:19,
    133:20, 140:22,
    146:3, 164:3,
    164:4, 164:7,
    164:8, 164:10.
Nobody 23:21, 23:24,
    24:2.
nomenclature 54:7,
    63:21, 96:6.

nonconducive 37:1.
None 45:23, 47:18.
Normally 7:4, 184:8,
    189:15, 199:13,
    213:1, 213:9,
    221:12.
north 120:13.
northbound 109:25,
    112:18, 113:23,
    122:20, 124:16,
    128:9, 130:2,
    131:11, 140:22,
    143:13, 157:12,
    157:13, 163:14.
Northeast 75:4.
northerly 109:17.
NORTHERN 1:2,
    120:13.
notation 115:13.
note 86:6, 170:7.
noted 89:15, 90:1,
    91:4, 103:4,
    103:5, 110:19,
    110:22, 133:20,
    153:2, 153:5.
notes 5:18, 59:5,
    101:1, 102:4,
    102:20, 117:20,
    132:14, 138:25,
    145:13, 147:14.
notetaker 100:23.
Nothing 7:10, 24:20,
    24:25, 68:20,
    95:4, 103:12,
    151:10, 152:10,
    227:20, 229:10.
notice 108:17,
    217:6.
notify 6:18.
notifying 222:3.
noting 106:11,
    107:8.
notion 66:14.
November 8:25,
    76:23.
numbering 135:13.
numbers 41:3, 80:15,
    133:7, 133:10,
    133:24, 145:9,
    206:10, 206:18,

206:19.
numeric 135:13.
Nurton 108:12,
  109:12, 109:23,
  110:2, 111:25,
  112:18, 120:15,
  120:17, 121:20,
  122:7, 122:20,
  123:6, 123:9,
  124:9, 124:14,
  124:18, 128:7,
  128:10, 128:23,
  128:24, 128:25,
  129:25, 130:2,
  130:18, 131:10,
  140:23, 157:12,
  157:14, 163:14.
NVR 84:15.
.
.
< O >.
o'clock 152:7.
oath 4:19, 56:13,
  104:24, 117:2,
  169:21, 210:10.
object 60:19, 65:7,
  92:14, 111:20,
  209:21, 210:7.
objecting 209:23.
Objection 29:14,
  72:5, 72:7, 95:17,
  96:1, 100:9,
  117:23, 146:10,
  158:18, 161:24,
  163:4, 163:5,
  164:17, 165:2,
  181:24, 209:11,
  218:12, 224:9,
  224:16.
objects 37:21,
  130:7.
observe 47:13,
  47:18, 49:17.
observed 69:17.
obsession 208:3.
obtain 35:14,
  86:23.
obtained 91:3.
obvious 38:5.
Obviously 38:16,

41:1, 47:1, 48:20,
  49:18, 51:23,
  68:10, 82:6,
  125:15, 132:2,
  146:17, 165:2,
  228:21.
occasion 21:11,
  28:15, 88:10,
  88:11.
occasions 28:7,
  28:9, 76:1, 78:3,
  86:13, 88:12,
  178:1.
occurred 185:8,
  188:12, 211:3.
occurrence 81:5.
occurrences 87:23.
occurring 206:22.
offense 11:16,
  11:21.
Office 19:6, 31:10,
  31:11, 31:15,
  51:16, 83:16,
  126:8, 126:9,
  148:11, 149:24,
  150:1, 153:9,
  153:10, 170:17,
  173:5, 217:20,
  218:1.
Officer 4:22, 5:3,
  5:5, 6:2, 6:22,
  7:9, 10:7, 10:8,
  10:11, 12:17,
  12:19, 12:23,
  22:12, 24:24,
  43:21, 76:20,
  77:7, 230:5.
officers 10:5,
  14:14.
Official 1:47,
  26:13.
often 37:15, 84:6,
  183:12.
oil 21:19.
Old 19:25, 48:7,
  87:18, 93:1,
  137:2, 175:11,
  175:23, 180:20.
old-fashioned 48:24,
  136:24.

once 5:13, 17:15,
  19:11, 37:1,
  85:15, 92:1,
  132:16, 144:24.
one. 37:25, 118:2,
  139:13.
ones 62:19, 91:2,
  112:24, 117:8,
  170:7, 171:19,
  229:4.
open 43:5, 99:18,
  135:22, 149:10,
  163:10, 166:7,
  210:16, 227:7.
opened 159:13.
openly 165:4.
Opens 226:3,
  226:4.
operating 154:25.
opinion 30:25, 68:4,
  72:2, 161:18,
  163:1.
opinions 29:21,
  62:21.
opposed 95:24,
  117:20.
optimal 60:7,
  62:22.
option 84:2, 84:3,
  151:24, 151:25.
options 154:10.
order 41:24, 43:21,
  54:25, 55:1, 55:5,
  64:23, 132:8.
ordinarily 148:25.
ordinary 87:14.
Organization 28:21,
  29:2.
organize 135:14.
original 32:9, 37:5,
  88:14, 97:11,
  99:7, 101:9,
  102:19, 105:8,
  105:12, 106:23,
  110:13, 110:22,
  137:13, 161:24,
  165:19.
originally 95:19,
  124:15, 129:2,
  154:6, 175:13,

196:7.
originals 48:17.
OSAC 28:20.
others 14:16,
  130:6.
Otherwise 72:6,
  208:2.
outside 21:18,
  24:11, 31:10,
  87:21, 154:16.
Overall 12:16,
  12:24, 13:5, 14:8,
  64:24, 182:1.
overlook 123:1.
overrule 72:10.
Overruled 218:13.
overwrite 85:17.
own 75:23, 76:2,
  83:3, 83:11,
  83:12, 133:21,
  176:2.
owned 187:20.
owner 78:19, 78:22,
  176:17.
owners 84:5,
  176:5.
.
.
< P >.
P-2 194:6.
p.m. 201:13.
package 9:7.
Page 2:7, 2:15,
  59:11, 79:10,
  88:21, 100:9,
  191:22, 191:23,
  192:2, 194:16,
  195:5, 200:8,
  214:13, 218:17,
  223:7, 223:9,
  223:11, 223:23,
  223:24, 225:16,
  230:3.
pages 6:22,
  224:25.
paint 38:24,
  40:23.
painting 45:7.
pan 144:24.
paper 2:19, 2:20,

20:11, 138:7.
paperwork 80:17.
par 27:16.
paragraph 59:11.
parking 36:20,
  51:16, 52:16,
  115:9, 126:7,
  126:13, 126:19,
  126:20, 126:24,
  127:9, 129:14,
  130:10, 131:7,
  132:23, 143:2,
  143:13, 210:19,
  210:22, 217:6.
Parkville 190:7.
Part 17:18, 18:24,
  27:7, 28:4, 30:2,
  50:23, 57:8,
  66:13, 71:16,
  71:21, 72:2,
  72:24, 77:12,
  77:14, 87:24,
  90:20, 99:4,
  104:14, 106:4,
  107:2, 134:22,
  167:4, 178:21,
  188:17, 226:13.
particularly
  129:8.
partnership 76:25.
parts 46:9,
  159:25.
pass 5:12, 117:11,
  122:15.
passed 11:23, 129:1,
  205:23.
password 84:18,
  84:20.
past 116:11, 131:9,
  135:9, 224:21.
path 161:21.
pathway 17:17,
  17:24, 19:16.
patrol 75:1.
paused 227:14.
payment 198:17,
  198:23, 201:13,
  201:14.
PC 133:16, 153:11,
  154:1.

