IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MARYLAND


UNITED STATES OF AMERICA,      )
                               )
          Plaintiff,           )
     vs.                       )
                               )   CRIMINAL NO.: GJH-17-0667
DAVON CARTER and CLIFTON       )   JURY TRIAL:  Day Five
MOSLEY,                        )
          Defendants.          )
_____)


                Transcript of Proceedings
            Before the Honorable George J. Hazel
                Tuesday, January 14th, 2020
                   Baltimore, Maryland


For the Plaintiff:

     Sandra Wilkinson, AUSA

     Kim Oldham, AUSA

For Defendant Davon Carter:

     Gerald T. Zerkin, Esquire

     Christopher M. Davis, Esquire

For Defendant Clifton Mosley:

     Harry J. Trainor, Jr., Esquire

     Stephen B. Mercer, Esquire


_____

                 Christine T. Asif, RPR, FCRR
                Federal Official Court Reporter
                101 W. Lombard Street, 4th Floor
                   Baltimore, Maryland 21201

```
 1              P R O C E E D I N G S

 2          THE COURT:  Good morning.  You may be seated.  I

 3  hope everyone enjoyed the weekend.  I understand there's

 4  nothing to talk about before we get the jury.

 5          MS. WILKINSON:  No, Your Honor.  And we took the

 6  liberty of having Sergeant Jones back on the stand.

 7          THE COURT:  Welcome back.

 8          THE WITNESS:  Thank you, sir.

 9          THE COURT:  All right.  We can get the jury.

10          (Jury entered the courtroom.)

11          THE COURT:  All right.  You may all be seated.  Good

12  morning, ladies and gentlemen.

13          JURORS:  Good morning.

14          THE COURT:  How was your weekend?

15          JURORS:  Wonderful.

16          THE COURT:  That's good.  That's good.  All right.

17  We are ready to continue.

18          Sir, I remind you, you are still under oath.

19          THE WITNESS:  Yes, sir.

20          THE COURT:  Government's witness.

21          MS. OLDHAM:  Thank you, Your Honor.

22                    SERGEANT SEAN JONES

23  called as a witness, having been previously duly sworn, was

24  examined and testified as follows:

25
```

1                    DIRECT EXAMINATION (cont'd)

2    BY MS. OLDHAM:

3    Q.  Good morning, Sergeant Jones.

4    A.  Good morning.

5    Q.  Sergeant Jones, when we broke on Thursday afternoon, we

6    were getting ready to play the recorded audio and visual

7    statement that you took from Mr. Carter.

8    A.  Uh-huh.

9    Q.  I'm not sure if we asked you this before we broke, but

10   have you had an opportunity to review the audio-visual

11   recording of that interview you did with Mr. Carter?

12   A.  Yes, ma'am, I have.

13   Q.  And have you had an opportunity to review a transcript as

14   an aid along with watching the video to ensure that it's an

15   accurate representation?

16   A.  Yes, I did both simultaneously.

17          MS. OLDHAM:  Your Honor, at this time I would

18   request we have permission to pass out transcripts as an aid

19   to the jury.  They are Government's C-5A, and we would be

20   playing Government's Exhibit C-5.

21          THE COURT:  Very well.

22          MS. OLDHAM:  Your Honor, I do have an updated

23   transcript.

24          THE COURT:  Great.  Thanks.  If there are extras, my

25   law clerk could have one.  Thank you.

1              (Video played.)

2              MS. OLDHAM:  Your Honor, shall I retrieve the

3    exhibits?

4              THE COURT:  Yes, please.

5    Q.  (BY MS. OLDHAM)  Sergeant Jones, throughout the

6    transcript, whenever there's capital "U," capital "I," what is

7    that?

8    A.  Unintelligible, the person typing the transcript couldn't

9    decipher what was being said.

10   Q.  And the part of the interview where it appears that you're

11   holding out your phone and showing something to Mr. Carter,

12   what are you showing him at that time?

13   A.  I'm showing him videotape from camera No. 8 from the Sinai

14   Ridge apartment complex, and it depicts his vehicle backing up

15   into the parking space.  That's ultimately where we got the

16   vehicle tag from.

17   Q.  At this point in the interview, are you approaching this

18   line of questioning with Mr. Carter as if he were the driver

19   of the vehicle at that time?

20   A.  Yes, I was.

21   Q.  At this point in the investigation, did you have yet cell

22   tower information from anyone's cell phones?

23   A.  No, I did not.

24   Q.  Did you have any call detail records, text messages,

25   instant messages from anyone's cell phones?

1    A.  Just the videotape.

2    Q.  When you were questioning Mr. Carter, and at one point you

3    referenced a departure time of 10 to 7:00 or 6:50, was that

4    information from Deanna Lawson?

5    A.  It was, yes.

6    Q.  You interviewed her before Mr. Carter?

7    A.  Yes, I did.

8    Q.  At the time of your interview with Mr. Carter, what was

9    your assumption with respect to Baltimore County charging

10   Mr. Carter for the drugs?

11   A.  I had assumed because of the quantity of marijuana, that

12   he was going to be charged with a controlled dangerous

13   substance violation.

14   Q.  Did there come a point after you concluded the interview

15   with Mr. Carter that you learned that Baltimore County was not

16   initiating charges against Mr. Carter?

17   A.  There did, yes.

18   Q.  Do you recall approximately what time then Mr. Carter was

19   released from headquarters?

20   A.  It was almost 10:30 at night.  I believe the exact time

21   was 10:22, but somewhere around that neighborhood.

22   Q.  Do you recall what was happening in the investigation from

23   the time you concluded your interview with Mr. Carter to the

24   time he was permitted to leave headquarters?

25   A.  We had executed a search and seizure warrant on his

1  vehicle, which was done in the basement of our headquarters

2  building in the crime lab bay for processing of fingerprints

3  and things of that nature.  I specifically took a look at the

4  front of his vehicle, the tires, to look at the brakes for his

5  claim that Tony was fixing the brakes on his car.

6  Q.  Okay.  Let me show you then since you're referencing the

7  Pontiac, we'll start with C-8, Government's Exhibit C-8.  Do

8  you recognize C-8, Sergeant Jones?

9  A.  Yes, I do.

10  Q.  And is that the Pontiac Grand Am in question?

11  A.  It is, that's the one I was referencing when I was talking

12  about the search and seizure warrant.

13  Q.  Okay.  Showing you C-9.

14  A.  This is the same vehicle from a different angle.

15  Q.  C-10.

16  A.  That's going to be the rear of the vehicle.

17  Q.  And C-11.

18  A.  Again, same vehicle from another angle.

19          MS. OLDHAM:  Court's indulgence.

20  Q.  (BY MS. OLDHAM)  Sergeant Jones, I'm also showing you

21  Government's Exhibit C-12.

22  A.  That's a picture of the tire, one of the tires on the

23  Pontiac.

24  Q.  And did you take this photo?

25  A.  No, I didn't, but I specifically directed the crime lab

1    technician to take this photo.

2    Q.  And why did you do that?

3    A.  Mr. Carter's claims that the brakes had been repaired, I

4    wanted to show that I could see no evidence that the brakes

5    had been repaired.  There was brake dust on the tire that had

6    been undisturbed, and if you look in the circular holes behind

7    the hubcap, which I did, I couldn't see any evidence of new

8    parts or brake shoes or anything of that nature.

9    Q.  And when you were just referencing -- did you say "brake

10   dust" on the outside?

11   A.  I did.

12   Q.  What specifically were you looking for to see if there had

13   recently been brakes placed on the tire?

14   A.  If the tire had been removed, you have to do that to

15   replace the brakes, and if the tire had been removed, I was

16   looking for smears or fingerprints or anything that would give

17   me evidence that the tire had been recently removed, and then

18   obviously put back on after the repairs were made, and I

19   couldn't see any undisturbed dust on the -- excuse me, on the

20   hubcaps.

21   Q.  Did you check the other front tire as well?

22   A.  I did.

23   Q.  And did you make similar observations?

24   A.  Correct, I did.

25   Q.  And to your knowledge, would changing the brakes require

1    both front tires to be taken off?

2    A.  If you were changing brake shoes on both sets of brakes,

3    yes, they would.

4    Q.  During the execution of that search warrant on the

5    Pontiac, was there anything that was recovered?

6    A.  I specifically remember $930 in cash from the glove

7    compartment.

8    Q.  And what was done with that $930 in cash?

9    A.  It was returned to Mr. Carter when he left our building.

10   Q.  During the interview, Sergeant Jones, you asked Mr. Carter

11   about his cell phone information?

12   A.  Yes, I did.

13   Q.  And were there three cell phones that were seized on that

14   day, June 1st?

15   A.  There were.

16   Q.  And were they kept in Baltimore Police Department's

17   custody --

18   A.  Yes, they were.

19   Q.  -- for further forensic analysis?

20   A.  Yes, they were.

21           MS. OLDHAM:  Your Honor, may I approach Sergeant

22   Jones?

23           THE COURT:  Sure.

24   Q.  (BY MS. OLDHAM)  Sergeant Jones, I'm showing you what

25   actually contained three different exhibits.  I'm going to

1   show you Exhibit P-8 first, if you can tell me what that is.

2   A.   This is a cell phone that was recovered from Matt

3   Hightower -- correction, I'm sorry, from Davon Carter, and it

4   bears the same cell phone number that he gave me when asked at

5   the interview, 2399.

6   Q.   And is that your handwriting that's on the Post-it

7   indicating the cell phone number?

8   A.   It is.

9   Q.   And that was retrieved June 1st from the time of the

10  stop?

11  A.   Correct.

12  Q.   And I also meant to ask you, the female individual that we

13  saw during the recording, is that Detective Sandy Forsythe?

14  A.   It is.

15  Q.   On your squad investigating this case with you?

16  A.   Yes.

17  Q.   Showing you P-9.

18  A.   This is a cell phone that was recovered on June 1st at the

19  stop of Davon Carter.

20  Q.   Okay.  And that's your handwriting indicating the

21  number?

22  A.   It is.

23  Q.   And what's the cell phone number there?

24  A.   (443) 761-5150.

25  Q.   And how did you determine the cell phone numbers for each

1    of these exhibits to --

2    A.   Specifically, I don't remember the course of conduct where

3    we got to the cell phone numbers.

4    Q.   Okay.

5    A.   These may have been written, and I do believe they were

6    written after June 1st when we were able to identify the

7    numbers via subpoena and/or search and seizure warrant.

8    Q.   Showing you P-10.

9    A.   That's again a cell phone recovered at the initial stop of

10   Mr. Carter on June 1st, and the phone number is

11   (443) 386-7626.

12   Q.   And that's your handwriting?

13   A.   It is.

14   Q.   Did you also obtain a search warrant for the cell phone of

15   Deanna Lawson?

16   A.   Yes, I believe that did occur.

17   Q.   Directing your attention to June 6th, 2016, Sergeant

18   Jones, during the course of this investigation, did you

19   continue to meet with multiple agencies?

20   A.   We did.  Agents from HHS, Baltimore County, police

21   officers from Baltimore County.  We spoke with Ms. Wilkinson

22   at length, so yeah.

23   Q.   And directing your attention to June 21st, 2016, did you

24   participate in surveillance that was conducted at an address

25   in Owings Mills, Maryland?

Direct Examination (cont'd) - Jones   (By Ms. Oldham)

1    A.  Yes, I did.

2    Q.  And do you recall whose residence you were conducting

3    surveillance at?

4    A.  I don't, off the top of my head.

5    Q.  What were you specifically looking for at that address?

6    A.  We were looking for an Audi that was registered to Michael

7    Fleming at the time.

8    Q.  Is that whose address you were --

9    A.  I believe it was Michael Fleming's address in Owings

10   Mills, yes, the one the DMV had.

11   Q.  So you learned at some point that the Audi in question was

12   registered in the name of a Michael Fleming?

13   A.  Correct.

14   Q.  And you were attempting to locate the Audi?

15   A.  We were.

16   Q.  And did you any success on June 21st, 2016?

17   A.  No, we didn't.

18   Q.  On August 9th, 2016, Sergeant Jones, did you participate

19   in the processing of that Audi when it was seized on

20   August 10th, 2016?

21   A.  Yes.  The Audi was ultimately found and transported down

22   to our -- again, our forensics bay in the basement of

23   headquarters, and I was present for the execution of the

24   search warrant and processing of the vehicle.

25   Q.  Okay.  And let me clarify, since I think I said two

Direct Examination (cont'd) - Jones  (By Ms. Oldham)

1    different dates in that last question.

2    A.  You did, you said the 9th and 10th.

3    Q.  So was it your squad of detectives that executed a search

4    warrant on August 9th, 2017?

5    A.  Yes.

6    Q.  And was it the location from where the Audi was

7    recovered?

8    A.  We recovered the Audi in the Park Heights area.

9    Q.  Okay.

10   A.  I wasn't there for that.  Ultimately it was towed down to

11   our headquarters building where I was present for the

12   execution of the search warrant.

13   Q.  Do you recall whether it was recovered at an automotive

14   location?

15   A.  Yeah, I learned that it was recovered at an automotive

16   repair shop.

17   Q.  4025 Belvedere Avenue?

18   A.  Correct.

19   Q.  So the next day then, you were present when that vehicle

20   was processed?

21   A.  Yes.

22   Q.  And did you retrieve or direct that it be retrieved, the

23   front license plate of that Audi?

24   A.  I did.  Based on additional video surveillance that we

25   reviewed from the Sinai Ridge Apartments, we did see a silver

1    Audi at and near the time of the incident driving around, and

2    it had a front sort of European-style tag on it that

3    interested me.

4         From the stop of Mr. Carter in Mr. Hightower's BMW on

5    June 1st, we also recovered a license plate, a Maryland

6    license plate.  It was a front license plate, didn't have any

7    stickers on it.  That came back to that Audi indicating that

8    the Audi I was looking for didn't have a front license plate

9    on it.

10   Q.  Didn't have a -- the normal Maryland license plate?

11   A.  Correct, did not have the normal Maryland license plate on

12   the front.

13   Q.  Let me first show you Government's Exhibit R-21.  And I'm

14   going to ask you to take it out of the brown envelope.

15   A.  Sure.  Yes, this is the front license plate recovered from

16   the Audi in our crime lab bag.

17   Q.  Okay.  Would you mind just holding it up and facing the

18   jury.

19   A.  Sure.  (Complying.)

20   Q.  And I'm going to show you what's been marked as

21   Government's Exhibit C-15.

22   A.  And this is the front license plate that was recovered

23   from Matthew Hightower's BMW SUV that was -- Mr. Carter was

24   stopped in on the morning of June 1st.

25   Q.  So same tag number?

1   A.   Correct, same tag number.

2   Q.   So C-15 is what in Maryland should have been on the front

3   of the Audi.

4   A.   Yes, that should have been, but this was affixed to the

5   front of the Audi.

6   Q.   Directing your attention to November 28th, 2016, Sergeant

7   Jones, did you interview a Norman Powell?

8   A.   I did.

9   Q.   And why did you interview Mr. Powell?

10   A.   I had received information, limited information but

11   information all the same, that a Cliff may have been involved

12   and/or had information concerning this homicide.  Digging

13   through various databases, both public and law enforcement,

14   led me to Norman Powell.  And at that time of the interview, I

15   actually thought he was Cliff.

16   Q.   Okay.  And do you recall you had testified last week on

17   Thursday about the piece of paper that you saw from -- that

18   was seized from Matthew Hightower's jail cell?

19   A.   Yes, yes.

20   Q.   And was Cliff one of the names and numbers that was

21   listed?

22   A.   Yes, he was.

23   Q.   And after your interview of Mr. Powell -- well, first,

24   were you looking for the subscriber or user of that particular

25   cell phone number that was listed on that paper?

1    A.  I was.

2    Q.  And after your interview with Norman Powell, who did you

3    then direct your attention to, to further investigate?

4    A.  Clifton Mosley.

5    Q.  And in December of 2016, Sergeant Jones, was the case

6    turned over from Baltimore Police Department to the federal

7    authorities?

8    A.  Yes, at that point we had basically officially turned over

9    all documents and evidence for the federal authorities to

10   follow up.

11          MS. OLDHAM:  Your Honor, the state previously had

12   introduced stipulations 1 through 4, requesting that we be

13   able to read them at a particular time.  I'd like permission

14   for Sergeant Jones to read stipulation 2 and 3 into the

15   record.

16          THE COURT:  Sure.  I'm assuming you meant the United

17   States.

18          MS. OLDHAM:  I'm sorry, the United States, thank

19   you.

20          THE COURT:  That's fine.

21   Q.  (BY MS. OLDHAM)  Sergeant Jones, if you could read

22   stipulation No. 2 into the record, please.

23   A.  Bear with me, please.

24       "In the United States District Court for the District of

25   Maryland United States of America versus Davon Carter, Clifton

1    Mosley, defendants" --

2         THE COURT:  If you could slow down just a little,

3    please.

4    A.  Yes, sir.  Stipulation No. 2:  United States of America

5    and the defendants, by and through counsel, do hereby

6    stipulate and agree that Tatyana Shvartzman, forensic

7    scientist II, DNA analyst, Baltimore Police Department,

8    performed forensic biology analysis on the swabs obtained from

9    the interior passenger handle of the 2005 Pontiac Grand Am,

10   property No. 16018988.1, and from Clifton Mosley.

11        The DNA analysis report was performed using procedures

12   that had been validated according to the FBI's quality

13   assurance standards for forensic DNA testing laboratories.

14   No. 3, the swabs yielded a partial DNA profile of at least two

15   contributors.  Clifton Mosley was excluded as a contributor.

16   Q.  (BY MS. OLDHAM)  Okay.  Thank you.  I'm going to ask if

17   you can read stipulation 3.

18   A.  In the United States District Court for the District of

19   Maryland, United States of America versus Davon Carter and

20   Clifton Mosley, defendants, stipulation No. 3:  The United

21   States of America and the defendants, by and through counsel,

22   do hereby stipulate and agree that if called to testify,

23   Jillian C.Y. Lacy, crime lab technician, Baltimore Police

24   Department, processed the 2005 Grand Am vehicle, Maryland tag

25   4BXC31, recovered on 1, June 2016.

1          The technician processed the vehicle for latent prints.

2     Technician Lacy recovered latent prints from the exterior door

3     handle of the Pontiac Grand Am, but neither were suitable for

4     comparison.  On August 2016, Technician Timika Jones processed

5     the 2008 SX Audi, Maryland tag 03591G as in George, for latent

6     prints.  Technician Jones obtained 12 lift cards from various

7     locations within the 2008 SX Audi as detailed below.

8          Should I continue?

9     Q.  Yes.

10    A.  Nine prints were determined to be suitable for comparison.

11    No. 3, all of the suitable finger and palm prints from the S6

12    Audi were placed in the automated fingerprint identification

13    system, or AFIS.  The parties stipulate and agree that both

14    Clifton Mosley and Davon Carter's are in AFIS.

15         Detective Sean Jones requested Baltimore Police

16    Department certified forensic print examiner Lorraine Lansey

17    examine the suitable prints and compare them on Davon Carter,

18    Norman Powell, and Michael Fleming.  On or about October 31st,

19    2016, the date of the report, Examiner Lansey concluded that

20    Carter and Powell as being the source of all the remaining

21    suitable prints.  Examiner Lansey excluded Michael Fleming as

22    a source of suitable prints, prints 4, 7, and 9, but no palm

23    exemplars from Fleming were available to compare to the palm

24    prints.

25         On or about November 2nd, 2019, the date of the report,

1   two of the latent prints, print 1-A and print 11-A, were

2   identified as a result of an AFIS search belonging to George

3   Matagaria (phonetic).  The parties stipulate and agree that

4   Matagaria is the owner of the garage where the S6 Audi was

5   stored when found on August 10th, 2016.

6              MS. OLDHAM:  Last, Your Honor, the government is

7   moving into evidence Government's Exhibit R-1 by agreement of

8   counsel.  These are the complete certified records from

9   Greenspring Physical Therapy and Associates.  I would ask if I

10  could have Sergeant Jones read a portion of it out loud to the

11  jury.

12             THE COURT:  Very well.

13  Q.  (BY MS. OLDHAM)  Sergeant Jones, I'm going to ask if you

14  could just read this first paragraph here on the page that's

15  date of visit 5/18/16, just that first short paragraph.

16  A.   Okay.  From Dr. Jeffrey D. Gaber and Associates:

17  Mr. Carter is ten and a half weeks status post injuries to his

18  right wrist and lumbar spine.  The steroid Marcaine injected

19  and administered at his last appointment to his right wrist

20  was markedly effective.  His chief concern is ongoing lumbar

21  pain, which radiates to his buttocks.  His pain flares with

22  sitting, standing, walking, and disturbs his sleep.

23             MS. OLDHAM:  Thank you, Sergeant Jones.

24             I have nothing further, Your Honor.

25             THE COURT:  Cross.  Mr. Zerkin.

1              MR. ZERKIN:   Thank you, Judge.

2                      CROSS-EXAMINATION

3    BY MR. ZERKIN:

4    Q.   Good morning, Sergeant.

5    A.   Good morning, sir.

6    Q.   Is it fair to say that you were the lead investigator as

7    long as it was in state hands?

8    A.   For the most part, yes, that's fair to say.

9    Q.   And then you continued to be associated with the

10   investigation once the federal authorities took over the

11   case?

12   A.   In a limited capacity, yes, sir.

13   Q.   Okay.   Now, you indicated that you searched the Grand Am;

14   correct?

15   A.   Yes, sir.

16   Q.   How many firearms did you find there?

17   A.   None.

18   Q.   And you -- did you search the BMW?

19   A.   No, sir, I wasn't present for that.

20   Q.   Are you familiar with the search of the BMW and the

21   results of that search?

22   A.   Yes.

23   Q.   And how many firearms were found in the BMW?

24   A.   None, sir.

25   Q.   And are you familiar with the search of the residence on

1    Arbor Station Way?

2    A.   I know it occurred, but I wasn't present for that.

3    Q.   Okay.  And you were familiar with the results of that too,

4    I assume.

5    A.   Limited, yes.

6    Q.   How many firearms were recovered from Arbor Station Way?

7    A.   My understanding is none.

8    Q.   And how many firearms were recovered from Mr. Carter?

9    A.   None.

10   Q.   Now, Mr. Carter arrived at Baltimore City Police

11   headquarters at approximately 11 -- not approximately, at

12   11:04 a.m.; correct?

13   A.   Yes, sir.

14   Q.   All right.  And who brought him there?

15   A.   I believe it was members of our operations squad, maybe

16   Detective Troy Taylor.

17   Q.   Okay.  And when did the interrogation of Mr. Carter

18   begin?

19   A.   We began the interview at about 4:20 in the afternoon.

20   Q.   So approximately five hours and 20 minutes elapsed until

21   you began the interrogation; correct?

22   A.   Correct.

23   Q.   And where was he during that period?

24   A.   He was in the -- it's basically an interview room.

25   They're interview rooms that we have within the homicide

Cross-examination - Jones   (By Mr. Zerkin)

1   unit.

2   Q.  So this is a, I assume, a windowless room; is that

3   correct?

4   A.  It doesn't have any windows to the exterior, no, there's a

5   window in the door.

6   Q.  Okay.  And what is in the room?

7   A.  A couple of chairs, a table.  It's a pretty spartan

8   area.

9   Q.  And about how big is it?

10  A.  Ten by ten, 12 by 12, roughly.

11  Q.  Okay.  Now, when the interview ended, you released him at

12  that point; correct?

13  A.  Yes, sir.

14  Q.  And he wasn't arrested in relation to the homicide for

15  another year and a half; correct?

16  A.  Yes, sir.

17  Q.  Okay.  He didn't, to the best of your knowledge, attempt

18  to flee during that period of time?

19  A.  Not that I know of.

20  Q.  He was not on an ankle bracelet; right?

21  A.  No, sir.

22  Q.  Was he under surveillance?

23  A.  Not by my squad.

24  Q.  You indicated that the -- you didn't see any dust

25  disturbed on the wheels; correct?

1    A.  Correct.

2    Q.  Did you remove the wheels in order to actually examine the

3    brakes?

4    A.  No, I did not.

5    Q.  Did anyone within Baltimore Police Department or from the

6    federal authorities ever remove the wheels to examine the

7    brakes?

8    A.  Not to my knowledge, no, sir.

9    Q.  Are there serial numbers on brakes, do you know?

10   A.  I don't know, sir.

11   Q.  Okay.

12          MR. ZERKIN:  Excuse me, Your Honor, one moment.

13          THE COURT:  Sure.

14   Q.  (BY MR. ZERKIN)  Did you examine what was in the trunk of

15   the Grand Am?

16   A.  I'm sure it was done, but what was in there, I don't

17   recall off the top of my head.

18   Q.  When did you learn from the Baltimore County authorities

19   that they were not interested in prosecuting the marijuana?

20   A.  It was fairly late in the evening.  It was probably

21   upwards of 8:00 or 9:00 o'clock.  It was a pretty long day

22   that day, and it was later in the evening.

23   Q.  And is that -- that's when he was released; is that

24   correct?

25   A.  Shortly thereafter, he was released about 10:22 at

1    night.

2    Q.  Okay.  So when did the interrogation end?

3    A.  It was about an hour long, it started at 4:20, it ended at

4    about 5:15, 5:20.

5    Q.  Okay.  Where was he then for -- from then until he was

6    released?

7    A.  He stayed, again, in that -- it's an interview room,

8    ultimately, is what it is, and that's where he was.

9    Q.  And was he at -- under arrest at any point during the

10   period you've described to us?

11   A.  Yes.  As far as to my knowledge, when he arrived at 11:04

12   in the morning, he was under arrest for the CDS violation in

13   Baltimore County, to my knowledge.

14   Q.  But they never charged him; right?

15   A.  No, they didn't.

16   Q.  So he was under arrest, but he was never charged?

17   A.  That appears to be what happened, yes.

18   Q.  Who placed him under arrest, do you know?

19   A.  I would have assumed that Baltimore County --

20   Q.  Don't tell us what you assume, but do you know who placed

21   him under arrest?

22   A.  No, I don't.

23   Q.  Have you ever seen paperwork of his being placed under

24   arrest?

25   A.  No.

1          MR. ZERKIN:  May I have a moment, Judge?

2          THE COURT:  Of course.

3          MR. ZERKIN:  That's all I have, Your Honor.

4          THE COURT:  Cross for Mr. Mosley.

5          MR. TRAINOR:  Your Honor, we have no questions for

6    Sergeant Jones.

7          THE COURT:  Very well.  Redirect from the

8    government.

9                    REDIRECT EXAMINATION

10   BY MS. OLDHAM:

11   Q.  Sergeant Jones, was Mr. Carter given a full meal while he

12   was at the Baltimore Police headquarters?

13   A.  Yes, he was.  As you saw in the interview, he --

14          MR. ZERKIN:  Objection, Your Honor.  Beyond the

15   scope.

16          THE COURT:  Sustained.  I don't think that came up

17   in cross.

18   Q.  (BY MS. OLDHAM)  Was he given breaks?

19   A.  Yes.

20   Q.  Was he given drinks?

21   A.  Yes.

22   Q.  During the -- you were just asked about whether or not

23   Mr. Carter was under arrest, but yet there were no charges at

24   the time, do you recall being just asked that?

25   A.  Yes, I do.

1    Q.  Is that the common procedure when someone is physically

2    placed under arrest and brought to the station?

3    A.  In other words, they're arrested and then unarrested, is

4    that --

5    Q.  No, as far as someone being arrested, but the paperwork

6    for charges isn't done yet, they're not yet --

7    A.  They're not booked.

8    Q.  They're not booked.

9    A.  That is a common procedure, yes.

10   Q.  Okay.  When you were present for the execution of the

11   search warrant on the Pontiac, were you specifically looking

12   for any evidence of a brake change?

13   A.  Yes.

14   Q.  You mentioned earlier that you were looking inside of the

15   tire well, am I using the right phrase?

16   A.  Correct, inside, through the holes in the tire or the

17   wheel itself, you can see the brake assembly in there.

18   Q.  You could physically see it?

19   A.  Yes.

20   Q.  And your observations when you could see that through the

21   holes that we saw in the picture were what?

22   A.  That it had been undisturbed, and it looked like it had

23   been that way for some time.

24            MS. OLDHAM:  Nothing further, Your Honor.

25            THE COURT:  Thank you.  Sir, thank you for your

1    testimony, you are excused.  Please don't discuss this case

2    with anyone until the trial's been completed.  Enjoy the rest

3    of your day.

4              THE WITNESS:  Thank you, sir.

5              THE COURT:  Government's next witness.

6              MS. WILKINSON:  Thank you, Your Honor.  The

7    government calls Michael Bailey.  I believe he's right

8    outside.

9              THE COURT:  Okay.

10             MS. WILKINSON:  Mr. Bailey, you're going to direct

11   your attention up here to the witness stand, and then draw

12   your attention to the Madame Court Reporter before you sit

13   down, and she will direct you further, sir.

14             THE CLERK:  Good morning, sir.  Please raise your

15   right hand.

16                        MICHAEL BAILEY,

17   called as a witness, being first duly sworn, was examined and

18   testified as follows:

19             THE WITNESS:  Yes.

20             THE CLERK:  Thank you.  You may have a seat.  Pull

21   your chair up to the microphone, please state and spell your

22   full name for the Court.

23             THE WITNESS:  Michael Bailey, M-i-c-h-a-e-l,

24   B-a-i-l-e-y.

25             THE CLERK:  Thank you.

1                        DIRECT EXAMINATION

2    BY MS. WILKINSON:

3    Q.  Good morning, Mr. Bailey.  Are you able to hear me all

4    right?

5    A.  Yes, ma'am.

6    Q.  Great.  How old are you, sir?

7    A.  45.

8            THE COURT:  And sir, please make sure you speak into

9    the microphone.

10   A.  45.

11           MS. WILKINSON:  We're all a little hard of hearing,

12   including myself, thank you, Your Honor.

13   Q.  (BY MS. WILKINSON)  Mr. Bailey, were you -- where were you

14   born and raised?

15   A.  Baltimore, Maryland.

16   Q.  Have you lived there pretty much your whole life?

17   A.  Yes, ma'am.

18   Q.  Have you previously been convicted of any crimes?

19   A.  Not recently.

20   Q.  Prior to -- well, what do you consider recently?

21   A.  About 15 years.

22   Q.  And were you then previously convicted -- have you been

23   convicted of crimes, is a better question?

24   A.  Yes, ma'am.

25   Q.  In the 2015 -- well, let me even go back further than

Direct Examination - Bailey  (By Ms. Wilkinson)

1   that, what is your -- in what field have you primarily worked

2   most of your life?

3   A.  Um, odd and end jobs doing mechanical work.

4   Q.  And at some point in 2015 and around there, did you have

5   your own business?

6   A.  Yes, ma'am.

7   Q.  And what was the name of that business?

8   A.  Value Deals Express.

9   Q.  And how long did you have it in operation?

10  A.  Maybe a couple years.

11  Q.  And what happened to it?

12  A.  It failed, money wasn't coming in that we expected.

13  Q.  Did you continue to do automotive mechanical work?

14  A.  Yes, ma'am.

15  Q.  And what are you skilled, you personally, skilled in, what

16  type of mechanical work do you do?

17  A.  Like lube jobs, tune ups, brakes, any small things besides

18  pulling a motor and transmission.

19  Q.  And once you're -- well, going back to the business that

20  you had, when you had a business, was there a storefront, an

21  actual building that you work out of?

22  A.  Yes, ma'am.

23  Q.  And where was that located?

24  A.  5300 Pennington Avenue -- well, I had two, one was at

25  Monroe Street, and the second one was at 5300 Pennington

Direct Examination - Bailey  (By Ms. Wilkinson)

1    Avenue.

2    Q.  As best you can recall, and you don't have to be exact on

3    the actual date, when did you stop working out of a

4    storefront?

5    A.  I can't remember what year, it's been a while.  I can't

6    remember what year it was.

7    Q.  And so how did you continue to do your automotive work,

8    where would you set up, what would you do?

9    A.  People were still calling my phone, so I would tell them

10   meet me at the auto parts stores and just work on the side of

11   their buildings because it was just easy access to get parts

12   and stuff that we needed.

13   Q.  And what automotive -- what store would you work near?

14   A.  Standard Auto.

15   Q.  Standard Auto?

16   A.  Yes, ma'am.

17   Q.  And where is Standard Autos located?

18   A.  We got a few of them, one on North Avenue, one in South

19   Baltimore, one out Rosedale.

20   Q.  And which one did you particularly work at, or did you

21   work at all three?

22   A.  Just North Avenue.

23   Q.  And what area of Baltimore, for those of us who don't live

24   in the city, is the North Avenue area, what would you call

25   that?

1    A.  West Baltimore, Sandtown-Winchester area.

2    Q.  Is that approximately the area that you were living back

3    in May of 2016?

4    A.  Yes, ma'am.

5    Q.  So it's called Sandtown?

6    A.  Yes, Sandtown-Winchester.

7    Q.  Now, in 2016, that's the time I'm really going to

8    concentrate on here, Mr. Bailey, did you have a cellular

9    telephone number?

10   A.  Yes.

11   Q.  Did you have more than one at certain times?

12   A.  Yes.

13   Q.  And did you -- are you familiar with the phrase "burner

14   phone"?

15   A.  Yes.

16   Q.  What's a burner phone, for the jury?

17   A.  Um, a phone you can just go get out of the store.  You

18   don't have to leave no name or nothing, you can put any name

19   or whatever, and just put minutes on there.

20   Q.  And have you used a -- burner phones before?

21   A.  Yes.

22   Q.  Are you familiar with the telephone number (443) 908-1434,

23   so ending in 1434?

24   A.  Um, yes, I believe so.

25   Q.  Well, would it refresh your recollection to look at phone

1    records that -- well, let me go back even further than that,

2    in preparation for your testimony, have you looked at phone

3    records involving your telephone number back in 2016?

4    A.  Yes, ma'am.

5    Q.  And as part of that process, did it refresh -- did it

6    refresh your recollection about what your actual phone number

7    or one of your phone numbers was back in 2016?

8    A.  Yes, ma'am.

9    Q.  And if I show it to you now, will it help refresh your

10   recollection?

11   A.  Yes.

12   Q.  Okay.  Let me show you just for -- eventually I'm going to

13   admit it, but 25A.  P-25A, I should say.  And take a minute to

14   look at the highlighting in blue.

15       First of all, have you seen this document before in

16   preparation for your testimony?

17   A.  Yes.

18   Q.  And looking at the part we highlighted in blue, read it to

19   yourself and tell the jury whether that refreshes your

20   recollection about the last four digits in your cellular

21   telephone number back in May of 2016.

22   A.  Yes, ma'am.

23   Q.  Okay.  Thank you.  And was it ending in 1434?

24   A.  Yes.

25   Q.  For brevity sake, I'm going to refer to it as the 1434

1    number and not say all nine digits, all right?

2         Do you know Davon Carter?

3    A.  Yes, ma'am.

4    Q.  Do you see him in the courtroom here today?

5    A.  Yes, ma'am.

6    Q.  Would you identify him now by an article of clothing.

7    A.  Got a blue sweater.

8    Q.  In the blue sweater?

9    A.  Yes.

10   Q.  Okay.  To the left of me?

11   A.  Yes.

12          MS. WILKINSON:  Let the record reflect the defendant

13   in this case, Mr. Carter.

14          THE COURT:  It will reflect that.

15   Q.  (BY MS. WILKINSON)   And do you also know Matthew

16   Hightower?

17   A.  Yes, ma'am.

18   Q.  How long have you known Mr. Hightower?

19   A.  About like 10, 15 years.

20   Q.  And same question with regard to Mr. Carter, how long have

21   you known him?

22   A.  Equal amount.

23   Q.  Do you know who you met first, Mr. Hightower or

24   Mr. Carter?

25   A.  Both around the same time.

1              THE COURT:  I'm sorry, I do need to remind you to

2    speak into the microphone and keep your voice up.

3    A.   I met them both around the same time.

4    Q.   (BY MS. WILKINSON)  Mr. Bailey, do you use marijuana, do

5    you smoke marijuana?

6    A.   Yes, ma'am.

7    Q.   And how often do you smoke marijuana?

8    A.   Every day.

9    Q.   Did you smoke marijuana today?

10   A.   No, ma'am.

11   Q.   Are you able to follow the testimony and listen to my

12   questions and answer them here today?

13   A.   Yes, ma'am.

14   Q.   Okay.  How long have you been a daily user of marijuana,

15   except for today?

16   A.   Since I was like 21.

17   Q.   Do you get your marijuana from various places?

18   A.   Yes, ma'am.

19   Q.   Now, going back to May of 2016, and referring to your

20   phone records that you looked at in preparation for your

21   testimony, did you see communications between your phone

22   number and Mr. Carter's phone number?

23   A.   Yes, ma'am.

24   Q.   And just as a general matter, what do you recall the

25   content or the subject matter of the conversations you had

Direct Examination - Bailey  (By Ms. Wilkinson)

1    with him back in May of 2016?

2    A.   I was asking him about doing brakes on one of his cars.

3    Q.   Have you done work on one of his cars before?

4    A.   Yes.

5    Q.   Which car had you done work on before?

6    A.   It was like a Pontiac or something.

7    Q.   Tell us --

8    A.   An Altima.

9    Q.   Tell us about the work you did on the Pontiac.

10   A.   Brakes.

11   Q.   And do you recall whether it was the front brakes or the

12   back brakes or do you know?

13   A.   I don't recall.

14   Q.   Tell us what the process is for installing brakes on

15   Mr. Carter's car, what do you recall physically doing?

16   A.   Got to pull the wheels off and check the brakes, see which

17   ones it is.  Some brakes, they was making noise, so in order

18   to diagnose it, you got to pull the wheels off just to see.

19   Q.   And did you do that?

20   A.   Yes.

21   Q.   And at some point, did you install brakes?

22   A.   Yes, that I can recall, yes.

23   Q.   Yes.  Now, I'm sorry, I'm having a little trouble hearing

24   you.

25   A.   I said yes.  Yes, that I recall.  Yes.

1   Q.  Okay.  Thank you.  Now, I'm going to come back to that in

2   a moment.  So that's one of the things that you would speak to

3   Mr. Carter about on the phone, did you also speak to him ever

4   about getting marijuana?

5   A.  I would ask him did he know where any was at.

6   Q.  So was that a "yes"?

7   A.  Yes.

8   Q.  And I'm going to talk to you about that in a minute.  In

9   addition to talking about the brakes and talking about

10  marijuana, do you remember the content of any other

11  communications you would have had with Mr. Carter back in the

12  2016 time frame?

13  A.  No, not really, just had general conversations, how you

14  doing today or everything good or how your family or

15  whatever.

16  Q.  So I'm going to put up on the screen here -- you know,

17  Mr. Bailee, if you look to the right of you, and there's like

18  a screen there --

19          MS. WILKINSON:  May I approach, Your Honor, and

20  clear the screen?

21          THE COURT:  Sure.

22          MS. WILKINSON:  I think there's an extra arrow on

23  there that might be distracting.

24          Excuse me, sir, for reaching over you.  There we go.

25  You touch it, inadvertently it shows that green arrow there.

1    Q.  (BY MS. WILKINSON)  Okay.  I'm going to first show you

2    P-25A.  If you can look over to the screen there.  And I'm

3    going to direct your attention to a phone number ending in

4    2399, Mr. Carter's number, and is that your number there,

5    1434?

6    A.  Yes.

7    Q.  And when we look below, there's a chat or a text,

8    iMessaging, I guess you would call it, down below and it says,

9    "On my way."  "Outside."  And then, "I'm at the movies."

10   "White Marsh."  And you see there's two conversations in May

11   2016.

12       Do you recall that -- do you see that there?

13   A.  Yes.

14   Q.  Okay.  Do you recall what the interaction with you and

15   Mr. Carter was about both on May 5th and May 15th, 2016?

16   A.  We probably were just discussing something about his cars

17   or something.

18   Q.  Is that what you generally spoke with him about?

19   A.  Yeah, because I do odds and ends jobs for people, so

20   normally when I'm talking to people, it's trying to make some

21   money.

22   Q.  I continue down on the same document, put it up on the

23   screen here.  See communications from Mr. Carter, and again,

24   is that your phone number there 1434?

25   A.  Yes.

1   Q.  You see that there?  And the date, May 23rd, 2016, you see

2   that there?

3   A.  Uh-huh.

4   Q.  Okay.

5   A.  Yes.

6   Q.  And I'm going to keep going.  Show you the next page, page

7   1021 of Government's Exhibit P-25A.  There was a contact, an

8   outgoing contact, although it says zero duration to you.

9       And again, is that you ending in 1434?

10  A.  Yes, ma'am.

11  Q.  And down here below, is that you, 1434?

12  A.  Yes.

13  Q.  Okay.  And then the back page of that, an incoming call,

14  this time from you to Mr. Carter, you see that there at 6:05

15  on May 26th?

16  A.  Yes.

17  Q.  Now I'm going to turn -- all of that, Mr. Bailey, was with

18  reference to the phone number -- of Mr. Carter's ending in

19  2399, do you see that there?

20  A.  Yes, ma'am.

21  Q.  Okay.  Then I'm going to also show you Government's

22  Exhibit P-25.  This is a different phone number.  Let me see

23  if I can get the phone number.  I think it's on the second

24  page.

25      This is a different phone number for Mr. Carter ending in

1  7626, do you see that there?

2  A.  Yes, ma'am.

3  Q.  Okay.  And again, I'm just going to walk you through these

4  communications, see an incoming call missed from you on

5  May 26, do you see that there?

6  A.  Yes.

7  Q.  Okay.  Down below, an incoming call May 26th, is that from

8  you?

9  A.  Yes.

10  Q.  And down here below, an outgoing call, 56 seconds on

11  May 25th, do you see that there?

12  A.  Yes.

13  Q.  So all of these calls -- let me go here so you can see the

14  rest of them -- from you on May 25th, another one on May 25th,

15  do you see that there, different communications back and forth

16  before your phone, some of them of duration, some of them of

17  limited duration, do you see that there?

18  A.  Yes.

19  Q.  Okay.  So each of those communications that we're seeing

20  between May 25th and May 26th of 2016, do you recall what you

21  and Mr. Carter were speaking about?

22  A.  Same thing, just I was --

23         MR. DAVIS:  Objection.

24         THE COURT:  Basis.

25         MR. DAVIS:  Speculation, he doesn't know.

1           MS. WILKINSON:  I think it's just a manner of

2    speaking.

3    Q.  (BY MS. WILKINSON)  Mr. Bailey, do you remember --

4           THE COURT:  He answered "not really."  Next

5    question.

6    Q.  (BY MS. WILKINSON)  Do you remember what the conversations

7    were about?

8    A.  Same conversation, I was pursuing him to do the brakes on

9    his cars because I needed the money.

10   Q.  Now, let me ask you, when is your birthday, sir?

11   A.  5/27.

12   Q.  May 27th?

13   A.  Yes, ma'am.

14   Q.  And in addition to the brakes, what was it about your

15   birthday were you having communications with Mr. Carter

16   about?

17   A.  I kept asking him did he know where I could get some good

18   weed from for my birthday.

19   Q.  Okay.  When you meant "good weed," what do you mean by

20   that?

21   A.  Like a higher THC level than normally.

22   Q.  So in that time frame, when you're talking about the

23   brakes, are you also trying to get some weed from

24   Mr. Carter?

25   A.  I wasn't trying to get it from him, I was asking him where

Direct Examination - Bailey  (By Ms. Wilkinson)

1    it was at.

2    Q.  Meaning, to connect you with it, I'm sorry; is that

3    right?

4    A.  Yeah, did he know anybody that was selling good weed.

5    Q.  Now, let me talk about the weed for a moment.  And first

6    of all, on your birthday, May 27th, 2016, did you end up

7    getting any information from Mr. Carter about where to get

8    some good weed?

9    A.  No.

10   Q.  And why is it that you remember that?

11   A.  Because it was my birthday, and I ain't get what I was

12   looking for.

13   Q.  Did you see Mr. Carter on your birthday, May 27th, 2016?

14   A.  No.

15   Q.  Did you get weed from Mr. Carter or anybody he connected

16   you with on May 27th, 2016?

17   A.  No.

18   Q.  Let me ask you about the brakes for a minute.  In

19   preparation for your testimony, do you see two text messages

20   from you, there it is, 1434, to Mr. Carter, both on May 25th

21   and May 26th, 2016?  I'm going to direct you over here, can

22   you read that, sir?

23   A.  "Yo, what happened with the brakes, did you get somebody

24   else to change" -- I mean, "did you change your mind?"

25   Q.  Okay.  Why were you texting, "Yo, what happened with the

Direct Examination - Bailey  (By Ms. Wilkinson)

1   brakes, you change your mind" on May 25th?

2   A.  Because he needed both brakes, both done, the front and

3   the back.

4   Q.  And what were you asking him?

5   A.  Basically can I do the other ones too.

6   Q.  Can you do the other one too?

7   A.  Yeah.

8   Q.  Because you had already done one of them?

9   A.  Yes.

10  Q.  Now, here we are on May 25th, two days before your

11  birthday, reading this text message, did you ever put brakes

12  in for Mr. Carter on May 25th, 2016?

13  A.  I don't recall what day it was, because I do so many cars.

14  I don't recall.

15  Q.  Did you put brakes on Mr. Carter's car on May 27th,

16  2016?

17  A.  No.

18  Q.  Any doubt in your mind that you put brakes in Mr. Carter's

19  car on May 27th, 2016?

20  A.  No.

21  Q.  Did you see Mr. Carter at any time on May 27th, 2016?

22  A.  Not that I can recall.

23  Q.  Do you remember talking to him on the phone on May 27th,

24  2016?

25  A.  I -- the 27th?

Direct Examination - Bailey  (By Ms. Wilkinson)

1    Q.   Yes.   The day of your birthday.

2    A.   I think we had a brief conversation, and I asked him what

3    was going on, was he all right.   And he just said, I'm going

4    out of town.

5    Q.   Okay.   Now, that conversation, when he said he was going

6    out of town, describe if you can, Mr. Carter's tone.

7    A.   He was just like, yo, I'm going out of town.   I was just

8    like, you good, everything all right?   He was just like, yo,

9    I'm going out of town.   So I just left it alone and mind my

10   business.

11   Q.   Were you angry at him?

12   A.   Not really.

13   Q.   Were you annoyed?

14   A.   I was just like, all right, I mean, he a grown man, so he

15   wanted his space.   Sometime people just want their space and

16   they don't want to explain every little detail to you, so I

17   was just like, all right, and we left it alone.

18   Q.   Was the conversation long or short?

19   A.   Short.

20   Q.   Where did he tell you he was going out of town to?

21   A.   I think he said he was going to North Carolina or

22   something, or somewhere like that.

23          MS. WILKINSON:   Court's indulgence, one second, Your

24   Honor.

25          THE COURT:   Sure.

Direct Examination - Bailey  (By Ms. Wilkinson)

1    Q.  (BY MS. WILKINSON)  Now, the night of your birthday, what

2    area were you sleeping in?

3    A.  2114 Westwood.

4    Q.  Is that in the Sandtown area?

5    A.  Yes, ma'am.

6    Q.  Do you recall being there the evening of your birthday,

7    your birthday eve?

8    A.  Yes, ma'am.

9    Q.  Did you wake up in that same area on Friday, May 27th?

10   A.  Yes, ma'am.

11   Q.  The day of your birthday?

12   A.  Yes.

13   Q.  And in preparation for your testimony, both here and in

14   the grand jury, Mr. Bailey, were you asked to identify where

15   that area was on Government's Exhibit P-27, and do you see the

16   area in blue here?

17   A.  Yes, ma'am.

18   Q.  Is that generally the area where you were living on

19   May 26th and into the early morning hours of May 27th?

20   A.  Yes.

21   Q.  And is that area different than the Park Heights area of

22   Baltimore?

23   A.  Yes.

24   Q.  Have you've been to the Park Heights area of Baltimore?

25   A.  You say have I been there?

Direct Examination - Bailey  (By Ms. Wilkinson)

1    Q.  Yes.

2    A.  Yes, ma'am, that's how you get to Reisterstown Plaza.

3    Q.  How far is it from the place you were living in

4    Sandtown?

5    A.  Park Heights?

6    Q.  Uh-huh.

7    A.  Maybe ten minutes, five minutes depends how you driving.

8    Q.  Now, in addition to staying there the night of May 22nd

9    and waking up there on your birthday, May 27th, speaking to

10   Mr. Carter on that day, did you see Mr. Carter after he got

11   back from the trip he told you he was taking?

12   A.  Yes.

13   Q.  Where did you see him?

14   A.  Around -- across on North Avenue.

15   Q.  Do you remember when that was?

16   A.  That Sunday.

17   Q.  And so if May 27th, your birthday, was a Friday, this

18   would be on May 29th?

19   A.  Yes.

20   Q.  That Sunday?

21   A.  Uh-huh.

22   Q.  And tell the grand jury what you remember -- how you

23   remember seeing Mr. Carter, where was he?

24   A.  He was driving up one way, I was going the opposite, I was

25   going to the gas station, and I actually thought he was Matt.

1    I thought he was somebody else.

2    Q.  And by Matt, who do you mean?

3    A.  Matt.

4    Q.  Matt who?

5    A.  I don't remember his last name, I just call him Matt.

6            MS. WILKINSON:  May I have Government's Exhibit PH,

7    I think it's 1.

8    Q.  (BY MS. WILKINSON)  Do you recognize the man on PH-3?

9    A.  Um, yes.

10   Q.  Who is that?

11   A.  Matt.

12   Q.  Is that the --

13   A.  I believe he's a little heavy.

14   Q.  I'm sorry?

15           THE COURT:  Sorry, sir, can you repeat that?

16   A.  Yes, he a little heavy on there, yes, but yes, I think

17   it's him.

18   Q.  (BY MS. WILKINSON)  And just to be clear, he looks heavier

19   in the picture, or heavier when you've seen him before?

20   A.  In the picture.

21   Q.  Is this the Matt who you thought you saw when you saw the

22   person on Sunday, May 29th?

23   A.  Yes.

24   Q.  What made you think it was Matt?

25   A.  Because I saw his car.

Direct Examination - Bailey  (By Ms. Wilkinson)

1    Q.  And what car are you referring to?

2    A.  I think it was an Audi.

3    Q.  And had you seen that Audi before?

4    A.  Yes, I worked on it before.

5    Q.  And what color is it?

6    A.  Like a -- I don't know, like a teal blue or something of

7    that nature.  Like a teal blue, something of that nature.

8    It's like a sunny color car, I don't know if it's blue or

9    silver, I don't know.

10   Q.  In preparation for your testimony in the grand jury, were

11   you asked to look at Government's Exhibit P-26?

12   A.  Yes.

13   Q.  And did you recognize the car on the left here?

14   A.  Yes, ma'am.

15   Q.  And what car is that?

16   A.  The Audi.

17   Q.  Is that the Audi you saw you thought was Matt, but you saw

18   Davon driving on Sunday, May 29th?

19   A.  Yeah -- it appear to be the same vehicle, yes.  I only

20   knew it because he had a different tag on the front.

21   Q.  He had what?

22   A.  A different tag on the front.

23   Q.  Okay.  And what do you mean by "a different tag on the

24   front"?

25   A.  Like, I think one of them European tags, the long tags.

Direct Examination - Bailey  (By Ms. Wilkinson)

1    Q.  You're holding your hands out, what are you showing us?

2    A.  It's like a long tag that goes on the front.

3    Q.  And the car that you saw on that Sunday, May 29th, did it

4    have that long tag on the Audi?

5    A.  Yes.

6    Q.  That you thought was Matt's?

7    A.  Yes.

8    Q.  And while I have P-26 up here, had you seen the car on the

9    right before?

10   A.  Yes.

11   Q.  What car is this?

12   A.  It's a BMW truck.

13   Q.  Whose BMW truck did you know this to be?

14   A.  I guess it was Matt's, I always seen him in it.

15   Q.  You saw Matt driving the BMW truck as well?

16   A.  Yes.

17   Q.  In addition to the Audi?

18   A.  Yes.

19   Q.  Now, again, in preparation for your testimony, and showing

20   you Government's Exhibit P-28, do you recognize this car,

21   Mr. Bailey?

22   A.  It look familiar, yes.

23   Q.  And how does it look familiar?

24   A.  Looks like one of the cars I worked on.

25              THE COURT:  Sir, again, remember to speak into the

Direct Examination - Bailey  (By Ms. Wilkinson)

1   microphone, keep your voice up.

2   A.   Looks like one of the cars I worked on.

3   Q.   (BY MS. WILKINSON)  For who?

4   A.   Davon.

5   Q.   What kind of work did you do on the car that's reflected

6   in Government's Exhibit P-28?

7   A.   Brakes.

8   Q.   To be clear to this grand jury, whatever work you did and

9   whatever day you did, it was not on May 27th, 2016,

10  Mr. Bailey?

11  A.   No.  I ain't do no work on my birthday.

12          THE COURT:  Ms. Wilkinson, I assume you're referring

13  to the trial jury, not the grand jury.

14          MS. WILKINSON:  Old habits are hard to break.  I'm

15  sorry, Your Honor.

16          THE COURT:  I didn't want the jury to get confused

17  as to what they were.

18          MS. WILKINSON:  I don't want to either, and I'm

19  sorry about that.  Thank you, Your Honor.

20  Q.   (BY MS. WILKINSON)  When you put brakes either in the car

21  that you just showed the jury -- that we just showed the jury,

22  Mr. Bailey, or when you do it in connection with the work that

23  you've done as a mechanic, do you test drive the car?

24  A.   No.

25  Q.   Why not?

1   A.  Because you can't normally tell by test driving it.  You

2   tell the customer to pull it forward, you stand outside the

3   car and try to listen the best you can to see where it's

4   coming from, but I always ask them to move it forward or move

5   it backwards so I can listen.

6   Q.  And give the jury an idea of how many brakes you've put in

7   cars over the years you've been a mechanic.

8   A.  Hundreds.

9   Q.  How long does it take you to do it?

10  A.  Brakes?

11  Q.  (Nodding.)

12  A.  About a half an hour.

13  Q.  It's required to pull the tires off of the -- off the

14  wheel?

15  A.  Yes, ma'am.

16  Q.  When you spoke to Mr. Carter the morning of May 27th,

17  Mr. Bailey, did you get mad at him?

18  A.  Can you repeat the question, please?

19  Q.  When you spoke to Mr. Carter on May 27th, when he told you

20  he was going out of town and you didn't get your marijuana,

21  did you get mad at him?

22  A.  No.

23  Q.  Do you remember testifying in the -- to the grand jury --

24  counsel, page 18 -- from the April 2018 grand jury, "I got

25  even madder on my birthday" --

1          MR. DAVIS:  Objection.

2          THE COURT:  Overruled.

3    Q.  (BY MS. WILKINSON)  "I got even madder on my birthday that

4    he was leaving, and now he's telling me he's leaving, and I

5    still haven't got my marijuana"?

6    A.  Oh, yeah, I recall.  It probably was early in the day

7    because I had ended up getting me some.

8    Q.  So when you spoke to Mr. Carter the morning of May 27th

9    and didn't have your marijuana, were you angry, were you

10   annoyed, were you mad?

11   A.  I was a little annoyed, but I didn't let him know I was

12   annoyed.  I just listened to what he had to say and just got

13   off the phone.

14   Q.  Now, back on that weekend of May 2016, Mr. Bailey, do you

15   recall seeing the news reports of a murder that happened up

16   in -- near Park Heights on Rosalind Avenue?

17   A.  Yeah, I think something on the news that morning.

18   Q.  And did you see the news?

19   A.  Yes.

20          MS. WILKINSON:  And I'm just going to play the clip

21   muted, Your Honor, now Government's Exhibit V- -- yes, just

22   mute it, if you can.

23          Can you give me the exhibit number, Agent Holiday,

24   if you know it.

25          V-19 for the record, Your Honor.

1              (Video played.)

2              MS. WILKINSON:  Okay.  You can turn that off now.

3    Q.  (BY MS. WILKINSON)  Remember seeing that news clip,

4    Mr. Bailey?

5    A.  Yes.

6    Q.  And what was your reaction upon seeing that news clip?

7    A.  This wasn't a news clip that I saw.  They had enhanced the

8    picture, I guess, but this wasn't what I saw.

9    Q.  Did you see a still photo, or a moving photo?

10   A.  They showed a moving photo like this, and then they showed

11   a still photo, but --

12   Q.  Whether it was the moving photo or the still photo that

13   you saw, Mr. Bailey, what was your --

14   A.  I remember this from that day, yes.

15   Q.  What was your -- I'm sorry?

16   A.  I saw this that day.

17   Q.  I'm sorry, I can't hear you.

18              THE COURT:  Speak into the microphone, please.

19   A.  I said I do recall seeing this video.

20   Q.  (BY MS. WILKINSON)  Okay.  And my question to you is, upon

21   seeing it, what was your reaction?

22   A.  This is not the one that I saw.  So it was no reaction to

23   this, because I didn't see somebody --

24   Q.  What was the reaction to the one that you saw about the

25   murder that happened over Rosalind Avenue, Mr. Bailey?

1    A.  Oh, I said it looked familiar to Davon.

2    Q.  Was that your immediate reaction?

3    A.  Because of facial hairs -- it was because the facial hairs

4    on the person, I was like, that look like Davon.

5    Q.  The time that this was, back in May of 2016, when you made

6    that observation, Mr. Bailey, or had had that reaction, how

7    long had you known Davon?

8    A.  About 10, 15 years.

9         MS. WILKINSON:  I'm just checking my notes, Your

10   Honor.

11        Switch it back over for me, Ms. Lesser, I just have

12   one more question.

13   Q.  (BY MS. WILKINSON)  I was asking you about the May 25th

14   text message, and now I just want to talk to you about the

15   May 26th one.

16        And it says, "Yo, GM," what does that mean?

17   A.  Good morning.

18   Q.  "How did it go yesterday?  Did things get back right?"  Do

19   you see that there?

20   A.  Uh-huh.

21   Q.  What did you mean by "did things get back right?"

22   A.  Oh, did he ever find someone with marijuana for me.

23        MS. WILKINSON:  I think that's all I have, Your

24   Honor.

25        THE COURT:  How much do you have on cross?

1          MR. DAVIS:  Probably about ten minutes.

2          THE COURT:  All right.  Cross.

3                     CROSS-EXAMINATION

4    BY MR. DAVIS:

5    Q.  Mr. Bailey, is it fair to say that you really have no

6    interest in testifying here today?

7    A.  Yes.

8    Q.  Would it be fair to say that you were somewhat elusive and

9    difficult to find before you were notified of your appearance

10   in court here today?

11   A.  Yes.

12   Q.  And you were contacted because your telephone number

13   showed up on some phones that the United States believe are

14   associated with Mr. Carter; is that correct?

15   A.  Yes, but I stated at the beginning that everybody used

16   that phone, it wasn't just me, everybody working at my shop

17   used that phone.

18   Q.  But that's why the authorities came to speak to you?

19   A.  Yes.

20   Q.  Now, you're 45 years old; correct?

21   A.  Yes.

22   Q.  And you've testified that you work on the streets, you

23   work on cars doing small things.

24   A.  After I closed my shop down, yes.

25   Q.  And how long have you been working on the streets?

Cross-examination - Bailey  (By Mr. Davis)

1   A.  I only did it for maybe a year after I closed my shop,

2   then things just dried up because people didn't want to come

3   to the side road to get their car -- they wanted to be at a

4   shop.

5   Q.  So people just kind of come around and see you there and

6   they arrange to have work done?

7   A.  They would call me.

8   Q.  And prior to your shop closing, where did you work?

9   A.  I didn't.

10  Q.  How did you survive?

11  A.  Sold drugs.

12  Q.  Now, you had your business for how long?

13  A.  Maybe, um, like -- maybe like four years at one place, but

14  I was locked up for two and a half years in between that.

15  Q.  Now --

16  A.  And I just had somebody leasing -- holding my lease until

17  I got released from jail.

18  Q.  Now, you told the United States that you've never paid

19  taxes in your life?

20  A.  No.

21  Q.  Is that -- did you work out any arrangement with them not

22  to be fined or audited or charged with tax evasion?

23  A.  No.

24  Q.  Did anyone say anything to you about that?

25  A.  No.

1    Q.  Now, as far as the brakes on that Pontiac are concerned,

2    you told the United States that you put brakes on that car and

3    you remembered jacking it up, pulling the tire off, and

4    replacing the brakes sometime during late April or early

5    May?

6    A.  Yes, that I can recall.  But once again, I do so many

7    cars, I don't know.

8    Q.  But you know you did -- you know you jacked the car up,

9    you don't know the exact date; right?

10   A.  Yes.

11   Q.  And then you wanted to do it again; correct?

12   A.  Yes.

13   Q.  Now, how much money do you charge to have brakes

14   replaced?

15   A.  40 bucks, 35.

16   Q.  Now, when you take the wheels off, what do you notice, how

17   do you know if the brakes are bad?

18   A.  I tell them turn the wheel all the way to the right, and

19   I'll look in between the calipers and see if the brake pad --

20   how low the brake pad is.

21   Q.  So when you say -- is it something you can physically see,

22   that the brake pads are physically worn down?

23   A.  Some cars you can see through the rotors, some rotors you

24   can't, it depends on -- I mean, the calipers, I'm sorry, some

25   calipers you can see right through and see the pads, and some

1    calipers you can't.

2    Q.  You take the tire off, you take the calipers off, and then

3    you see the pads; correct?

4    A.  Yes.

5    Q.  Now, you were asked a series of questions about phone

6    calls made around Memorial Day, around the day of your

7    birthday, Memorial weekend.

8    A.  Yes.

9    Q.  Now, some of those calls are pretty short, were all of

10   those calls connected, if you recall?

11   A.  No.

12   Q.  So --

13   A.  I mean, sometimes get the answering machine or something

14   and -- so someone can just be the voice mail, and I probably

15   just didn't hang up right away.

16   Q.  Now, would it be fair to say that most of the calls that

17   you made around the time of your birthday, were really about

18   obtaining some marijuana for your birthday?

19   A.  No, I contact him all the time any way because he was a

20   friend of mine.

21   Q.  Well, I mean, in terms of the calls around Memorial Day,

22   were you trying to obtain marijuana?  Which was more important

23   to you, obtaining marijuana for your birthday, or putting

24   other brakes on the Pontiac?

25   A.  I was trying to put brakes on the car so I could make

Cross-examination - Bailey  (By Mr. Davis)

 1   money.

 2   Q.  So you were trying to do both then?

 3   A.  Yeah.

 4   Q.  Did you believe that he did not want to use you for the

 5   brakes over Memorial weekend, did you get that feeling?

 6   A.  No.

 7   Q.  Why is it did you believe that he never brought the car in

 8   to have brakes put on it?

 9   A.  Um, I don't know.  I just keep moving, I don't question

10   why nobody didn't come or did they come.  But I always just

11   courtesy check back and see did they do it or not.  Because

12   some people have the tendency to just keep riding until they

13   destroy everything, till they start destroying the rotors and

14   everything, so to try to save them money, I would at least

15   check back with them.

16   Q.  So there was no complaint about the work you had done

17   earlier in the month?

18   A.  No.

19   Q.  And you didn't suspect that there was a complaint?

20   A.  Brake jobs are simple, there's nothing you can make a

21   mistake with really.

22   Q.  Did you ever put the brakes on?

23   A.  That I can recall, yes.

24   Q.  Did you ever put them on over Memorial weekend?

25   A.  No.

Cross-examination - Bailey  (By Mr. Davis)

1    Q.  Now, you were recently stopped driving a motor vehicle

2    within the past several days; correct?

3    A.  Yes.

4    Q.  And you don't have a driver's license, do you?

5    A.  No.

6    Q.  Were you arrested?

7    A.  No.

8    Q.  Who did you contact when you were stopped that day?

9    A.  Nobody.

10   Q.  You didn't text anyone from the United States?

11   A.  Oh, yeah, I did.  Oh, yeah, I did, I texted them and told

12   them -- because I didn't want another warrant put out for my

13   arrest, so I texted them and say I might be ready to get

14   locked up.

15   Q.  Are you the same Michael -- strike that.

16        Now, you weren't at -- that video clip that you saw, you

17   hadn't seen that one before, had you?

18   A.  I seen it on the news.

19   Q.  The one that was playing for you --

20   A.  Yes.

21   Q.  -- just recently?

22   A.  You say just recently?

23   Q.  Yes, in court as we were sitting here, had you seen that

24   video clip before?

25   A.  Yes, around my birthday, around the time of my birthday,

Cross-examination - Bailey  (By Mr. Davis)

1    yes.

2    Q.   Okay.   Now, you weren't at the scene of that incident that

3    is documented in that video clip we saw?

4    A.   No, sir.

5    Q.   You weren't out in Parkview; right?

6    A.   No, sir.

7    Q.   And you did not see Mr. Carter on May 27th; correct?

8    A.   No, sir.

9    Q.   You saw him a couple of days later on a Sunday; right?

10   A.   Yes.

11   Q.   Now, you've testified before the grand jury how many

12   times, do you recall?

13   A.   I think it was two times.

14   Q.   All right.   Would three -- would three sound right?

15   A.   Yes, because I wanted a lawyer before I went in there.

16   Q.   Now, you told us -- you told us on direct that you smoked

17   marijuana every day?

18   A.   Yes, sir.

19   Q.   Except for today?

20   A.   Yes.

21   Q.   So you were high when you testified before the grand jury

22   and every time you met with the United States; correct?

23   A.   Yes, most likely.

24   Q.   And you were high when they asked you about that video

25   clip?

1    A.  Yes, most likely.

2    Q.  And they asked you about that, didn't they?  You didn't

3    offer that, they asked you, they showed you that and said, do

4    you recognize that; right?

5    A.  Yes, that I can recall, yes.

6    Q.  And they were questioning you about Mr. Carter because

7    your number turned up on a phone associated with him; right?

8    A.  Yes.

9    Q.  Are you the same Michael Bailey that was convicted of

10   theft in 1999, theft greater than $300?

11   A.  Possibility, yes.

12   Q.  Are you the same Michael Bailey who was convicted of

13   possession with intent to distribute on May 8th of 2003?

14   A.  Yes, sir, I believe so.

15   Q.  And are you the same Michael Bailey that was convicted of

16   possession with intent to distribute on March 29 of 2011?

17   A.  Repeat that.

18   Q.  Are you the same Michael Bailey that was convicted of

19   possession with intent to distribute on March 29th of 2011?

20   A.  No.

21   Q.  You are not the same Michael Bailey that was convicted?

22   A.  No.

23   Q.  How many times --

24   A.  Possession of what?

25   Q.  Possession with intent to distribute a controlled

Cross-examination - Bailey  (By Mr. Davis)

1    substance.

2    A.   Oh, no, not in 2011, I was far out the game in 2011.

3    Q.   Are you the same Michael Bailey that was convicted on

4    March 9th, 2011 for transferring a firearm to a user of

5    narcotics?

6    A.   Yes.

7    Q.   Now, you mentioned that you're away for a couple of

8    years?

9    A.   Yes.

10   Q.   And that was when you had your shop; correct?

11   A.   Yes, sir.

12   Q.   What years did you have your shop?

13   A.   If I can recall, I was on Monroe Street from, I want to

14   say 2005 to around about 2011, if I can recall.

15   Q.   And when you were away, was that towards the end, in the

16   middle, in the beginning?

17   A.   In the middle.

18            MR. DAVIS:  Court's indulgence.

19            THE COURT:  Sure.

20   Q.   (BY MR. DAVIS)  Mr. Bailey, you're wearing glasses, are

21   they reading glasses, or are they prescription glasses?

22   A.   Prescription and reading, there's two visions in here,

23   nearsight and farsight.

24   Q.   What do they call those?  Does both, you look up and you

25   look down and you can see?

1    A.  Yes.

2            THE COURT:  Bifocals.

3    Q.  (BY MR. DAVIS)  Progressives; correct, does that sound

4    familiar?

5    A.  Yes, they kind of new, so --

6    Q.  So you just started recently wearing them?

7    A.  Yes.

8            MR. DAVIS:  I have no further questions, thank

9    you.

10            THE COURT:  Mr. Trainor.

11            MR. TRAINOR:  We have no questions.

12            THE COURT:  Redirect.

13            MS. WILKINSON:  Thank you, Your Honor.

14                    REDIRECT EXAMINATION

15   BY MS. WILKINSON:

16   Q.  Mr. Bailey, Mr. Davis asked you some questions about the

17   what you saw on TV --

18   A.  Yes.

19   Q.  -- that led you to think it could be Davon.  Just to be

20   clear, when did you first see anything on TV that led you to

21   think it was Davon?

22   A.  I think it was Saturday morning.

23   Q.  Of what day?

24   A.  Of the 28th, I think.  I think it would be Saturday

25   morning when I saw it.

1    Q.  The day after your birthday, May 27th, 2016?

2    A.  Yes, I was laying in the house watching the TV.

3    Q.  And that's the day that you saw the clip?

4    A.  Yes.

5    Q.  And what was your reaction when you saw the clip?

6    A.  When I seen that clip right there, there was no reaction,

7    but I seen a still photo, and I just to myself, from just

8    knowing, you know -- I just said to myself, is that Davon, but

9    I don't know.

10   Q.  Was that your immediate reaction?

11   A.  Um, I think -- yeah, because of the facial hairs, it was

12   just like because the facial hairs that I saw.

13   Q.  Did it --

14   A.  It was more or less about the -- because you see, you

15   know, beards and stuff, it was more or less about the facial

16   hairs, because he wear his hair like that.

17   Q.  Did it favor him?

18   A.  Yes.

19   Q.  Mr. Davis asked you about some phone communications that I

20   had shown you on your direct testimony and whether some of

21   the -- some of the communications were actually connections or

22   not, because some of them showed zero and some of them showed

23   more seconds, do you remember him asking you about that?

24   A.  Yes.

25   Q.  And I'm going to show you --

1          MS. WILKINSON:   Government's Exhibit, for the

2     record, Your Honor, P-25.

3     Q.  (BY MS. WILKINSON)  And this is the communication on

4     May 27th, 2016 reflecting an incoming call from your phone,

5     and it looks to be about a minute, do you see that there?

6     A.   Uh-huh.

7     Q.   Is that the conversation you had with Mr. Carter about him

8     going out of town?

9     A.   Yes, it could be.  But a lot of time I would get the

10    answering machine, so I don't -- I don't know exactly what

11    time was it that I talked to him about that.

12    Q.   And --

13    A.   Because a lot of times, you know, if we busy, we don't

14    answer the phone, or so -- when you see stuff like that,

15    sometimes it just be the voice mail.

16    Q.   But this one, any doubt in your mind that you called him

17    and you spoke to him at around 10:45 a.m. for about a minute

18    on May 27th?

19    A.   I don't recall what time it was that I talked to him

20    about -- I don't recall.

21    Q.   Did you talk to him that morning, no doubt in your mind?

22    A.   I do believe so.  It was so long ago, I can't remember the

23    time.

24    Q.   Okay.  Would it refresh your memory to look at your grand

25    jury testimony?

Redirect Examinaton - Bailey  (By Ms. Wilkinson)

1    A.  Yes, if you could show me.

2    Q.  And I am going to show you and mark it as Government's

3    Exhibit, for ID only, X- --

4              MS. WILKINSON:  What's the next, Agent Holiday?

5              X-8 for ID only.  Counsel, page 26 of the June 27th,

6    2017 grand jury testimony.

7    Q.  (BY MS. WILKINSON)  I'll show you the first page,

8    Mr. Bailey.

9    A.  Uh-huh.

10   Q.  And then down below, and you can just read to yourself and

11   see if it refreshes your memory about the conversation that

12   day.  You don't have to read all of it, just till it refreshes

13   your memory.

14   A.  Okay.

15   Q.  You let me know.

16   A.  (Complying.)

17   Q.  Is your recollection refreshed?

18   A.  Yes.

19   Q.  Okay.  Did you have a conversation of some length with

20   Mr. Carter on May 27th, 2016?

21   A.  Yes.

22   Q.  And recount for the grand jury, as best as you can recall,

23   what that conversation was about, Mr. Bailey.

24   A.  When he told me he was going out of town, I asked him was

25   he going because it was bike week because that's normally what

Redirect Examinaton - Bailey  (By Ms. Wilkinson)

1  they do down there on Memorial Day weekend.   They have like

2  a -- everybody got bikes come down there for bike week.

3  Q.   Was he testy with you?

4  A.   Um, yeah, he was rushing me off the phone.   It's not

5  unusual, you know, sometimes people talk, sometimes they

6  don't.

7           MS. WILKINSON:  Nothing further, Your Honor.

8           THE COURT:  All right.  Sir, thank you for your

9  testimony.  You are excused.  Don't discuss this case with

10  anyone until the trial's been completed.  Enjoy the rest of

11  your day.

12           THE WITNESS:  Thank you, sir.

13           THE COURT:  All right.  Ladies and gentlemen, we'll

14  take our morning break at this point.  I'll ask that you be

15  back in the jury room ready to go in 15 minutes, which would

16  be five minutes to 12.  Remember my instruction not to discuss

17  this case with anyone, even among yourselves.  I'll see you in

18  15 minutes.

19           MS. WILKINSON:  Your Honor, may I excuse Mr. Bailey?

20           THE COURT:  He's excused.

21           MS. WILKINSON:  I didn't hear, I'm sorry, Your

22  Honor.

23           THE COURT:  That's okay.

24           (Jury left the courtroom.)

25           THE COURT:  See you all in 15 minutes.

Direct Examination - Wilde  (By Ms. Wilkinson)

1          MS. WILKINSON:  Thank you, Your Honor.

2          (A recess was taken.)

3          THE COURT:  Get the jury.

4          (Jury entered the courtroom.)

5          THE COURT:  All right.  You may all be seated.

6          The government can call its next witness.

7          MS. WILKINSON:  Your Honor, the government calls

8    Special Agent Mathew Wilde.

9          THE COURT:  Okay.

10         THE CLERK:  Good morning, sir, please raise your

11   right hand.

12                   SPECIAL AGENT MATHEW WILDE,

13   called as a witness, being first duly sworn, was examined and

14   testified as follows:

15         THE WITNESS:  I do.

16         THE CLERK:  Thank you, you may have a seat.  Please

17   state and spell your full name for the Court.

18         THE WITNESS:  Mathew Wilde, M-a-t-h-e-w,

19   W-i-l-d-e.

20         THE CLERK:  Thank you.

21                      DIRECT EXAMINATION

22   BY MS. WILKINSON:

23   Q.  Good morning, Agent Wilde.

24   A.  Good morning, ma'am.

25   Q.  You are a special agent with the FBI?

Direct Examination - Wilde  (By Ms. Wilkinson)

1    A.  Yes, ma'am.

2    Q.  How long have you been working in that capacity?

3    A.  About ten year -- it will be ten years in May.

4    Q.  And can you briefly detail your law enforcement background

5    for members of the jury?

6    A.  Yes, ma'am, in the year 2000, I was hired by the

7    Spartanburg County South Carolina Sheriff's Department.  I

8    worked there as a patrol officer, or patrol deputy for about

9    three years and then transitioned into investigations.  And I

10   worked burglary, car break-ins, narcotics violations, up until

11   the point that I left the department and was hired by the FBI

12   in 2010.

13       In 2010, I went to the FBI academy.  Immediately after

14   graduating, I was assigned to the Rockville office here in

15   Baltimore, where I worked white collar and gangs and violent

16   crime.  And then I worked in Prince George's County for a

17   little bit, for about three years working violent crime that

18   crossed the border between Prince George's County and

19   Washington, D.C.

20       And since 2015, I've been working out of the main

21   Baltimore office, first on the violent crimes task force where

22   I worked with the Baltimore City Police Department to

23   investigate robberies, homicides, kidnappings, and then since

24   June of last year, I've been full time assigned to FBI

25   headquarters, but I work in Baltimore as a member of the FBI

1    CAST unit.

2    Q.   Okay.   I'm going to ask you about the CAST unit in a

3    moment.   Can you also tell the jury your -- very briefly your

4    educational background, before you started off in law

5    enforcement.

6    A.   Sure.   I have a bachelor's degree in business

7    administration with a concentration in accounting from

8    Limestone College in South Carolina.

9    Q.   And now, you used the acronym CAST, C-A-S-T; is that

10   correct?

11   A.   Yes, ma'am.

12   Q.   What does that stand for?

13   A.   So cast is the Cellular Analysis Survey Team, it's a group

14   of about 80 special agents and task force officers.   We're

15   located across the country, and what we do is we specialize in

16   reading historical call detail records or historical phone

17   records.

18   Q.   And I'm going to dig more into the weeds on that in a

19   moment, but generally speaking, in the CAST unit, do you

20   support all types of investigations that the FBI does?

21   A.   I support all types of investigations that the FBI does,

22   everything from crimes against children, to violent crime, to

23   public corruption, to national security cases, and then I also

24   support other federal state and local agencies in my capacity.

25   So I work with any county, city, police department you can

Direct Examination - Wilde  (By Ms. Wilkinson)

1    imagine in Maryland, as well as other places around the

2    country.

3    Q.   And I presume since you're here today, that also includes

4    the Department of Health and Human Services, HHS?

5    A.   Yes, ma'am.

6    Q.   And in addition to doing that kind of work with all of

7    your colleagues across the country, first of all, how many of

8    them are you -- CAST agents across the country from the FBI,

9    how many?

10   A.   I believe we're up to about 80 right now.

11   Q.   And so of you, you support different geographic areas, or

12   just depends on -- how do you get your cases?

13   A.   We support different geographic areas, so we're trying to

14   get a CAST agent in every single office, each one of our 56

15   offices.  But right now we cover the offices we're in, and

16   then if we have requests from other areas that don't have a

17   CAST agent, I cover those kind of requests as well.

18   Q.   And you used a phrase "call detail records," give us a

19   little bit more detail about your job in terms of phone

20   records and the types of records you look at and the

21   information that you're able to glean from it?

22   A.   So when I look at -- when I say call detail records, what

23   I'm referring to are basically like -- their billing records.

24   They're very much like the old paper phone bill you would get

25   in the mail, you know, 10 or 15 years ago.  Those records have

Direct Examination - Wilde  (By Ms. Wilkinson)

the date and time that the calls occurred, they have who called who.  So if it was my number, who I called or who called me.  They have the duration, or how long those calls were.

And most importantly, what I do is -- they tell me for each line or for each one of those activities, which cell tower and then which sector, which side of that tower is being used to handle that call.  So in my job, we analyze that type of data, that's most of what I do.  We also look at location data captured from maybe a download of a cell phone.

So when we download a cell phone using a specific device, it will tell us -- it will record some of the location data that was stored in that phone, so we analyze that as well. Then we analyze other types of Google location data, tracker data from vehicles.  I mean, any kind of thing with location-based service, we work on that stuff.

Q.  And when you talk about phone downloads, is there a term that has come to be associated with that phone download?

A.  We call it Cellebrite.  Cellebrite is the manufacturer, the vendor that makes the equipment that we use to download phones.  So it's known as a Cellebrite report or a Cellebrite dump or a phone dump.

Q.  So when you look at call detail records, meaning kind of like billing records, sometimes you get that -- the actual subscriber, the name and whom the person is, the phone is?

Direct Examination - Wilde  (By Ms. Wilkinson)

A.  You can.  There are some cases where the billing -- there
are some cases where a customer will sign up for an account
with Sprint, AT&T, Verizon, T-Mobile, whoever it might be, and
they use their actual name and address and e-mail address to
sign up for the account.

There are other types of accounts.  There are prepaid
accounts where you can go to 7-11, Wal-Mart, and you can just
buy a cheap phone in a box with a SIM card, and you don't need
to have any subscriber information to activate that -- to
activate those.

So you can see, from where I look at it, I see both --
both sides of it.  I see customers who have their subscriber
information listed on their account, and then I see the other
side where people, for whatever reason, they go to Wal-Mart or
7-11 and buy that phone, and they don't put their subscriber
information on it.

Q.  You talk generally about call detail records and kind of
referring old school to phone bills that we used to get.  Are
there different ways of communicating other -- that are --
showed up in phone bills other than calls, actual calls, the
way we think of a conversation between two phones?

A.  Absolutely.  So the call detail records, they're kept for
a couple reasons, number one reason is billing.  So the
company wants to know how much -- how many minutes you're
using, how much call activity you're making.  Second reason is

1    network diagnostics to figure out where the holes are in the

2    network, where they're having issues.  And the third reason is

3    non- -- emergency situations.

4         The reason I state that is because if a person is using

5    an application to communicate, maybe like FaceTime or Google

6    Voice, that information, it goes kind of down a different

7    road.  It doesn't go down -- it won't be recorded on the

8    regular call detail records, it goes over Google Voice, so it

9    goes over as data, like e-mail or like YouTube videos or

10   Netflix.

11        So from my perspective, when I'm reading the records, if

12   it's a Sprint record, for instance, I'm not going to see those

13   FaceTime, WhatsApp, any of those other application

14   transactions on the Sprint records because it goes down a

15   different route.

16   Q.  What about text messaging on -- between two phone devices,

17   will you sometimes get records related to that?

18   A.  Sometimes you can see that on the records.  But kind of

19   like paper phone bills, text messaging is, you know, it's an

20   older -- it's an older technology.  So where we might text

21   each other, might have two iPhones and two people who text

22   each other, they're calling it texting, but what you're really

23   doing is sending an iMessage, and that iMessage goes over data

24   as a data transaction, so it's not captured on the call detail

25   records.  So we'll see that sometimes as well.

1    Q.   Now, I'll probably come back to all the different types of

2    information that come out of call detail records and the

3    records you're just describing to the jury, but give us an

4    idea of where you get those records from, both generally and

5    specific to this case, where do they come from?

6    A.   So the records come from the carriers.  So what happens is

7    law enforcement develops a telephone number that they're

8    interested in and they believe that it's related to their

9    crime, and then they do a court order or a search warrant to

10   T-Mobile, Sprint, Verizon, AT&T, whoever the carrier might be,

11   and then the carrier returns the records back to law

12   enforcement, and so that's how law enforcement get the

13   records.

14   Q.   So court order, meaning a subpoena or a search warrant?

15   A.   Yes, ma'am.

16   Q.   And does that type of process depend on the type of

17   information you're trying to get from the phone company?

18   A.   Yes, ma'am, it does.  If you're not looking for the actual

19   cell tower information on those records, if they don't have

20   location information, you can obtain them with a simple

21   subpoena.  If you're looking for the location data, back in

22   2015, we had to -- we could do a court order to get the

23   records.  And then after, I believe the summer of 2015, we had

24   to get a search warrant to get those records.

25   Q.   So when we -- the companies that you're getting these

Direct Examination - Wilde  (By Ms. Wilkinson)

1   phone records from, are there key companies, that is, the

2   big -- the well-known service providers of phone

3   information?

4   A.  Yes, ma'am, there's basically five major providers in the

5   U.S. right now; Sprint, T-Mobile, Verizon, AT&T, and U.S.

6   Cellular.  And there might be hundreds of other smaller

7   carriers, but most of those smaller carriers, they actually

8   operate using one of the big carrier's network.

9        So take Cricket for instance, Cricket is a smaller

10  carrier, but it's really just a subset of AT&T.  So if you

11  were to have a Cricket phone, you think you have Cricket

12  service, but really you're just operating off of AT&T's

13  network.  And when I get the records, the Cricket records look

14  just like AT&T records.

15       Or Boost for instance, Boost Mobile is a subset of

16  Sprint, so you might have a Boost Mobile account, you might go

17  to the Boost Mobile store and sign up for a Boost Mobile

18  account, what you really have is a Sprint phone.  And when we

19  seek records for that Boost Mobile account, we're going to

20  seek Sprint records.

21  Q.  And when you get the records from, say, the big five

22  companies that you just told the jury about, do they come in

23  different forms to you?

24  A.  Yes.  The carriers -- again, the carriers are in the

25  business of being profitable, making money and serving their

1    customers.  They're not in the business of assisting law

2    enforcement.  So the -- they're not in the business of

3    assisting law enforcement.  So their records are set up for

4    each one of their networks, so they're all different.  They

5    come in different time zones, some of them come in Excel

6    format, some of them come in text format, they're all

7    different.

8    Q.  Does that require, as a person that works on the CAST unit

9    at FBI, some expertise to be able to understand and read and

10   distinguish between the different types of phone records you

11   get either from the companies or through search warrants and

12   the actual Cellebrites on the downloads, the phones

13   themselves?

14   A.  Yes, ma'am.

15   Q.  And you talked about when CAST started -- well, when did

16   CAST actually start?  I know when you started, but when did

17   CAST start within the FBI?

18   A.  So CAST officially started in -- I believe they named it

19   in 2010.  And it came about because we were starting to see --

20   with the rise of cell phones in the world, we were starting to

21   see more and more cases where cell phones were involved in our

22   cases, and we needed to have a group that would be able to

23   interpret that data to push our cases forward.

24   Q.  And did you have to have any specific training before you

25   were permitted to testify in court, such as we are here today,

Direct Examination - Wilde   (By Ms. Wilkinson)

1    as a member of the CAST unit?

2    A.   Yes, ma'am, I have over 400 hours of training.  Starting

3    in 2012, I went to a class called Basic Project Pinpoint.  It

4    was a two-day course where we learned how to read those call

5    detail records, and then using a very basic mapping program,

6    regenerate a very simple map to use in our cases.

7        From 2012 to 2016, I used call detail records in almost

8    every one of my cases that I worked, bank robberies,

9    kidnappings, white collar crimes.  Whatever I was working on,

10   I used call detail records.  In 2016, I was selected to go to

11   Advanced Project Pinpoint, which was a week long.  And during

12   that course, we took a deeper dive into what each of the

13   carriers could provide in terms of records, what was

14   available, and how to use that data.  During that class we

15   were provided with practicals on a day-to-day basis and those

16   were timed and we had to turn them in and we were rated by the

17   already-certified CAST team members at the time.

18       And then after that class, I was selected to go to the

19   CAST certification course.  The CAST certification course is

20   four weeks.  The first week is radio frequency theory, so we

21   would learn how radio waves are transmitted from cell phone

22   back to the network and how those signals travel through the

23   network and generate the records that we look at.

24       The second week, we met with each one of the carriers, so

25   we met with Sprint, AT&T, Verizon, T-Mobile, and U.S.

Direct Examination - Wilde  (By Ms. Wilkinson)

1    Cellular.  During those meetings, we met with their records

2    custodians, those are the people that provide records to law

3    enforcement when they're requested.  And then we also learned

4    from the network engineers, those are the people that design

5    and maintain the network.

6            The third week, we learned about our network survey

7    equipment.  So we have a piece of equipment we can put in our

8    car, and we can drive around a specific cell phone tower, and

9    we can figure out how far that cell phone tower actually

10   reaches.  And then the fourth week, we did a moot court

11   scenario.  So we were provided with a real case that we had to

12   read the call detail records, generate a map, go out and

13   drive-test using that network survey equipment, and then

14   present that case in a moot court scenario with real attorneys

15   acting as the defense, the prosecutor, and the judge.  And at

16   the conclusion of that training, I was certified as a CAST

17   team member.

18           Now, every year since then, so 2017, 2018, 2019,

19   I've attended the CAST recertification course, which is one

20   week, where again, we go back and meet with all the carriers,

21   we meet with the records custodians, and the engineers.  And

22   then we also, because we are located across the country and

23   sometimes in other parts of the world, we talk about emerging

24   technologies, what we see in different places, and just kind

25   of try to learn from each other.

Direct Examination - Wilde  (By Ms. Wilkinson)

1    Q.  Now, is there any particular software or computer program

2    that you use to do your job, particularly dealing with cell

3    site analysis?

4    A.  So I use a lot of Microsoft products because the data

5    usually comes in Excel format or a text format or a PDF

6    format.  But to actually do the physical mapping, we use a

7    Google-based piece of software that basically just takes the

8    call detail records and ingests them into the computer.  It

9    takes a tower list or list of all the cell phone towers in the

10   area, and it matches up the call detail records and puts it on

11   a Google map for us.

12        And I've been doing this since 2012, we didn't always

13   have that.  We used to have to hand draw everything and

14   manually input it.  But because this is what I do all day

15   every day, I use that program because it makes me more

16   efficient.

17   Q.  In addition to the training that you described to the

18   jury, and I think you mentioned too that you're actually -- go

19   through some moot courts, are you trained as an expert witness

20   to be able to relate this type of information to juries?

21   A.  Yes, ma'am.

22   Q.  And how so?

23   A.  Because we go through that moot court.  We go through that

24   moot court scenario, and when we're going through that, when I

25   went through, I think we had 12 people in my certification

Direct Examination - Wilde   (By Ms. Wilkinson)

1    class.  So it wasn't just my experience of sitting on the

2    stand and being questioned by the prosecutor and the defense,

3    I got to watch 11 other people go through it as well.  So you

4    get a good base to learn -- learn about how court goes, what

5    to expect, and that's the training we get.

6    Q.  Now, you talk about the fact that you're a certified CAST

7    member and that you have continuing education after getting

8    your certification -- after being certified, do you also

9    teach?

10   A.  Yes, I do.  I've taught the basic CAST course, Project

11   Pinpoint.  I've taught that between 12 and 15 times to local

12   law enforcement, other federal agencies here in Maryland, in

13   Virginia, in Florida, in Texas.  I've traveled quite a bit

14   teaching that class.  And then this past year, I helped

15   instruct the CAST advance course, a new course we came up with

16   called Critical Incident Readiness Assessment.  And then I was

17   also one of the evaluators for the moot court for the CAST

18   class that came through in 2019.

19   Q.  Now, part of your job is obviously the cell site analysis.

20   In addition to reading historical call detail records, Agent

21   Wilde, can you give the jury how many cases you've worked

22   on -- let's just deal with cell site analysis, which is a

23   little more specialized, how many times have you been asked to

24   work on and do cases with regard to cell phone analysis?

25   A.  So since 2016, I've done over 500 cases.  Just last year,

1    I did about 165 cases and analyzed over 300 sets of call

2    detail records.

3    Q.  And as part of that kind of big picture that we're looking

4    at, in some of those cases, have you been called upon to

5    testify like you are today?

6    A.  Yes, ma'am.

7    Q.  Okay.  And how many times do you think you have testified

8    as an expert in either state or federal court?

9    A.  I believe it's 80 times.

10             MS. WILKINSON:  Your Honor, I would offer Agent

11   Wilde as an expert in cellular telephone record analysis to

12   include cell site analysis.

13             THE COURT:  Any objection or request for voir dire

14   from Mr. Carter's counsel?

15             MR. DAVIS:  Not on behalf of Mr. Carter.

16             THE COURT:  Mr. Mosley's counsel.

17             MR. MERCER:  A few questions, Your Honor.

18             THE COURT:  Sure.  You may proceed with voir dire.

19                     VOIR DIRE EXAMINATION

20   BY MR. MERCER:

21   Q.  Good afternoon, Agent Wilde.

22   A.  Good afternoon, sir.

23   Q.  And just to confirm, you are a law enforcement officer?

24   A.  Yes, sir.

25   Q.  So you're a special agent, you're not a laboratory

Voir Dire Examination - Wilde  (By Mr. Mercer)

1    scientist?

2    A.  That's correct, I'm a special agent, I have arrest powers,

3    I've made arrests at the FBI many, many times.

4    Q.  Well, hopefully not at the FBI.

5        Now, the FBI does have a laboratory; right?

6    A.  Yes, sir.

7    Q.  And it's an accredited laboratory by an outside entity?

8    A.  I don't know, sir.  I don't know about their

9    accreditation.

10   Q.  Okay.  It's the one at Quantico?

11   A.  We do have a laboratory at Quantico.

12   Q.  And there's not -- you talked about the CAST

13   certification?

14   A.  Yes, sir.

15   Q.  That's an FBI certification?

16   A.  Yes, it is.

17   Q.  So there's not an outside entity that certifies you with

18   respect to CAST?

19   A.  There's not.  As far as I know, we're the only -- we're

20   the only agency -- actually, we're the only federal agency

21   that actually does what we do.  And we don't have an outside

22   agency that would certify us as, you know, coming to court, we

23   certify ourselves.

24   Q.  Now, you mentioned as part of your training you have a

25   week of radio wave theory?

Voir Dire Examination - Wilde  (By Mr. Mercer)

1    A.  Radio frequency theory.

2    Q.  You -- your education, you do not have a degree in

3    physics?

4    A.  No, sir, I have a degree in business with a concentration

5    in accounting.

6    Q.  You don't have a degree in electrical engineering?

7    A.  No, sir.

8    Q.  You discuss your employment, but you've never been

9    employed as a network engineer?

10   A.  No, sir.

11   Q.  You have no experience designing a cellular network?

12   A.  No.

13   Q.  You mentioned this network survey equipment?

14   A.  Yes, sir.

15   Q.  Do you have any training in the algorithms or

16   probabilistic modeling utilized for network survey mapping?

17   A.  No, I don't.  I have the equipment, I've been trained on

18   how to use the equipment, and in my experience, the equipment

19   works.

20   Q.  With respect to your experience with mapping cell sectors,

21   have you ever conducted a formal study to evaluate factors

22   that influence any changes in the area of coverage over a

23   period of time?

24   A.  No, sir, I have not.

25   Q.  You mentioned that carriers are not in the business of

Voir Dire Examination - Wilde  (By Mr. Mercer)

1   assisting law enforcement?

2   A.  What I meant by saying that is that they're not -- that's

3   not their business, their business model is to provide

4   cellular service and make a profit.  They do provide records

5   to us when requested.

6   Q.  Well, and part of their business model is to comply with

7   federal law; right?

8   A.  Yes, sir.

9   Q.  And federal law requires that they assist law

10  enforcement?

11  A.  I believe it does.

12  Q.  And federal law requires that they record tower and sector

13  information?

14  A.  Yes.

15  Q.  Now, are you going to be testifying about any GPS location

16  information of phones today?

17  A.  I don't believe so.

18  Q.  That's the most accurate location information available

19  for a phone?

20  A.  It can be, but I wouldn't say it's the most accurate,

21  because it's not always the most accurate.

22  Q.  What is more accurate than GPS?

23  A.  I mean, GPS, it's a broad term, sir, so like there's times

24  where GPS data can give us an accuracy of two to three meters,

25  and I would agree with you that that's accurate, but there's

Voir Dire Examination - Wilde  (By Mr. Mercer)

1    other times when we pull the GPS data or we actively try to

2    ping a phone, and we're getting 2- to 3,000-meter hits.  And

3    so within that area, you could have 20 or 30 different cell

4    towers, so in that instance, I wouldn't agree with you that

5    the GPS information is accurate.

6    Q.  Let me rephrase that, in terms of capacity for accuracy,

7    GPS is the greatest?  If you had a six-satellite GPS

8    configuration, that's going to be more accurate than a cell

9    tower sector; right?

10   A.  Again, it's dependant upon the circumstances and upon the

11   immediate situation.  I wouldn't agree with you broadly on

12   that.

13   Q.  So you don't agree that if you have a complete information

14   from global positioning satellites, that that category of

15   information is more accurate than cell tower sector

16   information?

17           THE COURT:  Counsel, let me just ask, do these

18   questions go to his qualifications?

19           MR. MERCER:  I think so, if he's not conceding that

20   GPS is more accurate --

21           MS. WILKINSON:  Objection, Your Honor.

22           MR. MERCER:  -- has greater capacity accuracy than

23   cell tower sectors.

24           THE COURT:  I'll let him ask this final question on

25   this point, and obviously you can continue this on your cross.

1    But at this point, I'll just -- you can answer that last

2    question.

3    A.  My answer is exactly the same as my previous answer, sir,

4    with regards to the accuracy of GPS.  It can be accurate.  It

5    can be very accurate, more accurate than a cell sector, but

6    there are times when, in my experience, it's not as accurate

7    as a cell sector, and I would rather have the cell phone tower

8    information to locate the person or the phone I'm looking

9    for.

10   Q.  (BY MR. MERCER)  What about RTT data, or round trip time

11   data, are you testifying about that today?

12   A.  No, sir.

13   Q.  And that's another area of cell phone location information

14   that can provide greater accuracy than tower sector

15   information?

16   A.  RTT data or real-time tool data, it's a term specifically

17   for Verizon, but it's also available under Sprint and T-Mobile

18   as per call measurement data and also as timing advance data.

19   And what that data does is, it tells you -- the carriers know

20   how fast the signal travels, it travels at the speed of light.

21   So they know how fast the signal travels.

22       So if they can time the time it takes for the signal to

23   go from the phone to the tower and back to the tower, then

24   they can estimate that distance.  So it can be very accurate.

25   The downfall of -- the bad part about PCMD, RTT data, or

1    timing advance data is that because of its volume, the

2    carriers don't keep it for a long time.  The longest Sprint

3    keeps PCMD data is 90 days.  Verizon, the good stuff goes away

4    after about seven days, and it's completely gone by 14 days.

5         T-Mobile, now in 2018, 2019, they keep that timing

6    advance data a little bit longer, but maybe three months is

7    the furthest out you're going to get.  So the challenge in

8    some cases is when you don't identify telephone numbers for

9    months after an incident occurred, a lot of times that data

10   has already been purged.

11   Q.  And you mentioned your experience with Cellebrite, that's

12   phone content?

13   A.  Yes, sir.

14   Q.  And you also mentioned that some information is not on a

15   call detail record that may be transmitted through data as

16   opposed to the sort of old-school text message?

17        MS. WILKINSON:  Your Honor, again, I'm going to

18   object for the same reason the Court just raised, and I was

19   about to object, we've gone kind of afield of voir dire and

20   what Agent Wilde's experience is.

21        THE COURT:  I'll overrule the objection, but let's

22   do try to move this along.

23   A.  I'm sorry, can you repeat your question.

24   Q.  (BY MR. MERCER)  Probably not, but you testified about

25   Cellebrite as capturing data from a phone itself.

1    A.  Yes, sir.

2    Q.  And that that can include data that would not be available

3    in the call detail records.

4    A.  That's correct.

5    Q.  So things like FaceTime, I think you mentioned?

6    A.  Yes, sir.

7    Q.  That wouldn't be available in the call detail record, but

8    you can see that in the Cellebrite extraction?

9    A.  Yes, sir.

10              MR. MERCER:  Nothing further, Your Honor.

11              THE COURT:  Any objection?

12              MR. MERCER:  No objection to his expertise in

13   cellular historical cell site location information.  With

14   respect to anything beyond -- or Cellebrite, extracting

15   content from phones, I'm just not sure how far afield the

16   government's going to go with cell signal mapping, and we may

17   need to be heard at an appropriate time about that.

18              THE COURT:  What's your specific request?

19              MS. WILKINSON:  Your Honor, I -- that is part of

20   the -- small part of what Agent Wilde will testify about, and

21   I can certainly continue if the Court has concerns about

22   his --

23              THE COURT:  For right now I'm just asking you to

24   repeat what you're asking he be qualified as.

25              MS. WILKINSON:  Oh, expert in cellular telephone

1    record analysis and cell site analysis.

2              THE COURT:  All right.  Is there any objection to

3    that?  If so, approach.  We can -- approach.

4              (Bench conference on the record.)

5              THE COURT:  I mean, if you don't think that he is

6    qualified as to what she's offering, then now would be the

7    time to say so.  If your question is just how far afield he

8    will go, then that's fine, you can wait until a specific

9    question is raised.  I'm just trying to see where we are.

10             MR. MERCER:  To the extent that the government's

11   proffer as to the scope of his qualifications as an expert

12   would include expertise in cell site mapping, I would object

13   to that specific part of the scope of expertise.

14             THE COURT:  All right.  And your basis for that

15   objection?

16             MR. MERCER:  That I do not believe he has the

17   training, skills, or experience with respect to cell site

18   mapping, which is a very different aspect of his testimony

19   than the historical cell site location information analysis,

20   which involves plotting towers and sectors, or for example,

21   the Cellebrite analysis, which involves extracting data from

22   phones.

23             Cell site mapping, it's much deeper into the

24   behaviors of radio waves, and it utilizes a system, software

25   that's probabilistic in nature to generate coverage maps that,

1    for example, here I'm not even sure when it was generated, but

2    I think it was well over a year after the fact.  So with

3    respect to the expertise of a law enforcement officer to

4    testify about that level of technology, I don't believe is

5    appropriate.

6              THE COURT:  Government.

7              MS. WILKINSON:  Just so I understand, because I'm

8    not 100 percent following Mr. Mercer, but are you referring to

9    the drive test?

10             MR. MERCER:  Yes.

11             MS. WILKINSON:  I don't intend to ask about the

12   drive test.  I thought you guys wanted to ask about that, but

13   I don't intend to ask about the drive test.  I'm just going

14   to -- if you open it up on cross, but I produced it because it

15   was performed by another analyst, and Agent Wilde went along,

16   but I'm not going to go there.

17             MR. MERCER:  Well, I think that resolves the issue,

18   and I apologize for taking up the Court's time, but that's why

19   I was trying to give the caveat up front.

20             MS. WILKINSON:  I think he's experienced to do it,

21   but I'm not going to concede that, but that is not what he's

22   going to testify about here.

23             THE COURT:  Sounds like a moot point.

24             MS. WILKINSON:  It's not one of the exhibits, it's

25   not marked as a exhibit, and I don't intend to ask him about

1    that.

2              THE COURT:  Mr. Davis wants to say something.

3              MR. DAVIS:  In the event that I make no objection or

4    say -- comment on what other counsel's representations are,

5    that means I'm joining their representations.

6              THE COURT:  Understood.  All right.  Sounds like

7    we're ready to go.

8              MS. WILKINSON:  Thank you, Your Honor.

9              MR. MERCER:  Thank you, Your Honor.

10             (The following proceedings were had in open court.)

11             THE COURT:  All right.  Ladies and gentlemen, I am

12   allowing this witness to testify as an expert in the areas

13   that the government has identified.

14             Ms. Wilkinson, you may inquire.

15             MS. WILKINSON:  Thank you, Your Honor.

16                           DIRECT EXAMINATION

17   BY MS. WILKINSON:

18   Q.  So we were using the phrase "cell site analysis," what is

19   cell site?

20   A.  So cell site just refers to as a cell tower.  And the

21   analysis portion of that is looking at these call detail

22   records, looking at the dates, the dates that the call

23   arguments occurred, looking at the time those calls occurred,

24   and looking at the cell tower and the sector and where that

25   cell tower and sector is, and comparing it with a known date,

1  time, and location, so a crime scene.

2  Q.  And do different cell site -- cell providers have

3  different places where their cell towers are located?

4  A.  Absolutely.

5  Q.  And how does that affect your work?

6  A.  Well, for each specific cell phone provider, I have to

7  refer and cross reference the call detail records to a

8  specific tower list or a list of all the towers for that

9  provider.  So when I look at AT&T records, I look at the AT&T

10  call records, I have to take that cell tower information and

11  look on a tower list, and it will tell me where that tower is

12  located, and then which way that sector faces.  I couldn't

13  look up a T-Mobile tower on the AT&T tower list, the numbers

14  aren't going to match.

15  Q.  Now, Mr. Mercer was asking you some questions about the

16  comparative accuracy of cell site analysis versus other types

17  of sophisticated location equipment and means of identifying a

18  phone's location, do you use cell site analysis to find, say,

19  victims of a kidnapping?

20  A.  Yes.

21  Q.  Tell us how that works.

22  A.  What I can do is identify -- we can identify a phone

23  that's associated with the kidnapping victim.  And then we can

24  pull the call detail records and look at the activity on that

25  phone to look for the last activity of where that phone was

1    located, and then get a general idea where the phone is, and

2    then from there, then we can request prospective data, and we

3    can start trying to locate that phone by using a ping, sending

4    a signal to the phone to ping the phone.  And that can be

5    accurate or it can be a pretty broad range.

6    Q.  And so is that the part of the analysis that you're

7    conducting as a CAST expert?

8    A.  Yes, ma'am.

9    Q.  And does cell site analysis sometimes provide you

10   information that excludes someone from a particular area?

11   A.  Absolutely.

12   Q.  And how does that work?

13   A.  If you had a -- let's say you had a crime on the front

14   steps of the courthouse this afternoon, we pulled the call

15   detail records for the person we thought was responsible for

16   that crime, and that person was in Towson making phone calls

17   at the time the crime occurred, if they're in Towson making

18   phone calls, there's no way -- it's impossible for them to be

19   on Lombard Street murdering somebody.

20   Q.  And Mr. Mercer was asking you some questions about whether

21   there can be factors that can affect where a cell tower hits

22   on a particular tower, did you hear him ask those questions?

23   A.  Yes.

24   Q.  And with regard to that, are there weather, geological,

25   geographic factors that may affect where a cell tower hits?

A.   So the first thing that affects which cell tower a phone

uses is the phone.   The phone makes that decision.   The phone,

when it's powered on and it's not in a call, it's constantly

scanning its environment.   It's scanning what's around it, and

it's trying to find the tower and the sector or the side of

that tower that phone sees as the strongest and clearest

signal.   Okay.

That is the tower and sector that's recorded on the

records that I look at.   There are some factors that can

affect which tower is being used.   Most of the time, the tower

that's being used is the closest tower, that's number one.

Most of the time, it's the closest tower.   There are time when

it's not the closest tower.   The times when that occurs is

when you have different landscape features.

Let's say you have a hill or mountain, let's say the

microphone in front of me is a mountain, a cell phone tower

might be on one side of the mountain, I might be on the other

side of the mountain, but the signals can't go through the

rock, so I might be closer to this tower on the right side of

my microphone, but I'm going to connect to the phone that's

down -- the tower that's further away that I have a better

line of sight of because my phone's going to select that

sector and tower as the strongest and clearest signal.   Those

are the effects, that's basically what's going to affect which

tower and sector it picks.

1        Weather doesn't really affect it.   Again, the equipment's

2   designed to be outside.   They spend millions and millions and

3   millions of dollars designing antennas and cell phones, and

4   the antennas are designed to be outside in the weather,

5   they're designed to work in the rain.   Unless a lightening

6   bolt hits the top of the tower and takes the tower out, that

7   tower's not going to go down, it's not designed to go down.

8   Q.   Thank you.   Agent Wilde, in connection with the case

9   that's on trial here today, were you asked to perform two

10  types of analysis, both cell site and historical kind of call

11  detail analysis, Cellebrite analysis, for purposes of

12  demonstration to the jury?

13  A.   Yes, ma'am.

14  Q.   And I'm going to intermingle them for a second, and then

15  we'll separate them apart.   In connection with your work in

16  connection with this particular case, were the phone records

17  that you received, received via a variety of different forms,

18  including subpoenas, search warrants, and phones that were

19  seized from individual people at different times?

20  A.   Yes, ma'am.

21  Q.   And would you say -- and give the jury an idea of how

22  voluminous the data was in connection with the requests that

23  the government team asked you to perform in connection with

24  this case.

25  A.   Yes, I believe just call detail records with cell site

1    information, I believe we had 57 different requests, so 57

2    different phone numbers.  Each one of those is thousands of

3    lines of Excel data.  And that doesn't even go into then the

4    other phones we didn't get cell site for and we just got toll

5    records, or just the to and from and the date and time for.

6    It's thousands and thousands and thousands of lines of data.

7    Q.  And in terms of your taking all of that data and

8    synthesizing it in terms of the selected data we're presenting

9    before the jury, did you prepare Government's Exhibit P-2, an

10   Excel spreadsheet?

11   A.  Yes, I did.

12   Q.  And I'm going to show you a copy of it now.

13            THE COURT:  Is your lapel mike on?

14            MS. WILKINSON:  P-2.

15            THE COURT:  Is your lapel mike on?  I can't tell if

16   it is.

17            MS. WILKINSON:  I'm sorry, I don't know how that

18   happened, thank you.

19   Q.  (BY MS. WILKINSON)  Just take a moment to take a look at

20   that.  And I'm just going to put the first page up on the

21   screen for everybody to see, before we get into the details.

22       Okay.  So are we looking at basically the first page of

23   what you're looking at, Government's Exhibit P-2?

24   A.  We're not looking at anything right now.

25   Q.  It's not up.  Here it comes.  I'm looking at it.

1    A.   Okay.

2    Q.   While we're waiting, I can ask you a few questions about

3    it.  First of all, how long is that document?

4    A.   It's 137 pages.

5    Q.   And what is the type of data, generally speaking, we'll

6    get into the weeds in a moment, generally speaking, went into

7    the preparation of that notebook?

8    A.   So it's the -- it's the -- I'm going to call it toll data,

9    but it's the data showing who called who and at what time,

10   that's the number one kind of data.  Number two is limited

11   data from a Cellebrite report.  So when we download a phone,

12   we can get the date and times of the calls, we can get some of

13   the content of the text messages, so we can tell what the

14   messages were between the two people that were talking.  So

15   generally that's the kind of data.  And then we assigned users

16   to the specific numbers that were involved in the case.

17   Q.   And was that based on the investigation and that sort of

18   thing, which we'll go into in a moment?

19   A.   Yes, ma'am.

20   Q.   Now, in addition to the -- the two types of records you

21   described, the Cellebrite and the call detail records that we

22   would get from the phone companies, did you also identify

23   selected events so the jury could see the different -- how the

24   calls fit into different events that happened in the course of

25   the investigation?

1   A.  Yes, ma'am.

2   Q.  And were those taken from a variety of different

3   documents, like court documents and that sort of thing?

4   A.  Yes.

5           MS. WILKINSON:  Okay.  So are we up on it yet?  No,

6   it's still not working.  Let's go this way, so while you're

7   working on that, Ms. Lesser.

8   Q.  (BY MS. WILKINSON)  With regard to the now all the 57 -- I

9   forget the number you said, the number of records we got in

10  connection with the case, did you identify selected, what we

11  call target numbers, and is there a column for target numbers

12  there?

13  A.  Yes, there is.

14  Q.  And just so we can get an idea, maybe I can ask Ms. Oldham

15  to help me at this point with regard to the actual -- this one

16  right here -- and if you ever need to look at your supporting

17  data, let me know, I have --

18  A.  Yes, ma'am.

19  Q.  Do you have your notebook up there?

20  A.  Yes.

21          MS. WILKINSON:  Go ahead.  Thank you, Ms. Oldham.

22  Q.  (BY MS. WILKINSON)  Are some of those target numbers, and

23  we're looking at it now over here on the left, do some of them

24  involve a number ending in 2399?

25  A.  Yes, ma'am.

1    Q.  And who do we attribute that number to?

2    A.  Davon Carter.

3            MS. WILKINSON:  Okay.  In addition to that, if I

4    could have you describe, Ms. Oldham, up there, that this is

5    Carter's number at the top, that would be very helpful for the

6    jury and for Agent Wilde.

7    Q.  (BY MS. WILKINSON)  In addition to that being one of the

8    target numbers, Agent Wilde, did you identify other cell phone

9    numbers that were attributed to Mr. Carter in connection with

10   the case?

11   A.  Yes.

12   Q.  Okay.  And did one of them end in 7626?

13   A.  Yes, it did.

14   Q.  Okay.  Is that data, insofar as we have it collected and

15   synthesized, on Government's Exhibit P-2?

16   A.  Yes.

17   Q.  Did you identify a number for Mr. Carter ending in 5150?

18   A.  Yes.

19   Q.  And is that -- to the extent we have it, is that

20   information synthesized and included on the summary,

21   Exhibit P-2?

22   A.  Yes.

23   Q.  Now, let's go to -- a second to Mr. Mosley, are there

24   target numbers that are associated with Mr. Mosley that you've

25   included in the P-2 summary that you're about to describe to

1   the jury?

2   A.   Yes.

3   Q.   Okay.   What are the phone numbers you attributed?   And we

4   can deal with the last four digits, if you will, at this

5   point, to Mr. Mosley.

6   A.   1533, and then 2650.

7   Q.   And was there a later number that we also identified,

8   5008?

9   A.   Yes.

10          MS. WILKINSON:   And eventually I'm going to mark

11   this as Government's Exhibit P- -- whatever the next one is,

12   Agent Holiday, you can let me know.

13   Q.   (BY MS. WILKINSON)   And with regard to --

14          THE COURT:   I'm sorry, what are you marking?

15          MS. WILKINSON:   The chart up here.

16          THE COURT:   Ms. Oldham's chart.   Okay.

17          MS. WILKINSON:   I think it would be 2A-N, tell me in

18   a moment, and we'll get to that.

19   Q.   (BY MS. WILKINSON)   Under Hightower, did you identify some

20   phone numbers that were connected with Mr. Hightower?

21   A.   Yes, 2513, 6448.

22   Q.   And a person by the name of Andre Farrell, did you include

23   records related to him on Government's Exhibit P-2?

24   A.   I did, they ended in 6191.

25   Q.   And Deanna Lawson, did you identify records related to her

 1   and include them in Government's Exhibit P-2?

 2   A.  Yes, 5670 and 1255.

 3              MS. WILKINSON:  And over -- if you still have room

 4   to write, thank you, Ms. Oldham.

 5   Q.  (BY MS. WILKINSON)  Under Kimberly Melvin, were you able

 6   to identify and attribute numbers to her and include them on

 7   Government's Exhibit P-2?

 8   A.  Yes, 7500, so 7-5-0-0.

 9   Q.  And I'm going to include one last one, a woman by the name

10   of Arielle Washington, did you include records related to

11   Ms. Washington on Government's Exhibit P-2?

12   A.  Yes, the last four of her number is 1222.

13   Q.  And I'm going to mark that Government's Exhibit P-2O.

14   Now, as we look at the spreadsheet that we're looking at, the

15   first page of this, Agent Wilde, and we have under target

16   number, I think there's some miscellaneous other ones, which

17   we'll get into when we go there, are those the primary numbers

18   that are summarized in Government's Exhibit P-2?

19   A.  Yes, ma'am.

20   Q.  Now, if you could, walk us across the top here, so when we

21   turn to these records, we know what we're looking at, what is

22   the call date and time?

23   A.  So the call date and time is the date and time that the

24   call occurred.  That time is going to be in local time.  These

25   records come in local time, sometimes Central Time, and also

1    Universal Coordinated Time.  So for this exhibit, we converted

2    all the numbers back to local time, so they're going to be in

3    Eastern Time.

4    Q.  And then the from phone and from user?

5    A.  So from phone, so that's the person making the call or the

6    phone number making the call.  The from user is the user

7    associated with that number, making the call.  And then the to

8    phone is the phone number receiving the call, and the to user

9    is the person associated with that phone number.

10   Q.  And you self-corrected yourself there for a moment.  You

11   can't say based on phone records who was actually using the

12   phone, only that that number is attributed to them?

13   A.  That's correct.

14   Q.  Okay.  And so over to the right-hand corner where it says

15   duration, what is that all about?

16   A.  So the duration is the time in minutes and seconds, how

17   long the call was.  And then the communication type is either

18   a call or text message.  And then going to the right, you have

19   the content of the message or text.  So if it was a text

20   message, and we have the content of it from a download of one

21   of the phones, that content will be placed in that column.

22   And then any notes.

23   Q.  So let's talk about the content of message column for a

24   moment.  Do the records that are provided by a phone company

25   like AT&T or Verizon, do they include content between two

Direct Examination - Wilde   (By Ms. Wilkinson)

1   different phone numbers?

2   A.   No, ma'am, they do not.

3   Q.   Okay.   Where do we -- if we have content, where do we get

4   that from?

5   A.   We got that from downloading the physical phone, so using

6   the Cellebrite to download a phone that was seized in the

7   case.

8   Q.   And if the content wasn't on the phone, in your training

9   and experience, have you seen that before where, you know, you

10   know a text message was made, but the content's not there, are

11   you able to include it on the chart?

12   A.   Obviously not.

13   Q.   Sometimes can you recover deleted messages?

14   A.   You sometimes can.

15   Q.   Can you sometimes not be able to recover deleted

16   messages?

17   A.   That's correct.

18   Q.   To the extent you have content of messages that are

19   pertinent to the events and the numbers we have on

20   Government's Exhibit P-2, have you included it from the

21   various Cellebrites?

22   A.   Yes.

23   Q.   Now, the Cellebrites that you reviewed in connection with

24   your analysis, Agent Wilde, did you perform all of them?

25   A.   No, did not.

Direct Examination - Wilde  (By Ms. Wilkinson)

1    Q.  Did you perform a number of them?

2    A.  Yes, I did.

3    Q.  If another analyst performed it, did you review that

4    Cellebrite performed by the other analyst?

5    A.  Yes, I did.

6    Q.  And did you truly and accurately report it on Government's

7    Exhibit P-2?

8    A.  I did.

9    Q.  Now, you talked about the number of pages, and I don't

10   know what the last line number is, maybe you could say it for

11   the record, at the very last page, just so we know the line

12   we're dealing with.

13   A.  I don't have the line number on my exhibit.

14   Q.  Okay.  It doesn't show up there?

15   A.  No, ma'am, it does not.

16   Q.  In any event, with regard to the number of lines of data

17   that we're dealing with, what did you do to avoid possible

18   duplication, if you had, say, the records of 2399,

19   Mr. Carter's number, and Ms. Lawson's number, 5670, what did

20   you do to try to avoid counting that call twice?

21   A.  We took out the -- we just included the outgoing portion

22   of that.  So if the person made the call, so if Mr. Carter

23   called Ms. Lawson, we took Ms. Lawson's line of data out of

24   there to avoid duplication, because what would happen is you'd

25   have Carter calling Lawson, and then the next line would be

Direct Examination - Wilde  (By Ms. Wilkinson)

1    Lawson receiving a call from Carter, so it was just doubling
2    up the numbers.
3    Q.  And will you let me know, did you do your best to review
4    and ensure the duplication was removed?
5    A.  Yes, ma'am.
6    Q.  And if you see one, will you highlight that to the jury,
7    that there was a error in the duplication count?
8    A.  Yes, I will.
9    Q.  Now, we're looking at over 6,000 lines of data in
10   particular in this Excel spreadsheet, and obviously we're not
11   going to go line by line on each one, but because it's Excel,
12   is there a way to sort the data in addition to looking at it
13   in the chronological order that we have here?
14   A.  Yes.  So in Excel, you can sort the data by date and time,
15   which is what we did, starting at the beginning, ending at the
16   end.  But then you can also take snippets of data and move
17   them from the main page into separate sheets, so you can
18   easily view them.
19   Q.  And up at the top here for the very first call that we
20   have on Government's Exhibit P-2, it indicates a call from
21   Davon Carter to Matthew Hightower on August 4th, 2004 (sic);
22   is that correct?
23   A.  Yes.
24   Q.  And one-minute duration, that's what we're looking at
25   here, can you see that there?

Direct Examination - Wilde   (By Ms. Wilkinson)

1    A.  Yes.

2    Q.  Now, with regard to that piece of information that we have

3    here at the top, so we -- do all of the records from the

4    numbers that you just indicated on Government's Exhibit P-2O,

5    the one Ms. Oldham did, go back as far as August 2014?

6    A.  No, they do not.

7    Q.  Are there different time frames for which we were -- from

8    which you obtained data for?

9    A.  Yes.

10   Q.  With regard to Mr. Carter's 2399 number and

11   Mr. Hightower's number, are they the numbers that go back to

12   August of 2014?

13   A.  They do.

14   Q.  And is it fair to say that many of the records are in that

15   May 2016 time frame?

16   A.  Yes.

17   Q.  Now, just to give the jury an idea, I'm going to go down

18   to -- right there.  So we're looking primarily at a black and

19   white document, are there times when lines of data are

20   recorded in red?

21   A.  Yes.  Those are the -- those are the events or the

22   pertinent events that occurred during this -- the period of

23   this timeline.  So if you see a red highlight, it just means

24   that something happened around that time.

25   Q.  Now, you have used the term "we" in connection with your

1   testimony, are you the only person that has looked at

2   Government's Exhibit P-2 in preparation for your testimony?

3   A.   No, ma'am, I worked on it with HHS Agent Fuchs.

4   Q.   And would that be the agent to the right of me?

5   A.   Yes, it is.

6   Q.   Have you, however, reviewed it, adopted it, and is it true

7   and accurate to the best of your abilities and knowledge?

8   A.   Yes, ma'am.

9   Q.   Now, again, just to be clear in terms of the data that you

10  analyzed, is it fair to say, Agent Wilde, that other than --

11  that there were phone records obtained far and above just the

12  ones that are identified in Government's Exhibit V-2O?

13  A.   Yes, ma'am.

14  Q.   And at times do you attribute other phone numbers in

15  Government's Exhibit P-2 based on your knowledge of the

16  investigation?

17  A.   Yes.

18  Q.   And does sometimes that come from subscriber

19  information?

20  A.   It can.

21  Q.   Does it come from self-admissions?

22  A.   It can.

23  Q.   And does it come from interviews?

24  A.   Yes.

25  Q.   And database searches, that sort of thing?

Direct Examination - Wilde   (By Ms. Wilkinson)

1    A.   Yes.

2    Q.   And I will ask you particular ones as we go along.  We'll

3    come back to that in a moment, and let's go back now, if I

4    could, to the cell site part of your -- the other hat that you

5    wore in connection with this.

6         In preparation for your testimony today and be able to

7    describe it to the jury, did you prepare a Power Point of the

8    final reports you did in connection with the case?

9    A.   Yes, ma'am.

10   Q.   And I don't know -- I'm first going to show you

11   Government's Exhibit, just for the record, P-3, P-4, P-5, P-6,

12   and P-7.  Just take a moment to look at them and tell me if

13   those are the CAST reports you prepared in connection with

14   this case.

15   A.   Yes, they are.

16   Q.   Okay.  And in connection with those reports, did you

17   synthesize them into a Power Point for purposes of court

18   demonstration?

19   A.   I did.

20   Q.   Is there anything on those reports that's -- anything on

21   the Power Point that's not in those reports?

22   A.   No, ma'am.

23   Q.   You can put them to the side, if you want.

24   A.   Okay.

25   Q.   If you need to refer to them, obviously you can.

1          So we've got the cover page here.  So what are we looking

2     at here on page 2?

3     A.   So this is the background for -- just for this specific

4     report that I did cell phone analysis for, (443) 908-1434,

5     which is a Verizon number, in connection with an incident that

6     occurred on May 27th, 2016.

7     Q.   And on that 1434 number, who do you attribute that to?

8     A.   Michael Bailey.

9     Q.   Okay.  And before we get to that, is this slide,

10    page No. 2, did you do a similar one for each of the five or

11    six reports that I just showed you?

12    A.   I did.  And those are not going to be in my Power Point,

13    they're going to be in the actual physical report.

14    Q.   So we kind of got rid of the general page for purposes of

15    demonstration here today --

16    A.   Yes, ma'am.

17    Q.   -- using just the first one, Mr. Bailey's phone ending in

18    1434?

19    A.   Yes.

20    Q.   And then do you describe the methodology and cell site

21    locations and conclusions, generally speaking, on each one of

22    the exhibits on the second page?

23    A.   I do.

24    Q.   Okay.  What are we looking at here?

25    A.   So this is --

Direct Examination - Wilde  (By Ms. Wilkinson)

1  Q.  Page 3, I should say.

2  A.  Page 3 is just a picture of a basic cell phone tower that

3  you might see going up and down 95 or 83 here in Baltimore.

4  There's a couple important things about this.  Number one, if

5  you look at the picture on the right, there's these antennas

6  that kind of look like speakers, those are the antennas that

7  transmit and receive the signals to and from the cell phone.

8      A cell phone is very much like a car radio.  As I drove

9  here today, I tune into my favorite radio station, my favorite

10  frequency, somewhere out in Baltimore there's a radio tower

11  that emits a signal, and then the antenna in my car is able to

12  receive that signal, and I'm able to listen to my favorite

13  station.

14      The major difference between my car radio and a cell

15  phone is that with a cell phone, that communication has to go

16  in two different directions, I have to be able to receive a

17  signal from the tower so I can receive a text message, receive

18  an e-mail, receive a call, but I also need to be able to

19  transmit, so I need to be able to send a signal from my phone

20  back to the tower.  And those are the antennas that transmit

21  and receive those signals.

22      Second important thing is, notice that these towers

23  are kind of set up in a triangular fashion, so they kind of

24  look like a triangle at the top.  Each one of these towers,

25  most of them are designed to cover 360 degrees or a full

1    circle.  And the way they do -- the way the carriers do that

2    is they divide that circle into three sides.  That's what I

3    call sectors.

4         So later in my report, you're going to see these wedge

5    shapes, and I just like to think of those wedge shapes, the

6    center of that wedge is nothing more than the center of one

7    side of this triangle.

8    Q.  I was going to ask you, are they -- they looked here like

9    a triangle with nice lines, does it come transmitted that way

10   as well when you talk about the sectors in connection with

11   your cell site analysis, are they perfect triangles?

12   A.  Oh, no, they're not perfect at all.  When you -- I like to

13   think of the sectors kind of like when you shine a flashlight

14   in a dark room, if I were to turn off all the lights in here

15   and shine a flashlight at the wall, you're going to have a

16   spot in the center of that beam of light that's very bright.

17   You'll be able to read a book, you'll be able to look in your

18   pocket, look in your pocketbook, whatever you want to do with

19   that beam of light.

20        But behind me, you're not really going to be able to use

21   that light.  You're not going to be able to see anything, you

22   won't be able to read a book with it.  But then on the edge of

23   that light, you're going to have the place where it's not very

24   light, but it's also not very dark, that kind of fuzzy area.

25        So each one of these sectors have the bright light in the

Direct Examination - Wilde  (By Ms. Wilkinson)

1    center where it has a lot of coverage, a lot of signal, a lot

2    of strength, and then they have that little fuzzy area on the

3    edges, and that edge delineates the two sectors.  Where

4    there's a fuzzy area on the edge, then it goes to the next

5    sector.

6    Q.  I'll probably ask you to give examples of that as we go

7    along, just generally speaking.

8        Turning to page 4, what are we looking at here?

9    A.  Page 4, these are other types of cell towers people might

10   see traveling around.  They're not very nice to look at, in my

11   opinion, so the carriers have tried to blend them into other

12   structures.  Here in the city, we'll see a lot of times

13   they'll mount those antennas on top of buildings or on the

14   side of the buildings and then spray-paint them the same color

15   as the building, so they kind of blend in.

16       The pine tree -- down in Montgomery County on the

17   intercounty connector, there's a pine tree that sits about 150

18   feet taller than all the ones around it at the top of the

19   hill.  And if you look closely at the top, there's antennas at

20   the top of that, they're spray-painted brown, so they kind of

21   blend in for the pine tree.

22   Q.  So just for demonstrative purposes about what a cell tower

23   might look like?

24   A.  Correct.

25   Q.  And then what are we looking at here on page 5?

A.   So page 5 deals with orientations.  When I look at the
call detail records, they tell me the tower that's being used
and the sector that's being used.  Then I have to figure out
which way that sector faces.  They don't all face the same
way.  So when I go to the call detail -- when I go to the
tower list, I look up that sector or that tower, I can find
the latitude and longitude of the tower, and then I look for
that sector.

So if it's sector 1, it's going to tell me something --
the azimuth or the orientation will be zero.  All the azimuth
or orientation are, are big scary words for direction.  So if
the azimuth is zero, all that means is that sector or that
side of the triangle faces north.  If this azimuth is 180,
that side of the triangle faces south.  And then what I have
to do, because I'm trying to break that circle into three even
pieces, what I have to do is, I draw a line at zero, I go 60
degrees in one direction, 60 degrees in the other, and then I
have one-third of that circle, and that's the sector that I'm
going the display on the maps.

THE COURT:  Ms. Wilkinson, let us know when you're
at a convenient breaking point for lunch.

MS. WILKINSON:  We can certainly break now, Your
Honor.

THE COURT:  All right.  Ladies and gentlemen, let's
take our lunch break at this point.  I'll ask that you be back

Direct Examination - Wilde  (By Ms. Wilkinson)

1    in the jury room in one hour, which will be 2:00 o'clock.

2    Please remember not to discuss the case with anyone, including

3    even among yourselves.  I'll see you in an hour.  Enjoy your

4    lunch.

5                    (Jury left the courtroom.)

6                    THE COURT:  I'll see you all in an hour.

7                    (A recess was taken.)

8                    THE COURT:  All right.  You may be seated.  Good

9    afternoon, ladies and gentlemen.

10                   JURORS:  Good afternoon.

11                   THE COURT:  Hope everyone enjoyed their lunch.

12   We're ready to move forward.

13                   Sir, I remind you that you're still under oath.

14                   THE WITNESS:  Yes, sir.

15                   THE COURT:  And Ms. Wilkinson, when you're ready.

16                   MS. WILKINSON:  Thank you.

17   Q.  (BY MS. WILKINSON)  Good afternoon, Agent Wilde.

18   A.  Good afternoon.

19   Q.  When we concluded for lunch, we were on the next slide of

20   your Power Point presentation.  I apologize, it's kind of over

21   to the right.  If you want to look at the originals, you can

22   do that as well.

23        What are we looking at with regard to the screen that's

24   up on the monitors now with the top right-hand that says

25   legend and the address is over on the left?

Direct Examination - Wilde   (By Ms. Wilkinson)

1    A.   So the very base of that red pin that you see, the large

2    red pin, indicates 2919 Rosalind Avenue in Baltimore, which is

3    the location of the crime scene in this case.   The very base

4    of the blue pin indicates 2827 Virginia Avenue in Baltimore.

5    And then every one of those small red dots, those are Verizon

6    cell phone towers in that area.

7    Q.   And we obviously know what 2919 Rosalind Avenue is, when

8    you began doing the CAST analysis for us, what was the

9    significance of the 2827 Virginia Avenue address?

10   A.   That's the subscriber location for the number ending in

11   2650.

12   Q.   And to remind the jury, what name was that phone

13   subscribed in?

14   A.   Cliff Mosley.

15   Q.   That's who used it, who was it subscribed --

16   A.   I'm sorry, Norman Powell.

17   Q.   Okay.   So we were starting off the cell site analysis with

18   your report pertaining to the number ending in 1434, which was

19   attributed to a man by the name of Michael Bailey; correct?

20   A.   Yes, ma'am.

21   Q.   So did you perform a cell site analysis of the location of

22   Mr. Bailey's 1434 number on May 27th, 2016?

23   A.   Yes, I did.

24   Q.   And I'm going to turn to the next page here, and is this

25   the mapping that you did with regard to Mr. Bailey's number?

1    A.  Yes, ma'am.  This shows the towers and sectors being used

2    by Mr. Bailey's number on the morning of May 27th between

3    9:03 a.m. and 7:59 p.m.  The first call for the day on those

4    records was at 9:03 a.m.

5    Q.  And on the top right-hand corner where it has the phone

6    number, is that consistent throughout your reports in terms of

7    the actual phone number that you're mapping on any individual

8    report?

9    A.  Yes, ma'am.

10   Q.  So are the only locations that are mapped here the use of

11   that 1434 number?

12   A.  I'm sorry, I don't understand your question.

13   Q.  I'm sorry, because it wasn't very good.  But are all the

14   indications that you have on this screen, on the monitor right

15   now, all of them pertain to just that 1434 number?

16   A.  Yes, ma'am.

17   Q.  And based on your training and experience, Agent Wilde, is

18   the location of that 1434 number as of 9:03 a.m. on 5/27

19   consistent or inconsistent with being in the area or the

20   vicinity of the murder on -- as noted, 2919 Rosalind Avenue?

21   A.  Well, the cell tower locations are inconsistent with being

22   in the area of the murder during that time.

23   Q.  And when you -- when you plot the number beginning as of

24   9:03 a.m., does that mean there's no data earlier than that

25   time?

Direct Examination - Wilde  (By Ms. Wilkinson)

1   A.   That's correct.   The first call of the day with cell phone

2   tower data was 9:03 a.m.

3   Q.   Let me go ahead and turn to the next report indicated by

4   your slide there.   And the two numbers that we -- you were

5   asked to provide mapping information to the jury about, as

6   reflected in the next series of slides, are what two phone

7   numbers?

8   A.   (443) 704-2650 and (410) 693-1533.

9   Q.   And again, who are these numbers attributed to?

10  A.   Clifton Mosley.

11  Q.   I'm going to go to the first page, and again, the same

12  legend that we see that's consistent throughout the reports?

13  A.   Yes, ma'am, the only difference here is the green dots

14  indicate the T-Mobile cell phone towers.

15  Q.   Is that because that is the data that you're about to map

16  on one of the phones attributed to Mr. Mosley?

17  A.   Yes, ma'am.

18  Q.   Okay.   And then the next slide indicates what cell

19  towers?

20  A.   The AT&T cell phone towers.

21  Q.   Is it fair to say one of the numbers attributed to him was

22  AT&T and the other one was Verizon?

23  A.   T-Mobile.

24  Q.   T-Mobile.

25  A.   Yes, ma'am.

Direct Examination - Wilde   (By Ms. Wilkinson)

1   Q.   Okay.  We'll go to the third slide.  Now, if you could,

2   describe what we're looking at.

3   A.   What we're looking at is all the activations on the 2650

4   phone between May 1st, 2016 and June 1st, 2016 in the area of

5   the Rosalind and Virginia Avenue locations.

6   Q.   Okay.  And are --

7   A.   So these aren't all the activations on that phone, but

8   they're all the activations that are in that general area

9   around those two places.

10   Q.   So this is meant to depict the times that that particular

11   telephone, this one, 2650, was hitting off towers consistent

12   with the Rosalind Avenue location?

13   A.   Yes, ma'am.

14   Q.   And give us an idea, just for the record, the dates that

15   are noted on the top right -- left-hand corner under the black

16   box.

17   A.   So May 1st, May 2nd, May 5th, May 10th, May 23rd, and

18   May 25th.

19   Q.   And that would be -- when you have the ENB and 44906 in

20   that top little box there, what does that pertain to?

21   A.   So the ENB is just a -- it's a tower number, it

22   indicates -- ENB is tower number on 4G or LTE technology, so

23   it just indicates the tower number that's going to correspond

24   with the call detail records.  It will tell you the tower

25   number and the sector that's being used.

Direct Examination - Wilde   (By Ms. Wilkinson)

1    Q.   Okay.  And then is there another tower that's reflected on

2    the monitor now pertaining to that 2650 number, a different

3    cell tower hitting off for a different number of

4    activations?

5    A.   There is, so that cell phone tower, the activations on

6    that are operating on LTE, which is 4G and UMTS, which is 3G

7    technology.  And so they have two different numbers for that

8    tower, but it's basically the same tower and sector.  And

9    between May 1st and June 1st, there's 1,012 activations on

10   that tower.

11   Q.   On different dates?

12   A.   On those different dates.

13   Q.   While I stay on this screen for a moment, and I think I

14   inartfully asked you this morning, when you have the two

15   lines, and I know you know what I'm talking about, if you

16   could circle them, that come off the tower.

17       Is that meant to be a hard and fast fence around the cell

18   tower information for that particular tower?

19   A.   No, ma'am.  Again, when you go -- I can go to the base of

20   that tower and look up and see those lines in space, and I

21   couldn't tell you on -- at this spot you're on one sector, and

22   on the other, you're at the other.  It's kind of a fuzzy line

23   between those sectors.  So it's not a hard and fast line, it's

24   kind of fuzzy, and it's just generally saying that the phone's

25   somewhere in that sector, and that's sector 1 consistently.

1    Q.   Okay.   I'm going to go ahead and go to the next screen of

2    the report pertaining to the phone numbers that are attributed

3    to Mr. Mosley in the top right-hand corner, what phone number

4    are we mapping here that's attributed to Mr. Mosley?

5    A.   (410) 693-1533.

6    Q.   And read the -- not read, but analyze and explain the

7    report to the jury for us, please.

8    A.   So again, these are showing the activations or the calls

9    and texts, incoming and outgoing, on that cell phone using the

10   towers in the area of Rosalind Avenue and Virginia Avenue.

11   And so the most commonly used one was the -- down at the

12   bottom left, 73811, and there's 161 calls or activations on

13   that tower between those times.

14   Q.   And with regard to the two hits on the top tower that

15   we're looking at, ENB72304, would you circle that so the jury

16   can see it on the screen.

17   A.   Sure.

18   Q.   Okay.   That top one there, there's two activations, can

19   you, for the record, tell us the date and time of those two

20   activations.

21   A.   So they're on May 27th, 2016 at 6:13 a.m. and 6:15 a.m.

22   Q.   And is that the date of the murder in this case?

23   A.   It is.

24   Q.   Now, those particular contacts or that particular -- those

25   two particular phone calls, they involve the 1533 number; is

1   that correct?

2   A.  Yes, ma'am.

3   Q.  And what -- who was the other caller, what was the other

4   phone number calling that number at those times?

5   A.  I have to look at my summary.

6   Q.  Sure.

7   A.  I'm sorry, I don't have it in front of me, I don't have

8   the binder, the summary.

9   Q.  Oh, it's not in front of you.  These are your reports

10  underlying your --

11  A.  Yes, ma'am.  Thank you.

12      I think I was referring to the other binder with all the

13  calls, the list of all the calls.

14  Q.  Oh, our main binder?

15  A.  Yes, ma'am.

16  Q.  I'm sorry.

17  A.  That's okay.

18  Q.  I can also show you this up on the screen, I should have

19  both of them.  P-2, for the record.  I'm sorry about that.

20  A.  It's okay.  Thank you.

21  Q.  And I'm also going to toggle over to P-2 for a minute and

22  show the jury.

23  A.  So at 6:13 a.m., that's a call from Davon Carter, 7626 to

24  Clifton Mosley, 1533.  And then at 6:15 a.m., that's a call

25  from Davon Carter using the 7626 number to Clifton Mosley

1    using the 1533.

2    Q.  I'm going to actually -- I'm not going to do this each

3    time because it will be too time consuming, but I'm going to

4    go up on P-2, and if you could, indicate by circling the two

5    communications that you were just referring to here.

6    A.  (Indicating.)  So they are at lines 5155 and 5156.

7    Q.  You can circle them, if you want to, on your screen.

8    A.  (Indicating.)  Right here, at 6:13 and 6:15.

9    Q.  Okay.  Great.  And sometimes when you analyze phone

10   records, are you able to tell whether a phone went to voice

11   mail or whether it was picked up?

12   A.  Yes.

13   Q.  Okay.  And on record --

14           THE COURT:  Ms. Wilkinson, you don't have your lapel

15   mike, so if you wander away, or you can stay by the mike,

16   either way.

17           MS. WILKINSON:  That's impossible for me to do.

18   I'll find that, but go ahead, and I'll speak loudly until I

19   find that.

20   A.  I'm sorry, what was the question?

21   Q.  (BY MS. WILKINSON)  The question is, are you able to tell

22   us whether they were actual connections in that call or

23   whether they went to voice mail or some other explanation?

24   A.  I can't tell -- I can usually tell, yes, ma'am, but I'm

25   not 100 percent sure whether or not they're connected in this

1    case.

2    Q.  Did you -- do you recall looking -- do you recall looking

3    at your summary notebook and being able to -- the original

4    records and being able to advise the jury whether or not they

5    went to voice mail or whether they were connections?  We'll

6    give you a moment to look.

7    A.  That's fine.

8    Q.  I know it's a lot of information.

9    A.  I don't think those records are in here.

10   Q.  Okay.  We'll come back to that in a moment when we have a

11   chance.  Let's turn to -- back to the Power Point, and we'll

12   go to the next screen.

13       And what is captured here on page 13 of the Power Point,

14   which is a page within the 1533 analysis?

15   A.  So these are showing all of the activations near that --

16   on that tower 73811 between May 1st and June 1st, 2016.

17   Q.  Okay.  And if I go back up to the screen before, which

18   tower would that be?

19   A.  This would be the one on the bottom left, I just

20   circled.

21   Q.  Okay.  Perfect, thank you.  Okay.  And did we next ask you

22   to map the same information, that is, the location of phones

23   pertaining to 2399 and other numbers attributed to Davon

24   Carter?

25   A.  Yes, ma'am.

1   Q.   Okay.   And I'm going to go to the first screen, and again,

2   the legend that we're looking at here?

3   A.   It's the AT&T cell phone tower and those two locations

4   that we talked about earlier.

5   Q.   Okay.   And then I am on the -- page 16 of the Power Point,

6   and what are we looking at here?

7   A.   So we're looking at the towers used during that time,

8   between May 1st and June 1st.   73811 was the most commonly

9   used tower, and then 70063 was only used three times.

10  Q.   And again, do you note the date and times of those

11  activations in terms of when they were hitting off those

12  particular towers in that time frame?

13  A.   Yeah, so May 2nd, May 3rd, May 4th, May 6th, May 7th,

14  May 10th, May 11th, May 15th, May 16th, May 17th, May 20th,

15  May 24th, 25th, and 30th.

16  Q.   Now, I'm going to show you Government's Exhibit P-10C.   Do

17  you recognize that document?

18  A.   Yes, ma'am.

19  Q.   Okay.   And we're going to come back to it in a moment, but

20  does that pertain to the 7626 number that is also attributed

21  to Mr. Carter?

22  A.   It does.

23  Q.   And does it note the effective date, the beginning date of

24  the records for 7626?

25  A.   It does, they started on May 25th, 2016.

Direct Examination - Wilde  (By Ms. Wilkinson)

1    Q.  Does that mean that's when -- well, what does that mean?

2    A.  That means that's when the account was initiated, it was

3    the first time it was used.

4    Q.  So when we look at the records -- I'll keep that up

5    there -- when we look at the records for 2399 prior to

6    May 25th, 2016, are those the only records of Mr. Carter's

7    between those two phones that we have available for us during

8    that time frame?

9    A.  Yes.

10   Q.  And the May 25th activation date for 7626, is that

11   reported on a different slide in a moment?

12   A.  Yes.

13   Q.  Did a part of your analysis involve looking at the date of

14   May 2nd, 2016?

15   A.  Yes, ma'am.

16   Q.  If I were to toggle over to the Excel spreadsheet and go

17   to May 2nd, is there -- and you can probably find it there on

18   P-2 maybe even faster than me, is there a particular event

19   that happened on May 2nd, 2016?

20   A.  Yes.  Sorry, that was May 3rd.

21   Q.  I have it up on the screen now.

22   A.  Okay.  May 2nd, there's a motions -- motions to revoke

23   conditions, U.S. versus Hightower.  They were going to

24   schedule the hearing for Tuesday at 2:00 o'clock.  So it was

25   an e-mail from Judge Coulson's chambers to Rich Bardos.

Direct Examination - Wilde   (By Ms. Wilkinson)

1    Q.  And down below, on the line 3229, is there another event

2    at about 11:35 a.m.?  And again, I have it toggled over here

3    on this screen.

4    A.  Mr. Bardos e-mails Matthew Hightower a copy of the

5    indictment.

6    Q.  Now, I'm going to go back to your cell site analysis here,

7    and the locations that you have now identified in the top

8    right-hand corner, what are we looking at here?

9    A.  So we're looking at the Rosalind Avenue address again, the

10   Virginia Avenue address again, the Arbor -- 8409 Arbor Station

11   Way address, 4 Harness Court in Pikesville is the green pin,

12   and 2909 Fallstaff Road is the dark blue pin.

13   Q.  Okay.  And the blue pin over here 8409 Arbor Station Way,

14   would that be the location where Mr. Carter was arrested --

15   well, taken into custody on June 1st, 2016?

16   A.  Yes.

17   Q.  And 4 Harness Court, is that the address of Kimberly

18   Melvin and Clifton Mosley?

19   A.  It is.

20   Q.  Now, I'm going to go to the second page of that in a

21   moment.  And what are we looking at here?

22   A.  So this is the -- all those same locations in relation to

23   the Verizon cell phone towers.

24   Q.  Noting just the different red dots where the cell towers

25   are located?

1    A.   Yes, ma'am.

2    Q.   Okay.  And that's on the bottom of page 20 of the Power

3    Point.

4         Okay.  Now we're on page 21, and what data, what cell

5    sites did you map on May 2nd, 2016?

6    A.   So this is the 6488 number, which is associated with

7    Mr. Hightower, and then the 2513 number, also associated with

8    Mr. Hightower, and I'm showing the activity between 11:09 a.m.

9    and 1:13 p.m.

10   Q.   Are some of the cell towers that are noted on page 23 --

11   page 21 of your Power Point consistent with being in the

12   vicinity of the murder scene?

13   A.   Not -- maybe the -- I'm sorry, the 40086, that's the cell

14   tower that's in the area of the crime scene.

15   Q.   Okay.  And the rest of them are as noted on the map?

16   A.   Yes, ma'am.

17   Q.   Okay.  Now, if we turn to the next page, what are we

18   noting here?

19   A.   So now we're just showing the activity between -- on the

20   same two phone numbers, 6488 and 2513, showing the activity

21   between 1:21 and 2:33 p.m.  So basically at 1:21, the phone is

22   up north towards Pikesville.  And then by about 1:28, it's

23   headed back down and now using these same two towers down in

24   Park Heights.

25   Q.   And then I'm going to turn to the next page, and is that

1    additional times and cell towers for which Mr. Hightower's

2    phone was hitting off on May 2nd, 2016?

3    A.  Yes, ma'am.

4    Q.  Okay.  I'm going to go to the third screen.  Again,

5    additional towers and times for the activity of

6    Mr. Hightower's phone on that day?

7    A.  Correct, so he's in the Park Heights area, or using towers

8    in the Park Heights area around 6:00 -- between 6:24 and 7:19,

9    and then after that point, using towers and sectors in the

10   area of his residence.

11   Q.  Now, are we looking at the activity of a different phone

12   on page 25 of the Power Point for May 2nd?

13   A.  Yes, ma'am, this is the 2399 phone associated with

14   Mr. Carter.

15   Q.  And is it showing him in a -- near a cell tower consistent

16   with being at his home?

17   A.  His phone is using the tower consistent with his home,

18   yes.

19   Q.  And then I'm going to turn to the next page, and what are

20   we looking at here?

21   A.  This is the next activity, it's at 12:16 p.m., the phone

22   is in southwest Baltimore.

23   Q.  Turning to the next screen, page 27.

24   A.  Now, this is 1:01 to 1:12 p.m.  At 1:01, the phone's using

25   that tower in the area of Park Heights, and then at 1:12, it's

1    moved over towards the east near Roland Park.

2    Q.  And then page 23 -- 28, I mean.

3    A.  1:33 through 1:37, the phone is in the area of the

4    residence there at Harness Court in Pikesville -- I'm sorry,

5    at Arbor Station Way.  And then between 1:56 and 2:37, the

6    phone moves from the area around Towson back down into Park

7    Heights again, so it moves kind of around the Beltway and back

8    down into Park Heights.

9    Q.  In the afternoon?

10   A.  Yes.

11   Q.  Okay.  And then on page 29 of the Power Point.

12   A.  This is 2:57 to 3:12, the phone is in and around the area

13   of Park Heights at that time.

14   Q.  I went back to Mr. Hightower's phones, was it consistent

15   with the area of Park Heights that same afternoon?

16   A.  Yes, it is.

17   Q.  And then on page 30.

18   A.  So this is 3:35 to 6:13, so 3:35 to 3:37, the phone is

19   using a tower near Loyola University.  And then between 3:39

20   and 6:13, the phone moves back towards the Arbor Station Way

21   address.

22   Q.  And concludes there around 6:13, at least on this slide?

23   A.  Yes, ma'am.

24   Q.  And then on page 31, are we still looking at the activity

25   of the 2399 phone?

Direct Examination - Wilde  (By Ms. Wilkinson)

1    A.  Yes, this is showing 8:44 p.m. to 11:29.  So at 8:44 to

2    10:30 the phone's in the area of Abbington.  And then

3    11:29 p.m. that phone is kind of more over towards the west.

4    Q.  And looking at the screen on page 31, for the times you

5    noted the later times, we don't see those markers for either

6    Arbor Station Way, Rosalind Avenue, or Harness Court, it's a

7    different area than that; is that correct?

8    A.  Correct, this is like above White Marsh on 95.

9    Q.  And then, now what phone number are we looking at?

10   A.  We're looking at the 5150 phone, which is associated with

11   Mr. Carter.

12   Q.  Do you know -- do you know when that phone became

13   associated with Mr. Carter?

14   A.  I do not.

15   Q.  Okay.  And did you map it for purposes of demonstration

16   here today?

17   A.  Yes.

18   Q.  And what time did you note the activations and the

19   location of the phone on May 2nd, for 5150?

20   A.  9:43 to 10:31 p.m.

21   Q.  And the area was not hitting off the tower closest to

22   Rosalind Avenue; is that fair to say?

23   A.  Correct, it was hitting off close to the Fallstaff address

24   where Mr. Hightower's residence was.

25   Q.  And that's that darker blue house up in the top left-hand

1   legend?

2   A.   Yes, ma'am.

3   Q.   And I think I neglected to ask you that, the Fallstaff

4   Road, that's Mr. Hightower's address before he was

5   incarcerated?

6   A.   Yes, ma'am.

7   Q.   Okay.   Thank you for reminding me.

8        Okay.   And the next slides we're turning to in terms of

9   the activity on May 2nd, were which phones?

10  A.   2650 and 1533, which are both associated with

11  Mr. Mosley.

12  Q.   Tell us what we're looking at on slide No. 33.

13  A.   Between 10:41 and 5:55 p.m. on May 2nd, the phone was in

14  and around Park Heights.

15  Q.   And again, on slide 34.

16  A.   6:20 to 8:49, now the phone's kind of shifted to the west

17  just a bit, so now it's in the area of the crime scene and

18  Virginia Avenue.

19  Q.   And page 35.

20  A.   9:24 to 10:30 p.m., the phones go from being north of

21  Northern Parkway, to going back towards the Harness Court

22  address, and then finally ending -- or at 10:30 it's using the

23  towers closest to the Fallstaff address, Mr. Hightower's

24  house.   And then at 10:31 it's headed up towards Pikesville

25  again.

Direct Examination - Wilde   (By Ms. Wilkinson)

1    Q.   And again, that little green box in between the purple and

2    the left tower that we're looking at, that would be the 4

3    Harness Court address associated with Mr. Mosley?

4    A.   Yes, ma'am.

5    Q.   That was on May 2nd.  In the afternoon of May 2nd, are all

6    the phones that you attributed to Mr. Carter and Mosley and

7    Mr. Hightower at some point in that Park Heights area?

8    A.   Yes.

9    Q.   Now, turning to page 37 of your Power Point, what are you

10   mapping in the next series of slides?

11   A.   So these are again, just the same addresses.  I believe

12   this is the activity for --

13   Q.   I'll turn to the next page, we'll go through.

14   A.   All right.  So this is May 27, so this is actually the day

15   of the homicide.

16   Q.   Okay.  And I turned to page 40, but now I'm going to go

17   back to page 38 so we can follow along.  What information is

18   depicted on slide 38?

19   A.   So 2919 Rosalind Avenue is the crime scene, 2827 Virginia

20   Avenue is the address on one of the phones, and then Arbor

21   Station Way and Harness Court are Mr. Carter's and

22   Mr. Mosley's addresses.

23   Q.   Okay.  So now we're looking at the AT&T cell tower

24   locations?

25   A.   Yes, ma'am.

Direct Examination - Wilde  (By Ms. Wilkinson)

1   Q.  And then the Verizon cell tower locations that are on

2   page 39 of the chart; is that correct?

3   A.  Yes, ma'am.

4   Q.  Now, at this point, with regard to Mr. Hightower, he's in

5   jail; correct?

6   A.  Yes, ma'am.

7   Q.  And according to P-2, he was incarcerated as of May 4th?

8   A.  Yes.

9   Q.  So the only phones you're looking at here are the ones

10  associated with Mr. Carter and Mr. Mosley?

11  A.  Yes, ma'am.

12  Q.  Okay.  So the first call that's depicted on slide 40 on

13  Government's Exhibit P-2O, what are we looking at here?

14  A.  This is a call to 2650, which is Mr. Mosley's phone, at

15  12:13 a.m.  So this is basically the night before the

16  homicide.  And the phone is using a tower number 44980.  It's

17  not the closest tower to the Harness Court address, but it's

18  in the area of Pikesville.

19  Q.  And I'm going to turn to the next communication on the

20  2650 phone, Mr. Mosley's phone, what are we looking at here?

21  A.  So this is at 7:20 a.m. on the morning of the homicide,

22  and the phone's using tower 44906, which is the tower and

23  sector depicted there, and the phone is in the area -- it's in

24  the area of Rosalind Avenue.

25  Q.  Now, if I go back here, Agent Wilde, and we note the time

Direct Examination - Wilde  (By Ms. Wilkinson)

1    on screen 40, and it says 12:13 a.m., and the next call that

2    we have is at 7:20 a.m., does that mean there's no calls in

3    between that you were able to map or have information on,

4    there were no contacts?

5    A.   That's correct.

6    Q.   So would that be the last call on -- using Mr. Mosley's

7    2650 number, and then the first call, where you're getting

8    cell site information on Mr. Mosley's phone?

9    A.   Yes, ma'am.

10   Q.   And looking at Government's Exhibit P-2 if you need to, to

11   refresh your memory, who is calling 2650 at 7:20 a.m.?

12   A.   Kimberly Melvin, so it's a call from Kimberly Melvin --

13   I'm sorry -- yeah, Kimberly Melvin -- yeah, (410) 949-7500 to

14   this number 704-2650.

15   Q.   And turning to our chart up there, V-20, is Ms. Melvin's

16   number recorded as that 7500 number right there?

17   A.   Yes, ma'am, it is.

18   Q.    Toggle over to P-2 for a second, I'm going to go to sheet

19   marked Mosley and Melvin.

20         MS. WILKINSON:  And the hard copy of this, counsel,

21   is P-2K, if you want to follow along.

22   Q.   (BY MS. WILKINSON)  Are we looking at a sort of the

23   information between the 7500 number and the two numbers that

24   are attributed to Mr. Mosley here?

25   A.   Yes, we just basically took those out of this full list of

Direct Examination - Wilde   (By Ms. Wilkinson)

1   calls to just show them together as one.

2   Q.  And are we seeing that initial 7:20 a.m. call that you

3   just mapped and showed the jury?

4   A.  Yes, we are, it's right -- it's line No. 2 here.

5   Q.  And prior to your testimony, did you determine whether or

6   not those calls that were from Ms. Melvin's phone to

7   Mr. Mosley went to voice mail?

8   A.  They did.

9   Q.  According to the chart that's up here now, Government's

10  Exhibit P-2K, the sort, what is the first time that Mr. Mosley

11  uses one of those phones, either the 2650 or the 1533

12  number?

13  A.  At 9:22.

14  Q.  When he's the actual --

15  A.  I'm sorry, when he's the actual caller, it's at

16  7:44 p.m. -- 7:44 a.m.

17  Q.  Go ahead and circle that so we can see it.

18  A.  Yes, ma'am.

19  Q.  I know it's a lot of data.  That's why I have it up there

20  on the screen.  Okay.  Great.

21       And that is the direction of that call being from

22  Mr. Mosley to Ms. Melvin, and that would be at 7:44 a.m.?

23  A.  Yes, ma'am, it's an outgoing call from Mr. Mosley to

24  Ms. Melvin.

25  Q.  Okay.  Now I'm going to go back over to our Power Point,

1    and we were looking at that call at 7:20 a.m., and I'm going

2    to go to the page 42 there.

3        And have you now mapped, with that 2650 number we were

4    just looking at, the rest of those go-to-voicemail calls of --

5    from Ms. Melvin to Mr. Mosley?

6    A.  Yes, ma'am, they're all using tower 40085, which is

7    displayed here in the center of the map.  And it's consistent

8    with being in the area of Rosalind Avenue.

9    Q.  And just for the record, are the times noted here 7:21,

10   7:22, 7:23, 7:44, and 7:47, before we get to the 8:00 o'clock

11   times, 8:43?

12   A.  Yes, ma'am.

13   Q.  So each time each of those activations on the 2650 from

14   Ms. Melvin to Mr. Mosley are going to voice mail?

15   A.  Yes, ma'am, they are.

16   Q.  And each of these activations, based on your training and

17   experience as a CAST expert, were they consistent with being

18   in the area of Rosalind Avenue?

19   A.  Yes, ma'am.

20   Q.  Turn to page 43, and what are we looking at here?

21   A.  This is just a close up of the previous slide, just

22   showing that in a closer view, showing that the tower and

23   sector are consistent with being in the area of Rosalind

24   Avenue.

25   Q.  And the jury has seen blow-ups of the area, but are you

1   able to read some of the street names that are around here

2   when we look at -- right under red, the Rosalind Avenue and

3   Virginia Avenue, if you were to look at it up close?

4   A.  Yes.

5   Q.  So we've just kind of blown up that prior slide for

6   purposes of the jury looking at it?

7   A.  Yes, ma'am.

8   Q.  Okay.  Do we continue to map the 2650 number, as depicted

9   on page 44 of the Power Point slide?

10  A.  Yes, ma'am.

11  Q.  And now what are you seeing, Agent Wilde, in terms of your

12  analysis?

13  A.  So now we're jumping from 9 -- well, last call on the

14  previous slide was at 9:22 a.m., and now the next call is at

15  9:44 a.m.  And so the phones -- the phone has moved from that

16  area around Rosalind Avenue more to the west, and between

17  those times, it's using these two towers displayed on the

18  screen.

19  Q.  Okay.  And I'm going to go to the next screen, page 45,

20  additional information about that 2650 number.

21  A.  So this is 10:29 to 11:14 a.m., and the phone is back

22  using tower 40085, which again, is the one consistent with

23  being near the Rosalind -- providing coverage to the Rosalind

24  Avenue area.

25  Q.  I'm going to go back for a second to those calls involving

1    this one right here.  Page 42 of the Power Point slide, those

2    7:21 to 7:47 calls, we do -- you note on this particular slide

3    that 4 Harness Court address up in Pikesville.

4    A.  Yes.

5    Q.  Is it actually -- can you see it on this particular map?

6    A.  No, ma'am, you cannot.

7    Q.  And why is that?

8    A.  Because it's located kind of north, northwest from this

9    location.

10   Q.  Is it -- does it exclude the phone being anywhere near

11   that area at that time?

12   A.  Near Harness Court?

13   Q.  Yes.

14   A.  Yes, ma'am.

15   Q.  Okay.  We're back to slide 46, and again, are you

16   following or mapping that 2650 number?

17   A.  Yes, ma'am.  This is 11:37, it should be a.m., it says

18   p.m. on the bottom, but in the text box it says a.m.  But

19   11:37 a.m. to 1:28 p.m., and now it's using tower 40149, which

20   is consistent with the area of Harness Court.

21   Q.  There's a typo, but up on the right-hand corner underneath

22   where it says ENB 40149, are those the correct times?

23   A.  Yes, ma'am.

24   Q.  And would we see those activations if we wanted to look

25   and go over to Government's Exhibit P-2?

1    A.  You would, they're in Universal Coordinated Time, though,

2    so what you would have to do is when you -- oh, I'm sorry,

3    yes, ma'am.

4    Q.  They're in Eastern Standard Time; correct?

5    A.  They're in Eastern Standard Time inside this -- in P-2

6    yes, ma'am.

7    Q.  Okay.  Now we are on slide 47 and --

8            THE COURT:  Actually, you lost the screen.

9            MS. WILKINSON:  Did I lose one?  Oh, I did.

10           Would you help me, Ms. Lesser.  Is it doing that

11   searching thing?

12           One minute, Your Honor, I'm sorry.

13           THE COURT:  Sure.

14           MS. WILKINSON:  I could, while we're doing this --

15   may I get the original reports, and I'll go back to the

16   old-fashioned way.

17           THE WITNESS:  Yes, ma'am.

18           MS. WILKINSON:  Can I do that, Ms. Lesser, will it

19   show on the screen if I go over to the ELMO?

20           MS. LESSER:  Probably if you zoom way in.

21           MS. WILKINSON:  Okay.  Switch me over, and then

22   we'll continue the old-fashioned way.

23           You want to work over here, that would be great.

24   Thank you.

25   Q.  (BY MS. WILKINSON)  Okay.  So we were on the concluding

1    slides for 2650, and let me go to the slide I believe we were

2    on.

3        Scooch that over, just so I can see a little bit of what

4    we're looking at here.

5        Okay.  And we continue to map the 2650 number on May 27th

6    of 2016.

7    A.  Yes, ma'am.  So this is showing 1:58 p.m. to 2:16 p.m.  So

8    1:58, the phone is in the area of Harness Court, but not using

9    the tower that's consistent with providing coverage, and then

10   by 2:16, it's back down near the Rosalind Avenue address.

11   Q.  Okay.  And then on the next slide, in terms of the

12   location of Mr. Mosley's phone at this point?

13   A.  This is showing 2:15 to 3:47, again, using towers -- one

14   to the west of 40085, so it's using 44663 and 40085 during

15   that time, again, in the area of Park Heights.

16   Q.  Now, because Mr. Mosley had two phones, that 1533 number,

17   were you able to also map that number at the same times you

18   were -- time frame on May 27 that you were mapping the 2650

19   number?

20   A.  Yes.

21   Q.  And I'm sure I'm stating the obvious, Agent Wilde, but

22   does it depend which phone is being contacted for you to be

23   able to map each particular phone?

24   A.  Yes, there has to be incoming and outgoing calls, and if

25   there's not, then there's nothing for me to map.

1    Q.  But if we harken back to the exhibit we were just looking

2    at with regard to Ms. Melvin's phone and that activity that

3    morning, is it fair to say that Ms. Melvin's calls went to

4    2650, 1533, and back and forth?

5    A.  Yes, she was calling both phones.

6    Q.  Thank you.  Just to remind the jury, is that what we're

7    seeing here on Government's Exhibit P-2K?

8    A.  Yes, ma'am, so these are all Kimberly Melvin's calls, and

9    she's calling 1533, 2650, and back and forth.  She's trying to

10   call both phones.

11   Q.  And then eventually, text messages, and then the direction

12   of those text messages during that time period?

13   A.  They're all from Kimberly Melvin to Cliff Mosley, they're

14   not returned at all.

15   Q.  If we look over here, why is it blank?

16   A.  Because we didn't have content for those, I don't -- we

17   don't have content for those.

18   Q.  Off of Ms. Melvin's cell phone, we don't have the

19   content?

20   A.  Correct.

21   Q.  Okay.  So we're going now to the next page of Government's

22   Exhibit -- I think it's --

23            MS. WILKINSON:  Help me out here, the first page of

24   this one.  Great.  P-7.  Thank you.  Doing it this way to be

25   clear for the record.

1    Q.  (BY MS. WILKINSON)  And again, is this the second phone

2    attributed to Mr. Mosley?

3    A.  Yes.

4    Q.  Okay.  And at this point in time, what time are you

5    mapping?

6    A.  This is just 6:05 a.m., so it's 6:00 o'clock in the

7    morning on the 27th.  And this is a call from Cliff Mosley,

8    this 1533 number, to Davon Carter at 7626.

9    Q.  Okay.  And remember we were back looking at those calls in

10   connection with the all calls in May, Power Point that we were

11   looking at a moment ago, is this that communication we saw at

12   6:05 a.m.?

13   A.  It is.

14   Q.  And then at the next screen, is this still the 1533 number

15   attributed to Mr. Mosley?

16   A.  It is, and this is 6:13 and 6:15 a.m. again.

17   Q.  And is this phone -- is this time consistent or

18   inconsistent with being in the area of the crime scene at 6:13

19   and 6:15 a.m.?

20   A.  It is.

21   Q.  It is what?

22   A.  It is consistent.

23   Q.  If we were to put -- I can't really show it side by side,

24   let me -- I can a little bit.

25        Does this indicate movement of the phone?

1    A.   Potentially.

2    Q.   Explain what you mean.

3    A.   All right.  So when the phone, can you leave those two

4    side by side, please.

5    Q.   Yes, I'm sorry.

6    A.   So when you -- what I look at when I say "potentially," is

7    because the phone is using one tower and then the other, but

8    there's a chance that that phone could be somewhere between

9    those two towers and just seeing them at about an equal

10   strength.  And so it's picking one, one time, picking the next

11   the next time.

12        So it could either move from one to the next, or it could

13   be somewhere between the two, but in the realm of things, the

14   phone is somewhere in the area between the two during those

15   two times.

16   Q.   And when you're explaining that concept looking at the

17   slides that we have up here, Agent Wilde, did that concept

18   hold true for the number of the slides we saw where there were

19   different cell towers being hit, say, five, ten minutes from

20   one another?

21   A.   Yes, ma'am.

22   Q.   The next slide that we're looking at, what time frames are

23   you incorporating?

24   A.   This is 7:20 a.m. to 10:52 a.m.

25   Q.   And again, starting with that 7:20, 7:20, 7:23, 7:23

1    calls, are they from Ms. Melvin's phone number to

2    Mr. Mosley?

3    A.   Yes, they are.

4    Q.   And are they going to voice mail?

5    A.   Yes, they are.

6    Q.   And are they consistent or inconsistent with being in the

7    area of the crime scene?

8    A.   They are consistent with being in the area.

9    Q.   And when you look at the 1533 activity in conjunction with

10   the 2650 number that is attributed to Mr. Mosley, are both of

11   those numbers together, having read them together in

12   connection with this time frame, and do you have an opinion

13   about whether those two phones together were consistent with

14   being at the crime scene?

15   A.   They could be in the same area, and again, they're on

16   different networks, so they're using different towers, but in

17   general, they're in the same general area during that time,

18   and they could have been together.

19            MS. WILKINSON:  Go back to my other one.  That's all

20   right, I just want to go back to the one we were just looking

21   at for a moment.

22   Q.   (BY MS. WILKINSON)  The time frame, May 27th 7:20 a.m. to

23   10:52 a.m., and again, between 7:23 and 8:24, the fact that

24   there's no calls that are recorded within that time, does that

25   mean that there was no phone activity on 1533 between 7:23 and

1    8:24 a.m.?

2    A.  That's correct.

3    Q.  On this particular phone?

4    A.  Yes, ma'am.

5    Q.  Okay.  Page 21 of the all calls May 27th report, what are

6    we looking at here?

7    A.  This is 1:06 and 1:48 p.m., and the phone's using a tower

8    consistent with providing coverage to the 4 Harness Court

9    address.

10   Q.  And is that that little green area -- if you could circle

11   it so the jury can see.

12   A.  (Indicating.)

13   Q.  Not to be repetitive.

14   A.  It is.

15   Q.  Is that the address we associate with Mr. Mosley?

16   A.  Yes, ma'am.

17   Q.  Okay.  And then time frame of 4:00 o'clock p.m.

18   A.  4:00 o'clock the phone is back down in the Park Heights

19   area, using tower 73811.

20   Q.  So with regard to -- those were Mr. Mosley's phones, did

21   we also ask you to look at the location of Mr. Carter's 2399

22   number and 7626 number on May 27th, 2016?

23   A.  Yes.

24   Q.  And with regard to the 5150 number, were you able to map

25   any information related to that?  That's the third number.

1    A.   I don't believe so.

2    Q.   Because there's no calls on that date?

3    A.   Correct.

4    Q.   Now, with regard to 7626, we're on page 23 here, what time

5    frame is being incorporated into this cell site analysis?

6    A.   So 6:04 to 8:26, 6:04 to 8:26 a.m.   But I like to kind of

7    split that into two groups because you really have 6:04 to

8    6:15, and then 8:26 a.m. because there's no calls between 6:15

9    and 8:26.

10   Q.   So this is all the data you have for 7626 on May 27th,

11   2016?

12   A.   Yes, ma'am.

13   Q.   And so as you say, let's split it into two, the three hits

14   that are recorded on the right side of the chart here under

15   the two cell towers, 6:04 a.m., 6:13, and 6:15, who were those

16   communications between?

17   A.   They were between Davon Carter and Clifton Mosley.

18   Q.   And this blue area that's indicated where I'm pointing up

19   here, is that Mr. Carter's home?

20   A.   It is.

21   Q.   And at 6:04 a.m., is the tower -- the tower that's being

22   hit the one closest to his home, or is there another tower

23   closest to his home?

24   A.   It's the one closest to his home.

25   Q.   And the next hits at 6:13 and 6:15, is -- based on your

Direct Examination - Wilde  (By Ms. Wilkinson)

1    training and experience, do you have an opinion about whether

2    that phone now has moved away from the area closest to

3    Mr. Carter's home?

4    A.  Yes, I believe that these two towers are far enough apart

5    from each another where the phone likely moved from one to the

6    other.

7    Q.  The next hit that you see on the 7626 number, Mr. Carter's

8    7626 number over here on the left at 8:26 a.m., who is that

9    communication with?

10   A.  Kareem Anthony.

11   Q.  I'm going to go over -- do you have P-2 in front of you?

12   A.  Yes, ma'am.

13   Q.  8:26 a.m.  I can't toggle back and forth now.

14   A.  Oh, I'm sorry, 8:26 was with Cliff Mosley.

15   Q.  So this communication over here is also with Mr. Mosley?

16   A.  Yes, ma'am.

17   Q.  At 8:26 a.m.  And those are all the communications in that

18   particular time frame.  And let me go to the next screen, and

19   do we see some additional use of that 7626 number on page 24

20   of your report?

21   A.  Yes, ma'am, so the 8:26 call is the one here on the left,

22   this is the one with Clifton Mosley.  And then at 8:28, for

23   some reason, the Verizon records didn't have the seconds, so

24   it can't tell you what the -- other than 8:28, it can't tell

25   you what seconds or when these calls occurred, but there's two

1    calls at 8:28, one is using tower 111, which is up here near

2    Pimlico Raceway, and then the other one is using tower 247,

3    which is down here by this park circle, and so both of those

4    calls occurred at 8:28.

5    Q.   Okay.  And can you tell us, based on your training and

6    experience, what your opinion is with reference to the

7    location and/or possible movement of the 7626 phone in that

8    time frame?

9    A.   I mean, between 8:26 and 8:28, the phone has to be

10   somewhere between all three of these towers to access those

11   three towers during that time.

12   Q.   Page 25, we have additional information about the location

13   of the 7626 number at 9:30 a.m.

14   A.   So at 9:30 a.m. it's using tower 22, sector 2, which is in

15   the area of 8409 Arbor Station Way.

16   Q.   Is that depicted by the little turquoise house up here in

17   the left that I'm pointing to here?

18   A.   Yes, ma'am, it is.

19   Q.   So at that point, is the phone, based on your opinion,

20   Agent Wilde, consistent with being near Mr. Carter's home at

21   that point?

22   A.   Yes.

23   Q.   Page 26, what are we looking at here?

24   A.   This is 10:44 and 10:45 a.m.  There's four calls.  And

25   again, the phone is back now over by the Park Heights

1    neighborhood.

2    Q.  And are there two different cell towers being hit?

3    A.  Yes, ma'am, 111 and 247.

4    Q.  And based on your experience and your training, again, do

5    you have an opinion about whether those are consistent with

6    being in that same area, again near Rosalind Avenue?

7    A.  They are consistent with that.  I mean, other than the

8    10:44 call at tower 111, all the other calls are on tower 247,

9    which is this lower tower.  So the phone has to be somewhere

10   between these two at that time.

11   Q.  Now, is there a point, Agent Wilde, with regard to the

12   7626 number and the 2399 number where you see both of those

13   phones going south and leaving Maryland?

14   A.  Yes, ma'am, it's after 1:40 -- or after about 12:30 p.m.

15   Q.  Okay.  And I'm going to first show you with regard to the

16   7626 number, slide No. 27, what are we looking at here?

17   A.  This is the phone's activity between 1:47 and 3:00 o'clock

18   p.m. on the 27th.  And it starts off just north of

19   Fredericksburg near Quantico, Virginia, and then at 3 o'clock

20   it's just north of Fredericksburg.

21   Q.  So this is the information you have about the 7626 number,

22   and is this main throughway that's indicated here 95 south?

23   A.  Yes, it is.

24   Q.  And then if I cross over to the 2399 number, what are we

25   looking at here?

Direct Examination - Wilde   (By Ms. Wilkinson)

1   A.   This is showing both the 2399 number and the 7626 number,

2   and their calls kind of overlapping as the phone moves from

3   the area north of Washington, D.C. down to Myrtle Beach, South

4   Carolina.

5   Q.   And is this where you've kind of given us an overlap of

6   the two phones as it makes its way south?

7   A.   Yes, ma'am, and those are just the two phones making calls

8   or receiving calls as they travel from Maryland down to South

9   Carolina.

10   Q.   And the earliest call that you have outside the Baltimore

11   area depicted up here where I'm pointing at the top of my

12   slide here, is at what time?

13   A.   At 12:22 p.m.

14   Q.   Now, I believe that -- I want to go back for a minute, so

15   that is when the 2399 number started to leave the Maryland

16   area?

17   A.   Yes, ma'am.

18   Q.   Going back to that time frame of the 2399 number now, is

19   that an iPhone, Agent Wilde?

20   A.   I believe so.

21   Q.   And that phone, did you compare and contrast it with the

22   movement of the 7626 phone in the early morning hours of

23   May 27th?

24   A.   I did, but that 2399 phone was consistently using a tower

25   and sector consistent with providing coverage to Arbor Station

1    Way during that time period.

2    Q.  That's what I have up here on page 28, and are we seeing

3    those repeated calls up there to the 2399 number hitting off

4    of the tower closest to Mr. Carter's home on that iPhone?

5    A.  Yes, ma'am.

6    Q.  Now, have -- and I can't toggle back and forth now to P-2,

7    but can you tell us who was hitting that phone consistently on

8    the 2399 number that is causing it to have all of these pings,

9    as depicted on the slide that's in front of the jury?

10   A.  I believe it was Deanna Lawson, so it's the 5670 number.

11   Q.  And do you have the page open on your book there?

12   A.  I do.

13   Q.  Let me see if I can find the -- P-2J.

14          MS. WILKINSON:  Thank you, guys, for helping me.  We

15   have too many pieces of paper.

16   Q.  (BY MS. WILKINSON)  Okay.  P-2J, did I ask you to do a

17   sort of Ms. Lawson's contacts between her number and that 2399

18   number, the morning hours of May 27th?

19   A.  Yes.

20   Q.  And what time does her contacts start?

21   A.  It starts with a call at 6:03 a.m.

22   Q.  Okay.  And then as we continue, did you or were you able

23   to get content off of the phone belonging to Ms. Lawson from a

24   Cellebrite?

25   A.  Yes.

1   Q.  And is that content recorded accurately on Government's

2   Exhibit P-2J?

3   A.  It is.

4   Q.  We can all read it, I don't have to do all of it here, but

5   the first one, "I need names and pictures of people you're

6   going with just in case something happens."  Have I read that

7   correctly?

8   A.  Yes, ma'am.

9   Q.  "Car make, model, tag number, and hotel y'all staying at."

10  A.  Yes.

11  Q.  Okay.  And is that phone number iMessaging this 2399

12  number?

13  A.  It is.

14  Q.  Now, can you tell the jury whether there's a difference in

15  your ability to map the calls versus the iMessages on the data

16  that we're looking at here?

17  A.  There is.  So again, with calls and texts, like a regular

18  call or regular text message, they go over AT&T's network as a

19  call and a text.  So they are -- they record the cell site

20  data, the cell tower data, and the sector information for

21  calls and texts.  The iMessages and FaceTime and all those

22  things go over as data.  Data usage.

23      And so they can record the cell site for data, but line

24  by line, you wouldn't be able to -- I can't tell the

25  difference between a FaceTime call, iMessage, Netflix, or

Direct Examination - Wilde   (By Ms. Wilkinson)

1   whatever else is going on with that phone, so -- and there's

2   some other issues with cell site mapping with data records

3   anyway.  So you have to rely on the Cellebrite report for

4   those messages.

5   Q.  Okay.  So when we're looking at this text right here at

6   6:20 a.m. from Lawson to Mr. Carter, "Now this is what we're

7   not going to do.  You better answer this damn phone," we'll

8   see information on your cell site map pertaining to around

9   that 6:20 time?

10  A.  Correct, because that's an iMessage.

11  Q.  Okay.  And what would -- if we have the approximate time

12  here without seconds, are these the times with seconds, if you

13  look at here, so we're doing the --

14  A.  Yes, ma'am.

15  Q.  So if we see the time frame of that particular iMessage

16  where Ms. Lawson is saying, "Now this is what we not going to

17  do.  You better answer this damn phone," where is that 2399

18  number as that's being sent?

19  A.  Well, it's using a cell tower consistent with providing

20  coverage to the Arbor Station Way address, which is

21  Mr. Carter's home.

22  Q.  And Ms. Lawson?

23  A.  And Ms. Lawson.

24  Q.  Now, I'm going to zero in, if I can, to the activity on

25  the phone.  And if you can, look at your Government's

Direct Examination - Wilde  (By Ms. Wilkinson)

1    Exhibit P-2, and putting them together, can you tell the jury,

2    when is the first time Mr. Carter, or a person using that 2399

3    number, in other words, not when it's being called, but when

4    it's used, when the 2399 number is being used that morning?

5    A.  It would be at 9:25 a.m.

6    Q.  So if I turn now to page 29, your last screen that I'm

7    going to look at, 9:25 a.m., would that be, again, consistent

8    with the phone now being -- still being at that 8409 Arbor

9    Station Way?

10   A.  Yes.

11   Q.  And that 9:25 a.m. call, the use of that phone, who is

12   that call being made to?

13   A.  It's an outgoing call to Deanna Lawson.

14   Q.  Who is the 9:29 call to?

15   A.  Parole and probation.

16   Q.  And who is the 9:32 call to?

17   A.  Andre Farrell.

18   Q.  And who is the 9:38 call to?

19   A.  Anthony Hart.

20   Q.  And who is the 9:47 call to?

21   A.  Andre Farrell.

22   Q.  And then I'm going to go over here, at some point looking

23   at Government's Exhibit -- I think the final report is P-7.

24        MS. WILKINSON:  Thank you, Ms. Lesser, so I can keep

25   the record straight.

1    Q.  (BY MS. WILKINSON)  And we're dealing with page 29 here.

2    At some point, does that 2399 number start to move away from

3    the Arbor Station Way address?

4    A.  Yes, ma'am.  After 10:16 -- 10:16 is the last time when

5    the phone is using that tower, consistent with being at Arbor

6    Station Way.  So at 10:19, the phone's now moved to the west.

7    And then 10:26 and by 11:49, it's in West Baltimore.

8    Q.  And is that -- are those the time that directly precede

9    your mapping of the phone as it heads down to South

10   Carolina?

11   A.  Yes.

12            MS. WILKINSON:  Your Honor, I know -- I would like

13   to toggle back to P-2 for the rest of mine, can we take a

14   moment to see if it's working, would that be okay?

15            THE COURT:  Or we can take our afternoon break.

16            MS. WILKINSON:  Would that be all right?

17            THE COURT:  That's fine.

18            MS. WILKINSON:  Thank you, Your Honor.

19            THE COURT:  Ladies and gentlemen, we'll take our

20   15-minute afternoon break at this point.  I'll ask that you be

21   back at 3:30, and we will go from there.  Please remember not

22   to discuss the case with anyone, including among yourselves.

23            (Jury left the courtroom.)

24            THE COURT:  All right.  See you in 15 minutes.

25            (A recess was taken.)

1              THE COURT:  Bring the jury.

2              (Jury entered the courtroom.)

3              THE COURT:  All right.  You may all be seated.  Good

4   afternoon, again, ladies and gentlemen.

5              Sir, I remind you, you are still under oath.

6              THE WITNESS:  Yes, sir.

7              THE COURT:  And Ms. Wilkinson, you can continue when

8   you're ready.

9              MS. WILKINSON:  And of course the battery is out.

10  I'll stay at the podium.

11             THE COURT:  Is that the only one we have?

12  Q.  (BY MS. WILKINSON)  Agent Wilde, in the -- you spoke

13  earlier in your testimony that you had -- that you had

14  performed certain Cellebrites yourself, as well as reviewed

15  certain Cellebrites in connection with the investigation; is

16  that right?

17  A.  That's correct.

18  Q.  Now, I have two -- I'll show you.  I don't think I need to

19  bring them up there, but to the right, and showing you first

20  Government's Exhibit P-9A, and I'll just hold it up here so

21  everybody can see it.  And there is a disk, but there's also a

22  printout, and I'm going to put it in front.

23             Are you familiar with this type of cover page?

24  A.  Yes, ma'am, this is the cover page, the first page of the

25  Cellebrite report.  So when we download the phone, the

Direct Examination - Wilde  (By Ms. Wilkinson)

1  files -- we download the files onto a removable disk, and then

2  we process it through something called physical analyzer,

3  which is a Cellebrite program, and it generates this report.

4  Q.  And it says, actually, extraction report, is this data

5  extracted from a certain cell phone?

6  A.  Yes, ma'am.

7  Q.  And on this particular one, does it have you as the actual

8  examiner?

9  A.  It does.

10  Q.  And this particular phone that Government's Exhibit P-9A

11  pertains to, for the record, which is?

12  A.  761-5150.

13  Q.  Is that one of the numbers we attributed to Mr. Carter?

14  A.  Yes.

15  Q.  And so attached to this, would be this be a full printout

16  of the information contained on the Cellebrite for 5150?

17  A.  Yes.

18  Q.  And the disk that is a digital copy of it, so to speak?

19  A.  Yes.

20  Q.  Okay.  And the same questions with regard to Government's

21  Exhibit P-10A.  Again, I'll put up the first page of the

22  extraction report.

23      And again, are you the examiner?

24  A.  Yes.

25  Q.  And down below, the phone number, the last four digits?

1    A.  7626.

2    Q.  And again, is this a printout of the Cellebrite together

3    with the disk copy of the Cellebrite itself?

4    A.  Yes, it is.

5           MS. WILKINSON:  Your Honor, subject to possible

6    redactions, counsel, we have all agreed that these are in at

7    this point, and we will consult about any needed redaction.

8           THE COURT:  Very well.

9    Q.  (BY MS. WILKINSON)  Now, I have up on the screen a

10   document you referred to earlier, Government's Exhibit P-10C.

11   From that 7626 number, Agent Wilde, were there contact

12   information saved as contacts within that 7626 number?

13   A.  Yes, ma'am.

14   Q.  And when I use the phrase "contacts," let's just make sure

15   we're on the same page, what does that mean in a Cellebrite?

16   A.  It means whoever's in possession of that phone, when they

17   entered that telephone number, and then entered the name

18   associated with the telephone number as a contact in

19   Cellebrite.

20   Q.  And did I ask you to kind of snip the actual -- the only

21   contact information in 7626 for purposes of showing the

22   jury?

23   A.  Yes.

24   Q.  And is that the information that's contained here in the

25   center of Government's Exhibit P-10C?

1    A.  Yes, it is.

2    Q.  And each of these -- this contact information that's

3    recorded there below, are these the phone numbers that are

4    associated with the nicknames that are No. 1, 2, 3, and so on,

5    on Government's Exhibit P-10C?

6    A.  Yes, ma'am.

7    Q.  Now, you referenced earlier a man named Anthony Hart, what

8    is Mr. Hart -- what number was attributed to Mr. Hart through

9    the course of the investigation?

10   A.  I believe it was (443) 400-4677.

11   Q.  And is that the number here as the nickname Hakim?

12   A.  Yes.

13   Q.  And did I ask you to -- for that Anthony Hart number, did

14   I ask you to perform cell site analysis of the location of

15   that 4677 phone the morning of May 27th, 2016?

16   A.  I believe so.

17   Q.  And what was the location of the phone?  And if you need

18   to check your --

19   A.  I need to check my notes.

20   Q.  Sure.

21   A.  So it was in South Carolina at 6:08 a.m., was the first

22   contact that day, and it was in Myrtle Beach, South

23   Carolina.

24   Q.  And --

25   A.  I'm sorry, it was in South Carolina.  I have it at Myrtle

1    Beach by 4:00 p.m.

2    Q.  Thank you.  Say that again, I'm sorry?

3    A.  I have it -- the 6:08 a.m. is in South Carolina, but I

4    have it at Myrtle Beach by 4:00 p.m.

5    Q.  The previous day, is that what you mean?

6    A.  Yes, ma'am.

7    Q.  Okay.  Is that correct?

8    A.  I think so.

9    Q.  Okay.  Well, check your report, I want to make sure you're

10   correct about it.  If you need to come back to it, we can.

11   A.  Yeah, the notes I have say in South Carolina by 6:08 a.m.

12   Q.  Okay.  Thank you.  Now, when we go down below here to

13   Cliff, is there a number that is associated with Mr. Mosley in

14   that 7626 number?

15   A.  Yes, it's (410) 693-1533.

16   Q.  And is that the phone number that we've been hearing about

17   in the course of your cell site mapping?

18   A.  Yes.

19   Q.  Now, in addition to having the full report as redacted in

20   Government's Exhibit P-9A that I just showed you, this is

21   Government's Exhibit, I should say P-10A, P-10B, is this just

22   a snip or a subset of some of that information that's

23   contained on that 7626 Cellebrite?

24   A.  Yes.

25   Q.  And on each one of these, is the same message associated

1    with an outgoing communication from 7626 to the four men that

2    are noted here?

3    A.   Yes, each one of those text messages are outgoing to each

4    one of those telephone numbers.

5    Q.   And what is the same text message, just for the record

6    here?

7    A.   It says, "This Davo, lock me in."

8    Q.   Okay.  And do you see the one with regard to Cliff and at

9    what time it was locked in, or asked to be locked in, I should

10   say?

11   A.   9:57 a.m. on May 25th.

12   Q.   And is this consistent with the times that are noted on

13   Government's Exhibit P-10B, consistent with the effective time

14   and date of the 7626 number, according to the phone records of

15   the company that provided them to us?

16   A.   Yes.

17   Q.   In other words, it started on May 25th?

18   A.   Correct.

19   Q.   We heard a little bit about a communication between

20   Mr. Carter's phone and a 14 -- 6191 number that you attributed

21   to Andre Farrell; is that correct?

22   A.   Yes, ma'am.

23   Q.   Now, at some point during the investigation, was there a

24   Cellebrite extraction of Mr. Farrell's phone?

25   A.   Yes.

Direct Examination - Wilde  (By Ms. Wilkinson)

1    Q.  And I'm going to put up the first page of Government's

2    Exhibit P-12.  Now, in this case you were not the actual

3    examiner; correct?

4    A.  Correct.

5    Q.  And it was done by someone at HHS?

6    A.  No, I believe it was -- SK, I believe is Sean Kennedy,

7    which is -- was one of my co-workers at the time.

8    Q.  Oh, case number, I'm sorry, it says HHS.

9    A.  Yes, ma'am.

10   Q.  Okay.  And down below here, let me see if I can find this

11   telephone number, it might be on the -- there it is.

12        Does it end in that 6191 number that is attributed to

13   Mr. Farrell?

14   A.  Yes, it does.

15   Q.  Okay.  You were discussing at some point that

16   communication between those two numbers, and I just wanted

17   to -- again, are there certain redactions for purposes of

18   demonstrative purposes on Government's Exhibit P-12, these

19   black -- that's not what it looks like in the Cellebrite?

20   A.  Correct, it has letters and numbers.

21   Q.  Down here below, drawing your attention to the four

22   unredacted, do those appear to be between that 61- -- well,

23   this is on the 6191 number, with Mr. Carter on the 2399

24   number?

25   A.  Yes.

Direct Examination - Wilde   (By Ms. Wilkinson)

1    Q.   And what time do they begin?

2    A.   They begin at 9:56 a.m., and they end at 10:01 a.m.

3    Q.   And then we can see the content here, these came from that

4    6191 actual extraction; correct?

5    A.   Correct.

6    Q.   And down below here where there is a message from Davon,

7    2399, do you see that there were some image files that were

8    sent?

9    A.   Yes.

10   Q.   And I'm going to pick up a page of that exhibit.  Are you

11   able to tell this is one of those image files?

12   A.   Yes, it is.

13   Q.   Okay.  And then the second page of that, all contained

14   within Government's Exhibit P-12.  Is that the second page of

15   that image file sent by Mr. Carter or someone using the 2399

16   number?

17   A.   It is.

18   Q.   Now, showing you Government's Exhibit P-12A, is this a

19   subset of Government's Exhibit P-2, that big notebook that you

20   were referring to this morning that reflects communications

21   between Mr. Carter and Mr. Farrell?

22   A.   Yes, ma'am.

23   Q.   And the first communication that has content that we can

24   see on here, is it -- for the record, just read what the text

25   message is.

1   A.   It says, "Captain Quarters, we can meet there, getting

2   room where we can last minute."

3   Q.   Okay.  And what does Mr. Carter say there?

4   A.   He says, "Go on Groupon."

5   Q.   Now, were you able to do a location of Mr. Farrell's

6   phone, as you were with regard to the location of Mr. Bailey's

7   phone, and as you were with the location of Hakim's phone in

8   connection with your work here?

9   A.   Yes.

10   Q.   And can you tell the jury where Mr. Farrell's phone was

11   and at what time you put it there?

12   A.   He was already in South Carolina by 6:08 a.m.

13   Q.   Now, prior to the -- before we went into your CAST

14   analysis, Agent Wilde, you were referring to Government's

15   Exhibit P-2, which I hope is in front of you.

16   A.   Yes, ma'am.

17   Q.   And it's that notebook.  And when we were starting at the

18   top of that exhibit, I think you noted that there was a line

19   or two missing, and on the break, did you determine that there

20   had been a Xeroxing error on the top of that page?

21   A.   Yes, it was missing the first two lines of the page.

22   Q.   I'm going to show you P-2P.  Were we able to, using Excel,

23   figure out which part had been erroneously omitted from the

24   copy?

25   A.   Yes, line 2 and 3 were omitted -- were not on the copy.

Direct Examination - Wilde  (By Ms. Wilkinson)

Q.  And when you do Microsoft Excel, because it's a lengthy document, you have to cut and paste the whole thing, essentially, to be able to print it?

A.  You have to set like the print area, and if you set the wrong print area, then it doesn't print the right area.

Q.  And does that appear to be what happened here?

A.  Yes, ma'am.

Q.  The last two pages of that document, do they appear not to be in the print area either?

A.  That's correct.

Q.  I'm going to include these in Government's Exhibit P-2 and put it up here in case you need to refer to it.  Thank you, sir.

     Now, as we -- I'm going to go back to our -- I'm going to go back to Government's Exhibit P-2 for a moment.

          MS. WILKINSON:  And if I could ask Ms. Oldham to help me again at the easel.

Q.  (BY MS. WILKINSON)  With regard to certain information collectively, I asked you to prepare in connection with Government's Exhibit P-2.  And again, I'm going to mark this as the next P number, which would be 2Q, P-2Q.

     And in connection with the phone analysis that you did, Agent Wilde, can you tell us how many times between that first date, August 4th, 2014, and continuing until Mr. Hightower's arrest on May 4th, 2016, how many times the phone numbers

Direct Examination - Wilde  (By Ms. Wilkinson)

1    attributed to Mr. Carter and the phone numbers to

2    Mr. Hightower were in communication with one another?

3    A.  I'm sorry, to Mr. Carter and Mr. --

4    Q.  Between Mr. Carter's phones and Mr. Hightower's phone,

5    between the first date, August 4th, and continuing through

6    May 4th, just how many communications between the two phones?

7    Do you need to see your notes?

8    A.  I'm looking at them right now.

9         MS. WILKINSON:  I think Ms. Oldham actually has

10   them, if you want to mark it for identification purposes only,

11   Government's Exhibit X -- what would that be, Agent Holiday?

12   I know it's a lot of numbers to remember.

13   Q.  (BY MS. WILKINSON)  If you need to refer to them, please

14   do.

15   A.  Yes.  Thank you.  So between Mr. Carter and Mr. Hightower,

16   there's over 1,000 contacts between the two of them.

17   Q.  Could you just write 1,000 contacts.  Now, based on the

18   call detail records, are you able to say whether there were

19   actually conversations during each one of those contacts, or

20   are some of them of zero duration, some of them of minutes?

21   A.  Correct, there's some that are of zero duration and some

22   that have minutes that they've talked, but specifically, there

23   are over 1,000 contacts.

24   Q.  Okay.  And those two -- it would be between those several

25   phones that we note that go back and forth with one another?

Direct Examination - Wilde  (By Ms. Wilkinson)

1    A.  Yes, ma'am.

2    Q.  Now, same question, and let me just go back for a moment

3    and ask you, with regard to the records that we have for phone

4    numbers that are associated with Mr. Mosley, can you tell

5    us -- I think the time frame is the end of December 2015,

6    12/29, I believe, exactly, through 5/4/2016, how many contacts

7    were there between Mr. Mosley's telephone numbers associated

8    with him and Mr. Hightower's phones associated with him before

9    he was arrested?

10   A.  253.

11   Q.  Now, do those -- some of those contacts come from

12   Mr. Hightower's phone records as opposed to Mr. Mosley's phone

13   records?

14   A.  Yes.

15   Q.  What time frame approximately did you get Mr. Mosley's

16   phone records for the 2650 and 1533 number?

17   A.  So May 4th, 2016 to May 31st, 2016 -- I'm sorry,

18   12/29/2015 to 5/4/2016.

19   Q.  Were those for Mr. Hightower's records?

20   A.  Those were for Mr. Mosley's records.

21          MS. WILKINSON:  Court's indulgence, one second.

22          THE COURT:  Sure.

23          MS. WILKINSON:  Let me check my notes real quick,

24   Your Honor.

25          THE COURT:  Okay.

1    Q.  (BY MS. WILKINSON)  I think I misheard you, do you --

2    A.  I'm sorry, I've got the -- the 1533 number is May 1st

3    to -- May 1st, 2016 to July 15th, 2016.

4           MS. WILKINSON:  If you would just note, Ms. Oldham,

5    we only have the records from 1533 from May 1st to the date

6    that Agent Wilde just stated.

7    Q.  (BY MS. WILKINSON)  So if, for example, there were

8    incoming text messages to Mr. Hightower, we don't know where

9    they're from, we can't attribute it to any particular

10   person?

11   A.  Correct.

12          MS. OLDHAM:  The date was May 1st.

13   A.  Yes, May 1st, 2016 to July 15th, 2016.

14   Q.  (BY MS. WILKINSON)  And along that same line, again, using

15   the phone data that's contained in Government's Exhibit P-2,

16   did I ask you to quantify the approximate time Mr. Carter's

17   phones were in contact with Mr. Mosley's phones in May of

18   2016?

19   A.  They had 148 contacts.

20   Q.  And again, can you say whether those are all actual

21   connections, or they're just contacts between the two

22   numbers?

23   A.  They're just back and forth between those two numbers.

24   Q.  Looking at Government's Exhibit, again, P-2, and in

25   connection with your preparation for trial, when was the first

1    call from Davon Carter's phone numbers associated with him to

2    numbers associated with Mr. Mosley?

3    A.   It was on -- I believe it was on May 3rd, but the first

4    one where it was actually connected was on May 4th.

5    Q.   Now, prior to May 1st --

6              MS. WILKINSON:  Are you with us, Ms. Oldham?  I

7    don't want to go too far ahead.

8    Q.   (BY MS. WILKINSON)  Prior to May 1st of 2016, did you have

9    records related to Mr. Carter's 2399 number, that iPhone?

10   A.   Yes.

11   Q.   That one, when you look at it, can you contrast the

12   time -- the number of contacts between Mr. Carter and

13   Mr. Mosley that you said happened in May of 2016, with any

14   contacts between Mr. Carter and Mr. Mosley's phones based on

15   Mr. Carter's phone records prior to May of 2016?

16   A.   There were no contacts prior to May of 2016 between those

17   two numbers.

18   Q.   In connection, I've asked you about several -- location of

19   several phones and some of them of the individuals that are

20   reported in your CAST reports, did you also prepare a report

21   of a number of other telephone numbers to determine whether or

22   not, for example, they were in South Carolina at the time of

23   the incident?

24   A.   Yes.

25   Q.   And do you have a copy of it in front of you?

1    A.   Yes.

2    Q.   And I think I misheard you or I mixed up Mr. Farrell and

3    Hakim, do you have both Anthony Hart and Mr. Farrell recorded

4    on your notes of the location report?  I just want to make

5    sure I heard it right.

6    A.   I think so.

7    Q.   The 6191 number -- and if you need to see Mr. Hakim's,

8    I'll show you.  Now, I'm dealing here with Mr. Farrell's, the

9    6191 --

10   A.   Yes, I've got Mr. Farrell's here, and I've got Hakim as

11   well.

12   Q.   Okay.  So again, just so I make sure I heard it right or I

13   got it right, the 6191 number attributed to Mr. Farrell, what

14   did you have -- what time did you have him first located in

15   South Carolina?

16   A.   I'm not sure, I don't have that listed here on my notes.

17   Q.   What do you have listed in terms of your location analysis

18   with regard to Mr. Farrell on 6191?

19   A.   On 6191, I have -- I have 7:09 a.m. he's at 695 and

20   Liberty Parkway, and at 9:30 a.m. near Calverton.

21   Q.   And when you say "near Calverton," is that south of

22   Baltimore, meaning in the PG County area?

23   A.   Yes.

24   Q.   And underneath the column where -- at some point, do you

25   have Mr. Farrell in South Carolina?  And I think that's

Direct Examination - Wilde  (By Ms. Wilkinson)

1    where we got confused.

2    A.  I do, but I don't have the time -- I don't have the time

3    listed here.

4    Q.  It's just put in as South Carolina?

5    A.  On 6191, I have -- it's blank on my notes.

6    Q.  Okay.  Terrific, and that's why I wanted to go back to

7    that for a second.  Thank you, Agent Wilde.

8         So now I'm going to toggle back to Government's

9    Exhibit P-2 for a moment and go to June 17th of 2015, and did

10   you prepare a separate sheet?

11            MS. WILKINSON:  And if I could put those in front of

12   you, you guys could help me keep the records straight.  Thank

13   you.

14   Q.  (BY MS. WILKINSON)  P-2A that we have up on the screen

15   here, and is there an event that are noted on Government's

16   Exhibit P-2A, the screen that we're looking at here?

17   A.  Yes, there's three events.

18   Q.  And the first event is noted as what?

19   A.  Agents attempt to arrest MH, which is Matthew Hightower.

20   Q.  And then do you see right below there, is there a contact

21   between Mr. Hightower and Agent Fuch's phone numbers?

22   A.  Yes, there is.

23   Q.  And then are there several communications between

24   Mr. Hightower and two attorneys, David Weinstein and Richard

25   Bardos?

1    A.   Yes.

2    Q.   And then the next event you note is -- is there a meeting

3    between Mr. Hightower and his attorney?

4    A.   Yes, there is.

5    Q.   And what time is it noted, the approximate time, on

6    Government's Exhibit P-2A?

7    A.   12:00 p.m.  12:00 p.m.

8    Q.   And at some point, what is the next event that we note on

9    June 17th, 2015?

10   A.   At 5:00 p.m. Mr. Hightower's released on home detention.

11   Q.   And after he's released on home detention -- and would

12   this be in the health care fraud case?

13   A.   Yes, ma'am.

14   Q.   Is there communications or contacts between Mr. Carter's

15   2399 number and Mr. Hightower's 6488 number on June 17th,

16   2015?

17   A.   Yes, they start at 5:22 p.m., and they go back and forth

18   all the way into the 18th.

19   Q.   Now, if you would go to Government's Exhibit P-2, and I

20   refer you to an event on July 2nd of 2014, '14 -- or '15, I

21   should say, 2015.  If we can get to it on the screen, I might

22   be able to do it quicker here.  There we go.

23        If you look up on the right, is there an event that's

24   referred to both on June 29th and then July 2nd, 2015, first

25   the one at the top?

Direct Examination - Wilde  (By Ms. Wilkinson)

1  A.  On June 29th, it says USAO provides a list of witnesses.

2  So the U.S. Attorney's Office provided a list of witnesses.

3  Q.  And down below, July 2nd, is there another event that's

4  noted there?

5  A.  Discovery letter was sent to Mr. Hightower's counsel, and

6  it's about the Edmonds memo included.

7  Q.  As part of that discovery?

8  A.  Yes.

9  Q.  And then can I have you turn to July -- I'll toggle down

10  to July 13th of 2015, and is there a note -- event recorded

11  here?

12  A.  July 13th, so there's an e-mail from the U.S. Attorney's

13  Office to Chris Nieto in reference to Belinda Turner,

14  enclosing witness letter.  And then on July 16th, there's a

15  Bardos meeting with Hightower.

16  Q.  Okay.  And if I go below here, I could --

17      MS. WILKINSON:  You know, Agent Holiday, I think I

18  neglected to get Government's Exhibit P-19. Can I pull that

19  for a second?

20  Q.  (BY MS. WILKINSON)  Okay.  So on July 16th you note that

21  there's a meeting with Mr. Bardos, is there a reference of a

22  communication between Mr. Hightower, and first of all, Belinda

23  Turner on July 16th, 2015?

24  A.  Yes, at 5:06 p.m. there's a call from Mr. Hightower to

25  Ms. Turner, and the duration is 13 minutes and 37 seconds.

Direct Examination - Wilde   (By Ms. Wilkinson)

1    Q.  And then down below that, I guess about a week or so

2    later, is there a contact, according to your analysis of a

3    variety of information we're getting, between Mr. Hightower

4    and Ms. Edmonds on July 25th at 13:10?

5    A.  Yes, Mr. Hightower calls -- or there's an e-mail from

6    Mr. Hightower to Ms. Edmonds, and it says, "What's up, Lisa?

7    This is Matt.  I have a question for you about your old job,

8    or our old job.  Call me at (443) 983-2513 when you get this.

9    Thanks."

10   Q.  And then what is the contact immediately below

11   Mr. Hightower's e-mail to Ms. Edmonds, as recorded in

12   Government's Exhibit P-2?

13   A.  It's a text message from Ms. Edmonds to SA Fuchs with a

14   screen shot of the e-mail from Mr. Hightower to Ms. Edmonds.

15   Q.  And as we go below into July of 2015, do you see a number

16   of communications between -- specifically on July 30th here

17   between Mr. Carter and Mr. Hightower, and then eventually a

18   new name here, Elma Myles?

19   A.  Yes.

20   Q.  And is Elma Myles the co-defendant in Mr. Hightower's

21   health care fraud case?

22   A.  Yes.

23   Q.  The next event I'm going to turn your attention to is in

24   September of 2015.

25            MS. WILKINSON:  And counsel, this is the sheet I

1    prepared, Government's Exhibit -- if you could help me with

2    the next exhibit number, P-2B is it, Agent Holiday?  Just so I

3    can keep the record straight.  P-2B.

4    Q.  (BY MS. WILKINSON)  And on this particular sheet or subset

5    of Government's Exhibit P-2, are you -- what information is

6    recorded generally on this subset of information?

7    A.  It's showing September 4th through September 30th of 2015,

8    and the activity between Davon Carter and Matthew Hightower

9    and Mr. Bardos.

10   Q.  And is -- are there intermittent communications between

11   Ms. Myles and Mr. Hightower, and directing your attention up

12   here to September 5th, and you see that 14-minute call?

13   A.  Yes, ma'am.

14   Q.  And then there continue to be communications between

15   Mr. Hightower and Mr. Carter's phone?

16   A.  Yes.

17   Q.  Okay.  And does that continue through the month of

18   September?

19   A.  It does.

20   Q.  Okay.  If I go down here to September 16th, there's a

21   14-minute call between Mr. Bardos and Mr. Hightower, do you

22   see that there?

23   A.  Yes, ma'am.

24   Q.  And then information between the connections, between the

25   phones, and Mr. Carter's; is that correct?

Direct Examination - Wilde   (By Ms. Wilkinson)

1    A.   Yes.

2    Q.   Okay.   Now, on September 30th of 2015, and I'm going to go

3    back to the main screen here, and we'll go down to May 30th --

4    I mean, September 30th.   Does it indicate two events on

5    September 30th of 2015, the one at the top, and then the one

6    in the middle of the page?

7    A.   Yes, the first one states Bardos meeting with Hightower,

8    the time on there is at midnight.   I don't believe that's

9    correct, but that's -- we just know there's a meeting on that

10   day.

11   Q.   Does that just mean that it didn't have a date and time on

12   it?

13   A.   Correct.

14   Q.   Okay.   Go ahead.

15   A.   And then the next one is at 2:00 o'clock p.m. and hearing

16   on Hightower release conditions.

17   Q.   Now, as part of your testimony, showing you Government's

18   Exhibit H-2, is this a -- I have to toggle back, I think I'll

19   bring it up to you so we don't have to do that.

20   A.   Okay.

21   Q.   Is this a copy of the detention hearing transcript that

22   transpired on September 30th, 2015?

23   A.   Yes, ma'am.

24   Q.   And we're going to have you here -- was somebody from the

25   U.S. Attorney's Office present on behalf of the government?

Direct Examination - Wilde  (By Ms. Wilkinson)

1    A.  Yes, ma'am.

2    Q.  Mr. Zelinsky?

3    A.  Yes.

4    Q.  And in front of Judge Coulson?

5    A.  Yes.

6    Q.  And Mr. Bardos was there for the defendant?

7    A.  Yes.

8    Q.  And the defendant was there?

9    A.  Yes.

10   Q.  And probation officer?

11   A.  Todd Stokes.

12   Q.  Okay.  And they spelled her name wrong, but Agent Fuchs

13   was there as well?

14   A.  Yes.

15   Q.  Okay.  And at this particular hearing, and going to

16   page 3, does Mr. Zelinsky make a statement to the Court

17   regarding the matter that was pending at that time?

18   A.  Yes, he does.

19   Q.  Okay.  And then I'm going to have you just read from here

20   down just where it says "the key."

21   A.  "The key point that the government disagrees with, the

22   defense motion is on page 4 where the line is no suggestion of

23   violence or ongoing criminal activity by Mr. Hightower."

24   Q.  And then I'm going to go down to line 13, so this is

25   Mr. Zelinsky speaking in the presence of Mr. Hightower and

1    Mr. Bardos?

2    A.   Yes.

3    Q.   And you can read line 13.

4    A.   "Mr. Hightower is also being investigated in the

5    September 22nd, 2013 homicide of David Wutoh, which I believe

6    had come up at his initial detention hearing with Your Honor.

7    And that was an individual who had engaged in health care

8    fraud.  There are a number of text messages on the night of

9    Mr. Wutoh's death and shortly beforehand between the victim

10   and Mr. Hightower, some of them relatively threatening,

11   referring to a money debt at that time."

12          MS. WILKINSON:  Okay.  And Your Honor, the rest I

13   will redact it just for those provisions on September 30th.

14          THE COURT:  Very well.

15   Q.  (BY MS. WILKINSON)  And if we go back to our main exhibit

16   here, at the conclusion of that September 30th hearing, did we

17   obtain content from Arielle Washington's phone that is

18   reported on Government's Exhibit P-2?

19   A.   Yes, ma'am.

20   Q.   Okay.  And if we work our way down to it, I'm going to go

21   down to line 9 of 5, and Ms. Washington, what does she say to

22   Mr. Hightower in a text?

23   A.   "It's like you done some sneaky shit."

24   Q.   And then I'm going to go down below here, on that

25   September 30th, are there a series of text messages between

Direct Examination - Wilde  (By Ms. Wilkinson)

1    Ms. Washington and Mr. Hightower that are recorded here on

2    Government's Exhibit P-2?

3    A.   Yes, ma'am.

4    Q.   And as we -- down below, do we see communications on

5    October 2nd between Mr. Hightower and Mr. Bardos, his

6    lawyer?

7    A.   Yes, there's two calls, one is one minute and 12 seconds,

8    the other one is 14 minutes and 14 seconds.

9    Q.   And do we see a lengthy communication between

10   Mr. Hightower's number and Mr. Carter's number on October 2nd,

11   2015?

12   A.   Yes, 13 minutes and 46 seconds.

13   Q.   Now, I'm going to go down further to October 3rd, and did

14   Mr. Hightower and Ms. Washington continue to have a number --

15   first of all, is there communications between Mr. Carter and

16   Mr. Hightower on October 3rd at around 18:41 and 18:56?

17   A.   Yes, it was a seven-second call, and then a 37-second

18   call.

19   Q.   And then after that, does Mr. Hightower text

20   Ms. Washington?

21   A.   Yes, he does.

22   Q.   Okay.  And down here below, on line 926 at 2119, what does

23   Mr. Hightower say to Ms. Washington?

24   A.   "I can't" -- "I can't lie" -- you said 19 -- line 26?

25   Q.   Uh-huh, "I can't lie."

1    A.   Okay.   "I can't lies, that just fucked me up, and niggas

2    saying I look crazy, like I got death in my eyes."

3    Q.   And then the text below from Mr. Hightower to

4    Ms. Washington?

5    A.   "Davon say I look like that, Cliff say I look like I been

6    drinking."

7    Q.   And then down below that, between Mr. Hightower and

8    Ms. Washington, what is the last text in that series of text

9    messages on October 3rd?

10   A.   "My home" -- it's "ny," but it should be "my," "My home

11   boy say I look like something wrong."

12   Q.   When you say that, are these typed exactly the way they

13   appear in the Cellebrite?

14   A.   Yes.

15   Q.   Is it possible it's NY for New York?

16   A.   Yes.

17   Q.   You don't know, it's just what it says in the

18   Cellebrite?

19   A.   Correct.

20   Q.   Okay.   Now, after that detention hearing that you read a

21   portion of on September 30th, 2015, and continuing up till

22   May 4th of 2015, did Mr. Hightower remain on release?

23   A.   Yes.

24   Q.   I'm going to go down, if I can, to October 7th of 2015,

25   and.   I'm afraid to move this thing and have this -- okay.

1        And we'll go to 11:23 a.m., and is there a call between

2   Mr. Hightower at 6:43 and Mr. Carter at about 1:28 -- I mean,

3   for one minute and 28 seconds?

4   A.  Yes.

5   Q.  And then as it follows, is there some text messages for

6   which we don't have the content for?

7   A.  Correct.

8   Q.  And then down below that, are there text messages between

9   Ms. Washington and Mr. Hightower?

10  A.  Yes.

11  Q.  And eventually does Mr. Hightower and Ms. Washington talk

12  about someone named Stokes at 1:30?

13  A.  Yes.

14  Q.  And on the transcript that you read, is Mr. Stokes the

15  supervising officer of Mr. Hightower when he was on release?

16  A.  Correct, he's the probation and parole officer.

17  Q.  Now, as that continues on October 7th, do you see

18  communications between Mr. Carter and Mr. Hightower, including

19  this one for a minute and 54 seconds?

20  A.  Yes, I do.

21  Q.  And then down below, the next day, are there

22  communications between Mr. Hightower and Mr. Bardos that

23  continue also on October 9th?

24  A.  Yes, there's three calls on the 8th -- or one call on the

25  8th and two calls on the 9th.

Direct Examination - Wilde   (By Ms. Wilkinson)

1    Q.   Now, I want to go down here to October 10th of 2015.  Let

2    me pull that up.  Please tell me if it's hard to read.

3         Is there a call at 8:45 in the morning on October 10th

4    between Mr. Carter's number and Mr. Hightower's number?

5    A.   Yes, there is, it's 26 minutes and 37 seconds long.

6    Q.   And then do we see on Government's Exhibit P-2 a number of

7    text messages from Lisa Edmonds to Special Agent Fuchs?

8    A.   Yes.

9    Q.   And is there another call at 10/10/2015 between Mr. Carter

10   and Mr. Hightower for 18 minutes and 58 seconds?

11   A.   Yes, at 9:24 a.m.

12   Q.   And down below that, are there two events noted from the

13   files of the probation office with Mr. Hightower being on

14   release there that are indicated on October 10th and then

15   again on October 12th?

16   A.   On October 10th at 5:04 p.m., it indicates that Matthew

17   Hightower returned home.  And then on October 12th, at

18   8:37 a.m. it says Hightower left the house at 8:37 and came

19   back at 9:25.

20   Q.   So Mr. Stokes was his electronic monitoring officer?

21   A.   Yes.

22   Q.   Okay.  I'm going to go down below, and do we see

23   additional communications between Mr. Hightower and his

24   attorney, and then one on October 12th between Mr. Carter and

25   Mr. Hightower for an hour and 24 seconds?

1    A.  Yes.

2    Q.  Now, the next event that's noted on here is another

3    meeting between Mr. Bardos and Mr. Hightower, and what date

4    would that be for?

5    A.  October 13th, 2015.

6    Q.  And do we see a series of text messages again between

7    Mr. Hightower and Ms. Washington?

8    A.  Yes.

9    Q.  Does he make a reference on October 13th to Mr. Bardos?

10   A.  It says, "I'm sitting here thinking about when I was

11   trying to be serious with Bardos, and you kept making me

12   laugh."

13   Q.  And after we see that communications, does Mr. Hightower

14   and Mr. Carter's phone continue to be in regular -- well,

15   strike that.

16       And in contact with one another on October 4 -- well, let

17   me see, October 15th, October 16th -- I mean, October 17th, do

18   you see those communications here?

19   A.  Yes.

20   Q.  Okay.  Let's go down to October 23, 2015, and what is the

21   next event we have noted on here?

22   A.  E-mail from Stokes, second notice of apparent violation to

23   court.

24   Q.  And on that particular day, did there continue to be

25   contacts between Mr. Carter and Mr. Hightower's phone, both on

Direct Examination - Wilde   (By Ms. Wilkinson)

1    October 23, October 24, October 25th, as indicated on

2    Government's Exhibit P-2?

3    A.  Yes.

4    Q.  And that included an 11-minute call on October 23rd?

5    A.  Yes.

6    Q.  Okay.  Now, and before when we were talking about

7    Government's Exhibit P-2, you said sometimes there's notes on

8    the right-hand corner.  We have one here in a text from

9    Mr. Hightower to Ms. Washington, was there actually a link and

10   a text message she received, and did you make an observation

11   that it had nothing to do with Ms. Ashburne's murder?

12   A.  Yes.

13   Q.  It was just a news link; is that right?

14   A.  That's correct.

15   Q.  Okay.  Now I'm going to direct your attention to

16   November 2nd of 2015, and particularly at 11:08, was there a

17   call between Mr. Hightower and Mr. Bardos for 25 seconds up

18   here at the top?

19   A.  Yes, there was.

20   Q.  And is it followed that even evening with a series of text

21   messages from Mr. Carter -- I mean, not Mr. Carter,

22   Mr. Hightower and Ms. Washington?

23   A.  Yes.

24   Q.  Okay.  And over here, what does Mr. Carter say --

25   Mr. Hightower, I'm sorry, say at 5:28 p.m.?

1   A.   He says, "I'm stressed."

2   Q.   What does she answer?

3   A.   "Why?"

4   Q.   Go ahead and keep reading.

5   A.   "What is the matter?"

6   Q.   And down below, does Ms. Washington say, "That was not my

7   intention"?

8   A.   Well, Hightower says, "You," and then she says, "That was

9   not my intention," and then Hightower comes back and says, "I

10   know you say it's nothing, but you changed my whole mood."

11   Q.   Okay.  Again, we can all read the content of these, but

12   let's go down to 5:45, does Mr. Hightower make a reference to

13   Mr. Stokes again?

14   A.   Yes, he says, "I'm sorry for pushing my troubles on you.

15   I wasn't having a good weekend, and I ain't been myself since

16   last week.  Today was a much better day for me until I talked

17   to Stokes."

18   Q.   Okay.  Now, I'm going to go down to November 16th of 2015,

19   and directing your attention to a text message between

20   Mr. Hightower and Ms. Washington at 23:51 on November 16, is

21   there a reference there to Davon and a man named Panama?

22   A.   Yes, it says, "Panama and Davon weren't talking about

23   shit, I was missing you the whole time."

24   Q.   And two lines down, is there another reference to Davon?

25   A.   Yes, it says, "I tried to give you and him time to kick it

1    because we talk all the time.  I didn't want Davon to feel

2    like he came up there and you being rude."

3    Q.  And was that text message actually from Ms. Washington to

4    Mr. Hightower?

5    A.  It was.

6    Q.  Now, come November 24th -- yes, November 24th, 2015, is

7    there another event that's recorded on Government's

8    Exhibit P-2 at 9:00 o'clock a.m.?

9    A.  Yes, the Court schedules a bail review hearing.

10   Q.  And subsequent to that, is there a message from

11   Mr. Hightower to Ms. Washington at 16:57 about that hearing?

12   A.  Afterwards, yes, it says, "Forward hearing is set for

13   Monday at 2:30.  I will meet you at 2:15.  Please have your

14   witness present."

15   Q.  And then again below that.

16   A.  "Sorry, the hearing is on Tuesday at 2:30."

17   Q.  And as we look and continue on November 24th, do we see

18   Mr. Carter attempting to reach Mr. Hightower several times, do

19   you see that here?

20   A.  Yes.

21   Q.  And then at 8:24 p.m. is there communication between

22   Mr. Hightower and Mr. Carter that lasts three minutes and 41

23   seconds?

24   A.  Yes, there is.

25   Q.  Now, if we continue down into later that month on

1    November 27th, does Mr. Hightower, Ms. Washington continue to

2    talk about Mr. Stokes at a 3:01 text message?

3    A.  Yes, it says, "Okay.  I'm about to call Stokes."

4    Q.  And then as I continue down here again, I won't have you

5    read all of these, but if you can go to November 29th, 2015 at

6    21:00s, between Mr. Hightower and Ms. Washington, if you can

7    read for the record what is noted here.

8    A.  "The Court hearing is heavy on my mind."

9    Q.  And what does she respond?

10   A.  "You worried about the outcome?"

11   Q.  And then down below at 23:00 hours, what does

12   Mr. Hightower text Ms. Washington, starting with "but yes"?

13   A.  "But yes, I'm worried about the outcome.  Most of all, I'm

14   scared to leave you."  And he says that twice.

15   Q.  Now, on December 1st, 2015, is there another reference to

16   a hearing involving Mr. Hightower's case?

17   A.  Yes.  December 1st, 2015 at 2:30 p.m., it says bail review

18   hearing.  And then December 2nd, Bardos meeting with

19   Hightower.

20   Q.  I think I neglect -- and I won't go back and do this, but

21   on November 24th, did I ask you to do one of those sheets that

22   just isolate the communications on November 24th, 2015, which

23   is Government's Exhibit P-2C?

24   A.  Yes, ma'am.

25   Q.  And I won't have you read them here, and I'm going to go

1    back now to the main exhibit.  And I'm going to go down to a

2    communication on December 9th of 2015.  And looking at 21:17

3    between Mr. Hightower and Ms. Washington, can you read the

4    text message there?

5    A.  "Hey, boo, I'm talking to Cliff right now.  I'm sorry, for

6    cutting our call short."

7    Q.  Does there continue to be communication between the parole

8    and probation number and Mr. Hightower in December, as

9    reflected on Government's Exhibit P-2?

10   A.  Yeah, so on December 10th beginning at 9:27 a.m., parole

11   and probation is calling Mr. Hightower, and then again at

12   10:34 a.m., parole and probation is calling Mr. Hightower.

13   Q.  Okay.  Let's go up to January 6th of 2016.  And do we

14   start to see those communications between Mr. Hightower and

15   Mr. Mosley's 1533 number?  And I'm referring now to line 1670

16   at 1/6/2016, 6:33 p.m.

17   A.  Yes, it's a 51-second call.

18   Q.  And is that the phone -- one of the phones that you mapped

19   and attributed to him in addition to the 2650 number?

20   A.  Yes.

21   Q.  Okay.  And after you see this here at 6:13, Mr. Mosley --

22   did there continue to be contacts between Mr. Mosley and

23   Mr. Hightower's number, as reflected on --

24   A.  After 6:33?

25   Q.  After -- yes, is there one on January 7th and again on

Direct Examination - Wilde   (By Ms. Wilkinson)

1    January 7th?

2    A.   Yes.

3    Q.   Just contacts back and forth between the phones?

4    A.   That's correct.

5    Q.   Now, just to remind the jury, we're looking over here at

6    the target number.  These communications, it says from

7    Mr. Mosley to Mr. Hightower, the target number is 6448, what

8    does that mean?

9    A.   That's the number where we retrieved the records from the

10   back and forth.  So we didn't have the 1533's number going

11   back that far, but we had 6448, and that number was in contact

12   with 1533, so we can get that contact from that record.

13   Q.   And January 7th, 2016, we continue to see some

14   communication between Mr. Hightower, like at 9:25 a.m. here,

15   and parole and probation?

16   A.   Yes.

17   Q.   And then right after that, there's a 10:57, is there a

18   communication from Mr. Mosley to Mr. Hightower, it's only 17

19   seconds, you see that there?

20   A.   Yes.

21   Q.   And do we continue to see additional communications

22   between Mr. Mosley and Mr. Hightower's number, as reflected on

23   P-2?

24   A.   Yes, ma'am.

25   Q.   Okay.  Now, I'm going to go to February 1st of 2016.  To

Direct Examination - Wilde   (By Ms. Wilkinson)

1    the extent we have content for all of the messages between

2    Ms. Washington, Arielle Washington, and Matthew Hightower, are

3    they from the Cellebrite we recovered on her phone?

4    A.   Yes.

5    Q.   Okay.  So we're beginning on December 1st, and we see

6    Mr. Hightower having some communication with parole and

7    probation on that day, do you see that?

8    A.   Yes, on February 1st.

9    Q.   And then down below that, 11:37, do you see a

10   communication between Mr. Hightower and his attorney,

11   Mr. Bardos?

12   A.   Yes, it's eight minutes and 37 seconds long.

13   Q.   And as we continue going down this, on February 1st at

14   10:50 p.m., between Mr. Hightower and Ms. Washington, what

15   text message did we recover from her phone?

16   A.   It says, "Yes, boo, I made it.  Had Davon and Cliff and

17   kid come through, they all just left."

18   Q.   And if I go down to 2/3 at 12:46, is there content

19   recovered from Mr. Hightower about where he was on

20   February 3rd of 2016?

21   A.   Yes, it says, "I'm at the Audi dealer for a couple hours."

22   Q.   And as we continue down into February, I'm going to go to

23   February 10th, 2016, and direct your attention to a series of

24   text messages, after some calls between parole and probation

25   and Mr. Hightower on February 10th, do you see that there?

1    A.  Yes, ma'am.

2    Q.  Okay.  And we're looking at February 10th, 22:33, and what

3    does Mr. Hightower tell Ms. Washington?

4    A.  "Stokes."

5    Q.  And what does she say?

6    A.  "What?"

7    Q.  And what does she continue with?

8    A.  "Are you saying?"  And then Hightower comes back and says,

9    "Just said he got a hit saying that I was pulled, okay."  And

10   then she comes back and says, "What's up?"

11        And he says, "Pulled."  And she says, "Pulled over?"  And

12   then Hightower says, "Yes, every time I get pulled, he gets an

13   alert."  And then --

14   Q.  Is there a text message on her phone, even though it

15   doesn't have the phone number, what is the response?

16   A.  It says, "Fuck him."

17   Q.  And is there a meeting between Mr. Bardos, Mr. Hightower's

18   attorney, on February 12th, 2016 that's recorded on

19   Government's Exhibit P-12?

20   A.  Yes, on February 12th.

21   Q.  Now, did I ask you to prepare a sheet reflecting a subset

22   of the calls that get rid of the extraneous calls between

23   February 12th and February 18th, and I will refer to

24   Government's Exhibit P-2D, and is that up on the screen now?

25   A.  It is.

Direct Examination - Wilde   (By Ms. Wilkinson)

1   Q.   And at the beginning of February 12th -- not the

2   beginning, the beginning of this sheet, at 3:38, do you see

3   contacts between Mr. Carter, Mr. Mosley, but the second one

4   really I'm directing your attention to is Mr. Hightower

5   reaching out to Mr. Mosley?

6   A.   Yes.

7   Q.   And does there continue to be contact between those two

8   phones up until the time Mr. Hightower calls Mr. Bardos on the

9   15th?

10   A.   Yes.

11   Q.   For a minute and 42 seconds, do you see that there?

12   A.   Yes, ma'am.

13   Q.   Does there continue to be contact in that time frame

14   between Mr. Mosley and Mr. Hightower's phone?

15   A.   Yes.

16   Q.   Now, directing your attention to the February 16th time

17   frame, did you locate text messages between Davon Carter and

18   Deanna Lawson pertaining to an injury that he had in February

19   of 2016, and as reflected on Government's Exhibit P-2B?

20         MS. WILKINSON:   Thank you, Ms. Lesser.

21   A.   Yes.

22   Q.   (BY MS. WILKINSON)  And are they up on the screen right

23   now?

24   A.   They are.

25   Q.   And again, I don't need to have you read all of them, but

1    the top one, the first two lines, just for the record, what

2    does Mr. Carter tell Ms. Lawson on February 27th, 2016?

3    A.   He says, "I slipped and fell at the job, I'm at

4    concentrate (sic) right now, call me."

5    Q.   And what does he say after that?

6    A.   "I fell, my wrist is killing me."

7    Q.   And does Mr. Carter make -- does he make a reference to

8    getting an Oscar for best actor a day later in a text message

9    to Ms. Lawson?

10   A.   Yes, he does.

11   Q.   And then down below, how does that series of text messages

12   conclude on February 18th, 2016?

13   A.   He says, "Oh, I'm not, but I live with this pain, so I

14   know how it feels as well as how to react and act."

15   Q.   Okay.  And I'm going to go now to March 3rd, 2016, and I'm

16   going to direct your attention to the middle of the page, is

17   there a text message that was recovered -- Ms. Lawson to

18   Mr. Carter, and what is the content of that message?

19   A.   It says, "Make sure you not running and carry the bags

20   with your left hand."

21   Q.   Okay.  I'm going to go down to March 20th of 2016.  And

22   direct your attention to a text message from Mr. Hightower to

23   Ms. Washington at 5:41, do you see that there?

24   A.   Yes, ma'am.

25   Q.   And if you can just read that for the content, over in

Direct Examination - Wilde   (By Ms. Wilkinson)

1    the -- from the Cellebrite.

2    A.  It says, "Boo, I'm sorry you don't understand why, but I

3    know you know why.  If you calm down and think for a min, I

4    had to get some things in motion, and I know this is not what

5    you're used to."

6    Q.  And then if I go down to four lines later at March 20th at

7    12:19, Mr. Hightower to Ms. Washington, what does he say

8    there?

9    A.  He says, "Everything's okay, boo, I gotta see Cliff."

10   Q.  And March 21st, do you see a communication between

11   Mr. Mosley's phone and Mr. Hightower's phone, for example, for

12   29 seconds?

13   A.  Yes, at 7:06 p.m.

14   Q.  And on that same day, was Mr. Hightower having

15   communication with his attorney, Mr. Bardos?

16   A.  He was, at 5:21 and 6:58 p.m.

17   Q.  And down below, on March 21st, do we pick up content from

18   Ms. Lawson to Mr. Carter that also refers to Matt?

19   A.  It says, "Come on, babe, we still have to go to Matt

20   house, and I told you I'm getting sleepy."

21   Q.  And did we see some text messages at 20:14, 20:18 between

22   Mr. Hightower and Mr. Carter, but we don't have content?

23   A.  Yes, ma'am.

24   Q.  I'm going to go down to April 15th of 2016.  Did you

25   recover text message content from Mr. Carter's 2399 phone?

Direct Examination - Wilde  (By Ms. Wilkinson)

1    And it's in the middle of the page, and if I could have you

2    read it for the record, over here.

3    A.  It says, "Slipped on some ice, fuck my wrist and back up.

4    May have to get surgery on my shit."

5    Q.  On April 16th, 2016 at 21:24, what does Mr. Hightower text

6    to Ms. Washington?

7    A.  It says, "I'm okay, boo, I'm rapping with old heads."

8    Q.  Okay.  And then down to April 19th, 2016, do we recover

9    the text messages from Ms. Lawson to Mr. Carter, and what is

10   the content that we get over here in the right-hand corner?

11   A.  "You need to get insurance money from Matt, it comes out

12   of my account in two days."

13   Q.  And does Mr. Carter indicate a response?

14   A.  He says, "Okay."

15   Q.  I'm going to go down to April 20th of 2016, and are there

16   a series of text messages recovered from Ms. Lawson's phone

17   between herself and Mr. Carter?

18   A.  Yes.

19   Q.  And I'm going to back up because that's what I intended to

20   do on my outline, and I'm going to show you Government's

21   Exhibit H-10, just the first page of it, for the record.

22       And does it reflect whether or not a witness appeared

23   before the federal grand jury in the Hightower matter on that

24   date?

25   A.  Yes.

Direct Examination - Wilde  (By Ms. Wilkinson)

1    Q.   And who was the witness that appeared?

2    A.   D'Angelo Herbert.

3    Q.   Could you spell Herbert for the record?

4    A.   It's H-e-r-b-e-r-t.

5    Q.   Did I ask you about the date, February 23rd, 2016?

6    A.   I can't see it from there, I'm sorry.

7    Q.   Sorry --

8    A.   Yes, ma'am, it's Tuesday, February 23rd, 2016.

9    Q.   So now we're in April 20th of 2016, do you see

10   communications from Mr. Hightower's phone with a person named

11   D'Angelo Herbert above, where my cursor is?  April 9th, do you

12   see communications back and forth between Mr. Hightower and

13   Mr. Herbert?

14   A.   Yes, ma'am, on the 19th, actually starts at 2:20 p.m., but

15   then goes back and forth.

16   Q.   And are these communications with Mr. Herbert on April

17   2016 after his appearance in the grand jury on February 23rd,

18   2016?

19   A.   Yes.

20   Q.   Now, going down to the April 20th text messages on

21   Ms. Lawson and Mr. Carter's phone, what does Ms. Lawson tell

22   Mr. Carter over on the right?

23   A.   She says, "All you have to do is stay out of the inner

24   city so you can stay out of trouble, but you can't seem to

25   leave it alone."

Direct Examination - Wilde  (By Ms. Wilkinson)

1  Q.  And you can keep reading the conversation.

2  A.  He says, "Really?"  She says, "Yup."  And then he comes

3  back and says, "Well, I'm not doing nothing to get in

4  trouble."  And then, "It's not, you are right."

5      And then Ms. Lawson comes back and says, "You will

6  understand where I'm coming from one day, just hope it's not

7  too late when you do.  Changing people and places is a must."

8  Q.  And does she say, "But I can't force it"?

9  A.  Then she says, "But I can't force it."  Then he comes back

10  and says, "You keep saying that like I be around all these

11  people or whatever.  But your opinion is your opinion."

12      And then she comes back and says, "It's not that you be

13  around all these people, it's that you aren't around the

14  people with the mind set that you want your future to go in.

15  So when you hanging around with people with nothing, you end

16  up losing."

17  Q.  Again, go down, I'm not going to have you read all of it,

18  but does Ms. Lawson say something about, "I'm not assuming

19  anything," and can you read that text message for the

20  record?

21  A.  So that's at 12:56, she says, "I'm not assuming anything.

22  I know how simple-minded people are and people don't forget

23  what people have done to them and bullets have no name.  I

24  could care less about what they are doing."  And then he says,

25  "Okay, I understand."

Direct Examination - Wilde   (By Ms. Wilkinson)

1        MS. WILKINSON:  And we just lost communication, I'm

2   not sure how.  One second, Your Honor.  Let's see if I can do

3   this.

4        THE COURT:  Technology and weather, two things we

5   can't control.

6        MS. WILKINSON:  I'm getting so close to the end.  I

7   might be able to do the ELMO.  Let me see.  I think I can.

8   I'm going to keep going, Your Honor.

9   Q.  (BY MS. WILKINSON)  If you can see P-2 in front of you,

10  Agent.

11  A.  I can.

12  Q.  Let's see if I can keep going without us stopping.  I

13  actually have snips of it that I'll show you up on the screen

14  as part of my outline here.

15       As we continue down on that series of communications

16  between Ms. Lawson and Mr. Carter --

17        MS. WILKINSON:  Oh, I can see it on here too.  So

18  you put me back on the door?  Thank you.

19  Q.  (BY MS. WILKINSON)  And on April 20th at 12:57, what does

20  Ms. Lawson text to Mr. Carter here?

21  A.  She says, "You don't know about these people past live and

22  what may come back to haunt them, and I don't want you around

23  it.  That's all I'm saying.  I want a long life with you."

24  And then she says, "Too many men are being killed in the inner

25  city and I don't want you there.  That's all I'm saying."  And

Direct Examination - Wilde   (By Ms. Wilkinson)

1    then he says, "Okay."

2    Q.  And if I -- I'm just going to search real quick so I make

3    sure I direct you to the right time.

4        And above those text messages, the one that I missed,

5    that one is at 12:55 from Mr. Carter to Ms. Lawson, and I'll

6    just put it up on the screen and have you read it.  What does

7    Mr. Carter tell Ms. Lawson?

8    A.  "You're assuming what people" --

9    Q.  Where my finger is.

10   A.  I'm sorry, oh, "Furthermore, no one can make me do nothing

11   I don't want to."

12   Q.  Now, as I continue down on April -- to April 26th of 2016,

13   is there a text message between Ms. Lawson and Mr. Carter

14   that's reflected on April 26 at 11:42?

15   A.  Yes, ma'am.

16   Q.  And what does Ms. Lawson say to Mr. Carter?

17   A.  "So you can tell one person now, which I know you probably

18   already told Matt."

19   Q.  You don't have to read the rest of it, that's fine.  Okay.

20   I'm going to proceed down into the beginning -- end of April,

21   beginning of May.

22       Okay.  And I know we can't look at it up on the screen,

23   but if I could draw your attention to April 29th, 2016, Agent

24   Wilde, and are there text messages again between Mr. Carter

25   and Ms. Lawson that refer to Matt?

1    A.  Yes.

2    Q.  Okay.  And I'm going to start with the 10:04 down to the

3    10:06, and if you could just -- there's five text messages,

4    can you just read the back and forth so the jury can get a

5    sense of what the content is.

6    A.  So this is from Mr. Carter to Ms. Lawson, "We spoke on it

7    yesterday.  That's why I didn't answer.  I took it as you,

8    just adding to what you already said, which didn't need a

9    response."

10        And then he says, "My thing, you act as if I'm hanging,

11   drinking, saying fuck everything.  Yes, I may speak to a

12   person on the phone, but I'm not over their house.  Yes, I

13   might stop by and say what's up with Matt, but I'm not sitting

14   outside with him.  Why?  Because he is at work."

15        And then she says, "I'm not saying you doing anything

16   negative, baby."  And then it ends with her, "Or the people in

17   seeing are gun-toting thugs."

18   Q.  Ask you to prepare a sheet, which I think I'm going to

19   have to use the door, indicating a series of communications,

20   beginning on May 2nd, 2016, that date that you did the cell

21   site mapping on through May 4th, 2016.

22        And I'm going to put it up on the screen now as

23   Government's Exhibit P-2F.  And the event that you recorded at

24   the top of the screen is what?  Can you see that there, it's

25   not very clear?

1    A.  Yes, it's kind of hard to read.  So it looks like an

2    e-mail from Mr. Bardos to Mr. Hightower it says, "Attachment,

3    second indictment."

4    Q.  Did I ask you to collect all of the communications back

5    and forth between Mr. Mosley and Mr. Hightower between May 2nd

6    and May 4th?

7    A.  Yes.

8    Q.  And Mr. Carter and Mr. Hightower between May 2nd and

9    May 4th?

10   A.  Yes, ma'am.

11   Q.  And where we have no content, obviously you indicate that

12   as well; is that correct?

13   A.  Yes, ma'am.

14   Q.  Now, at some point we were discussing earlier in your

15   testimony that there weren't any communications that you could

16   find in the phone records we have between Mr. Mosley and

17   Mr. Carter before May of 2016; is that correct?

18   A.  Yes, ma'am.

19   Q.  Do we start to see contact between the two phones on

20   Government's Exhibit P-2F?

21   A.  Yes, ma'am.

22   Q.  And I'm just -- draw -- you know, take one as an example

23   here, what time, for the record, do we see a communication on

24   May 3rd, 2016?

25   A.  3:55 p.m.

1    Q.  And does one of them end with a 56-second duration at

2    4:30 p.m. on May 3rd?

3    A.  Yes, ma'am.

4    Q.  Now, is this the night before Mr. Hightower was to go to

5    court and eventually be incarcerated on the murder charges of

6    Mr. Wutoh?

7    A.  Yes.

8    Q.  And I'm going to draw your attention to Government's

9    Exhibit -- the next one, P-2G.  And to the extent that you

10   were --

11            MS. WILKINSON:  I'm sorry, Your Honor, it's hard

12   when I --

13   Q.  (BY MS. WILKINSON)  Okay.  Did I ask you to prepare a

14   spreadsheet of when we were able to get content off of

15   Mr. Carter's 2399 phone or a phone that he was in

16   communication with and recorded on Government's Exhibit P-2G,

17   just isolating the content of what he said in May of 2016?

18   A.  Yes.

19   Q.  And down below, for example -- or up top, I should say,

20   was there communication from Mr. Carter on May 11th over

21   here -- can you just read that for the record?

22   A.  It says, "Yo, I got that fire, give me a holla."

23   Q.  And then down below -- start to have -- here it is down

24   below here -- communication on May 27th at 9:45 between

25   Mr. Carter and Anthony Hart, also known as Hakim?

1   A.  Yes.

2   Q.  And is this the individual you had indicated was already

3   in South Carolina by 6:30?

4   A.  Yes, ma'am.

5   Q.  And does he -- does it have the content of that

6   communication?

7   A.  It just says, "If it's any room, let me know."

8   Q.  Now, if I could turn to May 16th of 2016, and did we

9   prepare a sheet for the jury to see the communications between

10  Mr. Carter and Mr. Mosley on May 16th of 2016?

11  A.  Yes.

12  Q.  And are they accurately reflected on Government's Exhibit

13  P-2H?

14  A.  Yes, ma'am.

15  Q.  And where -- I'm sorry, I should do it like that so you

16  can see while I'm talking.

17      Now, to the extent we have content, can you read what it

18  says from Mr. Mosley to Mr. Carter's 1533 to the 2399 number

19  that morning?

20  A.  So at first from Mr. Mosley to Mr. Carter it says, "Wake

21  up."  Then Carter comes back to Mosley and says, "I'm up, out

22  the door to you now."  And then Mosley comes back and says,

23  "ARD."

24  Q.  And down below -- I haven't asked you about this before,

25  are there times in the exhibit -- the call detail records that

1    you get, Agent Wilde, where we see a reference to Global Tel

2    Link?

3    A.  Yes, ma'am.

4    Q.  And what is Global Tel Link?

5    A.  Global Tel Link is the jail call system, so when an inmate

6    is incarcerated and making phone calls from jail, Global Tel

7    Link is the company that handles that call.

8    Q.  So does this reflect on May 16th at 9:58 a jail call was

9    received by Mr. Carter that lasted about 24 minutes on

10   May 16th, 2016?

11   A.  Yes, ma'am.

12   Q.  Okay.  And then the event that's noted below here, is

13   what?

14   A.  Traffic violation, ticket issued to DC Carter in Audi, Old

15   Court Road and Greenwood Road.

16   Q.  And did there continue to be communications between

17   Mr. Carter and Mr. Mosley's phone into the evening of May 16th

18   of 2016?

19   A.  Yes, ma'am.

20          MS. WILKINSON:  Can I see Government's Exhibit

21   P-2H -- P-2I.  Put it up on the screen.

22   Q.  (BY MS. WILKINSON)  Now, we were talking earlier about the

23   7626 number, Mr. Carter's number that started on May 25th,

24   2016?

25   A.  Yes, ma'am.

1   Q.  And to the extent we were able to get communications

2   between that 7626 number and Mr. Mosley's 1533 number, are

3   they accurately recorded as a subset of P-2 on Government's

4   Exhibit P-2I?

5   A.  Yes.

6   Q.  And do we see the communications beginning May 25th and

7   concluding -- I'll go to the last one here, the May 30th one,

8   before I get to the last one, do you see that there?

9   A.  Yes, ma'am.

10   Q.  Okay.  Now, at some point an investigation on June 1st,

11   Mr. Carter's -- was stopped and arrested and his 7626 number

12   was seized that day; correct?

13   A.  Yes, ma'am.

14   Q.  Did a text message come in from Mr. Mosley on June 4th,

15   2016, and if you could read it over here in the content?

16   A.  It says, "You got some tree or not?  I need to get high."

17   Q.  And obviously, that came in when the phone was already in

18   police custody?

19   A.  Yes, ma'am.

20   Q.  I had previously showed you, but let me make sure it's in

21   the record, Government's Exhibit P-2J, is this the subset that

22   pertains to the communications between Ms. Lawson and

23   Mr. Carter on May 27th, 2016?

24   A.  Yes, it is.

25   Q.  And are all the communications between those two numbers

Direct Examination - Wilde   (By Ms. Wilkinson)

1   only on that 2399 number of Mr. Carter's?  You can take a

2   moment to look at it.  If you need me to bring it up, I will.

3   A.  Yes, ma'am.

4   Q.  See that there?

5   A.  Yes.

6   Q.  Thank you.  And then coming down to the nitty-gritty here,

7   Government's Exhibit P-2K, and again, I think I previously

8   showed you, is this the subset involving the communications

9   between Ms. Melvin's phone and Mr. Mosley on May 27th, 2016?

10  A.  Yes, ma'am.

11  Q.  And again, the calls, up until the time when the phone is

12  used at 7:44, went unanswered?

13  A.  Correct.

14  Q.  And then P-2L, did I ask you to do a subset of information

15  pertaining to the use of Mr. Carter's 2399 number beginning

16  with the first use of that phone on May 27th, 2016?

17  A.  Yes.

18  Q.  And what was the first use of Mr. Carter's 2399 phone?

19  A.  It was at 9:25 a.m.

20  Q.  And then to the extent we have content on that phone, is

21  it indicated -- under the content of messages, text machine

22  there?

23  A.  Yes, ma'am.

24  Q.  And P-2M, is this a subset of information pertaining to

25  contacts with a man by the name of Shayne Bird?

Direct Examination - Wilde  (By Ms. Wilkinson)

1    A.  Yes, ma'am, it is.

2    Q.  And that comes from P-2 as well?

3    A.  Yes, ma'am.

4    Q.  And then P-2N, I think I showed you this one before, it

5    pertains to the communications in July of 2015 through August

6    of 2015; correct?

7    A.  Yes.

8    Q.  Okay.  Let me turn this off for a second.  And I just want

9    to go through a couple of exhibits.  Before I had shown you

10   and offered into evidence the 7626 number and the 5150 number.

11       I did not show you the Cellebrite for the 2399 number,

12   can you give the jury an idea of how voluminous that entire

13   Cellebrite is?

14   A.  Yes, it's -- I believe it's for an iPhone, and it's

15   thousands and thousands of pages.

16   Q.  And to the extent you have summarized what came from that

17   2399 number, is it in Government's Exhibit P-2 and the various

18   sub exhibits that we just introduced to the jury?

19   A.  Yes, ma'am.

20   Q.  Now, with regard to Ms. Lawson's phone, did you review a

21   forensic extraction of her phone, Government's Exhibit P-14?

22   A.  Yes.

23   Q.  And as part of the analysis that you have done and your

24   testimony this afternoon, did we ask you to date and time

25   certain images that came from various phones on Government's

Direct Examination - Wilde  (By Ms. Wilkinson)

1    Exhibit C-22?

2    A.  Yes, ma'am.

3    Q.  And are the dates accurately recorded in terms of the one

4    on the right, the middle one, and over here that I'm pointing

5    to under 5/24/2016?

6    A.  Yes.

7    Q.  And over here, is that time correct, based on your review

8    of the documents?

9    A.  No, it is not.

10   Q.  What is the actual time?

11   A.  It should be 12:50 p.m.

12   Q.  So I'm going to go ahead and correct that document.

13        Again, each one of these photographs are they of

14   Mr. Carter?

15   A.  Yes.

16   Q.  And do they come from the forensic Cellebrites that you

17   described to the jury?

18   A.  They did.

19        MS. WILKINSON:  And I do want to check my notes.  I

20   am coming to the end, but I hate to turn the witness over when

21   I'm a little tired at the end.  May I have the Court's

22   indulgence and carry over the end of my direct tomorrow

23   morning?  I'll continue going, but I just want the make sure

24   that I've checked all my notes.

25        THE COURT:  Sure.  Keep going until you think you're

Direct Examination - Wilde  (By Ms. Wilkinson)

1    done, then we'll break for the evening.

2         MS. WILKINSON:  Thank you, Your Honor.

3    Q.  (BY MS. WILKINSON)  And I'm going to show you Government's

4    Exhibit -- this picture here taken at May 27th, at 7:25 p.m.,

5    is that the same picture that's reflected, just enlarged, from

6    Government's Exhibit C-22A?

7    A.  Yes, ma'am.

8    Q.  When you were reviewing the call detail records and

9    explaining them to the jury, you were talking about the

10   different time zones data can come in and how you have to make

11   it all converted to Eastern Standard Time so we can make sense

12   of it; is that correct, Agent Wilde?

13   A.  Yes, ma'am.

14   Q.  When you look at the original Cellebrites, occasionally

15   they are in UTC time, which I think you were getting ready to

16   describe at one point?

17   A.  Yes, ma'am.

18   Q.  And which is that?

19   A.  UTC is Coordinated Time, so a lot of technology companies,

20   they store things, they operate across different time zones.

21   So the easiest way to store the records is in UTC, so it's

22   standardized across the time zones they operate in.  And so

23   sometimes the call detail records come in UTC time.  Sometimes

24   the Cellebrite reports are generated in UTC time.

25        So you have to do that conversion.  Easiest way to think

1    of it is, in the summer for Maryland or Eastern Time, it's

2    minus four hours.  So I take my UTC time and I subtract four

3    hours.  In the winter, it's minus five.

4    Q.  And with regard to some of the Cellebrites, are you

5    familiar with a GMT time?

6    A.  Yes, that's the same thing as UTC time.

7    Q.  So I'm going to put up what's already been admitted as

8    C-18 and a reference to GMT times, if you were to convert

9    that, so it's compared to your P-2, and I think this is your

10   handwriting; is that correct, Agent Wilde?

11   A.  Oh, yes, ma'am.

12   Q.  And did you convert for us the actual times that appear on

13   Government's Exhibit C-18 to show the difference between GMT

14   and Eastern Standard Time?

15   A.  Yes, ma'am, so the first record is 18:31 GMT, subtract

16   four hours, it's 2:31 p.m.  And then the last record is at

17   19:53, so I subtract four hours, it's 3:53 p.m.

18   Q.  So Eastern Standard Time would be reflected, as in the

19   Post-it, if you were then to compare it to Government's

20   Exhibit P-2?

21   A.  Yes, ma'am.

22   Q.  And is these text messages between Ms. Lawson and

23   Mr. Carter?

24   A.  Yes, they are.

25   Q.  I'm going back to Government's Exhibit P-2, and I'm going

1    to go all the way to the end and come up to the time frame of

2    December of 2016.

3         Now, we didn't put it in red up here, but 12/19/2016 at

4    12:08, do you see an e-mail from Agent Fuchs to Ms. Melvin

5    that's reflected in Government's Exhibit P-2?

6    A.   Yes, ma'am.

7    Q.   And what does it reflect?

8    A.   It says, subpoena to testify on December 20th, 2016.

9    Q.   And issued to Mr. Mosley?

10   A.   I'm sorry?

11   Q.   I'm sorry, right below that, is there a text message from

12   Ms. Melvin to Mr. Mosley on 12/19 at 12:55?

13   A.   Yes, it says, "I spoke to them, they sent it to me."

14   Q.   And if you look here, does it appear to have the exact

15   same message right below the one that you just read?

16   A.   Yes, ma'am, it's going to two different numbers, same

17   message.

18   Q.   All right.  Now the two different numbers we have

19   attributed to Mr. Mosley, one of them is the 2650 number; is

20   that correct?

21   A.   Yes, ma'am.

22   Q.   Is that the number that you mapped with the 1533 number

23   back in May of 2016?

24   A.   Yes, ma'am.

25   Q.   And now, another number that's attributed to Mr. Mosley

1    ending in 5008?

2    A.   Yes, ma'am.

3    Q.   So from looking at this, is it -- and from looking at the

4    original phone data from Ms. Melvin's phone, is it that the

5    same message was sent to both phones?

6    A.   Yes.

7    Q.   And does that continue through a number of different text

8    messages that we're going to see in Government's

9    Exhibit P-2?

10   A.   Yes, ma'am.

11   Q.   And the contents as reflected here, I'm not going to go

12   through that with you today.  I am going to note up here

13   there's a gap between June 30th of 2016 and then November 28th

14   of 2016, do you see that there?

15   A.   Yes, ma'am.

16   Q.   The next series of records that we have are from the 5008

17   number and indicate an internet search, does that come from a

18   Cellebrite?

19   A.   Yes, it does.

20   Q.   Okay.  So the one down below here on -- that I'm

21   indicating, is there a time when there were internet searches

22   as indicated in -- where my cursor is?

23   A.   Yes, ma'am.

24   Q.   Okay.  And just read for the record what the internet

25   searches were.

1   A.   Baltimore crime watch, Harry Crawford.

2   Q.   You can keep going.

3   A.   Oh, I'm sorry.  Crime Baltimore November 30th, Matthew

4   Hightower.

5   Q.   And then the one here, crime Baltimore, that's the one you

6   just read?

7   A.   Yes, ma'am.

8   Q.   Okay.  And that was on December 1st at 3:06 p.m.?

9   A.   Yes, ma'am.

10          MS. WILKINSON:  Okay.  I'm going to check my notes

11   right now, Your Honor, but I think I'm done.  If I could just

12   have the Court's indulgence in the morning.

13          THE COURT:  We'll break for the evening.

14          MS. WILKINSON:  Thank you, I appreciate that.

15          THE COURT:  Sure.  All right.  Ladies and gentlemen,

16   we will break at this point.  I'll ask that you be back

17   tomorrow at 9:30.  Please remember my instructions not to

18   discuss this case with anyone, even among yourselves.  Don't

19   go looking for any information about it.  If you happen to see

20   a news report, push it away from you.  All the information

21   that you learned about this case needs to be learned in this

22   courtroom.  Enjoy your evening and I will see you tomorrow

23   morning at 9:30.

24          (Jury left the courtroom.)

25          THE COURT:  Now I'm nervous we're going to have

1  another two hours of direct in the morning.

2          MS. WILKINSON:  Oh, no, no.  I promise not, Your

3  Honor, I truly promise not.  I just want to check my notes.

4  May I ask Agent Wilde to step down?

5          THE COURT:  Yes, please return tomorrow morning at

6  9:30.

7          When are you planning to call Mr. Bardos?  We still

8  need to talk to him, I believe.

9          MS. WILKINSON:  And that is exactly what I wanted to

10  bring up with the Court too, we have not been able to reach an

11  agreement.  I -- I'm certainly available on Friday if the

12  Court is.  I don't know if the Court has other things

13  scheduled because that is your day to do other things.

14          THE COURT:  Yes, I know I have at least one

15  sentencing in Greenbelt on Friday.  You know, whether that

16  would leave me time to get here in the morning or afternoon, I

17  don't remember precisely what time it is, but I wouldn't

18  assume that I have time to be in Baltimore on Friday.

19          MS. WILKINSON:  Of course we're at the Court's

20  disposal on any of the --

21          THE COURT:  When are you planning to call him?

22          MS. WILKINSON:  Next week, whenever this is

23  resolved.  I can work around the Court's schedule.  We may

24  have to do some balancing anyway because of the weather

25  issue.

1        THE COURT:  I assume we're just talking about legal

2   argument, and it shouldn't be lengthy.

3        MS. WILKINSON:  I don't think so, although I think

4   Mr. Ruter might want to be heard.  But I don't know how the

5   Court wants to handle that part of it.

6        THE COURT:  Because it could be something as simple

7   as, you know, we start at 9:30 on, say, Thursday, and take up

8   that issue and bring in the jury at 10:00 o'clock that day.

9        MS. WILKINSON:  That's certainly -- this Thursday,

10  or next Thursday?

11        THE COURT:  Depending on when you want to call him.

12  If you want to call him next Tuesday, for example, then I

13  would do it on Thursday.

14        MS. WILKINSON:  Next Tuesday is our field trip, but

15  I think that next Thursday would work, Your Honor, not this

16  Thursday.  I think he was going to be one of our ending

17  witnesses, not one of our earlier witnesses.  I can certainly

18  change that.

19        THE COURT:  That's fine.

20        MS. WILKINSON:  It's up to --

21        THE COURT:  It's all the same to me.  If you want to

22  check with the schedule of all who would need to be present

23  for that and pencil that in --

24        MS. WILKINSON:  For Thursday morning.

25        THE COURT:  -- for Thursday.

1          MS. WILKINSON:  At 9:30.

2          THE COURT:  Not this coming Thursday, but next

3     Thursday at 9:30.

4          MS. WILKINSON:  So that would be the 23rd.

5          THE COURT:  That's what I have.

6          MS. WILKINSON:  And I will indicate such to

7     Mr. Ruter and to Mr. Bardos.

8          THE COURT:  All right.

9          MS. WILKINSON:  And maybe we can come to an

10    agreement on the limits of all of that, certainly hoping.

11         THE COURT:  Okay.  All right.  Anything else we need

12    to talk about today?

13         MS. WILKINSON:  Can I ask the Court one more

14    question?

15         THE COURT:  Sure.

16         MS. WILKINSON:  Do you need anything else from the

17    government in terms of what's happening on Tuesday?  I think

18    we had left it in -- counsel, you know, provided a map of

19    where they intended to go and our suggestions of where to be.

20    I know Ms. Oldham's working on a map for the jury that has

21    four pictures inset on it so they can from the evidence so

22    they can see it with that.  But if you need anything else from

23    the government, please let us know.

24         THE COURT:  So I think we should talk, and we can

25    set aside some time on this coming Thursday to talk among us

```
 1    to nail down exactly what's going to happen.  You know, I've

 2    already had some limited conversations with the Marshals.  I

 3    was going to have some more tomorrow actually.  And then, you

 4    know, maybe sometime early Thursday we can nail down what we

 5    expect to happen.

 6              MS. WILKINSON:  Sure.  Of course.  Thank you, Your

 7    Honor.

 8              THE COURT:  I'll make rulings as necessary if you

 9    don't agree on some things.

10              MS. WILKINSON:  And we're still on track.

11              THE COURT:  Okay.  Great.

12              MS. WILKINSON:  Thank you, sir.

13              THE COURT:  All right.  Anything else?

14              MS. WILKINSON:  No.  Thank you, Your Honor.

15              (The proceedings were concluded.)

16

17              I, Christine Asif, RPR, FCRR, do hereby certify that
      the foregoing is a correct transcript from the stenographic
      record of proceedings in the above-entitled matter.
18

19              _____/s/_____
                    Christine T. Asif
20              Official Court Reporter

21

22

23

24

25
```

1                                INDEX

2   Witness Name                                              Page

3   Sergeant Sean Jones

4       Direct Examination By Ms. Oldham.......................... 3

5       Cross-examination By Mr. Zerkin.......................... 19

6       Redirect Examination By Ms. Oldham ...................... 24

7   Michael Bailey

8       Direct Examination By Ms. Wilkinson ..................... 27

9       Cross-examination By Mr. Davis .......................... 53

10      Redirect Examination By Ms. Wilkinson................... 62

11  Special Agent Mathew Wilde

12      Direct Examination By Ms. Wilkinson ..................... 67

13      Voir Dire Examination By Mr. Mercer ..................... 81

14      Direct Examination By Ms. Wilkinson ..................... 91

15

16

17

18

19

20

21

22

23

24

25

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

< Dates >.
1, June 2016
  16:25.
1/6/2016 188:16.
10/10/2015 182:9.
12/19/2016 211:3.
12/29/2015 167:18.
5/18/16 18:15.
5/24/2016 208:5.
5/4/2016 167:6,
  167:18.
April 15th 194:24.
April 16th, 2016
  195:5.
April 19th, 2016
  195:8.
April 2016 196:16.
April 2018 49:24.
April 26 199:14.
April 26th 199:12.
April 29th, 2016
  199:23.
April 9th 196:11.
August 2014 106:5.
August 2016 17:4.
August 4th 166:5.
August 4th, 2004
  105:21.
August 4th, 2014
  165:24.
August 9th, 2016
  11:18.
August 9th, 2017
  12:4.
December 1st 190:5,
  213:8.
December 1st, 2015
  187:15, 187:17.
December 2015, 12/29
  167:5.
December 2nd
  187:18.
December 9th
  188:2.
February 16th
  192:16.
February 18th
  191:23.
February 18th, 2016
  193:12.

February 1st 189:25,
  190:8, 190:13.
February 23rd, 2016
  196:5, 196:8,
  196:17.
February 27th, 2016
  193:2.
February 3rd
  190:20.
January 14th, 2020
  1:19.
January 6th
  188:13.
January 7th 188:25,
  189:1.
January 7th, 2016
  189:13.
July 15th, 2016
  168:3, 168:13.
July 16th 173:14,
  173:20.
July 16th, 2015
  173:23.
July 25th 174:4.
July 2nd 172:20,
  173:3.
July 2nd, 2015,
  first 172:24.
June 17th 171:9.
June 17th, 2015
  172:9, 172:15.
June 1st 8:14, 9:9,
  9:18, 10:6, 10:10,
  13:5, 13:24,
  119:9, 124:8,
  205:10.
June 1st, 2016
  118:4, 123:16,
  126:15.
June 21st, 2016
  10:23, 11:16.
June 27th, 2017
  65:5.
June 29th 172:24,
  173:1.
June 4th, 2016
  205:14.
June 6th, 2016
  10:17.
March 21st 194:10,

194:17.
March 29 60:16.
March 29th 60:19.
March 3rd, 2016
  193:15.
March 9th, 2011
  61:4.
May 15th, 2016
  36:15.
May 15th, may 16th,
  may 17th, may
  124:14.
May 16th 203:8,
  203:10, 204:8,
  204:17.
May 16th, 2016
  204:10.
May 1st 119:9,
  123:16, 124:8,
  168:2, 168:5,
  168:12, 169:5,
  169:8.
May 1st, 2016 118:4,
  168:3, 168:13.
May 1st, may 2nd,
  may 5th, may
  118:17.
May 2016 36:10,
  50:14, 106:15.
May 22nd 44:8.
May 23rd 118:17.
May 23rd, 2016
  37:1.
May 24th, 25th
  124:15.
May 25th 38:11,
  38:14, 38:20,
  40:20, 41:1,
  52:13, 118:18,
  125:10, 161:11,
  161:17, 205:6.
May 25th, 2016
  41:12, 124:25,
  125:6, 204:23.
May 25th, two
  41:10.
May 26 38:5.
May 26th 37:15,
  38:7, 38:20,
  43:19.

May 26th one
  52:15.
May 26th, 2016
  40:21.
May 27 132:14,
  140:18.
May 27th 39:12,
  43:9, 43:19, 44:9,
  44:17, 49:16,
  49:19, 50:8, 59:7,
  64:18, 116:2,
  140:5, 145:5,
  150:23, 151:18,
  202:24, 209:4.
May 27th 7:20
  144:22.
May 27th, 2016 40:6,
  40:13, 40:16,
  41:15, 41:19,
  41:21, 41:23,
  48:9, 63:1, 64:4,
  65:20, 109:6,
  115:22, 120:21,
  145:22, 146:10,
  159:15, 205:23,
  206:9, 206:16.
May 29th 44:18,
  45:22, 46:18,
  47:3.
May 2nd 125:17,
  125:22, 128:12,
  130:19, 131:9,
  131:13, 132:5,
  201:5, 201:8.
May 2nd, 2016
  125:14, 125:19,
  127:5, 128:2,
  200:20.
May 2nd, may 3rd,
  may 4th, may 6th,
  may 7th, may
  124:13.
May 31st, 2016
  167:17.
May 3rd 125:20,
  169:3, 202:2.
May 3rd, 2016
  201:24.
May 4th 133:7,
  166:6, 169:4,

180:22, 201:6,
  201:9.
May 4th, 2016
  165:25, 167:17,
  200:21.
May 5th 36:15.
May 8th 60:13.
November 16
  185:20.
November 16th
  185:18.
November 24th 186:6,
  186:17, 187:21.
November 24th, 2015
  186:6, 187:22.
November 27th
  187:1.
November 28th
  212:13.
November 28th, 2016
  14:6.
November 29th, 2015
  187:5.
November 2nd
  184:16.
November 2nd, 2019
  17:25.
October 15th,
  october 16th
  183:17.
October 17th
  183:17.
October 23, 2015
  183:20.
October 23, october
  24, october 25th
  184:1.
October 23rd
  184:4.
October 2nd 179:5.
October 2nd, 2015
  179:10.
October 31st, 2016
  17:18.
October 3rd 179:13,
  179:16, 180:9.
October 4 183:16.
October 7th 180:24,
  181:17.
October 9th

181:23.
September 16th
  175:20.
September 22nd, 2013
  178:5.
September 4th
  175:7.
September 5th
  175:12.
$300 60:10.
$930 8:6, 8:8.
'14 172:20.
'15 172:20.
.
.
< 0 >.
000-meter 85:2.
00s 187:6.
03591G 17:5.
.
.
< 1 >.
1 15:12, 16:25,
  113:9, 119:25,
  159:4.
1,000 166:16,
  166:17, 166:23.
1,012 119:9.
1-A 18:1.
1. 45:7.
10 5:3, 32:19, 52:8,
  70:25.
100 90:8, 122:25.
101 1:48.
1021 37:7.
10:00 215:8.
10:01 163:2.
10:04 200:2.
10:06 200:3.
10:16 155:4.
10:19 155:6.
10:22 5:21, 22:25.
10:26 155:7.
10:29 137:21.
10:30 5:20, 130:2,
  131:20, 131:22.
10:31 130:20,
  131:24.
10:34 188:12.
10:41 131:13.

10:44 148:24,
   149:8.
10:45 64:17,
   148:24.
10:50 190:14.
10:52 143:24,
   144:23.
10:57 189:17.
10th 11:20, 12:2,
   18:5, 118:17,
   124:14, 182:1,
   182:3, 182:14,
   182:16, 188:10,
   190:23, 190:25,
   191:2.
11 20:11, 80:3.
11-A 18:1.
11-minute 184:4.
111 148:1, 149:3,
   149:8.
11:04 20:12,
   23:11.
11:08 184:16.
11:09 127:8.
11:14 137:21.
11:23 181:1.
11:29 130:3.
11:29. 130:1.
11:35 126:2.
11:37 138:17,
   138:19, 190:9.
11:42 199:14.
11:49 155:7.
11th 124:14,
   202:20.
12 17:6, 21:10,
   79:25, 80:11,
   179:7.
12. 66:16.
12/19 211:12.
1222 101:12.
1255 101:2.
12:00 172:7.
12:08 211:4.
12:13 133:15,
   134:1.
12:16 128:21.
12:19 194:7.
12:22 150:13.
12:30 149:14.

12:46 190:18.
12:50 208:11.
12:55 199:5,
   211:12.
12:56 197:21.
12:57 198:19.
12th 182:15, 182:17,
   182:24, 191:18,
   191:20, 191:23,
   192:1.
13 123:13, 173:25,
   177:24, 179:12.
13. 178:3.
137 97:4.
13:10 174:4.
13th 173:10, 173:12,
   183:5, 183:9.
14 87:4, 161:20,
   179:8.
14-minute 175:12,
   175:21.
1434 30:23, 31:23,
   31:25, 36:5,
   36:24, 37:9,
   37:11, 40:20,
   109:7, 109:18,
   115:18, 115:22,
   116:11, 116:15,
   116:18.
148 168:19.
15 27:21, 32:19,
   52:8, 66:15,
   66:18, 66:25,
   70:25, 80:11,
   155:24.
15-minute 155:20.
150 112:17.
1533 100:6, 120:25,
   122:1, 123:14,
   131:10, 135:11,
   140:16, 141:4,
   141:9, 142:8,
   142:14, 144:9,
   144:25, 167:16,
   168:2, 168:5,
   188:15, 189:10,
   189:12, 203:18,
   205:2, 211:22.
1533. 121:24.
15th 192:9.

16 124:5.
16018988.1 16:10.
161 120:12.
165 81:1.
1670 188:15.
16:57 186:11.
17 189:18.
18 49:24, 182:10.
180 113:13.
18:31 210:15.
18:41 179:16.
18:56 179:16.
18th 172:18.
19 179:24.
1999 60:10.
19:53 210:17.
19th 196:14.
1:01 128:24.
1:06 145:7.
1:12 128:24,
   128:25.
1:13 127:9.
1:21 127:21.
1:28 127:22, 138:19,
   181:2.
1:30 181:12.
1:33 129:3.
1:37 129:3.
1:40 149:14.
1:47 149:17.
1:48 145:7.
1:56 129:5.
1:58 140:7, 140:8.
.

< 2 >.
2 15:14, 15:22,
   109:2, 109:10,
   135:4, 148:14,
   159:4, 164:25.
2- 85:2.
2/3 190:18.
20 20:20, 85:3,
   127:2.
2000 68:6.
2003 60:13.
2005 16:9, 16:24,
   61:14.
2008 17:5, 17:7.
2010 68:13.

2010. 68:12,
    76:19.
2011 60:16, 60:19,
    61:2, 61:14.
2012 77:3, 77:7,
    79:12.
2014 106:12,
    172:20.
2015 27:25, 28:4,
    68:20, 74:22,
    74:23, 171:9,
    173:10, 174:15,
    175:7, 176:2,
    176:5, 176:22,
    180:21, 180:22,
    180:24, 183:5,
    184:16, 185:18,
    207:5, 207:6.
2015. 172:21,
    174:24, 182:1,
    188:2.
2016. 18:5, 31:21,
    140:6, 188:13,
    189:25, 193:21,
    194:24, 211:2,
    211:8.
2017 78:18.
2018 78:18, 87:5.
2019 78:18, 80:18,
    87:5.
20:14 194:21.
20:18 194:21.
20th 124:14, 193:21,
    194:6, 195:15,
    196:9, 196:20,
    198:19, 211:8.
21 33:16, 127:4,
    127:11, 145:5.
2114 43:3.
2119 179:22.
21201 1:49.
21: 187:6.
21:17 188:2.
21:24 195:5.
22 148:14.
22:33 191:2.
23 127:10, 129:2,
    146:4.
23:00 187:11.
23:51 185:20.

23rd 216:4.
24 147:19, 182:25,
    204:9.
247 148:2, 149:3,
    149:8.
25 128:12, 148:12,
    184:17.
2513 100:21, 127:7,
    127:20.
253 167:10.
25A 31:13.
26 65:5, 148:23,
    179:24, 182:5.
2650 115:11, 118:3,
    118:11, 119:2,
    131:10, 133:14,
    133:20, 134:7,
    134:11, 135:11,
    136:3, 136:13,
    137:8, 137:20,
    138:16, 140:1,
    140:5, 140:18,
    141:4, 141:9,
    144:10, 167:16,
    188:19, 211:19.
2650. 100:6.
27 149:16.
27. 128:23.
27th 41:25, 142:7,
    149:18.
28 129:2, 151:2,
    181:3.
2827 115:4, 115:9,
    132:19.
28th 62:24.
29 129:11, 154:6,
    155:1, 194:12.
2909 126:12.
2919 115:2, 115:7,
    116:20, 132:19.
2: 16:4.
2:00 114:1, 125:24,
    176:15.
2:15 140:13.
2:15. 186:13.
2:16 140:7,
    140:10.
2:20 196:14.
2:30 187:17.
2:30. 186:13,

    186:16.
2:31 210:16.
2:33 127:21.
2:37 129:5.
2:57 129:12.
2A-N 100:17.
2Q 165:21.
.
.
< 3 >.
3 15:14, 16:14,
    17:11, 85:2,
    110:1, 110:2,
    149:19, 159:4,
    164:25, 177:16.
3. 16:17.
30 85:3.
30. 129:17.
300 81:1.
30th 124:15, 174:16,
    175:7, 176:2,
    176:3, 176:4,
    176:5, 176:22,
    178:13, 178:16,
    178:25, 180:21,
    205:7, 212:13,
    213:3.
31 129:24, 130:4.
3229 126:1.
33. 131:12.
34. 131:15.
35 55:15.
35. 131:19.
360 110:25.
37 132:9, 173:25,
    182:5, 190:12.
37-second 179:17.
38 132:17, 132:18.
386-7626 10:11.
39 133:2.
3: 16:20.
3:00 149:17.
3:01 187:2.
3:06 213:8.
3:12 129:12.
3:30 155:21.
3:35 129:18.
3:37 129:18.
3:38 192:2.
3:39 129:19.

3:47 140:13.
3:53 210:17.
3:55 201:25.
3G 119:6.
.
.
< 4 >.
4 15:12, 17:22,
   112:8, 112:9,
   126:11, 126:17,
   132:2, 138:3,
   145:8, 177:22.
40 55:15, 132:16,
   133:12, 134:1.
400 77:2.
400-4677 159:10.
40085 136:6, 137:22,
   140:14.
40086 127:13.
40149 138:19,
   138:22.
4025 12:17.
41 186:22.
410 117:8, 120:5,
   134:13, 160:15.
42 136:2, 138:1,
   192:11.
43 136:20.
44 137:9.
443 9:24, 10:11,
   30:22, 109:4,
   117:8, 159:10,
   174:8.
44663 140:14.
44906 118:19,
   133:22.
44980. 133:16.
45 27:7, 27:10,
   53:20, 137:19.
46 138:15, 179:12.
4677 159:15.
47 139:7.
4:00 145:17, 145:18,
   160:1, 160:4.
4:20 20:19, 23:3.
4:30 202:2.
4BXC31 16:25.
4G 118:22, 119:6.
4th 1:48.
.

.
< 5 >.
5 112:25, 113:1,
   178:21.
5/27 39:11,
   116:18.
500 80:25.
5008 100:8, 212:1,
   212:16.
51-second 188:17.
5150 99:17, 130:10,
   130:19, 145:24,
   157:16, 207:10.
5155 122:6.
5156 122:6.
5300 28:24, 28:25.
54 181:19.
56 38:10, 70:14.
56-second 202:1.
5670 101:2, 104:19,
   151:10.
57 96:1, 98:8.
58 182:10.
5:00 172:10.
5:04 182:16.
5:06 173:24.
5:15 23:4.
5:20 23:4.
5:21 194:16.
5:22 172:17.
5:28 184:25.
5:41 193:23.
5:45 185:12.
5:55 131:13.
.
.
< 6 >.
6,000 105:9.
60 113:16, 113:17.
61- 162:22.
6191 161:20, 162:12,
   162:23, 163:4,
   170:7, 170:9,
   170:13, 170:18,
   170:19, 171:5.
6191. 100:24.
6448 189:7,
   189:11.
6448. 100:21.
6488 127:6, 127:20,

172:15.
693-1533 117:8,
   120:5, 160:15.
695 170:19.
6:00 128:8, 142:6.
6:03 151:21.
6:04 146:6, 146:7,
   146:15, 146:21.
6:05 37:14, 142:6,
   142:12.
6:08 159:21, 160:3,
   160:11, 164:12.
6:13 120:21, 121:23,
   122:8, 129:18,
   129:20, 129:22,
   142:16, 142:18,
   146:15, 146:25,
   188:21.
6:15 120:21, 121:24,
   122:8, 142:16,
   142:19, 146:8,
   146:15, 146:25.
6:20 131:16, 153:6,
   153:9.
6:24 128:8.
6:30 203:3.
6:33 188:16,
   188:24.
6:43 181:2.
6:50 5:3.
6:58 194:16.
.
.
< 7 >.
7 17:22.
7-11 72:7, 72:15.
7-5-0-0. 101:8.
70063 124:9.
704-2650 117:8,
   134:14.
73811 120:12,
   123:16, 124:8,
   145:19.
7500 101:8, 134:16,
   134:23.
761-5150 9:24,
   157:12.
7:00 5:3.
7:06 194:13.
7:09 170:19.

7:19 128:8.
7:20 133:21, 134:2,
  134:11, 135:2,
  136:1, 143:24,
  143:25.
7:21 136:9, 138:2.
7:22 136:10.
7:23 136:10, 143:25,
  144:23, 144:25.
7:25 209:4.
7:44 135:16, 135:22,
  136:10, 206:12.
7:47 136:10,
  138:2.
7:59 116:3.
.
.
< 8 >.
8 4:13.
80 69:14, 70:10,
  81:9.
83 110:3.
8409 126:10, 126:13,
  148:15, 154:8.
8:00 22:21,
  136:10.
8:24 144:23, 145:1,
  186:21.
8:26 146:6, 146:8,
  146:9, 147:8,
  147:13, 147:14,
  147:17, 147:21,
  148:9.
8:28 147:22, 147:24,
  148:1, 148:4,
  148:9.
8:37 182:18.
8:43 136:11.
8:44 130:1.
8:45 182:3.
8:49 131:16.
8th 181:24,
  181:25.
.
.
< 9 >.
9 17:22, 137:13,
  178:21.
90 87:3.
908-1434 30:22,

109:4.
926 179:22.
949-7500 134:13.
95 110:3, 130:8,
  149:22.
983-2513 174:8.
9:00 22:21, 186:8.
9:03 116:3, 116:4,
  116:18, 116:24,
  117:2.
9:22 135:13,
  137:14.
9:24 131:20,
  182:11.
9:25 154:5, 154:7,
  154:11, 182:19,
  189:14, 206:19.
9:27 188:10.
9:29 154:14.
9:30 148:13, 148:14,
  170:20, 215:7,
  216:1, 216:3.
9:30. 213:17,
  213:23, 214:6.
9:32 154:16.
9:38 154:18.
9:43 130:20.
9:44 137:15.
9:45 202:24.
9:47 154:20.
9:56 163:2.
9:57 161:11.
9:58 204:8.
9th 12:2, 181:25.
_____/s/_____
  _____ 217:21.
.
.
< A >.
Abbington 130:2.
abilities 107:7.
ability 152:15.
above 107:11, 130:8,
  196:11, 199:4.
above-entitled
  217:19.
Absolutely 72:22,
  92:4, 93:11.
academy 68:13.
access 29:11,

148:10.
According 16:12,
  133:7, 135:9,
  161:14, 174:2.
account 72:2, 72:5,
  72:13, 75:16,
  75:18, 75:19,
  125:2, 195:12.
accounting 69:7,
  83:5.
accounts 72:6,
  72:7.
accreditation
  82:9.
accredited 82:7.
accuracy 84:24,
  85:6, 85:22, 86:4,
  86:14, 92:16.
accurate 3:15,
  84:18, 84:20,
  84:21, 84:22,
  84:25, 85:5, 85:8,
  85:15, 85:20,
  86:4, 86:5, 86:6,
  86:24, 93:5,
  107:7.
accurately 104:6,
  152:1, 203:12,
  205:3, 208:3.
acronym 69:9.
across 44:14, 69:15,
  70:7, 70:8, 78:22,
  101:20, 209:20,
  209:22.
act 200:10.
act. 193:14.
acting 78:15.
activate 72:9,
  72:10.
activation 125:10.
activations 118:3,
  118:7, 118:8,
  119:4, 119:5,
  119:9, 120:8,
  120:12, 120:18,
  120:20, 123:15,
  124:11, 130:18,
  136:13, 136:16,
  138:24.
actively 85:1.

activities 71:6.
activity 72:25,
  92:24, 92:25,
  127:8, 127:19,
  127:20, 128:5,
  128:11, 128:21,
  129:24, 131:9,
  132:12, 141:2,
  144:9, 144:25,
  149:17, 153:24,
  175:8, 177:23.
actor 193:8.
actual 28:21, 29:3,
  31:6, 71:24, 72:4,
  72:20, 74:18,
  76:12, 98:15,
  109:13, 116:7,
  122:22, 135:14,
  135:15, 157:7,
  158:20, 162:2,
  163:4, 168:20,
  208:10, 210:12.
Actually 8:25,
  14:15, 22:2,
  44:25, 63:21,
  75:7, 76:16, 78:9,
  79:6, 79:18,
  82:20, 82:21,
  102:11, 122:2,
  132:14, 138:5,
  139:8, 157:4,
  166:9, 166:19,
  169:4, 184:9,
  186:3, 196:14,
  198:13, 217:3.
adding 200:8.
addition 35:9,
  39:14, 44:8,
  47:17, 70:6,
  79:17, 80:20,
  97:20, 99:3, 99:7,
  105:12, 160:19,
  188:19.
additional 12:24,
  128:1, 128:5,
  137:20, 147:19,
  148:12, 182:23,
  189:21.
address 10:24, 11:5,
  11:8, 11:9, 72:4,

  114:25, 115:9,
  126:9, 126:10,
  126:11, 126:17,
  129:21, 130:23,
  131:4, 131:22,
  131:23, 132:3,
  132:20, 133:17,
  138:3, 140:10,
  145:9, 145:15,
  153:20, 155:3.
addresses 132:11,
  132:22.
administered
  18:19.
administration
  69:7.
admit 31:13.
admitted 210:7.
adopted 107:6.
advance 80:15,
  86:18, 87:1,
  87:6.
Advanced 77:11.
advise 123:4.
affect 92:5, 93:21,
  93:25, 94:10,
  94:24, 95:1.
affects 94:1.
affixed 14:4.
afield 87:19, 88:15,
  89:7.
AFIS 17:13, 17:14,
  18:2.
afraid 180:25.
afternoon 3:5,
  20:19, 81:21,
  81:22, 93:14,
  114:9, 114:10,
  114:17, 114:18,
  129:9, 129:15,
  132:5, 155:15,
  155:20, 156:4,
  207:24, 214:16.
Afterwards 186:12.
agencies 10:19,
  69:24, 80:12.
agency 82:20,
  82:22.
Agents 10:20, 69:14,
  70:8, 171:19.

ago 64:22, 70:25,
  142:11.
agree 16:6, 16:22,
  17:13, 18:3,
  84:25, 85:4,
  85:11, 85:13,
  217:9.
agreed 158:6.
agreement 18:7,
  214:11, 216:10.
ahead 98:21, 117:3,
  120:1, 122:18,
  135:17, 169:7,
  176:14, 185:4,
  208:12.
aid 3:14, 3:18.
ain't 40:11, 48:11,
  185:15.
alert. 191:13.
algorithms 83:15.
allowing 91:12.
almost 5:20, 77:7.
alone 42:9, 42:17.
alone. 196:25.
already 41:8, 87:10,
  164:12, 199:18,
  200:8, 203:2,
  205:17, 210:7,
  217:2.
already-certified
  77:17.
although 37:8,
  215:3.
Altima 34:8.
America 1:5, 15:25,
  16:4, 16:19,
  16:21.
among 66:17, 114:3,
  155:22, 213:18,
  216:25.
amount 32:22.
analyst 16:7, 90:15,
  104:3, 104:4.
analyze 71:8, 71:13,
  71:14, 120:6,
  122:9.
analyzed 81:1,
  107:10.
analyzer 157:2.
and/or 10:7, 14:12,

148:7.
Andre 100:22,
    154:17, 154:21,
    161:21.
angle 6:14, 6:18.
angry 42:11, 50:9.
ankle 21:20.
annoyed 42:13,
    50:10, 50:11,
    50:12.
answer 33:12, 64:14,
    86:1, 86:3, 153:7,
    153:17, 185:2,
    200:7.
answered 39:4.
answering 56:13,
    64:10.
antenna 110:11.
antennas 95:3, 95:4,
    110:5, 110:6,
    110:20, 112:13,
    112:19.
Anthony 147:10,
    154:19, 159:7,
    159:13, 170:3,
    202:25.
anybody 40:4,
    40:15.
anyway 153:3,
    214:24.
apart 95:15,
    147:4.
apartment 4:14.
Apartments 12:25.
apologize 90:18,
    114:20.
apparent 183:22.
appear 46:19,
    162:22, 165:6,
    165:8, 180:13,
    210:12, 211:14.
appearance 53:9,
    196:17.
appeared 195:22,
    196:1.
appears 4:10,
    23:17.
application 73:5,
    73:13.
appointment 18:19.

appreciate 213:14.
approach 8:21,
    35:19, 89:3.
approaching 4:17.
appropriate 88:17,
    90:5.
approximate 153:11,
    168:16, 172:5.
approximately 5:18,
    20:11, 20:20,
    30:2, 167:15.
April 55:4, 195:15,
    196:9, 196:20,
    198:19, 199:12,
    199:20.
Arbor 20:1, 20:6,
    126:10, 126:13,
    129:5, 129:20,
    130:6, 132:20,
    148:15, 150:25,
    153:20, 154:8,
    155:3, 155:5.
ARD. 203:23.
areas 70:11, 70:13,
    70:16, 91:12.
argument 215:2.
arguments 91:23.
Arielle 101:10,
    178:17, 190:2.
arrange 54:6.
arrangement 54:21.
arrest 23:9, 23:12,
    23:16, 23:18,
    23:21, 23:24,
    24:23, 25:2,
    58:13, 82:2,
    165:25, 171:19.
arrested 21:14,
    25:3, 25:5, 58:6,
    126:14, 167:9,
    205:11.
arrests 82:3.
arrived 20:10,
    23:11.
arrow 35:22,
    35:25.
article 32:6.
Ashburne 184:11.
aside 216:25.
Asif 1:46, 217:17,

217:22.
aspect 89:18.
assembly 25:17.
Assessment 80:16.
assigned 68:14,
    68:24, 97:15.
assist 84:9.
assisting 76:1,
    76:3, 84:1.
associate 145:15.
associated 19:9,
    53:14, 60:7,
    71:18, 92:23,
    99:24, 102:7,
    102:9, 127:6,
    127:7, 128:13,
    130:10, 130:13,
    131:10, 132:3,
    133:10, 158:18,
    159:4, 160:13,
    160:25, 167:4,
    167:7, 167:8,
    169:1, 169:2.
Associates 18:9,
    18:16.
assume 20:4, 21:2,
    23:20, 48:12,
    214:18, 215:1.
assumed 5:11,
    23:19.
assuming 15:16,
    197:18, 197:21,
    199:8.
assumption 5:9.
assurance 16:13.
AT&T 72:3, 74:10,
    75:5, 75:10,
    75:12, 75:14,
    77:25, 92:9,
    92:13, 102:25,
    117:20, 117:22,
    124:3, 132:23,
    152:18.
at. 152:9.
attached 157:15.
Attachment 201:2.
attempt 21:17,
    171:19.
attempting 11:14,
    186:18.

attended 78:19.
attention 10:17,
  10:23, 14:6, 15:3,
  26:11, 26:12,
  36:3, 162:21,
  174:23, 175:11,
  184:15, 185:19,
  190:23, 192:4,
  192:16, 193:16,
  193:22, 199:23,
  202:8.
Attorney 172:3,
  173:2, 173:12,
  176:25, 182:24,
  190:10, 191:18,
  194:15.
attorneys 78:14,
  171:24.
attribute 99:1,
  101:6, 107:14,
  109:7, 168:9.
attributed 99:9,
  100:3, 102:12,
  115:19, 117:9,
  117:16, 117:21,
  120:2, 120:4,
  123:23, 124:20,
  132:6, 134:24,
  142:2, 142:15,
  144:10, 157:13,
  159:8, 161:20,
  162:12, 166:1,
  170:13, 188:19,
  211:19, 211:25.
Audi 11:6, 11:11,
  11:14, 11:19,
  11:21, 12:6, 12:8,
  12:23, 13:1, 13:7,
  13:8, 13:16, 14:3,
  14:5, 17:5, 17:7,
  17:12, 18:4, 46:2,
  46:3, 46:16,
  46:17, 47:4,
  47:17, 190:21,
  204:14.
audio 3:6.
audio-visual 3:10.
audited 54:22.
August 11:20, 18:5,
  106:12, 207:5.

AUSA 1:25, 1:27.
authorities 15:7,
  15:9, 19:10, 22:6,
  22:18, 53:18.
Auto 29:10, 29:14,
  29:15.
automated 17:12.
automotive 12:13,
  12:15, 28:13,
  29:7, 29:13.
Autos 29:17.
available 17:23,
  77:14, 84:18,
  86:17, 88:2, 88:7,
  125:7, 214:11.
avoid 104:17,
  104:20, 104:24.
away 56:15, 61:7,
  61:15, 87:3,
  94:21, 122:15,
  147:2, 155:2,
  213:20.
azimuth 113:10,
  113:12, 113:13.
.
.
< B >.
B-a-i-l-e-y 26:24.
B. 1:39.
babe 194:19.
baby. 200:16.
bachelor 69:6.
background 68:4,
  69:4, 109:3.
backing 4:14.
backwards 49:5.
bad 55:17, 86:25.
bag 13:16.
bags 193:19.
bail 186:9,
  187:17.
Bailee 35:17.
balancing 214:24.
bank 77:8.
Bardos 125:25,
  126:4, 171:25,
  173:15, 173:21,
  175:9, 175:21,
  176:7, 177:6,
  178:1, 179:5,

181:22, 183:3,
  183:9, 183:11,
  184:17, 187:18,
  190:11, 191:17,
  192:8, 194:15,
  201:2, 214:7,
  216:7.
base 80:4, 115:1,
  115:3, 119:19.
Based 12:24, 97:17,
  102:11, 107:15,
  116:17, 136:16,
  146:25, 148:5,
  148:19, 149:4,
  166:17, 169:14,
  208:7.
basement 6:1,
  11:22.
Basic 77:3, 77:5,
  80:10, 110:2.
Basically 15:8,
  20:24, 41:5,
  70:23, 75:4, 79:7,
  94:24, 96:22,
  119:8, 127:21,
  133:15, 134:25.
Basis 38:24, 77:15,
  89:14.
battery 156:9.
bay 6:2, 11:22.
Beach 150:3, 159:22,
  160:1, 160:4.
beam 111:16,
  111:19.
Bear 15:23.
beards 63:15.
bears 9:4.
became 130:12.
beforehand 178:9.
began 20:19, 20:21,
  115:8.
begin 20:18, 163:1,
  163:2.
beginning 53:15,
  61:16, 105:15,
  116:23, 124:23,
  188:10, 190:5,
  192:1, 192:2,
  199:20, 199:21,
  200:20, 205:6,

206:15.
behalf 81:15,
   176:25.
behaviors 89:24.
behind 7:6,
   111:20.
Belinda 173:13,
   173:22.
belonging 18:2,
   151:23.
Beltway 129:7.
Belvedere 12:17.
Bench 89:4.
besides 28:17.
best 21:17, 29:2,
   49:3, 65:22,
   105:3, 107:7,
   193:8.
better 27:23, 94:21,
   153:7, 153:17,
   185:16.
Beyond 24:14,
   88:14.
Bifocals 62:2.
big 21:9, 75:2,
   75:8, 75:21, 81:3,
   113:11, 163:19.
bike 65:25, 66:2.
bikes 66:2.
bill 70:24.
billing 70:23,
   71:24, 72:1,
   72:23.
bills 72:18, 72:20,
   73:19.
binder 121:8,
   121:12, 121:14.
biology 16:8.
Bird 206:25.
birthday 39:10,
   39:15, 39:18,
   40:6, 40:11,
   40:13, 41:11,
   42:1, 43:1, 43:6,
   43:7, 43:11, 44:9,
   44:17, 48:11,
   49:25, 50:3, 56:7,
   56:17, 56:18,
   56:23, 58:25,
   63:1.

bit 68:17, 70:19,
   80:13, 87:6,
   131:17, 140:3,
   142:24, 161:19.
black 106:18,
   118:15, 162:19.
blank 141:15,
   171:5.
blend 112:11,
   112:15, 112:21.
blow-ups 136:25.
blown 137:5.
blue 31:14, 31:18,
   32:7, 32:8, 43:16,
   46:6, 46:7, 46:8,
   115:4, 126:12,
   126:13, 130:25,
   146:18.
BMW 13:4, 13:23,
   19:18, 19:20,
   19:23, 47:12,
   47:13, 47:15.
bolt 95:6.
Boo 188:5, 190:16,
   194:2, 194:9,
   195:7.
book 111:17, 111:22,
   151:11.
booked 25:7, 25:8.
Boost 75:15, 75:16,
   75:17, 75:19.
border 68:18.
born 27:14.
bottom 120:12,
   123:19, 127:2,
   138:18.
box 72:8, 118:16,
   118:20, 132:1,
   138:18.
boy 180:11.
bracelet 21:20.
Brake 7:5, 7:8, 7:9,
   8:2, 25:12, 25:17,
   55:19, 55:20,
   55:22, 57:20.
break 48:14, 66:14,
   113:15, 113:22,
   113:25, 155:15,
   155:20, 164:19,
   209:1, 213:13,

213:16.
break-ins 68:10.
breaking 113:21.
breaks 24:18.
brevity 31:25.
brief 42:2.
briefly 68:4,
   69:3.
bright 111:16,
   111:25.
Bring 156:1, 156:19,
   176:19, 206:2,
   214:10, 215:8.
broad 84:23, 93:5.
broadly 85:11.
broke 3:5, 3:9.
brought 20:14, 25:2,
   57:7.
brown 13:14,
   112:20.
bucks 55:15.
building 6:2, 8:9,
   12:11, 28:21,
   112:15.
buildings 29:11,
   112:13, 112:14.
bullets 197:23.
burglary 68:10.
burner 30:13, 30:16,
   30:20.
business 28:5, 28:7,
   28:19, 28:20,
   42:10, 54:12,
   69:6, 75:25, 76:1,
   76:2, 83:4, 83:25,
   84:3, 84:6.
busy 64:13.
buttocks 18:21.
buy 72:8, 72:15.
.
< C >.
C-10 6:15.
C-11 6:17.
C-12 6:21.
C-15 13:21, 14:2.
C-18 210:8,
   210:13.
C-22 208:1.
C-22A 209:6.

C-5 3:20.
C-5A 3:19.
C-8 6:7, 6:8.
C-9 6:13.
C-A-S-T 69:9.
calipers 55:19,
    55:24, 55:25,
    56:1, 56:2.
called 2:23, 16:22,
    26:17, 30:5,
    64:16, 67:13,
    71:2, 71:3, 77:3,
    80:16, 81:4, 97:9,
    104:23, 154:3,
    157:2.
caller 121:3,
    135:15.
calling 29:9, 73:22,
    104:25, 121:4,
    134:11, 141:5,
    141:9, 188:11,
    188:12.
calm 194:3.
Calverton 170:20,
    170:21.
camera 4:13.
capacity 19:12,
    68:2, 69:24, 85:6,
    85:22.
capital 4:6.
Captain 164:1.
captured 71:10,
    73:24, 123:13.
capturing 87:25.
Car 6:5, 34:5,
    34:15, 41:15,
    41:19, 45:25,
    46:1, 46:8, 46:13,
    46:15, 47:3, 47:8,
    47:11, 47:20,
    48:5, 48:20,
    48:23, 49:3, 54:3,
    55:2, 55:8, 56:25,
    57:7, 68:10, 78:8,
    110:8, 110:11,
    110:14, 152:9.
card 72:8.
cards 17:6.
care 172:12, 174:21,
    178:7, 197:24.

Carolina 42:21,
    68:7, 69:8, 150:4,
    150:9, 155:10,
    159:21, 159:23,
    159:25, 160:3,
    160:11, 164:12,
    169:22, 170:15,
    170:25, 171:4,
    203:3.
carrier 74:10,
    74:11, 75:8,
    75:10.
carriers 74:6, 75:7,
    75:24, 77:13,
    77:24, 78:20,
    83:25, 86:19,
    87:2, 111:1,
    112:11.
carry 193:19,
    208:22.
cars 34:2, 34:3,
    36:16, 39:9,
    41:13, 47:24,
    48:2, 49:7, 53:23,
    55:7, 55:23.
cases 69:23, 70:12,
    72:1, 72:2, 76:21,
    76:22, 76:23,
    77:6, 77:8, 80:21,
    80:24, 80:25,
    81:1, 81:4,
    87:8.
cash 8:6, 8:8.
CAST 69:1, 69:2,
    69:9, 69:13,
    69:19, 70:8,
    70:14, 70:17,
    76:8, 76:15,
    76:16, 76:17,
    76:18, 77:1,
    77:17, 77:19,
    78:16, 78:19,
    80:6, 80:10,
    80:15, 80:17,
    82:12, 82:18,
    93:7, 108:13,
    115:8, 136:17,
    164:13, 169:20.
category 85:14.
causing 151:8.

caveat 90:19.
CDS 23:12.
Cellebrites 76:12,
    103:21, 103:23,
    156:14, 156:15,
    208:16, 209:14,
    210:4.
Cellular 30:8,
    31:20, 69:13,
    75:6, 78:1, 81:11,
    83:11, 84:4,
    88:13, 88:25.
center 111:6,
    111:16, 112:1,
    136:7, 158:25.
Central 101:25.
certain 30:11,
    156:14, 156:15,
    157:5, 162:17,
    165:18, 207:25.
certainly 88:21,
    113:22, 214:11,
    215:9, 215:17,
    216:10.
certification 77:19,
    79:25, 80:8,
    82:13, 82:15.
certified 17:16,
    18:8, 78:16, 80:6,
    80:8.
certifies 82:17.
certify 82:22,
    82:23, 217:17.
chair 26:21.
chairs 21:7.
challenge 87:7.
chambers 125:25.
chance 123:11,
    143:8.
change 25:12, 40:24,
    41:1, 215:18.
changed 185:10.
changes 83:22.
Changing 7:25, 8:2,
    197:7.
charge 55:13.
charged 5:12, 23:14,
    23:16, 54:22.
charges 5:16, 24:23,
    25:6, 202:5.

charging 5:9.
chart 100:15,
   100:16, 103:11,
   133:2, 134:15,
   135:9, 146:14.
chat 36:7.
cheap 72:8.
check 7:21, 34:16,
   57:11, 57:15,
   159:18, 159:19,
   160:9, 167:23,
   208:19, 213:10,
   214:3, 215:22.
checked 208:24.
checking 52:9.
chief 18:20.
children 69:22.
Chris 173:13.
Christine 1:46,
   217:17, 217:22.
Christopher 1:33.
chronological
   105:13.
circle 111:1, 111:2,
   113:15, 113:18,
   119:16, 120:15,
   122:7, 135:17,
   145:10, 148:3.
circled 123:20.
circling 122:4.
circular 7:6.
circumstances
   85:10.
City 20:10, 29:24,
   68:22, 69:25,
   112:12, 196:24,
   198:25.
claim 6:5.
claims 7:3.
clarify 11:25.
class 77:3, 77:14,
   77:18, 80:1,
   80:14, 80:18.
clear 35:20, 45:18,
   48:8, 62:20,
   107:9, 141:25,
   200:25.
clearest 94:6,
   94:23.
CLERK 3:25, 26:14,

26:20, 26:25,
   67:10, 67:16,
   67:20.
Cliff 14:11, 14:15,
   14:20, 115:14,
   141:13, 142:7,
   147:14, 160:13,
   161:8, 180:5,
   188:5, 190:16.
Cliff. 194:9.
Clifton 1:10, 1:35,
   15:4, 15:25,
   16:10, 16:15,
   16:20, 17:14,
   117:10, 121:24,
   121:25, 126:18,
   146:17, 147:22.
clip 50:20, 51:3,
   51:6, 51:7, 58:16,
   58:24, 59:3,
   59:25, 63:3, 63:5,
   63:6.
close 130:23,
   136:21, 137:3,
   198:6.
closed 53:24,
   54:1.
closely 112:19.
closer 94:19,
   136:22.
closest 94:11,
   94:12, 94:13,
   130:21, 131:23,
   133:17, 146:22,
   146:23, 146:24,
   147:2, 151:4.
closing 54:8.
clothing 32:6.
co-defendant
   174:20.
co-workers 162:7.
collar 68:15,
   77:9.
colleagues 70:7.
collect 201:4.
collected 99:14.
collectively
   165:19.
College 69:8.
color 46:5, 46:8,

112:14.
column 98:11,
   102:21, 102:23,
   170:24.
comes 79:5, 96:25,
   185:9, 191:8,
   191:10, 195:11,
   197:2, 197:5,
   197:9, 197:12,
   203:21, 203:22,
   207:2.
coming 28:12, 49:4,
   82:22, 197:6,
   206:6, 208:20,
   216:2, 216:25.
comment 91:4.
common 25:1, 25:9.
commonly 120:11,
   124:8.
communicate 73:5.
communicating
   72:19.
communication 64:3,
   102:17, 110:15,
   133:19, 142:11,
   147:9, 147:15,
   161:1, 161:19,
   162:16, 163:23,
   166:2, 173:22,
   179:9, 186:21,
   188:2, 188:7,
   189:14, 189:18,
   190:6, 190:10,
   194:10, 194:15,
   198:1, 201:23,
   202:16, 202:20,
   202:24, 203:6.
companies 74:25,
   75:1, 75:22,
   76:11, 97:22,
   209:19.
company 72:24,
   74:17, 102:24,
   161:15, 204:7.
comparative 92:16.
compare 17:17,
   17:23, 150:21,
   210:19.
compared 210:9.
comparing 91:25.

comparison 17:4,
    17:10.
compartment 8:7.
complaint 57:16,
    57:19.
complete 18:8,
    85:13.
completed 26:2,
    66:10.
completely 87:4.
complex 4:14.
comply 84:6.
Complying. 13:19,
    65:16.
computer 79:1,
    79:8.
concede 90:21.
conceding 85:19.
concentrate 30:8,
    193:4.
concentration 69:7,
    83:4.
concept 143:16,
    143:17.
concern 18:20.
concerned 55:1.
concerning 14:12.
concerns 88:21.
conclude 193:12.
concluded 5:14,
    5:23, 17:19,
    114:19.
concluded. 217:15.
concludes 129:22.
concluding 139:25,
    205:7.
conclusion 78:16,
    178:16.
conclusions
    109:21.
conditions 125:23,
    176:16.
conduct 10:2.
conducted 10:24,
    83:21.
conducting 11:2,
    93:7.
conference 89:4.
configuration
    85:8.

confirm 81:23.
confused 48:16,
    171:1.
conjunction 144:9.
connect 40:2,
    94:20.
connected 40:15,
    56:10, 100:20,
    122:25, 169:4.
connection 48:22,
    95:8, 95:15,
    95:16, 95:22,
    95:23, 98:10,
    99:9, 103:23,
    106:25, 108:5,
    108:8, 108:13,
    108:16, 109:5,
    111:10, 142:10,
    144:12, 156:15,
    164:8, 165:19,
    165:22, 168:25,
    169:18.
connections 63:21,
    122:22, 123:5,
    168:21, 175:24.
connector 112:17.
consider 27:20.
consistent 116:6,
    116:19, 117:12,
    118:11, 127:11,
    128:15, 128:17,
    129:14, 136:7,
    136:17, 136:23,
    137:22, 138:20,
    140:9, 142:17,
    142:22, 144:6,
    144:8, 144:13,
    145:8, 148:20,
    149:5, 149:7,
    150:25, 153:19,
    154:7, 155:5,
    161:12, 161:13.
consistently 119:25,
    150:24, 151:7.
constantly 94:3.
consult 158:7.
consuming 122:3.
cont'd 3:1.
contact 37:7, 37:8,
    56:19, 58:8,

158:11, 158:18,
    158:21, 159:2,
    159:22, 168:17,
    171:20, 174:2,
    174:10, 183:16,
    189:11, 189:12,
    192:7, 192:13,
    201:19.
contacted 53:12,
    140:22.
contacts 120:24,
    134:4, 151:17,
    151:20, 158:12,
    158:14, 166:16,
    166:17, 166:19,
    166:23, 167:6,
    167:11, 168:19,
    168:21, 169:12,
    169:14, 169:16,
    172:14, 183:25,
    188:22, 189:3,
    192:3, 206:25.
contained 8:25,
    157:16, 158:24,
    160:23, 163:13,
    168:15.
contents 212:11.
continued 19:9.
continues 181:17.
continuing 80:7,
    165:24, 166:5,
    180:21.
contrast 150:21,
    169:11.
contributor 16:15.
contributors
    16:15.
control 198:5.
controlled 5:12,
    60:25.
convenient 113:21.
conversation 39:8,
    42:2, 42:5, 42:18,
    64:7, 65:11,
    65:19, 65:23,
    72:21, 197:1.
conversations 33:25,
    35:13, 36:10,
    39:6, 166:19,
    217:2.

conversion 209:25.
convert 210:8,
  210:12.
converted 102:1,
  209:11.
convicted 27:18,
  27:22, 27:23,
  60:9, 60:12,
  60:15, 60:18,
  60:21, 61:3.
Coordinated 102:1,
  139:1, 209:19.
copy 96:12, 126:4,
  134:20, 157:18,
  158:3, 164:24,
  164:25, 169:25,
  176:21.
corner 102:14,
  116:5, 118:15,
  120:3, 126:8,
  138:21, 184:8,
  195:10.
correction 9:3.
correctly 152:7.
correspond 118:23.
corruption 69:23.
Coulson 125:25,
  177:4.
Counsel 16:5, 16:21,
  18:8, 49:24, 65:5,
  81:14, 81:16,
  85:17, 91:4,
  134:20, 158:6,
  173:5, 174:25,
  216:18.
count 105:7.
counting 104:20.
country 69:15, 70:2,
  70:7, 70:8,
  78:22.
County 5:9, 5:15,
  10:20, 10:21,
  22:18, 23:13,
  23:19, 68:7,
  68:16, 68:18,
  69:25, 112:16,
  170:22.
couple 21:7, 28:10,
  59:9, 61:7, 72:23,
  110:4, 190:21,

207:9.
course 10:2, 10:18,
  24:2, 77:4, 77:12,
  77:19, 78:19,
  80:10, 80:15,
  97:24, 156:9,
  159:9, 160:17,
  214:19, 217:6.
court. 91:10.
courtesy 57:11.
courthouse 93:14.
courtroom 32:4,
  213:22.
courtroom. 2:10,
  66:24, 67:4,
  114:5, 155:23,
  156:2, 213:24.
courts 79:19.
cover 70:15, 70:17,
  109:1, 110:25,
  156:23, 156:24.
coverage 83:22,
  89:25, 112:1,
  137:23, 140:9,
  145:8, 150:25,
  153:20.
Crawford 213:1.
crazy 180:2.
Cricket 75:9, 75:11,
  75:13.
Crime 6:2, 6:25,
  13:16, 16:23,
  68:16, 68:17,
  69:22, 74:9, 92:1,
  93:13, 93:16,
  93:17, 115:3,
  127:14, 131:17,
  132:19, 142:18,
  144:7, 144:14,
  213:1, 213:3,
  213:5.
crimes 27:18, 27:23,
  68:21, 69:22,
  77:9.
CRIMINAL 1:9,
  177:23.
Critical 80:16.
Cross 18:25, 24:4,
  24:17, 52:25,
  53:2, 85:25,

90:14, 92:7,
  149:24.
CROSS-EXAMINATION
  19:2, 53:3.
crossed 68:18.
cursor 196:11,
  212:22.
custodians 78:2,
  78:21.
custody 8:17,
  126:15, 205:18.
customer 49:2,
  72:2.
customers 72:12,
  76:1.
cut 165:2.
cutting 188:6.
.
.
< D >.
D'angelo 196:2,
  196:11.
D. 18:16.
daily 33:14.
damn 153:7,
  153:17.
dangerous 5:12.
dark 111:14, 111:24,
  126:12.
darker 130:25.
database 107:25.
databases 14:13.
dates 12:1, 91:22,
  118:14, 119:11,
  119:12, 208:3.
David 171:24,
  178:5.
DAVIS 1:33, 38:23,
  38:25, 50:1, 53:1,
  53:4, 61:18,
  61:20, 62:3, 62:8,
  62:16, 63:19,
  81:15, 91:2,
  91:3.
Davo 161:7.
day-to-day 77:15.
days 41:10, 58:2,
  59:9, 87:3,
  87:4.
days. 195:12.

DC 204:14.
deal 80:22, 100:4.
dealer 190:21.
dealing 79:2,
    104:12, 104:17,
    155:1, 170:8.
Deals 28:8, 113:1.
Deanna 5:4, 10:15,
    100:25, 151:10,
    154:13, 192:18.
death 178:9,
    180:2.
debt 178:11.
December 15:5,
    188:8, 188:10,
    211:2, 211:8.
decipher 4:9.
decision 94:2.
deeper 77:12,
    89:23.
Defendant 1:29,
    1:35, 32:12,
    177:6, 177:8.
Defendants 1:12,
    16:1, 16:5, 16:20,
    16:21.
defense 78:15, 80:2,
    177:22.
degree 69:6, 83:2,
    83:4, 83:6.
degrees 110:25,
    113:17.
deleted 103:13,
    103:15.
delineates 112:3.
demonstration 95:12,
    108:18, 109:15,
    130:15.
demonstrative
    112:22, 162:18.
Department 8:16,
    15:6, 16:7, 16:24,
    17:16, 22:5, 68:7,
    68:11, 68:22,
    69:25, 70:4.
departure 5:3.
depend 74:16,
    140:22.
dependant 85:10.
Depending 215:11.

depends 44:7, 55:24,
    70:12.
depict 118:10.
depicted 132:18,
    133:12, 133:23,
    137:8, 148:16,
    150:11, 151:9.
depicts 4:14.
deputy 68:8.
describe 42:6, 99:4,
    99:25, 108:7,
    109:20, 118:2,
    209:16.
described 23:10,
    79:17, 97:21,
    208:17.
describing 74:3.
design 78:4.
designed 95:2, 95:4,
    95:5, 95:7,
    110:25.
designing 83:11,
    95:3.
destroy 57:13.
destroying 57:13.
detailed 17:7.
details 96:21.
Detective 9:13,
    17:15, 20:16.
detectives 12:3.
detention 172:10,
    172:11, 176:21,
    178:6, 180:20.
determine 9:25,
    135:5, 164:19,
    169:21.
determined 17:10.
develops 74:7.
device 71:11.
devices 73:16.
diagnose 34:18.
diagnostics 73:1.
difference 110:14,
    117:13, 152:14,
    152:25, 210:13.
difficult 53:9.
dig 69:18.
Digging 14:12.
digital 157:18.
digits 31:20, 32:1,

100:4, 157:25.
DIRE 81:13, 81:18,
    81:19, 87:19.
DIRECT 3:1, 12:22,
    15:3, 26:10,
    26:13, 27:1, 36:3,
    40:21, 59:16,
    63:20, 67:21,
    91:16, 184:15,
    190:23, 193:16,
    193:22, 199:3,
    208:22, 214:1.
directed 6:25.
Directing 10:17,
    10:23, 14:6,
    175:11, 185:19,
    192:4, 192:16.
direction 113:11,
    113:17, 135:21,
    141:11.
directions 110:16.
directly 155:8.
disagrees 177:21.
Discovery 173:5,
    173:7.
discuss 26:1, 66:9,
    66:16, 83:8,
    114:2, 155:22,
    213:18.
discussing 36:16,
    162:15, 201:14.
disk 156:21, 157:1,
    157:18, 158:3.
display 113:19.
displayed 136:7,
    137:17.
disposal 214:20.
distance 86:24.
distinguish 76:10.
distracting 35:23.
distribute 60:13,
    60:16, 60:19,
    60:25.
District 1:1, 1:2,
    15:24, 16:18.
disturbed 21:25.
disturbs 18:22.
dive 77:12.
divide 111:2.
DMV 11:10.

DNA 16:7, 16:11,
  16:13, 16:14.
document 31:15,
  36:22, 97:3,
  106:19, 124:17,
  158:10, 165:2,
  165:8, 208:12.
documented 59:3.
documents 15:9,
  98:3, 208:8.
Doing 28:3, 34:2,
  34:15, 35:14,
  53:23, 70:6,
  73:23, 79:12,
  115:8, 139:10,
  139:14, 141:24,
  153:13, 197:3,
  200:15.
doing. 197:24.
dollars 95:3.
done 6:1, 8:8,
  22:16, 25:6, 34:3,
  34:5, 41:2, 41:8,
  48:23, 54:6,
  57:16, 80:25,
  162:5, 178:23,
  197:23, 207:23,
  209:1, 213:11.
door 17:2, 21:5,
  198:18, 200:19,
  203:22.
dots 115:5, 117:13,
  126:24.
doubling 105:1.
doubt 41:18, 64:16,
  64:21.
downfall 86:25.
download 71:10,
  71:11, 71:18,
  71:20, 97:11,
  102:20, 103:6,
  156:25, 157:1.
downloading 103:5.
downloads 71:17,
  76:12.
draw 26:11, 79:13,
  113:16, 199:23,
  201:22, 202:8.
drawing 162:21.
dried 54:2.

drinking 200:11.
drinking. 180:6.
drinks 24:20.
drive 48:23, 78:8,
  90:9, 90:12,
  90:13.
drive-test 78:13.
driver 4:18, 58:4.
driving 13:1, 44:7,
  44:24, 46:18,
  47:15, 49:1,
  58:1.
drove 110:8.
drugs 5:10, 54:11.
duly 2:23, 26:17,
  67:13.
dump 71:22.
duplication 104:18,
  104:24, 105:4,
  105:7.
duration 37:8,
  38:16, 38:17,
  71:3, 102:15,
  102:16, 105:24,
  166:20, 166:21,
  173:25, 202:1.
During 8:4, 8:10,
  9:13, 10:18,
  20:23, 21:18,
  23:9, 24:22, 55:4,
  77:11, 77:14,
  78:1, 106:22,
  116:22, 124:7,
  125:7, 140:14,
  141:12, 143:14,
  144:17, 148:11,
  151:1, 161:23,
  166:19.
dust 7:5, 7:10,
  7:19, 21:24.
.
.
< E >.
E-mail 72:4, 73:9,
  110:18, 125:25,
  173:12, 174:5,
  174:11, 174:14,
  183:22, 201:2,
  211:4.
e-mails 126:4.

earlier 25:14,
  57:17, 116:24,
  124:4, 156:13,
  158:10, 159:7,
  201:14, 204:22,
  215:17.
earliest 150:10.
early 43:19, 50:6,
  55:4, 150:22,
  217:4.
easel 165:17.
Easiest 209:21,
  209:25.
easily 105:18.
east 129:1.
Eastern 102:3,
  139:4, 139:5,
  209:11, 210:1,
  210:14, 210:18.
easy 29:11.
edge 111:22, 112:3,
  112:4.
edges 112:3.
Edmonds 173:6,
  174:4, 174:6,
  174:11, 174:13,
  174:14, 182:7.
education 80:7,
  83:2.
educational 69:4.
effective 18:20,
  124:23, 161:13.
effects 94:24.
efficient 79:16.
eight 190:12.
either 48:18, 48:20,
  76:11, 81:8,
  102:17, 122:16,
  130:5, 135:11,
  143:12, 165:9.
elapsed 20:20.
electrical 83:6.
electronic 182:20.
Elma 174:18,
  174:20.
ELMO 139:19,
  198:7.
elusive 53:8.
emergency 73:3.
emerging 78:23.

emits 110:11.
employed 83:9.
employment 83:8.
ENB 118:19, 118:21,
  118:22, 138:22.
ENB72304 120:15.
enclosing 173:14.
end 23:2, 28:3,
  40:6, 61:15,
  99:12, 105:16,
  162:12, 163:2,
  167:5, 197:15,
  198:6, 199:20,
  202:1, 208:20,
  208:21, 208:22,
  211:1.
ended 21:11, 23:3,
  50:7, 100:24.
ending 30:23, 31:23,
  36:3, 37:9, 37:18,
  37:25, 98:24,
  99:17, 105:15,
  109:17, 115:10,
  115:18, 131:22,
  212:1, 215:16.
ends 36:19,
  200:16.
enforcement 14:13,
  68:4, 69:5, 74:7,
  74:12, 76:2, 76:3,
  78:3, 80:12,
  81:23, 84:1,
  84:10, 90:3.
engaged 178:7.
engineer 83:9.
engineering 83:6.
engineers 78:4,
  78:21.
enhanced 51:7.
Enjoy 26:2, 66:10,
  114:3, 213:22.
enjoyed 2:3,
  114:11.
enlarged 209:5.
enough 147:4.
ensure 3:14,
  105:4.
entered 2:10, 67:4,
  156:2, 158:17.
entire 207:12.

entity 82:7,
  82:17.
envelope 13:14.
environment 94:4.
Equal 32:22,
  143:9.
equipment 71:20,
  78:7, 78:13,
  83:13, 83:17,
  83:18, 92:17,
  95:1.
erroneously
  164:23.
error 105:7,
  164:20.
Esquire 1:31, 1:33,
  1:37, 1:39.
essentially 165:3.
estimate 86:24.
European 46:25.
European-style
  13:2.
evaluate 83:21.
evaluators 80:17.
evasion 54:22.
eve 43:7.
evening 22:20,
  22:22, 43:6,
  184:20, 204:17,
  209:1, 213:13,
  213:22.
event 91:3, 104:16,
  125:18, 126:1,
  171:15, 171:18,
  172:2, 172:8,
  172:20, 172:23,
  173:3, 173:10,
  174:23, 183:2,
  183:21, 186:7,
  200:23, 204:12.
events 97:23, 97:24,
  103:19, 106:21,
  106:22, 171:17,
  176:4, 182:12.
eventually 31:12,
  100:10, 141:11,
  174:17, 181:11,
  202:5.
everybody 53:15,
  53:16, 66:2,

96:21, 156:21.
everyone 2:3,
  114:11.
Everything 35:14,
  42:8, 57:13,
  57:14, 69:22,
  79:13, 194:9,
  200:11.
evidence 7:4, 7:7,
  7:17, 15:9, 18:7,
  25:12, 207:10,
  216:21.
exact 5:20, 29:2,
  55:9, 211:14.
exactly 64:10, 86:3,
  167:6, 180:12,
  214:9, 217:1.
EXAMINATION 3:1,
  24:9, 27:1, 62:14,
  67:21, 81:19,
  91:16.
examine 17:17, 22:2,
  22:6, 22:14.
examined 2:24,
  26:17, 67:13.
Examiner 17:16,
  17:19, 17:21,
  157:8, 157:23,
  162:3.
example 89:20, 90:1,
  168:7, 169:22,
  194:11, 201:22,
  202:19, 215:12.
examples 112:6.
Excel 76:5, 79:5,
  96:3, 96:10,
  105:10, 105:11,
  105:14, 125:16,
  164:22, 165:1.
Except 33:15,
  59:19.
exclude 138:10.
excluded 16:15,
  17:21.
excludes 93:10.
Excuse 7:19, 22:12,
  35:24, 66:19.
excused 26:1, 66:9,
  66:20.
executed 5:25,

12:3.
execution 8:4,
  11:23, 12:12,
  25:10.
exemplars 17:23.
exhibits 4:3, 8:25,
  10:1, 90:24,
  109:22, 207:9,
  207:18.
expect 80:5,
  217:5.
expected 28:12.
experience 80:1,
  83:11, 83:18,
  83:20, 86:6,
  87:11, 87:20,
  89:17, 103:9,
  116:17, 136:17,
  147:1, 148:6,
  149:4.
experienced 90:20.
expert 79:19, 81:8,
  81:11, 88:25,
  89:11, 91:12,
  93:7, 136:17.
expertise 76:9,
  88:12, 89:12,
  89:13, 90:3.
Explain 42:16,
  120:6, 143:2.
explaining 143:16,
  209:9.
explanation
  122:23.
Express 28:8.
extent 89:10, 99:19,
  103:18, 190:1,
  202:9, 203:17,
  205:1, 206:20,
  207:16.
exterior 17:2,
  21:4.
extra 35:22.
extracted 157:5.
extracting 88:14,
  89:21.
extraction 88:8,
  157:4, 157:22,
  161:24, 163:4,
  207:21.

extraneous 191:22.
extras 3:24.
eyes. 180:2.
.
.
< F >.
face 113:4.
faces 92:12, 113:4,
  113:13, 113:14.
Facetime 73:5,
  73:13, 88:5,
  152:21, 152:25.
facial 52:3, 63:11,
  63:12, 63:15.
facing 13:17.
fact 80:6, 90:2,
  144:23.
factors 83:21,
  93:21, 93:25,
  94:9.
failed 28:12.
fair 19:6, 19:8,
  53:5, 53:8, 56:16,
  106:14, 107:10,
  117:21, 130:22,
  141:3.
fairly 22:20.
Fallstaff 126:12,
  130:23, 131:3,
  131:23.
familiar 19:20,
  19:25, 20:3,
  30:13, 30:22,
  47:22, 47:23,
  52:1, 62:4,
  156:23, 210:5.
family 35:14.
far 23:11, 25:5,
  44:3, 55:1, 61:2,
  78:9, 82:19,
  88:15, 89:7,
  106:5, 107:11,
  147:4, 169:7,
  189:11.
Farrell 100:22,
  154:17, 154:21,
  161:21, 161:24,
  162:13, 163:21,
  164:5, 164:10,
  170:2, 170:3,

170:8, 170:10,
  170:13, 170:18,
  170:25.
farsight 61:23.
fashion 110:23.
fast 86:20, 86:21,
  119:17, 119:23.
faster 125:18.
favor 63:17.
favorite 110:9,
  110:12.
FBI 16:12, 67:25,
  68:11, 68:13,
  68:24, 68:25,
  69:20, 69:21,
  70:8, 76:9, 76:17,
  82:3, 82:4, 82:5,
  82:15.
FCRR 1:46, 217:17.
features 94:14.
February 190:22,
  190:23, 190:25,
  191:2, 191:18,
  191:20, 191:23,
  192:1, 192:18.
Federal 1:47, 15:6,
  15:9, 19:10, 22:6,
  69:24, 80:12,
  81:8, 82:20, 84:7,
  84:9, 84:12,
  195:23.
feel 186:1.
feeling 57:5.
feels 193:14.
feet 112:18.
fell 193:3, 193:6.
female 9:12.
fence 119:17.
few 29:18, 81:17,
  97:2.
field 28:1,
  215:14.
figure 73:1, 78:9,
  113:3, 164:23.
file 163:15.
files 157:1, 163:7,
  163:11, 182:13.
final 85:24, 108:8,
  154:23.
finally 131:22.

find 19:16, 52:22, 53:9, 92:18, 94:5, 113:6, 122:18, 122:19, 125:17, 151:13, 162:10, 201:16.
fine 15:20, 89:8, 123:7, 155:17, 199:19, 215:19.
fined 54:22.
finger 17:11, 199:9.
fingerprint 17:12.
fingerprints 6:2, 7:16.
fire 202:22.
firearm 61:4.
firearms 19:16, 19:23, 20:6, 20:8.
fit 97:24.
Five 1:10, 20:20, 44:7, 66:16, 75:4, 75:21, 109:10, 143:19, 200:3, 210:3.
fixing 6:5.
flares 18:21.
flashlight 111:13, 111:15.
flee 21:18.
Fleming 11:7, 11:9, 11:12, 17:18, 17:21, 17:23.
Floor 1:48.
Florida 80:13.
follow 15:10, 33:11, 132:17, 134:21.
followed 184:20.
following 90:8, 91:10, 138:16.
follows 2:24, 26:18, 67:14, 181:5.
force 68:21, 69:14, 197:8, 197:9.
foregoing 217:18.
forensic 8:19, 16:6, 16:8, 16:13, 17:16, 207:21, 208:16.

forensics 11:22.
forget 98:9, 197:22.
formal 83:21.
format 76:6, 79:5, 79:6.
forms 75:23, 95:17.
Forsythe 9:13.
forth 38:15, 141:4, 141:9, 147:13, 151:6, 166:25, 168:23, 172:17, 189:3, 189:10, 196:12, 196:15, 200:4, 201:5.
Forward 49:2, 49:4, 76:23, 114:12, 186:12.
found 11:21, 18:5, 19:23.
four 31:20, 54:13, 77:20, 100:4, 101:12, 148:24, 157:25, 161:1, 162:21, 194:6, 210:2, 210:16, 210:17, 216:21.
fourth 78:10.
frame 35:12, 39:22, 106:15, 124:12, 125:8, 140:18, 144:12, 144:22, 145:17, 146:5, 147:18, 148:8, 150:18, 153:15, 167:5, 167:15, 192:13, 192:17, 211:1.
frames 106:7, 143:22.
fraud 172:12, 174:21, 178:8.
Fredericksburg 149:19, 149:20.
frequency 77:20, 83:1, 110:10.
Friday 43:9, 44:17, 214:11, 214:15, 214:18.

friend 56:20.
Fuch 171:21.
Fuchs 107:3, 174:13, 177:12, 182:7, 211:4.
Fuck 191:16, 195:3, 200:11.
fucked 180:1.
full 24:11, 26:22, 67:17, 68:24, 110:25, 134:25, 157:15, 160:19.
furthest 87:7.
future 197:14.
fuzzy 111:24, 112:2, 112:4, 119:22, 119:24.
.
.
< G >.
Gaber 18:16.
game 61:2.
gangs 68:15.
gap 212:13.
garage 18:4.
gas 44:25.
gave 9:4.
general 33:24, 35:13, 93:1, 109:14, 118:8, 144:17.
generally 36:18, 43:18, 69:19, 72:17, 74:4, 97:5, 97:6, 97:15, 109:21, 112:7, 119:24, 175:6.
generate 77:23, 78:12, 89:25.
generated 90:1, 209:24.
generates 157:3.
gentlemen 2:12, 66:13, 91:11, 113:24, 114:9, 155:19, 156:4, 213:15.
geographic 70:11, 70:13, 93:25.
geological 93:24.

George 1:18, 17:5,
  18:2, 68:16,
  68:18.
Gerald 1:31.
gets 191:12.
getting 3:6, 35:4,
  40:7, 50:7, 74:25,
  80:7, 85:2, 134:7,
  164:1, 174:3,
  193:8, 194:20,
  198:6, 209:15.
give 7:16, 49:6,
  50:23, 70:18,
  74:3, 80:21,
  84:24, 90:19,
  95:21, 106:17,
  112:6, 118:14,
  123:6, 185:25,
  202:22, 207:12.
given 24:11, 24:18,
  24:20, 150:5.
GJH-17-0667 1:9.
glasses 61:20,
  61:21.
glean 70:21.
Global 85:14, 204:1,
  204:4, 204:5,
  204:6.
glove 8:6.
GM 52:16.
GMT 210:5, 210:8,
  210:13, 210:15.
go-to-voicemail
  136:4.
Google 71:14, 73:5,
  73:8, 79:11.
Google-based 79:7.
gotta 194:9.
GPS 84:15, 84:22,
  84:23, 84:24,
  85:1, 85:5, 85:7,
  85:20, 86:4.
graduating 68:14.
Grand 6:10, 16:9,
  16:24, 17:3,
  19:13, 22:15,
  43:14, 44:22,
  46:10, 48:8,
  48:13, 49:23,
  49:24, 59:11,

  59:21, 64:24,
  65:6, 65:22,
  195:23, 196:17.
Great 3:24, 27:6,
  122:9, 135:20,
  139:23, 141:24,
  217:11.
greater 60:10,
  85:22, 86:14.
greatest 85:7.
green 35:25, 117:13,
  126:11, 132:1,
  145:10.
Greenbelt 214:15.
Greenspring 18:9.
Greenwood 204:15.
group 69:13,
  76:22.
Groupon. 164:4.
groups 146:7.
grown 42:14.
guess 36:8, 47:14,
  51:8, 174:1.
gun-toting 200:17.
guys 90:12, 151:14,
  171:12.
.
.
.
< H >.
H-10 195:21.
H-2 176:18.
H-e-r-b-e-r-t
  196:4.
habits 48:14.
hair 63:16.
hairs 52:3, 63:11,
  63:12, 63:16.
Hakim 159:11, 164:7,
  170:3, 170:7,
  170:10, 202:25.
half 18:17, 21:15,
  49:12, 54:14.
hand 26:15, 67:11,
  79:13.
hand. 193:20.
handle 16:9, 17:3,
  71:8, 215:5.
handles 204:7.
hands 19:7, 47:1.
handwriting 9:6,

  9:20, 10:12,
  210:10.
hang 56:15.
hanging 197:15,
  200:10.
happen 104:24,
  213:19, 217:1,
  217:5.
happened 23:17,
  28:11, 40:23,
  40:25, 50:15,
  51:25, 96:18,
  97:24, 106:24,
  125:19, 165:6,
  169:13.
happening 5:22,
  216:17.
happens 74:6.
happens. 152:6.
hard 27:11, 48:14,
  119:17, 119:23,
  134:20, 182:2,
  201:1, 202:11.
harken 141:1.
Harness 126:11,
  126:17, 129:4,
  130:6, 131:21,
  132:3, 132:21,
  133:17, 138:3,
  138:12, 138:20,
  140:8, 145:8.
Harry 1:37, 213:1.
Hart 154:19, 159:7,
  159:8, 159:13,
  170:3, 202:25.
hat 108:4.
hate 208:20.
haunt 198:22.
Hazel 1:18.
head 11:4, 22:17.
headed 127:23,
  131:24.
headquarters 5:19,
  5:24, 6:1, 11:23,
  12:11, 20:11,
  24:12, 68:25.
heads 155:9.
heads. 195:7.
Health 70:4, 172:12,
  174:21, 178:7.

hear 27:3, 51:17, 66:21, 93:22.
heard 88:17, 161:19, 170:5, 170:12, 215:4.
hearing 27:11, 34:23, 125:24, 160:16, 176:15, 176:21, 177:15, 178:6, 178:16, 180:20, 186:9, 186:11, 186:12, 186:16, 187:8, 187:16, 187:18.
heavier 45:18, 45:19.
heavy 45:13, 45:16, 187:8.
Heights 12:8, 43:21, 43:24, 44:5, 50:16, 127:24, 128:7, 128:8, 128:25, 129:7, 129:8, 129:13, 129:15, 131:14, 132:7, 140:15, 145:18, 148:25.
Help 31:9, 98:15, 139:10, 141:23, 165:17, 171:12, 175:1.
helped 80:14.
helpful 99:5.
helping 151:14.
Herbert 196:2, 196:3, 196:11, 196:13, 196:16.
hereby 16:5, 16:22, 217:17.
herself 195:17.
HHS 10:20, 70:4, 107:3, 162:5, 162:8.
high 59:21, 59:24.
high. 205:16.
higher 39:21.
highlight 105:6, 106:23.
highlighted 31:18.
highlighting

31:14.
Hightower. 177:23.
hill 94:15, 112:19.
him. 191:16.
hired 68:6, 68:11.
historical 69:16, 80:20, 88:13, 89:19, 95:10.
hit 143:19, 146:22, 147:7, 149:2, 191:9.
hits 85:2, 93:21, 93:25, 95:6, 120:14, 146:13, 146:25.
hitting 118:11, 119:3, 124:11, 128:2, 130:21, 130:23, 151:3, 151:7.
hold 143:18, 156:20.
holding 4:11, 13:17, 47:1, 54:16.
holes 7:6, 25:16, 25:21, 73:1.
Holiday 50:23, 65:4, 100:12, 166:11, 173:17, 175:2.
holla. 202:22.
home 128:16, 128:17, 146:19, 146:22, 146:23, 146:24, 147:3, 148:20, 151:4, 153:21, 172:10, 172:11, 180:10, 182:17.
homicide 14:12, 20:25, 21:14, 132:15, 133:16, 133:21, 178:5.
homicides 68:23.
Honorable 1:18.
Hope 2:3, 114:11, 164:15, 197:6.
hopefully 82:4.
hoping 216:10.
hotel 152:9.
hour 23:3, 49:12,

114:1, 114:3, 114:6, 182:25.
hours 20:20, 43:19, 77:2, 150:22, 151:18, 187:11, 210:2, 210:3, 210:16, 210:17, 214:1.
hours. 190:21.
house 63:2, 130:25, 131:24, 148:16, 182:18, 194:20, 200:12.
hubcap 7:7.
hubcaps 7:20.
Human 70:4.
Hundreds 49:8, 75:6.
.
.
< I >.
ice 195:3.
ID 65:3, 65:5.
idea 49:6, 74:4, 93:1, 95:21, 98:14, 106:17, 118:14, 207:12.
identification 17:12, 166:10.
identified 18:2, 91:13, 100:7, 107:12, 126:7.
identify 10:6, 32:6, 43:14, 87:8, 92:22, 97:22, 98:10, 99:8, 99:17, 100:19, 100:25, 101:6.
identifying 92:17.
II 16:7.
image 163:7, 163:11, 163:15.
images 207:25.
imagine 70:1.
imessage 73:23, 152:25, 153:10, 153:15.
imessages 152:15, 152:21.
imessaging 36:8,

152:11.
immediate 52:2,
    63:10, 85:11.
Immediately 68:13,
    174:10.
important 56:22,
    110:4, 110:22.
importantly 71:5.
impossible 93:18,
    122:17.
in. 112:15, 161:7,
    197:14, 209:22.
inadvertently
    35:25.
inartfully 119:14.
incarcerated 131:5,
    133:7, 202:5,
    204:6.
Incident 13:1, 59:2,
    80:16, 87:9,
    109:5, 169:23.
include 81:12, 88:2,
    89:12, 100:22,
    101:1, 101:6,
    101:9, 101:10,
    102:25, 103:11,
    165:11.
included 99:20,
    99:25, 103:20,
    104:21, 173:6,
    184:4.
includes 70:3.
including 27:12,
    95:18, 114:2,
    155:22, 181:18.
incoming 37:13,
    38:4, 38:7, 64:4,
    120:9, 140:24,
    168:8.
inconsistent 116:19,
    116:21, 142:18,
    144:6.
incorporated
    146:5.
incorporating
    143:23.
indicate 117:14,
    122:4, 142:25,
    176:4, 195:13,
    201:11, 212:17,

216:6.
indicated 19:13,
    21:24, 106:4,
    117:3, 146:18,
    149:22, 182:14,
    184:1, 203:2,
    206:21, 212:22.
indicates 105:20,
    115:2, 115:4,
    117:18, 118:22,
    118:23, 182:16.
indicating 9:7,
    9:20, 13:7,
    200:19, 212:21.
Indicating. 122:6,
    122:8, 145:12.
indications
    116:14.
indictment 126:5.
indictment. 201:3.
individual 9:12,
    95:19, 116:7,
    178:7, 203:2.
individuals
    169:19.
indulgence 6:19,
    42:23, 61:18,
    167:21, 208:22,
    213:12.
influence 83:22.
ingests 79:8.
initial 10:9, 135:2,
    178:6.
initiated 125:2.
initiating 5:16.
injected 18:18.
injuries 18:17.
injury 192:18.
inmate 204:5.
inner 196:23,
    198:24.
input 79:14.
inquire 91:14.
inset 216:21.
inside 25:14, 25:16,
    139:5.
insofar 99:14.
install 34:21.
installing 34:14.
instance 73:12,

75:9, 75:15,
    85:4.
instant 4:25.
instruct 80:15.
instruction 66:16.
instructions
    213:17.
insurance 195:11.
intend 90:11, 90:13,
    90:25.
intended 195:19,
    216:19.
intent 60:13, 60:16,
    60:19, 60:25.
intention 185:7,
    185:9.
interaction 36:14.
intercounty
    112:17.
interest 53:6.
interested 13:3,
    22:19, 74:8.
interior 16:9.
intermingle 95:14.
intermittent
    175:10.
internet 212:17,
    212:21, 212:24.
interpret 76:23.
interrogation 20:17,
    20:21, 23:2.
interview 3:11,
    4:10, 4:17, 5:8,
    5:14, 5:23, 8:10,
    9:5, 14:7, 14:9,
    14:14, 14:23,
    15:2, 20:19,
    20:24, 20:25,
    21:11, 23:7,
    24:13.
interviewed 5:6.
interviews 107:23.
introduced 15:12,
    207:18.
investigate 15:3,
    68:23.
investigated
    178:4.
investigating
    9:15.

investigation 4:21,
5:22, 10:18,
19:10, 97:17,
97:25, 107:16,
156:15, 159:9,
161:23, 205:10.
investigations 68:9,
69:20, 69:21.
investigator 19:6.
involve 98:24,
120:25, 125:13.
involved 14:11,
76:21, 97:16.
involves 89:20,
89:21.
involving 31:3,
137:25, 187:16,
206:8.
iphone 150:19,
151:4, 169:9,
207:14.
iphones 73:21.
isolate 187:22.
isolating 202:17.
issue 90:17, 214:25,
215:8.
issued 204:14,
211:9.
issues 73:2,
153:2.
it. 197:9.
itself 25:17, 87:25,
158:3.
.
.
< J >.
J. 1:18, 1:37.
jacked 55:8.
jacking 55:3.
jail 14:18, 54:17,
133:5, 204:5,
204:6, 204:8.
Jeffrey 18:16.
Jillian 16:23.
job 70:19, 71:8,
79:2, 80:19,
174:7, 174:8,
193:3.
jobs 28:3, 28:17,
36:19, 57:20.

joining 91:5.
Jones 2:6, 2:22,
3:3, 3:5, 4:5,
6:8, 6:20, 8:10,
8:22, 8:24, 10:18,
11:18, 14:7, 15:5,
15:14, 15:21,
17:4, 17:6, 17:15,
18:10, 18:13,
18:23, 24:6,
24:11.
Jr 1:37.
Judge 19:1, 24:1,
78:15, 125:25,
177:4.
July 173:9, 173:10,
173:12, 174:15,
174:16, 207:5.
jumping 137:13.
June 68:24,
212:13.
juries 79:20.
JURORS 2:13, 2:15,
114:10.
.
.
< K >.
Kareem 147:10.
Keep 33:2, 37:6,
48:1, 57:9, 57:12,
87:2, 87:5, 125:4,
154:24, 171:12,
175:3, 185:4,
197:1, 197:10,
198:8, 198:12,
208:25, 213:2.
keeps 87:3.
Kennedy 162:6.
kept 8:16, 39:17,
72:22, 183:11.
key 75:1, 177:21.
key. 177:20.
kick 185:25.
kid 190:17.
kidnapping 92:19,
92:23.
kidnappings 68:23,
77:9.
killed 198:24.
killing 193:6.

Kim 1:27.
Kimberly 101:5,
126:17, 134:12,
134:13, 141:8,
141:13.
know. 203:7.
knowing 63:8.
knowledge 7:25,
21:17, 22:8,
23:11, 23:13,
107:7, 107:15.
known 32:18, 32:21,
52:7, 71:21,
91:25, 202:25.
.
.
< L >.
lab 6:2, 6:25,
13:16, 16:23.
laboratories
16:13.
laboratory 81:25,
82:5, 82:7,
82:11.
Lacy 16:23, 17:2.
Ladies 2:12, 66:13,
91:11, 113:24,
114:9, 155:19,
156:4, 213:15.
landscape 94:14.
Lansey 17:16, 17:19,
17:21.
lapel 96:13, 96:15,
122:14.
large 115:1.
Last 12:1, 14:16,
18:6, 18:19,
31:20, 45:5,
68:24, 80:25,
86:1, 92:25,
100:4, 101:9,
101:12, 104:10,
104:11, 134:6,
137:13, 154:6,
155:4, 157:25,
164:2, 165:8,
180:8, 185:16,
205:7, 205:8,
210:16.
lasted 204:9.

lasts 186:22.
late 22:20, 55:4,
    197:7.
latent 17:1, 17:2,
    17:5, 18:1.
later 22:22, 59:9,
    100:7, 111:4,
    130:5, 174:2,
    186:25, 193:8,
    194:6.
latitude 113:7.
laugh. 183:12.
law 3:25, 14:13,
    68:4, 69:4, 74:7,
    74:11, 74:12,
    76:1, 76:3, 78:2,
    80:12, 81:23,
    84:1, 84:7, 84:9,
    84:12, 90:3.
lawyer 59:15,
    179:6.
laying 63:2.
lead 19:6.
learn 22:18, 77:21,
    78:25, 80:4.
learned 5:15, 11:11,
    12:15, 77:4, 78:3,
    78:6, 213:21.
lease 54:16.
leasing 54:16.
least 16:14, 57:14,
    129:22, 214:14.
leave 5:24, 30:18,
    143:3, 150:15,
    187:14, 196:25,
    214:16.
leaving 50:4,
    149:13.
led 14:14, 62:19,
    62:20.
left 8:9, 32:10,
    42:9, 42:17,
    46:13, 66:24,
    68:11, 98:23,
    114:5, 114:25,
    120:12, 123:19,
    132:2, 147:8,
    147:21, 148:17,
    155:23, 182:18,
    193:20, 213:24,

    216:18.
left-hand 118:15,
    130:25.
left. 190:17.
legal 215:1.
legend 114:25,
    117:12, 124:2,
    131:1.
length 10:22,
    65:19.
lengthy 165:1,
    179:9, 215:2.
less 63:14, 63:15,
    197:24.
Lesser 52:11, 98:7,
    139:10, 139:18,
    139:20, 154:24,
    192:20.
letter 173:5,
    173:14.
letters 162:20.
level 39:21, 90:4.
Liberty 2:6,
    170:20.
license 12:23, 13:5,
    13:6, 13:8, 13:10,
    13:11, 13:15,
    13:22, 58:4.
lie 179:24.
lie. 179:25.
lies 180:1.
life 27:16, 28:2,
    54:19, 198:23.
lift 17:6.
light 86:20, 111:16,
    111:19, 111:21,
    111:23, 111:24,
    111:25.
lightening 95:5.
lights 111:14.
likely 59:23, 60:1,
    147:5.
Limestone 69:8.
Limited 14:10,
    19:12, 20:5,
    38:17, 97:10,
    217:2.
limits 216:10.
line 4:18, 71:6,
    94:22, 104:10,

    104:11, 104:13,
    104:23, 104:25,
    105:11, 113:16,
    119:22, 119:23,
    126:1, 135:4,
    152:23, 152:24,
    164:18, 164:25,
    168:14, 177:22,
    177:24, 178:3,
    178:21, 179:22,
    179:24, 188:15.
lines 96:3, 96:6,
    104:16, 105:9,
    106:19, 111:9,
    119:15, 119:20,
    122:6, 164:21,
    185:24, 193:1,
    194:6.
Link 184:9, 184:13,
    204:2, 204:4,
    204:5, 204:7.
Lisa 174:6, 182:7.
list 79:9, 92:8,
    92:11, 92:13,
    113:6, 121:13,
    134:25, 173:1,
    173:2.
listed 14:21, 14:25,
    72:13, 170:16,
    170:17, 171:3.
listen 33:11, 49:3,
    49:5, 110:12.
listened 50:12.
little 16:2, 27:11,
    34:23, 42:16,
    45:13, 45:16,
    50:11, 68:17,
    70:19, 80:23,
    87:6, 112:2,
    118:20, 132:1,
    140:3, 142:24,
    145:10, 148:16,
    161:19, 208:21.
live 29:23, 193:13,
    198:21.
lived 27:16.
living 30:2, 43:18,
    44:3.
local 69:24, 80:11,
    101:24, 101:25,

102:2.
locate 11:14, 86:8,
   93:3, 192:17.
located 28:23,
   29:17, 69:15,
   78:22, 92:3,
   92:12, 93:1,
   126:25, 138:8,
   170:14.
location-based
   71:16.
locations 17:7,
   109:21, 116:10,
   116:21, 118:5,
   124:3, 126:7,
   126:22, 132:24,
   133:1.
lock 161:7.
locked 54:14, 58:14,
   161:9.
Lombard 1:48,
   93:19.
long 19:7, 22:21,
   23:3, 28:9, 32:18,
   32:20, 33:14,
   42:18, 46:25,
   47:2, 47:4, 49:9,
   52:7, 53:25,
   54:12, 64:22,
   68:2, 71:3, 77:11,
   87:2, 97:3,
   102:17, 182:5,
   190:12, 198:23.
longer 87:6.
longest 87:2.
longitude 113:7.
looked 25:22, 31:2,
   33:20, 52:1,
   107:1, 111:8.
Looks 45:18, 47:24,
   48:2, 64:5,
   162:19, 201:1.
Lorraine 17:16.
lose 139:9.
losing. 197:16.
lost 139:8, 198:1.
lot 64:9, 64:13,
   79:4, 87:9, 112:1,
   112:12, 123:8,
   135:19, 166:12,

209:19.
loud 18:10.
loudly 122:18.
low 55:20.
lower 149:9.
Loyola 129:19.
LTE 118:22, 119:6.
lube 28:17.
lumbar 18:18,
   18:20.
lunch 113:21,
   113:25, 114:4,
   114:11, 114:19.
.
.
.
< M >.
M-a-t-h-e-w 67:18.
M-i-c-h-a-e-l
   26:23.
M. 1:33.
machine 56:13,
   64:10, 206:21.
mad 49:17, 49:21,
   50:10.
Madame 26:12.
madder 49:25,
   50:3.
mail 56:14, 64:15,
   70:25, 122:11,
   122:23, 123:5,
   135:7, 136:14,
   144:4.
main 68:20, 105:17,
   121:14, 149:22,
   176:3, 178:15,
   188:1.
maintain 78:5.
major 75:4,
   110:14.
man 42:14, 45:8,
   115:19, 159:7,
   185:21, 206:25.
manner 39:1.
manually 79:14.
manufacturer
   71:19.
map 77:6, 78:12,
   79:11, 117:15,
   123:22, 127:5,
   127:15, 130:15,

134:3, 136:7,
   137:8, 138:5,
   140:5, 140:17,
   140:23, 140:25,
   145:24, 152:15,
   153:8, 216:18,
   216:20.
mapped 116:10,
   135:3, 136:3,
   188:18, 211:22.
mapping 77:5, 79:6,
   83:16, 83:20,
   88:16, 89:12,
   89:18, 89:23,
   115:25, 116:7,
   117:5, 120:4,
   132:10, 138:16,
   140:18, 142:5,
   153:2, 155:9,
   160:17, 200:21.
maps 89:25,
   113:19.
Marcaine 18:18.
March 193:21,
   194:6.
marijuana 5:11,
   22:19, 33:4, 33:5,
   33:7, 33:9, 33:14,
   33:17, 35:4,
   35:10, 49:20,
   50:5, 50:9, 52:22,
   56:18, 56:22,
   56:23, 59:17.
mark 65:2, 100:10,
   101:13, 165:20,
   166:10.
marked 13:20, 90:25,
   134:19.
markedly 18:20.
markers 130:5.
marking 100:14.
Marsh 130:8.
Marsh. 36:10.
Marshals 217:2.
Maryland 1:2, 1:20,
   1:49, 10:25, 13:5,
   13:10, 13:11,
   14:2, 15:25,
   16:19, 16:24,
   17:5, 27:15, 70:1,

80:12, 149:13,
150:8, 150:15,
210:1.
Matagaria 18:3,
18:4.
match 92:14.
matches 79:10.
Mathew 67:8, 67:12,
67:18.
Matt 9:2, 44:25,
45:2, 45:3, 45:4,
45:5, 45:11,
45:21, 45:24,
46:17, 47:6,
47:14, 47:15,
174:7, 194:18,
194:19, 195:11,
199:25, 200:13.
Matt. 199:18.
matter 33:24, 33:25,
177:17, 185:5,
195:23, 217:19.
Matthew 13:23,
14:18, 32:15,
105:21, 126:4,
171:19, 175:8,
182:16, 190:2,
213:3.
me. 193:4, 193:6,
211:13.
meal 24:11.
mean 39:19, 40:24,
42:14, 45:2,
46:23, 52:16,
52:21, 55:24,
56:13, 56:21,
71:15, 84:23,
89:5, 116:24,
125:1, 129:2,
134:2, 143:2,
144:25, 148:9,
149:7, 158:15,
160:5, 176:4,
176:11, 181:2,
183:17, 184:21,
189:8.
Meaning 40:2, 71:23,
74:14, 170:22.
means 91:5, 92:17,
106:23, 113:12,

125:2, 158:16.
meant 9:12, 15:16,
39:19, 84:2,
118:10, 119:17.
measurement 86:18.
mechanic 48:23,
49:7.
mechanical 28:3,
28:13, 28:16.
meet 10:19, 29:10,
78:20, 78:21,
164:1, 186:13.
meeting 172:2,
173:15, 173:21,
176:7, 176:9,
183:3, 187:18,
191:17.
meetings 78:1.
Melvin 101:5,
126:18, 134:12,
134:13, 134:15,
134:19, 135:6,
135:22, 135:24,
136:5, 136:14,
141:2, 141:3,
141:8, 141:13,
141:18, 144:1,
206:9, 211:4,
211:12, 212:4.
member 68:25, 77:1,
78:17, 80:7.
members 20:15, 68:5,
77:17.
memo 173:6.
Memorial 56:6, 56:7,
56:21, 57:5,
57:24, 66:1.
memory 64:24, 65:11,
65:13, 134:11.
men 161:1, 198:24.
mentioned 25:14,
61:7, 79:18,
82:24, 83:13,
83:25, 87:11,
87:14, 88:5.
Mercer 1:39, 81:17,
81:20, 85:19,
85:22, 86:10,
87:24, 88:10,
88:12, 89:10,

89:16, 90:8,
90:10, 90:17,
91:9, 92:15,
93:20.
messaging 73:16,
73:19.
met 32:23, 33:3,
59:22, 77:24,
77:25, 78:1.
meters 84:24.
methodology
109:20.
MH 171:19.
Michael 11:6, 11:9,
11:12, 17:18,
17:21, 26:7,
26:16, 26:23,
58:15, 60:9,
60:12, 60:15,
60:18, 60:21,
61:3, 109:8,
115:19.
microphone 26:21,
27:9, 33:2, 48:1,
51:18, 94:16,
94:20.
Microsoft 79:4,
165:1.
middle 61:16, 61:17,
176:6, 193:16,
195:1, 208:4.
midnight 176:8.
mike 96:13, 96:15,
122:15.
millions 95:2,
95:3.
Mills 10:25,
11:10.
min 194:3.
mind 13:17, 40:24,
41:1, 41:18, 42:9,
64:16, 64:21,
197:14.
mind. 187:8.
mine 56:20,
155:13.
minus 210:2,
210:3.
minute 31:13, 35:8,
40:18, 64:5,

64:17, 121:21,
139:12, 150:14,
179:7, 181:3,
181:19, 192:11.
minute. 164:2.
minutes 20:20,
30:19, 44:7, 53:1,
66:15, 66:16,
66:18, 66:25,
72:24, 102:16,
143:19, 155:24,
166:20, 166:22,
173:25, 179:8,
179:12, 182:5,
182:10, 186:22,
190:12, 204:9.
miscellaneous
101:16.
misheard 168:1,
170:2.
missed 38:4,
199:4.
missing 164:19,
164:21, 185:23.
mistake 57:21.
mixed 170:2.
Mobile 75:15, 75:16,
75:17, 75:19.
model 84:3, 84:6,
152:9.
modeling 83:16.
moment 22:12, 24:1,
35:2, 40:5, 69:3,
69:19, 96:19,
97:6, 97:18,
100:18, 102:10,
102:24, 108:3,
108:12, 119:13,
123:6, 123:10,
124:19, 125:11,
126:21, 142:11,
144:21, 155:14,
165:15, 167:2,
171:9, 206:2.
Monday 186:13.
money 28:12, 36:21,
39:9, 55:13, 57:1,
57:14, 75:25,
178:11, 195:11.
monitor 116:14,

119:2.
monitoring 182:20.
monitors 114:24.
Monroe 28:25,
61:13.
Montgomery 112:16.
month 57:17, 175:17,
186:25.
months 87:6, 87:9.
mood. 185:10.
moot 78:10, 78:14,
79:19, 79:23,
79:24, 80:17,
90:23.
motion 177:22,
194:4.
motions 125:22.
motor 28:18, 58:1.
mount 112:13.
mountain 94:15,
94:16, 94:17,
94:18.
move 49:4, 87:22,
105:16, 114:12,
143:12, 155:2,
180:25.
moved 129:1, 137:15,
147:2, 147:5,
155:6.
movement 142:25,
148:7, 150:22.
moves 129:6, 129:7,
129:20, 150:2.
movies. 36:9.
moving 18:7, 51:9,
51:10, 51:12,
57:9.
multiple 10:19.
murder 50:15, 51:25,
116:20, 116:22,
120:22, 127:12,
184:11, 202:5.
murdering 93:19.
must. 197:7.
mute 50:22.
muted 50:21.
Myles 174:18,
174:20, 175:11.
Myrtle 150:3,
159:22, 159:25,

160:4.
myself 27:12, 63:7,
63:8, 185:15.
.
.
< N >.
nail 217:1, 217:4.
name 11:12, 26:22,
28:7, 30:18, 45:5,
67:17, 71:25,
72:4, 100:22,
101:9, 115:12,
115:19, 158:17,
174:18, 177:12,
197:23, 206:25.
named 76:18, 159:7,
181:12, 185:21,
196:10.
names 14:20, 137:1,
152:5.
narcotics 61:5,
68:10.
national 69:23.
nature 6:3, 7:8,
46:7, 89:25.
Near 13:1, 29:13,
50:16, 123:15,
128:15, 129:1,
129:19, 137:23,
138:10, 138:12,
140:10, 148:1,
148:20, 149:6,
149:19, 170:20,
170:21.
nearsight 61:23.
necessary 217:8.
need 33:1, 72:8,
88:17, 98:16,
108:25, 110:18,
110:19, 134:10,
152:5, 156:18,
159:17, 159:19,
160:10, 165:12,
166:7, 166:13,
170:7, 192:25,
195:11, 200:8,
205:16, 206:2,
214:8, 215:22,
216:11, 216:16,
216:22.

needed 29:12, 39:9,
  41:2, 76:22,
  158:7.
needs 213:21.
negative 200:16.
neglect 187:20.
neglected 131:3,
  173:18.
neighborhood 5:21,
  149:1.
neither 17:3.
nervous 213:25.
Netflix 73:10,
  152:25.
network 73:1, 73:2,
  75:8, 75:13,
  77:22, 77:23,
  78:4, 78:5, 78:6,
  78:13, 83:9,
  83:11, 83:13,
  83:16, 152:18.
networks 76:4,
  144:16.
New 7:7, 62:5,
  80:15, 174:18,
  180:15.
news 50:15, 50:17,
  50:18, 51:3, 51:6,
  51:7, 58:18,
  184:13, 213:20.
nice 111:9,
  112:10.
nickname 159:11.
nicknames 159:4.
Nieto 173:13.
niggas 180:1.
night 5:20, 23:1,
  43:1, 44:8,
  133:15, 178:8,
  202:4.
Nine 17:10, 32:1.
nitty-gritty
  206:6.
No. 1:9, 4:13,
  15:22, 16:4,
  16:10, 16:14,
  16:20, 17:11,
  48:11, 109:10,
  131:12, 135:4,
  149:16, 159:4,

  214:2, 217:14.
Nobody 57:10,
  58:9.
Nodding. 49:11.
noise 34:17.
non- 73:3.
None 19:17, 19:24,
  20:7, 20:9.
normal 13:10,
  13:11.
normally 36:20,
  39:21, 49:1,
  65:25.
Norman 14:7, 14:14,
  15:2, 17:18,
  115:16.
North 29:18, 29:22,
  29:24, 42:21,
  44:14, 113:13,
  127:22, 131:20,
  138:8, 149:18,
  149:20, 150:3.
Northern 1:2,
  131:21.
northwest 138:8.
note 124:10, 124:23,
  130:18, 133:25,
  138:2, 166:25,
  168:4, 172:2,
  172:8, 173:10,
  173:20, 212:12.
notebook 97:7,
  98:19, 123:3,
  163:19, 164:17.
noted 116:20,
  118:15, 127:10,
  127:15, 130:5,
  136:9, 161:2,
  161:12, 164:18,
  171:15, 171:18,
  172:5, 173:4,
  182:12, 183:2,
  183:21, 187:7,
  204:12.
notes 52:9, 102:22,
  159:19, 160:11,
  166:7, 167:23,
  170:4, 170:16,
  171:5, 184:7,
  208:19, 208:24,

  213:10, 214:3.
Nothing 2:4, 18:24,
  25:24, 30:18,
  57:20, 66:7,
  88:10, 111:6,
  140:25, 184:11,
  185:10, 197:3,
  197:15, 199:10.
notice 55:16,
  110:22, 183:22.
notified 53:9.
Noting 126:24,
  127:18.
November 213:3.
now. 203:22.
NY 180:10, 180:15.
.
.
< O >.
o'clock 22:21,
  114:1, 125:24,
  136:10, 142:6,
  145:17, 145:18,
  149:17, 149:19,
  176:15, 186:8,
  215:8.
oath 2:18, 114:13,
  156:5.
object 87:18, 87:19,
  89:12.
Objection 24:14,
  38:23, 50:1,
  81:13, 85:21,
  87:21, 88:11,
  88:12, 89:2,
  89:15, 91:3.
observation 52:6,
  184:10.
observations 7:23,
  25:20.
obtain 10:14, 56:22,
  74:20, 178:17.
obtained 16:8, 17:6,
  106:8, 107:11.
obtaining 56:18,
  56:23.
obvious 140:21.
Obviously 7:18,
  80:19, 85:25,
  103:12, 105:10,

108:25, 115:7,
201:11, 205:17.
occasionally
209:14.
occur 10:16.
occurred 20:2, 71:1,
87:9, 91:23,
93:17, 101:24,
106:22, 109:6,
147:25, 148:4.
occurs 94:13.
October 182:1,
182:3, 182:14,
182:15, 182:16,
182:17, 182:24,
183:5, 183:9.
odd 28:3.
odds 36:19.
offer 60:3, 81:10.
offered 207:10.
offering 89:6.
Office 68:14, 68:21,
70:14, 173:2,
173:13, 176:25,
182:13.
officer 68:8, 81:23,
90:3, 177:10,
181:15, 181:16,
182:20.
officers 10:21,
69:14.
offices 70:15.
Official 1:47,
217:23.
officially 15:8,
76:18.
often 33:7.
Okay. 191:9, 195:14,
199:1.
Old 27:6, 48:14,
53:20, 70:24,
72:18, 174:7,
174:8, 195:7,
204:14.
old-fashioned
139:16, 139:22.
old-school 87:16.
older 73:20.
omitted 164:23,
164:25.

once 19:10, 28:19,
55:6.
one-minute 105:24.
one-third 113:18.
one. 3:25, 94:11,
141:24, 144:19.
ones 34:17, 41:5,
101:16, 107:12,
108:2, 112:18,
133:9.
ongoing 18:20,
177:23.
open 90:14, 91:10,
151:11.
operate 75:8,
209:20, 209:22.
operating 75:12,
119:6.
operation 28:9.
operations 20:15.
opinion 112:11,
144:12, 147:1,
148:6, 148:19,
149:5, 197:11.
opinion. 197:11.
opportunity 3:10,
3:13.
opposed 87:16,
167:12.
opposite 44:24.
order 22:2, 34:17,
74:9, 74:14,
74:22, 105:13.
orientation 113:10,
113:11.
orientations
113:1.
original 123:3,
139:15, 209:14,
212:4.
originals 114:21.
Oscar 193:8.
ourselves 82:23.
outcome 187:10,
187:13.
outgoing 37:8,
38:10, 104:21,
120:9, 135:23,
140:24, 154:13,
161:1, 161:3.

outline 195:20,
198:14.
outside 7:10, 26:8,
49:2, 82:7, 82:17,
82:21, 95:2, 95:4,
150:10, 200:14.
Outside. 36:9.
overlap 150:5.
overlapping 150:2.
overrule 87:21.
Overruled 50:2.
Owings 10:25,
11:9.
own 28:5.
owner 18:4.
.
.
< P >.
P- 100:11.
P-10 10:8.
P-10A 157:21,
160:21.
P-10B 160:21,
161:13.
P-10C 124:16,
158:10, 158:25,
159:5.
P-12 162:2, 162:18,
163:14, 191:19.
P-12A 163:18.
P-14 207:21.
P-19 173:18.
P-25 37:22, 64:2.
P-25A 31:13, 36:2,
37:7.
P-26 46:11, 47:8.
P-27 43:15.
P-28 47:20, 48:6.
P-2A 171:14, 171:16,
172:6.
P-2B 175:2, 175:3,
192:19.
P-2C 187:23.
P-2D 191:24.
P-2F 200:23,
201:20.
P-2G 202:9,
202:16.
P-2H 203:13,
204:21.

P-2I 204:21,
  205:4.
P-2J 151:13, 151:16,
  152:2, 205:21.
P-2K 134:21, 135:10,
  141:7, 206:7.
P-2L 206:14.
P-2M 206:24.
P-2N 207:4.
P-2O 101:13, 106:4,
  133:13.
P-2P 164:22.
P-2Q 165:21.
P-3 108:11.
P-4 108:11.
P-5 108:11.
P-6 108:11.
P-7 108:12, 141:24,
  154:23.
P-8 9:1.
P-9 9:17.
P-9A 156:20, 157:10,
  160:20.
pad 55:19, 55:20.
pads 55:22, 55:25,
  56:3.
pages 97:4, 104:9,
  165:8, 207:15.
paid 54:18.
pain 18:21,
  193:13.
palm 17:11, 17:22,
  17:23.
Panama 185:21,
  185:22.
paper 14:17, 14:25,
  70:24, 73:19,
  151:15.
paperwork 23:23,
  25:5.
paragraph 18:14,
  18:15.
Park 12:8, 43:21,
  43:24, 44:5,
  50:16, 127:24,
  128:7, 128:8,
  128:25, 129:1,
  129:6, 129:8,
  129:13, 129:15,
  131:14, 132:7,

140:15, 145:18,
  148:3, 148:25.
parking 4:15.
Parkview 59:5.
Parkway 131:21,
  170:20.
Parole 154:15,
  181:16, 188:7,
  188:10, 188:12,
  189:15, 190:6,
  190:24.
part 4:10, 19:8,
  31:5, 31:18,
  80:19, 81:3,
  82:24, 84:6,
  86:25, 88:19,
  88:20, 89:13,
  93:6, 108:4,
  125:13, 164:23,
  173:7, 176:17,
  198:14, 207:23,
  215:5.
partial 16:14.
participate 10:24,
  11:18.
particular 14:24,
  15:13, 79:1,
  93:10, 93:22,
  95:16, 105:10,
  108:2, 118:10,
  119:18, 120:24,
  120:25, 124:12,
  125:18, 138:2,
  138:5, 140:23,
  145:3, 147:18,
  153:15, 157:7,
  157:10, 168:9,
  175:4, 177:15,
  183:24.
particularly 29:20,
  79:2, 184:16.
parties 17:13,
  18:3.
parts 7:8, 29:10,
  29:11, 78:23.
pass 3:18.
passenger 16:9.
past 58:2, 80:14,
  198:21.
paste 165:2.

patrol 68:8.
PCMD 86:25, 87:3.
PDF 79:5.
pencil 215:23.
pending 177:17.
Pennington 28:24,
  28:25.
People 29:9, 36:19,
  36:20, 42:15,
  54:2, 54:5, 57:12,
  66:5, 72:14,
  73:21, 78:2, 78:4,
  79:25, 80:3,
  95:19, 97:14,
  112:9, 152:5,
  197:7, 197:11,
  197:13, 197:14,
  197:15, 197:22,
  197:23, 198:21,
  199:8, 200:16.
per 86:18.
percent 90:8,
  122:25.
Perfect 111:11,
  111:12, 123:21.
perform 95:9, 95:23,
  103:24, 104:1,
  115:21, 159:14.
performed 16:8,
  16:11, 90:15,
  104:3, 104:4,
  156:14.
period 20:23, 21:18,
  23:10, 83:23,
  106:22, 141:12,
  151:1.
permission 3:18,
  15:13.
permitted 5:24,
  76:25.
person 4:8, 45:22,
  52:4, 71:25, 73:4,
  76:8, 86:8, 93:15,
  93:16, 100:22,
  102:5, 102:9,
  104:22, 107:1,
  154:2, 168:10,
  196:10, 199:17,
  200:12.
personally 28:15.

perspective 73:11.
pertain 116:15,
  118:20, 124:20.
pertaining 115:18,
  119:2, 120:2,
  123:23, 153:8,
  192:18, 206:15,
  206:24.
pertains 157:11,
  205:22, 207:5.
pertinent 103:19,
  106:22.
PG 170:22.
PH 45:6.
PH-3 45:8.
phonetic 18:3.
photo 6:24, 7:1,
  51:9, 51:10,
  51:11, 51:12,
  63:7.
photographs
  208:13.
phrase 25:15, 30:13,
  70:18, 91:18,
  158:14.
Physical 18:9, 79:6,
  103:5, 109:13,
  157:2.
physically 25:1,
  25:18, 34:15,
  55:21, 55:22.
physics 83:3.
pick 163:10,
  194:17.
picked 122:11.
picking 143:10.
picks 94:25.
picture 6:22, 25:21,
  45:19, 45:20,
  51:8, 81:3, 110:2,
  110:5, 209:4,
  209:5.
pictures 152:5,
  216:21.
piece 14:17, 78:7,
  79:7, 106:2.
pieces 113:16,
  151:15.
Pikesville 126:11,
  127:22, 129:4,

131:24, 133:18,
  138:3.
Pimlico 148:2.
pin 115:1, 115:2,
  115:4, 126:11,
  126:12, 126:13.
pine 112:16, 112:17,
  112:21.
ping 85:2, 93:3,
  93:4.
pings 151:8.
Pinpoint 77:3,
  77:11, 80:11.
place 44:3, 54:13,
  111:23.
placed 7:13, 17:12,
  23:18, 23:20,
  23:23, 25:2,
  102:21.
places 33:17, 70:1,
  78:24, 92:3,
  118:9, 197:7.
Plaintiff 1:7,
  1:23.
planning 214:7,
  214:21.
plate 12:23, 13:5,
  13:6, 13:8, 13:10,
  13:11, 13:15,
  13:22.
play 3:6, 50:20.
played. 4:1, 51:1.
playing 3:20,
  58:19.
Plaza 44:2.
Please 4:4, 15:22,
  15:23, 16:3, 26:1,
  26:14, 26:21,
  27:8, 49:18,
  51:18, 67:10,
  67:16, 114:2,
  120:7, 143:4,
  155:21, 166:13,
  182:2, 186:13,
  213:17, 214:5,
  216:23.
plot 116:23.
plotting 89:20.
pocket 111:18.
pocketbook 111:18.

podium 156:10.
Point. 66:14,
  113:25, 127:3,
  129:11, 155:20,
  213:16.
pointing 146:18,
  148:17, 150:11,
  208:4.
Police 8:16, 10:20,
  15:6, 16:7, 16:23,
  17:15, 20:10,
  22:5, 24:12,
  68:22, 69:25,
  205:18.
Pontiac 6:7, 6:10,
  6:23, 8:5, 16:9,
  17:3, 25:11, 34:6,
  34:9, 55:1,
  56:24.
portion 18:10,
  91:21, 104:21,
  180:21.
positioning 85:14.
Possession 60:13,
  60:16, 60:19,
  60:24, 60:25,
  158:16.
Possibility 60:11.
possible 104:17,
  148:7, 158:5,
  180:15.
post 18:17.
Post-it 9:6,
  210:19.
Potentially 143:1,
  143:6.
Powell 14:7, 14:9,
  14:14, 14:23,
  15:2, 17:18,
  17:20, 115:16.
Power 108:7, 108:17,
  108:21, 109:12,
  114:20, 123:11,
  123:13, 124:5,
  127:2, 127:11,
  128:12, 129:11,
  132:9, 135:25,
  137:9, 138:1,
  142:10.
powered 94:3.

powers 82:2.
practicals 77:15.
precede 155:8.
precisely 214:17.
prepaid 72:6.
preparation 31:2,
   31:16, 33:20,
   40:19, 43:13,
   46:10, 47:19,
   97:7, 107:2,
   108:6, 168:25.
prepare 96:9, 108:7,
   165:19, 169:20,
   171:10, 191:21,
   200:18, 202:13,
   203:9.
prepared 108:13,
   175:1.
Prescription 61:21,
   61:22.
presence 177:25.
present 11:23,
   12:11, 12:19,
   19:19, 20:2,
   25:10, 78:14,
   176:25, 215:22.
present. 186:14.
presentation
   114:20.
presenting 96:8.
presume 70:3.
pretty 21:7, 22:21,
   27:16, 56:9,
   93:5.
previous 86:3,
   136:21, 137:14,
   160:5.
previously 2:23,
   15:11, 27:18,
   27:22, 205:20,
   206:7.
primarily 28:1,
   106:18.
primary 101:17.
Prince 68:16,
   68:18.
print 17:16, 18:1,
   165:3, 165:4,
   165:5, 165:9.
printout 156:22,

157:15, 158:2.
prints 17:1, 17:2,
   17:6, 17:10,
   17:11, 17:17,
   17:21, 17:22,
   17:24, 18:1.
Prior 27:20, 54:8,
   125:5, 135:5,
   137:5, 164:13,
   169:5, 169:8,
   169:15, 169:16.
probabilistic 83:16,
   89:25.
Probably 22:20,
   36:16, 50:6, 53:1,
   56:14, 74:1,
   87:24, 112:6,
   125:17, 139:20,
   199:17.
probation 154:15,
   177:10, 181:16,
   182:13, 188:8,
   188:11, 188:12,
   189:15, 190:7,
   190:24.
procedure 25:1,
   25:9.
procedures 16:11.
proceed 81:18,
   199:20.
Proceedings 1:17,
   91:10, 217:15,
   217:19.
process 31:5, 34:14,
   74:16, 157:2.
processed 12:20,
   16:24, 17:1,
   17:4.
processing 6:2,
   11:19, 11:24.
produced 90:14.
products 79:4.
proffer 89:11.
profile 16:14.
profit 84:4.
profitable 75:25.
program 77:5, 79:1,
   79:15, 157:3.
Progressives 62:3.
Project 77:3, 77:11,

80:10.
promise 214:2,
   214:3.
property 16:10.
prosecuting 22:19.
prosecutor 78:15,
   80:2.
prospective 93:2.
provide 77:13, 78:2,
   84:3, 84:4, 86:14,
   93:9, 117:5.
provided 77:15,
   78:11, 102:24,
   161:15, 173:2,
   216:18.
provider 92:6,
   92:9.
providers 75:2,
   75:4, 92:2.
provides 173:1.
providing 137:23,
   140:9, 145:8,
   150:25, 153:19.
provisions 178:13.
public 14:13,
   69:23.
Pull 26:20, 34:16,
   34:18, 49:2,
   49:13, 85:1,
   92:24, 173:18,
   182:2.
Pulled 93:14, 191:9,
   191:11, 191:12.
Pulled. 191:11.
pulling 28:18,
   55:3.
purged 87:10.
purple 132:1.
purposes 95:11,
   108:17, 109:14,
   112:22, 130:15,
   137:6, 158:21,
   162:17, 162:18,
   166:10.
pursuing 39:8.
push 76:23,
   213:20.
pushing 185:14.
puts 79:10.
putting 56:23,

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

154:1.
.
.
< Q >.
qualifications
    85:18, 89:11.
qualified 88:24,
    89:6.
quality 16:12.
Quantico 82:10,
    82:11, 149:19.
quantify 168:16.
quantity 5:11.
Quarters 164:1.
question 6:10,
    11:11, 12:1,
    27:23, 32:20,
    39:5, 49:18,
    51:20, 52:12,
    57:9, 85:24, 86:2,
    87:23, 89:7, 89:9,
    116:12, 122:20,
    122:21, 167:2,
    174:7, 216:14.
questioned 80:2.
questioning 4:18,
    5:2, 60:6.
questions 24:5,
    33:12, 56:5, 62:8,
    62:11, 62:16,
    81:17, 85:18,
    92:15, 93:20,
    93:22, 97:2,
    157:20.
quick 167:23,
    199:2.
quicker 172:22.
quite 80:13.
.
.
< R >.
R-1 18:7.
R-21 13:13.
Raceway 148:2.
radiates 18:21.
Radio 77:20, 77:21,
    82:25, 83:1,
    89:24, 110:8,
    110:9, 110:10,
    110:14.

rain 95:5.
raise 26:14,
    67:10.
raised 27:14, 87:18,
    89:9.
range 93:5.
rapping 195:7.
rated 77:16.
rather 86:7.
reach 186:18,
    214:10.
reaches 78:10.
reaching 35:24,
    192:5.
react 193:14.
reaction 51:6,
    51:21, 51:22,
    51:24, 52:2, 52:6,
    63:5, 63:6,
    63:10.
Readiness 80:16.
reading 41:11,
    61:21, 61:22,
    69:16, 73:11,
    80:20, 185:4,
    197:1.
ready 2:17, 3:6,
    58:13, 66:15,
    91:7, 114:12,
    114:15, 156:8,
    209:15.
real 78:11, 78:14,
    167:23, 199:2.
real-time 86:16.
Really 30:7, 35:13,
    42:12, 53:5,
    56:17, 57:21,
    73:22, 75:10,
    75:12, 75:18,
    95:1, 111:20,
    142:23, 146:7,
    192:4, 197:2.
really. 39:4.
realm 143:13.
rear 6:16.
reason 72:14, 72:23,
    72:25, 73:2, 73:4,
    87:18, 147:23.
reasons 72:23.
receive 110:7,

110:12, 110:16,
    110:17, 110:18,
    110:21.
received 14:10,
    95:17, 184:10,
    204:9.
receiving 102:8,
    105:1, 150:8.
recently 7:13, 7:17,
    27:19, 27:20,
    58:1, 58:21,
    58:22, 62:6.
recertification
    78:19.
recess 67:2, 114:7,
    155:25.
recognize 6:8, 45:8,
    46:13, 47:20,
    60:4, 124:17.
recollection 30:25,
    31:6, 31:10,
    31:20, 65:17.
record. 89:4.
recorded 3:6, 73:7,
    94:8, 106:20,
    134:16, 144:24,
    146:14, 152:1,
    159:3, 170:3,
    173:10, 174:11,
    175:6, 179:1,
    186:7, 191:18,
    200:23, 202:16,
    205:3, 208:3.
recording 3:11,
    9:13.
recount 65:22.
recover 103:13,
    103:15, 190:15,
    194:25, 195:8.
recovered 8:5, 9:2,
    9:18, 10:9, 12:7,
    12:8, 12:13,
    12:15, 13:5,
    13:15, 13:22,
    16:25, 17:2, 20:6,
    20:8, 190:3,
    190:19, 193:17,
    195:16.
red 106:20, 106:23,
    115:1, 115:2,

115:5, 126:24,
137:2, 211:3.
redact 178:13.
redacted 160:19.
redaction 158:7.
redactions 158:6,
162:17.
REDIRECT 24:7, 24:9,
62:12, 62:14.
refer 31:25, 92:7,
108:25, 165:12,
166:13, 172:20,
191:23, 199:25.
reference 37:18,
92:7, 148:6,
173:13, 173:21,
183:9, 185:12,
185:21, 185:24,
187:15, 193:7,
204:1, 210:8.
referenced 5:3,
159:7.
referencing 6:6,
6:11, 7:9.
referred 158:10,
172:24.
referring 33:19,
46:1, 48:12,
70:23, 72:18,
90:8, 121:12,
122:5, 163:20,
164:14, 178:11,
188:15.
refers 91:20,
194:18.
reflect 32:12,
32:14, 195:22,
204:8, 211:7.
reflected 48:5,
117:6, 119:1,
188:9, 188:23,
189:22, 192:19,
199:14, 203:12,
209:5, 210:18,
211:5, 212:11.
reflecting 64:4,
191:21.
reflects 163:20.
refresh 30:25, 31:5,
31:6, 31:9, 64:24,

134:11.
refreshed 65:17.
refreshes 31:19,
65:11, 65:12.
regard 32:20, 80:24,
93:24, 98:8,
98:15, 100:13,
104:16, 106:2,
106:10, 114:23,
115:25, 120:14,
133:4, 141:2,
145:20, 145:24,
146:4, 149:11,
149:15, 157:20,
161:8, 164:6,
165:18, 167:3,
170:18, 207:20,
210:4.
regarding 177:17.
regards 86:4.
regenerate 77:6.
registered 11:6,
11:12.
regular 73:8,
152:17, 152:18,
183:14.
Reisterstown 44:2.
relate 79:20.
related 73:17, 74:8,
100:23, 100:25,
101:10, 145:25,
169:9.
relation 21:14,
126:22.
relatively 178:10.
release 176:16,
180:22, 181:15,
182:14.
released 5:19,
21:11, 22:23,
22:25, 23:6,
54:17, 172:10,
172:11.
rely 153:3.
remain 180:22.
remaining 17:20.
Remember 8:6, 10:2,
29:5, 29:6, 35:10,
39:3, 39:6, 40:10,
41:23, 44:15,

44:22, 44:23,
45:5, 47:25,
49:23, 51:3,
51:14, 63:23,
64:22, 66:16,
114:2, 142:9,
155:21, 166:12,
213:17, 214:17.
remembered 55:3.
remind 2:18, 33:1,
114:13, 115:12,
141:6, 156:5,
189:5.
reminding 131:7.
removable 157:1.
remove 22:2, 22:6.
removed 7:14, 7:15,
7:17, 105:4.
repair 12:16.
repaired 7:3, 7:5.
repairs 7:18.
Repeat 45:15, 49:18,
60:17, 87:23,
88:24.
repeated 151:3.
repetitive 145:13.
rephrase 85:6.
replace 7:15.
replaced 55:14.
replacing 55:4.
report 16:11, 17:19,
17:25, 71:21,
97:11, 104:6,
109:4, 109:13,
111:4, 115:18,
116:8, 117:3,
120:2, 120:7,
145:5, 147:20,
153:3, 154:23,
156:25, 157:3,
157:4, 157:22,
160:9, 160:19,
169:20, 170:4,
213:20.
reported 125:11,
169:20, 178:18.
Reporter 1:47,
26:12, 217:23.
reports 50:15,
108:8, 108:13,

108:16, 108:20, 108:21, 109:11, 116:6, 117:12, 121:9, 139:15, 169:20, 209:24.
representation 3:15.
representations 91:4, 91:5.
request 3:18, 81:13, 88:18, 93:2.
requested 17:15, 78:3, 84:5.
requesting 15:12.
requests 70:16, 70:17, 95:22, 96:1.
require 7:25, 76:8.
required 49:13.
requires 84:9, 84:12.
residence 11:2, 19:25, 128:10, 129:4, 130:24.
resolved 214:23.
resolves 90:17.
respect 5:9, 82:18, 83:20, 88:14, 89:17, 90:3.
respond 187:9.
response 191:15, 195:13.
response. 200:9.
responsible 93:15.
rest 26:2, 38:14, 66:10, 127:15, 136:4, 155:13, 178:12, 199:19.
result 18:2.
results 19:21, 20:3.
retrieve 4:2, 12:22.
retrieved 9:9, 12:22, 189:9.
return 214:5.
returned 8:9, 141:14, 182:17.
returns 74:11.

review 3:10, 3:13, 104:3, 105:3, 186:9, 187:17, 207:20, 208:7.
reviewed 12:25, 103:23, 107:6, 156:14.
reviewing 209:8.
revoke 125:22.
Rich 125:25.
Richard 171:24.
rid 109:14, 191:22.
Ridge 4:14, 12:25.
riding 57:12.
right-hand 102:14, 114:24, 116:5, 120:3, 126:8, 138:21, 184:8, 195:10.
right. 197:4.
rise 76:20.
Road 54:3, 73:7, 126:12, 131:4, 204:15.
robberies 68:23, 77:8.
rock 94:19.
Rockville 68:14.
Roland 129:1.
room 20:24, 21:2, 21:6, 23:7, 66:15, 101:3, 111:14, 114:1, 164:2, 203:7.
rooms 20:25.
Rosalind 50:16, 51:25, 115:2, 115:7, 116:20, 118:5, 118:12, 120:10, 126:9, 130:6, 130:22, 132:19, 133:24, 136:8, 136:18, 136:23, 137:2, 137:16, 137:23, 140:10, 149:6.
Rosedale 29:19.
rotors 55:23, 57:13.

roughly 21:10.
round 86:10.
route 73:15.
RPR 1:46, 217:17.
RTT 86:10, 86:16, 86:25.
rude. 186:2.
rulings 217:8.
running 193:19.
rushing 66:4.
Ruter 215:4, 216:7.
.
.
< S >.
S6 17:11, 18:4.
SA 174:13.
sake 31:25.
Sandra 1:25.
Sandtown 30:5, 43:4, 44:4.
Sandtown-winchester 30:1, 30:6.
Sandy 9:13.
satellites 85:14.
Saturday 62:22, 62:24.
save 57:14.
saved 158:12.
saw 9:13, 14:17, 24:13, 25:21, 45:21, 45:25, 46:17, 47:3, 47:15, 51:7, 51:8, 51:13, 51:16, 51:22, 51:24, 58:16, 59:3, 59:9, 62:17, 62:25, 63:3, 63:5, 63:12, 142:11, 143:18.
saying 84:2, 119:24, 153:16, 180:2, 191:8, 191:9, 197:10, 198:23, 200:11, 200:15.
saying. 198:25.
scanning 94:4.
scared 187:14.
scary 113:11.
scenario 78:11,

78:14, 79:24.
scene 59:2, 92:1,
  115:3, 127:12,
  127:14, 131:17,
  132:19, 142:18,
  144:7, 144:14.
schedule 125:24,
  214:23, 215:22.
scheduled 214:13.
schedules 186:9.
school 72:18.
scientist 16:7,
  82:1.
Scooch 140:3.
scope 24:15, 89:11,
  89:13.
Sean 2:22, 17:15,
  162:6.
search 5:25, 6:12,
  8:4, 10:7, 10:14,
  11:24, 12:3,
  12:12, 18:2,
  19:18, 19:20,
  19:21, 19:25,
  25:11, 74:9,
  74:14, 74:24,
  76:11, 95:18,
  199:2, 212:17.
searched 19:13.
searches 107:25,
  212:21, 212:25.
searching 139:11.
seat 26:20, 67:16.
seated 2:2, 2:11,
  67:5, 114:8,
  156:3.
Second 28:25, 37:23,
  42:23, 72:25,
  77:24, 95:14,
  99:23, 109:22,
  110:22, 126:20,
  134:18, 137:25,
  142:1, 163:13,
  163:14, 167:21,
  171:7, 173:19,
  183:22, 192:3,
  198:2, 201:3,
  207:8.
seconds 38:10,
  63:23, 102:16,

147:23, 147:25,
  153:12, 173:25,
  179:7, 179:8,
  179:12, 181:3,
  181:19, 182:5,
  182:10, 182:25,
  184:17, 186:23,
  189:19, 190:12,
  192:11, 194:12.
sectors 83:20,
  85:23, 89:20,
  111:3, 111:10,
  111:13, 111:25,
  112:3, 116:1,
  119:23, 128:9.
security 69:23.
seeing 38:19, 44:23,
  50:15, 51:3, 51:6,
  51:19, 51:21,
  135:2, 137:11,
  141:7, 143:9,
  151:2, 200:17.
seek 75:19, 75:20.
seem 196:24.
seen 23:23, 31:15,
  45:19, 46:3, 47:8,
  47:14, 58:17,
  58:18, 58:23,
  63:6, 63:7, 103:9,
  136:25.
sees 94:6.
seized 8:13, 11:19,
  14:18, 95:19,
  103:6, 205:12.
seizure 5:25, 6:12,
  10:7.
select 94:22.
selected 77:10,
  77:18, 96:8,
  97:23, 98:10.
self-admissions
  107:21.
self-corrected
  102:10.
selling 40:4.
send 110:19.
sending 73:23,
  93:3.
sense 200:5,
  209:11.

sent 153:18, 163:8,
  163:15, 173:5,
  211:13, 212:5.
sentencing 214:15.
separate 95:15,
  105:17, 171:10.
September 174:24,
  175:7, 175:18,
  176:2, 176:4,
  176:5, 176:22,
  178:13, 178:16,
  178:25, 180:21.
Sergeant 2:6, 2:22,
  3:3, 3:5, 4:5,
  6:8, 6:20, 8:10,
  8:21, 8:24, 10:17,
  11:18, 14:6, 15:5,
  15:14, 15:21,
  18:10, 18:13,
  18:23, 19:4, 24:6,
  24:11.
serial 22:9.
series 56:5, 117:6,
  132:10, 178:25,
  180:8, 183:6,
  184:20, 190:23,
  193:11, 195:16,
  198:15, 200:19,
  212:16.
serious 183:11.
service 71:16, 75:2,
  75:12, 84:4.
Services 70:4.
serving 75:25.
set 29:8, 76:3,
  110:23, 165:4,
  186:12, 197:14,
  216:25.
sets 8:2, 81:1.
seven 87:4.
seven-second
  179:17.
several 58:2,
  166:24, 169:18,
  169:19, 171:23,
  186:18.
shall 4:2.
shapes 111:5.
Shayne 206:25.
sheet 134:18,

171:10, 174:25,
175:4, 191:21,
192:2, 200:18,
203:9.
sheets 105:17,
187:21.
Sheriff 68:7.
shifted 131:16.
shine 111:13,
111:15.
shit 185:23.
shit. 178:23,
195:4.
shoes 7:8, 8:2.
shop 12:16, 53:16,
53:24, 54:1, 54:4,
54:8, 61:10,
61:12.
Short 18:15, 42:18,
42:19, 56:9.
short. 188:6.
Shortly 22:25,
178:9.
shot 174:14.
shouldn't 215:2.
showed 48:21, 51:10,
53:13, 60:3,
63:22, 72:20,
109:11, 135:3,
160:20, 205:20,
206:8, 207:4.
Showing 4:11, 4:12,
4:13, 6:13, 6:20,
8:24, 9:17, 10:8,
47:1, 47:19, 97:9,
120:8, 123:15,
127:8, 127:19,
127:20, 128:15,
130:1, 136:22,
140:7, 140:13,
150:1, 156:19,
158:21, 163:18,
175:7, 176:17.
shown 63:20,
207:9.
shows 35:25,
116:1.
Shvartzman 16:6.
sic 105:21, 193:4.
side 29:10, 54:3,

71:7, 72:14, 94:5,
94:17, 94:18,
94:19, 108:23,
111:7, 112:14,
113:13, 113:14,
142:23, 143:4,
146:14.
sides 72:12,
111:2.
sight 94:22.
sign 72:2, 72:5,
75:17.
signal 86:20, 86:21,
86:22, 88:16,
93:4, 94:7, 94:23,
110:11, 110:12,
110:17, 110:19,
112:1.
signals 77:22,
94:18, 110:7,
110:21.
significance
115:9.
silver 12:25,
46:9.
SIM 72:8.
similar 7:23,
109:10.
simple 57:20, 74:20,
77:6, 215:6.
simple-minded
197:22.
simultaneously
3:16.
Sinai 4:13, 12:25.
single 70:14.
sit 26:12.
sites 127:5.
sits 112:17.
sitting 18:22,
58:23, 80:1,
183:10, 200:13.
situation 85:11.
situations 73:3.
six 109:11.
six-satellite
85:7.
SK 162:6.
skilled 28:15.
skills 89:17.

sleep 18:22.
sleeping 43:2.
sleepy. 194:20.
slide 109:9, 114:19,
117:4, 117:18,
118:1, 125:11,
129:22, 131:12,
131:15, 132:18,
133:12, 136:21,
137:5, 137:9,
137:14, 138:1,
138:2, 138:15,
139:7, 140:1,
140:11, 143:22,
149:16, 150:12,
151:9.
slides 117:6, 131:8,
132:10, 140:1,
143:17, 143:18.
Slipped 193:3,
195:3.
slow 16:2.
small 28:17, 53:23,
88:20, 115:5.
smaller 75:6, 75:7,
75:9.
smears 7:16.
smoke 33:5, 33:7,
33:9.
smoked 59:16.
sneaky 178:23.
snip 158:20,
160:22.
snippets 105:16.
snips 198:13.
software 79:1, 79:7,
89:24.
Sold 54:11.
somebody 40:23,
45:1, 51:23,
54:16, 93:19,
176:24.
someone 25:1, 25:5,
52:22, 56:14,
93:10, 162:5,
163:15, 181:12.
Sometime 42:15,
55:4, 217:4.
Sometimes 56:13,
64:15, 66:5,

71:24, 73:17,
73:18, 73:25,
78:23, 93:9,
101:25, 103:13,
103:14, 103:15,
107:18, 122:9,
184:7, 209:23.
somewhat 53:8.
somewhere 5:21,
42:22, 110:10,
119:25, 143:8,
143:13, 143:14,
148:10, 149:9.
sophisticated
92:17.
sort 13:2, 87:16,
97:17, 98:3,
105:12, 105:14,
107:25, 134:22,
135:10, 151:17.
sound 59:14, 62:3.
Sounds 90:23,
91:6.
source 17:20,
17:22.
South 29:18, 68:7,
69:8, 113:14,
149:13, 149:22,
150:3, 150:6,
150:8, 155:9,
159:21, 159:22,
159:25, 160:3,
160:11, 164:12,
169:22, 170:15,
170:21, 170:25,
171:4, 203:3.
southwest 128:22.
space 4:15, 42:15,
119:20.
spartan 21:7.
Spartanburg 68:7.
speakers 110:6.
speaking 38:21,
39:2, 44:9, 69:19,
97:5, 97:6,
109:21, 112:7,
177:25.
Special 67:8, 67:12,
67:25, 69:14,
81:25, 82:2,

182:7.
specialize 69:15.
specialized 80:23.
specific 71:11,
74:5, 76:24, 78:8,
88:18, 89:8,
89:13, 92:6, 92:8,
97:16, 109:3.
Specifically 6:3,
6:25, 7:12, 8:6,
10:2, 11:5, 25:11,
86:16, 166:22,
174:16.
Speculation 38:25.
speed 86:20.
spell 26:21, 67:17,
196:3.
spelled 177:12.
spend 95:2.
spine 18:18.
split 146:7,
146:13.
spoke 10:21, 36:18,
49:16, 49:19,
50:8, 64:17,
156:12, 200:6,
211:13.
spot 111:16,
119:21.
spray-paint
112:14.
spray-painted
112:20.
spreadsheet 96:10,
101:14, 105:10,
125:16, 202:14.
Sprint 72:3, 73:12,
73:14, 74:10,
75:5, 75:16,
75:18, 75:20,
77:25, 86:17,
87:2.
squad 9:15, 12:3,
20:15, 21:23.
stand 2:6, 26:11,
49:2, 69:12,
80:2.
Standard 29:14,
29:15, 29:17,
139:4, 139:5,

209:11, 210:14,
210:18.
standardized
209:22.
standards 16:13.
standing 18:22.
start 6:7, 57:13,
76:16, 76:17,
93:3, 151:20,
155:2, 172:17,
188:14, 200:2,
201:19, 202:23,
215:7.
started 23:3, 62:6,
69:4, 76:15,
76:16, 76:18,
124:25, 150:15,
161:17, 204:23.
Starting 76:19,
76:20, 77:2,
105:15, 115:17,
143:25, 164:17,
187:12.
starts 149:18,
151:21, 196:14.
state 15:11, 19:7,
26:21, 67:17,
69:24, 73:4,
81:8.
stated 53:15,
168:6.
statement 3:7,
177:16.
States 1:1, 1:5,
15:17, 15:18,
15:24, 15:25,
16:4, 16:18,
16:19, 16:21,
53:13, 54:18,
55:2, 58:10,
59:22, 176:7.
stating 140:21.
Station 20:1, 20:6,
25:2, 44:25,
110:9, 110:13,
126:10, 126:13,
129:5, 129:20,
130:6, 132:21,
148:15, 150:25,
153:20, 154:9,

155:3, 155:6.
status 18:17.
stay 119:13, 122:15,
    156:10, 196:23,
    196:24.
stayed 23:7.
staying 44:8,
    152:9.
stenographic
    217:18.
step 214:4.
Stephen 1:39.
steps 93:14.
steroid 18:18.
stickers 13:7.
stipulate 16:6,
    16:22, 17:13,
    18:3.
Stipulation 15:14,
    15:22, 16:4,
    16:17, 16:20.
stipulations
    15:12.
Stokes 177:11,
    181:12, 181:14,
    182:20, 183:22,
    185:13, 187:2.
Stokes. 185:17,
    187:3, 191:4.
stop 9:10, 9:19,
    10:9, 13:4, 29:3,
    200:13.
stopped 13:24, 58:1,
    58:8, 205:11.
stopping 198:12.
store 29:13, 30:17,
    75:17, 209:20,
    209:21.
stored 18:5,
    71:13.
storefront 28:20,
    29:4.
stores 29:10.
straight 154:25,
    171:12, 175:3.
Street 1:48, 28:25,
    61:13, 93:19,
    137:1.
streets 53:22,
    53:25.

strength 112:2,
    143:10.
stressed. 185:1.
strike 58:15,
    183:15.
strongest 94:6,
    94:23.
structures 112:12.
study 83:21.
stuff 29:12, 63:15,
    64:14, 71:16,
    87:3.
sub 207:18.
subject 33:25,
    158:5.
subpoena 10:7,
    74:14, 74:21,
    211:8.
subpoenas 95:18.
subscribed 115:13,
    115:15.
subscriber 14:24,
    71:25, 72:9,
    72:12, 72:15,
    107:18, 115:10.
subsequent 186:10.
subset 75:10, 75:15,
    160:22, 163:19,
    175:4, 175:6,
    191:21, 205:3,
    205:21, 206:8,
    206:14, 206:24.
substance 5:13,
    61:1.
subtract 210:2,
    210:15, 210:17.
success 11:16.
suggestion 177:22.
suggestions
    216:19.
suitable 17:3,
    17:10, 17:11,
    17:17, 17:21,
    17:22.
summarized 101:18,
    207:16.
summary 99:20,
    99:25, 121:5,
    121:8, 123:3.
summer 74:23,

210:1.
Sunday 44:16, 44:20,
    45:22, 46:18,
    47:3, 59:9.
sunny 46:8.
supervising
    181:15.
support 69:20,
    69:21, 69:24,
    70:11, 70:13.
supporting 98:16.
surgery 195:4.
surveillance 10:24,
    11:3, 12:24,
    21:22.
Survey 69:13, 78:6,
    78:13, 83:13,
    83:16.
survive 54:10.
suspect 57:19.
Sustained 24:16.
SUV 13:23.
swabs 16:8, 16:14.
sweater 32:7,
    32:8.
Switch 52:11,
    139:21.
sworn 2:23, 26:17,
    67:13.
SX 17:5, 17:7.
synthesize 108:17.
synthesized 99:15,
    99:20.
synthesizing 96:8.
system 17:13, 89:24,
    204:5.
.
.
< T >.
T-mobile 72:3,
    74:10, 75:5,
    77:25, 86:17,
    87:5, 92:13,
    117:14, 117:23,
    117:24.
T. 1:31, 1:46,
    217:22.
table 21:7.
tag 4:16, 13:2,
    13:25, 14:1,

16:24, 17:5,
46:20, 46:22,
46:23, 47:2, 47:4,
152:9.
tags 46:25.
taken. 67:2, 114:7,
155:25.
talked 64:11, 64:19,
76:15, 82:12,
104:9, 124:4,
166:22, 185:16.
taller 112:18.
target 98:11, 98:22,
99:8, 99:24,
101:15, 189:6,
189:7.
task 68:21, 69:14.
Tatyana 16:6.
taught 80:10,
80:11.
tax 54:22.
taxes 54:19.
Taylor 20:16.
teach 80:9.
teaching 80:14.
teal 46:6, 46:7.
Team 69:13, 77:17,
78:17, 95:23.
Technician 7:1,
16:23, 17:1, 17:2,
17:4, 17:6.
technologies
78:24.
Technology 73:20,
90:4, 118:22,
119:7, 198:4,
209:19.
Tel 204:1, 204:4,
204:5, 204:6.
telephone 30:9,
30:22, 31:3,
31:21, 53:12,
74:7, 81:11, 87:8,
88:25, 118:11,
158:17, 158:18,
161:4, 162:11,
167:7, 169:21.
tells 86:19.
Ten 18:17, 21:10,
44:7, 53:1, 68:3,

143:19.
tendency 57:12.
term 71:17, 84:23,
86:16, 106:25.
terms 56:21, 70:19,
77:13, 85:6, 96:7,
96:8, 107:9,
116:6, 124:11,
131:8, 137:11,
140:11, 170:17,
208:3, 216:17.
Terrific 171:6.
test 48:23, 49:1,
90:9, 90:12,
90:13.
testified 2:24,
14:16, 26:18,
53:22, 59:11,
59:21, 67:14,
81:7, 87:24.
testify 16:22,
76:25, 81:5,
88:20, 90:4,
90:22, 91:12,
211:8.
testifying 49:23,
53:6, 84:15,
86:11.
testimony 26:1,
31:2, 31:16,
33:11, 33:21,
40:19, 43:13,
46:10, 47:19,
63:20, 64:25,
65:6, 66:9, 89:18,
107:1, 107:2,
108:6, 135:5,
156:13, 176:17,
201:15, 207:24.
testing 16:13.
testy 66:3.
Texas 80:13.
texted 58:11,
58:13.
texting 40:25,
73:22.
texts 120:9, 152:17,
152:21.
Thanks 3:24.
Thanks. 174:9.

THC 39:21.
theft 60:10.
themselves 76:13.
theory 77:20, 82:25,
83:1.
Therapy 18:9.
thereafter 22:25.
they'll 112:13.
they've 166:22.
thinking 183:10.
third 73:2, 78:6,
118:1, 128:4,
145:25.
though 139:1,
191:14.
thousands 96:2,
96:6, 207:15.
threatening
178:10.
three 8:13, 8:25,
29:21, 59:14,
68:9, 68:17,
84:24, 87:6,
111:2, 113:15,
124:9, 146:13,
148:10, 148:11,
171:17, 181:24,
186:22.
throughout 4:5,
116:6, 117:12.
throughway 149:22.
thugs. 200:17.
Thursday 3:5, 14:17,
215:7, 215:9,
215:10, 215:13,
215:15, 215:16,
215:24, 215:25,
216:2, 216:3,
216:25, 217:4.
ticket 204:14.
till 57:13, 65:12,
180:21.
time. 178:11,
185:23.
timed 77:16.
timeline 106:23.
Timika 17:4.
timing 86:18, 87:1,
87:5.
tire 6:22, 7:5,

7:13, 7:14, 7:15,
  7:17, 7:21, 25:15,
  25:16, 55:3,
  56:2.
tired 208:21.
tires 6:4, 6:22,
  8:1, 49:13.
to. 194:5, 199:11.
Today 32:4, 33:9,
  33:12, 33:15,
  35:14, 53:6,
  53:10, 59:19,
  70:3, 76:25, 81:5,
  84:16, 86:11,
  95:9, 108:6,
  109:15, 110:9,
  130:16, 185:16,
  212:12, 216:12.
Todd 177:11.
together 135:1,
  144:11, 144:13,
  144:18, 154:1,
  158:2.
Toggle 121:21,
  125:16, 134:18,
  147:13, 151:6,
  155:13, 171:8,
  173:9, 176:18.
toggled 126:2.
toll 96:4, 97:8.
tomorrow 208:22,
  213:17, 213:22,
  214:5, 217:3.
tone 42:6.
Tony 6:5.
took 2:5, 3:7, 6:3,
  19:10, 77:12,
  104:21, 104:23,
  134:25, 200:7.
tool 86:16.
top 11:4, 22:17,
  95:6, 99:5,
  101:20, 105:19,
  106:3, 110:24,
  112:13, 112:18,
  112:19, 112:20,
  114:24, 116:5,
  118:15, 118:20,
  120:3, 120:14,
  120:18, 126:7,

130:25, 150:11,
  164:18, 164:20,
  172:25, 176:5,
  184:18, 193:1,
  200:24, 202:19.
touch 35:25.
towards 61:15,
  127:22, 129:1,
  129:20, 130:3,
  131:21, 131:24.
towed 12:10.
town 42:4, 42:6,
  42:7, 42:9, 42:20,
  49:20, 64:8,
  65:24.
Towson 93:16, 93:17,
  129:6.
track 217:10.
tracker 71:14.
Traffic 204:14.
trained 79:19,
  83:17.
training 76:24,
  77:2, 78:16,
  79:17, 80:5,
  82:24, 83:15,
  89:17, 103:8,
  116:17, 136:16,
  147:1, 148:5,
  149:4.
TRAINOR 1:37, 24:5,
  62:10, 62:11.
transaction 73:24.
transactions
  73:14.
Transcript 1:17,
  3:13, 3:23, 4:6,
  4:8, 176:21,
  181:14, 217:18.
transcripts 3:18.
transferring 61:4.
transitioned 68:9.
transmission
  28:18.
transmit 110:7,
  110:19, 110:20.
transmitted 77:21,
  87:15, 111:9.
transpired 176:22.
transported 11:21.

travel 77:22,
  150:8.
traveled 80:13.
traveling 112:10.
travels 86:20,
  86:21.
tree 112:16, 112:17,
  112:21, 205:16.
TRIAL 1:10, 26:2,
  48:13, 66:10,
  95:9, 168:25.
triangle 110:24,
  111:7, 111:9,
  113:13, 113:14.
triangles 111:11.
triangular 110:23.
tried 112:11,
  185:25.
trip 44:11, 86:10,
  215:14.
trouble 34:23,
  196:24.
trouble. 197:4.
troubles 185:14.
Troy 20:16.
truck 47:12, 47:13,
  47:15.
true 107:6,
  143:18.
truly 104:6,
  214:3.
trunk 22:14.
try 49:3, 57:14,
  78:25, 85:1,
  87:22, 104:20.
trying 36:20, 39:23,
  39:25, 56:22,
  56:25, 57:2,
  70:13, 74:17,
  89:9, 90:19, 93:3,
  94:5, 113:15,
  141:9, 183:11.
Tuesday 1:19,
  125:24, 186:16,
  196:8, 215:12,
  215:14, 216:17.
tune 28:17, 110:9.
Turn 37:17, 51:2,
  55:18, 77:16,
  101:21, 111:14,

115:24, 117:3,
123:11, 127:17,
127:25, 128:19,
132:13, 133:19,
136:20, 154:6,
173:9, 174:23,
203:8, 207:8,
208:20.
turned 15:6, 15:8,
60:7, 132:16.
Turner 173:13,
173:23, 173:25.
Turning 112:8,
128:23, 131:8,
132:9, 134:15.
turquoise 148:16.
TV 62:17, 62:20,
63:2.
twice 104:20,
187:14.
two-day 77:4.
type 28:16, 71:8,
74:16, 79:20,
97:5, 102:17,
156:23.
typed 180:12.
types 69:20, 69:21,
70:20, 71:14,
72:6, 74:1, 76:10,
92:16, 95:10,
97:20, 112:9.
typing 4:8.
typo 138:21.
.
.
< U >.
Ultimately 4:15,
11:21, 12:10,
23:8.
UMTS 119:6.
unanswered 206:12.
unarrested 25:3.
underlying 121:10.
underneath 138:21,
170:24.
understand 2:3,
76:9, 90:7,
116:12, 194:2,
197:6.
understand.

197:25.
understanding
20:7.
Understood 91:6.
undisturbed 7:6,
7:19, 25:22.
Unintelligible
4:8.
unit 21:1, 69:1,
69:2, 69:19, 76:8,
77:1.
United 1:1, 1:5,
15:16, 15:18,
15:24, 15:25,
16:4, 16:18,
16:19, 16:20,
53:13, 54:18,
55:2, 58:10,
59:22.
Universal 102:1,
139:1.
University 129:19.
Unless 95:5.
unredacted 162:22.
until 20:20, 23:5,
26:2, 54:16,
57:12, 66:10,
68:10, 89:8,
122:18, 165:24,
185:16, 192:8,
206:11, 208:25.
unusual 66:5.
up. 203:21.
updated 3:22.
ups 28:17.
upwards 22:21.
usage 152:22.
USAO 173:1.
user 14:24, 33:14,
61:4, 102:4,
102:6, 102:8.
users 97:15.
uses 94:2, 135:11.
UTC 209:15, 209:19,
209:21, 209:23,
209:24, 210:2,
210:6.
utilized 83:16.
utilizes 89:24.
.

.
< V >.
V- 50:21.
V-19 50:25.
V-20 134:15.
V-2O 107:12.
validated 16:12.
Value 28:8.
variety 95:17, 98:2,
174:3.
various 14:13, 17:6,
33:17, 103:21,
207:17, 207:25.
vehicle 4:14, 4:16,
4:19, 6:1, 6:4,
6:14, 6:16, 6:18,
11:24, 12:19,
16:24, 17:1,
46:19, 58:1.
vehicles 71:15.
vendor 71:20.
Verizon 72:3, 74:10,
75:5, 77:25,
86:17, 87:3,
102:25, 109:5,
115:5, 117:22,
126:23, 133:1,
147:23.
versus 15:25, 16:19,
92:16, 125:23,
152:15.
via 10:7, 95:17.
vicinity 116:20,
127:12.
victim 92:23,
178:9.
victims 92:19.
Video 3:14, 4:1,
12:24, 51:1,
51:19, 58:16,
58:24, 59:3,
59:24.
videos 73:9.
videotape 4:13,
5:1.
view 105:18,
136:22.
violation 5:13,
23:12, 183:22,
204:14.

violations 68:10.
violence 177:23.
violent 68:15,
  68:17, 68:21,
  69:22.
Virginia 80:13,
  115:4, 115:9,
  118:5, 120:10,
  126:10, 131:18,
  132:19, 137:3,
  149:19.
visions 61:22.
visit 18:15.
visual 3:6.
Voice 33:2, 48:1,
  56:14, 64:15,
  73:6, 73:8,
  122:10, 122:23,
  123:5, 135:7,
  136:14, 144:4.
VOIR 81:13, 81:18,
  81:19, 87:19.
volume 87:1.
voluminous 95:22,
  207:12.
vs 1:8.
.
.
< W >.
W-i-l-d-e 67:19.
W. 1:48.
wait 89:8.
waiting 97:2.
Wake 43:9, 203:20.
waking 44:9.
Wal-mart 72:7,
  72:14.
walk 38:3, 101:20.
walking 18:22.
wall 111:15.
wander 122:15.
wanted 7:4, 42:15,
  54:3, 55:11,
  59:15, 90:12,
  138:24, 162:16,
  171:6, 214:9.
wants 72:24, 91:2,
  215:5.
warrant 5:25, 6:12,
  8:4, 10:7, 10:14,

  11:24, 12:4,
  12:12, 25:11,
  58:12, 74:9,
  74:14, 74:24.
warrants 76:11,
  95:18.
watch 80:3, 213:1.
watching 3:14,
  63:2.
wave 82:25.
waves 77:21,
  89:24.
way. 36:9.
ways 72:19.
wear 63:16.
wearing 61:20,
  62:6.
Weather 93:24, 95:1,
  95:4, 198:4,
  214:24.
wedge 111:4, 111:5,
  111:6.
weed 39:18, 39:19,
  39:23, 40:4, 40:5,
  40:8, 40:15.
weeds 69:18, 97:6.
week 14:16, 65:25,
  66:2, 77:11,
  77:20, 77:24,
  78:6, 78:10,
  78:20, 82:25,
  174:1, 185:16,
  214:22.
weekend 2:3, 2:14,
  50:14, 56:7, 57:5,
  57:24, 66:1,
  185:15.
weeks 18:17,
  77:20.
Weinstein 171:24.
Welcome 2:7.
well-known 75:2.
West 30:1, 130:3,
  131:16, 137:16,
  140:14, 155:6,
  155:7.
Westwood 43:3.
Whatever 30:19,
  35:15, 48:8, 48:9,
  72:14, 77:9,

  100:11, 111:18,
  153:1, 197:11.
Whatsapp 73:13.
wheel 25:17, 49:14,
  55:18.
wheels 21:25, 22:2,
  22:6, 34:16,
  34:18, 55:16.
whenever 4:6,
  214:22.
Whether 12:13,
  24:22, 31:19,
  34:11, 51:12,
  63:20, 93:20,
  122:10, 122:11,
  122:22, 122:23,
  122:25, 123:4,
  123:5, 135:5,
  144:13, 147:1,
  149:5, 152:14,
  166:18, 168:20,
  169:21, 195:22,
  214:15.
White 36:10, 68:15,
  77:9, 106:19,
  130:8.
whoever 72:3, 74:10,
  158:16.
whole 27:16, 165:2,
  185:10, 185:23.
whom 71:25.
window 21:5.
windowless 21:2.
windows 21:4.
winter 210:3.
within 17:7, 20:25,
  22:5, 58:2, 76:17,
  85:3, 123:14,
  144:24, 158:12,
  163:14.
without 153:12,
  198:12.
WITNESS 2:8, 2:19,
  2:20, 2:23, 26:4,
  26:5, 26:11,
  26:17, 26:19,
  26:23, 66:12,
  67:6, 67:13,
  67:15, 67:18,
  79:19, 91:12,

114:14, 139:17,
156:6, 173:14,
186:14, 195:22,
196:1, 208:20.
witnesses 173:1,
173:2, 215:17.
woman 101:9.
Wonderful 2:15.
words 25:3, 113:11,
154:3, 161:17.
wore 108:5.
work. 200:14.
worked 28:1, 46:4,
47:24, 48:2, 68:8,
68:10, 68:15,
68:16, 68:22,
77:8, 80:21,
107:3.
working 29:3, 53:16,
53:25, 68:2,
68:17, 68:20,
77:9, 98:6, 98:7,
155:14, 216:20.
works 76:8, 83:19,
92:21.
world 76:20,
78:23.
worn 55:22.
worried 187:10,
187:13.
wrist 18:18, 18:19,
193:6, 195:3.
write 101:4,
166:17.
written 10:5,
10:6.
wrong. 180:11.
Wutoh 178:5, 178:9,
202:6.
.
.
< X >.
X- 65:3.
X-8 65:5.
Xeroxing 164:20.
.
.
< Y >.
y'all 152:9.
year 21:15, 29:5,

29:6, 54:1, 68:3,
68:6, 68:24,
78:18, 80:14,
80:25, 90:2.
years 27:21, 28:10,
32:19, 49:7, 52:8,
53:20, 54:13,
54:14, 61:8,
61:12, 68:3, 68:9,
68:17, 70:25.
yesterday 52:18,
200:7.
yielded 16:14.
Yo 40:23, 40:25,
42:7, 42:8, 52:16,
202:22.
York 180:15.
you. 187:14,
198:23.
yourself 31:19,
65:10, 102:10,
156:14.
yourselves 66:17,
114:3, 155:22,
213:18.
Youtube 73:9.
Yup. 197:2.
.
.
.
< Z >.
Zelinsky 177:2,
177:16, 177:25.
ZERKIN 1:31, 18:25,
19:1, 19:3, 22:12,
22:14, 24:1, 24:3,
24:14.
zero 37:8, 63:22,
113:12, 113:16,
153:24, 166:20,
166:21.
zero. 113:10.
zones 76:5, 209:10,
209:20, 209:22.
zoom 139:20.