**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF MARYLAND**

**UNITED STATES OF AMERICA,**          )
                                       )
          Plaintiff,                   )
     vs.                               )
                                       )   **CRIMINAL NO.:** GJH-17-0667
**DAVON CARTER** and **CLIFTON**       )   **JURY TRIAL:**  Day Six
**MOSLEY,**                            )
          Defendants.                  )
                                       )
_____)

**Transcript of Proceedings**
**Before the Honorable George J. Hazel**
**Wednesday, January 15th, 2020**
**Baltimore, Maryland**

**For the Plaintiff:**

     Sandra Wilkinson, AUSA

     Kim Oldham, AUSA

**For Defendant Davon Carter:**

     MR. ZERKIN, Esquire

     Christopher M. Davis, Esquire

**For Defendant Clifton Mosley:**

     Harry J. Trainor, Jr., Esquire

     Stephen B. Mercer, Esquire

_____

Christine T. Asif, RPR, FCRR
Federal Official Court Reporter
101 W. Lombard Street, 4th Floor
Baltimore, Maryland 21201

**P R O C E E D I N G S**

1

2          THE COURT:  Good morning.  One quick thing before I

3     get to the jury.  I just want to remind counsel and our

4     witness just to try to slow down a little bit as we're

5     talking.  Also, remember to speak into the microphone.

6          One thing I didn't appreciate until I was on this

7     side of the table is how much time it takes, either at the end

8     of the day or the end of trial, to go back and clean up the

9     transcript when counsel and witnesses are going so fast.

10    That's also why I try to insist counsel speak into the

11    mikes.

12          MS. WILKINSON:  Thank you, Your Honor.  We apologize

13    to Ms. Asif.

14          THE COURT:  I'm not saying she was complaining,

15    she's actually very nice.  I think the Greenbelt court

16    reporters are harder.

17          (Jury entered the courtroom.)

18          THE COURT:  All right.  You may all be seated.  Good

19    morning, ladies and gentlemen.

20          JURORS:  Good morning.

21          THE COURT:  How's everyone today?

22          JURORS:  How are you?

23          THE COURT:  I'm doing well.  Someone asked back,

24    thank you, that's very kind.  I think it's the first time.

25    I'm doing well, thank you for asking.  I think we're ready to

1     continue.

2              Sir, you're still under oath.

3                   SPECIAL AGENT MATHEW WILDE

4     called as a witness, being first duly sworn, was examined and

5     testified as follows:

6              THE WITNESS:  Thank you.

7                   DIRECT EXAMINATION

8     BY MS. WILKINSON:

9     Q.  Good morning as well.  Agent Wilde, three areas I just

10    want to close the loop on.  Yesterday as we were getting

11    toward the end of the day, I wanted you to relate to the jury

12    the location of Mr. Farrell at some point on May 27th, 2016,

13    and did you go back and check your records regarding his

14    location later on the day of May 27th?

15    A.  I did.

16    Q.  And at some point, does Mr. Farrell's phone arrive in

17    South Carolina?

18    A.  At about 7:25 p.m.

19    Q.  Now, I'm going to put up on the screen Government's

20    Exhibit P-24.  And again, it's just a first page of the

21    extraction, which I think is P-9A for the phone number, and

22    can you just indicate here the phone number that we're talking

23    about.

24    A.  (443) 761-5150.

25    Q.  Okay.  And I'm going to just show you the second page,

1    which is -- is this just an excerpt from Government's

2    Exhibit P-9A that has a number of communications between the

3    5150 number and a number ending in 2027, attributed to the

4    name Shell SS?

5    A.  Yes.

6    Q.  Now, that Shell SS, is that the way it was saved in that

7    5150 number?

8    A.  Yes, ma'am.

9    Q.  As one of those contacts?

10   A.  Yes.

11   Q.  Okay.  And the same question with regard to Government's

12   Exhibit P-23, does this appear to be an excerpt from the

13   Cellebrite of the 2399 number?

14   A.  Yes, ma'am.

15   Q.  Which is P-10A, and again, is it showing contacts with a

16   person by the -- Shells, S-h-e-l-l-s?

17   A.  Yes.

18   Q.  And the last four digits, just for the record?

19   A.  9896.

20   Q.  And this particular -- the fact that it's in red, does

21   that tell us that that's the way it's saved in the Cellebrite

22   for the 2399 number?

23   A.  The fact that -- yes.

24   Q.  Okay.  Last area.  You had mentioned during your direct

25   yesterday, the effective date of the 7626 number attributed to

1    Mr. Carter.  And showing you Government's Exhibit P-2V -- I

2    should put the certification on the front there.

3         Is this the type of information you get from various

4    service providers related to the effective date of particular

5    phones?

6    A.  Yes, ma'am.

7    Q.  And I'm just going to highlight over here 7626, and over

8    there, does that show the effective date that you were

9    discussing yesterday, just a record for that?

10   A.  Yes, ma'am, May 25th.

11   Q.  And down -- I'm sorry.

12   A.  May 25th.

13   Q.  And down -- so the information that's above for 7626,

14   those are -- the first one, forwarding to reseller, do you

15   know what that means when a company like Verizon forwards a

16   phone number to a Tracfone, like wireless?

17   A.  So again, like I was talking about yesterday you have the

18   big five carriers; Verizon, Sprint, AT&T, T-Mobile, and U.S.

19   Cellular.  Underneath those carriers are other companies, such

20   as Tracfone, Boost, Virgin Mobile.  So when it says forwarded

21   to reseller, what that means is that subscriber information is

22   going to be held by Tracfone, whereas the call detail records

23   will be held by Verizon.

24   Q.  And that's how we eventually get the first usage date of

25   that 7626 number for 5/25/16?

1    A.  Yes, ma'am.

2    Q.  Okay.  And down below, the effective date of the 5150

3    number, just for the record, what would that be?

4    A.  March 5th, 2016.

5    Q.  And is it that third phone that was attributed to

6    Mr. Carter yesterday during your testimony?

7    A.  Yes.

8    Q.  Staying on the 7626 number, going to the Cellebrite for

9    the 7626 number, showing you page 14 of that Cellebrite -- I

10   think I'm doing it in order, yes, 14.  And do you see the

11   6:05 a.m. call from Cliff that you talked about yesterday in

12   connection with your cell site mapping?

13   A.  Yes, ma'am.

14   Q.  And I'm going to go above and show you -- I should have

15   highlighted this one too, but do you see two additional

16   contacts the night before May 27th?

17   A.  Yes, ma'am.  There's one at 9:13 p.m.

18   Q.  Did I miss the one up here?

19   A.  Yes, ma'am.

20   Q.  Okay.

21   A.  Line 75.

22   Q.  Okay.  Thank you.  Am I pointing to it now?

23   A.  Yes, ma'am.

24   Q.  Okay.  And then the one below.

25   A.  It was at 10:04 p.m. on the 26th, line 79.

Direct Examination cont'd - Wilde  (By Ms. Wilkinson)

1    Q.  And those communications, the first two, can you tell us

2    from -- based on your training and experience and looking at

3    the records, whether those were connections to Mr. Carter's

4    phone?

5    A.  I'd have to look at the -- I'm sorry, the 1533 records.

6    Q.  Okay.  And showing you Government's Exhibit P-2U, first

7    page here.

8           MS. WILKINSON:  Can I get a highlighter, maybe

9    that's easier than my pen.  Thank you, Ms. Oldham.

10   Q.  (BY MS. WILKINSON)  And are these records from -- the

11   actual records from AT&T?

12   A.  Yes, ma'am.

13   Q.  And if I go to the 5/26 communication here --

14   A.  No, that's not it.  It's at -- the first one would be at

15   1:14 a.m. on the 27th.

16   Q.  Oh, because of the time.

17   A.  Because of the time conversion, yes, ma'am.

18   Q.  Okay.  So have me go down here and stop when you see it.

19   A.  Slide the exhibit to the right just a bit.  Thank you.  It

20   would be lines number 513 and 514.

21   Q.  Okay.  And explain that, please.

22   A.  So the AT&T records are stored in Universal Coordinated

23   Time, so what we have to do is subtract four hours from the

24   time that's on the records to get it back to Eastern time, so

25   that's why I'm saying it's at 9:14 p.m.

1  Q.  Now, we're looking at actually the source records, P-2 was

2  your conversion summary records, and the jury will see that

3  actual Eastern Standard Time on that record?

4  A.  Yes, ma'am.

5  Q.  Okay.  So here, from looking at this, can you tell us the

6  status of those two calls the evening before Ms. Ashburne was

7  murdered?

8  A.  So 513 and 514 are actually one call.  I'm going to circle

9  them here.  And what's going on is, the 7 -- you kind of have

10  to read these backwards, 514 is the first line, so 514 is the

11  incoming call to 1533 from 7626, and then down here at the

12  bottom, you have this F, which means that it was forwarded.

13  So then you go to the feature code over here to the right, and

14  what those features mean -- No-IP just means that caller ID

15  was present, VM means it was voice mail, and CFB means call

16  forward busy.  So what happened was, it was an incoming call

17  that was forwarded to voice mail.

18  Q.  Okay.  Then when you -- again, I'm not going to go back to

19  P-2, but on that same evening, was there a communication

20  between that 1533 number and Mr. Carter's other number, the

21  2399 number?

22  A.  Yes, ma'am.

23  Q.  Now, is that the call we see right below here?

24  A.  Yes, at 9:24:45.

25  Q.  So I'm going to actually write 9:24 so we don't get too

1   confused, Eastern Standard Time, and read that date for us.

2   A.  So that's an incoming call -- I'm sorry, that's a call

3   from the 1553 number -- 1533 to 2399.

4   Q.  Uh-huh.

5   A.  And that call lasted 24 seconds.

6   Q.  Okay.  And are you able to tell from looking at this

7   whether that was a connection or that one went to voice

8   mail?

9   A.  Well, I'd have to see the 2399 records to be sure, because

10  this is the 1533 records.

11  Q.  So it was the opposite way?

12  A.  Yes, ma'am.

13  Q.  But the first call went to voice call, and then this was

14  the second call?

15  A.  Yes, ma'am.

16  Q.  Okay.  Now, with regard to the calls that are on the

17  morning of the murder, first of all, looking at Government's

18  Exhibit P-2 -- actually, I think this is just an excerpt from

19  P-9A, the 7626 number, and showing us the communication at

20  6:05 a.m., do you see that there?

21  A.  Yes, ma'am.

22  Q.  Okay.  And that was an outgoing --

23  A.  I'm sorry, that's a call from 7626 to -- I'm sorry, from

24  1533 to 7626.

25  Q.  So Mosley phone to Carter phone?

1    A.  Yes.

2    Q.  At 6:04 a.m.  Now, yesterday -- 6:05 a.m.

3    A.  6:05 a.m.

4    Q.  Yesterday you had told the jury about two additional

5    contacts between those phones the morning of the murder of

6    Ms. Ashburne.  And looking at the Cellebrite, were those calls

7    on the Cellebrite for 7626?

8    A.  No, they are not.

9    Q.  Were they on the source documents, the call detail records

10   for the 7626 number?

11   A.  Yes.

12   Q.  How can that be?

13   A.  Either they were deleted from the phone or the equipment

14   did not recover the messages -- it didn't recover those

15   calls.

16   Q.  Well, I'm going to go now to those source records,

17   Government's Exhibit P-2T, and are you familiar generally with

18   the format in which the records come from the provider of the

19   7626 number?

20   A.  Yes, ma'am, they're Verizon.

21   Q.  And again, I included the certification as part of the

22   records there.  And I'm going to go down to -- I didn't mark

23   my pages, hold on.

24       27.  And I'm going to go to the -- highlight the two

25   calls right here.

Direct Examination cont'd - Wilde  (By Ms. Wilkinson)

1          And just for the record, which is the direction of these

2     calls between Mr. Mosley and Mr. Carter's phones?

3     A.   This is the 7626 number calling the 1533 number.

4     Q.   Now, from looking at the 7626 records, are you able to

5     tell if it's a connection?

6     A.   On the 6:13 and 6:15 calls?

7     Q.   Yes.

8     A.   No.

9     Q.   What records do you have to refer to?

10    A.   The 1533 records.

11    Q.   So now I'm going to go back to the 1533 records for those

12    two calls.  Again, we have to account for the hours, so can

13    you refer to me by the line item?

14    A.   521 and 522.

15    Q.   And if I need to go to the second page, let me know.

16    A.   No, we're fine, just those two.

17    Q.   And read this information, using your training and

18    experience for the jury to tell us whether or not there was a

19    forwarding to voice mail or a connection on that morning.

20    A.   So on both of these calls, it does not look like it was

21    forwarded to voice mail.  You have a seven-second set-up time,

22    that's the time from when the phone is dialed to the phone --

23    the call connects.  And then a 12-second duration on the first

24    call.  And 22-second duration on the second call.  And then if

25    you look at the feature codes over here to the right, you

1    don't have any voice mail, any code indicating that the call

2    went to voice mail.

3    Q.  And over here, even further to the right, what is all this

4    gobbledygook numbers over here?

5    A.  So that's the cell tower information that I mapped that we

6    saw yesterday.  The second set of numbers there identifies the

7    ENB number, which is the tower number.

8    Q.  And that cross references to your mapping that you did for

9    the jury yesterday?

10   A.  Yes, ma'am.

11   Q.  Okay.

12          MS. WILKINSON:  That's all I have, Your Honor.

13          THE COURT:  All right.  Cross.  Mr. Mercer.

14                    CROSS-EXAMINATION

15   BY MR. MERCER:

16   Q.  Good morning, Agent Wilde.

17   A.  Good morning.

18   Q.  Get situated here.  So where I would like to start is --

19   I'm going to flip this poster back.  Okay.  And I flipped it

20   to Government's Exhibit P-2Q, if everyone can see that, and

21   the witness can.

22       Now, on P-2Q, Agent, you provided some tallies of

23   connections; right?

24   A.  Well, contacts back and forth, yes, sir.

25   Q.  Contacts back and forth.

Cross-examinaton - Wilde  (By Mr. Mercer)

1    A.  Yes, sir.

2    Q.  And I think you said there were more than 1,000 between

3    Matt Hightower and Davon Carter?

4    A.  Yes.

5    Q.  And between 12/29/2015 and May 4th, 2016, there were about

6    253 contacts between Mosley, Cliff Mosley and Matt

7    Hightower?

8    A.  Yes.

9    Q.  And also, you gave the number of contacts in May 2016

10   between Davon Carter and Cliff Mosley as 148?

11   A.  Yes.

12   Q.  Now, first, did you tally up the universe of contacts that

13   Matt Hightower had during this same time period?

14   A.  I did not.

15   Q.  So we don't know, for example, out of how many total

16   contacts Matt Hightower had during this time 1,000 represents

17   a percentage of; right?

18   A.  Correct.

19   Q.  So we don't know if Matt Hightower has 30,000 contacts and

20   1,000 of those are with Mr. Carter?

21   A.  Correct.

22   Q.  And likewise, just trying to put these tallies into some

23   perspective, with regard to Mr. Mosley and Mr. Hightower, you

24   mentioned that the number was 253 contacts, and you -- maybe I

25   just need to get clarification here, you mentioned that you

1   only had Mr. Mosley's toll records for 1533 back to June 1 of

2   2016?

3   A.  I believe it's May 1 of 2016.

4   Q.  I'm sorry, May 1 of 2016.

5   A.  Yes, sir.

6   Q.  Now, toll records are fairly easy to obtain; right?

7   A.  Yes, sir.

8   Q.  They still exist as of today; right?

9   A.  Yes.

10  Q.  With the carrier, that is?

11  A.  Yes.

12  Q.  And maybe I misunderstood you, but I thought what you were

13  suggesting is that the 253 --

14          MS. WILKINSON:  Objection, Your Honor.  He's not

15  suggesting anything, he's just testifying.

16          THE COURT:  Overruled.

17  Q.  (BY MR. MERCER)  You had indicated that 253 may be a low

18  number because you didn't have Mr. Mosley's toll records for

19  1533?

20  A.  Going back before May 1st?

21  Q.  Right.

22  A.  Yes, sir.

23  Q.  But then you were also referring to contacts on

24  Mr. Hightower's call detail records that showed incoming calls

25  from Mr. Mosley?

Cross-examinaton - Wilde   (By Mr. Mercer)

1    A.   Yes.

2    Q.   On his 1533 number?

3    A.   Yes, sir.

4    Q.   So the data for 1533 is -- in terms of contacts to

5    Mr. Hightower, is captured in Mr. Hightower's call detail

6    records?

7    A.   It should be.  So if that 1533 number popped up on

8    Mr. Hightower's records before May 1st, then it should be

9    captured, yes.

10   Q.   Now, when you say "contact," I want to try and understand

11   this better.  So I have my cell phone here in my hand, and if

12   I dial your cell number, Agent Wilde, and you miss the call,

13   it just rings through, and then you see, oh, Mr. Mercer

14   called, and then you call me back, and I miss the call, and I

15   call you back, we now have, what, one, two, three contacts?

16   A.   Yes, sir.

17   Q.   But if I'm thinking of like the number of calls I had with

18   Agent Wilde, just in the ordinary sense, I would think I had

19   one call with Agent Wilde?

20   A.   That's correct.

21   Q.   So the contacts number represents any data that shows up

22   in the relevant record that you're looking at?

23   A.   Yes.

24   Q.   And sometimes that information between a phone extraction,

25   that is, you know, from the content of the phone itself and

1   the carrier records, can be different; right?

2   A.  Yes.

3   Q.  I mean, you were talking about the extraction process, I

4   mean, sometimes with these Tracfones, they tend to be lower

5   quality hardware?

6   A.  Yes, those flip phones specifically are of pretty much the

7   lowest quality phone you can get.

8   Q.  Right.  And so sometimes, just the extraction doesn't pull

9   all the content?

10  A.  Correct.

11  Q.  Now, so I want to try to understand the summary that you

12  were referring to.  And I'm going to start with, I believe it

13  was Government's Exhibit P-2D.  And P-2D, I'll just represent

14  to you, this is from February 12th of 2016.

15      And we see one area of your focus of testimony was with

16  Mr. -- calls between Mr. Hightower and Mr. Bardos?

17  A.  Yes.

18  Q.  And then calls then that occur -- or contacts that occur

19  between Mr. Hightower, and say, Mr. Mosley?

20  A.  Yes.

21          MR. MERCER:  Okay.  Sorry, we just lost our --

22          THE COURT:  What are you trying to do?

23          MR. MERCER:  Sorry, Your Honor --

24          MS. WILKINSON:  He needs to be able to write on the

25  screen here as opposed to just the witness.

Cross-examinaton - Wilde  (By Mr. Mercer)

1           Ms. Smith, do you know how to do that?

2           THE COURT:  That's a new one, the display is not

3      working.

4           MR. MERCER:  Correct, the camera's not picking up

5      the -- we're back.  Too many chefs in the kitchen, or in my

6      case, cook.

7      Q.  (BY MR. MERCER)  So Agent, can you mark on this screen on

8      your end?

9      A.  Yes, sir.

10     Q.  Okay.  So circle the -- red highlight with Richard Bardos.

11     A.  (Complying.)

12     Q.  So now, right below Mr. Bardos, there's Cliff Mosley?

13     A.  Yes, sir.

14     Q.  So just looking at the summary sheet, just on a quick

15     glance, looks like Mr. Hightower has a contact with

16     Mr. Bardos, and then Mr. Hightower has a contact with

17     Mr. Mosley.

18     A.  Yes.

19     Q.  But if we look at the date all the way over to the left,

20     we see that the contact with Mr. Hightower and Bardos is on

21     February 15th, but the contact between Mr. Hightower and

22     Mr. Mosley is not until the 16th, a day later.

23     A.  Well, if you go down at 16:23 on the 16th, there's contact

24     between Hightower and Mosley.

25     Q.  Right.

Cross-examinaton - Wilde  (By Mr. Mercer)

1   A.   And then right after that, a contact with Mr. Bardos and

2   Mr. Hightower, and then right after that, a contact with

3   Mr. Hightower and Mr. Mosley.

4   Q.   Okay.  I'm going to work my way through that.

5   A.   Correct.

6   Q.   Because what we're missing here is everything that happens

7   in between; right?

8   A.   Yes, sir.

9   Q.   So in your summary, you do not include any of

10  Mr. Hightower's contacts between February 15th and

11  February 16th?

12  A.   Correct, with anybody else outside of the immediate people

13  involved in this part of the case.

14  Q.   All right.  And so if I -- showing you what's

15  Defendant's 7, if you want to clear off that -- okay.

16       So now February 15th, and this is the UTC time?

17  A.   Yes, sir.

18  Q.   I have to do the correction, and this is, I think

19  wintertime, so it's actually five hours?

20  A.   Yes, sir.

21  Q.   And then that takes me back to that first call from

22  Bardos.  And then what's not in the summary sheet are the

23  calls, and this is from Hightower's phone, that are all

24  outgoing through the 16th?

25  A.   Yes, sir.

1    Q.  Now, when we get to the call on the 16th at 16:23, so that

2    would be 4:23 in the afternoon from the contact from

3    Mr. Hightower to Mr. Mosley; right?

4    A.  Yes.

5    Q.  And then there is a contact from Mr. Bardos at 4:27 to

6    Mr. Hightower?

7    A.  Yes.

8    Q.  Okay.  So there's no contact between Mr. Mosley and

9    Mr. Bardos; right?

10   A.  Correct.

11   Q.  And Mr. Bardos contacts Mr. Hightower, and then right

12   after that, at 17:09, which would be 5:09, you have a contact

13   from Mr. Hightower to Mr. Mosley?

14   A.  Yes.

15   Q.  Okay.  But again, if we look at the call detail record,

16   what we see before -- and this is now Defendant's 7A -- is

17   before we get to the call from Mr. Hightower to Mr. Mosley's

18   phone, we see that there's one, two, three outgoing calls

19   before that?

20   A.  Yes, sir.

21   Q.  Okay.  So it's not like Mr. Hightower gets a call from

22   Mr. Bardos, and then the first person he calls is

23   Mr. Mosley?

24   A.  That's correct.

25   Q.  Now, one of the things you look for in your work is

Cross-examinaton - Wilde  (By Mr. Mercer)

1    patterns; right?

2    A.  Yes, sir.

3    Q.  And so we see a pattern of contacts between Bardos and

4    Hightower?

5    A.  Yes, sir.

6    Q.  I mean, not a big surprise?

7    A.  Correct.  That's his attorney.

8    Q.  And so another contact I'll show you that is in your

9    summary, and this is on Mosley's 7B, is on February 23rd.

10   A.  Yes.

11   Q.  Okay.  Now, on February 23rd, what we see -- I'm sorry,

12   this is a meeting with Hightower, and up -- that's the red

13   highlight on 7B, and you see at the -- could you circle the

14   contact at 11:15 between Hightower and Bardos.

15   A.  11:15.

16   Q.  That's about six lines up from the red line.

17   A.  (Indicating.)

18   Q.  Right.  So that's at 11:15.  And then you're including

19   below that several lines of contact between Hightower and

20   Mosley; right?

21   A.  Yes, at 4:13 and 5:10.

22   Q.  Right.  So that's over about five hours later?

23   A.  Yes.

24   Q.  And so the -- again, the call from Bardos, the contact

25   between Hightower and Bardos did not prompt an immediate

1    contact to Mr. Mosley?

2    A.  I mean, that call was only 16 seconds long, so no, it did

3    not prompt an immediate call to Mr. Mosley.

4    Q.  Right.  And then after, if you look below the red line

5    event, and you see one, two, three, four, looks like four

6    contacts in a row between Mr. Hightower and Mr. Mosley;

7    right?

8    A.  Yes, sir, right here, starting at 18:53.

9    Q.  And again, you've excluded all the in-between stuff?

10   A.  Yes, sir.

11   Q.  And so -- and in fact, we see February 23rd, is that first

12   one Mr. Hightower to Mosley, and then the others are on

13   February 24th?

14   A.  Yes.

15   Q.  And so there's all this contact that Mr. Hightower's

16   having with other persons in between?

17   A.  There could be, yes, sir.

18   Q.  Well, and you have the call detail records to examine

19   that; right?

20   A.  We do have the call detail records, I don't have them in

21   front of me, though, sir.

22   Q.  And so all we have to do is just go to, for example, like

23   this is Mosley 7C, and again, we see that's Mr. Bardos's

24   number?

25   A.  Yes.

Cross-examinaton - Wilde  (By Mr. Mercer)

1    Q.  That's Mr. Hightower's number, that's the contact, that's

2    at 16:15, so if we subtract five, that's the 11:15 a.m. call

3    that's on your summary sheet?

4    A.  Yes.

5    Q.  And then there's not a contact with Mr. Mosley for some

6    five hours.

7    A.  Yes.

8    Q.  And we see that there's all this activity going on between

9    those times.

10   A.  Yes, sir.

11   Q.  So there's a lot of in between stuff that's not in the

12   summary?

13   A.  Yes.

14   Q.  And let's see, I'm showing you Mosley 8, which is another

15   page from your summary, and could you circle these contacts

16   with Mr. Bardos.

17   A.  (Indicating.)

18   Q.  Now, in looking at that, it appeared to be the same data

19   on both lines, is that just a duplicate?

20   A.  Yeah, it could potentially -- it probably is a

21   duplicate.

22   Q.  And then those are outbound -- that's an outbound contact

23   from Mr. Hightower to Mr. Bardos?

24   A.  Yes.

25   Q.  On Mosley 8.  And we see before that there is a contact

1    from Mr. Hightower to Mr. Mosley?

2    A.  Yes, there is, at 9:55.

3    Q.  Right.  And the contact after is from Mr. Mosley to

4    Mr. Hightower at 10:11.

5    A.  Yes.

6    Q.  So again, Mr. Mosley is reaching out to Mr. Hightower,

7    it's not as though Mr. Hightower is having a conversation with

8    his attorney, and then calling Mr. Mosley here?

9    A.  Correct.

10   Q.  And if we wanted to see who Mr. Mosley -- I'm sorry, who

11   Mr. Hightower was contacting immediately after, with an

12   outbound call, then for example, here on Mosley 8A, the first

13   outgoing, and then I'm just highlighting, these are the

14   outgoing; right?

15   A.  Yes, sir.  One of the -- one at 16:32, there's a call to

16   voice mail, so it's not actually a call from Mr. Hightower.

17   Q.  Okay.  So this is voice mail.

18   A.  Yes, sir.

19   Q.  Okay.  So if the question was, who is Mr. Hightower

20   contacting after his contact with Mr. Bardos, we'd have to go

21   to the call detail record for Mr. Hightower?

22   A.  Yes.

23   Q.  Now, I'm showing you Mosley 9, which again, is a page from

24   your summary book, and I'm just going to highlight Mr. Bardos.

25        Again, this was a situation where the data on both lines

1   looks to be the same?

2   A.  Yes, sir.

3   Q.  So that's probably a duplicate?

4   A.  Yes.

5   Q.  Now -- and again, here, we don't see after that contact

6   between Mr. Hightower and Mr. Bardos a contact with

7   Mr. Mosley?

8   A.  That's correct.

9   Q.  And we can confirm that looking at -- and I'm showing you

10  Mosley 9A -- so Mr. Bardos's number, and then if we look at

11  the outgoing, we wanted to know who Mr. Hightower's contacting

12  after those attorney calls.

13  A.  Correct, so the first outgoing would be on line 921, and

14  then 924.  Any time you see this 805 number, these are

15  outgoing calls -- these are calls that are incoming to

16  Mr. Hightower that go to voice mail.

17  Q.  Okay.

18  A.  So those I wouldn't count as outgoing calls.

19  Q.  Okay.  That's -- strike that.

20       But the other ones are the outgoing; right?

21  A.  Yes, sir.

22  Q.  And then -- and again, we see these calls from, you know,

23  Mr. Hightower -- these contacts between Mr. Hightower and

24  Mr. Bardos, and in looking for any pattern of whether that

25  somehow points to Mr. Mosley, if we look at here, Mosley 10,

1  which is another sheet, and we see here I've highlighted with

2  Mr. Bardos and Mr. Hightower.

3  A.  Yes.

4  Q.  And so that's on 4/6, so it's not until 4/7 that we see a

5  contact to Mr. Mosley?

6  A.  Yes.

7  Q.  And again, if we wanted to know who Mr. Hightower was

8  contacting, showing you Mosley 10A, we look at the call detail

9  records, and there's Mr. Bardos's incoming call, and that's

10  April 6th, and then we would generally look at the outgoing?

11  A.  So all of those until 21:32:14 on line 2341, those are all

12  incoming calls that go to voice mail, the ones you

13  highlighted.

14  Q.  Okay.  So these are all incoming calls?

15  A.  Yes, sir.

16  Q.  So we'd have to look even further into the call detail

17  records to see who Mr. Hightower may be contacting after a

18  phone call with his attorney?

19  A.  Well, the first one here is at 5:32 p.m., that outgoing

20  call to the number ending in 1222, it's on line 2341 at the

21  bottom.

22  Q.  2341, okay.  Okay.  And then on Mosley 11, there's another

23  call here on 4/27/2016 between Bardos and Hightower.

24  A.  Yes, sir.

25  Q.  And we don't see on your summary chart any contact then to

Cross-examinaton - Wilde  (By Mr. Mercer)

1    Mr. Mosley in the vicinity of that call?

2    A.  That's correct.

3    Q.  And again, if we look at the call detail records, and I'm

4    looking at Mosley 11A, if we wanted to analyze who

5    Mr. Hightower may be contacting, we'd have to do that analysis

6    of the outgoing to see which may be the closest in time

7    outgoing calls?

8    A.  Yes.

9    Q.  Okay.  And that's Mosley 11A.

10        Now, we spent -- or we spent a bit of time on direct

11   talking about May 2nd.  I believe this was Government's P-2F,

12   I've marked it Mosley 12.

13        So we're now at May 2nd.  And this is on the first line,

14   is -- I believe it's an e-mail from Mr. Bardos to

15   Mr. Hightower; right?

16   A.  Yes, sir.

17   Q.  And then right below that is a contact where Mr. Mosley is

18   contacting Mr. Hightower?

19   A.  Yes.

20   Q.  So not Mr. Hightower contacting Mr. Mosley, but Mr. Mosley

21   contacting Mr. Hightower?

22   A.  Yes, sir.

23   Q.  And that's, if I did my math right, an hour and 48 minutes

24   after the e-mail is sent by Mr. Bardos to Mr. Hightower?

25   A.  Yes, sir.

1    Q.  And just looking at Mosley 12A, there was a call at -- and

2    we're now in May, so we have Daylight Savings Time, so it's

3    now a four-hour subtraction; right?

4    A.  Yes, sir.

5    Q.  So that would be 11:09 on May 2nd in the morning?

6    A.  Yes.

7    Q.  All right.  And there's the incoming call from Bardos to

8    Hightower; right?

9    A.  Yes, sir.

10   Q.  But -- and I believe you had testified about the call with

11   Mr. Mosley, that's an incoming call, if I'm reading this

12   right, at -- maybe you need to correct me, at 17:55?

13   A.  Yes, sir, so minus four, so 1:55 p.m.

14   Q.  So 1:55 p.m.

15   A.  Yes, sir.

16   Q.  So the call from Bardos to Hightower at 11:09, and then

17   there was not a call from Hightower to Mosley, there's a call

18   from Mosley to Hightower at, I believe you said 1:55 p.m.?

19   A.  Yes.

20   Q.  Okay.  Now, you had done some historical cell site

21   location analysis for May 2nd.

22   A.  Yes.

23   Q.  And I believe your ultimate conclusion was that phones

24   associated with Mr. Hightower, with Mr. Carter, and with

25   Mr. Mosley, at some point in the afternoon, were in the Park

1   Heights area?

2   A.  Yes.

3   Q.  Now, I mean, just to state the obvious, you're not saying

4   those were the only phones in the Park Heights neighborhood?

5   A.  Of course not.

6   Q.  And nor are you saying that you analyzed all of

7   Mr. Hightower's contacts and determined that the only other

8   contacts he had that were in Park Heights were Mr. Mosley and

9   Mr. Carter?

10  A.  Correct, I did not do that.

11  Q.  And of course -- and I know you're very careful about your

12  opinions, you're not going to overstate things, but you're not

13  saying that you can tell from the cell site analysis that the

14  phones associated with those three individuals were in the

15  same place at the same time?

16  A.  Of course, I cannot.  What I can say is -- if it was this

17  courthouse, what I could say is, I can't say that they are on

18  the steps of the courthouse together.  What I can say is,

19  they're both using the tower on top of the courthouse.  That

20  tower faces the Inner Harbor, so the phone needs to be

21  somewhere between the courthouse and the Inner Harbor.  But I

22  can't tell you specifically where within that area those two

23  phones are located at those times.

24  Q.  Right.  And so I mean, we've heard a lot of "consistent

25  with."  I can pick any address in the sector, and I can say

Cross-examinaton - Wilde  (By Mr. Mercer)

1    consistent with being there.

2    A.  Yes, sir.

3    Q.  So now, and this is a sheet, I believe it's page 31 from

4    the government's Power Point for 2399, and that's the number

5    associated with Mr. Carter?

6    A.  Yes.

7    Q.  And now, you had analyzed that to be hitting off of towers

8    up near the Abingdon Reserve?

9    A.  Yes.

10   Q.  Around 10:30 on May 2nd?

11   A.  Between 8:44 and 10:30, yes, sir.

12   Q.  And that's north of Baltimore?

13   A.  Yes.

14   Q.  Now, so when 2399 is up north of Baltimore, let's see, the

15   numbers associated with Mr. Hightower, the 6448 and 2513, are

16   hitting off a tower that is near to his home on Fallstaff;

17   right?

18   A.  Yes.

19   Q.  Now -- and so just looking at the 10:30 time, you had also

20   plotted the -- Mr. Mosley's numbers, the 2650 and the 1533?

21   A.  Yes.

22   Q.  And the 2650 is T-Mobile, the 1533 is AT&T, and the black

23   is the T-Mobile, and we see at 10:30 a connection to the tower

24   and -- with the sector facing Fallstaff?

25   A.  Yes.

Cross-examinaton - Wilde  (By Mr. Mercer)

1   Q.  And then at 10:31, we see a contact with a tower that is

2   further west, northwest from the Fallstaff address?

3   A.  Yes.

4   Q.  You know, consistent with heading towards Harness Court,

5   which was Mr. Mosley's address?

6   A.  Yes.

7   Q.  So as of 10:30, Mr. Carter is up -- his phone's up around

8   north of Baltimore, Mr. Hightower's phone is nearby his home,

9   and Mr. Mosley's phone is consistent with him heading towards

10  his home?

11  A.  Yes.

12  Q.  Now, you also analyzed, and this is another page from the

13  government's Power Point I'm putting up, the 5150 number?

14  A.  Yes, sir.

15  Q.  Now, you said that number is associated with Mr. Carter;

16  right?

17  A.  I believe so, yes.

18  Q.  And I guess you're saying that because on June 1st when

19  Mr. Carter was arrested, that -- a flip phone with 5150 was

20  seized?

21  A.  Correct.

22  Q.  But you were just finishing up your direct about how that

23  phone was activated in early March?

24  A.  Yes.

25  Q.  And during the period of March and April up until

1    Mr. Hightower was locked up, the 5150 phone locations are

2    generally consistent where you plotted them with

3    Mr. Hightower's phones?

4    A.  Yes, now that -- I believe Mr. Hightower had that phone

5    until he was locked up.

6    Q.  Right.  So Mr. Hightower had the 5150 number, and we see,

7    for example, on May 2nd, as of 10:31, the 5150 number is

8    hitting off of a tower, the Verizon tower and sector that

9    faces Mr. Hightower's residence?

10   A.  Yes.

11   Q.  Okay.  So now, if we wanted to -- and you have certain

12   calls on there, 10:02, 10:10, and 10:31, that you've plotted;

13   right?

14   A.  Yes, sir.

15   Q.  So if I wanted to know what those -- if I wanted to know

16   who was being contacted then, I'm showing you Mosley 13, and I

17   go to the call detail record, and I just have a snip here from

18   5150 --

19   A.  Yes, sir.

20   Q.  -- and just the network element name, that's what you call

21   the switch?

22   A.  Yes, sir, it's a switch, it's nothing more than a group of

23   cell phone towers.  So under Woodlawn 2, there's going to be a

24   couple thousand towers in the Baltimore area underneath that

25   switch.

Cross-examinaton - Wilde  (By Mr. Mercer)

1    Q.  I think you described that in other times as like a ZIP

2    code or --

3    A.  It is somewhat like a ZIP code.

4    Q.  Right.  So sort of a geographic area?

5    A.  Yes.

6    Q.  And often named consistent with that geographic area, like

7    here, Woodlawn 2?

8    A.  On the east coast it is, yes, sir.

9    Q.  And so we see in the switch element 5150, and we see it's

10   connecting with a number that, I believe you were just

11   testifying to, that's 2027?

12   A.  Yes, that's an incoming call from that 2027 number that

13   goes to voice mail.

14   Q.  Right.  And that was the Shell S number; correct?

15   A.  Yes.

16   Q.  Okay.  So if I wanted to know where the Shell S number --

17   or where that phone was, and I look at -- I'm showing you

18   Mosley 14, and again, we see the correspondence in the calls,

19   22:02, 22:10, 22:31.  So that's 10:31 p.m.

20   A.  Yes.

21   Q.  And we see in the call detail record for the 2027, we

22   actually have the first serving cell in addition to the switch

23   identified; right?

24   A.  Yes, so it's the switch, and the first serving cell is the

25   cell tower number.

Cross-examinaton - Wilde  (By Mr. Mercer)

1    Q.  Okay.  And I had asked you -- I had shown you some maps --

2    A.  Yes.

3    Q.  -- yesterday --

4    A.  Yes, sir.

5    Q.  -- and I'm showing you Mosley 15, and so if I take the

6    information from the 2027 call detail record about the tower

7    number and the switch number, right, the process is, I go to

8    the tower index.

9    A.  Yes.

10   Q.  And then I look up for that switch, that tower number, and

11   there's either a physical address or GPS coordinates, and then

12   I plug those into a map?

13   A.  Yes.

14   Q.  All right.  So what we're looking at here on Mosley 15 is

15   Woodlawn 2 tower, which is the switch for this geographic

16   area.

17   A.  Yes, sir.

18   Q.  Like the ZIP code.  The tower number 264.

19   A.  Yes, sir.

20   Q.  And this is the May 2nd, 2016 at 22:02, so this is the

21   10:02 call.

22   A.  Yes.

23   Q.  And it's the 2027 connecting with the 5150 number?

24   A.  Yes, sir.

25   Q.  Right.  So -- and just hopefully I haven't lost anybody.

1        So as of -- and so this black dot here, the Philadelphia

2    Road, that's in White Marsh Station, Maryland?

3    A.  Yes.

4    Q.  So that's in a similar area as where we see 2399 during

5    that same time period?

6    A.  Could you go back to the other map, sir.

7    Q.  Sure.  So this is White Marsh Station, Joppa, Joppatowne,

8    Abingdon, and then if we look down here, we see Abingdon

9    Reserve, Joppatowne.

10   A.  Yes, sir, generally, it's in that same area.

11   Q.  Generally, same -- looks like they're sort of converging

12   on each other.

13   A.  Yes.

14   Q.  So 5150, which is the number that's in contact with the

15   2027, the 5150 is remaining at a location that's consistent

16   with Mr. Hightower's address?

17   A.  Yes.

18   Q.  And it looks and is consistent with the cell data that

19   Mr. Carter, and I guess this would be Shell S, are converging

20   up north of Baltimore?

21   A.  Yes.

22   Q.  Now -- and in fact, we see other times in May, and so this

23   is Mosley 14.  And just without getting into all the tower

24   plots and everything, we see the 2027 number?

25   A.  Yes, sir.

1    Q.  And it's making connections through the Woodlawn 2

2    switch?

3    A.  Yes, sir.

4    Q.  And this is on May 11th?

5    A.  Yes, sir.

6    Q.  Okay.  And that would be consistent, I guess, with being

7    in the geographic area in the Maryland area?

8    A.  Being somewhere in Maryland, yes.

9    Q.  And with respect to the 5151 number, I had also shown you

10   some additional plots that I had done?

11   A.  Yes, sir.

12   Q.  And so this is Mosley 16.  And so here on -- this is now

13   May 25th, 2016, at 15:28, which would be 3:28 p.m., and it's

14   5151 to 5150, and it's connecting to tower 104, and again, if

15   I take the switch and the tower number, and I look at the

16   tower index, what I end up with is the Greenspring Avenue,

17   Pikesville, Maryland address?

18   A.  I'm not 100 percent sure about that.  I'm not sure if it's

19   that one or the Smith Avenue address.

20   Q.  Oh, I'm sorry.

21   A.  I believe it's the Smith Avenue address.

22   Q.  You're absolutely right.  The Smith Avenue is the location

23   for the tower 104?

24   A.  Yes, and it's the tower that's closest to Mr. Hightower's

25   residence at Fallstaff, the Smith Avenue one is.

Cross-examinaton - Wilde  (By Mr. Mercer)

Q.  Okay.  All right.  Great.  So that's on May 25th.  And I guess I did this in reverse order.

But we see earlier on the 25th, it looks like it's consistent with 5151 coming from north?

A.  Yes, sir.

Q.  Along 95, down to Mr. Hightower's -- this is Mosley 17, and Mosley 18 is the Greenspring tower.

A.  Yes, sir.

Q.  So 16:03.  It looks as though on the 25th, if we kind of go through the sequence here, at 2:43 p.m., on Mosley 17, we see 5151 connecting with a tower around Aberdeen, and then at 3:28, we see it getting closer to Baltimore, connecting with the Smith Avenue tower.  And then at 4:03, it looks like or it's consistent with heading back north?

A.  It's just using a different tower, it's still in Baltimore, yes, sir.

Q.  Still in the Baltimore area.  Okay.

A.  Yes.

Q.  And that number 5151, you checked the activation records, that was activated at the same time as the 5150 number?

A.  I'm not 100 percent sure of that.

Q.  Okay.  But you checked the cell activations, the tower activations for 5151, is generally up in the New York area?

A.  Yes, sir.

Q.  But certainly as of May 25th, it was in the Baltimore

1    area?

2    A.   Yes, sir.

3    Q.   And if I wanted to know where 5151 was on May 27th, then I

4    would have to look to the call detail records; right?

5    A.   Yes, sir.

6    Q.   And I believe I'm at 18, and if I'm looking at, this is

7    Mosley 18, there's activity as close as May 25th, but there

8    doesn't appear to be any activity or connections on May 27th.

9    A.   Well, sir, if you look at the records, they're actually

10   not in order because a view of top to bottom, they start at

11   the 21st and then down to the 25th, the 31st, the 29th, and

12   back to the 23rd, so without correctly sorting the records,

13   you can't really come up with an opinion on that.

14   Q.   Well, I -- in looking at the entirety of the month of May,

15   because I notice this is almost -- I don't know, is this

16   sorted by switch or -- I'm not sure what -- this is how we

17   received them from --

18   A.   That's just how they come from Verizon, yes, sir.

19   Q.   But if I'm -- I believe you actually, as part of your

20   investigation here, you looked into whether 5151 was activated

21   on the 27th?

22   A.   There was no activations on the -- or not in use, so it

23   was not in use on the 27th.

24   Q.   Right.  It was not in use on the 27th?

25   A.   Yes, sir.

Cross-examinaton - Wilde  (By Mr. Mercer)

1    Q.  Right.  That's all I was trying to establish.

2    A.  Yes, sir.

3    Q.  I recognize that this is a little jumbled the way this is

4    coming to us, but I didn't want to change that.

5    A.  Yes, sir.

6    Q.  And then we see on May 28th, May 29th, May 31st, an

7    activation, Miami West?

8    A.  Yes, sir.

9    Q.  That's the switch.

10   A.  Yes.

11   Q.  So that's not the Baltimore area?

12   A.  That's correct.

13   Q.  Now, you talked some about Mosley and Melvin; right?

14   A.  Yes, sir.

15   Q.  And you had discussed sort of a snip from the summary,

16   from the government's phone summary; right, so this is what it

17   looked like?

18   A.  Yes, sir.

19   Q.  Okay.  So -- and this is for -- this is just on May 27th;

20   right?

21   A.  Yes, sir, the morning of the homicide.

22   Q.  And more or less, I think what you were saying is that

23   Ms. Melvin was trying to reach Mr. Mosley on both of his

24   phones.

25       And just to be clear, Mr. Mosley had -- or Mr. Mosley's

1    two phones were traveling together, the data is consistent

2    with that; right?

3    A.  Yes, sir.

4    Q.  It's not like Mr. Mosley left his 2650 phone at home on

5    the 27th.

6    A.  Correct.

7    Q.  He had both of those.  So -- and I think your point was,

8    well, it looks like Ms. Melvin's calling Mr. Mosley, but he's

9    not picking up?

10   A.  That's what happened, yes, sir.

11   Q.  So he's not answering a call from -- or a text from his

12   live-in girlfriend?

13   A.  I mean, he didn't answer any calls during that time

14   period.

15   Q.  Right.

16   A.  It just happens to be that all the calls were from her

17   during that time period.

18   Q.  Right.  They're all from Ms. Melvin?

19   A.  Yes.

20   Q.  So did you look to see -- and again, we look for patterns,

21   you know, sort of a life analysis, did you look to see if

22   maybe there's a pattern where Ms. Melvin is calling Mr. Mosley

23   and he's not picking up?

24   A.  No, sir, I did not.

25   Q.  Would it surprise you to see, for example, I'm showing you

1    Mosley 19, and this is a page from your summary, and again,

2    this is from May 4th, all right, so May 4th, it looks like

3    there's a succession of calls back and forth with zero or six

4    or four; right?

5    A.   Yes, sir.

6    Q.   So maybe there's a little pattern, perhaps, of times where

7    Mr. Mosley just doesn't want to pick up the phone from

8    Ms. Melvin?

9    A.   There could be.

10   Q.   Now, and there's other points too, and if I show -- and

11   this is -- we'll make this Mosley 19A, and so this is later in

12   the day on the 4th.

13        And again, we see these very short or a few-second

14   contacts on this?

15   A.   Yes, sir.

16   Q.   Maybe somebody's not picking up later in the day on

17   May 4th also.

18   A.   I feel like looking at those, there's a chance they might

19   be duplicates because you have the zero, and then the follow

20   up with 02.

21   Q.   Okay.

22   A.   So the zero would be one call -- they would actually be

23   one contact, so there's actually only two calls instead of

24   four.

25   Q.   Okay.  So maybe this didn't get scrubbed all the way?

Cross-examinaton - Wilde  (By Mr. Mercer)

1    A.   Correct.

2    Q.   All right.  Well, how about -- and this is, we'll call

3    19B, and again, just looking at the number of times where --

4    now, this is all 5/5/2016, 16:37 is the date, time, but then

5    we have zero seconds, 06, and then 3:57?

6    A.   Yeah, I believe that would probably be two calls.  Just

7    the way when we looked at those AT&T records earlier, there

8    was basically two lines for one call, that's what's happening,

9    it's just showing the different legs of the call as it comes

10   in and is routed to voice mail.

11   Q.   Okay.  So again, duplicate or maybe not answering or --

12   A.   I'd have to look to be sure.

13   Q.   -- putting it through to voice mail?

14   A.   Yes, sir.

15   Q.   Okay.  Now -- and again, here -- we'll call this 19C.  And

16   again, we see on -- this is May 3rd, and we see this

17   succession of zero, 05, and texting also?

18   A.   Yes, there's probably two texts and one call.

19   Q.   So if I'm looking for patterns of when there's very short

20   duration, contacts or maybe not answering, I don't just have

21   to look at the morning of the 27th, I can look at other days

22   in May?

23   A.   Of course.

24   Q.   And you mentioned before that where you had the content,

25   you've included it?

Cross-examinaton - Wilde  (By Mr. Mercer)

1    A.  Yes, sir.

2    Q.  And so if I was trying to get some insight into why there

3    are these -- tendency for these quick calls or unanswered

4    calls, or back and forth, it would be helpful to look at the

5    extraction from one of the phones?

6    A.  Yes.

7    Q.  And you have the extraction from Ms. Melvin's phone?

8    A.  Yes.

9    Q.  And it includes text content for the early -- for the

10   first two weeks in May?

11   A.  I'm not 100 percent sure, sir.  I believe it does.

12   Q.  And yet, for example, on May 3rd, where it says SMS text,

13   you haven't included any content from Ms. Melvin's phone?

14   A.  I mean, we included what was recorded on the Cellebrite

15   report.  Just because it wasn't there -- just because it

16   wasn't included on the Cellebrite report, the content, doesn't

17   mean that it did not happen.

18   Q.  Well, I'm not suggesting that.  I'm just the opposite,

19   that there is content in the Cellebrite report.

20   A.  Okay.

21   Q.  That is not in your summary sheet.

22   A.  Okay.

23   Q.  And it's content for the texting between Mr. Mosley and

24   Ms. Melvin between May 1st and May 14th.

25   A.  I wasn't aware of that.

Cross-examinaton - Wilde  (By Mr. Mercer)

1   Q.  Okay.  Well, I believe you had identified Ms. Melvin's

2   phone extraction.

3   A.  Yes.

4   Q.  Okay.  And --

5          MR. MERCER:  Your Honor, could we approach, please?

6          THE COURT:  Of course.

7          (Bench conference on the record.)

8          THE COURT:  All right.  Turn off your mike for just

9   a minute.

10         MR. MERCER:  So out of an abundance of caution, Your

11  Honor, I wanted to approach, because the content for the

12  texting explains why there are these sort of, I guess little

13  spats over the phone, where --

14         THE COURT:  You said "spats"?

15         MR. MERCER:  Spats.

16         THE COURT:  Okay.  I'm familiar with them.

17         MR. MERCER:  Answered, and you know, maybe sent to

18  voice mail, because the government is suggesting on

19  May 27th --

20         THE COURT:  Right.

21         MR. MERCER:  -- there was some --

22         THE COURT:  He was occupied and not answering the

23  calls for that reason.

24         MR. MERCER:  Right.  And so I want to show that this

25  is a pattern.

1              THE COURT:  Okay.

2              MR. MERCER:  And the content of Ms. Melvin's text

3      messages helps to understand and helps -- is helpful to

4      understanding that pattern.

5              THE COURT:  I'm with you so far.

6              MR. MERCER:  She discusses medication, she discusses

7      anxiety.

8              THE COURT:  Privacy issues as to Ms. Melvin.

9              MR. MERCER:  I wanted to raise it with the Court.  I

10     think given where we're at, I think it's very fair to go into,

11     but I didn't want to directly raise that content without --

12             THE COURT:  Can you give me one example?

13             MR. MERCER:  So --

14             MS. WILKINSON:  I think just first with regard to

15     the Cellebrite, I think Agent Wilde has forgotten that we only

16     put the content in of Ms. Lawson's phone.  We didn't put it in

17     of Ms. Melvin's until the end of December, so I mean, I can

18     clear that up.  But with regard to this, I haven't looked at

19     it in a long time.  And we have talked generally about keeping

20     some of the more specifics out about her mental health issues,

21     and we had raised that in the protective order.

22             We haven't had a chance to litigate, and I'll look

23     at it.  For the general part, I don't object for the reasons

24     Mr. Mercer wants to make the point, and I certainly see why

25     he's making the point.  But can you direct me to what she

1    exactly said, and we might be able to --

2           MR. MERCER:  For example, on May 6th, "I took a high

3    dose of meds last night too, so I was knocked out, feeling

4    pretty numb."  Response, "Did it wear off?"

5           "My anxiety is still there a little, I don't know

6    why.  It has not went into effect.  I'm picking up my new meds

7    today.  It could be the weather.  I feel an episode coming on,

8    I'm trying to prevent it."

9           THE COURT:  So how does that tie into the notion of

10   him then ignoring her or not answering her calls?

11          MR. MERCER:  Well, because her -- what happens is

12   she starts obsessively texting him or calling him, because of

13   her anxiety --

14          THE COURT:  Okay.  So then that's --

15          MR. MERCER:  -- because of her stress.

16          THE COURT:  I get that, and so in that specific

17   instance, is it -- again, I'm just trying to weigh the

18   probative value here, is it right after that that she starts

19   texting him repeatedly and he's not answering?

20          MR. MERCER:  Yes, so there's some of the periods

21   that I was just covering with the agent, which were, I believe

22   it was May 3rd, 4th, and 5th, in this time period, where she

23   is experiencing anxiety that she's discussing here in these

24   text messages.  So there is this proximity in time that would

25   help to understand why it may be that Cliff is getting calls

Cross-examinaton - Wilde  (By Mr. Mercer)

1    from Ms. Melvin, but he's not answering or immediately

2    responding to.  So I think that --

3              THE COURT:  All right.  Ms. Wilkinson.

4              MS. WILKINSON:  So two things, first of all, I

5    appreciate that both of us are using Agent Wilde to make

6    certain argumentative points as we go through.  Ms. Melvin is

7    going to be a witness and certainly won't respond to the

8    questions about the repeated calls, and perhaps we can revisit

9    some of the content with her.

10             Mr. Mercer just wants to make the point with Agent

11   Wilde because he did not review the content of Ms. Melvin's,

12   it's not included.  I think that's in our original letter,

13   that we did not include her content.  And I -- he did the

14   Cellebrite, and he can certainly talk to it, but there will be

15   a witness directly that can answer these exact questions.

16             Maybe there's a way to do it both without us having

17   to decide the issue of the specific text right now, just

18   indicating that there's content and having him identify it,

19   and then have Ms. Melvin answer those questions, because she

20   will --

21             THE COURT:  I guess the question I have based on --

22             MS. WILKINSON:  -- she called him all the time.

23             THE COURT:  The question I have based on

24   Ms. Wilkinson's comments is, is this witness in a position to

25   discuss those things?  This is a question, this isn't like a

Cross-examinaton - Wilde  (By Mr. Mercer)

1  rhetorical question, it's like an actual question.  Is he in a

2  position to discuss those things, if I'm following correctly,

3  that he's not the one who extracted that information, or am I

4  misunderstanding that?

5            MR. MERCER:  No, I think he did extract it.

6            THE COURT:  It just didn't get on the chart.

7            MR. MERCER:  He didn't -- and I think a key point

8  here is that he testified that all the content that was

9  available was in the chart.

10           MS. WILKINSON:  For Ms. Lawson and Ms. Washington.

11           MR. MERCER:  I remember it more broadly than that,

12 but --

13           MS. WILKINSON:  Okay.  And that's my fault that

14 we're not --

15           MR. MERCER:  And I thought I confirmed that with him

16 also when I was questioning him.  And I think he conceded that

17 he didn't -- wasn't aware that this wasn't included.  So you

18 know, in terms of what I don't want to get bogged down with is

19 this, you know, not being authenticated through Ms. Melvin.  I

20 mean, this is the extraction --

21           THE COURT:  I get that.

22           MR. MERCER:  -- from her phone.

23           THE COURT:  I get that.

24           MS. WILKINSON:  We stipulate to that, and we'll

25 never --

1          THE COURT:  I understand.  I understand.  How many

2    of these are you trying to go through with this witness?

3          MR. MERCER:  Well --

4          THE COURT:  Because if you're just trying to make

5    the point that Ms. Melvin dealt with anxiety issues, which is

6    not that uncommon --

7          MS. WILKINSON:  Uh-huh.

8          THE COURT:  -- and as a result of that, there would

9    be periods of times when she tried to contact him a lot, and

10   he's like, you know, all right, I'm just -- I'm going to

11   ignore her for right now, that's fine.  If you're going -- I'm

12   not saying you're going to do this, I just -- as an example.

13         If you're going to try to paint Ms. Melvin,

14   particularly in her absence, as someone -- I don't even want

15   to use a -- certain words, but you know, as someone who has

16   some extreme condition, I'd have more issue with that, but if

17   you're just pointing to a couple of things to make that point,

18   I'm fine with that.

19         MS. WILKINSON:  And there's never going to be an

20   objection to the authenticity of -- I mean, he did do the

21   number of extractions.

22         MR. MERCER:  All right.  So the -- just to be clear,

23   the government's conceding the authenticity.

24         THE COURT:  No, I get that.

25         MS. WILKINSON:  Of course.

1          MR. MERCER:  So we don't have that as an issue,

2     then --

3          THE COURT:  My point is, look, you raise -- I mean,

4     you raise the privacy issue, and I appreciate that.  I mean,

5     that seemed to be the reason you came up here.

6          MR. MERCER:  Well, yeah, I think we had an

7     understanding with the government that -- before any issue

8     came up about mental health, we would approach.

9          THE COURT:  Right.  And so I'm giving you my

10    guidance on that, that to the extent you want to put in a

11    handful of these to make the point that sometimes she dealt

12    with anxiety and would maybe get overanxious in terms of

13    reaching out to her boyfriend, and that might be a reason why

14    he ignored her sometimes, I'm giving you the leeway to make

15    that point, without going so far as to paint her as something

16    more than that.  That's the guide -- and I don't know what you

17    have there, so I --

18         MS. WILKINSON:  Some of it he could read to himself

19    without putting it up there and make the same point too.

20         MR. TRAINOR:  We were given discovery --

21         THE COURT:  Make sure you speak into the microphone,

22    sir.

23         MR. TRAINOR:  We were given discovery just before

24    the trial started, that the government interviewed Ms. Melvin

25    in December, I believe.

1              MS. WILKINSON:  In response to questions that

2    Mr. Davis had asked.

3              MR. TRAINOR:  And that she told them that she had

4    been diagnosed as schizophrenia and bipolar disorder and

5    that -- as I recall, sometimes she sees things and hears

6    things.

7              THE COURT:  That sounds like something that, if

8    anything, maybe we get into when she testifies.

9              MR. TRAINOR:  All right.

10             THE COURT:  If at all.  I'm not saying we'll get

11   into that, but it seems like that's when we can discuss that.

12   If we're just talking about a handful of texts where she

13   references, you know, what you've read to me so far, that's

14   fair game, I think, for you ask this witness about, whether --

15   you know.

16             MR. MERCER:  So I think I'll just move through this,

17   because I'd like to admit the exhibit.

18             THE COURT:  Doesn't seem to be any objection to

19   that.

20             MS. WILKINSON:  No objection, subject to redactions,

21   for irrelevant and privacy information that we can do later.

22             THE COURT:  We can discuss that later.

23             MS. WILKINSON:  You're not going to publish it now,

24   we can discuss it later.

25             THE COURT:  But there are certain points that you're

1    going to raise now.

2              MS. WILKINSON:  But I certainly don't have a problem

3    with the exhibit as a general matter coming in, parts of it

4    are in our --

5              MR. TRAINOR:  But if you redact or alter its

6    content --

7              THE COURT:  I guess what I'm trying to figure out is

8    what we need to accomplish now and what we can accomplish

9    later.  And so what I'm saying now -- you don't have to do

10   this now, what I'm saying now is, that if you want to, you can

11   ask him a handful of questions based on some of the texts you

12   just flagged for me.

13             We can discuss later whether or not portions of that

14   document need to be redacted.  I might decide they don't need

15   to be.  But that's something we don't have to decide right

16   now.  Unless -- I assume you're not publishing the whole thing

17   to the jury right now.

18             MR. MERCER:  No, I'm not going to walk through every

19   page of this, but I just don't want to step over a line,

20   because she does talk at places about another personality

21   coming out.

22             THE COURT:  Why don't we do this, why don't I send

23   them out for a 15-minute break, you can take those 15 minutes

24   and flag the ones that you would like to use for this witness,

25   and then we'll talk about it.

1          (The following proceedings were had in open court.)

2          THE COURT:  All right.  Ladies and gentlemen, so I

3    thought we were going to resolve that quickly, we're not, so

4    I'm going to give you your morning break, and we'll continue

5    to chat about some of these issues.  I'm going to ask that you

6    be back at 11:20, and we should be ready to go around about

7    then.

8          (Jury left the courtroom.)

9          THE COURT:  All right.  So you're excused until

10   11:20.

11         Now that you are on cross-examination, I'm going to

12   instruct you not to discuss this case with anyone, including

13   even with the prosecutors, during the break.

14         THE WITNESS:  Yes, sir.

15         THE COURT:  Take this time, flag what you want to

16   use, discuss it with the government, and if there are issues,

17   I'll resolve them when I get back.  See you 15 minutes.

18         (A recess was taken.)

19         THE COURT:  Anything we need to address?

20         MS. WILKINSON:  Your Honor, so we boiled it down to

21   just one line that we object to, the rest we have no objection

22   to.

23         If you could just put it up there.

24         THE COURT:  Okay.  So you can be seated.  Unless

25   you're addressing the court, you can be seated.  I'll look at

 1    the line.

 2                 MS. WILKINSON:  We may as well do it here.

 3                 THE COURT:  I don't see anybody in the courtroom.

 4                 MS. WILKINSON:  Nobody's in the courtroom, right.

 5    So it's the first line, Your Honor.

 6                 MR. MERCER:  And for the record, this is

 7    Defendant's, I believe 20, Mosley 20.

 8                 THE COURT:  To put it in context, how many other

 9    lines make the general point regarding anxiety and such?

10                 MS. WILKINSON:  If you go to the first part of

11    that --

12                 MR. MERCER:  Well, there's --

13                 THE COURT:  Because if this is the only one, that's

14    one thing.  If this is the fifth one, then I start to wonder

15    whether that's necessary.

16                 MS. WILKINSON:  So it's --

17                 MR. MERCER:  It's --

18                 MS. WILKINSON:  -- the next page, I think,

19    Mr. Mercer.  Where it talks about the anxiety, is that it?

20                 MR. MERCER:  It's the only --

21                 MS. WILKINSON:  It's the only one that talks about

22    another personality.  The rest is the ones that we read at the

23    bench.  "My anxiety is there still.  It has not went into

24    effect.  I'm picking up my new meds today.  I feel an episode

25    coming on," the government has no objection to that.  It's

1  just that one line seems a little offensive.

2        THE COURT:  Yes, so if you're doing -- that's why I

3  wanted to get a context.  If you're doing all the others, why

4  do you need that one line?  It does seem to go a little

5  farther.

6        MR. MERCER:  Well, I think it explains that it is --

7  her reference is a rather extreme reference, but that is what

8  it is.  And when you see, Your Honor, if you go further, what

9  this all leads up to is on a few days later on May 9th, she's

10 packing him up and throwing him out.  And what, and if you

11 look at the overall count, you know, it's 51 sent to Cliff,

12 only 18 received from Cliff.  I mean, there's some real

13 erratic behaviors going on, by her own admission.

14       THE COURT:  Sure.  But all we're trying to

15 accomplish here, and by "we," I mean you, all you're trying to

16 accomplish here is to establish why he might not be calling

17 his girlfriend back, right, just tell me if I'm wrong about

18 that.

19       MR. MERCER:  No, I'm rebutting the inference the

20 government wants the jury to draw from him not answering her

21 calls on May 27th.

22       THE COURT:  Right.  That's what I just said, like

23 we're just trying -- you're trying to establish that there

24 could be a different reason why he didn't call his girlfriend

25 back.  And I want to say this in a way it doesn't get myself

1    in trouble, it's being recorded, but how much do we really

2    need, male or female, to understand that sometimes you might

3    not want to call your significant other back, particularly if

4    she has some anxiety problem?

5            I don't think you need to also establish that she's

6    dealing with multiple personalities.  I just don't think you

7    need to do that, so I am going to sustain the government, at

8    least for now.  If as this case progresses, you convince me of

9    some deeper meaning it might have, then maybe I'll reconsider

10   that.  I don't think -- I think that is getting into a privacy

11   issue for Ms. Melvin, and I don't think that line is

12   additionally probative, if I'm allowing you, without objection

13   it seems, to get into all the other stuff.

14           MR. MERCER:  Yeah, and I would like to be able -- we

15   certainly will re-raise this at the appropriate time.

16           THE COURT:  Sure.

17           MR. MERCER:  Because it is her explanation, her

18   description, and it explains her behaviors and it explains --

19           THE COURT:  But all we're trying to -- in a

20   different context, all that you're saying would make a lot of

21   sense, if the only purpose of it is just to show a boyfriend

22   didn't want to return his girlfriend's call, it's not -- I

23   mean, that's getting into someone's privacy interest, and it's

24   just not necessary for that to make that point.

25           So you're obviously -- your record is made on the

1    issue.  I'm just not allowing that one line to come in.

2              Anything else?

3              MR. MERCER:  No.

4              THE COURT:  All right.  Get the jury.

5              (Jury entered the courtroom.)

6              THE COURT:  All right.  You may be seated.  Good

7    morning still, ladies and gentlemen.  Thank you for your

8    patience.

9              Sir, I'll remind you that you're still under oath.

10             THE WITNESS:  Yes, sir.

11             THE COURT:  And Mr. Mercer, you may continue.

12             MR. MERCER:  Thank you, Your Honor.

13   Q.  (BY MR. MERCER)  Agent, I have up on the screen Mosley 20,

14   and could you tell the jury what we're looking at here.

15   A.  We're looking at a download from Ms. Melvin's phone.

16   Q.  Now, the phone number here is the 923- -- ending in 9232;

17   right?

18   A.  Yes, sir.

19   Q.  But that's not the 7500 number that we've been talking

20   about with Ms. Melvin?

21   A.  That's correct.  The download was done in December of

22   2016, so Ms. Melvin had changed her number by then.

23   Q.  But we see content in this extraction that comes from the

24   phone activity when she had the 7500 number?

25   A.  Yes, sir.

Cross-examinaton - Wilde  (By Mr. Mercer)

1    Q.  So when she set up the new, I guess iPhone, many of us

2    have done this, she's downloading some content from a prior

3    backup, I guess?

4    A.  Yes, sir.

5    Q.  And it may be complete, it may not be complete.

6    A.  Correct.

7    Q.  And I just want to go over, before the break, we had

8    started talking about some of the text messages in this

9    extraction, and just to get our bearings here, looking at line

10   1285 in Mosley 20, now, the date and day format here is a

11   little different than we usually see; right, because it's

12   actually day, month, year, as opposed to month, day, year?

13   A.  I don't think so.

14   Q.  Well, if you look, for example, you see it's 6/5/2016?

15   A.  Yes, sir.

16   Q.  But then if you turn a few pages, it goes to 7/5/2016?

17   A.  Yes, sir.

18   Q.  So that's May 6th at line 1287, and at line 13, May 7th?

19   A.  Again, I'm not 100 percent sure of that, sir, if you go

20   down a little further.

21   Q.  Sure.  Now, like line 1480, it's 11/05, 1494 is 12/05, and

22   you see a blank line, 1563, it goes to --

23   A.  15/5.

24   Q.  -- 15/5?

25   A.  Yes, sir, you're correct.

1    Q.  So it's sort of, I guess the European style, so it's day,

2    month, year, as opposed to month, day, year?

3    A.  Yes, sir.

4    Q.  Now -- and so at line 1285, the time is GMT?

5    A.  Yes, sir.

6    Q.  So that's the equivalent of UTC; right?

7    A.  Correct, so you have to subtract four hours.

8    Q.  Right.  So summertime, we subtract four?

9    A.  Yes, sir.

10   Q.  So for Eastern Standard Time, and so looking at line 1285,

11   this would be a text.  Now, the sent, does that mean it's

12   going from Kim's phone to Cliff's phone?

13   A.  Yes.

14   Q.  Okay.  And that would be then at 8:22 in the morning?

15   A.  Yes, ma'am -- yes, sir.

16   Q.  On May 6th.  "And it's just back to you, Cliff."  And then

17   there's a series of, I guess one, two, three sent messages

18   from Kim to Cliff; right?

19   A.  Yes.

20   Q.  And we don't have to read every text, but it basically

21   references, "You hurt my feelings this morning," at line 1286;

22   right?

23   A.  Yes.

24   Q.  And then going down further to line 1291, if we can see

25   this, so this would now be at 8:24 a.m., and it reads -- and

1   this is going from Kim to Cliff's phone, "I took a high dose

2   of meds last night too, so I was knocked out feeling pretty

3   numb."

4   A.  Yes.

5   Q.  And then we have at line 1293, another text at 8:24 from

6   Kim to Cliff, "My anxiety is still there a little and I

7   don't" -- "Idky."

8   A.  Yes.

9   Q.  Okay.  And just to summarize, we see in the subsequent

10  texts, some discussions about new meds, and then at line

11  1297 -- and this is again on May 5th at 8:25 a.m., "But I feel

12  an episode coming on, and I'm trying to prevent it, but idky,

13  thou."

14  A.  Yes, sir, it was on May 6th.

15  Q.  That's May 6th.  I said that incorrectly, I'm sorry.

16  A.  Yes, sir.

17  Q.  And then a reference also a minute later or less than a

18  minute later, "If it doesn't go away soon, I'm going to have

19  to admit myself for the weekend."

20  A.  Yes, sir.

21  Q.  Now -- and then going further down to line 1304, and

22  again, this is May 6th at 8:27, so now --

23  A.  I can't see 1304 on the screen, sir.

24  Q.  I'm sorry, 1304.

25  A.  Thank you.

Cross-examinaton - Wilde  (By Mr. Mercer)

1    Q.  And now there's a reference to rent?

2    A.  Yes.

3    Q.  And that's a message from Cliff to Kim?

4    A.  Yes.

5    Q.  And then Kim responding, "After I work, I go to Towson."

6    A.  Yes.

7    Q.  Now -- and then I'm -- this is still on May 6th, but now

8    it's at 10:32 in the morning, and we see this message from Kim

9    to Cliff, "Just the baby voice," and then the response, "Can

10   you finish your whole day at work?"

11       At line 1343, from Cliff to Kim, "Be on point.  Please

12   don't act like a baby at work"; right?

13   A.  Yes.

14   Q.  And then if we jump now to line 1427, now this is May 9th,

15   and this would be at 9:08 a.m.; right?

16   A.  No, I think it would be at -- so it's 1:00 o'clock in the

17   morning GMT, so it would actually be on the previous day, it

18   would be at p.m.

19   Q.  Oh, p.m.  Okay.  So what time p.m.?

20   A.  It would be 9:08 p.m., I know it would be on the 8th.

21   Q.  9:08 p.m. on May 8th.

22   A.  Yes, sir.

23   Q.  So a message from Kim to Cliff all capped letters, and

24   I'll just read it back for the record, "I want all my shit

25   back that I bought you, everything, even the jeans you got on.

1    Better yet, I'm packing it up right now."

2    A.  Yes, sir.

3              THE COURT:  Counsel approach, and bring the document

4    with you.

5              (Bench conference on the record.)

6              THE COURT:  I actually might be reconsidering my

7    ruling, what are the other ones?

8              MS. WILKINSON:  It's just the one line.

9              THE COURT:  So you're done aside from that?

10             MR. MERCER:  Yeah.

11             THE COURT:  All right.  I am going to allow that

12   line in.  You know, having now seen it in context, the date is

13   not far in time, as I'm understanding it, from the date of the

14   actual homicide when -- that's when the issue arises, whether

15   or not he's avoiding her for some reason.  Having now heard

16   the rest of them, that line does kick it to another level,

17   it's not a legal term, but such that -- I'm not saying I find

18   this to be the case, but such that it does make it really

19   probative for the defense to be able to say, like, this is why

20   he's trying to avoid her.

21             And I understand the privacy concern, but certainly

22   when I balance it against the defendant's right to try to

23   defend himself with this evidence, I -- now I understand the

24   government's position on this.  I think it's a different issue

25   as to -- so we still have more to talk about later.  It's a

1  different issue as to medical diagnoses, and whether if and

2  when she testifies, we'll get into that.  That I'm not

3  deciding on yet.  But I am going to allow that one line in.

4           MR. MERCER:  Thank you, Your Honor.

5           (The following proceedings were had in open court.)

6  Q.  (BY MR. MERCER)  Agent, I have Mosley 20 on the screen.  I

7  want to go back to line 1339 where it says "the baby voice."

8  A.  Yes, sir.

9  Q.  And I'm going to remove the sticker right above that.  And

10 at line 1338, it says -- and this is a message sent on

11 May 6th, and this would be at 9:32 in the morning; right --

12 I'm sorry, 10:32 in the morning?

13 A.  10:32, sir.

14 Q.  Okay.  That's why I went to law school.

15 A.  That's okay.

16 Q.  And sent from Kim to Cliff, and it reads, "Yeah, but one

17 of my personalities trying to come out."

18 A.  Yes, sir.

19 Q.  Okay.  Now, just shifting gears here, you had testified

20 some about a snip from the government's summary of phone calls

21 between 7626, Davon Carter's phone and Cliff Mosley's 1533

22 number; right?

23 A.  Yes.

24 Q.  And the list here -- and I guess we'll just call this

25 Mosley 21, because I'm not sure of the government exhibit

Cross-examinaton - Wilde  (By Mr. Mercer)

1    number here.

2        Now, on this list, Mosley 21, you did not include any of

3    the contacts between 7626 and 2650?

4    A.  Correct, I'm just showing the contacts between 1533 and

5    7626.

6    Q.  Right.  And just, 7626 is the phone that was activated on

7    May 25th?

8    A.  Yes.

9    Q.  And there are phone contacts between 7626 and 2650 on

10   May 25th?

11   A.  I'd have to look at the records to be sure, sir.

12   Q.  So let's see, I'll show you what's Mosley 21, and this is

13   the extraction for 2399.  It might be easier if I just show it

14   to you.

15   A.  Yes, sir, it is.

16   Q.  Okay.  So Mosley 21 is the extraction from 239- -- I'm

17   sorry, I'm jumbling this.

18        Okay.  Mosley 21, I'm sorry, you said, is 2399; right?

19   A.  Yes, sir, if you slide the exhibit up.

20   Q.  Okay.

21   A.  It's down -- I just saw it.  Here it is right here, where

22   it says MSISDN.

23   Q.  Right here, so 2399?

24   A.  Yes, sir.

25   Q.  Okay.  So on the 26th -- and you were testifying about the

1    contacts on the 26th; right?

2    A.  Yes, sir.

3    Q.  So there is a contact from 2399 to 1533, Cliff?

4    A.  Yes, there is.

5    Q.  So it's not that -- and then there's a -- further down at

6    line 8260, there's -- looks like a contact from 1533 to

7    2399?

8    A.  Yes.

9    Q.  All right.  So it's -- it's not as though Cliff initiated

10   that communication from 1533, it started with a contact from

11   2399 to 1533?

12   A.  Yes, at 9:12 p.m.

13   Q.  Okay.  At 9:12 p.m.  And did you plot where 1533 was at

14   9:12 p.m.?

15   A.  I don't think I went back that far, sir.

16   Q.  So if Davon was only trying to communicate with Cliff

17   through this newly acquired 7626 number, here on the 26th, we

18   have Davon contacting Cliff with just the regular 2399

19   number?

20           MS. WILKINSON:  Objection to the form of the

21   question, Your Honor.  It's completely argumentative.

22           THE COURT:  Overruled.  You can answer the

23   question.

24   A.  There are other contacts with the other -- with the other

25   number, yes, sir.

Cross-examinaton - Wilde  (By Mr. Mercer)

1   Q.  (BY MR. MERCER)  Now -- and the latest contact on the 26th

2   is at what time?

3   A.  For the 7626 number?

4   Q.  Yes.

5   A.  The latest contact is at 10:06 p.m.

6   Q.  10:06 p.m.

7   A.  Yes, sir.

8   Q.  Okay.  Now, let me borrow the government's exhibit here,

9   which is V-10.  And now, just want to try to understand your

10  testimony about cell sector location on May 27th, and on that

11  map, the red dot on V-10 is 2919 Rosalind Avenue; right?

12  A.  Yes, sir.

13  Q.  Okay.  And you see down here where I put this green

14  sticker, that's Wylie Avenue?

15  A.  Yes, it is.

16  Q.  And you've been out and you've looked at the cell towers

17  in that area?

18  A.  Yes.

19  Q.  And so the cell tower for 2650 -- I'll call this Mosley

20  22, I believe.

21      So I have up on the document camera, the tower for

22  T-Mobile; right?

23  A.  Yes, sir.

24  Q.  And that tower and sector that's depicted on Mosley 22,

25  that's ENB40085?

Cross-examinaton - Wilde  (By Mr. Mercer)

1    A.  Yes.

2    Q.  That tower and sector certainly includes the area on Wylie

3    Avenue?

4    A.  Absolutely.

5    Q.  Now, you have, looking at Mosley 22, you say,

6    approximately 1012 activations?

7    A.  Yes, sir.

8    Q.  And that's from May 1st to June 1st?

9    A.  Yes.

10   Q.  And in fact, there's so many, you didn't list them all;

11   right?

12   A.  That's correct.

13   Q.  And so that -- and that was -- that would be consistent

14   with Mr. Mosley saying, I'm down in the Park Heights area all

15   the time, every day?

16   A.  It's consistent with him being in the Park Heights area

17   and having 1,000 activations during that time period.

18   Q.  And if he's working on Wylie Street (sic), if we're just

19   looking at his overall pattern of activations, it's certainly

20   consistent with that to see 1,000 activations during a

21   one-month period of time to that tower and sector?

22   A.  It could be, yes, sir.

23   Q.  Now, and in fact, that's one of the things you do when

24   you're doing pattern analysis, is you're looking where do

25   people live, where do people work; right?

Cross-examinaton - Wilde  (By Mr. Mercer)

1   A.  Yes, sir.

2   Q.  Because you're expecting over a period of time that you're

3   going to see more activations near where one works or where

4   one lives?

5   A.  That's correct.

6   Q.  And then also for -- you also did a -- activations for

7   1533; right?

8   A.  Yes, sir.

9   Q.  And I have up on the document camera, Mosley 23.  Now,

10  1533 is AT&T?

11  A.  Yes, it is.

12  Q.  And so it has different tower locations, but not far off

13  from T-Mobile?

14  A.  Yes, sir.

15  Q.  And so the -- and I'm looking at Mosley 23, ENB73811.

16  A.  Yes.

17  Q.  And you note here, this is for phone number 1533, has 161

18  activations?

19  A.  Yes, it does.

20  Q.  And that tower, 73811, would certainly be consistent with

21  him working on Wylie Avenue?

22  A.  Yes.

23  Q.  And if I turn the page, you've listed these, and so we

24  have a sort of a table of all the dates and times of the

25  activations?

1    A.  Yes.

2    Q.  And so for example, if I look at some of what you

3    testified to on 5/27, we see the activations at 7:20 a.m.;

4    right?

5    A.  Yes, sir.

6    Q.  We also see activations on May 31st at 7:48 a.m.

7    A.  Yes, sir.

8    Q.  And June 1st at 7:33 a.m.

9    A.  Yes.

10   Q.  Sort of towards the end of the month?

11   A.  Yes.

12   Q.  All right.  So if someone was working a little extra to

13   get the rent money, these activations would be consistent with

14   that?

15   A.  The activations are consistent with, you know, being in

16   the area of Wylie Avenue, as well as the area of the crime

17   scene.

18   Q.  And, you know, this whole "consistent with," I mean, if

19   any address I picked in the sector, consistent with?

20   A.  Correct.

21   Q.  I mean, the real power of cell sector analysis -- you were

22   talking about like Andre Farrell; right, I mean, his phone is

23   hitting down in Myrtle Beach?

24   A.  Yes.

25   Q.  But you know, when it comes to actually precision

1    location, to say somebody's at a specific address, you can't

2    really do that.

3    A.  I never said that, sir.

4    Q.  Right.  And, in fact, when you were talking -- I guess you

5    were asked about finding people that had been kidnapped or

6    what have you, you would use cell sector analysis, and that

7    allowed you to zoom in on and then ping the phone?

8    A.  Because this is a general area to go to, and then what we

9    do is try to figure out why that person would be in that area,

10   and then usually that gives us an address to go to.

11   Q.  Right.  From other information?

12   A.  Yes, sir.

13   Q.  Right.  But there's no way that you can, you know, tell us

14   where in the sector?

15   A.  That's correct.

16   Q.  Now, with respect to your testimony about May 27th in

17   particular, the cell site location information is consistent

18   with Cliff Mosley going to work in the morning in the Park

19   Heights area; right?

20   A.  I don't know if he went to work that morning, sir.

21   Q.  But if that's what he told detectives, he was going to

22   work in the Wylie Avenue area --

23             MS. WILKINSON:  Objection.  Assumes facts not in

24   evidence.

25             THE COURT:  Sustained.  Sustained.

Cross-examination - Wilde  (By Mr. Davis)

1    Q.  (BY MR. MERCER)  The data is consistent with Mr. Mosley,

2    around lunchtime, going back to his residence?

3    A.  Yes, sir.

4    Q.  And then it's consistent with him coming back down to the

5    Park Heights neighborhood until about 6:00 p.m. on the 27th?

6    A.  Yes.

7    Q.  The data is inconsistent with Mr. Mosley going to Arbor

8    Station Way?

9    A.  Yes.

10            MR. MERCER:  Just court's brief indulgence.

11            THE COURT:  Sure.

12            MR. MERCER:  Thank you, Agent, no further

13   questions.

14            THE WITNESS:  Thank you.

15            THE COURT:  All right.  Cross from Mr. Carter's

16   counsel.  Mr. Davis.

17            MR. DAVIS:  Thank you, Your Honor.

18                         CROSS-EXAMINATION

19   BY MR. DAVIS:

20   Q.  Agent Wilde, you indicated that there were over 1,000

21   contacts between Mr. Hightower's phone and the phone

22   associated with Mr. Carter between August of 2014 and May of

23   2016?

24   A.  Yes.

25   Q.  Were you requested to count those up by the United

1    States?

2    A.  Yes.

3    Q.  In the process of counting them up, did you note that 122

4    of them -- only 122 of them were a minute or longer?

5    A.  No, I did not -- I didn't focus on the duration of the

6    calls, I only focused on the fact that the calls or texts

7    occurred.

8    Q.  So you also did not note that greater than 50 percent of

9    them were from zero to 20 seconds long?

10   A.  No, sir, I did not.

11   Q.  Now, I -- maybe it's just me, I'm a little confused, you

12   gave us a lot of information over the past two days, is

13   there -- can you take the seconds -- when one phone call goes

14   to another phone, can you take the number of seconds, duration

15   of the contact, to determine whether it connects, or no, you

16   need to look at additional information?

17   A.  I'd like to look at additional information.  Just that the

18   call lasted 20 seconds does not tell me whether or not -- with

19   some carriers it doesn't tell me -- maybe with T-Mobile, it

20   doesn't tell me if that call was actually connected.  With

21   AT&T, you can see that the call was connected or you can

22   basically tell that it didn't go to voice mail.  So you can

23   assume that the call was connected.

24   Q.  For 20 seconds?

25   A.  Yes, sir.

Cross-examination - Wilde  (By Mr. Davis)

1   Q.  And the activation for the timing clock begins when the

2   other person answers?

3   A.  Yeah, I believe the -- so there's two time values on

4   there, there's a seizure time, which is the time it takes the

5   call to set up, and then the duration of the call, the elapsed

6   time, which is the actual duration of the call.

7   Q.  And it differs by carrier; correct?

8   A.  Of course.

9   Q.  Let me show you a few pages from Government's Exhibit P-2,

10  which is the summary --

11  A.  Yes, sir.

12  Q.  -- of the calls.  First of all, just looking at page --

13  see if I can get this on here -- page 67, and we know that

14  that may be off a little, the pagination, because there were

15  two lines that were off, and it's been corrected now;

16  correct?

17  A.  Yes, sir.

18  Q.  But in general, do you see where it says target up

19  there?

20  A.  Yes, I do.

21  Q.  You were provided numbers, and those numbers are

22  considered target numbers; correct?

23  A.  Yes, sir.

24  Q.  So your summary just represents the calls between phone A

25  and phone B, only if they're included within the target

Cross-examination - Wilde  (By Mr. Davis)

1    numbers; correct?

2    A.  I'm not sure I understand your question, sir.

3    Q.  All right.  Let me try that again.  If you're not -- see

4    the first number there, (443) 368-5670?

5    A.  Yes, sir.

6    Q.  If you're not provided that number, your summary sheet

7    isn't going to have any data for that phone that you were not

8    provided a number for; correct?

9    A.  Correct.  We have to have the call detail records to have

10   a record to put on the summary.

11   Q.  So you're told what phones are going to be target numbers,

12   and then you created this summary; correct?

13   A.  Yeah, I was asked to create this summary based upon the

14   phones that were of importance in the case.

15   Q.  And I'm going to continue on P-2, page 68.  And I note, I

16   have highlighted on the screen, there's a 4/21/2016 call, do

17   you see that highlighted portion between Matthew Hightower and

18   Rich Bardos?

19   A.  Yes, sir.

20   Q.  Now, below that are additional calls, that call that we

21   just referenced between Matthew Hightower to Rich Bardos,

22   that was at 17:22?

23   A.  Yes.

24   Q.  Correct?

25   A.  Yes.

Cross-examination - Wilde  (By Mr. Davis)

1    Q.  Now, the next call that shows up is Matthew Hightower to

2    Belinda Turner; correct?

3    A.  Yes.

4    Q.  Now, Belinda Turner's number is one of the target numbers;

5    correct?

6    A.  I'm not sure it's one of the target numbers, sir, but it's

7    one of the folks that was involved in the case.

8    Q.  Well, if you drop down below the one that's immediately

9    below the highlighted portion, where it says Belinda Turner,

10   that wouldn't appear there unless her number was a target

11   number; correct?

12   A.  It appears there because her number is in contact with

13   Matthew Hightower at that time, and it was deemed of

14   importance to the case.

15   Q.  All right.  Now, do you know if Matthew Hightower called

16   anyone else if you were not provided that target number?

17   A.  No, sir, because again, we went over that previously, that

18   we were just provided the -- we're just showing the calls of

19   importance in the case and not all the calls.

20   Q.  Of importance from the perspective of the investigators

21   and the lawyers working on the case; correct?

22   A.  Yes, sir.

23   Q.  But there could be other calls immediately after that

24   call?

25   A.  Absolutely.

1    Q.  Now, one thing we note from that particular page, there's

2    no call to Davon Carter after Matthew Hightower talks to

3    Richard Bardos on 4/21/2016.  There's no call immediately

4    after, nor is there any call to him for a couple of days?

5    A.  That's correct.

6    Q.  And again, Matthew Hightower may have called other numbers

7    after talking to Mr. Bardos, but someone decided that they

8    weren't important in the overall scheme of things; correct?

9    A.  He could have called other numbers, yes, sir.

10   Q.  Now, you also -- you also pointed out how there were calls

11   coming out of the Rosalind -- is it Rosalind -- I don't even

12   recall what the name of it is, Rosalind Place or Rosalind

13   Street?

14            MS. WILKINSON:  Avenue.

15   Q.  (BY MR. DAVIS)  Avenue, there we go, missing it on all

16   counts.

17       You pointed out that there was some communications, that

18   some phones were in the area of Rosalind Place (sic) on May

19   22nd and also on May 27th, do you recall that testimony?

20   A.  They're in the area of Park Heights, and Rosalind Avenue

21   is in Park Heights, yes, sir.

22   Q.  Give me a moment, I want to show you something, ask you a

23   couple of questions.

24       Now, I show you what's been marked P-7, and I'm showing

25   you page 5 of P-7.  That shows the calls between 2399, which

Cross-examination - Wilde  (By Mr. Davis)

1    you've testified is associated with Davon Carter; correct?

2    A.  Yes.

3    Q.  And as we look at that -- well, first of all, let me --

4    let's kind of define the area that that's in.  You see this

5    area right here, and for some reason I can't circle it.  Let

6    me show you, see if I can do this from here.  Nope, I can't

7    see it.  I tried.

8         This is Wylie Avenue; correct?

9    A.  Yes, it is.

10   Q.  And looking on your screen to the left, that pie-shaped

11   area is encompassing the Wylie Street area; correct?

12   A.  The Wylie Avenue area, yes, sir.

13   Q.  Wylie Avenue.  And in addition to May 2nd and May 27th,

14   when we look at -- when we look at this chart, again, that's

15   P-5, page 7, we see that 2399 hits the tower down there on

16   May 5th, May 7th, May 11th, May 15th, May 17th, May 24th, and

17   May 25th, does that look right --

18   A.  Yes, sir.

19   Q.  -- looking at that?

20        And then you look at the other little pie-shaped area, to

21   the right of that, and it hits the tower, and that second

22   pie-shaped area on May 10th, May 20th, and May 30th?

23   A.  Just May 10th and May 20th, sir.

24   Q.  I'm sorry, I missed it, May 30th is associated with the

25   other one.  My number's messed up.

Cross-examination - Wilde  (By Mr. Davis)

1    A.  Yes, sir.

2    Q.  It's fair to say that that 2399 is hitting those towers

3    down in the Rosalind Avenue area quite a bit in the month of

4    May?

5    A.  Yes.

6    Q.  And you didn't do any analysis prior to that?

7    A.  Correct.

8    Q.  Now, will a cell phone ping off a tower if it's turned

9    off?

10   A.  I mean, so if the phone is turned off, it cannot do that

11   calculation where it determines the strongest and clearest

12   signal because it's not powered on, it's not connected to the

13   network, so we won't have any records.  So if a phone is off

14   and it received a call, you'll see the call come in on the

15   records, but you won't have the tower information there.

16   Q.  So you can't chart it out, you can't map it out;

17   correct?

18   A.  Correct.

19   Q.  And actually, you don't physically map them out anymore,

20   there's a program for that; correct?

21   A.  We use a program, sir, yes.

22   Q.  You just take the numbers and you put them in and it

23   calculates it for you and spits out the map?

24   A.  It does, and then we go back and double check it to make

25   sure it's correct.

Cross-examination - Wilde  (By Mr. Davis)

Q.   And the same with your P-2, Exhibit P-2, the summary of
the calls, you just feed the numbers in and it spits out the
charts?

A.   No, sir, that was manually going through multiple
different data sets, and then manually entering that in there,
making sure the dates were correct, sorting it correctly,
trying to take out as many of the duplicates as we could.  It
was a lengthy process, it wasn't pumping it into a computer
and sticking it back out again.

Q.   So you actually had to manually do each line in there?

A.   Not every line, but we had to manually do each data set in
there because they come in different formats.  As you saw, the
Verizon records come in one format, the AT&T come in another,
the Cellebrite records come in a completely different format.
So we had to take all of those different data sets, come and
normalize them, put them in one sheet, and then make sure it
was sorted correctly by date and time.

          MR. DAVIS:  Bear with me for one second.  And you
know, I was mistakenly referring to that last exhibit as P-7,
that wasn't -- that 2399 exhibit, I believe that's P-5,
page 7.  Correct the record on that, Your Honor.

Q.   (BY MR. DAVIS)  Dropping down to P-7, this again -- and
that's at page 28, this is a mapped out area encompassing the
Arbor Station Way address; correct?

A.   Yes, sir.

Cross-examination - Wilde  (By Mr. Davis)

1    Q.  And that's detailing the number associated with

2    Mr. Carter, 2399; correct?

3    A.  Yes, sir.

4    Q.  And as we look at the little box there with the

5    activations on 5/27/2016, there's an activation at 6:03, 6:11,

6    6:19, it goes on and on; correct?

7    A.  Yes, sir.

8    Q.  So that means that phone was on during those time periods;

9    correct?

10   A.  It was.

11   Q.  And likely, although you can never tell exactly; correct,

12   but likely, at the Arbor Station Way address?

13   A.  It's using the tower consistent with being near the Arbor

14   Station Way address, yes.

15   Q.  So you know the phone's at Arbor Station Way; correct,

16   generally speaking?

17   A.  In the area of Arbor Station Way, yes, sir.

18   Q.  But as with any of these records, you never know where the

19   person associated with the phone is; correct?

20   A.  That's correct.

21   Q.  But based on the content -- you detailed records from

22   Deanna Lawson to Mr. Carter, do you recall that?

23   A.  Yes.

24   Q.  So based on the other circumstantial facts surrounding

25   that, you kind of conclude that Mr. Carter's probably not at

1    Arbor Station Way when Deanna Lawson was contacting him;

2    correct?

3    A.   Deanna's contacting him, to his phone, those are all

4    incoming transactions.   That means that they're not being

5    answered, it's not being responded to, none of the text

6    messages are being responded to.   So I conclude that nobody's

7    really using the phone, it's literally just laying there,

8    receiving messages and calls at the time.

9    Q.   And it's on?

10   A.   It's on, yes, sir.

11   Q.   Directing your attention to Exhibit P-7, at page 29,

12   you've plotted out 2399, and it appears that it leaves Arbor

13   Station Way after 10:00?

14   A.   Yes, sir, the last -- the first activation away from Arbor

15   Station is at 10:19 a.m.

16           MR. DAVIS:   Bear with me one second.

17           THE COURT:   Sure.

18   Q.   (BY MR. DAVIS)   Now, directing your attention to P-2J,

19   Government Exhibit P-2J, these are calls that you summarized

20   from Deanna Lawson and Mr. Carter back and forth on May 27th,

21   beginning at 6:03 a.m.; correct?

22   A.   Yes, sir.

23   Q.   And from looking at this, we see -- turn to page 2 of that

24   document, we see that Mr. Carter responds to a series of calls

25   between 6:03 a.m., he responds or someone responds using 2399

1  to Deanna Lawson at 9:25 a.m.

2  A.  Yes.

3  Q.  And we know from the prior exhibit that 2399 never left

4  Arbor Way Station; correct?

5  A.  It was using the tower consistent with being there, sir,

6  yes.

7  Q.  But taking into consideration all of the facts here, it's

8  reasonable to conclude that Mr. Carter's at Arbor Way Station

9  at 9:25 when he returns the call; correct?

10  A.  Whoever's using the phone is in the area of Arbor Station

11  when they return that call, yes, sir.

12  Q.  And I'm not going to go back to P-7, page 29, but do you

13  recall what time that phone begins its journey south?

14  A.  It was after -- it was 10:19, is the first call that's

15  away from Arbor Station Way, and from there, it begins its

16  journey basically through the center of Baltimore to West

17  Baltimore, and then south after that.

18  Q.  Sorry this takes so long.

19  A.  It's okay.

20  Q.  I have some in electronic format, some are in paper

21  format, it just makes it difficult.

22      So consistent with what we were talking about before, you

23  can't say Mr. Carter was using that phone, the 2399, but

24  someone uses that phone at 9:15 -- or 9:25 to contact Deanna

25  Lawson's phone?

Cross-examination - Wilde  (By Mr. Davis)

1    A.  Yes.

2    Q.  And then shortly after that, about 10:00 o'clock, that

3    phone starts to move; correct?

4    A.  Yes, sir.

5    Q.  And we see that on Government's Exhibit P-7, page 29?

6    A.  Yes.

7    Q.  And it's moving south now?

8    A.  Yes, sir, it goes -- 10:19, it's just west of the

9    residence of the Arbor Station Way, and then 10:26, heading

10   towards 83, and then 11:49, it's in West Baltimore.  And then

11   from there, after 11:49, it goes south from Baltimore down to

12   Myrtle Beach.

13   Q.  Now, directing your attention to P-10B, you indicated on

14   direct that the 7626 number was activated on May 25th;

15   correct?

16   A.  Yes.

17   Q.  And this P-10B is a series of text messages that were

18   issued on 5/25/2016 beginning at 9:54 a.m.; correct?

19   A.  Yes.

20   Q.  And each of these text messages are the same; correct?

21   A.  Yes.

22   Q.  And one is to New York Pan.

23   A.  Yes.

24   Q.  One is to Pili.

25   A.  Yes.

Cross-examination - Wilde  (By Mr. Davis)

1    Q.  Took me a day to get that name down.  And then the other

2    is to "T".

3    A.  Yes, sir.

4    Q.  And then the other is to Cliff?

5    A.  Yes.

6    Q.  Now, in your summaries, you just list Cliff, but these

7    individuals all got the same message on the day that 7626 was

8    activated?

9    A.  Yes, sir.

10   Q.  Did you have any idea -- from your experience in reviewing

11   text messages and cell phones, are you able to opine on what

12   this means, "lock me in"?

13   A.  It means to save that number as a contact for that

14   person.

15   Q.  So all these individuals are being saved on 7626 when it's

16   activated?

17   A.  Yes, sir.

18   Q.  Bear with me again one second.  I'm going to show you

19   P-10, which is the Cellebrite dump of 7626.  We're going to

20   the call log.  And the individuals that we were talking about

21   a few moments ago that were locked into 7626, again, here they

22   show up again, New York Pan, and then we've got someone new,

23   we have Jamie.

24   A.  Yes.

25   Q.  And there's a number of calls.  We have Droid.

Cross-examination - Wilde  (By Mr. Davis)

1    A.  Yes, sir.

2    Q.  Then we have Cliff.

3    A.  Yes.

4    Q.  And these names are coming off of 7626 after it was

5    activated on May 25th, 2016?

6    A.  Yes.

7    Q.  Do you know what the relationship between these

8    individuals and that phone are?

9    A.  I do not.

10   Q.  Let me direct your attention -- I'm sorry, I got to do

11   this again.

12       And again, you just told us that you -- that you can

13   opine by drawing on facts and circumstances and other

14   information you have as to what the meaning of different

15   things are; correct?

16   A.  Yes.

17   Q.  I show you what's been marked Government's Exhibit P-2I.

18   Now, we see Cliff at the bottom of that page, a call at -- on

19   June 4, 2016 at 9:29; correct?

20   A.  Yes, sir.

21   Q.  And then we see that it was a text message?

22   A.  Yes.

23   Q.  And then we see, "You got some tree or not, I need to get

24   high"; correct?

25   A.  Yes, sir.

Cross-examination - Wilde   (By Mr. Davis)

1    Q.  Is that a fact that you would reasonably conclude that

2    this particular phone, 7626, was being used for drug

3    transactions?

4    A.  Yes, sir.

5    Q.  But you can't comment on the other individuals because you

6    don't have any other facts to associate with them; correct?

7    A.  I don't know -- I personally don't know anything about

8    those individuals, sir.

9    Q.  Let me show you one more thing.

10           MR. DAVIS:  After having unplugged that five times,

11   apparently, they just told me I don't need to unplug it.  I

12   apologize for the delay.  And nobody watch me as I pump my

13   password into here.

14   Q.  (BY MR. DAVIS)  I'm going to direct your attention to P-7

15   at page 29.  Now, looking at this, it appears --

16           MR. DAVIS:  Court's indulgence.

17   Q.  (BY MR. DAVIS)  Let me take you back to that exhibit we

18   were working on, or working with.  I direct your attention to

19   P-2I again.  These are -- again, these are calls that --

20   between Mr. Carter and Cliff Mosley.

21        There appears to be a connection for 20 seconds at

22   6:13 a.m.; correct?

23   A.  Yes, sir.

24   Q.  One for 30 seconds at 6:15; correct?

25   A.  Yes.

Cross-examination - Wilde  (By Mr. Davis)

Q.  And that probably means it was a missed call or

something?

A.  Well, I know from looking at the records that the call did

not go to voice mail, it was not routed to voice mail.  So I

wouldn't -- I wouldn't expect that to be a missed call -- or a

missed call, they likely spoke.

Q.  On both occasions for 20 seconds and 30 seconds;

correct?

A.  Yes, sir.

Q.  And then there's no communications between 6:15 and 8:26,

it's silent; correct?

A.  Yes.

Q.  Now, with respect to these pie-shaped areas, this isn't an

exact science, is it?

A.  Of course not.

Q.  The lines that draw the pie-shaped -- let me show you

here.  The lines that draw the pie-shaped areas, I mean, is --

that looks like it's geometrical, but it isn't, the call could

be a little bit outside, the phone could be a little bit

outside; correct?

A.  It could be, yes.

Q.  It also depends on traffic and what's hitting the tower

and whether a lot of calls are hitting one tower, sometimes a

call will get bounced to another nearest tower?

A.  That's incorrect.

Cross-examination - Wilde   (By Mr. Davis)

1    Q.   Oh, that's incorrect?

2    A.   Yes, sir.

3    Q.   What effects whether it goes to the closest tower other

4    than the mountain example you gave us?

5    A.   The landscape and whether or not -- line of sight, those

6    are basically the two things that effect it.

7    Q.   Which ones?

8    A.   Line of sight and landscape.

9    Q.   Can you explain line of sight?

10   A.   Sure.   If -- say I was on the 8th floor of this building,

11   and there's a cell phone tower on top of the building three

12   blocks away, I'll have a straight line of sight between the

13   8th floor of this building and that cell tower, so I might

14   connect to that cell phone tower, whereas there might be one

15   that sits on top of a telephone pole outside of this building,

16   which is a very low tower, and so I'll have a better line of

17   sight.   I might be closer to the telephone pole tower, but

18   I'll have a better line of sight from the 8th floor of the

19   building to the one that's a few blocks away.

20   Q.   And that just demonstrates that it isn't a 100 percent

21   dead-certain answer that it's within that pie-shaped area;

22   correct?

23   A.   I mean, most of the time it connects to the tower that

24   it's closest to, but it connects to the tower it sees as the

25   strongest and clearest signal.

Redirect Examination - Wilde   (By Ms. Wilkinson)

1   Q.   And if you're in a building where you're not getting a

2   signal, it's not going to connect to anything; correct?

3   A.   If you're somewhere where you're not getting a signal,

4   like in the bottom of a parking garage, somebody calls you,

5   it's going to show up on your records as a call, but you're

6   not going to see the cell tower activation there because

7   you're going to get signal.  It's basically the same as having

8   the phone off.

9   Q.   Thank you.

10               MR. DAVIS:  Bear with me one moment.

11               Thank you, Agent.

12               THE WITNESS:  Thank you.

13               THE COURT:  Redirect.

14                         REDIRECT EXAMINATION

15   BY MS. WILKINSON:

16   Q.   Agent Wilde, Mr. Mercer asked you a number of questions

17   about the locations of Mr. Mosley's phones that hit near the

18   cell tower closest to Wylie Avenue here, do you recall those

19   questions?

20   A.   Yes, sir -- I mean, yes, ma'am.

21   Q.   And I believe Mr. Davis also asked you the same questions,

22   whether or not there were multiple times in May of 2016 where

23   Mr. Carter's phones also hit around this Wylie Avenue

24   location, is that fair to say?

25   A.   Yes.

1    Q.   And doing what Mr. Davis just asked you to do, draw any

2    conclusions about the fact that both of Mr. Mosley's phones

3    and both of Mr. Carter's phones repeatedly hit around that

4    Wylie Avenue tower, that all of those phones spent a lot of

5    time in Park Heights?

6    A.   That's correct.

7    Q.   Now, with regard to the fact that we spent a lot of time

8    this morning with Mr. Mercer talking about how phone records

9    show contacts between two different telephones; correct?

10   A.   Yes, ma'am.

11   Q.   And equally goes without saying, does it not, Agent Wilde,

12   that you can't tell the jury, based on phone records, whether

13   people met in person too?

14   A.   That's correct.

15   Q.   They saw each other on the street?

16   A.   Correct.

17   Q.   They happened to hang out at the same street corner on

18   Wylie Avenue?

19   A.   Yes, ma'am.

20   Q.   That's not going to be on any phone records?

21   A.   No, ma'am.

22   Q.   Other types of evidence might give us that information?

23   A.   Yes.

24   Q.   Now, with regard to Mosley 23.  We'll just bring it up

25   here on the screen.  And we're going to focus in on these

1    calls, and obviously these are the calls between the 7626

2    number utilized by Mr. Carter, and then the 1533 number

3    utilized by Mr. Mosley at 6:13 and 6:15 a.m. on the morning of

4    the murder?

5    A.  Yes, ma'am.

6    Q.  And you have depicted the cell tower that's closest to

7    where those two phones -- those two calls are hitting;

8    correct?

9    A.  Yes, ma'am.

10   Q.  Now, again, using the different types of evidence and

11   tools that are with --

12           MS. WILKINSON:  If I could ask Ms. Lesser to toggle

13   over to another piece of evidence.  Thank you.  Is it at the

14   very beginning?  Great.  Can we just play this for a second.

15           Noting for the record, this is 6:16 a.m.

16           (Video playing.)

17           MS. WILKINSON:  If you could stop it right there for

18   a second.

19   Q.  (BY MS. WILKINSON)  If you were to assume, Agent Wilde,

20   that a 1533 phone was in the car that we just saw pulling up

21   around 6:16 a.m., to the intersection of Nurton Avenue and

22   Woodland Avenue, would that be consistent with the credit site

23   tower hit that you just told the jury about?

24   A.  Absolutely.

25           MR. MERCER:  Object.  Beyond the scope.

1          THE COURT:  Overruled.

2          THE WITNESS:  Absolutely.

3          MS. WILKINSON:  I have nothing further, Your

4    Honor.

5          THE COURT:  All right.  Sir, thank you for your

6    testimony.  You can be excused at this time.

7          THE WITNESS:  Thank you, sir.

8          THE COURT:  Please don't discuss your testimony with

9    anyone until the case has been completed.  And enjoy the rest

10   of your day.

11         THE WITNESS:  Thank you, you do the same.

12         THE COURT:  Government's next witness.

13         MS. OLDHAM:  Your Honor, the government's next

14   witness is Officer Terry Norris.

15         THE COURT:  Very well.  Officer Norris.

16         THE CLERK:  Good afternoon, sir, please raise your

17   right hand.

18              OFFICER TERRY NORRIS,

19   called as a witness, being first duly sworn, was examined and

20   testified as follows:

21         THE WITNESS:  I do.

22         THE CLERK:  Thank you.  You may have a seat.  You

23   may slide up to the microphone, please keep your voice up for

24   the Court, state and spell your full name for the record.

25         THE WITNESS:  Officer Terry Norris, Baltimore County

Direct Examination - Norris  (By Ms. Oldham)

1    Police Department.

2              THE CLERK:  Spell your name for the record.

3              THE WITNESS:  T-e-r-r-y, N-o-r-r-i-s.

4              THE CLERK:  Thank you.

5                        DIRECT EXAMINATION

6    BY MS. OLDHAM:

7    Q.  Good afternoon, Officer Norris.

8    A.  Good afternoon.

9    Q.  How long have you been with the Baltimore County Police

10   Department?

11   A.  16 years March, this March.

12   Q.  What is your current assignment with the Baltimore County

13   Police Department?

14   A.  I'm actually in Pikesville precinct, the traffic division

15   there.

16   Q.  What are your responsibilities in the traffic division,

17   briefly?

18   A.  Investigating crashes, speed complaints, traffic

19   enforcement within the precinct.

20   Q.  Did you have that same assignment in May 16th of 2016?

21   A.  Yes, I did.

22   Q.  I'm going to direct your attention to the morning hours of

23   May 16th, 2016 around 10:30 a.m., what was your location at

24   that time?

25   A.  It was the intersection of Old Court Road and Greenwood

1   Road.

2   Q.  And what were you doing at that location?

3   A.  Traffic enforcement using LIDAR.

4   Q.  And in what town is that intersection located?

5   A.  Baltimore County, Pikesville, Maryland.

6   Q.  And tell us what action you took approximately 10:36 a.m.

7   while at that location.

8   A.  Again, we were using stationary LIDAR at the intersection

9   and conducting traffic stops based off of speeders that we

10   had.

11   Q.  And what is LIDAR, for those of us that don't know?

12   A.  It's like radar except it's vehicle specific.  Where radar

13   encompasses a large field to give you the numbers, LIDAR is --

14   there's like a scope, like a barrel of a gun that's on top of

15   it, you point it specifically at whatever vehicle you're

16   trying to gain a speed on, and it gives you that exact vehicle

17   readout of the speed back to you.

18   Q.  And did you conduct a traffic stop around that time?

19   A.  Yes, I did.

20   Q.  I'm going to show you what is Government's Exhibit C-14,

21   and you should be able to look to your right, Officer Norris,

22   and see Government's Exhibit C-14.

23   A.  Yes, I do.

24   Q.  Do you recognize that page of that document?

25   A.  Yes, that's a warning that we issue through the Maryland

Direct Examination - Norris   (By Ms. Oldham)

1   State e-ticket system.

2   Q.  Okay.  And so tell us about the traffic stop that you

3   conducted that resulted in the issuance of this warning.

4   A.  Again, it was a speeding violation at that intersection on

5   a 2008 silver Audi sedan.  The tag displayed was 03591CG, and

6   the defendant driving the vehicle that day was identified as

7   Davon Carter.

8   Q.  And from where does that information come from that is

9   entered into this warning?

10  A.  Do you mean --

11  Q.  Are you physically putting that information into your

12  computer system on scene?

13  A.  Yes, I am.

14  Q.  And where do you -- where did you learn the information

15  about the individual identified as Davon Carter?

16  A.  Speaking with the driver of the vehicle.

17  Q.  So when you used your LIDAR --

18  A.  Uh-huh.

19  Q.  -- you clock a certain speed, do you activate your lights

20  and sirens to conduct a traffic stop?

21  A.  At that intersection, no, we don't.  It's a four-lane

22  roadway, and there's a median strip in the middle.  We are

23  usually positioned on the median strip, and either we're

24  shooting LIDAR -- usually in eastbound direction, and we're

25  either on the median strip or the curb of the eastbound lane

Direct Examination - Norris  (By Ms. Oldham)

1    of travel, at which point, if we get a violator, we'll step in

2    the lane of travel using our -- wearing our reflective vest

3    issued by the county and flag the vehicle to a stop.  That's

4    how we initiate a traffic stop.  We don't -- at that

5    intersection use our lights and sirens because our car is

6    usually on the median.

7    Q.  Okay.  So in this instance then, the driver of that Audi

8    sedan pulled over?

9    A.  Yes.

10   Q.  And you approached the driver?

11   A.  Yes.

12   Q.  And was he the sole occupant of the car?

13   A.  Yes, he was.

14   Q.  And did he provide his identifying information to you

15   that's indicated there on the warning?

16   A.  He did not have his license with him, he did provide his

17   name and information.

18   Q.  And with that information, did you run your regular checks

19   that you do on the drivers during a traffic stop?

20   A.  Yes, I did.

21   Q.  And as a result of your interactions and your observations

22   that morning, you issued this warning for speed?

23   A.  Yes, that's correct.

24   Q.  Did you issue any other warnings or citations to

25   Mr. Carter?

1    A.  I believe I issued the warning for the speed, a citation

2    for not having his license with him, as well as the -- not

3    having the front registration plate attached to the vehicle.

4    Q.  Okay.  I'm showing you the next page of Government's

5    Exhibit C-14, can you tell us what this is?

6    A.  Yes, that's a traffic citation that's issued from the same

7    system that the state police created for citations.

8    Q.  Okay.  And the citations are for what?

9    A.  Failure for the driver to have his license with him and

10   not having the registration plates attached to the vehicle.

11   Q.  Okay.  And do you recall, were there no registration

12   plates attached to the vehicle?

13   A.  There was a Maryland registration plate to the rear of the

14   vehicle, the front of the vehicle had a -- what I would

15   describe as a European-like, German-style license plate that

16   was not Maryland.

17             MS. OLDHAM:  May I approach, Your Honor?

18             THE COURT:  Sure.

19   Q.  (BY MS. OLDHAM)  Officer Norris, first I'm going to show

20   you what has been introduced as Government's Exhibit C-15, is

21   this what you mean when you say a Maryland registration

22   plate?

23   A.  Yes, ma'am.

24   Q.  I'm also showing you what's been introduced as

25   Government's Exhibit R-21.  Do you recognize Government's

1    Exhibit R-21?

2    A.   That was the style of the plate that was on the vehicle,

3    however, I can't tell you if the numerics and all are the same

4    because I don't have notes or recollection of what the actual

5    numbers were, but that --

6    Q.   You indicated the tag number on your citation there that's

7    on the screen?

8    A.   Yes.  And that's what would be associated with the

9    Maryland tag, however, I don't recall if that was the one that

10   was on the front of the vehicle at the time.

11   Q.   Okay.  But the --

12   A.   It was a German style, but I don't remember it being

13   actual Maryland numbers that are associated with it.

14   Q.   But does it appear to be the same sequence of numbers?

15   A.   Yes, it is, has a Maryland registration plate.

16   Q.   Okay.  So the numbers match, the style is the same, but

17   you didn't physically take this off of the car?

18   A.   No, I did not.

19   Q.   Okay.  Did you explain to Mr. Carter why he was being

20   issued the citation for not having the front plate attached?

21   A.   Yes, I did.

22   Q.   And do you recall what his response was?

23   A.   I believe it was something along the lines about it being

24   his girlfriend's vehicle and that he wasn't aware that it

25   wasn't attached.  But I don't recall specifically what the

1   exchange was.

2   Q.  Okay.  Officer Norris, I'm going to direct your attention

3   to Government's Exhibit P-2H.  First I'm going to direct your

4   attention to this communication here at 8:12 a.m. on May 16th,

5   2016, from a Davon Carter to a Cliff Mosley where it

6   indicates, "I'm up, I'm out the door to you now."  The next

7   communication at 8:12 from Cliff Mosley to Davon Carter,

8   response is, "ARD."

9        Directing your attention just further down here, Officer

10  Norris, where this red event is, is this time indicated here,

11  May 16th, 2016, 10:36 a.m., this event noted as traffic

12  violation ticket issued in Audi, Old Court Road and Greenwood

13  Road, is that consistent with the time that you conducted this

14  traffic stop and issued a citation to Mr. Carter?

15  A.  Yes, it is.

16            MS. OLDHAM:  Nothing further, Your Honor.  Thank

17  you.

18            THE COURT:  Cross.

19            MR. ZERKIN:  No questions, Your Honor.

20            MR. TRAINOR:  No questions, thank you.

21            THE COURT:  Sir, thank you so much for your

22  testimony, you are excused.  Don't discuss your testimony with

23  anyone else until the trial has been completed.  Enjoy your

24  day.

25            Next government witness.

1            MS. OLDHAM:  Your Honor, the next witness is Deshawn

2   Walters.

3            THE COURT:  Very well.

4            THE CLERK:  Good afternoon, sir, please raise your

5   right hand -- stand and raise your right hand.

6                          DESHAWN WALTERS,

7   called as a witness, being first duly sworn, was examined and

8   testified as follows:

9            THE WITNESS:  Yes.

10            THE CLERK:  Thank you.  You may have a seat.  If

11   you'd slide up to the microphone, please state and spell your

12   full name for the record.

13            THE WITNESS:  Deshawn Walters.

14            THE CLERK:  Spell it, please.

15            THE WITNESS:  D-e-s-h-a-w-n.

16            THE CLERK:  Thank you.

17            THE WITNESS:  W-a-l-t-e-r-s.

18            THE CLERK:  Thank you.

19                        DIRECT EXAMINATION

20   BY MS. OLDHAM:

21   Q.  Good afternoon, Mr. Walters.

22   A.  Good afternoon.

23   Q.  Mr. Walters, how old are you?

24   A.  38.

25   Q.  And are you from the Maryland area?

1    A.  Yes.

2    Q.  Can you tell me if you have ever been convicted of a

3    crime?

4    A.  Yes, I have.

5    Q.  Can you tell me if you know an individual by the name of

6    Davon Carter?

7    A.  Yes.

8    Q.  I'm showing you what has been already introduced as

9    Government's Exhibit PH-1.  If you can look to the right there

10   on the monitor, Mr. Walters, do you recognize the person in

11   PH-1?

12   A.  Yes.

13   Q.  Who do you recognize that person as?

14   A.  Davon Carter.

15   Q.  And do you see Mr. Carter in the courtroom today?

16   A.  Yes.

17   Q.  Could you identify him by indicating where he is seated

18   and what he is wearing?

19   A.  He's the second person to my right, in front of me,

20   wearing blue.

21          MS. OLDHAM:  Your Honor, for the record, he's

22   identified Mr. Carter.

23          MR. DAVIS:  No objection.

24          THE COURT:  Record will reflect that.

25   Q.  (BY MS. OLDHAM)  Mr. Walters, how long approximately have

Direct Examination - Walters  (By Ms. Oldham)

1    you known Mr. Carter?

2    A.  For probably three and a half centuries -- three and a

3    half -- three decades and a half.

4    Q.  Did you grow up together?

5    A.  Yes.

6    Q.  I'm going to direct your attention to the time frame of

7    May of 2016, were you in contact with Mr. Carter during that

8    time?

9    A.  What's the date again?

10   Q.  May of 2016.

11   A.  I ain't for sure.

12   Q.  Did you say you don't --

13   A.  I don't have nothing --

14   Q.  Would it refresh your recollection to take a look at some

15   phone records?

16   A.  It's the only way.

17   Q.  Okay.  Let me show you what I've marked for identification

18   as P-29.

19           THE CLERK:  Turn your mike on, Counsel, please.

20   Q.  (BY MS. OLDHAM)  Showing you what has been marked for

21   identification as Government's Exhibit P-29, if you can just

22   take a look at that for a moment and tell me whether or not

23   that refreshes your recollection as to whether or not you were

24   having contact with Davon Carter in May of 2016.

25   A.  Yes.

Direct Examination - Walters  (By Ms. Oldham)

1  Q.  And do you recall why you were having contact with Davon

2  Carter in May of 2016?

3  A.  Yes, it was about trying to find me a job, he was working

4  at a warehouse, family, and marijuana.

5  Q.  Okay.  And specifically what about marijuana?

6  A.  I purchase marijuana.

7  Q.  You purchase marijuana?

8  A.  Yes.

9  Q.  Okay.  From whom?

10  A.  Davon Carter.

11  Q.  And approximately how much marijuana would you purchase

12  from Mr. Carter at a time?

13  A.  Probably three grams.

14  Q.  Do you know who Mr. Carter received his marijuana from,

15  who his source was?

16  A.  No.

17  Q.  Do you know whether or not he had more than one source?

18  A.  No.

19          MS. OLDHAM:  Court's indulgence.

20          THE COURT:  Sure.

21          MS. OLDHAM:  Thank you, Mr. Walters.

22          I have nothing further, Your Honor.

23          THE COURT:  Cross.

24          MR. ZERKIN:  No, Your Honor, thank you.

25          THE COURT:  Hold on one second, sir, hold on one

1    second.

2              Cross from Mr. Mosley's counsel.

3              MR. TRAINOR:  Thank you, Your Honor, we have no

4    questions.

5              THE COURT:  All right.  Sir, thank you for your

6    testimony, you are now excused.  Don't discuss your testimony

7    with anyone else, and enjoy your day.

8              THE WITNESS:  Thank you.

9              MS. WILKINSON:  Your Honor, would you like me to

10   start with our next witness?

11             THE COURT:  Sure.

12             MS. WILKINSON:  We're going to call Sheldon Grant.

13             THE COURT:  Very well.

14             THE CLERK:  Good afternoon, sir, please raise your

15   right hand.

16                        SHELDON GRANT,

17   called as a witness, being first duly sworn, was examined and

18   testified as follows:

19             THE WITNESS:  Yes.

20             THE CLERK:  Thank you.  You may have a seat.  If

21   you'll slide up to the microphone, please state and spell your

22   full name for the record.

23             THE WITNESS:  Sheldon Grant, S-h-e-l-d-o-n,

24   G-r-a-n-t.

25             THE CLERK:  Thank you.

```
 1                    DIRECT EXAMINATION

 2   BY MS. WILKINSON:

 3   Q.   Good afternoon, Mr. Grant.   How old are you, sir?

 4   A.   40.

 5   Q.   And before coming here today, did you travel from New York

 6   City?

 7   A.   Yes.

 8   Q.   And is that where you're primarily from?

 9   A.   Yes.

10   Q.   Do you know the picture I'm going to put up to the right

11   there, Government's Exhibit PH-3, do you know this man?

12   A.   Yes.

13   Q.   And who is this man?

14   A.   That's Matthew.

15             THE CLERK:   Speak into the microphone.

16             MS. WILKINSON:   I'm sorry, you'll have to keep your

17   voice up a little.

18   A.   That's Matthew.

19   Q.   (BY MS. WILKINSON)   And how do you know Matthew?

20   A.   Well, I know him through my baby mother's brother, I

21   believe, yeah.

22   Q.   Okay.   And on your best recollection, how long had you

23   known Matthew?

24   A.   I'm not sure how long, maybe about two, three years

25   maybe.
```

Direct Examination - Grant   (By Ms. Wilkinson)

1    Q.   Is that before he was incarcerated?

2    A.   Yes.

3    Q.   Since Matthew has been in jail, which for the record, is

4    May 4th of 2016, have you had any communications with

5    Mr. Hightower directly?

6    A.   Since -- excuse me?

7    Q.   With Matthew, I should say Matthew, I'm sorry, with this

8    man, have you had any communications with him since he was

9    incarcerated on May 4th, 2016?

10   A.   No.

11   Q.   Were you doing any business with Matthew?

12   A.   Business -- well, you know, like we spoke, I normally sold

13   marijuana to him.

14   Q.   And that's exactly my question, did you have a marijuana

15   business with Matthew?

16   A.   Yes.

17   Q.   And how did that marijuana business go, were you buying or

18   selling from Matthew?

19   A.   Well, I used to give it to Matt and he sells it, I

20   guess.

21   Q.   Were you his supplier?

22   A.   If you want to say so, yes.

23   Q.   Were you supplying him with --

24   A.   Yes, I was, uh-huh.

25   Q.   And in exchange for supplying him marijuana, did he pay

Direct Examination - Grant   (By Ms. Wilkinson)

1    you?

2    A.   Yes.

3    Q.   And how did he pay you?

4    A.   Cash.

5    Q.   And if he was incarcerated on May 4th, 2016, can you give

6    the jury your best recollection of how long you had been

7    supplying him with marijuana?

8    A.   Maybe two -- like I said, about a year, two years.

9    Q.   Do you recall a time in 2015 when Matthew was on the box,

10   an electronic home monitoring device?

11   A.   Yes.

12   Q.   When you learned he was on the box, did it affect where

13   you would meet him to sell him or supply him marijuana?

14   A.   No.

15   Q.   Where would you typically meet him to sell him

16   marijuana?

17   A.   Around his area where he lives at, his house.

18   Q.   I'm sorry, I didn't hear you.

19   A.   The area where he lives at, his house, apartment.

20   Q.   And to give the jury an idea, where would you travel from

21   that you would meet him in the area where he lived?

22   A.   I would travel from New York to Baltimore.

23   Q.   And how would you get there?

24   A.   Drive.

25   Q.   Would you drive with the marijuana that you were going to

Direct Examination - Grant  (By Ms. Wilkinson)

1    sell him?

2    A.   Yes.

3    Q.   And then you would meet him here in Maryland?

4    A.   Yes.

5    Q.   What kind of quantities are we talking about?

6    A.   Couple -- five -- four or five pounds.

7    Q.   And to give the jury an idea, how often would you sell him

8    pounds of marijuana?

9    A.   Every two, three weeks.

10   Q.   Did it start out with five pounds, or did it increase to

11   that amount, or was it always a set amount?

12   A.   It's always -- it started with like maybe one, two, you

13   know.  It's up to like five, you know.

14   Q.   And to give the jury an idea of how much a pound of

15   marijuana would cost back in 2016, how much would you sell it

16   to him for?

17   A.   Roughly $3,000, I don't remember.  3,000.

18   Q.   So if you had five pounds of marijuana, how much would

19   that be worth?

20   A.   15-.

21   Q.   So if you supplied him 5 pounds of marijuana, would you

22   expect to get about $15,000 in return?

23   A.   Yes.

24   Q.   Would that be provided to you in cash?

25   A.   Yes.

Direct Examination - Grant  (By Ms. Wilkinson)

1    Q.  Would your business, marijuana business relationship with

2    Mr. Hightower -- do you know the term "fronting," when you

3    front someone some drugs?

4    A.  Yes.

5    Q.  Okay.  Explain to the jury what fronting drugs means.

6    A.  Fronting drugs mean you give it to them and they owe the

7    pay, I guess.

8    Q.  So they would pay you later?

9    A.  Yes.

10   Q.  And can you tell the jury, did your relationship with

11   Mr. -- with Matt include fronting him drugs at times?

12   A.  Excuse me?

13   Q.  Did you front him drugs at times?

14   A.  Yes.

15   Q.  How would you communicate with Matt, how would he know you

16   were coming to bring the drugs?

17   A.  Well, we don't normally communicate, I just sometimes pull

18   up on him or whatever, you know.

19   Q.  I'm sorry, I didn't hear that.

20   A.  We don't always communicate, sometime I would just pull up

21   on him, that I'm there, I'm in the area whatever, you know.

22   Q.  So sometimes it was in person, you just pulled up in the

23   area?

24   A.  Yeah, call him, I'm in the area.

25   Q.  And would sometimes you communicate with him on the phone,

Direct Examination - Grant   (By Ms. Wilkinson)

1    too?

2    A.   Yes.

3    Q.   When you were in the marijuana business, do you have more

4    than one phone?

5    A.   Yes.

6    Q.   Would there be more than one phone that you have

7    communicated with Matt on during the time you were having

8    marijuana business with him?

9    A.   Yes.

10   Q.   Do you recall the kind of residence Mr. -- that Matt lived

11   in?

12   A.   Apartment.

13   Q.   Had you been inside the apartment before?

14   A.   Yes.

15   Q.   In addition to buying marijuana from you, do you know how

16   else Matt earned a living?

17   A.   Excuse me?

18   Q.   Do you know what else Matt did for a living?

19   A.   No, I thought he sold cars, stuff like that.

20   Q.   And what do you mean by "sold cars"?

21   A.   Used cars.

22   Q.   Did you ever buy a car from him?

23   A.   No.

24   Q.   Did you ever exchange drugs for cars, that sort of

25   thing?

1    A.   Nope.

2    Q.   Did you ever see Matt in an Audi?

3    A.   Yes.

4    Q.   Can you describe that for the jury?

5    A.   Well, he likes Audis, I guess, you know, he has an Audi.

6    Q.   What color was it?

7    A.   Maybe gray, if I'm correct.

8    Q.   While you would travel down from New York to Maryland to

9    supply him, did that ever work the reverse, in other words,

10   did Matt ever meet you in New York?

11   A.   No.

12   Q.   Did you ever meet a man by the name of Davon?

13   A.   Well, I met him through Matt.

14   Q.   Tell us the circumstances that you saw Davon the first

15   time.

16   A.   Well, I met him through Matt the first time at his

17   apartment complex.

18   Q.   And was he actually introduced to you?

19   A.   Maybe the -- well, I can't recall, maybe then.  Maybe

20   introduced me his name, this is my boy, whatever, I don't

21   remember, though.

22   Q.   Let me show you Government's Exhibit PH-1 again to the

23   right, you've seen this picture before?

24   A.   Yeah.

25   Q.   And who is this?

1    A.   Davon.

2    Q.   And do you see Davon in the courtroom here today as

3    well?

4    A.   Yes, he's right there to the right.

5              MS. WILKINSON:   Pointing to the defendant, Your

6    Honor.

7    A.   He's over there to the right.

8              THE COURT:   The record will reflect that.

9              MR. DAVIS:   No objection.

10   Q.   (BY MS. WILKINSON)   The first time that you recall seeing

11   Matt with Davon, was it for a marijuana transaction?

12   A.   I don't recall, I don't think so.

13   Q.   If you didn't -- I'm sorry, I think you touched the

14   screen.   If you put the bottom left-hand corner --

15             MS. WILKINSON:   May I approach the witness and clear

16   it, just so we -- I think he has to do it.   In the bottom

17   left-hand corner, you see where it says clear, if you push it,

18   that little green dot will go off.   Thank you, sir.

19             THE COURT:   It is now 1:00 o'clock, so let me know

20   when we're at a convenient place to break.

21             MS. WILKINSON:   This is as convenient as any, Your

22   Honor.   I'm not going to get through them before lunch, so

23   whatever the Court's preference is.

24             THE COURT:   All right.   The Court's preference is to

25   break now because I'm hungry.   So ladies and gentlemen, we

Direct Examination - Grant  (By Ms. Wilkinson)

1    will break right now.  I ask that you be in the jury room at

2    2:00 o'clock, and we will proceed from there.  Of course,

3    remember not to discuss the case with anyone, including among

4    yourselves.  See you in an hour.

5              (Jury left the courtroom.)

6              THE COURT:  All right.  Sir, you are to be back here

7    at 2:00 o'clock, okay?  I'll see you then.  See everyone in an

8    hour.

9              (A recess was taken.)

10             THE COURT:  All right.  Get the jury.

11             (Jury entered the courtroom.)

12             THE COURT:  All right.  You may all be seated.  Good

13   afternoon, ladies and gentlemen.

14             JURORS:  Good afternoon.

15             THE COURT:  Hopefully everyone enjoyed lunch.  I

16   believe we're ready to continue.

17             Sir, I do want to remind you, you're still under

18   oath.

19             THE WITNESS:  Most definitely.

20   Q.  (BY MS. WILKINSON)  Mr. Grant, before we broke for lunch,

21   I was asking you about the first time you met, or saw, I

22   should say, saw Davon with Matt when you came down to

23   Maryland, so I'm going to focus on that particular day.

24        And the first time that you saw the man you pointed out

25   as Davon, is that the only time you saw him in person?

Direct Examination - Grant  (By Ms. Wilkinson)

1   A.  I want to say no, I probably seen him another time.

2   Q.  Let's talk about the first time, that first occasion, were

3   you coming down to deliver marijuana, or to pick up cash?

4   A.  Definitely not picking up no -- dropping off any

5   marijuana, I didn't have anything.

6   Q.  I'm sorry?

7   A.  I didn't have any marijuana on me.

8   Q.  So you were picking up cash?

9   A.  Yes.

10  Q.  And to be clear, it was one or the other, you didn't

11  socialize with Matt or Davon, it was about supplying marijuana

12  or picking up cash?

13  A.  Yeah.

14  Q.  Now, on this particular, the first occasion with Davon,

15  did he participate in that conversation with you and Matt?

16  A.  No.

17  Q.  And just describe -- give us a visual memory of that first

18  occasion, where were you, where was Matt, and where was

19  Davon?

20  A.  Well, we was in the parking lot and Matt was talking and

21  he was there standing to the side, you know.

22  Q.  And because you're in a parking lot, did you see -- do you

23  know how you arrived?

24  A.  I drove.

25  Q.  And do you know how they arrived?

1    A.  They drove.

2    Q.  And did you make any observations about the type of car?

3    A.  I didn't make any observation, they pulled up in -- Matt

4    pulled up in his Audi.

5    Q.  And was he driving?

6    A.  Yes.

7    Q.  And was Davon a passenger --

8    A.  Passenger, yeah.

9    Q.  -- in the car?

10       And who got out of the car?

11   A.  Matt.

12   Q.  Did Davon get out of the car on that first occasion?

13   A.  Yeah, I believe so.

14   Q.  But did not participate in the conversation?

15   A.  No.

16   Q.  Now, did those -- at some point when Matt went to jail,

17   how did you find out about that, did you find out about that

18   in some particular way?

19   A.  I was calling, I couldn't get him, and Davon called me

20   back and told me the situation and said he's in charge now, so

21   I'm like, all right, whatever.

22   Q.  And that communication you had with Davon, was that on the

23   phone?

24   A.  Yes.

25   Q.  Was it on the same phone that you had been dealing with

1    Matt on?

2    A.   Yes.

3    Q.   Did you place the call and Davon answer?

4    A.   I called him and there was no answer and he called me

5    back, if I can remember.

6    Q.   Now, the conversation that you had with him, he said, "I'm

7    in charge now"?

8    A.   Yes, basically, he's -- Matt is not around, he's in

9    charge, he's the one that's taken up responsibility.

10   Q.   And how did that -- I don't mean to interrupt you, how did

11   you take that to mean on a going-forward basis?

12   A.   I'm just going forward, whatever we got going, whatever,

13   you know.

14   Q.   What does that mean?

15   A.   We're just going to continue what's been going on, I

16   guess.

17   Q.   You have to explain, what was going to continue going

18   on?

19   A.   We were going to continue with the marijuana business.

20   Q.   Now, at the point that you learned that Matt had been

21   locked up, did he owe you any money?

22   A.   Yes, he did.

23   Q.   How much did he owe you?

24   A.   Approximately somewhere around 15,000.  I don't remember

25   exactly what, it's around there.

Direct Examination - Grant   (By Ms. Wilkinson)

1    Q.  And that $15,000 debt, is it still owed to you today?

2    A.  Yes, but like I said, it's owed, but I'm not really

3    looking for it to get paid anyway, so --

4    Q.  We're here four years later, but at some point, the debt,

5    you wrote it off?

6    A.  Yes.

7    Q.  Now, in that first conversation with Davon that you just

8    told the jury about, and for the next couple days or couple

9    weeks after that, and I'll show you your phone records in a

10   moment, did you think you were going to collect that money?

11   A.  Yes.

12   Q.  And who did you think you were going to collect it from?

13   A.  Davon.

14   Q.  So back in May of 2016, we were talking about cellular

15   telephones.  And at some point, did you have a phone ending in

16   the digits 9896?

17   A.  Yes.

18   Q.  And that phone was, I think, subscribed in the name of a

19   company called Silverback Entertainment?

20   A.  Yes.

21   Q.  What is Silverback Entertainment?

22   A.  It's an entertainment company, music development and

23   whatever, artists development.

24   Q.  And what was your role in that company?

25   A.  I was the president.

Direct Examination - Grant  (By Ms. Wilkinson)

1   Q.   I'm sorry?

2   A.   President.

3   Q.   And is that company still in existence today?

4   A.   Yes.

5   Q.   And do you still do artist development-type work?

6   A.   Yes.

7   Q.   How long had that Silverback company been in existence?

8   A.   Since 2001.

9   Q.   And as a result of that company, does it require you to

10  travel sometimes?

11  A.   Definitely.

12  Q.   Does that include to California?

13  A.   California, Miami, wherever.

14  Q.   Now, you stated that your first name is Sheldon, are you

15  sometimes referred to by a nickname or an abbreviated version

16  of that name?

17  A.   Yes.

18  Q.   And what is that?

19  A.   Shells.

20  Q.   Is that a name or a nickname that you were known by back

21  in 2016 as well?

22  A.   Yes.

23  Q.   And did that include in communications with Matt and

24  Davon?

25  A.   Yes, I'm guessing, yes.

Direct Examination - Grant   (By Ms. Wilkinson)

1    Q.   Now, I'm going to direct your attention to Government's

2    Exhibit P-9A, it's going to require you to kind of awkwardly

3    look to the right there.

4         And this is information from a cell phone ending in the

5    digits 5150, do you see that there, Mr. Grant?

6    A.   Yeah.

7         THE COURT:   Sir, you still have to speak in the

8    microphone, even while you do that.

9    A.   Yes.

10   Q.   (BY MS. WILKINSON)  I know it's kind of awkward turning to

11   the right.   Try to remind you.

12        Now, if I go down into this document, you see some

13   communications with that 5150 number, and a person saved in

14   the name of Shells, do you see that there?

15   A.   Yeah, yes.

16   Q.   Is that phone number, 2027, familiar to you?

17   A.   Pretty much.

18   Q.   And how is it familiar to you?

19   A.   It's got a 516 number.

20   Q.   Is that a number that you used back in 2016?

21   A.   Yes.

22   Q.   Now, if I continue down, I'm going to reverse

23   chronological order, you can see that there's a number of

24   communications between that 5150 number and Shells.  And I'm

25   going to go to the beginning of them on this record, which is

Direct Examination - Grant   (By Ms. Wilkinson)

1    down to line 117.

2        You see that there, 2027, 3/14/2016 at 2:11, do you see

3    that communication between 2027 and 5150, Mr. Grant?

4    A.  I don't see the communication, I see --

5    Q.  Right here.  I'll try to do it closer.  There you go.  I'm

6    talking about this one right here.

7    A.  Okay.

8    Q.  Okay.  In March of 2016, with that 5150 number.  If you

9    were having communications prior to May 4th when Mr. -- when

10   Matt was locked up, who would those communications been with

11   on that 5150 number?

12   A.  Davon.

13   Q.  After or before Matt was locked up?

14   A.  After.

15   Q.  Okay.  Before Matt was locked up, who would they have been

16   with?

17   A.  Matt.

18   Q.  And those communications -- and we're going to see that

19   there's a number of them before May 4th, and I'm going to just

20   keep browsing through it so you can get this here until we

21   come up to another number -- were they about marijuana and

22   money for marijuana?

23   A.  Excuse me?

24   Q.  Were they about money?

25   A.  Yes.

Direct Examination - Grant   (By Ms. Wilkinson)

1   Q.   And marijuana money?

2   A.   Yes.

3   Q.   Did you have any other reason to communicate with --

4   A.   Not at all.

5   Q.   -- Matt?

6         So if we go up here to Shells Bro and 5151, are you

7   familiar with that number as well?

8   A.   Yes.

9   Q.   Okay.   The 5151 number and the 5150 number share the same

10  first six digits, is that fair to say, Mr. Grant?

11  A.   Yes.

12  Q.   And in preparation for your testimony, did you recall

13  something about those two phone numbers?

14  A.   That was two phone numbers I had bought Matt.  I bought

15  two phones and I gave Matt one and kept one for myself.

16            THE COURT:  Sir, before you continue, I'm going to

17  ask that you not cut off her question.  Make sure you wait

18  until she finishes her question, and then answer.

19            THE WITNESS:  Okay.  Got you.

20            MS. WILKINSON:  And I need to assure myself to do

21  that too.  Thank you, Your Honor.

22            THE COURT:  Same instruction to counsel.

23            MS. WILKINSON:  Thank you very much, Judge.

24  Q.   (BY MS. WILKINSON)  Mr. Grant, that 5151 number and that

25  5150 number that you talked to Davon on, you got them at the

Direct Examination - Grant   (By Ms. Wilkinson)

1    same time?

2    A.   Yes.

3    Q.   And what is your best recollection of when you got those

4    phones and where?

5    A.   Like I said, I don't know when, but at some time in March,

6    I'm guessing.   And I turned them on the same time, that's why

7    the numbers coincide.

8    Q.   Okay.   And where did you purchase them?

9    A.   Walmart.

10   Q.   And what was the purpose of having a phone between 5151

11   and 5150, giving one of them to Matt, what was the purpose of

12   that?

13   A.   Just to be safe when we talk on the phone, nobody

14   listening, I guess.

15   Q.   And what do you mean by that, to be safe on the phone,

16   make sure nobody's listening?

17   A.   Nobody recording our conversation, you know.

18   Q.   Because you were talking about marijuana?

19   A.   Not necessarily talking about marijuana, just whenever --

20   I like to feel safe, you know.

21   Q.   Were there any other criminal conversations besides the

22   talking about marijuana that you were having with Matt?

23   A.   No.

24   Q.   Just about the drugs?

25   A.   Yes.

Direct Examination - Grant  (By Ms. Wilkinson)

1    Q.  Now, going back to Government's Exhibit P-9A, I'm going to

2    go to the top here so you can see.  And there's an incoming

3    communication on May 2nd, 2016, which for the record, is two

4    days before Matt was incarcerated, do you see that there,

5    Mr. Grant?

6    A.  Yes.

7    Q.  The next communication, which is after Matt was

8    incarcerated, was on May 7th, and then there's one on May 8th,

9    both of those have zero, and they're from you, and then

10   there's one on May 8th for five minutes.

11       Knowing that this is after Matt was locked up, who was

12   this conversation with, Mr. Grant?

13   A.  I would say Davon.

14   Q.  Did you talk to anybody other than Davon on that phone,

15   and Matt?

16   A.  No.

17   Q.  Was it Davon on the phone?

18   A.  Yes.

19   Q.  And is that the phone call, as best as you can recall,

20   where he said he was in charge now?

21   A.  Yes.

22   Q.  Now, from May 8th and continuing, there's a number of

23   communications back and forth between that number, I'll just

24   show you them here, so we get a view of them, and I'm going to

25   lead you up to Government's Exhibit P-24.

Direct Examination - Grant   (By Ms. Wilkinson)

1    There we see some content in line 8 on P-24, from you on

2   April 26 -- April 22nd, 2006 just saying, "Checking in, my G,"

3   do you see that there?

4   A.  Yes.

5   Q.  From you.

6    Now, this was before May 4th, so this would be checking

7   in with Matt?

8   A.  Yes.

9   Q.  Okay.  Then I'm going to go above to here and show you

10  some communications on May 30th of 2016, after Matt was

11  incarcerated.  And you sent a text, "What's up, fam?"

12    What was that all about, Mr. Grant, on May 30th, 2016?

13  A.  I'm guessing I was just trying to reach out to him.

14  Q.  Reach out to who?

15  A.  Davon.

16  Q.  For what purpose?

17  A.  For the cash.

18  Q.  The $15,000?

19  A.  Yeah.

20  Q.  Now, up until the point where Matt went to jail on May 4th

21  and this one on May 30th, had you received any cash that was

22  owed to you for the last time you delivered marijuana?

23  A.  Not that I could remember.

24  Q.  And leading up to this May 30th text, do you recall if at

25  some point you traveled to Maryland?

Direct Examination - Grant   (By Ms. Wilkinson)

1   A.   I didn't travel to Maryland on May 30th, I traveled to

2   Maryland on the 1st.

3   Q.   That was my question, I wasn't very artful.  At some point

4   after that, did you travel to Maryland?

5   A.   Yes, I did.

6   Q.   Okay.  And how did you get to Maryland?

7   A.   I drove.

8   Q.   And you drove from New York?

9   A.   Yes.

10  Q.   And what was the purpose of driving from New York?

11  A.   Come get the cash.

12  Q.   Had you set that up ahead of time with Davon?

13  A.   Yes.

14  Q.   And would that be through phone communications?

15  A.   Definitely.

16  Q.   Now, at one point, we see phone communications -- we saw a

17  reference to Shells and Shells Bro, did you see that?

18  A.   Yeah.

19  Q.   Attribution?

20  A.   Yes.

21  Q.   Okay.  Do you have a brother?

22  A.   Yes.

23  Q.   And you have more than one brother?

24  A.   Definitely.

25  Q.   But did you have one brother that would assist you

1    sometimes in your marijuana business?

2    A.  Yes.

3    Q.  And which brother was that, you can just use his first

4    name?

5    A.  Greg.

6    Q.  Now, at some point, did Greg use your other telephone as

7    well?

8    A.  Yes.

9    Q.  Did Greg know Matt?

10   A.  He met him.

11   Q.  And did he meet him through you?

12   A.  Yes.

13   Q.  And at some -- within the time that you were having a --

14   business transactions with Matt for that time period, would

15   there be times when Greg, for example, would pick up cash?

16   A.  Yes.

17   Q.  At your request?

18   A.  Yes.

19   Q.  Now, you mentioned traveling down on June 1st -- give that

20   to Ms. Lesser so I don't lose it -- in preparation for your

21   testimony, did you look at a series of text messages between

22   one of your phones and another phone belonging to Davon, 2399,

23   do you see that there?

24   A.  Yes.

25   Q.  Okay.  And we'll read them -- hopefully it won't be

1    blurry, but we'll read them down here before -- the first one

2    says what?

3    A.  "I need that address."

4    Q.  And is that you to Davon?

5    A.  Yes.

6    Q.  What are you telling him?

7    A.  Basically I'm here and I need an address.

8    Q.  And down below, what are you saying?

9    A.  "Yo, I been here."

10   Q.  And where were you when you're texting to Davon, "I need

11   that address, yo, I been here"?

12   A.  In Baltimore.

13   Q.  And were you expecting to meet with Davon that morning on

14   June 1st?

15   A.  Yes.

16   Q.  And down below, when you text again -- well, this is on a

17   different date, so let me stay on June 1st.  "Yo, brother, I

18   been here, fam."

19       After this text message, did there come a time when you

20   met with him on June 1st?

21   A.  No.

22   Q.  Do you know why you weren't able to meet with him on

23   June 1st?

24   A.  I didn't know why.

25   Q.  He just didn't respond?

Direct Examination - Grant   (By Ms. Wilkinson)

1    A.   Yes.

2    Q.   And at some point, did you give up and go back home?

3    A.   Yes.

4    Q.   And did you send additional text messages to him, as are

5    reflected in Government's Exhibit P-2B?

6    A.   Yes.

7    Q.   Okay.  And so when it says here on June 4th, "Yo, what's

8    Gucci," what did you mean by that?

9    A.   "What's up?"

10   Q.   And down below when you say I-g-h-t, what does that

11   mean?

12   A.   "Aight."

13   Q.   What did you mean to convey?

14   A.   "All right then, I gotcha."  I ain't get no response.

15   Q.   And then down below when you wrote, "That's how we

16   moving," what do you mean by that?

17   A.   Well, that's how we move, meaning not answering each

18   other, basically.

19   Q.   And at that point, did you stop communicating with

20   Davon?

21   A.   Definitely.

22        MS. WILKINSON:  Just checking my notes.  I believe

23   that's all I have, Your Honor.

24        THE COURT:  Cross.  Mr. Davis.

25        MR. DAVIS:  Yes, briefly, Your Honor.

```
 1                      CROSS-EXAMINATION

 2    BY MR. DAVIS:

 3    Q.  So Mr. Grant, in sum total, you saw Mr. Carter one time;

 4    correct?

 5    A.  I didn't see him one time, I seen him more than one time,

 6    I seen him before.

 7    Q.  Before -- well, the first time you were talking about the

 8    parking lot where Matt got --

 9    A.  I seen him again, yeah.

10    Q.  You saw him again after that?

11    A.  Yeah.

12    Q.  And under -- what transpired then?

13    A.  Nothing had transpired.

14    Q.  Where did you see him?

15    A.  I don't remember exactly, but I know nothing transpired.

16    Q.  Well, you don't come to Baltimore a lot, do you?

17    A.  Not at all.

18    Q.  And is there a reason for that?

19    A.  No.

20    Q.  Just don't come; right?

21    A.  Yup.

22    Q.  Unless you have something to do; right?

23    A.  Yup.

24    Q.  What were you having to do when you saw him the other

25    time?
```

1    A.  Who?

2    Q.  Mr. Carter.

3    A.  Didn't have to do nothing.

4    Q.  Then why were you in Baltimore?  You just said you would

5    not come to Baltimore unless you had something to do.

6    A.  Well, if I seen him -- it was nothing pertaining with him,

7    it had to have been Matt.

8    Q.  Well, you saw him the first time --

9    A.  With Matt and I seen him the other time with Matt.  If I

10   see him, I'm going to see him with Matt.

11          THE COURT:  Same instruction applies to Mr. Davis,

12   you let him finish his question first.

13          THE WITNESS:  All right.

14   Q.  (BY MR. DAVIS)  I'm confused, the first time you saw him

15   he was with Matt?

16   A.  Yes.

17   Q.  And it was in a parking lot; correct?

18   A.  Yes.

19   Q.  And when was that in relation to when Matt got locked

20   up?

21   A.  I'm not sure when, but it's before that.

22   Q.  Before he got -- obviously --

23   A.  Yes.

24   Q.  -- before he got locked up, was it a long time before

25   it?

1    A.  I'm not sure.

2    Q.  Do you even know when Matt got locked up?

3    A.  Well, I know now he got locked up on May 4th.

4    Q.  Okay.  And did you see Mr. Carter after Matt got locked

5    up?

6    A.  No.

7    Q.  How many times did you personally hand marijuana to

8    Mr. Carter?

9    A.  I didn't hand marijuana to him.  He told me that he's

10   going to have the cash and that we were supposed to meet up on

11   June 1st, and I never seen him because he got arrested,

12   obviously.

13   Q.  Now, you don't carry a weapon, do you?

14   A.  No.

15   Q.  And Mr. Carter didn't have a weapon that time you saw him;

16   correct?

17            MS. WILKINSON:  Objection.

18            THE COURT:  He can answer, if he knows the answer.

19            MS. WILKINSON:  Okay.  I'm sorry.

20   A.  I don't know.

21   Q.  (BY MR. DAVIS)  You didn't see one, did you?

22   A.  I don't know.

23   Q.  You don't know if you saw --

24   A.  I don't know if he carry one, I don't know what he does.

25   Q.  Listen to my question carefully, did you see a weapon with

1    Mr. Carter when you saw him that one time?

2    A.  No.

3    Q.  Did you also go to Matthew Hightower's girlfriend's house

4    looking for your money?

5    A.  No -- his baby mother?

6    Q.  I think -- I believe her name is Michelle.

7    A.  I'm not sure.  I wasn't looking for my money, I was

8    basically trying to figure out what happened to him.

9    Q.  So you didn't go to talk to Michelle about retrieving

10   money that Matthew Hightower --

11   A.  No, not at all.

12   Q.  Who else did you go to, to retrieve money from?

13   A.  Nobody.

14   Q.  No one at all, for the 15,000 --

15   A.  Nobody.

16   Q.  -- the only --

17           MR. DAVIS:  I have no further questions, thank

18   you.

19           THE COURT:  Counsel for Mr. Mosley.  Mr. Trainor.

20           MR. TRAINOR:  Thank you, Your Honor.  I just have a

21   couple.

22                      CROSS-EXAMINATION

23   BY MR. TRAINOR:

24   Q.  Mr. Grant, I just want to ask you about these two phones

25   that you bought at Walmart.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

1    A.   Yeah.

2    Q.   One was 5150 and one was 5151; correct?

3    A.   Yeah.

4    Q.   And you gave Matthew Hightower 5150 in March?

5    A.   I believe so.

6    Q.   That would be March of 2016; correct?

7    A.   I'm guessing, if that's what it says.

8    Q.   And you kept 5151 for yourself; correct?

9    A.   Yes.

10   Q.   And the purpose of buying those phones is so you could

11   have a clean communication line with him that is less likely

12   to be intercepted due to a wiretap; correct?

13   A.   I guess so.

14   Q.   All right.  Now, I think you testified that if you were

15   here in Maryland, in the Baltimore area, you were here either

16   to deliver marijuana to Mr. Hightower or to collect money from

17   Mr. Hightower; correct?

18   A.   Yes.

19   Q.   So -- and you would carry your phone with you when you

20   traveled, I would assume; correct?

21   A.   Maybe.

22   Q.   So if we see your phone hitting off a tower in the

23   Baltimore area, we can be pretty certain that you're here to

24   see Mr. Hightower; correct?

25   A.   Yes.

Redirect Examination - Grant   (By Ms. Wilkinson)

1    Q.  And if we see your phone hitting off a tower in Miami, we

2    can assume that you were there, and you had reason to go

3    there, didn't you?

4    A.  Yes, I guess.

5    Q.  All right.  Was that the -- where you met the source of

6    your marijuana?

7    A.  No.

8    Q.  It's not.  And the same goes for California, when you went

9    to California, was that to meet the source of your marijuana

10   supply?

11   A.  No.

12   Q.  You're not telling us that Matt Hightower was your only

13   marijuana customer, are you?

14   A.  Yes.

15   Q.  You are?  All right.  Thank you.

16            THE COURT:  Redirect.

17            MS. WILKINSON:  Thank you, Your Honor.

18                        REDIRECT EXAMINATION

19   BY MS. WILKINSON:

20   Q.  Just one question to firm up -- based on what Mr. Trainor

21   was just asking, when you came to Maryland, you said you came

22   on June 1st; is that correct?

23   A.  Yes.

24   Q.  And if I look down here to -- oh, that's a terrible -- I'm

25   sorry, let me give it a chance to -- there we go.

Redirect Examination - Grant   (By Ms. Wilkinson)

            If I look down here to the evening before June 1st, on
May 31st, do you see a two-minute call from Mr. -- the 5150
number, Mr. Carter, Davon, to you, would that be consistent
with setting up the time to come on June 1st, to come to
Maryland the night before?

A.   I don't remember, but if I'm correct, he called me in the
morning.

Q.   Well, tell us what you recall about, did you travel to
Maryland on June 1st, or did you come the day before?

A.   I came on the 1st.

Q.   You came on the 1st, so if you spoke to Mr. Carter the
night before, on May 31st, would that be about coming down the
next day to get the money for the marijuana?

            Do you see it right there?  I'll move it up, I'm sorry.
I'm just really talking about this two-minute conversation on
May 31st.

A.   I don't remember what we was talking about, but either he
told me he just came out of jail or something, I don't
remember.  I don't remember exactly how --

Q.   This is the day before June 1st.

A.   Yes, I don't remember what -- it's been so long, I don't
remember exactly what happened, but apparently I was trying to
reach him, and I couldn't get in contact with him because --
for whatever reason.  Four or five days, I was trying to get
out to him, and I got a phone call from him, I don't know if

1    that's the call, I don't remember.

2    Q.  Let me see -- and it's fair that it's been some time, but

3    let me see if I can correct that.  If Mr. Carter was stopped

4    on June 1st, the day he was arrested, and that's the day he

5    was supposed to meet you, and this was the day before that,

6    and you were making -- you were calling him the day before you

7    came down on June 1st, would that be about coming to Maryland

8    to pick up the money?

9    A.  Hold on a second, I got -- I don't remember exactly, so I

10   got to kind of look at it.

11   Q.  So it's the day before you came --

12           MR. DAVIS:  Objection, Your Honor.

13           THE COURT:  Sustained as asked and answered.

14           MS. WILKINSON:  Pardon me?

15           THE COURT:  Sustained as asked and answered.

16           MS. WILKINSON:  Okay.  I'm sorry, I was just trying

17   to refresh his memory, and maybe if I --

18           THE COURT:  If you have something to refresh his

19   recollection, that's different.

20           MS. WILKINSON:  Give me two minutes, Your Honor.

21   Q.  (BY MS. WILKINSON)  Let me show you from your grand jury

22   testimony, for the record, dated -- line number -- page 43,

23   44, 45, I'm just going to show you to see if it refreshes your

24   recollection about coming down on June 1st.

25       Just have you read your testimony right here, starting

1    here, to yourself, and see if it refreshes your memory about

2    the night before June 1st.  And then over here.

3    A.  I finished.

4    Q.  Does it refresh your memory about -- on June 1st, did

5    Davon know you were coming?

6    A.  Yes, he knows I was coming.

7    Q.  And you had indicated to him in conversations that you

8    were coming that day; is that right?

9    A.  Yes.

10   Q.  And had you set up a place to meet prior to that?

11   A.  No, we didn't set up a place, I just came down and text

12   him, I'm here.

13   Q.  And when you texted him -- there's a text to you at

14   June -- on June 1st, that really went unsent, that says 8409,

15   and then a little "a."  Do you have any way of knowing if

16   that's an address, or if that was the address?

17   A.  I don't know.

18   Q.  By all accounts, you did not receive that text?

19   A.  No.

20   Q.  Was that the morning you were set up to meet him and get

21   the address?

22   A.  Yes.

23   Q.  Thank you.

24           MS. WILKINSON:  Nothing further.  Your Honor.

25           THE COURT:  All right, sir, thank you for your

1    testimony.  Please don't discuss your testimony with anyone

2    until the trial has been concluded.  You are excused.  Enjoy

3    the rest of your day.

4            MS. WILKINSON:  Thank you, Judge.  We're going to

5    call Andre Farrell -- oh, no, there's one between --

6    Mr. Farrell first.

7            Okay.  Andre Farrell.

8            THE COURT:  Very well.

9            MS. WILKINSON:  Agent Holiday, before Mr. Farrell,

10   let's call the brief other witness first.

11            And then, Your Honor, may I step out for one second

12   and deal with a witness issue.

13            MS. OLDHAM:  Your Honor, the government's next

14   witness is Geovini Vier.

15            THE COURT:  Very well.

16            THE CLERK:  Good afternoon, sir, please raise your

17   right hand.

18                    LUIZ GEOVINI VIER,

19   called as a witness, being first duly sworn, was examined and

20   testified as follows:

21            THE WITNESS:  I do.

22            THE CLERK:  Thank you.  You may have a seat.  Please

23   state and spell your full name for the record.

24            THE WITNESS:  It's Luiz Geovini Vier.

25            THE CLERK:  Spell it, please, first name --

1          THE WITNESS:  L-u-i-z, G-e-o-v-i-n-i, V-i-e-r.

2          THE CLERK:  Thank you.

3                         DIRECT EXAMINATION

4     BY MS. OLDHAM:

5     Q.  Good afternoon, Mr. Vier.

6     A.  Good afternoon.

7     Q.  Mr. Vier, from where did you travel this afternoon?

8     A.  From Norwalk, Connecticut.

9     Q.  Norwalk, Connecticut?

10    A.  Correct.

11    Q.  And can you tell us how you're employed?

12    A.  Sure.  I work for Priceline for about five years, started

13    as a software engineer.  Currently I manage teams, and we

14    handle the search and booking, especially for hotels at

15    Priceline.

16    Q.  Okay.  And is that how you would describe primarily what

17    Priceline does?

18    A.  Correct, yes, so we are an online travel agency, which

19    means you can buy hotel stays or flights or rental cars

20    through us, so that's what we do.

21    Q.  What is your current position with Priceline?

22    A.  I'm a senior director for the travel fulfillment platform,

23    which just means what I had said, with search and booking on

24    Priceline.

25    Q.  And as the senior director for travel and booking, do you

Direct Examination - Vier   (By Ms. Oldham)

1    manage a set of teams?

2    A.  Correct, yeah, I manage three teams, which one of them

3    handles booking in general.  One of them handles the hotels

4    engine, which you can think like a car, like what's under the

5    hood, so when you search at Priceline, how we find hotels and

6    book the hotels that's owned by my teams.

7    Q.  And as senior director and as -- did you say you're also a

8    software engineer for Priceline?

9    A.  Correct, yeah, so I've been a manager for about two years,

10   and before that I was a developer.

11   Q.  So would you describe your role as being both one of

12   management and then also technical?

13   A.  Correct, yes.

14   Q.  And as a software engineer and senior director for

15   Priceline, are you familiar with the different types of forms

16   and tables that are generated through the reservation and

17   booking process through Priceline?

18   A.  Yes, absolutely.

19   Q.  Okay.  I'm going to show you first, Mr. Vier, what I have

20   marked Government's Exhibit P-16A.  Can you see that document

21   Mr. Vier?

22   A.  Yes, absolutely.

23   Q.  And what is the document contained in P-16A?

24   A.  Right.  So this is kind of -- it's an extract of

25   information about one reservation specific.  And it gets

1   pulled out of a database, so the same information that was

2   recorded during the booking process, we archive it, and this

3   is from two years ago, so it sits in a database, and this is

4   an export of that data.

5   Q.   So once the information is put into the system by the

6   person seeking the reservation, this is what's essentially

7   compiled by Priceline; is that correct?

8   A.   Correct.   Yes.

9   Q.   Okay.   And so the caption says "offer data," what is

10  that?

11  A.   Right.   Because Priceline started as a bidding company, we

12  call our reservation an offer because it's not yet necessarily

13  accepted.   So one of the pieces of information here mentions

14  the status of the offer, but it just means that the customer

15  entered their information, it's the intention of purchasing,

16  basically is the offer.   So this is the data about that

17  particular offer, so that's why it's called offer data.

18  Q.   So what I would like to do on P-16A, Mr. Vier, is go

19  through and highlight some of the lines and the information

20  that's contained, and if you could, I'm going to have you

21  explain what each line means.

22  A.   Okay.

23  Q.   Okay.   So the first two lines, the offer number and offer

24  ID, what are those?

25  A.   Those are just identifiers for the offer, so the --

1    there's a slight difference between the two because the second

2    one is hotel specifically.  First one is a global, like

3    Priceline.  This is a unique identifier across the products,

4    and the second one is just for hotels.  So it's just two --

5    like it's kind of like a sequential, so like if you book the

6    first offer, Priceline would have been offer one and two and

7    et cetera, it's like an incremental number.

8    Q.  Okay.  The second line, the offer ID, you indicated, is

9    assigned that particular number because the individual is

10   searching for a hotel specifically?

11   A.  Yes, correct.

12   Q.  The next line, PLF code, what does that mean?

13   A.  It stands for Priceline look and fill, and it is -- just

14   means -- web means that it was booked through a smart phone

15   and not through the app, but through the web browser.  So if

16   you have, like Chrome on the phone or Safari, it depends on

17   your type of device.

18   Q.  Okay.  So the mobile web indicates that this individual

19   made this reservation through the use of a smart phone?

20   A.  Correct, or tablet.

21   Q.  Or a tablet.  Okay.

22        So then current status, OA accepted, what does that

23   mean?

24   A.  That means that we were able to get a room with that

25   hotel.  So like when you place a reservation, sometimes it

Direct Examination - Vier   (By Ms. Oldham)

1    doesn't get accepted either because of credit card or fraud or

2    the hotel doesn't have a room anymore.  We ask the customer to

3    search for something else, in which case, will have been

4    rejected, in this case, means accepted, just means that we

5    were able to book the room with the hotel.

6    Q.  Okay.  So you have found a hotel that meets the

7    requested --

8    A.  Correct, yes.

9    Q.  -- conditions.  Okay.

10       And then the current reason, RC, reservation confirmed,

11   what does that mean?

12   A.  Yeah, it's basically the same thing.  It's just the

13   reason, in the case of accepted, doesn't matter because it was

14   accepted.  But in case of a rejection, there's like kind --

15   like explanation for the rejection.  You can think of like no

16   funds or the room's not available.  "Accept" is kind of

17   redundant.

18   Q.  Okay.  How about merchant of record, Priceline, that's

19   your company?

20   A.  Right.  That means that we are charging the credit card.

21   Q.  As opposed to --

22   A.  As opposed to, there's cases where you stay at the hotel,

23   without having paid yet, you pay at the hotel.  That's usually

24   the reason why Priceline wouldn't be the merchant of record.

25   Q.  Okay.  So in this particular instance, the individual paid

1    for the hotel directly through Priceline?

2    A.   Correct.

3    Q.   Okay.  The next line, submitted date and time, May 27th,

4    2016, 11:37:34 p.m.  Please tell us what that line is for.

5    A.   So the time is the time that this offer was placed, so

6    when you are in the checkout page and you click the book

7    button, then it hits the servers at Priceline, which is

8    applications we code that we run and the -- each computer has

9    basically a clock, just like when you're looking at your

10   desktop, it has a little clock at the bottom, so it's kind of

11   the same.  So we get the time and attach it to the record so

12   that we know when an offer was placed.

13   Q.   And so based on your knowledge and experience working at

14   Priceline, what is the -- how long does it take once the

15   individual clicks the book --

16   A.   Right.

17   Q.   -- on that final page, is the date and time then

18   recorded?

19   A.   Right.  So when you submit -- it's within less than a

20   minute we should receive it, because otherwise, like when you

21   try to interact with the browser and the server doesn't

22   respond, then it's a time out, so it doesn't hit the server,

23   and in which case you get an error, and in this case we did

24   receive it.  So it's within that window of one minute.

25   Q.   So --

Direct Examination - Vier   (By Ms. Oldham)

1    A.   Roughly --

2    Q.   -- within a minute?

3    A.   Yeah, a minute or two, yeah.

4    Q.   Okay.  And then offer price, $113, that's the price that

5    Priceline was able to locate for this individual for a room?

6    A.   Correct.  That's the nightly price of the room.

7    Q.   Now, what's the LQRR, lowest qualifying rack rate?

8    A.   Yes, so for Priceline we have different kinds of offerings

9    for hotels, but one is called Express Views, which we don't

10   tell the -- which hotel you're staying before you actually

11   book, so after you -- you can see in the map the area where

12   you're going to stay, and you'll know the stars on it, the

13   guest review score, but you don't know which hotel exactly

14   yet.

15       And the reason for that is that the hotels don't want to

16   advertise low price publicly and then cannibalize their retail

17   price, so when you choose this option, then we will have a few

18   hotels to choose from, and we can pair you with one of the

19   hotels that basically sits in that price range.  So we offer a

20   lower price than retail, so this is a difference of like how

21   much this cost versus how much it will have cost on retail

22   price.

23   Q.   So this individual has gone that express route where --

24   A.   Yes.

25   Q.   -- they are saying, go ahead and pick any one of these

Direct Examination - Vier   (By Ms. Oldham)

1    hotels that you have in mind, and then I will get the $113

2    rate, is my characterization of that --

3    A.   Yes, so when you do a search, let's say you search for

4    Baltimore, then it will show you a bunch of hotels, like

5    Hilton or whatever, and there will be -- one of those options

6    will be like three stars in downtown.  And you won't know

7    which hotel it is, but it's going to be a lower price.  So if

8    you were to choose this particular hotel -- this particular

9    Best Western, on that list you would have paid like $200, but

10   if you choose not -- like not knowing yet which hotel, then

11   you pay lower, but immediately after the -- you book and the

12   reservation is confirmed, then we will tell you which hotel it

13   is.

14   Q.   Okay.  So let's say I'm the one that's inputting this

15   information and trying to make this reservation, once --

16   before I've actually hit the book button, I don't know which

17   hotel you're going to select for me?

18   A.   No.

19   Q.   It's only until after I've hit booked, at some point, I'm

20   notified by Priceline which hotel you've selected for me?

21   A.   Uh-huh.

22   Q.   Okay.  Thank you.

23   A.   Uh-huh.

24   Q.   Okay.  So check-in date, May 27th, 2016, that's requested

25   by the individual?

1    A.   Yes.

2    Q.   Okay.

3    A.   So one of the first things you have to do on the website

4    is pick the location and the dates.

5    Q.   Okay.  Checkout date, May 29th, 2016.  Days advance,

6    purchase zero, what does that mean, Mr. Vier?

7    A.   It means it's for the same night, so zero is how many days

8    ahead from the current time.

9    Q.   So does that mean that this individual is making this

10   reservation the exact same day that they are arriving?

11   A.   Yeah, exactly.  So since we have the time on the top, so

12   submitted date time is on the 27th and the check-in date is

13   also on the 27th, so the advance purchase is zero.

14   Q.   Okay.  And then reservation name, that is information that

15   is input by the individual seeking the reservation, Davon

16   Carter?

17   A.   Correct.

18   Q.   Okay.  Hotel property?

19   A.   It's just a name and address of the hotel.

20   Q.   Okay.  And the information for customer name, e-mail

21   address, day phone, is that all information that is input by

22   the individual seeking the reservation?

23   A.   Correct, yeah, it's part of the form for the booking.

24   Q.   Okay.  And the same with the payment information, credit

25   card number, expiration date, billing address, and shipping

1    address?

2    A.   Correct.

3    Q.   Okay.

4         MS. OLDHAM:   And if I could ask that we show P-16.

5    Q.   (BY MS. OLDHAM)   Mr. Vier, can you take a look at the

6    monitor, we're showing you Government's Exhibit P-16.

7    A.   Uh-huh.

8    Q.   And what is that?

9    A.   This is a copy of the e-mail that we send after the

10   reservation is accepted, so you get the copy.  Like we also

11   show on the web page that your reservation has been accepted

12   and this is the location and everything, but you also get an

13   e-mail sent to you, and it happens not immediately, but

14   happens within a few minutes.  So a couple minutes.

15   Q.   Okay.  So if the submitted date and time on the prior

16   exhibit, P-16A, you noted was 11:37:34 p.m., and this e-mail

17   from Priceline customer service is showing May 27th, 2016,

18   11:39 p.m., is that consistent with your understanding of the

19   window of time that it takes for Priceline to bounce an e-mail

20   back to the individual?

21   A.   Yes, absolutely.  So there's a -- it's a different system

22   that does the -- handles the e-mail, so it is put on a cue to

23   process with all the other reservations that we handle, and

24   then eventually we'll get to this -- the servers get to this

25   one and send out the e-mail.

1   Q.  And it would be during -- on this confirmation e-mail that

2   the individual learns that the reservation has been made for

3   them at this particular hotel, the Best Western Plus?

4   A.  Well, they would have known already because on the

5   confirmation page on the website, we also tell, so this is

6   just extra piece of -- like especially -- usually when

7   you're -- when you -- the day of your travel you -- it's

8   useful to have the e-mail for knowing where to go and --

9   Q.  So that information pops up on my screen after I've

10  officially booked it, but then I also get this e-mail within

11  two minutes?

12  A.  Correct, yeah.  Usually two -- yeah, two minutes.

13          MS. OLDHAM:  All right.  Thank you, Mr. Vier.

14          No further questions, Your Honor.

15          THE COURT:  Cross.  Mr. Davis.

16                    CROSS-EXAMINATION

17  BY MR. DAVIS:

18  Q.  Good afternoon, sir.

19  A.  Good afternoon.

20  Q.  I just want the make certain I heard this correctly.

21  Government's Exhibit P-16 is on your screen right now?

22  A.  Uh-huh.

23  Q.  And you indicated that this notifies the person that was

24  booking the room, and it took about two minutes for that

25  e-mail to go out; correct?

Cross-examination - Vier  (By Mr. Davis)

1    A.  Correct.

2    Q.  So it's -- that reservation was not booked until after

3    11:00 p.m. that evening; correct?

4    A.  Yes.  Yeah, it was booked at 11:37 from the previous

5    exhibit.

6    Q.  And it was accepted, and he had the reservation at

7    11:39 p.m. on May 27th; correct?

8    A.  Correct.

9            MR. DAVIS:  Thank you.

10           THE COURT:  Any questions from Mr. Mosley's counsel?

11           MR. TRAINOR:  No questions, Your Honor.

12           THE COURT:  Redirect.

13           MS. OLDHAM:  No, Your Honor, thank you.

14           THE COURT:  All right.  Sir, thank you for your

15   testimony.  Please don't discuss your testimony with anyone

16   until the trial has been completed.  You are excused, and

17   enjoy the rest of your day.

18           THE WITNESS:  All right.  Thank you.

19           THE COURT:  Government's next witness.

20           MS. WILKINSON:  Andre Farrell.

21           THE CLERK:  Good afternoon, sir, please raise your

22   right hand.

23           THE WITNESS:  Right hand or --

24           THE CLERK:  You can stand right there.  Thank you.

25                   ANDRE FARRELL,

Direct Examination - Farrell  (By Ms. Wilkinson)

1    called as a witness, being first duly sworn, was examined and

2    testified as follows:

3              THE WITNESS:  Yes.

4              THE CLERK:  Thank you.  You may have a seat.  Please

5    state and spell your full name for the record, keep your voice

6    up and speak up into the microphone.

7              THE WITNESS:  A-n-d-r-e, F-a-r-r-e-l-l, Andre

8    Farrell.

9              THE CLERK:  Thank you.

10             MS. WILKINSON:  If you would, Mr. Farrell, would you

11   sit up, so I can make sure I hear you, and speak into the

12   microphone.

13             THE WITNESS:  I'm sitting up, you want me to raise

14   the seat or something?  I'm sitting up.

15             THE COURT:  Sir, we just need you to speak into the

16   microphone.

17             THE WITNESS:  Slide the seat up?

18             THE COURT:  Yes, please.

19             THE WITNESS:  All right.  Cool.  Any closer?

20                        DIRECT EXAMINATION

21   BY MS. WILKINSON:

22   Q.  How old are you, sir?

23   A.  I'm 41 years old.

24   Q.  And do you live in the Baltimore City area?

25   A.  No.

Direct Examination - Farrell  (By Ms. Wilkinson)

1   Q.  Are you from Baltimore?

2   A.  No.

3   Q.  Where are you originally from?

4   A.  I'm from New York.

5   Q.  And when did you move to the Baltimore area?

6   A.  In the early '80s, mid '80s.

7   Q.  And have you been in this general area of Maryland,

8   Baltimore City, county, whatever you want to call it, since

9   then?

10  A.  Predominantly.

11  Q.  Now, I'm going to direct your attention to the monitor to

12  the right of you.  Showing you a photograph from Government's

13  Exhibit P-12, do you recognize the men in this photograph?

14  A.  Yes.

15  Q.  And who's the man on the right?

16  A.  That's me.

17  Q.  Pardon me?

18  A.  That's me.

19  Q.  I'm going to put -- are you referred to sometimes by the

20  nickname Dre?

21  A.  Yeah, that's -- yeah, go ahead.

22  Q.  Are you sometimes referred to by the nickname Dre?

23  A.  Andre, Deandre, little man, everything.

24  Q.  Are you sometimes referred to by the nickname Dre?

25  A.  Yes.  Cool.

Direct Examination - Farrell  (By Ms. Wilkinson)

1    Q.  And the man to the left, who is that?

2    A.  Day Day.

3    Q.  Pardon me?

4    A.  Day Day.

5    Q.  Do you know him by any other name?

6    A.  Yeah, now Davon -- Davon.

7    Q.  Did there come a time -- I want to direct your attention

8    to the spring, thereabouts, of 2016, did there come a time

9    when you and Mr. -- this man, Davon, went shopping together?

10   A.  Yes.

11   Q.  And prior to that, did you and Davon, quote, unquote,

12   "hang out" together?

13   A.  Prior to what?  Like before --

14   Q.  Prior to the time you went shopping together in the spring

15   of 2016.

16   A.  We worked out every day before that.

17   Q.  Do you recall responding to the grand jury question, "Did

18   you ever hang out with Mr. Carter before that, meaning the

19   time you went shopping?"  Answer, "No, we didn't hang out."

20   A.  "No, we didn't hang out," what time period?  You said the

21   spring, that's what I'm trying to say.  Did we hang out in the

22   spring?  No.  Years before that, I told you, I worked out with

23   the man every day.

24   Q.  Oh.  Directing your attention to the spring of 2016, is

25   that the time frame when you went shopping with him?

1    A.   Yes, I went on a shopping trip with him in the spring of

2    2016.

3    Q.   And how did the shopping trip come about?

4    A.   Phone call.  Like we was talking on the phone.

5    Q.   And where did you go shopping?

6    A.   The outlets.

7    Q.   And what outlets did you go shopping?

8    A.   The prime outlets, premium outlets, it was one of those

9    two.

10   Q.   And where were they located?

11   A.   Either Hagerstown or Leesburg.

12   Q.   Besides yourself and Davon, did anyone else go shopping

13   with you?

14   A.   No.

15   Q.   During the course of the time up at the outlets, did you

16   talk to him about bike week and Myrtle Beach?

17   A.   It could have been that day, but we probably like -- yeah,

18   we definitely, probably talked about it that day.

19   Q.   Is that the day you presented it to him?

20   A.   I wouldn't say I presented it to him, but that's the day

21   we talked about it.  I can't say who presented it, I can't

22   remember that far back.

23   Q.   Do you remember testifying in the grand jury, "Did you

24   talk to him about bike week?"  Answer, "I would say around

25   that time is when I presented it to him."

Direct Examination - Farrell   (By Ms. Wilkinson)

1   A.   Like I said, I can't say on that date, like you just said,

2   around that time, yes, I can say that.   That is what I said to

3   the grand jury.   I didn't say that day, that trip, I didn't

4   say I didn't present anything, that's what I said.

5   Q.   Are you a person who is interested in bikes?

6   A.   I'm bike life, that's what I do, ride.

7   Q.   And at that point, were you thinking of going down to bike

8   week?

9   A.   That's what we were talking about, Myrtle Beach is in bike

10   week -- bike week is in Myrtle Beach.

11   Q.   Did you tell Davon in the spring when you went to the

12   outlets that you were -- you were thinking of going down to

13   bike week?

14   A.   I said I was interested in going, yes.

15   Q.   And were you going to go to bike week with some friends of

16   yours?

17   A.   Yes.

18   Q.   And who were those friends?

19   A.   Guys that ride bikes with me.

20   Q.   Pardon me?

21   A.   Guys that ride bikes with me.

22   Q.   What are their names, for the record here?

23   A.   Who did I go with, or who did I plan on going with?

24   Q.   When you went to bike week, you went with your friends,

25   what are their names?

1    A.   Okay.   Thank you.   Scotty, Kirby, Shorty.

2    Q.   And what about Justin?

3    A.   Kirby.

4    Q.   Is that Kirby?

5    A.   Kirby, you asked if I went with Kirby, Scotty, and Shorty.

6    Do you want -- what do you want me to do, say Kirby is this

7    and that?   Can you be specific, please?

8    Q.   What is Aaron's full name?

9    A.   Oh, I don't know that.

10   Q.   Do you remember being asked in the grand jury what's

11   Aaron's legal name, and you told me Aaron Scott?

12   A.   Yeah, I seen that on the paper that you showed me.

13   Q.   Is that his last name?

14   A.   To my recollection, yes.

15   Q.   Had you been down to bike week before May of 2016 with

16   those guys?

17   A.   Yes.   Yes.

18   Q.   Do you recall testifying in the grand jury that this was

19   going to be your first time?

20   A.   With them?   I can't -- listen, I testified before the

21   grand jury two years ago, so my -- my lawyer advised me if I'm

22   not sure, just say I'm not sure.   You can refer -- listen, if

23   you want to tell me, like did I say it, then I said it, yes.

24   Q.   Mr. Farrell --

25             THE COURT:   Sir, I'm going to ask you to just answer

Direct Examination - Farrell  (By Ms. Wilkinson)

1    her questions, okay?

2    Q.  (BY MS. WILKINSON)  Did you come to the offices on Monday

3    and read your grand jury testimony?

4    A.  No.

5    Q.  Did you have it read to you?

6    A.  Yes.

7    Q.  On Monday?

8    A.  Yes.

9    Q.  Two days ago?

10   A.  Yes.

11   Q.  When -- so you indicated to Mr. Carter that you were

12   thinking of going down, did he tell you that he was interested

13   at all at that point?

14   A.  Yes.

15   Q.  Between then, your shopping trip at the outlets and May

16   of -- 26, did you have additional communications with

17   Mr. Carter about going down to Myrtle Beach?

18   A.  Not that I can remember.

19   Q.  Did you have a contact with him the day before you left

20   for Myrtle Beach?

21   A.  I would like to say yes, I mean -- I can't remember.  You

22   can read it from the paper, and I'll tell you yes or no.

23   Q.  I'm going to put up on the screen here, Grand Jury

24   Exhibit P-12A, and I'll just refer your attention.

25        I can do it this way so we can see it.

Direct Examination - Farrell   (By Ms. Wilkinson)

1          P-12A, do you see that there, Mr. Farrell?

2    A.  Can you point to it, please?

3    Q.  Up here at the top, at 9:50, May 26th, you, Mr. Carter, a

4    six-minute conversation, do you recall that?

5    A.  I don't recall the conversation.  That's my phone, yes.

6    Q.  Do you recall having a conversation before that day, on

7    May 26th, where he called to ask you if you were still going

8    down to Myrtle Beach?

9    A.  The day before -- all right.  So this is -- he called me,

10   I'm asking, so you're saying he called me on the day of -- the

11   day before we went on the trip?

12   Q.  Did you have a communication with him?  It doesn't matter

13   which direction it was.

14   A.  It was hard for me to get in touch with him.  I was riding

15   a four-wheeler the day before the trip.  So I know I tried the

16   reach out to him.  I wanted -- I just -- that's what my time

17   frame on whether I talked to him that day.  I'm trying to get

18   to the next question, but I can't say yes or no, so I don't

19   know.

20   Q.  How about right here --

21   A.  I don't know what -- you say I talked to him for six

22   minutes, if I talked to him six minutes the day before the

23   trip, we probably talked about going on the trip.  I'm sorry

24   to say, I just don't know the exact dates.  I know I talked to

25   you all on Monday, but I don't know, I can't recall four years

1    ago what I said on the phone.

2    Q.  At that point, had you decided to go to Myrtle Beach with

3    your friends?

4    A.  I decided to go to Myrtle Beach with my friends way before

5    that.

6    Q.  So the morning of May 27th, did you go to Myrtle Beach?

7    A.  Yes.

8    Q.  And can you walk us through kind of your morning that

9    morning, Mr. Farrell?  Where were you staying at the time?

10   A.  I was probably -- I don't -- I came from the dirt bike

11   trail, but I was in the western Maryland area.

12   Q.  Were you in the western Maryland area?

13   A.  That's what I just said.

14   Q.  Okay.  Near Hagerstown?

15   A.  Yes.

16   Q.  Okay.  And at a couple that you stayed at?

17   A.  Huh?

18   Q.  Were you staying at the couple's house that you would

19   sometimes stay at?

20   A.  I don't sometime stay at no couple house, I don't know

21   that.

22   Q.  Were you staying at Aaron's house?

23   A.  Could have been, I don't know, it was a long time ago.

24   Q.  Do you remember testifying in the grand jury, "You were in

25   Hagerstown overnight at someone's home?"  "Yes."

1         "Who's home?"  "A couple I stayed at.  I guess you could

2    I say I was at Aaron's house, but we did go out."

3    A.   There you go.

4    Q.   Is that correct?

5    A.   That's correct.

6    Q.   Come Friday morning, where do you go from Hagerstown?

7    A.   To my house.

8    Q.   Pardon me?

9    A.   To my house.

10   Q.   Where is that?

11   A.   Baltimore.

12   Q.   What did you go to Baltimore for?

13   A.   To get my clothes to go on my trip, my bag.

14   Q.   Did you pick up another guy?

15   A.   Two guys, one or two guys.  It was four of us that went.

16   I don't know, I can't remember because you want specific --

17   one or two guys.  I know this, we either picked up one guy or

18   we picked up two guys.  I can't remember did the other guy

19   meet me in Hagerstown.  It was four of us in the car, that's

20   it.

21   Q.   Just so we're clear, who were the four of you in the car,

22   Mr. Farrell?

23   A.   Shorty, Kirby, Scotty, and I.

24   Q.   Not Davon?

25   A.   Kirby, Shorty, Scotty, and I.

Direct Examination - Farrell  (By Ms. Wilkinson)

1  Q.  Now, did you go get something to eat that morning before

2  you left Baltimore?

3  A.  Breakfast.

4  Q.  And where did you get breakfast?

5  A.  Plaza.

6  Q.  What plaza?

7  A.  The plaza.

8  Q.  What plaza?

9  A.  It says the plaza on it, Miss.

10  Q.  Was it the plaza on Reisterstown Road?

11  A.  That's the plaza.  It's called the plaza, it's not called

12  the plaza on Reisterstown Road.  I'm answering the questions.

13  You didn't say where the plaza -- you know what I mean?  We

14  ate at the food court, if you want to be specific, in the

15  plaza, in the back.

16  Q.  Had there been any kind of plan that morning for you to

17  pick up with Davon?

18  A.  Pick up with Davon, pick what up with Davon?

19  Q.  Had there been any kind of plan that morning for you to

20  meet up Davon?

21  A.  No.  I didn't talk to him that morning.

22  Q.  And you weren't supposed to pick Davon up that morning?

23  A.  Not that I know of.

24  Q.  And at that point, in the morning on May 27th, Davon

25  didn't even know you were going down because you told him

1    you'd confirm with your friends and let him know, but you

2    never talked to him the night before, after you had the

3    original conversation; is that right?

4    A.  You just said I talked to him for six minutes, that's what

5    I'm getting confused at.

6    Q.  I'm talking about after that conversation, Mr. Farrell.

7    A.  Oh, no, because that's what I said, whatever I said on

8    that conversation was like, you know, I'm going tomorrow.  We

9    talked for six minutes.

10   Q.  And then you never confirmed with him whether he was going

11   or not; is that right, Mr. Farrell?

12   A.  Never got in contact -- no, no, I did not.

13   Q.  So that morning as you were on your way to Myrtle Beach,

14   did you have further contact with Davon?

15   A.  Yes.

16   Q.  What was the nature of your communications, what did you

17   talk about?

18   A.  Getting a room, going to Myrtle.

19   Q.  Did you ask him whether or not he was still coming?

20   A.  Yes, I wouldn't be trying to get a room if he wasn't

21   coming.

22   Q.  And did he indicate to you that he was going to come?

23   A.  He said he was on his way.

24   Q.  And did you talk to him about booking the rooms?

25   A.  Yeah, we had a conversation about that.

Direct Examination - Farrell  (By Ms. Wilkinson)

1   Q.  Was there a conversation about Groupon, for example?

2   A.  There was a conversation a lot about rooms.

3   Q.  Was there a conversation about Groupon?

4   A.  It wasn't a conversation, that I can recall.

5   Q.  Let me direct your attention to the screen, up to P-12.

6   A.  That's a text message, it's not a conversation.

7   Q.  Thank you for the clarification.

8   A.  You're welcome.

9   Q.  Did you have a text message with him about Groupon?

10  A.  Yes.

11  Q.  Let me go down here so we're here.  And the communications

12  here begin at 9:56 a.m., you see that?  Do you see that,

13  Mr. Farrell?

14  A.  (No verbal response.)

15  Q.  And it's to Davon, and over here, can you just read what

16  that says for the record.  Read out loud, this part right

17  here.

18  A.  I don't feel comfortable reading out loud.  You trying to

19  make a mockery out of me.  I don't read that well, but I will

20  agree to whatever.  I'm not about to read that in front of

21  these people, and you make a fool out of me.

22          THE COURT:  Ms. Wilkinson is not trying to make a

23  fool out of you.  She will read it.

24          You can read it for him.

25  Q.  (BY MS. WILKINSON)   "Captain Quarters, we can meet there.

1    We getting room where we can last minute," do you see that?

2    A.   Yes.

3    Q.   Did you write that?

4    A.   No -- oh, yeah, I wrote that.  That's right, that was me.

5    Q.   And did you end up getting a room at Captain's Quarters

6    with your friends?

7    A.   Yes, yes.

8    Q.   Now, down below, from Davon, again, at 9:59 a.m., does he

9    say, "Go on Groupon," yes?

10   A.   That's -- yes, that's the text, yes.

11   Q.   Then from Davon, "My N, but do it now," from Davon, and

12   then there's two text messages that are sent, do you recall

13   seeing these in your phone?

14   A.   Yup.

15   Q.   And these came from Davon?

16   A.   Yup.

17   Q.   And we have the time up here at 10:00 a.m., do you see

18   that up there?

19   A.   Yes.

20   Q.   Now, I'm going to show you Government's Exhibit P-15 --

21   R-15, I should say.  I'm sorry.

22        And first of all, this is the Captain Quarter's

23   registration card, do you see that there, Mr. Farrell?

24   A.   Yes.

25   Q.   And you looked at this on Monday when you came in;

1    correct?

2    A.  Yes.

3    Q.  And you told me you could identify your handwriting down

4    below as the people checking in.  Which one is yours, which

5    one is your handwriting?

6    A.  To my recollection, only one is my handwriting.

7    Q.  And that would be which one?

8    A.  The first one, my name.

9    Q.  Your name, and then the people below, Aaron Scott,

10   Ronald -- I don't know what this says, Mouster, who is that?

11   A.  I don't know that name.

12   Q.  Pardon me?

13   A.  I don't know no Ronald Mouster, I don't know that.  I

14   don't know what it says.

15   Q.  I'm not sure what it says, do you know anybody named

16   Ronald?

17   A.  I don't know anybody named Ronald.

18   Q.  Would that be Shorty?

19   A.  I guess so.  Process of elimination, it would be Shorty.

20   I don't know his real name, so I don't know.

21   Q.  Is he somebody that drove down with you?

22   A.  Yes, Shorty was in the car with me, that was it.

23   Q.  With Justin and Aaron?

24   A.  Yeah.

25   Q.  Do you see that there?

1   A.   I see, yeah.

2   Q.   Okay.   Those four men, are they the ones that traveled

3   down in the same car, you, Justin, Aaron, and this third man

4   that you don't know his real name?

5   A.   Right.   I said --

6   Q.   Down below do you see the name Davon Carter?

7   A.   Yup.

8   Q.   Is that your handwriting?

9   A.   My handwriting is the first handwriting.   All the other

10  handwriting look to be the same.   I'm not a handwriting

11  analyst, but all those T's and R's and E's look the same.

12  They don't look nothing --

13  Q.   So is that a no, it's not your handwriting?

14  A.   I just said -- you asked me which one was mines, I said

15  the top was mines.

16  Q.   Okay.   Did Mr. Carter ever stay in your room at Captain's

17  Quarters?

18  A.   Stay, or visit?

19  Q.   Did he stay in your room at Captain's Quarters?

20  A.   Like what do you mean "stay," like overnight?   I'm just

21  saying, like --

22  Q.   This is a registration form.

23  A.   Davon met me at the Captain Quarters.

24  Q.   Pardon me?

25  A.   Davon met me at the Captain's Quarters.   I was asleep, I

Direct Examination - Farrell  (By Ms. Wilkinson)

1    can't say like -- I don't recall, but he didn't sleep there,

2    to my -- that's what you're saying.

3    Q.  Now, to your knowledge, you saw Davon at Myrtle Beach,

4    yes?

5    A.  We was on the picture together.

6    Q.  And did he tell you how he got down to Myrtle Beach?

7    A.  No, we didn't talk about that.

8    Q.  Remember testifying in the grand jury, "He said he was

9    driving"?

10   A.  He sent me a text while he was driving, that's why I was

11   saying like -- you asked me did he discuss how he got there

12   once he got there, no, we were talking on the way there.

13   Q.  Did you see a Facebook post that day on Davon's

14   Facebook?

15   A.  Yeah.

16   Q.  Tell the jury what you saw on the Facebook post,

17   Mr. Farrell.

18   A.  He said he was coming to Myrtle.

19   Q.  We'll come back to that in a moment.  So you said you went

20   down to Myrtle Beach, and then you took -- you were

21   sleeping?

22   A.  Yeah, I went to sleep.

23   Q.  You took a nap?

24   A.  Call it that.

25   Q.  Remember testifying in the grand jury, "When you got to

1    Myrtle Beach, did you take a nap?"  Answer, "Yes."

2    A.  I'm going to say yes.

3    Q.  Did you take a nap?

4    A.  I was put to sleep.

5    Q.  And when you woke up, was Davon there?

6    A.  Yes.

7    Q.  And when -- was Davon drunk when you saw him?

8    A.  Yeah, pretty much.

9    Q.  And was that in the evening of May 27th?

10   A.  Yes.

11   Q.  Now, when Davon was there on that evening, Mr. Farrell,

12   did he have anybody else with him?

13   A.  No.

14   Q.  And did he mention anybody else that he was with?

15   A.  No.

16   Q.  Do you know where he was staying?

17   A.  No.

18   Q.  Did you see the car that he --

19   A.  No.

20   Q.  -- drove down in?

21           THE COURT:  Sir, you need to wait until she finishes

22   her question before you answer.

23           THE WITNESS:  All right.

24   Q.  (BY MS. WILKINSON)  Did he tell you anything about the car

25   that he drove down in?

Direct Examination - Farrell  (By Ms. Wilkinson)

1    A.  No.

2    Q.  Did you borrow some money from Davon that night?

3    A.  Probably so, could have.  I don't travel with a lot of

4    money, so when we was out on the strip, I probably did.  I

5    borrowed money from everybody, but to my recollection -- I

6    can't say yes or no.  But if you got it on there, then I could

7    probably say yes or no.

8    Q.  Is that because you were telling the truth when you

9    testified in the grand jury back in 2017, Mr. Farrell?

10   A.  I'm telling -- yes, I was telling the truth.

11   Q.  Thank you.

12   A.  So what are you trying to say, I'm not telling the truth

13   now?  Because that was a kind of insinuating question, that's

14   all.

15   Q.  So if you told the grand jury, Question, "Did you borrow

16   some money from Davon that evening?"  "Yeah," that was fresher

17   in your mind back then, it was the truth?

18   A.  So it's not in fresh in my -- listen, it's just the way

19   you're asking me questions.  I will answer any question that

20   you want me to, like, you know what I mean, but you --

21   Q.  Did you borrow some money from Davon that evening?

22   A.  And I said, can you read it off, and I will tell you yes

23   or no.  I just said I can't remember.  Like probably so, yeah.

24   I don't know, that evening or the next day, I did borrow some

25   money.

Direct Examination - Farrell  (By Ms. Wilkinson)

1   Q.  And you're not sure where Davon slept that night?

2   A.  No.  It wasn't my concern.

3   Q.  Did you eventually come back to Myrtle Beach with your

4   three friends?  Did you come back from Myrtle Beach?

5   A.  Oh, did I come back?

6   Q.  Yes.

7   A.  Yeah, we went home.

8   Q.  Was Davon with you?

9   A.  No.

10  Q.  Do you know an individual that goes by the name of

11  Mooch?

12  A.  No.

13  Q.  And you go by Dre; correct?

14  A.  Yes.

15  Q.  When you spoke to Mr. Carter, Davon, the morning of

16  May 27th, or -- well, strike that.

17      When you spoke to Davon any time the day of the 27th, did

18  he mention anything about what he had been doing that

19  morning?

20  A.  No.

21  Q.  Did you tell him, "You got to catch up, bro, we're on the

22  road already"?

23  A.  Yes -- hold on, hold on, excuse me.  Because the way

24  you're asking the questions, right, I don't know -- when I

25  said that -- was this -- because you just ask me who did I

Cross-examination - Farrell  (By Mr. Davis)

1    leave with, so I don't -- am I saying this about when I'm

2    going home, is that what you're referring to?

3    Q.  I'm asking you, did you ever tell Davon he needed to catch

4    up with you, you were already on the road?

5    A.  Yes, I said that.  I probably did.  Was that a text or --

6    I don't know.  That's what I'm trying to figure out.  You ask

7    me the questions in a different order, that's the only reason

8    I asked you.  You asked me did he come with us when we were

9    leaving, and that just confused me.  I'm sorry about that.

10   Q.  Did you ever see Davon in an Audi?

11   A.  No.

12   Q.  In a Pontiac?

13   A.  No.

14           MS. WILKINSON:  I don't think I have anything

15   further for Mr. Farrell, Your Honor.

16           THE COURT:  Cross-examination.

17           MR. DAVIS:  Thank you, Your Honor.

18           THE COURT:  Mr. Davis.

19                    CROSS-EXAMINATION

20   BY MR. DAVIS:

21   Q.  Mr. Farrell, on the TV screen to your right, there should

22   be Government Exhibit R-15, which is a registration card for

23   Captain's Quarters.

24       Captain's Quarters is where you and your friends stayed

25   on May 27th, 2016 for bike week?

Cross-examination - Farrell  (By Mr. Davis)

1    A.  Correct.

2    Q.  And you arrived prior to Mr. Carter arriving; correct?

3    A.  Yes, before -- prior, meaning before; right?

4    Q.  That's exactly.

5    A.  Okay.

6    Q.  And directing your attention to the --

7             MS. WILKINSON:  I'm sorry, I didn't hear his

8    answer.

9             THE COURT:  He said, "Prior, meaning before?"  And

10   he said, "Exactly."

11            MS. WILKINSON:  Thank you, Your Honor.

12   Q.  (BY MR. DAVIS)  And directing your attention to the bottom

13   of the docket, the registration card, R-15, it has your name

14   written; correct?

15   A.  Correct.

16   Q.  And you printed it; correct?

17   A.  Correct.

18   Q.  And then there's another name below your name, and it's

19   Aaron Scott; correct?

20   A.  Correct.

21   Q.  And then there's Ronald -- I can't really make that out,

22   looks like --

23   A.  Royster.

24   Q.  "Rooster."

25   A.  Royster.

Cross-examination - Farrell  (By Mr. Davis)

1    Q.  Royster.  And then there's another signature, Justin.  And

2    I can't --

3    A.  Scott.

4    Q.  Now, did all you guys -- did they require each person that

5    was staying in the room to sign in?

6    A.  If you wanted a wristband to be in the hotel, they wanted

7    everybody to sign in.

8    Q.  And that's why Mr. Carter's name appears there, because he

9    wanted to get a wristband like everyone else; correct?

10   A.  I imagine so.

11   Q.  Now, Mr. Carter didn't stay there that night, was it

12   because the room was too crowded?

13   A.  Could possibly be.

14   Q.  You just don't remember?

15   A.  I don't -- I don't remember.  I was at bike week Myrtle

16   Beach, I was intoxicated, that's why I was sleeping when I got

17   there.

18   Q.  Okay.  And then you guys went out afterwards, or no?

19   A.  Yes, we went out.

20   Q.  Okay.  Did you meet him some place, or do you even

21   remember?

22   A.  Um, like I say, one of the guys that stayed in the room,

23   they called me and say Day Day was downstairs, and I came

24   downstairs, and that's when we just started hanging out.

25   Q.  Did you even bother asking him where he was staying?

1    A.  I want to say -- I want to say he said he found a room,

2    and I just didn't know.

3    Q.  Did he come up to the room that was reserved at Captain's

4    Quarters?

5    A.  Yeah, yeah.

6    Q.  He actually came in?

7    A.  Yeah.

8    Q.  Was he satisfied with the sleeping arrangements?

9            MS. WILKINSON:  Objection to what Mr. Carter is

10   satisfied with, Your Honor.

11           THE COURT:  If you know, you can answer.

12   A.  I can't -- I can't recollect.

13   Q.  (BY MR. DAVIS)  Just don't remember, you're intoxicated?

14   A.  Don't remember.

15   Q.  But he didn't stay there, you do remember that?

16   A.  I do remember that.

17   Q.  And he got another room?

18   A.  I do remember that.

19           MR. DAVIS:  I have no further questions.  Thank you.

20           MR. TRAINOR:  We have no questions.

21           THE COURT:  Redirect.

22                    REDIRECT EXAMINATION

23   BY MS. WILKINSON:

24   Q.  Mr. Farrell --

25           MS. WILKINSON:  You can keep that document up there

1    for a moment, if you would.

2             MR. DAVIS:  That's okay, I'll do it again.

3             MS. WILKINSON:  Thank you, if it was quick.  If it

4    isn't, that's okay.

5    Q.  (BY MS. WILKINSON)  I just wanted to make one point,

6    Mr. Farrell, based on Mr. Davis showing you that record.

7         Up in the left-hand corner, it said your checkout time --

8    your checkout date, while we're waiting for it, do you recall

9    the day you checked out?

10   A.  No, I don't.

11   Q.  Okay.  We'll wait for it to come up.

12   A.  Okay.  I believe my answer to you was like, I know we left

13   at the end of the weekend, towards the end.  We was like the

14   last people to leave.

15   Q.  I'm sorry, can you say that again?

16   A.  I know I told you before that -- when you questioned me,

17   when you went over it Monday and you said, didn't you say

18   y'all were the last people to leave, word for word, that's

19   what I said.

20   Q.  So you departed on Monday, May 30th?

21   A.  That's what it says, that's the checkout time.

22   Q.  Okay.  And Davon did not go home with you?

23   A.  I said earlier when you asked me, did we leave on our own,

24   the same answer for the same question.

25   Q.  He had left the day before?

1    A.  I don't know that.

2    Q.  But he didn't leave with you?

3    A.  I said he did not leave with me.

4    Q.  Thank you.

5            MS. WILKINSON:  Thank you, Your Honor, I have no

6    further questions of Mr. Farrell.

7            THE COURT:  All right.  Sir, thank you for you

8    testimony.  Please don't discuss your testimony with anyone

9    until the trial has been completed.  Enjoy the rest of your

10   day.  And you are excused.

11           THE WITNESS:  All right.  I'm not coming back no

12   more ever again; right?

13           THE COURT:  You are excused from your testimony in

14   this case.

15           MS. WILKINSON:  Detective Sekou Hinton.

16           THE COURT:  Ladies and gentlemen, we're going to

17   take our afternoon break at this point.  I'm going to ask that

18   you be back in the jury room at 3:40, and we will continue

19   from there.  Thank you.

20           (Jury left the courtroom.)

21           THE COURT:  See you in 15 minutes.

22           (A recess was taken.)

23           THE COURT:  I think we said this already, but we

24   should block out some time tomorrow to just talk about the

25   details of our field trip.

1          MS. WILKINSON:  I think you did, Your Honor.

2          THE COURT:  Okay.  I just wanted to make sure to say

3     that.

4          MS. WILKINSON:  Would it start at 9:30, or would we

5     start earlier than 9:30?

6          THE COURT:  Maybe we'll send the jury out for lunch

7     a little early tomorrow and do it then.  But I'm saying that

8     so that the parties will be prepared to discuss whatever

9     objections you might have, raise them tomorrow, and we'll hash

10    them out tomorrow.

11          (Jury entered the courtroom.)

12          THE COURT:  All right.  You may all be seated.  Good

13    afternoon, ladies and gentlemen.

14          I was about to tell you you're still under oath, but

15    you're a new witness, so you have to be placed under oath.

16          THE CLERK:  Good afternoon, sir, please raise your

17    right hand.

18                    DETECTIVE SEKOU HINTON,

19    called as a witness, being first duly sworn, was examined and

20    testified as follows:

21          THE WITNESS:  I do.

22          THE CLERK:  Thank you, you may have a seat.  Will

23    you state and spell your full name for the Court.

24          THE WITNESS:  Detective Sekou Hinton.  I'll spell my

25    first and last name for you.  First name is S-e-k-o-u, last

Direct Examination - Hinton  (By Ms. Wilkinson)

1    name, H-i-n-t-o-n.  I'm assigned to the Baltimore County

2    Police Department, specifically in the sex crimes unit right

3    now.

4                      DIRECT EXAMINATION

5    BY MS. WILKINSON:

6    Q.  And so you're a detective with Baltimore County?

7    A.  Yes.

8    Q.  And can you just briefly detail how long you've been with

9    the county, and very generally, what positions you've held?

10   A.  I've been with Baltimore County for approximately 21

11   years, just over 21 years.  I started out in the patrol

12   division around 1999.  Upon graduating from the academy, I was

13   promoted to the drug division, the Community Drug and Violence

14   Interdiction team.  I did that for approximately eight or nine

15   years, then I went to the vice unit, which is in the vice

16   narcotics section.  Then once again, I was essentially

17   promoted to the homicide unit around 2008, and I did that for

18   approximately eight years, and now I'm currently assigned to

19   the special victims unit.

20   Q.  And what kind of work does special victims do?

21   A.  We investigate rapes of anyone over the age of 16,

22   attempted rapes, is essentially what we do.

23   Q.  So directing your attention to the time frame of the fall

24   of 2013, is that a period of time when you were a homicide

25   detective?

1    A.  Yes.

2    Q.  And to be a homicide detective, do you have special

3    training once you're promoted to that position?

4    A.  I think it's kind of you're -- yes, we do get training,

5    but there was also the background I had prior to that and the

6    cases I had worked and the things I did prior to that to be

7    able to obtain that title.

8    Q.  So for the five or so -- how many total years did you have

9    in homicide?

10   A.  I believe it was five or six, or maybe seven.

11   Q.  And in that time frame -- I know, years blur into one

12   another.  In that time frame, did you -- were you lead

13   detective on a number of homicides out in Baltimore County?

14   A.  Yes.  The entire time that I was there I was probably the

15   lead detective in around 20 or so cases, and I can't tell you

16   how many I was secondary on.  There's a lot of us, and we help

17   each other, so I was secondary on a lot more cases than I was

18   primary on because we help each other out.

19   Q.  And when you say "secondary," providing support to other

20   detectives?

21   A.  Yes, the supporting detective to other detectives.

22   Q.  Is it fair to say, as a general matter, the homicide rate

23   in Baltimore County is a lot different than the rate in

24   Baltimore City?

25   A.  Significantly lower.

Direct Examination - Hinton  (By Ms. Wilkinson)

1   Q.  As a result of that, your caseload, while hefty, is not as

2   hefty as the city detectives, say?

3   A.  Yes, everything is done according to the number of people

4   that you have.  Baltimore City has more homicides, therefore,

5   they have more detectives.  We have less homicides, so we have

6   less detectives.  So our case management is similar, but it's

7   on a lower rate.

8   Q.  And I'm going to direct your attention now to

9   September 22nd of 2013, were you the lead detective in the

10  murder of a man by the name of David Wutoh?

11  A.  Yes.

12  Q.  And when you're assigned a case to become the lead

13  detective, does it happen on that day, the actual day the

14  murder happens?

15  A.  Yes.

16  Q.  And is that what happened with you?

17  A.  Yes, on that particular day.  Yes, I just so happened to

18  be on call for that weekend, and I was called in.

19  Q.  And again, I -- did there come a time when you actually

20  testified in connection with that murder against a man by the

21  name of Matthew Hightower?

22  A.  Yes.

23  Q.  And I don't want, obviously, to go into that kind of

24  detail here, but give the jury a general understanding of what

25  the crime scene looked like and what the beginning of that

1    investigation looked like and how it turned to Matthew

2    Hightower.

3    A.   The beginning of the investigation was essentially me

4    getting called in.  I drove up to the location, upon arriving

5    there, it was a single-family home, just a driveway that led

6    right up into the living room area that used to be a garage,

7    but makeshift into a living room.  So it was like a remodel.

8         You could see that there were some casings on the

9    driveway.  And then there were quite a few holes in the front

10   window.  I was able to go inside of the house where I found

11   the victim, David Wutoh.  He was dead there in the living

12   room, obviously from the gunshots that came from the window.

13   The neighbors informed us that there were seven rounds that

14   were heard.  We found seven casings, which would be consistent

15   with what they heard.  Mr. Wutoh was shot numerous times.

16        One of his cell phones was actually struck by one of the

17   rounds that came through the window, shattered the cell phone,

18   and just barely touched the SIM card that was in that phone.

19   His girlfriend was home at the time.  She grabbed his cell

20   phone that was on his person, and she was using that, so we

21   were able to recover his cell phone.

22        So what we wound up doing is, we didn't have anything,

23   essentially, except for his girlfriend, who was upstairs and

24   him, who was downstairs.  So we obtained the cell phone that

25   she took from him and tried to figure out who the last person

1    that he talked to.  Unfortunately, the cell phone was missing

2    some messages, so we had to order his phone records to see who

3    the last person he talked to.  And we were able to find

4    several numbers within his cell phone.  He talked to one

5    person that night before, a -- last four digits were 5540, who

6    we later identified as Harry Crawford.

7        And then going through his text messages, we saw that he

8    had a conversation with someone with the last four numbers

9    ending in 1240, who wound up being Matthew Hightower, and that

10   person was asking him for cheese.  And we just assumed that

11   the cheese was money that he owed from him.  So that's what we

12   started -- beginning of our investigation.

13       A lot of cell phone records, we ordered those cell phone

14   records to see who those people who were contacting the victim

15   was talking to that night, just to kind of find out who was

16   where and what they were doing.  And we actually wound up

17   finding a lot of information out from those phone calls the

18   very first night.

19   Q.  Sorry about that, I'm just telling Ms. Lesser I'm about to

20   put a picture up there.  But before I do, and I have a couple

21   follow-up questions for you, Detective Hinton, you mentioned

22   that casings were found in the course of that investigation,

23   was a gun ever recovered?

24   A.  No.

25   Q.  And you mentioned a number of different phone records that

1    were obtained that kind of began your investigation, and those

2    directed you towards Mr. Hightower and Mr. Crawford?

3    A.  Yes.

4    Q.  And I'm just going to put up here for demonstrative

5    purposes, as we go forward, Government's Exhibit PH-4, are all

6    the people depicted on this picture familiar to you in the

7    course of that investigation?

8    A.  Yes.

9    Q.  Okay.  And the person that you mentioned, Mr. Crawford,

10   was he the owner of -- did you come to find out he was the

11   owner of any company related to your investigation?

12   A.  Yes, he was the owner of RXRS Resources.

13   Q.  And then down below, would that be Mr. Hightower?

14   A.  Yes.

15   Q.  And I'll come back to these other individuals in a moment.

16   So the two phone numbers that you had identified in connection

17   with your investigation, did there come a time, because of

18   Mr. Crawford's business, that you kind of joined forces with a

19   federal agency in connection with your investigation?

20   A.  Yes, so the beginning when we were in Mr. Wutoh's house

21   when we first found out that he was murdered, there were a lot

22   of prescription drugs, things that.  Although I was in the

23   narcotics unit, I dealt with mostly Schedule I and Schedule II

24   narcotics, drugs of cocaine, heroin, of those things.  This

25   was like pharmaceuticals, a lot of weird papers and things

1   that were Medicare papers and things of that nature.

2        So it was something I wasn't used to, so I called our

3   intelligence unit to see if they knew anything about it or if

4   they could put me in contact with someone who would lead me

5   down the right path, because at that point, you're still

6   trying to figure out what's going on, and we were just trying

7   to create the right resources.  And our intelligence unit was

8   able to put us in contact with HHS.

9   Q.  And eventually, did that lead you to Agent Fuchs and Agent

10  Holiday?

11  A.  Yes.

12  Q.  And did they work with you, in part, on that investigation

13  of Mr. Wutoh's murder?

14  A.  Yes.

15  Q.  And while you were investigating the murder, did they

16  become involved in an investigation involving health care

17  fraud?

18  A.  Yes.

19  Q.  And again, I'm not going to have you go too much in the

20  weeds about it, but what was the general nature of the

21  investigation?

22  A.  Durable medical equipment and essentially diapers.

23  Q.  Incontinence supplies for older folks?

24  A.  Incontinence supplies, yes.

25  Q.  Billing Medicaid?

1    A.  Yes.

2    Q.  And not being provided?

3    A.  Yes.

4    Q.  Now, as your investigation continued into the phone

5    communications, did a particular cell site hit come to your --

6    or ping, so to speak, come to your attention in the course of

7    that investigation?

8    A.  Yes, so when we sent off the first two numbers that I

9    described for you, 5540 and the 1240, we were able to see that

10   there was another number that was speaking to Harry Crawford's

11   line, which was the 5540 number.  That number was 4173.  The

12   4173 number, when we ran that number and saw where it was, it

13   hit off of a cell phone tower that was in close proximity to

14   where my victim was killed, at --

15   Q.  And did you -- go ahead.

16   A.  At the time that my victim was killed.

17   Q.  And did you come to link that 4173 number with any person

18   of interest in your investigation?

19   A.  Yes, when Harry Crawford came into our headquarters

20   building and he was interviewed.  I downloaded his phone,

21   which is something that we do at our headquarters.  We're able

22   to look through the entire contents of your phone.  And in his

23   contacts, he had the 1240 number, which he had under Matt.  It

24   was NYT, but it was Matthew Hightower.  And then there was

25   another number under Matt, which was the 4173 number.

1       So we were able to, for the first time, see who Matt was

2   because through the records it only came back as LG nom de

3   plume, so there was no name associated.   So Harry Crawford's

4   phone was the first link to putting it as Matthew Hightower.

5   We later called the 1240, and Matthew Hightower picked up the

6   phone, so we were able to put all those things together.

7   Q.  And with regard to that number that was associated with

8   Matt, that is the number of the cell that was used to hit near

9   the murder scene of Mr. Wutoh in those early morning hours

10  when he was shot?

11  A.  Yes.

12  Q.  And that phone, it was not in Matt's name?

13  A.  No.

14  Q.  Did it -- did -- based on your investigation, did you

15  identify in whose name that phone was?

16  A.  It was in LG nom de plume.

17  Q.  And I should say, who was using it when you eventually

18  located the phone?

19  A.  When we -- originally when we located the phone, it was

20  Candace Anderson had it in her hands.   We sent out a -- we

21  sent out -- our intel- -- it's not our intelligence unit, but

22  it's people that we go and have pick up people for us and do

23  surveillance for us.   So our surveillance team went out and

24  tracked the 4173 number to see who was using it at that time,

25  and they were able to find Candace Anderson with the phone in

1      her hands.

2            She told us that when we stopped her -- on a ruse, we

3      just said that there were cell phone thefts in the area.  She

4      informed us that she just got the phone from her mother's

5      friend Matt and that he gave her the SIM card so that she

6      could use that phone.  She walked into the house that was very

7      close by, we were going to leave the area, and then we were

8      able to see that the 1240 number, which is Matthew's number,

9      was coming back home to that location where we just left

10     Candace.

11           Shortly thereafter, Matthew Hightower exits his truck, he

12     walks -- has a meeting with someone out in the front yard.

13     And the 4173 number, that was the last time it was ever

14     used.

15     Q.  Okay.  And that 4173 number belonging to that young woman,

16     Ms. Anderson, did you eventually identify her mother?

17     A.  Jemeika Anderson, yes.

18     Q.  And Jemeika Anderson, would she become a witness in the

19     case involving Mr. Hightower?

20     A.  Yes.

21     Q.  And I'm going to spell her name for the record for the

22     court reporter, J-e-m-e-i-k-a; is that correct, Detective

23     Hinton?

24     A.  Yes.

25     Q.  So as your -- the murder happened September 22nd, and the

Direct Examination - Hinton  (By Ms. Wilkinson)

1   events you described, are they pretty much the fall of 2013?

2   A.  Yes.

3   Q.  And in that time frame, getting to know Agent Holiday and

4   Agent Fuchs through the course of that health care fraud

5   investigation?

6   A.  Yes.

7   Q.  At some point, did you learn that there had been a hotline

8   complaint made against Harry Crawford and RX Resources?

9   A.  Yes.

10  Q.  Did you come to find out who the whistleblower was, the

11  complainant was in that hotline complaint?

12  A.  Yes.

13  Q.  And what was her name?

14  A.  Lisa Edmonds.

15  Q.  Now, based on your investigation, did you subsequently

16  meet Ms. Edmonds?

17  A.  Yes, I did.

18  Q.  And did you meet her several times over the course of the

19  next couple months, more than once, I should say?

20  A.  Yes.

21  Q.  Now, at some point, did you interview Ms. Edmonds?

22  A.  Yes, we interviewed her at Baltimore County Police

23  headquarters.

24  Q.  And did you -- at that -- at some point after that

25  interview -- first of all, did you create a summary of that

1    interview for your own purposes, for the purposes of the

2    Court -- the file that you were compiling on the

3    investigation?

4    A.  Yes, I did.

5    Q.  And did it include other information that you had

6    developed in the course of the investigation?

7    A.  Yes.

8    Q.  And that document I'm going to put up here is Government's

9    Exhibit H-7, you'll see that here.  Do you recognize this

10   document, Detective Hinton?

11   A.  Yes, I do.

12   Q.  Okay.  Now, this is a -- I think a 12-page document, it's

13   a Bates stamp number at the bottom, and each of it is a typed

14   page, do you see that there?

15   A.  Yes, I do.

16   Q.  And did you typewrite -- write, actually, all of the

17   information that's contained in this report?

18   A.  I did.

19   Q.  I'm going to go to page 8 of that report.  And does this

20   record the meeting that you had with Lisa Edmonds on

21   December 4th, 2013?

22   A.  Yes, it does.

23   Q.  And I know it's not too long, but I'm just going to have

24   you read the paragraph here.

25        So is this the information you obtained from Ms. Edmonds

1    in December of 2013?

2    A.   Yes.

3    Q.   Okay.  Can you read it, please.  Do you want me to bring

4    it up, is it awkward to do it that way, are you okay?

5    A.   It's a little awkward, I think I can make it work.

6    Q.   Are you sure?

7    A.   Yes.

8    Q.   Okay.

9    A.   "On December 4th, 2013, at approximately 16:30 hours" --

10              THE COURT:  Slow down just a little.

11              THE WITNESS:  I'm sorry.

12              THE COURT:  It's okay.

13   A.   "On December 4th, 2013, at approximately 16:30 hours,

14   Detective Hinton spoke with Lisa Edmonds at Baltimore City

15   Police headquarters.  Detective Hinton informed Ms. Edmonds

16   that he was investigating the death of David Wutoh, who was

17   the victim.  Ms. Edmonds advised she was not aware that the

18   victim was killed.  Ms. Edmonds informed Detective Hinton that

19   she was a former employee of RX Resources and that she

20   overheard a lot of conversations that she did not want to be

21   privy to."

22        "Ms. Edmonds began by explaining that she used to work

23   for Harry Crawford at RX Resources and that Matthew Hightower

24   was a delivery guy for the company.  Ms. Edmonds continued by

25   saying she overheard Matthew Hightower and Harry Crawford

1    discussing an investment with the victim.  Ms. Edmonds said

2    Harry borrowed $10,000 to $20,000 from Matthew Hightower to

3    give to the victim for the business venture.  Ms. Edmonds

4    stated the business venture did not go as planned, and the

5    money was not paid back to Matthew Hightower."

6         "Ms. Edmonds advised Harry Crawford did not lose any

7    money in the business transaction and continually blamed the

8    victim for Matthew Hightower's monetary loss.  Ms. Edmonds

9    said the business transaction occurred sometime in June or

10   July of 2013, and the victim had not paid Matthew Hightower

11   any funds as of August when she stopped working at the

12   location."

13        "Ms. Edmonds explained that Matthew Hightower became

14   angry of the victim owing him money, some of which was because

15   Harry Crawford provoking the situation.  Ms. Edwards advised

16   Matthew Hightower openly talked about the victim owing him

17   money.  Ms. Edwards was able to remember a few statements that

18   Matthew Hightower made.  Ms. Edmonds stated on one occasion,

19   Matthew Hightower was informing an employee at the location,

20   Belinda Turner, that he, Matthew Hightower, went to the

21   victim's address to confront the victim about the money.

22   Ms. Edmonds said she also heard Matthew Hightower tell the

23   employee, Belinda Turner, that the victim's girlfriend let

24   him, Matthew Hightower, into the location."

25        "Ms. Edmonds said this conversation occurred in July of

2013.  Ms. Edmonds advised on a separate occasion, she heard
Matthew Hightower say, 'If you don't pay me my money, I'm
going to burn him'" -- I'm sorry, it says, "If he don't pay me
my money, I'm going to burn him."

        "When questioned as to what Matthew Hightower meant,
Ms. Edwards advised Matthew Hightower was talking about
inflicting serious bodily harm to the victim.  Ms. Edmonds
later stated that Matthew Hightower was so enraged during the
conversation, that she thought Matthew Hightower could have
killed the victim.  Ms. Edmonds advised Harry Crawford and
Matthew Hightower would often talk about the money the victim
owed them.  Ms. Edmonds thought the victim and Mr. Hightower
were friends, but Harry Crawford would continually instigate
the situation by telling Matthew Hightower the victim had
plenty of money."

        "In addition, Ms. Edmonds heard Matthew Hightower say the
victim was supposed to give him either his Hummer truck or his
Infinity car to pay off his debt.  Ms. Edmonds said generally
Matthew Hightower would talk about the victim owing money
openly, but Harry Crawford would often make Matthew
Hightower" -- I'm sorry, "but Harry Crawford would often take
Matthew Hightower to his, Harry Crawford's, office to discuss
the victim's financial debt."

        "Ms. Edmonds went on to explain another incident she
remembered.  Ms. Edmonds advised she did not remember the

1   exact month, but the victim received a bed from Harry

2   Crawford.  Ms. Edmonds stated the victim had the bed for a

3   while and did not pay or make payments for having the bed.

4   Ms. Edmonds said Harry Crawford was angry the victim was not

5   paying for the bed, so he, Harry Crawford, sent Matthew

6   Hightower to confiscate the bed from the victim."

7   Q.  (BY MS. WILKINSON)  Okay.  Now, obviously, your report is

8   longer, I'm not going to have you read all of it.  Having

9   gotten that information from Ms. Edmonds, was that significant

10  to your investigation?

11  A.  Yes.

12  Q.  This is December of 2013, at some point in the beginning

13  of 2014, were search warrants executed at the home of Harry

14  and Elma Myles, as well as the offices of RXRS Resources?

15  A.  Yes.

16  Q.  And were they federal warrants, or state warrants?

17  A.  Federal warrants.

18  Q.  And were they based on the health care fraud

19  investigation?

20  A.  Yes, they were.

21  Q.  What personal participation did you have in the operation

22  that involved the execution of the search warrants at that

23  house?

24  A.  So we were working together at that time.  I was obviously

25  investigating the homicide, and they were investigating the

1    Medicare fraud, so we did everything at the same time.  As

2    they were executing the warrants, people within my unit from

3    homicide were picking up some of the -- what we believed to be

4    witnesses in the case.  So we were pretty much around the

5    county speaking to RXRS Resources employees, speaking to

6    people who were related to David Wutoh, and speaking to people

7    who had any relation to Harry Crawford or Matthew Hightower

8    that we knew of.

9    Q.  And did you personally conduct some interviews?

10   A.  Yes.

11   Q.  And what interviews did you conduct?  I'm not going to go

12   into the substance of them, but which ones did you personally

13   conduct?

14   A.  I spoke to -- attempted to speak to Harry Crawford.

15   Sorry, there were so many that day.  Michael Fleming, Michelle

16   Fleming came to the headquarters that day.  Belinda Turner,

17   but she was interviewed by one of my colleagues.  That's -- I

18   can't remember all the rest, there were numerous interviews.

19   Q.  Okay.  And if I direct your attention back to PH-4, are

20   Michelle Fleming and Michael Fleming represented on this

21   particular demonstrative exhibit?

22   A.  Yes.

23   Q.  And their relationship, Michelle and Michael's

24   relationship to Mr. Hightower, is what?

25   A.  Michelle and Michael are brother and sister.  Michelle

1    Fleming is the mother of -- I'm sorry, Michelle Fleming is the

2    mother of Matthew Hightower's kids, and she's the brother

3    of -- she's the sister of Michael.  And Michael is just --

4    that's pretty much it, they're really just friends, Michael

5    and Matthew.

6    Q.  I'm sorry, I was telling Agent Holiday the wrong number.

7        Now, this woman up here you mentioned, Belinda Turner,

8    she was one of the employees at RXRS?

9    A.  Yes.

10   Q.  And after the interview with the other detectives that

11   day, was there phone contact between her phone and Matthew

12   Hightower?

13   A.  Yes.

14   Q.  Now, in the -- in the -- strike that.

15       We're dealing now with the search warrants that were in

16   the 2014 time frame, did the investigation, yours and the

17   health care fraud investigation, continue as you collected

18   phone records and that sort of thing, interviewed witnesses?

19   A.  Yes.

20   Q.  And did there come a time in June of 2015, when a federal

21   grand jury returned a health care fraud indictment against

22   Ms. Myles, Mr. Crawford, and Mr. Hightower?

23   A.  Yes.

24   Q.  And at that point, in June of 2015, had there been any

25   charges yet for the murder of David Wutoh?

 1    A.  No.

 2    Q.  Did that come in May of 20- -- I mean, April, late April

 3    of 2016?

 4    A.  Yes.

 5    Q.  And touched on this briefly before, how did the state

 6    murder investigation kind of dovetail in with the federal

 7    agencies in terms of a federal indictment for the murder of

 8    David Wutoh?

 9    A.  Well, we had started working together in the beginning,

10    and because of their knowledge in the health care fraud and

11    also because of the extortion being a federal charge with the

12    homicide that happened with me, we decided to take the case

13    federally, and that's why it was federal charges.

14    Q.  Now, the memo that I directed you toward with Ms. Edmonds,

15    and this is page 7, sometime after the indictment of

16    Mr. Hightower and Mr. Crawford and Ms. Myles, does there begin

17    a process known as discovery?

18    A.  Yes.

19    Q.  And that's where the government provides information to

20    the defendants' counsel about the case?

21    A.  Yes.

22    Q.  And in the course of that, at some point, did you learn

23    that Government's Exhibit H-7 was produced in that discovery

24    process?

25    A.  I did.

1    Q.  Now, in October of 2015, Detective Hinton, were you called

2    in connection with any complaint or call that Ms. Edmonds had

3    made related to car -- a car outside her home?

4    A.  Yes, she contacted me and said that there was a car that

5    was, I guess essentially in her neighborhood parked up the

6    street from her, that just didn't sit there.  And the way that

7    her neighborhood is, is they know cars that come up and down

8    the road, no one's just going to sit there, so she knew it was

9    out of the ordinary.  So she contacted me, and A, wanted to

10   know -- make sure that we weren't there, and then to see if we

11   could check out that car.  So we were --

12   Q.  What did you do as a result?

13   A.  So we were concerned, so the first thing that I did was

14   called my supervisor.  My supervisor contacted Baltimore City

15   and had them take a car over there.  Now, the normal standard

16   is to call 911, but because of the person that was calling us

17   was a witness for us, we made sure that we spoke directly to

18   someone who would be in contact with the patrol officer that

19   would go down there immediately, otherwise, if you call 911,

20   then they just go in the list of priority of calls.  And we

21   wanted to make sure that they understood that this was

22   important that we got out there right away.  So they ensured

23   us that they were sending someone there.

24   Q.  To your knowledge, one way or the other, do you know if,

25   in fact, there was a 911 call made?

1    A.  There was no 911 call made, to the best of my knowledge.

2    It was really us calling in, I guess it's just a favor, so to

3    speak.  But we knew that it would get done because of the way

4    that we were handling it.

5    Q.  And at some point, do you know whether or not the police

6    who responded, did you receive information as to whether or

7    not they had made any interaction with that car?

8    A.  No, they went to the area and the vehicle was no longer

9    there.

10   Q.  Now, as the -- and no further complaints from Ms. Edmonds

11   at that point?

12   A.  No, she also confirmed that the vehicle was no longer

13   there anymore.

14   Q.  To you?

15   A.  To me.

16   Q.  Now, at some point come the beginning of 2016, and let me

17   jump ahead and kind of finish that thought with you, Detective

18   Hinton, Ms. Edmonds --

19            THE COURT:  Is your lapel mike on?

20            MS. WILKINSON:  Oh, it turned off -- I had it on.

21   Thank you.  I'm sorry, Your Honor.

22   Q.  (BY MS. WILKINSON)  At some point, Detective Hinton, as

23   you prepared for the trial of Mr. Hightower for the murder of

24   David Wutoh, was that in September of 2016?

25   A.  Yes.

1    Q.  And at some point, did Ms. Edmonds stop having

2    communications with federal law enforcement authorities?

3    A.  Yes.

4    Q.  And do you know whether or not a warrant had to be issued

5    for her arrest to appear to testify at the trial of

6    Mr. Hightower?

7    A.  Yes, I do.

8    Q.  And how do you know that?

9    A.  Because I was there when the warrant was served.

10   Q.  When she was brought to court, who was she accompanied

11   by?

12   A.  I believe she was accompanied by her son.

13   Q.  Would that be this individual that's indicated up here on

14   Government's Exhibit PH-4?

15   A.  Yes.

16   Q.  And did you have an opportunity to observe Ms. Edmonds's

17   demeanor at that time?

18   A.  Yes.

19   Q.  And can you describe it for the jury?

20   A.  It was completely different than our first talk.  She came

21   in voluntarily, obviously, when she first reached out to us.

22   She was very helpful.  She was completely different the day

23   that she came in and she was arrested, obviously, because she

24   was arrested and a lot of things had happened in that time.

25   And she was -- she was completely different, she had gone

Direct Examination - Hinton  (By Ms. Wilkinson)

1    through a lot.

2    Q.  Now, I'm going to go back now, because that kind of

3    bookends Ms. Edmonds's involvement.  In the early part of

4    2016, were you part of a grand jury investigation, now a

5    federal one, regarding Mr. Wutoh's murder?

6    A.  Yes.

7    Q.  And as part of that, did you participate in a number of

8    different meetings and interviews and that sort of thing?

9    A.  I did.

10   Q.  And were witnesses put in the grand jury connected to both

11   the David Wutoh murder and with relation to information about

12   RX Resources?

13   A.  Yes.

14   Q.  And at times, did you actually come to the grand jury for

15   those pre-grand jury-type interviews?

16   A.  Yes.

17            MS. WILKINSON:  And I'm just going to put up here,

18   and it's not the substance, Your Honor, just cover pages of

19   the witnesses.

20   Q.  (BY MS. WILKINSON)  And showing you Government's

21   Exhibit H-10, did a man by the name of D'Angelo Herbert

22   testify on February 23rd, 2016?

23   A.  Yes, I know him as Gap, but yes.

24   Q.  Gap being his nickname?

25   A.  His nickname.

Direct Examination - Hinton  (By Ms. Wilkinson)

1    Q.  And was he a witness, eventually, at the trial for

2    Mr. Hightower?

3    A.  Yes.

4    Q.  And showing you the cover page for Jemeika Anderson, would

5    that be the woman whose phone -- the phone was -- her daughter

6    had the phone?

7    A.  Candace Anderson had the phone, yes.

8    Q.  Okay.  That's the same person?

9    A.  Yes.

10   Q.  And then on April 26th, 2016, would that be Mr. Fleming,

11   the brother-in-law that you indicated or Michelle Fleming's

12   brother?

13   A.  Michelle Fleming's brother, yes.

14   Q.  And then two other witnesses, Shykia Crosby on March 1st.

15   A.  Yes.

16   Q.  And Mika Grant on March 1st, 2016.

17   A.  Yes.

18   Q.  Now, all of that investigation, did it result in an

19   eventual indictment of Mr. Hightower and Mr. Crawford

20   connected with the extortion murder of Mr. Wutoh?

21   A.  Yes.

22   Q.  Now, bringing you up to the morning of May 27th, 2016,

23   Detective Hinton, did you receive any communications from

24   Ms. Edmonds personally on that day?

25   A.  Yes.

Direct Examination - Hinton  (By Ms. Wilkinson)

1    Q.  Did you speak with her on that day?

2    A.  Yes.

3    Q.  What did she tell you?

4    A.  She was very frantic, she was -- she was very much

5    concerned.  She said that her neighbor had been killed and

6    that she thought that it was for her.

7    Q.  And what did you do as a result of obtaining that

8    information from Ms. Edmonds?

9    A.  As usual, I called my supervisor and let him know that I

10   needed to go in.  I explained the situation.  I contacted the

11   agents on the case.  I contacted a couple of guys in the

12   homicide unit.  And we all immediately went to the area and

13   just -- we were just trying to figure out what was going on,

14   to see if it was just a coincidence or if -- what was really

15   involved in the murder.

16   Q.  And at that point, did you meet Sergeant Jones and

17   Detective Forsythe and other members of the Baltimore City

18   homicide unit?

19   A.  We had -- yes, we had a brief conversation with them.

20   They were still very early on in their investigation.  And

21   because we're detectives too, we just felt the need to just do

22   what detectives do.

23   Q.  So you went to the crime scene?

24   A.  Yes.

25   Q.  Now, after that day, and now moving to June 1st of 2016,

Direct Examination - Hinton  (By Ms. Wilkinson)

1   did you receive information about the vehicle stop of a BMW

2   that Mr. Carter was driving in?

3   A.  Yes.

4   Q.  And how did you get that information?

5   A.  The -- Sandra Forsythe, she was the lead investigator on

6   the murder that happened in Baltimore City, she contacted

7   someone from my office, Detective Massey, who contacted me to

8   let me know what was going on, so it was kind of one person

9   called the next person, which called me.

10  Q.  And at some point, did you arrive on the scene of 8409

11  Arbor Station Way --

12  A.  I did.

13  Q.  -- out there in Pikesville?

14  A.  Yes.

15  Q.  And when you got there, were there members of the

16  Baltimore City Police Department there as well as

17  Mr. Carter?

18  A.  Yes, it was -- our patrol officer was there, as well as

19  Mr. Carter was in the back of a van, a minivan.  Baltimore

20  City Detective Sandra Forsythe was there, and I was the only

21  Baltimore County representative aside from the patrol

22  officer.

23  Q.  At some point, the patrol officer, just her name for the

24  record, what's her name?

25  A.  Tabitha Hays, I believe it is.  I'm sorry, I call her

1    Tabitha all the time, sorry.

2    Q.  But Tabitha Hays, and she was the actual patrol officer

3    that arrived, was she in uniform?

4    A.  She was in uniform in a marked Baltimore County Police

5    car.

6    Q.  And at some point, did you also see Agent Fuchs and Agent

7    Holiday?

8    A.  Yes, I contacted everyone that was a part of the case that

9    we were indicting in federal court, because we did believe

10   that they were linked.  So I contacted, again, my supervisors,

11   and then I contacted all of the detectives and the special

12   agents that were involved so that everyone knew what was going

13   on.

14       I also contacted the narcotics division, because as soon

15   as I pulled up, I mean, the smell of marijuana just kind of

16   hits you in the face, so I knew it was a large quantity just

17   from being in narcotics for as long as I was.

18   Q.  Now, I will say, with regard to the fact that the city

19   detectives are in the county and they made a seizure of

20   marijuana, is there some jurisdictional little dispute going

21   on that morning, Detective Hinton?

22   A.  I would just say that we were just trying to figure out

23   why they didn't just let us in.  We kind of let them in in the

24   beginning, so there was a little brush back and forth in the

25   beginning, but we worked it out.

Direct Examination - Hinton  (By Ms. Wilkinson)

1    Q.  So at that point -- at some point, did a state's --

2    assistant state's attorney from Baltimore County make a

3    decision not to pursue the marijuana charges against

4    Mr. Carter?

5    A.  Yes.

6    Q.  And at some point, did those marijuana charges become part

7    of the federal investigation of Mr. Carter?

8    A.  Yes.

9    Q.  And in fact, are part of the indictment that the jury's

10   being asked to consider; correct?

11   A.  Yes.

12   Q.  Now, that -- when you got there, you said Mr. Carter was

13   still there, at some point, is he transported to Baltimore

14   City for questioning?

15   A.  Yes.

16   Q.  And are you and Detective -- Detective -- Agent Holiday

17   and Agent Fuchs, what was your next project, so to speak, in

18   the investigation?

19   A.  We were still trying to figure out everything that was

20   going on.  It really did -- everything happened kind of

21   quickly because we didn't know about it.  It was kind of like

22   being thrown into it right away.  So we were trying to assist

23   Baltimore City with what they had to handle, but at the same

24   time, we were trying to figure out what we had right then,

25   which was we had a lot of narcotics and we had no city

1    detectives.

2        So we were trying to figure out what was left for us.  So

3    we had to at that point stop and assess the situation.  So we

4    kind of stopped, figured out what we had there, which was we

5    had a bag full of drugs, and we knew that we had money, so the

6    next thing that we did was start to write search warrants for

7    where the subject was seen coming out of and the vehicle that

8    was stopped there.

9    Q.  Okay.  So that would be the apartment at Arbor Station Way

10   and the black BMW?

11   A.  Yes.

12   Q.  And the Pontiac that was there, was that part of a city

13   search warrant that was executed?

14   A.  Yes.

15   Q.  Okay.  And were federal warrants obtained for the BMW and

16   the apartment later that evening of May 27th?

17   A.  Yes.

18   Q.  And did you participate in the execution of both of those

19   warrants?

20   A.  Yes, I did.

21   Q.  Now, suffice to say, was a gun ever found?

22   A.  No.

23   Q.  And when you searched the BMW, the jury has already seen

24   it, did you find a license plate tag?

25   A.  Yes, I did.

1    Q.  I know your throat is sore, please, if you need to take

2    water, feel free to do so.

3         Did you find a license plate tag?

4    A.  Yes, I did.

5    Q.  And that license plate tag, I won't pull it out again, the

6    jury has seen it, but just describe it with your own words.

7    A.  It was just a small Chesapeake Bay tag, it was by itself

8    just sitting in the back of the trunk.

9    Q.  Great.  And I'm going to ask, I forgot to -- I neglected

10   to pull some exhibits out.  I think it's in the C range.  Let

11   me just grab them real quick.  They're just the photographs.

12             MS. WILKINSON:  Court's indulgence, Your Honor.

13             THE COURT:  Sure.

14   Q.  (BY MS. WILKINSON)  Now, at some point, did you learn that

15   three phones had been with Mr. Carter when he was taken down

16   to Baltimore City?

17   A.  Yes.

18   Q.  And in addition to that, were there some electronic

19   devices that were still in the BMW?

20   A.  Yes.

21   Q.  And showing you Government's Exhibit C-23, is that a

22   photograph of those electronic devices?

23   A.  Yes.

24   Q.  And were they seized?

25        I know that's a terrible picture, I'll bring it up if you

1    need to me, but I know you've seen it when you came in today.

2    A.   Yes.

3    Q.   Now, in addition to that, in the black BMW, was a

4    photograph taken of documents that were found in the car?

5    A.   Yes.

6    Q.   Okay.  And what are we looking at here on the top two

7    documents shown on the monitor here?

8    A.   They're registration cards for Matthew Hightower.

9    Q.   And both the top one indicating a date of 6/9/14 -- I've

10   got pen on my finger -- and the one below, and is that for the

11   actual BMW?

12   A.   Yes.

13   Q.   And that's where the cards were actually found?

14   A.   Yes.

15   Q.   And in addition to that, was a photograph taken of that

16   license plate that the jury has seen here as Government's

17   Exhibit C-25?

18   A.   Yes.

19   Q.   Now, you spoke about the marijuana, and it was seized by

20   Baltimore County, eventually tested, and later destroyed;

21   correct?

22   A.   Correct.

23   Q.   Now, was money also found and seized by the county that

24   came out of the BMW?

25   A.   Yes.

1    Q.  And I'm going -- was a photograph taken of the money and

2    counted in the processes of seizing it from the BMW?

3    A.  Yes.

4    Q.  And I'm going to just put on here Government's

5    Exhibit C-27.  And is this the photograph of the money that

6    was in the BMW at the time?

7    A.  Yes, it is.

8    Q.  And how much, just for the record, I know it's notated

9    here, was found?

10   A.  $7,322.

11   Q.  The second page of that, are you familiar with that

12   document?

13   A.  Yes.

14   Q.  And what kind of document are we looking at here?

15   A.  It's just an itemized sheet to show you exactly what the

16   bills were that added up to the $7,322.

17              MS. WILKINSON:  Your Honor, may we approach one

18   second, I have to ask the Court's advice.

19              THE COURT:  Sure.

20              (Bench conference on the record.)

21              MS. WILKINSON:  Your Honor, we're about to start to

22   play some jail calls where Mr. Carter was the incarcerated

23   person, there's three of them.  We have transcripts for the

24   jury and a number of other jail calls that happen later where

25   Mr. Carter -- Mr. Hightower is the incarcerated person, but

1    there are three involving Mr. Carter.  Pursuant to the Court's

2    instructions, I believe I have redacted all references to

3    the -- before the audio, and I'm certainly going to stand on

4    top of it, if it hasn't --

5              THE COURT:  It sounds like you were probably

6    speaking into your --

7              MS. WILKINSON:  But it wasn't on.

8              THE COURT:  Very well.

9              MS. WILKINSON:  Can you hear me now?

10             THE COURT:  Let's take the husher off.

11             (The following proceedings were had in open court.)

12             THE COURT:  All right.  Yes, I don't know if there

13   was a hot mike moment, but I would just instruct you to

14   disregard anything that you may have heard being said up

15   there.

16             Put the husher back on.

17             (Bench conference on the record.)

18             MS. WILKINSON:  Anyway, Your Honor, I --

19             THE COURT:  Okay.  I guess not, they're not --

20             MS. WILKINSON:  I neglected to tell Detective

21   Hinton, in the rush of things, and I feel like I need to

22   instruct him not to mention that these are jail calls with

23   Mr. Carter, that they're just recorded conversations.  Would I

24   be able to instruct them about that and the best way to do it?

25   I know --

Direct Examination - Hinton   (By Ms. Wilkinson)

1          THE COURT:  I have no issue with you doing it, are

2    you suggesting that you whisper in his ear quickly?

3          MS. WILKINSON:  Yes, if that's all right, with the

4    Court's permission.

5          THE COURT:  I don't have an issue with it.

6          MR. ZERKIN:  That's fine, Your Honor.

7          MS. WILKINSON:  I just neglected to tell him.  I'm

8    sorry.  It's a lot of moving pieces.  So would it be all

9    right, while we're still here?

10          THE COURT:  That's fine.  Make sure the mike's

11    off.

12          MS. WILKINSON:  With the Court's permission.  Thank

13    you.

14          (Pause in the proceedings.)

15          MS. WILKINSON:  Thank you, Your Honor.

16          THE COURT:  All right.  Thank you.

17          MR. ZERKIN:  I just want the record to be clear that

18    what happened was, as the issue was being described about what

19    was in the jail call references on the phone calls, that

20    counsel accidentally had the mike on, and that therefore, that

21    was broadcast to the jury, and that is what the judge

22    instructed the jury.

23          THE COURT:  Correct.  And I'll also add, I mean,

24    unfortunately, the cat sort of slipped out of the bag on that

25    issue anyway.

1          MR. ZERKIN:  Yeah.

2          THE COURT:  So that's why I was less concerned about

3    it, even as I realized what had happened.

4          MS. WILKINSON:  Thank you.

5          (The following proceedings were had in open court.)

6    Q.  (BY MS. WILKINSON)  One more question about the documents

7    that Ms. Oldham noted that I didn't, was this document also

8    contained in the BMW?

9    A.  Yes, it was.

10   Q.  And this one has Mr. Carter's name on it?

11   A.  Yes, it's an insurance card.

12   Q.  For which car?

13   A.  For the BMW.

14         MS. WILKINSON:  Thank you, Ms. Oldham.

15   Q.  (BY MS. WILKINSON)  In the course of preparing and during

16   the investigation of Mr. Hightower, did there come a time when

17   you obtained or had recorded conversations between Mr. Carter

18   and Matthew Hightower?

19   A.  Yes.

20   Q.  And are there three for which you listened in preparation

21   for this trial?

22   A.  Yes.

23   Q.  And those three conversations, were they in the 2013 and

24   2014 time frame?

25   A.  Yes.

1    Q.  And the participants in that call were who?

2    A.  Davon Carter and Matthew Hightower.

3             MS. WILKINSON:  Your Honor, with the Court's

4    permission, we're going to play some calls that are later in

5    2016.  We prepared a transcript book for each of the jurors

6    with each of the transcripts in it, now just for ease of

7    passing out.  I'll leave, of course, for the Court to instruct

8    the jury how you wish to proceed.  We're going to start with

9    the first call.

10            THE COURT:  Sure.  So you can go ahead and pass out

11   the books.

12            Ladies and gentlemen, you've heard my previous

13   instructions regarding the use of transcripts, that they're

14   not evidence themselves.  So I wouldn't suggest you write on

15   them because you're not going to get to keep them.  It sounds

16   like you're going to be handed a number of transcripts at the

17   same time.  So I will instruct you that that's being done for

18   convenience.  I'll instruct you, you should not go flipping

19   through the book and look at other transcripts.  Only look at

20   the transcript for the call you're listening to at that

21   time.

22            MS. WILKINSON:  Ms. Lesser, do you have one for the

23   judge?  And we've given counsel theirs.  Okay.  And have we

24   given the Court his?

25            THE COURT:  Have you?

1          MS. WILKINSON:  To your right.  Thank you, Your

2     Honor.

3          THE COURT:  Thank you.

4     Q.  (BY MS. WILKINSON)  And I was also advised -- it's late in

5     the day -- by Agent Fuchs, that I had talked about search

6     warrants on May 27th, I meant June 1st, were the search

7     warrants for the BMW in the apartment on June 1st?

8     A.  Yes.

9     Q.  To be clear for the record.  Okay.

10         So playing -- before we get to the actual recording,

11    which is marked as Exhibit J-1, on the top right-hand -- do

12    you have a copy of the transcript?

13    A.  I do not.

14         MS. WILKINSON:  It would be nice if the witness

15    actually had one.  We're just going to do one call now.  We're

16    only going to make it through one call, I think.  Thank you,

17    Agent Holiday.  So --

18         THE COURT:  So just -- the transcript we should be

19    looking at is J-1A?

20         MS. WILKINSON:  J-1A that goes with J-1, so just

21    J-1A.

22    Q.  (BY MS. WILKINSON)  And at the top of the transcript,

23    there's some information there, is the call between Mr. Carter

24    and Matthew Hightower, that's recorded; is that correct?

25    A.  Yes.

1    Q.  And a phone number (443) 983-1240, is that Matthew

2    Hightower's phone number that you previously mentioned

3    before?

4    A.  Yes.

5    Q.  So that's one end of the conversation.  And the date of

6    this conversation was what?

7    A.  April 15th, 2013.

8    Q.  And now, just to put things in context, this is May, June,

9    July, August, September, five months before Mr. Wutoh was

10   murdered?

11   A.  Yes.

12   Q.  And the time of the call is about 9:20?

13   A.  Yes.

14   Q.  Now, there's obviously portions that are redacted, is this

15   a subset of that call?

16   A.  Yes.

17   Q.  Or that conversation?

18   A.  Yes.

19   Q.  Okay.  If I could, is DC meant to refer to Mr. Carter?

20   A.  Yes.

21   Q.  And MH refer to Mr. Hightower?

22   A.  Yes.

23          MS. WILKINSON:  Okay.  If I could ask Ms. Lesser to

24   play it, and I may ask you to stop it at times, but go ahead.

25          (Audio played.)

1          MS. WILKINSON:  That completes that call, which is

2    good timing, Your Honor, can I just ask two questions about

3    that before we wrap up for the day?

4          THE COURT:  Sure.

5    Q.  (BY MS. WILKINSON)  Down to the transcript on page 7 at

6    the bottom, and the person that said, "Man, keep your head

7    clear, goddamn, she seem like she going to go and tell

8    someone, get some people caught up," what voice did you hear

9    making that statement?

10   A.  Davon Carter.

11   Q.  And the references to Ashley, in the course of your

12   investigation, did you identify a woman named Ashley?

13   A.  Yes, Ashley Myles.

14   Q.  And showing you Government's Exhibit PH-4, is that Elma

15   Myles's daughter?

16   A.  Yes.

17   Q.  And the name, again, of Ms. Edmonds's son would be what?

18   A.  Tony Carter.

19          MS. WILKINSON:  That's all I have for today, Your

20   Honor.

21          THE COURT:  All right.  Ladies and gentlemen, at

22   this point we will break for the evening.  I'll ask that you

23   be back tomorrow at 9:30 a.m. and we will continue on at that

24   point.  Please remember my repeated instructions not to

25   discuss the case with anyone, including among yourselves.  If

1    there's any newspaper coverage or any other coverage of the

2    case, push it away from you so that all you learn about this

3    case you learn here in this courtroom.

4              Enjoy your evening and I'll see you tomorrow.

5              JUROR 4:  Where do you want these?

6              THE COURT:  You can just leave them on your chair as

7    you leave.

8              (Jury left the courtroom.)

9              THE COURT:  All right.  Anything to discuss before

10   we break for the evening?

11             MS. WILKINSON:  I do have one item, Your Honor, may

12   detective --

13             THE COURT:  Sir, you can be excused until tomorrow

14   morning.

15             Everyone else, you can be seated unless addressing

16   the Court.

17             MS. WILKINSON:  Thank you, Your Honor, I think I

18   told you before, I know I told you before, that Officer Hays

19   had some medical issues as a result of a shooting in the line

20   of duty earlier this year, she advices us she can come to

21   testify with the Court's permission on next Thursday, which

22   was the time we had set for Mr. Bardos's hearing.  What I

23   propose, Your Honor, if the Court is all right with that,

24   there is a very brief statement that she takes from Mr. Carter

25   that morning, that we have not litigated the voluntariness of

 1     it.

 2              She Mirandized him, and I think counsel are

 3     reserving their rights to litigate it, so we need probably 15

 4     minutes of your time to hear that testimony, and then we would

 5     try to put her on the stand immediately after that, no matter,

 6     really, where we are in the proceedings.  Just because of her

 7     medical condition, we're making special arrangements for her

 8     to come.  I don't know, she may be in a wheelchair, I'm not

 9     really sure, but she definitely needs some accommodations, and

10     I'm asking the Court for that.

11              THE COURT:  So it sounds like on Thursday, the 23rd,

12     we'll tell the jury to come in maybe 10:30 because we'll have

13     a couple legal issues to deal with.  We'll resolve those, and

14     move on with the trial.  I'm writing it on my little pad here,

15     but feel free to remind me on the 22nd.

16              MS. WILKINSON:  Thank you.  That's all I have.

17              THE COURT:  Anything else?

18              MR. ZERKIN:  Nothing from us.

19              THE COURT:  All right.  Everyone enjoy your evening.

20     I'll see you tomorrow.

21              (The proceedings were concluded.)

22              I, Christine Asif, RPR, FCRR, do hereby certify that
       the foregoing is a correct transcript from the stenographic
       record of proceedings in the above-entitled matter.

23              _____/s/_____
                Christine T. Asif, Official Court Reporter

24

25

```
 1                              INDEX

 2   Witness Name                                       Page

 3   Special Agent Mathew Wilde

 4       Direct Examination By Ms. Wilkinson.....................   3

 5       Cross-examination By Mr. Mercer.........................  12

 6       Cross-examination By Mr. Davis..........................  70

 7       Redirect Examination By Ms. Wilkinson...................  88

 8   Officer Terry Norris

 9       Direct Examination By Ms. Oldham........................  92

10   Deshawn Walters

11       Direct Examination By Ms. Oldham........................  99

12   Sheldon Grant

13       Direct Examination By Ms. Wilkinson..................... 104

14       Cross-examination By Mr. Davis.......................... 128

15       Cross-examination By Mr. Trainor........................ 131

16       Redirect Examination By Ms. Wilkinson................... 133

17   Luiz Geovini Vier

18       Direct Examination By Ms. Oldham........................ 138

19       Cross-examination By Mr. Davis.......................... 148

20   Andre Farrell

21       Direct Examination By Ms. Wilkinson..................... 150

22       Cross-examination By Mr. Davis.......................... 170

23       Redirect Examination By Ms. Wilkinson................... 173

24   Detective Sekou Hinton

25       Direct Examination By Ms. Wilkinson..................... 177
```

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

< Dates >.
12/29/2015 13:5.
13, May 7th 57:18.
253 may 14:17.
3/14/2016 119:2.
4/21/2016 73:16.
4/21/2016. 75:3.
4/27/2016 25:23.
5/25/16 5:25.
5/25/2016 82:18.
5/27/2016 79:5.
5/5/2016 41:4.
6/5/2016 57:14.
6/9/14 207:10.
7/5/2016 57:16.
9:50, May 26th
   157:3.
April 15th, 2013
   214:8.
April 22nd, 2006
   123:2.
April 26 123:2.
April 26th, 2016
   200:10.
April 6th 25:10.
December 4th, 2013
   188:21, 189:9,
   189:13.
February 15th 17:21,
   18:10, 18:16.
February 16th
   18:11.
February 23rd 20:9,
   20:11, 21:11.
February 23rd, 2016
   199:22.
February 24th
   21:13.
January 15th, 2020
   1:19.
June 1 14:1.
June 1st 30:18,
   66:8, 68:8,
   125:19, 126:14,
   126:17, 126:20,
   126:23, 130:11,
   133:22, 134:1,
   134:4, 134:9,
   134:20, 135:4,
   135:7, 135:24,

136:2, 136:4,
   136:14, 202:1,
   213:7, 213:8.
June 4, 2016
   84:19.
June 4th 127:7.
March 1st 200:15.
March 1st, 2016
   200:17.
March 5th, 2016
   6:4.
May 1 14:3, 14:4.
May 14th 42:24.
May 15th, may 17th,
   may 24th 76:16.
May 16th 92:20.
May 16th, 2016
   92:23, 98:4.
May 16th, 2016,
   10:36 98:11.
May 1st 14:20, 15:8,
   42:24, 66:8.
May 2016 13:9.
May 22nd 75:18.
May 25th 5:10, 5:12,
   36:1, 36:25, 37:7,
   63:7, 63:10,
   76:17, 82:14.
May 25th, 2016
   35:13, 84:5.
May 26th 157:7.
May 27th 3:14, 6:16,
   37:3, 37:8, 38:19,
   43:19, 54:21,
   65:10, 69:16,
   75:19, 76:13,
   80:20, 149:7,
   158:6, 160:24,
   167:9, 169:16,
   205:17, 213:7.
May 27th, 2016 3:12,
   145:24, 170:25,
   200:23.
May 27th, 2016,
   11:37:34 143:3.
May 27th, 2016,
   11:39 147:17.
May 28th, may 29th,
   may 31st 38:6.
May 29th, 2016

146:5.
May 2nd 26:11,
   26:13, 27:5,
   27:21, 29:10,
   31:7, 76:13.
May 2nd, 2016 33:20,
   122:3.
May 31st 68:6,
   134:2, 134:12,
   134:16.
May 3rd 41:16,
   42:12.
May 3rd, 4th
   45:22.
May 4th 40:2, 40:17,
   105:4, 119:9,
   119:19, 123:6,
   123:20, 130:3.
May 4th, 2016 13:5,
   105:9, 106:5.
May 5th 59:11.
May 5th, may 7th,
   may 76:16.
May 6th 45:2, 57:18,
   58:16, 59:14,
   59:15, 59:22,
   60:7, 62:11.
May 7th 122:8.
May 8th 60:21,
   122:8, 122:10,
   122:22.
May 9th 54:9,
   60:14.
May, june, july,
   august, september,
   five 214:9.
September 22nd
   179:9, 186:25.
$10,000 190:2.
$113 144:4, 145:1.
$15,000 107:22,
   116:1, 123:18.
$20,000 190:2.
$200 145:9.
$3,000 107:17.
$7,322 208:11,
   208:17.
.
.
.
< 0 >.

02. 40:20.
03591CG 94:5.
05 41:17.
06 41:5.
.
.
< 1 >.
1,000 13:2, 13:16,
  13:20, 66:17,
  66:20, 70:20.
10 24:25.
100 35:18, 36:21,
  42:11, 57:19,
  87:20.
101 1:48.
1012 66:6.
104 35:14, 35:23.
10:00 80:13, 82:2,
  163:17.
10:02 31:12,
  33:21.
10:04 6:25.
10:06 65:5, 65:6.
10:10 31:12.
10:11. 23:4.
10:19 80:15, 81:14,
  82:8.
10:26 82:9.
10:30 29:10, 29:11,
  29:19, 29:23,
  30:7, 92:23,
  217:13.
10:31 30:1, 31:7,
  31:12, 32:19.
10:32 60:8, 62:12,
  62:13.
10:36 93:6.
10A 25:8.
10th 76:22, 76:23.
11 25:22.
11/05 57:21.
117. 119:1.
11:00 149:3.
11:09 27:5, 27:16.
11:15 20:14, 20:15,
  22:2.
11:15. 20:18.
11:20 52:6.
11:20. 52:10.
11:37 149:4.

11:37:34 147:16.
11:39 149:7.
11:49 82:10,
  82:11.
11A 26:4, 26:9.
11th 35:4, 76:16.
12-page 188:12.
12-second 11:23.
12. 26:12.
12/05 57:21.
122 71:3, 71:4.
1222 25:20.
1240 181:9, 184:9,
  184:23, 185:5,
  186:8.
1285 57:10, 58:4,
  58:10.
1286 58:21.
1287 57:18.
1291 58:24.
1293 59:5.
1297 59:11.
12A 27:1.
12th 16:14.
13 31:16, 57:18.
1304 59:21, 59:23.
1304. 59:24.
1338 62:10.
1339 62:7.
1343 60:11.
14 6:9, 32:18.
14. 6:10, 34:23.
1427 60:14.
148 13:10.
1480 57:21.
1494 57:21.
15 33:5, 33:14,
  51:23, 52:17,
  175:21, 217:4.
15,000 131:14.
15,000. 115:24.
15- 107:20.
15-minute 51:23.
15/5 57:24.
15/5. 57:23.
1533 7:5, 8:11,
  8:20, 9:3, 9:10,
  9:24, 11:3, 11:10,
  11:11, 14:1,
  14:19, 15:2, 15:4,

15:7, 29:20,
  29:22, 62:21,
  63:4, 64:3, 64:6,
  64:10, 64:11,
  64:13, 67:7,
  67:10, 67:17,
  90:2, 90:20.
1553 9:3.
1563 57:22.
15:28 35:13.
16 21:2, 92:11,
  177:21.
16. 35:12.
161 67:17.
16:03. 36:9.
16:15 22:2.
16:23 17:23, 19:1.
16:30 189:9,
  189:13.
16:32 23:15.
16:37 41:4.
16th 17:22, 17:23,
  18:24, 19:1.
17 36:6, 36:10.
17:09 19:12.
17:22 73:22.
17:55 27:12.
18 36:7, 37:6, 37:7,
  54:12.
18:53 21:8.
19 40:1.
1999. 177:12.
19A 40:11.
19B 41:3.
19C 41:15.
1:00 60:16,
  111:19.
1:14 7:15.
1:55 27:13, 27:14,
  27:18.
1st 124:2, 134:10,
  134:11.
.
.
< 2 >.
2 31:23, 32:7,
  33:15, 35:1,
  80:23.
20 53:7, 56:13,
  57:10, 62:6, 71:9,

71:18, 71:24,
85:21, 86:7,
178:15.
20- 195:2.
2001 117:8.
2008 94:5, 177:17.
2013 177:24, 179:9,
187:1, 189:1,
190:10, 192:12,
211:24.
2013. 191:1.
2014 70:22, 192:13,
194:16, 211:25.
2015 106:9, 194:20,
194:24, 196:1.
2016 14:2, 14:3,
56:22, 70:23,
88:22, 92:20,
101:7, 102:2,
105:4, 107:15,
116:14, 117:21,
118:20, 119:8,
123:10, 123:12,
132:6, 152:8,
152:24, 153:2,
155:15, 195:3,
197:16, 197:24,
199:4, 202:1.
2016. 14:4, 16:14,
101:10, 101:24,
152:15, 212:6.
2017 168:9.
2027 4:3, 32:11,
32:12, 32:21,
33:6, 33:23,
34:15, 34:24,
118:16, 119:2,
119:3.
20th 76:22, 76:23.
21 62:25, 63:2,
63:12, 63:16,
63:18, 177:10,
177:11.
21201 1:49.
21:32:14 25:11.
21st 37:11.
22 65:20, 65:24,
66:5.
22-second 11:24.
22:02 32:19,

33:20.
22:10 32:19.
22:31. 32:19.
22nd 217:16.
23 67:15.
23. 67:9, 89:24.
2341 25:11, 25:20,
25:22.
239- 63:16.
2399 4:13, 4:22,
8:21, 9:3, 9:9,
29:4, 29:14, 34:4,
63:18, 63:23,
64:3, 64:7, 64:11,
64:18, 75:25,
76:15, 77:2,
78:20, 79:2,
80:12, 80:25,
81:3, 81:23,
125:22.
2399. 63:13.
23rd 37:12,
217:12.
24 9:5.
2513 29:15.
253 13:6, 13:24,
14:13.
25th 36:3, 36:9,
37:11.
26 156:16.
264. 33:18.
2650 29:20, 29:22,
39:4, 63:3, 63:9,
65:19.
26th 6:25, 63:25,
64:1, 64:17,
65:1.
27. 10:24.
27th 7:15, 37:21,
37:23, 37:24,
39:5, 41:21, 70:5,
146:12, 146:13,
169:17.
28 78:23.
29 80:11, 81:12,
82:5.
29. 85:15.
2919 65:11.
29th 37:11.
2:00 112:2, 112:7.

2:11 119:2.
2:43 36:10.
.
.
< 3 >.
3,000 107:17.
30 85:24, 86:7.
30,000 13:19.
30th 76:22, 76:24,
123:10, 123:12,
123:21, 123:24,
124:1, 174:20.
31 29:3.
31st 37:11.
368-5670 73:4.
38 99:24.
3:28 35:13, 36:12.
3:40 175:18.
3:57 41:5.
.
.
< 4 >.
4/6 25:4.
4/7 25:4.
40 104:4.
41 150:23.
4173 184:12, 184:17,
184:25, 185:24,
186:13, 186:15.
4173. 184:11.
43 135:22.
44 135:23.
443 3:24, 73:4,
214:2.
45 135:23.
48 26:23.
4: 216:6.
4:03 36:13.
4:13 20:21.
4:23 19:2.
4:27 19:5.
4th 1:48, 40:12.
.
.
< 5 >.
5 75:25, 107:21.
5/26 7:13.
5/27 68:3.
50 71:8.
51 54:11.

513 7:20, 8:8.
514 7:20, 8:8,
  8:10.
5150 4:3, 4:7, 6:2,
  30:13, 30:19,
  31:1, 31:6, 31:7,
  31:18, 32:9,
  33:23, 34:14,
  34:15, 35:14,
  36:20, 118:5,
  118:13, 118:24,
  119:3, 119:8,
  119:11, 120:9,
  120:25, 121:11,
  132:2, 132:4,
  134:2.
5151 35:9, 35:14,
  36:4, 36:11,
  36:19, 36:23,
  37:3, 37:20,
  120:6, 120:9,
  120:24, 121:10,
  132:2, 132:8.
516 118:19.
521 11:14.
522. 11:14.
5540 181:5, 184:9,
  184:11.
5:09 19:12.
5:10 20:21.
5:32 25:19.
5th 45:22.
.
.
< 6 >.
6448 29:15.
67 72:13.
68. 73:15.
6:00 70:5.
6:03 79:5, 80:21,
  80:25.
6:04 10:2.
6:05 6:11, 9:20,
  10:2, 10:3.
6:11 79:5.
6:13 11:6, 85:22,
  90:3.
6:15 11:6, 85:24,
  86:10, 90:3.
6:16 90:15, 90:21.

6:19 79:6.
.
.
< 7 >.
7 8:9, 18:15, 76:15,
  195:15, 215:6.
7. 78:21.
73811 67:20.
75 6:21.
7500 56:19, 56:24.
761-5150 3:24.
7626 4:25, 5:7,
  5:13, 5:25, 6:8,
  6:9, 8:11, 9:19,
  9:23, 9:24, 10:7,
  10:10, 10:19,
  11:3, 11:4, 62:21,
  63:3, 63:5, 63:6,
  63:9, 64:17, 65:3,
  82:14, 83:7,
  83:15, 83:21,
  84:4, 85:2,
  90:1.
7626. 83:19.
79 6:25.
7:20 68:3.
7:25 3:18.
7:33 68:8.
7:48 68:6.
7A 19:16.
7B 20:9, 20:13.
7C 21:23.
.
.
< 8 >.
8 22:14, 123:1,
  188:19.
8. 22:25.
805 24:14.
80s 151:6.
8260 64:6.
83 82:10.
8409 136:14,
  202:11.
8:12 98:4, 98:7.
8:22 58:14.
8:24 58:25, 59:5.
8:25 59:11.
8:26 86:10.
8:27 59:22.

8:44 29:11.
8A 23:12.
8th 60:20, 87:10,
  87:13, 87:18.
.
.
< 9 >.
9 23:23.
911 196:16, 196:19,
  196:25, 197:1.
921 24:13.
923- 56:16.
9232 56:16.
924. 24:14.
95 36:6.
983-1240 214:2.
9896 4:19, 116:16.
9:08 60:15, 60:20,
  60:21.
9:12 64:12, 64:13,
  64:14.
9:13 6:17.
9:14 7:25.
9:15 81:24.
9:20 214:13.
9:24 8:25.
9:24:45 8:24.
9:25 81:1, 81:9,
  81:24.
9:29 84:19.
9:30 176:4, 176:5,
  215:24.
9:32 62:11.
9:50 157:3.
9:54 82:18.
9:55 23:2.
9:56 162:12.
9:59 163:8.
9A 24:10.
_____/s/_____
  _____ 217:26.
.
.
< A >.
A-n-d-r-e 150:7.
a. 136:15.
a.m. 6:11, 7:15,
  9:20, 10:2, 10:3,
  22:2, 58:25,
  59:11, 60:15,

68:3, 68:6, 68:8,
80:15, 80:21,
80:25, 81:1,
82:18, 85:22,
90:3, 90:15,
90:21, 92:23,
93:6, 98:4, 98:11,
162:12, 163:8,
163:17, 215:24.
Aaron 155:8, 155:11,
158:22, 159:2,
164:9, 164:23,
165:3, 171:19.
abbreviated
117:15.
Aberdeen 36:11.
Abingdon 29:8,
34:8.
able 9:6, 11:4,
16:24, 45:1,
55:14, 61:19,
83:11, 93:21,
126:22, 141:24,
142:5, 144:5,
178:7, 180:10,
180:21, 181:3,
183:8, 184:9,
184:21, 185:1,
185:6, 185:25,
186:8, 190:17,
209:25.
above 5:13, 6:14,
62:9, 123:9.
above-entitled
217:25.
absence 48:14.
Absolutely 35:22,
66:4, 74:25,
90:24, 91:2,
139:18, 139:22,
147:21.
abundance 43:10.
academy 177:12.
Accept 142:16.
accepted 140:13,
141:22, 142:1,
142:4, 142:13,
142:14, 147:10,
147:11, 149:6.
accidentally

210:21.
accommodations
217:10.
accompanied 198:10,
198:12.
accomplish 51:8,
54:15, 54:16.
according 179:3.
account 11:12.
accounts 136:18.
acquired 64:17.
across 141:3.
act 60:12.
action 93:6.
activate 94:19.
activated 30:23,
36:20, 37:20,
63:6, 82:14, 83:8,
83:16, 84:5.
activation 36:19,
38:7, 72:1, 79:5,
80:14, 88:6.
activations 36:22,
36:23, 37:22,
66:6, 66:17,
66:19, 66:20,
67:3, 67:6, 67:18,
67:25, 68:3, 68:6,
68:13, 68:15,
79:5.
activity 22:8, 37:7,
37:8, 56:24.
actual 7:11, 8:3,
47:1, 61:14, 72:6,
97:4, 97:13,
179:13, 203:3,
207:12, 213:11.
add 210:24.
added 208:17.
addition 32:22,
76:13, 109:15,
191:16, 206:19,
207:4, 207:16.
additional 6:15,
10:4, 35:10,
71:16, 71:17,
73:20, 127:4,
156:16.
additionally
55:12.

address 28:25, 30:2,
30:5, 33:11,
34:16, 35:17,
35:19, 35:21,
52:19, 68:19,
69:1, 69:10,
78:24, 79:12,
79:14, 126:7,
126:11, 136:16,
136:21, 146:19,
146:21, 146:25,
147:1, 190:21.
address. 126:3.
addressing 52:25,
216:16.
admission 54:13.
admit 50:17,
59:19.
advance 146:5,
146:13.
advertise 144:16.
advice 208:19.
advices 216:21.
advised 155:21,
189:17, 190:6,
190:15, 191:1,
191:6, 191:10,
191:25, 213:5.
affect 106:12.
afternoon 19:2,
27:25, 91:16,
92:7, 92:8, 99:4,
99:21, 99:22,
103:14, 104:3,
112:13, 112:14,
137:16, 138:5,
138:6, 138:7,
148:18, 148:19,
149:21, 175:17,
176:13, 176:16.
afterwards 172:18.
age 177:21.
agencies 195:7.
agency 138:18,
182:19.
agents 201:12,
203:13.
ago 83:21, 140:3,
155:21, 156:9,
158:1, 158:23.

agree 162:20.
ahead 124:12,
  144:25, 146:8,
  151:21, 184:15,
  197:17, 212:11,
  214:25.
Aight. 127:12.
ain't 101:11,
  127:14.
allow 61:11, 62:3.
allowed 69:7.
allowing 55:12,
  56:1.
almost 37:15.
already 100:8,
  148:4, 169:22,
  170:4, 175:23,
  205:24.
alter 51:5.
Although 79:11,
  182:22.
AMERICA 1:5.
among 112:3,
  216:1.
amount 107:11.
analysis 26:5,
  27:21, 28:13,
  39:21, 66:24,
  68:21, 69:6,
  77:6.
analyst 165:11.
analyze 26:4.
analyzed 28:6, 29:7,
  30:12.
Anderson 185:20,
  185:25, 186:16,
  186:17, 186:18,
  200:4, 200:7.
Andre 68:22, 137:5,
  137:7, 149:20,
  149:25, 150:7,
  151:23.
angry 190:14,
  192:4.
Answer 39:13, 46:15,
  46:19, 64:22,
  87:21, 115:3,
  115:4, 120:18,
  130:18, 152:19,
  153:24, 155:25,

167:1, 167:22,
  168:19, 171:8,
  173:11, 174:12,
  174:24.
Answered 43:17,
  80:5, 135:13,
  135:15.
answering 39:11,
  41:11, 41:20,
  43:22, 45:10,
  45:19, 46:1,
  54:20, 127:17,
  160:12.
answers 72:2.
anxiety 44:7, 45:5,
  45:13, 45:23,
  48:5, 49:12, 53:9,
  53:19, 53:23,
  55:4, 59:6.
anybody 18:12,
  33:25, 53:3,
  122:14, 164:15,
  164:17, 167:12,
  167:14.
Anyway 116:3,
  209:19, 211:1.
Apartment 106:19,
  109:12, 109:13,
  110:17, 205:10,
  205:17, 213:8.
apologize 2:12,
  85:12.
app 141:15.
apparently 85:11,
  134:22.
appear 4:12, 37:8,
  74:10, 97:14,
  198:5.
appeared 22:18.
appears 74:12,
  80:12, 85:15,
  85:21, 172:8.
applications
  143:8.
applies 129:11.
appreciate 2:6,
  46:5, 49:4.
approach 43:5,
  43:11, 49:8, 61:3,
  96:17, 111:15,

208:18.
approached 95:10.
appropriate 55:15.
Approximately 66:6,
  93:6, 100:25,
  102:11, 115:24,
  177:10, 177:14,
  177:18, 189:9,
  189:13.
April 30:25,
  195:2.
Arbor 70:7, 78:24,
  79:12, 79:13,
  79:15, 79:17,
  80:1, 80:12,
  80:14, 81:4, 81:8,
  81:10, 81:15,
  82:9, 202:12,
  205:10.
archive 140:2.
ARD. 98:8.
areas 3:9, 86:13,
  86:17.
argumentative 46:6,
  64:21.
arises 61:14.
Around 29:10, 30:7,
  36:11, 52:6, 70:2,
  88:23, 89:3,
  90:21, 92:23,
  93:18, 106:17,
  115:8, 115:24,
  115:25, 153:24,
  154:2, 177:12,
  177:17, 178:15,
  193:4.
arrangements 173:8,
  217:8.
arrest 198:5.
arrested 30:19,
  130:11, 135:4,
  198:23, 198:24.
arrive 3:16,
  202:11.
arrived 113:23,
  113:25, 171:2,
  203:4.
arriving 146:10,
  171:2, 180:4.
artful 124:3.

artist 117:5.
artists 116:23.
Ashburne 8:6,
   10:6.
Ashley 215:12,
   215:13, 215:14.
aside 61:9,
   202:22.
Asif 1:46, 2:13,
   217:23, 217:27.
asleep 165:25.
assess 205:4.
assigned 141:9,
   177:1, 177:18,
   179:12.
assignment 92:12,
   92:20.
assist 124:25,
   204:23.
assistant 204:3.
associate 85:6.
associated 27:24,
   28:14, 29:5,
   29:15, 30:15,
   70:22, 76:1,
   76:24, 79:1,
   79:19, 97:8,
   97:13, 185:3,
   185:7.
assume 51:16, 71:23,
   90:19, 132:20,
   133:2.
assumed 181:10.
Assumes 69:23.
assure 120:20.
AT&T 5:18, 7:11,
   7:22, 29:22, 41:7,
   67:10, 71:21,
   78:13.
ate 160:14.
attach 143:11.
attached 96:3,
   96:10, 96:12,
   97:20, 97:25.
attempted 177:22,
   193:14.
attention 80:11,
   80:18, 82:13,
   84:10, 85:14,
   85:18, 92:22,

98:2, 98:4, 98:9,
   101:6, 118:1,
   151:11, 152:7,
   152:24, 156:24,
   162:5, 171:6,
   171:12, 177:23,
   179:8, 184:6,
   193:19.
attorney 20:7, 23:8,
   24:12, 25:18,
   204:3.
attributed 4:3,
   4:25, 6:5.
Attribution
   124:19.
Audi 94:5, 95:7,
   98:12, 110:2,
   110:5, 114:4,
   170:10.
Audio 209:4,
   215:1.
Audis 110:5.
August 70:22,
   190:11.
AUSA 1:25, 1:27.
authenticated
   47:19.
authenticity 48:20,
   48:23.
authorities 198:2.
available 47:9,
   142:16.
Avenue 35:16, 35:19,
   35:21, 35:22,
   35:25, 36:13,
   65:11, 65:14,
   66:3, 67:21,
   68:16, 69:22,
   75:14, 75:15,
   75:20, 76:8,
   76:12, 76:13,
   77:3, 88:18,
   88:23, 89:4,
   89:18, 90:21,
   90:22.
avoid 61:20.
avoiding 61:15.
aware 42:25, 47:17,
   97:24, 189:17.
away 59:18, 80:14,

81:15, 87:12,
   87:19, 196:22,
   204:23, 216:3.
awkward 118:10,
   189:4, 189:5.
awkwardly 118:2.
.
.
< B >.
B. 1:39.
baby 60:9, 60:12,
   62:7, 104:20,
   131:5.
background 178:5.
backup 57:3.
backwards 8:10.
bag 159:13, 205:6,
   210:25.
balance 61:22.
barely 180:18.
barrel 93:14.
based 7:2, 46:21,
   46:23, 51:11,
   73:13, 79:21,
   79:24, 89:12,
   93:9, 133:20,
   143:13, 174:6,
   185:14, 187:15,
   192:18.
Basically 41:8,
   58:20, 71:22,
   81:16, 87:6, 88:7,
   115:8, 126:7,
   127:18, 131:8,
   140:16, 142:12,
   143:9, 144:19.
basis 115:11.
Bates 188:13.
Bay 206:8.
Beach 68:23, 82:12,
   153:16, 154:9,
   154:10, 156:17,
   156:20, 157:8,
   158:2, 158:4,
   158:6, 161:13,
   166:3, 166:6,
   166:20, 167:1,
   169:3, 169:4,
   172:16.
Bear 78:18, 80:16,

83:18, 88:10.
bearings 57:9.
became 190:13.
become 179:12,
    183:16, 186:18,
    204:7.
bed 192:1, 192:2,
    192:3, 192:5,
    192:6.
began 182:1,
    189:22.
begin 162:12,
    195:16.
beginning 80:21,
    82:18, 90:14,
    118:25, 179:25,
    180:3, 181:12,
    182:20, 192:12,
    195:9, 197:16,
    203:25, 204:1.
begins 72:1, 81:13,
    81:15.
behaviors 54:13,
    55:18.
believed 193:3.
Belinda 74:2, 74:4,
    74:9, 190:20,
    190:23, 193:16,
    194:7.
belonging 125:22,
    186:15.
below 6:2, 6:24,
    8:23, 17:12,
    20:19, 21:4,
    26:17, 73:20,
    74:8, 74:9, 126:8,
    126:16, 127:10,
    127:15, 163:8,
    164:4, 164:9,
    165:6, 171:18,
    182:13, 207:11.
Bench 43:7, 53:23,
    61:5, 208:21,
    209:18.
Besides 121:21,
    153:12.
Best 104:22, 106:6,
    121:3, 122:19,
    145:9, 148:3,
    197:1, 209:25.

Better 15:11, 61:1,
    87:16, 87:18.
Beyond 90:25.
bidding 140:11.
big 5:18, 20:6.
bike 153:16, 153:24,
    154:6, 154:7,
    154:9, 154:10,
    154:13, 154:15,
    154:24, 155:15,
    158:10, 170:25,
    172:15.
bikes 154:5, 154:19,
    154:21.
Billing 146:25,
    183:25.
bills 208:17.
bipolar 50:4.
bit 2:4, 7:19,
    26:10, 77:3,
    86:19.
black 29:22, 34:1,
    205:11, 207:4.
blamed 190:7.
blank 57:22.
block 175:24.
blocks 87:12,
    87:19.
blue 100:20.
blur 178:11.
blurry 126:1.
BMW 202:2, 205:11,
    205:16, 205:24,
    206:20, 207:4,
    207:12, 207:25,
    208:3, 208:7,
    211:9, 211:14,
    213:8.
bodily 191:7.
bogged 47:18.
boiled 52:20.
book 23:24, 139:6,
    141:5, 142:5,
    143:6, 143:15,
    144:11, 145:11,
    145:16, 212:6,
    212:20.
booked 141:14,
    145:19, 148:10,
    149:2, 149:4.

bookends 199:3.
booking 138:14,
    138:23, 138:25,
    139:3, 139:17,
    140:2, 146:23,
    148:24, 161:24.
books 212:12.
Boost 5:20.
borrow 65:8, 168:2,
    168:15, 168:21,
    168:24.
borrowed 168:5,
    190:2.
bother 172:25.
bottom 8:12, 25:21,
    37:10, 84:18,
    88:4, 111:14,
    111:16, 143:10,
    171:12, 188:13,
    215:7.
bought 60:25,
    120:14, 131:25.
bounce 147:19.
bounced 86:24.
box 79:4, 106:9,
    106:12.
boy 110:20.
boyfriend 49:13,
    55:21.
break 51:23, 52:4,
    52:13, 57:7,
    111:20, 111:25,
    112:1, 175:17,
    215:23, 216:11.
Breakfast 160:3,
    160:4.
brief 70:10, 137:10,
    201:20, 216:25.
briefly 92:17,
    127:25, 177:8,
    195:5.
bring 61:3, 89:24,
    108:16, 189:3,
    207:1.
bringing 200:23.
Bro 120:6, 124:17,
    169:21.
broadcast 210:22.
broadly 47:11.
broke 112:20.

brother 104:20,
124:21, 124:23,
124:25, 125:3,
126:17, 193:25,
194:2, 200:12,
200:13.
brother-in-law
200:11.
brought 198:10.
browser 141:15,
143:21.
browsing 119:20.
brush 203:25.
building 87:10,
87:11, 87:13,
87:15, 87:19,
88:1, 184:20.
bunch 145:4.
burn 191:3, 191:4.
Business 105:11,
105:12, 105:15,
105:17, 108:1,
109:3, 109:8,
115:19, 125:1,
125:14, 182:18,
190:3, 190:4,
190:7, 190:9.
busy 8:16.
button 143:7,
145:16.
buy 109:22,
138:19.
buying 105:17,
109:15, 132:10.
.
.
< C >.
C-14 93:20, 93:22,
96:5.
C-15 96:20.
C-23 206:22.
C-25 207:18.
C-27 208:6.
calculates 77:23.
calculation 77:11.
California 117:12,
117:13, 133:8,
133:9.
caller 8:14.
calling 11:3, 23:8,

39:8, 39:22,
45:12, 54:16,
114:19, 135:6,
196:16, 197:2.
camera 17:4, 65:21,
67:9.
Candace 185:20,
185:25, 186:10,
200:7.
cannibalize
144:16.
capped 60:23.
Captain 162:25,
163:5, 163:22,
165:16, 165:19,
165:23, 165:25,
170:23, 170:24,
173:3.
caption 140:9.
captured 15:5,
15:9.
car 90:20, 95:5,
95:12, 97:17,
109:22, 114:2,
114:9, 114:10,
114:12, 139:4,
159:19, 159:21,
164:22, 165:3,
167:18, 167:24,
191:18, 196:3,
196:4, 196:11,
196:15, 197:7,
203:6, 207:5,
211:13.
card 142:1, 142:20,
146:25, 163:23,
170:22, 171:13,
180:18, 186:5,
211:12.
cards 207:9,
207:14.
care 183:16, 187:4,
192:18, 194:17,
194:21, 195:10.
careful 28:11.
carefully 130:25.
Carolina 3:17.
carrier 14:10, 16:1,
72:7.
carriers 5:18, 5:19,

71:19.
carry 130:13,
130:24, 132:19.
cars 109:19, 109:20,
109:21, 109:24,
138:19, 196:7.
case 17:6, 18:13,
52:12, 55:8,
61:18, 73:14,
74:7, 74:14,
74:19, 74:21,
91:9, 112:3,
142:3, 142:4,
142:13, 142:14,
143:23, 175:14,
179:6, 179:12,
186:19, 193:4,
195:12, 195:20,
201:12, 203:9,
216:1, 216:3,
216:4.
caseload 179:1.
cases 142:22, 178:6,
178:15, 178:17.
Cash 106:4, 107:24,
113:3, 113:8,
113:12, 123:17,
123:21, 124:11,
125:15, 130:10.
casings 180:8,
180:14, 181:22.
cat 210:25.
catch 169:21,
170:3.
caught 215:9.
caution 43:10.
Cellebrite 4:13,
4:21, 6:8, 6:9,
10:6, 10:7, 42:14,
42:16, 42:19,
44:15, 46:14,
78:14, 83:19.
Cellular 5:19,
116:14.
center 81:16.
centuries 101:2.
certain 31:11, 46:6,
48:15, 50:25,
94:19, 132:23,
148:20.

certainly 36:25,
44:24, 46:7,
46:14, 51:2,
55:15, 61:21,
66:2, 66:19,
67:20, 209:4.
certification 5:2,
10:21.
certify 217:23.
cetera 141:7.
CFB 8:15.
chair 216:7.
chance 40:18, 44:22,
133:25.
change 38:4.
changed 56:22.
characterization
145:2.
charge 114:20,
115:7, 115:9,
122:20, 195:11.
charges 194:25,
195:13, 204:4,
204:7.
charging 142:20.
chart 25:25, 47:6,
47:9, 76:14,
77:16.
charts 78:3.
chat 52:5.
check 3:13, 77:24,
196:11.
check-in 145:24,
146:12.
checked 36:19,
36:22, 174:9.
Checking 123:2,
123:6, 127:22,
164:4.
Checkout 143:6,
146:5, 174:7,
174:8, 174:21.
checks 95:18.
cheese 181:10,
181:11.
chefs 17:5.
Chesapeake 206:8.
choose 144:17,
144:18, 145:8,
145:10.

Christine 1:46,
217:23, 217:27.
Christopher 1:33.
Chrome 141:16.
chronological
118:23.
circle 8:8, 17:10,
20:13, 22:15,
76:5.
circumstances 84:13,
110:14.
circumstantial
79:24.
citation 96:1, 96:6,
97:6, 97:20,
98:14.
citations 95:24,
96:7, 96:8.
City 104:6, 150:24,
151:8, 178:24,
179:2, 179:4,
189:14, 196:14,
201:18, 202:7,
202:17, 202:21,
203:19, 204:15,
204:24, 205:1,
205:13, 206:17.
clarification 13:25,
162:7.
clean 2:8, 132:11.
clear 18:15, 38:25,
44:18, 48:22,
111:15, 111:17,
113:10, 159:21,
210:18, 213:10,
215:8.
clearest 77:11,
87:25.
CLERK 91:16, 91:22,
92:2, 92:4, 99:4,
99:10, 99:14,
99:16, 99:18,
101:19, 103:14,
103:20, 103:25,
104:15, 137:16,
137:22, 137:25,
138:2, 149:21,
149:24, 150:4,
150:9, 176:16,
176:22.

click 143:6.
clicks 143:15.
Cliff 6:11, 13:6,
13:10, 17:12,
45:25, 54:11,
54:12, 58:12,
58:18, 59:1, 59:6,
60:3, 60:9, 60:11,
60:23, 62:16,
62:21, 64:3, 64:9,
64:16, 64:18,
69:18, 83:4, 83:6,
84:2, 84:18,
85:20, 98:5,
98:7.
Cliff. 58:16.
Clifton 1:10,
1:35.
clock 72:1, 94:19,
143:9, 143:10.
close 3:10, 37:7,
184:13, 186:7.
closer 36:12, 87:17,
119:5, 150:19.
closest 26:6, 35:24,
87:3, 87:24,
88:18, 90:6.
clothes 159:13.
coast 32:8.
cocaine 182:24.
code 8:13, 12:1,
32:2, 32:3, 33:18,
141:12, 143:8.
codes 11:25.
coincide 121:7.
coincidence
201:15.
colleagues 193:17.
collect 116:10,
116:12, 132:16.
collected 194:17.
color 110:6.
comes 41:9, 56:23,
68:25.
comfortable
162:18.
coming 36:4, 38:4,
45:7, 51:3, 51:21,
53:25, 59:12,
70:4, 75:11, 84:4,

104:5, 108:16,
113:3, 134:12,
135:7, 135:24,
136:5, 136:6,
136:8, 161:19,
161:21, 166:18,
175:11, 186:9,
205:8.
comment 85:5.
comments 46:24.
communicate 64:16,
108:15, 108:17,
108:20, 108:25,
120:3.
communicated
109:7.
communicating
127:19.
communication 7:13,
8:19, 9:19, 64:10,
98:4, 98:7,
114:22, 119:3,
119:4, 122:3,
122:7, 132:11,
157:12.
communications 4:2,
7:1, 75:17, 86:10,
105:4, 105:8,
117:23, 118:13,
118:24, 119:9,
119:10, 119:18,
122:23, 123:10,
124:14, 124:16,
156:16, 161:16,
162:11, 184:5,
198:2, 200:24.
Community 177:13.
companies 5:19.
company 5:15,
116:19, 116:22,
116:24, 117:3,
117:7, 117:9,
140:11, 142:19,
182:11, 189:24.
compiled 140:7.
compiling 188:2.
complainant
187:11.
complaining 2:14.
complaint 187:8,

187:11, 196:2.
complaints 92:18,
197:10.
complete 57:5.
completed 91:9,
98:23, 149:16,
175:9.
completely 64:21,
78:14, 198:20,
198:22, 198:25.
completes 215:2.
complex 110:17.
Complying. 17:11.
computer 78:8,
94:12, 143:8.
conceded 47:16.
conceding 48:23.
concern 61:21,
169:2.
concerned 196:13,
201:6, 211:3.
conclude 79:25,
80:6, 81:8,
85:1.
concluded 137:2.
concluded. 217:22.
conclusion 27:23.
conclusions 89:2.
condition 48:16,
217:8.
conditions 142:9.
conduct 93:18,
94:20, 193:9,
193:11, 193:13.
conducted 94:3,
98:13.
conducting 93:9.
conference 43:7,
61:5, 208:21,
209:18.
confirm 24:9,
161:1.
confirmation 148:1,
148:5.
confirmed 47:15,
142:10, 145:12,
161:10, 197:12.
confiscate 192:6.
confront 190:21.
confused 9:1, 71:11,

129:14, 161:5,
170:9.
connect 87:14,
88:2.
connected 71:20,
71:21, 71:23,
77:12, 199:10,
200:21.
Connecticut 138:8,
138:9.
connecting 32:10,
33:23, 35:14,
36:11, 36:12.
connection 6:12,
9:7, 11:5, 11:19,
29:23, 85:21,
179:20, 182:16,
182:19, 196:2.
connections 7:3,
12:23, 35:1,
37:8.
connects 11:23,
71:15, 87:23,
87:24.
consider 204:11.
consideration
81:7.
considered 72:22.
contacted 31:16,
196:4, 196:9,
196:14, 201:11,
201:12, 202:7,
202:8, 203:9,
203:11, 203:12,
203:15.
contacting 23:11,
23:20, 24:11,
25:8, 25:17, 26:5,
26:18, 26:20,
26:21, 64:18,
80:1, 80:3,
181:14.
contained 139:23,
140:20, 188:17,
211:9.
content 15:25, 16:9,
41:24, 42:9,
42:13, 42:16,
42:19, 42:23,
43:11, 44:2,

44:11, 44:16,
46:9, 46:11,
46:13, 46:18,
47:8, 51:6, 56:23,
57:2, 79:21,
123:1.
contents 184:22.
context 53:8, 54:3,
55:20, 61:12,
214:9.
continually 190:7,
191:13.
continue 3:1, 52:4,
56:11, 73:15,
112:16, 115:15,
115:17, 115:19,
118:22, 120:16,
175:18, 194:17,
215:24.
continued 184:4,
189:24.
continuing 122:22.
convenience
212:19.
convenient 111:20,
111:21.
converging 34:11,
34:19.
conversation 23:7,
113:15, 114:14,
115:6, 116:7,
121:17, 122:12,
134:15, 157:4,
157:5, 157:6,
161:3, 161:6,
161:8, 161:25,
162:1, 162:2,
162:3, 162:4,
162:6, 181:8,
190:25, 191:9,
201:20, 214:6,
214:7, 214:18.
conversations
121:21, 136:7,
189:20, 209:24,
211:18, 211:24.
conversion 7:17,
8:2.
convey 127:13.
convicted 100:2.

convince 55:8.
cook 17:6.
Cool 150:19,
151:25.
Coordinated 7:22.
coordinates 33:11.
copy 147:9, 147:10,
213:13.
corner 89:17,
111:14, 111:17,
174:7.
corrected 72:15.
correction 18:18.
correctly 37:12,
47:2, 78:6, 78:17,
148:20.
correspondence
32:18.
cost 107:15,
144:21.
Counsel 2:3, 2:9,
2:10, 61:3, 70:16,
101:19, 103:2,
120:22, 131:19,
149:10, 195:20,
210:21, 212:24,
217:3.
count 24:18, 54:11,
70:25.
counted 208:3.
counting 71:3.
counts 75:16.
County 91:25, 92:9,
92:12, 93:5, 95:3,
151:8, 177:1,
177:6, 177:9,
177:10, 178:13,
178:23, 187:22,
193:5, 202:22,
203:5, 203:20,
204:3, 207:21,
207:24.
Couple 31:24, 48:17,
75:4, 75:23,
107:6, 116:8,
131:21, 147:14,
158:16, 158:18,
158:20, 159:1,
181:20, 187:19,
201:12, 217:14.

course 28:5, 28:11,
28:16, 41:23,
43:6, 48:25, 72:8,
86:15, 112:2,
153:15, 181:22,
182:7, 184:6,
187:4, 187:18,
188:6, 195:22,
211:16, 212:8,
215:12.
court. 52:1, 62:5,
209:12, 211:6.
courthouse 28:17,
28:18, 28:19,
28:21.
courtroom 53:3,
53:4, 100:15,
111:2, 216:4.
courtroom. 2:17,
52:8, 56:5, 112:5,
112:11, 175:20,
176:11, 216:9.
cover 199:18,
200:4.
coverage 216:2.
covering 45:21.
crashes 92:18.
Crawford 181:6,
182:2, 182:9,
182:18, 184:10,
184:19, 185:3,
187:8, 189:23,
189:25, 190:6,
190:15, 191:10,
191:13, 191:20,
191:21, 191:22,
192:2, 192:4,
192:5, 193:7,
193:14, 194:22,
195:16, 200:20.
create 73:13, 183:7,
187:25.
created 73:12,
96:7.
credit 90:22, 142:1,
142:20, 146:24.
crime 68:16, 100:3,
179:25, 201:24.
crimes 177:2.
CRIMINAL 1:9,

121:21.
Crosby 200:14.
Cross 12:8, 12:13,
    70:15, 98:18,
    102:23, 103:2,
    127:24, 148:15.
CROSS-EXAMINATION
    12:14, 52:11,
    70:18, 128:1,
    131:22, 148:16,
    170:16, 170:19.
crowded 172:12.
cue 147:22.
curb 94:25.
current 92:12,
    138:21, 141:22,
    142:10, 146:8.
Currently 138:13,
    177:18.
customer 133:13,
    140:14, 142:2,
    146:20, 147:17.
cut 120:17.
.
.
< D >.
D'angelo 199:21.
D-e-s-h-a-w-n
    99:15.
data 15:4, 15:21,
    22:18, 23:25,
    34:18, 39:1, 70:1,
    70:7, 73:7, 78:5,
    78:11, 78:15,
    140:4, 140:9,
    140:16, 140:17.
database 140:1,
    140:3.
date 4:25, 5:4, 5:8,
    5:24, 6:2, 9:1,
    17:19, 41:4,
    57:10, 61:12,
    61:13, 78:17,
    101:9, 126:17,
    143:3, 143:17,
    145:24, 146:5,
    146:12, 146:25,
    147:15, 154:1,
    174:8, 207:10,
    214:6.

dated 135:22.
dates 67:24, 78:6,
    146:4, 157:24.
daughter 200:5,
    215:16.
David 179:10,
    180:11, 189:16,
    193:6, 194:25,
    195:8, 197:24,
    199:11.
Daylight 27:2.
Days 41:21, 54:9,
    71:12, 75:4,
    116:8, 122:4,
    134:24, 146:5,
    146:7, 156:9.
DC 214:20.
de 185:2, 185:16.
dead 180:11.
dead-certain
    87:21.
deal 137:12,
    217:14.
dealing 55:6,
    114:25, 194:15.
dealt 48:5, 49:11,
    182:23.
Deandre 151:23.
Deanna 79:22, 80:1,
    80:3, 80:20, 81:1,
    81:24.
death 189:16.
debt 116:1, 116:4,
    191:18.
debt. 191:23.
decades 101:3.
December 44:17,
    49:25, 56:21,
    189:1, 192:12.
decide 46:17, 51:14,
    51:15.
decided 75:7, 158:2,
    158:4, 195:12.
deciding 62:3.
decision 204:4.
deemed 74:13.
deeper 55:9.
defend 61:23.
Defendant 1:29,
    1:35, 18:15,

19:16, 53:7,
    61:22, 94:6,
    111:5.
Defendants 1:12,
    195:20.
defense 61:19.
define 76:4.
Definitely 112:19,
    113:4, 117:11,
    124:15, 124:24,
    127:21, 153:18,
    217:10.
delay 85:12.
deleted 10:13.
deliver 113:3,
    132:16.
delivered 123:22.
delivery 189:24.
demeanor 198:17.
demonstrates
    87:20.
demonstrative 182:4,
    193:21.
departed 174:20.
Department 92:1,
    92:10, 92:13,
    177:2, 202:17.
depends 86:22,
    141:16.
depicted 65:24,
    90:6, 182:6.
describe 96:15,
    110:4, 113:17,
    138:16, 139:11,
    198:19, 206:7.
described 32:1,
    184:9, 187:1,
    210:19.
description 55:18.
Deshawn 99:1, 99:6,
    99:13.
desktop 143:10.
destroyed 207:21.
detail 5:22, 10:9,
    14:24, 15:5,
    19:15, 21:18,
    21:20, 23:21,
    25:8, 25:16, 26:3,
    31:17, 32:21,
    33:6, 37:4, 73:9,

177:8, 179:24.
detailed 79:21.
detailing 79:1.
details 175:25.
Detective 175:15,
    176:18, 176:24,
    177:6, 177:25,
    178:2, 178:13,
    178:15, 178:21,
    179:9, 179:13,
    181:21, 186:22,
    188:10, 189:14,
    189:15, 189:18,
    196:1, 197:17,
    197:22, 200:24,
    201:18, 202:8,
    202:21, 203:22,
    204:17, 209:21,
    216:13.
detectives 69:21,
    178:20, 178:21,
    179:2, 179:5,
    179:6, 194:10,
    201:22, 201:23,
    203:12, 203:20,
    205:2.
determine 71:15.
determined 28:7.
determines 77:11.
developed 188:6.
developer 139:10.
development 116:22,
    116:23.
development-type
    117:5.
device 106:10,
    141:17.
devices 206:20,
    206:23.
diagnosed 50:4.
diagnoses 62:1.
dial 15:12.
dialed 11:22.
diapers 183:22.
difference 141:1,
    144:20.
different 16:1,
    36:15, 41:9,
    54:24, 55:20,
    57:11, 61:24,

62:1, 67:12, 78:5,
    78:12, 78:14,
    78:15, 84:14,
    89:9, 90:10,
    126:17, 135:19,
    139:15, 144:8,
    147:21, 170:7,
    178:23, 181:25,
    198:20, 198:22,
    198:25, 199:8.
differs 72:7.
difficult 81:21.
digits 4:18, 116:16,
    118:5, 120:10,
    181:5.
DIRECT 3:7, 4:24,
    26:10, 30:22,
    44:25, 82:14,
    84:10, 85:14,
    85:18, 92:5,
    92:22, 98:2, 98:3,
    99:19, 101:6,
    104:1, 118:1,
    138:3, 150:20,
    151:11, 152:7,
    162:5, 177:4,
    179:8, 193:19.
directed 182:2,
    195:14.
Directing 80:11,
    80:18, 82:13,
    98:9, 152:24,
    171:6, 171:12,
    177:23.
direction 11:1,
    94:24, 157:13.
directly 44:11,
    46:15, 105:5,
    143:1, 196:17.
director 138:22,
    138:25, 139:7,
    139:14.
dirt 158:10.
discovery 49:20,
    49:23, 195:17,
    195:23.
discuss 46:25, 47:2,
    50:11, 50:22,
    50:24, 51:13,
    52:12, 52:16,

91:8, 98:22,
    103:6, 112:3,
    137:1, 149:15,
    166:11, 175:8,
    176:8, 191:22,
    216:1, 216:10.
discussed 38:15.
discusses 44:6.
discussing 5:9,
    45:23, 190:1.
discussions 59:10.
disorder 50:4.
display 17:2.
displayed 94:5.
dispute 203:21.
disregard 209:15.
DISTRICT 1:1, 1:2.
division 92:14,
    92:16, 177:12,
    177:13, 203:15.
docket 171:13.
document 51:14,
    61:3, 65:21, 67:9,
    80:24, 93:24,
    118:12, 139:20,
    139:23, 173:25,
    188:8, 188:10,
    188:12, 208:13,
    208:15, 211:8.
documents 10:9,
    207:5, 207:8,
    211:7.
doing 2:23, 2:25,
    6:10, 54:2, 54:3,
    66:24, 89:1, 93:2,
    105:11, 169:18,
    180:22, 181:16,
    210:2.
done 27:20, 35:10,
    56:21, 57:2, 61:9,
    179:3, 197:3,
    212:18.
door 98:6.
dose 45:3, 59:1.
dot 34:1, 65:11,
    111:18.
double 77:24.
dovetail 195:6.
download 56:15,
    56:21.

downloaded 184:20.
downloading 57:2.
downstairs 172:23,
  172:24, 180:24.
downtown 145:6.
draw 54:20, 86:16,
  86:17, 89:1.
drawing 84:13.
Dre 151:20, 151:22,
  151:24, 169:13.
Drive 106:24,
  106:25.
driver 94:16, 95:7,
  95:10, 96:9.
drivers 95:19.
driveway 180:5,
  180:9.
driving 94:6, 114:5,
  124:10, 166:9,
  166:10, 202:3.
Droid 83:25.
drop 74:8.
Dropping 78:22,
  113:4.
drove 113:24, 114:1,
  124:7, 124:8,
  164:21, 167:20,
  167:25, 180:4.
Drug 85:2, 177:13.
drugs 108:3, 108:5,
  108:6, 108:11,
  108:13, 108:16,
  109:24, 121:24,
  182:22, 182:24,
  205:6.
drunk 167:7.
due 132:12.
duly 3:4, 91:19,
  99:7, 103:17,
  137:19, 150:1,
  176:19.
dump 83:19.
duplicate 22:19,
  22:21, 24:3,
  41:11.
duplicates 40:19,
  78:7.
Durable 183:22.
duration 11:23,
  11:24, 41:20,

71:5, 71:14, 72:5,
  72:6.
During 4:24, 6:6,
  13:13, 13:16,
  30:25, 34:4,
  39:13, 39:17,
  52:13, 66:17,
  66:20, 79:8,
  95:19, 101:7,
  109:7, 140:2,
  148:1, 153:15,
  191:8, 211:16.
duty 216:21.
.
.
.
< E >.
e-mail 26:14, 26:24,
  146:20, 147:9,
  147:13, 147:16,
  147:19, 147:22,
  147:25, 148:1,
  148:8, 148:10,
  148:25.
e-ticket 94:1.
ear 210:3.
earlier 36:3, 41:7,
  174:23, 176:5,
  216:21.
early 30:23, 42:9,
  151:6, 176:7,
  185:9, 199:3,
  201:21.
earned 109:16.
ease 212:7.
easier 7:9, 63:13.
east 32:8.
eastbound 94:24,
  94:25.
Eastern 7:24, 8:3,
  9:1, 58:10.
easy 14:6.
eat 160:1.
Edwards 190:15,
  190:17, 191:6.
effect 45:6, 53:24,
  87:6.
effective 4:25, 5:4,
  5:8, 6:2.
effects 87:3.
eight 177:14,

177:18.
Either 2:7, 10:13,
  33:11, 94:23,
  94:25, 132:15,
  134:17, 142:1,
  153:11, 159:17,
  191:17.
elapsed 72:5.
electronic 81:20,
  106:10, 206:19,
  206:23.
element 31:20,
  32:9.
elimination
  164:19.
Elma 192:14,
  215:15.
employed 138:11.
employee 189:19,
  190:19, 190:23.
employees 193:5,
  194:8.
ENB 12:7.
ENB40085 65:25.
ENB73811 67:15.
encompasses 93:13.
encompassing 76:11,
  78:23.
end 2:7, 2:8, 3:11,
  17:8, 35:16,
  44:17, 68:10,
  163:5, 174:13,
  214:6.
ending 4:3, 25:20,
  56:16, 116:15,
  118:4, 181:9.
enforcement 92:19,
  93:3, 198:2.
engine 139:4.
engineer 138:13,
  139:8, 139:14.
Enjoy 91:9, 98:23,
  103:7, 137:2,
  149:17, 175:9,
  216:5, 217:20.
enjoyed 112:15.
enraged 191:8.
ensured 196:22.
entered 2:17, 56:5,
  94:9, 112:11,

140:15, 176:11.
entering 78:5.
Entertainment
116:19, 116:21,
116:22.
entire 178:14,
184:22.
entirety 37:14.
episode 45:7, 53:24,
59:12.
equally 89:11.
equipment 10:13,
183:22.
equivalent 58:6.
erratic 54:13.
error 143:23.
especially 138:14,
148:6.
Esquire 1:31, 1:33,
1:37, 1:39.
essentially 140:6,
177:16, 177:22,
180:3, 180:23,
183:22, 196:5.
establish 38:1,
54:16, 54:23,
55:5.
et 141:7.
European 58:1.
European-like
96:15.
evening 8:6, 8:19,
134:1, 149:3,
167:9, 167:11,
168:16, 168:21,
168:24, 205:17,
215:23, 216:5,
216:11, 217:20.
event 21:5, 98:10,
98:11.
events 187:1.
eventual 200:20.
eventually 5:24,
147:24, 169:3,
183:9, 185:17,
186:16, 200:1,
207:21.
everybody 168:5,
172:7.
Everyone 2:21,

12:20, 112:7,
112:15, 172:9,
203:9, 203:13,
216:16, 217:20.
everything 18:6,
34:24, 60:25,
147:12, 151:23,
179:3, 193:1,
204:20, 204:21.
evidence 61:23,
69:24, 89:22,
90:10, 90:13,
212:15.
exact 46:15, 86:14,
93:16, 146:10,
157:24, 192:1.
exactly 45:1, 79:11,
105:14, 115:25,
128:15, 134:19,
134:22, 135:9,
144:13, 146:11,
171:4, 208:16.
Exactly. 171:10.
EXAMINATION 3:7,
88:14, 92:5,
99:19, 104:1,
133:18, 138:3,
150:20, 173:22,
177:4.
examine 21:18.
examined 3:4, 91:19,
99:7, 103:17,
137:19, 150:1,
176:19.
example 13:15,
21:22, 23:12,
31:7, 39:25,
42:12, 44:12,
45:2, 48:12,
57:14, 68:2, 87:4,
125:15, 162:1.
except 93:12,
180:23.
excerpt 4:1, 4:12,
9:18.
exchange 98:1,
105:25, 109:24.
excluded 21:9.
Excuse 105:6,
108:12, 109:17,

119:23, 169:23.
excused 52:9, 91:6,
98:22, 103:6,
137:2, 149:16,
175:10, 175:13,
216:14.
executed 192:13,
205:14.
executing 193:2.
execution 192:22,
205:19.
exhibits 206:11.
exist 14:8.
existence 117:3,
117:7.
exits 186:11.
expect 86:5,
107:22.
expecting 67:2,
126:13.
experience 7:2,
11:18, 83:10,
143:13.
experiencing
45:23.
expiration 146:25.
Explain 7:21, 87:9,
97:19, 108:5,
115:17, 140:21,
191:24.
explained 190:13,
201:11.
explaining 189:22.
explains 43:12,
54:6, 55:18.
explanation 55:17,
142:15.
export 140:4.
Express 144:9,
144:23.
extent 49:10.
extortion 195:11,
200:21.
extra 68:12,
148:6.
extract 47:5,
139:24.
extracted 47:3.
extraction 3:21,
15:24, 16:3, 16:8,

42:5, 42:7, 43:2,
47:20, 56:23,
57:9, 63:13,
63:16.
extractions 48:21.
extreme 48:16,
54:7.
.
.
< F >.
F-a-r-r-e-l-l
150:7.
face 203:17.
Facebook 166:13,
166:14, 166:16.
faces 28:20, 31:9.
facing 29:24.
fact 4:20, 4:23,
21:11, 34:22,
66:10, 66:23,
69:4, 71:6, 85:1,
89:2, 89:7,
196:25, 203:19,
204:10.
facts 69:23, 79:24,
81:7, 84:13,
85:6.
Failure 96:9.
fair 44:10, 50:14,
77:2, 88:24,
120:10, 135:2,
178:22.
fairly 14:6.
fall 177:23,
187:1.
Fallstaff 29:16,
29:24, 30:2,
35:25.
fam 123:11.
fam. 126:18.
familiar 10:17,
43:16, 118:16,
118:18, 120:7,
139:15, 182:6,
208:12.
family 102:4.
far 44:5, 49:15,
50:13, 61:13,
64:15, 67:12,
153:22.

Farrell 3:12, 3:16,
68:22, 137:5,
137:6, 137:7,
137:9, 149:20,
149:25, 150:8,
150:10, 155:24,
157:1, 158:9,
159:22, 161:6,
161:11, 162:13,
163:23, 166:17,
167:11, 168:9,
170:15, 170:21,
173:24, 174:6,
175:6.
farther 54:5.
fast 2:9.
fault 47:13.
favor 197:2.
FCRR 1:46, 217:23.
feature 8:13,
11:25.
features 8:14.
February 16:14.
Federal 1:47,
182:19, 192:16,
192:17, 194:20,
195:6, 195:7,
195:11, 195:13,
198:2, 199:5,
203:10, 204:8,
205:16.
federally 195:13.
feed 78:2.
feel 40:18, 45:7,
53:24, 59:11,
121:20, 162:18,
206:3, 209:22,
217:16.
feeling 45:3,
59:2.
feelings 58:21.
felt 201:22.
female 55:2.
few 54:9, 57:16,
72:9, 83:21,
87:19, 144:17,
147:14, 180:9,
190:17.
few-second 40:13.
field 93:13,

175:25.
fifth 53:14.
figure 51:7, 69:9,
131:8, 170:6,
180:25, 183:6,
201:14, 203:23,
204:20, 204:25,
205:3.
figured 205:5.
file 188:2.
fill 141:13.
final 143:17.
financial 191:23.
find 61:17, 102:3,
114:17, 139:5,
181:3, 181:15,
182:10, 185:25,
187:10, 205:25,
206:4.
finding 69:5,
181:17.
fine 11:16, 48:11,
48:18, 210:7,
210:11.
finger 207:11.
finish 60:10,
129:12, 197:17.
finished 136:3.
finishes 120:18,
167:21.
finishing 30:22.
firm 133:20.
five 5:18, 18:19,
20:22, 22:2, 22:6,
85:10, 107:6,
107:10, 107:13,
107:18, 122:10,
134:24, 138:12,
178:8, 178:10.
flag 51:24, 52:15,
95:3.
flagged 51:12.
Fleming 193:15,
193:16, 193:20,
194:1, 200:10,
200:11, 200:13.
flights 138:19.
flip 12:19, 16:6,
30:19.
flipped 12:19.

flipping 212:19.
Floor 1:48, 87:10,
 87:13, 87:18.
focus 16:15, 71:5,
 89:25, 112:23.
focused 71:6.
folks 74:7,
 183:23.
follow 40:19.
follow-up 181:21.
following 47:2,
 52:1, 62:5,
 209:12, 211:6.
follows 3:5, 91:20,
 99:8, 103:18,
 137:20, 150:2,
 176:20.
food 160:14.
fool 162:21,
 162:23.
forces 182:18.
foregoing 217:24.
forgot 206:10.
forgotten 44:15.
form 64:20, 146:23,
 165:22.
format 10:18, 57:10,
 78:13, 78:14,
 81:20, 81:21.
formats 78:12.
former 189:19.
forms 139:15.
Forsythe 201:18,
 202:6, 202:21.
forth 12:24, 12:25,
 40:3, 42:4, 80:20,
 122:23, 203:25.
forward 8:16,
 115:12, 182:5.
forwarded 5:20,
 8:12, 8:17,
 11:21.
forwarding 5:14,
 11:19.
forwards 5:15.
found 142:6, 173:1,
 180:10, 180:14,
 181:22, 182:21,
 205:22, 207:5,
 207:14, 207:24,

 208:10.
Four 4:18, 7:23,
 21:5, 27:13, 40:4,
 40:24, 58:7, 58:8,
 107:6, 116:4,
 134:24, 157:25,
 159:15, 159:19,
 159:21, 165:2,
 181:5, 181:8.
four-hour 27:3.
four-lane 94:21.
four-wheeler
 157:15.
frame 101:6, 152:25,
 157:17, 177:23,
 178:11, 178:12,
 187:3, 194:16,
 211:25.
frantic 201:5.
fraud 142:1, 183:17,
 187:4, 192:18,
 193:1, 194:17,
 194:21, 195:10.
free 206:3,
 217:16.
fresh 168:18.
fresher 168:16.
Friday 159:6.
friend 186:5.
friends 154:15,
 154:18, 154:24,
 158:3, 158:4,
 161:1, 163:6,
 169:4, 170:24,
 191:13, 194:4.
front 5:2, 21:21,
 96:3, 96:14,
 97:10, 97:20,
 100:19, 108:3,
 108:13, 162:20,
 180:9, 186:12.
Fronting 108:2,
 108:5, 108:6,
 108:11.
Fuchs 183:9, 187:4,
 203:7, 204:18,
 213:6.
fulfillment
 138:22.
full 91:24, 99:12,

 103:22, 137:23,
 150:5, 155:8,
 176:23, 205:6.
funds 142:16,
 190:11.
.
.
< G >.
G-e-o-v-i-n-i
 138:1.
G-r-a-n-t 103:24.
gain 93:16.
game 50:14.
Gap 199:23,
 199:24.
garage 88:4,
 180:6.
gave 13:9, 71:12,
 87:4, 120:15,
 132:4, 186:5.
gears 62:19.
general 44:23, 51:3,
 53:9, 69:8, 72:18,
 139:3, 151:7,
 178:22, 179:24,
 183:20.
Generally 10:17,
 25:10, 31:2,
 34:10, 34:11,
 36:23, 44:19,
 79:16, 177:9,
 191:18.
generated 139:16.
gentlemen 2:19,
 52:2, 56:7,
 111:25, 112:13,
 175:16, 176:13,
 212:13, 215:22.
geographic 32:4,
 32:6, 33:15,
 35:7.
geometrical 86:18.
George 1:18.
Geovini 137:14,
 137:18, 137:24.
German 97:12.
German-style
 96:15.
gets 19:21,
 139:25.

Getting 3:10, 34:23,
    36:12, 45:25,
    55:10, 55:23,
    88:1, 88:3, 161:5,
    161:18, 163:1,
    163:5, 180:4,
    187:3.
girlfriend 39:12,
    54:17, 54:24,
    55:22, 97:24,
    131:3, 180:19,
    180:23, 190:23.
Give 44:12, 52:4,
    75:22, 89:22,
    93:13, 105:19,
    106:5, 106:20,
    107:7, 107:14,
    108:6, 113:17,
    125:19, 127:2,
    133:25, 135:20,
    179:24, 190:3,
    191:17.
given 44:10, 49:20,
    49:23, 212:24,
    212:25.
gives 69:10,
    93:16.
giving 49:9, 49:14,
    121:11.
GJH-17-0667 1:9.
glance 17:15.
global 141:2.
GMT 58:4, 60:17.
gobbledygook 12:4.
goddamn 215:8.
going-forward
    115:11.
gotcha. 127:14.
gotten 192:9.
GPS 33:11.
grab 206:12.
grabbed 180:19.
graduating 177:12.
grams 102:13.
Grand 135:21,
    152:17, 153:23,
    154:3, 155:10,
    155:18, 155:21,
    156:3, 156:23,
    158:24, 166:8,

166:25, 168:9,
    168:15, 194:21,
    199:4, 199:10,
    199:14.
Grant 103:12,
    103:16, 103:23,
    104:3, 112:20,
    118:5, 119:3,
    120:10, 120:24,
    122:5, 122:12,
    123:12, 128:3,
    131:24, 200:17.
gray 110:7.
Great 36:1, 90:14,
    206:10.
greater 71:8.
green 65:13,
    111:18.
Greenbelt 2:15.
Greenspring 35:16,
    36:7.
Greenwood 92:25,
    98:12.
Greg 125:5, 125:6,
    125:9, 125:15.
group 31:22.
Groupon 162:1,
    162:3, 162:9,
    163:9.
grow 101:4.
Gucci 127:8.
guess 30:18, 34:19,
    35:6, 36:2, 43:12,
    46:21, 51:7, 57:1,
    57:3, 58:1, 58:17,
    62:24, 69:4,
    105:20, 108:7,
    110:5, 115:16,
    121:14, 132:13,
    133:4, 159:1,
    164:19, 196:5,
    197:2, 209:20.
guessing 117:25,
    121:6, 123:13,
    132:7.
guest 144:13.
guidance 49:10.
guide 49:16.
gun 93:14, 181:23,
    205:22.

gunshots 180:12.
guy 159:14, 159:17,
    159:18, 189:24.
Guys 154:19, 154:21,
    155:16, 159:15,
    159:17, 159:18,
    172:4, 172:18,
    172:22, 201:12.
.
.
< H >.
H-10 199:21.
H-7 188:9, 195:23.
H-i-n-t-o-n 177:1.
Hagerstown 153:11,
    158:14, 158:25,
    159:6, 159:19.
half 101:2, 101:3.
hand 15:11, 91:17,
    99:5, 103:15,
    130:7, 130:9,
    137:17, 149:22,
    149:23, 176:17.
handed 212:17.
handful 49:11,
    50:12, 51:11.
handle 138:14,
    147:23, 204:24.
handles 139:3,
    147:22.
handling 197:4.
hands 185:20,
    186:1.
handwriting 164:3,
    164:5, 164:6,
    165:8, 165:9,
    165:10, 165:13.
hang 89:17, 152:12,
    152:18, 152:19,
    152:20, 152:21.
hanging 172:24.
happen 42:17,
    179:13, 208:25.
happened 8:16,
    39:10, 89:17,
    131:8, 134:22,
    179:16, 179:17,
    186:25, 195:12,
    198:24, 202:7,
    204:21, 210:19,

211:4.
happening 41:8.
happens 18:6, 39:16,
  45:11, 147:13,
  147:14, 179:14.
Harbor 28:20,
  28:21.
hard 157:14.
harder 2:16.
hardware 16:5.
harm 191:7.
Harness 30:4.
Harry 1:37, 181:6,
  184:10, 184:19,
  185:3, 187:8,
  189:23, 189:25,
  190:2, 190:6,
  190:15, 191:10,
  191:13, 191:20,
  191:21, 191:22,
  192:1, 192:4,
  192:5, 192:13,
  193:7, 193:14.
hash 176:9.
Hays 203:1, 203:3,
  216:19.
Hazel 1:18.
head 215:7.
heading 30:4, 30:9,
  36:14, 82:9.
headquarters 184:19,
  184:21, 187:23,
  189:15, 193:16.
health 44:20, 49:8,
  183:16, 187:4,
  192:18, 194:17,
  194:21, 195:10.
hear 106:18, 108:19,
  150:11, 171:7,
  209:10, 215:9,
  217:5.
heard 28:24, 61:15,
  148:20, 180:14,
  180:15, 190:22,
  191:1, 191:16,
  209:15, 212:13.
hearing 216:23.
hears 50:5.
hefty 179:1,
  179:2.

Heights 28:1, 28:4,
  28:8, 66:14,
  66:16, 69:19,
  70:5, 75:20,
  75:21, 89:5.
held 5:22, 5:23,
  177:9.
help 45:25, 178:16,
  178:18.
helpful 42:4, 44:3,
  198:22.
helps 44:3.
Herbert 199:21.
here. 126:9.
hereby 217:23.
heroin 182:24.
HHS 183:8.
high 45:2, 59:1,
  84:24.
highlight 5:7,
  10:24, 17:10,
  20:13, 23:24,
  140:19.
highlighted 6:15,
  25:1, 25:13,
  73:16, 73:17,
  74:9.
highlighter 7:8.
highlighting
  23:13.
Hightower. 190:5.
Hilton 145:5.
him' 191:3.
him. 153:25,
  191:4.
Hinton 175:15,
  176:18, 176:24,
  181:21, 186:23,
  188:10, 189:14,
  189:15, 189:18,
  196:1, 197:18,
  197:22, 200:24,
  203:22, 209:22.
historical 27:20.
hit 88:17, 88:23,
  89:3, 90:23,
  143:22, 145:16,
  145:19, 184:5,
  184:13, 185:8.
hits 76:15, 76:21,

143:7, 203:17.
hitting 29:7, 29:16,
  31:8, 68:23, 77:2,
  86:22, 86:23,
  90:7, 132:22,
  133:1.
Hold 10:23, 102:25,
  135:9, 169:23.
holes 180:9.
Holiday 137:9,
  183:10, 187:3,
  194:6, 203:8,
  204:17, 213:18.
home 29:16, 30:8,
  30:10, 39:4,
  106:10, 127:2,
  158:25, 159:1,
  169:7, 170:2,
  174:22, 180:5,
  180:19, 186:9,
  192:13, 196:3.
homicide 38:21,
  61:14, 177:17,
  177:24, 178:2,
  178:9, 178:22,
  192:25, 193:3,
  195:12, 201:13,
  201:19.
homicides 178:13,
  179:4, 179:5.
Honorable 1:18.
hood 139:5.
Hopefully 33:25,
  112:15, 125:25.
hot 209:14.
Hotel 138:19, 141:2,
  141:10, 141:25,
  142:2, 142:5,
  142:6, 142:22,
  142:23, 143:1,
  144:10, 144:13,
  145:7, 145:8,
  145:10, 145:12,
  145:17, 145:20,
  146:18, 146:19,
  148:3, 172:6.
hotels 138:14,
  139:3, 139:5,
  139:6, 141:4,
  144:9, 144:15,

144:18, 144:19,
145:1, 145:4.
hotline 187:7,
187:11.
hour 26:23, 112:4,
112:8.
hours 7:23, 11:12,
18:19, 20:22,
22:6, 58:7, 92:22,
185:9, 189:9,
189:13.
house 106:17,
106:19, 131:3,
158:18, 158:20,
158:22, 159:2,
159:7, 159:9,
180:10, 182:20,
186:6, 192:23.
Hummer 191:17.
hungry 111:25.
hurt 58:21.
husher 209:11,
209:17.
.
.
.
< I >.
I-g-h-t 127:10.
ID 8:14, 140:24,
141:8.
idea 83:10, 106:20,
107:7, 107:14.
identification
101:17, 101:21.
identified 32:23,
43:1, 94:6, 94:15,
100:22, 181:6,
182:16.
identifier 141:3.
identifiers
140:25.
identifies 12:6.
identify 46:18,
100:17, 164:3,
185:15, 186:16,
215:13.
identifying 95:14.
idky 59:12.
Idky. 59:7.
ignore 48:11.
ignored 49:14.

ignoring 45:10.
II 182:23.
imagine 172:10.
immediate 18:12,
20:25, 21:3.
immediately 23:11,
46:1, 74:8, 74:23,
75:3, 145:11,
147:13, 196:19,
201:13, 217:6.
importance 73:14,
74:14, 74:19,
74:20.
important 75:8,
196:22.
in-between 21:9.
in. 56:1, 61:12,
76:4, 164:4,
180:4, 201:11,
203:24.
incarcerated 105:1,
105:9, 106:5,
122:4, 122:8,
123:11, 208:23,
209:1.
incident 191:24.
include 18:9, 46:13,
63:2, 108:11,
117:12, 117:23,
188:5.
included 10:21,
41:25, 42:13,
42:14, 42:16,
46:12, 47:17,
72:25.
includes 42:9,
66:2.
including 20:18,
52:12, 112:3,
216:1.
incoming 8:11, 8:16,
9:2, 14:24, 24:15,
25:9, 25:12,
25:14, 27:7,
27:11, 32:12,
80:4, 122:2.
inconsistent 70:7.
Incontinence 183:23,
183:24.
incorrect 86:25,

87:1.
incorrectly 59:15.
increase 107:10.
incremental 141:7.
index 33:8, 35:16.
indicate 3:22,
161:22.
indicated 14:17,
70:20, 82:13,
95:15, 97:6,
98:10, 136:7,
141:8, 148:23,
156:11, 198:13,
200:11.
indicates 98:6,
141:18.
indicating 12:1,
46:18, 100:17,
207:10.
Indicating. 20:17,
22:17.
indicting 203:10.
indictment 194:21,
195:7, 195:15,
200:20, 204:10.
individual 94:15,
100:5, 141:9,
141:18, 142:25,
143:15, 144:5,
144:23, 145:25,
146:9, 146:15,
146:22, 147:20,
148:2, 169:10,
198:13.
individuals 28:14,
83:7, 83:15,
83:20, 84:8, 85:5,
85:8, 182:15.
indulgence 70:10,
85:16, 102:19,
206:13.
inference 54:19.
Infinity 191:18.
inflicting 191:7.
informed 180:13,
186:4, 189:15,
189:18.
informing 190:19.
initiate 95:4.
initiated 64:9.

Inner 28:20,
  28:21.
input 146:15,
  146:21.
inputting 145:14.
inside 109:13,
  180:10.
insight 42:2.
insinuating
  168:13.
insist 2:10.
instance 45:17,
  95:7, 142:25.
instead 40:23.
instigate 191:13.
instruct 52:12,
  209:14, 209:23,
  209:25, 212:8,
  212:18, 212:19.
instructed 210:23.
instruction 120:22,
  129:11.
instructions 209:3,
  212:14, 215:25.
insurance 211:12.
intel- 185:21.
intelligence 183:3,
  183:7, 185:21.
intention 140:15.
interact 143:21.
interaction 197:7.
interactions
  95:21.
intercepted
  132:12.
Interdiction
  177:14.
interest 55:23,
  184:18.
interested 154:5,
  154:14, 156:12.
interrupt 115:10.
intersection 90:21,
  92:25, 93:4, 93:8,
  94:4, 94:21,
  95:5.
interview 187:21,
  187:25, 188:1,
  194:10.
interviewed 49:24,

184:20, 187:22,
  193:17, 194:18.
interviews 193:9,
  193:11, 193:18,
  199:8, 199:15.
intoxicated 172:16,
  173:13.
introduced 96:20,
  96:24, 100:8,
  110:18, 110:20.
investigate
  177:21.
Investigating 92:18,
  183:15, 189:16,
  192:25.
investigator
  202:6.
investigators
  74:20.
investment 190:1.
involved 18:13,
  74:7, 183:16,
  192:22, 201:16,
  203:13.
involvement 199:3.
involving 183:16,
  186:19, 209:2.
iphone 57:1.
irrelevant 50:21.
issuance 94:3.
issue 46:17, 48:16,
  49:1, 49:4, 49:7,
  55:11, 56:1,
  61:14, 61:24,
  62:1, 93:25,
  95:24, 137:12,
  210:2, 210:6,
  210:19, 211:1.
issued 82:18, 95:3,
  95:22, 96:1, 96:6,
  97:20, 98:12,
  98:14, 198:4.
issues 44:8, 44:20,
  48:5, 52:5, 52:16,
  216:20, 217:14.
it. 45:8.
item 11:13,
  216:12.
itemized 208:16.
itself 15:25,

206:8.
.
.
< J >.
J-1 213:12,
  213:21.
J-1A 213:20, 213:21,
  213:22.
J-e-m-e-i-k-a
  186:22.
J. 1:18, 1:37.
jail 105:3, 114:16,
  123:20, 134:18,
  208:23, 208:25,
  209:23, 210:20.
Jamie 83:23.
jeans 60:25.
Jemeika 186:17,
  186:18, 200:4.
job 102:3.
joined 182:18.
Jones 201:17.
Joppa 34:7.
Joppatowne 34:7,
  34:9.
journey 81:13,
  81:16.
Jr 1:37.
Judge 120:23, 137:4,
  210:22, 212:24.
July 190:10,
  190:25.
jumbled 38:3.
jumbling 63:17.
jump 60:14,
  197:17.
June 136:14, 190:9,
  194:20, 194:24.
jurisdictional
  203:21.
JUROR 216:6.
JURORS 2:20, 2:22,
  112:14, 212:6.
jury-type 199:15.
Justin 155:2,
  164:23, 165:3,
  172:1.
.
.
< K >.

keep 91:23, 104:16,
   119:20, 150:5,
   173:25, 212:16,
   215:7.
keeping 44:19.
kept 120:15,
   132:8.
key 47:7.
kick 61:16.
kidnapped 69:5.
kids 194:2.
killed 184:14,
   184:16, 189:18,
   191:10, 201:6.
Kim 1:27, 58:12,
   58:18, 59:1, 59:6,
   60:3, 60:5, 60:8,
   60:11, 60:23,
   62:16.
kinds 144:8.
Kirby 155:1, 155:3,
   155:4, 155:5,
   155:6, 159:23,
   159:25.
kitchen 17:5.
knocked 45:3,
   59:2.
Knowing 122:11,
   136:15, 145:10,
   148:8.
knowledge 143:13,
   166:3, 195:10,
   196:24, 197:1.
known 101:1, 104:23,
   117:20, 148:4,
   195:17.
knows 130:18,
   136:6.
.
.
< L >.
L-u-i-z 138:1.
Ladies 2:19, 52:2,
   56:7, 111:25,
   112:13, 175:16,
   176:13, 212:13,
   215:22.
landscape 87:5,
   87:8.
lane 94:25, 95:2.

lapel 197:19.
large 93:13,
   203:17.
Last 4:18, 4:24,
   45:3, 59:2, 78:19,
   80:14, 123:22,
   155:13, 163:1,
   174:14, 174:18,
   176:25, 180:25,
   181:3, 181:5,
   181:8, 186:13.
lasted 9:5, 71:18.
late 195:2, 213:5.
later 3:14, 17:22,
   20:22, 40:11,
   40:16, 50:21,
   50:22, 50:24,
   51:9, 51:13, 54:9,
   59:17, 59:18,
   61:25, 108:8,
   116:4, 181:6,
   185:5, 191:8,
   205:17, 207:21,
   208:25, 212:5.
latest 65:1, 65:5.
law 62:14, 198:2.
Lawson 44:16, 47:10,
   79:22, 80:1,
   80:20, 81:1,
   81:25.
lawyer 155:21.
lawyers 74:21.
laying 80:7.
lead 122:25, 178:12,
   178:15, 179:9,
   179:12, 183:4,
   183:9, 202:6.
leading 123:24.
leads 54:9.
learn 94:14, 187:7,
   195:22, 206:15,
   216:3, 216:4.
learned 106:12,
   115:20.
learns 148:2.
least 55:8.
leave 170:1, 174:14,
   174:18, 174:23,
   175:2, 175:3,
   186:7, 212:8,

   216:7, 216:8.
leaves 80:12.
leaving 170:9.
led 180:5.
Leesburg 153:11.
leeway 49:14.
left 17:19, 39:4,
   52:8, 76:10, 81:3,
   112:5, 152:1,
   156:19, 160:2,
   174:12, 174:25,
   175:20, 186:9,
   205:3, 216:9.
left-hand 111:14,
   111:17, 174:7.
legal 61:17, 155:11,
   217:14.
legs 41:9.
lengthy 78:8.
less 38:22, 59:17,
   132:11, 143:19,
   179:5, 179:6,
   211:3.
Lesser 90:12,
   125:20, 181:19,
   212:23, 214:24.
letter 46:12.
letters 60:23.
level 61:16.
LG 185:2, 185:16.
license 95:16, 96:2,
   96:9, 96:15,
   205:25, 206:4,
   206:6, 207:17.
LIDAR 93:3, 93:8,
   93:11, 93:13,
   94:17, 94:24.
life 39:21, 154:6.
lights 94:19,
   95:5.
likely 79:11, 79:12,
   86:6, 132:11.
likes 110:5.
likewise 13:22.
lines 7:20, 20:16,
   20:19, 22:19,
   23:25, 41:8, 53:9,
   72:15, 86:16,
   86:17, 97:23,
   140:19, 140:23.

link 184:17,
  185:4.
linked 203:11.
Lisa 187:14, 188:20,
  189:14.
list 62:24, 63:2,
  66:10, 83:6,
  145:9, 196:20.
listed 67:23.
Listen 130:25,
  155:20, 155:22,
  168:18.
listened 211:21.
listening 121:14,
  121:16, 212:21.
literally 80:7.
litigate 44:22,
  217:4.
litigated 217:1.
little 2:4, 38:3,
  40:6, 43:12, 45:5,
  54:1, 54:4, 57:11,
  57:20, 59:6,
  68:12, 71:11,
  72:14, 76:20,
  79:4, 86:19,
  104:17, 111:18,
  136:15, 143:10,
  151:23, 176:7,
  189:5, 189:10,
  203:21, 203:25,
  217:15.
live 66:25,
  150:24.
live-in 39:12.
lived 106:21,
  109:10.
lives 67:4, 106:17,
  106:19.
living 109:16,
  109:18, 180:6,
  180:7, 180:11.
locate 144:5.
located 28:23, 93:4,
  153:10, 185:18,
  185:19.
location 3:12, 3:14,
  27:21, 34:15,
  35:22, 65:10,
  69:1, 69:17,

88:24, 92:23,
  93:2, 93:7, 146:4,
  147:12, 180:4,
  186:9, 190:19.
location. 190:12,
  190:24.
locations 31:1,
  67:12, 88:17.
lock 83:12.
locked 31:1, 31:5,
  83:21, 115:21,
  119:10, 119:13,
  119:15, 122:11,
  129:19, 129:24,
  130:2, 130:3,
  130:4.
log 83:20.
Lombard 1:48.
long 21:2, 44:19,
  71:9, 81:18, 92:9,
  100:25, 104:22,
  104:24, 106:6,
  117:7, 129:24,
  134:21, 143:14,
  158:23, 177:8,
  188:23, 203:18.
longer 71:4, 192:8,
  197:8, 197:12.
looked 37:20, 38:17,
  41:7, 44:18,
  65:16, 163:25,
  179:25, 180:1.
looks 17:15, 21:5,
  24:1, 34:11,
  34:18, 36:3, 36:9,
  36:13, 39:8, 40:2,
  64:6, 86:18,
  171:22.
loop 3:10.
lose 125:20,
  190:6.
loss 190:8.
lost 16:21, 33:25.
lot 22:11, 28:24,
  48:9, 55:20,
  71:12, 86:23,
  89:4, 89:7,
  113:20, 113:22,
  128:8, 128:16,
  129:17, 162:2,

168:3, 178:16,
  178:17, 178:23,
  181:13, 181:17,
  182:21, 182:25,
  189:20, 198:24,
  199:1, 205:1,
  210:9.
loud 162:16,
  162:18.
low 14:17, 87:16,
  144:16.
lower 16:4, 144:20,
  145:7, 145:11,
  178:25, 179:7.
lowest 16:7,
  144:7.
LQRR 144:7.
Luiz 137:18,
  137:24.
lunch 111:22,
  112:15, 112:20,
  176:6.
lunchtime 70:2.
.
.
< M >.
M. 1:33.
ma'am 4:8, 4:14,
  5:6, 5:10, 6:1,
  6:13, 6:17, 6:19,
  6:23, 7:12, 7:17,
  8:4, 8:22, 9:12,
  9:15, 9:21, 10:20,
  12:10, 58:15,
  88:20, 89:10,
  89:19, 89:21,
  90:5, 90:9,
  96:23.
mail 8:15, 8:17,
  9:8, 11:19, 11:21,
  12:1, 12:2, 23:16,
  23:17, 24:16,
  25:12, 32:13,
  41:10, 41:13,
  43:18, 71:22,
  86:4.
makeshift 180:7.
male 55:2.
Man 104:11, 104:13,
  105:8, 110:12,

112:24, 151:15,
151:23, 152:1,
152:9, 152:23,
165:3, 179:10,
179:20, 199:21,
215:7.
manage 138:13,
139:1, 139:2.
management 139:12,
179:6.
manager 139:9.
manually 78:4, 78:5,
78:10, 78:11.
map 33:12, 34:6,
65:11, 77:16,
77:19, 77:23,
144:11.
mapped 12:5,
78:23.
mapping 6:12,
12:8.
maps 33:1.
March 30:23, 30:25,
92:11, 119:8,
121:5, 132:4,
132:6.
mark 10:22, 17:7.
marked 26:12, 75:24,
84:17, 101:17,
101:20, 139:20,
203:5, 213:12.
Marsh 34:2, 34:7.
Massey 202:8.
match 97:16.
math 26:23.
MATHEW 3:3.
matter 51:3, 142:13,
157:12, 178:22,
217:6, 217:25.
meaning 55:9, 84:14,
127:17, 152:18,
171:3, 171:9.
means 5:15, 5:21,
8:12, 8:14, 8:15,
79:8, 80:4, 83:12,
83:13, 86:1,
108:5, 138:19,
138:23, 140:14,
140:21, 141:14,
141:24, 142:4,

142:20, 146:7.
meant 191:5, 213:7,
214:20.
median 94:22, 94:23,
94:25, 95:6.
Medicaid 183:25.
medical 62:1,
183:22, 216:20,
217:8.
Medicare 183:1,
193:1.
medication 44:6.
meds 45:3, 45:6,
53:24, 59:2,
59:10.
meet 106:13, 106:15,
106:21, 107:3,
110:10, 110:12,
125:11, 126:13,
126:22, 130:10,
133:9, 135:5,
136:10, 136:20,
159:19, 160:20,
162:25, 172:20,
187:16, 187:18,
201:17.
meeting 20:12,
186:12, 188:20.
meetings 199:8.
meets 142:6.
Melvin 38:13, 38:23,
39:8, 39:18,
39:22, 40:8, 42:7,
42:13, 42:24,
43:1, 44:2, 44:8,
44:17, 46:1, 46:6,
46:11, 46:19,
47:19, 48:5,
48:13, 49:24,
55:11, 56:15,
56:20, 56:22.
members 201:18,
202:16.
memo 195:14.
memory 113:17,
135:17, 136:1,
136:4.
men 151:13, 165:2.
mental 44:20,
49:8.

mention 167:14,
169:18, 209:23.
mentioned 4:24,
13:24, 13:25,
41:24, 125:19,
181:21, 181:25,
182:9, 194:7,
214:3.
mentions 140:13.
merchant 142:18,
142:24.
message 60:3, 60:8,
60:23, 62:10,
83:7, 84:21,
126:19, 162:6,
162:9.
messages 10:14,
44:3, 45:24, 57:8,
58:17, 80:6, 80:8,
82:17, 82:20,
83:11, 125:21,
127:4, 163:12,
181:2, 181:7.
messed 76:25.
met 89:13, 110:13,
110:16, 112:21,
125:10, 126:20,
133:5, 165:23,
165:25.
MH 214:22.
Miami 38:7, 117:13,
133:1.
Michael 193:15,
193:20, 193:23,
193:25, 194:3,
194:4.
Michelle 131:6,
131:9, 193:15,
193:20, 193:23,
193:25, 194:1,
200:11, 200:13.
microphone 2:5,
49:21, 91:23,
99:11, 103:21,
104:15, 118:8,
150:6, 150:12,
150:16.
mid 151:6.
middle 94:22.
Mika 200:17.

mike 43:8, 101:19,
  197:19, 209:14,
  210:11, 210:21.
mikes 2:11.
mind 145:1,
  168:17.
mines 165:14,
  165:15.
minivan 202:20.
minus 27:13.
minute 43:9, 59:17,
  59:18, 71:4,
  143:20, 143:24,
  144:2, 144:3,
  163:1.
minutes 26:23,
  51:23, 52:17,
  122:10, 135:20,
  147:14, 148:11,
  148:12, 148:24,
  157:22, 161:4,
  161:9, 175:21,
  217:5.
Mirandized 217:3.
missed 76:24, 86:1,
  86:5, 86:6.
missing 18:6, 75:15,
  181:1.
mistakenly 78:19.
misunderstanding
  47:4.
misunderstood
  14:12.
Mobile 5:20,
  141:18.
mockery 162:19.
moment 75:22, 88:10,
  101:22, 116:10,
  166:19, 174:1,
  182:15, 209:14.
moments 83:21.
Monday 156:2, 156:7,
  157:25, 163:25,
  174:17, 174:20.
monetary 190:8.
money. 191:15.
monitor 100:10,
  147:6, 151:11,
  207:8.
monitoring 106:10.

month 37:14, 57:12,
  58:2, 68:10, 77:3,
  192:1.
months 187:19,
  214:10.
Mooch 169:11.
mostly 182:23.
mother 104:20,
  131:5, 186:4,
  186:16, 194:1,
  194:2.
mountain 87:4.
Mouster 164:10,
  164:13.
move 50:16, 82:3,
  127:17, 134:14,
  151:5, 217:15.
moving 82:7, 127:16,
  202:1, 210:9.
MSISDN 63:22.
multiple 55:6, 78:4,
  88:22.
murder 9:17, 10:5,
  90:4, 179:10,
  179:14, 179:20,
  183:13, 183:15,
  185:9, 186:25,
  194:25, 195:6,
  195:7, 197:23,
  199:5, 199:11,
  200:21, 201:16,
  202:7.
murdered 8:7,
  182:21, 214:11.
music 116:22.
Myles 192:14,
  194:22, 195:16,
  215:14, 215:16.
Myrtle 68:23, 82:12,
  153:16, 154:9,
  154:10, 156:17,
  156:20, 157:8,
  158:2, 158:4,
  158:6, 161:13,
  161:18, 166:3,
  166:6, 166:18,
  166:20, 167:1,
  169:3, 169:4,
  172:15.
myself 54:25, 59:19,

120:15, 120:20.
.
.
< N >.
N-o-r-r-i-s 92:3.
named 32:6, 164:15,
  164:17, 215:13.
names 84:4, 154:22,
  154:25.
nap 166:23, 167:1,
  167:3.
narcotics 177:16,
  182:23, 182:24,
  203:15, 203:18,
  205:1.
nature 161:16,
  183:1, 183:20.
Near 29:8, 29:16,
  67:3, 79:13,
  88:17, 158:14,
  185:8.
nearby 30:8.
nearest 86:24.
necessarily 121:19,
  140:12.
necessary 53:15,
  55:24.
need 11:15, 13:25,
  27:12, 51:8,
  51:14, 52:19,
  54:4, 55:2, 55:5,
  55:7, 71:16,
  84:23, 85:11,
  120:20, 126:3,
  126:7, 126:10,
  150:15, 167:21,
  201:22, 206:2,
  207:2, 209:22,
  217:4.
needed 170:3,
  201:11.
needs 16:24, 28:20,
  217:10.
neglected 206:10,
  209:21, 210:8.
neighbor 201:6.
neighborhood 28:4,
  70:5, 196:5,
  196:7.
neighbors 180:13.

network 31:20,
  77:13.
New 17:2, 36:23,
  45:6, 53:24, 57:1,
  59:10, 82:22,
  83:22, 104:5,
  106:22, 110:8,
  110:10, 124:8,
  124:10, 151:4,
  176:15.
newly 64:17.
newspaper 216:2.
Next 53:18, 74:1,
  91:12, 91:13,
  96:4, 98:6, 98:25,
  99:1, 103:10,
  116:8, 122:7,
  134:13, 137:13,
  141:12, 143:3,
  149:19, 157:18,
  168:24, 187:19,
  202:10, 204:18,
  205:7, 216:22.
nice 2:15, 213:15.
nickname 117:15,
  117:20, 151:20,
  151:22, 151:24,
  199:24, 199:25.
night 6:16, 45:3,
  59:2, 134:5,
  134:12, 136:2,
  146:7, 161:2,
  168:2, 169:1,
  172:11, 181:5,
  181:15, 181:18.
nightly 144:6.
nine 177:14.
No-ip 8:14.
No. 1:9, 152:22,
  160:21, 168:6,
  168:23, 169:2.
Nobody 53:4, 80:6,
  85:12, 121:13,
  121:16, 121:17,
  131:13, 131:15.
nom 185:2, 185:16.
none 80:5.
Nope 76:6, 110:1.
nor 28:6, 75:4.
normal 196:15.

normalize 78:16.
normally 105:12,
  108:17.
Norris 91:14, 91:15,
  91:18, 91:25,
  92:7, 93:21,
  96:19, 98:2,
  98:10.
north 29:12, 29:14,
  30:8, 34:20, 36:4,
  36:14.
NORTHERN 1:2.
northwest 30:2.
Norwalk 138:8,
  138:9.
notated 208:9.
note 67:17, 71:3,
  71:8, 73:15,
  75:1.
noted 98:11, 147:16,
  211:8.
notes 97:4,
  127:22.
Nothing 31:22, 91:3,
  98:16, 101:13,
  102:22, 128:13,
  128:15, 129:3,
  129:6, 136:24,
  165:12, 217:19.
notice 37:15.
notified 145:20.
notifies 148:23.
Noting 90:15.
notion 45:9.
now. 61:1, 98:6.
numb. 45:4, 59:3.
numbers 12:4, 12:6,
  29:15, 29:20,
  72:21, 72:22,
  73:1, 73:11, 74:4,
  74:6, 75:6, 75:9,
  77:22, 78:2,
  93:13, 97:5,
  97:13, 97:14,
  97:16, 120:13,
  120:14, 121:7,
  181:4, 181:8,
  182:16, 184:8.
numerics 97:3.
numerous 180:15,

  193:18.
Nurton 90:21.
NYT 184:24.
.
.
< O >.
o'clock 60:16, 82:2,
  111:19, 112:2,
  112:7.
OA 141:22.
oath 3:2, 56:9,
  112:18, 176:14,
  176:15.
Object 44:23, 52:21,
  90:25.
Objection 14:14,
  48:20, 50:18,
  50:20, 52:21,
  53:25, 55:12,
  64:20, 69:23,
  100:23, 111:9,
  130:17, 135:12,
  173:9.
objections 176:9.
observation 114:3.
observations 95:21,
  114:2.
observe 198:16.
obsessively 45:12.
obtain 14:6,
  178:7.
obtained 180:24,
  182:1, 188:25,
  205:16, 211:18.
obtaining 201:8.
obvious 28:3.
obviously 55:25,
  90:1, 129:22,
  130:12, 179:23,
  180:12, 192:7,
  192:24, 198:21,
  198:23, 214:15.
occasion 113:2,
  113:14, 113:18,
  114:12, 190:18,
  191:1.
occasions 86:7.
occupant 95:12.
occupied 43:22.
occur 16:18.

occurred 71:7,
190:9, 190:25.
October 196:1.
offensive 54:1.
offer 140:9, 140:12,
140:14, 140:16,
140:17, 140:23,
140:25, 141:6,
141:8, 143:5,
143:12, 144:4,
144:19.
offerings 144:8.
office 191:22,
202:8.
Officer 91:14,
91:15, 91:18,
91:25, 92:7,
93:21, 96:19,
98:2, 98:9,
196:18, 202:19,
202:23, 202:24,
203:3, 216:19.
offices 156:2,
192:14.
Official 1:47,
217:27.
officially 148:10.
often 32:6, 107:7,
191:11, 191:20,
191:21.
Old 92:25, 98:12,
99:23, 104:3,
150:22, 150:23.
older 183:23.
Oldham 1:27, 7:9,
91:13, 92:6,
96:17, 96:19,
98:16, 99:1,
99:20, 100:21,
100:25, 101:20,
102:19, 102:21,
137:13, 138:4,
147:4, 147:5,
148:13, 149:13,
211:8, 211:15.
once 140:5, 143:14,
145:15, 166:12,
177:16, 178:3,
187:19.
one-month 66:21.

one. 76:25,
213:16.
ones 24:20, 25:12,
51:24, 53:22,
61:7, 87:7, 165:2,
193:12.
online 138:18.
open 52:1, 62:5,
209:12, 211:6.
openly 190:16,
191:20.
operation 192:21.
opine 83:11,
84:13.
opinion 37:13.
opinions 28:12.
opportunity
198:16.
opposed 16:25,
57:12, 58:2,
142:21, 142:22.
opposite 9:11,
42:18.
option 144:17.
options 145:5.
order 6:10, 36:2,
37:10, 44:21,
118:23, 170:7,
181:2.
ordered 181:13.
ordinary 15:18,
196:9.
original 46:12,
161:3.
originally 151:3,
185:19.
others 21:12,
54:3.
otherwise 143:20,
196:19.
out. 62:17, 152:19,
159:2.
outbound 22:22,
23:12.
outgoing 9:22,
18:24, 19:18,
23:13, 23:14,
24:11, 24:13,
24:15, 24:18,
24:20, 25:10,

25:19, 26:6,
26:7.
outlets 153:6,
153:7, 153:8,
153:15, 154:12,
156:15.
outside 18:12,
86:19, 86:20,
87:15, 196:3.
overall 54:11,
66:19, 75:8.
overanxious 49:12.
overheard 189:20,
189:25.
overnight 158:25,
165:20.
Overruled 14:16,
64:22, 91:1.
overstate 28:12.
owe 108:6, 115:21,
115:23.
owed 116:1, 116:2,
123:22, 181:11,
191:12.
owing 190:14,
190:16, 191:19.
own 54:13, 174:23,
188:1, 206:7.
owned 139:6.
owner 182:10,
182:11, 182:12.
.
.
< P >.
P-10 83:19.
P-10A 4:15.
P-10B 82:13,
82:17.
P-12 151:13,
162:5.
P-12A 156:24,
157:1.
P-15 163:20.
P-16 147:4, 147:6,
148:21.
P-16A 139:20,
139:23, 140:18,
147:16.
P-2 8:1, 8:19, 9:18,
72:9, 73:15,

78:1.
P-23 4:12.
P-24 3:20, 122:25,
123:1.
P-29 101:18,
101:21.
P-2B 127:5.
P-2D 16:13.
P-2F 26:11.
P-2H 98:3.
P-2I 84:17, 85:19.
P-2J 80:18, 80:19.
P-2Q 12:20, 12:22.
P-2T 10:17.
P-2U 7:6.
P-2V 5:1.
P-5 76:15, 78:20.
P-7 75:24, 75:25,
78:19, 78:22,
80:11, 81:12,
82:5, 85:14.
P-9A 3:21, 4:2,
9:19, 118:2,
122:1.
p.m. 3:18, 6:17,
6:25, 7:25, 25:19,
27:13, 27:14,
27:18, 32:19,
35:13, 36:10,
60:18, 60:19,
60:20, 60:21,
64:12, 64:13,
64:14, 65:5, 65:6,
70:5, 143:4,
147:16, 147:18,
149:3, 149:7.
packing 54:10,
61:1.
pad 217:15.
pages 10:23, 57:16,
72:9, 199:18.
pagination 72:14.
paid 116:3, 142:23,
142:25, 145:9,
190:5, 190:10.
paint 48:13,
49:15.
pair 144:18.
Pan 82:22, 83:22.
paper 81:20, 155:12,

156:22.
papers 182:25,
183:1.
paragraph 188:24.
Pardon 135:14,
151:17, 152:3,
154:20, 159:8,
164:12, 165:24.
Park 27:25, 28:4,
28:8, 66:14,
66:16, 69:18,
70:5, 75:20,
75:21, 89:5.
parked 196:5.
parking 88:4,
113:20, 113:22,
128:8, 129:17.
part 10:21, 18:13,
37:19, 44:23,
53:10, 146:23,
162:16, 183:12,
199:3, 199:4,
199:7, 203:9,
204:7, 204:10,
205:13.
participants
212:2.
participate 113:15,
114:14, 199:7,
205:19.
participation
192:21.
particular 4:20,
5:4, 69:17, 75:1,
85:2, 112:23,
113:14, 114:18,
140:17, 141:9,
142:25, 145:8,
148:3, 179:17,
184:5, 193:21.
particularly 48:14,
55:3.
parties 176:8.
parts 51:3.
pass 212:11.
Passenger 114:7,
114:8.
passing 212:8.
password 85:13.
past 71:12.

path 183:5.
patience 56:8.
patrol 177:11,
196:18, 202:19,
202:22, 202:24,
203:3.
pattern 20:3, 24:24,
39:22, 40:6,
43:25, 44:4,
66:19, 66:24.
patterns 20:1,
39:20, 41:19.
Pause 210:15.
pay 105:25, 106:3,
108:7, 108:8,
142:23, 145:11,
191:2, 191:3,
191:18, 192:3.
paying 192:5.
payment 146:24.
payments 192:3.
pen 7:9, 207:11.
people 18:12, 66:25,
69:5, 89:13,
162:21, 164:4,
164:9, 174:14,
174:18, 179:3,
181:14, 182:6,
185:22, 193:2,
193:6, 215:9.
percent 35:18,
36:21, 42:11,
57:19, 71:8,
87:20.
percentage 13:17.
perhaps 40:6,
46:8.
period 13:13, 30:25,
34:5, 39:14,
39:17, 45:22,
66:17, 66:21,
67:2, 125:14,
152:20, 177:24.
periods 45:20, 48:9,
79:8.
permission 210:5,
210:13, 212:5,
216:22.
personal 192:21.
personalities 55:6,

62:17.
personality 51:20,
  53:22.
personally 85:7,
  130:7, 193:9,
  193:12, 200:25.
persons 21:16.
perspective 13:23,
  74:20.
pertaining 129:6.
PH-1 100:9, 100:11,
  110:22.
PH-3 104:11.
PH-4 182:5, 193:19,
  198:14, 215:15.
pharmaceuticals
  182:25.
Philadelphia 34:1.
phones 5:5, 10:5,
  11:2, 16:6, 27:23,
  28:4, 28:14,
  28:23, 31:3,
  38:24, 39:1, 42:5,
  73:11, 73:14,
  75:18, 83:11,
  88:17, 88:23,
  89:2, 89:3, 89:4,
  90:7, 120:15,
  121:4, 125:22,
  131:24, 132:10,
  180:16, 206:16.
photograph 151:12,
  151:13, 206:23,
  207:5, 207:16,
  208:2, 208:6.
photographs
  206:12.
physical 33:11.
physically 77:19,
  94:11, 97:17.
Pick 28:25, 40:7,
  113:3, 125:15,
  135:8, 144:25,
  146:4, 159:14,
  160:17, 160:18,
  160:22, 185:22.
picked 68:19,
  159:17, 159:18,
  185:5.
picking 17:4, 39:9,

39:23, 40:16,
  45:6, 53:24,
  113:4, 113:8,
  113:12, 193:3.
picture 104:10,
  110:23, 166:5,
  181:20, 182:6,
  207:1.
pie-shaped 76:10,
  76:20, 76:22,
  86:13, 86:16,
  86:17, 87:21.
piece 90:13,
  148:6.
pieces 140:13,
  210:9.
Pikesville 35:17,
  92:14, 93:5,
  202:14.
Pili 82:24.
ping 69:7, 77:8,
  184:6.
Place 28:15, 75:12,
  75:18, 111:20,
  115:3, 136:10,
  136:11, 141:25,
  172:20.
placed 143:5,
  143:12, 176:15.
places 51:20.
Plaintiff 1:7,
  1:23.
plan 154:23, 160:16,
  160:19.
planned 190:4.
plate 96:3, 96:13,
  96:15, 96:22,
  97:2, 97:15,
  97:20, 205:25,
  206:4, 206:6,
  207:17.
plates 96:10,
  96:12.
platform 138:22.
play 90:14, 208:23,
  212:5, 214:25.
played. 215:1.
playing 213:11.
playing. 90:16.
Plaza 160:5, 160:6,

160:7, 160:8,
  160:9, 160:10,
  160:11, 160:12,
  160:13, 160:15.
Please 7:21, 43:5,
  60:11, 91:8,
  91:16, 91:23,
  99:4, 99:11,
  99:14, 101:19,
  103:14, 103:21,
  137:1, 137:16,
  137:22, 137:25,
  143:4, 149:15,
  149:21, 150:4,
  150:18, 155:7,
  157:2, 175:8,
  176:16, 189:3,
  206:2, 215:25.
plenty 191:15.
PLF 141:12.
plot 64:13.
plots 34:24,
  35:10.
plotted 29:20, 31:2,
  31:12, 80:12.
plug 33:12.
plume 185:3,
  185:16.
Plus 148:3.
point. 44:25, 55:24,
  60:11, 175:17,
  215:25.
pointed 75:10,
  75:17, 112:24.
Pointing 6:22,
  48:17, 111:5.
points 24:25, 40:10,
  46:6, 50:25.
pole 87:15, 87:17.
Police 92:1, 92:9,
  92:13, 96:7,
  177:2, 187:22,
  189:15, 197:5,
  202:17, 203:5.
Pontiac 170:12,
  205:13.
popped 15:7.
pops 148:9.
portion 73:17,
  74:9.

portions 51:13, 214:15.
position 46:24, 47:2, 61:24, 138:21, 178:3.
positioned 94:23.
positions 177:9.
possibly 172:13.
post 166:13, 166:16.
poster 12:19.
potentially 22:20.
pound 107:14.
pounds 107:6, 107:8, 107:10, 107:18, 107:21.
Power 29:4, 30:13, 68:21.
powered 77:12.
pre-grand 199:15.
precinct 92:14, 92:19.
precision 68:25.
Predominantly 151:10.
preference 111:23, 111:24.
premium 153:8.
preparation 120:12, 125:20, 211:21.
prepared 176:8, 197:23, 212:6.
preparing 211:16.
prescription 182:22.
present 8:15, 154:4.
presented 153:19, 153:20, 153:21, 153:25.
President 116:25, 117:2.
Pretty 16:6, 45:4, 59:2, 118:17, 132:23, 167:8, 187:1, 193:4, 194:4.
prevent 45:8, 59:12.
previous 60:17,

149:4, 212:13.
previously 74:17, 214:3.
price 144:4, 144:6, 144:16, 144:17, 144:19, 144:20, 144:22, 145:7.
Priceline 138:12, 138:15, 138:17, 138:21, 138:24, 139:5, 139:8, 139:15, 139:17, 140:7, 140:11, 141:3, 141:6, 141:13, 142:18, 142:24, 143:1, 143:7, 143:14, 144:5, 144:8, 145:20, 147:17, 147:19.
primarily 104:8, 138:16.
primary 178:18.
prime 153:8.
printed 171:16.
Prior 57:2, 77:6, 81:3, 119:9, 136:10, 147:15, 152:11, 152:13, 152:14, 171:2, 171:3, 171:9, 178:5, 178:6.
priority 196:20.
Privacy 44:8, 49:4, 50:21, 55:10, 55:23, 61:21.
privy 189:21.
Probably 22:20, 24:3, 41:6, 41:18, 79:25, 86:1, 101:2, 102:13, 113:1, 153:17, 153:18, 157:23, 158:10, 168:3, 168:4, 168:7, 168:23, 170:5, 178:14, 209:6, 217:4.
probative 45:18, 55:12, 61:19.

problem 51:2, 55:4.
proceed 112:2, 212:9.
Proceedings 1:17, 52:1, 62:5, 209:12, 211:6, 217:7, 217:22, 217:25.
proceedings. 210:15.
Process 16:3, 33:7, 71:3, 78:8, 139:17, 140:2, 147:23, 164:19, 195:17, 195:24.
processes 208:3.
produced 195:23.
products 141:3.
program 77:20, 77:21.
progresses 55:8.
project 204:18.
promoted 177:13, 177:17, 178:3.
prompt 20:25, 21:3.
property 146:18.
propose 216:24.
prosecutors 52:13.
protective 44:21.
provide 95:14, 95:16.
provided 12:22, 72:21, 73:6, 73:8, 74:16, 74:18, 107:24, 184:2.
provider 10:18.
providers 5:4.
provides 195:19.
providing 178:19.
provoking 190:15.
proximity 45:24, 184:13.
publicly 144:16.
publish 50:23.
publishing 51:16.
pull 16:8, 108:17, 108:20, 206:6, 206:11.

pulled 95:8, 108:22,
 114:3, 114:4,
 140:1, 203:16.
pulling 90:20.
pump 85:12.
pumping 78:8.
purchase 102:6,
 102:7, 102:11,
 121:8, 146:6,
 146:13.
purchasing 140:15.
purpose 55:21,
 121:10, 121:11,
 123:16, 124:10,
 132:10.
purposes 182:5,
 188:1.
Pursuant 209:2.
pursue 204:4.
push 111:17,
 216:3.
putting 30:13,
 41:13, 49:19,
 94:11, 185:4.
.
.
< Q >.
qualifying 144:7.
quality 16:5,
 16:7.
quantities 107:5.
quantity 203:17.
Quarter 163:22.
Quarters 162:25,
 163:5, 165:17,
 165:19, 165:23,
 165:25, 170:23,
 170:24, 173:4.
Question 4:11,
 23:19, 46:21,
 46:23, 46:25,
 47:1, 64:21,
 64:23, 73:2,
 105:14, 120:17,
 120:18, 124:3,
 129:12, 130:25,
 133:20, 152:17,
 157:18, 167:22,
 168:13, 168:15,
 168:19, 174:24,

 211:7.
questioned 174:16,
 191:5.
questioning 47:16,
 204:15.
questions 46:8,
 46:15, 46:19,
 50:1, 51:11,
 70:13, 75:23,
 88:16, 88:19,
 88:21, 98:19,
 98:20, 103:4,
 131:17, 148:14,
 149:10, 149:11,
 156:1, 160:12,
 168:19, 169:24,
 170:7, 173:19,
 173:20, 175:6,
 181:21, 215:3.
quick 2:2, 17:14,
 42:3, 174:3,
 206:12.
quickly 52:3,
 204:22, 210:3.
quite 77:3, 180:9.
quote 152:11.
.
.
< R >.
R-15 163:21, 170:22,
 171:13.
R-21 96:25, 97:1.
rack 144:7.
radar 93:12.
raise 44:9, 44:11,
 49:3, 49:4, 51:1,
 91:16, 99:4, 99:5,
 103:14, 137:16,
 149:21, 150:13,
 176:9, 176:16.
raised 44:21.
ran 184:12.
range 144:19,
 206:11.
rapes 177:21,
 177:22.
rate 144:7, 145:2,
 178:22, 178:23,
 179:7.
rather 54:7.

RC 142:10.
re-raise 55:15.
Reach 38:23, 123:13,
 123:14, 134:23,
 157:16.
reached 198:21.
reaching 23:6,
 49:13.
Read 8:10, 9:1,
 11:17, 49:18,
 50:13, 53:22,
 58:20, 60:24,
 125:25, 126:1,
 135:25, 156:3,
 156:5, 156:22,
 162:15, 162:16,
 162:19, 162:20,
 162:23, 162:24,
 168:22, 188:24,
 189:3, 192:8.
reading 27:11,
 162:18.
readout 93:17.
reads 58:25,
 62:16.
ready 2:25, 52:6,
 112:16.
real 54:12, 68:21,
 164:20, 165:4,
 206:12.
realized 211:4.
really 37:13, 55:1,
 61:18, 69:2, 80:7,
 116:2, 134:15,
 136:14, 171:21,
 194:4, 197:2,
 201:15, 204:21,
 217:7, 217:10.
rear 96:13.
reason 43:23, 49:5,
 49:13, 54:24,
 61:15, 76:5,
 120:3, 128:18,
 133:2, 134:24,
 142:10, 142:13,
 142:24, 144:15,
 170:7.
reasonable 81:8.
reasonably 85:1.
reasons 44:23.

rebutting 54:19.
receive 136:18,
    143:20, 143:24,
    197:6, 200:24,
    202:2.
received 37:17,
    54:12, 77:14,
    102:14, 123:21,
    192:1.
receiving 80:8.
recess 52:18, 112:9,
    175:22.
recognize 38:3,
    93:24, 96:25,
    100:10, 100:13,
    151:13, 188:9.
recollect 173:12.
recollection 97:4,
    101:14, 101:23,
    104:22, 106:6,
    121:3, 135:19,
    135:24, 155:14,
    164:6, 168:5.
reconsider 55:9.
reconsidering
    61:6.
record. 43:7, 61:5,
    208:21, 209:18.
recorded 42:14,
    55:1, 140:2,
    143:18, 209:24,
    211:18, 213:25.
recording 121:17,
    213:11.
recover 10:14,
    180:21.
recovered 181:23.
red 4:20, 17:10,
    20:12, 20:16,
    21:4, 65:11,
    98:10.
redact 51:5.
redacted 51:14,
    209:3, 214:15.
redactions 50:20.
REDIRECT 88:13,
    88:14, 133:16,
    133:18, 149:12,
    173:21, 173:22.
redundant 142:17.

refer 11:9, 11:13,
    155:22, 156:24,
    214:20, 214:22.
reference 54:7,
    59:17, 60:1,
    124:17.
referenced 73:21.
references 12:8,
    50:13, 58:21,
    209:3, 210:20,
    215:12.
referred 117:15,
    151:19, 151:22,
    151:24.
referring 14:23,
    16:12, 78:19,
    170:2.
reflect 100:24,
    111:8.
reflected 127:5.
reflective 95:2.
refresh 101:14,
    135:17, 135:18,
    136:4.
refreshes 101:23,
    135:23, 136:1.
regard 4:11, 9:16,
    13:23, 44:14,
    44:18, 89:7,
    89:24, 185:7,
    203:19.
regarding 3:13,
    53:9, 199:5,
    212:14.
registration 96:3,
    96:10, 96:11,
    96:13, 96:21,
    97:15, 163:23,
    165:22, 170:22,
    171:13, 207:9.
regular 64:18,
    95:18.
Reisterstown 160:10,
    160:12.
rejected 142:4.
rejection 142:14,
    142:15.
relate 3:11.
related 5:4, 182:11,
    193:6, 196:3.

relation 129:19,
    193:7, 199:11.
relationship 84:7,
    108:1, 108:10,
    193:23, 193:24.
relevant 15:22.
remaining 34:15.
remembered 191:25.
remind 2:3, 56:9,
    112:17, 118:11,
    217:16.
remodel 180:7.
remove 62:9.
rent 60:1, 68:13.
rental 138:19.
repeated 46:8,
    215:25.
repeatedly 45:19,
    89:3.
report 42:15, 42:16,
    42:19, 188:17,
    188:19, 192:7.
Reporter 1:47,
    186:22, 217:27.
reporters 2:16.
represent 16:13.
representative
    202:22.
represented
    193:20.
represents 13:16,
    15:21, 72:24.
request 125:17.
requested 70:25,
    142:7, 145:24.
require 117:9,
    118:2, 172:4.
reseller 5:14,
    5:21.
reservation 139:16,
    139:25, 140:6,
    140:12, 141:19,
    141:25, 142:10,
    145:12, 145:15,
    146:10, 146:14,
    146:15, 146:22,
    147:10, 147:11,
    148:2, 149:2,
    149:6.
reservations

147:23.
Reserve 29:8,
   34:9.
reserved 173:3.
reserving 217:4.
residence 31:9,
   35:25, 70:2, 82:9,
   109:10.
resolve 52:3, 52:17,
   217:14.
Resources 182:12,
   183:7, 187:8,
   189:19, 189:23,
   192:14, 193:5,
   199:12.
respect 35:9, 69:16,
   86:13.
respond 46:7,
   126:25, 143:22.
responded 80:5,
   80:6, 197:6.
responding 46:2,
   60:5, 152:17.
responds 80:24,
   80:25.
Response 45:4, 50:1,
   60:9, 97:22, 98:8,
   127:14.
response. 162:14.
responsibilities
   92:16.
responsibility
   115:9.
rest 52:21, 53:22,
   61:16, 91:9,
   137:3, 149:17,
   175:9, 193:18.
result 48:8, 95:21,
   117:9, 179:1,
   196:12, 200:19,
   201:8, 216:20.
resulted 94:3.
retail 144:16,
   144:20, 144:21.
retrieve 131:12.
retrieving 131:9.
return 55:22, 81:11,
   107:22.
returned 194:21.
returns 81:9.

reverse 36:2, 110:9,
   118:22.
review 46:11,
   144:13.
reviewing 83:10.
revisit 46:8.
rhetorical 47:1.
Rich 73:18, 73:21.
Richard 17:10,
   75:3.
ride 154:6, 154:19,
   154:21.
riding 157:14.
right-hand 213:12.
rights 217:4.
rings 15:13.
Road 34:2, 92:25,
   93:1, 98:12,
   98:13, 160:10,
   160:12, 169:22,
   170:4, 196:8.
roadway 94:22.
role 116:24,
   139:11.
Ronald 164:10,
   164:13, 164:16,
   164:17, 171:21.
room 112:1, 141:24,
   142:2, 142:5,
   142:16, 144:5,
   144:6, 148:24,
   161:18, 161:20,
   163:1, 163:5,
   165:16, 165:19,
   172:5, 172:12,
   172:22, 173:1,
   173:3, 173:17,
   175:18, 180:6,
   180:7, 180:12.
rooms 161:24,
   162:2.
Rooster. 171:24.
Rosalind 65:11,
   75:11, 75:12,
   75:18, 75:20,
   77:3.
Roughly 107:17,
   144:1.
rounds 180:13,
   180:17.

route 144:23.
routed 41:10,
   86:4.
row 21:6.
Royster 171:23,
   171:25, 172:1.
RPR 1:46, 217:23.
ruling 61:7.
run 95:18, 143:8.
ruse 186:2.
rush 209:22.
RX 187:8, 189:19,
   189:23, 199:12.
RXRS 182:12, 192:14,
   193:5, 194:8.
.
.
< S >.
S-e-k-o-u 176:25.
S-h-e-l-d-o-n
   103:23.
S-h-e-l-l-s 4:16.
Safari 141:16.
safe 121:13, 121:15,
   121:20.
Sandra 1:25, 202:6,
   202:21.
satisfied 173:8,
   173:10.
save 83:13.
saved 4:6, 4:21,
   83:15, 118:13.
Savings 27:2.
saw 12:6, 63:21,
   78:12, 89:15,
   90:20, 110:14,
   112:21, 112:22,
   112:24, 112:25,
   124:16, 128:3,
   128:10, 128:24,
   129:8, 129:14,
   130:15, 130:23,
   131:1, 166:3,
   166:16, 167:7,
   181:7, 184:12.
saying 2:14, 7:25,
   28:3, 28:6, 28:13,
   30:18, 38:22,
   48:12, 50:10,
   51:9, 51:10,

55:20, 61:17,
66:14, 89:11,
123:2, 126:8,
144:25, 157:10,
165:21, 166:2,
166:11, 170:1,
176:7, 189:25.
says 5:20, 42:12,
62:7, 62:10,
63:22, 72:18,
74:9, 111:17,
126:2, 127:7,
132:7, 136:14,
140:9, 160:9,
162:16, 164:10,
164:14, 164:15,
174:21, 191:3.
scene 68:17, 94:12,
179:25, 185:9,
201:24, 202:11.
Schedule 182:23.
scheme 75:8.
schizophrenia
50:4.
school 62:14.
science 86:14.
scope 90:25,
93:14.
score 144:13.
Scott 155:11, 164:9,
171:19, 172:3.
Scotty 155:1, 155:5,
159:23, 159:25.
screen 3:19, 16:25,
17:7, 56:13,
59:23, 62:6,
73:16, 76:10,
89:25, 97:7,
111:14, 148:9,
148:21, 156:23,
162:5, 170:21.
scrubbed 40:25.
search 138:14,
138:23, 139:5,
142:3, 145:3,
192:13, 192:22,
194:15, 205:7,
205:14, 213:6,
213:7.
searched 205:24.

searching 141:10.
seat 91:22, 99:10,
103:20, 137:22,
150:4, 150:14,
150:17, 176:22.
seated 2:18, 52:24,
52:25, 56:6,
100:17, 112:12,
176:12, 216:16.
second 3:25, 9:14,
11:15, 11:24,
12:6, 76:21,
78:18, 80:16,
83:18, 90:14,
90:18, 100:19,
102:25, 103:1,
135:9, 137:11,
141:1, 141:4,
141:8, 208:12,
208:19.
secondary 178:16,
178:17, 178:19.
seconds 9:5, 21:2,
41:5, 71:9, 71:13,
71:14, 71:18,
71:24, 85:21,
85:24, 86:7.
section 177:16.
sector 28:25, 29:24,
31:8, 65:10,
65:24, 66:2,
66:21, 68:19,
68:21, 69:6,
69:14.
sedan 94:5, 95:8.
seeing 111:10,
163:13.
seeking 140:6,
146:15, 146:22.
seem 50:18, 54:4,
215:8.
seemed 49:5.
seems 50:11, 54:1,
55:13.
seen 61:12, 110:23,
113:1, 128:5,
128:6, 128:9,
129:6, 129:9,
130:11, 155:12,
205:8, 205:24,

206:7, 207:2,
207:17.
sees 50:5, 87:24.
seized 30:20,
206:25, 207:20,
207:24.
seizing 208:3.
seizure 72:4,
203:20.
Sekou 175:15,
176:18, 176:24.
select 145:17.
selected 145:20.
sell 106:13, 106:15,
107:1, 107:7,
107:15.
selling 105:18.
sells 105:19.
send 51:22, 127:4,
147:9, 147:25,
176:6.
sending 196:23.
senior 138:22,
138:25, 139:7,
139:14.
sense 15:18,
55:21.
sent 26:24, 43:17,
54:11, 58:11,
58:17, 62:10,
62:16, 123:11,
147:13, 163:12,
166:10, 184:8,
185:20, 185:21,
192:5.
separate 191:1.
September 197:24.
sequence 36:10,
97:14.
sequential 141:5.
Sergeant 201:17.
series 58:17, 80:24,
82:17, 125:21.
serious 191:7.
served 198:9.
server 143:21,
143:22.
servers 143:7,
147:24.
service 5:4,

147:17.
serving 32:22,
  32:24.
set 12:6, 57:1,
  72:5, 78:11,
  107:11, 124:12,
  136:10, 136:11,
  136:20, 139:1,
  216:23.
set-up 11:21.
sets 78:5, 78:15.
setting 134:4.
seven 178:10,
  180:13, 180:14.
seven-second
  11:21.
several 20:19,
  181:4, 187:18.
sex 177:2.
share 120:9.
shattered 180:17.
sheet 17:14, 18:22,
  22:3, 25:1, 29:3,
  42:21, 73:6,
  78:16, 208:16.
Sheldon 103:12,
  103:16, 103:23,
  117:14.
Shell 4:4, 4:6,
  32:14, 32:16,
  34:19.
Shells 4:16, 117:19,
  118:14, 118:24,
  120:6, 124:17.
shifting 62:19.
shipping 146:25.
shit 60:24.
shooting 94:24,
  216:20.
shopping 152:9,
  152:14, 152:19,
  152:25, 153:1,
  153:3, 153:5,
  153:7, 153:12,
  156:15.
short 40:13,
  41:19.
Shortly 82:2,
  186:11.
Shorty 155:1, 155:5,

159:23, 159:25,
  164:18, 164:19,
  164:22.
shot 180:15,
  185:10.
showed 14:24,
  155:12.
shown 33:1, 35:9,
  207:8.
shows 15:21, 74:1,
  75:25.
Shykia 200:14.
sic 66:18, 75:18.
side 2:7, 113:21.
sight 87:5, 87:8,
  87:9, 87:12,
  87:17, 87:18.
sign 172:5, 172:7.
signal 77:12, 87:25,
  88:2, 88:3,
  88:7.
signature 172:1.
significant 55:3,
  192:9.
Significantly
  178:25.
silent 86:11.
silver 94:5.
Silverback 116:19,
  116:21, 117:7.
SIM 180:18, 186:5.
similar 34:4,
  179:6.
single-family
  180:5.
sirens 94:20,
  95:5.
sister 193:25,
  194:3.
sit 150:11, 196:6,
  196:8.
site 6:12, 27:20,
  28:13, 69:17,
  90:22, 184:5.
sits 87:15, 140:3,
  144:19.
sitting 150:13,
  150:14, 206:9.
situated 12:18.
situation 23:25,

114:20, 190:15,
  191:14, 201:11,
  205:4.
Six 1:10, 20:16,
  40:3, 120:10,
  157:21, 157:22,
  161:4, 161:9,
  178:10.
six-minute 157:4.
sleep 166:1, 166:22,
  167:4.
sleeping 166:21,
  172:16, 173:8.
slept 169:1.
Slide 7:19, 63:19,
  91:23, 99:11,
  103:21, 150:17.
slight 141:1.
slipped 210:25.
Slow 2:4, 189:10.
small 206:8.
smart 141:14,
  141:19.
smell 203:16.
Smith 17:1, 35:19,
  35:21, 35:22,
  35:25, 36:13.
SMS 42:12.
snip 31:17, 38:15,
  62:20.
socialize 113:11.
software 138:13,
  139:8, 139:14.
sold 105:12, 109:19,
  109:20.
sole 95:12.
somebody 40:16,
  69:1, 88:4,
  164:21.
somehow 24:25.
Someone 2:23, 48:14,
  48:15, 55:23,
  68:12, 75:7,
  80:25, 81:24,
  83:22, 108:3,
  158:25, 181:8,
  183:4, 186:12,
  196:18, 196:23,
  202:8, 215:9.
sometime 108:20,

158:20, 190:9,
195:15.
sometimes 15:24,
16:4, 16:8, 49:11,
49:14, 50:5, 55:2,
86:23, 108:17,
108:22, 108:25,
117:10, 117:15,
125:1, 141:25,
151:19, 151:22,
151:24, 158:19.
somewhat 32:3.
somewhere 28:21,
35:8, 88:3,
115:24.
son 198:12,
215:18.
soon 59:18,
203:15.
sore 206:2.
Sort 32:4, 34:11,
38:15, 39:21,
43:12, 58:1,
67:24, 68:10,
109:24, 194:18,
199:8, 210:25.
sorted 37:16,
78:17.
sorting 37:12,
78:6.
sounds 50:7, 209:6,
212:16, 217:12.
source 8:1, 10:9,
10:16, 102:15,
102:17, 133:5,
133:9.
South 3:17, 81:13,
81:17, 82:7,
82:11.
Spats 43:13, 43:14,
43:15.
Speaking 79:16,
94:16, 184:10,
193:5, 193:6,
209:7.
SPECIAL 3:3, 177:19,
177:20, 178:2,
203:12, 217:8.
specific 45:16,
46:17, 69:1,

93:12, 139:25,
155:7, 159:16,
160:14.
specifically 16:6,
28:22, 93:15,
97:25, 102:5,
141:2, 141:10,
177:2.
specifics 44:20.
speed 92:18, 93:16,
93:17, 94:19,
95:22, 96:1.
speeders 93:9.
speeding 94:4.
Spell 91:24, 92:2,
99:11, 99:14,
103:21, 137:23,
137:25, 150:5,
176:23, 176:24,
186:21.
spent 26:10, 89:4,
89:7.
spits 77:23, 78:2.
spoke 86:6, 105:12,
134:11, 169:15,
169:17, 189:14,
193:14, 196:17,
207:20.
spring 152:8,
152:14, 152:21,
152:22, 152:24,
153:1, 154:11.
Sprint 5:18.
SS 4:4, 4:6.
stamp 188:13.
stand 99:5, 149:24,
209:4, 217:6.
Standard 8:3, 9:1,
58:10, 196:15.
standing 113:21.
stands 141:13.
stars 144:12,
145:6.
start 12:18, 16:12,
37:10, 53:14,
103:10, 107:10,
176:4, 176:5,
205:7, 208:22,
212:9.
started 49:24, 57:8,

64:10, 107:12,
138:12, 140:11,
172:24, 177:11,
181:12, 195:9.
starting 21:8,
135:25.
starts 45:12, 45:18,
82:3.
State 28:3, 91:24,
94:1, 96:7, 99:11,
103:21, 137:23,
150:5, 176:23,
192:16, 195:5,
204:2, 204:3.
stated 117:14,
190:4, 190:18,
191:8, 192:2.
statement 215:10,
216:25.
statements 190:17.
States 1:1, 1:5,
71:1.
Station 34:2, 34:7,
70:8, 78:24,
79:12, 79:14,
79:15, 79:17,
80:1, 80:13,
80:15, 81:4, 81:8,
81:10, 81:15,
82:9, 202:12,
205:10.
stationary 93:8.
status 8:6, 140:14,
141:22.
Stay 126:17, 142:22,
144:12, 158:19,
158:20, 165:16,
165:18, 165:19,
165:20, 172:11,
173:15.
stayed 158:16,
159:1, 170:24,
172:22.
Staying 6:8, 144:10,
158:9, 158:18,
158:22, 167:16,
172:5, 172:25.
stays 138:19.
stenographic
217:24.

step 51:19, 95:1,
  137:11.
Stephen 1:39.
steps 28:18.
sticker 62:9,
  65:14.
sticking 78:9.
stipulate 47:24.
stop 7:18, 90:17,
  93:18, 94:2,
  94:20, 95:3, 95:4,
  95:19, 98:14,
  127:19, 198:1,
  202:2, 205:4,
  214:25.
stopped 135:3,
  186:2, 190:11,
  205:5, 205:9.
stops 93:9.
stored 7:22.
straight 87:12.
Street 1:48, 66:18,
  75:13, 76:11,
  89:15, 89:17,
  196:6.
stress 45:15.
strike 24:19,
  169:16, 194:14.
strip 94:22, 94:23,
  94:25, 168:4.
strongest 77:11,
  87:25.
struck 180:16.
stuff 21:9, 22:11,
  55:13, 109:19.
style 58:1, 97:2,
  97:12, 97:16.
subject 50:20,
  205:8.
submit 143:19.
submitted 143:3,
  146:12, 147:15.
subscribed 116:18.
subscriber 5:21.
subsequent 59:9.
subsequently
  187:15.
subset 214:16.
substance 193:12,
  199:18.

subtract 7:23, 22:2,
  58:7, 58:8.
subtraction 27:3.
succession 40:3,
  41:17.
suffice 205:22.
suggest 212:15.
suggesting 14:13,
  14:15, 42:18,
  43:18, 210:3.
sum 128:3.
summaries 83:6.
summarize 59:9.
summarized 80:19.
summary 8:2, 16:11,
  17:14, 18:9,
  18:22, 20:9, 22:3,
  22:12, 22:15,
  23:24, 25:25,
  38:15, 38:16,
  40:1, 42:21,
  62:20, 72:10,
  72:24, 73:6,
  73:10, 73:12,
  73:13, 78:1,
  187:25.
summertime 58:8.
supervisor 196:14,
  201:10.
supervisors
  203:11.
supplied 107:21.
supplier 105:21.
supplies 183:23,
  183:24.
supply 106:13,
  110:9, 133:10.
supplying 105:23,
  105:25, 106:7,
  113:11.
support 178:19.
supporting 178:21.
supposed 130:10,
  135:5, 160:22,
  191:17.
surprise 20:6,
  39:25.
surrounding 79:24.
surveillance
  185:23.

sustain 55:7.
Sustained 69:25,
  135:13, 135:15.
switch 31:21, 31:22,
  31:25, 32:9,
  32:22, 32:24,
  33:7, 33:10,
  33:15, 35:2,
  35:15, 37:16,
  38:9.
sworn 3:4, 91:19,
  99:7, 103:17,
  137:19, 150:1,
  176:19.
system 94:1, 94:12,
  96:7, 140:5,
  147:21.
.
.
< T >.
T-e-r-r-y 92:3.
T-mobile 5:18,
  29:22, 29:23,
  65:22, 67:13,
  71:19.
T. 1:46, 217:27.
Tabitha 203:1,
  203:2, 203:3.
table 2:7, 67:24.
tables 139:16.
tablet 141:20,
  141:21.
tag 94:5, 97:6,
  97:9, 205:25,
  206:4, 206:6,
  206:8.
taken. 52:18, 112:9,
  175:22.
talked 6:11, 38:13,
  44:19, 120:25,
  153:18, 153:21,
  157:17, 157:21,
  157:22, 157:23,
  157:24, 161:2,
  161:4, 161:9,
  181:1, 181:3,
  181:4, 190:16,
  213:6.
talks 53:19, 53:21,
  75:2.

tallies 12:22,
  13:22.
tally 13:12.
target 72:18, 72:22,
  72:25, 73:11,
  74:4, 74:6, 74:10,
  74:16.
team 177:14,
  185:23.
teams 138:13, 139:1,
  139:2, 139:6.
technical 139:12.
telephone 87:15,
  87:17, 125:6.
telephones 89:9,
  116:15.
tend 16:4.
tendency 42:3.
term 61:17, 108:2.
terms 15:4, 47:18,
  49:12, 195:7.
terrible 133:24,
  207:1.
Terry 91:14, 91:18,
  91:25.
tested 207:21.
testified 3:5,
  27:10, 47:8,
  62:19, 68:3, 76:1,
  91:20, 99:8,
  103:18, 132:14,
  137:20, 150:2,
  155:20, 168:9,
  176:20, 179:20.
testifies 50:8,
  62:2.
testify 198:5,
  199:22, 216:22.
testifying 14:15,
  32:11, 63:25,
  153:23, 155:18,
  158:24, 166:8,
  166:25.
testimony 6:6,
  16:15, 65:10,
  69:16, 75:19,
  91:6, 91:8, 98:22,
  103:6, 120:12,
  125:21, 135:22,
  135:25, 137:1,

149:15, 156:3,
  175:8, 175:13,
  217:5.
texted 136:13.
texting 41:17,
  42:23, 43:12,
  45:12, 45:19,
  126:10.
texts 41:18, 50:12,
  51:11, 59:10,
  71:6.
thefts 186:3.
theirs 212:24.
themselves 212:15.
thereabouts 152:8.
thereafter 186:11.
thinking 15:17,
  154:7, 154:12,
  156:12.
third 6:5, 165:3.
thou. 59:13.
though 21:21, 23:7,
  36:9, 64:9,
  110:21.
thousand 31:24.
three 3:9, 15:15,
  19:18, 21:5,
  28:14, 58:17,
  87:11, 101:2,
  101:3, 102:13,
  104:24, 107:9,
  139:2, 145:6,
  169:4, 206:16,
  208:24, 209:2,
  211:21, 211:24.
throat 206:2.
throwing 54:10.
thrown 204:23.
Thursday 216:22,
  217:12.
ticket 98:12.
tie 45:9.
timing 72:1,
  215:3.
title 178:7.
to. 189:21.
today 2:21, 14:8,
  45:7, 53:24,
  100:15, 104:5,
  111:2, 116:1,

117:3, 207:2,
  215:20.
together 28:18,
  39:1, 101:4,
  152:9, 152:12,
  152:14, 166:5,
  185:6, 192:24,
  195:9.
toggle 90:12.
toll 14:1, 14:6,
  14:18.
tomorrow 161:8,
  175:24, 176:7,
  176:9, 176:10,
  215:24, 216:5,
  216:14, 217:21.
Tony 215:19.
Took 45:2, 59:1,
  83:1, 93:6,
  148:24, 166:20,
  166:23, 180:25.
tools 90:11.
top 28:19, 37:10,
  87:11, 87:15,
  93:14, 122:2,
  146:11, 157:3,
  165:15, 207:7,
  207:10, 209:5,
  213:12, 213:23.
total 13:15, 128:3,
  178:8.
touch 157:14.
touched 111:13,
  180:18, 195:5.
toward 3:11,
  195:14.
towards 30:4, 30:9,
  68:10, 82:10,
  174:13, 182:2.
towers 29:7, 31:23,
  31:24, 65:16,
  77:2.
town 93:4.
Towson. 60:5.
Tracfone 5:16, 5:20,
  5:22.
Tracfones 16:4.
tracked 185:24.
Traffic 86:22,
  92:14, 92:16,

92:18, 93:3, 93:9,
93:18, 94:2,
94:20, 95:4,
95:19, 96:6,
98:11, 98:14.
trail 158:11.
training 7:2, 11:17,
178:3, 178:4.
TRAINOR 1:37, 49:20,
49:23, 50:3, 50:9,
51:5, 98:20,
103:3, 131:19,
131:20, 131:23,
133:20, 149:11,
173:20.
transaction 111:11,
190:7, 190:9.
transactions 80:4,
85:3, 125:14.
Transcript 1:17,
2:9, 212:6,
212:21, 213:13,
213:19, 213:23,
215:6, 217:24.
transcripts 208:24,
212:7, 212:14,
212:17, 212:20.
transpired 128:12,
128:13, 128:15.
transported
204:14.
travel 95:1, 95:2,
104:5, 106:20,
106:22, 110:8,
117:10, 124:1,
124:4, 134:8,
138:7, 138:18,
138:22, 138:25,
148:7, 168:3.
traveled 123:25,
124:1, 132:20,
165:2.
traveling 39:1,
125:19.
tree 84:23.
TRIAL 1:10, 2:8,
49:24, 98:23,
137:2, 149:16,
175:9, 197:23,
198:5, 200:1,

211:22, 217:15.
tried 48:9, 76:7,
157:15, 180:25.
trip 153:1, 153:3,
154:3, 156:15,
157:11, 157:15,
157:23, 159:13,
175:25.
trouble 55:1.
truck 186:11,
191:17.
trunk 206:9.
truth 168:8, 168:10,
168:12, 168:17.
Try 2:4, 2:10,
15:10, 16:11,
48:13, 61:22,
65:9, 69:9, 73:3,
118:11, 119:5,
143:21, 217:6.
Turn 43:8, 57:16,
67:23, 80:23,
101:19.
turned 77:8, 77:10,
121:6, 180:1,
197:20.
Turner 74:2, 74:4,
74:9, 190:20,
190:23, 193:16,
194:7.
turning 118:10.
TV 170:21.
two-minute 134:2,
134:15.
type 5:3, 114:2,
141:17.
typed 188:13.
types 89:22, 90:10,
139:15.
typewrite 188:16.
typically 106:15.
.
.
< U >.
ultimate 27:23.
unanswered 42:3.
uncommon 48:6.
Underneath 5:19,
31:24.
understand 15:10,

16:11, 44:3,
45:25, 48:1, 55:2,
61:21, 61:23,
65:9, 73:2.
understanding 44:4,
49:7, 61:13,
147:18, 179:24.
understood 196:21.
Unfortunately 181:1,
210:25.
uniform 203:4,
203:5.
unique 141:3.
unit 177:2, 177:15,
177:17, 177:19,
182:23, 183:3,
183:7, 185:21,
193:2, 201:13,
201:19.
United 1:1, 1:5,
70:25.
Universal 7:22.
universe 13:12.
Unless 51:16, 52:24,
74:10, 128:22,
129:5, 216:16.
unplug 85:11.
unplugged 85:10.
unquote 152:11.
unsent 136:14.
until 2:6, 17:22,
25:4, 25:11,
30:25, 31:5,
44:17, 52:9, 70:5,
91:9, 98:23,
119:20, 120:18,
123:20, 137:2,
145:19, 149:2,
149:16, 167:21,
175:9, 216:14.
upstairs 180:23.
usage 5:24.
useful 148:8.
uses 81:24.
using 11:17, 28:19,
36:15, 46:5,
79:13, 80:7,
80:25, 81:5,
81:10, 81:23,
90:10, 93:3, 93:8,

95:2, 180:20,
185:17, 185:24.
usual 201:10.
UTC 18:16, 58:6.
utilized 90:2,
90:3.
.
.
< V >.
V-10 65:9, 65:11.
V-i-e-r 138:1.
value 45:18.
values 72:3.
van 202:20.
various 5:3.
vehicle 93:12,
93:15, 93:16,
94:6, 94:16, 95:3,
96:3, 96:10,
96:12, 96:14,
97:2, 97:10,
97:24, 197:8,
197:12, 202:2,
205:8.
venture 190:3,
190:4.
verbal 162:14.
Verizon 5:15, 5:18,
5:23, 10:20, 31:8,
37:18, 78:13.
version 117:15.
versus 144:21.
vest 95:2.
vice 177:15.
vicinity 26:1.
victim 180:11,
181:14, 184:14,
184:16, 189:17,
189:18, 190:1,
190:3, 190:8,
190:10, 190:14,
190:16, 190:21,
190:23, 191:7,
191:10, 191:11,
191:12, 191:14,
191:17, 191:19,
191:23, 192:1,
192:2, 192:4.
victim. 192:6.
victims 177:19,

177:20.
Video 90:16.
Vier 137:14, 137:18,
137:24, 138:5,
138:7, 139:19,
139:21, 140:18,
146:6, 147:5,
148:13.
view 37:10,
122:24.
Views 144:9.
violation 94:4,
98:12.
violator 95:1.
Violence 177:13.
Virgin 5:20.
visit 165:18.
visual 113:17.
VM 8:15.
voice 8:15, 8:17,
9:7, 9:13, 11:19,
11:21, 12:1, 12:2,
23:16, 23:17,
24:16, 25:12,
32:13, 41:10,
41:13, 43:18,
60:9, 71:22, 86:4,
91:23, 104:17,
150:5, 215:9.
voice. 62:7.
voluntarily
198:21.
voluntariness
217:1.
vs 1:8.
.
.
< W >.
W-a-l-t-e-r-s
99:17.
W. 1:48.
wait 120:17, 167:21,
174:11.
waiting 174:8.
walk 51:18, 158:8.
walked 186:6.
walks 186:12.
Walmart 121:9,
131:25.
Walters 99:2, 99:6,

99:13, 99:21,
99:23, 100:10,
100:25, 102:21.
wanted 3:11, 23:10,
24:11, 25:7, 26:4,
31:11, 31:15,
32:16, 37:3,
43:11, 44:9, 54:3,
157:16, 172:6,
172:9, 174:5,
176:2, 196:9,
196:21.
wants 44:24, 46:10,
54:20.
warehouse 102:4.
warning 93:25, 94:3,
94:9, 95:15,
95:22, 96:1.
warnings 95:24.
warrant 198:4,
198:9, 205:14.
warrants 192:13,
192:16, 192:17,
192:22, 193:2,
194:15, 205:7,
205:16, 205:20,
213:7, 213:8.
Washington 47:10.
watch 85:12.
water 206:3.
weapon 130:13,
130:15, 130:25.
wear 45:4.
wearing 95:2,
100:18, 100:20.
weather 45:7.
web 141:14, 141:15,
141:18, 147:11.
website 146:3,
148:5.
Wednesday 1:19.
weeds 183:20.
week 153:16, 153:24,
154:8, 154:10,
154:13, 154:15,
154:24, 155:15,
170:25, 172:15.
weekend 174:13,
179:18.
weekend. 59:19.

weeks 42:10, 107:9,
  116:9.
weigh 45:17.
weird 182:25.
welcome 162:8.
West 30:2, 38:7,
  81:16, 82:8,
  82:10.
Western 145:9,
  148:3, 158:11,
  158:12.
whatever 93:15,
  108:18, 108:21,
  110:20, 111:23,
  114:21, 115:12,
  116:23, 134:24,
  145:5, 151:8,
  161:7, 162:20,
  176:8.
wheelchair 217:9.
whenever 121:19.
whereas 5:22,
  87:14.
wherever 117:13.
whether 7:3, 9:7,
  11:18, 24:24,
  37:20, 50:14,
  51:13, 53:15,
  61:14, 62:1,
  71:15, 71:18,
  86:23, 87:3, 87:5,
  88:22, 89:12,
  101:22, 101:23,
  102:17, 157:17,
  161:10, 161:19,
  197:5, 197:6,
  198:4.
whisper 210:3.
whistleblower
  187:10.
White 34:2, 34:7.
Whoever 81:10.
whole 51:16, 60:10,
  68:18.
whom 102:9.
Wilde 3:3, 3:9,
  12:16, 15:12,
  15:18, 15:19,
  44:15, 46:5,
  46:11, 70:20,

88:16, 89:11,
  90:19.
window 143:24,
  147:19, 180:10,
  180:12, 180:17.
wintertime 18:19.
wireless 5:16.
wiretap 132:12.
wish 212:9.
with. 28:25.
within 28:22, 72:25,
  87:21, 92:19,
  125:13, 143:19,
  143:24, 144:2,
  147:14, 148:10,
  181:4, 193:2.
without 34:23,
  37:12, 44:11,
  46:16, 49:15,
  49:19, 55:12,
  89:11, 142:23.
witnesses 2:9,
  193:4, 194:18,
  199:10, 199:19,
  200:14.
woke 167:5.
woman 186:15, 194:7,
  200:5, 215:13.
wonder 53:14.
Woodland 90:22.
Woodlawn 31:23,
  32:7, 33:15,
  35:1.
word 174:18.
words 48:15, 110:9,
  206:7.
work 18:4, 19:25,
  60:5, 60:10,
  60:12, 66:25,
  69:18, 69:20,
  69:22, 110:9,
  117:5, 138:12,
  177:20, 183:12,
  189:5, 189:22.
worked 152:16,
  152:22, 178:6,
  204:1.
working 17:3, 66:18,
  67:21, 68:12,
  74:21, 85:18,

102:3, 143:13,
  190:11, 192:24,
  195:9.
works 67:3.
worth 107:19.
wound 180:22, 181:9,
  181:16.
wrap 215:4.
wristband 172:6,
  172:9.
write 8:25, 16:24,
  163:3, 188:16,
  205:7, 212:15.
writing 217:15.
written 171:14.
wrote 116:5, 127:15,
  163:4.
Wutoh 179:10,
  180:11, 180:15,
  182:20, 183:13,
  185:9, 189:16,
  193:6, 194:25,
  195:8, 197:24,
  199:5, 199:11,
  200:21, 214:10.
Wylie 65:14, 66:2,
  66:18, 67:21,
  68:16, 69:22,
  76:8, 76:11,
  76:12, 76:13,
  88:18, 88:23,
  89:4, 89:18.
.
.
.
< Y >.
y'all 174:18.
yard 186:12.
year 57:12, 58:2,
  106:8, 216:21.
Years 92:11, 104:24,
  106:8, 116:4,
  138:12, 139:9,
  140:3, 150:23,
  152:22, 155:21,
  157:25, 177:11,
  177:15, 177:18,
  178:8, 178:11.
Yes. 158:25,
  167:1.
Yesterday 3:10,

4:25, 5:9, 5:17,
6:6, 6:11, 10:2,
10:4, 12:6, 12:9,
33:3.
Yo 126:9, 126:11,
126:17, 127:7.
York 36:23, 82:22,
83:22, 104:5,
106:22, 110:8,
110:10, 124:8,
124:10, 151:4.
young 186:15.
yourself 132:8,
136:1, 153:12.
yourselves 112:4,
216:1.
Yup 128:21, 128:23,
163:14, 163:16,
165:7.
.
.
< Z >.
ZERKIN 1:31, 98:19,
102:24, 210:7,
210:18, 211:2,
217:19.
zero 40:3, 40:19,
40:22, 41:5,
41:17, 71:9,
122:9, 146:6,
146:7, 146:13.
ZIP 32:1, 32:3,
33:18.
zoom 69:7.