**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF MARYLAND**

**UNITED STATES OF AMERICA,**    )
                                  )
          Plaintiff,              )
      vs.                         )
                                  )   **CRIMINAL NO.:** GJH-17-0667
**DAVON CARTER** and **CLIFTON**  )   **JURY TRIAL:**  Day Nine
**MOSLEY,**                       )
          Defendants.             )
                                  )
_____  )

**Transcript of Proceedings**
**Before the Honorable George J. Hazel**
**Wednesday, January 22nd, 2020**
**Baltimore, Maryland**

**For the Plaintiff:**

     Sandra Wilkinson, AUSA

     Kim Oldham, AUSA

**For Defendant Davon Carter:**

     Gerald T. Zerkin, Esquire

     Christopher M. Davis, Esquire

**For Defendant Clifton Mosley:**

     Harry J. Trainor, Jr., Esquire

     Stephen B. Mercer, Esquire

_____

Christine T. Asif, RPR, FCRR
Federal Official Court Reporter
101 W. Lombard Street, 4th Floor
Baltimore, Maryland 21201

1                    **P R O C E E D I N G S**

2           THE COURT:  Good morning.  Be seated unless

3     addressing the Court.  I understand there's an issue.

4           MS. WILKINSON:  Well, I don't know about an issue,

5     Your Honor, but I forgot to tell the Court yesterday, on

6     Friday when we were not in, Ms. Heise-Forcina, the victim

7     witness coordinator at the U.S. Attorney's Office, who's here

8     in the courtroom, commented to Ms. Oldham that on the second

9     day of trial, after she went out of the -- she was sitting in

10    the courtroom and went out to look out the window at a break,

11    that she believes Alternate No. 2 was looking out the window

12    at the same time and made a comment to her to the effect,

13    "there's a lot of information in there."  And Ms. Heiss didn't

14    really acknowledge it and moved away, but since it was a

15    communication from a juror to somebody not in the courtroom, I

16    mean, one of us, that I thought I would report that to the

17    Court.  And that's all the communication was.

18          THE COURT:  All right.  And just to make the record

19    clear, so it was, at least, you perceived it as being directed

20    towards her?

21          MS. WILKINSON:  Yes.

22          THE COURT:  Okay.  And she didn't respond?

23          MS. WILKINSON:  And she didn't respond, but to kind

24    of smile or just kind of move away.

25          THE COURT:  Okay.

```
 1              MS. WILKINSON:  Am I right about that --
 2              THE COURT:  I do see that she's in the courtroom.
 3              MS. WILKINSON:  Yes.
 4              THE COURT:  All right.  Does any counsel feel like
 5     anything needs to be done about that?
 6              MR. ZERKIN:  I don't, Your Honor.  And I think
 7     actually doing anything about it, especially with an alternate
 8     when it's getting close to the end of the trial, it's unlikely
 9     we'll need the alternates, it makes an issue that we don't
10     need to have.  So I would suggest that we not do anything
11     about it.
12              THE COURT:  All right.  Counsel for Mr. Mosley have
13     any suggestions?
14              MR. TRAINOR:  I tend to agree with Mr. Zerkin.
15              THE COURT:  Is counsel for the government asking me
16     to do anything?
17              MS. WILKINSON:  No, sir.
18              THE COURT:  All right.  Yes, I appreciate the
19     government bringing that to my attention.  I don't think it
20     requires me to bring in the juror.  I agree with Mr. Zerkin's
21     comment that, if anything, it would make a big deal of
22     something that he's probably forgotten about by now.  But I do
23     appreciate the government bringing that to my attention.
24              MS. WILKINSON:  Thank you, Your Honor.  The only
25     last item is that yesterday I had advised the Court that the
```

1    government did not intend to call Mr. Bardos.  And that still

2    holds true today, but there was a communication between the

3    U.S. Attorney's Office and Mr. Bardos that we would like to

4    move in via stipulation through counsel in lieu of Mr. Bardos.

5            And we can probably get it in through someone from

6    my office as well, since it was an e-mail back and forth, but

7    it's essentially the witness list that we've heard information

8    about and the timing of when the witness was produced.  And I

9    believe counsel don't have an objection, recognizing that we

10   can call an e-mail person from the U.S. Attorney's Office if

11   we had to.

12           And I think Mr. Trainor has asked me to draft

13   something up that included a description of who the counsel

14   were in that case to make clear it's not the counsel in this

15   case who received the witness list, which of course we will

16   do.  And we will probably introduce it tomorrow, just move it

17   in via stipulation.  Otherwise, I intend to call off

18   Mr. Bardos, unless counsel for the defendants want to call

19   him, and then therefore, I won't excuse him from the subpoena

20   that exists, obviously, even though it's a government

21   subpoena, as the Court knows, we always make available any

22   witnesses that we have to the defense.

23           THE COURT:  Okay.

24           MR. ZERKIN:  Your Honor, the only thing -- counsel

25   brought this to our attention, you know, ten or 15 minutes

1    ago, and I think we still need to talk about the admission of

2    that document standing alone.

3              THE COURT:  Okay.

4              MR. ZERKIN:  So we will discuss it at a break and

5    get back to the Court.

6              THE COURT:  I appreciate the update.  We still have

7    Officer Hays coming in early tomorrow; is that right?

8              MS. WILKINSON:  We do, Your Honor.  And Ms. Heiss

9    has made arrangements for her to come up at, I believe -- now

10   I don't know, the Court was going to start at 9:30.

11             THE COURT:  I would still say we'll start at 9:30,

12   it's just a matter of how long I need to hold the jury out.

13             MS. WILKINSON:  Right.

14             THE COURT:  She needs to come in and testify for the

15   purposes of a hearing.

16             MS. WILKINSON:  Voluntariness, and she actually

17   Mirandized Mr. Carter.

18             THE COURT:  Do you have a sense how long that will

19   take?

20             MS. WILKINSON:  Ten minutes on direct.

21             THE COURT:  Okay.  All right.

22             MS. WILKINSON:  I don't know what cross is.  I mean,

23   I --

24             THE COURT:  I'll tell the jury 10:15, somewhere

25   around that.

1          MS. WILKINSON:  Her admission that she got from

2     Mr. Carter was very, very brief.  Her testimony will be very

3     brief.  And I actually advised counsel today, I mean,

4     obviously we have to keep continuing to check our notes and

5     our exhibits, but it is possible the government would rest

6     tomorrow afternoon.  So we are on schedule, as the Court can

7     see.

8          THE COURT:  Sure.

9          MS. WILKINSON:  And I advised defense counsel too,

10    and I don't know how the Court wants to proceed, but we will

11    know more after today.  We have a number of what we believe

12    are somewhat limited witnesses, but you know, it's no

13    predicting how long cross-examination and the like will take.

14         So -- but we do have a number of lay witnesses

15    scheduled, and that brings its own unique, you know,

16    challenges to the courtroom, so --

17         THE COURT:  Sure.  I won't hold any counsel to it at

18    this point, but at least as we sit here now, for scheduling

19    purposes, is Mr. Carter planning to put on a case?  I won't

20    hold you to it, just as you're thinking now.

21         MR. DAVIS:  Your Honor, very briefly, maybe a

22    custodian --

23         THE COURT:  Okay.

24         MR. DAVIS:  -- of records to identify a record and

25    explain it and possibly an investigator, depending on how

1    things pan out over the next day or two.

2              THE COURT:  Okay.

3              MR. DAVIS:  But hour max.

4              THE COURT:  Okay.  Mr. Mosley's counsel, again, not

5    holding you to it, but just as things sit here now, do you

6    think you'll have a case?

7              MR. TRAINOR:  We still have to have a talk, but I'm

8    predicting now that our case would be no longer than

9    Mr. Carter's case and perhaps shorter.

10             THE COURT:  All right.  So if -- you think best

11   prediction is end of the day tomorrow or sometime tomorrow?

12             MS. WILKINSON:  Yes, sometime tomorrow.  It's hard

13   for me to say, but I will be able to tell the Court at the end

14   of the day today.  I've given counsel, as I have all along, a

15   list of who the witnesses are.  There's probably seven on the

16   witness list today, which is ambitious, but they are short

17   witnesses except for Ms. Melvin, and then some -- a couple

18   more jail calls we intend to play at the end of the day.  And

19   we have the medical examiner tomorrow and that sort of thing,

20   some family members, but it could be more than -- earlier than

21   5:00 o'clock tomorrow, but it's hard to say right now.

22             THE COURT:  I'm just thinking about in terms of

23   scheduling a charging conference.  I mean, we can say we'll do

24   it first thing Tuesday morning and then go into defense case

25   after that.  And so then I would have the instructions ready

1    to go if we need to do it in the afternoon, but I'll figure

2    that out by the end of the day, depending where we are.  Maybe

3    we do it at the end of the day tomorrow.

4         MS. WILKINSON:  Thank you, Judge.  And then the last

5    item is that I advised counsel when the Court denied our

6    request for the jury to see the crime scene, we went back and

7    discussed the importance of the evidence, and we sent a

8    special agent out to do some videotaping.  It's not our

9    preferred choice, but it's better than nothing.

10        THE COURT:  I suspected that would end up being the

11   plan B.

12        MS. WILKINSON:  So I asked -- I told counsel about

13   it, and we are just preparing the final version of it so we

14   can let them look at it.  But we don't intend to introduce it

15   tomorrow.  The only kind of glitch is that the agent that was

16   available was not on the original government's list of persons

17   to be mentioned.  She's a new agent, came from an out of

18   state, I doubt anybody on the jury knows about her.  Her name

19   is Summer Meunier, and I'm going to spell that for the court

20   reporter when I remember myself how she spells it.

21        But we would put it in through her because she had

22   time, she's relatively new, and went out and did the

23   videotaping for us.  So with that, it's going to be very brief

24   testimony, it's brief video, but I did want to let the Court

25   know about that as well.

```
 1              THE COURT:  Okay.  Anything else?  Mr. Mercer.
 2              MR. MERCER:  Thank you, Your Honor.  One
 3    housekeeping matter, yesterday I referred for identification
 4    purposes to the last page of Mr. Mosley's interview with the
 5    agents as an area that the defense -- Mr. Mosley believed
 6    should be included in the government's excerpt or that
 7    alternatively Mr. Mosley should be able to cross-examine the
 8    witness about, the Court denied that request.  I referred to
 9    that exhibit as Mosley 23, it's actually Mosley 24.
10              THE COURT:  Okay.
11              MR. MERCER:  So just wanted to clarify that on the
12    record for the court reporter.
13              THE COURT:  Sure.  Anything else?
14              MS. WILKINSON:  No, sir, I don't think so.
15              THE COURT:  All right.  We can get the jury.
16              (Jury entered the courtroom.)
17              THE COURT:  All right.  You may all be seated.  Good
18    morning, ladies and gentlemen.
19              THE JURORS:  Good morning.
20              THE COURT:  How's everyone today?
21              THE JURORS:  Good, how are you?
22              THE COURT:  I'm fantastic, thank you for asking.
23    Woke up in a particularly good mood today, so happy to see all
24    of you.  I think we're ready to continue.
25              Ma'am, you're still under oath.
```

1              Ms. Wilkinson, when you're ready.

2              MS. WILKINSON:  Thank you, Your Honor.

3                        KIMBERLY MELVIN,

4    called as a witness, being previously duly sworn, was examined

5    and testified as follows:

6                        DIRECT EXAMINATION

7    BY MS. WILKINSON:

8    Q.  Good morning, Ms. Melvin.

9    A.  Good morning.

10   Q.  Ms. Melvin, yesterday toward the end of the day, I could

11   not find a document that I wanted to show you, and forgive me

12   for that, but I wanted to talk to you about the two events in

13   your son's life that you talked about yesterday in reference

14   to events you recall regarding Mr. Mosley, all right?

15       And did your son go to Owings Mills High School?

16   A.  Correct, yes.

17   Q.  And I'm just going to put up on the screen, this is the

18   certification from the high school.

19       And we are talking about two events, and just to be clear

20   for the record, one was a prom send off and another was an

21   award ceremony; is that right, Ms. Melvin?

22   A.  Yes.

23   Q.  And the prom send off is the date when you saw first saw

24   the silver Audi; is that right, Ms. Melvin?

25   A.  Yes.

Direct Examination - Melvin  (By Ms. Wilkinson)

1   Q.  And you have a picture of it from that date, and I just

2   wanted to show you one of the documents here.  It's a letter

3   from Owings Mills High School, do you see that there?

4   A.  Yes.

5   Q.  And does it accurately record the date of the senior prom

6   as Saturday, May 21st, the day that you first saw the silver

7   Audi?

8   A.  Yes.

9   Q.  And down below, what I really couldn't find yesterday was

10  the date of the senior awards ceremony, and the --

11          THE COURT:  Just hold on a second.  Are we okay over

12  there?

13          THE CLERK:  The front row is not working, the back

14  row is.

15          THE COURT:  Let's hold on a second.  Do we need IT

16  to come up?

17          THE CLERK:  IT is on their way.  I'm just going to

18  take it down.

19          (Pause in the proceedings.)

20          THE COURT:  You may continue.

21          MS. WILKINSON:  Thank you, Your Honor.

22  Q.  (BY MS. WILKINSON)  And with regard to the senior awards

23  ceremony, does this refresh your recollection about the date

24  of the senior awards ceremony?

25  A.  Yes.

1    Q.  And in fact, as part of the package that the school had

2    provided to us, the actual brochure from the senior awards

3    ceremony, do you see that there?

4    A.  Yes.

5    Q.  Okay.  So would this be the night before May 27th when you

6    spoke to Mr. Mosley about the Maryland Judiciary Case

7    Search?

8    A.  Yes.

9         MS. WILKINSON:  Government's Exhibit M-9, thank you,

10   Your Honor.  In evidence.

11   Q.  (BY MS. WILKINSON)  Now, when we concluded yesterday, you

12   were talking about a statement that Mr. Mosley had made to you

13   about the location information on Fats's phone having

14   something to do with his case, do you remember that

15   testimony?

16   A.  Yes.

17   Q.  Was that the first time Mr. Mosley had ever said something

18   about the location information and its effect on Fats's

19   case?

20   A.  No.

21   Q.  When -- do you recall him saying it on more than one

22   occasion before, or another occasion before?

23   A.  I think it was probably another occasion, I don't recall,

24   though, the occasion, though.

25   Q.  And what did he say to you?

1    A.  The same thing, that's why he keeps, you know, keep phones

2    in the car, don't keep the location on, you know, as far as

3    being located, people can be calling at the wrong time, in

4    reference to Fats's situation.

5    Q.  Was there a difference or not in the way he said it on

6    May 27th when he talked to you as opposed to the earlier

7    occasion when he said it, was there a difference in how he

8    said it to you?

9    A.  Yes.  I mean, he said it -- by me already being shouting

10   and loud, and of course sometimes Mr. Mosley can feed into my

11   energy and sometimes he doesn't, so it was he seen I was

12   upset, so he said it in like a, you know, he -- what you call

13   it -- projected his voice and said it.  I can't really get the

14   word out, but he projected his voice and said it.

15   Q.  And this was on the evening of May 27th?

16   A.  Yes.

17   Q.  Now, you had spoken yesterday about when you first saw the

18   silver Audi, do you remember seeing it again after the prom

19   situation?

20   A.  No.

21   Q.  Now, do you remember hearing about it again?

22   A.  Yes.

23   Q.  Did you talk to Mr. Mosley about it?

24   A.  Yes.

25   Q.  Okay.  And tell us what you can recall about statements

1    Mr. Mosley made about the silver Audi and the location of it

2    after you first saw it at the prom send off for your son.

3    A.  After I first saw it?

4    Q.  Yes, after --

5    A.  Or after I questioned about it?

6    Q.  Yes.

7    A.  After I questioned about it?

8    Q.  Yes.

9    A.  Okay.  Yes, he was just letting me know that of course

10   when I hadn't seen it, he told me he had lent it out.  He did

11   tell me he had lent it out.  And I pretty much didn't ask

12   anymore questions until like later on.  I didn't know, you

13   know, the whole gist of the reason of why he lent it out or

14   anything like that.

15        But he -- when I drove through where he normally would be

16   at, this was like after the holiday weekend, though, and I had

17   seen it, but I knew that he was driving another vehicle and

18   then he had lent out the Lincoln.  So I was a little

19   misconstrued up thinking, in my insecure ways again, that

20   maybe he lent it out to, you know, a female or -- of some

21   sort.

22        Then I do know when it came up again, which was maybe

23   like in middle of June, maybe, I think that's when he had told

24   me that Skinny was told to get all of Fat vehicles, you know,

25   basically off the street or if he was trying to sell them, I

1    don't know.

2    Q.  When you were talking about the holiday, are you referring

3    to Memorial Day?

4    A.  Yes, Memorial Day weekend.

5    Q.  So sometime after that, you had a conversation or more

6    than one conversation with Mr. Mosley about the location of

7    the silver Audi?

8    A.  Yes.

9    Q.  And you stated that you drove by looking for him or the

10   car, which --

11   A.  It was really him, I just -- because I thought that he

12   would be, you know, on Wylie, so when I seen the car parked,

13   you know, I was thinking he has to be around here somewhere,

14   but when I called him, he was in another vehicle.

15   Q.  Okay.  And so you saw the silver Audi parked?

16   A.  Yes.

17   Q.  And where was it parked?

18   A.  It was on Pimlico, like where that old church at, like --

19   Q.  I have a map next to you.

20          MS. WILKINSON:  If I can approach, Your Honor, and

21   I'll put my microphone --

22   Q.  (BY MS. WILKINSON)  When you're referring to -- bring this

23   up to you.  This is Government's Exhibit V-10.

24          And if Wylie is down here -- and I'll move out of the way

25   so the jury can see -- and if Wylie is down here, where would

Direct Examination - Melvin  (By Ms. Wilkinson)

1    you have seen the --

2    A.   Pimlico Road, Pimlico Road.   This is going -- this is

3    going towards Cold Spring; right?

4    Q.   So you're pointing to the south part or the bottom part of

5    the map.

6    A.   Right.   It was past Wylie going like if you came up

7    Pimlico Road through -- off of Belvedere, but going this way,

8    because Woodland and Rosalind -- yeah, coming up this way.   It

9    was parked right in here, that church -- it looks like a

10   church, I don't know, but it's an old church that sits --

11   Q.   In that area?

12   A.   Uh-huh.

13   Q.   And that's where you had seen the silver Audi at that

14   time?

15   A.   Uh-huh.

16   Q.   Okay.   And I'm going to go ahead and let's see if I can

17   rip this little Post-it sticker.

18   A.   It's normally -- a lot of times it's normally where he

19   would park.

20   Q.   And have you just approximate where you saw the silver

21   Audi.   Sorry about that.

22            MR. TRAINOR:  Excuse me, Your Honor.

23            THE COURT:  If counsel needs to move around to be

24   able to see.

25            MR. TRAINOR:  We have trouble hearing her when she

Direct Examination - Melvin  (By Ms. Wilkinson)

1    turns away from the --

2              THE COURT:  I don't know if we can get the hand held

3    mike.

4              MS. WILKINSON:  I'll hold it like this and we'll try

5    to do it.  Can you see it?

6              THE WITNESS:  Yeah, I can see it.

7              MS. WILKINSON:  Go ahead and put it on, and I'll

8    bring it over to you, Mr. Trainor.

9    A.  I mean, I could be -- I just know it's in between here and

10   here.  I do know that's where he would normally park

11   sometimes.

12   Q.  (BY MS. WILKINSON)  So you're giving us a general

13   approximation?

14   A.  Yeah, like right in between here and here.

15   Q.  Okay.  So I'll just go ahead and --

16             THE COURT:  I'm sorry, can we describe for the

17   record what "here" and "here" --

18             MS. WILKINSON:  I am going to, Your Honor.

19             THE COURT:  Okay.

20             MS. WILKINSON:  So we're looking at between Wylie

21   Avenue and Dupont Avenue and Virginia Avenue on Pimlico

22   Avenue.  And I'll show counsel over here.

23   Q.  (BY MS. WILKINSON)  So you state that Mr. Mosley was in

24   another car that day, what car did you see him in that day?

25   A.  Which day, Ms. Wilkinson?

Direct Examination - Melvin  (By Ms. Wilkinson)

1    Q.   The day when you were looking for him and you saw the

2    silver Audi, but you called him --

3    A.   Oh, he was driving a truck, a BMW X5.

4    Q.   Okay.  And what color was that car?

5    A.   Black.

6    Q.   Now, do you recall one way or the other what day that was,

7    or just simply that it was after Memorial Day?

8    A.   It was after Memorial Day weekend.  It was -- because

9    Sunday -- I don't have the calendar up, but Sunday, going --

10   and the day before Memorial Day weekend, we had breakfast on

11   the patio, and that's when I noticed the X5.

12   Q.   So let's go up -- let's finish what your recollections are

13   after Memorial Day when you see the Audi, you talked to

14   Mr. Mosley, but he's in the black X5 on that occasion.

15        Did you talk to him that day about who had the Audi?

16   A.   Yes.

17   Q.   And what did he say?

18   A.   He told me he lent it out to a friend.

19   Q.   And did he say what the purpose was or whose friend it

20   was?

21   A.   No, he said -- only thing he said was that he know that

22   Fats wanted him to lend the car out.

23   Q.   Fats being Matthew Hightower?

24   A.   Yes.

25   Q.   Wanted him to lend the car out?

Direct Examination - Melvin  (By Ms. Wilkinson)

1    A.  Yes, and I asked him the reason, but he didn't know.

2    Q.  Now, we were -- you were about to talk about a

3    recollection you had the Sunday before Memorial Day, meaning

4    the murder happened on May 27th, Saturday is May 28th, do you

5    mean May 29th?

6    A.  The Sunday?

7    Q.  Sunday.

8    A.  Yes.  Memorial Day was May 30th.

9    Q.  Had you actually shown us a picture of the breakfast you

10   made that morning in your phone?

11   A.  Yes.

12   Q.  And showing you Government's Exhibit M-3C, that help

13   refresh your recollection about the date of the breakfast and

14   the conversation you had with Mr. Mosley on that day?

15   A.  Yes.

16   Q.  Okay.  And this is a picture from your phone?

17   A.  Yes.

18   Q.  Okay.  And of a breakfast that you made?

19   A.  Yes.

20   Q.  Okay.  Tell us your recollections about your conversation

21   with Mr. Mosley on Sunday May 29th.

22   A.  It was pretty much the make-up breakfast since we was, you

23   know, I was still upset about not knowing where he was at that

24   Friday.  He had basically told me that he was taking his

25   daughter to school, so I had no choice but to believe it and

1    was just patching things up.  It was make-up, it was personal,

2    just make-up type stuff.

3    Q.  So yesterday you had indicated that you had a view from

4    your apartment, whether you went out the front or the back, so

5    where was this particular breakfast, where were you sitting?

6    A.  We were on the patio on the back where he parked at, so if

7    you're sitting, you know, because first floor patio is not a

8    level, it's not a balcony, you're on the flat surface, so you

9    just got bushes right there.  It's a little gate, you know, so

10   when you're sitting there, you can see the parking lot and you

11   can see the doggy park as well.

12   Q.  Okay.  And what cars, if any, did you observe at that

13   time?

14   A.  I seen the X5.  I believe I seen the Lincoln too, but

15   by -- the Lincoln was lent out to the maintenance guy, so he

16   was at work I guess.  But it was a Sunday, no, he was off.

17   But I seen the Lincoln too.

18   Q.  So do you recall one way or the other talking to

19   Mr. Mosley on that Sunday about the silver Audi, or did you

20   just simply make an observation about the black car being out

21   there, the X5?

22   A.  No, I talked to him about the Audi, and that's when he was

23   telling me that he lent it out to a friend.

24   Q.  And Fats's friend?

25   A.  Yes.

1   Q.  And did he say what the purpose of it was for?

2   A.  No, he just said that Fats had sent word for him to lend

3   the car -- well, to lend the car out, sorry.

4   Q.  Now, you mentioned that at some point that Skinny wanted

5   the cars back?

6   A.  Yes.

7   Q.  Okay.  First of all, Skinny is the woman that you

8   described yesterday, have you ever met her face to face?

9   A.  No.

10  Q.  Okay.  So when you talk about her, is it -- that is how

11  her name was described to you, they called her Skinny?

12  A.  Yes.

13  Q.  Okay.  And who called her Skinny?

14  A.  I believe between Cliff and Fats, it's labels on women, I

15  guess, I don't know, how they look.

16  Q.  And -- but you personally have never met her?

17  A.  No.

18  Q.  Okay.  So what did Mr. Mosley tell you about Skinny and

19  Fats's cars?

20  A.  Say the question one more time.

21  Q.  What did Mr. Mosley tell you about Skinny and Fats's

22  cars?

23  A.  Oh, okay.  That Fats was just trying to collect all of his

24  cars, even cars that didn't have no tags or anything on it, he

25  wanted all of his vehicles, supposedly, off the street.  And I

Direct Examination - Melvin  (By Ms. Wilkinson)

don't know if it was his intentions to sell them, I don't know

why, but it just was like, you know, Skinny was in charge of,

you know, getting the cars off the street, or if he was to

communicate with Fats's, I guess baby mother, you know, to get

the cars off the street.

Q.   Okay.  And when you say "all of his cars," do you know how

many cars Fats had?

A.   No, I don't.

Q.   And did Mr. Mosley ever talk about how many cars Fats

had?

A.   No, he didn't.

Q.   And when Mr. Mosley is talking about all the cars off the

street, is he mentioning any particular cars that had to be

off the street?

A.   No, he just said all of them.  Like, I guess because he

had a dealership license or something too.

Q.   Who had a dealership license?

A.   Fats, I don't know this for sure, but --

Q.   Did Mr. Mosley tell you that he had a dealership?

A.   No, he didn't, but it was that he sold cars.  Besides

working at the dealership he was working at, he was selling

cards on the side.  You get what I'm saying?

Q.   Yes.

A.   Yeah.

Q.   So that came from Mr. Mosley?

Direct Examination - Melvin  (By Ms. Wilkinson)

1    A.  Yes.

2    Q.  So when Mr. Mosley's telling you this about Skinny, do you

3    recall it being on more than one occasion, or did you just

4    talk to him about it one time, about the cars having to get

5    off the street?

6    A.  I talked to him about it twice because then it came once

7    the Audi popped back up on the scene, you know, when I seen

8    him driving it or coming to the house with it, but he wasn't

9    parking it on our complex -- it was on the complex, but it

10   wasn't where it normally would be parked.  It's almost as if

11   you're hiding from the repo man or something.

12       So I couldn't figure out why he was parking at different

13   places, but he had told me he had to hurry up and get another

14   vehicle and get the Lincoln back from the maintenance guy.

15   Q.  Let me kind of break that down.  So you saw the Audi again

16   after the prom date, but after Memorial Day, you saw the Audi

17   again?

18   A.  Yes, it was -- but when I first seen it again, it was when

19   I seen it parked.

20   Q.  As you just described?

21   A.  Yes.

22   Q.  And then at some point, did you see Cliff driving it

23   again?

24   A.  That was a week or so later, it was like a week or so

25   later.

1   Q.  And in your mind, I mean, are you specific about dates, or

2   are you just having a general recollection?

3   A.  It's a general recollection, because we didn't see each

4   other every day.  Like if I got up for work, I didn't see what

5   he was driving or sometimes what was back there, so that's why

6   it was just if I happened to seen him or if he pulled up and I

7   was up.  That's why it's, you know, moving around so much, the

8   time frame.

9   Q.  And just to make sure we're clear, so you see the Audi on

10  your son's prom send off, you see the Audi at some point

11  parked along, generally, the area you described for the jury

12  on Government's Exhibit V-10, the map, and then you see the

13  Audi again and you see Cliff driving it and that's sometime

14  after.

15      Is that the sequence of events as you recall it?

16  A.  Yes.

17  Q.  Now, when you see Cliff driving it again, and you say that

18  occasionally you would see it parked around your apartment

19  complex, was it parked in the ordinary place?

20  A.  No.

21  Q.  And did you ask him why?

22  A.  No.

23  Q.  And how many occasions did you observe the Audi not parked

24  in the regular place but that you saw it?

25  A.  One, it was one time.  It was one time.

1   Q.   Okay.

2   A.   Because then it was to the point that it was parked, but

3   he wasn't driving it, he had somebody come to pick him up, a

4   guy that he hired to pick him up, driving.

5   Q.   And was -- and was that -- that he had somebody else

6   picking him up, are you talking about Mr. Mosley?

7   A.   Yes.

8   Q.   And did you make personal observations of somebody picking

9   up Mr. Mosley?

10   A.   No, he would never let me see -- I think just one time,

11   one day when I happened to call out of work and he was leaving

12   out because he had to go to his nephew's graduation, so it was

13   a Charger, and it was a guy in a Charger that came.  I think

14   it was a Charger or Challenger or something like that, but it

15   was that, that was only one time that I seen the guy.

16   Q.   How did you know that Mr. Mosley was using a driver to

17   drive him around after the events that you just described?

18   A.   He told me.

19   Q.   Okay.  And what did he actually say, as best you can

20   recall?  I know you don't recall exact words, but as best you

21   can recall, what did he tell you and how did he explain

22   that?

23   A.   He just had told me that he hired -- well, not like hired,

24   he got familiar with the guy, the guy comes and pick him up in

25   the morning, takes him around the way.  I never asked him why,

Direct Examination - Melvin  (By Ms. Wilkinson)

 1    though.  I never asked him why, I didn't know.  I thought

 2    maybe something was wrong with the Audi.

 3         But it -- I'm trying to figure out what was wrong with

 4    the Lincoln then, I was confused.  I just stopped asking

 5    questions, because I would never know the answer.  So I just

 6    stopped.

 7    Q.  Okay.  Is the occasion where you saw him driving the Audi

 8    before or after Mr. Mosley told you he was having somebody

 9    drive him now?

10    A.  Say that question one more time.

11    Q.  Was the -- I'm just trying to figure out the sequence of

12    events as best you can recall.  You see Mr. Mosley driving the

13    Audi again, is the time he had a driver before that or after

14    that?

15    A.  It was before, from -- I believe.  What I recall, it was

16    before.

17    Q.  And in sequence of things, when is it in relation to

18    Mr. Mosley telling you that Skinny said Fats wants the cars

19    off the street?

20    A.  Right when I noticed that the Audi was parked in different

21    places, you know, in the complex.

22    Q.  And you say "different places," did you see it parked on

23    more than one occasion?

24    A.  No, I'm sorry to say different places, but a different

25    spot.

Direct Examination - Melvin  (By Ms. Wilkinson)

1    Q.  The one time that you saw it in a different spot?

2    A.  Yes, uh-huh.

3    Q.  Okay.  Now, did you and Mr. Mosley continue your

4    relationship through December of 2016?  In other words, after

5    this series of events you just described to the jury, did he

6    continue to live there with you?

7    A.  Yes.

8    Q.  And were there times in that six-month or so period, and

9    I'm going to refer to December of 2016, because that's when

10   you first testified in the grand jury; is that right?

11   A.  Yes.

12   Q.  In that six-month period, were there times that you and

13   Mr. Mosley were on the outs with one another?

14   A.  No.

15   Q.  You were living there together?

16   A.  Yes.

17   Q.  And did that continue to be at the 4 Harness Court address

18   in Pikesville?

19   A.  Yes.

20   Q.  To your knowledge, in that six-month time period, what was

21   Mr. Mosley doing to make money?

22   A.  He was selling marijuana.

23   Q.  Now, you stated yesterday that Fats had been supplying

24   Mr. Mosley with marijuana, and now, did you know that at some

25   point Fats was locked up, he was in jail?

1    A.   Yes.

2    Q.   And so to your knowledge, this is just a yes or no

3    question, did Mr. Mosley tell you who was supplying him

4    marijuana after Fats got locked up?

5    A.   No.

6    Q.   Now, did -- but in that six-month time period, when you

7    were talking earlier about how Mr. Mosley would go around the

8    way, and what did you understand around the way to mean, or

9    where he would go during the day?

10   A.   Park Heights and Wylie, Pimlico and Wylie.

11   Q.   And is that the area you generally described yesterday?

12   A.   Yes.

13   Q.   And is that inclusive of the yellow Post-it note and that

14   area, Pimlico and Wylie, that you described just a moment ago

15   to the jury?

16   A.   Say it one more time, Ms. Wilkinson.

17   Q.   Is that Park Heights too, the area you just described?

18   A.   Yes, this area, yes.

19   Q.   So we're talking in that area, Wylie, Pimlico area, that

20   you're referring to as Park Heights?

21   A.   Yes.

22   Q.   Now, I'm going to put up on the screen here so we can see

23   PH-1, do you know this man?

24   A.   No.

25   Q.   Never met him before?

1    A.  Never met him.

2    Q.  Now, did you ever talk to Mr. Mosley about a man named

3    Davon?

4    A.  Not -- didn't have a name.

5    Q.  How did Mr. Mosley refer to who you believe was the man

6    named Davon?

7    A.  "Yo."

8    Q.  And why is it you think that Yo is Davon?

9    A.  Um, if he refers to anybody as Yo, it's because he doesn't

10   want to say their name out loud, even if --

11              MR. DAVIS:  Objection.

12              THE COURT:  Sustained.

13   Q.  (BY MS. WILKINSON)  Did Mr. Mosley ever say why he uses

14   the word "Yo"?

15   A.  Yes.

16   Q.  What did he tell you?

17   A.  It's just he don't --

18              MR. DAVIS:  Objection.

19              THE COURT:  Approach.  Approach.

20              (Bench conference on the record.)

21              MR. DAVIS:  Your Honor, it calls for speculation,

22   for the most part, what she's testifying about now.  In

23   addition --

24              THE COURT:  Well, just to be clear, the specific

25   question right now is, did Mr. Mosley ever say why he used the

1    word -- what did he tell you?

2           MR. DAVIS:  And now it's hearsay.

3           THE COURT:  Well, no, that's --

4           MS. WILKINSON:  An admission.

5           THE COURT:  As to one of you maybe, as to one of you

6    maybe not, and I guess ultimately it depends on where you're

7    going with this.

8           MS. WILKINSON:  Well, she has information related to

9    Yo, who she believes to be Davon based on his description as

10   Fats's friend.  And where I'm going with all of it is, is her

11   information that she knows from Mr. Mosley about the

12   relationship with Yo, meaning Davon, and marijuana and where

13   the cars and her recollections about furniture that he had

14   provided, things of that nature.  She has specific

15   information, he just never called him Davon.

16          THE COURT:  Were those statements in furtherance of

17   the conspiracy?

18          MS. WILKINSON:  Uh-huh.

19          THE COURT:  It seems like that would be why it's not

20   hearsay, as to either client.

21          MR. DAVIS:  But the beginning point of all those

22   statements are coming from, "I think," "I believe."

23          THE COURT:  That was the first question, that's why

24   I sustained the first objection.  But now she's asking

25   specifically, what did Mr. Mosley say.  And I paused for a

1    second, but having processed it, it's in furtherance of the

2    conspiracy, so it wouldn't be hearsay as to either

3    defendant.

4         MR. DAVIS:  I don't know what the following

5    answers --

6         THE COURT:  We'll see.  But I think your current

7    objection is overruled.

8         MR. DAVIS:  I still fail to see how it's in

9    furtherance of the conspiracy, though, maybe I'm missing

10   something.

11        THE COURT:  Well, they're selling, allegedly,

12   marijuana together, and to the extent that where I think

13   Ms. Wilkinson says they're going -- she's going is, you know,

14   Mr. Carter becomes the supplier, that would be in furtherance

15   of the conspiracy.

16        MS. WILKINSON:  And depending on different facts

17   that she will relate, Your Honor, there are different hearsay

18   exceptions.  For example, she has a story about how there was

19   furniture that was purchased or provided by Mr. Carter to

20   Mr. Mosley, and she knows for a number of reasons she'll

21   explain, but we're not offering it to prove the truth in the

22   matter asserted, but to prove that they had a relationship

23   with one another.

24        So in other words, I don't really care whether or

25   not they bought furniture, but it's her -- it's his

1    explanation of their relationship with one another and how

2    they know each other more than what Mr. Mosley testified --

3    not testified about, but told -- well, testified in the grand

4    jury about and told investigators.

5             THE COURT:  So if it's just about their

6    relationship --

7             MS. WILKINSON:  Well, different facts have different

8    hearsay exceptions.

9             THE COURT:  Right.  I understand that.  But in terms

10   of the facts that are just about establishing a relationship

11   and nothing more, I don't know, I'm trying to understand,

12   maybe I wasn't following you, but what's --

13            MR. DAVIS:  I just didn't know where --

14            THE COURT:  No, go ahead.

15            MR. DAVIS:  I didn't know where this is going.

16            THE COURT:  All right.  The objection is overruled.

17   The objection's overruled.

18            (The following proceedings were had in open court.)

19   Q.  (BY MS. WILKINSON)  Ms. Melvin, I was just asking you

20   about -- and I actually don't have the exact question that I

21   was asking you, but did Mr. Mosley ever tell you why he uses

22   the word "Yo"?

23   A.  He didn't tell me specifics, but I made my own

24   interpretation that --

25            MR. DAVIS:  Objection.

1          THE COURT:  Sustained.

2    Q.  (BY MS. WILKINSON)  Did he use the word "Yo" to describe

3    certain people?

4          MR. DAVIS:  Objection.

5    Q.  (BY MS. WILKINSON)  Did he use the word "Yo" to describe

6    certain people?

7    A.  Yes.

8    Q.  Did there come a time in December of 2016 when you were

9    served with a grand jury subpoena?

10   A.  Yes.

11   Q.  And how did you first become alerted to the fact that you

12   were going to be served with a subpoena, Ms. Melvin, when did

13   you -- first in your memory that you learned agents were

14   looking for you?

15   A.  My mom called me and told me that some agents came past

16   the house and was looking for me and left a business card for

17   me to call them.

18   Q.  And did you, in fact, call them?

19   A.  Yes.

20   Q.  And do you recall who the agents were?

21   A.  It was Holiday and I think Erin was with him, I'm not

22   sure.  I know Holiday because I seen the video footage on a

23   camera.

24   Q.  And what do you mean the "video footage"?

25   A.  My mother has Vivant, so everything's recorded as far as

Direct Examination - Melvin  (By Ms. Wilkinson)

1  people walking up the walkway.

2  Q.  And referring to Agent Holiday here in the courtroom?

3  A.  Yes, but he was with someone else, I don't --

4  Q.  Recall who it was?

5  A.  Right.

6  Q.  So your mom told you, but then you also say that she had

7  video footage of who had come to her house?

8  A.  Correct.

9  Q.  And at some point, did you -- you said you e-mailed back

10  the agents, and did you receive an e-mail copy of the

11  subpoena?

12  A.  Yes.

13  Q.  And at that point, did you talk to Mr. Mosley about the

14  subpoena?

15  A.  Yes.

16  Q.  And what is your first recollection of talking to him

17  about the fact that you had received a grand jury subpoena?

18  A.  When I spoke to him about it, because I didn't know --

19  don't judge me, but I didn't know what a grand jury was, I

20  didn't know anything, so when I spoke to him about it, he had

21  told me -- he was like, well, have you done anything, you

22  know, anything -- and I was like, I thought maybe I messed up

23  a Social Security case, like a disability or retirement, and

24  he just was there to encourage me, you know, I'm quite sure

25  everything's okay, you know, just go and see what they want.

Direct Examination - Melvin  (By Ms. Wilkinson)

1   That was pretty much it.

2   Q.  Okay.  And did you -- did you, in fact, go to the grand

3   jury and appear on December 20th?

4   A.  Yes.

5   Q.  And testify at that time?

6   A.  Yes.

7   Q.  Now, did you speak to Mr. Mosley before you left, did he

8   know when you were going?

9   A.  Yes.

10  Q.  Did you tell him where you were going?

11  A.  Yes.

12  Q.  And at that point, you didn't know what it was for?

13  A.  Yes.

14  Q.  Okay.  When you got there and testified, did you speak to

15  Mr. Mosley after your testimony?

16  A.  Yes.

17  Q.  Can -- do you have a recollection of the conversation and

18  the circumstances of that conversation with him?

19  A.  Yes.

20  Q.  And can you relate that to the jury?

21  A.  From the time I left?

22  Q.  Yes.

23  A.  Oh, okay.  So when I left with speaking with the grand

24  jury that day, I believe it was December the 20th, 2016, I

25  went home and I spoke with Cliff when I walked in the house,

1    he was sitting on the couch, and basically telling him what it

2    was all about.  And I explained to him that I seen his picture

3    and Fats's picture and other people pictures that was in a

4    book.

5        And I told him what it was in reference to as far as a

6    murder that had took place.  And he had told me, he said, yes,

7    Kim, you know, people been telling him that they have been

8    pulled up and questioned in reference to a murder, trying to

9    say that he had basically some affiliation with it.  He didn't

10   use that exact word, but it was -- just had some dealings with

11   it.

12   Q.  And when he said that to you, what was your reaction

13   knowing that you had told him you thought it could be

14   something else?

15   A.  Right.  He -- his reaction to me or --

16   Q.  What was your reaction to him when he told you --

17   A.  Oh, with him, oh, yes, and I told him, I said, so you knew

18   all this time really what I was going down there for, and he

19   said well, Kim, I really didn't know.  You know, I don't

20   know -- he doesn't know what I could have been doing or

21   whatever, I guess in my own personal life.  But yeah, he

22   really --

23   Q.  Were you doing anything wrong in your personal life?

24   A.  No, no.

25   Q.  You can continue.

Direct Examination - Melvin  (By Ms. Wilkinson)

1   A.   Yes, no.  Yeah, so when he was talking to me, he did state

2   that -- he said, yeah, my mans did tell me that he seen you

3   down there, and I didn't know which mans he was talking about.

4   I only knew that I was in contact with one man out in the

5   lobby hallway out here.  So he -- I said, oh, okay, so then

6   you already probably knew what it was about, you know.

7   Q.   And so let me stop you there, so once he said his mans had

8   been in contact with him, and you harkened back to a man that

9   you had run into in the courthouse, is that what you mean?

10  A.   Yes.

11  Q.   And when you -- is the grand jury actually in the same

12  U.S. courthouse we are in now?

13  A.   Yes.

14  Q.   And when you -- do you recall seeing the man before, or

15  after you went into the grand jury?

16  A.   Before.

17  Q.   And did you have -- had you seen that man before?

18  A.   No.

19  Q.   And did you have any communications with him when you were

20  at the grand jury?

21  A.   Yes, it wasn't by me, though.  It was by him.

22  Q.   And what do you recall him saying?

23  A.   Well, I was sitting on the bench out in the hallway out

24  here, and he came up to me and he was like, do you happen to

25  know what this is about.  And I didn't even know we part of

1    the same -- because I didn't know what a grand jury was, I

2    didn't know what I was there for.

3        So I was just looking at him like, no, and then he

4    mentioned the supply store, you know, that Fats owned, and

5    then he told me how they came at his house, I think it was,

6    something like that, that he came at his house.  And I think

7    because he was at work or he drive trucks or something, I

8    can't -- don't mock me on that.

9    Q.  So he related some information to you about what he

10   believed the grand jury was asking about?

11   A.  Correct.

12   Q.  So -- and with that information in mind, you go in and

13   testify to the grand jury, you come home, you speak to

14   Mr. Mosley, and he says his mans had seen you that day, is

15   that why you believed it was that man?

16   A.  Yes.

17   Q.  And do you, to this day, know who that man was?

18   A.  No.

19   Q.  Now, after Mr. Mosley -- after that part of the

20   conversation, what happened next, Ms. Melvin?

21   A.  Mr. Mosley had told me that he didn't have anything to do

22   with what -- you know, being charged for as far as murder or

23   anything.  He said he didn't -- he said he didn't have

24   anything to do with it.  He doesn't know how he even got

25   miscon- -- basically mixed up in it.  Right.

1    Q.  Now, did you ask him about the fact that the morning of

2    the murder he had told you he had gone to see his daughter?

3    A.  Yes.

4    Q.  And what did he respond to you about that?

5    A.  I told -- I asked -- well, not I asked him, but I told

6    him, you know, when they asked me about that morning and I

7    said -- because they have, you know, the phone records,

8    whereas though, I was calling you, and when you -- you know, I

9    told them you told me you were going to go pick your daughter

10   up.  And he just looked at me, he didn't really say anything,

11   he was like, yeah, that was it.

12   Q.  And at some point, did he ever tell you that that, in

13   fact, isn't what he did that morning?

14   A.  Yes.

15   Q.  And when was that, when did he tell you, no, he hadn't

16   gone to pick up his daughter that morning?

17   A.  He told me this after he met up with you guys, that

18   morning when they came and picked him up for questioning.

19   Q.  Are you referring to December 23rd, three days later?

20   A.  Is that what -- yes.

21   Q.  So let's -- if you can, recall for the jury what he said

22   to you after he was interviewed by the police in terms of

23   where he was that morning.

24   A.  He had told me that he told, I guess it was -- I don't

25   know if you was there -- well, he told the agents, I guess,

1  whoever picked him up, that he was actually trying to re-up

2  that morning.

3  Q.  And is "re-up" a word that you use, or a word that he

4  uses?

5  A.  He uses, I use it too, it's like a slang term where it's

6  daily used.

7  Q.  And what does -- did he use it that morning that he

8  went to --

9  A.  Yes, to re-up.

10  Q.  And what do you -- what did you understand him to mean by

11  the use of the word "re-up"?

12  A.  Normally it means to meet up with your supplier, you know,

13  if you re-up on any type of product, and I'm taking it that

14  his product, of course, is what he sold.

15  Q.  Which is what?

16  A.  It was marijuana.

17  Q.  So he's telling you now that he went to re-up that morning

18  to get marijuana?

19  A.  Yes.

20  Q.  And did he tell you who he met up with?

21  A.  Yeah, he told me who he was trying to meet up with.

22  Q.  And what did he say --

23  A.  He said it was the guy who you guys are charging, saying

24  that shot this lady.

25  Q.  And how did he describe that person?

1    A.  He didn't give like a description, he said -- he's saying

2    that's basically how he got mixed up in the situation, in the

3    case.

4    Q.  And is he giving you any information about that person,

5    who they are in relation to him or to Fats or to anybody?

6    A.  Say that one more time.

7    Q.  Is he giving you any information in this conversation with

8    you about who that man is other than the person he was going

9    to re-up with, in terms of, is it a friend of his, is it a

10   friend of Fats's, who is it --

11   A.  Oh, yes, he did.  I'm sorry, I didn't understand at first.

12   Yes, he did.  He told me that it was a friend of Fats's, and

13   I'm taking it that that's who might take over --

14            MR. DAVIS:  Objection.

15            THE COURT:  Sustained.

16   Q.  (BY MS. WILKINSON)  When he -- did he describe him as a

17   friend of Fats's?

18   A.  Yes.

19   Q.  Did he say anything about the person in that conversation

20   in relation to the Audi?

21   A.  Did -- say it again.

22   Q.  In that conversation you had with him after December 23rd,

23   when he's telling you, no, he didn't go to see his baby's

24   mother or pick up his child, he was going to re-up, did he say

25   anything about that person he was going to re-up with and the

Direct Examination - Melvin  (By Ms. Wilkinson)

1    Audi?

2    A.   Yes.

3    Q.   What did he say about that?

4    A.   That he was the one who he lent the Audi to.  And the

5    relationship was that he's friends with the -- the young man

6    was friends with Fats.

7    Q.   Now, you used the phrase "young man."

8    A.   I'm sorry, I just --

9    Q.   That's all right, we're all -- just make sure I

10   understand.

11        When Cliff is talking about this person, what -- is he

12   giving that person a name or a nickname or anything, how is he

13   referring to the person in that conversation?

14   A.   He was saying Carter.

15   Q.   Now, I'm going to go back to the grand jury, so we're

16   talking about the time frame between December 20th when you

17   testified in the grand jury and December 23rd when Mr. Mosley

18   was interviewed by the police.

19        Ms. Melvin, after you had the conversation -- first of

20   all, that conversation you had with Mr. Mosley when you came

21   home from the grand jury that night, did you -- do you recall

22   anything else about that conversation, what was Mr. -- for

23   example, what was Mr. Mosley's tone of voice, his demeanor?

24   A.   He was quiet talking, but you know, his demeanor was like

25   worried -- not worried, but like either he was hot because he

Direct Examination - Melvin  (By Ms. Wilkinson)

1   was a little sweaty, but not, you know, just when you -- like

2   how I feel right now, but you can't see it.  I don't know.

3   Q.  Did you -- well, where was the conversation actually

4   held?

5   A.  In the den.

6   Q.  And what is the den, is that the main area where you sit

7   in your apartment?

8   A.  Yes.

9   Q.  And is that what you call the den, like we would call a

10  living room?

11  A.  Yes.

12  Q.  And when you came in there, and you told him that it was

13  about the murder of a woman, did you express an opinion one

14  way or the other about whether Mr. Mosley should talk to the

15  police?

16  A.  Yes.

17  Q.  What did you say about that?

18  A.  I had told him that I did let you guys know where I live

19  at and that we did reside together.  And I told him, I said,

20  they're probably going to question you, or I didn't know, come

21  down Wylie Avenue, pull up on you or whatever, that's what I

22  told him.

23  Q.  And what was his response?

24  A.  He said, okay.  He said, okay, they had to come and pull

25  up on me.  He wasn't, you know -- he just said, okay.

Direct Examination - Melvin  (By Ms. Wilkinson)

1   Q.  He wasn't what?

2   A.  He wasn't like saying that he was going to come to you.

3   Q.  He was saying what?

4   A.  No, that's what I was saying, that he wasn't going to just

5   come to you voluntarily.

6   Q.  Did he express one way or the other whether or not he

7   thought that day would come?

8   A.  Um --

9   Q.  That the police would interview him?

10  A.  I'm -- yes, I'm not sure.  I'm not sure.

11  Q.  Was that the conclusion of the conversation that night?

12  A.  Yes.

13  Q.  Did you and Mr. Mosley spend the night together that

14  night?

15  A.  Yes.

16  Q.  And was your relationship in a -- the regular routine

17  place that night?

18  A.  Not -- for me it wasn't, you know, because I was shocked.

19  I was in shock.

20  Q.  And at some point, did you call the agents the next day on

21  December 21st?

22  A.  Yes.

23  Q.  And why did you call them?

24  A.  I can't recall, I think --

25  Q.  Did you relate the conversation that you had had with them

Direct Examination - Melvin  (By Ms. Wilkinson)

1   the night before on December 20th?

2   A.  Yes.

3   Q.  During that -- when you contacted the agents the next day,

4   did you relate what information Mr. Mosley had provided to you

5   the night before about the lending of the car from Fats to the

6   man?

7   A.  Yes.

8   Q.  And did you have any information about what the purpose of

9   lending the car was?

10  A.  No, I didn't know the purpose.  He didn't tell me the

11  purpose.

12  Q.  Did he indicate one way or the other whether the man would

13  take the car somewhere other than Maryland?

14  A.  No.  Didn't find -- didn't find out actually until it was

15  presented to me with you guys, I believe.

16  Q.  Now, at -- the night before, that night, on December 20th,

17  the day before you called the agents, did you -- did you look

18  up in the news what had happened to this woman?

19  A.  Yes.

20  Q.  And how did you look it up?

21  A.  On my phone, Google.

22  Q.  And did you do it alone, or did you do it in the presence

23  of Cliff?

24  A.  I did it in the presence of him, he was in the room, in

25  the den area.

Direct Examination - Melvin  (By Ms. Wilkinson)

1   Q.  And do you recall one way or the other what his reaction

2   was?

3   A.  He didn't want to see the video.

4   Q.  And what did he say about it?

5   A.  He just said he didn't want to see the video.  I can't

6   recall what he said, but I know he didn't want to see the

7   video.

8   Q.  Had he indicated one way or the other whether he already

9   knew about it?

10  A.  I don't know.

11  Q.  You don't remember?

12  A.  I don't -- yeah, I don't know.

13  Q.  So let me go now to Mr. Mosley -- were you there when the

14  agents came to serve Mr. Mosley with his grand jury

15  subpoena?

16  A.  Yes.

17  Q.  And when they left with him, did he come back home that

18  night?

19  A.  Yes, he -- yes, yes.

20  Q.  And did you have a conversation with him that night about

21  what had happened?

22  A.  Yes.  He really didn't say much of what the questioning

23  and everything.  That's when he just only told me that he told

24  y'all the truth of what he was doing, where he was going at

25  that morning.

Direct Examination - Melvin  (By Ms. Wilkinson)

1    Q.  Which was what?

2    A.  To re-up.

3    Q.  Now, at some point -- I'm going to put up on the screen

4    here a series of text messages, and this is from Government's

5    Exhibit P-2, which is page 137.

6         And this is the night before, the night before the 20th

7    when you were going to the grand jury, Ms. Melvin.

8    A.  Uh-huh.

9    Q.  And you see over here, "Are you ignoring my calls?"

10   "WTF?"  "What are you doing?"  Do you see all these text

11   messages that are in here?

12   A.  Yes.

13   Q.  Okay.  What was all that about?

14   A.  Okay.  So you want me to start from the top?

15   Q.  You don't have to go -- yes, start right here, "I spoke to

16   them, they sent it to me."  Up here, 12/19.

17   A.  Okay.  Right.  I was letting him know that I had spoke to

18   the agents, they sent me the e-mail for my -- you know, for me

19   to appear in front of the grand jury.

20   Q.  Uh-huh.  And are you sending the same text message to the

21   two phones he had in December of 2016?

22   A.  Yes.

23   Q.  And we're seeing a different phone number here, 5008 from

24   the 1533 number you talked about yesterday, at some point, did

25   Mr. Mosley get a new phone?

Direct Examination - Melvin  (By Ms. Wilkinson)

1    A.   Yes, I had switched phone companies, so that's a new

2    iPhone I had got with Sprint.

3    Q.   Okay.  Do you recall when you did that, Ms. Melvin, in

4    relation to these texts?

5    A.   I know it was before y'all contacted me, I know that.

6    Q.   So sometime between May 2016 and December, obviously of

7    2016?

8    A.   I think it was in July when I switched.

9    Q.   Sometime in that time frame?

10   A.   Uh-huh.  July 2016.

11   Q.   Okay.  So then you're telling him that, and then down here

12   below, "Hello, hello, hello."  I can pan out so you can see

13   that these are coming in, in that evening.

14       What are you -- why are you writing these repeated

15   messages to Mr. Mosley?

16   A.   I wanted -- 12/19, was that on a Sunday?

17   Q.   I can go back and look, but whatever your recollection --

18   A.   Because I believe it was the day of my sister's 40th

19   birthday party I was throwing, and I was concerned if he was

20   going to come, if that was that day, because I think it was a

21   Sunday.

22   Q.   Okay.  And why is it that that date sticks out in your

23   mind?

24   A.   Because it's my sister's birthday.

25   Q.   Okay.  And was there a specific recollection you had about

Direct Examination - Melvin  (By Ms. Wilkinson)

1   Mr. Mosley being or not being at your sister's birthday

2   party?

3   A.  Yes, he showed up.

4   Q.  Okay.  And so do you recall what his demeanor and his

5   participation was in that party?

6   A.  Not as how he usually would participate.  I mean, he made

7   a plate of food and went into the bedroom and watched TV.

8   Q.  And was that usual, or unusual for him?

9   A.  Unusual.

10   Q.  And how did you respond to that?

11   A.  I had walked in the bedroom to ask him, you know, what was

12   going on.  And he said he just had things on his mind.

13   Q.  And so at this point, on December 19 in the evening, when

14   you're saying, "I guess you made your choice.  I'm tired of

15   the same old routine.  Between Monday and Tuesday, all you do

16   is lie.  I've been calling you for over, an expletive, hour,

17   there is no reason why you're not answering your phone," what

18   was all that about, Ms. Melvin?  This is the night before your

19   grand jury testimony.

20   A.  Right.  I know when he was -- when the par- -- because I

21   had the party at the house, so he had to leave out for some

22   reason, I don't know why.  He left out.  It wasn't because of

23   me.  But that's when I probably started back texting him

24   again, going off because I felt as though it was disrespectful

25   to leave an event.

Direct Examination - Melvin  (By Ms. Wilkinson)

1    Q.   Now, at this point, did you make any -- between this time

2    of December 19th and up until the time he was interviewed by

3    the police, can you tell the jury about Mr. Mosley's demeanor

4    and how he was responding to the investigation coming to your

5    door?

6    A.   Which time?  Y'all came so many.

7    Q.   Between December 19th and December 23rd, what are your

8    recollections about Mr. Mosley's behavior?

9    A.   Oh, when they came and knocked at the door?

10   Q.   Yes.

11   A.   He was calm.  They came in, I let them in.  I looked

12   through the peephole, and I told him, I said, they here for

13   you.  He was real calm.  He got up, you know, lit a Black &

14   Mild, I told him he can't smoke in the house, put his coat on,

15   and he did everything they asked him to do, and they walked

16   out the door.

17   Q.   And he came home that night?

18   A.   It was like in a few hours, they didn't -- it was like in

19   a few hours.

20   Q.   Thank you for clarifying that, I'm the one that said

21   night.

22        At some point, did you learn that -- fast forwarding

23   ahead, in 2017, did you learn that Mr. Carter had been

24   arrested for the murder of Ms. Ashburne?

25   A.   Yes, when I seen it on the news.

Direct Examination - Melvin  (By Ms. Wilkinson)

1    Q.  Okay.  And when you learned that, did you have a

2    conversation with Mr. Mosley about it?

3    A.  Yes.

4    Q.  And do you recall where you were when you had this

5    conversation with him?

6    A.  No.

7    Q.  And can you relate -- do you remember talking to him?

8    A.  Yes.

9    Q.  And do you remember what he said?

10   A.  Yes.

11   Q.  What did he talk about?

12   A.  Well, I pointed it out to him that I noticed on the news

13   of the arrest of Mr. Carter, and I was not saying like, I was

14   happy, but I was just like, oh, so you know you really don't

15   have anything to do with this.  And he just was like, Kim, you

16   just never know, you know, basically, it might not be over.

17   Q.  And what did you say in response to that?

18   A.  I said, why, when I feel as though you didn't do

19   nothing.

20   Q.  And what was his response to that?

21   A.  I don't recall.

22   Q.  Did you talk to him -- do you use the phrase "what's in

23   the dark will always come to light"?

24   A.  Yes.

25   Q.  And what do you mean by that, "what's in the dark will

Direct Examination - Melvin  (By Ms. Wilkinson)

1  always come to light"?

2  A.  I -- I believe that whatever you hide, hide or lie about

3  or even if you not hiding or lying, if you doing something

4  that you have no business doing, it always come to light.

5  Like it will be -- it will be on display, it will resemble

6  itself, it's going to come out when you least expect it to

7  come out.

8  Q.  Have you ever used that phrase with Mr. Mosley about the

9  investigation of Ms. Ashburne?

10  A.  Yes.

11  Q.  And when do you recall making those statements to him in

12  the time frame that we're talking about now?

13  A.  I know it was -- I believe -- I'm not sure.  I believe it

14  was probably before Mr. Carter's arrest, because I was just --

15  I wasn't saying like to go against it, I was just like, oh,

16  okay, well, what's in the dark comes to light.

17  Q.  Now, at any point -- well, strike that for a second.

18      Did Mr. Mosley ever, in the context of the meetings or

19  the discussions you had in the grand jury or going to the

20  grand jury, Ms. Melvin, about your ability to take a lie

21  detector test?

22  A.  Did he --

23  Q.  Did he ever say something about a lie detector test?

24  A.  Asking me to take one?

25  Q.  No, did he ever say or discuss a lie detector test with

Direct Examination - Melvin  (By Ms. Wilkinson)

1   you?

2   A.  I can't remember, Ms. Wilkinson, I'm sorry.  I can't --

3   um, I don't -- I don't -- I can't recall.  I don't know.

4   Q.  Okay.  Very well, I'm going to see if I can refresh your

5   memory.

6   A.  Thank you.

7   Q.  Give me one second.

8           MS. WILKINSON:  I'm sorry, Your Honor, I'm not

9   finding my location.  I'm just going to go ahead and move on

10  to another area.

11          THE COURT:  Okay.  How much more do you have with

12  this witness?

13          MS. WILKINSON:  I'm almost done, Your Honor, I'm

14  just checking my notes.

15  Q.  (BY MS. WILKINSON)  Showing you to refresh your

16  recollection --

17          MS. WILKINSON:  Grand jury testimony at page 13 and

18  14, counsel.

19          MR. TRAINOR:  What day?

20          MS. WILKINSON:  I think it's the second one in March

21  of --

22  Q.  (BY MS. WILKINSON)  I'll have you read just from the top

23  here, and see if that refreshes your recollection about the

24  conversation and the things Mr. Mosley said.  Page 13 and 14,

25  start from the top.

1    A.  (Complying.)

2    Q.  And once your recollection is refreshed, you can give it

3    back to me.  You don't have to read the whole thing, if it

4    refreshes your recollection.

5    A.  Uh-huh.

6    Q.  Does that help refresh your recollection, Ms. Melvin?

7    A.  I don't know what that was part of.

8    Q.  Do you want me to go get you page 12?

9    A.  Yeah.

10             MR. TRAINOR:  Your Honor, may we approach?

11             THE COURT:  Of course.

12             (Bench conference on the record.)

13             THE COURT:  Sir.

14             MR. TRAINOR:  I am objecting to this, the

15    government's question was, did Mr. Mosley say anything about a

16    lie detector test, and she said that she either didn't recall

17    or she didn't know.  I think it's inappropriate in any trial

18    to bring a lie detector test before a jury.

19             THE COURT:  I mean, it depends on what it is we're

20    talking about, which I don't know.  I thought it was about her

21    taking a lie detector test.

22             MS. WILKINSON:  It's about a conversation she

23    related to us where she said he said, if you don't know

24    anything, you can't tell them anything, or words to that

25    effect, that because I'm not going to tell you everything, so

1   you don't know anything.  So part of that was the lie detector

2   and part of it was her whole conversation about --

3           THE COURT:  Is it about -- I guess what I'm trying

4   to get at, is it about him taking a lie detector test, or her

5   taking a lie detector test?

6           MS. WILKINSON:  About that she would be able to take

7   one and legitimately say she doesn't know anything.  And she's

8   like, well, I do know some things, so I have to tell them.

9   It's that conversation I'm trying to refresh her collection

10  about.  It's not about him taking the lie detector test.

11          THE COURT:  I don't have any issue with that.

12          MR. TRAINOR:  Well, I object.  If it's going to

13  go -- if you're going to go into lie detector test, I move for

14  a mistrial.

15          THE COURT:  All right.  Well, I'm overruling your

16  objection, and I will preemptively deny your request for a

17  mistrial, assuming that's what she ends up getting into.  All

18  right.

19          (The following proceedings were had in open court.)

20  Q.  (BY MS. WILKINSON)  I don't have the top page of that.

21  A.  Okay.

22  Q.  Does it refresh your recollection, Ms. Melvin, about a

23  conversation that you had with Mr. Mosley about what you knew

24  or didn't know?

25  A.  Yes.

Direct Examination - Melvin  (By Ms. Wilkinson)

1    Q.  And can you recall for the grand jury that conversation

2    with Mr. Mosley?

3    A.  When I was reading -- you talking about from March --

4    Q.  Only if your recollection is refreshed, did you have a

5    conversation with Mr. Mosley about what you knew and what you

6    didn't know in relation to the investigation?

7    A.  Yes.

8    Q.  And as best as you recall, when was that conversation and

9    what do you recall?

10   A.  Conversation, I believe it sped up to March of 2019.

11   Q.  You mean the second time you testified in the grand

12   jury?

13   A.  Yes.

14   Q.  And for the record, that's actually March of 2018, does

15   that sound right?

16   A.  No.

17   Q.  Oh, March of 2019, yes, you're right.

18   A.  March 2019, yeah.

19   Q.  And do you recall a conversation you had with him then

20   about that?

21   A.  Yes.  Because it was just all about what I did know and

22   what I don't know.  And of course, he had told me, well, if

23   you don't know, then you can't be questioned about it.

24   Q.  And what was your response to that?

25   A.  Well, some things I do know, but I don't know anything

1    about Ms. Ashburne's murder.  But I do know some things in

2    reference, like I was saying, you know, like when you guys

3    first had showed me the picture of him, was I supposed to lie

4    and say I don't know him, you know, that wouldn't have made

5    sense.

6    Q.  And did he say, what you don't know, they can't hold

7    against you?

8    A.  Yeah -- did I say that?

9    Q.  Did he say that?

10   A.  Oh, yes.  Yes.

11   Q.  And what did you understand that to mean, what you don't

12   know, they can't hold against you?

13          MR. TRAINOR:  Objection.

14          THE COURT:  Overruled.

15   Q.  (BY MS. WILKINSON)  What did you understand him to be

16   saying when he said that to you?

17   A.  I thought that I was being held accountable for stuff that

18   I might have did know, if it was, you know, something I didn't

19   say.  That's what -- I mean, the way I felt "against," it felt

20   like as if I was going to be locked up or something.

21   Q.  Why did you think that, Ms. Melvin?

22   A.  Because he used the word "against you."

23   Q.  And who said that?

24   A.  Mr. Mosley.

25   Q.  And why was he saying to you when you answer questions and

1    you say you don't know, they can't hold it against you, what

2    was he trying to tell you?

3              MR. TRAINOR:  Objection.

4              THE COURT:  I sustain that.  Sustain that

5    objection.

6    A.  I mean --

7              THE COURT:  That means you can't answer.

8              THE WITNESS:  Oh, okay.

9    Q.  (BY MS. WILKINSON)  This conversation after the second

10   time you testified in the grand jury, did it include any

11   additional information about Fats and the Audi, did you say

12   anything further about that?

13   A.  Just about the, you know, that the Audi did go to South

14   Carolina, and it had got a ticket.

15   Q.  And who told you that?

16   A.  Mr. Mosley.

17   Q.  Did Mr. Mosley say at that time anything further about

18   Fats's friend and his relationship with him?

19   A.  That he, you know, they don't really get along, he only

20   really co- -- well, get along with him because he's Fats's

21   friend.

22   Q.  And -- strike that.

23              MS. WILKINSON:  Let me just ask Ms. Oldham.

24              THE COURT:  Sure.

25              MS. WILKINSON:  I think I'm done, Your Honor.  No

Cross-examination - Melvin  (By Mr. Trainor)

1    further questions.

2              THE COURT:  All right.  Cross, Mr. Trainor.

3                        CROSS-EXAMINATION

4    BY MR. TRAINOR:

5    Q.  Good morning, Ms. Melvin.

6    A.  Good morning.

7    Q.  I'm Harry Trainor, and I represent Mr. Mosley, along with

8    Mr. Mercer.

9        You lived with Clifton Mosley before you and he moved

10   into the Harness Court address correct?

11   A.  Yes.

12   Q.  And so as I understand it, you lived at the Harness Court

13   address from sometime in 2015 through sometime in 2018;

14   correct?

15   A.  Correct.

16   Q.  And at the prior address where you lived with Mr. Mosley,

17   how long had you lived there with him?

18   A.  Six months.

19   Q.  All right.  Six months.  And you shared expenses in both

20   situations?

21   A.  The six months on Clarks Lane, he took care of all the

22   expenses.

23   Q.  All right.  And then when you got to Harness Court, which

24   is more expensive --

25   A.  Yes.

Cross-examination - Melvin  (By Mr. Trainor)

1   Q.  -- you shared some of the expenses?

2   A.  Yes.

3   Q.  And one of the things you did for him is pay his phone

4   bill, and he contributed to rent; correct?

5   A.  Correct, it was one phone bill, though.

6   Q.  All right.  On 1533, the iPhone?

7   A.  Yes.

8   Q.  You got a family plan, which allowed you to have three

9   phones, and you had one for you, one for your son, I

10  believe?

11  A.  Four phones.

12  Q.  Four phones.  One for your two -- I mean, one each for

13  your two children and one for Mr. Mosley; correct?

14  A.  And two iPads.

15  Q.  All right.  And you loved each other, both of you?

16  A.  Yes.

17  Q.  Correct.  And that went on even after he was arrested in

18  this case?

19  A.  Yes.

20  Q.  One of the unpleasant things about your relationship with

21  Mr. Mosley might have been difficult for you because you felt

22  jealous?

23  A.  Not jealous, insecure.

24  Q.  Insecure.  So to you, that's different from jealous?

25  A.  Yes, very.

Cross-examination - Melvin  (By Mr. Trainor)

1    Q.  All right.  So by your insecurity, when he was more or

2    less out of your sight, you first went to, well, he must be

3    with another woman?

4    A.  Yes.

5    Q.  All right.  So that was always the first concern;

6    correct?

7    A.  Yes.

8    Q.  And I think you've described previously just how insecure

9    you were when you were before the grand jury, to the point

10   that you would sort of stalk him, am I right?

11   A.  Yes.

12   Q.  And when you argued, it would be shouting and your getting

13   upset?

14   A.  Yes.

15   Q.  All right.  And he would at times avoid answering the

16   phone when you would call him; correct?

17   A.  Yes.

18   Q.  And he would not respond to your texts, and you think part

19   of that may have been the fact that you stalked him, the fact

20   that you shouted?

21   A.  No.

22   Q.  You don't think so?

23   A.  No.

24   Q.  All right.  But you agree with me, when he was out of your

25   sight, he -- you were on him?

Cross-examination - Melvin  (By Mr. Trainor)

1    A.   Not a lot, it was certain times of the night.

2    Q.   Uh-huh.

3    A.   When you should be in the house too.

4    Q.   Right.  Attentive, insecure, and even stalking, that's how

5    you described it before the grand jury; correct?

6    A.   Yes.

7    Q.   And you used to -- even apart from May 27th, 2016, prior

8    to that, there were things that you called "fussing," and you

9    two fussed about the fact that he didn't answer his phone when

10   you called?

11   A.   Yes.

12   Q.   All right.  Now, when you -- the stalking part is that you

13   would like to know where he was on -- because you could check

14   it on the iPhone; correct?

15   A.   I could, but --

16   Q.   You didn't do that?

17   A.   No, no, no, I tried, then he beat me to the punch, he had

18   the locator turned off.

19   Q.   And then if necessary, you would drive out to check on his

20   whereabouts; correct?

21   A.   No, no, no.  No.  Not just randomly drive, no.

22   Q.   You had a place to go look.

23   A.   If I was en route to going home and I knew I had to go

24   past where he be at, yes, I would drive through there.

25   Q.   And if you ever looked for him, you would look on Wylie

Cross-examination - Melvin  (By Mr. Trainor)

1    Avenue?

2    A.   Yes.

3    Q.   In Park Heights, because that's where you can find Cliff

4    Mosley?

5    A.   Yes.

6    Q.   All right.  Now, you have described a day when you were

7    living together with Mr. Mosley and he had what you believed

8    to be a large bag of marijuana; correct?

9    A.   Yes.

10   Q.   And you told him, no, that will not be in the house;

11   correct?

12   A.   Yes.

13   Q.   And after that, it wasn't in the house again?

14   A.   Correct.

15   Q.   All right.  So you never saw him distribute marijuana?

16   A.   No.  No.  No.

17   Q.   Never did.  All right.  Never saw him sell any marijuana

18   at all; correct?

19   A.   No, not -- no.

20   Q.   Let me ask you about these cars, automobiles.  During your

21   time with Clifton Mosley when you two were together as a

22   couple, he drove a number of different cars; correct?

23   A.   Correct.

24   Q.   And he would change them from time to time?

25   A.   Yes.

1    Q.  Now, I think you mentioned first a Lexus that he actually

2    bought, you thought, with Erica Blanding?

3    A.  That I thought he bought me?

4    Q.  No, no, no.

5    A.  Oh, what you say, I'm sorry?

6    Q.  That he purchased, but it was in the name of Erica

7    Blanding?

8    A.  Yes.

9    Q.  And I suppose they were making payments on it?

10   A.  Yes, he was -- yes.

11   Q.  So he had that when you first moved in with him;

12   correct?

13   A.  No, it came after we moved in.

14   Q.  All right.  So he was still seeing Erica Blanding at

15   times?

16   A.  Not seeing her as far as relationship.

17   Q.  Uh-huh.

18   A.  Just his daughter's mom.

19   Q.  All right.  But they bought a car together after you were

20   in a relationship?

21   A.  Yes.

22   Q.  With Mr. Mosley.

23        I think you testified, at least your understanding is,

24   Fats or Mr. Hightower had several cars, a number of cars on

25   the street, you're not sure how many?

Cross-examination - Melvin  (By Mr. Trainor)

1    A.  Correct.

2    Q.  All right.  But you know he had an Audi?

3    A.  Yes.

4    Q.  That was bluish, greenish, silver -- or bluish,

5    silverish?

6    A.  Yes, I'm not sure about the color, but that color

7    scheme.

8    Q.  But it was between blue, gray, silver?

9    A.  Yes.

10   Q.  And that's the one you described as raggedy?

11   A.  Than a bowl of Yakamein.

12   Q.  It made --

13          THE COURT:  I'm sorry, raggedy than a what?

14          THE WITNESS:  A bowl of Yakamein.

15          THE COURT:  Okay.

16   Q.  (BY MR. TRAINOR)  Can you just repeat that, I'm

17   not familiar with that term.

18   A.  It's raggedier than a bowl of Yakamein, like Yakamein, you

19   eat.

20   Q.  Got you.  And the engine light would stay on?

21   A.  Yes.

22   Q.  All right.  And it made noise like a spaceship?

23   A.  Yes.

24   Q.  Is that a fair statement?

25   A.  That's a fair statement, yes.

1   Q.  And then it consumed a lot of gasoline; correct?

2   A.  Yes.  Yes.

3   Q.  All right.  And that is the car that you've testified on

4   direct that you first saw on May 21st, 2016; correct?

5   A.  Yes.

6   Q.  Now, you are aware, are you not, that these folks from the

7   government have taken your phone and downloaded the contents

8   of your phone; correct?

9   A.  Yes, they did a dump.

10  Q.  All right.  And by doing that, they were able to pull out

11  your messages.

12  A.  Yes, I'm aware.

13          MR. TRAINOR:  Court's indulgence.

14          THE COURT:  Sure.

15  Q.  (BY MR. TRAINOR)  Yesterday, I think you were asked by

16  Ms. Wilkinson whether your son wanted an Audi?

17  A.  Yes.

18  Q.  And you laughed and you said no.

19  A.  Yes.

20  Q.  All right.  Do you remember texting on May the 1st, 2016

21  something to the order, "Checking on this car for Dre, will

22  have to take donations, all-wheel drive"?

23  A.  I don't remember it, but if I texted, you know --

24  Q.  If I showed you an exhibit, which is marked as Defendant's

25  Exhibit No. 25, which is the phone examination preview

Cross-examination - Melvin  (By Mr. Trainor)

1    report --

2    A.  Uh-huh.

3    Q.  -- would that help --

4    A.  Yes, it --

5    Q.  It's printed small, I apologize for that.  If you can see

6    this, the date being May the 1st.

7    A.  Uh-huh.

8    Q.  And there is that -- I wonder if you could turn the page

9    and read the portion to yourself at this point, that is

10   highlighted.

11   A.  (Complying.)  Oh, okay.  I didn't recall that, but yes,

12   that is true, that is true.

13   Q.  That refreshes your memory?

14   A.  Uh-huh.

15   Q.  Let me take it back, and I'm going to ask you a question.

16   Your memory is refreshed?

17   A.  Yes.

18   Q.  Isn't it true that on May the 1st, 2016, you tested -- you

19   texted or instant messaged that, "Cliff is driving an Audi

20   right now, it burns a lot of gas and the engine light stays

21   on"?

22   A.  Yes.

23   Q.  And that was May 1st of 2016?

24   A.  Yes.

25   Q.  So you were wrong when you said that on May 21st, it was

Cross-examination - Melvin  (By Mr. Trainor)

 1   the first time you saw the bluish grayish Audi; correct?

 2   A.  I can't correct that, because it was two Audis involved.

 3   But it probably was that Audi, I'm not sure.

 4   Q.  Well, it had the engine light on --

 5   A.  All the cars had engine lights on, even the Lexus.

 6   Q.  -- it was raggedy and it ate gas?

 7   A.  (No verbal response.)

 8            THE COURT:  You have to say yes or no.

 9   A.  Oh, yes.

10   Q.  (BY MR. TRAINOR)  That's the Audi you were talking about

11   on May the 1st, 2016; correct?

12   A.  Yes.

13   Q.  In addition to the Audi, there were -- there was a Lincoln

14   that he had in his possession for a while that came from

15   Mr. Hightower; correct?

16   A.  Yes.

17   Q.  And it was driven by the maintenance man in your

18   apartment?

19   A.  Yes.

20   Q.  Who parked it outside of your apartment so you could see

21   it; correct?

22   A.  Yes.

23   Q.  All right.  And there was -- among these cars was also a

24   BMW truck that you described today; right?

25   A.  Yes.

Cross-examination - Melvin  (By Mr. Trainor)

1    Q.  X5 --

2    A.  Yes.

3    Q.  -- black?

4        And you'd see that there now and then?

5    A.  You say "now and then," I only seen it one time there.

6    Q.  Which was it, May 29th?

7    A.  That was that -- yes.

8    Q.  Uh-huh.  Now, this is the first time you've ever talked to

9    me; correct?

10   A.  Yes.

11   Q.  And in fact, the first time you've talked to anyone from

12   the defense side?

13   A.  Yes.

14   Q.  But you've met with the prosecution team many times;

15   correct?

16   A.  Yes.

17   Q.  You had meetings over the years from 2016 up until -- when

18   was the last meeting you had with them?

19   A.  December 2019.

20   Q.  All right --

21   A.  Well, Friday --

22   Q.  Last Friday?

23   A.  Yes.

24   Q.  All right.  And you talked to them yesterday after --

25   A.  Oh, yes.  Well, yes.

Cross-examination - Melvin  (By Mr. Trainor)

1    Q.  After the break yesterday?

2    A.  No, no.  I went home.

3    Q.  Yesterday, you were asked about this -- the night of

4    March 26th -- or excuse me, May 26th, 2016, and you related to

5    the ladies and gentlemen of the jury that Cliff had asked you

6    about how to do a certain Maryland Judiciary Case Search on

7    his cell phone?

8    A.  Yes.

9    Q.  And you told him from bed, you were in bed; correct?

10   A.  I -- yes.

11   Q.  Then you got up to get a glass of water, he didn't try to

12   hide what he was doing?

13   A.  No, he -- no.

14   Q.  And that's your recollection of it now?

15   A.  Yes.

16   Q.  But the first time that ever came to mind was when you

17   testified on March 5th, 2019; correct?

18   A.  Yes.

19   Q.  All right.  You had already testified in December of '16

20   when all this was easier to remember; correct?

21   A.  Yes.

22   Q.  But that particular fact, that you remembered the case

23   search, didn't come out until 2019?

24   A.  Yes.

25   Q.  And as -- and it came out as a result of -- what you said

1    was that you were -- it came to you in your sleep?

2    A.  Yes.

3    Q.  All right.  And that's one of the things that came to you

4    in your sleep; correct?

5    A.  Yes.

6    Q.  Also, this business about the man standing -- what you

7    called a beanpole, in the grand jury, a man talking to you,

8    that came to you in your sleep as well; correct?

9    A.  No.

10   Q.  You didn't say that?

11   A.  That that -- what, the man standing by the beanpole, I got

12   to see -- no, that didn't come.  I believe I made them fully

13   aware of that before March of -- 4th or 5th of 2019.

14            MR. TRAINOR:  Court's indulgence a moment.

15            THE COURT:  Sure.

16   Q.  (BY MR. TRAINOR)  I'm going to show you --

17            THE COURT:  You need a lapel mike if you're going to

18   talk on the move.

19   Q.  (BY MR. TRAINOR)  So you testified before the grand jury

20   on March the 5th of 2019?

21   A.  Yes.

22   Q.  And you -- I think I have the right page.  All right.

23       Isn't it true that when you testified on March the 5th,

24   2019, you testified that the gentleman standing by the

25   beanpole came to your recognition last night when you were

Cross-examination - Melvin  (By Mr. Trainor)

1    asleep?

2    A.  Yes, I -- yes.

3    Q.  All right.  So that was something you remembered for the

4    first time on March the 5th, 2019; correct?

5    A.  Yes.  I thought it was before, though, but if you -- okay.

6    I really think it was before, but okay.

7    Q.  That was your testimony.

8    A.  Okay.  But I was asked about the gentleman before I even

9    really voluntarily out the information when I was sitting out

10   in the lobby.

11   Q.  Typically, when you've gone to the grand jury, the

12   government would meet with you in advance to kind of rehearse

13   what was --

14   A.  Yes.

15   Q.  All right.  And so you think it may have come up at that

16   meeting, and then you went in and repeated it to the grand

17   jury?

18   A.  Correct.  Yes.

19   Q.  But you don't quarrel with me that that's what your

20   testimony was?

21   A.  Yes, if that's what it say, I'm not going to -- yes.

22   Q.  Do you need to see it?

23   A.  Yes.

24   Q.  Page 64, lines 5 through 6.  I just marked --

25              THE COURT:  Start by showing her the date of the

1   testimony, since I know that was part of the issue.  Just show

2   her the first page that has the date of the testimony.

3             MR. TRAINOR:  Oh, if I can get to it.

4             THE COURT:  If you have it there.

5   Q.  (BY MR. TRAINOR)  Do you recall testifying on that day?

6   A.  Uh-huh.

7   Q.  It was March the 5th of 2019?

8   A.  Uh-huh.

9   Q.  Let me show you the pertinent page at the top and see if

10  that refreshes your memory.

11  A.  Okay.

12  Q.  Does that refresh your memory?

13  A.  It do, it's blurry, but it do.

14  Q.  But it does say that you testified that it came to you

15  last night in your sleep?

16  A.  Yes.

17  Q.  Now, you testified today, I believe, that Mr. Mosley told

18  you that Mr. Hightower told him to switch cars with one of

19  Hightower's friends; correct?

20  A.  Yes.

21  Q.  And that's the one Mr. Mosley called Yo?

22  A.  Yes.

23  Q.  All right.  And I think, as I understand your testimony

24  today, you indicated that Mr. Mosley didn't particularly like

25  that person?

Cross-examination - Melvin  (By Mr. Trainor)

1    A.   Yes.

2    Q.   But he did it because he respected Mr. Hightower, who

3    owned the car, and he agreed to switch the car; correct?

4    A.   Yes.

5    Q.   And that turned out to be so that the other driver could

6    drive it to Myrtle Beach for bike week; is that right?

7    A.   Yes.

8    Q.   All right.  Now, you don't have any idea where the cars

9    were exchanged, do you?

10   A.   No.

11   Q.   All right.  And it's your belief that Mr. Mosley exchanged

12   the Audi for the black BMW; correct?

13   A.   Yes.

14   Q.   All right.  But it would be Mr. Mosley's practice to park

15   the car up around Wylie where he normally hangs out;

16   correct?

17   A.   Yes.

18   Q.   But that morning, you assumed that he had gone to see

19   another woman?

20   A.   Yes.

21   Q.   All right.

22   A.   What morning, the morning --

23   Q.   Of the 27th.

24   A.   Yes.

25   Q.   Ms. Melvin, you had a meeting with the government on

Cross-examination - Melvin  (By Mr. Trainor)

1    January 2nd of this year; correct?

2    A.  2020?

3    Q.  Yes.

4    A.  My last meeting was December; right?  December 2019, did I

5    have a -- I don't -- I'm sorry --

6    Q.  At your last meeting with the government, or at any

7    meeting with the government, do you remember the meeting at

8    which time they started asking you about your mental health?

9    A.  Yes, that was in December.

10   Q.  Oh, it was in December?

11   A.  Yes.

12   Q.  All right.  So you met with Ms. Wilkinson, Ms. Oldham,

13   Agent Fuchs, Agent Holiday?

14   A.  Yes.

15   Q.  And discussed the issue of your long-standing mental

16   health issues; correct?

17   A.  Yes.

18   Q.  All right.  As a result of that mental health condition,

19   you've been hospitalized, at least twice; correct?

20   A.  Yes.

21   Q.  And once in 2012 and once in 2015; correct?

22   A.  Yes.

23   Q.  All right.  And part of the problems that you have from

24   that condition or that health condition, is that you will see

25   things that are not there sometimes?

Cross-examination - Melvin   (By Mr. Trainor)

1    A.   No.

2    Q.   You will hear things that are not there?

3    A.   Yes.

4    Q.   You will assume different personalities?

5    A.   Yes.

6    Q.   And that's been something that's been part of your life

7    for a long time; correct?

8    A.   Yes.

9    Q.   You've been given medication that helps keep the symptoms

10   down when you're going into an episode?

11   A.   Yes.

12   Q.   And it helps a lot when you need it; right?

13   A.   Sometimes.

14   Q.   All right.  Do you remember -- of course you remember the

15   events of May 27th, but within days after that, you were

16   telling Mr. Mosley in text messages that are in evidence, that

17   you were -- you felt an episode coming on, and that you were

18   seeing things that were not there, a ghost lady, remember

19   that?

20   A.   Do you have the text message?

21   Q.   Uh-huh.

22   A.   Can I see it?

23   Q.   Uh-huh.  I want to make sure this is turned on.  It is

24   now.

25        I'm going to show you Mosley 20.  Now, if you would be

1   kind enough to take a look at this exhibit, and I can point

2   out some things if you'd like, why don't you hold that and I

3   will look at my copy.

4       I don't know that these pages are numbered, but -- so it

5   may take you a moment to read --

6   A.  To find it.  I'm looking for me sending him; right, not --

7   Q.  Uh-huh.

8           THE COURT:  If there's a specific text message

9   you're referring to, is it possible to direct her to it if you

10  know where it is?

11          MR. TRAINOR:  I can take it apart and do that.

12          THE COURT:  If you know where it is, otherwise, you

13  have to look through it.

14  Q.  (BY MR. TRAINOR)  Let me show you on this copy of it.

15      Was there a message from you to Cliff on June the 5th,

16  2016 indicating, "I took a high dose of meds last night, so I

17  was knocked out, feeling pretty numb"?

18  A.  Yes, I know -- I would send him --

19  Q.  And you said, "I feel an episode coming on and I'm trying

20  to prevent it, but I don't know why, though"?

21  A.  Yes, plenty of times.

22  Q.  "If it doesn't go away soon, I'm going to have to admit

23  myself for the weekend."

24  A.  Yes.

25  Q.  All right.  You speak of seeing a ghost lady yesterday

1    morning and, "Didn't you see the lady?  I seen her again this

2    morning when I was walking to the truck."

3    A.  What day is that?

4    Q.  That's the same day, June the 5th, 2016.

5    A.  Yes.

6    Q.  And then you began talking about your different

7    personalities.  You indicate, "But one of my personalities is

8    trying to come out and the baby voice"?

9    A.  Yes.

10   Q.  All right.  And he asked you if you thought you could

11   finish your day at work.  And -- let me stop there for a

12   moment.

13       Now, you haven't always taken your meds, have you?

14   A.  No.

15   Q.  In fact, according to what I've -- well, strike that.

16            THE COURT:  Mr. Trainor, so you can move your

17   microphone further up, your mike, so it doesn't make that

18   ruffling sound -- or further up your tie, I'm sorry.

19            MR. TRAINOR:  There we go.

20   Q.  (BY MR. TRAINOR)  You stopped taking your meds in April or

21   May of 2016; correct?

22   A.  I'm not sure, did I say that?

23   Q.  That's what I believe to be true based on the report I

24   received.

25   A.  Okay.

Cross-examination - Melvin  (By Mr. Trainor)

1    Q.  When do you -- tell me, what's your --

2    A.  I take my medication as needed, okay.  So if I might take

3    some, you know, for a few days and stop, and the stop could be

4    way more like months, you know, and then go back.  It just all

5    depends on, like I stated in that text, what I feel.  If I

6    feel some type of way or something is approaching or if I'm

7    hearing voices, then yes, I will take medicine.

8    Q.  And how long have you had this problem?

9           MS. WILKINSON:  Objection.

10          THE COURT:  Overruled.

11   A.  For a long time.  I know about the age of eight years

12   old.

13   Q.  (BY MR. TRAINOR)  All right.  Now, there came a time

14   earlier today that you talked about getting served to go to

15   the grand jury; correct?

16   A.  Yes.

17   Q.  And that would have been the original grand jury

18   appearance on December 20th of 2016?

19   A.  Correct.

20   Q.  All right.  And at that time, you really didn't know why

21   you were being called in?

22   A.  Correct.

23   Q.  And Mr. Mosley indicated he didn't either?

24   A.  Correct.

25   Q.  Okay.

1          THE COURT:  Mr. Trainor, how much more do you have

2     on cross?  I'm not rushing you, I just want to get a sense for

3     scheduling.

4          MR. TRAINOR:  If we could have a short break, I will

5     cut it down to ten minutes or so.

6          THE COURT:  If a break will make it shorter, then

7     yes, absolutely, we'll take our break.  That's a way to always

8     get me to take a break.

9          We will take our break now for 15 minutes.  I'll ask

10    that you be back in the jury room at 11:45 ready to go

11    forward.  Thank you.

12          (Jury left the courtroom.)

13          THE COURT:  All right.  Ma'am, you're excused for

14    the next 15 minutes, I ask that you be back.  Now that you're

15    on cross-examination, I'm also going to instruct you not to

16    talk to anyone else, including even the prosecutors, about

17    your testimony.  See you in 15 minutes.

18          (A recess was taken.)

19          (Jury entered the courtroom.)

20          THE COURT:  All right.  You may all be seated.  Good

21    morning again, ladies and gentlemen.  It is still morning,

22    just barely.

23          Ma'am, I remind you that you are still under oath.

24          And sir, you may continue.

25          MR. TRAINOR:  Thank you, Your Honor.

1   Q.  (BY MR. TRAINOR)  Ms. Melvin, during your last

2   hospitalization from mental health issues in '15, 2015, you

3   had to be taken in an ambulance by paramedics; correct?

4   A.  Yes.

5           MS. WILKINSON:  Objection, Your Honor.

6           THE COURT:  Sustained as to relevance.  The jury can

7   disregard that question and answer.

8   Q.  (BY MR. TRAINOR)  Was Mr. Mosley very supportive of you at

9   that time?

10  A.  No.

11  Q.  He wasn't supportive.  Wasn't he with you just prior to

12  your hospitalization?

13  A.  You mean the same day it happened?

14  Q.  Yes.

15  A.  He wasn't with me when I got there.  I was out of it, I

16  don't recall.  I was really -- I was out, I was under the

17  influence, I was out of it.

18  Q.  All right.  But you do recall in December of 2016, when

19  you were served with the grand jury subpoena; right?

20  A.  Yes.

21  Q.  And Mr. Mosley said, just go and see what it's all about;

22  correct?

23  A.  Yes.

24  Q.  And that's what you did?

25  A.  Yes.

1          MR. TRAINOR:  No further questions.

2          THE COURT:  All right.  Any questions from

3    Mr. Carter's counsel?

4          MR. DAVIS:  No questions, Your Honor.  Thanks.

5          THE COURT:  Redirect from the government.

6                    REDIRECT EXAMINATION

7    BY MS. WILKINSON:

8    Q.  Ms. Melvin, Mr. Trainor had a lot of questions, personal

9    questions for you about your mental health, do you recall

10   those?

11   A.  Yes.

12   Q.  Just a moment ago.

13        Let me ask you this:  You work for Social Security

14   Administration for how long?

15   A.  15 years.

16   Q.  And have you maintained that employment for those

17   continual 15 years?

18   A.  Yes.

19   Q.  And do you work full time?

20   A.  Yes.

21   Q.  Do you engage with your colleagues at work?

22   A.  Yes.

23   Q.  Are you a full participant in your job duties and

24   responsibilities at the Social Security Administration?

25   A.  Yes.

Redirect Examination - Melvin  (By Ms. Wilkinson)

1   Q.  Have you received promotions?

2   A.  Yes.

3   Q.  Have you received accolades from the type of work you

4   do?

5   A.  Yes.

6   Q.  Does your work require mental acumen and intelligence?

7   A.  Yes.

8   Q.  Do you maintain relationships with your friends and your

9   family?

10  A.  Yes.

11  Q.  Do you have a business of your own that you also operate

12  at night?

13  A.  Yes.

14  Q.  Do you keep a bank account and pay attention to your

15  credit?

16  A.  Absolutely.

17  Q.  In the last three or four years that you worked -- that

18  you are with Mr. Mosley, in the time frame, I think you said

19  2013 until, you know, more recently when this all happened,

20  Ms. Melvin, did he have a job that he had maintained for 15

21  years?

22  A.  No.

23  Q.  And the longest you said he worked is a month for what,

24  three different jobs that he worked at a time?

25          MR. TRAINOR:  Objection.

1            THE COURT:  Overruled.

2    Q.  (BY MS. WILKINSON)  Is that right?

3    A.  Yes.

4    Q.  And in that time, he didn't have a bank account, did he,

5    Ms. Melvin?

6    A.  No.

7    Q.  And when he paid you, he paid you in cash, didn't he,

8    Ms. Melvin?

9    A.  Yes.

10   Q.  And Mr. Trainor asked you questions about how the last

11   time you saw the marijuana in the house, the big stack that

12   you described for the jury yesterday, that's the last time you

13   had seen it in the house because you told him to take it out

14   of there; correct?

15   A.  Yes.

16   Q.  That doesn't mean he stopped dealing drugs; is that right,

17   Ms. Melvin?

18   A.  No.

19   Q.  He still sold marijuana; right?

20   A.  Yes.

21            MR. TRAINOR:  Objection.

22            THE COURT:  Sustained as to leading.  This is still

23   your witness.

24   Q.  (BY MS. WILKINSON)  Let me ask it this way:  Showing you

25   Government's Exhibit M-3, did he seem to have cash,

1    Ms. Melvin?

2    A.   Yes.

3    Q.   Did Mr. Mosley have access to cash?

4    A.   Yes.

5    Q.   And showing you Government's Exhibit M-3D, is this a

6    picture that you had provided from your phone dated

7    October 2nd, 2016?

8    A.   Yes.

9    Q.   And what is in Mr. Mosley's hand here?

10   A.   Money.

11   Q.   Do you know where he got that money?

12   A.   I don't know specifically where he got it, no.

13   Q.   Did you give it to him?

14   A.   No.

15   Q.   Mr. Trainor spent some -- Mr. Trainor spent some time

16   asking you about and -- seeing the man outside the grand jury

17   room in December of 2016, you remember him asking you those

18   questions?

19   A.   Yes.

20   Q.   And -- well, first let me step back and say, when you are

21   feeling not well, do you go see a doctor when you need to?

22   A.   Yes.

23   Q.   And do you take the medication as you're prescribed?

24   A.   Yes.

25   Q.   And do you try to take care of your mental health as well

1    as your physical health and well-being?

2            MR. TRAINOR:  Objection to leading.

3            THE COURT:  I'll overrule that one.

4    A.  Yes.

5    Q.  (BY MS. WILKINSON)  When Mr. Trainor was asking you those

6    questions about when you saw the man, and he showed you your

7    March 2019 grand jury appearance, you remember he put up the

8    screen and showed you that something had come to you in your

9    sleep, do you remember those questions?

10   A.  Yes.

11   Q.  And I believe that in response you had said, well, I'm

12   pretty sure I told the agents about that back in December of

13   2016, do you remember telling Mr. Trainor that?

14   A.  Yes.

15   Q.  And if I put up on the screen here, and I'll mark this as

16   Government's Exhibit X, I'll just say 20 because I think we're

17   not that far, does this appear to be a report of conversation

18   from you to the agents on December 21st, 2016, Ms. Melvin?

19   A.  Yes.

20   Q.  And down below here, does it state, "Before Melvin could

21   answer, Cliff informed Melvin that he was contacted by the

22   guy" --

23           THE COURT:  Slow down.

24           MS. WILKINSON:  I'm sorry, Your Honor.

25   Q.  (BY MS. WILKINSON)  "Before Melvin could answer, Cliff

1    informed Melvin that he was contacted by the guy, Kareem

2    Anthony, that she saw earlier at the courthouse, and that he

3    told Cliff that he saw Melvin there.  Cliff and Anthony spoke

4    about what was going on and what they had to do with this

5    investigation.  Cliff asked Anthony if the investigators asked

6    anything about him."

7        Did you report that information, as you just recalled to

8    Mr. Trainor, back in December of 2016, Ms. Melvin?

9    A.  Yes, but I didn't know his name, I didn't know his name

10   was --

11   Q.  You just reported the man?

12   A.  Yes.

13   Q.  Now, let me ask you this, Ms. Melvin, your memory was

14   pretty good about that event; correct?

15   A.  Yes.

16   Q.  And you directed it to the agents the very next day; isn't

17   that right, Ms. Melvin?

18   A.  Yes.

19   Q.  Is there any doubt in your mind, in terms of your memory,

20   Ms. Melvin, that Mr. Mosley asked you to look up Maryland

21   Judiciary Case Search on May 26th, 2016, any doubt in your

22   mind?

23   A.  No.

24   Q.  Any doubt in your mind that when you were getting in the

25   shower before work May 27th, Mr. Mosley said he was going to

1    see his baby's mother so he could get his child and take her

2    to school?

3    A.  No.

4    Q.  He told you that?

5    A.  Yes.

6    Q.  You remember that?

7    A.  Yes.

8    Q.  Were you having any issues with your memory on that day?

9    A.  No.

10   Q.  On March 1st, 2019, when you came -- not March 1st, March

11   2019 when you came back to the grand jury, Ms. Melvin, did you

12   relate a conversation that you had had with Mr. Mosley

13   directly before coming to the grand jury in those day or two

14   before it happened?

15   A.  Ask me one more time, you lost me when you was doing --

16   Q.  I'm sorry.  When you came back to the grand jury in March

17   of 2019, did you tell the grand jury about a recent

18   conversation that you had also had with Mr. Mosley?

19   A.  Yes.

20   Q.  And do you recall that conversation now?

21   A.  Yes.

22   Q.  And at that time, did Mr. Mosley -- did you confront

23   Mr. Mosley with where he was the morning of May 27th, 2016?

24   A.  I don't recall -- I think so, yes.

25   Q.  Well, tell us what you do recall, and if I need to refresh

1    your recollection, I will.  Tell the jury what you do recall

2    about the conversation you had with Mr. Mosley just before you

3    went into the grand jury again in March of 2000.

4    A.  I was having a conversation with him, I was in my living

5    where I currently reside, and I actually really wanted to ask

6    him in reference to the Maryland Judiciary Search, but I could

7    not get that out because he didn't want to discuss nothing.

8    He didn't want to discuss it.

9        So I just was asking him in reference to, you know, me

10   going, is there anything else that, you know, maybe I need to

11   know or -- and there was nothing.  He didn't -- it was -- he

12   didn't discuss -- he didn't have no response.

13   Q.  Now, did you -- did Mr. Mosley continue to maintain

14   that --

15             THE COURT:  You need a lapel mike if you're going to

16   move from the --

17             MS. WILKINSON:  I'm sorry, I sound so loud to

18   myself.

19   Q.  (BY MS. WILKINSON)  Did Mr. Mosley continue to maintain

20   that he had gone to see his daughter that morning to take her

21   to school?

22   A.  No, no.  No.

23             MS. WILKINSON:  I have nothing further, Your

24   Honor.

25             THE COURT:  All right.  Ma'am, thank you for your

1    testimony.  Please don't discuss your testimony with anyone

2    else until this case has been concluded.  Enjoy the rest of

3    your day, and you are excused.

4                THE WITNESS:  Thank you.

5                THE COURT:  Next government witness.

6                MS. OLDHAM:  Next witness, Your Honor, is Norman

7    Powell.

8                THE COURT:  Very well.

9                THE CLERK:  Good afternoon, sir.  Please raise your

10   right hand.

11                        NORMAN POWELL,

12   called as a witness, being first duly sworn, was examined and

13   testified as follows:

14                THE WITNESS:  Yes.

15                THE CLERK:  Thank you.  You may have a seat.  Please

16   state and spell your full name for the Court.

17                THE WITNESS:  Norman Powell.  N-o-r-m-a-n,

18   P-o-w-e-l-l.

19                THE CLERK:  Thank you.

20                       DIRECT EXAMINATION

21   BY MS. OLDHAM:

22   Q.  Good afternoon, Mr. Powell.

23   A.  Good afternoon.

24   Q.  Mr. Powell, how old are you, sir?

25   A.  35.

Direct Examination - Powell  (By Ms. Oldham)

1   Q.  35?

2   A.  Yes.

3   Q.  Okay.  And if you could just pull the microphone a little

4   closer to you so we can all hear you.  Thank you.

5       And just yes or no, Mr. Powell, have you ever been

6   convicted of a crime?

7   A.  Yes.

8   Q.  Can you tell us what your relation is to Clifton Mosley?

9   A.  That's my first cousin.

10  Q.  Okay.  I'm going to ask you to take a look at PH-2.

11          MS. OLDHAM:  If I can put that on the monitor,

12  Ms. Lesser, for Mr. Powell.

13  Q.  (BY MS. OLDHAM)  Can you look to the right and tell me, is

14  that your cousin Clifton Mosley?

15  A.  Yes.

16  Q.  Okay.  Now, you indicated he's your first cousin, what's

17  the exact relation?

18  A.  My father's sister's child.

19  Q.  And is your father Norman Powell as well?

20  A.  Yes.

21  Q.  Is he still alive?

22  A.  No.

23  Q.  Is your grandfather a Norman Powell as well?

24  A.  Yes.

25  Q.  Is he still alive?

Direct Examination - Powell   (By Ms. Oldham)

1    A.  No.

2    Q.  So you're technically Norman Powell, the third?

3    A.  Uh-huh.

4            THE COURT:  You have to say yes or no, sir.

5    A.  Yes.

6    Q.  (BY MS. OLDHAM)  Directing your attention, Mr. Powell, to

7    the spring of 2016, did you at the time have a phone number

8    that you used that was ending in 6986?

9    A.  Yes.

10   Q.  And was that the only phone that you primarily used at the

11   time for yourself?

12   A.  I believe so.

13   Q.  Were you familiar with a phone number ending in 2650?

14   A.  No.

15   Q.  Okay.  I'm going to show you, Mr. Powell, what I am

16   marking as Government's Exhibit M-8.  Actually, I'll approach

17   and show you this, Mr. Powell.

18       I'm going to show you Government's Exhibit M-8, which has

19   a T-Mobile caption at the top for a phone number --

20   A.  Point it out.

21   Q.  Yes.

22   A.  Okay.

23   Q.  (443) 704-2650, have you ever had that phone number?

24   A.  No.

25   Q.  Is that a phone number that you've ever used for

1    yourself?

2    A.  Not at all.

3    Q.  Okay.  And directing your attention to where it says

4    subscriber name, it says Norman Powell with a subscriber

5    address of 2738 Virginia Avenue in Baltimore, Maryland.  Has

6    that ever been your address?

7    A.  I lived on Virginia Avenue before, but I'm not sure if

8    that's the address.  I don't think so.

9    Q.  Okay.  And how long ago did you live on Virginia Avenue?

10   A.  I think it was 2007 or '8.

11   Q.  And did you ever live at that address on Virginia -- not

12   this address, but the one on Virginia Avenue with Clifton

13   Mosley?

14   A.  No.

15   Q.  And the subscriber effective date says November 21st,

16   2015, but to your knowledge, that was never the phone number

17   that you --

18   A.  No.

19   Q.  -- used and got for yourself?

20   A.  Huh-uh, not at all.

21   Q.  Did you ever give anyone permission to obtain that phone

22   number in your name?

23   A.  No.

24   Q.  Did you know that your cousin Clifton Mosley had obtained

25   that phone number in your name?

Direct Examination - Powell  (By Ms. Oldham)

1    A.  No, I didn't.

2    Q.  In the spring of 2016 --

3          MS. OLDHAM:  I apologize, Your Honor, I just

4    realized I didn't have the mike on with me up there.

5    Q.  (BY MS. OLDHAM)  In the spring of 2016, were you in touch

6    with your cousin Clifton Mosley?

7    A.  Yes.

8    Q.  And would you be in touch with him over the telephone?

9    A.  Yes.

10   Q.  I'm going to try to place on the DOER machine so you can

11   just look at the screen, Mr. Powell, what I've marked as

12   Exhibit M-10.

13      Do you see these contacts from May of 2016 between these

14   two phone numbers, the one ending in 2650 that you are not

15   familiar with and the one that's ending in 6986 that was your

16   phone number, see those contacts?

17   A.  Yes.

18   Q.  And do you recall that you were having pretty regular

19   contact with your cousin at that time?

20   A.  I do.

21   Q.  And am I looking at these correctly in that during these

22   communications or contacts, you are using your own phone, the

23   one ending in 6986, and your cousin Mr. Mosley is using the

24   one ending in 2650?

25   A.  Yes.  Now, when you say my name, does that mean, you know,

1    me, my grandfather, and my father's name?

2    Q.  Well, just referring to the subscriber information on that

3    phone as Norman Powell, you are not aware --

4    A.  No, I'm not.

5    Q.  -- that your name or that name --

6    A.  I didn't do it, right.

7    Q.  Okay.

8           MS. OLDHAM:  Court's indulgence.

9           THE COURT:  Sure.

10   Q.  (BY MS. OLDHAM)  Mr. Powell, if you can look to the

11   screen, I'm showing you PH-3, do you know that individual?

12   A.  I've seen him before.

13   Q.  I'm sorry?

14   A.  I know who he is.

15   Q.  How do you know that individual?

16   A.  From my cousin's friend, my cousin's home boy.

17   Q.  Okay.

18   A.  My cousin's friend.

19   Q.  Okay.  And what was the last thing you said?

20   A.  His home boy.

21   Q.  Okay.  And when you say "cousin," are you referring to

22   Mr. Mosley?

23   A.  Yeah.

24   Q.  And when you say "his home boy," what does that mean?

25   A.  A friend.

1   Q.  Good friends?

2   A.  I don't know how much they friends, I just know they're

3   friends.

4   Q.  Do you recall referring to him previously as your cousin's

5   wing man?

6   A.  No, I don't.

7   Q.  Do you recall testifying in front of the grand jury in

8   this matter back on April 3rd, 2018?

9   A.  I don't.

10  Q.  You don't remember having come to --

11  A.  I don't recall saying that at all.

12  Q.  Okay.  But do you recall coming to testify before the

13  grand jury?

14  A.  Yes.

15  Q.  Okay.  Would it refresh your recollection if I showed you

16  your prior testimony from the grand jury?

17  A.  I'm not sure.

18  Q.  Okay.  We'll try.

19          THE COURT:  Remember your microphone if you are

20  going to question from up here.  It's on the table.

21  Q.  (BY MS. OLDHAM)  Mr. Powell, I'm going to ask that you

22  just take a look starting about midway through page 23 and

23  just reading down to the top of page 24.  Just to yourself.

24  A.  (Complying.)  Right-hand man, I believe.  Right-hand man,

25  I believe.

1    Q.  Okay.  Can you just keep reading the next couple lines to

2    yourself.

3        Does that refresh your recollection as to whether or not

4    you also used the phrase --

5    A.  Yes.

6    Q.  -- "wing man."  Okay.

7        So in the past, you have described this individual

8    identified in PH-3 as Clifton Mosley's home boy, right-hand

9    man, wing man?

10   A.  Yes.

11   Q.  Okay.

12           MS. OLDHAM:  Nothing further, Your Honor.  Thank

13   you.

14           THE COURT:  Cross-examination from Mr. Mosley's

15   counsel.  Mr. Mercer.

16           MR. MERCER:  Thank you, Your Honor.

17                    CROSS-EXAMINATION

18   BY MR. MERCER:

19   Q.  Good afternoon, Mr. Powell.

20   A.  Good afternoon.

21   Q.  Mr. Powell, is your formal name the third?

22   A.  Yes.

23   Q.  And you were shown some a list of phone calls?

24   A.  Uh-huh.

25   Q.  Of phone contacts; right?

Cross-examination - Powell   (By Mr. Mercer)

1    A.  Yes.

2    Q.  And so it's fair to say that if there was a phone

3    connection that -- with Mr. Mosley, you were not in his

4    presence?

5    A.  Yes.

6    Q.  And I gather you wanted to have a closer relationship with

7    Mr. Mosley?

8    A.  Yes.

9    Q.  So I mean, it's safe to assume then that you didn't see

10   him that often?

11   A.  No, I didn't.

12   Q.  Now, you described a family connection with Mr. Mosley;

13   right?

14   A.  Yes.

15   Q.  He's your first cousin?

16   A.  My first cousin.

17   Q.  So you know Mr. Mosley grew up on Woodland?

18   A.  Yes.

19   Q.  And had family on Virginia Avenue?

20   A.  Yes.

21   Q.  He also had a brother on Virginia Avenue?

22   A.  Right.  Me and his brother lived together.

23   Q.  And Mr. Mosley could be found around the way of Wylie

24   Avenue?

25   A.  All over that area, yes.

Redirect Examination - Powell  (By Ms. Oldham)

1   Q.  And Mr. Mosley, actually, he told you he put the 2650

2   phone number in your uncle's name?

3   A.  Right.

4   Q.  Okay.

5           MR. MERCER:  Nothing further.

6           THE COURT:  Any questions from Mr. Carter's counsel?

7           MR. ZERKIN:  Yes, Your Honor, briefly.

8                    CROSS-EXAMINATION

9   BY MR. ZERKIN:

10  Q.  Mr. Powell, by "wing man," you just meant that you'd see

11  them together a lot; right?

12  A.  That's exactly what I said.

13          MR. ZERKIN:  That's all I have.

14          THE COURT:  Any redirect from the government?

15                  REDIRECT EXAMINATION

16  BY MS. OLDHAM:

17  Q.  Mr. Powell, did you indicate that Mr. Mosley told you that

18  he put that number in his uncle's name?

19  A.  At some point in time, yes, he did tell me that.

20  Q.  At some point in time, would that have been after you

21  testified before the grand jury?

22  A.  Maybe so, I think so.

23  Q.  Okay.

24          MS. OLDHAM:  Nothing further.  Thank you.

25          THE COURT:  All right.  Sir, thank you for your

1    testimony.  Please don't discuss your testimony with anyone

2    until the trial has been concluded.  Enjoy the rest of your

3    day, and you are excused.

4                THE WITNESS:  Thanks.

5                THE COURT:  You are welcome.

6                Next government witness.

7                MS. WILKINSON:  Shayne Bird.  Your Honor, while

8    Mr. Bird's coming, may I approach on an issue?

9                THE COURT:  Of course.

10               (Bench conference on the record.)

11               MS. WILKINSON:  Wrong witness came in.  I'm sorry,

12   Your Honor.  The Court will recall that during the interview

13   of Mr. Mosley, he -- during the grand jury testimony of

14   Mr. Mosley, he was asked whether he knew a man named Bird,

15   B-i-r-d, and he indicated that he did, he was a tow truck

16   driver.  And then the next question was, does Bird know

17   Mr. Hightower, and Mr. Mosley said no.  And the fact of the

18   matter is that Mr. Mosley and Mr. Hightower and Mr. Bird all

19   know each other from prison and have known each other for a

20   long time.

21               And Mr. Bird, I have instructed him not to answer

22   questions related to Mr. Mosley's time in prison, even though

23   I contend it's relevant as to that point.  But I would ask

24   permission to lead, because I am going to elicit that

25   Mr. Hightower was in prison with him, and then indicate that

Redirect Examination - Powell   (By Ms. Oldham)

1    Mr. Hightower does know Mr. Bird, but I will not -- I have

2    indicated to him not to answer the question as to -- not to

3    volunteer the information that Mr. Mosley knows him from

4    prison, even though I contend it's relevant to show the nature

5    of the relationship, but I won't go there, given the Court's

6    ruling.  But I just wanted to make sure I could lead --

7              THE COURT:  I don't see prison as a special bonding

8    time.

9              MS. WILKINSON:  It's just that that's how he knows

10   they all know each other.

11             THE COURT:  Fair enough.

12             MS. WILKINSON:  And sometimes it is a special

13   bonding area.

14             MR. MERCER:  I don't know if I agree with that.

15             THE COURT:  We've had that discussion.

16             Any issue with her leading to get us through that

17   without problems?

18             MR. TRAINOR:  To get us through any mention of

19   prison?

20             THE COURT:  Make sure you're --

21             MR. TRAINOR:  To get us through any mention of

22   prison?

23             THE COURT:  To get us through any mention of

24   Mr. Mosley having been in prison with him, she's offering to

25   lead, any issue with that?

 1              MR. TRAINOR:  No issue on that.

 2              THE COURT:  Very well.  Sorry, hold on.

 3              MR. MERCER:  Is the government moving in --

 4              THE COURT:  Make sure you're speaking in the

 5    microphone.

 6              MR. MERCER:  Is the government moving in any jail

 7    call through Mr. --

 8              MS. WILKINSON:  Yes, J-16.

 9              MR. MERCER:  That's the call of --

10              MS. WILKINSON:  Where Mr. Bird's a party to the

11    conversation.

12              MR. MERCER:  Yeah, I think we need to be heard on

13    that, Your Honor.

14              THE COURT:  I'll hear you.  Do I have that

15    transcript?  Do I need that transcript?

16              MS. WILKINSON:  You should have it, Your Honor,

17    it's -- well, maybe not in that book.

18              THE COURT:  We'll see if we need it.

19              MR. MERCER:  Yeah, this is Government's

20    Exhibit J-16A.  And it just contains lengthy discussion by

21    Mr. Hightower with Mr. Bird.

22              THE COURT:  Okay.

23              MR. MERCER:  That we would object to.

24              THE COURT:  Your basis for objecting?

25              MR. MERCER:  Well, we have no right -- we have no

Redirect Examination - Powell   (By Ms. Oldham)

1   opportunity to cross-examine Mr. Hightower.  The only purpose

2   of it coming in or its only relevance is if it's true.

3          THE COURT:  So hearsay, hearsay objection.

4          MR. MERCER:  So I don't see it -- well, it's both

5   cross-examination and hearsay.  I don't see as relevance

6   unless it's true.  And I don't see any relevance to

7   Mr. Hightower's state of mind or anything of that sort.  And

8   it's also not any statement that is relevant to the ongoing

9   conspiracy.

10          THE COURT:  All right.  But before we start

11   eliminating all the possibilities, let's ask the government

12   what their actual argument is.

13          MS. WILKINSON:  Can you put it up here, because I

14   don't know which statement he's specifically referring to.

15          THE COURT:  Sounds like he's referring to the whole

16   thing, as best I can tell.

17          MS. WILKINSON:  So Your Honor, the beginning of this

18   call is --

19          THE COURT:  Is between Mr. Hightower and --

20          MS. WILKINSON:  First it's Mr. Carter, who then

21   brings Mr. Bird on to the phone.

22          THE COURT:  It's actually Mr. Bird, that's like his

23   last name or --

24          MS. WILKINSON:  Yeah, that's his name, Mr. Bird.

25          THE COURT:  Okay.

1          MS. WILKINSON:  So it's Mr. Hightower calls

2   Mr. Carter, and Mr. Carter brings Mr. Bird on the phone.  So

3   that in and of itself is an important fact for us.

4          THE COURT:  Sure.

5          MS. WILKINSON:  And we've already proven that

6   Mr. Carter and Mr. Mosley were together on May 16th, and now

7   we're going to prove they were together on May 17th, 2016, and

8   they're together because they're going to meet with Mr. Bird

9   about towing certain cars that Mr. Bird will testify he

10  observed, including the Audi, and the -- and his, you know,

11  knowledge of that particular event.

12         So as we go on -- so first of all, the conversations

13  with Mr. Carter, then brings Mr. Bird on the phone, and then

14  they were talking about the case.  And essentially, the

15  interchange is Cliff and Davon about his discovery, and I need

16  to get some discovery about his case.  And we contend that

17  Mr. Carter's listening, right, because he's making the

18  three-way call for him, and he's talking about the case in

19  that regard.

20         So that goes to his state of mind and the

21  information that he has with regard to the discovery that he's

22  waiting on in relation to his case.

23         THE COURT:  Mr. Hightower's state of mind.

24         MS. WILKINSON:  Uh-huh, Mr. Hightower's state of

25  mind.  And then Mr. Carter says, "Me and Cliff just got

1    finished talking about that.  I don't see what them saying" --

2    so that goes to the fact that Mr. Carter is putting himself

3    with Cliff.  Part of their defense is that these men don't

4    really know each other or like each other like that, and

5    Mr. Carter's interjecting in the middle of the conversation,

6    "Me and Cliff just got finished talking about that, and you're

7    coming out to meet them."  So the entire conversation about is

8    about that part, about them coming to meet.  And I don't

9    know --

10           THE COURT:  I'm sorry, about them setting up a

11   meeting, or about --

12           MS. WILKINSON:  About them going -- Mr. Bird's going

13   up there to meet with Mr. Carter and Mr. Mosley on this day.

14           THE COURT:  So the purpose of that part of the call

15   is to establish that they were going to meet that day, or they

16   were going to meet at some point.

17           MS. WILKINSON:  And that they're together, that "me

18   and Cliff just got finished talking about that, I don't see

19   what I'm saying" -- so each -- what I guess I'm saying, Your

20   Honor, is there's a lot in this call, and I don't know about

21   the generic description, but there's a number of things

22   relevant that we would have to go page by page, and as I go

23   through it -- because like I said, I've given these to counsel

24   long before now.

25           And Mr. Hightower starts talking about a witness

1    list to Mr. Bird and how he -- getting it, and as the Court

2    has heard, there's a lot of testimony about who Mr. Hightower

3    believed the witnesses were.  And again, our contention is

4    that this is during a three-way call that Mr. Carter made when

5    he's talking to Mr. Bird about it.

6              THE COURT:  Hold on a second.  So are you literally

7    objecting to the whole call?  I didn't realize it was this

8    long.  So I've been having Ms. Wilkinson go line by line,

9    defending every line.  Can we get to the core of what your

10   objection is?

11             MR. MERCER:  Here's what I'm specifically focused

12   on, which is the statements by Mr. Hightower that purport to

13   characterize anything related to a witness list, what his

14   lawyer did, what he was given, what he was shown, you know,

15   that he wasn't supposed to talk.

16             THE COURT:  So your primary objection is to what you

17   flagged there.

18             MR. TRAINOR:  Yes.

19             THE COURT:  Can I just read that?

20             What's the timeline on this, when is this call

21   taking place?

22             MS. WILKINSON:  It's about a week before the murder.

23   Ten days, I should say.  I think it's the 17th.

24             THE COURT:  State of mind, I mean, it goes to he's

25   concerned about the witness, he's concerned about what's going

1   on.   It's Mr. Hightower's state of mind, so I overrule the

2   objection.   I overrule the objection.

3            (The following proceedings were had in open court.)

4            THE COURT:   I'm sorry, do we need counsel back?   I

5   thought we were done, but I guess not.   My apologies.

6            MR. ZERKIN:   Can we have the jury instructed that

7   it's only admitted for -- that it's not admitted for the truth

8   of --

9            THE COURT:   I mean, it's an exception to the hearsay

10   rule.

11           MS. WILKINSON:   That's one of the exceptions.   It's

12   also a statement in furtherance of the conspiracy because I

13   believe Mr. Carter's listening in on the call, and he's

14   talking about the witness list.   And our whole theory is that

15   he's having communications with witnesses, including

16   Ms. Turner.   He knows Ms. Edmonds is on the witness list, and

17   he's talking about it to Mr. Bird, who's going to meet with

18   the two people we contend are the co-conspirators in the

19   case.

20           THE COURT:   I mean, that particular section that I

21   just read, I mean, just he's talking about the fact that he

22   got the witness list and expressing his concerns about it.   I

23   thought there was going to be a stipulation to Bardos giving

24   him something, I mean -- so I don't -- I don't see why we need

25   that instruction at this point.

1          MR. ZERKIN:  All right.

2          (The following proceedings were had in open court.)

3          THE CLERK:  Good afternoon, sir, please stand and

4    raise your right hand.

5                          SHAYNE BIRD,

6    called as a witness, being first duly sworn, was examined and

7    testified as follows:

8          THE WITNESS:  Yes.

9          THE CLERK:  Thank you.  You may have a seat.  Please

10   state and spell your full name for the record.

11         THE WITNESS:  Shayne Bird.

12         THE CLERK:  Spell your name, please.

13         THE WITNESS:  S-h-a-y-n-e, S-i-d-h-a-r-t-h,

14   B-i-r-d.

15         THE CLERK:  Thank you.

16                    DIRECT EXAMINATION

17   BY MS. WILKINSON:

18   Q.  Mr. Bird, how old are you, sir?

19   A.  42 -- 41.

20         THE CLERK:  Speak into that microphone, sir.

21   A.  41.

22   Q.  (BY MS. WILKINSON)  Are you able the hear me all right?  I

23   think I have my microphone on.

24   A.  Yes.

25   Q.  And what area do you live in?

1    A.  Silver Spring, Maryland.

2    Q.  And are you employed?

3    A.  Yes.

4    Q.  And what type of work do you do?

5    A.  I own a towing company.

6    Q.  And what is the name of the towing company that you own?

7    A.  Drive Towing.

8    Q.  Drive Towing?

9    A.  Yeah.

10   Q.  And like drive a car?

11   A.  Uh-huh.

12   Q.  And how long have you owned that company?

13   A.  Since January of '17.

14   Q.  Did you -- were you working as a tow truck driver prior

15   to?

16   A.  2018, I'm sorry, January 2018.

17   Q.  And were you working as a tow truck driver --

18   A.  Yeah.

19   Q.  Let me finish the question first -- back in 2016 time

20   frame as well?

21   A.  Yes.

22   Q.  And when you were doing tow truck driver work back then,

23   did you work for a particular company, or is this before you

24   owned your own company?

25   A.  Yes, it's the same company.

1    Q.   And what, did you eventually buy the company?

2    A.   Yeah.

3    Q.   So it was always called Drive Towing?

4    A.   Yes.

5    Q.   Okay.  Have you previously been convicted of a crime?

6    A.   Yes.

7    Q.   Do you know Matthew Hightower?

8    A.   Yes.

9    Q.   Did you meet Mr. Hightower when you were incarcerated?

10   A.   Yes.

11   Q.   And when you came out -- and let me go ahead and put up

12   Government's Exhibit PH-3, is that a picture of Mr. Hightower?

13   A.   Yes.

14   Q.   When you both were released from prison, Mr. Bird, did you

15   continue a relationship with Mr. Hightower?

16   A.   Yes.

17   Q.   And how often would you see him and talk to him, that sort

18   of thing?

19   A.   In the beginning, maybe once a year, and then after that,

20   every few months or something.  I mean --

21   Q.   So it gradually increased at some point?

22   A.   Yeah.

23   Q.   Let me see if I can kind of shoulder or bookend the time

24   frame, do you recall the time when Mr. Hightower went to

25   prison in May of 2016?

Direct Examination - Bird   (By Ms. Wilkinson)

1    A.  Yes.

2    Q.  And do you recall a time when Mr. Hightower was on

3    electronic home monitoring in June of 2015?

4    A.  Yes.

5    Q.  And in that time frame, between June of 2015 and May of

6    2016, would you have communications with Mr. Hightower, would

7    you talk to him --

8    A.  Yes.

9    Q.  -- see him --

10   A.  Yeah.

11   Q.  -- that sort of thing?

12       And what was the nature of your relationship in that time

13   frame?

14   A.  Mostly I just go -- when he was on house arrest?

15   Q.  Yes.

16   A.  I would go to give him a haircut most the time.

17   Q.  So you would go give him a haircut?

18   A.  Uh-huh.

19   Q.  What other things -- would you socialize with him?

20   A.  About cars.

21   Q.  Would you do cars with him, is that what you said?

22   A.  No, socialize?

23   Q.  Yes, would you socialize with him?

24   A.  Yeah.

25   Q.  And by that, did you go to his house and have dinner, that

1    sort of thing?

2    A.  Not dinner, but yeah.

3    Q.  What would you do to socialize?

4    A.  Lunch maybe.

5    Q.  Would you eat with him?

6    A.  Yeah.

7    Q.  And did you come to know any personal information about

8    him?

9    A.  Not really.

10   Q.  Did you know if he was married or had children?

11   A.  Yes.

12   Q.  And which was it, was he married, did he have children?

13   A.  He just had children.

14   Q.  And did you know the baby's mother?

15   A.  Which -- I mean, I knew one, yeah, the one he lived

16   with.

17   Q.  And did you remember her name?

18   A.  No.

19   Q.  Do you remember the name Michelle?

20   A.  Yes.

21   Q.  And who is Michelle?

22   A.  Yeah, that's her.

23   Q.  And had you met Michelle before?

24   A.  Yeah, a couple times.

25   Q.  Had Michelle ever asked you to -- do you remember a time

Direct Examination - Bird   (By Ms. Wilkinson)

1   when Mr. Hightower was arrested prior to June of 2015, and you

2   were asked to bond him out?

3   A.   Yes.

4   Q.   Tell us about that.

5   A.   He got arrested for -- they said he was trying to shoot

6   somebody or -- they said he tried to shoot somebody, and he

7   said he didn't do it.  And --

8   Q.   And did he tell you that he had beaten those charges?

9   A.   I can't really remember, but yeah, at the end, yeah, he

10  beat them, yes.

11  Q.   And did you provide bail money for him in connection with

12  that shooting?

13  A.   Yes.

14  Q.   And is that how you knew Michelle?

15  A.   No, I knew Michelle before that.

16  Q.   You had met Michelle before then?

17  A.   Yeah.

18  Q.   Let me ask it this way, prior to June of 2015, did you

19  know what Mr. Hightower did for a living, before he was on

20  house arrest?

21  A.   No.

22  Q.   Did you know him to work at a medical supply company?

23  A.   Oh, yes.  Yes.

24  Q.   And what medical supply company did you know him to work

25  at?

Direct Examination - Bird  (By Ms. Wilkinson)

1    A.  I don't remember the name, but --

2    Q.  What type of work did he do?

3    A.  Delivery driver.

4    Q.  And how do you know that?

5    A.  From talking to him.

6    Q.  And did they deliver diapers and things of that nature?

7    A.  And medical equipment, yeah.

8    Q.  Now, when he was put on house arrest, did you know what it

9    was for?

10   A.  Um, yeah, for the -- for -- on house arrest in what year,

11   when?

12   Q.  In 2015, when he was on house arrest.

13   A.  I think it was for the -- interacting with -- I don't

14   know, I think it was something to do with the murder, I don't

15   know.

16   Q.  Did he talk to you about health care fraud before

17   murder?

18   A.  No.

19   Q.  At some point when he was on house arrest, is that when

20   you went to go -- when you would see him and socialize with

21   him?

22   A.  Yes.

23   Q.  Would he come to you, or would you go to him?

24   A.  No, I'd go to him.

25   Q.  And is that because he was on house arrest?

1    A.   Yes.

2    Q.   And how often would you go visit him?

3    A.   Once -- once every couple weeks, once a month maybe.

4    Q.   Did you start doing business with him?

5    A.   No.

6    Q.   Did you buy and sell cars with him?

7    A.   Yes.

8    Q.   Is that business?

9    A.   Yes.

10   Q.   Did you have financial transactions with him?

11   A.   Yes.

12   Q.   Explain that to the jury.

13   A.   We would buy cars and stuff from the auction and resell

14   them.

15   Q.   In that time frame, do you know how many cars

16   Mr. Hightower had?

17   A.   I mean, around 20.

18   Q.   Did you -- personally involved in the purchase of 20 cars

19   with him?

20   A.   Yeah.

21   Q.   How so?

22   A.   I mean, we would split the money.  We'd always flip cars

23   together.  I mean --

24   Q.   Now, did there come a time in -- well, strike that.

25        Do you know Cliff Mosley?

Direct Examination - Bird  (By Ms. Wilkinson)

1    A.  Yes.

2    Q.  And do you know, does Mr. Mosley know Mr. Hightower?

3    A.  Yes.

4    Q.  And were the three of you friends?

5    A.  Yes.

6    Q.  And do they call you Bird sometimes?

7    A.  Yes.

8    Q.  And you're a tow truck driver?

9    A.  Uh-huh.

10   Q.  Yes?

11   A.  Yes.  Yes.

12   Q.  When -- on occasion when you would come to see

13   Mr. Hightower from where you live up here, would he -- would

14   Mr. Mosley be there?

15   A.  Once in a while.

16   Q.  There were times when the three of you were together?  I'm

17   not asking you to quantify it, were there at least one

18   occasion when the three of you were together, Mr. Bird?

19   A.  Yes.

20   Q.  Were there more than one occasion when the three of you

21   were together?

22   A.  I don't remember.

23   Q.  You had mentioned that you knew Mr. Hightower was being

24   charged with a murder, and did he tell you that?

25   A.  Yes.

Direct Examination - Bird   (By Ms. Wilkinson)

1    Q.   Did he tell you he was under investigation for that

2    murder?

3    A.   Yes.

4    Q.   What did he -- how did he describe it, what did he say to

5    you?

6    A.   That he was under investigation for a murder.

7    Q.   What type of murder, what did he tell you about it?   Who

8    was the victim?

9    A.   He just said that it was the guy that -- somebody they

10   lent money to.

11   Q.   Somebody that he lent money to, did he describe him in any

12   other way?

13   A.   No.

14   Q.   Did he describe what he physically looked like or what his

15   nationality?

16   A.   He was African.

17   Q.   He said he was African?

18   A.   Yeah.

19   Q.   And that he had lent him money?

20   A.   Yeah.

21   Q.   I'm going to put up on the screen here Government's

22   Exhibit P-30 and just have you identify, back in May of 2016,

23   was your telephone number (240) 888-1456, Mr. Bird?

24   A.   Yes.

25   Q.   And you can see here that there's some communications --

1    or contacts, I should call them -- between your phone number

2    and a number attributed to Mr. Hightower, and down below -- or

3    Mr. Hightower to you from a phone number ending in 6448, is it

4    correct that occasionally you and he would have contact over

5    the telephone?

6    A.   Yes.

7    Q.   And does that hold true for Mr. Mosley as well, in other

8    words, there's communications between a 1533 number,

9    Mr. Mosley and you, and this is in the May-June time frame, do

10   you recall that as well?

11   A.   I mean, I don't recall it, but yeah, I guess.

12   Q.   Up here above, there seems to be on May 17th, a

13   communication from -- to you from Mr. Davon Carter at 2399, do

14   you recall what this conversation was about?

15   A.   No.

16   Q.   In that time frame, Mr. Bird, do you recall seeing

17   Mr. Mosley with Davon Carter?

18   A.   Within what time frame?

19   Q.   In the May 2016 time frame.

20   A.   If that was when I met them at the restaurant, then yes.

21   Q.   So is there only one occasion where you saw Mr. Mosley --

22   A.   Yes.

23   Q.   -- and Mr. Carter together?

24   A.   Yes.

25   Q.   And whatever date that was --

1    A.  Yes.

2    Q.  -- I'll refresh your memory in a moment, but that's what

3    you're recalling?

4    A.  Yes.

5    Q.  And it was a time at a restaurant?

6    A.  Yes.

7    Q.  Now, can you tell us, what was the point of that

8    communication or that meeting or that restaurant, however you

9    want to characterize it, with Mr. Mosley and Mr. Carter, why

10   were the three of you together?

11   A.  We were just trying to figure out what we were going to do

12   about all the cars and belongings of Matt.

13   Q.  And what do you mean by that, "all the cars and belongings

14   of Matt"?

15   A.  Just everything he owned that he's never going to have

16   again.

17   Q.  And that was what you believed the purpose of the meeting

18   was?

19   A.  Yes.

20   Q.  Now, prior to -- did you have to come from your home in --

21   down here -- down south up here to Baltimore?

22   A.  Yes, from --

23   Q.  -- the Silver Spring area?

24   A.  From Silver Spring, yeah.

25   Q.  And did you come from there to come up to Baltimore?

1    A.  Yes.

2    Q.  Do you recall where the restaurant meeting was?

3    A.  I can't remember the restaurant, but it was somewhere --

4    around Baltimore County somewhere.

5    Q.  I'm going to -- in preparation for your testimony -- first

6    of all, did you testify before a federal grand jury?

7    A.  Yes.

8    Q.  And did you have occasion to listen to a recorded

9    conversation with yourself and Mr. Hightower on the phone?

10   A.  Yes.

11   Q.  And was that -- what was the subject matter of that

12   conversation?

13   A.  We were talking about the vehicles that needed to be

14   towed.

15   Q.  I'm going to go ahead and play portions of it and stop and

16   ask you some questions about it, Mr. Bird.

17   A.  Yeah.

18          MS. WILKINSON:  J-16, for the record.  I'm sorry,

19   Ms. Lesser.

20          THE COURT:  I'm sorry, is there a transcript for

21   this one?

22          MS. WILKINSON:  There isn't.

23          THE COURT:  Okay.

24          (Audio played.)

25   Q.  (BY MS. WILKINSON)  Do you recognize the voices that we've

1    heard so far?

2    A.   Yes.

3    Q.   And whose voices are we listening to?

4    A.   Matt.

5    Q.   And do you recognize the other voice?

6    A.   I don't even know Davon's voice, but --

7    Q.   Why do you say Davon?

8    A.   Because that's what it said on the transcript.

9    Q.   Is that -- oh, you mean before you came in here today, you

10   had seen a transcript of the call?

11   A.   Well, I've heard it before, yes.

12   Q.   Well, who actually placed the call, Mr. Bird?

13   A.   Matt -- or Davon.

14            MS. WILKINSON:  Go ahead, you can keep playing.

15            (Audio played.)

16            MS. WILKINSON:  Stop that for a second right there.

17   Q.   (BY MS. WILKINSON)  That phone number that we're now

18   hearing, (301) 758-4744, is that another phone number for you,

19   Mr. Bird?

20   A.   Yes, it's my work phone.

21   Q.   Is that in addition to the number that you just testified

22   to with the grand jury -- I mean, with the jury, I don't know

23   why I keep saying that -- ending in 1456?

24   A.   Yes.

25   Q.   You had two phones at the time?

1    A.  Yes.

2    Q.  Did you have more than two phones, or just one phone?

3    A.  Two phones.

4    Q.  Only two phones or --

5    A.  Two phones.

6            MS. WILKINSON:  Okay.  Go ahead.

7            (Audio played.)

8    Q.  (BY MS. WILKINSON)  Do you know what that blowing sound is

9    that we're hearing?

10   A.  No.

11           MS. WILKINSON:  Okay.  Go ahead.

12           (Audio played.)

13   Q.  (BY MS. WILKINSON)  Do you recognize the voices now --

14   A.  Yes.

15   Q.  -- Mr. Bird?

16        And who is speaking on the phone?

17   A.  Matt.

18   Q.  And do you recognize the other person's voice?

19   A.  Yes.

20   Q.  Who is it?

21   A.  Davon.

22   Q.  Davon, or you?  Let's keep going.

23   A.  Oh, me.

24           MS. WILKINSON:  Stop for a second.

25   Q.  (BY MS. WILKINSON)  Are you on the phone now, Mr. Bird?

1    A.  Yes.

2              MS. WILKINSON:  Go ahead.

3              (Audio played.)

4    Q.  (BY MS. WILKINSON)  Is that you saying, "I'm like 20

5    minutes away from where Cliff at?"

6    A.  Yes.

7    Q.  And who are you preferring to when you say "Cliff"?

8    A.  Cliff, Cliff --

9    Q.  The defendant in this case?

10   A.  Yes.

11   Q.  And you can identify him, you were pointing over here.

12   A.  Yeah, Cliff.

13   Q.  Can you identify him by an article of clothing?

14   A.  Cliff in the white shirt.

15             MS. WILKINSON:  For the record, the defendant.

16             THE COURT:  The record will reflect that.

17   Q.  (BY MS. WILKINSON)  Mr. Bird, this says, "I'm 20 minutes

18   away from Cliff," did you have a prearranged meeting with

19   Cliff?

20   A.  I don't remember.  I mean, I was supposed to meet -- yeah,

21   but I just don't remember the details of how --

22   Q.  It's really just yes or no, did you know you were going to

23   meet with Cliff --

24   A.  Yes.

25   Q.  -- when you had this jail call, Mr. Bird?

Direct Examination - Bird  (By Ms. Wilkinson)

1    A.  Yes.

2              (Audio played.)

3    Q.  (BY MS. WILKINSON)  When you ask him -- is that you asking

4    him about the bail hearing?

5    A.  Yes.

6    Q.  What are you referring to?

7    A.  A bail hearing.

8    Q.  What are you referring to?

9    A.  The bail hearing on his case that he's locked up for.

10   Q.  How do you know that he had a bail hearing for the case

11   that he's locked up for?

12   A.  I don't know, I must have heard somewhere, but -- or he --

13   Q.  Well, let's explore that, Mr. Bird.  Who would you have

14   heard from?

15              MR. ZERKIN:  Object to "who you would have heard

16   from," Judge, question is, who he did hear from.

17   Q.  (BY MS. WILKINSON)  Who did you talk to in this time

18   frame, did you talk to Cliff?

19   A.  Yeah, maybe Cliff.

20   Q.  Who else besides Cliff --

21              MR. ZERKIN:  Move to strike the answer, Judge.

22              THE COURT:  Sustained as to "maybe Cliff," so I'll

23   strike that, he's not sure.

24   Q.  (BY MS. WILKINSON)  Who else besides Cliff would talk to

25   you, Mr. Bird, about a bail hearing for Matt?  Who else would

1    have that conversation with you?

2    A.  I don't remember.

3    Q.  Was there anybody else that shared information about Matt

4    with you, Mr. Bird, in this time frame?

5    A.  If there was, I don't remember who it was.

6    Q.  What other associates did you have with Matt that knew

7    about his bail hearing?

8    A.  Cliff.

9          MS. WILKINSON:  Go ahead.

10         (Audio played.)

11   Q.  (BY MS. WILKINSON)  So when Mr. Hightower says, "I just

12   don't, um, you know, you can get them, you know, get back at

13   him a little later or something," what was he talking about?

14   A.  I don't remember what he was talking about.

15   Q.  When you say, "Yeah, yeah, I'm gonna, yeah," what were you

16   gonna do?

17   A.  I don't remember.

18   Q.  Well, what would you do for Mr. Hightower, Mr. Bird?

19         MR. ZERKIN:  Objection to what he would do, Judge.

20         THE COURT:  Overruled.  You're asking factually what

21   sort of things he did for him.  Overruled.

22   Q.  (BY MS. WILKINSON)  What sort of things did you do for

23   Mr. Hightower?

24   A.  We sold cars.

25   Q.  Did this have something to do with the cars?

1    A.  Maybe, I don't remember.

2    Q.  What other things would you for Mr. Hightower?

3    A.  That's it.

4    Q.  Okay.

5              (Audio played.)

6    Q.  (BY MS. WILKINSON)  So is that you, Mr. Bird, when you

7    say, "What's up, you coming out there too, where Cliff at,

8    right," is that you?

9    A.  Yes.

10   Q.  And does Mr. Carter respond, "Yeah, I'm sitting here all

11   ready," does he respond that, did you hear that?

12   A.  Yes.

13   Q.  And my question to you is, Mr. Bird, when you knew you

14   were going to meet with Cliff, did you know you were going to

15   meet Davon too?

16   A.  Yes.

17   Q.  How did you know that?

18   A.  I was on the phone -- oh, you're --

19   Q.  Before this date, Mr. Bird.

20   A.  Oh, no, I don't think so.  I don't remember if I knew that

21   or not.

22   Q.  Well, what was the point of Mr. -- with Davon being there

23   when you were going to meet with Cliff?

24   A.  What was the point?

25   Q.  Yes.

1   A.  I don't know, I don't know what we were meeting for.  I

2   just told you it's for what we were going to do with the

3   stuff.

4   Q.  Is that -- was that the plan when you went up there?

5   A.  Yeah.

6           MS. WILKINSON:  Go ahead.

7           (Audio played.)

8   Q.  (BY MS. WILKINSON)  What's UFC?

9   A.  I don't know.

10  Q.  Did you hear yourself say that?

11  A.  I mean, it sounded like it, but I think I was just

12  mumbling something.

13  Q.  We can go back for a second.

14          MS. WILKINSON:  Can you go back, Ms. Lesser?

15          (Audio played.)

16  Q.  (BY MS. WILKINSON)  Did you hear that there?

17  A.  That was me?

18  Q.  Huh?

19  A.  That was me?

20  Q.  I'm asking you.

21  A.  Oh, I don't know, I couldn't tell.

22  Q.  Do you hear UFC?

23  A.  Yeah.

24  Q.  What does that mean?

25  A.  I don't know.

1                    MS. WILKINSON:  Go ahead.

2                    (Audio played.)

3    Q.  (BY MS. WILKINSON)  You see -- did you hear there,

4    Mr. Bird, where Mr. Hightower's talking about, "Whatever Harry

5    said to that man in his messages, they blaming me," did you

6    hear that?

7    A.  Yes.

8    Q.  And is this the first time Mr. Hightower had talked to you

9    about the details of the investigation?

10   A.  No.

11   Q.  He had talked to you about it before?

12   A.  Yes.

13   Q.  This wasn't a new subject matter to you, was it,

14   Mr. Bird?

15   A.  No.

16   Q.  And that would be before Mr. Hightower was locked up?

17   A.  Yes.

18                    MS. WILKINSON:  Go ahead.

19                    (Audio played.)

20   Q.  (BY MS. WILKINSON)  Is that you asking about whether Harry

21   was over there too, or is Harry still up?

22   A.  Yes.

23   Q.  Okay.  And did you know who Harry was?

24   A.  Yes.

25   Q.  Had you met Harry before?

Direct Examination - Bird  (By Ms. Wilkinson)

1   A.  I never spoke to him, but I've seen him before, yeah.

2   Q.  And in what context had you seen Harry before?

3   A.  Just at the office when I used to go by and visit Matt.

4   Q.  Why would you go to the office to visit Matt?

5   A.  Just stopping by when I was in the area.

6   Q.  What were you doing in the area?

7   A.  I was -- I don't know, if I had a tow to do down there or

8   something, I would stop by in the tow truck.

9           (Audio played.)

10  Q.  (BY MS. WILKINSON)  Where were you going to go on

11  Thursday, Mr. Bird?

12  A.  To see his wife -- I mean, his girl, I think.

13  Q.  And for what purpose?

14  A.  See if they were all right.

15  Q.  What do you mean by that?

16  A.  Just checking up on them.

17          (Audio played.)

18  Q.  (BY MS. WILKINSON)  When Mr. Hightower says, "I wasn't

19  really trying to get rid of it and shit, but I ain't know, I

20  just wanted to see how you was going to feel about it first,

21  so I wanted to ask you and shit, would you be able to," did

22  you say, "Yeah"?

23  A.  Did I say, "Yeah"?

24  Q.  Yeah.

25  A.  About if I get rid of what?

Direct Examination - Bird   (By Ms. Wilkinson)

1    Q.  What was Mr. Hightower asking you to do?

2    A.  I don't remember.

3    Q.  He says, "At first, so I wanted to ask can you and shit,"

4    what would he be trying to get rid of that you had?

5    A.  I don't remember.

6    Q.  Well --

7    A.  I haven't talked to him, I didn't talk to him after

8    that -- or remember.

9    Q.  "I was really trying to get rid of it and shit, but I

10   ain't know, I just wanted to see, though."

11        What did you have of Mr. Hightower's that he wanted to

12   get rid of?

13   A.  I didn't have anything.

14   Q.  Did you have anything of Mr. Hightower's?

15   A.  No.

16             (Audio played.)

17   Q.  (BY MS. WILKINSON)  So you say, "I'm talking about all the

18   ones you bought from the auction," what are you referring to

19   there?

20   A.  The cars.

21   Q.  Did you have his cars?

22   A.  No.

23   Q.  Did you have any of his cars?

24   A.  In possession, no.

25             (Audio played.)

1   Q.  (BY MS. WILKINSON)  What did you say there, Mr. Bird?

2   A.  I didn't understand it.  I didn't understand --

3   Q.  If we play it again, will you listen and tell us what you

4   said?

5   A.  Yeah.

6           MS. WILKINSON:  Okay.  Go ahead.

7           (Audio played.)

8   A.  I still couldn't understand it.

9   Q.  (BY MS. WILKINSON)  Were you in the car driving when this

10  conversation --

11  A.  Yes.

12  Q.  Were you in the car driving when this conversation took

13  place?

14  A.  Yes.

15  Q.  And where were you headed?

16  A.  To a restaurant in Baltimore County.

17  Q.  With who?

18  A.  Cliff and Davon.

19          THE COURT:  How much longer, Ms. Wilkinson?

20          MS. WILKINSON:  We have like two more minutes of the

21  call, and then I just have some more questions.  Do you want

22  me to finish the call?

23          THE COURT:  Go ahead.

24          MS. WILKINSON:  Okay.

25          (Audio played.)

1           MS. WILKINSON:  Your Honor, that's a good stopping

2    place, 21:43.

3           THE COURT:  All right.  Ladies and gentlemen, we

4    will take our lunch break at this point.  I'll ask that you be

5    in the jury room at 2:10 ready to go from there.  Please

6    remember not to discuss this case with anyone, including among

7    yourselves.  And I'll see you in an hour.  Enjoy your lunch.

8           (Jury left the courtroom.)

9           THE COURT:  All right.  Sir, you're instructed to be

10   back here at 2:10.

11          All right.  See you all in an hour.

12          (A recess was taken.)

13          THE COURT:  Just one second.  Before bringing the

14   jury in, having now listened to the call, for the record, it's

15   being admitted under both 803 (3) regarding Mr. Hightower's

16   state of mind, but also as statements made by co-conspirators

17   in furtherance of a conspiracy.

18          The objections are preserved for the record, but I

19   did want to make my ruling clear on that.

20          MR. MERCER:  Thank you, Your Honor, I probably

21   should -- we were referencing a page from the transcript at

22   the bench earlier.

23          THE COURT:  You can be seated unless addressing the

24   Court.

25          MR. MERCER:  I should probably mark that as a Mosley

Direct Examination - Bird  (By Ms. Wilkinson)

1    exhibit, just so the record's --

2           THE COURT:  That actually makes sense, which page it

3    was, if needed.

4           MR. MERCER:  It's page 3, this would be Mosley 25.

5           THE CLERK:  26.

6           THE COURT:  For identification.

7           MR. MERCER:  For identification, yes.

8           THE COURT:  26?

9           THE CLERK:  Yes.

10          THE COURT:  26, I'm told.

11          MR. MERCER:  Mosley 26.

12          THE COURT:  For identification purposes.

13          All right.  You can get the jury.

14          (Jury entered the courtroom.)

15          THE COURT:  All right.  You may all be seated.  Good

16   afternoon, ladies and gentlemen, hopefully everyone enjoyed

17   their lunch.

18          Sir, I do want to remind you, you are still under

19   oath.

20          Ms. Wilkinson, you may continue.

21          MS. WILKINSON:  Thank you.

22   Q.  (BY MS. WILKINSON)  Mr. Bird, when we completed the jail

23   call, we were referring to a jail call that took place on

24   May 17th, 2016 about 4:09 in the afternoon, the call being

25   placed from Mr. Hightower to 2399 and bringing in your phone

1    number 4744; correct?

2    A.   Yes.

3    Q.   Now, that day, you said you were in your car, did you

4    eventually make it up to your meeting with Mr. Carter and

5    Mr. Mosley?

6    A.   Yes.

7    Q.   And where were you driving from?

8    A.   Silver Spring.

9    Q.   And is that where you work, or where your business was and

10   your home, or both?

11   A.   Both, they're both the same place, yes.

12   Q.   And how did you drive up there?

13   A.   In my car.

14   Q.   And what kind of car did you have at the time?

15   A.   A GMC Denali.

16   Q.   And were you by yourself, or were you with anybody?

17   A.   I was by myself.

18   Q.   And who did you meet with when you got to Baltimore?

19   A.   Cliff and Davon.

20   Q.   And did you see them arrive?

21   A.   Yes.

22   Q.   Who got there first?

23   A.   Davon -- well, Davon was there before me.

24   Q.   And when -- where was he actually when you saw him

25   first?

1    A.  Just inside.

2    Q.  Inside where?

3    A.  The restaurant.

4    Q.  And do you recall what kind of restaurant it was?

5    A.  I mean, a -- it might have been an Outback or Applebee's

6    or something, I don't remember exactly what restaurant.

7    Q.  And was he already seated at the table?

8    A.  In the bar area, I believe, I don't really remember.

9    Q.  And did you greet him?

10   A.  I didn't know who he was.

11   Q.  At some point --

12   A.  But yes.

13   Q.  -- did you greet him?

14   A.  Yes.

15   Q.  Now, did you greet him -- at some point, did Cliff

16   arrive?

17   A.  Yes.

18   Q.  And did he come after you were already in the restaurant

19   with Davon?

20   A.  Yes, I think so.

21   Q.  And how is it that you -- if you never met Davon before,

22   how is it that you interacted with him, somebody introduce

23   you?

24   A.  No, we just looked at each other, and he just asked if I

25   was Bird.

Direct Examination - Bird   (By Ms. Wilkinson)

1    Q.   Asked if you were Bird?

2    A.   Yeah.

3    Q.   And you acknowledged that you were?

4    A.   Yes.

5    Q.   So did you and Davon have some interaction before Cliff

6    got there?

7    A.   No.

8    Q.   Did you talk with one another?

9    A.   Not really.

10   Q.   Just to introduce yourself as Bird?

11   A.   Yes.

12   Q.   And at some point, did Cliff arrive?

13   A.   Yes.

14   Q.   And what happened next?

15   A.   We just talked.

16   Q.   What did you talk about?

17   A.   About the cars and everything else, like I said, the --

18   his -- the -- what were supposed to do with all the cars and

19   stuff, his money.

20   Q.   And what were you supposed to do with the cars and

21   stuff?

22   A.   I was supposed to sell them or get them at some point and

23   start selling them, but that never happened.

24   Q.   Was there any discussion of towing the cars?

25   A.   Yes.

Direct Examination - Bird  (By Ms. Wilkinson)

1    Q.  And tell us about that.

2    A.  I was supposed to tow a black Audi A7.

3    Q.  And who wanted you -- was there a discussion about more

4    than one Audi?

5    A.  I don't really remember, but I know for a fact I was

6    supposed to tow the black Audi and keep it in my lot.

7    Q.  And was there a discussion about the other Audi as well?

8    A.  I don't know, I can't really remember.

9    Q.  Would it refresh your recollection to look at your

10   testimony?

11   A.  Okay.

12   Q.  Showing you -- counsel -- page 46, from grand jury

13   testimony, May 23rd, 2017.

14        Just go ahead and read it to yourself, and is there any

15   discussion about two Audis?

16   A.  Okay.

17   Q.  Was there a discussion about two Audis?

18   A.  Yes.

19   Q.  And what was the other Audi that you discussed?

20   A.  A silver Audi.

21   Q.  And did you see that Audi there that day?

22   A.  Yes.

23   Q.  And where did you see the Audi there that day?

24   A.  In the parking lot.

25   Q.  Was this after the meeting, or before the meeting?

1    A.   After.

2    Q.   I put up on the screen Government's Exhibit P-26, do you

3    recognize the car on the left?

4    A.   Yes.

5    Q.   What is it?

6    A.   An Audi.

7    Q.   And is it the car you saw that day?

8    A.   Yes.

9    Q.   Let's go back to the meeting that you were having with

10   Cliff and Davon about Matt's things and towing the black Audi,

11   you said?

12   A.   Yes.

13   Q.   Where were you supposed to tow the black Audi to?

14   A.   To my lot.

15   Q.   And I'll get to the end of the story, did you do it?

16   A.   No.

17   Q.   Why not?

18   A.   Because I never got a hold of the girl to get it from.

19   Q.   Did you agree to do it?

20   A.   Yes.

21   Q.   Where were you supposed to take it?

22   A.   Where was I supposed to take it?

23   Q.   Uh-huh.

24   A.   To my lot.

25   Q.   And you say you agreed to do it, but you never met up with

1    the girl?

2    A.   Yeah.

3    Q.   Do you recall testifying in the grand jury it was because

4    you didn't feel comfortable dealing with any of them

5    anymore?

6    A.   Yeah, I don't remember.

7    Q.   Did you say that in front of the grand jury, Mr. Bird?

8    A.   Yes, yes.

9    Q.   Well, tell the jury what you meant by "I didn't feel

10   comfortable dealing with them anymore."

11   A.   I didn't feel comfortable dealing with them anymore

12   because I didn't know what was going on.  I didn't know why I

13   was supposed to take anything anywhere, I just know I'm

14   supposed to take the car.

15   Q.   Had either Davon or Cliff asked you to tow cars before?

16   A.   No.

17   Q.   Who's Joey?

18   A.   Joey's one of Matthew's friend -- Matt's friends.

19   Q.   What does he do for a living?

20   A.   He tows cars.

21   Q.   What's the difference between you towing cars for Matt and

22   Joey towing cars for Matt?

23   A.   What's the difference?

24   Q.   Yeah, do you have a different --

25   A.   He drives a flatbed, I drive a -- wreckers, just the hook

Direct Examination - Bird  (By Ms. Wilkinson)

1   trucks.

2   Q.   Who drives which?

3   A.   Joey drives flatbeds, from what I remember.

4   Q.   Did you discuss Joey with Davon and Cliff?

5   A.   I don't remember.

6   Q.   What was the discussion about the silver Audi during the

7   meeting?

8   A.   During the meeting?

9   Q.   Yes.

10  A.   I don't remember.

11  Q.   Would it refresh your recollection to look at your

12  testimony, Mr. Bird?

13  A.   Sure.

14  Q.   Showing you page 47.

15          MS. WILKINSON:  For identification purposes only,

16  Your Honor.

17  A.   Which one?

18  Q.   (BY MS. WILKINSON)  Read it to yourself and tell me if

19  your recollection is refreshed, and then I will ask you some

20  questions.

21  A.   Okay.

22  Q.   Does it refresh your recollection, Mr. Bird?

23  A.   Yes.

24  Q.   Did you have a discussion about the silver Audi at the

25  meeting with Cliff and Davon?

Direct Examination - Bird  (By Ms. Wilkinson)

1    A.  Yes.

2    Q.  What was the discussion?

3    A.  For Cliff to return the car.

4    Q.  And who -- who stated that Matt was -- that Matt wanted

5    Cliff to return the car?

6    A.  Davon.

7    Q.  Who's telling you this?

8    A.  Davon.

9    Q.  Was Cliff driving the Audi that day?

10   A.  Yes.

11   Q.  Did you go out and see it?

12   A.  I was outside with them, so yes.

13   Q.  Did you go out and see it?

14   A.  When I was leaving, yes.

15   Q.  Pardon me?

16   A.  When I left.

17   Q.  Did you see it?

18   A.  Yes.

19   Q.  Did you see Cliff in it?

20   A.  Yes.

21   Q.  Was he driving it that day?

22   A.  Yes.

23   Q.  Did you know how long Cliff had been driving it at that

24   point?

25   A.  No.

1   Q.  Would it refresh your memory to look at your grand jury

2   testimony, Mr. Bird?

3   A.  Sure.

4   Q.  Showing you page 48.  There's the page numbers up on the

5   top right-hand corner.

6        Read it to yourself, and does it refresh your memory,

7   Mr. Bird?

8   A.  Okay.

9   Q.  Does it refresh your memory, Mr. Bird?

10  A.  Yes.

11  Q.  How long had Cliff been driving the Audi at that point?

12  A.  A few months.

13  Q.  Do you recall -- do you recall meeting in preparation for

14  your testimony with your attorney about a month or so ago,

15  Mr. Bird?

16  A.  Yes.

17  Q.  At that time, did you have any further recollections about

18  what Audis -- what Audis they wanted you to tow that day?

19  A.  Yes, but I didn't fully remember.

20  Q.  I'm sorry?

21  A.  Yes, I remember.

22  Q.  What did you relate to investigators at that time,

23  Mr. Bird?

24  A.  About the Audis?

25  Q.  Yes.

1          MR. ZERKIN:  Your Honor, I object to what he related

2     at that time.  It's hearsay, it's an out-of-court statement.

3          THE COURT:  Sustained as to that question.

4     Q.  (BY MS. WILKINSON)  Did you have a further recollection

5     about what Audis were discussed at that meeting, Mr. Bird?

6     A.  I just thought -- I just didn't really remember.  I don't

7     know if both of the Audis were supposed to be towed or one.  I

8     don't really remember.

9          MS. WILKINSON:  I think that's all I have, Your

10    Honor.

11         THE COURT:  Cross-examination.

12         MR. MERCER:  I have just a few questions, Your

13    Honor.

14         THE COURT:  Mr. Mercer.

15                      CROSS-EXAMINATION

16    BY MR. MERCER:

17    Q.  Mr. Bird, regarding the switch of the Audi from Cliff,

18    Mr. Mosley was not too happy about that?

19    A.  No.

20    Q.  It didn't appear to you that he wanted to accept

21    Mr. Carter's say so that Mr. Hightower wanted the Audi

22    returned?

23    A.  Yes.

24    Q.  And it looked to you like an argument even?

25    A.  Yes.

Cross-examination - Bird  (By Mr. Mercer)

1  Q.  Now, the government asked you about how long Mr. Mosley

2  had been driving the silver Audi?

3  A.  Yes.

4  Q.  And you saw Mr. Mosley driving the Audi, he arrived at the

5  restaurant in the silver Audi?

6  A.  Well, I didn't see him arrive at the restaurant, I just

7  saw it when we left.

8  Q.  When you left.  Okay.

9  A.  Yes.

10  Q.  But Mr. Carter was already at the restaurant when you

11  arrived?

12  A.  Yes.

13  Q.  And then after that, Mr. Mosley arrived?

14  A.  Yes.

15  Q.  Okay.  And with respect to how long Cliff had been driving

16  it, that was just your belief?

17  A.  Yeah, I don't really know exactly how long he was driving

18  it for.  I just figured it was a few months.

19  Q.  Now, the government asked you some questions about what

20  was said to you about the murder of the African guy?

21  A.  Uh-huh.

22  Q.  Is that how you referred to it?

23  A.  Yes.

24  Q.  And in one of the questions, the government used the word

25  "they" spoke to you, but you were just testifying as to what

1    Mr. Hightower said to you?

2    A.  Yes.

3    Q.  Okay.  Mr. Mosley has never spoken to you about the Wutoh

4    murder or the African murder or anything like that?

5    A.  No.

6    Q.  And you knew that Skinny was in charge of all this

7    property for Mr. Hightower?

8    A.  Yes.

9    Q.  You weren't particularly fond of dealing with Skinny?

10   A.  I just never dealt with her.

11   Q.  The government was asking you about some of your

12   statements during this call.  I believe the government asked

13   you how you knew about a bail hearing earlier?

14   A.  Yes.

15   Q.  Well, just want to point your direction to the transcript.

16           MS. WILKINSON:  Your Honor, objection, is there a

17   question pending to show him the transcript.

18           THE COURT:  Good point.

19   Q.  (BY MR. MERCER)  I'll ask a question, you were asking a

20   question about a bail hearing, weren't you?

21   A.  Yes.

22   Q.  And your question was, "You ain't got no bail hearing, no

23   nothing," question?

24   A.  Yes.

25   Q.  So it's not as though someone had told you about a bail

1    hearing?

2    A.   Yes -- I don't know.

3    Q.   You were just asking him in general whether he had a bail

4    hearing?

5    A.   Yes, in that statement, yes.

6    Q.   And that was in your conversation with Mr. Hightower?

7    A.   Yes.

8    Q.   Now, the government also asked you about what UFC is, they

9    played that part?

10   A.   Yes.

11   Q.   You were driving your vehicle at the time; right?

12   A.   Yes.

13   Q.   So did you say you were just watching UFC?

14   A.   To be honest, I don't know what UFC means.

15   Q.   Is it like a karate --

16   A.   I mean, I know what UFC is, but I don't know anything

17   about --

18   Q.   Right.  Okay.  So -- and the government also asked you

19   about a part of the recording about -- at page 4 in the

20   transcript, whether -- where Mr. Hightower is asking you if

21   you could -- take something for you?

22   A.   Yes.

23   Q.   Or for him.  Was he just asking you about taking over a

24   car he isn't really ready to sell yet?

25   A.   I don't remember anything from then.

Cross-examination - Bird  (By Mr. Zerkin)

1    Q.  In the context of just Mr. Hightower wanting a vehicle

2    towed, the idea was to get the vehicle away from the repo

3    man?

4    A.  Maybe, I don't know.

5    Q.  And because he wasn't ready to sell it yet?

6    A.  Yeah, I don't know.

7    Q.  And this conversation at the restaurant, all this

8    conversation had to do with was just dealing with the vehicles

9    and the property of Mr. Hightower?

10   A.  Yes.

11   Q.  That's all that was discussed?

12   A.  Yes.

13            MR. MERCER:  Nothing further.

14            THE COURT:  Hold on, it's not your turn yet.

15            MS. WILKINSON:  I forgot about you.

16            THE COURT:  Mr. Zerkin.

17            MR. ZERKIN:  Too quick for me.

18                    CROSS-EXAMINATION

19   BY MR. ZERKIN:

20   Q.  Mr. Bird, so just so I'm clear, they -- "they," meaning

21   Mr. Carter and Mr. Mosley, in that meeting, wanted you to do

22   something only with the black Audi; right?

23   A.  What do you mean?

24   Q.  Well, they wanted you to do something with the black Audi;

25   is that right?

Cross-examination - Bird  (By Mr. Zerkin)

1   A.  Yeah, I was supposed to tow the black Audi and keep it in

2   my lot.

3   Q.  Okay.  But not the silver Audi?

4   A.  I don't really remember anything from that meeting.

5   Q.  Do you remember testifying in front of --

6   A.  Yes.

7   Q.  -- the grand jury?

8   A.  Yes.

9   Q.  Would it refresh your recollection --

10  A.  Well, no, she just referred -- if that's what I said,

11  then, yeah.

12  Q.  Okay.  So do you recall that you were asked, did they want

13  you to do anything with the silver Audi, and you answered

14  no?

15  A.  I answered no?

16  Q.  Yes.

17  A.  Okay.

18  Q.  Does that --

19  A.  Yes.

20  Q.  -- sound right?

21  A.  Yes.

22  Q.  Okay.  And you didn't want to pay any attention to

23  anything that Mr. Carter said; right, because you didn't know

24  him?

25  A.  Yes.

Redirect Examination - Bird  (By Ms. Wilkinson)

1   Q.  And you told him that; right?

2   A.  Yes.

3   Q.  Like, who are you?

4   A.  Yes.

5          MR. ZERKIN:  Nothing further, Judge.

6          THE COURT:  Now your turn.  Redirect.

7          MS. WILKINSON:  Thank you, Your Honor.

8                  REDIRECT EXAMINATION

9   BY MS. WILKINSON:

10  Q.  Were you only there, Mr. Bird, because of your deep and

11  long relationship with Mr. Mosley?

12  A.  Yes.

13  Q.  And because of your deep and long relationship with

14  Mr. Hightower?

15  A.  Yes.

16  Q.  And when counsel asked you about your testimony in the

17  grand jury, you were not represented by counsel at that time;

18  is that correct?

19  A.  Yes.

20  Q.  And when you came in to meet with investigators in

21  preparation for your testimony, you were represented by

22  counsel; is that correct?

23  A.  Yes.

24  Q.  And that was about a month ago?

25  A.  Yes.

1  Q.  And it was at that time -- is it at that meeting with your

2  counsel present that you corrected your recollection and

3  thought it could possibly be the silver Audi that they

4  discussed too --

5         MR. ZERKIN:  Objection, Your Honor, to what he

6  "possibly" thought.  Possibly is not --

7         MS. WILKINSON:  I'll ask it a different way.

8         THE COURT:  Rephrase.

9         MS. WILKINSON:  I will ask it a different way.

10  Q.  (BY MS. WILKINSON)  Did you, Mr. Bird, did you raise the

11  idea that it was towing both the silver Audi and the black

12  Audi?

13  A.  Well, I was just asking if there was another conversation,

14  because I just don't remember --

15  Q.  Let's be clear about it, Mr. Bird, I didn't raise it; is

16  that correct?

17  A.  No.

18  Q.  You raised it; correct?

19  A.  Yes.

20  Q.  And you told us that you thought it could possibly involve

21  the silver Audi as well; isn't that right?

22         MR. ZERKIN:  Objection to "possibly," again, Your

23  Honor.

24         THE COURT:  Overruled.

25  A.  I don't -- yes.

1   Q.  (BY MS. WILKINSON)  And Mr. Bird, when you were at that

2   meeting in May of 2016, that Mr. Mercer asked you about with

3   regard to there was an argument because Cliff wanted to keep

4   the silver Audi, do you remember those questions?

5   A.  Yes.

6   Q.  And Mr. Mosley wanted to keep that silver Audi; correct?

7   A.  Yes.

8   Q.  Do you know when Cliff and Davon wanted you to tow those

9   cars?

10  A.  No.

11  Q.  Because you didn't do it?

12  A.  Yes.

13  Q.  And why didn't you do it?

14  A.  I didn't want -- I didn't want anything to do with the

15  cars.  Plus, I couldn't tow it anyway, I told you, they're

16  all-wheel drives.  Either way, I don't have the right

17  equipment to tow those cars.

18  Q.  Okay.

19          MS. WILKINSON:  Nothing further, Your Honor.

20          THE COURT:  Sir, thank you for your testimony.

21  Don't discuss your testimony with anyone until the trial is

22  complete.  Enjoy your day, and you are excused.

23          THE COURT:  Next witness.

24          MS. WILKINSON:  Arriell Lee, Your Honor.

25          THE COURT:  Just a general reminder to counsel to

1    try to slow down a little bit.

2              MS. WILKINSON:  Thank you, Your Honor.

3              THE CLERK:  Good afternoon, ma'am, please raise your

4    right hand -- stand up, please.

5                        ARRIELL LEE,

6    called as a witness, being first duly sworn, was examined and

7    testified as follows:

8              THE WITNESS:  Yes.

9              THE CLERK:  Speak up.

10             THE WITNESS:  Yes.

11             THE CLERK:  Have a seat.  Adjust that microphone.

12   State and spell your full name for the record.

13             THE WITNESS:  Arriell Lee, A-r-r-i-e-l-l, L-e-e.

14             THE CLERK:  Thank you.

15                      DIRECT EXAMINATION

16   BY MS. WILKINSON:

17   Q.  Ms. Lee, in 2015, were you in a relationship with Davon

18   Carter?

19   A.  Yeah.

20   Q.  Did you become pregnant with his child?

21   A.  Yes.

22   Q.  And when was that child born?

23   A.  July the 20th.

24   Q.  Of what year?

25   A.  '17.

Direct Examination - Lee  (By Ms. Wilkinson)

1    Q.  '17?

2    A.  Uh-huh.

3    Q.  2017?

4    A.  '16.

5    Q.  July 20th of 2016?

6    A.  Yeah.

7    Q.  And --

8    A.  No, I'm sorry --

9          THE COURT:  Take your time, ma'am.  Take your

10   time.

11   A.  7/20/16.

12   Q.  (BY MS. WILKINSON)  I'm sorry, I didn't hear you.

13         THE COURT:  She said 7/20/16.

14   A.  I said 7/20/16.

15   Q.  (BY MS. WILKINSON)  Does that mean that you became

16   pregnant sometime in the fall of 2015; is that correct?

17   A.  Uh-huh.

18   Q.  So you're going to have to answer yes or no, Ms. Lee, did

19   you say "yes"?

20   A.  Uh-huh.

21         THE COURT:  You have to say yes or no.

22   A.  Yes.

23         MS. WILKINSON:  Thank you, Your Honor.

24   Q.  (BY MS. WILKINSON)  Ms. Lee, does that time period -- were

25   you in a relationship the fall of 2015, at least --

1    A.  No.

2    Q.  -- until you had your child -- you have to wait until I

3    finish the question, please.

4         In that time frame, were you in a relationship with

5    Mr. Carter?

6    A.  I believe we broke up the end of '14.

7    Q.  And did it continue through the time --

8    A.  No, it did not.

9         THE COURT:  Ma'am, you do have to wait until she

10   finishes her question.

11   Q.  (BY MS. WILKINSON)  Did that relationship continue until

12   you had your child in July of 2016?

13   A.  No, it did not.

14   Q.  And at what point were you and he no longer in a

15   relationship with one another?

16   A.  What you say?

17   Q.  What point were you and he no longer in a relationship

18   with one another?

19   A.  It was early in the pregnancy.

20   Q.  Have you ever seen Mr. Carter with a gun?

21   A.  No.

22   Q.  Do you recall testifying in the grand jury, "Have you ever

23   seen Mr. Carter with a gun?"  "Answer:  Yes"?

24   A.  I said I thought I did at one time, but I didn't actually

25   see it.

Direct Examination - Lee   (By Ms. Wilkinson)

1    Q.  Do you recall testifying in the grand jury?  Would you

2    explain the circumstances --

3            MS. WILKINSON:  Oh, page 13, counsel, grand jury

4    appearance, December 5th, 2017.

5    Q.  (BY MS. WILKINSON)  "And did you ever see Mr. Carter with

6    a gun?"  "Answer:  Yes."

7        "Question:  Would you explain the circumstances under

8    which you saw Mr. Carter with the gun?"  "We were arguing one

9    day, and I threatened to call the police on him, and at that

10   time, he ran upstairs and he came back downstairs and he had a

11   gun in his hand."

12       Was that your testimony before the grand jury?

13   A.  Some of it.  I say he ran upstairs and he came back

14   downstairs and he had something, I don't know what it was, and

15   he ran out the door.

16   Q.  Did you testify, "And did you see it in his hand?"

17   "Answer:  Yes, in his hand."  "Question" --

18   A.  He had something in his hand.

19           THE COURT:  Ma'am, you have to wait until she

20   finishes.

21   Q.  (BY MS. WILKINSON)  "Question:  And as best as you can

22   recall what did it look like?"  "Answer:  A black gun."

23        Did you testify to that in the grand jury?

24   A.  He had something in his hands and it looked like it was

25   black and he ran out the door.

1    Q.   And I asked you what kind of a handgun was it.   What kind

2    of gun was it?   Did you tell me it didn't have one --

3             MR. DAVIS:   Objection, Your Honor.

4             THE COURT:   Overruled.

5    Q.   (BY MS. WILKINSON)   Did you testify that, "It didn't have

6    one of the twirly things, it was like the flat kind"?

7    A.   I wouldn't know if I didn't see the whole thing.

8    Q.   Did you testify -- I asked you whether you knew it was

9    kind of the flat kind of handgun, or if it had one of those

10   twirly things.   "Answer:  Right."  "Question:  Like a

11   revolver."  "Answer:  And it didn't have the twirly thing, it

12   was like the flat" --

13   A.   Because from what I thought I saw, from the -- would have

14   been the back of it, which would not have -- I know that kind

15   of gun does not have the twirly thing on it.

16   Q.   Now, is that the only time you saw the gun?

17   A.   Yeah.

18             MS. WILKINSON:   If I could show -- showing

19   Government's Exhibit -- Agent Holiday, will you tell us the

20   news clip exhibit number when you have a moment.   I'll correct

21   it for the record in a second, but go ahead and show us this

22   news clip.

23             THE COURT:   You want the witness looking at the

24   screen?

25             MS. WILKINSON:   Yes.

1    Q.  (BY MS. WILKINSON)  Ms. Lee, could you look to the right

2    of the screen, please.

3           MS. WILKINSON:  You'll have to go back for a moment,

4    if you would, Ms. Lesser.

5    A.  I saw that already.

6    Q.  (BY MS. WILKINSON)  Go ahead and turn to the right and

7    look at it please, Ms. Lee.

8        When you first saw the clip of the man running, what was

9    your reaction?

10   A.  I said I don't know.

11   Q.  I'm sorry?

12   A.  You asked me was it him, and I said I don't know.

13   Q.  Do you recall saying, "Did you use the phrase it sure

14   looks like him?"  "Answer:  Yes, it looks like him, yes," was

15   that your testimony in the grand jury?

16   A.  I said it could be anybody.

17   Q.  Was that your testimony in the grand jury?

18   A.  I said it could be anybody.

19   Q.  Ms. Lee, did you testify, did you use the phrase, "It sure

20   looks like him"?  "Answer:  Yes, it looks like him, yes."

21       Was that your testimony in the grand jury, Ms. Lee?

22   Ms. Lee, was that your testimony in the grand jury?

23           THE COURT:  Ma'am, you have to answer the

24   question.

25   A.  No.

1   Q.  (BY MS. WILKINSON)  That was not your testimony in the

2   grand jury?

3   A.  No.

4   Q.  It was your testimony in the grand jury?

5   A.  Excuse me?

6   Q.  Was that your testimony?

7   A.  No.

8   Q.  May I show you?

9   A.  It doesn't matter.

10  Q.  Ms. Lee, do you recall commenting that you had not seen

11  Mr. Carter with a brimmed hat before?

12  A.  Uh-huh.

13  Q.  Pardon me?

14  A.  Yes.

15  Q.  You do remember testifying about that?

16  A.  Yes.

17  Q.  Can I show you -- have you look up on the screen, do you

18  recognize the man in Government's Exhibit C-19?

19  A.  Yes.

20  Q.  Who is it?  Who is it?

21  A.  Davon.

22  Q.  And is he wearing a brimmed hat?

23  A.  Uh-huh.

24  Q.  Is that a "yes"?

25  A.  Yes.

1          MS. WILKINSON:  Nothing further, Your Honor.

2          THE COURT:  All right.  Cross-examination.

3   Cross-examination, counsel for Mr. Carter.

4          MR. DAVIS:  Yes, Your Honor.  Thank you.

5          MS. WILKINSON:  For the record, that was V-19 that I

6   played.

7          THE COURT:  Very well.

8                      CROSS-EXAMINATION

9   BY MR. DAVIS:

10  Q.  Directing counsel's attention to page 21 of Ms. Arriell

11  Lee's grand jury transcript, "Question:  And when you first

12  saw the clip of the man running, what was your reaction?"

13  "Answer:  I can't say it's him, I can't say it's not, kind of

14  looked like."

15      That was your answer at the grand jury, wasn't it,

16  Ms. Lee?

17  A.  It could have been.

18  Q.  Now, you were interviewed before you went into the grand

19  jury; correct?

20  A.  Uh-huh.

21  Q.  Would you -- how would you characterize the questioning

22  during the interview prior to getting in before the grand

23  jury?

24  A.  It was different.

25  Q.  Was it aggressive?

1   A.   It was.

2   Q.   Now, Ms. Lee, it's your testimony here today that

3   Mr. Carter did not have a gun, that you saw, you saw he had

4   something; correct?

5   A.   Something, yes.

6              MR. DAVIS:  I have no further questions.

7              THE COURT:  All right.  Counsel.  Hold on.

8              MR. TRAINOR:  Nothing.

9              THE COURT:  No, hold on.

10              MR. DAVIS:  Court's indulgence.

11              THE COURT:  Please.

12              MS. WILKINSON:  Your Honor --

13              THE COURT:  Not yet.  Anything else, Mr. Davis?

14              MR. DAVIS:  Nothing further.

15              THE COURT:  Mr. Trainor.

16              MR. TRAINOR:  We have no questions.

17              THE COURT:  Redirect.

18              MS. WILKINSON:  May I approach?

19              THE COURT:  Sure.

20              (Bench conference on the record.)

21              THE COURT:  Just wait a second for counsel for

22   Mr. Mosley to join us.

23              MS. WILKINSON:  First of all, I intend to introduce

24   the portions of the grand jury testimony that were read, 14,

25   15, and page 21, but second of all, Your Honor, given her

1    recent answer to Mr. Davis, I think it opens the door to her

2    testimony that he said he was going to shoot her with the item

3    that she saw because it goes to her recollection that it was a

4    gun at the time.

5              THE COURT:  Mr. Davis.

6              MR. DAVIS:  Your Honor, I'm not -- well, first of

7    all, the segments are coming in from the transcripts, I would

8    ask that the other portions be redacted.

9              THE COURT:  What are you referring to as the other

10   portions?  I assume she's only going to admit the parts that

11   she's asked about so far.

12             MR. DAVIS:  I'm just clarifying for purposes of the

13   record.

14             THE COURT:  That's my understanding.

15             MR. DAVIS:  And I would submit that if that's coming

16   in, it's only fair to bring in the part where she gave the

17   answer that we just read, that -- that I just read to her, and

18   she agreed that that was her answer in the grand jury where

19   she said that she could not --

20             THE COURT:  Okay.  We have two different issues

21   here.  First, are you objecting to --

22             MR. DAVIS:  To the shooting, yes.

23             THE COURT:  What's your position on that?

24             MR. DAVIS:  Well, it's --

25             THE COURT:  Why hasn't the door been opened to the

1    extent that she's denying that it was a gun, that on cross you

2    then elicited further denials that it was a gun?  It's hard to

3    be -- it's hard to be under the impression that someone

4    threatened to shoot you with something.  It seems like now the

5    government should be permitted to get that in.

6              MR. DAVIS:  Well, my interpretation of what she said

7    was, is she didn't know what it was, she couldn't see it.  She

8    thought it might have been a gun, but she didn't see it.  So I

9    don't think my clarifying for the record that she felt pushed

10   to say it was a gun -- again, we're going back to the same

11   questioning-and-answer situation that it was referring to

12   earlier in the trial.  When these witnesses are interviewed

13   before they go into the grand jury, they're pushed into

14   answering.

15             THE COURT:  You can explore that.  You had an

16   opportunity to explore that.  You sort of did with this

17   witness.

18             MR. DAVIS:  I did, I did.

19             THE COURT:  It is what it is.

20             MR. DAVIS:  I just don't see how she thought he was

21   going to shoot her does anything to contradict her testimony

22   that she did not see that it was a weapon.

23             THE COURT:  I disagree with that -- well, I disagree

24   with that.

25             MR. DAVIS:  May I ask a couple questions afterwards

1   then to elicit why she thought it was a gun?  Because I know

2   what she's going to say, or at least ask the United States to

3   ask her why she thought it was a gun, if they would do that.

4              THE COURT:  Well, what does that have to do -- I

5   mean -- entertaining something specifically related to what

6   I'm about to let counsel introduce, and I am going to let the

7   government introduce that now.  If you have questioning

8   directly related to that, that's something you did not

9   previously get a chance to question on.  But beyond that, I

10  would not allow it.

11             (Interruption in the public gallery.)

12             MR. DAVIS:  She was out in the hall earlier.

13             THE COURT:  Who is that?

14             MR. DAVIS:  I don't know who that is, but she's not

15  all here mentally.

16             THE COURT:  That's great.

17             MR. DAVIS:  I guess a bottom line objection would

18  be, what the United States seeks to elicit is really not that

19  probative of the point they want to make, that she just said

20  she's --

21             THE COURT:  All right.  So I --

22             MR. DAVIS:  Therefore, it's more prejudicial than it

23  is probative.

24             THE COURT:  I respectfully disagree.  I do think

25  that that door has now been opened, both by her initial

1    responses, but then also, you further opened it with your

2    questioning, you're just going to say the same thing he did.

3                MR. ZERKIN:  No, I'm not going to say the same

4    thing.  They can't open the door themselves.

5                THE COURT:  That's fine, that's fine, that's fair,

6    but then he further opened it.

7                MR. ZERKIN:  He opened it already, so what I'm

8    saying is, he can't cross-examine on something they questioned

9    about because he then opens the door when they opened it

10   themselves.

11               THE COURT:  So here's how it played out, there's a

12   transcript where she testified that she saw a gun, that she

13   described it as not having the twirly thing or whatever.  She

14   then denies that; right?  At that point, I was just being

15   candid and transparent here.  I was already thinking, oh, I

16   wonder if Ms. Wilkinson's going to push that at this point.

17   But she didn't.  But then counsel asked her additional

18   questions to sort of buffer her denial of believing that it

19   was even a gun.

20               And so now the Court's ruling is that that door's

21   open and that she can come back with, well, at some point, you

22   testified that he was going to shoot you, or whatever the

23   exact language is.  So now the only thing I'm still discussing

24   with you is what you would want -- I might consider allowing

25   you to have recross, because that is going to be new, you

1    didn't get a chance to cross on that before.  If there's

2    something specific to that statement.

3              MR. DAVIS:  I would just elicit that she would say

4    that she saw him with his hand up around his chest area and

5    that she feared -- that's when she said --

6              THE COURT:  All right.  I will allow Ms. Wilkinson

7    to go into the area she's identified.  I am going to allow

8    recross on that specifically.

9              MR. DAVIS:  While we're up here, so we don't have to

10   come up again, can I get the portion where she said that she

11   did not recognize the person in the video?  I didn't show it

12   to her, so it's really not up here, but I'm going to ask that

13   that be moved in because that's in response to the --

14             THE COURT:  I'll ask if there's an objection to

15   that.

16             MS. WILKINSON:  Your Honor, I have no objection to

17   the relevant parts of all her grand jury testimony.

18             THE COURT:  I don't think that's what he's asking

19   about.

20             MS. WILKINSON:  I'm talking about the gun and the --

21   that's the only thing I asked her about.

22             THE COURT:  But are you agreeing to his specific

23   request?

24             MS. WILKINSON:  Yes, and the answer that follows,

25   which is, did you say, "It sure looks like him," and she said

1    yes.  So as long as it includes the full part of that

2    provision, I have no problem with that.

3              THE COURT:  This can be worked out later.

4              (The following proceedings were had in open court.)

5                      REDIRECT EXAMINATION

6    BY MS. WILKINSON:

7    Q.  Ms. Lee, Mr. Davis asked you questions related to your

8    observations the day you saw the gun in Mr. Carter's -- in his

9    hand, do you recall those questions?

10             THE COURT:  Ma'am, you have to answer the

11   question.

12   A.  No.

13   Q.  (BY MS. WILKINSON)  Did you see the gun in his hand?

14   A.  No.

15   Q.  Do you recall testifying, "Question:  And did you see it

16   in his hand?"  "Answer:  Yes, in his hand"?

17   A.  No.

18   Q.  In addition, during your -- well, let me ask it this way,

19   when you first made the observations, Ms. Lee, did Mr. Carter

20   say anything to you?

21   A.  No.

22   Q.  Did you say anything to him?

23   A.  Uh-huh.

24   Q.  What did you say to him?

25   A.  I asked him was he going to kill me, because like I said,

Direct Examination - Anthony  (By Ms. Oldham)

1  what I thought I saw, but he kept running right out the

2  door.

3  Q.  And if I -- well, strike that.

4          MS. WILKINSON:  That's all I have, Your Honor.

5          THE COURT:  All right.  Ma'am, thank you for you

6  testimony.  Please don't discuss your testimony with anyone

7  else until the case has been completed.  You are now excused,

8  and enjoy the rest of your day.

9          Next government witness.

10          MS. OLDHAM:  Your Honor, the next government witness

11  is Kareem Anthony.

12          THE CLERK:  Good afternoon, sir, please raise your

13  right hand.

14                  KAREEM ANTHONY,

15  called as a witness, being first duly sworn, was examined and

16  testified as follows:

17          THE WITNESS:  Yes.

18          THE CLERK:  Thank you.  You may have a seat.  Please

19  state and spell your full name for the Court.

20          THE WITNESS:  Kareem Anthony.

21          THE CLERK:  Spell your name for me, please.

22          THE WITNESS:  K-a-r-e-e-m, A-n-t-h-o-n-y.

23          THE CLERK:  Thank you.

24                  DIRECT EXAMINATION

25  BY MS. OLDHAM:

Direct Examination - Anthony   (By Ms. Oldham)

1    Q.   Good afternoon, Mr. Anthony.

2    A.   Good afternoon.

3    Q.   Mr. Anthony, how old are you, sir?

4    A.   45.

5    Q.   And I'm just going to ask you to keep your voice up a

6    little bit and make sure you're speaking into the microphone,

7    okay?

8         Did you say 45?

9    A.   Yeah.

10   Q.   Where are you from originally?

11   A.   New York.

12   Q.   And what type of work do you do for a living,

13   Mr. Anthony?

14   A.   I cut hair.

15   Q.   Can I ask you if you know Matthew Hightower?

16   A.   Yes.

17   Q.   How long have you known Matthew Hightower?

18   A.   For about 20 years.

19   Q.   20 years?

20   A.   Yeah.

21   Q.   And how about Davon Carter, do you know Davon Carter?

22   A.   Yes.

23   Q.   About how long have you known Davon Carter?

24   A.   About 19.

25   Q.   19 years?

1    A.   Yes.

2    Q.   How about Clifton Mosley, do you know Clifton Mosley?

3    A.   Yes.

4    Q.   And about how long have you known Clifton Mosley?

5    A.   Just a few years.

6    Q.   Whom did you meet Clifton Mosley through?

7    A.   Matthew.

8    Q.   Matthew Hightower?

9    A.   Yeah.

10   Q.   Okay.  About how often would you see Matthew Hightower?

11   A.   Uh, I don't know, maybe twice a week, something like

12   that.

13   Q.   Twice a week.  And I guess I should put a time frame

14   reference into that.

15        Let me ask you first, Mr. Anthony, when did you move to

16   the Maryland area from New York?

17   A.   In 2000.

18   Q.   2000?

19   A.   Yeah -- oh --

20   Q.   And -- did I cut you off?

21   A.   Well, I was going to say, I didn't see him two times a

22   week for 20 years.

23   Q.   Right.  Okay.  So I'm going to maybe direct you to 2016,

24   were you --

25   A.   Right.

Direct Examination - Anthony  (By Ms. Oldham)

1   Q.  -- talking to Matthew Hightower on somewhat of a regular

2   basis?

3   A.  Yes.

4   Q.  And what type of cars did you know Matthew Hightower to

5   drive?

6   A.  He had a black Beamer truck and an Audi.

7   Q.  Okay.  Do you remember what color the Audi was?

8   A.  Silver.

9   Q.  Did you ever see anyone else driving the black Beamer

10  truck?

11  A.  It would be a lot of people driving the truck.

12  Q.  Okay.  And when you say "Beamer truck," do you mean BMW?

13  A.  Yes.

14  Q.  Did you ever see Davon Carter driving that black BMW?

15  A.  Yes.

16  Q.  What about Clifton Mosley?

17  A.  No, I never saw him driving it.

18  Q.  Okay.  How about the silver Audi, did you ever see Davon

19  Carter driving the silver Audi?

20  A.  No.

21  Q.  How about Clifton Mosley, did you ever see him driving the

22  silver Audi?

23  A.  Yeah, I saw him driving it.

24  Q.  Approximately how many times have you seen Mr. Mosley

25  driving the silver Audi?

1    A.  Well, Matt was on house arrest, so if he needed a favor,

2    somebody go to the store, stuff like that, he would just let

3    people use the car.

4    Q.  Okay.  So let me -- let's talk about that.  Prior to

5    Mr. Hightower being placed on house arrest, would you visit

6    him at his residence?

7    A.  Sometimes, yes.

8    Q.  Is this when he lived on Fallstaff Road?

9    A.  Yes.

10    Q.  And approximately how often would you visit Mr. Hightower

11    at his residence?

12    A.  Like I said, once or twice a week.  I think when I -- when

13    I used to see him, I wasn't working at the time, so I had a

14    lot of free time, I would just come check him.

15    Q.  Did you ever visit Mr. Hightower at his residence and see

16    Davon Carter there?

17    A.  Davon wasn't really there a lot like that.

18    Q.  But did you ever see Davon Carter at Matthew Hightower's

19    residence?

20    A.  Yeah, I saw him once, once or twice.

21    Q.  Once or twice.  Okay.  How about Clifton Mosley, did you

22    ever visit Mr. Hightower's residence and see Clifton Mosley

23    there?

24    A.  Yeah, I saw him there.

25    Q.  About how many times would you say for Mr. Mosley?

1    A.  It's been years, I mean, it wasn't -- like I said, it

2    wasn't every day, I would come only once or twice a week.

3    Sometimes he'd be there, sometimes he wouldn't.

4    Q.  And this is regarding Mr. Mosley?

5    A.  Yes.

6    Q.  Okay.  Now, you referenced a point in time where

7    Mr. Hightower was on home detention?

8    A.  Yes.

9    Q.  Did you continue to visit him at his residence when he was

10   on home detention?

11   A.  Yes.

12   Q.  And during that time, did you ever see Mr. Carter at

13   Matthew Hightower's residence?

14   A.  Yes.

15   Q.  Okay.  And how about Mr. Mosley?

16   A.  Yes.

17   Q.  Do you go by any nicknames, Mr. Anthony?

18   A.  Panama.

19   Q.  And did Mr. Hightower know you as Panama or refer to you

20   as Panama?

21   A.  Yes.

22   Q.  How about Mr. Carter, did he refer to you as Panama?

23   A.  Yes.

24   Q.  And how about Mr. Mosley?

25   A.  Yes.

1    Q.  Now, in May of 2016, did your phone number end in 4762, if

2    you recall?

3    A.  Yes, it's the same number I have now.

4    Q.  Okay.  Thank you.

5        And would you sometimes communicate with Matthew

6    Hightower over the phone using that number?

7    A.  Probably, yeah.

8    Q.  Okay.  How about Davon Carter?

9    A.  Yeah.

10   Q.  Did you ever purchase marijuana from Davon Carter?

11   A.  What, like some to smoke?

12   Q.  Yes.

13   A.  Something to smoke, yeah.

14   Q.  Just for your own use?

15   A.  Yeah, just personal.

16   Q.  About how often would you purchase marijuana from Davon

17   Carter?

18   A.  I mean, he only had bud for like 30 days, he wasn't -- he

19   ain't have no weed like that, he just had it for a minute.

20   Q.  He just had it for a minute?

21   A.  Yeah, he had -- he wasn't working, so he just had a little

22   something just to make -- make his little bills meet, you

23   know.

24   Q.  Okay.  So when you say he wasn't working, do you mean

25   Mr. Carter?

1    A.  Yeah, yeah, he had lost his job.

2    Q.  He lost his job?

3    A.  Yeah.

4    Q.  Okay.  So he was selling money -- I mean, selling

5    marijuana to make some money?

6    A.  I mean, like $20 bags, yeah, you know, a dub or something,

7    yeah.

8    Q.  A $20 bag?

9    A.  Yeah.

10   Q.  And approximately how much marijuana, for those of us that

11   don't know, is a $20 bag, like how much are we talking

12   about?

13   A.  Like a gram.

14   Q.  And what type of quantities would you purchase from

15   Mr. Carter?

16   A.  Like a gram, I was working, so I would just buy little

17   stuff.

18   Q.  So you had a regular job at the time?

19   A.  Yeah.

20   Q.  In spring of 2016, where were you working?

21   A.  Duron.

22   Q.  Duron the paint store?

23   A.  Uh-huh.

24   Q.  Okay.  So the marijuana that you would purchase from

25   Mr. Carter was just something from time to time for

Direct Examination - Anthony  (By Ms. Oldham)

1    yourself?

2    A.   Yeah, smoke, yeah.

3    Q.   So a dime -- a $20 bag, what are we talking?

4    A.   Yeah.

5    Q.   Half ounce, ounce?

6    A.   $20 bag, he probably only had a half ounce, he ain't had

7    nothing.

8    Q.   Did you ever see him with the marijuana?

9    A.   Little bag, like a little bag, yeah.  Like $20 bags,

10   yeah.

11   Q.   Okay.  And about how frequently would you purchase

12   marijuana from Mr. Carter?

13   A.   Like I say, he only had it for like a month.

14   Q.   Okay.  For a one-month period of time was all that

15   Mr. Carter had marijuana, or are you saying that's how much he

16   would have on his person at a time to sell?

17   A.   No, he only had it for a minute, he ain't have no -- he

18   wasn't like running no ongoing enterprise, just a little

19   something that -- you know what I'm saying.

20   Q.   Do you know where he got his marijuana from to sell to

21   you?

22   A.   No, you can get weed from anybody.

23   Q.   Was he the only person that you would get your weed

24   from?

25   A.   No.

Direct Examination - Anthony  (By Ms. Oldham)

1   Q.  When you would get your marijuana from Mr. Carter, would

2   you pay for it, or would he give it to you for free?

3   A.  Sometimes I was broke, like I said I had a little -- I had

4   a regular job, he was my friend forever, so I asked for him,

5   you know, he let me hold some.

6   Q.  So sometimes you would get it for free?

7   A.  Yeah.

8   Q.  Okay.  Sometimes would you have to pay?

9   A.  Yeah.

10          MS. OLDHAM:  Court's indulgence.

11          THE COURT:  Sure.

12  Q.  (BY MS. OLDHAM)  Mr. Anthony, when you had phone contact

13  with Mr. Carter, do you recall whether or not you were having

14  contact with him on a phone number ending on 2399, meaning

15  Mr. Carter's number?

16  A.  I don't know.

17  Q.  Would it refresh your recollection if I showed you some

18  phone records?

19  A.  No.

20  Q.  It would not refresh your recollection?

21  A.  No.

22  Q.  What if it included text messages between you and

23  Mr. Carter?

24  A.  Okay.  But I still don't remember the number.

25  Q.  Okay.  Let me just approach and see if that helps.

1    A.  Okay.

2    Q.  This is P-2, for the record.  Directing your attention to

3    page 107 of Government's Exhibit P-2.  I'm going to direct you

4    to this communication here between your number ending in 4762

5    to this number here 2399, "Can we meet up?"  The response is,

6    "When?"

7         Then directing your attention farther down, your number

8    to the 2399 --

9              MR. DAVIS:  Objection, Your Honor.

10             THE COURT:  Sustained as to "your number," since we

11   haven't established that.

12             MR. DAVIS:  Well, I'm going to object -- should we

13   approach, or may I say it from here?

14             THE COURT:  Approach if you have more to say.

15             (Bench conference on the record.)

16             MR. DAVIS:  Though the exhibit is in evidence, I

17   don't think it's proper to refresh a witness's recollection to

18   read it to him when he's already said that there's nothing

19   that would refresh his recollection.  I think if you're

20   refreshing his recollection, you should show it to him and see

21   what he has to say.  But to read it in, it's not really -- the

22   point isn't to refresh his recollection, it's just to read it

23   out to the jury.

24             MS. OLDHAM:  I'll move on, Your Honor.

25             THE COURT:  Okay.  That resolves the issue.

1          (The following proceedings were had in open court.)

2    Q.  (BY MS. OLDHAM)  Mr. Anthony, if you can look down here to

3    the contacts and just read that part to yourself as well.

4    A.  Okay.

5    Q.  And tell me, does that refresh your recollection as to

6    whether or not you were having contact with Mr. Carter at that

7    time --

8    A.  On my phone?

9    Q.  I'm sorry?

10   A.  On my phone?

11   Q.  Well, you had testified earlier that you had the number

12   that ended in 4762?

13   A.  Yeah.

14   Q.  Okay.  So did you see -- did you have an opportunity to

15   look at those?

16   A.  Yeah, you asked me about another number, I didn't know the

17   number.  You saying if it was on my phone, yeah, I talked to

18   him on my phone.

19   Q.  Okay.  So looking at those communications that I just

20   showed you, were you having those communications with

21   Mr. Carter at that time over the cell phone?

22   A.  Yeah.

23   Q.  Okay.  And then do you recall this specific exchange where

24   you asked Mr. Carter if he can meet up with you, and that

25   you're at Darcars Toyota on Eastern Avenue?

1    A.  Yeah.

2    Q.  Were you seeking to meet up with Mr. Carter at that

3    time?

4    A.  Yes.

5    Q.  And why was that?

6    A.  I think I wanted to borrow some money or I owed him some

7    money, I can't remember.

8    Q.  Was it to purchase marijuana?

9    A.  It could have been.  Like I say, I worked from like 12:00

10   to 8:00 -- 12:00 to 9:00, so I smoke.  So I probably just

11   wanted to smoke before work or after work.

12   Q.  Okay.  So on this particular day, are you saying that you

13   probably were looking to purchase marijuana to smoke some

14   before you reported to work?

15   A.  Maybe, or like I said, maybe I needed to borrow some money

16   or I owed him some money, I can't remember.

17           MS. OLDHAM:  Court's indulgence.

18           THE COURT:  Sure.

19   Q.  (BY MS. OLDHAM)  If those text messages, Mr. Anthony, were

20   on May 23rd, 2016 when you were at Darcars Toyota, do you

21   recall two days later on the 25th having text communications

22   with Mr. Carter about him coming to your workplace?

23   A.  Yeah, I know he came up to my job, I don't remember the

24   conversation, but yeah, he came up to my job.

25   Q.  While you were working at Duron?

1   A.   Yes.

2   Q.   Okay.  Do you recall what happened when he came to meet

3   you?

4   A.   What you mean?

5   Q.   Well, what was the reason that he came to Duron?

6   A.   Like I said, I think I owed him some money.  I think I

7   owed him like $30 or something.

8   Q.   For the marijuana?

9   A.   Yeah, it would have been, yeah.

10  Q.   Okay.  So on the 23rd, you reach out to him because you

11  want him to meet you at Darcar, possibly to get marijuana to

12  smoke before reporting to work, and then on the 25th, he's

13  coming by Duron to collect money that you owe for marijuana?

14  A.   Yeah, it could have been, yeah.

15  Q.   Do you recall which vehicle Mr. Carter was driving when he

16  came by Duron?

17  A.   Yeah, he was in the truck.

18  Q.   When you say "truck," can you be more specific?

19  A.   He was in the SUV.

20  Q.   Is that the BMW?

21  A.   Yeah.

22  Q.   Did you receive a subpoena to testify before the federal

23  grand jury, Mr. Anthony, on December 20th, 2016?

24  A.   I don't remember the dates, but yeah, I was subpoenaed.

25  Q.   And did you report here into the Federal Court house to

1    testify before the federal grand jury?

2    A.  Yeah.

3    Q.  And was that grand jury investigating the murder of

4    Latrina Ashburne?

5    A.  I didn't know what it was about, actually.

6    Q.  And was there a point in time where you were waiting

7    outside before you had to testify?

8    A.  Yeah, I think so.  Yeah.

9    Q.  While you were waiting to testify, did you see other

10   individuals or witnesses who were waiting to testify as

11   well?

12   A.  Yeah.

13   Q.  And did you know who any of those individuals were?

14   A.  No.

15   Q.  Did you talk to any of them?

16   A.  No.

17   Q.  Do you know an individual by the name of Kimberly

18   Melvin?

19   A.  No.

20   Q.  You did, in fact, testify before the grand jury that day,

21   however; correct?

22   A.  Yeah.

23   Q.  When you left the courthouse that afternoon, did you see

24   Clifton Mosley?

25   A.  Yeah, I saw him at the gas station.

1    Q.  Which gas station?

2    A.  I think it was Reisterstown Road or something.

3    Q.  Reisterstown Road?

4    A.  I think so, yeah.

5    Q.  Okay.  And did you just bump into him?

6    A.  Yeah.

7    Q.  Tell us about when you bumped into Mr. Mosley.

8    A.  I told him I got grand jury.

9    Q.  And was that the only thing that was said?

10   A.  Yeah, I asked him did he -- did they -- did he get grand

11   jury, because I thought it was about this -- the health care

12   fraud with Matthew.

13   Q.  And what did he say?

14   A.  Um, I don't remember.  I don't think -- I don't think he

15   had grand jury or anything yet.

16   Q.  Did you talk with Mr. Mosley about whether or not there

17   were any other individuals present?

18   A.  Present when?

19   Q.  At the courthouse when you were waiting to testify.

20   A.  Yeah, but I didn't know any people that were here.

21   Q.  Okay.  Earlier, Mr. Anthony, you testified that you maybe

22   were meeting Mr. Carter on May 23rd at the Toyota to purchase

23   marijuana, would it refresh your recollection if I showed you

24   your grand jury testimony --

25   A.  Okay.

Direct Examination - Anthony  (By Ms. Oldham)

1    Q.  -- from February 6th, 2018?

2    A.  Okay.

3    Q.  Start at page 8, if you wouldn't mind reading to yourself,

4    starting at line 14, just to the next page, and then you can

5    stop if it refreshes your recollection.

6    A.  Okay.

7    Q.  Does that refresh your recollection as to why you

8    requested Mr. Carter to meet you at Darcar Toyota?

9    A.  Okay.

10   Q.  Does it refresh your recollection?

11   A.  Uh-huh.

12   Q.  And did you want to see him there so that you could

13   purchase marijuana from him?

14   A.  Yeah.

15   Q.  Did you ever purchase a half ounce of marijuana from

16   Mr. Carter?

17   A.  No.

18   Q.  Okay.  Did you testify before the grand jury, referencing

19   here page 10 on your same testimony, that you would purchase a

20   half ounce, stuff like that --

21   A.  Uh --

22   Q.  -- that would cost you like $100?

23   A.  Uh, I think that's all he had was a half ounce.

24   Q.  Okay.  So you have purchased that quantity from Mr. Carter

25   in the past?

Direct Examination - Anthony  (By Ms. Oldham)

1    A.   Yeah, probably like $50, $50.

2    Q.   Okay.  Well, were you telling the grand jurors the truth

3    when you said that in the past you had purchased a half ounce

4    of marijuana from Mr. Carter?

5    A.   No, I wasn't making no exaggeration, just price points is

6    different, you know what I mean, $50 could be a half ounce,

7    $50 could be a bag, could be whatever at the time.

8    Q.   Do you recall telling the grand jurors that the most that

9    you had bought from him was "a few ounces, stuff like that"?

10   A.   No.

11   Q.   You don't recall testifying to that?

12   A.   No, not a few ounces.

13   Q.   Now, you testified earlier about an occasion two days

14   later in which Mr. Carter came by to collect money that you

15   owed to him for marijuana, this was at your place of work at

16   Duron?

17   A.   Uh-huh.

18   Q.   Did his girlfriend Deanna Lawson ever come by Duron while

19   you were at work to collect money as well?

20   A.   She didn't come collect no money, she asked me about some

21   money.

22   Q.   Okay.  Tell us about that.

23   A.   She just asked me did I know anything about some money,

24   and I said no.  You know, I offered to see if I could help her

25   find out anything.  But I didn't do anything.

Direct Examination - Anthony  (By Ms. Oldham)

1   Q.  Just to give us a time frame, was this after the May 2016

2   contacts and meetings that we just discussed with Mr. Carter,

3   this was after that; is that right?

4   A.  Ma'am, this is three years ago, I don't remember dates,

5   but she came up there and she asked me and I said I don't know

6   nothing about it, but I'll try to see if I could find out

7   anything, you know, to help out.

8   Q.  Okay.  Was this an unexpected visit at Duron?

9   A.  Yeah, it was unexpected.

10  Q.  And does she know you as Kareem Anthony, or does she know

11  you as Panama?

12  A.  She knows me as Panama, I've known her for 20 years too,

13  18 years --

14  Q.  You've known her for 20 years as well?

15  A.  Yeah.

16  Q.  Okay.  And approximately how much money was she looking

17  for on behalf of Mr. Carter?

18  A.  It was a few thousand dollars.

19  Q.  Few thousand dollars?

20  A.  Uh-huh.

21  Q.  Do you recall testifying that it was $7,000?

22  A.  That's what you told me.

23  Q.  I'm asking you, do you recall testifying before the grand

24  jury that it was $7,000?

25  A.  Yeah.

1    Q.  Is that a true statement?

2    A.  That's what you told me that the money was -- that the

3    amount was.

4    Q.  Mr. Anthony, I'm going to show you page 33 of your

5    testimony.

6    A.  Okay.

7    Q.  "And she was coming to collect it from you, but you didn't

8    have it?"  "No, ma'am."  "And you recall it being about

9    $7,000?"  "Yes, ma'am."

10         Was it about $7,000?

11   A.  Yeah, like I said, you all told me about the money.

12   Q.  So -- but you did not have the money when Deanna Lawson

13   was looking for it --

14   A.  No --

15   Q.  -- on that occasion?

16   A.  -- I never had the money.

17   Q.  And so what were you supposed to do based on your meeting

18   with Deanna Lawson, what was she hoping you would do?

19   A.  Deanna didn't know -- you know, Deanna didn't know nothing

20   about what was going on or any of these people or nothing.  I

21   was her friend, so I guess she figured, you know, come talk to

22   me.  I worked, so she knew where she could find me.

23   Q.  So did you indicate to her you would try to collect

24   $7,000?

25   A.  I said I would try to find out about it.

Direct Examination - Anthony  (By Ms. Oldham)

1    Q.  And was this money that people owed for marijuana?

2    A.  I don't know what it was owed for, I just told her I would

3    try to help her find it, find out about it.

4    Q.  Directing your attention, Mr. Anthony, to the morning of

5    Friday, May 27th, 2016, a.m., which is when the murder

6    occurred that is the subject of the grand jury investigation

7    in which you testified.

8         Do you recall whether or not you worked that Friday?

9    A.  Yeah, I worked.

10   Q.  Okay.  Do you recall what your shift was on Friday?

11   A.  Yeah, it was -- it was either 11:00 to 8:00 or 12:00 to

12   9:00.  We had -- we was having shift changes, so I can't

13   remember my exact --

14   Q.  And what exactly did you do for Duron at the time?

15   A.  I drove forklifts.

16   Q.  And when you worked for Duron, was that through the spring

17   of 2016?

18   A.  Uh-huh.

19            THE COURT:  You have to say yes or no.

20   A.  Yes.

21   Q.  (BY MS. OLDHAM)  And do you recall receiving phone calls

22   from Mr. Carter that morning?

23   A.  What morning?

24   Q.  Friday, May 27th, 2016.

25   A.  Ma'am, I cannot remember these dates.

Direct Examination - Anthony  (By Ms. Oldham)

1    Q.  Okay.  Do you recall --

2    A.  This is three years ago.

3    Q.  Do you recall whether you talked to Mr. Carter at all on

4    that day, for which you were questioned during the federal

5    grand jury investigation, the day of the murder?

6    A.  The day of the murder?

7    Q.  Yes.

8    A.  No, I didn't speak to him.

9    Q.  Let me show you phone records, Mr. Anthony, from that

10   morning.  Showing you page 114, Government's Exhibit P-2.  If

11   you can look at that screen, Mr. Anthony, and do you see the

12   two calls of short duration here, 20 seconds and 29 seconds

13   from this phone number to your phone number ending in 4762 --

14   A.  Uh-huh.

15   Q.  -- at 8:28 in the morning.

16       Do you recall actually answering calls from Mr. Carter

17   that morning?

18   A.  No, I was sleeping.

19   Q.  And you recall that your shift at Duron had not yet

20   started?

21   A.  Right, because like I said, I got off at 8:00, 9:00 at

22   night, you know, had to wind down.  I wouldn't go to bed till

23   late.  I'm in my 40s, I had a 20-year-old girlfriend in her

24   20s, and kept me up all night, so you know.

25   Q.  Where were you residing at the time?

Direct Examination - Anthony  (By Ms. Oldham)

1   A.  Dundalk.

2   Q.  On the same day but later in the afternoon, Mr. Anthony,

3   I'm going to direct your attention to these contacts here 2:46

4   in the afternoon.

5   A.  Okay.

6   Q.  Do you see these contacts between your phone number and

7   this phone number here with Mr. Carter?

8   A.  Uh-huh.

9   Q.  They appear to be text messages, the content isn't there,

10  but do you recall later in the afternoon at about 2:46 if you

11  had been working at Duron that day?

12  A.  Yeah, I probably was at work.

13  Q.  Do you recall actually texting back and forth with

14  Mr. Carter while you were at work that day?

15  A.  No.

16  Q.  I'm sorry?

17  A.  No.

18  Q.  No?

19  A.  No.

20  Q.  At some point, did you learn from Mr. Carter that he had

21  gone to Myrtle Beach that day?

22  A.  You said did I know he went that day?

23  Q.  Did there come a point in time where you learned from

24  Mr. Carter that he went to Myrtle Beach?

25  A.  Yes.

1    Q.  Yes?

2    A.  Yes.

3    Q.  Okay.  When did you learn that?

4    A.  I don't know.  It was some days later.

5    Q.  Days later?

6    A.  Yeah.

7    Q.  Okay.  Do you recall whether you spoke to or texted with

8    Mr. Carter while he was in Myrtle Beach?

9    A.  No, I don't -- I don't think I did.

10   Q.  Did you know beforehand that Mr. Carter was going to

11   Myrtle Beach?

12   A.  Yeah, I think it was -- I think bike week was coming up.

13   I think that was the reason, everybody wanted to go.

14   Q.  But did you learn before or after the trip that Mr. Carter

15   was -- went to Myrtle Beach?

16   A.  I think I knew that he wanted to go.  I don't think I knew

17   he went until after.

18   Q.  Do you recall telling the grand jury that you were

19   positive that you did not know beforehand that he went to

20   Myrtle Beach, because if you had known, that you would have

21   found a way to go as well, do you remember telling the grand

22   jury that?

23   A.  Yeah, like I said, I wanted to go, everybody wanted to

24   go.

25   Q.  There's a contact in one of Mr. Carter's phones,

1    Mr. Anthony, that is saved as New York Panama.

2    A.  Uh-huh.

3    Q.  Ending in your phone number.

4    A.  Uh-huh.

5    Q.  Was that you?

6    A.  Yeah, probably, but like I said, it was -- we have a

7    mutual friend with the same nickname, so that was the way of

8    differentiating me from the other one, I guess.

9    Q.  So there was another Panama, but you're the New York

10   Panama?

11   A.  Yeah.

12   Q.  Okay.  Did you ever speak to Matthew Hightower about his

13   pending cases?

14   A.  Yeah.

15   Q.  What did he say about them?

16   A.  He's innocent.

17   Q.  Did he talk to you about the witnesses in the cases?

18   A.  No.  I didn't even know there was witnesses in the

19   cases.

20   Q.  Did you ever talk to Davon Carter about Matthew

21   Hightower's cases?

22   A.  No.

23   Q.  Did you ever talk to Clifton Mosley about Matthew

24   Hightower's cases?

25   A.  After he got locked up, I probably talked about it, like

Direct Examination - Anthony  (By Ms. Oldham)

1    you know, in disbelief that this even happened.

2    Q.  Prior to -- just prior to testifying before the federal

3    grand jury in December of 2016, do you remember deleting text

4    messages off of your phone?

5    A.  Yeah.  And I told the grand jury what that was about.

6    Q.  Something about storage?

7    A.  Yeah.  Because I had an iPhone that didn't have a lot of

8    memory and I was subscribing to a punch bunch of podcast, and

9    every time it downloaded, it ate up space.  I didn't know it

10   did that, so I would delete everything else but the podcast,

11   because I wasn't -- I didn't know that that was the reason

12   that I didn't have any space on my phone, not because there

13   was anything to delete.

14   Q.  But the timing of it was just prior to your grand jury

15   testimony?

16   A.  No, it was before then.  And like I said, if there was

17   something to hide, I would have changed my phone number, I had

18   the same phone number then, I have the same phone number now.

19   I never changed it after you called me, after you subpoenaed

20   me.  I never changed the e-mail, I have the same phone

21   numbers.  If you wanted to, I'm pretty sure you could go into

22   my phone and see everything that I did, so there was no need

23   to hide anything.  That was the reason.

24              MS. OLDHAM:  Court's indulgence.

25              THE COURT:  Sure.

1          MS. OLDHAM:  Nothing further, Your Honor.  Thank

2    you, Mr. Anthony.

3          THE COURT:  Cross.

4          MR. DAVIS:  No questions, Your Honor.

5          MR. TRAINOR:  And we have no questions.

6          THE COURT:  All right.  Sir, thank you for your

7    testimony.  Don't discuss your testimony with anyone until

8    this trial has been concluded.  You are now excused, and enjoy

9    the rest of your day.

10          THE WITNESS:  All right.

11          THE COURT:  All right.  Ladies and gentlemen, let's

12   take our afternoon break at this point.  I'm going to ask that

13   you be back in the jury room at 3:45 ready to go forward.

14   Please remember not to discuss this case with anyone, even

15   among yourselves, and enjoy your break.

16          (Jury left the courtroom.)

17          THE COURT:  I've lost count, Ms. Wilkinson, you said

18   at the beginning of the day seven witnesses today, how many

19   have we had so far?

20          MS. WILKINSON:  We've had a lot, but I've lost count

21   too, Your Honor.

22          THE COURT:  Okay.  Figure it out over the break.

23          MS. WILKINSON:  We've had five, and we might

24   actually get to three more.  We might have eight today.

25          THE COURT:  Okay.  So we're ahead of pace.  That's a

1    good thing.  All right.  See you all in 15 minutes.

2              (A recess was taken.)

3              (Jury entered the courtroom.)

4              THE COURT:  All right.  You may be seated.  I do

5    check every seat before we get started to make sure.

6              All right.  Good afternoon, welcome back from your

7    break.  We're ready to continue.

8              THE CLERK:  Good afternoon, sir, please raise your

9    right hand.

10                         ALEXANDER PINCHUK,

11   called as a witness, being first duly sworn, was examined and

12   testified as follows:

13             THE WITNESS:  Yes.

14             THE CLERK:  Thank you.  You may have a seat.  Please

15   state and spell your full name for the record.

16             THE WITNESS:  Alexander C. Pinchuk,

17   A-l-e-x-a-n-d-e-r, my middle name is Chase, C-h-a-s-e, and my

18   last name is Pinchuk, it's P-i-n-c-h-u-k.

19             THE CLERK:  Thank you.

20                         DIRECT EXAMINATION

21   BY MS. OLDHAM:

22   Q.  Good afternoon, Mr. Pinchuk.

23   A.  Hello.

24   Q.  Mr. Pinchuk, how old are you, sir?

25   A.  30 years old.

Direct Examination - Pinchuk  (By Ms. Oldham)

1    Q.  And are you from the Maryland area originally?

2    A.  Yes.

3    Q.  Just yes or no, can you tell me if you've ever been

4    convicted of a crime?

5    A.  Yes.

6    Q.  Mr. Pinchuk, I'm going to show you what we have introduced

7    as Government's Exhibit PH-3.  I'm going to ask you to look to

8    the right on your screen.

9         Can you tell me if you recognize that individual?

10   A.  Yes, I do.

11   Q.  And who is that?

12   A.  It's my old -- used to be my neighbor, Matthew.

13   Q.  Okay.  And did you know Matthew's last name?

14   A.  Hightower.

15   Q.  Okay.  And approximately when were you neighbors with

16   Mr. Hightower?

17   A.  I moved, me and my father moved into an apartment 2009.

18   Q.  Okay.

19   A.  In the fall time.

20   Q.  And do you recall what your address was when you moved

21   with your father to that area?

22   A.  On Fallstaff?

23   Q.  Yes.

24   A.  Yes.  2909 Fallstaff Road.

25   Q.  And was it just you and your father living in that

1    residence?

2    A.   Yes.

3    Q.   Was it an apartment, townhome?

4    A.   It's apartments.

5    Q.   And tell us where Mr. Hightower lived while you resided

6    there with your father.

7    A.   Mr. Hightower lived over top of me -- over top of me in

8    the unit upstairs on the second floor, I was on the first

9    floor.

10   Q.   And when you moved in with your father in 2009, was

11   Mr. Hightower already residing in the apartment complex?

12   A.   Yes, he already lived there before we moved in.

13   Q.   Okay.  And how did you become friendly with

14   Mr. Hightower?

15   A.   Mr. Hightower gave me and my father a hand by helping us

16   move some stuff from the vehicle into our apartments.  And

17   then from there, we just kind of had a friendship because he

18   was my neighbor.

19   Q.   And were there times where you did each other favors as

20   neighbors from time to time?

21   A.   When I got to know Mr. Hightower, yes.

22   Q.   Okay.  And about how long did that take, if you moved in

23   in 2009 around the fall, about how long before you would say

24   that you and Mr. Hightower were friendly?

25   A.   Well, I was friendly when I first moved in.

1    Q.   When did you consider him a friend?

2    A.   Probably two years.

3    Q.   Okay.  And would you -- did you ever go to Mr. Hightower's

4    apartment to hang out?

5    A.   I've been to his house several times.

6    Q.   And who -- with whom was he residing in his apartment

7    above you?

8    A.   I believe his wife or fiancee, Michelle.

9    Q.   Okay.

10   A.   They had children there and Michelle's mother.

11   Q.   And did there come a point in time where Mr. Hightower

12   switched apartments?

13   A.   Yes, he switched -- I live on the backside towards the

14   woods, he switched apartments to face front towards the front

15   of the building, towards the main road.

16   Q.   And do you know approximately when that occurred after you

17   moved in in 2009?

18   A.   That occurred four years.

19   Q.   Did he tell you why he switched apartments?

20   A.   He needed a bigger unit because he has a lot of kids.  And

21   the unit I live in is a two bedroom, he had a two bedroom over

22   top of me, so he needed a bigger unit.

23   Q.   Okay.  Did you know Mr. Hightower to sell marijuana?

24   A.   Yes.

25   Q.   How did you know that he sold marijuana?

Direct Examination - Pinchuk  (By Ms. Oldham)

1    A.   I asked him about it before, and then he told me he had

2    some, and I purchased it from him.

3    Q.   And on more than one occasion, did you purchase marijuana

4    from Mr. Hightower?

5    A.   Yes.

6    Q.   Approximately how often did you purchase marijuana from

7    Mr. Hightower?

8    A.   A few times a week.

9    Q.   Okay.  Do you recall about how much you would purchase a

10   few times a week?

11   A.   Not a lot.  3.5, it's called a half a baby on the

12   streets.

13   Q.   On the streets it's called --

14   A.   On the street it's called half a baby.

15   Q.   And this was something you were just purchasing for your

16   own personal use?

17   A.   Yes.

18   Q.   And how much would it cost you to purchase 3.5 grams at

19   the time?

20   A.   It's between 40- to $50.

21   Q.   Okay.  What else did you know about Mr. Hightower's

22   marijuana business?

23   A.   That's pretty much everything I knew, I worked full time

24   myself at a pawnshop, so I wasn't with Mr. Hightower all the

25   time, so I don't know what he did all day long.

Direct Examination - Pinchuk  (By Ms. Oldham)

1   Q.  Okay.  Did you ever see him with his marijuana stash?

2   A.  No, I've seen -- I've seen him with a bag of marijuana,

3   but I've never seen like large -- a lot of it.

4   Q.  Do you know where he kept it?

5   A.  No, I did not.

6   Q.  Do you know who any of his -- where he received his

7   marijuana from?

8   A.  No.

9   Q.  Mr. Pinchuk, I'm showing you what I have marked as

10  Government's Exhibit M-11, do you recognize that individual?

11  A.  Yes.

12  Q.  Who do you recognize that individual to be?

13  A.  I -- this person -- I don't know their name, but this

14  person came to hang out with Matthew quite a bit of times.

15  Q.  He what?

16  A.  He came to hang out with Matthew.

17          THE COURT:  Sir, please lean into the microphone,

18  just to make sure we can hear you.

19  A.  He came to hang out with Matthew a couple of times.

20  Q.  (BY MS. OLDHAM)  Did you know him to be one of the

21  individuals who would provide marijuana to Mr. Hightower?

22  A.  I assumed it was one of his individuals, just because they

23  would meet for a little bit, and then kind of split -- one

24  person goes one direction, other person goes a different

25  direction.

Direct Examination - Pinchuk  (By Ms. Oldham)

1   Q.  Where would those meetings occur?

2   A.  In our neighborhood.  They would meet in the parking

3   lot.

4   Q.  Any particular time of day?

5   A.  It would be after work, after 6:00 o'clock.

6   Q.  Do you recall a point in time, Mr. Pinchuk, in May of --

7   I'm sorry, in the spring of 2016 when Mr. Hightower was on

8   house arrest?

9   A.  Yes.

10  Q.  And did he talk to you about why he was on house arrest?

11  A.  Not really.  He didn't tell me much.  I read an article --

12  well, I saw an article about that.

13  Q.  Okay.  While Mr. Hightower was on house arrest, did you

14  continue to purchase marijuana from him?

15  A.  Sometimes I would, if he would have it.  Or I would have

16  to go find it if he didn't have it available because he

17  couldn't leave his house.

18  Q.  Okay.  Did he direct you to anyone else?

19  A.  Yes, he gave me a person's phone number.  The person named

20  by Cliff.

21  Q.  Showing you Government's Exhibit M-6B, not sure how well

22  you can see that, Mr. Pinchuk, do you recognize the screen

23  shot?

24  A.  Yes.

25  Q.  Okay.  What do you recognize that screen shot to be?

1    A.   That's how I identified Cliff in my phone book.

2    Q.   And why does it say "Cliff S6"?

3    A.   It says "Cliff S6" because he drove that vehicle quite a

4    bit of times.  It's an Audi S6, so that's why I saved it.

5    Q.   Okay.  So the S6 is referring to the type of Audi?

6    A.   Yes, it was Matthew's vehicle.

7    Q.   And real quick, let me show you also M-6A, another screen

8    shot, do you recognize M-6A, Mr. Pinchuk?

9    A.   Yes, I do.

10   Q.   What is that?

11   A.   Matthew's cell number at the time.

12   Q.   Is that how you had it saved in your phone?

13   A.   Yes.

14   Q.   And why does it say "Matt Connect"?

15   A.   I had so many Matt's in my phone that I needed to know

16   which Matt was which, and Matt would change his phone pretty

17   frequently too.

18   Q.   So what does the "Connect" refer to?

19   A.   Connect for marijuana.

20   Q.   Showing you Government's Exhibit PH-2, do you recognize

21   the individual in PH-2?

22   A.   Yes.

23   Q.   And who is that?

24   A.   That is Cliff.

25   Q.   And is that the individual whom you had saved in your

1    phone as Cliff S6?

2    A.  Yes.

3    Q.  Okay.  So how is it that you first came to have Cliff S6's

4    phone number?

5    A.  I was introduced from -- I was introduced -- Matthew

6    introduced me and Cliff to each other, and I saved Cliff's

7    phone number in my phone book under Matt's vehicle because he

8    drove Matthew's car a lot.

9    Q.  Okay.  And do you -- in relation to when Mr. Hightower was

10   on house arrest, do you have any idea as to when you did first

11   meet Cliff?

12   A.  I knew Cliff before Mr. Hightower was on house arrest.

13   Q.  Okay.  And you were then put in touch with him

14   specifically for marijuana by Matthew Hightower?

15   A.  Yes.

16   Q.  Okay.  How frequently would you see Cliff driving the

17   Audi?

18   A.  Couple of times a week, sometimes I would see him in the

19   morning when I was leaving to work, warming up my car.

20   Q.  In addition to driving the Audi, did you ever see Cliff

21   doing anything else with that car, like to take care of it?

22   A.  Just normal stuff.  He would keep up with it, detail it,

23   make it smell good.  They always drove around clean cars.

24   Q.  And when you say "they" always drove around clean cars --

25   A.  Matthew and Cliff.

1    Q.  And where would you see Cliff detailing the Audi?

2    A.  In our parking lot at Fallstaff Road.  In the morning when

3    everyone leaves for work, the whole thing is empty.

4    Q.  In addition to selling you marijuana, do you know whether

5    or not Mr. Hightower sold marijuana in the Park Heights

6    area?

7    A.  Yes, he sold it in the Park Heights area.

8    Q.  In all of Park Heights, do you know?

9    A.  I don't know all, I worked full time at a pawnshop, so I

10   don't know everything about Mr. Hightower, his -- all of his

11   movements and everything.

12   Q.  When -- did there come a point in time you became aware

13   Mr. Hightower was incarcerated pending his trial?

14   A.  Sorry?

15   Q.  Did there come a point in time you recall Mr. Hightower

16   going to jail while his case was pending?

17   A.  Yes.

18   Q.  And at that point, from whom were you buying marijuana?

19   A.  From Cliff.

20   Q.  And is it your understanding that Cliff was at least at

21   that point taking over that part of the marijuana business?

22   A.  Yes, because Matthew wasn't around anymore and Cliff was,

23   I guess right-hand man, if you want to say it like that, he

24   would take care of things for him.

25   Q.  Thank you.

1              MS. OLDHAM:  Court's indulgence.

2              THE COURT:  Sure.

3              MS. OLDHAM:  Nothing further, Your Honor.

4              THE COURT:  Cross, whoever stands first.

5    Mr. Trainor.

6              MR. TRAINOR:  All right.  Thank you.

7                        CROSS-EXAMINATION

8    BY MR. TRAINOR:

9    Q.  Mr. Pinchuk, I'm Harry Trainor, I represent Mr. Mosley.

10        So you got to know Matthew Hightower from the Fallstaff

11   apartments; correct?

12   A.  Yes.

13   Q.  As a neighbor.  And you were a marijuana user virtually

14   every day; correct?

15   A.  Yes.

16   Q.  And so you would see Mr. Hightower, you'd buy what you

17   called half a baby, which is 3.5 grams?

18   A.  Yes.

19   Q.  For 40- or $50?

20   A.  Yes.

21   Q.  And how long would that last you?

22   A.  It would last me about two to three days.  I would work,

23   so during work I can't smoke it, I can only smoke after

24   work.

25   Q.  All right.  So -- but Matt was the guy who supplied you

1    with the 3.5 grams at a time every couple days; correct?

2    A.  I'm sorry?

3    Q.  But Matt Hightower was the man who supplied you with your

4    3.5 grams every few days?

5    A.  Yes.

6    Q.  All right.  And then there came a time in -- well, there

7    came a time when Mr. Hightower was no longer available to sell

8    it to you because he was in jail; correct?

9    A.  Yes.

10   Q.  And as of May the 4th of 2016, am I right?

11   A.  Yes.

12   Q.  All right.  And he gave you some phone numbers of people

13   who might have enough marijuana to cover your daily habit?

14   A.  I did not get the number before Mr. Hightower went to

15   jail, I had the number.

16   Q.  All right.  Now, if you were going to get a small quantity

17   of marijuana, say, from Cliff Mosley, you would have to go out

18   to Wylie Avenue to get the marijuana; correct?

19   A.  Yes.

20   Q.  And that's really on the other side of where you live, I

21   mean, from -- how far is that from Fallstaff?

22   A.  Five minutes driving.

23   Q.  You also saw Mr. Mosley driving the Audi, which you say is

24   quite a few times?

25   A.  Yes.

1    Q.  And you would see him driving it when you left for work in

2    the morning, am I right?

3    A.  Yes.

4    Q.  What time do you leave for work in the morning?

5    A.  I used to leave around 9:00 like 20.

6    Q.  And you seen him driving the Audi earlier than that;

7    correct?

8    A.  I would see the car outside in the parking lots.

9    Q.  See it in the parking lot, without Mr. Mosley connected to

10   it in any way?

11   A.  Not all -- not all the time, the car would be parked.

12   Matt would have his car parked at home, and then sometimes

13   Mr. Mosley would drive the vehicle.

14   Q.  All right.  Now, when you testified before the grand jury

15   in this case, do you remember the date that was?

16   A.  I do not.

17   Q.  You did testify before the grand jury, didn't you?

18   A.  Yup.

19   Q.  All right.

20          MR. TRAINOR:  Court's indulgence.

21   Q.  (BY MR. TRAINOR)  I believe that was -- does January 29th,

22   2019 sound accurate to you, about a year ago?

23   A.  I'm not sure.

24   Q.  Are you still smoking marijuana every day?

25   A.  Yes.

1   Q.  The last time you were -- the only time you were before

2   the grand jury, you told the grand jury that the last time

3   that you bought anything from Cliff was maybe two years ago,

4   does that sound right?

5   A.  I haven't seen Cliff in a while, yeah.

6   Q.  All right.  And that the last message you sent him was on

7   August 18th, 2018, saying, "I tried to reach you for weed, I

8   no longer need it.  I have a medical marijuana card now,"

9   remember that?

10  A.  No.

11  Q.  You don't remember sending that to him?

12  A.  I don't remember this.

13  Q.  All right.  You saw other people with the Audi other than

14  Cliff; correct?

15  A.  Matt and Cliff.

16  Q.  And how about Wolf?

17  A.  Wolf I saw with -- yeah, I've seen Wolf with the Audi,

18  once or twice.

19  Q.  All right.

20          MR. TRAINOR:  That's all I have, thank you.

21          THE COURT:  Cross from Mr. Carter's counsel.

22          MR. DAVIS:  No, Your Honor, thank you.

23          THE COURT:  Redirect from the government.

24                  REDIRECT EXAMINATION

25  BY MS. OLDHAM:

1    Q.  Mr. Pinchuk, just to clarify, what was the time frame

2    approximately that you were purchasing marijuana from Matthew

3    Hightower?

4    A.  Before he was locked up, I was purchasing -- I was

5    purchasing from 2009 to 2013, '14.

6    Q.  Okay.  And as a point of reference, you indicated that you

7    were -- continued to purchase from him even when he was on

8    home monitoring, or home detention; right?

9    A.  Yes, if he had the product with him, I would get it there,

10   because it's convenient for me not to leave my house.

11   Q.  Okay.  So if he were on home detention the summer of 2015,

12   would you still have been purchasing from him in the summer of

13   2015?

14   A.  If he -- yes, if he had it available, I would be.

15   Q.  Okay.  And then through the time that he was incarcerated

16   then?

17   A.  I would have to go to other people.

18   Q.  Okay.  And does January 19th -- January 29th, 2019 sound

19   accurate as far as when you appeared to testify before the

20   federal grand jury?

21   A.  I -- I'm not 100 percent sure, I don't remember.

22   Q.  If it was 2019, and you testified in the grand jury, as

23   you were just asked, that it had been approximately two years

24   since you last purchased marijuana, would that have been

25   accurate, an accurate statement to the grand jury?

1    A.   That --

2    Q.   That it would have been in 2017?

3            THE COURT:   Last purchased marijuana, or last

4    purchased it from a certain person?

5    Q.   (BY MS. OLDHAM)   I believe the question on

6    cross-examination was you had last purchased marijuana from

7    Matthew Hightower two years prior to testifying -- I'm sorry,

8    from Mr. Mosley?

9    A.   I'm confused.

10   Q.   Okay.

11   A.   I purchased marijuana from Clifford (sic) till he got

12   locked up.   And when he got locked up, I had to look elsewhere

13   for marijuana.

14   Q.   Okay.   Once Matthew Hightower got locked up, you began

15   purchasing marijuana from Clifton Mosley?

16   A.   Yes.

17   Q.   Okay.   And for about how long did you continue purchasing

18   marijuana from Clifton Mosley?

19   A.   Um --

20   Q.   If you can estimate the time frame.

21   A.   I'm going to say more than a year.

22   Q.   Okay.   Thank you.

23           THE COURT:   All right.   Sir, thank you for your

24   testimony.   Please don't discuss your testimony with anyone

25   until the trial has been completed.   Enjoy the rest of your

Direct Examination - Faber  (By Ms. Wilkinson)

1    day, you're excused.

2              THE WITNESS:  Thank you, sir.

3              THE COURT:  You're welcome.

4              Next government witness.

5              MS. WILKINSON:  Christopher Faber, Your Honor.

6              THE COURT:  Very well.

7              THE CLERK:  Good afternoon, sir, please raise your

8    right hand.

9                        CHRISTOPHER FABER,

10   called as a witness, being first duly sworn, was examined and

11   testified as follows:

12             THE WITNESS:  Yes, I do.

13             THE CLERK:  Thank you, you may have a seat.  Please

14   state and spell your full name for the record.

15             THE WITNESS:  Christopher Faber, F as in Frank, a, b

16   as in boy, e-r.

17             THE CLERK:  Thank you.

18                       DIRECT EXAMINATION

19   BY MS. WILKINSON:

20   Q.  Mr. Faber, how are you employed?

21   A.  I work for the City of Baltimore Firearms Analysis Unit

22   within the laboratory division.

23   Q.  And how long have you been working in that position?

24   A.  In that position in Baltimore, or just in the position of

25   firearms?

Direct Examination - Faber   (By Ms. Wilkinson)

1    Q.  In firearms.

2    A.  Oh, in the firearms -- in the -- in firearms, I've been

3    working in the discipline for over 20 years.  And with

4    Baltimore City, I've been working there in this -- in the

5    capacity of a firearms examiner, forensic scientist since

6    2005.

7    Q.  And what other police departments did you work for?

8    A.  I worked for the Philadelphia Police Department from 1989

9    to 2005 as a sworn officer.  The last seven of those years

10   were in the firearms identification unit there, where I

11   conducted my formal training.

12   Q.  And when you came down to Baltimore, was it exclusively to

13   work in firearms examination, or did you do other law

14   enforcement responsibilities as well?

15   A.  No, I came to Baltimore as -- to continue my career in the

16   discipline of firearms and tool mark examination in that

17   laboratory, where I'm still employed.

18   Q.  And can you just describe for the jury your training and

19   experience in firearms examination?

20   A.  Yes, in addition to the responsibilities, I have a

21   familiarization and proficiency of anything in the laboratory,

22   such as the make, the model, the serial number, the caliber of

23   firearms, test firing of firearms, operability purposes, test

24   shots being retrieved to compare to other questioned evidence

25   on a comparison microscope, serial number restoration, tool

Direct Examination - Faber  (By Ms. Wilkinson)

1    mark identification, distance determination, gunshot residue

2    testing, at the time.

3        But in addition to the proficiency and testing of that,

4    it also took me through -- I had to go through approximate

5    three-year formal study following guidelines or training

6    guidelines by AFTE.  AFTE is an acronym for the Association of

7    Firearms and Tool Mark Examiners, for which I've also been a

8    member since 2000.

9        And training, some of the formal training took me outside

10   the laboratory, that included various firearm manufacturers,

11   such as Smith and Wesson, Colt, Savage Arms, Mossberg, Ruger,

12   just to name a few, to understand how a firearm is

13   manufactured from a simple block of steel to its finished

14   product, looking at each and every unique individual

15   characteristic mark and striations that are left behind on the

16   parts of the firearm during the manufacturing process, of

17   course, by the tools.

18        Other training has taken me to barrel manufacturers,

19   such as Wilson Barrels, various laboratories to -- with the

20   sharing of information between my peers, that includes various

21   laboratories.  They included, at the time, was Baltimore City,

22   but Prince George's County, in Landover, Maryland, Connecticut

23   State Lab, the laboratories of our ATF and FBI.  We would

24   study the sharing of standard operating policies, procedures,

25   the handling of evidence and so forth.

1           There's been a serial number restoration school that
2   I've had to -- through ATF that I've had to go through.
3   There's various conferences, regional conferences, national
4   conferences.  Even to this day, there's proficiency tests, I
5   even still take on an annual basis to keep up with my
6   discipline and to keep up with the accreditation of my
7   laboratory.
8   Q.  And have you -- just for the sake of brevity, have you
9   detailed your training and experience in your curriculum vitae
10  marked here as Government's Exhibit A-34?
11  A.  Yes.
12  Q.  And in the years that you have been doing firearms
13  examination, I believe you also talked about tool mark
14  identification as well.  And again, very briefly, what does
15  that include, that discipline?
16  A.  Tool mark very much the same, tools, such as screwdrivers,
17  wrenches, pliers, for example, looking at the unique
18  individual characteristic mark and striations that are left
19  behind during the manufacturing and process of those tools.
20  Q.  Now, because you're discipline encompasses both firearms
21  and tool marks examination, are there other professionals at
22  the Baltimore City Police Department who do the same job that
23  you do?
24  A.  Yes, I have other examiners within my laboratory.
25  Q.  And do you have professional contact with them, share

1   information, learn and teach from them, that sort of thing?

2   A.  Of course, yes.

3   Q.  And does that include firearms examiners and tool marks

4   experts from all over the state of Maryland and probably even

5   the country?

6   A.  Yeah, we -- yes, we have a pretty good rapport with each

7   other and the different laboratories and -- and on a regular

8   basis.

9   Q.  You talked about the variety of different types of

10  examinations that you do within your work to include whether

11  or not a firearm operates, the serial restoration, and

12  examining bullets, does that include that as well?

13  A.  Yes, ma'am, it does.

14  Q.  And whether or not a particular bullet could have been

15  fired from a particular type of gun, is that within your

16  expertise as well?

17  A.  Yes, it is.

18  Q.  Now, have you testified previously as an expert in any

19  court?

20  A.  Yes, ma'am.

21  Q.  And approximately how many occasions have you testified?

22  A.  Over 335.

23  Q.  And what types of courts have you testified in?

24  A.  That would include the circuit courts of Baltimore City

25  here, the juvenile courts, district courts in Baltimore City,

Direct Examination - Faber  (By Ms. Wilkinson)

1  also municipal courts in Philadelphia, the Courts in

2  Montgomery County of Maryland, Baltimore County, Maryland, and

3  the federal courts in the states of Maryland, Pennsylvania,

4  Georgia, and in superior court in Washington, D.C.

5  Q.  And because we're going to talk today about your

6  examination of a bullet, can you give the jury an idea of how

7  many -- in your years of experience, how many bullets you've

8  been asked to examine and draw professional opinions about in

9  connection with your experience as a firearms examiner?

10 A.  I don't have an exact number, it's fair to say whether

11 it's fired bullets, unfired ammunition, whether it's primary

12 examiner on my evidence or secondary examiner, we have peer

13 reviewing.  It's -- in over 20 years, it's well over

14 thousands, thousand or thousands.  I mean, several.

15          MS. WILKINSON:  Your Honor, at this time I would

16 proffer Mr. Faber as an expert in firearms and tool mark

17 examination.

18          THE COURT:  Objection or request for voir dire,

19 Mr. Mosley's counsel.

20          MR. MERCER:  No, Your Honor.

21          MR. DAVIS:  No, Your Honor.

22          THE COURT:  All right.  Very well.  I will allow

23 this witness to testify as an expert in those areas.  You may

24 inquire.

25          MS. WILKINSON:  Thank you, Your Honor.

1              THE WITNESS:  Thank you, Your Honor.

2    Q.  (BY MS. WILKINSON)  Did there come a time, Mr. Faber, when

3    you were asked to perform an examination with regard to a

4    bullet that was taken from the body of Latrina Ashburne after

5    her murder in May 27th of 2016?

6    A.  There was a bullet that I had to do an examination, I

7    don't have the victim's name.

8    Q.  I'm going to go ahead and put it up here.

9    A.  On the paperwork -- on this paperwork, I do have a Latrina

10   Ashburne as the victim.

11   Q.  And let me ask it this way, when you do your bullet

12   examination, is it -- it's a scientific test, you're not

13   considering all the facts of a particular case, you're doing

14   your job as a scientist?

15   A.  Yes, I don't care about when, where, why.  I just want the

16   evidence, let me do my examination, and then proceed from

17   there.

18   Q.  And so showing you Government's Exhibit A-32, do you see

19   that there, Government's Exhibit?

20   A.  Yes, I do.

21   Q.  And then I'm going to go here to Government's Exhibit 37.

22   I'm sorry.

23              THE COURT:  You're not able to move it --

24   Q.  (BY MS. WILKINSON)  I'm sorry.

25   A.  I was going to move it over a little bit.

Direct Examination - Faber  (By Ms. Wilkinson)

1    Q.  I know, it's very awkward.  You have to keep your voice up

2    too, it's very weird.  Not designed by a witness, I don't

3    think, the witness box.

4        To the right there, do you recognize the photograph

5    that's in Government's Exhibit A-37?

6    A.  Yes, ma'am, I do.

7    Q.  And how do you recognize it?

8    A.  That is a photograph I took of a -- of the bullet that

9    has -- in the bottom of the page to the left of the Government

10   Exhibit 37 label, has 306, my initials, and the date of when I

11   took it, which is August 1st, 2018.  That's my initials, and

12   then also a -- secondary initials of a -- to the right is a

13   secondary examiner.

14   Q.  So I'll go ahead and -- the photograph that you took and

15   lay it next to the envelope containing the bullet that was

16   taken from the left lung of Ms. Ashburne.  You can see the

17   name of the medical examiner here below and the name of the

18   victim and the date the bullet was actually recovered.

19       And does that appear to be a copy of the same -- what

20   we're talking about here, Mr. Faber?

21   A.  Yes, it is, and also to further identify that in the

22   sealed envelope, at the top right where your finger is, has my

23   initials, the date of when I sealed it.

24   Q.  Terrific.  Now, what were you -- what examination were you

25   asked to perform with regard to the bullet from Ms. Ashburne

1    in August of 2018?

2    A.  Oh, in 2018.

3    Q.  Well, go to the first one first, and then we'll -- were

4    you asked to perform two types of examinations?

5    A.  Yeah, there was two.  One was -- the bullet was -- I

6    received a bullet, and at the time, it was -- I was the

7    secondary examiner on that with that bullet.  The primary

8    examiner has since retired.  However, I do all the exact

9    examination as a primary examiner, except for actually

10   literally write the report.

11        So when this came to us in 2016, the bullet was

12   identified, it was examined, it was decontaminated, of course,

13   for any potential biohazard conditions, and it was identified

14   as a -- as bullet specimen No. 1 or Q1B, questioned bullet

15   number 1.  That's how we identify our bullets.  Recovered from

16   the victim and it was caliber -- the caliber is a 9mm with a

17   brass alloy jacket.  Jacket had hollow point, meaning the tip

18   of the nose is hallowed out.  An open base, and it has a

19   general rifling characteristics of six right, meaning six

20   lands and grooves and a right-hand twist.

21        If I may, the lines and grooves are -- means the rifling

22   from a barrel that's imparted itself onto the bearing surface

23   of the bullet.  It gives the bullet its spin in flight.  So

24   there's six lands and grooves.  Lands are the raised portions

25   in a barrel, and grooves are the shallow portions in a barrel,

1    and they go in a left-hand or right-hand twist.  So that's

2    what I have here.

3        Under the microscope, I am able to determine that it is

4    suitable for any further comparison, meaning if any evidence

5    came in.

6    Q.  Does that mean whether a gun had been recovered?

7    A.  Yeah, whether a firearm came in or other fired evidence,

8    they would be required of me to do a microscopic comparison.

9    Q.  And to be clear, Mr. Faber, in connection with your work

10   in this case, no firearm -- you were never asked to examine a

11   firearm in connection with this bullet, no firearm having been

12   recovered?

13   A.  That's correct, yes.

14   Q.  And so go ahead, you can continue.

15   A.  Yes, sure, so able to determine that it was suitable for

16   any further comparisons, the construction and design

17   characteristics of this bullet is consistent with the

18   Remington Golden Saber.  Remington manufactures a type of

19   bullet that's called the Golden Saber, it's a brand name.  And

20   so that was in 2016, there was nothing else further to do at

21   that time.

22   Q.  You used the phrase "lands and grooves," just to give the

23   jury an idea, is that what that actually looks like on a

24   bullet?

25   A.  Yes, well, I briefly just mentioned that lands are those

Direct Examination - Faber   (By Ms. Wilkinson)

1  raised portions in a bullet, and grooves are the shallow

2  portions on the bullet.  And they -- when you look at the

3  bullet upright, you'll see it, it looks almost like vertical

4  with a set of shoulders on the other side of the land and

5  groove, and there's six lands and six grooves on this way --

6  in this particular bullet, Q1B, and again, a right-handed

7  twist.

8  Q.  Are those the markings on a bullet that give it -- that

9  could give it some unique characteristics that would allow you

10  determine if it had been fired from a certain gun?

11  A.  Yes, there's a -- I can take -- if requested, in this case

12  it was requested, to take measurements of the lands and

13  grooves, each one of the land and groove, width dimensions to

14  further identify what type of firearm or firearms may have

15  been used to fire this bullet.

16  Q.  And is that the -- comprise the second part of the

17  examination that you did?

18  A.  Yes.  In 2018, I was requested to deal with some

19  additional examination that includes -- there was some

20  questions that was -- it was -- I was asked to try and

21  answer.

22  Q.  And did you perform that examination?

23  A.  Yes, I did.

24  Q.  And have you reached an opinion with regard to the

25  examination you did, and I'll talk about it in a moment, as to

Direct Examination - Faber   (By Ms. Wilkinson)

1    what type of weapon fired the Remington Saber that you

2    previously identified as the Golden Saber?

3    A.   Yes, ma'am.

4    Q.   And what was that opinion?

5    A.   I was able to come to a determination that it is

6    consistent with being fired with a Ruger firearm.

7    Q.   And what type of Ruger firearm?

8    A.   Well, what it came down to, looking at the file, called a

9    GRC file, a general rifling characteristic file of -- that is

10   from the ATF, and also FBI has their file, and anything that's

11   reported to them from the manufacturer is listed, with land

12   and groove, width dimensions, minimum and maximum land and

13   groove width dimensions.

14       And because this is -- fortunately, this was a pristine

15   bullet, there's no deformation, there's no real damage to the

16   bullet, able to really take a pretty good -- accurate

17   measurements on each land and each groove to come up with

18   the -- and look at the list and see that there was -- it was

19   consistent with a Ruger firearm, and it came down to a P

20   series.  It's -- they have a P90, a P95 series.  I can't tell

21   you whether it was a P90 or a P95, but a semi-automatic

22   firearm.

23   Q.   That's the ultimate question I have for you.

24   A.   Okay.

25   Q.   Is the opinion you have that it was fired from a

Direct Examination - Faber   (By Ms. Wilkinson)

1    semi-automatic, or from a revolver?

2    A.   Yeah, my opinion is that it was fired with a Ruger

3    semi-automatic firearm because of -- there was no skidding

4    observed on the bearing surface of the ball.   Sometimes

5    there's skidding, meaning it's the bullet is undersized in the

6    barrel because it's not the right exact caliber.   Like I said,

7    the overall design characteristics, the weight of the bullet,

8    I believe I have the weight of the bullet -- there's -- I have

9    146.7 grain.   Remington Golden Saber makes 147-grain Remington

10   Golden Saber bullet for their semi-automatics.

11        As of right now, I don't know of any 147-grain Golden

12   Saber bullets that is for a revolver.   I looked up .38 and

13   .357 calibers because they're the same diameter as this

14   bullet, and again, that collectively, I felt confident to say

15   that it was a Ruger firearm with those dimensions that I was

16   able to measure and so on.

17   Q.   And the examination you did in August 2018, some of the

18   factors you just told the jury, that went into your expert

19   opinion, Mr. Faber, did you also take photographs to kind of

20   demonstrate what you were looking at?

21   A.   Yes.   I was also asked if I could just take some

22   photographs of the bullet itself, just to show even further.

23   Q.   Perfect.   And I'm going to go ahead and put -- and I know

24   it's kind of awkward to look and then speak to the jury, but

25   if you could just take a look at it, and then turn to the jury

1   and explain to them Government's Exhibit A-38.

2   A.  Yes, well, you see here it's page 4 of 6 of my notes with

3   my initials and the date of when it was completed, when it

4   was -- August 1st, 2018.  And you see in the middle of the

5   page, it says Q1B with my initials again.

6        Right.  And the bullet is here now -- what you're looking

7   is the top of the bullet, and you may be able to see from the

8   photograph what is the nose, and it's a hallow point.  In this

9   particular picture, the way it's -- you can't really quite see

10  its side, but it's a hallow point, you'll see some lead in

11  there.

12  Q.  And what is the difference between a bullet that is a

13  hallow point and one that is not, for people that are not

14  familiar with guns?

15  A.  Sure.  The hallow point is just that the nose is hallowed

16  out.  It's -- because of -- what it does is, is upon impact,

17  it gives -- the bullet is designed to give -- expand upon

18  impact for a larger cavity wound, and it also keeps that --

19  the -- with that expansion of the bullet, upon impact, it's to

20  not go through the body, and that's -- and hit something else

21  behind or somebody else behind.

22       As opposed to a full metal jacket where it's just that,

23  it's a enclosed nose.  And upon impact, there might be some

24  indentation depending on what it hits, but it -- but that nose

25  is enclosed and could possibly go through the directed target

Direct Examination - Faber  (By Ms. Wilkinson)

1   depending on --

2   Q.  And here we know the bullet was actually found in

3   Ms. Ashburne's lung, which is consistent with your opinion as

4   well; is that right, Mr. Faber?

5   A.  Yes, from what I'm -- on the paperwork, it was extracted

6   from the victim, I don't know exactly where.  I think it says

7   on the envelope you showed.  Oh, here's a better one.

8   Q.  Showing you Government's Exhibit A-39, and again, on the

9   bottom, I'll go ahead and  -- is that your numbering down

10  below as part of your work papers?

11  A.  Yes, that is a -- it's another photograph, page 5.

12  Q.  Okay.  What are we looking at here?

13  A.  What you're looking at, the bullet -- you might be able to

14  see it, it's a brass alloy.  And you'll see actually, there's

15  some cuts in the top of that nose.  Those cuts, what it is,

16  are those are the petals that expand upon impact, now you can

17  see more of the nose in there in this particular photograph

18  with the lead.

19       And this photograph and the last one, you may have been

20  able to see around the bearing surface, you see some lines,

21  some striations, those are the shoulders of each land and

22  groove.

23  Q.  Are those the -- what you were able to measure, in terms

24  of your opinion, in terms of the distance of the lands and the

25  grooves?

1   A.   Yes.

2   Q.   Now, can you tell by looking at this picture and taking

3   this picture, Mr. Faber, the condition the bullet was in when

4   it was recovered?  You talked about it being not deformed, I

5   think the word you say is "not that deformed," and can you

6   explain that to the jury?

7   A.   Correct.  Well, you see this bullet here, it's what we

8   deem sometime in our discipline as a pristine or near pristine

9   bullet, meaning there's very little to no deformation or

10  damage to the bullet's bearing surface.

11  Q.   And is that -- I don't mean to interrupt you, but is that

12  factor important when you determine, say, the weight of the

13  bullet?

14  A.   Yes, which is why I mentioned there, because it was such

15  a -- it was a really good bullet, especially coming out of a

16  body, that it didn't expand.  And the bullet -- so we would

17  get an almost exact weight of what Remington makes, 147-grain

18  bullet.  And because of the lack of deformation, I was able to

19  measure each land and each groove width dimensions, because a

20  lot of times we have bullets that are still intact, but they

21  are deformed or mutilated in some fashion, where I'm limited

22  with the amount of measurements I can take.

23  Q.   And lastly showing you Government's Exhibit A-40 and just

24  another angle of the bullet and the condition that you found

25  it in upon examination after decontamination, of course?

1    A.  Yeah, yeah, I have to decontaminate it first, but yes,

2    that's another shelling on the set of wax there, it's part of

3    the microscope, sitting upright.  Again, you can see some of

4    the cutouts of the top of the bullet, which is the petals.

5    Q.  Now, with regard to your report, you provided Government's

6    Exhibit A-36, and what, generally, type of document are we

7    looking at here in Government's Exhibit A-36?

8    A.  A-36 is a copy of the general rifling characteristic file.

9    This is what I was just talking about earlier.  You look at it

10   and you see a whole list in the 9mm Luger class.

11   Q.  What is the name of the book?

12   A.  Oh, it's a GRC, it's abbreviated for general rifling

13   characteristic.

14   Q.  And for people in your business, is that -- what's the

15   significance of that book?

16   A.  This file is -- lays out all the calibers, whether

17   obsolete or modern or wildcat cartridges of -- throughout

18   the -- that have ever been made, and it gives me a list of all

19   the ammunition, all the minimum and maximum lands and groove

20   width dimensions, and also what twist.  In this case, you'll

21   see right next to 9 by 1 9 M M, so that's --

22   Q.  You can actually touch the screen where you're touching

23   it, and we can see --

24   A.  Oh, okay.  I'm sorry.  You know, R is right, and 6,

25   meaning six lands and grooves, and then the minimum and the

1   maximum of land and groove width dimensions.  So those numbers

2   here, for example, .076 to .077, .102 to .103, the maximum and

3   minimum.  And then with that --

4   Q.  And which part have you highlighted here?

5   A.  Of course, I should have just touched where it's

6   highlighted.

7   Q.  That's all right, you can clear it on the left-hand

8   corner.

9   A.  The reason I highlighted this is because -- this

10  particular one, is because my measurements, my land width

11  dimensions, minimum and maximum, was set at .076.  And in my

12  groove width dimensions, my minimum was .095, and my maximum

13  was .096.  This goes up to .099.

14      So with that, all that combined, the caliber, its six

15  lands and grooves, right-hand twist -- because part of the

16  other -- there's nine that also have a four right, four left,

17  six right, seven right, eight right, so on.  This case, I had

18  six right, so I had to do the class characteristics; the size

19  of the bullet, the caliber, the weight, the lands and grooves

20  I mentioned, six right, all that collectively, and then

21  actually, literally measure these on the microscope, and those

22  are the minimum and maximum dimensions that I received that I

23  got.

24      And I look and see a little further over, you'll see here

25  that, all right, what firearms had those land and groove width

1    dimensions, and sometimes it can be several.  And in this

2    case, I found only one, with this file.  And in this case, a

3    semi-automatic.  PI is just a code for a semi-automatic pistol

4    and a Ruger, and it says P95DC.  That is one particular model

5    of the Ruger.

6        I went and I didn't just stop there.  I had to look at

7    the other part of the other files, if there's anything else

8    that's close to these minimum, maximum width land and groove

9    dimensions.  I looked at the other caliber, like .38 and .357,

10   because it has the same diameter as a 9, and nothing came

11   close.  The closest I came to was a -- 30 specials that the

12   groove was .100 to .105.  I couldn't find anything that was

13   even close to what I have here.

14   Q.  So for all of the reasons you just described, Mr. Faber,

15   to a reasonable degree of scientific certainty, is your

16   opinion that the bullet that was found in Ms. Ashburne that

17   you examined was fired from a semi-automatic weapon, or a

18   revolver?

19   A.  What I have here, it comes down to a semi-automatic

20   firearm.

21            MS. WILKINSON:  Nothing further, Your Honor.

22            THE COURT:  All right.  Cross-examination.

23            MR. DAVIS:  Yes.

24            THE COURT:  Mr. Davis.

25            MS. WILKINSON:  Mr. Faber, if you push clear in the

Direct Examination - Faber  (By Ms. Wilkinson)

1  bottom left-hand corner, it will clear the screen.  Bottom

2  left-hand corner, you see the little clear -- there you go.

3          THE WITNESS:  Okay.

4          MS. WILKINSON:  Your Honor, can I ask one more

5  question, Ms. Sullivan just reminded me of something, I'm

6  sorry, before Mr. Davis starts.  Just one question.

7  Q.  (BY MS. WILKINSON)  Mr. Faber, and I'm sorry, I didn't ask

8  you this, but what's the difference between a semi-automatic

9  and a revolver?

10  A.  Simply enough, a revolver has a cylinder with a set number

11  of chambers that's bored out, which accepts ammunition of

12  particular caliber of that firearm.

13  Q.  And how does that look on a gun?

14  A.  It's a cylinder, like a revolver, like you see a -- a

15  cylinder in the middle of the firearm and the frame that will

16  rotate either clockwise or counter clockwise with each pull of

17  the trigger.

18  Q.  And does a semi-automatic have that?

19  A.  No, a semi-automatic has a -- it's a frame with a slide

20  assembly set on a set of rails on the frame.  And with each

21  pull, that slide, when it falls forward under spring tension,

22  it strips the top of the cartridge out of a magazine or a clip

23  that's in the magazine well of the firearm or the frame of the

24  firearm, and with each pull of the trigger, the ammunition,

25  when it's fired, it will be extracted and ejected out of the

1    firearm.

2        What's important, and maybe what you were alluding to is

3    that in a revolver, the cartridges, whether fired or unfired,

4    stays in that cylinder until it is manually extracted and

5    ejected by the person handling the firearm.

6    Q.  And the two types of guns look different?

7    A.  Oh, yes.  Yes, there's a difference, yes.

8        MS. WILKINSON:  I'm sorry, Mr. Davis, that's my

9    fault for not asking.

10       MR. DAVIS:  Very briefly.

11                      CROSS-EXAMINATION

12   BY MR. DAVIS:

13   Q.  Mr. Faber, you weren't provided with a shell cartridge to

14   examine along with the bullet, were you?

15   A.  No, I did not receive a fired cartridge case.

16   Q.  Can you explain to us what the relationship of a shell

17   cartridge would be to that bullet that you did analyze?

18   A.  Sure, absolutely.  With ammunition, there are four

19   components of a bullet.  Some people know it as a cartridge.

20   The one is a cartridge case.  What's inside the cartridge case

21   is powder.  In the rear of the cartridge case is a primer.

22   The primer is what gets indented when a firearm pin strikes,

23   causing a flash through the primer flash hole, turn the solid

24   powder in the cartridge case from a solid to a gas.

25       Those gases expand and forces that last component, which

1    is the bullet that's seated in that cartridge case, out of its

2    seated position, down the barrel to its directed target.  So

3    now what's left behind is that if the bullet is recovered, now

4    the bullet will have those rifling marks on there I mentioned

5    from a rifled barrel.

6        The cartridge case, if it's recovered, will have a --

7    evidence of microscopic marks or impressions that are -- when

8    it gets pressed against the breech of the firearm where the

9    firearm pin protrudes, what we call the breech block, and

10   those manufacturer marks are now pressed on the rear of the

11   cartridge case.

12       The firearm pin is now indented into the primer, and

13   also, there will be extractor and ejector marks if it's a

14   semi-automatic, and also chamber marks, meaning the marks

15   within the chamber of the barrel where the cartridge case

16   expanded against the chamber walls and leaving, again,

17   microscopic manufacturing markings.

18       And inside the cartridge case, you'll see evidence of

19   what was powder, and sometimes there's unburned particles in

20   there.  So collectively, the totality of that is that you have

21   a cartridge case that is now fired, and if it's -- if it was

22   collected at the scene, it would -- I would have received it

23   under the CC number.

24   Q.  And it would be a further way to identify what that

25   bullet -- what type of weapon it was fired from; correct?

1    A.  It can.  Not necessarily, but it can.  The cartridge case,

2    if I had it, can assist me because it can leave different --

3    some firearms leave unique class characteristics, markings,

4    for example, parallel markings versus elliptical or --

5    elliptical, meaning look like rectangular.

6    Q.  So you might be able to exclude it from being the

7    cartridge that held that bullet versus the one it -- versus it

8    did hold it?

9    A.  Well, I don't -- what I do is, when -- I can't relate the

10   bullet back to the cartridge case, meaning it was at one time

11   one entity, keep in mind.  I can give you class

12   characteristics, meaning if I had a bullet specimen or a fired

13   bullet and a fired cartridge case, I can go as far as saying

14   they have -- they're in the same class, they're the same, that

15   that bullet could fit in that cartridge case or could not.

16        Because this bullet was a -- the brass alloy Remington

17   Golden Saber, and it had a cartridge case that is -- it's

18   usually seated in a nickel alloy cartridge case, and it says

19   RP on the back of it, 9mm, yeah, you can kind of conclude that

20   it's a good chance that at one time it was one entity.  But my

21   examination, one cartridge case is separate versus the

22   bullets.

23   Q.  I'm going to show you what's been marked -- I guess the

24   short answer is, is it can be used for identification

25   purposes; right?

1    A.  To a degree, that's fair.

2    Q.  I'm going to show you what's marked as Government's

3    Exhibit A-40.  Now, do you see those -- I'm going to point my

4    finger at the top of this bullet, which you've identified as

5    the bullet that you analyzed, see those deep marks there?

6    A.  Yes.

7    Q.  What is that, is that the groove, or is that the land?

8    A.  No, no, no, that has nothing to do with the land and

9    groove.  As I mentioned earlier, that is the top -- what we

10   call the ogive, it's where the bullet starts to bend in a

11   little bit.  Those are the petals.  Those are indentations of

12   the petals.

13       So in a cartridge case -- I might have a sample just for

14   show in my bag there -- but the petals are what expands.  So

15   in there, that's actually just like -- they're like cutouts.

16   So they look -- that's exactly what you're looking at, is like

17   a cutout of those petals.  So when it expands -- in this case,

18   it didn't expand, but when a bullet expands, those petals,

19   it's almost like a -- like a flower, okay, like petals on a

20   flower opening up.

21   Q.  And I'll show you what's been marked Government's

22   Exhibit A-36.  Looking at this without the aid of any tools

23   that you may utilize when you do your analysis, can we see

24   where the lands and grooves are on this bullet?

25   A.  Yes, you can see right here, that is evidence of lands and

1    grooves in that.  You can see those little lines I just

2    circled, those are part of the lands and grooves.  What you

3    were showing earlier was the petals that were up along here.

4    Q.  Can we actually see -- I mean, I see the lines there on

5    that exhibit, can we actually -- on Exhibit A-36, we're

6    looking down on top of the bullet; correct?

7    A.  Yes, sir.

8    Q.  And we can see -- I can see, not knowing anything about

9    them, I can see, and I'm certain the jury can see, the lines.

10   Are the lines representative of either a land or a groove?

11   A.  The -- well, in this photo, you're not going to be able to

12   tell which one's a land, which one's a groove.

13   Q.  But you can tell?

14   A.  I can tell because I can tell you right now, this is a

15   land, and the wider portion next to the land is the groove.  I

16   just know that from the bullet and the microscopic --

17   Q.  And you indicated that this was a six land and groove with

18   a right twist; correct?

19   A.  Yes, sir.

20   Q.  So that gives you six points of areas to measure;

21   correct?

22   A.  Yes, I have to -- if -- in this case, because it was a

23   near pristine bullet, I was able to measure each land and each

24   groove.

25   Q.  And when you received this, you literally redid the

1    analysis that your predecessor did on this; correct?

2    A.  Well, I did the -- I did additional examination.

3    Q.  So you didn't redo what he did -- I mean, did you

4    re-measure the lands and grooves?

5    A.  No, initially in 2016, the lands and grooves were not

6    measured.  It's not required unless it's requested.  Or if I

7    had fired evidence in addition to this bullet, there would be

8    more done.  But in this case, I just had one bullet to do an

9    examination, a cartridge bullet -- or cartridge case or bullet

10   report.  In this case, just a bullet report.

11   Q.  Bear with me until I find the plug, it's around here some

12   place.  Just give me a minute to get this up.

13   A.  Sure.

14   Q.  Now, when you do your comparisons, you referenced a chart,

15   I'm going to put that up while I'm playing around with this.

16   Government's A-36.

17   A.  Yes, sir.

18   Q.  And you pointed out measurements, you pointed out minimum.

19   If you look at the top next to T number, you pointed out the

20   minimum land and groove measurement; correct?

21   A.  Yes, sir.

22   Q.  And then you pointed out the maximum land measurement;

23   correct?

24   A.  Yes, sir.

25   Q.  And then to the right of that, you pointed out the range

1    for the minimum and maximum of the groove measurement;

2    correct?

3    A.  Yes, sir.  That's the minimum and maximum, I had to fall

4    in line between those measurements.

5    Q.  I'm going to show you what's been marked Defendant's

6    Exhibit Number 4.  I think I am.  Yes, I am.

7         This is a report that you did; correct?

8    A.  Yes, sir.

9    Q.  And your signature appears on the bottom of that report;

10   correct?

11   A.  Yes, sir.

12   Q.  And you've testified that you measured the lands and

13   grooves; correct?

14   A.  Yes, sir.

15   Q.  And that's reflected in your report, right under the

16   sentence that reads, "No skidding was observed on the bearing

17   surface of Q1B"; correct?

18   A.  Yes, sir.

19   Q.  And then you have the land width, and you have two land

20   widths there.

21   A.  Yes.

22   Q.  Can you explain why?

23   A.  I mentioned earlier, those are the minimum and maximum, so

24   LWD is land width dimensions, and with that will be a minimum

25   and maximum, so .076/.076.  In this case, I didn't have a

Cross-examination - Faber  (By Mr. Davis)

1  minimum and maximum, they -- every land fell in line within

2  .76 hundredths of an inch in land width dimensions.

3      The GWD, as I mentioned, is groove width dimensions.

4  They're usually a little bid wider, and here we are.  My

5  minimum is .095 and the maximum was .096, very little

6  difference.

7  Q.  Are you -- well, it's off by one thousandth of a --

8  A.  Yeah, remember you saw it on the previous form that you

9  just showed, it has a minimum and maximum.  It has to fall in

10  line with those measurements.

11  Q.  Now, these are the actual measurements that you did;

12  correct?

13  A.  Well, yes, these are the actual measurements, yes, sir.

14  Q.  So the .06 and then -- so you did two measurements on

15  lands and grooves; correct?

16  A.  I do -- I measure every land and every groove, and I write

17  down for every land for every groove what the measurement

18  is.

19  Q.  You write down where?

20  A.  I would just take a -- I just take a note on the side

21  there and on a little noted page, or a note, I'll just write

22  down what each one is, and then divide by the number of

23  times -- number of lands.  Sometimes there's bullets that are

24  deformed, where I can then maybe do three -- let's say it's

25  six lands and grooves, I can only do three or four of them

1    because there's deformation.

2         In this case, I did all six lands, take each measurement,

3    divide it by six, and it's -- and it comes up with the

4    average, is what I have here, .076.  And same thing with the

5    grooves.

6    Q.  Well, .076; right?

7    A.  Yeah, I'm sorry, I apologize.

8    Q.  So it doesn't represent two land width dimensions that you

9    measured, it doesn't indicate that you found two land widths

10   with .076?

11   A.  It gives you a minimum and maximum of the dimensions.

12   Q.  Well, I mean, it doesn't reflect what you actually

13   measured, though.  You said you wrote those down on a piece of

14   paper; correct?

15   A.  Yes, I do the overall of each land and each groove.

16   Q.  Are these worksheets that you utilize?

17   A.  There's times when -- if there's a number of notations

18   made, that will be documented.  In this case, I don't have

19   a -- I didn't keep a little sheet of paper, I just scribbled

20   some numbers on.

21   Q.  I'm still a little bit confused, maybe it's just me, but

22   the .076/.076, why -- I don't understand -- that's the range,

23   so in other words, .076 -- .076, you did -- first you measured

24   .076, then you did an average of everything?

25   A.  I measure each land -- let's start with the lands.

1    Q.  Okay.

2    A.  So I measure each land.

3    Q.  Let's stay with the land too.

4    A.  Okay.  Let's stick with the land.  So each land I measure,

5    and each land on this particular bullet happened to be .076.

6    Q.  Why the -- oh, that's why -- that's the range then, I

7    understand.

8    A.  Yes, the slash is the range.

9    Q.  It is the range.

10   A.  Yes.

11   Q.  Now, if the bullet is in pristine shape --

12   A.  Or near pristine.

13   Q.  -- why do you have a difference in the groove width

14   dimension, why is there a difference?  I mean, if the bullet

15   is in pristine shape, the groove width dimension should be

16   identical, just as the land width dimension is?

17   A.  No.

18   Q.  No?

19   A.  No, not --

20   Q.  Why is that?

21   A.  In lands -- lands are normally a -- thinner portions on

22   the bearing surface of the bullet, grooves are -- being the

23   shallow portions, are usually a little bit wider than the

24   lands.  And it depends on the manufacturer and what they come

25   up with, what the dimensions they want to make each land and

1    each groove.

2    Q.  So what you're telling us is, is that it isn't an exact

3    science, there's some fluctuation?

4    A.  An exact science in regards to the measurements?

5    Q.  Measurements, yes.

6    A.  Well, I could say that's -- I wouldn't say it's a science,

7    it's a tool utilized by way of the manufacturer specifications

8    of how they rifle their barrels, right down to when it's

9    reported to the TRC file.  And that's -- those are the -- you

10   have a little give or take on their land and groove width

11   dimensions.

12   Q.  And how much give or take can you have?

13   A.  Well, as you saw on the form, there's a little bit of

14   variation between a point -- there's a little bit of leeway

15   with the -- with some of the manufacturer.

16   Q.  What threw off your calculation with respect to the groove

17   width dimension?

18   A.  I'm sorry, repeat that.

19   Q.  What threw off your calculation with respect to the groove

20   width dimension?  What threw it off, what grooves threw it

21   off?

22   A.  Well, respectfully, there was no confusion.

23   Q.  Well, not -- I didn't mean to imply there was confusion, I

24   was just asking you why it isn't -- I'm just asking you why it

25   isn't exact, why they don't match like the other -- like the

1    land width dimensions matched.

2    A.  That's just depends on the manufacturing process and their

3    tolerance levels of when they have a rifle tool to rifle the

4    barrel of the firearm.

5    Q.  Now, there are many types of 9mms; correct?

6    A.  Yes, there are several.

7    Q.  More than several, wouldn't you agree?

8    A.  Several, many.

9    Q.  How many can you think of offhand, how many brand names of

10   9mms can you think of?

11   A.  How much time do we have.

12   Q.  So quite a few?

13   A.  Okay.

14   Q.  And the six right twist, that's a very, very common

15   identification feature for firearms; correct?

16   A.  Yes, six right is one of -- it's a very common twist.

17   Q.  And when you do your comparisons and you refer to this

18   chart, which is -- hold on, if you can bear with me for one

19   second.

20        When you utilize this chart to do your comparisons, this

21   chart is based on a database; correct?

22   A.  Yes, sir.

23   Q.  In other words, if a weapon's not in that database, you're

24   not going to identify it from this chart and your land and

25   groove measurements; correct?

1    A.   That's correct.

2              MR. DAVIS:  Court's indulgence.

3              THE COURT:  Sure.

4    Q.  (BY MR. DAVIS)  And I guess the final question is, are

5    there other types of handguns other than revolvers and 9mms?

6    A.   Yes.

7              MR. DAVIS:  Thank you.

8              THE WITNESS:  Thank you, you're welcome.

9              THE COURT:  Any questions from Mr. Mosley's counsel?

10             MR. TRAINOR:  We have no questions.

11             THE COURT:  Redirect.

12             MS. WILKINSON:  No, sir.

13             THE COURT:  All right.  Thank you, sir, for your

14   testimony.  Please don't discuss your testimony with anyone

15   until the trial has been completed.  Enjoy your evening, and

16   you are excused.

17             THE WITNESS:  Thank you, Your Honor.

18             THE COURT:  Thank you.  All right.  Ladies and

19   gentlemen, this seems like a good place to break for the

20   evening.  I'm actually going to ask you to come back tomorrow

21   at 10:15.  So a little later tomorrow, 10:15 a.m., and we'll

22   go from there.  We are generally on schedule, if you're

23   concerned about that.  And so that's good news.

24             I'll ask that you remember not to discuss the case

25   with anyone, including among yourselves.  Remember, everything

1    you learn about this case has to be learned in this courtroom.

2    With that, I'll see you tomorrow at 10:15.  Please enjoy your

3    evening.  Take care.

4              (Jury left the courtroom.)

5              THE COURT:  Officer Hays at 9:30 tomorrow?

6              MS. WILKINSON:  Yes, Your Honor, I have a number --

7    I had a number of lay witnesses here, and Mr. Soloman actually

8    represents Aurielle Washington, who was going to be a witness

9    today, and she's on pretrial release because she was arrested

10   pursuant to a material witness warrant when she didn't show up

11   on the first day.  And Mr. Soloman has indicated that she will

12   be back tomorrow, but I -- in the event we needed to explain

13   it to her -- is everything all right, Mr. Soloman?

14             I feel bad that she was here all day.  But I thought

15   we would get to her, but I'm assuming that everything is all

16   right and she'll be here tomorrow.  So that's -- we've had a

17   little bit of difficulty with some of our witnesses, Your

18   Honor, so I just wanted to make sure --

19             THE COURT:  I didn't get that sense at all.

20             MS. WILKINSON:  Really?

21             THE COURT:  I thought all your witnesses liked you,

22   that's been my sense.

23             MS. WILKINSON:  Thank you, Your Honor.

24             THE COURT:  All right.  Tomorrow at 9:30.

25             (The proceedings were concluded.)

1        I, Christine Asif, RPR, FCRR, do hereby certify that
the foregoing is a correct transcript from the stenographic
2   record of proceedings in the above-entitled matter.

3        _____/s/_____
              Christine T. Asif
4         Official Court Reporter

5

6                      INDEX

7   Witness Name                                         Page

8   Kimberly Melvin

9       Direct Examination By Ms. Wilkinson ..................... 10

10      Cross-examination By Mr. Trainor........................ 59

11      Redirect Examination By Ms. Wilkinson................... 82

12  Norman Powell

13      Direct Examination By Ms. Oldham........................ 90

14      Cross-examination By Mr. Mercer ........................ 97

15      Cross-examination By Mr. Zerkin......................... 99

16      Redirect Examination By Ms. Oldham ..................... 99

17  Shayne Bird

18      Direct Examination By Ms. Wilkinson .................... 108

19      Cross-examination By Mr. Mercer ....................... 143

20      Cross-examination By Mr. Zerkin........................ 147

21      Redirect Examination By Ms. Wilkinson.................. 149

22  Arriell Lee

23      Direct Examination By Ms. Wilkinson .................... 152

24      Cross-examination By Mr. Davis ........................ 159

25      Redirect Examination By Ms. Wilkinson.................. 166

INDEX (cont'd)

Witness Name                                                    Page

Kareem Anthony

    Direct Examination By Ms. Oldham.......................... 167

Alexander Pinchuk

    Direct Examination By Ms. Oldham.......................... 194

    Cross-examination By Mr. Trainor.......................... 204

    Redirect Examination By Ms. Oldham ....................... 207

Christopher Faber

    Direct Examination By Ms. Wilkinson ...................... 210

    Cross-examination By Mr. Davis ........................... 230

< Dates >
.076/.076. 236:25.
7/20/16 153:11,
  153:13, 153:14.
April 3rd, 2018
  96:8.
August 18th, 2018
  207:7.
August 1st, 2018
  217:11, 223:4.
August 2018
  222:17.
December 19 49:13.
December 19th 50:2,
  50:7.
December 2019 69:19,
  75:4.
December 21st
  44:21.
December 21st, 2016
  86:18.
December 23rd 41:22,
  42:17, 50:7.
December 23rd, three
  39:19.
December 5th, 2017
  155:4.
February 6th, 2018
  183:1.
January 19th
  208:18.
January 2018
  109:16.
January 22nd, 2020
  1:19.
January 29th, 2019
  206:21, 208:18.
January 2nd 75:1.
July 2016 48:10.
March 1st, 2019
  88:10.
March 1st, march
  2019 88:10.
March 2019 56:18,
  86:7.
March 26th 70:4.
March 5th, 2019
  70:17.
May 16th 104:6.
May 17th 118:12.

May 17th, 2016
  104:7, 133:24.
May 1st 67:23.
May 2016 48:6,
  118:19, 185:1.
May 21st 11:6,
  67:25.
May 21st, 2016
  66:4.
May 23rd 182:22.
May 23rd, 2016
  179:20.
May 23rd, 2017
  137:13.
May 26th, 2016 70:4,
  87:21.
May 27th 12:5, 13:6,
  13:15, 19:4,
  76:15, 87:25,
  216:5.
May 27th, 2016 62:7,
  88:23, 187:5,
  187:24.
May 28th 19:4.
May 29th 19:5,
  19:21, 69:6.
May-June 118:9.
November 21st, 2015
  93:15.
October 2nd, 2016
  85:7.
$100 183:22.
$20 174:6, 174:8,
  174:11, 175:3,
  175:6, 175:9.
$30 180:7.
$50 184:1, 184:6,
  184:7, 198:20,
  204:19.
$7,000 185:21,
  185:24, 186:9,
  186:10, 186:24.
'14 154:6, 208:5.
'15 81:2.
'16 70:19, 153:4.
'17 109:13, 152:25,
  153:1.
'8 93:10.
.06 237:14.
.076 227:2, 238:6,

  238:10, 238:23,
  238:24, 239:5.
.076. 227:11,
  238:4.
.076/.076 238:22.
.077 227:2.
.095 227:12,
  237:5.
.096 237:5.
.096. 227:13.
.099. 227:13.
.100 228:12.
.102 227:2.
.103 227:2.
.105. 228:12.
.357 222:13,
  228:9.
.38 222:12, 228:9.
.76 237:2.
.
.
< 1 >.
1 218:14, 226:21.
1. 218:15.
10 183:19, 244:16.
100 208:21.
101 1:48.
107 177:3.
108 244:34.
10:15 5:24,
  242:21.
10:15. 242:21,
  243:2.
114 188:10.
11:00 187:11.
11:45 80:10.
12 54:8.
12/19 48:16.
12/19. 47:16.
12:00 179:9, 179:10,
  187:11.
13 53:17, 53:24,
  155:3.
137. 47:5.
14 53:18, 53:24,
  160:24, 183:4.
143 244:36.
1456 121:23.
146.7 222:9.
147 244:38.

147-grain 222:9,
  222:11, 225:17.
149 244:40.
15 4:25, 80:9,
  80:14, 80:17,
  82:15, 82:17,
  83:20, 160:25,
  194:1.
152 244:44.
1533 47:24, 60:6,
  118:8.
159 244:46.
166 244:48.
167 245:7.
17th 106:23.
18 185:13.
19 168:24, 168:25.
194 245:11.
1989 211:8.
1st 66:20, 67:6,
  67:18, 68:11.
.
.
< 2 >.
2 2:11.
20 86:16, 115:17,
  115:18, 123:4,
  123:17, 168:18,
  168:19, 169:22,
  185:12, 185:14,
  188:12, 206:5,
  211:3, 215:13.
20-year-old
  188:23.
20. 76:25.
2000 169:17,
  169:18.
2000. 89:3, 212:8.
2005 211:6, 211:9.
2007 93:10.
2009 195:17, 196:10,
  196:23, 197:17,
  208:5.
2012 75:21.
2013 83:19, 208:5.
2015 59:13, 75:21,
  81:2, 111:3,
  111:5, 113:1,
  113:18, 114:12,
  152:17, 153:16,

  153:25, 208:11,
  208:13.
2017 50:23, 153:3,
  209:2.
2018 56:14, 59:13,
  109:16, 218:1,
  220:18.
2018. 218:2.
2019 56:10, 56:17,
  70:23, 71:13,
  71:20, 71:24,
  72:4, 73:7, 88:17,
  208:22.
2020 75:2.
204 245:13.
207 245:15.
20s 188:24.
20th 35:3, 35:24,
  42:16, 45:1,
  45:16, 47:6,
  79:18, 152:23,
  153:5, 180:23.
21 159:10, 160:25.
210 245:19.
21201 1:49.
21:43 132:2.
23 9:9, 96:22.
230 245:21.
2399 118:13, 133:25,
  176:14, 177:5,
  177:8.
23rd 180:10.
24 9:9.
24. 96:23.
240 117:23.
25 66:25, 133:4.
25th 179:21,
  180:12.
26 133:5, 133:8,
  133:10, 133:11.
2650 92:13, 94:14,
  94:24, 99:1.
2738 93:5.
27th 74:23.
29 188:12.
2909 195:24.
2:10 132:5.
2:10. 132:10.
2:46 189:3,
  189:10.

.
.
< 3 >.
3 132:15, 133:4.
3.5 198:11, 198:18,
  204:17, 205:1,
  205:4.
30 173:18, 194:25,
  228:11.
301 121:18.
306 217:10.
30th 19:8.
33 186:4.
335 214:22.
35 90:25, 91:1.
37 217:10.
37. 216:21.
3:45 193:13.
.
.
< 4 >.
4 27:17, 146:19,
  223:2.
4. 236:6.
40- 198:20,
  204:19.
40s 188:23.
40th 48:18.
41 108:19, 108:21.
42 108:19.
443 92:23.
45 168:4, 168:8.
46 137:12.
47. 140:14.
4744 134:1.
4762 173:1, 177:4,
  178:12, 188:13.
48. 142:4.
4:09 133:24.
4th 1:48, 71:13,
  205:10.
.
.
< 5 >.
5 72:24, 224:11.
5008 47:23.
59 244:18.
5:00 7:21.
5th 71:13, 71:20,
  71:23, 72:4, 73:7,

77:15, 78:4.
.
.
< 6 >.
6 223:2, 226:24.
6. 72:24.
64 72:24.
6448 118:3.
6986 92:8, 94:15,
  94:23.
6:00 200:5.
.
.
< 7 >.
704-2650 92:23.
758-4744 121:18.
.
.
< 8 >.
8 183:3.
803 132:15.
82 244:20.
888-1456 117:23.
8:00 179:10, 187:11,
  188:21.
8:28 188:15.
.
.
< 9 >.
9 226:21, 228:10.
90 244:24.
97 244:26.
99 244:28, 244:30.
9:00 179:10, 188:21,
  206:5.
9:00. 187:12.
9:30 5:10, 5:11,
  243:5.
9:30. 243:24.
9mm 218:16, 226:10,
  232:19.
9mms 241:5, 241:10,
  242:5.
_____/s/_____
  _____ 244:5.
.
.
< A >.
A-32 216:18.
A-34 213:10.

A-36 226:6, 226:7,
  226:8, 233:22,
  234:5, 235:16.
A-37 217:5.
A-38 223:1.
A-39 224:8.
A-40 225:23,
  233:3.
A-l-e-x-a-n-d-e-r
  194:17.
A-n-t-h-o-n-y
  167:22.
A-r-r-i-e-l-l
  152:13.
a.m. 187:5,
  242:21.
A7 137:2.
abbreviated
  226:12.
ability 52:20.
able 7:13, 9:7,
  16:24, 55:6,
  66:10, 108:22,
  129:21, 216:23,
  219:3, 219:15,
  221:5, 221:16,
  222:16, 223:7,
  224:13, 224:20,
  224:23, 225:18,
  232:6, 234:11,
  234:23.
above 118:12,
  197:7.
above-entitled
  244:3.
Absolutely 80:7,
  83:16, 230:18.
accept 143:20.
accepts 229:11.
access 85:3.
accolades 83:3.
according 78:15.
account 83:14,
  84:4.
accountable 57:17.
accreditation
  213:6.
accurate 206:22,
  208:19, 208:25,
  221:16.

accurately 11:5.
acknowledge 2:14.
acknowledged
  136:3.
acronym 212:6.
actual 12:2, 103:12,
  237:11, 237:13.
acumen 83:6.
addition 29:23,
  68:13, 121:21,
  166:18, 202:20,
  203:4, 211:20,
  212:3, 235:7.
additional 58:11,
  164:17, 220:19,
  235:2.
address 27:17,
  59:10, 59:13,
  59:16, 93:5, 93:6,
  93:8, 93:11,
  93:12, 195:20.
addressing 2:3,
  132:23.
Adjust 152:11.
Administration
  82:14, 82:24.
admission 5:1, 6:1,
  30:4.
admit 77:22,
  161:10.
admitted 107:7,
  132:15.
advance 72:12.
advised 3:25, 6:3,
  6:9, 8:5.
affiliation 36:9.
African 117:16,
  117:17, 144:20,
  145:4.
AFTE 212:6.
afternoon 6:6, 8:1,
  90:9, 90:22,
  90:23, 97:19,
  97:20, 108:3,
  133:16, 133:24,
  152:3, 167:12,
  168:1, 168:2,
  181:23, 189:2,
  189:4, 189:10,
  193:12, 194:6,

194:8, 194:22,
210:7.
afterwards 162:25.
age 79:11.
Agent 8:8, 8:15,
8:17, 34:2, 75:13,
156:19.
agents 9:5, 33:13,
33:15, 33:20,
34:10, 39:25,
44:20, 45:3,
45:17, 46:14,
47:18, 86:12,
86:18, 87:16.
aggressive 159:25.
ago 5:1, 28:14,
82:12, 93:9,
142:14, 149:24,
185:4, 188:2,
206:22, 207:3.
agree 3:14, 3:20,
61:24, 101:14,
138:19, 241:7.
agreed 74:3, 138:25,
161:18.
agreeing 165:22.
ahead 16:16, 17:7,
17:15, 32:14,
50:23, 53:9,
110:11, 120:15,
121:14, 122:6,
122:11, 123:2,
125:9, 127:6,
128:1, 128:18,
131:6, 131:23,
137:14, 156:21,
157:6, 193:25,
216:8, 217:14,
219:14, 222:23,
224:9.
aid 233:22.
ain't 129:19,
130:10, 145:22,
173:19, 175:6,
175:17.
alerted 33:11.
Alexander 194:10,
194:16, 245:9.
alive 91:21,
91:25.

all-wheel 66:22,
151:16.
allegedly 31:11.
allow 163:10, 165:6,
165:7, 215:22,
220:9.
allowed 60:8.
allowing 164:24.
alloy 218:17,
224:14, 232:16,
232:18.
alluding 230:2.
almost 23:10, 53:13,
220:3, 225:17,
233:19.
alone 5:2, 45:22.
already 13:9, 37:6,
46:8, 70:19,
104:5, 135:7,
135:18, 144:10,
157:5, 164:7,
164:15, 177:18,
196:11, 196:12.
Alternate 2:11,
3:7.
alternates 3:9.
alternatively 9:7.
ambitious 7:16.
ambulance 81:3.
AMERICA 1:5.
ammunition 215:11,
226:19, 229:11,
229:24, 230:18.
among 68:23, 132:6,
193:15, 242:25.
amount 186:3,
225:22.
Analysis 210:21,
233:23, 235:1.
analyze 230:17.
analyzed 233:5.
angle 225:24.
annual 213:5.
Answer 26:5, 57:25,
58:7, 62:9, 81:7,
86:21, 86:25,
100:21, 101:2,
124:21, 153:18,
154:23, 155:6,
155:17, 155:22,

156:10, 156:11,
157:14, 157:20,
157:23, 159:13,
159:15, 161:1,
161:17, 161:18,
165:24, 166:10,
166:16, 220:21,
232:24.
answered 148:13,
148:15.
answering 49:17,
61:15, 162:14,
188:16.
answers 31:5.
Anthony 87:2, 87:3,
87:5, 167:11,
167:14, 167:20,
168:1, 168:3,
168:13, 169:15,
172:17, 176:12,
178:2, 179:19,
180:23, 182:21,
185:10, 186:4,
187:4, 188:9,
188:11, 189:2,
191:1, 193:2,
245:5.
anybody 8:18, 29:9,
41:5, 125:3,
134:16, 157:16,
157:18, 175:22.
anymore. 139:10.
anyway 151:15.
apart 62:7, 77:11.
apartment 20:4,
24:18, 43:7,
68:18, 68:20,
195:17, 196:3,
196:11, 197:4,
197:6.
apartments 196:4,
196:16, 197:12,
197:14, 197:19,
204:11.
apologies 107:5.
apologize 67:5,
94:3, 238:7.
appear 35:3, 47:19,
86:17, 143:20,
189:9, 217:19.

appearance 79:18,
86:7, 155:4.
appeared 208:19.
appears 236:9.
Applebee 135:5.
appreciate 3:18,
3:23, 5:6.
Approach 15:20,
29:19, 54:10,
92:16, 100:8,
160:18, 176:25,
177:13, 177:14.
approaching 79:6.
approximate 16:20,
212:4.
Approximately
170:24, 171:10,
174:10, 185:16,
195:15, 197:16,
198:6, 208:2,
208:23, 214:21.
approximation
17:13.
April 78:20.
area 9:5, 16:11,
24:11, 28:11,
28:14, 28:17,
28:18, 28:19,
43:6, 45:25,
53:10, 98:25,
101:13, 108:25,
119:23, 129:5,
129:6, 135:8,
165:4, 165:7,
169:16, 195:1,
195:21, 203:6,
203:7.
areas 215:23,
234:20.
argued 61:12.
arguing 155:8.
argument 103:12,
143:24, 151:3.
Arms 212:11.
around 5:25, 15:13,
16:23, 24:7,
24:18, 25:17,
25:25, 28:7, 28:8,
74:15, 98:23,
115:17, 120:4,

165:4, 196:23,
202:23, 202:24,
203:22, 206:5,
224:20, 235:11,
235:15.
arrangements 5:9.
arrest 51:13, 52:14,
111:14, 113:20,
114:8, 114:10,
114:12, 114:19,
114:25, 171:1,
171:5, 200:8,
200:10, 200:13,
202:10, 202:12.
arrested 50:24,
60:17, 113:1,
113:5, 243:9.
Arriell 151:24,
152:5, 152:13,
159:10, 244:42.
arrive 134:20,
135:16, 136:12,
144:6.
arrived 144:4,
144:11, 144:13.
article 123:13,
200:11, 200:12.
Ashburne 50:24,
52:9, 57:1, 181:4,
216:4, 216:10,
217:16, 217:25,
224:3, 228:16.
Asif 1:46, 244:1,
244:6.
asleep 72:1.
assembly 229:20.
asserted 31:22.
assist 232:2.
associates 125:6.
Association 212:6.
assume 76:4, 98:9,
161:10.
assumed 74:18,
199:22.
assuming 55:17,
243:15.
ate 68:6, 192:9.
ATF 212:23, 213:2,
221:10.
attention 3:19,

3:23, 4:25, 83:14,
92:6, 93:3,
148:22, 159:10,
177:2, 177:7,
187:4, 189:3.
Attentive 62:4.
Attorney 2:7, 4:3,
4:10, 142:14.
attributed 118:2.
auction 115:13,
130:18.
Audio 120:24,
121:15, 122:7,
122:12, 123:3,
124:2, 125:10,
126:5, 127:7,
127:15, 128:2,
128:19, 129:9,
129:17, 130:16,
130:25, 131:7,
131:25.
Audis 68:2, 137:15,
137:17, 142:18,
142:24, 143:5,
143:7.
August 218:1.
Aurielle 243:8.
AUSA 1:25, 1:27.
automobiles 63:20.
available 4:21,
8:16, 200:16,
205:7, 208:14.
Avenue 17:21, 17:22,
43:21, 63:1, 93:5,
93:7, 93:9, 93:12,
98:19, 98:21,
98:24, 178:25,
205:18.
average 238:4,
238:24.
avoid 61:15.
award 10:21.
awards 11:10, 11:22,
11:24, 12:2.
aware 66:6, 66:12,
71:13, 95:3,
203:12.
away 2:14, 2:24,
17:1, 77:22,
123:5, 123:18,

147:2.
awkward 217:1,
  222:24.
.
.
< B >.
B-i-r-d 100:15,
  108:14.
B. 1:39.
baby 22:4, 41:23,
  78:8, 88:1,
  112:14, 198:11,
  198:14, 204:17.
backside 197:13.
bad 243:14.
bag 63:8, 174:8,
  174:11, 175:3,
  175:6, 175:9,
  184:7, 199:2,
  233:14.
bags 174:6, 175:9.
bail 113:11, 124:4,
  124:7, 124:9,
  124:10, 124:25,
  125:7, 145:13,
  145:20, 145:22,
  145:25, 146:3.
balcony 20:8.
ball 222:4.
Baltimore 1:20,
  1:49, 93:5,
  119:21, 119:25,
  120:4, 131:16,
  134:18, 210:21,
  210:24, 211:4,
  211:12, 211:15,
  212:21, 213:22,
  214:24, 214:25,
  215:2.
bank 83:14, 84:4.
bar 135:8.
Bardos 4:1, 4:3,
  4:4, 4:18,
  107:23.
barely 80:22.
barrel 212:18,
  218:22, 218:25,
  222:6, 231:2,
  231:5, 231:15,
  241:4.

Barrels 212:19,
  240:8.
base 218:18.
based 30:9, 78:23,
  186:17, 241:21.
basically 14:25,
  19:24, 36:1, 36:9,
  38:25, 41:2,
  51:16.
basis 102:24, 170:2,
  213:5, 214:8.
Beach 74:6, 189:21,
  189:24, 190:8,
  190:11, 190:15,
  190:20.
Beamer 170:6, 170:9,
  170:12.
beanpole 71:7,
  71:11, 71:25.
Bear 235:11,
  241:18.
bearing 218:22,
  222:4, 224:20,
  225:10, 236:16,
  239:22.
beat 62:17,
  113:10.
beaten 113:8.
became 153:15,
  203:12.
become 33:11,
  152:20, 196:13.
becomes 31:14.
bed 70:9, 188:22.
bedroom 49:7, 49:11,
  197:21.
beforehand 190:10,
  190:19.
began 78:6,
  209:14.
beginning 30:21,
  103:17, 110:19,
  193:18.
behalf 185:17.
behavior 50:8.
behind 212:15,
  213:19, 223:21,
  231:3.
belief 74:11,
  144:16.

believe. 30:22.
believed 9:5, 38:10,
  38:15, 63:7,
  106:3, 119:17.
believes 2:11,
  30:9.
believing 164:18.
belongings 119:12,
  119:13.
below 11:9, 48:12,
  86:20, 118:2,
  217:17, 224:10.
Belvedere 16:7.
Bench 29:20, 37:23,
  54:12, 100:10,
  132:22, 160:20,
  177:15.
bend 233:10.
Besides 22:20,
  124:20, 124:24.
best 7:10, 25:19,
  25:20, 26:12,
  56:8, 103:16,
  155:21.
better 8:9, 224:7.
beyond 163:9.
bid 237:4.
big 3:21, 84:11.
bigger 197:20,
  197:22.
bike 74:6, 190:12.
bill 60:4, 60:5.
bills 173:22.
biohazard 218:13.
birthday 48:19,
  48:24, 49:1.
bit 152:1, 168:6,
  199:14, 199:23,
  201:4, 216:25,
  233:11, 238:21,
  239:23, 240:13,
  240:14, 243:17.
Black 18:5, 18:14,
  20:20, 50:13,
  69:3, 74:12,
  137:2, 137:6,
  138:10, 138:13,
  147:22, 147:24,
  148:1, 150:11,
  155:22, 155:25,

170:6, 170:9,
170:14.
blaming 128:5.
Blanding 64:2, 64:7,
64:14.
block 212:13,
231:9.
blowing 122:8.
blue 65:8.
bluish 65:4, 68:1.
blurry 73:13.
BMW 18:3, 68:24,
74:12, 170:12,
170:14, 180:20.
body 216:4, 223:20,
225:16.
bond 113:2.
bonding 101:7,
101:13.
book 36:4, 102:17,
201:1, 202:7,
226:11, 226:15.
bookend 110:23.
bored 229:11.
born 152:22.
borrow 179:6,
179:15.
Bottom 16:4, 163:17,
217:9, 224:9,
229:1, 236:9.
bought 31:25, 64:2,
64:3, 64:19,
130:18, 184:9,
207:3.
bowl 65:11, 65:14,
65:18.
box 217:3.
boy 95:16, 95:20,
95:24, 97:8,
210:16.
brand 219:19,
241:9.
brass 218:17,
224:14, 232:16.
break 2:10, 5:4,
23:15, 70:1, 80:4,
80:6, 80:7, 80:8,
80:9, 132:4,
193:12, 193:15,
193:22, 194:7,

242:19.
breakfast 18:10,
19:9, 19:13,
19:18, 19:22,
20:5.
breech 231:8,
231:9.
brevity 213:8.
brief 6:2, 6:3,
8:23, 8:24.
briefly 6:21, 99:7,
213:14, 219:25,
230:10.
brimmed 158:11,
158:22.
bring 3:20, 15:22,
17:8, 54:18,
161:16.
bringing 3:19, 3:23,
132:13, 133:25.
brings 6:15, 103:21,
104:2, 104:13.
brochure 12:2.
broke 154:6,
176:3.
brother 98:21,
98:22.
brought 4:25.
bud 173:18.
buffer 164:18.
building 197:15.
bullets 214:12,
215:7, 215:11,
218:15, 222:12,
225:20, 232:22,
237:23.
bump 182:5.
bumped 182:7.
bunch 192:8.
burns 67:20.
bushes 20:9.
business 33:16,
52:4, 71:6, 83:11,
115:4, 115:8,
134:9, 198:22,
203:21, 226:14.
buy 110:1, 115:6,
115:13, 174:16,
204:16.
buying 203:18.

.
.
< C >.
C-19 158:18.
C-h-a-s-e 194:17.
C. 194:16.
calculation 240:16,
240:19.
calendar 18:9.
caliber 211:22,
218:16, 222:6,
227:14, 227:19,
228:9, 229:12.
calibers 222:13,
226:16.
called 10:4, 15:14,
18:2, 21:11,
21:13, 30:15,
33:15, 45:17,
62:8, 62:10, 71:7,
73:21, 79:21,
90:12, 108:6,
110:3, 152:6,
167:15, 192:19,
194:11, 198:11,
198:13, 198:14,
204:17, 210:10,
219:19, 221:8.
calling 13:3, 39:8,
49:16.
calls 7:18, 29:21,
47:9, 97:23,
104:1, 187:21,
188:12, 188:16.
calm 50:11, 50:13.
camera 33:23.
candid 164:15.
capacity 211:5.
caption 92:19.
card 33:16, 207:8.
cards 22:22.
care 31:24, 59:21,
85:25, 114:16,
182:11, 202:21,
203:24, 216:15,
243:3.
career 211:15.
Carolina 58:14.
cartridge 229:22,
230:13, 230:15,

230:17, 230:19,
230:20, 230:21,
230:24, 231:1,
231:6, 231:11,
231:15, 231:18,
231:21, 232:1,
232:7, 232:10,
232:13, 232:15,
232:17, 232:18,
232:21, 233:13,
235:9.
cartridges 226:17,
230:3.
cases 191:13,
191:17, 191:19,
191:21, 191:24.
cash 84:7, 84:25,
85:3.
causing 230:23.
cavity 223:18.
CC 231:21.
cell 70:7, 178:21,
201:11.
ceremony 10:21,
11:10, 11:23,
11:24, 12:3.
certain 33:3, 33:6,
62:1, 70:6, 104:9,
209:4, 220:10,
234:9.
certainty 228:15.
certification
10:18.
certify 244:1.
Challenger 25:14.
challenges 6:16.
chamber 231:14,
231:15, 231:16.
chambers 229:11.
chance 163:9, 165:1,
232:20.
change 63:24,
201:16.
changed 192:17,
192:19, 192:20.
changes 187:12.
characteristic
212:15, 213:18,
221:9, 226:8,
226:13.

characteristics
218:19, 219:17,
220:9, 222:7,
227:18, 232:3,
232:12.
characterize 106:13,
119:9, 159:21.
charge 22:2,
145:6.
charged 38:22,
116:24.
Charger 25:13,
25:14.
charges 113:8.
charging 7:23,
40:23.
chart 235:14,
241:18, 241:20,
241:21, 241:24.
Chase 194:17.
check 6:4, 62:13,
62:19, 171:14,
194:5.
Checking 53:14,
66:12, 129:16.
chest 165:4.
child 41:24, 88:1,
91:18, 152:20,
152:22, 154:2,
154:12.
children 60:13,
112:10, 112:12,
112:13, 197:10.
choice 8:9, 19:25,
49:14.
Christine 1:46,
244:1, 244:6.
Christopher 1:33,
210:5, 210:9,
210:15, 245:17.
church 15:18, 16:9,
16:10.
circled 234:2.
circuit 214:24.
circumstances 35:18,
155:2, 155:7.
City 210:21, 211:4,
212:21, 213:22,
214:24, 214:25.
clarify 9:11,

208:1.
clarifying 50:20,
161:12, 162:9.
Clarks 59:21.
class 226:10,
227:18, 232:3,
232:11, 232:14.
clean 202:23,
202:24.
clear 2:19, 4:14,
10:19, 24:9,
29:24, 132:19,
147:20, 150:15,
219:9, 227:7,
228:25, 229:1,
229:2.
CLERK 11:13, 11:17,
90:9, 90:15,
90:19, 108:3,
108:9, 108:12,
108:15, 108:20,
133:5, 133:9,
152:3, 152:9,
152:11, 152:14,
167:12, 167:18,
167:21, 167:23,
194:8, 194:14,
194:19, 210:7,
210:13, 210:17.
client 30:20.
Clifford 209:11.
Clifton 1:10, 1:35,
59:9, 63:21, 91:8,
91:14, 93:12,
93:24, 94:6, 97:8,
169:2, 169:4,
169:6, 170:16,
170:21, 171:21,
171:22, 181:24,
191:23, 209:15,
209:18.
clip 156:20, 156:22,
157:8, 159:12,
229:22.
clockwise 229:16.
close 3:8, 228:8,
228:11, 228:13.
closer 91:4, 98:6.
closest 228:11.
clothing 123:13.

co- 58:20.
co-conspirators
   107:18, 132:16.
coat 50:14.
code 228:3.
Cold 16:3.
colleagues 82:21.
collect 21:23,
   180:13, 184:14,
   184:19, 184:20,
   186:7, 186:23.
collected 231:22.
collection 55:9.
collectively 222:14,
   227:20, 231:20.
color 18:4, 65:6,
   170:7.
Colt 212:11.
combined 227:14.
comes 25:24, 52:16,
   228:19, 238:3.
comfortable 139:4,
   139:10, 139:11.
coming 5:7, 16:8,
   23:8, 30:22,
   48:13, 50:4,
   76:17, 77:19,
   88:13, 96:12,
   100:8, 103:2,
   105:7, 105:8,
   126:7, 161:7,
   161:15, 179:22,
   180:13, 186:7,
   190:12, 225:15.
comment 2:12,
   3:21.
commented 2:8.
commenting 158:10.
common 241:14,
   241:16.
communicate 22:4,
   173:5.
communication 2:15,
   2:17, 4:2, 118:13,
   119:8, 177:4.
communications
   37:19, 94:22,
   107:15, 111:6,
   117:25, 118:8,
   178:19, 178:20,

179:21.
companies 48:1.
company 109:5,
   109:6, 109:12,
   109:23, 109:24,
   109:25, 110:1,
   113:22, 113:24.
compare 211:24.
comparison 211:25,
   219:4, 219:8.
comparisons 219:16,
   235:14, 241:17,
   241:20.
complete 151:22.
completed 133:22,
   167:7, 209:25,
   223:3, 242:15.
complex 23:9, 24:19,
   26:21, 196:11.
Complying. 54:1,
   67:1, 96:24.
component 230:25.
components 230:19.
comprise 220:16.
concern 61:5.
concerned 48:19,
   106:25, 242:23.
concerns 107:22.
conclude 232:19.
concluded 12:11,
   90:2, 100:2,
   193:8.
concluded. 243:25.
conclusion 44:11.
condition 75:18,
   75:24, 225:3,
   225:24.
conditions 218:13.
conducted 211:11.
conference 7:23,
   29:20, 54:12,
   100:10, 160:20,
   177:15.
conferences 213:3,
   213:4.
confident 222:14.
confront 88:22.
confused 26:4,
   209:9, 238:21.
confusion 240:22,

240:23.
Connect 201:14,
   201:18, 201:19.
connected 206:9.
Connecticut
   212:22.
connection 98:3,
   98:12, 113:11,
   215:9, 219:9,
   219:11.
consider 164:24,
   197:1.
considering
   216:13.
consistent 219:17,
   221:6, 221:19,
   224:3.
conspiracy 30:17,
   31:2, 31:9, 31:15,
   103:9, 107:12,
   132:17.
construction
   219:16.
consumed 66:1.
cont'd 245:1.
contact 37:4, 37:8,
   94:19, 118:4,
   176:12, 176:14,
   178:6, 190:25,
   213:25.
contacted 45:3,
   48:5, 86:21,
   87:1.
contacts 94:13,
   94:16, 94:22,
   97:25, 118:1,
   178:3, 185:2,
   189:3, 189:6.
containing 217:15.
contains 102:20.
contend 100:23,
   101:4, 104:16,
   107:18.
content 189:9.
contention 106:3.
contents 66:7.
context 52:18,
   129:2, 147:1.
continual 82:17.
continue 9:24,

11:20, 27:3, 27:6,
27:17, 36:25,
80:24, 89:13,
89:19, 110:15,
133:20, 154:7,
154:11, 172:9,
194:7, 200:14,
209:17, 211:15,
219:14.
continued 208:7.
continuing 6:4.
contradict 162:21.
contributed 60:4.
convenient 208:10.
conversations
104:12.
convicted 91:6,
110:5, 195:4.
coordinator 2:7.
copy 34:10, 77:3,
77:14, 217:19,
226:8.
core 106:9.
corner 142:5, 227:8,
229:1, 229:2.
corrected 150:2.
correctly 94:21.
cost 183:22,
198:18.
couch 36:1.
count 193:17,
193:20.
counter 229:16.
country 214:5.
County 120:4,
131:16, 212:22,
215:2.
Couple 7:17, 63:22,
97:1, 112:24,
115:3, 162:25,
199:19, 202:18,
205:1.
course 4:15, 13:10,
14:9, 40:14,
54:11, 56:22,
76:14, 100:9,
212:17, 214:2,
218:12, 225:25,
227:5.
court. 32:18, 55:19,

107:3, 108:2,
166:4, 178:1.
courthouse 37:9,
37:12, 87:2,
181:23, 182:19.
courtroom 2:8, 2:10,
2:15, 3:2, 6:16,
34:2, 243:1.
courtroom. 9:16,
80:12, 80:19,
132:8, 133:14,
193:16, 194:3,
243:4.
Courts 214:23,
214:24, 214:25,
215:1, 215:3.
cousin 91:9, 91:14,
91:16, 93:24,
94:6, 94:19,
94:23, 95:16,
95:18, 95:21,
96:4, 98:15,
98:16.
cover 205:13.
credit 83:15.
crime 8:6, 91:6,
110:5, 195:4.
CRIMINAL 1:9.
Cross 5:22, 59:2,
80:2, 162:1,
165:1, 193:3,
204:4, 207:21.
Cross-examination
6:13, 59:3, 80:15,
97:14, 97:17,
99:8, 103:5,
143:11, 143:15,
147:18, 159:2,
159:3, 159:8,
204:7, 209:6,
228:22, 230:11,
244:18, 244:26,
244:28, 244:36,
244:38, 244:46,
245:13, 245:21.
cross-examine 9:7,
103:1, 164:8.
current 31:6.
currently 89:5.
curriculum 213:9.

custodian 6:22.
cut 80:5, 168:14,
169:20.
cutout 233:17.
cutouts 226:4,
233:15.
cuts 224:15.
cylinder 229:10,
229:14, 229:15,
230:4.
.
.
< D >.
daily 40:6,
205:13.
damage 221:15,
225:10.
Darcar 180:11,
183:8.
Darcars 178:25,
179:20.
dark 51:23, 51:25,
52:16.
database 241:21,
241:23.
date 10:23, 11:1,
11:5, 11:10,
11:23, 19:13,
23:16, 48:22,
67:6, 72:25, 73:2,
93:15, 118:25,
126:19, 206:15,
217:10, 217:18,
217:23, 223:3.
dated 85:6.
dates 24:1, 180:24,
185:4, 187:25.
daughter 19:25,
39:2, 39:9, 39:16,
64:18, 89:20.
Days 39:19, 76:15,
79:3, 106:23,
173:18, 179:21,
184:13, 190:4,
190:5, 204:22,
205:1, 205:4.
deal 3:21, 220:18.
dealership 22:16,
22:17, 22:19,
22:21.

dealing 84:16,
    139:4, 139:10,
    139:11, 145:9,
    147:8.
dealings 36:10.
dealt 145:10.
Deanna 184:18,
    186:12, 186:18,
    186:19.
December 27:4, 27:9,
    33:8, 35:3, 35:24,
    42:16, 45:1,
    45:16, 47:21,
    48:6, 70:19, 75:4,
    75:9, 75:10,
    79:18, 81:18,
    85:17, 86:12,
    87:8, 180:23,
    192:3.
decontaminate
    226:1.
decontaminated
    218:12.
decontamination
    225:25.
deem 225:8.
deep 149:10, 149:13,
    233:5.
Defendant 1:29,
    1:35, 31:3, 66:24,
    123:9, 123:15,
    236:5.
Defendants 1:12,
    4:18.
defending 106:9.
defense 4:22, 6:9,
    7:24, 9:5, 69:12,
    105:3.
deformation 221:15,
    225:9, 225:18,
    238:1.
deformed 225:4,
    225:5, 225:21,
    237:24.
degree 228:15,
    233:1.
delete 192:10,
    192:13.
deleting 192:3.
deliver 114:6.

Delivery 114:3.
demeanor 42:23,
    42:24, 49:4,
    50:3.
demonstrate
    222:20.
den 43:5, 43:6,
    43:9, 45:25.
Denali 134:15.
denial 164:18.
denials 162:2.
denied 8:5, 9:8.
denies 164:14.
deny 55:16.
denying 162:1.
Department 211:8,
    213:22.
departments 211:7.
depending 6:25, 8:2,
    31:16, 223:24,
    224:1.
depends 30:6, 54:19,
    79:5, 239:24,
    241:2.
describe 17:16,
    33:2, 33:5, 40:25,
    41:16, 117:4,
    117:11, 117:14,
    211:18.
described 21:8,
    21:11, 23:20,
    24:11, 25:17,
    27:5, 28:11,
    28:14, 28:17,
    61:8, 62:5, 63:6,
    65:10, 68:24,
    84:12, 97:7,
    98:12, 164:13,
    228:14.
description 4:13,
    30:9, 41:1,
    105:21.
design 219:16,
    222:7.
designed 217:2,
    223:17.
detail 202:22.
detailed 213:9.
detailing 203:1.
details 123:21,

128:9.
detector 52:21,
    52:23, 52:25,
    54:16, 54:18,
    54:21, 55:1, 55:4,
    55:5, 55:10,
    55:13.
detention 172:7,
    172:10, 208:8,
    208:11.
determination 212:1,
    221:5.
determine 219:3,
    219:15, 220:10,
    225:12.
diameter 222:13,
    228:10.
diapers 114:6.
difference 13:5,
    13:7, 139:21,
    139:23, 223:12,
    229:8, 230:7,
    237:6, 239:13,
    239:14.
different 23:12,
    26:20, 26:22,
    26:24, 27:1,
    31:16, 31:17,
    32:7, 47:23,
    60:24, 63:22,
    76:4, 78:6, 83:24,
    139:24, 150:7,
    150:9, 159:24,
    161:20, 184:6,
    199:24, 214:7,
    214:9, 230:6,
    232:2.
differentiating
    191:8.
difficult 60:21.
difficulty 243:17.
dime 175:3.
dimension 239:14,
    239:15, 239:16,
    240:17, 240:20.
dimensions 220:13,
    221:12, 221:13,
    222:15, 225:19,
    226:20, 227:1,
    227:11, 227:12,

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

227:22, 228:1,
228:9, 236:24,
237:2, 237:3,
238:8, 238:11,
239:25, 240:11,
241:1.
dinner 111:25,
112:2.
dire 215:18.
Direct 5:20, 10:6,
66:4, 77:9, 90:20,
108:16, 152:15,
167:24, 169:23,
177:3, 189:3,
194:20, 200:18,
210:18, 244:16,
244:24, 244:34,
244:44, 245:7,
245:11, 245:19.
directed 2:19,
87:16, 223:25,
231:2.
Directing 92:6,
93:3, 159:10,
177:2, 177:7,
187:4.
direction 145:15,
199:24, 199:25.
directly 88:13,
163:8.
disability 34:23.
disagree 162:23,
163:24.
disbelief 192:1.
discipline 211:3,
211:16, 213:6,
213:15, 213:20,
225:8.
discovery 104:15,
104:16, 104:21.
discuss 5:4, 52:25,
89:7, 89:8, 89:12,
90:1, 100:1,
132:6, 140:4,
151:21, 167:6,
193:7, 193:14,
209:24, 242:14,
242:24.
discussed 8:7,
75:15, 137:19,

143:5, 147:11,
150:4, 185:2.
discussing 164:23.
discussion 101:15,
102:20, 136:24,
137:3, 137:7,
137:15, 137:17,
140:6, 140:24,
141:2.
discussions 52:19.
display 52:5.
disregard 81:7.
disrespectful
49:24.
distance 212:1,
224:24.
distribute 63:15.
DISTRICT 1:1, 1:2,
214:25.
divide 237:22,
238:3.
division 210:22.
doctor 85:21.
document 5:2, 10:11,
226:6.
documented 238:18.
documents 11:2.
DOER 94:10.
doggy 20:11.
doing 3:7, 27:21,
36:20, 36:23,
46:24, 47:10,
52:3, 52:4, 66:10,
70:12, 88:15,
109:22, 115:4,
129:6, 202:21,
213:12, 216:13.
dollars 185:18,
185:19.
donations 66:22.
done 3:5, 34:21,
53:13, 58:25,
107:5, 235:8.
door 50:5, 50:9,
50:16, 155:15,
155:25, 161:1,
161:25, 163:25,
164:4, 164:9,
164:20, 167:2.
dose 77:16.

doubt 8:18, 87:19,
87:21, 87:24.
downloaded 66:7,
192:9.
downstairs 155:10,
155:14.
draft 4:12.
draw 215:8.
Dre 66:21.
Drive 25:17, 26:9,
38:7, 62:19,
62:21, 62:24,
66:22, 74:6,
109:7, 109:8,
109:10, 110:3,
134:12, 139:25,
170:5, 206:13.
driven 68:17.
driver 25:16, 26:13,
74:5, 100:16,
109:14, 109:17,
109:22, 114:3,
116:8.
drives 139:25,
140:2, 140:3,
151:16.
drove 14:15, 15:9,
63:22, 187:15,
201:3, 202:8,
202:23, 202:24.
drugs 84:16.
dub 174:6.
duly 10:4, 90:12,
108:6, 152:6,
167:15, 194:11,
210:10.
dump 66:9.
Dundalk 189:1.
Dupont 17:21.
duration 188:12.
During 28:9, 45:3,
63:20, 81:1,
94:21, 100:12,
100:13, 106:4,
140:6, 140:8,
145:12, 159:22,
166:18, 172:12,
188:4, 204:23,
212:16, 213:19.
Duron 174:21,

174:22, 179:25,
180:5, 180:13,
180:16, 184:16,
184:18, 185:8,
187:14, 187:16,
188:19, 189:11.
duties 82:23.
.
.
< E >.
e-mail 4:6, 4:10,
34:10, 47:18,
192:20.
e-mailed 34:9.
e-r 210:16.
Earlier 7:20, 13:6,
28:7, 79:14, 87:2,
132:22, 145:13,
162:12, 163:12,
178:11, 182:21,
184:13, 206:6,
226:9, 233:9,
234:3, 236:23.
early 5:7, 154:19.
easier 70:20.
Eastern 178:25.
eat 65:19, 112:5.
Edmonds 107:16.
effect 2:12, 12:18,
54:25.
effective 93:15.
eight 79:11, 193:24,
227:17.
Either 30:20, 31:2,
42:25, 54:16,
79:23, 139:15,
151:16, 187:11,
229:16, 234:10.
ejected 229:25,
230:5.
ejector 231:13.
electronic 111:3.
elicit 100:24,
163:1, 163:18,
165:3.
elicited 162:2.
eliminating
103:11.
elliptical 232:4,
232:5.

elsewhere 209:12.
employed 109:2,
210:20, 211:17.
employment 82:16.
empty 203:3.
en 62:23.
enclosed 223:23,
223:25.
encompasses
213:20.
encourage 34:24.
end 3:8, 7:11, 7:13,
7:18, 8:2, 8:3,
8:10, 10:10,
113:9, 138:15,
154:6, 173:1.
ended 178:12.
Ending 92:8, 92:13,
94:14, 94:15,
94:23, 94:24,
118:3, 121:23,
176:14, 177:4,
188:13, 191:3.
ends 55:17.
energy 13:11.
enforcement
211:14.
engage 82:21.
engine 65:20, 67:20,
68:4, 68:5.
Enjoy 90:2, 100:2,
132:7, 151:22,
167:8, 193:8,
193:15, 209:25,
242:15, 243:2.
enjoyed 133:16.
enough 77:1, 101:11,
205:13, 229:10.
entered 9:16, 80:19,
133:14, 194:3.
enterprise 175:18.
entertaining
163:5.
entire 105:7.
entity 232:11,
232:20.
envelope 217:15,
217:22, 224:7.
episode 76:10,
76:17, 77:19.

equipment 114:7,
151:17.
Erica 64:2, 64:6,
64:14.
Erin 33:21.
especially 3:7,
225:15.
Esquire 1:31, 1:33,
1:37, 1:39.
essentially 4:7,
104:14.
establish 105:15.
established
177:11.
establishing
32:10.
estimate 209:20.
evening 13:15,
48:13, 49:13,
242:15, 242:20,
243:3.
event 49:25, 87:14,
104:11, 243:12.
events 10:12, 10:14,
10:19, 24:15,
25:17, 26:12,
27:5, 76:15.
eventually 110:1,
134:4.
everybody 190:13,
190:23.
everyone 9:20,
133:16, 203:3.
everything 33:25,
34:25, 46:23,
50:15, 54:25,
119:15, 136:17,
192:10, 192:22,
198:23, 203:10,
203:11, 238:24,
242:25, 243:13,
243:15.
evidence 8:7, 12:10,
76:16, 177:16,
211:24, 212:25,
215:12, 216:16,
219:4, 219:7,
231:7, 231:18,
233:25, 235:7.
exact 25:20, 32:20,

36:10, 91:17, 164:23, 187:13, 215:10, 218:8, 222:6, 225:17, 240:2, 240:4, 240:25.
exactly 99:12, 135:6, 144:17, 187:14, 224:6, 233:16.
exaggeration 184:5.
examinations 214:10, 218:4.
examine 215:8, 219:10, 230:14.
examined 10:4, 90:12, 108:6, 152:6, 167:15, 194:11, 210:10, 218:12, 228:17.
examiner 7:19, 211:5, 215:9, 215:12, 217:13, 217:17, 218:7, 218:8, 218:9.
Examiners 212:7, 213:24, 214:3.
examining 214:12.
example 31:18, 42:23, 213:17, 227:2, 232:4.
except 7:17, 218:9.
exception 107:9.
exceptions 31:18, 32:8, 107:11.
excerpt 9:6.
exchange 178:23.
exchanged 74:9, 74:11.
exclude 232:6.
exclusively 211:12.
Excuse 4:19, 16:22, 70:4, 158:5.
excused 80:13, 90:3, 100:3, 151:22, 167:7, 193:8, 210:1, 242:16.

exhibits 6:5.
exists 4:20.
expand 223:17, 224:16, 225:16, 230:25, 233:18.
expanded 231:16.
expands 233:14, 233:17, 233:18.
expansion 223:19.
expect 52:6.
expenses 59:19, 59:22, 60:1.
expensive 59:24.
experience 211:19, 213:9, 215:7, 215:9.
expert 214:18, 215:16, 215:23, 222:18.
expertise 214:16.
experts 214:4.
Explain 6:25, 25:21, 31:21, 115:12, 155:2, 155:7, 223:1, 225:6, 230:16, 236:22, 243:12.
explained 36:2.
explanation 32:1.
expletive 49:16.
explore 124:13, 162:15, 162:16.
express 43:13, 44:6.
expressing 107:22.
extent 31:12, 162:1.
extracted 224:5, 229:25, 230:4.
extractor 231:13.
.
.
< F >.
Faber 210:5, 210:9, 210:15, 210:20, 215:16, 216:2, 217:20, 219:9, 222:19, 224:4, 225:3, 228:14, 228:25, 229:7,

230:13, 245:17.
face 21:8, 197:14.
fact 12:1, 33:11, 33:18, 34:17, 35:2, 39:1, 39:13, 61:19, 62:9, 69:11, 70:22, 78:15, 100:17, 104:3, 105:2, 107:21, 137:5, 181:20.
factor 225:12.
factors 222:18.
facts 31:16, 32:7, 32:10, 216:13.
factually 125:20.
fail 31:8.
Fair 65:24, 65:25, 98:2, 101:11, 161:16, 164:5, 215:10, 233:1.
fall 153:16, 153:25, 195:19, 196:23, 236:3, 237:9.
falls 229:21.
Fallstaff 171:8, 195:22, 195:24, 203:2, 204:10, 205:21.
familiar 25:24, 65:17, 92:13, 94:15, 223:14.
familiarization 211:21.
family 7:20, 60:8, 83:9, 98:12, 98:19.
fantastic 9:22.
far 13:2, 33:25, 36:5, 38:22, 64:16, 86:17, 121:1, 161:11, 193:19, 205:21, 208:19, 232:13.
farther 177:7.
fashion 225:21.
fast 50:22.
Fat 14:24.
father 91:18, 91:19, 95:1, 195:17,

195:21, 195:25,
196:6, 196:10,
196:15.
fault 230:9.
favor 171:1.
favors 196:19.
FBI 212:23,
221:10.
FCRR 1:46, 244:1.
feared 165:5.
feature 241:15.
Federal 1:47, 120:6,
180:22, 180:25,
181:1, 188:4,
192:2, 208:20,
215:3.
feed 13:10.
feel 3:4, 43:2,
51:18, 77:19,
79:5, 79:6,
129:20, 139:4,
139:9, 139:11,
243:14.
feeling 77:17,
85:21.
fell 237:1.
felt 49:24, 57:19,
60:21, 76:17,
162:9, 222:14.
female 14:20.
Few 50:18, 50:19,
79:3, 110:20,
142:12, 143:12,
144:18, 169:5,
184:9, 184:12,
185:18, 185:19,
198:8, 198:10,
205:4, 205:24,
212:12, 241:12.
fiancee 197:8.
Figure 8:1, 23:12,
26:3, 26:11,
119:11, 193:22.
figured 144:18,
186:21.
file 221:8, 221:9,
221:10, 226:8,
226:16, 228:2,
240:9.
files 228:7.

final 8:13, 242:4.
financial 115:10.
find 10:11, 11:9,
45:14, 63:3, 77:6,
184:25, 185:6,
186:22, 186:25,
187:3, 200:16,
228:12, 235:11.
finding 53:9.
fine 164:5.
finger 217:22,
233:4.
finish 18:12, 78:11,
109:19, 131:22,
154:3.
finished 105:1,
105:6, 105:18,
212:13.
finishes 154:10,
155:20.
fire 220:15.
firearm 212:10,
212:12, 212:16,
214:11, 219:7,
219:10, 219:11,
220:14, 221:6,
221:7, 221:19,
221:22, 222:3,
222:15, 228:20,
229:12, 229:15,
229:23, 229:24,
230:1, 230:5,
230:22, 231:8,
231:9, 231:12,
241:4.
Firearms 210:21,
210:25, 211:1,
211:2, 211:5,
211:10, 211:13,
211:16, 211:19,
211:23, 212:7,
213:12, 213:20,
214:3, 215:9,
215:16, 220:14,
227:25, 232:3,
241:15.
fired 214:15,
215:11, 219:7,
220:10, 221:1,
221:6, 221:25,

222:2, 228:17,
229:25, 230:3,
230:15, 231:21,
231:25, 232:12,
232:13, 235:7.
firing 211:23.
fit 232:15.
Five 193:23,
205:22.
flagged 106:17.
flash 230:23.
flat 20:8, 156:6,
156:9, 156:12.
flatbed 139:25.
flatbeds 140:3.
flight 218:23.
flip 115:22.
Floor 1:48, 20:7,
196:8, 196:9.
flower 233:19,
233:20.
fluctuation 240:3.
focused 106:11.
folks 66:6.
following 31:4,
32:12, 32:18,
55:19, 107:3,
108:2, 166:4,
178:1, 212:5.
follows 10:5, 90:13,
108:7, 152:7,
165:24, 167:16,
194:12, 210:11.
fond 145:9.
food 49:7.
footage 33:22,
33:24, 34:7.
forces 230:25.
foregoing 244:2.
forensic 211:5.
forever 176:4.
forgive 10:11.
forgot 2:5,
147:15.
forgotten 3:22.
forklifts 187:15.
form 237:8,
240:13.
formal 97:21,
211:11, 212:5,

212:9.
forth 4:6, 189:13,
   212:25.
fortunately
   221:14.
forward 80:11,
   193:13, 229:21.
forwarding 50:22.
found 98:23, 190:21,
   224:2, 225:24,
   228:2, 228:16,
   238:9.
Four 60:11, 60:12,
   83:17, 197:18,
   227:16, 230:18,
   237:25.
frame 24:8, 42:16,
   48:9, 52:12,
   83:18, 109:20,
   110:24, 111:5,
   111:13, 115:15,
   118:9, 118:16,
   118:18, 118:19,
   124:18, 125:4,
   154:4, 169:13,
   185:1, 208:1,
   209:20, 229:15,
   229:19, 229:20,
   229:23.
Frank 210:15.
fraud 114:16,
   182:12.
free 171:14, 176:2,
   176:6.
frequently 175:11,
   201:17, 202:16.
Friday 2:6, 19:24,
   69:21, 69:22,
   187:5, 187:8,
   187:10, 187:24.
friend 18:18, 18:19,
   20:23, 20:24,
   30:10, 41:9,
   41:10, 41:12,
   41:17, 58:18,
   58:21, 95:16,
   95:18, 95:25,
   139:18, 176:4,
   186:21, 191:7,
   197:1.

friendly 196:13,
   196:24, 196:25.
friends 42:5, 42:6,
   73:19, 83:8, 96:1,
   96:2, 96:3, 116:4,
   139:18.
friendship 196:17.
front 11:13, 20:4,
   47:19, 96:7,
   139:7, 148:5,
   197:14.
Fuchs 75:13.
full 82:19, 82:23,
   90:16, 108:10,
   152:12, 166:1,
   167:19, 194:15,
   198:23, 203:9,
   210:14, 223:22.
fully 71:12,
   142:19.
furniture 30:13,
   31:19, 31:25.
furtherance 30:16,
   31:1, 31:9, 31:14,
   107:12, 132:17.
fussed 62:9.
fussing 62:8.
.
.
< G >.
gallery. 163:11.
gas 67:20, 68:6,
   181:25, 182:1,
   230:24.
gases 230:25.
gasoline 66:1.
gate 20:9.
gather 98:6.
gave 161:16, 196:15,
   200:19, 205:12.
general 17:12, 24:2,
   24:3, 146:3,
   151:25, 218:19,
   221:9, 226:8,
   226:12.
generally 24:11,
   28:11, 226:6,
   242:22.
generic 105:21.
gentleman 71:24,

72:8.
gentlemen 9:18,
   70:5, 80:21,
   132:3, 133:16,
   193:11, 242:19.
George 1:18,
   212:22.
Georgia 215:4.
Gerald 1:31.
gets 230:22,
   231:8.
getting 3:8, 22:3,
   55:17, 61:12,
   79:14, 87:24,
   106:1, 159:22.
ghost 76:18,
   77:25.
girl 129:12, 138:18,
   139:1.
girlfriend 184:18,
   188:23.
gist 14:13.
Give 41:1, 53:7,
   54:2, 85:13,
   93:21, 111:16,
   111:17, 176:2,
   185:1, 215:6,
   219:22, 220:8,
   220:9, 223:17,
   232:11, 235:12,
   240:10, 240:12.
given 7:14, 76:9,
   101:5, 105:23,
   106:14, 160:25.
gives 218:23,
   223:17, 226:18,
   234:20, 238:11.
giving 17:12, 41:4,
   41:7, 42:12,
   107:23.
GJH-17-0667 1:9.
glass 70:11.
glitch 8:15.
GMC 134:15.
Golden 219:18,
   219:19, 221:2,
   222:9, 222:10,
   222:11, 232:17.
gonna 125:15,
   125:16.

Google 45:21.
gradually 110:21.
graduation 25:12.
grain 222:9.
gram 174:13,
    174:16.
grams 198:18,
    204:17, 205:1,
    205:4.
grandfather 91:23,
    95:1.
gray 65:8.
grayish 68:1.
GRC 221:9, 226:12.
great 163:16.
greenish 65:4.
greet 135:9, 135:13,
    135:15.
grew 98:17.
grooves 218:20,
    218:21, 218:24,
    218:25, 219:22,
    220:1, 220:5,
    220:13, 224:25,
    226:25, 227:15,
    227:19, 233:24,
    234:1, 234:2,
    235:4, 235:5,
    236:13, 237:15,
    237:25, 238:5,
    239:22, 240:20.
guess 20:16, 21:15,
    22:4, 22:15, 30:6,
    36:21, 39:24,
    39:25, 49:14,
    55:3, 105:19,
    107:5, 118:11,
    163:17, 169:13,
    186:21, 191:8,
    203:23, 232:23,
    242:4.
guidelines 212:5,
    212:6.
gun 154:20, 154:23,
    155:6, 155:8,
    155:11, 156:2,
    156:15, 156:16,
    160:3, 161:4,
    162:1, 162:2,
    162:8, 162:10,

163:1, 163:3,
    164:12, 164:19,
    165:20, 166:8,
    166:13, 214:15,
    219:6, 220:10,
    229:13.
gun. 155:22.
guns 223:14,
    230:6.
gunshot 212:1.
guy 20:15, 23:14,
    25:4, 25:13,
    25:15, 25:24,
    40:23, 86:22,
    87:1, 117:9,
    144:20, 204:25.
guys 39:17, 40:23,
    43:18, 45:15,
    57:2.
GWD 237:3.
.
.
< H >.
habit 205:13.
hair 168:14.
haircut 111:16,
    111:17.
Half 175:5, 175:6,
    183:15, 183:20,
    183:23, 184:3,
    184:6, 198:11,
    198:14, 204:17.
hall 163:12.
hallow 223:8,
    223:10, 223:13,
    223:15.
hallowed 218:18,
    223:15.
hallway 37:5,
    37:23.
hand 17:2, 85:9,
    90:10, 108:4,
    152:4, 155:16,
    155:18, 165:4,
    166:9, 166:13,
    166:16, 167:13,
    194:9, 196:15,
    210:8.
hand. 155:11,
    155:17.

handgun 156:1,
    156:9.
handguns 242:5.
handling 212:25,
    230:5.
hands 155:24.
hang 197:4, 199:14,
    199:16, 199:19.
hangs 74:15.
happen 37:24.
happened 19:4, 24:6,
    25:11, 38:20,
    45:18, 46:21,
    81:13, 83:19,
    88:14, 136:14,
    136:23, 180:2,
    192:1, 239:5.
happy 9:23, 51:14,
    143:18.
hard 7:12, 7:21,
    162:2, 162:3.
harkened 37:8.
Harness 27:17,
    59:10, 59:12,
    59:23.
Harry 1:37, 59:7,
    128:4, 128:20,
    128:21, 128:23,
    128:25, 129:2,
    204:9.
hat 158:11,
    158:22.
Hays 5:7, 243:5.
Hazel 1:18.
headed 131:15.
health 75:8, 75:16,
    75:18, 75:24,
    81:2, 82:9, 85:25,
    86:1, 114:16,
    182:11.
hear 76:2, 91:4,
    102:14, 108:22,
    124:16, 126:11,
    127:10, 127:16,
    127:22, 128:3,
    128:6, 153:12,
    199:18.
heard 4:7, 102:12,
    106:2, 121:1,
    121:11, 124:12,

124:14, 124:15.
hearing 5:15, 13:21,
    16:25, 79:7,
    121:18, 122:9,
    124:4, 124:7,
    124:9, 124:10,
    124:25, 125:7,
    145:13, 145:20,
    145:22, 146:1,
    146:4.
hearsay 30:2, 30:20,
    31:2, 31:17, 32:8,
    103:3, 103:5,
    107:9, 143:2.
Heights 28:10,
    28:17, 28:20,
    63:3, 203:5,
    203:7, 203:8.
Heise-forcina 2:6.
Heiss 2:13, 5:8.
held 17:2, 43:4,
    57:17, 232:7.
Hello 48:12,
    194:23.
hello. 48:12.
help 19:12, 54:6,
    67:3, 184:24,
    185:7, 187:3.
helping 196:15.
helps 76:9, 76:12,
    176:25.
hereby 244:1.
hide 52:2, 70:12,
    192:17, 192:23.
hiding 23:11,
    52:3.
High 10:15, 10:18,
    11:3, 77:16.
highlighted 67:10,
    227:4, 227:6,
    227:9.
him. 87:6.
hired 25:4, 25:23.
hit 223:20.
hits 223:24.
Hold 5:12, 6:17,
    6:20, 11:11,
    11:15, 17:4, 57:6,
    57:12, 58:1, 77:2,
    102:2, 106:6,

118:7, 138:18,
    147:14, 160:7,
    160:9, 176:5,
    232:8, 241:18.
holding 7:5.
holds 4:2.
hole 230:23.
Holiday 14:16, 15:2,
    33:21, 33:22,
    34:2, 75:13,
    156:19.
hollow 218:17.
home 35:25, 38:13,
    42:21, 46:17,
    50:7, 62:23,
    70:2, 95:16,
    95:20, 95:24,
    97:8, 111:3,
    119:20, 134:10,
    172:7, 172:10,
    206:12, 208:8,
    208:11.
honest 146:14.
Honorable 1:18.
hook 139:25.
hopefully 133:16.
hoping 186:18.
hospitalization
    81:2, 81:12.
hospitalized
    75:19.
hot 42:25.
hour 7:3, 49:16,
    132:7, 132:11.
hours 50:18,
    50:19.
housekeeping 9:3.
Huh-uh 93:20.
hundredths 237:2.
hurry 23:13.
.
.
.
< I >.
idea 74:8, 147:2,
    150:11, 202:10,
    215:6, 219:23.
identical 239:16.
identification 9:3,
    133:6, 133:7,
    133:12, 140:15,

211:10, 212:1,
    213:14, 232:24,
    241:15.
identified 97:8,
    165:7, 201:1,
    218:12, 218:13,
    221:2, 233:4.
identify 6:24,
    117:22, 123:11,
    123:13, 217:21,
    218:15, 220:14,
    231:24, 241:24.
ignoring 47:9.
impact 223:16,
    223:18, 223:19,
    223:23, 224:16.
imparted 218:22.
imply 240:23.
importance 8:7.
important 104:3,
    225:12, 230:2.
impression 162:3.
impressions 231:7.
in. 50:11, 100:11.
inappropriate
    54:17.
incarcerated 110:9,
    203:13, 208:15.
inch 237:2.
include 58:10,
    213:15, 214:3,
    214:10, 214:12,
    214:24.
included 4:13, 9:6,
    176:22, 212:10,
    212:21.
includes 166:1,
    212:20, 220:19.
including 80:16,
    104:10, 107:15,
    132:6, 242:25.
inclusive 28:13.
increased 110:21.
indentation
    223:24.
indentations
    233:11.
indented 230:22,
    231:12.
INDEX 244:10,

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

245:1.
indicate 45:12,
  78:7, 99:17,
  100:25, 186:23,
  238:9.
indicated 20:3,
  46:8, 73:24,
  79:23, 91:16,
  100:15, 101:2,
  208:6, 234:17,
  243:11.
indicating 77:16.
individual 95:11,
  95:15, 97:7,
  181:17, 195:9,
  199:10, 199:12,
  201:21, 201:25,
  212:14, 213:18.
individuals 181:10,
  181:13, 182:17,
  199:21, 199:22.
indulgence 66:13,
  71:14, 95:8,
  160:10, 176:10,
  179:17, 192:24,
  204:1, 206:20,
  242:2.
influence 81:17.
information 2:13,
  4:7, 12:13, 12:18,
  30:8, 30:11,
  30:15, 38:9,
  38:12, 41:4, 41:7,
  45:4, 45:8, 58:11,
  72:9, 87:7, 95:2,
  101:3, 104:21,
  112:7, 125:3,
  212:20, 214:1.
informed 86:21,
  87:1.
initial 163:25.
initially 235:5.
initials 217:10,
  217:11, 217:12,
  217:23, 223:3,
  223:5.
innocent 191:16.
inquire 215:24.
Insecure 14:19,
  60:23, 60:24,

61:8, 62:4.
insecurity 61:1.
Inside 135:1, 135:2,
  230:20, 231:18.
instant 67:19.
instruct 80:15.
instructed 100:21,
  107:6, 132:9.
instruction
  107:25.
instructions 7:25.
intact 225:20.
intelligence 83:6.
intend 4:1, 4:17,
  7:18, 8:14,
  160:23.
intentions 22:1.
interacted 135:22.
interacting
  114:13.
interaction 136:5.
interchange
  104:15.
interjecting
  105:5.
interpretation
  32:24, 162:6.
interrupt 225:11.
Interruption
  163:11.
interview 9:4, 44:9,
  100:12, 159:22.
interviewed 39:22,
  42:18, 50:2,
  159:18, 162:12.
introduce 4:16,
  8:14, 135:22,
  136:10, 160:23,
  163:6, 163:7.
introduced 195:6,
  202:5, 202:6.
investigating
  181:3.
investigation 50:4,
  52:9, 56:6, 87:5,
  117:1, 117:6,
  128:9, 187:6,
  188:5.
investigator 6:25.
investigators 32:4,

87:5, 142:22,
  149:20.
involve 150:20.
involved 68:2,
  115:18.
ipads 60:14.
iphone 48:2, 60:6,
  62:14, 192:7.
issue 2:3, 2:4, 3:9,
  55:11, 73:1,
  75:15, 100:8,
  101:16, 101:25,
  102:1, 177:25.
issues 75:16, 81:2,
  88:8, 161:20.
item 3:25, 8:5,
  161:2.
itself 52:6, 104:3,
  218:22, 222:22.
.

< J >.
J-16 102:8,
  120:18.
J-16A 102:20.
J. 1:18, 1:37.
Jacket 218:17,
  223:22.
jail 7:18, 27:25,
  102:6, 123:25,
  133:22, 133:23,
  203:16, 205:8,
  205:15.
January 109:13.
jealous 60:22,
  60:23, 60:24.
job 82:23, 83:20,
  174:1, 174:2,
  174:18, 176:4,
  179:23, 179:24,
  213:22, 216:14.
jobs 83:24.
Joey 139:17, 139:18,
  139:22, 140:3,
  140:4.
join 160:22.
Jr 1:37.
Judge 8:4, 34:19,
  124:16, 124:21,
  125:19, 149:5.

Judiciary 12:6,
    70:6, 87:21,
    89:6.
July 48:8, 152:23,
    153:5, 154:12.
June 14:23, 77:15,
    78:4, 111:3,
    111:5, 113:1,
    113:18.
juror 2:15, 3:20.
JURORS 9:19, 9:21,
    184:2, 184:8.
juvenile 214:25.
.
.
< K >.
K-a-r-e-e-m
    167:22.
karate 146:15.
Kareem 87:1, 167:11,
    167:14, 167:20,
    185:10, 245:5.
keep 6:4, 13:1,
    13:2, 76:9, 83:14,
    97:1, 121:14,
    121:23, 122:22,
    137:6, 148:1,
    151:3, 151:6,
    168:5, 202:22,
    213:5, 213:6,
    217:1, 232:11,
    238:19.
keeps 13:1,
    223:18.
kept 167:1, 188:24,
    199:4.
kids 197:20.
kill 166:25.
Kim 1:27, 36:7,
    36:19, 51:15.
Kimberly 10:3,
    181:17, 244:14.
kind 2:23, 2:24,
    8:15, 23:15,
    72:12, 77:1,
    110:23, 134:14,
    135:4, 156:1,
    156:6, 156:9,
    156:14, 159:13,
    196:17, 199:23,

222:19, 222:24,
    232:19.
knocked 50:9,
    77:17.
knowing 19:23,
    36:13, 234:8.
knowledge 27:20,
    28:2, 93:16,
    104:11.
known 100:19,
    168:17, 168:23,
    169:4, 185:12,
    185:14, 190:20.
knows 4:21, 8:18,
    30:11, 31:20,
    101:3, 101:9,
    107:16, 185:12.
.
.
< L >.
L-e-e 152:13.
Lab 212:23.
label 217:10.
labels 21:14.
laboratories 212:19,
    212:21, 212:23,
    214:7.
laboratory 210:22,
    211:17, 211:21,
    212:10, 213:7,
    213:24.
lack 225:18.
Ladies 9:18, 70:5,
    80:21, 132:3,
    133:16, 193:11,
    242:18.
lady 40:24, 76:18,
    77:25, 78:1.
Landover 212:22.
Lands 218:20,
    218:24, 219:22,
    219:25, 220:5,
    220:12, 224:24,
    226:19, 226:25,
    227:15, 227:19,
    233:24, 233:25,
    234:2, 235:4,
    235:5, 236:12,
    237:15, 237:23,
    237:25, 238:2,

238:25, 239:21,
    239:24.
Lane 59:21.
language 164:23.
lapel 71:17,
    89:15.
large 63:8, 199:3.
larger 223:18.
Last 3:25, 8:4, 9:4,
    69:18, 69:22,
    71:25, 73:15,
    75:4, 75:6, 77:16,
    81:1, 83:17,
    84:10, 84:12,
    95:19, 103:23,
    194:18, 195:13,
    204:21, 204:22,
    207:1, 207:2,
    207:6, 208:24,
    209:3, 209:6,
    211:9, 224:19,
    230:25.
lastly 225:23.
late 188:23.
later 14:12, 23:24,
    23:25, 39:19,
    125:13, 166:3,
    179:21, 184:14,
    189:2, 189:10,
    190:4, 190:5,
    242:21.
Latrina 181:4,
    216:4, 216:9.
laughed 66:18.
law 211:13.
Lawson 184:18,
    186:12, 186:18.
lawyer 106:14.
lay 6:14, 217:15,
    243:7.
lays 226:16.
lead 100:24, 101:6,
    101:25, 223:10,
    224:18.
leading 84:22, 86:2,
    101:16.
lean 199:17.
learn 50:22, 50:23,
    189:20, 190:3,
    190:14, 214:1,

243:1.
learned 33:13, 51:1,
  189:23, 243:1.
least 2:19, 6:18,
  52:6, 64:23,
  75:19, 116:17,
  153:25, 163:2,
  203:20.
leave 49:21, 49:25,
  200:17, 206:4,
  206:5, 208:10,
  232:2, 232:3.
leaves 203:3.
leaving 25:11,
  141:14, 202:19,
  231:16.
Lee 151:24, 152:5,
  152:13, 152:17,
  153:18, 153:24,
  157:1, 157:7,
  157:19, 157:21,
  157:22, 158:10,
  159:11, 159:16,
  160:2, 166:7,
  166:19, 244:42.
leeway 240:14.
left 33:16, 35:7,
  35:21, 35:23,
  46:17, 49:22,
  80:12, 132:8,
  138:3, 141:16,
  144:7, 144:8,
  181:23, 193:16,
  206:1, 212:15,
  213:18, 217:9,
  217:16, 227:16,
  231:3, 243:4.
left-hand 219:1,
  227:7, 229:1,
  229:2.
legitimately 55:7.
lend 18:22, 18:25,
  21:2, 21:3.
lending 45:5,
  45:9.
lengthy 102:20.
lent 14:10, 14:11,
  14:13, 14:18,
  14:20, 18:18,
  20:15, 20:23,

42:4, 117:10,
  117:11, 117:19.
less 61:2.
Lesser 91:12,
  120:19, 127:14,
  157:4.
letter 11:2.
letting 14:9,
  47:17.
level 20:8.
levels 241:3.
Lexus 64:1, 68:5.
license 22:16,
  22:17.
lie 49:16, 52:2,
  52:20, 52:23,
  52:25, 54:16,
  54:18, 54:21,
  55:1, 55:4, 55:5,
  55:10, 55:13,
  57:3.
lieu 4:4.
life 10:13, 36:21,
  36:23, 76:6.
light 51:23, 52:1,
  52:4, 52:16,
  65:20, 67:20,
  68:4.
lights 68:5.
like. 159:14.
limited 6:12,
  225:21.
Lincoln 14:18,
  20:14, 20:15,
  20:17, 23:14,
  26:4, 68:13.
line 106:8, 106:9,
  163:17, 183:4,
  236:4, 237:1,
  237:10.
lines 72:24, 97:1,
  218:21, 224:20,
  234:1, 234:4,
  234:9, 234:10.
list 4:7, 4:15,
  7:15, 7:16, 8:16,
  97:23, 106:1,
  106:13, 107:14,
  107:16, 107:22,
  221:18, 226:10,

226:18.
listed 221:11.
listen 120:8,
  131:3.
listened 132:14.
listening 104:17,
  107:13, 121:3.
lit 50:13.
literally 106:6,
  218:10, 227:21,
  234:25.
live 27:6, 43:18,
  93:9, 93:11,
  108:25, 116:13,
  197:13, 197:21,
  205:20.
lived 59:9, 59:12,
  59:16, 59:17,
  93:7, 98:22,
  112:15, 171:8,
  196:5, 196:7,
  196:12.
living 27:15, 43:10,
  63:7, 89:4,
  113:19, 139:19,
  168:12, 195:25.
lobby 37:5, 72:10.
located 13:3.
location 12:13,
  12:18, 13:2, 14:1,
  15:6, 53:9.
locator 62:18.
locked 27:25, 28:4,
  57:20, 124:9,
  124:11, 128:16,
  191:25, 208:4,
  209:12, 209:14.
Lombard 1:48.
long 5:12, 5:18,
  6:13, 59:17, 76:7,
  79:8, 79:11,
  82:14, 93:9,
  100:20, 105:24,
  106:8, 109:12,
  141:23, 142:11,
  144:1, 144:15,
  144:17, 149:11,
  149:13, 166:1,
  168:17, 168:23,
  169:4, 196:22,

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

196:23, 198:25,
204:21, 209:17,
210:23.
long-standing
75:15.
longer 7:8, 131:19,
154:14, 154:17,
205:7, 207:8.
longest 83:23.
looked 39:10, 50:11,
62:25, 117:14,
135:24, 143:24,
155:24, 159:14,
222:12, 228:9.
Looking 2:11, 15:9,
17:20, 18:1,
33:14, 33:16,
38:3, 77:6, 94:21,
156:23, 178:19,
179:13, 185:16,
186:13, 212:14,
213:17, 221:8,
222:20, 223:6,
224:12, 224:13,
225:2, 226:7,
233:16, 233:22,
234:6.
looks 16:9, 157:14,
157:20, 165:25,
219:23, 220:3.
lost 88:15, 174:1,
174:2, 193:17,
193:20.
lot 2:13, 16:18,
20:10, 62:1, 66:1,
67:20, 76:12,
82:8, 99:11,
105:20, 106:2,
137:6, 137:24,
138:14, 138:24,
148:2, 170:11,
171:14, 171:17,
192:7, 193:20,
197:20, 198:11,
199:3, 200:3,
202:8, 203:2,
206:9, 225:20.
lots 206:8.
loud 13:10, 29:10,
89:17.

loved 60:15.
Luger 226:10.
Lunch 112:4, 132:4,
132:7, 133:17.
lung 217:16,
224:3.
LWD 236:24.
lying 52:3.
.
.
< M >.
M-10 94:12.
M-11 199:10.
M-3 84:25.
M-3C 19:12.
M-3D 85:5.
M-6A 201:7, 201:8.
M-6B 200:21.
M-8 92:16, 92:18.
M-9 12:9.
M. 1:33.
Ma'am 9:25, 80:13,
80:23, 89:25,
152:3, 153:9,
154:9, 155:19,
157:23, 166:10,
167:5, 185:4,
187:25, 214:13,
214:20, 217:6,
221:3.
ma'am. 186:8,
186:9.
machine 94:10.
magazine 229:22,
229:23.
main 43:6, 197:15.
maintain 83:8,
89:13, 89:19.
maintained 82:16,
83:20.
maintenance 20:15,
23:14, 68:17.
make-up 19:22, 20:1,
20:2.
man. 42:7, 97:6.
mans 37:2, 37:3,
37:7, 38:14.
manually 230:4.
manufactured
212:13.

manufacturer 221:11,
231:10, 239:24,
240:7, 240:15.
manufacturers
212:10, 212:18.
manufactures
219:18.
manufacturing
212:16, 213:19,
231:17, 241:2.
map 15:19, 16:5,
24:12.
March 53:20, 56:3,
56:10, 56:14,
56:17, 71:13,
71:20, 71:23,
72:4, 73:7, 88:16,
89:3.
Mark 86:15, 132:25,
211:16, 212:1,
212:7, 212:15,
213:13, 213:16,
213:18, 215:16.
marked 66:24, 72:24,
94:11, 199:9,
213:10, 232:23,
233:2, 233:21,
236:5.
marking 92:16.
markings 220:8,
231:17, 232:3,
232:4.
marks 213:21, 214:3,
231:4, 231:7,
231:10, 231:13,
231:14, 233:5.
married 112:10,
112:12.
Maryland 1:2, 1:20,
1:49, 12:6, 45:13,
70:6, 87:20, 89:6,
93:5, 109:1,
169:16, 195:1,
212:22, 214:4,
215:2, 215:3.
match 240:25.
matched 241:1.
material 243:10.
Matt 119:12, 119:14,
121:4, 121:13,

122:17, 124:25,
125:3, 125:6,
129:3, 129:4,
138:10, 139:18,
139:21, 139:22,
141:4, 171:1,
201:14, 201:15,
201:16, 202:7,
204:25, 205:3,
206:12, 207:15.
matter 5:12, 9:3,
31:22, 96:8,
100:18, 120:11,
128:13, 158:9,
244:3.
max 7:3.
maximum 221:12,
226:19, 227:1,
227:2, 227:11,
227:12, 227:22,
228:8, 235:22,
236:1, 236:3,
236:23, 236:25,
237:1, 237:5,
237:9, 238:11.
me. 47:16.
meaning 19:3, 30:12,
147:20, 176:14,
218:17, 218:19,
219:4, 222:5,
225:9, 226:25,
231:14, 232:5,
232:10, 232:12.
means 40:12, 58:7,
146:14, 218:21.
meant 99:10,
139:9.
measure 222:16,
224:23, 225:19,
227:21, 234:20,
234:23, 237:16,
238:25, 239:2,
239:4.
measured 235:6,
236:12, 238:9,
238:13, 238:23.
measurement 235:20,
235:22, 236:1,
237:17, 238:2.
Measurements 220:12,

221:17, 225:22,
227:10, 235:18,
236:4, 237:10,
237:11, 237:13,
237:14, 240:4,
240:5, 241:25.
medical 7:19,
113:22, 113:24,
114:7, 207:8,
217:17.
medication 76:9,
79:2, 85:23.
medicine 79:7.
meds 77:16, 78:13,
78:20.
meet 40:12, 40:21,
72:12, 104:8,
105:7, 105:8,
105:13, 105:15,
105:16, 107:17,
110:9, 123:20,
123:23, 126:14,
126:15, 126:23,
134:18, 149:20,
169:6, 173:22,
177:5, 178:24,
179:2, 180:2,
180:11, 183:8,
199:23, 200:2,
202:11.
meeting 69:18,
72:16, 74:25,
75:4, 75:6, 75:7,
105:11, 119:8,
119:17, 120:2,
123:18, 127:1,
134:4, 137:25,
138:9, 140:7,
140:8, 140:25,
142:13, 143:5,
147:21, 148:4,
150:1, 151:2,
182:22, 186:17.
meetings 52:18,
69:17, 185:2,
200:1.
member 212:8.
members 7:20.
Memorial 15:3, 15:4,
18:7, 18:8, 18:10,

18:13, 19:3, 19:8,
23:16.
memory 33:13, 53:5,
67:13, 67:16,
73:10, 73:12,
87:13, 87:19,
88:8, 119:2,
142:1, 142:6,
142:9, 192:8.
men 105:3.
mental 75:8, 75:15,
75:18, 81:2, 82:9,
83:6, 85:25.
mentally 163:15.
mention 101:18,
101:21, 101:23.
mentioned 8:17,
21:4, 38:4, 64:1,
116:23, 219:25,
225:14, 227:20,
231:4, 233:9,
236:23, 237:3.
mentioning 22:13.
message 47:20,
76:20, 77:8,
77:15, 207:6.
messaged 67:19.
messages 47:4,
47:11, 48:15,
66:11, 76:16,
128:5, 176:22,
179:19, 189:9,
192:4.
messed 34:22.
met 21:8, 21:16,
28:25, 29:1,
39:17, 40:20,
69:14, 75:12,
112:23, 113:16,
118:20, 128:25,
135:21, 138:25.
metal 223:22.
Meunier 8:19.
Michelle 112:19,
112:21, 112:23,
112:25, 113:14,
113:15, 113:16,
197:8, 197:10.
microphone 15:21,
78:17, 91:3,

96:19, 102:5,
108:20, 108:23,
152:11, 168:6,
199:17.
microscope 211:25,
219:3, 226:3,
227:21.
microscopic 219:8,
231:7, 231:17,
234:16.
middle 14:23, 105:5,
194:17, 223:4,
229:15.
midway 96:22.
mike 17:3, 71:17,
78:17, 89:15,
94:4.
Mild 50:14.
Mills 10:15, 11:3.
mind 24:1, 38:12,
48:23, 49:12,
70:16, 87:19,
87:22, 87:24,
103:7, 104:20,
104:23, 104:25,
106:24, 107:1,
132:16, 183:3,
232:11.
minimum 221:12,
226:19, 226:25,
227:3, 227:11,
227:12, 227:22,
228:8, 235:18,
235:20, 236:1,
236:3, 236:23,
236:24, 237:1,
237:5, 237:9,
238:11.
minute 173:19,
173:20, 175:17,
235:12.
minutes 4:25, 5:20,
80:5, 80:9, 80:14,
80:17, 123:5,
123:17, 131:20,
194:1, 205:22.
Mirandized 5:17.
miscon- 38:25.
misconstrued
14:19.

missing 31:9.
mistrial 55:14,
55:17.
mixed 38:25, 41:2.
mock 38:8.
model 211:22,
228:4.
modern 226:17.
mom 33:15, 34:6,
64:18.
moment 28:14, 71:14,
77:5, 78:12,
82:12, 119:2,
156:20, 157:3,
220:25.
Monday 49:15.
Money 27:21, 85:10,
85:11, 113:11,
115:22, 117:10,
117:11, 117:19,
136:19, 174:4,
174:5, 179:6,
179:7, 179:15,
179:16, 180:6,
180:13, 184:14,
184:19, 184:20,
184:21, 184:23,
185:16, 186:2,
186:11, 186:12,
186:16, 187:1.
monitor 91:11.
monitoring 111:3,
208:8.
Montgomery 215:2.
month 83:23, 115:3,
142:14, 149:24,
175:13.
months 59:18, 59:19,
59:21, 79:4,
110:20, 142:12,
144:18.
mood 9:23.
Mossberg 212:11.
Mostly 111:14.
mother 22:4, 33:25,
41:24, 88:1,
112:14, 197:10.
Move 2:24, 4:4,
4:16, 15:24,
16:23, 53:9,

55:13, 71:18,
78:16, 89:16,
124:21, 169:15,
177:24, 196:16,
216:23, 216:25.
moved 2:14, 59:9,
64:11, 64:13,
165:13, 195:17,
195:20, 196:10,
196:12, 196:22,
196:25, 197:17.
movements 203:11.
moving 24:7, 102:3,
102:6.
mumbling 127:12.
municipal 215:1.
murder 19:4, 36:6,
36:8, 38:22, 39:2,
43:13, 50:24,
57:1, 106:22,
114:14, 114:17,
116:24, 117:2,
117:6, 117:7,
144:20, 145:4,
181:3, 187:5,
188:5, 188:6,
216:5.
mutilated 225:21.
mutual 191:7.
Myrtle 74:6, 189:21,
189:24, 190:8,
190:11, 190:15,
190:20.
myself 8:20, 77:23,
89:18, 134:17,
198:24.
.
.
.
< N >.
N-o-r-m-a-n 90:17.
named 29:2, 29:6,
100:14, 200:19.
names 241:9.
national 213:3.
nationality
117:15.
nature 30:14, 101:4,
111:12, 114:6.
near 225:8, 234:23,
239:12.

necessarily 232:1.
necessary 62:19.
need 3:9, 3:10, 5:1,
    5:12, 8:1, 11:15,
    71:17, 72:22,
    76:12, 85:21,
    88:25, 89:10,
    89:15, 102:12,
    102:15, 102:18,
    104:15, 107:4,
    107:14, 192:22,
    207:8.
needed 79:2, 120:13,
    133:3, 171:1,
    179:15, 197:20,
    197:22, 201:15,
    243:12.
needs 3:5, 5:14,
    16:23.
neighbor 195:12,
    196:18, 204:13.
neighborhood
    200:2.
neighbors 195:15,
    196:20.
nephew 25:12.
New 8:17, 8:22,
    47:15, 48:1,
    128:13, 164:25,
    168:11, 169:16,
    191:1, 191:9.
news 45:18, 50:25,
    51:12, 156:20,
    156:22, 242:23.
Next 7:1, 15:19,
    38:20, 44:20,
    45:3, 80:14,
    87:16, 90:5, 90:6,
    97:1, 100:6,
    100:16, 136:14,
    151:23, 167:9,
    167:10, 183:4,
    210:4, 217:15,
    226:21, 234:15,
    235:19.
nickel 232:18.
nickname 42:12,
    191:7.
nicknames 172:17.
night 12:5, 42:21,

44:11, 44:13,
    44:14, 44:17,
    45:1, 45:5, 45:16,
    46:18, 46:20,
    47:6, 49:18,
    50:17, 50:21,
    62:1, 70:3, 71:25,
    73:15, 77:16,
    83:12, 188:22,
    188:24.
Nine 1:10, 227:16.
No. 1:9, 2:11,
    36:24, 37:1,
    45:14, 62:21,
    63:16, 64:4,
    66:18, 66:25,
    70:2, 89:22,
    100:17, 130:24,
    184:24, 187:19,
    191:18, 218:14.
noise 65:22.
normal 202:22.
Normally 14:15,
    16:18, 17:10,
    23:10, 40:12,
    74:15, 239:21.
Norman 90:6, 90:11,
    90:17, 91:19,
    91:23, 92:2, 93:4,
    95:3, 244:22.
NORTHERN 1:2.
nose 218:18, 223:8,
    223:15, 223:23,
    223:24, 224:15,
    224:17.
notations 238:17.
note 28:13, 237:20,
    237:21.
noted 237:21.
notes 6:4, 53:14,
    223:2.
Nothing 8:9, 32:11,
    51:19, 89:7,
    89:11, 89:23,
    97:12, 99:5,
    99:24, 145:23,
    147:13, 149:5,
    151:19, 159:1,
    160:8, 160:14,
    175:7, 177:18,

185:6, 186:19,
    186:20, 193:1,
    204:3, 219:20,
    228:10, 228:21,
    233:8.
noticed 18:11,
    26:20, 51:12.
numb 77:17.
numbered 77:4.
numbering 224:9.
numbers 94:14,
    142:4, 192:21,
    205:12, 227:1,
    238:20.
.
.
< O >.
o'clock 7:21,
    200:5.
oath 9:25, 80:23,
    133:19.
Object 55:12,
    102:23, 124:15,
    143:1, 177:12.
objecting 54:14,
    102:24, 106:7,
    161:21.
objections 132:18.
observation 20:20.
observations 25:8,
    166:8, 166:19.
observe 20:12,
    24:23.
observed 104:10,
    222:4, 236:16.
obsolete 226:17.
obtain 93:21.
obtained 93:24.
obviously 4:20, 6:4,
    48:6.
occasion 12:22,
    12:23, 12:24,
    13:7, 18:14, 23:3,
    26:7, 26:23,
    116:12, 116:18,
    116:20, 118:21,
    120:8, 184:13,
    186:15, 198:3.
occasionally 24:18,
    118:4.

occasions 24:23,
  214:21.
occur 200:1.
occurred 187:6,
  197:16, 197:18.
offered 184:24.
offering 31:21,
  101:24.
offhand 241:9.
Office 2:7, 4:3,
  4:6, 4:10, 129:3,
  129:4.
Officer 5:7, 211:9,
  243:5.
Official 1:47,
  244:7.
often 98:10, 110:17,
  115:2, 169:10,
  171:10, 173:16,
  198:6.
ogive 233:10.
old 15:18, 16:10,
  49:15, 79:12,
  90:24, 108:18,
  168:3, 194:24,
  194:25, 195:12.
Once 23:6, 37:7,
  54:2, 75:21,
  110:19, 115:3,
  116:15, 171:12,
  171:20, 171:21,
  172:2, 207:18,
  209:14.
one-month 175:14.
one. 143:7.
ones 130:18.
ongoing 103:8,
  175:18.
open 32:18, 55:19,
  107:3, 108:2,
  164:4, 164:21,
  166:4, 178:1,
  218:18.
opened 161:25,
  163:25, 164:1,
  164:6, 164:7,
  164:9.
opening 233:20.
opens 161:1,
  164:9.

operability
  211:23.
operate 83:11.
operates 214:11.
operating 212:24.
opinion 43:13,
  220:24, 221:4,
  221:25, 222:2,
  222:19, 224:3,
  224:24, 228:16.
opinions 215:8.
opportunity 103:1,
  162:16, 178:14.
opposed 13:6,
  223:22.
order 66:21.
ordinary 24:19.
original 8:16,
  79:17.
originally 168:10,
  195:1.
Otherwise 4:17,
  77:12.
ounce 175:5, 175:6,
  183:15, 183:20,
  183:23, 184:3,
  184:6.
ounces 184:9,
  184:12.
out-of-court
  143:2.
Outback 135:5.
outs 27:13.
outside 68:20,
  85:16, 141:12,
  181:7, 206:8,
  212:9.
overall 222:7,
  238:15.
overrule 86:3,
  107:1, 107:2.
Overruled 31:7,
  32:16, 32:17,
  57:14, 79:10,
  84:1, 125:20,
  125:21, 150:24,
  156:4.
overruling 55:15.
owe 180:13.
owed 179:6, 179:16,

180:6, 180:7,
  184:15, 187:1,
  187:2.
Owings 10:15,
  11:3.
own 6:15, 32:23,
  36:21, 83:11,
  94:22, 109:5,
  109:6, 109:24,
  173:14, 198:16.
owned 38:4, 74:3,
  109:12, 109:24,
  119:15.
.
.
< P >.
P-2 47:5, 177:2,
  177:3, 188:10.
P-26 138:2.
P-30 117:22.
P-i-n-c-h-u-k
  194:18.
P-o-w-e-l-l 90:18.
P90 221:20,
  221:21.
P95 221:20,
  221:21.
P95DC 228:4.
pace 193:25.
package 12:1.
pages 77:4.
paid 84:7.
paint 174:22.
pan 7:1, 48:12.
Panama 172:18,
  172:19, 172:20,
  172:22, 185:11,
  185:12, 191:1,
  191:9, 191:10.
paper 238:14,
  238:19.
papers 224:10.
paperwork 216:9,
  224:5.
par- 49:20.
parallel 232:4.
paramedics 81:3.
Pardon 141:15,
  158:13.
Park 16:19, 17:10,

20:11, 28:10,
28:17, 28:20,
63:3, 74:14,
203:5, 203:7,
203:8.
parked 15:12, 15:15,
15:17, 16:9, 20:6,
23:10, 23:19,
24:11, 24:18,
24:19, 24:23,
25:2, 26:20,
26:22, 68:20,
206:11, 206:12.
parking 20:10, 23:9,
23:12, 137:24,
200:2, 203:2,
206:8, 206:9.
Part 12:1, 16:4,
29:22, 37:25,
38:19, 54:7, 55:1,
55:2, 61:18,
62:12, 73:1,
75:23, 76:6,
105:3, 105:8,
105:14, 146:9,
146:19, 161:16,
166:1, 178:3,
203:21, 220:16,
224:10, 226:2,
227:4, 227:15,
228:7, 234:2.
participant 82:23.
participate 49:6.
participation
49:5.
particles 231:19.
particular 20:5,
22:13, 70:22,
104:11, 107:20,
109:23, 179:12,
200:4, 214:14,
214:15, 216:13,
220:6, 223:9,
224:17, 227:10,
228:4, 229:12,
239:5.
particularly 9:23,
73:24, 145:9.
parts 161:10,
165:17, 212:16.

party 48:19, 49:2,
49:5, 49:21,
102:10.
past 16:6, 33:15,
62:24, 97:7,
183:25, 184:3.
patching 20:1.
patio 18:11, 20:6,
20:7.
Pause 11:19.
paused 30:25.
pawnshop 198:24,
203:9.
pay 60:3, 83:14,
148:22, 176:2,
176:8.
payments 64:9.
peephole 50:12.
peer 215:12.
peers 212:20.
pending 145:17,
191:13, 203:13,
203:16.
Pennsylvania
215:3.
people 13:3, 33:3,
33:6, 34:1, 36:3,
36:7, 107:18,
170:11, 171:3,
182:20, 186:20,
187:1, 205:12,
207:13, 208:17,
223:13, 226:14,
230:19.
perceived 2:19.
percent 208:21.
Perfect 222:23.
perform 216:3,
217:25, 218:4,
220:22.
perhaps 7:9.
period 27:8, 27:12,
27:20, 28:6,
153:24, 175:14.
permission 93:21,
100:24.
permitted 162:5.
person 4:10, 40:25,
41:4, 41:8, 41:19,
41:25, 42:11,

42:12, 42:13,
73:25, 122:18,
165:11, 175:16,
175:23, 199:13,
199:14, 199:24,
200:19, 209:4,
230:5.
personal 20:1, 25:8,
36:21, 36:23,
82:8, 112:7,
173:15, 198:16.
personalities 76:4,
78:7.
personally 21:16,
115:18.
persons 8:16.
pertinent 73:9.
petals 224:16,
226:4, 233:11,
233:12, 233:14,
233:17, 233:18,
233:19, 234:3.
PH-1 28:23.
PH-2 91:10, 201:20,
201:21.
PH-3 95:11, 97:8,
110:12, 195:7.
Philadelphia 211:8,
215:1.
phones 13:1, 47:21,
60:9, 60:11,
60:12, 121:25,
122:2, 122:3,
122:4, 122:5,
190:25.
photo 234:11.
photograph 217:4,
217:8, 217:14,
223:8, 224:11,
224:17, 224:19.
photographs 222:19,
222:22.
phrase 42:7, 51:22,
52:8, 97:4,
157:13, 157:19,
219:22.
physical 86:1.
physically 117:14.
PI 228:3.
pick 25:3, 25:4,

25:24, 39:9,
39:16, 41:24.
picked 39:18,
40:1.
picking 25:6,
25:8.
picture 11:1, 19:9,
19:16, 36:2, 36:3,
57:3, 85:6,
110:12, 223:9,
225:2, 225:3.
pictures 36:3.
piece 238:13.
Pikesville 27:18.
Pimlico 15:18, 16:2,
16:7, 17:21,
28:10, 28:14,
28:19.
pin 230:22, 231:9,
231:12.
Pinchuk 194:10,
194:16, 194:18,
194:22, 194:24,
195:6, 199:9,
200:6, 200:22,
201:8, 204:9,
208:1, 245:9.
pistol 228:3.
place 24:19, 24:24,
36:6, 44:17,
62:22, 94:10,
106:21, 131:13,
132:2, 133:23,
134:11, 184:15,
235:12, 242:19.
placed 121:12,
133:25, 171:5.
places 23:13, 26:21,
26:22, 26:24.
Plaintiff 1:7,
1:23.
plan 8:11, 60:8,
127:4.
planning 6:19.
plate 49:7.
play 7:18, 120:15,
131:3.
played 146:9, 159:6,
164:11.
played. 120:24,

121:15, 122:7,
122:12, 123:3,
124:2, 125:10,
126:5, 127:7,
127:15, 128:2,
128:19, 129:9,
129:17, 130:16,
130:25, 131:7,
131:25.
playing 121:14,
235:15.
Please 90:1, 90:9,
90:15, 100:1,
108:3, 108:9,
108:12, 132:5,
152:3, 152:4,
154:3, 157:2,
157:7, 160:11,
167:6, 167:12,
167:18, 167:21,
193:14, 194:8,
194:14, 199:17,
209:24, 210:7,
210:13, 242:14,
243:2.
plenty 77:21.
pliers 213:17.
plug 235:11.
Plus 151:15.
podcast 192:8,
192:10.
point. 100:23,
107:25, 132:4,
164:16, 193:12,
223:8.
pointed 51:12,
235:18, 235:19,
235:22, 235:25.
pointing 16:4,
123:11.
points 184:5,
234:20.
Police 39:22, 42:18,
43:15, 44:9, 50:3,
155:9, 211:7,
211:8, 213:22.
policies 212:24.
popped 23:7.
portion 67:9,
165:10, 234:15.

portions 120:15,
160:24, 161:8,
161:10, 218:24,
218:25, 220:1,
220:2, 239:21,
239:23.
position 161:23,
210:23, 210:24,
231:2.
positive 190:19.
possession 68:14,
130:24.
possibilities
103:11.
possible 6:5,
77:9.
Possibly 6:25,
150:3, 150:6,
150:20, 150:22,
180:11, 223:25.
Post-it 16:17,
28:13.
potential 218:13.
powder 230:21,
230:24, 231:19.
Powell 90:7, 90:11,
90:17, 90:22,
90:24, 91:5,
91:12, 91:19,
91:23, 92:2, 92:6,
92:15, 92:17,
93:4, 94:11, 95:3,
95:10, 96:21,
97:19, 97:21,
99:10, 99:17,
244:22.
practice 74:14.
prearranged
123:18.
predecessor 235:1.
predicting 6:13,
7:8.
prediction 7:11.
preemptively
55:16.
preferred 8:9.
preferring 123:7.
pregnancy 154:19.
pregnant 152:20,
153:16.

prejudicial
  163:22.
preparation 120:5,
  142:13, 149:21.
preparing 8:13.
prescribed 85:23.
presence 45:22,
  45:24, 98:4.
Present 150:2,
  182:17, 182:18.
presented 45:15.
preserved 132:18.
pressed 231:8,
  231:10.
pretrial 243:9.
pretty 14:11, 19:22,
  35:1, 77:17,
  86:12, 87:14,
  94:18, 192:21,
  198:23, 201:16,
  214:6, 221:16.
prevent 77:20.
preview 66:25.
previous 237:8.
previously 10:4,
  61:8, 96:4, 110:5,
  163:9, 214:18,
  221:2.
price 184:5.
primarily 92:10.
primary 106:16,
  215:11, 218:7,
  218:9.
primer 230:21,
  230:22, 230:23,
  231:12.
Prince 212:22.
printed 67:5.
Prior 59:16, 62:7,
  81:11, 96:16,
  109:14, 113:1,
  113:18, 119:20,
  159:22, 171:4,
  192:2, 192:14,
  209:7.
prison 100:19,
  100:22, 100:25,
  101:4, 101:7,
  101:19, 101:22,
  101:24, 110:14,

110:25.
pristine 221:14,
  225:8, 234:23,
  239:11, 239:12,
  239:15.
Probably 3:22, 4:5,
  4:16, 7:15, 12:23,
  37:6, 43:20,
  49:23, 52:14,
  68:3, 132:20,
  132:25, 173:7,
  175:6, 179:10,
  179:13, 184:1,
  189:12, 191:6,
  191:25, 197:2,
  214:4.
probative 163:19,
  163:23.
problem 79:8,
  166:2.
problems 75:23,
  101:17.
procedures 212:24.
proceed 6:10,
  216:16.
Proceedings 1:17,
  32:18, 55:19,
  107:3, 108:2,
  166:4, 178:1,
  243:25, 244:3.
proceedings.
  11:19.
process 212:16,
  213:19, 241:2.
processed 31:1.
produced 4:8.
product 40:13,
  40:14, 208:9,
  212:14.
professional 213:25,
  215:8.
professionals
  213:21.
proffer 215:16.
proficiency 211:21,
  212:3, 213:4.
projected 13:13,
  13:14.
prom 10:20, 10:23,
  11:5, 13:18, 14:2,

23:16, 24:10.
promotions 83:1.
proper 177:17.
property 145:7,
  147:9.
prosecution 69:14.
prosecutors 80:16.
protrudes 231:9.
prove 31:21, 31:22,
  104:7.
proven 104:5.
provide 113:11,
  199:21.
provided 12:2,
  30:14, 31:19,
  45:4, 85:6, 226:5,
  230:13.
provision 166:2.
public 163:11.
pull 43:21, 43:24,
  66:10, 91:3,
  229:16, 229:21,
  229:24.
pulled 24:6, 36:8.
punch 62:17,
  192:8.
purchase 115:18,
  173:10, 173:16,
  174:14, 174:24,
  175:11, 179:8,
  179:13, 182:22,
  183:13, 183:15,
  183:19, 198:3,
  198:6, 198:9,
  198:18, 200:14,
  208:7.
purchased 31:19,
  64:6, 183:24,
  184:3, 198:2,
  208:24, 209:3,
  209:4, 209:6,
  209:11.
purchasing 198:15,
  208:2, 208:4,
  208:5, 208:12,
  209:15, 209:17.
purport 106:12.
purpose 18:19, 21:1,
  45:8, 45:10,
  45:11, 103:1,

105:14, 119:17,
129:13.
purposes 5:15, 6:19,
9:4, 133:12,
140:15, 161:12,
211:23, 232:25.
pursuant 243:10.
push 164:16,
228:25.
pushed 162:9,
162:13.
put 6:19, 8:21,
10:17, 15:21,
17:7, 28:22, 47:3,
50:14, 86:7,
86:15, 91:11,
99:1, 99:18,
103:13, 110:11,
114:8, 117:21,
138:2, 169:13,
202:13, 216:8,
222:23, 235:15.
putting 105:2.
.
.
< Q >.
Q1B 218:14, 220:6,
223:5, 236:17.
quantify 116:17.
quantities 174:14.
quantity 183:24,
205:16.
quarrel 72:19.
questioned 14:5,
14:7, 36:8, 56:23,
164:8, 188:4,
211:24, 218:14.
questioning 39:18,
46:22, 159:21,
163:7, 164:2.
questioning-and-answ
er 162:11.
quick 147:17,
201:7.
quiet 42:24.
quite 34:24, 199:14,
201:3, 205:24,
223:9, 241:12.
.
.

< R >.
raggedier 65:18.
raggedy 65:10,
65:13, 68:6.
rails 229:20.
raise 90:9, 108:4,
150:10, 150:15,
152:3, 167:12,
194:8, 210:7.
raised 150:18,
218:24, 220:1.
ran 155:10, 155:13,
155:15, 155:25.
randomly 62:21.
range 235:25,
238:22, 239:6,
239:8, 239:9.
rapport 214:6.
re-measure 235:4.
re-up 40:1, 40:3,
40:9, 40:11,
40:13, 40:17,
41:9, 41:24,
41:25, 47:2.
reach 180:10,
207:7.
reached 220:24.
reaction 36:12,
36:15, 36:16,
46:1, 157:9,
159:12.
Read 53:22, 54:3,
67:9, 77:5,
106:19, 107:21,
137:14, 140:18,
142:6, 160:24,
161:17, 177:18,
177:21, 177:22,
178:3, 200:11.
reading 56:3, 96:23,
97:1, 183:3.
reads 236:16.
ready 7:25, 9:24,
10:1, 80:10,
126:11, 132:5,
146:24, 147:5,
193:13, 194:7.
real 50:13, 201:7,
221:15.
realize 106:7.

realized 94:4.
rear 230:21,
231:10.
reason 14:13, 19:1,
49:17, 49:22,
180:5, 190:13,
192:11, 192:23,
227:9.
reasonable 228:15.
reasons 31:20,
228:14.
recalled 87:7.
recalling 119:3.
receive 34:10,
180:22, 230:15.
received 4:15,
34:17, 78:24,
83:1, 83:3, 199:6,
218:6, 227:22,
231:22, 234:25.
receiving 187:21.
recent 88:17,
161:1.
recently 83:19.
recess 80:18,
132:12, 194:2.
recognition 71:25.
recognize 120:25,
121:5, 122:13,
122:18, 138:3,
158:18, 165:11,
195:9, 199:10,
199:12, 200:22,
200:25, 201:8,
201:20, 217:4,
217:7.
recognizing 4:9.
recollections 18:12,
19:20, 30:13,
50:8, 142:17.
record 2:18, 6:24,
9:12, 10:20, 11:5,
17:17, 56:14,
108:10, 120:18,
123:15, 123:16,
132:14, 132:18,
133:1, 152:12,
156:21, 159:5,
161:13, 162:9,
177:2, 194:15,

210:14, 244:3.
record. 29:20,
    54:12, 100:10,
    160:20, 177:15.
recorded 33:25,
    120:8.
recording 146:19.
records 6:24, 39:7,
    176:18, 188:9.
Recovered 217:18,
    218:15, 219:6,
    219:12, 225:4,
    231:3, 231:6.
recross 164:25,
    165:8.
rectangular 232:5.
redacted 161:8.
redid 234:25.
Redirect 82:5, 82:6,
    99:14, 99:15,
    149:6, 149:8,
    160:17, 166:5,
    207:23, 207:24,
    242:11, 244:20,
    244:30, 244:40,
    244:48, 245:15.
redo 235:3.
refer 27:9, 29:5,
    172:19, 172:22,
    201:18, 241:17.
reference 10:13,
    13:4, 36:5, 36:8,
    57:2, 89:6, 89:9,
    169:14, 208:6.
referenced 172:6,
    235:14.
referencing 132:21,
    183:18.
referred 9:3, 9:8,
    144:22, 148:10.
referring 15:2,
    15:22, 28:20,
    34:2, 39:19,
    42:13, 77:9, 95:2,
    95:21, 96:4,
    103:14, 103:15,
    124:6, 124:8,
    130:18, 133:23,
    161:9, 162:11,
    201:5.

refers 29:9.
reflect 123:16,
    238:12.
reflected 236:15.
refresh 11:23,
    19:13, 53:4,
    53:15, 54:6, 55:9,
    55:22, 73:12,
    88:25, 96:15,
    97:3, 119:2,
    137:9, 140:11,
    140:22, 142:1,
    142:6, 142:9,
    148:9, 176:17,
    176:20, 177:17,
    177:19, 177:22,
    178:5, 182:23,
    183:7, 183:10.
refreshed 54:2,
    56:4, 67:16,
    140:19.
refreshes 53:23,
    54:4, 67:13,
    73:10, 183:5.
refreshing 177:20.
regard 11:22,
    104:19, 104:21,
    151:3, 216:3,
    217:25, 220:24,
    226:5.
regarding 10:14,
    132:15, 143:17,
    172:4.
regards 240:4.
regional 213:3.
regular 24:24,
    44:16, 94:18,
    170:1, 174:18,
    176:4, 214:7.
rehearse 72:12.
Reisterstown 182:2,
    182:3.
relate 31:17, 35:20,
    44:25, 45:4, 51:7,
    88:12, 142:22,
    232:9.
related 30:8, 38:9,
    54:23, 70:4,
    100:22, 106:13,
    143:1, 163:5,

163:8, 166:7.
relation 26:17,
    41:5, 41:20, 48:4,
    56:6, 91:8, 91:17,
    104:22, 202:9.
relationship 27:4,
    30:12, 31:22,
    32:1, 32:6, 32:10,
    42:5, 44:16,
    58:18, 60:20,
    64:16, 64:20,
    98:6, 101:5,
    110:15, 111:12,
    149:11, 149:13,
    152:17, 153:25,
    154:4, 154:11,
    154:15, 154:17,
    230:16.
relationships
    83:8.
relatively 8:22.
release 243:9.
released 110:14.
relevance 81:6,
    103:2, 103:5,
    103:6.
relevant 100:23,
    101:4, 103:8,
    105:22, 165:17.
remembered 70:22,
    72:3.
remind 80:23,
    133:18.
reminded 229:5.
reminder 151:25.
Remington 219:18,
    221:1, 222:9,
    225:17, 232:16.
rent 60:4.
repeat 65:16,
    240:18.
repeated 48:14,
    72:16.
Rephrase 150:8.
repo 23:11, 147:2.
report 2:16, 67:1,
    78:23, 86:17,
    87:7, 180:25,
    218:10, 226:5,
    235:10, 236:7,

236:9, 236:15.
reported 87:11,
  179:14, 221:11,
  240:9.
Reporter 1:47, 8:20,
  9:12, 244:7.
reporting 180:12.
represent 59:7,
  204:9, 238:8.
representative
  234:10.
represented 149:17,
  149:21.
represents 243:8.
request 8:6, 9:8,
  55:16, 165:23,
  215:18.
requested 183:8,
  220:11, 220:12,
  220:18, 235:6.
require 83:6.
required 219:8,
  235:6.
requires 3:20.
resell 115:13.
resemble 52:5.
reside 43:19,
  89:5.
resided 196:5.
residence 171:6,
  171:11, 171:15,
  171:19, 171:22,
  172:9, 172:13,
  196:1.
residing 188:25,
  196:11, 197:6.
residue 212:1.
resolves 177:25.
respect 144:15,
  240:16, 240:19.
respected 74:2.
respectfully 163:24,
  240:22.
respond 2:22, 2:23,
  39:4, 49:10,
  61:18, 126:10,
  126:11.
responding 50:4.
response 43:23,
  51:17, 51:20,

56:24, 86:11,
  89:12, 165:13,
  177:5.
response. 68:7.
responses 164:1.
responsibilities
  82:24, 211:14,
  211:20.
rest 6:5, 90:2,
  100:2, 167:8,
  193:9, 209:25.
restaurant 118:20,
  119:5, 119:8,
  120:2, 120:3,
  131:16, 135:3,
  135:4, 135:6,
  135:18, 144:5,
  144:6, 144:10,
  147:7.
restoration 211:25,
  213:1, 214:11.
result 70:25,
  75:18.
retired 218:8.
retirement 34:23.
retrieved 211:24.
return 141:3,
  141:5.
returned 143:22.
reviewing 215:13.
revolver 222:1,
  222:12, 228:18,
  229:9, 229:10,
  229:14, 230:3.
revolver. 156:11.
revolvers 242:5.
rid 129:19, 129:25,
  130:4, 130:9,
  130:12.
rifle 240:8,
  241:3.
rifled 231:5.
rifling 218:19,
  218:21, 221:9,
  226:8, 226:12,
  231:4.
Right-hand 96:24,
  97:8, 142:5,
  203:23, 218:20,
  219:1, 227:15.

right-handed
  220:6.
Right. 156:10.
rip 16:17.
Road 16:2, 16:7,
  171:8, 182:2,
  182:3, 195:24,
  197:15, 203:2.
room 43:10, 45:24,
  80:10, 85:17,
  132:5, 193:13.
Rosalind 16:8.
rotate 229:16.
route 62:23.
routine 44:16,
  49:15.
row 11:13, 11:14.
RP 232:19.
RPR 1:46, 244:1.
ruffling 78:18.
Ruger 212:11, 221:6,
  221:7, 221:19,
  222:2, 222:15,
  228:4, 228:5.
rule 107:10.
ruling 101:6,
  132:19, 164:20.
run 37:9.
running 157:8,
  159:12, 167:1,
  175:18.
rushing 80:2.
.
.
< S >.
S-h-a-y-n-e
  108:13.
S-i-d-h-a-r-t-h
  108:13.
S6 201:2, 201:3,
  201:4, 201:5,
  202:1, 202:3.
Saber 219:18,
  219:19, 221:1,
  221:2, 222:9,
  222:10, 222:12,
  232:17.
safe 98:9.
sake 213:8.
sample 233:13.

Sandra 1:25.
Saturday 11:6,
   19:4.
Savage 212:11.
saved 191:1, 201:4,
   201:12, 201:25,
   202:6.
saying 12:21, 22:22,
   37:22, 40:23,
   41:1, 42:14, 44:2,
   44:3, 44:4, 49:14,
   51:13, 52:15,
   57:2, 57:16,
   57:25, 96:11,
   105:1, 105:19,
   121:23, 123:4,
   157:13, 164:8,
   175:15, 175:19,
   178:17, 179:12,
   207:7, 232:13.
says 31:13, 38:14,
   93:3, 93:4, 93:15,
   104:25, 123:17,
   125:11, 129:18,
   130:3, 201:3,
   223:5, 224:6,
   228:4, 232:18.
scene 8:6, 23:7,
   231:22.
schedule 6:6,
   242:22.
scheduled 6:15.
scheduling 6:18,
   7:23, 80:3.
scheme 65:7.
School 10:15, 10:18,
   11:3, 12:1, 19:25,
   88:2, 89:21,
   213:1.
science 240:3,
   240:4, 240:6.
scientific 216:12,
   228:15.
scientist 211:5,
   216:14.
screen 10:17, 28:22,
   47:3, 86:8, 86:15,
   94:11, 95:11,
   117:21, 138:2,
   156:24, 157:2,

158:17, 188:11,
   195:8, 200:22,
   200:25, 201:7,
   226:22, 229:1.
screwdrivers
   213:16.
scribbled 238:19.
sealed 217:22,
   217:23.
Search 12:7, 70:6,
   70:23, 87:21,
   89:6.
seat 90:15, 108:9,
   152:11, 167:18,
   194:5, 194:14,
   210:13.
seated 2:2, 9:17,
   80:20, 132:23,
   133:15, 135:7,
   194:4, 231:1,
   231:2, 232:18.
second 2:8, 11:11,
   11:15, 31:1,
   52:17, 53:7,
   53:20, 56:11,
   58:9, 106:6,
   121:16, 122:24,
   127:13, 132:13,
   156:21, 160:21,
   160:25, 196:8,
   220:16, 241:19.
secondary 215:12,
   217:12, 217:13,
   218:7.
seconds 188:12.
section 107:20.
Security 34:23,
   82:13, 82:24.
seeing 13:18, 37:14,
   47:23, 64:14,
   64:16, 76:18,
   77:25, 85:16,
   118:16.
seeking 179:2.
seeks 163:18.
seem 84:25.
seems 30:19, 118:12,
   162:4, 242:19.
segments 161:7.
sell 14:25, 22:1,

63:17, 115:6,
   136:22, 146:24,
   147:5, 175:16,
   175:20, 197:23,
   205:7.
selling 22:21,
   27:22, 31:11,
   136:23, 174:4,
   203:4.
semi-automatic
   221:21, 222:1,
   222:3, 228:3,
   228:17, 228:19,
   229:8, 229:18,
   229:19, 231:14.
semi-automatics
   222:10.
send 10:20, 10:23,
   14:2, 24:10,
   77:18.
sending 47:20, 77:6,
   207:11.
senior 11:5, 11:10,
   11:22, 11:24,
   12:2.
sense 5:18, 57:5,
   80:2, 133:2,
   243:19, 243:22.
sent 8:7, 21:2,
   47:16, 47:18,
   207:6.
sentence 236:16.
separate 232:21.
sequence 24:15,
   26:11, 26:17.
serial 211:22,
   211:25, 213:1,
   214:11.
series 27:5, 47:4,
   221:20.
serve 46:14.
served 33:9, 33:12,
   79:14, 81:19.
set 220:4, 226:2,
   227:11, 229:10,
   229:20.
setting 105:10.
seven 7:15, 193:18,
   211:9, 227:17.
Several 64:24,

197:5, 215:14,
228:1, 241:6,
241:7, 241:8.
shallow 218:25,
220:1, 239:23.
shape 239:11,
239:15.
share 213:25.
shared 59:19, 60:1,
125:3.
sharing 212:20,
212:24.
Shayne 100:7, 108:5,
108:11, 244:32.
she'll 31:20,
243:16.
sheet 238:19.
shell 230:13,
230:16.
shelling 226:2.
shift 187:10,
187:12, 188:19.
shirt 123:14.
shit 129:19, 129:21,
130:3, 130:9.
shock 44:19.
shocked 44:18.
shoot 113:5, 113:6,
161:2, 162:4,
162:21, 164:22.
shooting 113:12,
161:22.
short 7:16, 80:4,
188:12, 232:24.
shorter 7:9, 80:6.
shot 40:24, 200:23,
200:25, 201:8.
shots 211:24.
shoulder 110:23.
shoulders 220:4,
224:21.
shouted 61:20.
shouting 13:9,
61:12.
show 10:11, 11:2,
17:22, 71:16,
73:1, 73:9, 76:25,
77:14, 92:15,
92:17, 92:18,
101:4, 145:17,

156:18, 156:21,
158:8, 158:17,
165:11, 177:20,
186:4, 188:9,
195:6, 201:7,
222:22, 232:23,
233:2, 233:14,
233:21, 236:5,
243:10.
showed 49:3, 57:3,
66:24, 86:6, 86:8,
96:15, 176:17,
178:20, 182:23,
224:7, 237:9.
shower 87:25.
Showing 19:12,
53:15, 72:25,
84:24, 85:5,
95:11, 137:12,
140:14, 142:4,
156:18, 188:10,
199:9, 200:21,
201:20, 216:18,
224:8, 225:23,
234:3.
shown 19:9, 97:23,
106:14.
sic 209:11.
side 22:22, 69:12,
205:20, 220:4,
223:10, 237:20.
sight 61:2, 61:25.
signature 236:9.
significance
226:15.
silverish 65:5.
simple 212:13.
Simply 18:7, 20:20,
229:10.
sister 48:18, 48:24,
49:1, 91:18.
sit 6:18, 7:5,
43:6.
sits 16:10.
sitting 2:9, 20:5,
20:7, 20:10, 36:1,
37:23, 72:9,
126:10, 226:3.
situation 13:4,
13:19, 41:2,

162:11.
situations 59:20.
Six 59:18, 59:19,
59:21, 218:19,
218:24, 220:5,
226:25, 227:14,
227:17, 227:18,
227:20, 234:17,
234:20, 237:25,
238:2, 238:3,
241:14, 241:16.
six-month 27:8,
27:12, 27:20,
28:6.
size 227:18.
skidding 222:3,
222:5, 236:16.
Skinny 14:24, 21:4,
21:7, 21:11,
21:13, 21:18,
21:21, 22:2, 23:2,
26:18, 145:6,
145:9.
slang 40:5.
slash 239:8.
sleep 71:1, 71:4,
71:8, 73:15,
86:9.
sleeping 188:18.
slide 229:19,
229:21.
Slow 86:23, 152:1.
small 67:5,
205:16.
smell 202:23.
smile 2:24.
Smith 212:11.
smoke 50:14, 173:11,
173:13, 175:2,
179:10, 179:11,
179:13, 180:12,
204:23.
smoking 206:24.
Social 34:23, 82:13,
82:24.
socialize 111:19,
111:22, 111:23,
112:3, 114:20.
sold 22:20, 40:14,
84:19, 125:24,

197:25, 203:5,
203:7.
solid 230:23,
230:24.
Soloman 243:7,
243:11, 243:13.
Somebody 2:15, 25:3,
25:5, 25:8, 26:8,
113:6, 117:9,
117:11, 135:22,
171:2, 223:21.
someone 4:5, 34:3,
145:25, 162:3.
Sometime 7:11, 7:12,
15:5, 24:13, 48:6,
48:9, 59:13,
153:16, 225:8.
Sometimes 13:10,
13:11, 17:11,
24:5, 75:25,
76:13, 101:12,
116:6, 171:7,
172:3, 173:5,
176:3, 176:6,
176:8, 200:15,
202:18, 206:12,
222:4, 228:1,
231:19, 237:23.
somewhat 6:12,
170:1.
somewhere 5:24,
15:13, 45:13,
120:3, 120:4,
124:12.
son 10:13, 10:15,
14:2, 24:10, 60:9,
66:16.
soon 77:22.
sort 7:19, 14:21,
61:10, 103:7,
110:17, 111:11,
112:1, 125:21,
125:22, 162:16,
164:18, 214:1.
sound 56:15, 78:18,
89:17, 122:8,
148:20, 206:22,
207:4, 208:18.
sounded 127:11.
Sounds 103:15.

South 16:4, 58:13,
119:21.
space 192:9,
192:12.
spaceship 65:22.
speaking 35:23,
102:4, 122:16,
168:6.
special 8:8, 101:7,
101:12.
specials 228:11.
specific 24:1,
29:24, 30:14,
48:25, 77:8,
165:2, 165:22,
178:23, 180:18.
specifically 30:25,
85:12, 103:14,
106:11, 163:5,
165:8, 202:14.
specifications
240:7.
specifics 32:23.
specimen 218:14,
232:12.
speculation 29:21.
sped 56:10.
Spell 8:19, 90:16,
108:10, 108:12,
152:12, 167:19,
167:21, 194:15,
210:14.
spells 8:20.
spend 44:13.
spent 85:15.
spin 218:23.
split 115:22,
199:23.
spoke 12:6, 34:18,
34:20, 35:25,
47:15, 47:17,
87:3, 129:1,
144:25, 190:7.
spoken 13:17,
145:3.
spot 26:25, 27:1.
Spring 16:3, 92:7,
94:2, 94:5, 109:1,
119:23, 119:24,
134:8, 174:20,

187:16, 200:7,
229:21.
Sprint 48:2.
stack 84:11.
stalk 61:10.
stalked 61:19.
stalking 62:4,
62:12.
stand 108:3,
152:4.
standard 212:24.
standing 5:2, 71:6,
71:11, 71:24.
stands 204:4.
Start 5:10, 5:11,
47:14, 47:15,
53:25, 72:25,
103:10, 115:4,
136:23, 183:3,
238:25.
started 49:23, 75:8,
188:20, 194:5.
starting 96:22,
183:4.
starts 105:25,
229:6, 233:10.
stash 199:1.
State 8:18, 17:23,
37:1, 86:20,
90:16, 103:7,
104:20, 104:23,
104:24, 106:24,
107:1, 108:10,
132:16, 152:12,
167:19, 194:15,
210:14, 212:23,
214:4.
stated 15:9, 27:23,
79:5, 141:4.
statement 12:12,
65:24, 65:25,
103:8, 103:14,
107:12, 143:2,
146:5, 165:2,
186:1, 208:25.
statements 13:25,
30:16, 30:22,
52:11, 106:12,
132:16, 145:12.
States 1:1, 1:5,

163:2, 163:18,
215:3.
station 181:25,
182:1.
stay 65:20, 239:3.
stays 67:20,
230:4.
steel 212:13.
stenographic
244:2.
step 85:20.
Stephen 1:39.
stick 239:4.
sticker 16:17.
sticks 48:22.
stipulation 4:4,
4:17, 107:23.
Stop 37:7, 78:11,
79:3, 120:15,
121:16, 122:24,
129:8, 183:5,
228:6.
stopped 26:4, 26:6,
78:20, 84:16.
stopping 129:5,
132:1.
storage 192:6.
store 38:4, 171:2,
174:22.
story 31:18,
138:15.
Street 1:48, 14:25,
21:25, 22:3, 22:5,
22:13, 22:14,
23:5, 26:19,
64:25, 198:14.
streets 198:12,
198:13.
striations 212:15,
213:18, 224:21.
strike 52:17, 58:22,
78:15, 115:24,
124:21, 124:23,
167:3.
strikes 230:22.
strips 229:22.
study 212:5,
212:24.
stuff 20:2, 57:17,
115:13, 127:3,

136:19, 136:21,
171:2, 174:17,
183:20, 184:9,
196:16, 202:22.
subject 120:11,
128:13, 187:6.
submit 161:15.
subpoena 4:19, 4:21,
33:9, 33:12,
34:11, 34:14,
34:17, 46:15,
81:19, 180:22.
subpoenaed 180:24,
192:19.
subscriber 93:4,
93:15, 95:2.
subscribing 192:8.
suggest 3:10.
suggestions 3:13.
suitable 219:4,
219:15.
Sullivan 229:5.
Summer 8:19, 208:11,
208:12.
Sunday 18:9, 19:3,
19:6, 19:7, 19:21,
20:16, 20:19,
48:16, 48:21.
superior 215:4.
supplied 204:25,
205:3.
supplier 31:14,
40:12.
supply 38:4, 113:22,
113:24.
supplying 27:23,
28:3.
supportive 81:8,
81:11.
suppose 64:9.
supposed 57:3,
106:15, 123:20,
136:18, 136:20,
136:22, 137:2,
137:6, 138:13,
138:21, 138:22,
139:13, 139:14,
143:7, 148:1,
186:17.
supposedly 21:25.

surface 20:8,
218:22, 222:4,
224:20, 225:10,
236:17, 239:22.
suspected 8:10.
Sustain 58:4.
Sustained 29:12,
30:24, 33:1,
41:15, 81:6,
84:22, 124:22,
143:3, 177:10.
SUV 180:19.
sweaty 43:1.
switch 73:18, 74:3,
143:17.
switched 48:1, 48:8,
197:12, 197:13,
197:14, 197:19.
sworn 10:4, 90:12,
108:6, 152:6,
167:15, 194:11,
210:10, 211:9.
symptoms 76:9.
.
.
.
< T >.
T-mobile 92:19.
T. 1:31, 1:46,
244:6.
table 96:20,
135:7.
tags 21:24.
taken. 80:18,
132:12, 194:2.
talked 10:13, 13:6,
18:13, 20:22,
23:6, 47:24, 69:8,
69:11, 69:24,
79:14, 128:8,
128:11, 130:7,
136:15, 178:17,
188:3, 191:25,
213:13, 214:9,
225:4.
target 223:25,
231:2.
teach 214:1.
team 69:14.
technically 92:2.
telephone 94:8,

117:23, 118:5.
Ten 4:25, 5:20,
  80:5, 106:23.
tend 3:14.
tension 229:21.
term 40:5, 65:17.
terms 7:22, 32:9,
  39:22, 41:9,
  87:19, 224:23,
  224:24.
Terrific 217:24.
test 52:21, 52:23,
  52:25, 54:16,
  54:18, 54:21,
  55:4, 55:5, 55:10,
  55:13, 211:23,
  216:12.
tested 67:18.
testify 5:14, 35:5,
  38:13, 96:12,
  104:9, 120:6,
  155:16, 155:23,
  156:5, 156:8,
  157:19, 180:22,
  181:1, 181:7,
  181:9, 181:10,
  181:20, 182:19,
  183:18, 206:17,
  208:19, 215:23.
testifying 29:22,
  73:5, 96:7, 139:3,
  144:25, 148:5,
  154:22, 155:1,
  158:15, 166:15,
  184:11, 185:21,
  185:23, 192:2,
  209:7.
testing 212:2,
  212:3.
tests 213:4.
text 47:4, 47:10,
  47:20, 76:16,
  76:20, 77:8, 79:5,
  176:22, 179:19,
  179:21, 189:9,
  192:3.
texted 66:23, 67:19,
  190:7.
texting 49:23,
  66:20, 189:13.

texts 48:4, 61:18.
Thanks 82:4,
  100:4.
them. 105:7.
themselves 164:4,
  164:10.
theory 107:14.
there. 2:13.
thinking 6:20, 7:22,
  14:19, 15:13,
  164:15.
thinner 239:21.
third 92:2, 97:21.
Though 4:20, 12:24,
  14:16, 26:1, 31:9,
  37:21, 39:8,
  49:24, 51:18,
  60:5, 72:5, 77:20,
  100:22, 101:4,
  145:25, 177:16,
  238:13.
though. 130:10.
thousand 185:18,
  185:19, 215:14.
thousands 215:14.
thousandth 237:7.
threatened 155:9,
  162:4.
three 60:8, 83:17,
  83:24, 116:4,
  116:16, 116:18,
  116:20, 119:10,
  185:4, 188:2,
  193:24, 204:22,
  237:24, 237:25.
three-way 104:18,
  106:4.
three-year 212:5.
threw 240:16,
  240:19, 240:20.
throughout 226:17.
throwing 48:19.
Thursday 129:11.
ticket 58:14.
tie 78:18.
till 188:22,
  209:11.
timeline 106:20.
timing 4:8,
  192:14.

tip 218:17.
tired 49:14.
today 4:2, 6:3,
  6:11, 7:14, 7:16,
  9:20, 9:23, 68:24,
  73:17, 73:24,
  79:14, 121:9,
  160:2, 193:18,
  193:24, 215:5,
  243:9.
together 27:15,
  31:12, 43:19,
  44:13, 63:7,
  63:21, 64:19,
  98:22, 99:11,
  104:6, 104:7,
  104:8, 105:17,
  115:23, 116:16,
  116:18, 116:21,
  118:23, 119:10.
tolerance 241:3.
Tomorrow 4:16, 5:7,
  6:6, 7:11, 7:12,
  7:19, 7:21, 8:3,
  8:15, 242:20,
  242:21, 243:2,
  243:5, 243:12,
  243:16, 243:24.
tone 42:23.
took 36:6, 59:21,
  77:16, 131:12,
  133:23, 212:4,
  212:9, 217:8,
  217:11, 217:14.
Tool 211:16, 211:25,
  212:7, 213:13,
  213:16, 213:21,
  214:3, 215:16,
  240:7, 241:3.
tools 212:17,
  213:16, 213:19,
  233:22.
top 47:14, 53:22,
  53:25, 55:20,
  73:9, 92:19,
  96:23, 142:5,
  196:7, 197:22,
  217:22, 223:7,
  224:15, 226:4,
  229:22, 233:4,

233:9, 234:6,
235:19.
totality 231:20.
touch 94:5, 94:8,
202:13, 226:22.
touched 227:5.
touching 226:22.
tow 100:15, 109:14,
109:17, 109:22,
116:8, 129:7,
129:8, 137:2,
137:6, 138:13,
139:15, 142:18,
148:1, 151:8,
151:15, 151:17.
toward 10:10.
towards 2:20, 16:3,
197:13, 197:14,
197:15.
towed 120:14, 143:7,
147:2.
Towing 104:9, 109:5,
109:6, 109:7,
109:8, 110:3,
136:24, 138:10,
139:21, 139:22,
150:11.
townhome 196:3.
tows 139:20.
Toyota 178:25,
179:20, 182:22,
183:8.
training 211:11,
211:18, 212:5,
212:9, 212:18,
213:9.
transactions
115:10.
Transcript 1:17,
102:15, 120:20,
121:8, 121:10,
132:21, 145:15,
145:17, 146:20,
159:11, 164:12,
244:2.
transcripts 161:7.
transparent
164:15.
TRC 240:9.
TRIAL 1:10, 2:9,

3:8, 54:17, 100:2,
151:21, 162:12,
193:8, 203:13,
209:25, 242:15.
tried 62:17, 113:6,
207:7.
trigger 229:17,
229:24.
trip 190:14.
trouble 16:25.
truck 18:3, 68:24,
100:15, 109:14,
109:17, 109:22,
116:8, 129:8,
170:6, 170:10,
170:11, 170:12,
180:17, 180:18.
truck. 78:2.
trucks 38:7,
140:1.
true 4:2, 67:12,
67:18, 71:23,
78:23, 103:2,
103:6, 118:7,
186:1.
truth 31:21, 46:24,
107:7, 184:2.
try 17:4, 70:11,
85:25, 94:10,
96:18, 152:1,
185:6, 186:23,
186:25, 187:3,
220:20.
trying 14:25, 21:23,
26:3, 26:11,
32:11, 36:8, 40:1,
40:21, 55:3, 55:9,
58:2, 77:19, 78:8,
113:5, 119:11,
129:19, 130:4,
130:9.
Tuesday 7:24,
49:15.
turn 67:8, 147:14,
149:6, 157:6,
222:25, 230:23.
turned 62:18, 74:5,
76:23.
Turner 107:16.
turns 17:1.

TV 49:7.
Twice 23:6, 75:19,
169:11, 169:13,
171:12, 171:20,
171:21, 172:2,
207:18.
twirly 156:6,
156:10, 156:11,
156:15, 164:13.
twist 218:20, 219:1,
220:7, 226:20,
227:15, 234:18,
241:14, 241:16.
two. 218:5.
type 20:2, 40:13,
79:6, 83:3, 109:4,
114:2, 117:7,
168:12, 170:4,
174:14, 201:5,
214:15, 219:18,
220:14, 221:1,
221:7, 226:6,
231:25.
types 214:9, 214:23,
218:4, 230:6,
241:5, 242:5.
Typically 72:11.
.
.
< U >.
UFC 127:8, 127:22,
146:8, 146:13,
146:14, 146:16.
ultimate 221:23.
ultimately 30:6.
unburned 231:19.
uncle 99:2, 99:18.
undersized 222:5.
understand 2:3,
28:8, 32:9, 32:11,
40:10, 41:11,
42:10, 57:11,
57:15, 59:12,
73:23, 131:2,
131:8, 212:12,
238:22, 239:7.
understanding 64:23,
161:14, 203:20.
unexpected 185:8,
185:9.

unfired 215:11,
  230:3.
unique 6:15, 212:14,
  213:17, 220:9,
  232:3.
Unit 196:8, 197:20,
  197:21, 197:22,
  210:21, 211:10.
United 1:1, 1:5,
  163:2, 163:18.
unless 2:2, 4:18,
  103:6, 132:23,
  235:6.
unlikely 3:8.
unpleasant 60:20.
until 14:12, 45:14,
  50:2, 69:17,
  70:23, 83:19,
  90:2, 100:2,
  151:21, 154:2,
  154:9, 154:11,
  155:19, 167:7,
  190:17, 193:7,
  209:25, 230:4,
  235:11, 242:15.
Unusual 49:8,
  49:9.
update 5:6.
upright 220:3,
  226:3.
upset 13:12, 19:23,
  61:13.
upstairs 155:10,
  155:13, 196:8.
user 204:13.
uses 29:13, 32:21,
  40:4, 40:5.
using 25:16, 94:22,
  94:23, 173:6.
usual 49:8.
utilize 233:23,
  238:16, 241:20.
utilized 240:7.
.
.
< V >.
V-10 15:23, 24:12.
V-19 159:5.
variation 240:14.
variety 214:9.

various 212:10,
  212:19, 212:20,
  213:3.
vehicle 14:17,
  15:14, 23:14,
  146:11, 147:1,
  147:2, 180:15,
  196:16, 201:3,
  201:6, 202:7,
  206:13.
vehicles 14:24,
  21:25, 120:13,
  147:8.
verbal 68:7.
version 8:13.
versus 232:4, 232:7,
  232:21.
vertical 220:3.
via 4:4, 4:17.
victim 2:6, 117:8,
  216:7, 216:10,
  217:18, 218:16,
  224:6.
video 8:24, 33:22,
  33:24, 34:7, 46:3,
  46:5, 46:7,
  165:11.
videotaping 8:8,
  8:23.
view 20:3.
Virginia 17:21,
  93:5, 93:7, 93:9,
  93:11, 93:12,
  98:19, 98:21.
virtually 204:13.
visit 115:2, 129:3,
  129:4, 171:5,
  171:10, 171:15,
  171:22, 172:9,
  185:8.
vitae 213:9.
Vivant 33:25.
voice 13:13, 13:14,
  42:23, 78:8,
  121:5, 121:6,
  122:18, 168:5,
  217:1.
voices 79:7, 120:25,
  121:3, 122:13.
voir 215:18.

voluntarily 44:5,
  72:9.
Voluntariness
  5:16.
volunteer 101:3.
vs 1:8.
.
.
< W >.
W. 1:48.
wait 154:2, 154:9,
  155:19, 160:21.
waiting 104:22,
  181:6, 181:9,
  181:10, 182:19.
walked 35:25, 49:11,
  50:15.
walking 34:1,
  78:2.
walkway 34:1.
walls 231:16.
wanting 147:1.
wants 6:10, 26:18.
warming 202:19.
warrant 243:10.
Washington 215:4,
  243:8.
watched 49:7.
watching 146:13.
water 70:11.
wax 226:2.
ways 14:19.
weapon 162:22,
  221:1, 228:17,
  231:25, 241:23.
wearing 158:22.
Wednesday 1:19.
weed 173:19, 175:22,
  175:23, 207:7.
week 23:24, 74:6,
  106:22, 169:11,
  169:13, 169:22,
  171:12, 172:2,
  190:12, 198:8,
  198:10, 202:18.
weekend 14:16, 15:4,
  18:8, 18:10.
weekend. 77:23.
weeks 115:3.
weight 222:7, 222:8,

225:12, 225:17,
227:19.
weird 217:2.
welcome 100:5,
194:6, 210:3,
242:8.
well-being 86:1.
Wesson 212:11.
Whatever 36:21,
43:21, 48:17,
52:2, 118:25,
128:4, 164:13,
164:22, 184:7.
whereabouts 62:20.
whereas 39:8.
whether 20:4, 31:24,
43:14, 44:6,
45:12, 46:8,
66:16, 97:3,
100:14, 128:20,
146:3, 146:20,
156:8, 176:13,
178:6, 182:16,
187:8, 188:3,
190:7, 203:4,
214:10, 214:14,
215:10, 215:11,
219:6, 219:7,
221:21, 226:16,
230:3.
white 123:14.
whoever 40:1,
204:4.
whole 14:13, 54:3,
55:2, 103:15,
106:7, 107:14,
156:7, 203:3,
226:10.
Whom 169:6, 197:6,
201:25, 203:18.
wider 234:15, 237:4,
239:23.
width 220:13,
221:12, 221:13,
225:19, 226:20,
227:1, 227:10,
227:12, 227:25,
228:8, 236:19,
236:24, 237:2,
237:3, 238:8,

239:13, 239:15,
239:16, 240:10,
240:17, 240:20,
241:1.
widths 236:20,
238:9.
wife 129:12,
197:8.
wildcat 226:17.
Wilson 212:19.
wind 188:22.
window 2:10, 2:11.
wing 96:5, 97:6,
97:9, 99:10.
Within 76:15,
118:18, 210:22,
213:24, 214:10,
214:15, 231:15,
237:1.
without 101:17,
206:9, 233:22.
witnesses 4:22,
6:12, 6:14, 7:15,
7:17, 106:3,
107:15, 162:12,
181:10, 191:17,
191:18, 193:18,
243:7, 243:17,
243:21.
Woke 9:23.
Wolf 207:16,
207:17.
woman 21:7, 43:13,
45:18, 61:3,
74:19.
women 21:14.
wonder 67:8,
164:16.
Woodland 16:8,
98:17.
woods 197:14.
word 13:14, 21:2,
29:14, 30:1,
32:22, 33:2, 33:5,
36:10, 40:3,
40:11, 57:22,
144:24, 225:5.
words 25:20, 27:4,
31:24, 54:24,
118:8, 238:23,

241:23.
worked 83:17, 83:23,
83:24, 166:3,
179:9, 186:22,
187:8, 187:9,
187:16, 198:23,
203:9, 211:8.
working 11:13,
22:21, 109:14,
109:17, 171:13,
173:21, 173:24,
174:16, 174:20,
179:25, 189:11,
210:23, 211:3,
211:4.
workplace 179:22.
worksheets 238:16.
worried 42:25.
wound 223:18.
wreckers 139:25.
wrenches 213:17.
write 218:10,
237:16, 237:19,
237:21.
writing 48:14.
wrote 238:13.
WTF 47:10.
Wutoh 145:3.
Wylie 15:12, 15:24,
15:25, 16:6,
17:20, 28:10,
28:14, 28:19,
43:21, 62:25,
74:15, 98:23,
205:18.
.
.
< X >.
X5 18:3, 18:11,
18:14, 20:14,
20:21, 69:1.
.
.
< Y >.
Y'all 46:24, 48:5,
50:6.
Yakamein 65:11,
65:14, 65:18.
year 75:1, 110:19,
114:10, 152:24,

206:22, 209:21.
years 69:17, 79:11,
  82:15, 82:17,
  83:17, 83:21,
  168:18, 168:19,
  168:25, 169:5,
  169:22, 172:1,
  185:4, 185:12,
  185:13, 185:14,
  188:2, 194:25,
  197:2, 197:18,
  207:3, 208:23,
  209:7, 211:3,
  211:9, 213:12,
  215:7, 215:13.
yellow 28:13.
Yes. 155:6,
  157:20.
Yesterday 2:5, 3:25,
  9:3, 10:10, 10:13,
  11:9, 12:11,
  13:17, 20:3, 21:8,
  27:23, 28:11,
  47:24, 66:15,
  69:24, 70:1, 70:3,
  77:25, 84:12.
Yo 29:8, 29:9,
  29:14, 30:9,
  30:12, 32:22,
  33:2, 33:5,
  73:21.
Yo. 29:7.
York 168:11, 169:16,
  191:1, 191:9.
you. 57:22.
young 42:5, 42:7.
yourself 67:9,
  92:11, 93:1,
  93:19, 96:23,
  97:2, 120:9,
  127:10, 134:16,
  136:10, 137:14,
  140:18, 142:6,
  175:1, 178:3,
  183:3.
yourselves 132:7,
  193:15, 242:25.
Yup 206:18.
.
.

< Z >.
Zerkin 1:31, 3:6,
  3:14, 3:20, 4:24,
  5:4, 99:7, 99:9,
  99:13, 107:6,
  108:1, 124:15,
  124:21, 125:19,
  143:1, 147:16,
  147:17, 147:19,
  149:5, 150:5,
  150:22, 164:3,
  164:7, 244:28,
  244:38.