Pc-based 77:2,
  84:16, 150:7,
  153:10.
PDF 67:13, 67:15,
  68:1.
pen 138:14.
pending 31:4,
  41:4.
People 21:25, 29:3,
  82:23, 83:12,
  130:6, 148:11,
  148:17, 159:23,
  179:1, 195:20,
  202:13, 204:6,
  206:4, 206:6,
  207:2.
per 50:2, 86:1.
percent 213:11,
  225:18.
Perfect 48:16,
  137:18.
perform 30:4, 31:2,
  32:24, 34:22,
  35:2, 35:9, 36:10,
  37:15, 47:9, 48:3,
  77:18, 78:16.
performed 47:8,
  51:14.
perhaps 229:2.
period 58:3, 61:16,
  158:6, 224:15,
  225:5, 225:11.
periods 67:2.
permission 83:25,
  194:6.
person 10:14, 10:16,
  21:19, 32:25,
  33:8, 33:9, 33:16,
  34:6, 35:3, 35:22,
  46:7, 54:24,
  108:19, 207:13,
  207:19, 222:17.
personal 93:12,
  147:23, 153:11.
perspective 12:4,
  12:7, 16:4, 16:6,
  47:4, 47:23,
  108:22, 112:10,
  128:13.
perspectives 62:13,

68:10.
pertinent 13:16,
    79:22.
phase 24:22.
phones 36:3,
    193:20.
photo 17:16, 18:3,
    38:21, 90:2,
    132:4, 220:18,
    220:22, 221:15,
    226:23.
Photogrammetry 30:8,
    32:18, 32:19,
    33:5, 33:6, 36:12,
    36:13.
photograph 11:14,
    12:4, 12:10,
    13:16, 14:3,
    14:24, 15:8, 16:8,
    30:24, 32:25,
    34:17, 136:14,
    136:15, 222:17,
    224:4.
photographed 11:3,
    15:12.
photographic 26:13,
    26:15, 26:19,
    27:18, 29:5,
    29:12, 30:4.
photographically
    49:25.
photographing
    11:17.
photographs 11:9,
    14:19, 15:20,
    16:7, 17:2, 20:24,
    30:9, 30:16,
    37:20, 37:21,
    37:22, 50:19,
    56:22, 58:14,
    59:22, 64:3,
    72:24, 73:10,
    185:17, 185:21.
photography 30:18.
photos 176:14,
    211:22.
Photoshop 43:15.
phrase 40:3, 54:3,
    147:25, 148:1.
physical 2:14,

19:20, 26:13,
    27:18, 81:25,
    83:15, 145:3.
physically 20:8,
    81:24, 196:15,
    213:22.
physics 33:20.
PI 149:20.
pick 99:24, 126:10,
    151:12.
picked 112:4.
picking 111:13,
    113:22, 205:7.
picks 151:19.
picture 12:6, 16:18,
    33:21, 51:6, 68:6,
    85:25, 151:19,
    158:7, 220:3,
    220:9, 220:25,
    221:4, 221:7,
    225:21.
pictures 33:23,
    33:24, 63:23,
    65:22, 67:5,
    70:11, 70:21,
    71:6, 71:12,
    71:20, 71:22,
    72:6, 72:11,
    72:17, 195:20,
    219:11.
piece 20:11, 71:7,
    80:21, 138:7.
pieces 109:3.
PIO 77:4.
pissing 198:16.
pixels 35:19, 35:23,
    50:2.
place 14:11, 14:15,
    19:9, 20:1, 30:11,
    33:18, 34:6,
    34:21, 134:1,
    205:19.
places 44:2.
plain 61:12.
Plaintiff 1:7,
    1:23.
planning 207:9,
    207:11, 207:15,
    207:18.
plans 212:21.

plate 41:1, 41:3,
    46:16, 168:12.
play 5:6, 35:25,
    57:14, 85:19,
    91:8, 107:4,
    111:1, 114:25,
    115:22, 115:25,
    120:23, 123:14,
    125:17, 141:1.
playback 86:10.
played 33:24, 57:24,
    60:13, 166:13,
    173:21.
playing 118:21,
    119:12, 121:9,
    137:6, 137:9,
    157:10, 164:19,
    166:10.
Please 8:1, 8:7,
    25:13, 25:19,
    36:2, 41:11,
    55:19, 58:18,
    73:16, 73:24,
    74:6, 91:20,
    92:15, 101:3,
    110:8, 116:12,
    116:16, 163:11,
    169:14, 174:10,
    174:20, 175:5,
    177:11, 179:22,
    180:4, 180:10,
    180:17, 181:17,
    181:20, 227:25.
Plus 138:6, 138:19,
    138:20, 139:3,
    140:12, 157:22.
PO 199:3.
point. 46:7, 116:10,
    169:7, 227:24.
pointed 159:6.
pointing 67:11,
    134:1, 150:15.
points 102:15.
poles 36:21.
Police 5:8, 6:13,
    6:17, 8:18, 8:20,
    9:2, 74:19, 74:20,
    74:24, 76:4,
    76:20, 77:7, 77:9,
    80:5, 80:17, 84:6,

```
 1    120:5, 131:15,          presence 77:23.         159:23, 161:23.
      191:10, 210:25,         present 10:4, 10:24,   proceed 222:2.
 2    211:4.                    83:1, 87:13,          Proceedings 1:17,
      Pontiac 51:20, 54:3,      101:1, 147:16.         43:5, 99:18,
 3      54:7, 54:9,           presentation 9:8.        149:10, 163:10,
        131:22, 131:24,       presentations           166:7, 210:16,
 4      132:19, 132:20,         77:4.                  227:7.
        143:8, 143:15,        presented 134:17.      process 9:6, 11:6,
 5      156:21, 157:3,        pressure 21:22,          21:1, 21:3, 21:12,
        176:2, 176:11,          21:23, 138:16.         22:23, 23:4, 24:2,
 6      176:14, 187:9,        Pretty 50:8, 89:10,      24:5, 24:17,
        187:11, 206:14,         127:11, 142:3,         64:10, 66:13,
 7      206:16, 208:19,         150:9, 200:6.          78:20, 88:18.
        209:3, 209:5,         prevent 206:22.        processed 23:16,
 8      210:19, 210:21.       prevented 40:13.         24:19.
      pool 15:15.             previous 15:8,         processing 20:22.
 9    pop 173:3.                15:19, 17:16.        produced 98:5,
      portable 86:15.         previously 4:23,         100:14.
10    portion 23:3, 23:5,       17:12, 100:13,       product 49:1.
        61:1, 194:6.            131:1, 176:2,        profession 26:17.
11    portions 62:4,            222:15.              professional 27:4,
        160:3.                primary 10:7, 10:8,      28:17.
12    position 3:16, 37:5,      10:10, 30:5,         proffer 29:12.
        188:25.                 81:9.                proffered 29:9.
13    positions 74:24.        print 21:16, 49:18,   program 19:13,
      possibility 66:23.        49:20, 49:24,         26:23, 83:11,
14    possible 67:9,            50:6.                  157:22, 159:4,
        198:11, 213:1.        printed 50:9.           162:4, 171:22.
15    possibly 10:23,         printing 49:25,       projection 32:16,
        22:19.                  50:4.                  32:17, 32:18,
16    poster 56:22, 60:11,    prints 21:13, 21:22,     32:23, 33:6,
        62:5, 63:23,           21:24, 23:17,          33:19, 34:22,
17      67:14, 68:1, 68:2,     24:6, 50:1.            35:10, 35:13,
        90:13, 112:25.        Prior 16:6, 75:22,      35:24, 36:10,
18    posters 68:10,           77:9, 126:1,           36:15, 73:3.
        91:4.                   130:8, 160:12,       projector 48:21.
19    powder 21:20,             160:13, 160:15,      promotion 8:24.
        21:23.                  191:9, 193:24,       prompted 221:5.
20    power 65:24.              208:23, 210:9,       proper 209:17,
      precaution 21:7.          214:10, 217:13,        210:1.
21    precise 69:25.            217:15, 217:20,      properly 77:1, 77:3,
      pregnant 204:20.          218:3, 218:10,         154:25.
22    premarked 58:22.          223:3.               properties 154:16.
      preparation 91:10,      private 82:17.        property 78:22,
23      106:4.                privileged 56:3.         81:2, 84:24,
      prepare 41:5, 71:17,    probably 32:21,          153:13.
24      106:5, 128:17.          46:23, 55:24,        proprietary 86:10,
      prepared 43:9,            76:6, 81:20,           172:24.
25      43:10, 43:12,           87:16, 87:18,        prosecutor 218:1.
        43:21, 78:10.           115:20, 144:8,       protect 226:16.
```

protocol 10:6.
provide 29:20, 69:8,
   84:6, 84:20,
   84:23, 148:24.
provided 6:3, 86:24,
   88:15, 97:25,
   103:10, 117:5,
   147:21, 148:3,
   148:22, 149:15.
providing 75:6.
psychiatrists
   28:22.
public 77:4.
publicity 2:3.
publish 60:2.
pull 6:21, 43:8,
   75:22, 75:23,
   78:18, 79:20,
   79:22, 82:18,
   88:14, 132:10,
   170:5.
pulled 42:10, 56:25,
   82:22, 83:7,
   102:19, 105:8,
   129:4, 158:7,
   170:7, 172:19,
   215:20, 215:22.
pulling 82:9,
   118:25.
pulls 78:21, 82:4,
   129:13.
purports 103:16.
purpose 159:20,
   184:3, 184:4.
purposes 6:18, 35:7,
   36:7, 59:8, 73:10,
   77:5, 78:10,
   101:18, 103:16,
   106:17, 136:21,
   140:20, 191:17,
   227:21.
push 4:15.
pushed 96:22.
putting 30:11,
   72:23, 147:13,
   224:24.
.
.
< Q >.
qualified 29:5,

29:8.
Quality 85:25, 86:4,
   87:4, 87:14,
   150:9.
Quantico 26:5.
questioned 29:5,
   61:25, 62:1,
   63:11, 63:13,
   203:19, 205:3,
   205:6, 209:2,
   211:2, 211:9,
   211:16, 226:11.
questions 7:14,
   7:17, 22:6, 25:2,
   70:15, 73:14,
   132:3, 149:6,
   159:10, 169:24,
   170:1, 172:8,
   172:12, 174:4,
   179:11, 205:8,
   211:19.
quick 114:12,
   166:25.
quicker 140:14.
quickly 174:10,
   179:10.
quite 26:6, 69:25,
   76:5, 76:15,
   76:17, 192:23.
quizzed 26:25.
quote 69:16.
.
.
< R >.
R-12 189:5.
R-14 177:1, 177:2,
   177:9.
R-20 190:13,
   212:20.
rabbit 161:24.
rained 21:17.
raise 8:1, 25:13,
   73:24, 174:20,
   180:5.
raised 182:4.
range 64:22, 66:15,
   66:17, 156:25.
rate 33:24, 76:15,
   76:16, 87:6.
reach 183:10,

195:10, 195:16,
   197:22, 198:8,
   203:20.
reached 183:11.
reaches 85:16.
reaching 196:20.
reacting 101:25.
reaction 223:18,
   224:4, 224:6,
   225:4, 225:16.
read 2:13, 26:24,
   95:2, 101:1,
   191:23, 208:24,
   210:20, 214:13,
   217:12, 218:16,
   218:18, 218:20,
   223:4, 223:8,
   223:20, 223:24,
   225:17, 227:16,
   227:18.
reading 133:12,
   202:21, 203:3,
   204:19, 214:17,
   221:7, 223:13,
   224:16.
Ready 3:22, 56:8,
   56:15, 102:15,
   143:9, 190:24,
   192:18, 192:22,
   192:24, 193:2,
   227:25.
real 79:6, 85:4,
   85:8, 92:6, 92:8,
   92:12, 101:5,
   101:10, 103:2,
   106:12, 106:16,
   110:22, 137:17,
   137:23, 155:23,
   222:12.
real-time 86:4.
realize 147:5.
Really 13:19, 65:24,
   103:25, 129:22,
   148:16, 149:5,
   151:18, 165:18,
   165:20, 202:1,
   203:14, 209:17,
   209:25, 220:5.
rear 23:13, 23:15,
   67:5, 169:1,

169:3.
rear-view 39:1.
reason 95:17, 162:3,
   205:13, 208:2,
   217:23.
reasons 35:6.
rebut 161:4.
recalling 201:20.
receive 6:4, 44:23,
   66:11, 81:17.
received 31:8,
   95:19, 98:9.
receiving 202:11,
   202:15, 202:22,
   203:1, 219:17,
   221:4.
recent 8:24, 158:12,
   158:13, 159:8,
   159:12, 184:13.
recently 146:19,
   150:10.
recess 56:7, 104:18,
   116:20, 169:17.
recited 193:23,
   194:20.
recognize 46:7,
   49:1, 176:10,
   176:14, 185:20,
   187:15, 193:24,
   194:19, 194:23,
   210:6, 210:7,
   220:17.
recognized 2:12,
   222:17, 225:21.
recognizes 159:1.
recollection 9:23,
   18:21, 58:17,
   60:25, 97:22,
   160:11, 191:8,
   191:11, 192:4,
   192:7, 192:17,
   194:2, 201:23,
   208:22, 209:20,
   210:2, 210:11,
   210:14, 212:14,
   213:6, 214:9,
   214:11, 214:19,
   218:9, 218:15,
   218:21, 223:2,
   223:15, 224:3,

224:21.
recopy 95:5,
   95:11.
record 23:9, 23:10,
   25:20, 34:15,
   53:4, 67:19,
   67:23, 86:17,
   97:1, 98:25, 99:6,
   111:9, 113:18,
   119:21, 151:2,
   151:13, 180:12,
   181:22, 181:25,
   194:1, 226:24,
   227:8.
record. 42:20,
   92:17, 146:14,
   158:23, 165:12,
   209:14, 224:19.
recorded 92:11,
   152:4.
recorder 84:15.
recording 5:13, 6:8,
   150:18.
recordings 5:8.
records 80:6,
   100:24, 151:17,
   194:9, 198:7.
recover 9:5, 9:6,
   21:8, 24:21, 77:2,
   77:3, 77:24,
   78:24, 79:18,
   83:21, 86:14,
   90:10, 90:20.
recovered 20:12,
   24:20, 71:8,
   86:11.
recovering 81:21,
   81:23, 81:25,
   82:1.
recovery 80:2,
   80:22, 87:25,
   88:23, 89:9,
   106:11.
recreating 30:11.
rectangular 168:2,
   168:19.
red 49:14.
redid 173:18.
Redirect 25:3, 71:2,
   71:3, 172:3,

172:6, 179:19,
   230:23, 230:33.
refer 9:23, 32:18,
   89:25, 126:5,
   146:2.
reference 10:14,
   90:24, 114:19,
   123:8, 126:4,
   129:16, 141:20,
   223:5.
references 6:15.
referencing 61:23,
   67:15.
referred 10:19,
   51:19, 58:5,
   58:13, 59:14,
   59:17, 62:1,
   218:9.
referring 12:9,
   12:10, 13:22,
   14:25, 16:21,
   87:13, 93:6,
   93:12, 94:9,
   117:10, 121:13,
   198:22, 208:25,
   216:3.
reflect 9:21,
   100:24, 181:25.
reflected 195:14.
refresh 9:23, 18:21,
   58:16, 60:25,
   97:3, 160:10,
   191:8, 191:11,
   192:4, 194:1,
   208:22, 210:2,
   210:10, 214:9,
   214:11, 214:19,
   218:9, 218:14,
   218:20, 223:2,
   223:15, 224:3.
refreshes 192:7,
   210:3, 210:13.
refreshing 209:19,
   224:21.
refuse 84:3,
   218:2.
regard 30:4, 32:11,
   37:16, 37:18,
   40:17, 41:6, 52:6,
   76:18, 77:8,

84:10, 89:2, 95:3,
99:5, 111:11,
139:13.
regarding 100:25.
registered 176:5,
176:15, 176:17.
registration
177:9.
regular 66:21,
176:24, 183:15,
184:8, 203:22.
regularly 76:15,
199:9, 217:3.
related 115:13.
relates 100:9.
relation 17:1.
relationship 175:25,
184:18, 184:20,
195:3, 201:8,
215:13.
relaying 6:11, 7:1,
7:2.
releases 149:21.
relevant 19:25.
reliability 102:9,
102:12.
reliable 96:15.
relied 162:11.
rely 157:17.
relying 63:1.
remain 29:22,
224:14.
remind 5:16, 29:22,
55:23, 56:12,
104:24, 106:14,
117:2, 169:21.
reminded 100:23.
rent 186:20,
186:22.
repeatedly 2:21,
203:9.
repetitive 53:3,
110:12.
rephrase 111:22.
replace 212:17.
reported 45:25.
Reporter 1:47, 39:7,
53:8, 107:24.
reporting 81:14.
representation

226:6.
representatives
42:24.
request 31:6, 31:7,
31:24, 44:12,
47:11, 51:18,
62:22, 63:19,
66:11, 73:9, 83:4,
89:14, 217:16.
requested 21:1,
29:14, 32:9,
37:23, 40:6,
42:13, 51:24,
52:13, 53:20,
62:9, 70:23,
77:23, 170:8,
170:9, 206:18,
206:19, 225:5,
225:11, 225:20,
225:22.
requester 52:1,
62:25, 63:1, 63:4,
63:7, 64:6,
70:1.
requesting 58:9,
60:17, 61:18,
161:1, 220:25.
requests 31:9,
31:12, 217:15.
required 31:14,
33:14, 41:25,
154:4.
requirement 34:8.
requires 33:6,
36:16, 37:2.
researched 159:14.
residence 12:12,
13:7, 13:8, 82:14,
178:1, 185:14,
190:9.
residences 75:18.
residential 82:21,
83:16.
resolution 33:15,
35:16, 35:23,
36:18, 40:12,
49:22, 49:24,
50:1, 50:12, 79:7,
85:24, 85:25,
87:19, 150:21.

resolutions 87:11.
respect 20:23,
23:13.
respective 82:5.
respond 9:4, 9:13,
9:17, 9:19, 90:23,
201:12, 201:19.
responded 10:7,
11:6, 88:18.
responding 161:19,
199:11, 202:1,
205:24.
response 9:21, 10:2,
102:16, 121:17,
129:21, 197:1,
197:2, 199:4,
199:15, 201:16,
203:21, 204:20,
205:13, 220:25,
222:22.
response. 191:12.
responsibilities
27:7.
responsibility
29:23, 171:1.
rest 7:21, 25:8,
73:18, 81:4,
179:22, 229:1.
Restate 60:24.
restrictions
178:19.
result 26:8.
retention 79:7,
85:12, 85:17.
retrieval 75:11,
76:3, 76:19,
76:24, 77:19,
78:15, 82:18.
retrievals 76:6.
retrieve 5:13, 5:24,
75:16, 78:2,
82:13, 83:23,
83:25, 87:5,
88:10, 110:20.
retrieved 6:6,
43:17, 76:9, 78:8,
92:7, 96:11,
105:13, 110:14.
return 173:5,
174:16, 202:3,

218:22.
returned 212:14,
  215:19, 218:6.
Reverse 32:16,
  32:17, 32:18,
  32:22, 33:5,
  33:19, 34:22,
  35:9, 35:13,
  35:24, 36:10,
  36:15, 73:3.
review 72:25,
  148:13, 171:10,
  171:24.
reviewed 5:7, 71:13,
  91:10.
reviewing 131:4.
Ridge 77:24, 78:3,
  82:17, 83:16,
  88:9, 88:24, 91:3,
  105:9, 110:14,
  126:11, 133:15,
  133:17, 133:18,
  133:19, 170:6,
  170:12, 170:22,
  172:18, 172:20.
right-hand 13:23,
  14:9, 49:7, 50:14,
  51:3, 53:4, 53:22,
  54:21, 55:2, 55:7,
  89:20, 108:14,
  115:3, 115:11,
  123:1, 123:11.
ring 219:20.
rings 157:22,
  159:22, 167:15.
RIT 26:20.
road 66:6, 122:5.
robberies 75:3,
  75:23.
Robert 74:1, 74:8,
  230:25.
Rochester 26:19,
  26:20.
role 76:2.
rolling 18:16.
romantic 184:18.
room 55:19, 93:18,
  116:11, 153:14,
  224:1.
Rosalind 9:14, 9:20,

10:3, 10:17,
  108:10, 109:21,
  112:17, 113:20,
  120:11, 120:17,
  121:22, 122:15,
  124:5, 129:16,
  129:23, 130:1,
  131:9, 163:13.
rough 19:11.
Roughly 229:5.
route 16:25,
  121:18.
row 17:8, 67:24,
  67:25.
rows 57:3, 57:11,
  57:23, 58:2, 58:8,
  60:10, 62:5.
RPR 1:46.
ruin 116:5.
ruling 163:8.
run 79:2, 125:15,
  137:9.
running 123:3,
  129:8, 141:23,
  142:25, 151:18.
runs 154:4.
rust 38:23.

.
.
< S >.
S-1 191:15.
S6 158:9, 159:7.
safe 195:15,
  202:3.
safely 3:21.
samples 9:6,
  24:11.
Sandra 1:25.
sat 129:5, 149:18.
satellite 126:23.
Saturday 219:25.
saying 10:19, 37:12,
  43:9, 56:2, 67:10,
  68:4, 68:7, 68:17,
  68:18, 69:21,
  83:23, 83:25,
  92:19, 92:20,
  94:9, 96:14,
  96:22, 98:18,
  102:24, 106:3,

133:18, 153:19,
  153:25, 154:3,
  158:25, 160:23,
  203:8, 203:10,
  225:13.
says 11:21, 70:3,
  70:4, 81:20, 82:6,
  83:13, 85:12,
  93:15, 97:16,
  97:18, 97:25,
  98:10, 101:8,
  105:7, 106:22,
  110:11, 115:5,
  123:1, 146:4,
  152:9, 152:18,
  156:3, 179:7,
  189:10, 195:19,
  224:23.
scenes 9:4, 9:5,
  14:14, 16:22,
  76:2, 130:6.
scheduled 26:8,
  43:22, 198:17.
school 137:2.
science 26:18,
  28:23, 30:9,
  46:9.
Scientific 28:21,
  29:1, 32:23.
scientist 26:13,
  52:2.
scientists 27:18,
  28:22.
scoot 175:2.
screens 93:4, 97:10,
  106:19, 110:11,
  173:15.
screenshots 106:5.
Sean 81:13.
search 83:18, 83:20,
  84:1, 84:3.
seat 8:7, 25:19,
  48:1, 74:5,
  108:25, 112:7,
  130:4, 175:1,
  180:10.
seated 2:2, 3:7,
  55:23, 56:11,
  100:7, 104:23,
  116:23, 169:20,

181:17.
Second 39:19, 47:8,
  74:13, 86:1,
  88:21, 88:23,
  93:16, 108:23,
  109:4, 113:11,
  115:2, 119:3,
  124:23, 137:24,
  155:8, 155:9,
  172:4, 177:3.
section 6:17, 6:20,
  57:18, 137:7.
secure 173:6.
security 50:20,
  52:7, 77:15, 78:3,
  152:14, 154:23,
  155:4, 155:23.
seeing 36:9, 49:19,
  111:11, 124:13,
  151:10, 196:15,
  224:4.
seem 50:10,
  228:22.
seems 4:14,
  148:21.
seen 2:5, 2:8, 2:11,
  17:2, 60:15,
  104:9, 112:18,
  114:4, 126:1,
  131:1, 207:17,
  214:4, 214:20,
  214:22.
sees 33:23.
segment 156:25.
segue 128:15.
seize 20:8.
seized 20:15.
seizure 84:1,
  84:3.
self- 81:20.
selfie 220:24,
  221:23.
Send 32:1, 42:16,
  195:23, 220:2,
  220:9.
sending 44:20,
  195:19, 195:21,
  198:15, 203:14,
  220:6, 220:15,
  220:24.

senior 27:1, 27:3.
sense 47:17, 66:2,
  68:18, 69:22,
  102:7, 112:23.
sent 32:2, 32:8,
  51:18, 76:23,
  92:20, 221:7,
  221:23.
sentence 112:23.
separately 216:14.
sequence 33:22,
  52:10, 52:25,
  53:6, 53:13,
  53:15, 53:25,
  54:15, 57:19,
  57:24, 60:14,
  61:6.
Sergeant 81:13,
  191:9, 210:24,
  211:23.
serial 84:11.
series 11:8, 50:17,
  50:23, 72:22,
  163:12, 164:9.
seriousness 3:14.
server 173:6.
serves 97:22.
services 77:12.
setting 151:8,
  154:7.
settings 85:19,
  87:3.
setup 86:21,
  152:13.
several 10:5,
  31:3.
shadows 13:20.
Shaking 98:7, 98:8,
  199:24, 201:6.
Shall 5:23,
  126:25.
shape 40:25, 46:10,
  46:15, 46:18,
  46:19, 64:18,
  64:19.
share 46:5, 46:25,
  186:18.
shared 47:16,
  82:2.
she'd 84:25.

sheet 48:21, 79:3,
  94:24, 99:7,
  99:9.
shelf 43:14.
shift 189:13.
shooting 7:7,
  76:16.
shootings 76:14.
short 164:9,
  171:9.
shot 10:14, 10:16,
  12:24, 13:5,
  13:12, 14:8, 15:6,
  15:18, 15:22,
  16:1, 16:23,
  17:11, 17:22,
  18:6, 166:25.
shots 144:18.
shouldn't 4:4, 5:17,
  208:17.
showed 16:7, 43:19,
  53:15, 54:17,
  91:4, 94:3, 95:2,
  95:8, 159:5,
  172:11, 173:13,
  191:8, 194:1,
  208:22, 212:3,
  212:7, 214:9,
  223:2.
shown 211:23,
  222:16, 223:16.
shows 7:8, 11:15,
  113:9, 127:23,
  151:14, 159:6,
  165:16, 226:15.
sic 108:8.
side 14:10, 15:2,
  16:11, 17:1, 17:2,
  17:4, 17:14,
  17:16, 18:3, 18:6,
  19:21, 21:1,
  22:23, 23:3,
  37:25, 46:18,
  67:17, 90:14,
  142:2, 226:5.
sidewalk 129:12.
sighting 97:19.
significant 95:24.
silent 224:14,
  225:5, 225:10.

```
 1    silver 72:14, 72:15,        104:10, 104:14,         16:23, 84:2,
        214:5, 214:6,              180:11.                 99:10, 99:15,
 2      214:7.                   slides 103:25,            99:20, 103:19,
      silver-toned                 166:11.                 151:16, 162:8,
 3      72:16.                   slightly 55:1.            162:13, 186:3,
      similar 46:1, 65:2,        Slow 101:3.              202:25, 207:7,
 4      65:3, 65:7, 65:8,        slower 101:5.            207:23, 210:2,
        69:7, 69:9, 69:12,       small 14:9, 35:20,       217:25, 226:18.
 5      160:23, 167:23,            63:1, 118:3,          Sometimes 3:14,
        168:10, 205:8.             123:7.                  21:22, 36:24,
 6    simple 61:12, 95:17,       smaller 117:5,            49:16, 64:25,
        201:5.                     117:10.                 90:5, 151:3,
 7    simply 20:6, 30:8,         smallest 35:19.           178:2, 178:25,
        30:22, 31:23,            SMH 199:21,               183:17, 189:25.
 8      33:22, 34:6,               199:23.               somewhere 136:1.
        35:19.                   SMH. 201:5.             soon 104:3.
 9    Sinai 77:23, 78:3,         smooth 86:4.            sooner 148:24.
        82:17, 83:16,            smoother 86:2.          sophisticated
10      88:9, 88:24, 91:3,       smoothly 201:4.           150:12.
        105:8, 110:14,           snip 93:10, 97:12,      sort 15:1, 16:17,
11      126:11, 133:14,            119:6, 119:20,          40:25, 57:23,
        133:17, 133:18,            120:23, 121:4,          57:24, 60:14,
12      133:19, 170:6,            123:2, 125:9,           61:16, 64:20,
        170:12, 170:22,            130:8, 132:18,          89:6, 96:22,
13      172:18, 172:20.           133:2, 134:11,          100:16, 101:25,
      single 33:25,                136:13, 139:17,         184:18.
14      34:1.                      140:16, 141:11.       sorts 19:23.
      sit 84:25, 217:15,         snips 57:22, 94:3,      sought 226:18.
15      229:5.                     95:6, 95:7, 99:5,     sound 55:17.
      site 95:22.                  120:18, 126:1,        sounds 40:3, 94:5,
16    sits 127:10.                 128:17, 129:7,          202:5, 205:11.
      sitting 218:1.               129:23, 132:10,       southbound 119:10,
17    situated 108:3.              141:18, 141:20,         120:10, 122:7,
      situation 10:12,             148:12, 172:11,         130:18.
18      10:14, 85:23.              173:14.               Southwest 75:1,
      six 46:24.                 snow 3:19, 26:8,          75:2.
19    size 38:25, 40:25,           43:23.               speaking 225:8.
        50:7, 50:9, 152:5,       so-called 97:19.       Special 118:11.
20      152:6.                   softer 168:15.          specific 9:22, 30:7,
      sizes 152:11,              Software 7:3, 27:13,      45:1, 61:11,
21      152:12.                    27:15, 27:16,          71:21, 78:13,
      sketch 18:25,                27:17, 43:14,          84:14, 86:11,
22      19:11.                     86:8, 86:10,          170:9, 171:22,
      sketchy 16:18,               134:20, 136:20,        192:25, 213:6,
23      16:20.                     154:4, 156:16,         226:8, 226:21.
      skips 151:7.                 172:23, 172:24.      specifically 4:8,
24    sleep 190:19,              somebody 10:20,          42:16, 45:4,
        190:21.                    98:7, 98:8,           62:14, 77:22,
25    sleepy. 202:14.              151:11, 228:16.        186:13, 188:2,
      slide 101:17,              Someone 2:18, 10:21,     190:14, 218:10.
```

specifics 85:5,
    105:15.
specify 2:23.
Spell 8:8, 25:20,
    74:7, 175:3,
    175:5, 180:12.
spend 44:13, 96:18,
    149:5.
spent 75:11.
spirit 149:2.
spoiler 123:18,
    124:8, 124:14,
    125:21, 128:23,
    130:9, 130:24,
    131:2, 131:23,
    132:19, 143:7,
    157:3.
spoke 78:23,
    196:2.
sports 38:16.
spring 96:8.
squad 171:2.
square 49:14.
staff 63:1.
stains 13:24.
stamp 79:5, 97:7.
stand 3:23, 4:11,
    48:1, 104:22,
    107:17, 148:18,
    203:19, 203:21.
standard 79:18,
    79:23.
standards 28:25.
standing 17:19,
    34:7, 68:9, 128:1,
    128:22, 145:7,
    151:11.
stands 31:20.
star 101:5.
start 5:16, 11:9,
    42:5, 48:20, 61:6,
    64:21, 78:14,
    109:4, 137:20,
    141:1, 142:9,
    145:20, 145:25,
    151:12, 161:7,
    161:8, 161:21,
    189:13, 189:15,
    195:16.
started 26:22,

31:11, 75:1,
    96:11, 98:23,
    105:24, 140:4,
    140:5, 154:22,
    166:25, 204:14,
    227:12.
Starting 2:7, 32:16,
    49:13, 107:2,
    134:24, 192:2,
    218:18, 223:7.
starts 32:3, 85:17,
    134:12, 134:23,
    143:16, 164:7.
state 8:8, 25:20,
    28:12, 31:9, 74:6,
    175:3, 180:12.
statement 96:2,
    210:9.
States 1:1, 1:5,
    27:24, 51:15.
Station 26:4, 178:3,
    185:13, 187:7,
    187:21, 189:19,
    189:23, 190:3,
    198:8, 206:13.
stationary 132:5.
stations 2:19.
stay 11:18, 14:17,
    27:16, 52:2,
    107:18, 145:4.
stayed 52:1, 219:20,
    219:22.
staying 26:11,
    196:24, 208:7,
    219:6, 219:9.
stays 143:2.
steady 187:5.
step 41:12, 77:6,
    99:17, 180:4,
    227:14.
Stephen 1:39.
steps 87:19.
stickers 38:25,
    40:25.
stickler 209:16.
sticky 57:4.
stipulates 78:7.
stipulation 166:9.
stopped 34:20,
    123:24, 129:2,

129:3, 167:8.
stopping 115:17,
    201:13.
storage 75:11, 76:3,
    76:19, 77:18,
    78:15, 78:18,
    82:18.
store 77:3, 82:20.
stored 85:18.
storeroom 150:24.
stores 134:21,
    154:17.
story 35:1.
straight 208:17,
    216:19.
stream 134:15.
Street 1:48, 12:13,
    12:14, 17:3,
    18:11, 18:15,
    18:19, 18:22,
    19:21, 82:25,
    87:12, 87:14,
    90:8, 91:14,
    111:8, 112:11,
    112:15, 119:8,
    120:6, 123:9,
    130:6, 171:19.
string 133:7,
    133:24.
structured 77:13.
students 27:5.
stuff 2:18, 77:17,
    146:1.
subject 35:17,
    194:7, 211:16,
    211:20.
subjects 211:9.
submit 44:11.
submitted 31:17,
    42:11.
subpoenaed 184:1.
subsequent 211:11.
substance 225:19.
successive 195:5.
sudden 151:10.
sufficient 33:15,
    35:23, 37:11,
    159:9.
suggest 96:22.
suggested 228:20.

```
1    suggesting 69:24,
        96:21.
2    summary 194:8.
     Sun 2:15.
3    Sun. 2:7.
     Sunday 212:15,
4        212:16, 212:20,
         212:21, 212:24,
5        213:1, 213:4,
         213:7, 218:7,
6        218:25.
     supervisor 8:17,
7        8:19, 8:22, 31:18,
         31:25, 81:14,
8        187:1.
     support 75:15,
9        76:2.
     supportive 76:13.
10   supposed 56:2,
         164:15, 196:7.
11   surface 21:19,
         21:21, 21:25.
12   surprised 96:9,
         102:1.
13   surveillance 30:12,
         30:14, 33:7,
14       36:17, 44:10,
         77:24, 80:1,
15       80:22, 88:22,
         150:2, 171:17,
16       212:3.
     survived 3:12.
17   suspect 6:12,
         226:12.
18   suspected 13:19,
         13:24, 14:8, 15:6,
19       15:10.
     suspicions 204:11,
20       205:7.
     suspicious 204:18,
21       207:25.
     sustain 224:12.
22   Sustained 158:20.
     sustaining 163:4,
23       163:5.
     swabs 20:19, 20:20,
24       24:8.
     sweater 181:19.
25   switch 60:5,
         72:19.
```

```
switches 164:6.
sworn 4:23, 8:4,
    25:16, 74:2,
    174:23, 180:7.
systems 75:17, 77:2,
    77:3, 77:13,
    77:15, 171:18.
.
.
< T >.
T-r-a-v-i-s 8:9.
T. 1:31, 1:46.
tag 131:8, 163:19,
    167:17, 167:18,
    168:15, 168:19,
    176:10, 196:23,
    206:10, 206:18,
    206:19.
taillights 46:15,
    157:18.
taken. 56:7, 104:18,
    116:20, 169:17.
talked 2:9, 19:16,
    32:10, 64:10,
    88:7, 128:8,
    147:4, 149:16,
    184:24, 185:3,
    199:8.
tall 33:9, 34:7.
tape 10:6, 18:16.
taped 10:5.
task 37:14, 48:2,
    76:22, 78:16.
tasks 30:3, 31:1,
    31:3.
tattoo 179:2,
    179:6.
tattooed 178:21.
tattoos 178:23,
    178:25.
taught 26:25.
teach 27:5.
teacher 138:9.
teaches 77:1.
team 32:2, 32:8,
    110:16.
tear-shaped 168:6.
technical 75:6,
    75:15, 77:17,
    86:9, 145:25.
```

```
Technician 7:25,
    8:19, 9:2, 9:3,
    9:11, 11:2, 11:5,
    18:25, 77:11,
    149:15.
technicians 11:14.
technologist
    26:14.
technologists
    27:19.
Technology 26:20,
    101:16.
tedious 141:21.
teenage 182:15.
telephone 36:20,
    88:3, 183:7,
    183:16.
television 21:25,
    75:17, 171:15.
televisions 48:7,
    48:8.
tells 10:13, 136:22,
    137:5.
ten 87:18, 100:5,
    222:10, 228:21.
ten-minute 99:16,
    99:21, 99:22.
tend 66:20.
term 31:19, 32:23,
    83:9, 171:14,
    171:17.
terminal 34:11.
terminology 70:6.
terms 39:9, 87:4,
    87:6, 89:5, 123:8,
    133:12, 144:21,
    147:5, 154:12,
    154:15.
Terrific 49:3.
testified 4:24, 8:5,
    25:17, 28:6, 28:9,
    28:14, 29:4, 74:3,
    77:6, 150:4,
    156:18, 157:11,
    159:18, 167:10,
    168:21, 173:16,
    174:24, 180:8,
    205:9, 211:12,
    211:15, 218:5,
    218:10, 222:15,
```

```
 1      225:17.
        testify 26:9, 28:4,
 2        29:19, 73:1,
          94:3.
 3      testifying 161:22,
          204:25, 205:16,
 4        225:1.
        text 193:5, 195:6,
 5        195:19, 195:21,
          197:18, 206:7,
 6        206:20, 219:11,
          219:17, 220:2,
 7        221:8.
        textbooks 26:25.
 8      texted 203:5, 221:9,
          221:24.
 9      texting 196:23,
          198:15, 203:9.
10      themselves 5:17,
          72:12, 83:3,
11        99:5.
        they'll 108:18,
12        150:23, 151:1,
          151:2.
13      they've 87:21.
        third 46:15, 48:2.
14      though 148:18,
          161:25, 211:20.
15      thousands 46:13,
          66:5.
16      Three 1:10, 20:12,
          32:15, 46:23,
17        48:13, 72:25,
          75:21, 82:4,
18        104:2, 104:15,
          141:17, 187:10,
19        187:15, 220:6.
        three- 151:9.
20      through. 111:21.
        Throughout 83:1,
21        93:22, 93:23,
          131:14, 147:22,
22        212:9.
        Thursday 190:18,
23        190:21.
        tight 151:6.
24      till 118:2.
        tilt 43:8, 144:24.
25      timely 75:24.
        timestamp 63:5,
```

```
        100:10, 100:14,
        100:17, 100:18,
        105:19, 137:19,
        151:21.
      timing 95:23.
      tire 23:12, 23:13,
        23:15, 23:16.
      title 26:12,
        26:13.
      tobacco 20:11.
      today 3:10, 28:5,
        28:7, 31:4, 77:17,
        78:11, 91:11,
        181:15, 210:17,
        217:13, 217:16,
        217:21, 218:3,
        227:11, 227:21,
        228:3, 229:5.
      together 48:18,
        93:25, 147:1,
        149:14, 149:16,
        149:18, 177:24,
        178:13, 186:25,
        200:8, 213:2,
        216:16.
      toggling 117:16.
      tomorrow 198:18,
        227:25, 228:7,
        228:10, 228:14,
        229:13.
      tone 202:5,
        224:20.
      took 12:3, 12:5,
        14:19, 16:18,
        20:18, 20:19,
        20:20, 26:23,
        55:4, 138:25,
        153:23, 186:20,
        186:22.
      Top 50:25, 52:21,
        53:18, 54:19,
        54:23, 55:5, 57:3,
        57:11, 62:16,
        107:8, 109:11,
        109:19, 115:24,
        122:12, 123:1,
        139:3, 142:20,
        191:23, 214:13.
      topic 163:5.
      topics 184:9, 211:6,
```

```
        211:13.
      total 137:7,
        137:9.
      touch 14:3, 15:1,
        23:24, 170:14,
        170:15, 196:21,
        208:4, 212:9,
        219:3.
      touched 21:19, 22:4,
        23:21.
      toward 45:21.
      towards 60:15,
        125:4, 129:15.
      town 190:2, 195:24,
        196:4, 196:11,
        203:24, 204:1,
        204:3, 204:5,
        213:7, 213:14.
      Townhouse 178:6.
      townhouses 17:8.
      trace 14:4.
      track 80:16, 154:21,
        228:24, 229:5,
        229:6.
      tracked 81:4.
      traditional 30:17,
        105:19, 106:2.
      traffic 161:15.
      train 27:13.
      trained 77:13.
      training 26:16,
        26:23, 27:9,
        76:20, 76:24,
        76:25, 82:2,
        84:5.
      Trainor 1:37, 93:6,
        93:11, 93:15,
        93:22, 97:4, 98:1,
        98:22, 100:25,
        102:21, 146:23,
        147:6, 179:12,
        179:13, 179:15,
        179:18, 230:39.
      Transcript 1:17,
        191:9, 224:18,
        224:22.
      transcripts 5:12,
        5:17, 5:18, 6:1,
        117:21.
      transferred 32:4.
```

transition 74:13,
   108:24, 159:6.
transitioned
   112:5.
travel 178:15,
   178:18.
traveling 3:17,
   30:13, 113:23,
   131:11, 206:24.
Travis 7:25, 8:3,
   8:9, 230:9.
tree 13:13, 13:18,
   13:25, 15:8,
   15:19, 16:10,
   16:11, 18:8,
   125:1.
trees 36:20.
TRIAL 1:10, 2:7,
   2:22, 7:20, 25:7,
   73:17, 174:11,
   179:23, 183:19,
   184:1, 184:25,
   185:2, 218:3.
tried 73:5.
trim 46:18.
trip 207:16.
trouble 220:11.
true 84:16, 155:16,
   210:5.
trunk 46:17,
   157:18.
try 3:20, 12:4,
   21:6, 30:23, 35:5,
   39:9, 73:3, 85:22,
   110:12, 115:17,
   136:9, 161:12,
   228:4.
trying 61:12, 68:3,
   86:10, 96:8, 98:4,
   100:18, 101:11,
   147:25, 148:1,
   149:1, 160:8,
   161:11, 161:13,
   161:14, 165:21,
   166:2, 193:5,
   195:10, 195:16,
   196:20, 198:8,
   201:4, 203:20,
   210:10, 225:19,
   226:16.

turn 2:9, 2:24,
   37:14, 63:5,
   107:15, 108:9,
   109:25, 111:8,
   111:24, 112:4,
   112:17, 113:22,
   114:1, 114:3,
   119:11, 120:10,
   120:11, 122:15,
   126:19, 129:1,
   129:4, 130:2,
   139:15, 143:12,
   177:4, 179:24,
   223:9.
turned 3:20, 77:11,
   120:7.
turning 61:22, 89:8,
   112:16, 119:8,
   121:20.
turns 111:4, 143:1,
   154:11.
tutelage 27:2.
TV 2:19, 48:9.
two-hour 26:7.
Two-minute 92:8,
   92:22, 92:25,
   93:19, 93:24,
   94:1, 94:4, 94:18,
   95:18, 96:10,
   102:6, 102:7,
   119:24, 120:1,
   142:16, 143:24,
   143:25, 146:1,
   148:14, 155:11,
   166:6, 166:15,
   173:16.
two-second 137:22.
two-year 26:22.
two. 138:19,
   138:20.
type 16:25, 19:24,
   21:20, 32:24,
   35:2, 35:9, 37:14,
   40:10, 41:6,
   45:19, 46:6,
   46:10, 47:8, 47:9,
   48:2, 65:5, 75:19,
   76:9, 80:1, 85:21,
   131:21, 185:14,
   187:8.

types 27:15, 27:16,
   30:3, 30:5, 31:1,
   32:19, 38:1,
   39:25, 40:4,
   45:18, 77:2,
   82:19, 87:13.
Typically 14:14,
   14:15, 16:24,
   38:23, 49:25,
   189:22, 199:6,
   208:12, 208:13,
   208:15, 221:20.
typing 7:1.
.
.
.
< U >.
ultimately 71:9,
   219:20.
unable 21:12,
   86:23.
unanswered 198:4.
uncommon 66:11.
underscore 133:17,
   134:25, 135:4,
   135:12.
understanding 24:5,
   56:21, 100:8,
   132:8, 149:12,
   164:21, 164:24,
   206:15.
understood 94:15,
   96:7, 102:3,
   156:2.
unfair 148:21.
Unfortunately 36:24,
   43:20, 76:5,
   86:18, 150:21.
unique 11:15, 38:3,
   38:22, 40:24,
   66:8.
Unit 75:3, 75:4,
   75:8, 75:9, 76:7,
   76:8.
United 1:1, 1:5,
   27:24.
university 27:8.
Unless 100:7,
   117:22, 145:3,
   162:13.
unsuccessful 37:9.

until 7:20, 25:7,
    73:17, 108:20,
    151:6, 151:19,
    161:21, 174:11,
    179:23, 200:12.
unusual 199:11.
unusually 203:20.
update 66:20,
    151:18.
upgraded 87:9,
    150:10.
upper 15:2, 50:7.
upset 201:21.
USB 173:5.
user 84:18, 84:20,
    86:20, 87:2.
uses 33:5, 80:25,
    86:19, 155:2.
Using 18:19, 20:5,
    21:20, 43:13,
    43:14, 70:6,
    79:14, 86:14,
    107:22, 112:15,
    113:17, 120:6,
    145:21.
usual 154:15.
utilities 186:23.
utility 186:20.
utilize 36:16.
.
.
< V >.
V– 57:15.
V-1 43:20, 53:15,
    54:16, 56:25,
    57:14, 57:15,
    68:1, 91:8, 105:5,
    107:3, 115:5,
    118:17, 126:2,
    131:15, 136:13,
    173:22.
V-11 132:16, 139:16,
    141:17, 172:5,
    172:11.
V-12 139:15, 139:16,
    141:17, 152:17,
    156:3.
V-13 140:20, 140:24,
    141:17.
V-14 142:1.

V-15 143:4.
V-16 144:16,
    145:5.
V-2A 78:1, 80:15.
V-2B 78:1.
V-2C 78:2.
V-3 170:4.
V-3A 89:22,
    112:16.
V-3B 90:8, 111:10,
    115:6, 117:6,
    119:4, 133:21,
    144:13, 145:10.
V-3C 138:22.
V-4 227:9, 227:10.
V-4A 48:14, 48:15,
    48:20, 49:13,
    50:23, 51:7.
V-4B 50:24.
V-4E 53:1, 53:7.
V-4F 53:6.
V-4G 53:14.
V-4H 53:24.
V-4I 54:11.
V-4J 54:15.
V-4L 55:4.
V-4M 48:16, 54:23,
    72:20.
V-5 79:10, 88:22,
    92:5, 150:15.
V-6 42:9, 43:10,
    43:12, 45:23,
    52:6, 54:8, 71:6,
    71:12, 72:17,
    72:22.
V-7 47:6, 52:6,
    54:8, 56:23,
    63:23, 71:7,
    71:13, 72:18,
    72:22, 92:18,
    100:14.
vacation 196:8,
    206:25.
vacuum 24:10.
vague 68:18, 69:21,
    69:24.
variable 95:24,
    143:25.
variation 137:22,
    142:16.

various 44:2, 80:16,
    91:3, 112:19.
varying 86:19,
    152:12.
VCR 154:7.
vehicle. 69:17.
vehicles 30:19,
    38:15, 39:4, 40:6,
    40:16, 45:21,
    45:25, 46:2,
    46:12, 47:11,
    51:19, 54:6,
    58:12, 66:6,
    66:20, 68:7, 69:6,
    69:11, 121:18,
    123:25, 131:16,
    156:18, 187:8,
    187:20, 211:8.
velocity 30:13.
vendor 154:8.
vendors 154:18.
verbal 191:12.
verify 158:2.
Verizon 77:11,
    155:1.
version 90:9, 93:1,
    93:3, 94:9, 94:10,
    94:11, 94:14,
    94:15, 94:16,
    94:18, 95:4,
    95:18, 96:4, 96:5,
    96:6, 96:7, 96:13,
    101:6, 118:3,
    148:6, 148:9.
versions 117:5,
    117:10, 147:21,
    148:2, 159:8,
    159:12.
versus 85:9, 86:3,
    86:4.
victim 6:3, 6:6,
    10:21, 10:23,
    10:24, 11:22,
    13:2, 13:6, 13:7,
    13:12, 14:24,
    15:23, 16:2, 17:1,
    17:4, 17:7, 17:23,
    18:3, 18:8, 20:23,
    21:5, 22:3, 22:17,
    22:19.

1   Victor 34:14, 42:6,
      52:11, 52:20,
2     55:9.
    videos 30:17, 50:20,
3     71:10, 75:16,
      78:6, 92:7, 97:5,
4     101:10, 105:8,
      105:12, 105:13,
5     106:12, 110:14,
      110:23, 113:2,
6     135:25.
    videotape 94:1,
7     141:23.
    videotapes 71:8.
8   view 12:16, 18:2,
      67:17, 86:11,
9     90:5, 107:12,
      108:9, 109:11,
10    120:6, 120:7,
      122:19, 123:25,
11    127:9, 127:17,
      128:2, 128:3,
12    141:24, 142:18,
      143:5, 143:15,
13    144:23, 144:24,
      145:6, 163:25.
14  viewers 86:11.
    viewing 106:17.
15  views 128:14,
      128:18, 144:12,
16    144:18.
    violate 149:1.
17  Virginia 26:5,
      115:11, 115:13,
18    118:25, 119:7,
      119:10, 119:11,
19    119:14, 129:9,
      132:22, 141:23,
20    142:18, 143:1,
      143:11, 143:12,
21    143:13.
    visible 40:14.
22  visit 88:23,
      204:11.
23  voice 107:19,
      180:11, 180:16,
24    180:17, 181:13.
    voices 224:1.
25  voir 29:14,
      228:20.

volume 76:1,
  76:11.
voluntarily 84:6.
vs 1:8.
.
.
< W >.
W-i-n-d-e-r 8:10.
W. 1:48.
wait 104:15, 118:1,
  128:24, 138:15.
waiting 202:13.
walk 11:8, 17:15,
  17:17, 145:22.
walkaround 20:6,
  20:7.
walked 98:22,
  159:24.
walking 79:24.
walkway 16:1, 17:11,
  17:14, 17:15,
  17:16, 17:22,
  18:7.
wanted 2:10, 15:10,
  50:12, 62:16,
  67:24, 88:4,
  89:10, 145:10,
  154:10, 228:18.
wants 103:24.
warehouse 187:1,
  187:4.
warrant 84:1.
Watch 4:13, 57:19,
  61:1, 83:2, 83:3,
  83:10, 83:11,
  87:17, 87:20,
  100:20, 110:1,
  171:6, 171:8,
  171:11, 171:12,
  171:20, 171:21,
  171:22.
watching 121:24,
  122:14, 125:15,
  131:14, 131:21,
  132:2, 135:18,
  137:10, 150:24.
ways 39:25, 49:17,
  73:1.
wear 191:19.
wearing 181:18.

weather 21:17.
Wednesday 1:19.
weeds 77:16.
week 183:1, 183:2,
  184:4, 196:1.
weekend 190:16,
  212:10, 212:13,
  212:22, 219:1.
weight 161:18.
weird 48:19,
  108:5.
welcome 41:24,
  41:25, 180:1.
Wells 215:12.
west 90:16.
westbound 112:17,
  114:3, 119:11,
  120:12, 128:9,
  130:20, 131:13.
Western 219:21.
whatever 2:17, 14:5,
  81:2, 85:6,
  148:25, 154:9,
  154:10, 155:7.
whatsoever 160:18,
  209:7.
wheel 45:16.
wheels 18:16,
  18:17.
whoever 78:22,
  151:24.
whole 27:21, 43:24,
  80:25, 84:4,
  95:11, 135:25,
  139:12, 226:3.
whom 6:4.
wide 64:20.
width 18:10, 18:15,
  18:19, 18:22,
  43:24.
Winder 7:25, 8:3,
  8:9, 8:14, 9:9,
  11:9, 13:22, 14:2,
  18:9, 19:20,
  230:9.
window 46:19.
windows 39:1,
  41:1.
windshield 45:13.
winter 188:13,

188:15.
wintertime 188:16.
wiped 21:22.
wiring 77:12.
wish 91:21, 222:2.
withdraw 93:12.
within 29:21, 30:16,
  30:20, 33:17,
  36:19, 37:20,
  40:6, 40:15, 44:2,
  45:6, 74:24,
  105:13, 126:11,
  144:8.
without 84:1, 103:3,
  130:9, 205:24.
witnesses 23:18,
  29:20, 229:3.
woke 190:24, 192:5,
  192:10, 192:12,
  196:9, 198:11.
woman 204:12,
  204:17, 204:20,
  204:23.
wooded 17:3, 17:18,
  18:7.
Woodland 108:9,
  108:12, 110:5,
  113:9, 114:3,
  120:9, 121:8,
  124:18, 125:2,
  125:4, 128:6,
  128:8, 130:19,
  130:20, 131:13,
  163:14, 167:5.
word 32:21, 36:11.
words 63:18,
  136:9.
wore 221:12,
  221:20.
work. 209:7.
workaround 106:2.
worked 27:2, 74:20,
  77:10, 189:15.
workers 188:5,
  188:6.
Working 26:21, 29:1,
  50:13, 66:13,
  76:18, 77:9, 96:6,
  99:10, 188:3,
  190:16, 201:23.

works 33:19, 65:5.
worksheet 150:14.
world 137:18.
worry 49:4, 202:1,
  202:2.
worse 165:16.
worth 228:21.
wrapped 20:11,
  227:4.
wreath 13:9, 13:10,
  13:13, 14:25,
  15:24, 16:5,
  16:13.
wrist 179:7.
write 70:5, 88:3,
  134:5, 135:7,
  135:10, 139:2,
  141:5, 142:20.
writes 29:2,
  134:14.
writing 28:25.
written 32:7,
  83:17.
wrote 37:11,
  136:9.
.
.
< Y >.
year 64:21, 66:14,
  66:17, 69:7,
  76:12, 80:7, 80:9,
  80:11, 80:13,
  133:25, 135:5,
  156:25, 157:2,
  159:22.
yearly 76:17.
years 8:21, 9:1,
  26:21, 27:2,
  74:22, 75:21,
  87:18, 182:13,
  182:15, 182:18,
  182:19, 203:15.
yesterday 2:13,
  3:20, 5:5, 26:9.
York 26:20.
you. 203:7, 220:9.
young 6:10,
  205:14.
yourself 4:10,
  191:25, 192:3,

214:15, 218:18,
  223:8, 223:11.
yourselves 55:21,
  116:13, 169:12,
  228:1.
.
< Z >.
Zerkin 1:31, 7:12,
  7:14, 42:18,
  42:22, 70:18,
  71:1, 72:5,
  100:25, 117:24,
  224:2, 230:21.
zoom 144:24,
  189:6.
zooming 13:21.