**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF MARYLAND**

**UNITED STATES OF AMERICA,**           )
                                        )
              Plaintiff,                )
       vs.                              )
                                        )   **CRIMINAL NO.:** GJH-17-0667
**DAVON CARTER** and **CLIFTON**          )   **JURY TRIAL:**  Day Ten
**MOSLEY,**                              )
              Defendants.               )
                                        )
_____)

**Transcript of Proceedings**
**Before the Honorable George J. Hazel**
**Thursday, January 23rd, 2020**
**Baltimore, Maryland**


**For the Plaintiff:**

       Sandra Wilkinson, AUSA

       Kim Oldham, AUSA

**For Defendant Davon Carter:**

       Gerald T. Zerkin, Esquire

       Christopher M. Davis, Esquire

**For Defendant Clifton Mosley:**

       Harry J. Trainor, Jr., Esquire

       Stephen B. Mercer, Esquire


_____

                Christine T. Asif, RPR, FCRR
              Federal Official Court Reporter
              101 W. Lombard Street, 4th Floor
                 Baltimore, Maryland 21201

1                        P R O C E E D I N G S

2               (Jury not present.)

3               THE COURT:  Good morning.  You may be seated.  All

4     right.  So we're here for an evidentiary hearing on a motion

5     to suppress.  I guess we have to hear from an officer who was

6     not available when we were having our motions hearing, and so

7     we'll do that now.

8               We'll take that witness when you're ready.

9               MS. WILKINSON:  Officer Tabitha Hays.

10              THE CLERK:  Good morning, please raise your right

11    hand.

12                    OFFICER TABITHA HAYS,

13    called as a witness, being first duly sworn, was examined and

14    testified as follows:

15              THE WITNESS:  I do.

16              THE CLERK:  Thank you.  You may have a seat.

17              THE WITNESS:  Thank you, ma'am.

18              THE COURT:  You may adjust that microphone down in

19    front of you state and spell your full name for the Court,

20    please.

21              THE WITNESS:  My name is Officer Tabitha,

22    T-a-b-i-t-h-a, and the last name is Hays, H-a-y-s.

23                        DIRECT EXAMINATION

24    BY MS. WILKINSON:

25    Q.  Good morning, Officer Hays.

Direct Examination - Hays  (By Ms. Wilkinson)

1    A.  Good morning, ma'am.

2    Q.  How are you employed?

3    A.  With the Baltimore County Police Department.

4    Q.  And how long have you been working with the Baltimore

5    County Police Department?

6    A.  Almost 15 years.

7    Q.  And generally, what have your duties and responsibilities

8    included in that 15 years?

9    A.  I've worked patrol, I've operated as a field training

10   officer, I was temporarily assigned to a community action team

11   and an investigative services detective unit for a short

12   period of time, and then back in patrol.

13   Q.  Are you currently recovering from an in-the-line-of-duty

14   shooting that occurred earlier in 2019?

15   A.  Yes, ma'am, I am.

16   Q.  And can you tell the judge whether or not you were on duty

17   back in May, May 27th, 2016, as a patrol officer for Baltimore

18   County Police Department?

19   A.  Yes, I was.

20   Q.  And what was your geographic territory at that time?

21   A.  I worked in the Parkville precinct.  Specifically we have

22   post numbers, I was assigned to the area of 827 post, to the

23   area around Perring Parkway and the neighbors therein, in

24   between there and Harford Road.

25   Q.  And directing your attention to 10:30 that morning, did

1   you respond to a call, a dispatch call, at that time?

2   A.  Yes.

3   Q.  And did you respond to an area on Arbor Station Way in

4   Pikesville?

5   A.  In Parkville, yes, ma'am.

6   Q.  I'm sorry, in Parkville.

7   A.  Yes, ma'am.

8   Q.  And were you alone, or were you traveling with a

9   partner?

10  A.  We work alone, so I was alone.

11  Q.  Okay.  And were you in uniform?

12  A.  Yes, ma'am.

13  Q.  And were you in a marked police vehicle?

14  A.  Yes, ma'am.

15          THE COURT:  I apologize, what day was this?

16          MS. WILKINSON:  Oh, June 1st, 2016.  I'm so sorry,

17  Your Honor, I'm so sleepy this morning.  June 1st, 2016, Thank

18  you.  I kept writing 2020 on everything today for things that

19  happened in 2016.  Thank you for the correction, Your Honor.

20  Q.  (BY MS. WILKINSON)  June 1st, 2016, were you on duty

21  then?

22  A.  Yes, ma'am.

23  Q.  And I'm sorry I was going so fast.

24      And you got your dispatch call, and what did you see upon

25  arrival?

Direct Examination - Hays  (By Ms. Wilkinson)

1    A.  Upon arrival -- so Arbor Station Way is kind of a -- it's

2    a round street that goes -- that's a neighborhood, apartment

3    complexes and townhomes, when I came around the corner on

4    Arbor Station Way, I saw a lot of police officers, which I

5    assumed were from the Baltimore Police Department.  They were

6    in plain clothes, some of them were in what we call raid

7    vests, they're like a black tactical vest that had the sign

8    "police" on it.  There was also a black SUV in a parking spot

9    with the doors open and the tailgate raised.

10   Q.  Okay.  And at that point, did you make contact with any

11   particular officer?

12   A.  I made contact with a female detective from Baltimore

13   City, who I assumed had initiated the call for the police

14   assist.

15   Q.  And would that be Detective Forsythe?

16   A.  Yes, ma'am.

17   Q.  And is she the only person you talked to from the police

18   department at that time?

19   A.  Yes, there were a lot of other, like I said, detectives

20   and people there, but there was a lot going on, a lot of

21   people are making phone calls, a lot of back and forth, so she

22   was my one contact.

23   Q.  Okay.  And what did you believe you were there to do?

24   A.  So the initial comments were to meet a detective in

25   reference to a possible homicide investigation.  Our calls

Direct Examination - Hays  (By Ms. Wilkinson)

1    come across the radio, and then we also have what's a CAD

2    system, it's a computer-aided dispatch system that gives a few

3    lines of what a caller might request.  So I had that basic

4    information and went there to just get a little bit further to

5    see what she needed from me.

6    Q.  And at some point, did you learn that there were -- there

7    had been drugs that had been recovered in the vehicle?

8    A.  Correct.  So she indicated to me that in the midst of

9    their investigation, this vehicle had a large amount of

10   marijuana in the rear of the vehicle.  She directed my

11   attention to the raised tailgate and the contents inside the

12   vehicle.

13   Q.  And did you go over there and observe them for yourself?

14   A.  Yes, ma'am, I did.

15   Q.  And what did you see?

16   A.  So a large duffel bag, black, the zipper was open and it

17   appeared to be a large quantity of marijuana, some in

18   individual baggies or what looked like a Ziploc baggie, and

19   then also a plastic bag filled with U.S. currency.

20   Q.  And did you make any observations in terms of the smell?

21   A.  Obviously it was a very strong odor of marijuana coming

22   from the bag.

23   Q.  And what were you asked to do vis-a-vis the duffel bag and

24   the drugs and the cash?

25   A.  So because this was in Baltimore County then and not

Direct Examination - Hays  (By Ms. Wilkinson)

1    within the jurisdiction of Baltimore City, the detectives

2    wanted me to take possession of the drugs for, you know, the

3    criminal event that happened within Baltimore County, which

4    was the possession of the drugs.

5    Q.  And did you -- is that one of the roles that you assumed

6    that day, which is to take responsibility of the drugs that

7    had been seized at that point?

8    A.  Correct.  Like I said, there were a lot of officers around

9    the area, it was very locked down, so just made sure that

10   nobody else disturbed or took possession of those drugs.

11   Q.  Did you physically remove them from the SUV?

12   A.  No, ma'am, I left them inside the SUV.

13   Q.  And did you see who eventually did remove them from the

14   SUV?

15   A.  Yes, I did.

16   Q.  Who would that have been?

17   A.  It was Detective Taylor from the Baltimore County Police

18   Department narcotics unit.

19   Q.  And how did she become involved?

20   A.  So due to the circumstances of the call and the large

21   amount of drugs, I obviously contacted my supervisor as per

22   our policy.  Any time we have any kind of critical incident or

23   large amount of currency or drugs, we notify a supervisor.

24   And due to the amount, we chose to include our narcotics unit,

25   who would be better suited to investigate a crime like this.

Direct Examination - Hays  (By Ms. Wilkinson)

1   Q.  And did she eventually arrive?

2   A.  She did.

3   Q.  And before that happened, did you keep your eyes on the

4   duffel bag and the drugs and the cash that you had

5   responsibility for?

6   A.  Yes.

7   Q.  Now, at any time, did you see the person that had been

8   stopped in the vehicle?

9   A.  Yes, who I was told was stopped in the vehicle.

10   Q.  Of course, you weren't there when it was stopped?

11   A.  Correct, ma'am.

12   Q.  So tell us your first observations of the individual you

13   were told that had been driving the vehicle.

14   A.  So it was just I wanted to get some basic information,

15   basic -- like kind of name, date of birth, things like that,

16   information that I could pass along to my detectives to help

17   expedite their process for their report writing.

18       But I also recognize that the investigation was a serious

19   one with it being in reference to a possible homicide, and

20   then also with a large amount of drugs and currency.  So

21   before I was speaking to him, I read him his rights per

22   Miranda in case he said anything that could be involved with

23   any part of the investigation.

24   Q.  Okay.

25   A.  Just as a precaution.

1    Q.   So when -- before you Mirandized him, did you make any

2    observations in terms of, was he cuffed, was he sitting,

3    standing, where was he actually when you approached him to

4    Mirandize him?

5    A.   He was cuffed and he was seated.

6    Q.   And at some point when you read him his Miranda rights,

7    did you do it from memory, or what is your recollection?

8    A.   No, I always carry a card with me that our department has

9    that has the Miranda rights.  I keep it with me all the time,

10   and when I read somebody their rights, I read from the card.

11   Q.   And did you actually show me the same Miranda card that

12   you had back then that you have now?

13   A.   Yes, ma'am.

14   Q.   And would you take it out now for the Court?

15   A.   Yes, ma'am.

16              MS. WILKINSON:  I'll mark that as Government's

17   Exhibit No. 1 for purposes of this hearing, Your Honor.

18   Q.   (BY MS. WILKINSON)  And do you actually read it, or do you

19   have it and show it to the person, how does that work?

20   A.   No, I read it to them.

21   Q.   And did you read it to the driver, the person that you

22   were told was the driver?

23   A.   Yes.

24   Q.   And what rights did you provide to him?

25   A.   I advised -- I said, you are hereby advised that you have

1    the absolute right to remain silent.

2              THE COURT:  Slow down a little bit while you read

3    that.

4    A.  Yes, sir.  You have the absolute right to remain silent.

5    Anything you say can and will be used against you in a court

6    of law.  You have the right to talk with a lawyer at any time

7    before or during any questioning.  If you want a lawyer, and

8    cannot afford one, you can request the Court to appoint a

9    lawyer prior to any questioning.  And if you agree to answer

10   questions, you may stop at any time and no further questions

11   will be asked of you.

12        Then underneath there, there is a statement, it's, I have

13   read and understood the explanation of my rights, my decision

14   to waive these rights and be interviewed is free and voluntary

15   on my own part.

16   Q.  (BY MS. WILKINSON)  And once you read that to him, did he

17   respond?

18   A.  He said he would talk to me.

19   Q.  And did he appear to understand what you were saying?

20   A.  Yes.

21   Q.  And did he appear to be under the influence of any drugs

22   or alcohol?

23   A.  No.

24   Q.  Did he acknowledge you and look at you in the eye when he

25   was speaking with you?

1    A.  Yes.

2    Q.  Did you hit or touch him at any time?

3    A.  No.

4    Q.  Did you force or coerce or do anything to make him speak

5    with you?

6    A.  No.

7    Q.  How long was the conversation that you engaged with him

8    after providing him his Miranda rights?

9    A.  Very brief.

10   Q.  And once you were done, what happened next?

11   A.  So we had the brief conversation, I had asked him about,

12   you know, the contents of the vehicle.  He told me that the

13   vehicle was not his, that it belonged to a friend of his named

14   Tony.  And the reason that he was driving it is that his

15   car -- or the car that he drives is in his girlfriend's name

16   and it had bad tags, so because of the bad tags, he couldn't

17   drive it.  And he said, you know, the drugs aren't mine, you

18   can take them.  He basically said he didn't know anything

19   about them.

20   Q.  And at that point, what interactions did you have with the

21   driver?

22   A.  After that, it was very quick and I got some basic, like I

23   said, personal information, name, date of birth, address,

24   things like that, and then that was it.

25   Q.  And did you go about your patrol -- well, at some point,

Cross-examination - Hays  (By Mr. Davis)

1  did the interactions there outside Arbor Station Way, did the

2  police leave and disburse?

3  A.  Yeah, after our narcotics detectives arrived on scene, I

4  believe a few of my supervisors arrived on scene, just to make

5  sure everything was okay.  Eventually I spoke to Detective

6  Taylor and relayed to her the information that the driver had

7  given to me, and then told her about the drugs.  I believe,

8  you know, there was some interaction between the detectives.

9        Again, I'm in patrol, so I was kind of just guarding the

10  scene, making sure nothing went awry, and then our narcotics

11  detectives, Detective Taylor, took custody of the drugs.  And

12  I believe I was relieved from the scene by another officer

13  because of the shift change time, so I went about, finished my

14  patrol, and then went to shift change.  I think some things

15  happened after I left, but I'm not privy to what they were.

16  Q.  Do you recognize the driver here today?

17  A.  No.

18  Q.  How much interaction had you had with him on that day?

19  A.  Very, very brief.

20        MS. WILKINSON:  That's all I have, Your Honor.

21        THE COURT:  All right.  Cross from Mr. Carter's

22  counsel.

23        MR. DAVIS:  Thank you, Your Honor.

24                    CROSS-EXAMINATION

25  BY MR. DAVIS:

Cross-examination - Hays  (By Mr. Davis)

1    Q.  Officer, do you know how long Mr. Carter had been

2    handcuffed --

3    A.  No, sir.

4    Q.  -- prior to your arrival?

5    A.  No, sir.

6    Q.  You indicated that he was seated, do you know where he was

7    seated?

8    A.  I believe at the time that he was seated, like on a curb

9    on the sidewalk near a van.

10   Q.  And were his hands handcuffed behind his back, or in front

11   of him?

12   A.  I believe they were behind him.

13   Q.  And it's fair to say that he was not free to go at the

14   time; correct?

15   A.  Yes.

16   Q.  And you don't know how long he had been detained prior to

17   your arrival?

18   A.  No, sir.

19   Q.  Now, were you arresting him?

20   A.  I personally was not.

21   Q.  Was he under arrest?

22   A.  I don't know if he was or not.

23   Q.  Did anyone tell you why he was detained, handcuffed, and

24   seated on the curb?

25   A.  Well, I was told it was in reference to an investigation

Cross-examination - Hays  (By Mr. Davis)

1  for a homicide, and then as well as the large quantity of

2  marijuana that was found in the car.

3  Q.   Now, you indicated you contacted your supervisor, and a

4  Detective Taylor appeared on the scene?

5  A.   Correct.

6  Q.   And Detective Taylor left with the narcotics?

7  A.   Correct.

8  Q.   Did Detective Taylor arrive before or after Mr. Carter

9  responded to your -- well, you indicated Mr. Carter made a

10  statement to you; correct?

11  A.   Correct.

12  Q.   Had Detective Taylor arrived before that statement was

13  made to you?

14  A.   It was after.

15  Q.   It was after.  Did Detective Taylor place Mr. Carter under

16  arrest?

17  A.   I don't know what Detective Taylor did specifically.

18        THE COURT:  The record should reflect, though, I

19  don't think she's identified Mr. Carter.  You keep referring

20  to it as Mr. Carter, just as I read the record, I don't think

21  she identified who it was.

22        MR. DAVIS:  I stand corrected, Your Honor.

23  Q.   (BY MR. DAVIS)  Officer, as you sit here today, did you

24  have an opportunity to review the reports that were generated

25  in this matter?

Cross-examination - Hays  (By Mr. Davis)

1    A.  I reviewed Detective Taylor's report.

2    Q.  And do you know who the driver, or who the individual that

3    you were speaking to, do you know what his name was?

4    A.  I believe it was Mr. Carter, but I -- that was the name

5    that was provided to me.

6    Q.  And do you recognize Mr. Carter seated to my left?

7    A.  Again, I don't, it was a few years ago and my interaction

8    was very brief.

9    Q.  Now, did you have -- were you equipped with a body cam

10   when you arrived on the scene?

11   A.  No, this was prior to me being equipped or having the

12   body-worn camera program.

13   Q.  And was Mr. Carter's comments about the contents -- the

14   contraband in the vehicle, were those -- was that in response

15   to a question?

16   A.  Yes.

17   Q.  And the question was?

18   A.  It was just, hey, what's going on man, what's up with the

19   drugs in the car, you know, it was a very -- kind of a light

20   conversation, just trying to interact with him to see if I

21   could find out, you know, where all the drugs came from.

22   Q.  And it's fair to say that no written statement was ever

23   executed; correct?

24   A.  Not by me, sir.  I don't know what happened after.

25   Q.  And was that the duration of your encounter with him, as

Cross-examination - Hays  (By Mr. Davis)

1   you testified?

2   A.  Yes, it was very brief.

3          MR. DAVIS:  I have no further questions, thank

4   you.

5          THE COURT:  I think your client wanted your

6   attention.

7   Q.  (BY MR. DAVIS)  Officer, did you write down the statement

8   that you've testified that Mr. Carter made?

9   A.  I did not.

10  Q.  Did -- so you didn't memorialize it in a report;

11  correct?

12  A.  No, I gave that information to the detective, who placed

13  it in her report.

14  Q.  And you did not have Mr. Carter write anything out,

15  obviously?

16  A.  No.

17         MR. DAVIS:  I have no further questions, thank

18  you.

19         THE COURT:  Does Mr. Mosley's counsel have any

20  questions?

21         MR. TRAINOR:  No questions.

22         THE COURT:  All right.  Redirect from the

23  government.

24         MS. WILKINSON:  Nothing.

25         THE COURT:  Ma'am, thank you for your testimony.

Cross-examination - Hays  (By Mr. Davis)

 1    You're excused from this hearing, I don't know if you're

 2    needed for the trial.  I presume you are.

 3              MS. WILKINSON:  She'll be the first witness at

 4    10:30.

 5              THE COURT:  Sure.  10:15, I think, is what I told

 6    the jury.

 7              MS. WILKINSON:  Oh, okay.

 8              THE COURT:  You're excused until 10:15.

 9              THE WITNESS:  Thank you, Your Honor.

10              THE COURT:  Thank you.

11              MS. WILKINSON:  May I have her step out?

12              THE COURT:  I will ask that she step outside.

13              MS. WILKINSON:  Thank you.

14              THE COURT:  All right.  Mr. Davis, this was defense

15    motion, so I'll hear from you.

16              MR. DAVIS:  Certainly, very briefly.

17              THE COURT:  Sure.

18              MR. DAVIS:  Your Honor, based on the record we have

19    before us, there's no indication how long Mr. Carter was

20    detained.  And clearly he was detained, I don't think there

21    was any question about that.

22              THE COURT:  So let me ask this, from -- and I didn't

23    review the entire trial for the purposes of preparing for this

24    hearing, I'll concede, but there has been other testimony

25    regarding this stop; right?

Cross-examination - Hays  (By Mr. Davis)

1          MR. DAVIS:  There has.

2          THE COURT:  And has there been -- because I was

3    wondering about this issue before you stood up.  I mean, has

4    there been any testimony that he was detained out there for

5    some lengthy period of time?

6          MR. DAVIS:  I --

7          MS. WILKINSON:  Detective Taylor testified it was at

8    10:05 when they made the stop.

9          MR. DAVIS:  Yeah, I don't think we have -- do we

10   have a time on the -- I don't think we have a time on the

11   statement.

12         THE COURT:  I thought she just said 10:30.  She just

13   said 10:30 is when she got there.

14         MR. DAVIS:  I'm sorry, I missed that.  So 20

15   minutes, he's detained, he's seated on a curb, he's obviously

16   not free to go, and he's not under arrest.  I think the fact

17   that he's not under arrest kind of kills what happened here.

18   I mean, he's detained for no reason, as far as Officer Hays is

19   concerned, and she's questioning him.

20         THE COURT:  I mean, is there any authority that says

21   that someone can't be detained on a Terry stop, which of

22   course can include handcuffs, for 20 minutes, without that

23   somehow making a statement -- well, I phrased that question

24   poorly.

25             Is there any authority for the notion that an

1    officer who conducts a Terry stop, puts handcuffs on him, sits

2    him there for 20 minutes, is somehow violating his Fifth

3    Amendment rights, or turns a statement that would otherwise be

4    voluntary into an involuntary statement as a result of that

5    length?

6              MR. DAVIS:  As I stand here, I can't think of a

7    case.

8              THE COURT:  Given how I phrased that question, it

9    would be impossible to, but --

10             MR. DAVIS:  I don't want to belabor the point, I

11   would just say the whole -- the circumstances as a whole.  I

12   understand Your Honor's inquiry regarding Terry stop.  But the

13   circumstances as a whole, that we all know this wasn't a Terry

14   stop, this was a stop Mr. Carter and take him in for

15   questioning about the homicide.

16             I think that's clearly what -- we've taken the whole

17   record into consideration independent of what Officer Hays

18   testified to.  And again, I would say it was improper, and

19   therefore, anything that flowed after that stop and detention

20   was not proper.

21             THE COURT:  All right.  Ms. Wilkinson.

22             MS. WILKINSON:  Your Honor, the Court -- as the

23   Court has already found, there was reasonable suspicion to

24   stop the car.  Once the car stopped, Detective Taylor smelled

25   the marijuana, and everything really flows from there.  It

 1    would be weird if he could be arrested, taken down to the

 2    Baltimore County Police Department, wait until a detective

 3    comes and interviews him, which would take longer than the 20

 4    minutes or so that this interaction -- 25 minutes or so this

 5    interaction happened in, and find that that was okay, but

 6    somehow, the 25 minutes or so to get the patrol officer there

 7    is too long as a result of a Terry stop.

 8              We all know that there was probable cause to arrest

 9    him once the smell of that marijuana and it was found.  The

10    circumstances under which who was going to interview him first

11    and whether or not Baltimore County ultimately would decide to

12    decline prosecution is irrelevant to the 10:30 a.m.

13    interaction between a patrol officer who did everything right.

14    There's nothing to deter here.  She walked over to a suspect

15    who was at a stop where he literally could have been arrested,

16    under arrest at that point.

17              He was certainly in custody, and so she properly and

18    very thoroughly and very clearly Mirandized him.  He agreed to

19    speak with her.  There was no duress, there was no -- this is

20    clearly a voluntary statement made pursuant to Miranda, and no

21    one's denying he was in custody.  He was in custody at the

22    time.

23              And I don't see that there's any authority, and

24    moreover, the Court has already found that the statement that

25    Mr. Carter made hours later in the Baltimore City Police

Cross-examination - Hays  (By Mr. Davis)

1   Department, also pursuant to Miranda, is equally admissible

2   and was admissible during the course of this trial as a result

3   of the circumstances of the stop that was properly made by

4   Baltimore on that day.

5        THE COURT:  So I'll give you the last word if you

6   want it since it's your motion.

7        MR. DAVIS:  The only thing I would add is, is it's

8   interesting to note that the statement Mr. Carter made on

9   videotape is completely different than does -- he owns up to

10  being in possession of the marijuana, he took it, and this

11  story about Tony is totally different than what Officer Hays

12  is testifying to.

13       THE COURT:  Just give me one more moment, just to

14  finish jotting down some notes.

15       All right.  So we are here to resolve a motion to

16  suppress as to Mr. Carter's statements made on June 1st.  I

17  just took testimony from Officer Tabitha Hays.  We delayed her

18  testimony as she was recovering from an on-duty shooting.  She

19  testified that on June 1st, 2016, she was called at

20  approximately 10:30 a.m. to Arbor Station Way.  She was asked

21  to assist in a stop of a black SUV.  She made contact with a

22  female detective, who we now know to be Detective Forsythe.

23  She testified that there were many officers there.

24       She learned that drugs had been recovered in the

25  vehicle.  She was directed to the back of the vehicle.  She

1    referred to it as a raised tailgate where there was a large

2    duffel bag containing a large amount of marijuana, a plastic

3    bag filled with currency.  She said, as other officers have

4    indicated, it gave off a strong odor of marijuana.  Primarily,

5    city officers there because of the interest in the homicide.

6    As a county officer, they wanted her to take possession of the

7    drugs.  She personally did not do that, she left them in an

8    SUV, called her supervisor, a detective from a narcotics unit

9    came and took possession.

10          We know from other testimony in this case that the

11   defendant was, for whatever reason, not ever charged by the

12   county for that -- for that offense.  Officer Hays testified

13   that she went to get some basic information.  She read the

14   driver his Miranda rights.  He was cuffed and seated on the

15   curb, she believes.  She used a Miranda card she carries with

16   her, she says.  It's the same card that she carries on her

17   person even today.  She pulled it out and read it and it is

18   consistent with the Miranda warnings that have been blessed by

19   the Supreme Court.

20          After providing the Miranda warning, Mr. Carter, or

21   at least who we now know to be Mr. Carter, said he would talk

22   to her.  The officer made clear that he did not appear to be

23   under the influence of anything.  He appeared to understand

24   her commands.  He indicated that the vehicle belonged to

25   someone else and that the drugs were not his.

1              It is certainly clear that he was not free to go at

2    the time and that whether he was under arrest or not, he was

3    certainly in custody.  I am going to deny the motion, as I've

4    already held the stop in this case was justified for a number

5    of reasons.  Certainly, as I've already also held, probable

6    cause to arrest formed once they smelled -- well, probable

7    cause to search the vehicle, at least, formed once they

8    smelled the marijuana.  Certainly, once it had been found,

9    they had probable cause to place him under arrest, so there's

10   no issue with the fact that he's placed in cuffs and put in

11   custody at that point.

12             The officer, as I just indicated, provided Miranda.

13   I should say for the record, I have no reason not to credit

14   the officer's testimony.  So I did -- I do credit her

15   testimony, and my recitation of her testimony does make my

16   findings of fact for this hearing.

17             So I do find that there was Miranda provided.  I do

18   find that he waived his Miranda rights.  There's no indication

19   at all that that waiver was involuntary.  There's no

20   indication at all that his will was overborne or that his

21   capacity for self-determination impaired.  There's no

22   indication of any coercive government conduct at all.

23             Mr. Davis makes the point that his statement given

24   to the officer is different from the statement he made later

25   on, and that may be true.  That's a different issue for him to

Cross-examination - Hays  (By Mr. Davis)

```
 1   argue whatever he wants to argue from that point.  But in

 2   terms of whether or not the waiver of Miranda was voluntary,

 3   it does not impact that issue.  And so I do conclude that he

 4   voluntarily waived his Miranda rights, and therefore, his

 5   statement will not be suppressed.

 6           So it's 10:00 o'clock now, I told the jury to be

 7   back at 10:15.  So I guess we'll take a 15-minute break or so

 8   and wait for the jury, unless there's something else counsel

 9   wants to talk about.

10           MS. WILKINSON:  Not from the government, Your

11   Honor.

12           MR. ZERKIN:  No, sir.

13           THE COURT:  I'll wait to -- I see them consulting,

14   I'll just wait to make sure.

15           Anything counsel needs to discuss?

16           MR. DAVIS:  No, Your Honor, I'm sorry.

17           THE COURT:  That's okay.  We'll take a 15-minute

18   break and wait for the jury to come.

19           I assume the Bardos issue is resolved.

20           MS. WILKINSON:  Yes, Your Honor, I advised

21   Mr. Bardos yesterday.

22           (A recess was taken.)

23           THE COURT:  Bring the jury.

24           (Jury entered the courtroom.)

25           THE COURT:  All right.  You may all be seated.  Good
```

Direct Examination - Hays  (By Ms. Wilkinson)

1    morning, ladies and gentlemen.  How is everyone today?

2             JURORS:  Good, how are you?

3             THE COURT:  I'm doing well, thank you.  Thank you

4    for being here on time, at the time I asked you to be here, it

5    allowed us to get a couple of things done this morning, which

6    we did.  Again, I just want to commend you, you've been here

7    on time, prompt every day, and it really helps us to keep on a

8    schedule, so I really do commend you on that.

9             I think we are now ready for our next witness.

10            THE CLERK:  Good morning, ma'am.  Please raise your

11   right hand.

12                      OFFICER TABITHA HAYS,

13   called as a witness, being first duly sworn, was examined and

14   testified as follows:

15            THE WITNESS:  Yes, ma'am.

16            THE CLERK:  Thank you.  You may have a seat.

17            THE WITNESS:  Thank you.

18            THE CLERK:  Please state and spell your full name

19   for the Court.

20            THE WITNESS:  My first name is Tabitha,

21   T-a-b-i-t-h-a, last name is Hays, H-a-y-s.

22            THE CLERK:  Thank you.

23                      DIRECT EXAMINATION

24   BY MS. WILKINSON:

25   Q.  Good morning, Officer Hays.

Direct Examination - Hays  (By Ms. Wilkinson)

1   A.  Good morning.

2   Q.  How are you employed?

3   A.  With the Baltimore County Police Department.

4   Q.  And how long have you been a police officer for Baltimore

5   County?

6   A.  Almost 15 years.

7   Q.  And can you detail for the jury the duties and

8   responsibilities that you've held in those 15 years?

9   A.  Sure.  I've worked in a patrol capacity, I worked out of

10  precinct 12, Dundalk, and currently precinct 8, Parkville.  I

11  was also briefly detailed to the community action team in

12  Dundalk, dealing with high crime areas, and the investigative

13  services team, which is like a precinct-level detective unit,

14  and just details working with different units within the

15  department.  But primarily patrol.

16  Q.  Are you currently on medical leave?

17  A.  Yes.

18  Q.  Why?

19  A.  I had a --

20          MR. DAVIS:  Objection.

21          THE COURT:  Overruled.

22  A.  I had a line of duty gunshot wound in May.

23  Q.  (BY MS. WILKINSON)  And --

24          THE COURT:  Just to be clear, that's unrelated to

25  this case; correct?

1              THE WITNESS:  Correct.

2              MS. WILKINSON:    And thank you, Your Honor, that was

3    my next question.

4    Q.  (BY MS. WILKINSON)  But you're home currently convalescing

5    from that?

6    A.  Correct.

7    Q.  Back in June of 2016, were you on duty that day?

8    A.  Yes.

9    Q.  Is that when you were working in the Parkville area?

10   A.  Yes, ma'am.

11   Q.  And on patrol?

12   A.  Yes.

13   Q.  And specifically, directing your attention to 10:30 or so

14   a.m. on June 1st, did you respond to a call for service on

15   that day?

16   A.  Yes.

17   Q.  And how would you get call for services?

18   A.  We received our dispatch calls over the radio, and then we

19   also have laptops in our patrol cars.  It's called a CAD

20   system, which is computed-aided dispatch, where there will be

21   an address, a title of the call, and a very brief synopsis as

22   typed by the 911 call taker to direct you where to go.

23   Q.  And where did you go?

24   A.  To Arbor Station Way.

25   Q.  And what was the purpose of the call, as you understood

1    it, as you're going there?

2    A.  It was generally titled like a police assist.  It was to

3    assist another agency, the Baltimore Police Department, in

4    reference to a possible homicide investigation, just to aid

5    them since they were within the boundaries of Baltimore

6    County.

7    Q.  Okay.  And were you in uniform?

8    A.  Yes, ma'am.

9    Q.  And were you in a marked police vehicle?

10   A.  Yes, ma'am.

11   Q.  And were you traveling alone, or with a partner?

12   A.  We travel alone, so I was alone that day as well.

13   Q.  When you arrived to 8409 Arbor Station Way, tell the jury

14   what you observed upon arrival.

15   A.  When I arrived on scene -- so Arbor Station Way is a kind

16   of a circular road that is an apartment complex neighborhood,

17   and has townhomes.  So when I came around the corner on Arbor

18   Station Way, there were a lot of police officers, detectives

19   in plain clothes wearing what we refer to as raid vests,

20   they're like black tactical vests that say "police" on them,

21   have badges on them.  I also saw a black SUV that was parked

22   and it had the doors open and it had a -- like an SUV, the

23   tailgate was up in the vehicle.

24   Q.  And upon pulling your vehicle in, did you speak to any

25   particular officer there?

1    A.  Yes, I spoke to a female Baltimore City police

2    detective.

3    Q.  Would that be Detective Forsythe?

4    A.  Yes, ma'am.

5    Q.  Now, did you recognize Detective Forsythe, had you had any

6    prior dealings with her?

7    A.  No, ma'am.

8    Q.  And the other officers who were wearing the raid jackets,

9    knowing they're from Baltimore City, did you recognize any of

10   them?

11   A.  No.

12   Q.  And once you made contact with Detective Forsythe, what

13   did you do next?

14   A.  She gave me a very brief synopsis of why they were doing

15   an investigation.  Very little information was passed, but she

16   said in the course of their investigation, a large amount of

17   drugs and money were found in this SUV.

18   Q.  And is that the SUV that you were directed to?

19   A.  Yes.

20   Q.  And describe it for the jury.

21   A.  So like I said, the tailgate or the door hatch was open,

22   and there was a lot of property in the back of the vehicle,

23   but there was a large black duffel bag that was unzipped and

24   kind of spread open.  There was a large amount of what I

25   recognized to be marijuana inside that duffel bag, and it was

1    packaged in like clear bags.  And then also a plastic -- kind

2    of like a shopping-style bag, that had U.S. currency in it.

3    Q.  And did you make any observations with your nose as

4    well?

5    A.  Yes, there was a very strong, powerful smell of

6    marijuana.

7    Q.  And what, if anything, were you asked to do vis-a-vis the

8    duffel bag that was in the back of the truck with the --

9    A.  So because this was in Baltimore County and not -- and

10   they were Baltimore City detectives, they wanted Baltimore

11   County, me, to, you know, deal with the issue of the drugs and

12   to take possession of the drugs.

13   Q.  And so what did you do as a result of making those initial

14   observations, talking to Detective Forsythe, what did you do

15   next?

16   A.  So I obviously -- clearly the scene was very locked down

17   with officers, made sure that no one disturbed the vehicle or

18   disturbed any of the evidence in any way.

19   Q.  Okay.  And did you continue to do that part until you

20   disbursed?

21   A.  Correct.

22   Q.  And in the interim, did you make any contact with your

23   supervisors?

24   A.  Yes, I did.

25   Q.  And what was the purpose of that?

1    A.  Just due to the large quantity of marijuana, and then also

2    the nature of the call for service with an outside agency,

3    just wanted to let my supervisors know what was going on, and

4    then possibly have them contact our narcotics unit, who deals

5    with distribution of drugs and large amounts of drugs and

6    things like that, that they could be of assistance in this

7    case, since I'm in patrol.  It might be something that they

8    would want to look into.

9    Q.  And at some point, does a narcotics officer arrive?

10   A.  Yes.

11   Q.  Okay.  But before that happens, having made the call to

12   supervisors, what do you do next?

13   A.  I spoke -- I spoke to who the detectives told me was the

14   driver of the vehicle.

15   Q.  Okay.  And did you make any observations about the driver

16   in terms of where he was and was he in handcuffs?

17   A.  He was handcuffed and he was seated.

18   Q.  And do you recall which way his handcuffs were?

19   A.  I believe they were behind him.

20   Q.  And one of the officers told you that was the driver?

21   A.  Yes.

22   Q.  What did you do next?

23   A.  So because I knew that this was also going to be --

24   besides the Baltimore City Police and their investigation, I

25   knew there was going to be an investigation by Baltimore

1    County, so I wanted to get some basic information about who he

2    was and some just general information so that I could relay

3    that on to the detectives.

4    Q.  So did you go about doing that?

5    A.  Yes, ma'am.

6    Q.  And what's the first thing that you did?

7    A.  I read him his rights per Miranda.

8    Q.  And I won't have you go through the whole thing, but what

9    is your specific recollection that day and what is your

10   habit?

11   A.  So what I do is I carry a card with me that was given by

12   the police department, and it's covered in plastic, and it has

13   the Miranda rights specifically written out.  And I keep them

14   in a pocket of my uniform all the time.  So when I read

15   somebody their rights, I read it specifically from the card,

16   just so I make sure I have them exactly right.

17   Q.  I won't mark it as an exhibit since you keep it with you,

18   but can you just show the jury that you brought it with you

19   today?

20   A.  Yes.  It's a card like this.

21   Q.  So on that particular day, on June 1st, do you have a

22   specific recollection of providing those Miranda warnings to

23   the driver?

24   A.  Yes.

25   Q.  And upon completing the Miranda warnings, did you ask him

1    if he would speak with you?

2    A.   Yes.

3    Q.   And did he agree to speak with you?

4    A.   He did.

5    Q.   And what did you -- what did you ask and what did he

6    say?

7    A.   I just said, you know, hey, what's going on with the

8    drugs, what's all this, you know, what's going on man, just

9    very -- like a conversational tone.  And he told me that the

10   vehicle wasn't his, it belonged to a friend named Tony, that

11   you know, we could take the drugs, they weren't his, he didn't

12   know anything about it, and that the reason that he was

13   driving that car is that his car was in his girlfriend's name,

14   but it had bad tags, so because it had bad tags, he couldn't

15   drive it, so he was driving the friend's car.

16   Q.   And how long was your interaction with the driver?

17   A.   Very brief, it was literally that, and I got some very

18   basic personal information, name, date of birth, address, that

19   I could relay to the detectives, and then that was it.  It was

20   very, very short.

21   Q.   So this information that you had obtained from the driver,

22   did you eventually provide it to your narcotics detective?

23   A.   Yes, I did.

24   Q.   And who would that be?

25   A.   It was Detective Taylor.

Direct Examination - Hays  (By Ms. Wilkinson)

1   Q.  And did she actually arrive on scene when you were still

2   there?

3   A.  Yes.

4   Q.  And did you leave before she left?

5   A.  Yes.

6   Q.  And when she came, did she take custody of the drugs?

7   A.  Yes.

8   Q.  And did you relate to her, as you related to the jury, the

9   information you obtained from the driver?

10   A.  Yes.

11   Q.  And did she subsequently memorialize that in a report for

12   the file?

13   A.  Yes.

14   Q.  And have you had a chance to review it and refresh your

15   recollection about it prior to testifying today?

16   A.  Yes, ma'am.

17   Q.  Can you give the jury an idea of how many traffic stops

18   you have done, say, in a particular year, you pick the time

19   frame, and why you would memorialize information like that in

20   a report?

21   A.  It was just because of the nature of the circumstance and

22   the severity of all the crimes that were possibly being

23   investigated, I just knew that that might be important, so I

24   relayed that to her.

25        You know, I've been involved in narcotics investigations

Cross-examination - Hays  (By Mr. Davis)

1    before, done probably thousands of traffic stops in a time,

2    and you want to be as thorough as possible, especially when

3    you work with detectives of other units, to enhance their case

4    or their ability to investigate a case to give them as much

5    information as possible.

6              MS. WILKINSON:  Nothing further.

7              THE COURT:  Cross.  Mr. Davis.

8              MR. DAVIS:  Thank you, Your Honor.

9                        CROSS-EXAMINATION

10   BY MR. DAVIS:

11   Q.  Now, Officer Hays, when you arrived at the scene -- well,

12   let me have you do something first.

13        First of all, do you recognize the individual in the

14   courtroom that you talked to at the scene that day?

15   A.  I don't, my interaction was very brief.

16   Q.  Now, thinking back to when you interacted with this

17   individual, were you at any point in time -- well, actually,

18   in preparation for your testimony here today, did you review

19   any police reports to refresh your recollection?

20   A.  Yes.

21   Q.  And during your -- the time you were refreshing your

22   recollection, did you note the name of the individual that you

23   were questioning that day?

24   A.  Yes.

25   Q.  And what was that individual's name?

Cross-examination - Hays  (By Mr. Davis)

1    A.  It was Mr. Carter.

2    Q.  Now, when you arrived at the scene, Mr. Carter was

3    detained; correct?

4    A.  Correct.

5    Q.  And could you tell us where he was detained?

6    A.  He was seated on Arbor Station Way, right near a van.

7    Q.  When you say he was seated, is it fair to say that he was

8    put down on the curb?

9    A.  I don't know if it was specifically a curb, but something

10   like that, yes, sir.

11   Q.  So he wasn't in a chair, he wasn't sitting in a car, he

12   was on a curb?

13   A.  Yes, sir.

14   Q.  And was he cuffed?

15   A.  Yes, sir.

16   Q.  And was he cuffed from the front, or was he cuffed from

17   the back?  And I'm putting my hands behind my back and putting

18   them in front.

19   A.  In the back.

20   Q.  And was he free to go?

21   A.  Not to my knowledge, no.

22   Q.  And do you know how long he had been seated on the curb

23   cuffed --

24   A.  No, sir.

25   Q.  -- prior to your arrival?

Cross-examination - Hays  (By Mr. Davis)

1   A.  No, sir, I don't.

2   Q.  Now, you indicated that it was a county case; correct?

3   A.  Well, it was -- which part?

4   Q.  With reference to the marijuana.

5   A.  Yes, sir, so the marijuana and everything, that all

6   occurred within the jurisdiction of Baltimore County, so

7   Baltimore City doesn't have jurisdiction to investigate that

8   case, because it's within the confines of Baltimore County.

9   Q.  So it's Baltimore County's marijuana case?

10  A.  Yes, sir.

11  Q.  Now, when you arrived at the scene, was Mr. Carter arguing

12  with any detectives?

13  A.  Not that I saw, sir.

14  Q.  Do you know Detective Forsythe?

15  A.  I know of her, I don't know her personally.

16  Q.  But you didn't observe her and Mr. Carter speaking?

17  A.  Not that I can recall, sir.

18  Q.  You spoke to her when you arrived?

19  A.  I did.

20  Q.  And when you spoke to her, she wasn't with Mr. Carter?

21  A.  No.

22  Q.  Was anyone with Mr. Carter as he was seated on the curb?

23  A.  I don't remember specifically.  Like I said, there were a

24  lot of detectives there, and I was trying to gather basic

25  information from Detective Forsythe, so I don't know who was

Cross-examination - Hays  (By Mr. Davis)

1    with him or if anyone was with him initially.

2    Q.  Now, at some point you, notified your colleagues in

3    Baltimore County, in particular, Detective Taylor, that there

4    were narcotics at the scene; correct?

5    A.  So I notified my supervisors of the incident, who in turn

6    got a hold of the narcotics unit.  I don't know who

7    specifically told Detective Taylor about the drugs, but yes,

8    ultimately that information was relayed through certain

9    channels to get them to the scene.

10   Q.  And the narcotics arrived at the scene; correct?

11   A.  Yes, sir.

12   Q.  And they were from the county; correct?

13   A.  Yes, sir.

14   Q.  And did they arrest Mr. Carter?

15   A.  I don't believe they arrested him at the time.

16   Q.  Did you arrest him?

17   A.  No.

18   Q.  So he was just seated there detained for you don't know

19   how long, with his hands cuffed behind his back, and you

20   didn't arrest him and your colleagues from narcotics didn't

21   arrest him; correct?

22   A.  Yes, sir.

23   Q.  And the city didn't have jurisdiction to arrest him?

24   A.  So I know that there are certain times where officers can

25   detain people, and like I said, with a police assist call it

takes some time to figure out maybe who has jurisdiction, what

kind of call this is, so I didn't specifically arrest him, I

left that to the expertise of the narcotics detectives, and

then the detectives from Baltimore City who are investigating

another case.

Detectives routinely go outside of jurisdiction to do

interviews, to talk to people, or to detain subjects in

reference to their investigation.

Q.  So the city didn't arrest him; correct, because they

didn't have jurisdiction to arrest him for the marijuana?

A.  So --

MS. WILKINSON:  Objection.  Asked and answered.  She

doesn't know if --

THE COURT:  Asked and answered.  Sustained.  Asked

and answered.

Q.  (BY MR. DAVIS)  And you didn't arrest him?

A.  No, sir.

Q.  And narcotics didn't arrest him?

A.  Not at that time, no.

Q.  So he's not under arrest, he's just handcuffed with his

hands behind his back, seated on the curb for we don't know

how long, is that fair to say?

A.  He was detained, yes.

Q.  Now, are you aware that he gave a taped interview a few

hours later saying that the SUV belonged to Matthew

Cross-examination - Hays  (By Mr. Davis)

1    Hightower?

2              MS. WILKINSON:  Objection, Your Honor.  It's not an

3    appropriate question.  First, it's --

4              THE COURT:  I mean, she can answer yes or no,

5    whether or not she's aware of it.  Overruled.

6              MS. WILKINSON:  Without saying what's in the

7    interview.

8              THE COURT:  Approach.  Approach.  Let's not --

9              (Bench conference on the record.)

10             THE COURT:  You can ask whether or not she's aware

11   of what was said in a prior interview, if she says she's not

12   aware, then it's not appropriate for you to just start reading

13   the interview to her.

14             MR. DAVIS:  I think the tape's in evidence, though.

15   I'm not -- it's not a question based on facts that are not in

16   evidence, that tape's in evidence.

17             MS. WILKINSON:  It's argumentative.  If she doesn't

18   know, she doesn't know.  You're asking a question that the

19   answer you know is no.  You know the answer's no.

20             MR. DAVIS:  I mean, it's -- I don't think it's

21   argumentative, I'm not arguing with her.  When she says no,

22   I'm going to move on.  But the facts are in evidence, so it's

23   not a question based on facts not in evidence.

24             THE COURT:  What's your precise question going to

25   be?

1          MR. DAVIS:  My precise question is going to be, are

2     you aware he gave a taped interview hours later admitting that

3     the marijuana was his and the vehicle belonged to a friend of

4     his, Matthew Hightower.

5          THE COURT:  I'll overrule it, it's cross.  I'll

6     overrule it.

7          (The following proceedings were had in open court.)

8     Q.  (BY MR. DAVIS)  Officer Hays, are you aware that

9     Mr. Carter was interviewed a few hours later on videotape, and

10    he admitted the marijuana was his and that the vehicles

11    belonged to Matthew Hightower?

12    A.  No.

13    Q.  Did you reduce the statement he made to you to writing?

14    A.  I'm sorry, sir --

15    Q.  Did you reduce the statement he made to you denying the

16    marijuana was his, and saying it belonged -- the car belonged

17    to Tony to writing?

18    A.  I did not write it personally, I relayed --

19    Q.  Did you have him reduce it to writing?

20    A.  I didn't have him write a statement, no.

21    Q.  And did your body cam capture this interview?

22    A.  This incident occurred prior to our body-worn camera

23    program being implemented by the Baltimore County Police

24    Department.

25         MR. DAVIS:  Thank you, Officer Hays.

1          THE COURT:  Any questions from Mr. Mosley's counsel?

2          MR. TRAINOR:  No, Your Honor.

3          THE COURT:  Redirect from the government.

4                    REDIRECT EXAMINATION

5    BY MS. WILKINSON:

6    Q.  Officer Taylor -- Officer Hays, did Detective Taylor

7    accurately record the information that you had gotten from

8    Mr. Carter in her report?

9    A.  Yes.

10   Q.  And had you reviewed it and determined it was as you had

11   remembered it and as you told her?

12   A.  Yes.

13   Q.  And we've dealt with two Detective Taylors, the Detective

14   Taylor you're speaking with, what is her first name?

15   A.  It's Detective Amy Taylor, she's a female detective from

16   Baltimore County Narcotics.

17   Q.  Is that different from Detective Troy Taylor, a man from

18   Baltimore City?

19   A.  Yes.

20   Q.  And did you have any interaction with that Detective

21   Taylor that morning that you can remember?

22   A.  No, not that I can remember, ma'am.

23   Q.  And the interview that Mr. Davis spoke about that happened

24   a few hours later, to your knowledge, was that in connection

25   with the homicide investigation?

Redirect Examination - Hays  (By Ms. Wilkinson)

1    A.  I'm not aware of any -- anything that happened after I

2    left the scene.  Once I -- Detective Taylor went on scene, I

3    relayed the information to her and was promptly relieved and

4    went back about my business.

5    Q.  So when you were questioning Mr. Carter, it was just in

6    reference to the marijuana?

7    A.  Correct.

8    Q.  And to your knowledge, was that interaction with

9    Mr. Carter shortly after you had arrived?

10   A.  Yes.

11              MS. WILKINSON:  Nothing further, Your Honor.

12              THE COURT:  All right.  Thank you.  Ma'am, thank you

13   for your testimony.  Please don't discuss your testimony with

14   anyone else until the trial has been concluded.  Enjoy the

15   rest of your day, and you are excused.

16              THE WITNESS:  Thank you, Your Honor.

17              THE COURT:  Government's next witness.

18              MS. WILKINSON:  Aurielle Washington.

19              THE CLERK:  Good morning, ma'am, if you would step

20   up to the witness stand, please, and raise your right hand.

21                        AURIELLE WASHINGTON,

22   called as a witness, being first duly sworn, was examined and

23   testified as follows:

24              THE WITNESS:  Yes.

25              THE CLERK:  Thank you, you may have a seat.

1              THE WITNESS:  Thank you.

2              THE CLERK:  You may adjust the microphone down in

3     front of you, state and spell your full name for the Court.

4              THE WITNESS:  Aurielle Washington,

5     A-u-r-i-e-l-l-e.

6                         DIRECT EXAMINATION

7     BY MS. WILKINSON:

8     Q.   Good morning, Ms. Washington, how old are you?

9     A.   I'm 33.

10    Q.   And where were you born and raised?

11    A.   Baltimore, Maryland.

12    Q.   And do you currently live in Baltimore City as well?

13    A.   Yes.

14    Q.   And do you recognize this man?

15    A.   Yes.

16    Q.   And who is he?

17    A.   Matthew.

18    Q.   And do you know his last name?

19    A.   Hightower.

20    Q.   And what is your relationship, if any, with

21    Mr. Hightower?

22    A.   I had a romantic relationship with him.

23    Q.   And from when to when did you have a romantic relationship

24    with him?

25    A.   2013.

Direct Examination - Washington  (By Ms. Wilkinson)

1    Q.  And did that continue after 2013?

2    A.  Well, he was arrested at some point, so I'm not sure of

3    how long it lasted.

4    Q.  Well, he was taken into custody on May 4th of 2016, did

5    your relationship continue from 2013 up until at least May 4th

6    of 2016?

7    A.  Yes.

8    Q.  And when you talk about romantic relationship, physical

9    relationship with Mr. Hightower?

10   A.  Romantic, we were sexually involved.

11   Q.  And after that time, did you continue to make a --

12   communications with Mr. Hightower?

13   A.  Yes.

14   Q.  And how long have those communications continued since his

15   incarceration on May 4th of 2016?

16   A.  Are you speaking of from then until currently?

17   Q.  Until currently, yes.

18   A.  Yes, I speak to him often.  I haven't talked to him in

19   about probably like two and a half weeks, maybe three.

20   Q.  Prior to that, and at least in May of 2016, did you have

21   regular phone communication with Mr. Hightower from prison?

22   A.  Yes.

23   Q.  And give the jury how many times he would call you in that

24   time frame, say, May of 2016, continuing through his

25   conviction on the extortion murder charges in September of

Direct Examination - Washington  (By Ms. Wilkinson)

1   2016, how often would he call you?

2   A.  I can't give an estimate number of the times that he

3   called.  But we spoke often, I can say that.

4   Q.  In 2015, did there come a time when Mr. Hightower was on

5   electronic home monitoring for an arrest related to health

6   care fraud charges?

7   A.  Yes.

8   Q.  And were you and he living with each other at the time?

9   A.  No, we weren't.

10  Q.  Did you ever live with Mr. Hightower?

11  A.  No, we didn't.  I never lived with him, he never lived

12  with me.

13  Q.  Do you know where he lived?

14  A.  I don't know the address, but I'm familiar with the

15  area.

16  Q.  And what area is it?

17  A.  It's near like Fallstaff.

18  Q.  Is it in Park Heights?

19  A.  I wouldn't say Park Heights.

20  Q.  How close is it to Park Heights?

21  A.  It's not far, but I would consider it to be like

22  Pikesville.

23  Q.  I'm sorry, I didn't hear you.

24  A.  Pikesville maybe.

25  Q.  Pikesville.  And had you been to that home before?

Direct Examination - Washington  (By Ms. Wilkinson)

1    A.  Yes.

2    Q.  And do you know who he lived there with?

3    A.  Yes, I do.

4    Q.  Who did he live there with?

5    A.  With his girlfriend.

6    Q.  And were you his girlfriend too?

7    A.  Well, I wouldn't say that, I said before that we were

8    romantically involved.

9    Q.  Well, did you express your --

10   A.  She was, in fact -- well, she's the mother of his

11   children, so I can't really state the relationship that he

12   had, so excuse me for saying girlfriend, because I'm not sure

13   if they were still together.  But I do know that they do have

14   children together.

15   Q.  Okay.  And that's where they lived?

16   A.  Yes.

17   Q.  And had you -- did you have a friendship or relationship

18   with his baby's mother as well?

19   A.  No, I didn't.

20   Q.  What -- were the occasions you would go to his house,

21   would she be there?

22   A.  No, I went to Matthew's house twice.

23   Q.  Only twice?

24   A.  Like twice, yes.

25   Q.  And on those two occasions, was it when he was on

 1   electronic home monitoring, or was it before that?

 2   A.  It was when he was on the electronic monitor, yes.

 3   Q.  Now, prior to him being on electronic home monitoring,

 4   what job did you know him to have?

 5   A.  Can you repeat that, I'm sorry?

 6   Q.  Prior to him being on electronic home monitoring, what job

 7   did you know him to have?

 8   A.  I just know we worked together at a learning center, I

 9   don't know what job he had before that.

10   Q.  Did you know he worked some place doing medical supplies

11   or some medical company?

12   A.  No, I wasn't aware of that.

13   Q.  He never discussed the fact that he had worked at a

14   company doing some kind of medical supplies?

15   A.  No.

16   Q.  And you don't have any knowledge of that?

17   A.  I had knowledge when he went to trial, I believe a lot of

18   that stuff came up as far as the way he worked the

19   pharmaceutical company or something like that.

20   Q.  Did there -- how did you find out about the fact that he

21   had been arrested on the health care fraud charges?

22   A.  He stayed the night at my house, and I don't know who

23   called him, but he received a phone call.  And that was how I

24   found out, because he had told me that someone was at his

25   house and he needed to contact his attorney.

Direct Examination - Washington  (By Ms. Wilkinson)

1    Q.  At some point after he was on electronic home monitoring,

2    did you know him to work at a car dealership?

3    A.  Yes.

4    Q.  And what was your basis of knowledge, how did you know

5    that?

6    A.  I mean, the car dealership is in the area, and Matthew was

7    told that he could find employment while he was on the

8    detention box, or something like that.

9    Q.  All right.  That wasn't my question, my question was, how

10   did you know that he worked there?  How did you know, did you

11   see him, did you hear him, did you go there?  How did you know

12   he was working there?

13   A.  I saw him there plenty of times.

14   Q.  Pardon me?

15   A.  I saw him there before.

16   Q.  So would you visit him there on occasion?

17   A.  Sometimes I have.

18   Q.  And what kind of work did he do for them?

19   A.  I can't really say, but I do believe it was something

20   involving maybe the sales of cars, I don't know the nature of

21   exactly what he did.

22   Q.  Do you know --

23   A.  I don't have a description of his job title.

24   Q.  I'm sorry, I didn't mean to interrupt you.  Do you know

25   whether or not he was there as an employee, he didn't own the

Direct Examination - Washington  (By Ms. Wilkinson)

1    company; correct?

2    A.   No.

3    Q.   He was an employee?

4    A.   Yes.

5    Q.   Did you also know Matthew to buy and sell cars?

6    A.   On occasions, yes.

7    Q.   Apart from the dealership?

8    A.   Yes.

9    Q.   Did you buy a car from him?

10   A.   No.

11   Q.   Did he ever give you a car?

12   A.   No.

13   Q.   Did you ever drive one of his cars?

14   A.   Yes.

15   Q.   And what car did you drive?

16   A.   I drove all of them.

17   Q.   And how many car -- when you say "all of them," how many

18   cars did you know Matthew to have?

19   A.   He had three.

20   Q.   In your knowledge?

21   A.   That's all I saw.

22   Q.   And what are the three that you saw?

23   A.   I saw a BMW.

24   Q.   And what color?

25   A.   A black.

Direct Examination - Washington  (By Ms. Wilkinson)

1   Q.  And what kind of car was it?

2   A.  A BMW.

3   Q.  I know, but was it a sedan, was it a truck, was it an

4   SUV?

5   A.  It was a SUV.

6   Q.  And then you can continue, the other?

7   A.  He had an Audi.

8   Q.  And what color Audi?

9   A.  It was gray.

10  Q.  And do you know what type it was?

11  A.  No.

12  Q.  And then what other type of car?

13  A.  He had another Audi.

14  Q.  And what color was that?

15  A.  It was black.

16  Q.  And you've driven all three?

17  A.  I -- when I say driven, I've actually -- I wouldn't say

18  driven, I've actually drove the BMW, and I've also drove the

19  Audi, but I've moved one car to my house before, like from one

20  side of the street to another side of the street, things of

21  that nature, so you can say I did drive all of them.

22  Q.  And when we speak about the Audis, would you differentiate

23  between the silver and black one when you talk about one, so

24  the Audi that you just mentioned, was that the silver one or

25  the black one?

Direct Examination - Washington  (By Ms. Wilkinson)

1    A.  I mentioned both of them.

2    Q.  So the -- which car did you actually drive, or which is

3    the one you moved from one side?

4    A.  I drove the -- I drove the silver Audi before to a

5    market.

6    Q.  And what about the one that you moved from side to side to

7    the streets?

8    A.  It was black.

9    Q.  The black Audi.  Now, did you have your own car as well?

10   A.  Yes.

11   Q.  And what kind of car was that?

12   A.  I have a 2001 Acura CL and I also have a 2011 Audi.

13   Q.  Not at the same time, at two different times?

14   A.  At the same time.

15   Q.  Now, when Matthew was on electronic home monitoring, did

16   you come to know his attorney?

17   A.  Yes, I knew of him.

18   Q.  Okay.  And what's his name?

19   A.  Richard Bardos.

20   Q.  And how -- how much interaction, if any, did you

21   personally have with Mr. Bardos?

22   A.  I had a few.

23   Q.  And what was the nature of the interaction that you had

24   with him, was it in phone, or in person?

25   A.  Some were in phone, some were in person.

Direct Examination - Washington  (By Ms. Wilkinson)

1    Q.   And did all of those contacts with Mr. Bardos, did they

2    happen with Matthew present, or when Matthew wasn't present?

3    A.   Both.

4    Q.   And the -- when you first met him, was Matthew present?

5    A.   Yes.

6    Q.   And then when Matthew was incarcerated, would you have

7    communications with Mr. Bardos when Matthew wasn't present?

8    A.   Yes.

9    Q.   Would Matthew relay information to you that he wanted you

10   to provide to his attorney, Mr. Bardos?

11   A.   Yes.

12   Q.   And questions and things of that nature?

13   A.   Yes.

14   Q.   And so what kind of things did Matthew ask you to ask of

15   Mr. Bardos?

16   A.   I can't remember everything.

17   Q.   Well, can you remember any of them?

18   A.   Not really.

19   Q.   Did he ask you to find out who the witnesses were?

20   A.   No.

21   Q.   What did he ask you to do then?

22   A.   I can't remember what Matthew asked me to do and what I --

23   what conversations I had with Mr. Bardos, that was like three

24   years ago.

25   Q.   Three years ago, true, but you have testified before a

Direct Examination - Washington  (By Ms. Wilkinson)

1   federal grand jury on at least two occasions; correct,

2   Ms. Washington?

3   A.  Right, and that was three years ago.

4   Q.  And you've been in -- have -- did you decline to meet with

5   government prosecutors in preparation for your testimony here

6   today, Ms. Washington?

7   A.  No, I didn't decline, I was called by -- I'm sorry, I was

8   called by you, actually, back, I believe in December.  And you

9   wanted to come to my home to give me a subpoena, and I did

10  decline.  I said no.  And then I also been arrested --

11  Q.  Did you --

12  A.  -- because my -- I'm sorry, is my attorney here, because

13  he has a notice I brought in with the subpoena you had me

14  sign?

15  Q.  I'm simply asking you, did you decline?  It's a yes-or-no

16  question.

17  A.  No, I -- ask me again, I'm sorry.

18  Q.  Did you decline to meet with government investigators

19  prior to your testimony, through your attorney or otherwise?

20  A.  No, I did not decline.

21  Q.  Okay.  Did you --

22  A.  I declined for --

23         THE COURT:  Ma'am, you have to wait until she asks

24  the question, and then you answer it.

25  A.  I apologize.

Direct Examination - Washington  (By Ms. Wilkinson)

1   Q.  (BY MS. WILKINSON)  Ms. Washington, at times, did you

2   attend hearings involving Mr. Hightower's release conditions

3   while he had been charged -- after he had been charged with

4   the health care fraud?

5   A.  Yes.

6   Q.  And do you recall, was it on more than one occasion that

7   you came to court, or was it just one occasion?

8   A.  I was there more than one time.

9   Q.  And what is your recollection of the nature of those

10  proceedings?

11  A.  I don't remember.  There were many, I don't remember.

12  Q.  On some of those occasions, would Mr. Hightower continue

13  to go home, to be released after the hearing?

14  A.  Yes.

15  Q.  Would you drive with him, would you go with him?

16  A.  Not every time.

17  Q.  When you didn't drive with him, how would he get there?

18  A.  He would drive himself.

19  Q.  And then you would see him --

20  A.  Because there were sometimes maybe I didn't come.  I can't

21  remember the nature of that.  Like I said, that was a really

22  long time ago.  What I do know, I was there and I was there

23  just for support.  Some of the things that were spoken of in

24  there, I had no idea, I was just there sitting.

25  Q.  And were there times you recall driving him to court?

Direct Examination - Washington  (By Ms. Wilkinson)

1    A.  I didn't drive -- I didn't -- I drove him when he had his

2    initial appearance here, when he was first -- the charges were

3    first brought.  I brought him here, but I don't believe that I

4    drove the car.

5    Q.  Well, that's probably --

6    A.  I'm sorry, I came here with him, yeah --

7         THE COURT:  Sorry.  One at a time, one at a time.

8    Q.  (BY MS. WILKINSON)  So you might have been a passenger,

9    but in the same car with him?

10   A.  Yes.

11   Q.  Okay.  I'm sorry for -- let me make that clear, you

12   accompanied him, is that a better way to say it?

13   A.  Yes.

14   Q.  And on that occasion, was he allowed -- released and

15   allowed to go home on electronic home monitoring?

16   A.  Later that evening he was.

17   Q.  And then did there come a time when you accompanied him to

18   court when he wasn't allowed to come home?

19   A.  I can't remember, I do remember coming to court, and I do

20   remember he couldn't come home.  But I don't know if I

21   accompanied him that day, like riding with him, I'm not

22   sure.

23   Q.  There were actually two hearings, one on May 4th and

24   May 6th that pertained to the new charges against him, do you

25   recall whether you were in court one of those days, or either

Direct Examination - Washington  (By Ms. Wilkinson)

1   of those days?

2   A.  I don't remember.

3   Q.  Were you --

4   A.  But I'm sure maybe -- sorry.

5   Q.  No, go ahead, you can finish.

6   A.  I was going to say, I know that I was there a few times.

7   I don't know the dates and the natures of the proceedings, but

8   I was there a few times.

9   Q.  Would there be other people who would attend the hearings

10  that you attended that were there in support of

11  Mr. Hightower?

12  A.  I'm sure his family was.

13  Q.  Okay.  And did you see them?

14  A.  I saw his sister.

15  Q.  Okay.  And which sister did you see?

16  A.  Her name is Biggie, I don't know her real name.

17  Q.  And apart from seeing Biggie at one of the hearings, do

18  you recall whether or not anybody else came to the hearings

19  when you were there, that you knew and observed to be there in

20  support of Mr. Hightower?

21  A.  I actually didn't pay attention to everyone that was

22  there, but I do know I recognized her, because I spoke to her

23  before.

24  Q.  Does that mean you remember other people being there, you

25  just don't know who they were?

Direct Examination - Washington  (By Ms. Wilkinson)

1   A.   Yeah, I remember lots of people being there, just like

2   people sitting back here.  I didn't pay attention to everyone.

3   I just remember his sister's face because I had personally

4   spoke with her one time before.

5   Q.   Now, do you know Davon Carter, the man right here sitting

6   next --

7   A.   I'm familiar with him.

8   Q.   Okay.  And how do you know Mr. Carter?

9   A.   I know that he knows Mr. Hightower.

10  Q.   And how would you, based on your -- would you see them

11  together?

12  A.   I saw them together before.  I mean, they're friends.

13  Q.   And how -- where would you see them together?

14  A.   I can't per se -- where I actually seen them together, but

15  I have saw them together before.

16  Q.   Would it be at his baby's mother's house, you were only

17  there on two occasions?

18  A.   Yes, and the times that I was there, no, I didn't see him

19  there.

20  Q.   So where would you see them together?

21  A.   I mean, we're all kind of from the same area.

22  Q.   Which is where?

23  A.   That's like Park Heights, the west side of Baltimore City,

24  so --

25  Q.   So where would you see them together?

Direct Examination - Washington  (By Ms. Wilkinson)

1  A.  Like randomly, and I didn't see them together a lot, but I

2  did see them together before, maybe like in passing.  Maybe

3  someone would pull up next to someone in the car, and it would

4  be something like that.  Like just not all the time.  I'm not

5  saying that I always see them together, but I do know that

6  they know each other.

7  Q.  Did you socialize with Mr. Carter and Mr. Hightower

8  together, go out on double dates, that sort of thing?

9  A.  No, never.

10  Q.  What did you know about Mr. Carter's personal life, was

11  he --

12  A.  I don't --

13  Q.  -- married?

14  A.  No, I don't know anything about Mr. Carter, I was just

15  introduced to him by Mr. Hightower.  Like I said, like maybe

16  if I was in the car with Matthew and he was right there or

17  something.  I can't particularly say what area, but it was

18  just a full introduction and that was it.  And then I recently

19  met him when Mr. Hightower was incarcerated.  That's it.

20  Q.  And I'll talk to you about that in a moment, do you know

21  Cliff Mosley?

22  A.  I'm familiar with him as well.

23  Q.  How do you know Mr. Mosley?

24  A.  I know him because he knows Mr. Hightower.

25  Q.  Pardon me?

1   A.  Because he knows Mr. Hightower.

2   Q.  And did you know him prior to Mr. Hightower being

3   incarcerated on May 4th?

4   A.  I don't know when I actually met him.  I just -- I do know

5   that I met him through Mr. Hightower, I don't know when I met

6   him.

7   Q.  Well, does that mean it would have had to have been before

8   Matthew went to jail, because that's how you met him?

9   A.  I don't know.  I don't know the dates of either, of when

10  Matthew was incarcerated, his court proceedings.  I don't

11  know, I don't keep up with those things because they're not

12  important to me.

13  Q.  Do you recall if you ever socialized with Mr. Hightower

14  and Mr. Mosley, Cliff?

15  A.  I'm sure I have.

16  Q.  And so does that mean you met him before Matthew was

17  incarcerated?

18  A.  I don't know if it was before Matthew was incarcerated.

19  Q.  But you were out on the street when you saw him?

20  A.  Yes.

21  Q.  And that's really just what I mean, I don't mean to be

22  flip about it, but that means it was before Matthew was

23  incarcerated; correct?

24  A.  Yes.

25  Q.  Okay.  And where would you see Mr. Mosley, where would you

1    see Cliff?  Is that how you knew him?

2    A.  I'm sorry, when you were asking me that question, I

3    thought that you were referring to a date when Matthew got

4    incarcerated.  I didn't -- I kind of misunderstood what you

5    were saying.

6    Q.  Okay.  I'm sorry.

7    A.  It's fine.

8    Q.  How did you know Mr. Mosley, by what name?

9    A.  Cliff.

10   Q.  Did you know his last name?

11   A.  No.

12   Q.  So if I refer to him as Cliff here today, I'm going to do

13   so because that's how you knew him and not out of disrespect

14   of using his last name.

15       So did you know Davon's last name?

16   A.  No.

17   Q.  So did you only know them as Davon and Cliff?

18   A.  Yes.

19   Q.  Now, come the -- would you and -- do you recall what your

20   phone number was back in 2015 and '16?

21   A.  Yes.

22   Q.  And what was it?

23   A.  (443) 858-1222.

24   Q.  And is that a number that you would communicate with

25   Mr. Hightower on?

1    A.  Yes.

2    Q.  And I'm going to go ahead and just put on page 20 of

3    Government's Exhibit P-2.  Make sure I have the right thing

4    queued up here.

5        And I'm going to refer you -- you have to look to the

6    right, and I know it's kind of awkward, so forgive the

7    courtroom, the process here.

8        But over here on October 3rd, 2015, Mr. Hightower's

9    sending a text, "I need lawyer money.  I'm trying my best

10   because my lawyer is not the best for me, and I need to be

11   prepared for the worst case scenario or my ass is going to

12   jail for no reason."

13       Do you recall getting that text message from

14   Mr. Hightower?

15   A.  I don't, but it's listed, so -- I don't recall.

16   Q.  Did you recall discussing with Mr. Hightower, apart from

17   the text messages, about helping him get a lawyer other than

18   Mr. Bardos?

19   A.  Yes.

20   Q.  And did you help him do that?

21   A.  No.

22   Q.  And did you collect or try to collect money to help him do

23   that?

24   A.  No.

25   Q.  And so what did you do, what steps did you do to help him

1   get a lawyer?

2   A.  I didn't do anything to help Matthew --

3   Q.  Oh, I'm sorry, you just said that.

4   A.  -- get a lawyer.

5   Q.  You knew he was trying to get another lawyer.  I'm sorry,

6   I didn't hear what your answer was when I asked you whether or

7   not he wanted another lawyer other than Mr. Bardos.

8   A.  Yes, he said -- I do recall him saying in front of

9   Mr. Bardos that he did not think Mr. Bardos had his best

10  interest, that was in person.  I didn't help him do anything

11  as far as retaining any counsel.

12  Q.  Any other different counsel?

13  A.  No.

14  Q.  So down here below, the next message from Mr. Hightower on

15  October 30 says, "I can't lies, that just F'ed me up and N's

16  saying I look crazy, like I got death in my eyes."

17      And then down below, "Davon say I look like that, Cliff

18  say I look like I been drinking."

19      Ms. Washington, when you got this text from Matthew, what

20  Davon and Cliff did you understand him to be referring to?

21  A.  Davon and Cliff.

22  Q.  Meaning the defendants in this case?

23  A.  Yes.

24  Q.  And Mr. Hightower didn't have any other friends that you

25  knew about named Davon and Cliff?

1    A.  I can't say that.

2    Q.  Did you meet any other friends of Mr. Hightower named

3    Davon or Cliff?

4    A.  No.

5    Q.  And that's how you took that to mean, that he was talking

6    about the defendants in this case, Davon and Cliff?

7    A.  I actually don't even remember these texts.

8    Q.  Let me ask the next one.  "My New York home boy say I look

9    like something wrong."

10       When Mr. Hightower sent that one, who was his New York

11   home boy?

12   A.  I don't know, it sounds like this is a bunch of drunk talk

13   to me.

14   Q.  I'm sorry?

15   A.  It sounds like someone's drunk to me.

16   Q.  Well, above it, it says, "It looks like I've been

17   drinking," but I'm asking you another question, when he sent

18   you that, "My New York home boy say I look like something

19   wrong," who did you understand him to be talking about, who

20   was his New York home boy?

21   A.  I don't know.

22   Q.  Had you ever met from Mr. Hightower anyone from New

23   York?

24   A.  No.

25   Q.  Did you know him to have friends from New York?

Direct Examination - Washington  (By Ms. Wilkinson)

1    A.  I can't say, I don't know.

2    Q.  Did you know who his drug supplier was, and whether he was

3    from New York?

4    A.  I didn't even know Matthew sold drugs.

5    Q.  The next text I want to show you is from November 29th,

6    2015.  And over here, Mr. Hightower is saying, "The Court

7    hearing is heavy on my mind."  And you say, "You worried about

8    the outcome?"  And then down below, he's talking about being

9    scared to leave you and that he loves you.

10        And then you say that you love him too, do you see that

11   there?

12   A.  Yes.

13   Q.  Down below.

14        So my first question to you is, at this point, were you

15   and Mr. Hightower in love with one another?

16   A.  I said that we were romantically involved.

17   Q.  Well, did you love him?

18   A.  Yes.

19   Q.  And that's why you write it in your text message; is that

20   fair to say?

21   A.  Sometimes.

22   Q.  Now --

23   A.  Because sometimes I didn't love him.

24   Q.  Above that, where it says, "I'm worried about the

25   outcome," November 29th, 2015, "I'm worried about the

Direct Examination - Washington   (By Ms. Wilkinson)

1    outcome."

2         What was Mr. Hightower referring to there?

3    A.   I don't know.

4    Q.   Did he talk about the Court hearing that was heavy on his

5    mind with you?

6    A.   No.

7    Q.   He texted you in a message, but you didn't talk about

8    it?

9    A.   No, I don't know what you're talking about.

10   Q.   Well, I'm looking here at a message that Mr. Hightower

11   sent to you on November 29th, "The Court hearing is heavy on

12   my mind."  And you respond, "You worried about the outcome?"

13        What was that about?

14   A.   It must be about the court, but I don't know.  I really

15   don't even remember these text messages, I just told you

16   that.

17   Q.   But do you remember generally that Mr. Hightower was

18   stressed and worried about the court hearings?

19   A.   We never talked about that.  He talked about his lawyer

20   not having his best interest.

21   Q.   "The Court hearing is heavy on my mind."

22        "You worried about the outcome?"

23        "Yes, I'm worried about the outcome."

24        You're saying you never spoke in person with him about

25   his state of mind regarding the pending court proceedings?

Direct Examination - Washington  (By Ms. Wilkinson)

1    A.  I didn't speak to him about his state of mind.

2    Q.  About the pending court proceedings?

3    A.  We talked about -- we talked about things about court, but

4    I never spoke with him about his state of mind, about how he

5    really felt about the court proceedings.  Like I said, I was

6    just there, coming for moral support.  I really didn't even

7    know what was going on.  I just was there.

8    Q.  And down below, you can see that eventually there was a

9    bail review hearing a couple days later on December 1st, do

10   you recall if that's one of the hearings that you went to

11   court with him on?

12   A.  I don't know, I was there plenty of times, but I don't

13   recall all of these dates.  They're really not drawing my

14   memory.

15   Q.  Do you recall whether or not if you were -- strike that.

16       In May of 2016, Mr. Hightower was indicted for the murder

17   of David Wutoh, had he ever spoken to you about the

18   investigation involving the murder of Mr. Wutoh?

19   A.  No.

20   Q.  He never mentioned it to you?

21   A.  No, I never knew anything about it until he came to court.

22   Like I said, I never knew anything about Matthew's court

23   proceedings until he came to court.

24   Q.  And when -- and when Mr. Hightower was indicted for the

25   murder, how did you find out about it?

Direct Examination - Washington  (By Ms. Wilkinson)

1    A.  Like I said, I didn't know anything about it.  I came here

2    with him for support.  I just showed up, and I learned things

3    just by sitting in the courtroom, some of which I didn't have

4    a clue about what was going on.  I just was there.

5    Q.  So let me ask you this, the first you recall hearing that

6    he had been charged with the extortion murder of Mr. Wutoh

7    you're saying that was in the courtroom that day?

8    A.  I can't remember where I heard it.  I do remember, like I

9    said, when I came to court before, I remember -- it may have

10   been the trial, I didn't know anything about this court

11   case.

12   Q.  And when Mr. Hightower, on that day, on May 4th when he

13   had to come for his initial appearance, is that the court

14   appearance you recall coming to, Ms. Washington?

15   A.  I remember coming to the first court appearance that he

16   had.

17   Q.  Where he didn't go home?

18   A.  He did go home.

19   Q.  And I'm talking about the later one -- well, let me ask

20   you this way, Ms. Washington, what is your best recollection

21   of the last time you saw Mr. Hightower when he wasn't in jail,

22   when he was out as a free man, when was the last time you saw

23   the man you loved not in jail, what is the occasion?

24   A.  I do not know.

25   Q.  Was it the day before he went to the hearing, or the day

1    of the hearing?  Did you come with him?  When is the last time

2    you saw him not in handcuffs?

3    A.  I just told you, I don't know the last time I saw him not

4    in handcuffs.

5    Q.  Do you recall that after -- after he didn't come home from

6    court that day, that you went over to his sister's house?

7    A.  That's not true, I don't even know where his sister

8    lives.

9    Q.  You've never been to his sister's house?

10   A.  I don't even know where she lives.  What sister are you --

11   I only know one sister.

12   Q.  And that's Biggie?

13   A.  Yes.

14   Q.  That's the only sister --

15   A.  No, I know Angela.  I went to school with her, I went to

16   middle school with her.  And I don't know where either of them

17   live.

18   Q.  Do you remember having a conversation with her after the

19   hearing?

20   A.  Which hearing?

21   Q.  The one where he was detained.

22   A.  I remember sitting out there talking to Matthew's

23   attorney.

24   Q.  And did you drive home Matt's sister and drop her off

25   somewhere near where your aunt lived?

Direct Examination - Washington  (By Ms. Wilkinson)

1   A.  I did.  I did take someone home that day, I did take her

2   home.  I didn't take her to her house.  I did not take -- I

3   took her from this courtroom -- I mean, from this courthouse

4   to the area like where my aunt live.  Like I said, we're all

5   from the same area.  I did.

6   Q.  And is that where you saw Cliff?

7   A.  That day?

8   Q.  Yes.

9   A.  Yes.

10  Q.  So whatever day that was, after one of those hearings --

11  A.  Yes.

12  Q.  -- where Matt didn't come home, that's when you saw

13  Cliff?

14  A.  I thought Matthew was already detained then.

15  Q.  Well, that's what I said, after he had already been

16  detained, when you --

17  A.  You said when he didn't come home.

18  Q.  From court, meaning detained.

19  A.  I think he was already -- I believe he was already locked

20  up.

21  Q.  Okay.  So when Mr. Hightower was locked up, did you -- you

22  said you communicate with him on the phone, did he also write

23  you letters?

24  A.  Yes.

25  Q.  And on how many occasions would he write you letters?

Direct Examination - Washington  (By Ms. Wilkinson)

1    A.  I can't say, it was often.  Many.

2    Q.  Did you ever make third-party calls for him when he called

3    you?

4    A.  Yes.

5    Q.  And why?

6    A.  I mean, he asked me to make a three-way call and I would

7    do it.

8    Q.  And how many times would you make three-way calls for

9    him?

10   A.  I can't say, it wasn't many.  But I know that I did it

11   before.

12   Q.  And who would you call for him?

13   A.  Anyone that he probably asked me to call.

14   Q.  And your recollection is, who would that be?

15   A.  I can't say, I made a couple of calls to him -- I mean,

16   for him.

17   Q.  Did you make calls --

18   A.  To his sister, I made calls to him before, Davon before.

19   I can't really recall everyone, but it's not a lot of people,

20   and they weren't a lot of calls.

21   Q.  And when Matthew was incarcerated, did you --

22   A.  His attorney.

23   Q.  Did you have communications with Davon and Cliff in that

24   time period, after he was incarcerated?

25   A.  Yes, I spoke with them before.

1   Q.  And was that true before Matthew was incarcerated, in

2   other words, would you have phone communication with Davon

3   before Matthew was incarcerated?

4   A.  No.

5   Q.  And what about Cliff, would you have any reason to call

6   him or talk to him before Matthew was incarcerated?

7   A.  No.

8   Q.  So your communications with them over the phone was after

9   Matthew was incarcerated?

10  A.  Yes.

11  Q.  And would you -- would you -- and what would you talk to

12  them about?  Let's start with Davon, what was the nature of

13  your communications with Davon after Matthew was

14  incarcerated?

15  A.  I really rarely talked to him.  I actually may have made a

16  call for Matthew, Matthew spoke to him.  I had an instance

17  where I spoke to Davon like once when Matthew thought --

18  sorry, Matthew's kids' mother was going to throw his clothes

19  out, and Davon and I were talking about that and how we were

20  going to get his things so that they wouldn't be outside,

21  things of that nature.

22  Q.  And what about Cliff, what would be the nature of your

23  communications with him after Matthew was incarcerated?

24  A.  I didn't have really communications with Cliff, I would

25  make -- I made -- I'm sure I -- I don't know even know if I

Direct Examination - Washington  (By Ms. Wilkinson)

1    ever made a three-way call to him.

2    Q.  And apart from three-way calls, did you have any phone

3    communication with Cliff after Matthew was incarcerated?

4    A.  I'm not sure, I don't remember ever really speaking to

5    Cliff, really.

6    Q.  When Matthew called you from jail, would he -- did you

7    know that the phone calls were recorded?

8    A.  Yes.

9    Q.  And do you recall hearing the video -- the audiotape

10   recording of the operator about them being recorded?

11   A.  Sometimes I skip over them, but yeah, I'm familiar with

12   it.

13   Q.  And to accept a call from Matthew, do you have to actually

14   accept the call, or does it automatically come to you?  You

15   have to agree to accept the charges, so to speak?

16   A.  Yes.

17   Q.  And do you know -- would you -- did you also visit

18   Mr. Hightower when he was incarcerated?

19   A.  Yes.

20   Q.  And how often -- when did you first go visit him, is there

21   a process by which -- I guess I'm going to say, is there a

22   process by which you have to be an approved visitor?

23   A.  Yes.

24   Q.  And do you recall when you were first able to go visit him

25   in person?

1   A.  I do not.

2   Q.  And when is the last time you visited him?

3   A.  I do not remember.  He was at Chesapeake Detention Center.

4   It's been over a year.

5   Q.  If I could -- and when you testified in the grand jury, do

6   you recall hearing some of the recorded conversations you had

7   with Mr. Hightower?

8   A.  I don't remember.

9   Q.  Well, I'm going to play one now for the record, and I'll

10  give you a chance to listen and tell me if you recognize the

11  callers.

12          MS. WILKINSON:  If I could turn to, Ms. Lesser,

13  to -- oh, we actually have transcripts for these, Your Honor,

14  and there's a number of them.  If we could pass them out and

15  do them one by one, if that's all right, Your Honor.

16          THE COURT:  Sure.

17          MS. WILKINSON:  Let's start with J-4.  For the

18  record, playing a call dated May 5th, 2016 to telephone number

19  (443) 858-1222.

20  Q.  (BY MS. WILKINSON)  Is that you, Ms. Washington?

21  A.  Yes.

22  Q.  And the call was at 8:43 in the morning.  This is on

23  May 5th, 2016.

24          MS. WILKINSON:  Go ahead, Ms. Lesser.

25          (Audio played.)

1          MS. WILKINSON:  Will you stop it there for a second,

2  Ms. Lesser.

3  Q.  (BY MS. WILKINSON)  Are you able to recognize the voices

4  on that call, Ms. Washington?

5  A.  Yes.

6  Q.  And do you have a copy of the transcript too?

7  A.  No.

8          MS. WILKINSON:  Agent Holiday, if there are extras,

9  can you provide one for the witness as well.  I'm sorry.

10          THE WITNESS:  Thank you.

11  Q.  (BY MS. WILKINSON)  And were you able to capture the

12  nature of the discussion at the beginning about putting like

13  $25 or something like that, did you hear the beginning of that

14  call?

15  A.  It was kind of choppy, but all I heard was $25.

16  Q.  Well, let's play it for a moment.  I just want to ask you

17  what that's all about.  So take a listen.

18          MS. WILKINSON:  Go ahead, Ms. Lesser.

19          (Audio played.)

20          MS. WILKINSON:  You can stop it there, Ms. Lesser.

21  Q.  (BY MS. WILKINSON)  So when you're talking about the $25

22  put on there, what is -- just for purposes of context, what

23  are you talking about there?

24  A.  I don't know.  I can't even understand that.

25  Q.  Would you put money on an account for Mr. Hightower to be

Direct Examination - Washington  (By Ms. Wilkinson)

1    able to call you?

2    A.  I would put money on -- I believe it was my phone.

3    Q.  And that's how you accept the charges?

4    A.  Yes.

5             MS. WILKINSON:  Okay.  Go ahead.

6             (Audio played.)

7    Q.  (BY MS. WILKINSON)  So where you say, "Yeah, because

8    everybody, they talk to everybody," what are you referring to

9    there, Ms. Washington?

10   A.  I don't even know.

11   Q.  This isn't the first conversation with you, is it,

12   Ms. Washington, where Mr. Hightower discussed that he was

13   under investigation?

14   A.  I don't know.

15   Q.  Well, he states in here that two and a half years they

16   have been harassing him, are you saying that Mr. Hightower

17   never mentioned that he was under investigation to you until

18   he was arrested in May of 2016?

19   A.  I don't believe so.

20            (Audio played.)

21   Q.  (BY MS. WILKINSON)  So now he mentions a woman named

22   Belinda, who's Belinda?

23   A.  I've learned that she's someone who worked at the company

24   that he worked for.  When he had trial, that name came up.

25   Q.  Who did you know her to be on May 5th, 2016?

Direct Examination - Washington  (By Ms. Wilkinson)

 1    A.  I don't know her.

 2    Q.  Well, we'll listen to the rest of the call, but do you

 3    ever say to him, "Who's Belinda?"

 4    A.  I don't know, I don't remember this call.

 5    Q.  Had you met Belinda before --

 6    A.  I don't know a Belinda.

 7              (Audio played.)

 8              MS. WILKINSON:  Can you stop it there for a

 9    second.

10    Q.  (BY MS. WILKINSON)  So what did you not want to talk to

11    Mr. Hightower about because the calls were being monitored and

12    recorded?

13    A.  I don't even remember this call, but I was advised that

14    some -- you shouldn't talk about it or something like that,

15    actually you said it before.

16    Q.  What I'm asking you, Ms. Washington, you tell

17    Mr. Hightower, "I don't want to talk about this on here,

18    because the calls are being recorded and monitored," I'm just

19    asking you to tell the jury, what is it you didn't want to

20    talk about with Mr. Hightower on the phone because they were

21    being monitored?

22    A.  It must be about this case, the case.

23    Q.  And that's my question to you, so this isn't the first

24    time Mr. Hightower had talked to you about this pending case;

25    is that right, Ms. Washington?

Direct Examination - Washington  (By Ms. Wilkinson)

1    A.  I don't know.  I honestly never cared about this case

2    because it didn't have anything to do with me, and no

3    disrespect to anyone, but I always try to be supportive of

4    him.  Some of the times when he talked, I didn't even really

5    listen to it.  I just actually was there listening, but not

6    listening.  I really didn't care about it.  I was just trying

7    to be supportive for him.  It had nothing to do with me.

8            MS. WILKINSON:  Can we turn now, if we could, Agent

9    Holiday, to Government's Exhibit J-5 and J-5A transcript.

10           Your Honor, if you want to let me know when a good

11   time is for you, but we started later, so I'm fine.

12           THE COURT:  Since we started late, I was going to

13   say, let's go until about 11:45.

14           MS. WILKINSON:  11:45, I'll keep an eye out.  Thank

15   you, Your Honor.

16           Does the witness have one too, Agent Holiday?

17           Yes, playing now for the record, Government's

18   Exhibit J-5, a call from Matthew Hightower to (443) 858-1222,

19   May 5th, 2016, later that evening, 6:51 p.m.

20           (Audio played.)

21   Q.  (BY MS. WILKINSON)  When you say here, Ms. Washington, why

22   didn't he follow up like when he said he didn't get it and he

23   knew that was an attachment, who are you referring to there?

24   A.  It must be his attorney.

25   Q.  And how did you get that information?

Direct Examination - Washington  (By Ms. Wilkinson)

1   A.  I don't know.

2   Q.  Had you spoken to his attorney?

3   A.  Several times.

4   Q.  Had you been in court that day when it was talked about?

5   A.  I don't know.  I went to court several times, I don't --

6   these dates do not stand out to me, none of them.

7        MS. WILKINSON:  Okay.  You can go ahead, Ms. Lesser.

8        (Audio played.)

9   Q.  (BY MS. WILKINSON)  Is that accurately recorded there, did

10  you say, "And maybe it was, you know, because anything can

11  happen to people"?

12  A.  If that's my voice, so yeah, but I don't recall this

13  conversation.  Like I said, these dates were so long ago, but

14  yeah, I'm sure that's me, so I said it.

15  Q.  Did you know the company that Mr. Hightower worked for,

16  the medical company was a very small company?

17  A.  I didn't know anything about that company at all.

18  Q.  Did he tell you he was the delivery driver?

19  A.  Well, he was -- when he started these court proceedings,

20  yes, I found out about it.  But prior to, I didn't know

21  anything about that.

22  Q.  So prior to May 4th, when he gets locked up, you're saying

23  you did not know that he was a delivery driver for a health

24  care company?

25  A.  I found out when -- I believe he -- when all the court

1    proceedings and stuff happened, I believe I found out around

2    that time.  I'm not sure of the dates, but I do know that he

3    was a delivery driver, I'm not sure when I found out.  I

4    didn't know anything about the company, though.

5    Q.  Really all I'm trying to find out, Ms. Washington, is

6    before Mr. Hightower was incarcerated, which we know was on

7    May 4th, 2016, while he was home, while he was out, while he

8    was romantically involved with you, did he talk about his

9    case, not later on the jail calls, we can hear those, I'm

10   asking you before that, before --

11   A.  I don't remember.

12   Q.  -- the -- him talking about his case with you?

13   A.  I don't remember.

14   Q.  Because it's not important to you?

15   A.  It doesn't involve me, so -- I don't remember.  Things

16   that are significant in my life -- I'm not saying anything to

17   be biased or anything, but dates that are significant to me.

18   If you was to ask me when my son's father was murdered, I can

19   tell you that date.  I can tell you everything from morning to

20   night about what happened with that.  Anything else, like

21   those dates don't stand out to me.  When you ask me things

22   about my children and those dates, stuff like that stands out

23   to me.

24   Q.  Okay.  Go ahead.

25              (Audio played.)

1    Q.  (BY MS. WILKINSON)  So when you say, "Somebody would get

2    hurt with you -- like that somebody would get hurt by -- why

3    they got to be so secretive about it," what are you referring

4    to there?

5    A.  It must be about the case, that's what we were talking

6    about; right?

7    Q.  What did you mean by that, like that somebody -- the type

8    of -- "like that somebody would get hurt by"?

9    A.  Like I said, I found out about the case when I came down

10   here with him.  I didn't know anything about the case.  All I

11   knew that, when he came down, it was something about Medicare

12   fraud, that's it.

13   Q.  And do you remember a time when it changed from Medicare

14   fraud to murder?

15   A.  When he started coming to trial and things, I don't

16   remember the dates or how things transpired or when he

17   shifted, I don't know, but I was at the trial.

18   Q.  When you were saying, "Not even that sensitive," and then,

19   "Like that somebody would get hurt by," were you referring to

20   the nature of the case being health care fraud as opposed to

21   later murder?

22   A.  Maybe.

23           (Audio played.)

24           MS. WILKINSON:  Can you stop it there for a

25   second.

1    Q.   (BY MS. WILKINSON)  Were you able to hear what you said

2    there, "The punishment for don't" -- what did you say there,

3    Ms. --

4    A.   I don't even know if he -- play it again.  I'm not even

5    really -- like now, I'm not even --

6    Q.   Paying attention?

7    A.   It's not that I'm not paying attention, but it's nothing

8    standing out to me.  Some of the times when I spoke to him, I

9    really can't even recall the instances of what we spoke about,

10   like I just was being supportive and half the time I probably

11   wasn't even listening to what Matthew was saying.  I would

12   give some response, just to let him feel like I was listening.

13        I really didn't care about this case, I didn't know

14   anything about it.  I only showed up, like I said, because I

15   was trying to give him moral support.  I didn't really know

16   anything about it or care, I still don't, doesn't have nothing

17   to do with me.

18   Q.   And did that support continue even after his conviction on

19   the murder charges in September of 2016, did you continue to

20   be in a relationship with him?

21   A.   I've been talking to Matthew for some time, like I can't

22   recall when we stopped being in a relationship, but --

23            MS. WILKINSON:  You can -- she asked us to pull it

24   back for just a second.

25            I just want to see if you're able to catch what you

1    say in there, Ms. Washington.

2              (Audio played.)

3    Q.  (BY MS. WILKINSON)  Do you hear what you say there?

4    A.  No, I just heard something about them witnesses.

5              MS. WILKINSON:  Okay.  We can finish this call.

6              (Audio played.)

7    Q.  (BY MS. WILKINSON)  So this was on May 5th, and the next

8    day, May 6th, there was another hearing.  And I -- my question

9    to you is, do you recall going to that hearing,

10   Ms. Washington?

11       Having heard the call now, Matthew's talking about the

12   hearing the next day, and this was all about whether or not he

13   would be detained or not, did you go?

14   A.  I don't know.

15   Q.  Do you remember being in court that day?

16   A.  I don't know.  I don't -- these dates do not stick out to

17   me, is what I'm trying to tell you.

18   Q.  Apart from the date, I'm talking about the event, the

19   event of the hearing when Mr. -- a judge is finding that

20   Matthew cannot go home now until the trial, do you remember

21   that event and being in court?

22   A.  I remember being in court one day when he couldn't go

23   home, yes, I do.

24   Q.  And do you remember at that time who was present in the

25   courtroom?

1    A.  No, I don't.

2    Q.  Or how you got there, or how Mr. Hightower got there?

3    A.  I don't.

4         MS. WILKINSON:  Okay.  Playing now for the record --

5    does the jury have all of the transcripts now?  We've

6    separated them so we don't have to do this process each time,

7    Your Honor -- I mean, we've combined them.

8         THE COURT:  Are they supposed to be taking one from

9    each stack?

10        **SPECIAL AGENT HOLIDAY:**  No, it's a packet.

11        THE COURT:  Oh, okay.

12        MS. WILKINSON:  Sorry about that, Your Honor.

13   Q.  (BY MS. WILKINSON)  So the next call we're going to play

14   is from May 7th, which is the day after the hearing,

15   Ms. Washington, but I wanted to direct your attention up to

16   the screen, if you would, for a minute.

17        And there are some text messages to you from a person

18   named Vanessa Davis, do you know who that is?

19   A.  That may be Matthew's sister.

20   Q.  Is that Biggie?

21   A.  Yes, I believe so.

22   Q.  So the first one up above here, just direct your attention

23   to the evening of May 6 at about 5:35, from Biggie to you, and

24   it says, "Cliff on his way, IDH enough for the garage."

25        What was Biggie telling you about, "Cliff on his way, IDH

1  enough for the garage," Cliff was on his way where?

2  A.  I don't know.

3  Q.  Do you know what "IDH" means, is it "I don't have enough"

4  for the garage or something like that?

5  A.  It may be, yes, it sounds like from --

6  Q.  Was Cliff on his way to see you?

7  A.  No --

8  Q.  Did you --

9  A.  -- I don't believe so.

10 Q.  Did you talk to Cliff the night of the hearing detaining

11 Mr. Hightower?

12 A.  I don't recall.

13 Q.  Down below, at 5:30, Biggie then writes to you, "You

14 think?"  "Yeah, thank you.  I'm not mad at Cliff either, he's

15 stressed."

16      And then you write back, "Okay.  I was supposed to tell

17 him what happened, but I'm kind of glad I didn't have to tell

18 him.  We just gotta stay strong."

19      What is that about?

20 A.  I'm not sure.

21 Q.  This is the night of the hearing involving Mr. Hightower's

22 incarceration on the murder charges --

23          MR. DAVIS:  Objection.

24 Q.  (BY MS. WILKINSON)  -- what do you recall writing?

25          THE COURT:  Overruled.

1   Q.  (BY MS. WILKINSON)  When -- Ms. Washington, when you

2   write --

3            THE COURT:  I'm sorry, Ms. Wilkinson, hold on, we

4   have an objection.  You may approach.

5            MR. DAVIS:  Just very quickly.

6            (Bench conference on the record.)

7            THE COURT:  Was it asked and answered?

8            MR. DAVIS:  No, no, I didn't blurt it out, but when

9   Ms. Wilkinson is referencing murder and she's mentioning Cliff

10  in the same question, we're -- it's going to cause confusion

11  with the jury that they're talking about the murder of --

12            MS. WILKINSON:  I hope not, because that murder

13  hasn't happened yet.

14            MR. DAVIS:  I know, but when you hear it in the same

15  sentence, it's --

16            THE COURT:  Okay.  So just clarify that.

17            MR. DAVIS:  Thank you, Your Honor.

18            (The following proceedings were had in open court.)

19  Q.  (BY MS. WILKINSON)  The May 6th hearing when Mr. Hightower

20  was indicted on extortion murder charges, did you know that

21  was in reference to the murder of David Wutoh?

22  A.  No, I didn't know him.

23  Q.  Did you know it was the charges involved an allegation

24  that Mr. Hightower was involved in the murder of a man named

25  David Wutoh?

Direct Examination - Washington  (By Ms. Wilkinson)

1   A.  No.

2   Q.  So this conversation on the evening of May 6th from you to

3   Ms. Davis, what is your recollections of who were you supposed

4   to tell what happened and was kind of glad you didn't have to

5   tell him?

6   A.  I don't even know.

7   Q.  And who -- what did you mean by, "We just gotta stay

8   strong"?

9   A.  I don't even recall this text, I don't know.

10  Q.  Were you concerned that Mr. Hightower wasn't coming home

11  now?

12  A.  I don't even know what you're talking about.  I thought

13  you told me he was already -- I don't know.  I don't know.

14  Q.  The call on May 7th, Government's Exhibit J -- I think

15  we're on J-6, from Mr. Hightower to Ms. Washington,

16  (443) 858-1222 the morning of May 7th, 2016.

17          (Audio played.)

18  Q.  (BY MS. WILKINSON)  That was the next morning, May 7th,

19  2016, Ms. Washington.

20          MS. WILKINSON:  It's the time the Court wanted, and

21  I have a number of questions about this call, is this a good

22  time, Your Honor?

23          THE COURT:  Sure.  If it's a good time for you, it's

24  a good time for me.  Let's take our break at this point.

25          Ladies and gentlemen, I'll ask that you be back in

Direct Examination - Washington  (By Ms. Wilkinson)

 1    the jury room at noon, and we will go from there.  Please

 2    enjoy your break.

 3              (Jury left the courtroom.)

 4              THE COURT:  All right.  Ma'am, you're instructed to

 5    be back at 12:00 o'clock.  You are excused until

 6    12:00 o'clock.

 7              THE WITNESS:  Thank you.

 8              THE COURT:  You're welcome.  See you in 15 minutes.

 9              (A recess was taken.)

10              THE COURT:  Get the jury.

11              (Jury entered the courtroom.)

12              THE COURT:  All right.  You may all be seated.

13    Welcome back, ladies and gentlemen.

14          Ma'am, I do want to remind you that you're still

15    under oath.

16              THE WITNESS:  Yes.

17              MS. WILKINSON:  Thank you.

18    Q.  (BY MS. WILKINSON)  Ms. Washington, when we broke, we were

19    listening to a jail call from May 7th, 2016 at 8:48 a.m.  And

20    at the beginning of the call, you tell Mr. Hightower, correct

21    me if I'm wrong, you said, "I was talking to C yesterday, like

22    C," who were you referring to there?

23    A.  I don't know.  I don't even remember the call.  I don't

24    remember that date.

25    Q.  Well, did you ever refer to Cliff as C?

1    A.  No, I believe I called him Cliff.

2    Q.  And do you know whether or not you spoke to Cliff the

3    night before?

4    A.  I don't know.

5    Q.  And would your phone records perhaps refresh your

6    recollection?

7    A.  Maybe so.

8    Q.  I'm going to show you an excerpt from Government's

9    Exhibit P-2.  Okay.  And it shows 2:02 -- at 2:02 in the

10   afternoon, Aurielle Washington calling a phone number, 2650,

11   Cliff Mosley, for a duration of one minute and three seconds,

12   and then one at 5:43, Aurielle Washington calling 2650 for a

13   minute and 22 seconds.

14       Do you see that there?

15   A.  Yes, I saw it.

16   Q.  So do you know who 2650 belongs to?

17   A.  No.

18   Q.  And it says Mr. Mosley, do you know that that's Cliff

19   Mosley's phone number?

20   A.  I don't know his number.

21   Q.  Did you call Mr. Washington on -- Mr. Mosley, Cliff, whose

22   name starts with C, May 6th at 2:02 p.m. for a minute and

23   three seconds?

24   A.  I can't recall.

25   Q.  This was the day of Mr. Carter's hearing, and as we

1   listened to the call, Mr. Hightower's commenting on your

2   appearance.  Can we assume by that, or does it refresh your

3   recollection that you were in court that day and Mr. Hightower

4   saw you?

5   A.  I don't recall.  I said I was there a couple of times, but

6   I don't recall the dates or anything like that.

7   Q.  So when he says, "I was so speechless, though.  I was

8   like, my boo look good, she got her hair done," did you have

9   your hair done that day?

10  A.  I don't remember.

11  Q.  And when Mr. Hightower says to you, "The guy, he claims

12  the manufactured stuff that I'm talking about, he claims that

13  I left my house that night and went to Dave's house," so with

14  that being said, did you hear Mr. Hightower say that on the

15  call?

16  A.  Yes.

17  Q.  And you can look at the transcript and refer back to your

18  recollection of the call, did you ever say, "Who's Dave?"

19  A.  I don't remember.

20  Q.  This is not the first time Mr. Hightower talked to you

21  about Dave?

22  A.  I don't even know who Dave is, I don't remember.  I don't

23  know what you're talking about.

24  Q.  So then down below, Ms. -- oh, well, let me ask you this

25  way, Ms. Washington, do you -- did you see Cliff Mosley the

1    evening of May 6th, 2014 -- '16?

2    A.  Ma'am, I cannot tell you what happened on that date.

3    Q.  Do you recall testifying in the grand jury about it?

4    A.  I don't remember.

5    Q.  And that you had --

6    A.  I don't even know the dates I went to the grand jury, I

7    just know I went there twice.  I don't know the dates.

8            MS. WILKINSON:  Court's indulgence one second, Your

9    Honor.

10           THE COURT:  Sure.

11   Q.  (BY MS. WILKINSON)  The phone call that we saw at 2:02 for

12   a minute duration, did anybody else use your phone?

13   A.  I wouldn't be able to tell you that.  I've let people use

14   my phone before, I don't know if that was a particular day or

15   yesterday was the day.  I'm a single mother --

16   Q.  Well, in grand jury --

17   A.  -- I don't remember a lot of things.

18   Q.  Okay.  Grand jury page 44, line 23, "Question:  Would it

19   be somebody else that was using your phone?"  "Answer:  No,

20   there wouldn't be," on that day.

21   A.  That's what I said?

22   Q.  Yes.

23   A.  Well, that's what I said.  I don't remember saying that

24   either.

25   Q.  And where did you talk to him, was it on the phone, or in

1    person?

2    A.  I told you I don't remember talking to him.  I don't

3    remember this date that you're referring to.

4    Q.  Do you remember me asking you a question, "Where did you

5    talk to him in person?"  "Answer:  He was around where my aunt

6    lived at.  Right after I left court, I had Matthew Hightower's

7    sister.  I dropped Matthew's sister off at her house, and once

8    I dropped her off, I saw him and I spoke to him.  I didn't

9    call him.  I don't recall calling him."

10        Does that refresh your memory?

11   A.  I do remember that.

12   Q.  Okay.  Did you see Cliff the night of Matthew Hightower's

13   hearing?

14   A.  I don't know if it was the night, but I do remember seeing

15   him around my aunt's area before.

16   Q.  And where was he?

17   A.  He was on -- like by Pimlico Road.

18   Q.  Was he in a car, or --

19   A.  I don't remember.

20   Q.  Was he standing outside?

21   A.  I'm sure -- yeah, I believe so.

22   Q.  Did you see him on purpose, in other words, was that 2:02

23   call perhaps, trying to refresh your memory, a planned meeting

24   with him that night?

25   A.  I don't remember planning meeting with him.  I don't even

Direct Examination - Washington  (By Ms. Wilkinson)

1   really recall meeting him, but some of the things that you're

2   saying, I do remember saying those things to you.  I do

3   remember dropping his sister off.

4   Q.  And did you talk to him about what had happened in court

5   that day?

6   A.  I don't remember.

7   Q.  Do you recall -- tell us about the conversation that you

8   do recall.

9   A.  I recall leaving a courtroom, and I do recall dropping his

10  sister off around an area where my aunt does live.

11  Q.  Is that Park Heights?

12  A.  It's in the Park Heights area.

13  Q.  And what street is it?

14  A.  She -- and she's not -- she's up -- she's a really close

15  family member, but she's not my aunt.

16  Q.  What street is she on?

17  A.  She lives on Wylie.

18  Q.  Okay.  And is that Wylie?

19  A.  Wylie.

20  Q.  Am I saying it right, W-y-l-i-e?

21  A.  Yes, Wylie.

22  Q.  Is that in the heart of Park Heights?

23  A.  I wouldn't say the heart, but it's in Park Heights.

24  Q.  So it's on that street that you saw Cliff?

25  A.  Maybe, I believe if it was by my aunt house, then yes.

Direct Examination - Washington  (By Ms. Wilkinson)

1    Q.  And what did you all talk about?

2    A.  I don't recall.

3    Q.  Did you tell him that Matthew had been detained?

4    A.  I do not recall.

5    Q.  Page 47, line 15, and you tell us what the conversation

6    was, "His sister said that he was supposed to come, that's how

7    I know he was supposed to come.  When I saw him" --

8              THE COURT:  If you could slow down just a little,

9    please.

10             MS. WILKINSON:  Thank you, sir.

11   Q.  (BY MS. WILKINSON)  "When I saw him, yes, I saw him

12   outside.  We spoke about what happened and Matthew being

13   detained."

14      Is that your testimony in front of the grand jury,

15   Ms. Washington?

16   A.  I don't remember, that was in like, what, 2015, 2016?

17   Q.  Did you tell him that the Court hearing had involved a

18   discussion of the murder charges involving Dave?

19   A.  Can you repeat that?

20   Q.  Did you tell him what Matthew was telling you in this

21   call, "The manufactured stuff, that I left my home that night

22   and went to Dave's house," did you relate that information you

23   learned in court to Cliff?

24   A.  I don't even remember talking to Cliff, but you said that

25   I said that at the grand jury, so -- I don't recall.  And I'm

 1   sure I wouldn't have said anything like that.

 2   Q.  In the conversation on May 7th, 2016, Matthew uses a

 3   phrase, "a cell phone ping near the area," what did you

 4   understand him to mean by "a cell phone ping near the area"?

 5   A.  I don't -- Matthew -- I heard that from Matthew's attorney

 6   before.

 7   Q.  And what did Matthew's attorney tell you before?

 8   A.  He just said something about a cell phone ping, that means

 9   that someone's phone was within an area or something.

10   Q.  And when Matthew said -- you also learned it from

11   Matthew?

12   A.  I learned it from Mr. Bardos, but maybe I did hear Matthew

13   speak of it.

14   Q.  Do you know whether or not you talked to him about it

15   before the hearing on May 6th, or after the hearing on

16   May 6th?

17   A.  I don't remember.

18   Q.  Okay.  Turning now to jail call No. J-7, transcript 7A.

19          (Audio played.)

20   Q.  (BY MS. WILKINSON)  So what was this part of the

21   conversation about between you and Mr. Hightower,

22   Ms. Washington?

23   A.  He said he wanted to get two numbers.

24   Q.  From where?

25   A.  What do you mean "from where"?

Direct Examination - Washington  (By Ms. Wilkinson)

1   Q.  Where were you supposed to get the numbers?

2   A.  On a cell phone.

3   Q.  Whose cell phone?

4   A.  Matthew's.

5   Q.  So did you have Matthew's cell phone at this point in

6   time?

7   A.  Yes.

8   Q.  And what cell phone did you have of his?

9   A.  I don't remember which cell phone it was, I do know I just

10  had his cell phone.

11  Q.  Did Matthew have more than one cellular telephone in the

12  time that you went out with him?

13  A.  That's the only one I had, that's the only one I knew

14  about.

15  Q.  You called him multiple times, what was the phone number

16  on it?

17  A.  I don't remember.

18  Q.  Did it end in 6448?

19  A.  Yes, I remember that.

20  Q.  Was that the phone number -- the phone, the physical phone

21  that you had after Matthew was locked up?

22  A.  Yes.

23  Q.  Okay.  And you had access to it?

24  A.  Yes.

25  Q.  And you could use it?

Direct Examination - Washington  (By Ms. Wilkinson)

1   A.   No, I couldn't use it.

2   Q.   Well, you could look at it for phone numbers?

3   A.   Yes.

4   Q.   But why couldn't you use it?

5   A.   I believe the phone was turned off.

6   Q.   Could you get phone numbers if a phone is turned off?

7   A.   Yes.

8   Q.   So the phone numbers that he wants to provide to you, when

9   he says, "I want to get Davon's number," and then you say "D,"

10  who are you referring to there?

11  A.   Davon?

12  Q.   Yes.

13  A.   This gentleman right here.

14  Q.   The defendant Davon?

15  A.   Yes.

16  Q.   And then when he says, "And C number," who was he

17  referring to there?

18  A.   I'm not sure if he's talking about my friend, because my

19  friend name is C also, and she was subpoenaed to the grand

20  jury as well.

21  Q.   And who was that?

22  A.   Her name is -- I call her C.

23  Q.   What's her name?

24  A.   Ciara.

25  Q.   And you mean that when Mr. Hightower wanted to speak to

1    Davon and possibly C, named Ciara?

2    A.  I don't know who he's talking about, but if you play it,

3    maybe it would be a little bit more clearer who he's talking

4    about.

5              (Audio played.)

6    Q.  (BY MS. WILKINSON)  So before we get to the next part

7    about it, did you have access to Mr. Hightower's Wells Fargo

8    bank account?

9    A.  No.

10   Q.  When he says, "Get my phone.  When you log in, try to log

11   in to my Wells Fargo," what was he referring to there?

12   A.  A bank account.

13   Q.  Could you access his Wells Fargo bank account?

14   A.  I can access it with him giving me the code, but I don't

15   know if I did it from that phone.  I can still use my phone,

16   even if I'm on a call.

17   Q.  Would you say that Mr. Hightower trusted you?

18   A.  I can't say, I hope he did.

19             (Audio played.)

20   Q.  (BY MS. WILKINSON)  So Mr. Hightower says, "C, oh, I got

21   his number," does that refresh your recollection whether this

22   was C, your girlfriend Ciara, or C, somebody else?

23   A.  It may have been a guy, yes, it may have been him,

24   Cliff.

25             MS. WILKINSON:  Okay.  You can continue.

1                    (Audio played.)

2   Q.  (BY MS. WILKINSON)  Now, Ms. Washington, at this point,

3   you don't have Mr. Hightower's phone; correct, you're looking

4   in your phone?

5   A.  I'm not sure what I'm looking at.

6   Q.  Well, let's finish that call, and then we'll come back to

7   that question.

8                    (Audio played.)

9              MS. WILKINSON:  You can stop it there.

10  Q.  (BY MS. WILKINSON)  "So I'm -- I'm in -- it's -- I'm not

11  in your phone, I'm in my phone."

12      Does that refresh your recollection where you got the

13  phone number (443) 704-2650?

14  A.  Yes, it sounds like it.

15  Q.  Pardon me?

16  A.  Sounds so.

17  Q.  And that number belonged to who?

18  A.  If he said it was -- I mean, C, I guess that's Cliff, so

19  it has to be Cliff's number.

20  Q.  Let's go back to the phone records here.  And at least

21  this one, 5:43 on the evening of May 6, contact between your

22  number and 2650 attributed to C, Cliff Mosley, do you see that

23  there?

24  A.  Yes.

25  Q.  Does that refresh your recollection, Ms. Washington, that

1  the C that you all are discussing on this phone is Cliff?

2  A.  Yes.

3  Q.  And that you had Cliff's phone number in your phone?

4  A.  I probably did.

5  Q.  And that the night before this, when I asked you whether

6  or not you had had a conversation with him after the May 6th

7  hearing, does it for -- any way further refresh your

8  recollection whether you and he spoke on the phone?

9  A.  No.

10  Q.  No?

11  A.  No, I don't remember.

12  Q.  And do you recall these were some of the questions that

13  were asked about you in the grand jury back in April of

14  2018?

15  A.  I was in there for three hours, I don't remember

16  everything that you all asked.

17  Q.  You remembered that we played jail calls for you;

18  correct?

19  A.  Maybe, I believe so.  Maybe one or two, I'm not sure how

20  many.  I don't really remember that day.  I just know I was in

21  there for a very extensive time.

22  Q.  And at the time, were you advised it was in relation to an

23  investigation of a murder of a woman named Ms. Ashburne on

24  May 27th, 2016, you knew that was the nature of the

25  investigation then; isn't that right, Ms. Washington?

1   A.  I didn't know why I was being subpoenaed.

2   Q.  Do you know when you came in to testify that that's what

3   your testimony was in reference to?

4   A.  No, I don't.  I remember talking to my attorney with you

5   all in a private room, and I do remember you -- my attorney

6   letting me go over some information.  But it wasn't nothing

7   pertaining to a lady, it was something about Matthew's case

8   with the guy named David Wutoh.

9          MS. WILKINSON:  One second, please, Your Honor.

10  Q.  (BY MS. WILKINSON)  Page 6 of Ms. Ashburne -- I mean,

11  Ms. Washington's grand jury testimony, "Question:  You have

12  been subpoenaed to come here today in connection with an

13  investigation that the grand jury is doing on a murder that

14  happened back on May 27th of 2016" --

15         THE COURT:  Please slow down a little.

16  Q.  (BY MS. WILKINSON)  -- "of a woman named Latrina Ashburne,

17  and you're here today as a witness in connection with the

18  investigation of those proceedings.  Do you understand that

19  you're here pursuant to a subpoena?"  "Answer:  Yes, I do."

20   Was that your testimony as part of your grand jury

21  appearance back in 2018, Ms. Washington?

22  A.  If you have it down that I said, yes, I'm sure.  But I

23  didn't know anything about that until I came there.  I still

24  don't know anything about it.

25  Q.  And my question to you, Ms. Washington, is when you were

Direct Examination - Washington  (By Ms. Wilkinson)

1    answering questions in the grand jury, had you been advised

2    that it was in connection with a murder investigation of a

3    woman named Latrina Ashburne, does that refresh your memory

4    that you knew the nature of the investigation?

5    A.  No.  I was harassed several times by you all.

6             MS. WILKINSON:  Please ask the -- there's no

7    question pending.

8             THE COURT:  Just answer the next question.

9             MS. WILKINSON:  Thank you.

10            Can we turn to -- let me get back to my outline here

11   for a second.  We're going to take one out of order.  It's out

12   of order in the book, it's J-25.  It will be the last one in

13   your -- I don't think they're in chronological order, I think

14   they're in sequential order.  J-25, transcript 25A.

15            And for the record, this is a call on the same day,

16   May 7th, 2016 at 6:12 p.m. from Mr. Hightower to Aurielle

17   Washington at (443) 858-1222.

18            (Audio played.)

19   Q.  (BY MS. WILKINSON)  So do you recall trying to go visit

20   Mr. Hightower on May 7th, 2016 and not being able to get in

21   because of the fingerprint issue you discuss here?

22   A.  I do recall going to try to visit and couldn't get in.

23   Q.  Did you see his sister Biggie that night before you went

24   there, to make sure -- she was to make sure that you got in

25   and to give you somebody's phone number?

Direct Examination - Washington  (By Ms. Wilkinson)

1    A.  Yes, maybe.  But I don't remember doing it, but --

2    Q.  And what phone number did she give you?

3    A.  I don't know.  Does it say on the tape?

4    Q.  What was her relationship with you?

5    A.  I had no relationship with her.

6    Q.  So what was the phone number for?

7    A.  I don't know, could you play it so we can find out?

8    Q.  I'm asking you your recollection.

9          THE COURT:  Ma'am, you have to just let her ask the

10   questions and you just answer the questions.

11   Q.  (BY MS. WILKINSON)  Do you recall at this point what phone

12   number she had provided to you?

13   A.  No.

14          (Audio played.)

15   Q.  (BY MS. WILKINSON)  So that's you, "I guess I got to just

16   wait for the letter," what letter are you waiting for?

17   A.  I believe a letter to visit.

18          (Audio played.)

19          MS. WILKINSON:  In the interest of time, if you

20   would like, you're more than welcome for me to play the whole

21   call, but I'm going to fast forward ahead because I have some

22   questions about a call.

23          Going to 10:57, at that portion of the call, if you

24   would for a second, Ms. Lesser.

25          THE COURT:  I'm sorry, is that a different part of

1    the transcript?

2           MS. WILKINSON:  Yes, Your Honor, I'm about to refer

3    you to page 4.  Start time, it says 4:07, but the actual time

4    on the call is at 10:57.

5           (Audio played.)

6    Q.  (BY MS. WILKINSON)  So does this refresh your recollection

7    about -- first of all, about what Big was able to get for

8    you?

9    A.  No.

10   Q.  When Mr. Hightower says, "She was able to get" -- "Big was

11   able to get that," and you said, "Yeah," and he says, "Oh,

12   okay," and you said, "I got it, I got it, I can give it to you

13   if you want me to," what were you referring to there?

14   A.  I don't know.

15   Q.  Was it a phone number?

16   A.  I don't know.

17   Q.  Was it a person's name?

18   A.  I don't know.

19   Q.  Were you at -- were you called as a witness at

20   Mr. Hightower's extortion/murder trial as a witness?

21   A.  I don't believe I received a subpoena for that.

22   Q.  Did you testify --

23   A.  No.

24   Q.  -- on his behalf?

25   A.  No.

1    Q.  Did you go and watch the proceedings, the trial?

2    A.  Yes.

3    Q.  Did you go every day?

4    A.  I'm not sure if I was there every day, I do work.  So I'm

5    not sure if I was there every day.

6    Q.  Do you recall who testified on his behalf, if anyone?

7    A.  I know his kids' mother, I saw her.

8    Q.  You mean Michelle?

9    A.  Yes.

10   Q.  Is that the only person?

11   A.  That I can remember seeing.

12   Q.  Okay.  If we could go now to --

13   A.  Oh, I remember seeing Mr. Holiday there, on the stand.

14   Q.  As a government witness, you mean Agent Holiday?

15   A.  Yes.

16          MS. WILKINSON:  Okay.  Can we turn to -- back to in

17   sequential order, jail call J-8, transcript J-8A.

18          (Audio played.)

19   Q.  (BY MS. WILKINSON)  What are you referring to here, "Davon

20   do not know how to cut the air off"?

21   A.  I believe the air conditioner.

22   Q.  On what?

23   A.  I don't know.

24   Q.  Is it the same car you're driving at this time in this

25   conversation?

Direct Examination - Washington  (By Ms. Wilkinson)

1  A.  Well, I've never rode in a car with him before, so I don't

2  know.

3  Q.  What car were you driving in when you said, "This car hold

4  heat to me"?

5  A.  I don't know.

6           (Audio played.)

7  Q.  (BY MS. WILKINSON)  So Mr. Hightower -- you're telling

8  Mr. Hightower "he," is that Davon?

9  A.  Yes.

10  Q.  Asked you yesterday.

11      What was your recollection of a conversation you had with

12  Davon on May 7th, 2016, what was that about?

13  A.  I don't know.

14  Q.  Well, what are the nature of your communications with

15  Davon after Mr. Hightower was incarcerated but before the

16  murder of Ms. Ashburne?

17  A.  I told you earlier, that I had conversation with him

18  before about picking up clothing that belongs to Matthew when

19  he was going to be put out.  I did have an instance where we

20  talked about car insurance.

21  Q.  Did you talk about Matthew's case?

22  A.  I don't recall.

23  Q.  Do you know what -- having listened to more of the call,

24  do you know what car you're referring to where, "He asked me

25  yesterday, and I was like, I do not know, something about the

Direct Examination - Washington  (By Ms. Wilkinson)

1   fan on the car," what were you showing Davon, in what car?

2   A.  I don't know.

3            (Audio played.)

4   Q.  (BY MS. WILKINSON)  When Mr. Hightower says, "Tell him I

5   said check the car real good for that too, what he was looking

6   for," and you said, "Uh-huh, he'll get them too, we'll see,"

7   did you relate to Davon what Mr. Hightower asked you to tell

8   him, to check the car real good for "that" too?

9   A.  I don't know what "that" would be.

10  Q.  Did you ask Mr. Hightower what "that" would be?

11  A.  I don't know, is it on there?  I don't know.

12  Q.  We'll go ahead and play it and maybe it will refresh your

13  memory about what "that" is.

14           (Audio played.)

15  Q.  (BY MS. WILKINSON)  When Mr. Hightower says, "I'm trying,

16  I'm trying to come home," after he asks you to tell Davon to

17  "check the car real good for that," what was he referring

18  to?

19  A.  I don't know.

20  Q.  "I'm trying to come home," did that mean out of jail?

21  A.  I believe so.

22           (Audio played.)

23  Q.  (BY MS. WILKINSON)  We have the transcript that said,

24  "Davon is on edge like a little bit," what did you actually

25  say there, is that what you said?

1   A.  I didn't say that.

2   Q.  I think -- turn back and tell us what you said.

3   A.  Play it -- can you play it?

4   Q.  Yes, we're going to play it.

5       MS. WILKINSON:  Go back just about ten -- 15

6   seconds, Ms. Lesser.  Thank you.

7       (Audio played.)

8   Q.  (BY MS. WILKINSON)  What did you say there about Davon?

9   A.  I didn't even hear me say anything about him.

10      MS. WILKINSON:  Go back ten seconds, please.

11      (Audio played.)

12  Q.  (BY MS. WILKINSON)  Does that assist you in what you were

13  saying above there, "Damn, you find it," what did you say

14  after that?

15  A.  I didn't hear that, I don't --

16  Q.  What are you talking about here, "Davon probably whip his

17  ass, Cliff be too drunk.  Cliff can fight, though.  Cliff

18  ain't let Davon beat his ass."  Then you say, "Damn, you find

19  it," what are you talking about here?

20  A.  I don't know, sometimes people just do humor, it's not

21  nothing serious.  I don't think it's anything with any

22  misconduct, if that's what you're trying to --

23  Q.  No, I'm just trying to ask what you're talking about,

24  there's --

25  A.  I don't even know what I'm talking about, but sometimes

Direct Examination - Washington  (By Ms. Wilkinson)

1   people make jokes about different things, like all the time.

2   That could have just been a little inside joke.

3   Q.  Had you seen Davon and -- I don't mean to interrupt you,

4   but had you seen Davon and Cliff before together?

5   A.  I have.

6   Q.  In what context?

7   A.  Oh, I saw them at the car lot.

8   Q.  And what -- was that around this time?

9   A.  Maybe, I believe so.

10  Q.  And what car lot?

11  A.  Cars Plus.

12  Q.  And what was the purpose of seeing them together at the

13  Cars Plus?  That's where Matthew worked; correct?

14  A.  Yes.

15  Q.  And what was the purpose of seeing Davon and Cliff at the

16  Cars Plus lot around this time?

17  A.  They were picking up Matthew's job material.

18  Q.  And what material?

19  A.  I don't really recall everything that he had at his job,

20  but I do know it was something related to his job.

21  Q.  And were you there too?

22  A.  Yes.

23  Q.  Okay.  And how did they get there, did you see?

24  A.  I don't remember how they got there, but --

25  Q.  Did they come together?

Direct Examination - Washington  (By Ms. Wilkinson)

1    A.  I don't -- I don't recall.

2    Q.  But they were there together?

3    A.  I do remember seeing both of them there.

4            (Audio played.)

5    Q.  (BY MS. WILKINSON)  When you were talking about, "They're

6    cool together, but they don't always see eye to eye," who are

7    you referring to?

8    A.  Davon and Cliff.

9    Q.  Sounds to me like you're talking about more than one

10   occasion when you saw them together, did you see them together

11   on more than one occasion, Ms. Washington?

12   A.  I don't believe so.

13   Q.  Well, when you say, "Yesterday was fun," what were you

14   referring to then?

15   A.  On what day?

16   Q.  This is in the middle of the jail call.  On May 8th, 2016,

17   you say, "Yesterday it was fun," what was fun?

18   A.  I don't know.  I don't even know what you're talking

19   about.  Is there anything else that you can play that would

20   jog my memory, because you're just asking me questions like

21   I'm supposed to know?  I probably did a lot of things that I

22   don't remember.  I don't remember what was fun.

23           MS. WILKINSON:  Go ahead, Ms. Lesser.

24           (Audio played.)

25           MS. WILKINSON:  Okay.  Stop it right there,

1    Ms. Lesser.

2    Q.  (BY MS. WILKINSON)  I believe that's all about this part

3    of it, but Mr. Hightower says, "Davon, you can tell him check

4    the car for it."  And you say, "Yeah, but my head's like,

5    yeah, don't forget to do what?"

6         And he says, "Tell him to check the car real good for

7    whatever, what he was looking for yesterday."  And you said,

8    "Oh, yeah, all right."

9         What was he looking for in the car?

10   A.  I can't tell you, I only had two instance where I was

11   around him, and the one time it was to move the things from

12   Matthew's job and the other was about car insurance.

13   Q.  So when Matthew --

14   A.  So he may have been looking for a car insurance paper.

15   I'm not sure, I can't tell you.

16   Q.  He says, "Tell him to check real good for whatever he was

17   looking for yesterday."  "Oh, yeah, all right."

18        What did -- what were you saying you would okay to do,

19   what were you doing?  Did you tell Davon to check the car for

20   it?

21   A.  I didn't tell Davon to check the car for anything.

22   Q.  I think that's the conclusion of this call.  Let's go on

23   to J-9.  For the record, May 9th, 2016 at 9:21 a.m. from

24   Matthew Hightower to Aurielle Washington.

25             (Audio played.)

1          MS. WILKINSON:  Stop right there.

2    Q.  (BY MS. WILKINSON)  What do you say right there,

3    Ms. Washington?

4    A.  I couldn't even hear it.

5    Q.  Did you say something about "getting the money"?

6    A.  I heard the word "money."

7    Q.  Now, what money are you and Mr. Hightower talking about?

8    A.  I believe I was supposed to have met to get money for car

9    insurance for Matthew.

10   Q.  Car insurance for what?

11   A.  His car.

12   Q.  For which car?

13   A.  I'm not sure exactly which car it was.

14   Q.  And who's supposed to give you the money for which car?

15   A.  I believe Mike.

16   Q.  Mike who?

17   A.  Mike, um, Michelle's brother.

18   Q.  And who was supposed to give who money?

19   A.  I believe I was supposed to give Mike the money.

20   Q.  For what?

21   A.  Car insurance.

22   Q.  Why would you give Matt -- why would you give Mike money

23   for car insurance from Matt?

24   A.  Because Matthew car was still out on the street and it

25   still had tags on it and he still had car insurance and he had

1    to pay it and he was arrested and he couldn't do it, so --

2    Q.  But why to Mike?

3    A.  I don't know exactly why to Mike, but --

4    Q.  Was the car in Mike's name?

5    A.  No, everyone was trying -- they were trying to find

6    paperwork, basically, about the car, like who was -- it was

7    insured with and all that.  That stuff, I really don't know.

8    I just know that I said I would help him pay the insurance,

9    that's it.

10   Q.  Are we talking here about the silver Audi?

11   A.  I'm not sure which car it was, I just know that one of the

12   cars needed insurance paid.

13   Q.  And where did you get the money to give it to them?

14   A.  I had money.

15   Q.  Oh, you used your own money?

16   A.  Yes.

17            (Audio played.)

18   Q.  (BY MS. WILKINSON)  Is it -- do you hear the word

19   "flip"?

20   A.  I thought he said "slip."

21   Q.  "Slip," okay.  And what would this be about then?

22   A.  I only had dealings with them about car insurance and

23   removing Matthew's stuff.

24   Q.  And when you say "them," who did you have dealings with

25   car insurance about?

1  A.  Davon and I dealt with Mike.

2  Q.  Okay.  And let's talk about the car insurance you dealt

3  with with Davon, what was that about?

4  A.  I'm saying that's the only dealing, so it must have been

5  about car insurance.  Maybe they were trying to find out who

6  the car was insured with.  I think the paper, which you guys

7  seized from my car, is something called Gateway, I'm not sure.

8  All I did was give money to -- so that the car insurance could

9  get paid for one month.

10          MS. WILKINSON:  Okay.  You can continue.  Finish

11  this call up.

12          (Audio played.)

13          MS. WILKINSON:  You can stop there, Ms. Lesser.

14  Q.  (BY MS. WILKINSON)  What are you talking about there,

15  Ms. Washington, about "Michelle and a Vanessa was trying to

16  lie to him, because he's like, I went up there," what was that

17  about?

18  A.  I told you earlier that she was trying to throw Matthew

19  clothes out.  He was going to get the clothes, and either he

20  was going to give them to me, or he was going to hold on to

21  them.  I'm not sure what was going to happen, but he was

22  supposed to pick up clothing that were supposedly going to the

23  street.

24  Q.  And so Davon was supposed to be doing a favor for Matt to

25  go get his clothing from Michelle?

1  A.  I don't know if that was the nature of their conversation,

2  but I do know he was going to -- I don't know if it was

3  considered a favor, I don't know, but I know that we were just

4  trying to prevent her from throwing his stuff outside, because

5  he was not home.

6  Q.  And Davon was the person to do that?

7  A.  I don't know if he was the person to do it, I just know

8  that we both were -- even if I had to contact her, I would

9  never want to see anybody stuff in the street.

10 Q.  Was Davon supposed to be the one to go do that for Matt?

11 A.  I don't know if he was supposed to, I don't know if he

12 volunteered, I don't know.

13 Q.  Well, you say, "Because he like, I went up there," does

14 that mean Davon told you he had gone there?

15 A.  I'm sure he did then, if he said, "I went up there," yes,

16 I'm sure he did.

17 Q.  Okay.

18 A.  I don't know if he was -- volunteered to do it.  All I

19 know is that we were trying to make sure stuff didn't go in

20 the street.

21           MS. WILKINSON:  Okay.  Go ahead.

22           (Audio played.)

23 Q.  (BY MS. WILKINSON)  What was he referring to here?

24 A.  Maybe a car.

25 Q.  Which car?

1    A.  I'm not sure.

2    Q.  "I want you to hold it, though, like I don't know where

3    you want to put it at."  And you said, "Driving it."

4         What was he referring to here?  What car would you have

5    been holding for him?

6    A.  I had -- I told you, I had two cars of his, so I'm not

7    sure which one we are talking about.

8              MS. WILKINSON:  This is probably a good breaking

9    time, if you want, Your Honor, but I can go on to the last

10   call, if you want me to finish.

11             THE COURT:  I need to break by 1:00 o'clock, so if

12   this is the best way to break by 1:00 o'clock.

13             MS. WILKINSON:  I think it is, Your Honor.

14             THE COURT:  All right.  Ladies and gentlemen, we'll

15   take our hour lunch break at this point.  I'll ask that you be

16   back in the jury room at 2:00 o'clock.  Please remember my

17   instruction not to discuss the case with anyone, even among

18   yourselves.  And please enjoy your lunch.  See you in an hour.

19             (Jury left the courtroom.)

20             THE COURT:  All right.  Ma'am, I will instruct you

21   to be back by 2:00 o'clock as well.

22             THE WITNESS:  Thank you.

23             THE COURT:  Everyone enjoy your lunch.  See you in

24   an hour.

25             (A recess was taken.)

1              THE COURT:  Bring the jury.

2              (Jury entered the courtroom.)

3              THE COURT:  All right.  You may all be seated.

4    Welcome back, ladies and gentlemen, hopefully everyone enjoyed

5    today's lunch.

6              Ma'am, I will remind you that you are still under

7    oath.

8              And Ms. Wilkinson, you may continue.

9              MS. WILKINSON:  Thank you, Your Honor.

10   Q.  (BY MS. WILKINSON)  Ms. Washington, one of the questions I

11   had asked you, I think before the break, was whether or not

12   you had occasionally placed three-way calls for Mr. Hightower

13   while he was incarcerated, and I believe you said you did?

14   A.  Yes.

15   Q.  And can I ask you, so what would be the reason for placing

16   a three-way call instead of having Mr. Hightower calling the

17   person direct?

18   A.  Sometimes individuals that aren't incarcerated, they don't

19   have the funds on their phone, so an individual that's

20   incarcerated would not be able to contact them if they don't

21   have the proper funds on their phone.

22   Q.  And so you would pay for the call, in other words, and

23   then place the call.  So the person would answer, and you

24   would be the one that would be charged for the call?

25   A.  Um --

1   Q.   Is that what you mean?

2   A.   I don't know exactly to the extent that it works that way,

3   I just know that I accept the call, and if I place a three-way

4   call, that means that the other party is merged into the phone

5   call.

6   Q.   And so is that the reason you would place three-way

7   calls?

8   A.   Yes.

9   Q.   And did Mr. Hightower explain that to you, how did you

10   know to do that?

11   A.   I talked to people before that's been incarcerated, and I

12   do know -- I mean, I use my personal phone, and you can do

13   that on your personal line, you can add a third-party call, so

14   it's not nothing that's abnormal.

15   Q.   So I'm just going to put up on the screen page 1 of 5 of

16   Government's P-2, and it's a text message from you dated

17   May 21st to Mr. Carter where he said, "He's calling now, you

18   want me to call you, or tell him -- or tell him to himself?"

19        And I guess my question is, were you going to place a

20   three-way call for Mr. Hightower to Mr. Carter?

21   A.   I don't know if that's what I was going to do.  It sounds

22   a little chopped up, I don't really --

23   Q.   But you would place a three-way call --

24   A.   I had placed a three-way call to Mr. Carter before.

25   Q.   From Mr. Hightower?

1    A.   Yes.

2    Q.   Now, occasionally, to that end, did you also receive calls

3    from Mr. Hightower that were not made on his own inmate

4    line?

5    A.   Yes.

6    Q.   Okay.   And why would that be, if you're paying for the

7    call, why would Mr. Hightower call you from another inmate's

8    line?

9    A.   Well, I don't pay for the calls.   The money is, actually,

10   I believe -- I don't know -- I never been arrested, except for

11   up until recently when you guys did that for a court date.

12   But I don't know how it works over at the jail as far as the

13   finding whose account it comes out of, even if I put it on my

14   phone.   I really don't know how it works.

15        But I've made three-way calls to Mr. Carter before.   And

16   the reason why Mr. Hightower would call on another account is

17   because at certain facilities you only have a certain time

18   frame to be on the phone.   So say if you're on a 30-minute

19   call, if it ends, you're not allowed to make another call, I

20   guess for sometime.   I'm not really sure, I think it's 45

21   minutes.   It just depends on where you're housed at.

22   Q.   So that's another reason why someone might make a call

23   from some other inmate's account, was because his time had

24   elapsed that day, is that what you mean?

25   A.   I don't know if -- it's not that day, but yes, it's

Direct Examination - Washington  (By Ms. Wilkinson)

1    similar to --

2    Q.  Well, we saw, certainly with regard to you, that

3    Mr. Hightower called you from his account on the same day more

4    than once, we saw that earlier this morning; correct?

5    A.  Yes.  It had -- it's a time frame, so if you are given a

6    30-minute time to make a jail call, that's it.  You have to

7    wait more -- like more time has to pass before you're able to

8    get back on your account again.

9    Q.  Do you know --

10   A.  You can call more than once a day, yes.

11   Q.  Do you know whether or not an inmate is permitted under

12   the rules to make three-way calls, or have three-way calls

13   made for them?

14   A.  That's not permitted, it's says that on the recording.

15   Q.  I'm sorry, I didn't hear you.

16   A.  It's not permitted.

17   Q.  But you do it any way?

18   A.  I have did it.

19        MS. WILKINSON:  Now, I'm going to ask Ms. Lesser to

20   play a final call, though it's somewhat lengthy.  And for the

21   record, ladies and gentlemen, it's J-21, J-21A, and the call

22   was from Mr. Hightower using Raphael Wallace's inmate account

23   to you on June 8th, 2016 at 12:48 p.m. the phone number 1222.

24   Q.  (BY MS. WILKINSON)  Do you know who Raphael Wallace is?

25   A.  No.

1    MS. WILKINSON:  Oh, I'm told that yours doesn't have

2    the exhibit sticker on it.  Were you able to find it -- we're

3    all on the same jail call here, 6/8/16.

4    Q.  (BY MS. WILKINSON)  Anyway, I'm sorry, I didn't hear your

5    answer, do you know who Raphael Wallace is?

6    A.  No, I don't know him, I know he was incarcerated.

7    Q.  Have you received other calls from Mr. Hightower using

8    Mr. Wallace's inmate account?

9    A.  Yes.

10   Q.  Would Mr. Hightower ever call you on phone numbers not

11   1222, on other phones?

12   A.  I don't believe so.

13   Q.  Okay.  Let's go ahead and listen to this call.

14       (Audio played.)

15   Q.  (BY MS. WILKINSON)  Ms. Washington, what are you and

16   Mr. Hightower talking about here where, "There must be

17   something wrong with their phone" and "that shit takes voice

18   mail," what are you and he discussing in this part of the

19   call?

20   A.  I don't remember.

21   Q.  Well, he said, "I don't know, like you checked to see if I

22   was muted by mistake, because that shit takes voice mail."

23   And you said, "It wasn't, I heard you.  There must be

24   something wrong with their phone."

25       What was he referring to -- or what were you referring

 1  to, "There must be something wrong with their phone"?

 2  A.  I don't know, must be the jail phone, maybe.

 3  Q.  And when Mr. Hightower said, "Them F'ers will say that the

 4  three-way shit," what did you understand him to be saying

 5  there?

 6  A.  It's a recording that comes on if you make a three-way

 7  call.

 8  Q.  And what happens if you make a three-way call and the

 9  recording catches it?

10  A.  Nothing -- I mean, it will hang up, but it will -- it's

11  very -- the jail recordings are very sensitive, so sometimes

12  it will even hang up if it's too much noise in the background,

13  so it doesn't have to be a three-way call.

14  Q.  And in the time that you have spoken to inmates over a

15  time, have you made three-way calls where the inmate or the

16  person tries to blow in the phone to cover up the fact that

17  they're making a three-way call?

18  A.  Sometimes, yes.

19  Q.  And is that because you're not allowed to make three-way

20  calls because they're -- it's against prison rules?

21  A.  It's against the -- yeah.

22  Q.  Okay.

23          (Audio played.)

24  Q.  (BY MS. WILKINSON)  Ms. Washington, what is Mr. Hightower

25  saying in here, saying, "But I be trying to catch him while

1  he's out," and he said something in there, "When he's not

2  using it, so I don't know"?

3  A.  I think he's -- well, I know he's referring to the

4  gentleman who you said was Raphael.

5  Q.  And what do you mean by that?

6  A.  About using his phone account.

7  Q.  In the time that Mr. Hightower's been incarcerated, did

8  you ever know him to be able to communicate with you other

9  than on the prison recording system, in other words, where he

10  had a contraband cell phone in his possession?

11  A.  No.

12  Q.  And what about through any social internet-based type

13  messaging, did you ever receive any communications with him

14  like that?

15  A.  No.

16            (Audio played.)

17  Q.  (BY MS. WILKINSON)  Did you catch what you said there,

18  Ms. Washington?

19  A.  No, it was blurry, I don't even --

20  Q.  You don't know what you said?

21  A.  No.

22            (Audio played.)

23  Q.  (BY MS. WILKINSON)  What are you talking about there,

24  Ms. Washington?

25  A.  I'm talking about a vehicle.

1    Q.  And what are you talking about, which vehicle?

2    A.  I'm talking about an Audi.

3    Q.  Which Audi?

4    A.  I had two of them, so I'm not sure which one I'm talking

5    about, but I'm talking about one of those Audis.

6    Q.  The transcript says -- there's something about C in here,

7    did you say something about C?

8    A.  I -- can you play it again?

9    Q.  Sure.

10            MS. WILKINSON:  Can you go back about 15 seconds?

11            (Audio played.)

12   Q.  (BY MS. WILKINSON)  What are you talking there about?

13   A.  I'm talking about tags on a car.

14   Q.  Tags on a car?

15   A.  Yes, license plate tags.

16   Q.  What about the tags on the car?

17   A.  I said that I would take them off.

18   Q.  Off of what?

19   A.  Off the car.

20   Q.  Which car?

21   A.  I don't know what car I'm referring to, but I know I said

22   I'll take the tags off the car.

23   Q.  The tags off the car?

24   A.  Yes.

25   Q.  Okay.  And does this have to be one of Matthew's cars?

1  A.  Yes.

2  Q.  Okay.  And would that be either the silver Audi, the black

3  Audi, or the black truck?

4  A.  Yes.

5  Q.  But you don't know which one?

6  A.  I don't know which one I'm talking about on here.  I don't

7  know which one I'm talking about on this recording that you

8  just played.  But I do know I'm talking about license plates

9  because I told Matthew several times that he should park his

10  vehicles.

11  Q.  And we'll talk about that in a second, but who's the

12  Muslim dude --

13  A.  I don't know who the Muslim dude is.

14  Q.  -- that you knew his last name of?

15  A.  That what?

16  Q.  It says, "You know his last name?"  And you said, "Yeah."

17  "I don't know, I'm trying to figure out -- I don't know if

18  these people trying grab him up or what, like he be here in

19  another unit."

20      What was he talking about?

21  A.  I don't know what that conversation is about.

22  Q.  You don't know who his last name is?

23  A.  No, I don't know who we're referring to.

24          (Audio played.)

25  Q.  (BY MS. WILKINSON)  Who are you talking about here,

1    Ms. Washington?

2    A.   I'm talking about Cliff.

3    Q.   And what about Cliff and the flip flop of the cars?

4    A.   I told Matthew that he should -- well, that I wanted to

5    take the tags so that no one could drive the cars.  They

6    needed to be parked because Mr. Hightower was locked up.

7    Q.   Okay.  And who was driving his cars at the time, and what

8    cars are you referring to?

9    A.   There were multiple people driving those cars.

10   Q.   Was Cliff one of the people driving the cars?

11   A.   Yes.

12   Q.   And why were you -- sounds like you were angry, were you

13   angry?

14   A.   I wasn't angry, but I felt as though that if something

15   belongs to someone else, no one should be able to be upset

16   about someone getting their property back, it doesn't belong

17   to you, so I was a bit frustrated.

18   Q.   Does this mean you had had a conversation with Cliff prior

19   to this call where you told him the things that you're

20   discussing here with Matthew?

21   A.   I don't know if I had a discussion beforehand, maybe

22   Matthew talked to him, but I know that my position was just to

23   get Matthew's cars and park them because he was incarcerated

24   and that I didn't want anything else to happen in those cars,

25   like maybe an accident or anything like that, and then that

1    would be something else he has to deal with.

2        Or you know, I didn't know that the court proceedings

3    were this major.  Like I said, I never even paid attention

4    while I was in court, I just came for moral support.  But when

5    I started going for the grand jury, is when I found out the

6    nature of the case.

7    Q.  So -- well, you had been to some of the court hearings;

8    right, Ms. Washington?

9    A.  I've been to a few.

10   Q.  And during those court hearings, it was stated out in the

11   open that Mr. Hightower was being investigated for the murder

12   of David Wutoh; isn't that right?

13   A.  I found that out when he went to trial.  I found that -- I

14   didn't -- go ahead.

15   Q.  Anyway, did you have a conversation with Cliff prior to

16   talking to Mr. Hightower about the flip flop of the cars?

17   A.  I'm not sure if I had a conversation with him.  Like I

18   said, Matthew may have told him.  I had a conversation with

19   Matthew about getting his cars and taking the tags off.

20   Q.  Would that have been on an inmate account in the name of

21   Raphael Wallace, some other inmate, or some other way he

22   communicated with you?

23   A.  I'm not sure if it was on that account, or it was on

24   Matthew's account.

25            MS. WILKINSON:  Okay.  Ms. Lesser --

1          THE COURT:  If I can -- before you play it, if I can

2   ask both counsel and the witness to try to slow down a little

3   bit.

4          THE WITNESS:  Yes.

5          MS. WILKINSON:  Sorry, Your Honor.  Thank you.

6          (Audio played.)

7   Q.  (BY MS. WILKINSON)  Who's Joey?

8   A.  I don't know, I guess it's Matthew friend, somebody with a

9   tow truck maybe.

10  Q.  He what?

11  A.  I don't know.

12  Q.  I'm sorry, I didn't catch the last part of what you said

13  before.

14  A.  A tow truck.

15  Q.  He does tow trucks?

16  A.  I heard Matthew say something about a tow, did he say

17  something about a tow?

18  Q.  Did you know Joey to be a tow truck driver?

19  A.  I don't know him to be a tow truck driver, but I do recall

20  him getting one of Matthew's cars towed.  I don't know if

21  that's what he does, though.

22  Q.  And at the -- let me go ahead and put up Government's

23  Exhibit C-2, is that the tag number that Mr. Hightower was

24  trying to remember of the black truck?

25  A.  Yes.

1   Q.  And he gets it a little bit off.  This one is 55193, I

2   think he says 55143 on it, but was he talking about this car,

3   or the Audi?

4   A.  I believe he's talking about this car.

5   Q.  So when you were discussing the flip flop of the cars with

6   Cliff before, was that about the Audi, or about the black

7   truck, or is that what you used the word "flip flop" for?

8   A.  I don't know why I said "flip flop."  I just -- I don't

9   know why I said "flip flop of cars."

10  Q.  Well, which car was Cliff driving that you were angry

11  about?

12  A.  He had two -- he had both of them.

13  Q.  Which ones?

14  A.  The Audis.

15  Q.  And the -- which car, the Audi and the -- what's the

16  second car?

17  A.  Two Audis.

18  Q.  He had both Audis?

19  A.  Yes.

20  Q.  So why are you talking about the black truck here?

21  A.  I don't know why we're talking about the black truck.  You

22  asked me what cars did he have, I told you what cars he had.

23  Q.  That you saw him have?

24  A.  Yes.

25           (Audio played.)

1  Q.  (BY MS. WILKINSON)  So what were you asking here,

2  Ms. Washington, "I'm trying to find out did he go with him

3  that day when he picked him up from the car shop and they was

4  putting him in the truck"?  Who are you talking about?

5  A.  I'm talking about Davon and Cliff.

6  Q.  And now, when you say "the truck," are you talking

7  about -- I mean, "the trunk," what trunk are you talking

8  about?

9  A.  I'm not sure what trunk I'm talking about, but I'm -- I

10  remember that day, they were picking up his work -- all his

11  belongings from work, and they picked up a set of rims, like

12  car wheels.

13  Q.  So you're talking about the three-week ago conversation

14  back in May when you said that they showed up at Cars Plus

15  and -- to get Matthew's things, is that the event you're

16  talking about?

17  A.  Yes.

18  Q.  So you're saying, "I'm trying to find out, did he go with

19  him that day when they picked him up from the car shop and

20  putting them in the trunk," and what -- the trunk of which car

21  are you talking about here?

22  A.  I'm not sure which trunk of which car I'm talking about

23  because when they came, I didn't see them come, I was already

24  there.  I didn't see them two come -- I can't even talk if

25  they came together.

1    Q.  And when you say, "I'm trying to find out," how are you

2    trying to find out, who are you trying to have communication

3    with?

4    A.  I don't know, I don't remember, ma'am.

5    Q.  Well, would it be Davon or Cliff?

6    A.  Apparently, but I don't know who, I don't remember.

7            (Audio played.)

8    Q.  (BY MS. WILKINSON)  Who are you talking about there,

9    Ms. Washington?

10   A.  I'm thinking I'm talking about Davon.

11   Q.  Did he show you where he lived?

12   A.  No.

13   Q.  You said, "He was just like, I live down there, that day,

14   he didn't show me where his house was, he was just like, I

15   live down there."

16       Where was he showing you?

17   A.  I don't know.  I met him somewhere near -- I can't even

18   remember the street, but it's not far from -- oh, my God, I

19   don't know like the name of the street, but I just met him,

20   and he pointed in a certain direction, but I don't remember

21   the name of the street that we were on.

22   Q.  And which meeting of --

23   A.  Maybe not far from Towson or something like that, I don't

24   know.

25   Q.  Which meeting with Davon was this one?

1    A.  What do you mean what meeting?

2    Q.  Well, you said you were meeting with Davon.

3    A.  I met him, but what do you mean, what meeting?

4    Q.  What circumstances did you meet with him at this time?

5    A.  Only time I had encounters with him, I told you, was when

6    the situation happened with the clothing, and I think some

7    stuff about insurance, like Gateway -- the insurance company

8    was Gateway, finding paperwork.

9            (Audio played.)

10   Q.  (BY MS. WILKINSON)  So what are you talking about here,

11   Ms. Washington?

12   A.  I don't know what that conversation is about, it has to

13   do -- it still has something to do with Davon.

14   Q.  And did you get in touch with somebody -- it says, "They

15   got a different number now, they got different phone numbers

16   and everything.  I told you, her" -- Matthew says, "I told

17   you, her name is Deanna Lawson."  And you say, "They got a

18   different number now."

19       Had you been trying to contact one of them on your

20   number?

21   A.  No, I said that his sister said -- I said that Matthew's

22   sister said that they had a different number.

23   Q.  Did you know they had been arrested in the truck, the

24   black truck, the BMW?

25   A.  At what point?

1    Q.  At this point, around this time.

2    A.  What time is this, what time frame is this, what month is

3    this?

4    Q.  This call is on June 8th, and Mr. Carter had been locked

5    up on June 1st in the black BMW.

6    A.  I don't know if I was aware of that.  I do know that the

7    car was impounded.

8              (Audio played.)

9    Q.  (BY MS. WILKINSON)  You say, "Your sister said it's

10   supposed to be so many conflicting ass stories," was there

11   talk on the street, conflicting stories about why Mr. Carter

12   had gotten locked up and was now released?

13   A.  I said his sister said that, I don't know if that -- it's

14   the truth, whether it was a bunch of stories on the street in

15   regards to him.  I don't even really know Davon that well.  I

16   met him briefly a couple of times, and then like I said, those

17   two times, that was the nature, and it may have been three-way

18   calls that were made to Davon.

19   Q.  So was there some concern from his sister or otherwise

20   that perhaps Mr. Carter, after his arrest, was cooperating

21   with the police?

22   A.  I can't talk to that, because I don't know that.

23   Q.  What were the, "Your sister said it's supposed to be so

24   many conflicting ass stories," I assume you talked to

25   Mr. Hightower's sister?

1    A.  I prob- -- I'm sure I did, his son goes to the same day

2    care center that my son goes to, but I do talk to her in

3    regards to what's happening with him.  But I'm sure that it

4    probably was conflicting stories.  I wouldn't know, I didn't

5    say that.  I didn't say there were conflicting stories.

6    Q.  You said, "Your sister said it's supposed to be so many

7    conflicting ass stories."

8    A.  Yes, you heard me say that he supposed to have been locked

9    up, then he wasn't locked up.  I said that his sister said

10   they were conflicting stories, I would not know that.

11   Q.  Okay.  And that his sister was saying it in relation to,

12   why is he out on release and --

13   A.  I don't know why his sister was saying what she's saying.

14             (Audio played.)

15   Q.  (BY MS. WILKINSON)  Now, in response, after you say, "Your

16   sister said it's supposed to be so many conflicting ass

17   stories," and you say, "None of them make sense to me," so

18   which ones were you hearing?

19   A.  I don't know which ones I were hearing, and I just made a

20   statement, because earlier you heard Mr. Hightower say -- I

21   mean, you heard me tell Mr. Hightower he's supposed to be

22   locked up, he's not supposed to be locked up, none of them

23   make sense to me.  I honestly really -- no disrespect, but I

24   don't care if he was locked up or he weren't locked up.

25   Q.  You were just concerned about getting Matthew's cars for

Direct Examination - Washington  (By Ms. Wilkinson)

1    yourself?

2    A.  Not for myself, because they weren't going to be for my

3    personal use, I was just concerned about parking the cars.

4    Q.  Well, at this point, you had control over Mr. Hightower's

5    phone, yes?

6    A.  I didn't have control over anything.

7    Q.  You have possession of his phone, yes?

8    A.  I did have his phone.

9    Q.  You had the ability to get into his bank account, yes?

10   A.  With the help of him giving me his password over the

11   phone.

12   Q.  And you were the one he primarily spoke to from jail,

13   yes?

14   A.  I don't know if I was the only one, but he has talked to

15   me.

16   Q.  And you're the one who knew where his three cars were?

17   A.  Not at all times, but I did know where they were most of

18   the time.  I do know that someone was driving them.

19   Q.  So you were monitoring them?

20   A.  I was not monitoring anything, I was trying to simply help

21   him park his vehicles and that's it.  I was trying to help him

22   pay his car insurance because I didn't know that he was going

23   to be locked up this long.

24           (Audio played.)

25   Q.  (BY MS. WILKINSON)  So who was lying and who did you

1    see?

2    A.  I saw Mr. Carter driving in the car.

3    Q.  Which car?

4    A.  The BMW.

5    Q.  And had he lied to you that he hadn't been driving it?

6    A.  No.  I never had a conversation with him about driving

7    it.

8              (Audio played.)

9    Q.  (BY MS. WILKINSON)  Who are you talking about here, who's

10   T that you "seen him anyway," that's "so black and so

11   little"?

12   A.  That's a friend of Matthew's also.

13   Q.  What's his name?

14   A.  T.

15   Q.  Do you know his real name?

16   A.  No.

17   Q.  Had you met him before?

18   A.  I seen him one time with Matthew.

19   Q.  And where did you see him with Matthew?

20   A.  In a car, just beside us.

21   Q.  Is that how you had met him?

22   A.  I believe so.

23   Q.  Did you go down and meet him as directed by Mr. Hightower

24   here?

25   A.  I don't know if I went down to meet him anywhere.

1   Q.  He said, "You can just knock on the door and just ask for

2   him."

3                   MS. WILKINSON:  Can you play that part, Ms. Lesser?

4                   (Audio played.)

5   Q.  (BY MS. WILKINSON)  So did you go down and knock on T's

6   door and say you were coming from Fats's?

7   A.  Coming for who?

8   Q.  Fat, "I'm coming from Fat," what was just said on the call

9   here, did you go down and see T and knock on his door and ask

10  for him and speak with him as directed by Mr. Hightower?

11  A.  I don't know if I did that, and I don't know who Fats

12  is.

13  Q.  Do some people call Mr. Hightower Fats?

14  A.  I never heard anyone call him that.

15  Q.  Did you go down and talk to T and tell him you were coming

16  for Mr. Hightower?

17  A.  I don't remember doing that.

18  Q.  Did you go to T's house?

19  A.  I don't even know where he lives, I don't remember doing

20  that.  If you play it a little bit more, maybe you can jog my

21  memory.  I know who he is, I remember seeing him, I do not

22  remember no one named Fats or anything like that.  I've never

23  been in touch with any Fats.

24  Q.  Mr. Hightower says, "You can just tell him get whatever

25  they hear because whatever going on with him."  And you said,

Direct Examination - Washington  (By Ms. Wilkinson)

1    "I seen him anyways, he's so black and little."

2        "Yeah, he be chilling, just go knock on the door and ask

3    for him and just -- you know, he call me Fat, just be like,

4    I'm coming from Fat or something."

5        And I'm just asking you, did you go do it?

6    A.  I don't remember doing that.

7    Q.  Did you later tell Matthew that you didn't go down and see

8    T near 645 Bentalou and do whatever Mr. Hightower is asking

9    you to do here?

10   A.  I don't know what he's asking me to do.  I don't remember

11   doing that.  I'm not going to say I didn't, I just don't

12   remember doing that.

13   Q.  Well, I'm trying to understand the various things you did

14   for Mr. Hightower when he was locked up, and we know that you

15   gave him phone numbers, yes?

16   A.  Yes, I did.

17   Q.  You got him phone numbers, and he wrote you letters?

18   A.  He did.

19   Q.  And you had communication with Davon and Cliff; correct?

20   A.  I did.

21   Q.  And at times, you dealt with his insurance and that sort

22   of thing for the cars?

23   A.  One time I did.

24   Q.  And then I believe you're going to tell us you also made

25   sure his cars came under cover, I guess to use your word, that

Direct Examination - Washington  (By Ms. Wilkinson)

1   they were brought in?

2   A.  Not brought in under cover like that, I said that he

3   should park them and put a cover on them.

4   Q.  And what does that mean, "park them and put a cover on

5   them"?

6   A.  Park them -- if you park them on the streets -- like I

7   said, I was trying to tell him he should take the plates off,

8   park the cars, and put a cover on them.  You can't have a car

9   just sitting on the street in Baltimore.  I was told that you

10  can't have it sitting there without a cover if it's not

11  license-plate tagged.

12  Q.  Or hiding them?

13  A.  Hiding them for what reason?  I blatantly told you that I

14  was trying to park them.  Why would I be hiding them?

15  Q.  So going back to my question about T, did you go down

16  there, as Mr. Hightower directed, after this call and have a

17  conversation with him?

18  A.  I'm not sure if I did that or not.

19          (Audio played.)

20  Q.  (BY MS. WILKINSON)  What did he mean by, "I don't

21  think" -- did he say, "Her L's are straight yet"?

22  A.  Yes.

23  Q.  What does that mean?

24  A.  Your license.

25  Q.  Her license, okay.  So she couldn't drive legally, is that

1    what you meant?

2    A.  I don't know.  I don't know if she had her permit yet or

3    not.  I don't know her business, I'm just listening as you are

4    too.

5    Q.  But that would be Biggie with whom you had some

6    conversations with --

7    A.  Yes.

8         (Audio played.)

9    Q.  (BY MS. WILKINSON)  Who are they talking about there, who

10   drinks too much and who Matthew told her to do something?

11   A.  He said something about -- he's talking about Cliff, and I

12   said that he drinks too much.

13        (Audio played.)

14   Q.  (BY MS. WILKINSON)  Did you hear Mr. Hightower, did he

15   say, "It's not too late, bro, he did -- you know, he still

16   owe," did you hear Mr. Hightower say that?

17   A.  Yes.

18   Q.  What was he referring to there?

19   A.  I don't know what he's referring to.  He doesn't owe me,

20   so I wouldn't know what he owes.

21        (Audio played.)

22   Q.  (BY MS. WILKINSON)  So at the end of the call, you say,

23   "I'm going 'round there," where were you going 'round?

24   A.  Probably around the corner, like I said, like I saw him

25   before where my aunt lives at.

Direct Examination - Washington  (By Ms. Wilkinson)

1    Q.  Okay.  And that would be --

2    A.  So I'm sure I was sitting outside.  I've only been down

3    there a couple times.

4    Q.  That would be down around Wylie?

5    A.  Yes.

6    Q.  At some point, did you get the Audi, the silver Audi

7    back --

8    A.  Yes.

9    Q.  -- Ms. Washington?

10   A.  Yes.

11   Q.  And do you recall when you got the silver Audi back and

12   from who?

13   A.  I don't remember when I got it back, but I got it back

14   from Cliff.

15   Q.  And tell us the circumstances under which he got -- you

16   got it back from him.

17   A.  There were no circumstances, I told him that I wanted to

18   get the car back for Matthew.

19   Q.  Yes, and how did you physically get it back, where did you

20   go or did he go, how did that happen?

21   A.  I got it from him on Wylie.

22   Q.  What does that mean?

23   A.  That means exactly what I said, I got it from him on

24   Wylie.

25   Q.  So did he give you the keys at that point, and then you

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

1    were driving it?

2    A.  He didn't give me the keys at first, no, he didn't.

3    Q.  So again, I'll ask you, just describe the circumstances

4    under which the Audi came back into your possession and

5    control.

6    A.  Um, the first time I asked for it, he didn't want to give

7    it to me.  He had to take his daughter to school the next day,

8    so he wanted to hold it a little while longer.  And then later

9    that evening, I wound up picking it up around 7:00, I believe.

10   Around like -- it was almost getting nightfall.

11   Q.  And where did you go?

12   A.  7:00 or 8:00.

13   Q.  And where did you go at nightfall, where did you go?

14   A.  I picked the car up, and then I drove it to a parking lot

15   where my uncle lives.  And he has a parking pass, we put a

16   parking pass in it and it stayed there.

17   Q.  Let me just go back for a second.  You picked it up on

18   Wylie at nightfall?

19   A.  Yes, it was getting ready to get dark kind of.

20   Q.  Okay.  And what did you do with your car when you got in

21   the Audi?

22   A.  I wasn't driving my car, my cousin was driving my car.

23   Q.  And who was that?

24   A.  Shantay.

25   Q.  So Shantay dropped you off, and then you got in the --

Direct Examination - Washington  (By Ms. Wilkinson)

1   A.  We rode together.

2   Q.  And then you got out of the car?

3   A.  Yes.

4   Q.  And you got in the silver Audi?

5   A.  After I got the keys from him, yes.

6   Q.  And then you drove it where?

7   A.  I drove it to my uncle's house.

8   Q.  And did you put it under cover?

9   A.  No, it was in a parking lot, and it had a parking pass in

10  the front of the dash.

11  Q.  And did it stay there until the police seized it?

12  A.  No, it stayed -- it stayed there for some time, but it was

13  moved because my uncle lives in like a senior building, and

14  the car wasn't -- I wasn't moving it, so they wanted to know

15  who it belongs to.  The only time your car could stay there

16  was if you resided there.  So my uncle contacted me, and he

17  didn't want them to tow it, so I then took the car to

18  Matthew's mechanic.  I asked him was it okay if I could bring

19  the car there, and he said yeah.

20  Q.  Is that George Mat --

21  A.  Yes.

22  Q.  Okay.  And let me ask you if you can recall,

23  Ms. Washington, when you -- the Audi changed locations from

24  where you first put it at your uncle's house to where you took

25  it to the garage, was it before or after the police came to

1    interview you the very first time?

2    A.  I'm not sure exactly when I moved it, I just know it

3    couldn't stay where it was.  If it stayed there, it would have

4    gotten towed, so I moved it when I spoke to George, and he

5    said that it could come there.  And he said he didn't mind

6    keeping it until Matthew came home.

7    Q.  And was it before or after --

8    A.  I do not remember.

9    Q.  -- the police came to interview you --

10            THE COURT:  Ma'am, you have to wait until she

11   finishes the question.

12            THE WITNESS:  Sorry.

13   Q.  (BY MS. WILKINSON)  -- when the police came to interview

14   you the first time?

15   A.  I'm not sure what you're talking about.  I don't remember,

16   because I was interviewed several times.  The first time when

17   I was interviewed, I was snatched out of a vehicle, so I'm not

18   sure what you're talking about.  The car was sitting on a

19   parking lot, with a parking pass, like I said.  It had to be

20   moved, and that's what I did.  I don't remember what date I

21   did it.  I don't remember if it was before police talked to me

22   or after police talked to me.

23   Q.  Was it in the garage that the police eventually found it

24   in and searched it?

25   A.  Well, you guys had me in a private room, and you asked me

1    where the car was, and I told you where you could go and find

2    it.

3    Q.  That's my question, thank you, Ms. Washington.

4    A.  You're welcome.

5              THE COURT:  Cross.  Mr. Trainor.

6              MR. TRAINOR:  Thank you, Your Honor.

7                      CROSS-EXAMINATION

8    BY MR. TRAINOR:

9    Q.  Good afternoon, Ms. Washington, my name's Harry Trainor, I

10   represent Mr. Mosley in this case.

11   A.  Hello.

12   Q.  As I understand your testimony, you met Matthew Hightower

13   in approximately 2014; is that right?

14   A.  No, I've known Matthew before 2014.

15   Q.  All right.  But weren't you working together, and he

16   became a chef at your work?

17   A.  Yes.

18   Q.  All right.  And at that time, he was living with Michelle

19   Fleming?

20   A.  Yes.

21   Q.  And their children at the Fallstaff; is that right?

22   A.  When we were working together?

23   Q.  Yes.

24   A.  Yes.

25   Q.  All right.  But there came a time when you were working

1    together that you became romantically involved with

2    Mr. Hightower; correct?

3    A.   I wasn't working with him when me and Mr. Hightower became

4    involved.

5    Q.   Let's be clear, when did you become romantically involved

6    with Mr. Hightower?

7    A.   I believe in 2013.

8    Q.   All right.  So 2013 through at least the time that he was

9    incarcerated, which we know was May the 4th of 2016;

10   correct?

11   A.   I'm not sure the date that he was incarcerated.

12   Q.   Okay.  Well, during the time before he was incarcerated,

13   from 2013 on, you knew that he was working for an automobile

14   dealership?

15   A.   Yes.

16   Q.   And also selling or buying used cars at auction and

17   selling them; correct?

18   A.   Yes.

19   Q.   And he had sort of an inventory of cars that -- you've

20   talked about three of them here, a couple of Audis and a black

21   BMW X5?

22   A.   Yes.

23   Q.   All right.  And those are the cars you're aware of, and

24   you've actually seen them, driven them, and been in all of

25   them; correct?

1    A.  Yes.

2    Q.  Matthew Hightower was generous with his friends as far as

3    letting them drive some of his cars; is that fair?

4    A.  Yes, he would give a car to anybody that needed one

5    sometimes.

6    Q.  Now, in the time before Matthew Hightower was locked up,

7    you didn't know Clifton Mosley very well, did you?

8    A.  No.

9    Q.  In fact, you'd only seen him a few times; is that fair?

10   A.  That's fair to say.

11   Q.  All right.  But after Matthew Hightower was locked up,

12   there were problems because all of these things he invested

13   in, these automobiles, were spread out over Baltimore and no

14   one had control of them; correct?

15   A.  Yes, a lot of people was just driving.

16   Q.  And you felt that he was being taken advantage of; fair?

17   A.  I wouldn't say taken advantage of, I would just say that a

18   lot of people was driving those cars.  Because, I mean, he

19   would loan people cars, but at that point, I felt like when

20   someone is arrested, you should kind of put their property to

21   the side because it doesn't belong to you and they were

22   loaning you it, so you should park it.

23   Q.  Well, after Matthew was locked up, he let you know that he

24   wanted to hire a lawyer for himself rather than have a

25   court-appointed lawyer?

1    A.   Yes.  He didn't trust his attorney.

2    Q.   He wasn't happy with the attorney that was appointed for

3    him?

4    A.   Yes.

5    Q.   All right.  And that would take money, he needed money to

6    do that, didn't he?

7    A.   Yes.

8    Q.   All right.  So at that point in his life, after he was

9    locked up, he had been detained here, you were still pretty

10   loyal to him, you would be the one who took his phone calls,

11   you would be the one who visited him on visiting days;

12   correct?

13   A.   Yes.  When you say take phone calls, I didn't really take

14   phone calls, but yeah.

15   Q.   Well, you accepted phone calls when he called you;

16   correct?

17   A.   Oh, yes.  You saying accept his calls, oh, yes.

18   Q.   His jail calls, and sometimes you would get charged for

19   those?

20   A.   I don't really know how it worked because I was never

21   charged for the calls.  If I paid money, it was on my account;

22   if he paid money, it was his account, something of that sort.

23   Q.   All right.  But you got -- it was clear to you that the

24   calls were coming from Matthew Hightower, who was in jail?

25   A.   Yes.

Cross-examination - Washington  (By Mr. Trainor)

1    Q.   At the Chesapeake Detention Facility; correct?

2    A.   Yes.

3    Q.   And you would meet with him in person as well as take the

4    phone calls, many of which we've heard?

5    A.   Yes.

6    Q.   One of the positions you took was, Mr. Hightower, or

7    Matthew, you've got to get control of these vehicles?

8    A.   Yes.

9    Q.   And he gave you authority to do that; correct?

10   A.   Well, he was in agreement with me doing it.

11   Q.   Yeah.

12   A.   He didn't mind.

13   Q.   And it started to come -- in your view, it became clear

14   that he might be there in jail for a while, and you wanted to

15   have him have something to come back to or to use, whatever

16   money could be raised to hire an attorney; correct?

17   A.   Yes.

18   Q.   So you got some -- you got authority from Matthew to get

19   these vehicles back from wherever they were?

20   A.   Yes.

21   Q.   And you were able to recover the Audi, just as you've

22   testified.  You went up to Wylie Avenue and saw the vehicle

23   parked one night, you knew you would find Cliff up on Wylie in

24   that area; correct?

25   A.   Yes, I just went there because I'm familiar with that

Cross-examination - Washington  (By Mr. Trainor)

1    area.  Like I said, I been down there a few times, my aunt

2    lives there, so I saw him there before.

3    Q.  And you made it clear to Mr. Mosley that Matthew had told

4    you to get his car back?

5    A.  Yes.

6    Q.  And that was -- that was within about at least a month --

7    within a month of the time that Matthew was locked up;

8    correct?

9    A.  I don't really know if it was within a month, but I do

10   know it wasn't a long period of time that he was dealing with

11   the court proceedings that I started to tell him you should

12   get your cars, so I don't know what the time frame.

13   Q.  So when you first approached Mr. Mosley to get the Audi

14   back, that was the silver bluish Audi?

15   A.  Yes.

16   Q.  He was reluctant to return the car to you?

17   A.  He wanted to, but he wanted to hold it for an extra day

18   because he wanted to be able to ensure he can get his daughter

19   to school, day care, something like that.

20   Q.  All right.  And when you say hold a car, you mean to keep

21   it and use it; correct?

22   A.  Yes.

23   Q.  All right.  So rather than argue with him, you came back

24   the next evening, and you and your cousin arranged to take the

25   car; correct?

Cross-examination - Washington  (By Mr. Trainor)

1   A.  We came that same evening, that --

2   Q.  That same evening?

3   A.  Yeah.

4   Q.  All right.  So you gave him a couple of hours to get his

5   daughter --

6   A.  Situated, yeah.  Yes.

7   Q.  All right.  And then when you came back again, he gave you

8   the keys?

9   A.  Yes.

10  Q.  All right.  And that was the last of -- you got control of

11  the Audi that day?

12  A.  Yes.

13  Q.  All right.  And that Audi then went to your uncle's

14  apartment?

15  A.  Yes.

16  Q.  And then it went to somebody named George's garage?

17  A.  Yes.

18  Q.  All right.  Where's the Audi now?

19  A.  I'm not sure.  I know that Ms. Wilkinson and --

20          MS. WILKINSON:  Objection.  Nonresponsive.  She said

21  she's not sure where the Audi is now.

22  A.  Well --

23          THE COURT:  Overruled.  You can complete your

24  answer.

25  A.  Ms. Wilkinson and some federal agents asked me where it

1    was, in a small room, and then I informed them where it was,

2    and they went and got it.  I believe -- George told me that

3    some people came to his shop, and I guess kicked his door down

4    or something, to get that car.

5    Q.  (BY MR. TRAINOR) But that's what you believe to be true,

6    but George told you that?

7    A.  Yes, but I don't know where it is.  But that's what the

8    owner of the shop told me.

9    Q.  All right.  Well, how about the other Audi, the black one,

10   what happened to that one, did you get it back?

11   A.  Yes.  I took that to Cars Plus, and I gave it back to them

12   because that's where it had came from.

13   Q.  And some money was owed on it?

14   A.  Yes, I believe so.

15   Q.  And so you just canceled out a debt?

16   A.  Yes.

17   Q.  And you didn't get any cash from that?

18   A.  No.

19   Q.  All right.  How about the third one, the BMW X5, the black

20   one?

21   A.  I had that car parked in front of my son's grandmother

22   house, which was right around the corner from where George's

23   shop is, but my son's grandmother is always home, all day.  So

24   that -- in a case that she could move it from side to side if

25   need be, if I couldn't come every single day in that area, so

1    I left it there.  And then the car was stolen.

2    Q.  When was it stolen?

3    A.  The car was stolen in December.

4    Q.  Of what year?

5    A.  2016.

6    Q.  So did you report that to the police?

7    A.  Or 2017, I believe.  I did, I filed a police report.

8    Q.  And was it ever recovered?

9    A.  It was, but it -- I didn't have it, I never got it back in

10   my possession.  They recovered it, but it was given back to

11   the person who stole it because they switched some things

12   around the title.  They fraudulently forged the title, is what

13   I found out from the motor vehicle.

14           MS. WILKINSON:  Your Honor, I'll -- hearsay move to

15   strike.

16   A.  No, I was --

17           THE COURT:  Ma'am, hold on.

18           So basis of knowledge, have you asked her how she

19   knows that?

20   Q.  (BY MR. TRAINOR)  How do you know that?

21   A.  How do I know that it was stolen?

22   Q.  Well, let's start with that.

23   A.  I know that it was stolen because it was parked where my

24   son's grandmother lived.  In the morning time, I got a call

25   and they said, hey, have you moved the car, I said no.  I came

1    up immediately, and since I didn't move it, we knew that it

2    had been stolen, so we filed a police report.

3         And when we filed the police report, we took some papers

4    to the MVA, and when they pulled everything up with the VIN

5    number, we was told that the car -- that someone fraudulently

6    did a title and that title did not match Mr. Hightower's name

7    anymore.

8    Q.   So that's what someone at the MVA told you?

9    A.   Yes.

10   Q.   The fact is, you haven't seen the car since 2018?

11   A.   Yes, I haven't seen it.

12        THE COURT:  So for the record, I'm going to sustain

13   the objection as to hearsay.  And the jury should disregard

14   the testimony regarding whether or not the tags have been

15   fraudulently changed.

16        You may continue.

17   Q.   (BY MR. TRAINOR)  But -- what we do know from your own

18   personal knowledge is that you parked the car in Baltimore,

19   and it came up missing, and you reported it stolen, and you've

20   never seen the car again?

21   A.   Yes.

22   Q.   Now, you mentioned that there was a time that you saw

23   Clifton Mosley at Mr. Hightower's place of employment, the

24   dealership?

25   A.   Yes.

1    Q.  And that was after Matthew Hightower was locked up;

2    correct?

3    A.  Yes.

4    Q.  And the purpose for him being there was to help you load

5    Mr. Hightower's belongings and get them out of the

6    dealership?

7    A.  Yes.

8    Q.  And that included heavy things like wheels and rims and

9    just regular tires?

10   A.  Yes.

11   Q.  So he was there as a -- just as a helper; am I correct?

12   A.  Yes.

13           MR. TRAINOR:  Court's indulgence a moment.

14           THE COURT:  Sure.

15   Q.  (BY MR. TRAINOR)  Were you able to sell any of this stuff

16   in order to -- for Matthew to hire a lawyer?

17   A.  No.

18   Q.  And Clifton Mosley has never been to your house?

19   A.  I don't believe so.

20   Q.  You don't really know him well at all, do you?

21   A.  No, not that well.

22           MR. TRAINOR:  That's all I have, Your Honor, thank

23   you.

24           THE COURT:  Cross from Mr. Carter's counsel.

25           MR. DAVIS:  Thank you, Your Honor.  Very briefly.

1                         CROSS-EXAMINATION

2    BY MR. DAVIS:

3    Q.  Ms. Washington, your knowledge of Davon Carter and Clifton

4    Mosley is that they were not close friends; correct?

5    A.  I don't believe they were, I'm not sure.  I just know that

6    they were friends of Mr. Hightower.

7    Q.  Did they appear to get along, based on your personal

8    knowledge?

9    A.  They were fussing a lot.

10   Q.  Now, directing your attention to the BMW truck on June 1st

11   of 2016, Mr. Carter had it.  Did he have it for any particular

12   reason?

13   A.  I believe he was supposed to have taken it to a car shop

14   to get some repairs done.

15            MS. WILKINSON:  Objection, Your Honor, to basis of

16   knowledge at this point.  Can we establish --

17   Q.  (BY MR. DAVIS)  Well, do you know if that's the reason

18   that he had the vehicle?

19            MS. WILKINSON:  Objection.  Basis of knowledge.

20            THE COURT:  Ask her how she knows.

21   Q.  (BY MR. DAVIS)  How do you know?

22   A.  From Mr. Hightower.

23   Q.  And --

24            MS. WILKINSON:  Objection.

25            MR. DAVIS:  Everything else Mr. Hightower said came

1    in, so I don't know why --

2            THE COURT:  Approach.  Well, let's approach, let's

3    approach.

4            (Bench conference on the record.)

5            THE COURT:  We've been at this for a while now, but

6    let's still have these discussions at the bench.

7            Your objection.

8            MS. WILKINSON:  My objection is to hearsay as to

9    what Matthew Hightower told her.

10           MR. DAVIS:  We've probably spent a week solid

11   listening to Mr. --

12           MS. WILKINSON:  The rules apply to --

13           THE COURT:  Hold on, hold on.

14           MR. DAVIS:  -- listening to what Mr. Hightower is

15   saying.  I don't --

16           THE COURT:  So that occurs to me, but from -- they

17   have established either in furtherance of the conspiracy, or

18   at times, state of mind, and so now I'm asking you what such

19   exception would apply here.  It's not just the general

20   Hightower rule, I'm tired of hearing about Hightower myself.

21           MS. WILKINSON:  We are too.

22           THE COURT:  But when it applies, it applies.

23           MR. DAVIS:  All right.  Let me think.

24           THE COURT:  In the meantime, I'm going to sustain

25   the objection.

1       MR. DAVIS:  To explain why Mr. Carter has the car.

2  It doesn't go to the truth of the matter asserted, it just

3  explains why he had it.

4       THE COURT:  You're trying to get --

5       MR. DAVIS:  It doesn't necessarily mean that he was

6  going to take the car to get the tires fixed, but it explains

7  why he had it, why she -- why he had it.  It's -- but it

8  doesn't -- it doesn't mean that he was taking it to the shop

9  to get the tires --

10       THE COURT:  I'm trying to remember myself what the

11  actual question was.

12       MR. DAVIS:  I asked --

13       THE COURT:  Did he have it for a particular reason?

14       MR. DAVIS:  Yes, exactly.

15       THE COURT:  The objection is sustained.  Objection

16  is sustained.

17       (The following proceedings were had in open court.)

18  Q.  (BY MR. DAVIS)  Do you have any personal knowledge if

19  there were any problems with the BMW truck prior to Mr. Carter

20  taking possession of it?

21  A.  It was making a loud noise sometimes, I think the engine

22  light was on.

23  Q.  Now, on the telephone call -- one of the telephone

24  calls -- one of the many telephone calls we've heard between

25  you and Mr. Hightower, he was talking about how he didn't know

1    why his BMW truck had been seized.  And it appeared during the

2    course of that call that Mr. Carter had had the BMW truck when

3    it was seized.

4         Do you recall that call, he was saying he didn't know

5    what he was doing with it, he doesn't know why they --

6    A.  Yeah.

7    Q.  -- seized his truck?

8         So at the time of that call, Mr. Hightower had no idea

9    that there was marijuana in that truck, did he?

10              MS. WILKINSON:  Objection, Your Honor.

11              THE COURT:  Overruled.  Overruled.  If you know, you

12   can answer the question.

13              MS. WILKINSON:  How would she know?  Basis of

14   knowledge.

15              THE COURT:  If you know -- it's my ruling.

16              If you know, you can answer the question.

17   A.  Can you repeat the question?

18   Q.  (BY MR. DAVIS)  Certainly.  So at the time of that call,

19   Mr. Hightower had no idea that marijuana had been found in

20   the -- in that BMW truck when Mr. Carter was driving it?

21   A.  I don't believe so.

22   Q.  He went on to say that, "There was nothing in the truck, I

23   don't know why they seized it."

24        Do you recall that when the call was played a few moments

25   ago?

1    A.  Yes.

2    Q.  Now, I'm going to take you back to your grand jury

3    appearances, you appeared before the grand jury on two

4    occasions; correct?

5    A.  Yes.

6    Q.  How is it that you were notified that you were going to

7    appear before the grand jury, could you explain to us how you

8    would come to know that you had to go there?  I mean, did

9    someone knock on your door, would someone call you?

10   A.  I'm not sure if they called me, but I do recall the

11   government calling me before.  I'm not sure if that was the

12   instance of how I knew this time.  But I think I received a

13   court subpoena.

14   Q.  And how was -- how did you actually get that, did someone

15   deliver it to you, did someone knock on your door, did they

16   stop you in the car, did they come to your job, did they come

17   to your house?

18   A.  I don't know, I have been harassed so much, I can't -- I

19   don't know.

20   Q.  And you said you've "been harassed so much," would you

21   characterize the way you were approached by the authorities as

22   harassment, is that your view of how you were approached

23   regarding all these --

24   A.  Yes.

25   Q.  -- interviews you had?

1    So you would go down there; correct, and where would you
2  go when you would be interviewed?
3  A.  Into a room, a -- are you talking about before the grand
4  jury, or --
5  Q.  Well, let's just talk about the interviews, how many times
6  were you brought in to be interviewed?
7  A.  I was brought in twice.
8  Q.  To be interviewed?
9  A.  Well, I was interviewed several times.  I was interviewed
10  at a homicide unit, I don't know why.  I was interviewed in a
11  small room with the federal agents and Ms. Wilkinson on two
12  different occasions.  It's been so much, I don't know.
13  Q.  So it's fair to say, from your viewpoint, you were
14  interviewed a lot?
15  A.  If you want to call them interviews, I consider them to be
16  harassment.  They weren't interviewing me about anything, they
17  were harassing me.
18  Q.  Let me ask you a question, would you characterize the
19  questioning by the authorities as aggressive?
20    MS. WILKINSON:  Your Honor, can we approach?
21  A.  Are you --
22    THE COURT:  Of course.  Hold on.
23    (Bench conference on the record.)
24    THE COURT:  So --
25    MS. WILKINSON:  So Your Honor, Mr. Davis's -- this

1    has been a line of questioning with at least three witnesses

2    so far, and each one of them, I'll enter the grand jury

3    recording, and we did it with Mr. Sampson, I intend to do it

4    with Ms. Lee, to show that there was no aggressive tone or the

5    context in which the call -- the information was being asked.

6            My question at this point is, what is the relevance

7    to Mr. Davis's insinuation and allowing the kind of testimony

8    about harassment in a murder case, where I'm simply using

9    court process to ask questions of a person that's completely

10   relevant to the investigation, by her own admission, having

11   knowledge of the cars that were involved in the shooting?

12           THE COURT:  Sure.  So a couple points, one as to

13   whether or not you get to play the grand jury, you'll do that

14   if I allow it.

15           MS. WILKINSON:  Of course.

16           THE COURT:  I've allowed it before in part because

17   the questioning went directly to how you were questioning her

18   in the grand jury, and I'm not sure he's done that in terms of

19   the questioning in the grand jury.  In terms of the overall

20   relevance of, you know, what he's referring to as harassment,

21   yes, there will be a -- there can be an instruction as to the

22   process the government's allowed to use, but in terms of bias

23   or potential bias, or you know -- it's relevant if, as an

24   example, if she's afraid of you, afraid of being -- for the

25   same reason that, you know, issues about cooperation are fully

1    fleshed out, you know.

2          If she's here because she feels like she's, for

3    example -- I'm not saying this is the case, I'm just saying he

4    can inquire on this, because she's afraid you're going to lock

5    her up, if not, or because she's tired of people coming to her

6    house.  If you didn't do those things, I mean, you can bring

7    that out and we argue that.  But it's a relevant line of

8    inquiry.

9          MR. DAVIS:  I would like to put it perspective.  I'm

10   not saying she's being harassed.  I'm not saying the

11   witnesses -- well, in responding to Ms. Wilkinson, it is the

12   witnesses that are saying this, and that is what

13   cross-examination is about, how they felt when they were

14   interviewed.  And in terms of playing the grand jury --

15         MS. WILKINSON:  These are --

16         THE COURT:  That's --

17         MR. DAVIS:  Back you up -- when they play the grand

18   jury, that's after everything I'm inquiring about, which is

19   precisely why I'm inquiring as to the preinterview.

20         THE COURT:  In some ways, Mr. Davis and I might be

21   trying to accomplish the same thing, which is to say, neither

22   my ruling or his questioning is meant to suggest that the

23   government has done anything inappropriate other than use the

24   process.

25         MR. DAVIS:  Exactly.

1          MS. WILKINSON:  Of course not.

2          THE COURT:  It's a relevant line of inquiry to see

3  how that's impacted her and how it impacts her testimony, so I

4  will allow it.

5          MS. WILKINSON:  Thank you, Your Honor.

6          (The following proceedings were had in open court.)

7  Q.  (BY MR. DAVIS)  So Ms. Washington, you've indicated that

8  you felt it was harassment when you were being questioned, and

9  this was during the interview process; correct?

10  A.  Yes.

11  Q.  And this is before you actually go into the grand jury;

12  correct?

13  A.  Yes.

14  Q.  And how would it work, you would be questioned prior to

15  going to the grand jury; correct?

16  A.  Yes.

17  Q.  And if you didn't give an answer that the authorities

18  anticipated or expected you to give them, what would happen --

19          MS. WILKINSON:  Objection to what we anticipated.

20          THE COURT:  Let me hear the whole question before I

21  decide.  Finish your question.

22  Q.  (BY MR. DAVIS)  If you wouldn't -- from your perspective,

23  if you didn't give the answer that the authorities expected

24  during the interview process, not the grand jury, but during

25  the interview process, what would happen if you didn't tell

1   them what they expected you to tell them?

2           THE COURT:  I'll sustain that objection as that

3   question is phrased.  You can rephrase, but sustained as

4   phrased.

5   Q.  (BY MR. DAVIS)  If you were asked a question and it wasn't

6   the answer the authorities expected, could you tell us what

7   would happen?

8           MS. WILKINSON:  Same objection.

9           THE COURT:  Sustained.  I don't know how she would

10  know what they expected.  Sustained as to how that question is

11  phrased.

12  Q.  (BY MR. DAVIS)  Did you ever answer a question that they

13  weren't happy with the answer?

14  A.  Yes.

15          MS. WILKINSON:  Objection.

16          THE COURT:  You can ask as to her perspective, if

17  she perceived that.

18  Q.  (BY MR. DAVIS)  And from what you gathered, that wasn't

19  the answer they expected; correct?

20  A.  Yes.

21  Q.  Would that lengthen or shorten the interview process if

22  you didn't give the correct answer?

23  A.  Long -- it would make it longer.

24  Q.  And how long would it go on?

25  A.  I can't tell you, long -- like they would start going -- I

1    don't really -- going hard and getting loud and telling me

2    don't plead the fifth when I come in here.

3    Q.   And did you attend these interviews voluntarily on each

4    occasion?

5    A.   No, I thought I was coming to the grand jury, and before I

6    would come to the grand jury, I was told that they wanted to

7    speak with me before I come in.

8    Q.   And were there any occasions when you were brought down

9    when you thought you were going to the grand jury and you were

10   interviewed for a lengthy period of time and then you were not

11   put in the grand jury?

12   A.   I don't believe that happened.

13   Q.   Now, how many times did you go before the grand jury, do

14   you remember?

15   A.   I went twice.

16   Q.   And how many times did you interview?

17   A.   Twice.

18   Q.   So you interviewed with the authorities on two occasions,

19   or more than two occasions?

20   A.   I believe -- I know for certain I did one interview with

21   them in a small room, and then I had -- I believe I did

22   something else where they plugged my phone up to a some type

23   of device, I'm not sure if that was considered interview, I

24   don't know.

25   Q.   To unload the contents of your phone?

1    A.  The contents on my phone.

2    Q.  And your testimony here today, you were subpoenaed to

3    come; correct?

4    A.  I was subpoenaed to come, and on that subpoena, yes, it

5    did have the January 6 date.  But I was also arrested because

6    I didn't come when -- the back of the subpoena says that I

7    didn't have to come, that someone would notify me, but then I

8    was arrested on my job for not coming.

9    Q.  You were arrested, I mean, actually taken into custody,

10   handcuffed, and brought down?

11   A.  Yes.  It was the most humiliating thing in my life.

12              MS. WILKINSON:  Objection.  Move to strike.

13              THE COURT:  Sustained as to that last statement.

14              MR. DAVIS:  I have no further questions.  Thank you.

15              THE COURT:  Redirect.

16                      REDIRECT EXAMINATION

17   BY MS. WILKINSON:

18   Q.  To that end, Ms. Washington, do you recall getting --

19   having communications with Agent Holiday where he asked you if

20   you would accept service of a subpoena via e-mail, and you

21   essentially hung up the phone on him?

22   A.  No, I remember talking to you and that was recently, you

23   called my personal cell phone and said that you are U.S.

24   State's Attorney Sandra Wilkinson and that you know I don't

25   like you guys to come to my home or the police, but you wanted

1    to serve me with a subpoena, would I be home tonight, and I

2    said -- you said what time do I get off, because you guys

3    wanted to come to my home, and I said that I did have a

4    problem with that.

5    Q.  At the time when you were first interviewed by the

6    authorities, back in 2016, Ms. Washington, did you -- were you

7    represented by counsel, Mr. Ticknor?

8    A.  I was.

9    Q.  And Mr. Ticknor was there to represent your interests;

10   correct?

11   A.  Yes.

12   Q.  And Mr. Ticknor represented you throughout the process by

13   which you were being interviewed in connection back in 2016,

14   am I right about that?

15   A.  Yes.

16   Q.  And then as the investigation progressed, you were then

17   served with a grand jury subpoena sometime in 2018; correct?

18   A.  I don't know the date of when I got the subpoena.

19   Q.  And when you go into the grand jury, are you advised --

20   and let me get to the place in the transcript -- at that

21   point, are you --

22            MR. DAVIS:  I'm going to object, Your Honor, this

23   isn't redirect, this is just reading --

24            THE COURT:  Overruled.

25   Q.  (BY MS. WILKINSON)  Are you advised about your rights?

1    A.   What -- when?

2    Q.   When you go into the grand jury, are you advised about

3    your rights?

4    A.   Before I testified?

5    Q.   Yes, before you testified.

6    A.   Yes.

7    Q.   And so just to be clear for the jury, when you go in, is

8    it a question and answer like it is here today, in other

9    words, you're sitting at a desk and the prosecutor is asking

10   you a question in front of, say, 20 to 25 people?

11   A.   Yes.

12   Q.   And it's very formal, and it's like a little classroom in

13   there, and you're being asked questions as I am doing with you

14   here today; correct?

15   A.   Yes, but there was a time when it wasn't like that,

16   before.

17   Q.   And so I want to -- I just want to go in here -- the first

18   thing that happened when you go in the jury, are you told that

19   you were being subpoenaed here today in connection with an

20   investigation of a murder of a woman on May 27th, 2016, are

21   you advised about that?

22   A.   I believe that it was something to that extent that you

23   said, yes.

24   Q.   And then are you told about your rights, that you're

25   placed under oath, and that if --

1    A.  Yes.

2    Q.  -- you make a false statement, it could be perjury, and

3    those rights are provided to you; correct?

4    A.  Yes.

5    Q.  And then are you provided that if you don't have the right

6    to remain silent, in other words, you must answer the

7    questions unless a truthful answer would put you in a crime,

8    and then you could assert your right against

9    self-incrimination.

10       Do you recall that right being explained to you,

11   Ms. Washington?

12   A.  Yes.

13   Q.  And did you remember the right being told to you that

14   everything you said was actually being taken down by a court

15   reporter?

16   A.  Yes.

17   Q.  Right.  So that there was no misunderstanding on the

18   record, the questions that were asked and the answers that

19   were provided; correct?

20   A.  Um, yes, but prior to me coming here today, I was looking

21   over some things with my attorney, and some of those things

22   look like the wording are different.

23   Q.  Oh, that you didn't say the things that are in the

24   transcript, is that what you're saying?

25   A.  Yes, some of the things are like worded differently.

1  Q.  And is it fair to say the transcript had been provided to

2  your attorney Mr. Solomon because you had previously testified

3  in the grand jury and in preparation for your testimony here

4  today?

5  A.  No, I wouldn't say that, because yesterday he didn't have

6  anything.  And I was asking him why was I here, why -- you

7  know, what is the nature of me being here and what is this

8  whole case surrounding and what does it have to do with me.

9  He couldn't give me any --

10  Q.  Did he remind you that it's --

11  A.  -- information.

12  Q.  -- a murder trial about a woman?

13  A.  No, he didn't.

14  Q.  He didn't do that?

15  A.  No.

16  Q.  Okay.  So were you also advised that all grand jury

17  witnesses have a right to consult with an attorney, all people

18  in the world have a right to speak to an attorney, and asked

19  you at this point, in 2018, did you have an attorney, and did

20  you respond "no"?

21  A.  I didn't have an attorney at one time when I came to the

22  grand jury.

23  Q.  Do you remember --

24  A.  I think that's the second time --

25              THE COURT:  Ma'am, listen to her question and answer

1   her question.

2            THE WITNESS:  Okay.

3   Q.  (BY MS. WILKINSON)  -- being told all -- question --

4            MS. WILKINSON:  Page 7, line 24, counsel.

5   Q.  (BY MS. WILKINSON)  "All grand jury witnesses have a right

6   to consult with an attorney, really, all people in the world

7   have a right to speak to an attorney, but certainly a grand

8   jury witness does too.  Do you have an attorney?"  "Answer:

9   No."

10       Do you recall being told about that right that you have

11  in the grand jury?

12  A.  Yes.

13  Q.  And do you being -- remind being told that if at any time

14  you feel like you want to talk to an attorney, you just need

15  to let me know, I will give you a reasonable opportunity to

16  hire one, and if you can't afford one, I'll provide the

17  paperwork for you so that you can ask the court to appoint one

18  for you --

19            THE COURT:  Ms. Wilkinson, you have to slow down.

20            MS. WILKINSON:  I'm sorry, Your Honor, I feel like

21  I'm reading so slow.

22  Q.  (BY MS. WILKINSON)  "Do you understand that answer?"

23  "Yes."

24       Do you remember being told that and indicated that you

25  responded "yes"?

1    A.  Yes.

2    Q.  And do you remember being told --

3              MS. WILKINSON:  Line 10, page 8, counsel.

4    Q.  (BY MS. WILKINSON)  "As with all grand jury witnesses,

5    there's a decision you can make" -- "that's a decision you can

6    make at any time during the course of these proceedings.  In

7    other words, it doesn't stop here.  At any time during this

8    proceeding, if you think you want to talk to somebody, you

9    just need to let me know, okay?"  "Answer:  Yes."

10        Do you recall being told that right and being advised

11   about that as well?

12             MR. DAVIS:  Objection, Your Honor, may we approach

13   for a moment?

14             THE COURT:  Of course.

15             (Bench conference on the record.)

16             MR. DAVIS:  This whole redirect examination is

17   geared towards the grand jury.  I asked her hardly any

18   questions about the grand jury.  All of my questions were

19   directed to the preinterview.

20             THE COURT:  And those are points you can make in

21   argument.  I permitted you to question --

22             MR. DAVIS:  I --

23             THE COURT:  No, I want to put this on the record.  I

24   permitted you to question this witness and leave the

25   impression, right or wrong, that, you know, Ms. Wilkinson was

1    out dragging people out of cars and throwing them on the

2    stand, and I'm allowing her to rebut that notion.  And so your

3    objection is overruled.  You all can argue at closing as to

4    the niceties of it, but the objection is overruled.

5              MR. DAVIS:  I understand the Court's ruling.  Thank

6    you.

7              (The following proceedings were had in open court.)

8    Q.  (BY MS. WILKINSON)  Do you recall being called back to the

9    grand jury a second time and being reminded that you're still

10   under oath and the same rights and obligations we discussed

11   previously apply, do you recall that, Ms. Washington?

12   A.  I believe so.

13   Q.  And at that time, as we -- questions were asked of you,

14   did you continue to answer them and not break, for example, to

15   go speak to or avail yourself of the right to speak to an

16   attorney, even though you had been told you had such a right

17   and that one would be provided to you if you could not afford

18   one?

19   A.  Well, I didn't -- I didn't come to the grand jury with an

20   attorney, so can you repeat that again?

21   Q.  I'm simply asking you whether during the course of both of

22   those recorded proceedings in front of 20 to 25 people, in a

23   very formal setting, when you were told what your rights were

24   and that you could get counsel at any time you wanted, if you

25   had an issue you wanted to speak to somebody about, and you

1   did not do so; is that right, Ms. Washington?

2   A.  I didn't seek counsel when I went to the grand jury the

3   second time, no.

4   Q.  And you continued to answer the questions that were asked

5   to you, although you did not want to; is that fair to say,

6   Ms. Washington?

7   A.  I wouldn't say I didn't want to.  I was complying with

8   you.  You were asking me questions as you are now, and I was

9   answering questions that I knew, I would tell you if I didn't

10  know, I would tell you I didn't know.

11  Q.  And just like today, in front of the grand jury, you

12  received a court order requiring you to be there; is that

13  right, Ms. Washington?

14  A.  I did.

15  Q.  Because that -- you understand that to mean that you have

16  to answer the questions when an investigation is going on, a

17  murder investigation; right, Ms. Washington?

18  A.  Say it again, please.

19  Q.  That you understand that when you get a subpoena, which is

20  a court order to be somewhere, it's because there's an

21  investigation, and you are required to answer those questions

22  unless a truthful answer would put you in a crime; correct?

23  A.  I knew that I had to -- all I knew is that I had to come

24  when I got the grand jury subpoena.  I just had to be there,

25  it said that I must appear.

1   Q.  And the same thing with regard to your testimony here

2   today, meaning you're here pursuant to a subpoena?

3   A.  Yes.

4   Q.  Now -- and then -- and now you are represented by an

5   attorney?

6   A.  Yes.

7   Q.  And that person is there to protect your interests;

8   correct?

9   A.  I believe so.

10  Q.  Now, in the course of the grand jury proceeding, do you

11  recall, Ms. Washington, that we had to go through the jail

12  calls, some of which we were asking you about this morning and

13  this afternoon, to inquire about your recollections regarding

14  the jail calls, do you remember that?

15  A.  Not really.

16  Q.  You don't remember being played jail calls and listening

17  to them and being asked --

18  A.  Oh, I do, I think it was two of them.

19  Q.  Right.  And I can refresh your recollection if it was more

20  than that, but would you agree with me that as we did so, it's

21  somewhat time consuming because we have to ask questions about

22  what is being discussed, would you agree with me about that?

23  A.  No.

24  Q.  That we don't have to ask you questions about what is

25  being discussed?

1  A.  No, that it's time consuming, I wouldn't agree with

2  that.

3  Q.  That it was time consuming?

4  A.  No.

5  Q.  Were you on the stand about three hours today, four,

6  maybe?

7  A.  Yeah.

8  Q.  And again, were you listening to jail calls, stopping, and

9  then being asked a question about a particular statement that

10  was made?

11  A.  Some of the time I was, then some of the time I was just

12  questioned, that's it, no jail calls.  I just remember being

13  questioned about different things.

14  Q.  And is it fair that you were being asked questions about

15  Matthew Hightower?

16  A.  Yes.

17  Q.  Were you being asked questions about Davon Carter?

18  A.  Yes.

19  Q.  Were you being asked questions about Clifton Mosley?

20  A.  I was asked a question about him, yes.

21  Q.  Were you asked questions about your knowledge about a

22  silver Audi that might have appeared on a video around the

23  time the murder was committed, were you asked questions about

24  the silver Audi?

25  A.  I was asked questions, but not about no video cameras or

1    what you're talking about, I do remember you asking me where

2    it was --

3    Q.  Whatever the relevance --

4    A.  Whatever you asked me right before I went into the grand

5    jury, yes, that's the same question you asked, where was it.

6    Q.  They asked you questions about the silver Audi, yes?

7    A.  Yes.

8    Q.  And were you asked questions about the black BMW, the

9    truck?

10   A.  I believe -- yes.

11   Q.  Okay.  And again, you might not know the relevance of

12   those questions, but that was the nature of the

13   communications; is that right, Ms. Washington?

14   A.  In the grand jury, it was.

15   Q.  Yes.  Now, at the conclusion of the grand jury

16   testimony --

17              THE COURT:  Sorry, how much more on redirect?

18              MS. WILKINSON:  One question, Your Honor.

19              THE COURT:  Okay.  Sure.

20   Q.  (BY MS. WILKINSON)  Do you recall being told -- get to it

21   right here.

22              MS. WILKINSON:  I don't have the last page in front

23   of me, Your Honor -- oh, no, yes, I do.  Hold on.

24   Q.  (BY MS. WILKINSON)  Do you recall being told, "So I'm

25   going to finish and wrap" --

1          MS. WILKINSON:  Page 156, line 14, counsel.

2          MR. DAVIS:  Objection.

3     Q.  (BY MS. WILKINSON)  "I'm going to wrap" --

4          MR. DAVIS:  If the question and answer are going to

5     be read into the record, I don't know what --

6          THE COURT:  Let's approach.  I don't know what she's

7     going to read, so let's --

8          (Bench conference on the record.)

9          THE COURT:  Make sure you're speaking into the

10    mike.

11         MS. WILKINSON:  She responded to a question on

12    cross-examination, I don't know if I was in response to mine,

13    to be honest with you at this point, Your Honor, but that she

14    didn't say all the things she said in grand jury, and I'm

15    simply going to make the point that she was advised that if

16    she misspoke or said something she felt was incorrect, she had

17    a right to come back and correct her testimony by letting

18    agents know, and she was advised that and never did that.

19         MR. DAVIS:  I think she can ask the question, but I

20    don't think it's proper to just read from the grand jury into

21    the record.  The witness is there to provide the evidence, not

22    Ms. Wilkinson to read the grand jury.

23         MS. WILKINSON:  Well, I want to make sure I ask the

24    question right, which is, were you told this in the grand

25    jury, and that's the only reason I'm reading it.  Then she'll

1    say she doesn't remember, and then I'd have to show it to her

2    anyway.

3              THE COURT:  Yes, I mean, she's not impeaching her

4    right now, she's asking her, but she needs that to --

5              MR. DAVIS:  I would just ask that it not be read

6    into the record.

7              THE COURT:  Well, I mean, she's reading it so that

8    she'll know what she said.

9              MR. DAVIS:  I guess my point is --

10             THE COURT:  She's not introducing that into evidence

11   as substantive evidence.

12             MR. DAVIS:  But I guess my point is, is when she

13   stands there and reads from the grand jury transcript,

14   nobody's listening to the witness, they're just listening to

15   Ms. Wilkinson repeating what happened in the grand jury, and I

16   don't think that's --

17             THE COURT:  I mean, her stylistic approach to asking

18   the question is not something I'm going to monitor.

19             MR. DAVIS:  Will Your Honor give a limiting

20   instruction stating it's not -- it's impeachment.

21             THE COURT:  They don't know what she's reading.  At

22   this point, you're just asking her whether or not she was told

23   that.

24             MS. WILKINSON:  Yes.

25             THE COURT:  She'll say yes, or she'll say no.

1          MR. DAVIS:  It's late in the day.

2          (The following proceedings were had in open court.)

3   Q.  (BY MS. WILKINSON)  Do you remember being told,

4   Ms. Washington, that if you leave here, meaning the grand

5   jury, and you think you misspoke, or you think you remember

6   something that you didn't remember when you were asked by

7   myself or Mr. Mihok, the other prosecutor, you'll have the

8   chance to come in and correct your testimony, meaning you

9   would have to tell us, oh, I forgot to tell you this, and then

10  you would come back here and tell the grand jury that, do you

11  remember being told of those rights as well, Ms. Washington?

12  A.  I don't remember.

13  Q.  Would you like to see line -- your grand jury testimony?

14  A.  No.

15  Q.  Would it refresh your recollection to see it?

16  A.  No.

17          MS. WILKINSON:  Nothing further.

18          THE COURT:  All right.  Ma'am, thank you for you

19  testimony.  Please don't discuss your testimony with anyone

20  else until the trial has been completed.  Enjoy the rest of

21  your day, and you're excused.

22          THE WITNESS:  Thank you.

23          THE COURT:  You're welcome.

24          All right.  Ladies and gentlemen, let's take a

25  15-minute break at this point.  You can give those back to

1    Ms. Wilkinson on the way out.  I'll ask that you all be back

2    at 4:00 o'clock ready to go forward from there.  Thank you.

3              (Jury left the courtroom.)

4              THE COURT:  How many more witnesses does the

5    government have left?

6              MS. OLDHAM:  Your Honor, I can definitely get

7    through two witnesses, but I have a third that I would like to

8    try to get through today, if --

9              THE COURT:  Okay.  But is that -- I don't just mean

10   today, I mean --

11             MS. WILKINSON:  Oh, we're going to have to come back

12   Monday, Your Honor, because we didn't get to the medical

13   examiner, and then we have the video of -- but I think that

14   might be -- that might be it, I think, on Monday.

15             THE COURT:  Good to know.

16             MR. DAVIS:  For planning purposes, will Your Honor

17   hold the charging conference before -- obviously, before we do

18   the closing arguments, we can probably expect to do closings

19   on Tuesday.

20             THE COURT:  So -- so now I have to rethink it in my

21   mind.  I thought we might get to the charging conference

22   today.  As I sit here now, it sounds like the government will

23   take up most of Monday morning, maybe.

24             MS. OLDHAM:  Yes.

25             THE COURT:  All right.  Defense case, Monday

1    afternoon.

2              MR. DAVIS:  If I take 15 or 20 minutes, that will be

3    a lot, unless there's a major surprise.

4              THE COURT:  Charging conference late Monday

5    afternoon, and hopefully closings Tuesday, that would be my

6    best projection now.  I will never make you -- this is my

7    general rule, not just in cases like this, I'll never make you

8    close without at least a day's notice, so it's not like we're

9    going to finish early one day and I say, let's go to closings.

10   So you don't have to worry about that.

11             MR. DAVIS:  Thank you, Your Honor.

12             (A recess was taken.)

13             (Jury entered the courtroom.)

14             THE COURT:  All right.  You may all be seated.

15   Looks like we have a new witness.

16             THE CLERK:  Good afternoon, sir.  Please raise your

17   right hand.

18                        ANTONIO VINES,

19   called as a witness, being first duly sworn, was examined and

20   testified as follows:

21             THE WITNESS:  Yes.

22             THE CLERK:  Thank you.  You may have a seat.  Please

23   state and spell your full name for the record.

24             THE WITNESS:  Antonio C. Vines.

25             THE COURT:  Spell your first name, please.

1          THE WITNESS:  A-n-t-o-n-i-o.

2          THE CLERK:  And your last name.

3          THE WITNESS:  Vines, V as in Victor, i-n-e-s.

4          THE CLERK:  Thank you.

5                    DIRECT EXAMINATION

6     BY MS. OLDHAM:

7     Q.  Good afternoon, Mr. Vines, how are you, sir?

8     A.  How are you doing?

9     Q.  Mr. Vines, can you please tell us how old you are?

10    A.  55.

11    Q.  And are you retired?

12    A.  No.

13    Q.  At some point, were you in the military?

14    A.  Yes.

15    Q.  Okay.  What branch of the military were you in?

16    A.  Marines.

17    Q.  And for how long?

18    A.  Four years.

19    Q.  Mr. Vines, I'm going to ask you if you know an individual

20    named Davon Carter.

21    A.  Yes.

22    Q.  And I'm showing you what's been introduced as Government's

23    PH-1, if you can look to the right on the screen and tell me

24    if you know that to be Davon Carter.

25    A.  Yes.

Direct Examination - Vines  (By Ms. Oldham)

1   Q.   And for how long have known Mr. Carter?

2   A.   Probably at least 20 years.

3           THE COURT:  Sir, make sure you're speaking into the

4   microphone.

5   A.   Probably at least 20 years.

6   Q.   (BY MS. OLDHAM)  Did you grow up together?

7   A.   No, because I was older than him.  He was in the

8   neighborhood I used to hang out.

9   Q.   Okay.  What neighborhood would that be?

10  A.   Greenmount and North Avenue.

11  Q.   Would you describe yourself as long time friends with

12  Mr. Carter?

13  A.   Yes.

14  Q.   Mr. Vines, in 2016, did you have the phone number

15  (443) 687-4737?

16  A.   Yes.

17  Q.   I'm just going to show you what's marked as Government's

18  R-23, do you recognize this as the subscriber information in

19  your name with that number ending in 4737?

20  A.   Yes.

21  Q.   From the time frame of December 2014 to May of 2017?

22  A.   Yes.

23  Q.   And is that the number that you would use to communicate

24  with Mr. Carter over the telephone?

25  A.   Yes.

1    Q.  Do you go by any nicknames?

2    A.  I mean, yeah.

3    Q.  What do --

4    A.  Mainly Tony, most people call me Tony.

5    Q.  Did Mr. Carter refer to you as Tony?

6    A.  Yes.

7    Q.  Mr. Vines, I'm showing you what is page 125 of

8    Government's Exhibit P-2.  If you can look there at these two

9    contacts here on June 1st, 2016, from your number ending in

10   4737, listed as Tony, to the number 2399, associated with

11   Davon Carter.

12        Is that you, Tony, with that number ending in 4737,

13   trying to contact Davon Carter on June 1st, 2016?

14   A.  I mean, yeah, it's the number.

15   Q.  Around that time or in the spring of 2016, were you in

16   contact with Mr. Carter?

17   A.  Probably so, yes.

18   Q.  And would you ever hang out with Mr. Carter?

19   A.  I mean, he'd come over to my house.

20   Q.  What sorts of things would you do when he would hang out

21   at your house?

22   A.  Talk, play the football game.

23   Q.  Like on a computer?

24   A.  No.

25   Q.  Xbox?

Direct Examination - Vines  (By Ms. Oldham)

1   A.  Yes.

2   Q.  Okay.  Do you have a particular trade, Mr. Vines?

3   A.  No.

4   Q.  Have you ever been a mechanic?

5   A.  No.

6   Q.  Do you know how to work on cars?

7   A.  No.

8   Q.  Were you ever asked to work on a car by Mr. Carter?

9   A.  No.

10  Q.  Have you ever worked on a car with Mr. Carter?

11  A.  No, I don't -- no, I don't think so.

12  Q.  And just yes or no, Mr. Vines, have you ever been

13  convicted of a crime?

14  A.  Yes.

15  Q.  Okay.

16          MS. OLDHAM:  That's all I have, Your Honor.  Thank

17  you, Mr. Vines.

18          THE COURT:  Cross.

19          MR. ZERKIN:  No questions.

20          THE COURT:  Mr. Mosley's counsel.

21          MR. TRAINOR:  No questions.

22          THE COURT:  Sir, thank you for your testimony.

23  Please don't discuss your testimony with anyone until the

24  trial has been completed.  You're excused.  Enjoy the rest of

25  your day.

1          MS. OLDHAM:  Your Honor, the government's next

2    witness is Michael Fleming.

3          THE CLERK:  Sir, you may step up to the witness

4    stand and raise your right hand.

5                    MICHAEL FLEMING,

6    called as a witness, being first duly sworn, was examined and

7    testified as follows:

8          THE WITNESS:  Yes.

9          THE CLERK:  Thank you, you may have a seat, sir.

10   Please state and spell your full name for the record.

11         THE WITNESS:  Say that again.

12         THE CLERK:  State and spell your full name for the

13   record.

14         THE WITNESS:  Michael Fleming, M-i-c-h-a-e-l,

15   F-l-e-m-i-n-g.

16         THE CLERK:  Thank you.

17                    DIRECT EXAMINATION

18   BY MS. OLDHAM:

19   Q.  Good afternoon, Mr. Fleming.

20   A.  Good afternoon.

21   Q.  Mr. Fleming, how old are you, sir?

22   A.  34.

23   Q.  And what do you do for a living?

24   A.  I'm a behavioral specialist.

25   Q.  And can you tell us what a behavioral specialist is?

Direct Examination - Fleming  (By Ms. Oldham)

1   A.   Level 5 kids, I implement behavior plans for them to

2   transition back to public schools.

3   Q.   And for how long have you had that as your career?

4   A.   13 years.

5   Q.   For whom do you work for?

6   A.   Sheppard Pratt Health System.

7   Q.   And where is that located?

8   A.   Main campus is in Towson, but I work in Glyndon.

9   Q.   And where is Glyndon?

10   A.   Reisterstown.

11   Q.   Reisterstown?

12   A.   Yes, Reisterstown, Owings Mills area.

13   Q.   Okay.  Mr. Fleming, if you could just turn to the right

14   and look at your monitor and tell me if you recognize the

15   person depicted in Government's Exhibit PH-3.

16   A.   Yes.

17   Q.   Who is that individual?

18   A.   Matthew Hightower.

19   Q.   And how do you know Matthew Hightower?

20   A.   He is the father of my nieces and nephew.

21   Q.   I'm sorry?

22   A.   He is the father of my nieces and nephew.

23   Q.   And is your --

24          THE COURT:  Sir, make sure you speak into the

25   microphone.

1    A.  He is the father of my nieces and nephew.

2    Q.  (BY MS. OLDHAM)  And the mother of your nieces and nephew

3    is?

4    A.  Michelle Fleming.

5    Q.  That's your sister?

6    A.  Yes.

7    Q.  Okay.  And how long have you known Mr. Hightower?

8    A.  Can't give you an accurate date, but my oldest is -- well,

9    his oldest, I would say is 14, so I would say 12, 13 years

10   probably, around that time frame.

11   Q.  In addition to being related to Mr. Hightower, would you

12   consider yourself a friend of Mr. Hightower's?

13   A.  Yes.

14   Q.  Are you familiar with the cars that Mr. Hightower drove?

15   A.  Yes.

16   Q.  And what cars would he drive?

17   A.  I'm familiar with a BMW and an Audi.

18   Q.  Okay.  I'm going to show you what's been introduced as

19   Government's Exhibit C2.  Do you recognize Government's

20   Exhibit C2?

21   A.  Yes.

22   Q.  Okay.  And is that the BMW that you recall Mr. Hightower

23   driving?

24   A.  Yes.

25   Q.  Showing you first R-3B and R-3A, do you recognize that

Direct Examination - Fleming  (By Ms. Oldham)

1   vehicle, Mr. Fleming?

2   A.  Yes.

3   Q.  And is that the Audi that you knew Mr. Hightower to

4   drive?

5   A.  Yes.

6   Q.  R-3A, do you recognize that as the front of the Audi?

7   A.  Yes.

8   Q.  Now, who was that Audi registered to?

9   A.  Myself, Michael Fleming.

10   Q.  Showing you Government's Exhibit R-3, is that the

11   registration for that vehicle in your name?

12   A.  Yes, it is.

13   Q.  Okay.  And why was the Audi registered in your name?

14   A.  I got a good insurance rate on it, so I volunteered to put

15   it in my name because the insurance, it was cheaper than what

16   he was getting quotes for.

17   Q.  Okay.  And so is this something that Mr. Hightower asked

18   of you as a favor?

19   A.  No, ma'am.

20   Q.  You offered to do that for him?

21   A.  Yes, ma'am.

22   Q.  Because he was having trouble getting a good insurance

23   quote?

24   A.  Yes, ma'am.

25   Q.  And do you remember if you got anything in return from

1    Mr. Hightower for doing this for him?

2    A.  No, I got nothing in return for doing this for him.

3    Q.  Who made the insurance payments on the car?

4    A.  Mr. Hightower did.

5    Q.  And how would he pay you for the insurance payments?

6    A.  He gave me cash.

7    Q.  And do you recall the point in time when Mr. Hightower was

8    on home detention, home monitoring?

9    A.  Yes.

10   Q.  And during that period of time, did he continue to make

11   the insurance payments to you for the Audi?

12   A.  Yes.

13   Q.  And then did there come a point in time where

14   Mr. Hightower was incarcerated?

15   A.  Yes.

16   Q.  And how is it that you were able to get payments for the

17   insurance for this vehicle?

18   A.  So when he was incarcerated, the vehicle -- one of his

19   buddies took over the vehicle, and I got the insurance

20   payments from him.

21   Q.  Okay.  And which buddy are you referring to?

22   A.  His friend Cliff.

23   Q.  Do you see Cliff in the courtroom today?

24   A.  Yes.

25   Q.  Could you identify him, where he's seated?

1    A.  Right next to the two gentlemen in the middle.

2    Q.  Okay.  Can you describe what he's wearing?

3    A.  White shirt, low cut.

4         MS. OLDHAM:  Your Honor, for the record, he's

5    identified the defendant, Mr. Mosley.

6         THE COURT:  Any objection?

7         MR. TRAINOR:  No, thank you.

8         THE COURT:  All right.  Very well.

9    Q.  (BY MS. OLDHAM)  Mr. Fleming, when you say that Mr. Mosley

10   "took over the vehicle," what do you mean specifically?

11   A.  He was driving the vehicle while Mr. Hightower was

12   incarcerated.

13   Q.  To your knowledge, was he the only person that was

14   primarily driving it?

15   A.  Yes, to my knowledge, yes.

16   Q.  And do you know approximately how long Mr. Mosley had the

17   vehicle for?

18   A.  No.

19   Q.  How often would you see Mr. Mosley?

20   A.  Seen him probably once or twice when it was time for the

21   insurance payment to be made.

22   Q.  And was this the only way that you knew Mr. Mosley, was

23   just through the usage of the Audi, or did you know him

24   before?

25   A.  Well, I met him through Mr. Hightower.

1   Q.  Okay.  And so approximately when did you first meet

2   Mr. Mosley?

3   A.  I can't give you a specific time or date when I met him, I

4   just know that's how I met him, through Mr. Hightower.

5   Q.  How about in relation to -- could you estimate prior to --

6   how long prior to Mr. Hightower going to jail did you meet

7   Mr. Mosley, if that makes sense?

8   A.  Only time I met Mr. Mosley once Mr. Hightower was in jail

9   was to pick up insurance money.

10  Q.  Okay.  So how would that be arranged?  When it was time

11  for you to get insurance money for the Audi, tell me how that

12  would work.

13  A.  I called him, let him know it was due, and that was it.

14  Q.  So how did you get his contact information?

15  A.  Can't really recall how I got it, I'm not sure how we

16  exchanged numbers.

17  Q.  But at some point, he gave you his cell phone number, you

18  gave him your cell phone number?

19  A.  Yes, ma'am.

20  Q.  Okay.  Do you recall whether or not that occurred through

21  Mr. Hightower?

22  A.  I do not recall.

23  Q.  And so approximately how many times did you collect

24  insurance money from Mr. Mosley for the Audi?

25  A.  I think one -- once for sure.  Once for sure.  I'm not

1   sure if it was one or two times, but I know it was definitely

2   one time.

3   Q.   And how did Mr. Mosley pay for the insurance?

4   A.   He gave me cash.

5   Q.   And where did that meeting occur?

6   A.   I can't -- I do not recall.   I cannot tell you exactly

7   where we met at.

8   Q.   Did you know an individual by the name of Aurielle

9   Washington?

10   A.   Yes.

11   Q.   How do you know Aurielle Washington?

12   A.   Through Mr. Hightower.

13   Q.   And did you ever meet Ms. Washington?

14   A.   Yes, ma'am.

15   Q.   What were the circumstances under which you met her?

16   A.   I met Ms. Washington for insurance money with -- for

17   insurance money for the Audi.

18   Q.   And how is it that you ended up meeting with

19   Ms. Washington to get insurance money for the Audi?

20   A.   Not sure how the conversation went, but I reached out to

21   Cliff for it.   He didn't have it, so somewhere along the

22   lines, I reached out to Aurielle to get it paid, and that's

23   how I was able to get the insurance money from her.

24   Q.   Did Mr. Mosley put you in touch with Ms. Washington?

25   A.   That's a tough -- I think so, but I really -- I mean, I'm

Direct Examination - Fleming  (By Ms. Oldham)

1   not sure how I got her information, if it was through

2   Mr. Mosley or Mr. Hightower, I'm not actually sure.

3   Q.  And then subsequently, did you physically meet with

4   Ms. Washington to get money from her?

5   A.  Yes, ma'am.

6   Q.  And do you remember where that meeting occurred?

7   A.  We met at Buffalo Wild Wings in Owings Mills, Maryland.

8   Q.  And did you go to Buffalo Wild Wings to meet with

9   Ms. Washington by yourself?

10  A.  Yes.

11  Q.  And did you go physically into the restaurant to meet with

12  her?

13  A.  No.  Outside in the parking lot.

14  Q.  And had you ever met her before?

15  A.  No.

16  Q.  How did you know who to look for?

17  A.  I didn't hear you, say that again.

18  Q.  I'm sorry, how did you know who to look for?

19  A.  Through text messages, I mean, once she got off, I assume

20  that that's what that was for, to give me the insurance

21  money.

22  Q.  Okay.  So she did arrive in the parking lot?

23  A.  Yes, ma'am.

24  Q.  And what happened then?

25  A.  She gave me insurance money for the Audi, and that was

Direct Examination - Fleming  (By Ms. Oldham)

1    that.

2    Q.  And was she with anyone else?

3    A.  No, she was on a bus, so I'm not sure if it was other

4    people on a bus or something, but she walked over to me by

5    herself, yes.

6    Q.  Was she on an actual bus, or is that slang for another

7    type of car?

8    A.  No, like a school bus, I mean, a minivan or something, but

9    it wasn't a car.  It was a bus.

10   Q.  Did you say it was like a minivan, like was she driving

11   something?

12   A.  No.

13   Q.  Someone else had driven her?

14   A.  Yes, if I'm not mistaken, yes.

15   Q.  Did she pay you in cash?

16   A.  Yes.

17   Q.  Any other discussions with her other than that exchange of

18   money for the insurance?

19   A.  No other discussions with her.

20   Q.  Do you know Davon Carter?

21   A.  Yes.

22   Q.  How do you know Davon Carter?

23   A.  Through Mr. Hightower and also he's my cousin.

24   Q.  Cousin on which side?

25   A.  I would say my dad's side.

1    Q.  Now, did there come a point in time, Mr. Fleming, where

2    you were interviewed in the fall of 2016 about a murder that

3    occurred on May 27th of that year?

4    A.  Yes.

5    Q.  And do you recall whether the reason that detectives were

6    interviewing you was because they had information on that Audi

7    as it pertained to --

8              MR. TRAINOR:  Objection to leading.

9              THE COURT:  Overruled.  You can finish your

10   question.

11             MS. OLDHAM:  Thank you, Your Honor.

12   Q.  (BY MS. OLDHAM)  Was it your understanding that the reason

13   you were being interviewed by detectives in the fall was

14   because they had information about your Audi as it pertained

15   to the murder that occurred on May 27th, 2016?

16   A.  Yes.

17   Q.  And at some point, did you discuss with detectives or

18   direct them to your employment schedule for Friday, May 27th,

19   2016?

20   A.  Yes.

21   Q.  Do you recall where -- if you worked on the morning of

22   Friday, May 27th, 2016?

23   A.  Yes, I did.

24   Q.  Did you have a set schedule?

25   A.  I do have a set schedule.

1    Q.  And what was it on May 27th, 2016?

2    A.  My set schedule is Monday through Fridays, 8:00 to 4:00.

3    Q.  And were you working at the location that you described

4    earlier, did you say it was Owings Mills?

5    A.  Yes.

6    Q.  Okay.  I'm going to show you what --

7         MS. OLDHAM:  Court's indulgence -- what I'm going to

8    mark R series -- Court's indulgence.

9         R-24.  Thank you.

10   Q.  (BY MS. OLDHAM)  Do you recognize these as your employment

11   schedule for May of 2016, Mr. Fleming?

12   A.  My time sheet that I had printed out from offline.

13   Q.  This is the time sheet you obtained online?

14   A.  Yes.

15   Q.  And just directing your attention to the highlighted line

16   here for Friday, May 27th, is this your arrival time or start

17   time at work, 7:39 a.m.?

18   A.  Yes.

19   Q.  And the 3:31 p.m., is that your --

20   A.  That's the time I punch out.

21        MS. OLDHAM:  Court's indulgence.

22        Nothing further, Your Honor.

23        THE COURT:  All right.  Cross, Mr. Trainor.

24        MR. TRAINOR:  Thank you, Your Honor.

25                   CROSS-EXAMINATION

Cross-examination - Fleming  (By Mr. Trainor)

1    BY MR. TRAINOR:

2    Q.  Good afternoon, Mr. Fleming.  I just really have one

3    question for you.

4    A.  Yes.

5    Q.  On direct you were asked sort of a leading question, do

6    you know if Mr. Mosley was the only person primarily driving

7    the Audi?

8    A.  Say -- can you repeat that, please?

9    Q.  You were asked if you know if Mr. Mosley was the only

10   person primarily driving the Audi.  I'm not sure what that

11   means, but after your name was on the insurance --

12   A.  Yes.

13   Q.  -- you were never in the Audi, were you?

14   A.  No, I never had --

15   Q.  And you really never saw it much, did you?

16   A.  No.

17   Q.  So you really don't know who was driving the Audi, do

18   you?

19   A.  Correct.  Yes.

20            MR. TRAINOR:  Thank you.

21            THE COURT:  All right.  Cross from Mr. Carter's

22   counsel.

23            MR. DAVIS:  No questions, Your Honor, thank you.

24            THE COURT:  Any redirect?

25            MS. OLDHAM:  No, Your Honor, thank you.

Direct Examination - Mutolo  (By Ms. Oldham)

1          THE COURT:  All right.  Sir, thank you for your

2   testimony.  Please don't discuss your testimony with anyone

3   until the trial is complete.  Enjoy your day, and you are

4   excused.

5          THE WITNESS:  Thank you.

6          THE COURT:  Next government witness.

7          MS. OLDHAM:  Matthew Mutolo, Your Honor.

8          THE CLERK:  Good afternoon, sir, please raise your

9   right hand.

10                      MATTHEW MUTOLO,

11   called as a witness, being first duly sworn, was examined and

12   testified as follows:

13          THE WITNESS:  I do.

14          THE CLERK:  Thank you, you may have a seat.  Please

15   state and spell your full name for the record.

16          THE WITNESS:  Matt Mutolo, M-u-t-o-l-o.

17          THE CLERK:  Thank you.

18                     DIRECT EXAMINATION

19   BY MS. OLDHAM:

20   Q.  Good afternoon, Mr. Mutolo.

21   A.  Hi.

22   Q.  Mr. Mutolo, can you tell us how you're employed?

23   A.  Baltimore City schoolteacher.

24   Q.  And for what school do you teach?

25   A.  Francis Scott Key Elementary/Middle.

Direct Examination - Mutolo  (By Ms. Oldham)

1   Q.  How long have you been a teacher at Francis Scott Key

2   Elementary and Middle?

3   A.  Seven years.

4   Q.  And this might be an obvious question, but given the name,

5   it's both an elementary school combined with a middle

6   school?

7   A.  Yes.

8   Q.  So K up through 8th?

9   A.  Pre-K to 8th.

10  Q.  Pre-K to 8th.  And what grade do you teach?

11  A.  4th and 5th grade math.

12  Q.  Okay.  Mr. Mutolo, I'm going to show you what I have

13  marked as Government's Exhibit A27, if you can just look to

14  the right.

15      Do you know who that is depicted in A27?

16  A.  Yeah, that's Ms. Ashburne.

17  Q.  How do you know -- do you know her first name?

18  A.  No, we just called her Ms. A.

19  Q.  Ms. A?

20  A.  Yeah.

21  Q.  How long have you known Ms. Ashburne?

22  A.  She worked with us for two years -- well, shy of two

23  years.

24  Q.  And what position did she hold at Francis Scott Key?

25  A.  She was a paraprofessional.

Direct Examination - Mutolo   (By Ms. Oldham)

1    Q.   What's a paraprofessional?

2    A.   They travel with kids, they work with the teachers, it's

3    like a teacher's assistant.

4    Q.   Teacher's assistant?

5    A.   Yes.

6    Q.   When you say she would "travel with kids," what do you

7    mean?

8    A.   She would go to lunch with them, go to resource, which is

9    like gym, art, stuff like that, recess.  She was with kids 95

10   percent of the day.

11   Q.   And what was her role as a teacher's aid as she would

12   travel with the kids?

13   A.   De-escalation of students, because we worked with

14   emotionally disturbed children.  We were a school inside of a

15   school.  At that point in time, I was the program manager and

16   manned the school inside the school.

17   Q.   Was there a name for that program?

18   A.   It's called Pride.

19   Q.   And so was Ms. Ashburne a teacher's aid for the Pride

20   program?

21   A.   Yes.

22   Q.   So the students that she was traveling with were all part

23   of this school within the school?

24   A.   Yes, school within the school.

25   Q.   What was her -- was she full time?

Direct Examination - Mutolo  (By Ms. Oldham)

1   A.  Yes, she was full time.

2   Q.  What type of schedule did she have as a full-time

3   paraprofessional?

4   A.  Monday through Friday our bell time is at 8:15, so she had

5   to be there by 8:00.  She was usually always early, like 15

6   minutes early, and then our closing bell is -- back then it

7   was 2:45, so she could leave by 3:00.

8   Q.  So you saw her on a daily basis?

9   A.  Yes, every day.

10  Q.  Was there a place at Francis Scott Key school where

11  Ms. Ashburne, you, or other teachers would sort of meet and

12  start the day together?

13  A.  We would have meetings sometimes, not always, but it would

14  be in my office.

15  Q.  Was there a particular uniform that Ms. Ashburne wore to

16  school?

17  A.  She would wear a gray polo shirt, and then khaki pants,

18  usually.

19  Q.  And was that part of a uniform as a para-educator that she

20  was wearing?

21  A.  She worked for a company that paid her to work with us.

22  So she was a para-educator, but she was from a -- can't

23  remember the company she worked for, but she wore that.

24  Q.  And other than seeing her in the morning when the school

25  day began, did you have occasions to see her then throughout

Direct Examination - Mutolo  (By Ms. Oldham)

1  the day?

2  A.  Yes, I saw her, because I was constantly going in and out

3  of classrooms checking on students.

4  Q.  And was she assigned to a particular class or set of

5  students, or was she -- was it sort of she would go where she

6  was needed during the day?

7  A.  We'd go by grades, so it was middle school that we worked

8  with.  So if you were the 6th grade paraprofessional, you

9  traveled with the sixth graders because emotionally disturbed

10 kids don't really thrive with a lot of change.

11 Q.  Which grade was she assigned to?

12 A.  She was 7th grade the second year -- 6th grade -- she

13 traveled with the same kids from 6th to 7th.

14 Q.  Tell us how you would describe her interactions with the

15 students.

16 A.  Amazing, they pretty much considered her like a mom.

17 Q.  Why do you say that?

18 A.  Because she was caring, she was strict, but they knew deep

19 down inside that she would pull you up when you were doing

20 something wrong, but it was for a good reason.

21 Q.  Would you say she was dedicated?

22 A.  100 percent.

23 Q.  Friday, May 27th, 2016 was the Friday before Memorial Day,

24 would there have been school that day?

25 A.  Yes.

Direct Examination - Mutolo   (By Ms. Oldham)

1    Q.   And was Ms. Ashburne expected to report to work that

2    morning?

3    A.   Yes, uh-huh.

4    Q.   Did you know her to -- did you ever have an opportunity to

5    see her interact with other staff at the school?

6    A.   Constantly.

7    Q.   And how did she get along with the staff?

8    A.   Perfect employee, it was a family unit.

9    Q.   Did you know her to have any enemies within the school?

10   A.   No.

11   Q.   How about outside of the school?

12   A.   Nope.

13   Q.   Did you report to work on Friday, May 27th?

14   A.   Uh-huh.

15   Q.   And approximately --

16            THE COURT:   Sir, you have to say yes or no.

17   A.   Yes.

18   Q.   (BY MS. OLDHAM)  Approximately what time did you arrive?

19   A.   I usually get there around like 7:00 o'clock.

20   Q.   And did there come a point in time where you noticed that

21   Ms. Ashburne had not yet reported?

22   A.   Yes, around 7:45, we all thought it was kind of strange.

23   And then the day went on, she didn't show up, and then we got

24   a phone call.

25   Q.   At the end of the day?

Direct Examination - Mutolo   (By Ms. Oldham)

1   A.   No, it was midway through the day, because we had to --

2   because the kids, we had to get a crisis intervention team.

3   So basically every social worker in the city came to our

4   school to deal with the kids, because emotionally disturbed

5   children are not going to react well to finding out someone

6   they loved and cared about was murdered.

7   Q.   So the crisis intervention team that was called to the

8   school was because of the children finding out about

9   Ms. Ashburne?

10   A.   Yeah, we had to let them know.

11   Q.   And was that actually on Friday, May 27th?

12   A.   Yes, that was that day.

13           MS. OLDHAM:   I don't have any further questions,

14   Your Honor, thank you.

15           THE COURT:   All right.   Cross.

16           MR. TRAINOR:   No questions.

17           MR. DAVIS:   No questions, Your Honor, thank you.

18           THE COURT:   All right.   Sir, thank you for your

19   testimony.   Please don't discuss your testimony with anyone

20   until the trial has been completed.   You are excused.   Enjoy

21   the rest of your day.

22           MS. WILKINSON:   May we approach?

23           THE COURT:   Sure.

24           (Bench conference on the record.)

25           THE COURT:   So if my math was right, that's three.

1          MS. WILKINSON:  That means we're out of witnesses

2     for the first time ever.  We released -- we weren't sure how

3     long Ms. Washington would take, and Dr. Ali, we didn't want to

4     start him and have to have him come back.  So on Monday, our

5     schedule is Ms. Payton, who is Ms. Ashburne's sister, and then

6     we have the video, and then Dr. Ali.  And we're going to clear

7     up, you know, whatever exhibits we have, but that would be the

8     end of the government's case.

9          THE COURT:  I'm actually inclined to have the jury

10    come back at 10:30, and we can do our charge conference at

11    9:30 on Monday, unless that -- unless that's a real issue with

12    someone's schedule, one of the witnesses.

13         MS. WILKINSON:  I don't know, did Dr. Ali say -- he

14    was fine, I think he was fine, Your Honor.

15         THE COURT:  Yes, that way then, my staff will have

16    time to put the edits in, and if we can get to the

17    instructions by the end of the day, then we can do that.

18         That sounds fine.  You still think you'll have half

19    an hour, hour between the two of you.

20         MR. TRAINOR:  I don't know what they're doing,

21    but --

22         THE COURT:  Sure, fair enough.

23         MR. TRAINOR:  If we can take the picture down --

24         THE COURT:  I would have said that, I didn't think

25    about it until you were up here.

1        MS. WILKINSON:  Just to remind -- we had --
2   Ms. Heiss was dealing with Ms. Ashburne's sister for us, and
3   we were concerned that she had some later appointment that she
4   had to make, but now Ms. --

5        MS. OLDHAM:  Can I just step back to confirm that
6   she has not left?  If she is here, I could still call her.

7        THE COURT:  That's fine.  If you can actually take
8   the picture down on your way.

9        MS. WILKINSON:  I'll do that.

10       (The following proceedings were had in open court.)

11       THE COURT:  All right.  Ladies and gentlemen, we're
12  just working through scheduling, so if you just give us a
13  moment.

14       MS. OLDHAM:  That's all for today, Your Honor.

15       THE COURT:  All right.  Very well.  Ladies and
16  gentlemen, I'm going to release you for today.  I'm going to
17  ask you to come back at 10:30 on Monday.  We are almost at the
18  conclusion of the case, and at the conclusion of the case,
19  there are more issues that I needed to work through with the
20  attorneys, and so that's why both today and on Monday I'm
21  letting you start a little late, so I can deal with some
22  issues with the attorneys.

23       So I'll ask that you remember my repeated
24  instruction not to discuss the case with anyone.  Everything
25  you learn about the case needs to be learned in this

1    courtroom.  Please enjoy your weekend, get some rest.  And I

2    will see you at 10:30 on Monday.  Take care.

3              (Jury left the courtroom.)

4              THE COURT:  All right.  Anything to talk about

5    before we break for the weekend?

6              MR. DAVIS:  Nothing on behalf of Mr. Carter.

7              THE COURT:  All right.  So counsel here at 9:30 for

8    a charge conference, and hopefully we get that wrapped up by

9    10:30 for the jury.  All right.  Enjoy your weekend.

10             MS. WILKINSON:  Thank you, Judge.

11             (The proceedings were concluded.)

12

13             I, Christine Asif, RPR, FCRR, do hereby certify that
     the foregoing is a correct transcript from the stenographic
     record of proceedings in the above-entitled matter.

14
                _____/s/_____
15                   Christine T. Asif
                   Official Court Reporter
16

17

18

19

20

21

22

23

24

25

```
 1                              INDEX

 2    Witness Name                                         Page

 3    Officer Tabitha Hays
      (No jury present.)
 4      Direct Examination By Ms. Wilkinson ...................... 2

 5      Cross-examination By Mr. Davis ........................... 12

 6    (Jury present.)
        Direct Examination By Ms. Wilkinson ...................... 25
 7
        Cross-examination By Mr. Davis ........................... 35
 8
        Redirect Examination By Ms. Wilkinson.................... 42
 9
      Aurielle Washington
10
        Direct Examination By Ms. Wilkinson ...................... 44
11
        Cross-examination By Mr. Trainor.......................... 145
12
        Cross-examination By Mr. Davis ........................... 156
13
        Redirect Examination By Ms. Wilkinson.................... 167
14
      Antonio Vines
15
        Direct Examination By Ms. Oldham.......................... 184
16
      Michael Fleming
17
        Direct Examination By Ms. Oldham.......................... 188
18
        Cross-examination By Mr. Trainor.......................... 200
19
      Matthew Mutolo
20
        Direct Examination By Ms. Oldham.......................... 201
21

22

23

24

25
```

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

< Dates >
(443) 858-1222, May
   5th, 2016 78:19.
6/8/16. 121:3.
December 1st 67:9.
December 2014
   185:21.
January 23rd, 2020
   1:19.
January 6 167:5.
June 1st 21:16,
   27:14, 32:21,
   133:5, 156:10.
June 1st, 2016 4:16,
   4:17, 4:20, 21:19,
   186:9, 186:13.
June 8th 133:4.
June 8th, 2016
   120:23.
May 21st 118:17.
May 27th 101:14,
   198:3, 199:16,
   206:13, 207:11.
May 27th, 2016
   100:24, 169:20,
   198:15, 198:18,
   198:22, 199:1,
   205:23.
May 4th 45:4, 45:5,
   45:15, 56:23,
   60:3, 68:12,
   79:22.
May 4th, 2016
   80:7.
May 5th 83:7.
May 5th, 2016 74:18,
   74:23, 76:25.
May 6 84:23,
   99:21.
May 6th 56:24, 83:8,
   86:19, 87:2,
   89:22, 95:15,
   95:16, 100:6.
May 6th, 2014
   91:1.
May 7th 84:14,
   87:14.
May 7th, 2016 87:16,
   87:18, 88:19,
   95:2, 102:16,

102:20, 106:12.
May 8th, 2016
   110:16.
May 9th, 2016
   111:23.
May, may 27th, 2016
   3:17.
November 29th
   66:11.
November 29th, 2015
   65:5, 65:25.
October 30 63:15.
October 3rd, 2015
   62:8.
$25 75:13, 75:15,
   75:21.
'16 61:20, 91:1.
   .
   .
< 1 >.
1 9:17, 118:15.
10 173:3.
100 205:22.
101 1:48.
10:00 24:6.
10:05 18:8.
10:15 17:5, 17:8.
10:15. 24:7.
10:30 3:25, 18:13,
   20:12, 21:20,
   27:13, 208:10,
   209:17, 210:2,
   210:9.
10:30. 17:4,
   18:12.
10:57 103:23.
10:57. 104:4.
11:45 78:13,
   78:14.
12 26:10, 190:9,
   211:9.
1222 121:11.
1222. 120:23.
125 186:7.
12:00 88:5, 88:6.
12:48 120:23.
13 189:4, 190:9.
14 179:1, 190:9.
145 211:22.
15 3:6, 3:8, 26:6,

26:8, 88:8, 94:5,
   108:5, 124:10,
   183:2, 204:5.
15-minute 24:7,
   24:17, 181:25.
156 179:1, 211:24.
167 211:26.
184 211:30.
188 211:34.
1:00 116:11,
   116:12.
   .
   .
< 2 >.
2 211:7.
20 18:14, 18:22,
   19:2, 20:3, 62:2,
   169:10, 174:22,
   183:2, 185:2,
   185:5.
200 211:36.
2001 52:12.
201 211:40.
2011 52:12.
2013 44:25, 45:1,
   45:5, 146:7,
   146:8, 146:13.
2014 145:13,
   145:14.
2015 46:4, 61:20,
   94:16.
2016 27:7, 45:4,
   45:6, 45:15,
   45:20, 45:24,
   46:1, 67:16,
   76:18, 82:19,
   94:16, 146:9,
   153:5, 156:11,
   168:6, 168:13,
   185:14, 186:15,
   198:2, 199:11.
2016" 101:14.
2016. 4:19.
2017 153:7,
   185:21.
2018 100:14, 101:21,
   154:10, 168:17,
   171:19.
2019 3:14.
2020 4:18.

21201 1:49.
22 89:13.
23 91:18.
2399 186:10.
24 172:4.
25 20:4, 20:6,
   169:10, 174:22,
   211:12.
25A 102:14.
2650 89:10, 89:12,
   89:16, 99:22.
2:00 116:16,
   116:21.
2:02 89:9, 89:22,
   91:11, 92:22.
2:45 204:7.
.
.
< 3 >.
30-minute 119:18,
   120:6.
33 44:9.
34 188:22.
35 211:14.
3:00 204:7.
3:31 199:19.
.
.
< 4 >.
4. 104:3.
42 211:16.
44 91:18, 211:20.
443 61:23, 74:19,
   78:18, 87:16,
   99:13, 102:17,
   185:15.
45 119:20.
47 94:5.
4737 185:19, 186:10,
   186:12.
4:00 182:2, 199:2.
4:07 104:3.
4th 1:48, 146:9,
   202:11.
.
.
< 5 >.
5 118:15, 189:1.
55 184:10.
55143 129:2.

55193 129:1.
5:30 85:13.
5:35 84:23.
5:43 89:12, 99:21.
5th 202:11.
.
.
< 6 >.
6 101:10.
6448 96:18.
645 138:8.
687-4737 185:15.
6:12 102:16.
6:51 78:19.
6th 205:8, 205:12,
   205:13.
.
.
< 7 >.
7 172:4.
704-2650 99:13.
7:00 142:9, 142:12,
   206:19.
7:39 199:17.
7:45 206:22.
7A 95:18.
7th 205:12,
   205:13.
.
.
< 8 >.
8 26:10, 173:3.
827 3:22.
8409 28:13.
858-1222 61:23,
   74:19, 78:18,
   87:16, 102:17.
8:00 142:12,
   199:2.
8:00. 204:5.
8:15 204:4.
8:43 74:22.
8:48 88:19.
8th 202:8, 202:9,
   202:10.
.
.
< 9 >.
911 27:22.
95 203:9.

9:21 111:23.
9:30 208:11,
   210:7.
_____/s/_____
   _____ 210:17.
.
.
< A >.
A-n-t-o-n-i-o
   184:1.
A-u-r-i-e-l-l-e
   44:5.
a.m. 20:12, 21:20,
   27:14, 88:19,
   111:23, 199:17.
A27 202:13,
   202:15.
ability 35:4,
   135:9.
able 73:24, 75:3,
   75:11, 76:1, 82:1,
   82:25, 91:13,
   102:20, 104:7,
   104:10, 104:11,
   117:20, 120:7,
   121:2, 123:8,
   126:15, 149:21,
   150:18, 155:15,
   192:16, 195:23.
abnormal 118:14.
Above 64:16, 65:24,
   84:22, 108:13.
above-entitled
   210:15.
absolute 10:1,
   10:4.
accept 73:13, 73:14,
   73:15, 76:3,
   118:3, 148:17,
   167:20.
accepted 148:15.
access 96:23, 98:7,
   98:13, 98:14.
accident 126:25.
accompanied 56:12,
   56:17, 56:21.
accomplish 163:21.
account 75:25, 98:8,
   98:12, 98:13,
   119:13, 119:16,

119:23, 120:3,
120:8, 120:22,
121:8, 123:6,
127:20, 127:23,
127:24, 135:9,
148:21, 148:22.
accurate 190:8.
accurately 42:7,
79:9.
acknowledge 10:24.
across 6:1.
action 3:10,
26:11.
actual 104:3,
158:11, 197:6.
actually 9:3, 9:11,
9:18, 34:1, 35:17,
51:17, 51:18,
52:2, 54:8, 56:23,
57:21, 58:14,
60:4, 64:7, 72:15,
73:13, 74:13,
77:15, 78:5,
107:24, 119:9,
146:24, 160:14,
164:11, 167:9,
170:14, 196:2,
207:11, 208:9,
209:7.
Acura 52:12.
add 21:7, 118:13.
addition 190:11.
address 11:23,
27:21, 33:18,
46:14.
adjust 2:18, 44:2.
admissible 21:1,
21:2.
admission 162:10.
admitted 41:10.
admitting 41:2.
advantage 147:16,
147:17.
advised 9:25, 24:20,
77:13, 100:22,
102:1, 168:19,
168:25, 169:2,
169:21, 171:16,
173:10, 179:15,
179:18.

afford 10:8, 172:16,
174:17.
afraid 162:24,
163:4.
afternoon 89:10,
145:9, 176:13,
183:1, 183:5,
183:16, 184:7,
188:19, 188:20,
200:2, 201:8,
201:20.
agency 28:3, 31:2.
Agent 75:8, 78:8,
78:16, 84:10,
105:14, 167:19.
agents 151:25,
161:11, 179:18.
aggressive 161:19,
162:4.
ago 15:7, 53:24,
53:25, 54:3,
55:22, 79:13,
130:13, 159:25.
agree 10:9, 33:3,
73:15, 176:20,
176:22, 177:1.
agreed 20:18.
agreement 149:10.
ahead 57:5, 62:2,
74:24, 75:18,
76:5, 79:7, 80:24,
103:21, 107:12,
110:23, 115:21,
121:13, 127:14,
128:22.
aid 28:4, 203:11,
203:19.
ain't 108:18.
air 105:20,
105:21.
alcohol 10:22.
Ali 208:3, 208:6,
208:13.
allegation 86:23.
allow 162:14,
164:4.
allowed 25:5, 56:14,
56:15, 56:18,
119:19, 122:19,
162:16, 162:22.

allowing 162:7,
174:2.
Almost 3:6, 26:6,
142:10, 209:17.
alone 4:8, 4:10,
28:11, 28:12.
already 19:23,
20:24, 23:4, 23:5,
70:14, 70:15,
70:19, 87:13,
130:23.
although 175:5.
Amazing 205:16.
Amendment 19:3.
AMERICA 1:5.
among 116:17.
amount 6:9, 7:21,
7:23, 7:24, 8:20,
22:2, 29:16,
29:24.
amounts 31:5.
Amy 42:15.
Angela 69:15.
angry 126:12,
126:13, 126:14,
129:10.
answered 39:12,
39:14, 39:15,
86:7.
answering 102:1,
175:9.
answers 170:18.
anticipated 164:18,
164:19.
Antonio 183:18,
183:24, 211:28.
anybody 57:18,
91:12, 115:9,
147:4.
Anyway 121:4,
127:15, 136:10,
180:2.
anyways 138:1.
Apart 50:7, 57:17,
62:16, 73:2,
83:18.
apartment 5:2,
28:16, 151:14.
apologize 4:15,
54:25.

Apparently 131:6.
appear 10:19, 10:21,
 22:22, 156:7,
 160:7, 175:25.
appearance 56:2,
 68:13, 68:14,
 68:15, 90:2,
 101:21.
appearances 160:3.
appeared 6:17, 14:4,
 22:23, 159:1,
 160:3, 177:22.
applies 157:22.
apply 157:12,
 157:19, 174:11.
appoint 10:8,
 172:17.
appointed 148:2.
appointment 209:3.
Approach 40:8, 86:4,
 157:2, 157:3,
 161:20, 173:12,
 179:6, 180:17,
 207:22.
approached 9:3,
 150:13, 160:21,
 160:22.
appropriate 40:3,
 40:12.
approved 73:22.
Approximately 21:20,
 145:13, 193:16,
 194:1, 194:23,
 206:15, 206:18.
April 100:13.
Arbor 4:3, 5:1, 5:4,
 12:1, 21:20,
 27:24, 28:13,
 28:15, 28:17,
 36:6.
area 3:22, 3:23,
 4:3, 7:9, 27:9,
 46:15, 46:16,
 49:6, 58:21,
 59:17, 70:4, 70:5,
 92:15, 93:10,
 93:12, 95:3, 95:4,
 95:9, 149:24,
 150:1, 152:25,
 189:12.

areas 26:12.
argue 24:1, 150:23,
 163:7, 174:3.
arguing 37:11,
 40:21.
argument 173:21.
argumentative 40:17,
 40:21.
arguments 182:18.
Around 3:23, 5:3,
 7:8, 28:17, 80:1,
 92:5, 92:15,
 93:10, 109:8,
 109:16, 111:11,
 133:1, 140:24,
 141:4, 142:9,
 142:10, 152:22,
 153:12, 177:22,
 186:15, 190:10,
 206:19, 206:22.
arranged 150:24,
 194:10.
arrest 13:21, 14:16,
 18:16, 18:17,
 20:8, 20:16, 23:2,
 23:6, 23:9, 38:14,
 38:16, 38:20,
 38:21, 38:23,
 39:2, 39:9, 39:10,
 39:16, 39:18,
 39:20, 46:5,
 133:20.
arrested 20:1,
 20:15, 38:15,
 45:2, 48:21,
 54:10, 76:18,
 113:1, 119:10,
 132:23, 147:20,
 167:5, 167:8,
 167:9.
arresting 13:19.
arrival 4:25, 5:1,
 13:4, 13:17,
 28:14, 36:25,
 199:16.
arrive 8:1, 14:8,
 31:9, 34:1,
 196:22, 206:18.
arrived 12:3, 12:4,
 14:12, 15:10,

28:13, 28:15,
 35:11, 36:2,
 37:11, 37:18,
 38:10, 43:9.
art 203:9.
Ashburne 100:23,
 101:10, 101:16,
 102:3, 106:16,
 202:16, 202:21,
 203:19, 204:11,
 204:15, 206:1,
 206:21, 207:9,
 208:5, 209:2.
Asif 1:46, 210:13,
 210:18.
asks 54:23,
 107:16.
ass 62:11, 108:17,
 133:10, 133:24,
 134:7, 134:16.
ass. 108:18.
assert 170:8.
asserted 158:2.
assigned 3:10, 3:22,
 205:4, 205:11.
assist 5:14, 21:21,
 28:2, 28:3, 38:25,
 108:12.
assistance 31:6.
assistant 203:3,
 203:4.
associated 186:10.
assume 24:19, 90:2,
 133:24, 196:19.
assumed 5:5, 5:13,
 7:5.
at. 116:3.
attachment 78:23.
attend 55:2, 57:9,
 166:3.
attended 57:10.
attention 3:25,
 6:11, 16:6, 27:13,
 57:21, 58:2, 82:6,
 82:7, 84:15,
 84:22, 127:3,
 156:10, 199:15.
Attorney 48:25,
 52:16, 53:10,
 54:12, 54:19,

69:23, 71:22,
78:24, 79:2, 95:5,
95:7, 101:4,
101:5, 148:1,
148:2, 149:16,
167:24, 170:21,
171:2, 171:17,
171:18, 171:19,
171:21, 172:6,
172:7, 172:8,
172:14, 174:16,
174:20, 176:5.
attorneys 209:20,
209:22.
attributed 99:22.
auction 146:16.
audiotape 73:9.
Audis 51:22, 124:5,
129:14, 129:17,
129:18, 146:20.
aunt 69:25, 70:4,
92:5, 92:15,
93:10, 93:15,
93:25, 140:25,
150:1.
Aurielle 43:18,
43:21, 44:4,
89:10, 89:12,
102:16, 111:24,
195:8, 195:11,
195:22, 211:18.
AUSA 1:25, 1:27.
authorities 160:21,
161:19, 164:17,
164:23, 165:6,
166:18, 168:6.
authority 18:20,
18:25, 20:23,
149:9, 149:18.
automatically
73:14.
automobile 146:13.
automobiles
147:13.
avail 174:15.
available 2:6.
Avenue 149:22,
185:10.
aware 39:24, 40:5,
40:10, 40:12,

41:2, 41:8, 43:1,
48:12, 133:6,
146:23.
awkward 62:6.
awry 12:10.
.
.
< B >.
B. 1:39.
baby 47:18, 58:16.
background 122:12.
bad 11:16, 33:14.
badges 28:21.
bag 6:16, 6:19,
6:22, 6:23, 8:4,
22:2, 22:3, 29:23,
29:25, 30:2,
30:8.
baggie 6:18.
baggies 6:18.
bags 30:1.
bail 67:9.
bank 98:8, 98:12,
98:13, 135:9.
Bardos 24:19, 24:21,
52:19, 52:21,
53:1, 53:7, 53:10,
53:15, 53:23,
62:18, 63:7, 63:9,
95:12.
based 17:18, 40:15,
40:23, 58:10,
156:7.
basic 6:3, 8:14,
8:15, 11:22,
22:13, 32:1,
33:18, 37:24.
basically 11:18,
113:6, 207:3.
Basis 49:4, 153:18,
156:15, 156:19,
159:13, 204:8.
beat 108:18.
became 145:16,
146:1, 146:3,
149:13.
become 7:19,
146:5.
beforehand 126:21.
began 204:25.

beginning 75:12,
75:13, 88:20.
behalf 104:24,
105:6, 210:6.
behavior 189:1.
behavioral 188:24,
188:25.
behind 13:10, 13:12,
31:19, 36:17,
38:19, 39:21.
belabor 19:10.
believes 22:15.
Belinda 76:22, 77:3,
77:5, 77:6.
bell 204:4, 204:6.
belong 126:16,
147:21.
belonged 11:13,
22:24, 33:10,
39:25, 41:3,
41:11, 41:16,
99:17.
belongings 130:11,
155:5.
belongs 89:16,
106:18, 126:15,
143:15.
below 63:14, 63:17,
65:8, 65:13, 67:8,
85:13, 90:24.
Bench 40:9, 86:6,
157:4, 157:6,
161:23, 173:15,
179:8, 207:24.
Bentalou 138:8.
beside 136:20.
besides 31:24.
best 62:9, 62:10,
63:9, 66:20,
68:20, 116:12,
183:6.
better 7:25,
56:12.
bias 162:22,
162:23.
biased 80:17.
Big 104:7, 104:10.
Biggie 57:16, 57:17,
69:12, 84:20,
84:23, 84:25,

85:13, 102:23,
140:5.
birth 8:15, 11:23,
33:18.
bit 6:4, 10:2, 98:3,
107:24, 126:17,
128:3, 129:1,
137:20.
black 5:7, 5:8,
6:16, 21:21,
28:20, 28:21,
29:23, 50:25,
51:15, 51:23,
51:25, 52:8, 52:9,
125:2, 125:3,
128:24, 129:6,
129:20, 129:21,
132:24, 133:5,
136:10, 138:1,
146:20, 152:9,
152:19, 178:8.
blatantly 139:13.
blessed 22:18.
blow 122:16.
bluish 150:14.
blurry 123:19.
blurt 86:8.
BMW 50:23, 51:2,
51:18, 132:24,
133:5, 136:4,
146:21, 152:19,
156:10, 158:19,
159:1, 159:2,
159:20, 178:8,
190:17, 190:22.
body 15:9, 41:21.
body-worn 15:12,
41:22.
boo 90:8.
book 102:12.
born 44:10.
boundaries 28:5.
box 49:8.
boy 64:8, 64:11,
64:18, 64:20.
branch 184:15.
break 24:7, 24:18,
87:24, 88:2,
116:11, 116:12,
116:15, 117:11,

174:14, 181:25,
210:5.
breaking 116:8.
brief 11:9, 11:11,
12:19, 15:8, 16:2,
27:21, 29:14,
33:17, 35:15.
briefly 17:16,
26:11, 133:16,
155:25.
Bring 24:23, 117:1,
143:18, 163:6.
bro 140:15.
broke 88:18.
brother 112:17.
brought 32:18,
54:13, 56:3,
139:1, 139:2,
161:6, 161:7,
166:8, 167:10.
buddies 192:19.
buddy 192:21.
Buffalo 196:7,
196:8.
building 143:13.
bunch 64:12,
133:14.
bus 197:3, 197:4,
197:6, 197:8,
197:9.
business 43:4,
140:3.
buy 50:5, 50:9.
buying 146:16.
.
.
< C >.
C-2 128:23.
C. 183:24.
C2 190:19, 190:20.
CAD 6:1, 27:19.
called 2:13, 21:19,
22:8, 25:13,
27:19, 43:22,
46:3, 48:23, 54:7,
54:8, 71:2, 73:6,
89:1, 96:15,
104:19, 114:7,
120:3, 148:15,
160:10, 167:23,

174:8, 183:19,
188:6, 194:13,
201:11, 202:18,
203:18, 207:7.
caller 6:3.
callers 74:11.
calling 89:10,
89:12, 92:9,
117:16, 118:17,
160:11.
cam 15:9, 41:21.
camera 15:12,
41:22.
cameras 177:25.
campus 189:8.
canceled 152:15.
capacity 23:21,
26:9.
capture 41:21,
75:11.
card 9:8, 9:10,
9:11, 22:15,
22:16, 32:11,
32:15, 32:20.
care 46:6, 48:21,
55:4, 78:6, 79:24,
81:20, 82:13,
82:16, 134:2,
134:24, 150:19,
210:2.
cared 78:1, 207:6.
career 189:3.
caring 205:18.
carries 22:15,
22:16.
carry 9:8, 32:11.
cars. 129:9.
cases 183:7.
cash 6:24, 8:4,
152:17, 192:6,
195:4, 197:15.
catch 82:25, 122:25,
123:17, 128:12.
catches 122:9.
cause 20:8, 23:6,
23:7, 23:9,
86:10.
cell 95:3, 95:4,
95:8, 96:2, 96:3,
96:5, 96:8, 96:9,

96:10, 123:10,
167:23, 194:17,
194:18.
cellular 96:11.
Center 48:8, 74:3,
134:2.
certain 38:8, 38:24,
119:17, 131:20,
166:20.
Certainly 17:16,
20:17, 23:1, 23:3,
23:5, 23:8, 120:2,
159:18, 172:7.
certify 210:13.
chair 36:11.
chance 34:14, 74:10,
181:8.
change 12:13, 12:14,
205:10.
changed 81:13,
143:23, 154:15.
channels 38:9.
characterize 160:21,
161:18.
charge 208:10,
210:8.
charged 22:11, 55:3,
68:6, 117:24,
148:18, 148:21.
charges 45:25, 46:6,
48:21, 56:2,
56:24, 73:15,
76:3, 82:19,
85:22, 86:20,
86:23, 94:18.
Charging 182:17,
182:21, 183:4.
cheaper 191:15.
check 107:5, 107:8,
107:17, 111:3,
111:6, 111:16,
111:19, 111:21.
checked 121:21.
checking 205:3.
chef 145:16.
Chesapeake 74:3,
149:1.
children 47:11,
47:14, 80:22,
145:21, 203:14,

207:5, 207:8.
chilling 138:2.
chopped 118:22.
choppy 75:15.
chose 7:24.
Christine 1:46,
210:13, 210:18.
Christopher 1:33.
chronological
102:13.
Ciara 97:24, 98:1,
98:22.
circular 28:16.
circumstance
34:21.
circumstances 7:20,
19:11, 19:13,
20:10, 21:3,
132:4, 141:15,
141:17, 142:3,
195:15.
City 5:13, 7:1,
20:25, 22:5, 29:1,
29:9, 30:10,
31:24, 37:7,
38:23, 39:4, 39:9,
42:18, 44:12,
58:23, 201:23,
207:3.
CL 52:12.
claims 90:11,
90:12.
clarify 86:16.
class 205:4.
classroom 169:12.
classrooms 205:3.
clear 22:22, 23:1,
26:24, 30:1,
56:11, 146:5,
148:23, 149:13,
150:3, 169:7,
208:6.
clearer 98:3.
clearly 17:20,
19:16, 20:18,
20:20, 30:16.
CLERK 2:10, 2:16,
25:10, 25:16,
25:18, 25:22,
43:19, 43:25,

44:2, 183:16,
183:22, 184:2,
184:4, 188:3,
188:9, 188:12,
188:16, 201:8,
201:14, 201:17.
client 16:5.
Clifton 1:10, 1:35,
147:7, 154:23,
155:18, 156:3,
177:19.
close 46:20, 93:14,
156:4, 183:8.
closing 174:3,
182:18, 204:6.
closings 182:18,
183:5, 183:9.
clothes 5:6, 28:19,
72:18, 114:19.
clothing 106:18,
114:22, 114:25,
132:6.
clue 68:4.
code 98:14.
coerce 11:4.
coercive 23:22.
colleagues 38:2,
38:20.
collect 62:22,
194:23.
color 50:24, 51:8,
51:14.
combined 84:7,
202:5.
comes 20:3, 119:13,
122:6.
Coming 6:21, 56:19,
67:6, 68:14,
68:15, 81:15,
87:10, 137:6,
137:7, 137:8,
137:15, 138:4,
148:24, 163:5,
166:5, 167:8,
170:20.
commands 22:24.
commend 25:6,
25:8.
commenting 90:1.
comments 5:24,

15:13.
committed 177:23.
communicate 61:24,
  70:22, 123:8,
  185:23.
communicated
  127:22.
communication 45:21,
  72:2, 73:3, 131:2,
  138:19.
communications
  45:12, 45:14,
  53:7, 71:23, 72:8,
  72:13, 72:23,
  72:24, 106:14,
  123:13, 167:19,
  178:13.
community 3:10,
  26:11.
company 48:11,
  48:14, 48:19,
  50:1, 76:23,
  79:15, 79:16,
  79:17, 79:24,
  80:4, 132:7,
  204:21, 204:23.
complete 151:23,
  201:3.
completed 181:20,
  187:24, 207:20.
completely 21:9,
  162:9.
completing 32:25.
complex 28:16.
complexes 5:3.
complying 175:7.
computed-aided
  27:20.
computer 186:23.
computer-aided
  6:2.
concede 17:24.
concern 133:19.
concerned 18:19,
  87:10, 134:25,
  135:3, 209:3.
conclude 24:3.
concluded 43:14.
concluded. 210:11.
conclusion 111:22,

178:15, 209:18.
conditioner
  105:21.
conditions 55:2.
conduct 23:22.
conducts 19:1.
conference 40:9,
  86:6, 157:4,
  161:23, 173:15,
  179:8, 182:17,
  182:21, 183:4,
  207:24, 208:10,
  210:8.
confines 37:8.
confirm 209:5.
conflicting 133:10,
  133:11, 133:24,
  134:4, 134:5,
  134:7, 134:10,
  134:16.
confusion 86:10.
connection 42:24,
  101:12, 101:17,
  102:2, 168:13,
  169:19.
consider 46:21,
  161:15, 190:12.
consideration
  19:17.
considered 115:3,
  166:23, 205:16.
consistent 22:18.
conspiracy 157:17.
Constantly 205:2,
  206:6.
consult 171:17,
  172:6.
consulting 24:13.
consuming 176:21,
  177:1, 177:3.
contact 5:10, 5:12,
  5:22, 21:21,
  29:12, 30:22,
  31:4, 48:25,
  99:21, 115:8,
  117:20, 132:19,
  186:13, 186:16,
  194:14.
contacted 7:21,
  14:3, 143:16.

contacts 53:1,
  186:9.
containing 22:2.
contents 6:11,
  11:12, 15:13,
  166:25, 167:1.
context 75:22,
  109:6, 162:5.
continue 30:19,
  45:1, 45:5, 45:11,
  51:6, 55:12,
  82:18, 82:19,
  98:25, 114:10,
  117:8, 154:16,
  174:14, 192:10.
continued 45:14,
  175:4.
continuing 45:24.
contraband 15:14,
  123:10.
control 135:4,
  135:6, 142:5,
  147:14, 149:7,
  151:10.
convalescing 27:4.
conversation 11:7,
  11:11, 15:20,
  69:18, 76:11,
  79:13, 87:2, 93:7,
  94:5, 95:2, 95:21,
  100:6, 105:25,
  106:11, 106:17,
  115:1, 125:21,
  126:18, 127:15,
  127:17, 127:18,
  130:13, 132:12,
  136:6, 139:17,
  195:20.
conversational
  33:9.
conversations 53:23,
  74:6, 140:6.
convicted 187:13.
conviction 45:25,
  82:18.
cool 110:6.
cooperating
  133:20.
cooperation
  162:25.

copy 75:6.
corner 5:3, 28:17,
  140:24, 152:22.
corrected 14:22.
correction 4:19.
counsel 12:22,
  16:19, 24:8,
  24:15, 42:1,
  63:11, 63:12,
  128:2, 155:24,
  168:7, 172:4,
  173:3, 174:24,
  175:2, 179:1,
  187:20, 200:22,
  210:7.
County 3:3, 3:5,
  3:18, 6:25, 7:3,
  7:17, 20:2, 20:11,
  22:6, 22:12, 26:3,
  26:5, 28:6, 30:9,
  30:11, 32:1, 37:2,
  37:6, 37:8, 37:9,
  38:3, 38:12,
  41:23, 42:16.
couple 25:5, 67:9,
  71:15, 90:5,
  133:16, 141:3,
  146:20, 151:4,
  162:12.
course 8:10, 18:22,
  21:2, 29:16,
  159:2, 161:22,
  162:15, 164:1,
  173:6, 173:14,
  174:21, 176:10.
court-appointed
  147:25.
court. 41:7, 86:18,
  158:17, 164:6,
  174:7, 181:2,
  209:10.
courthouse 70:3.
courtroom 35:14,
  62:7, 68:3, 68:7,
  70:3, 83:25, 93:9,
  192:23, 210:1.
courtroom. 24:24,
  88:3, 88:11,
  116:19, 117:2,
  182:3, 183:13,

210:3.
Cousin 142:22,
  150:24, 197:23,
  197:24.
cover 122:16,
  138:25, 139:2,
  139:3, 139:4,
  139:8, 139:10,
  143:8.
covered 32:12.
crazy 63:16.
credit 23:13,
  23:14.
crime 7:25, 26:12,
  170:7, 175:22,
  187:13.
crimes 34:22.
CRIMINAL 1:9, 7:3.
crisis 207:2,
  207:7.
critical 7:22.
Cross 12:21, 35:7,
  41:5, 145:5,
  155:24, 187:18,
  199:23, 200:21,
  207:15.
Cross-examination
  12:24, 35:9,
  145:7, 156:1,
  163:13, 179:12,
  199:25, 211:9,
  211:14, 211:22,
  211:24, 211:36.
cuffed 9:2, 9:5,
  22:14, 36:14,
  36:16, 36:23,
  38:19.
cuffs 23:10.
curb 13:8, 13:24,
  18:15, 22:15,
  36:8, 36:9, 36:12,
  36:22, 37:22,
  39:21.
currency 6:19, 7:23,
  8:20, 22:3,
  30:2.
currently 3:13,
  26:10, 26:16,
  27:4, 44:12,
  45:16, 45:17.

custody 12:11,
  20:17, 20:21,
  23:3, 23:11, 34:6,
  45:4, 167:9.
cut 105:20, 193:3.
.
.
< D >.
dad 197:25.
daily 204:8.
Damn 108:13,
  108:18.
dark 142:19.
dash 143:10.
date 8:15, 11:23,
  33:18, 61:3,
  80:19, 83:18,
  88:24, 91:2, 92:3,
  119:11, 144:20,
  146:11, 167:5,
  168:18, 190:8,
  194:3.
dated 74:18,
  118:16.
dates 57:7, 59:8,
  60:9, 67:13, 79:6,
  79:13, 80:2,
  80:17, 80:21,
  80:22, 81:16,
  83:16, 90:6, 91:6,
  91:7.
daughter 142:7,
  150:18, 151:5.
Dave 90:13, 90:18,
  90:21, 90:22,
  94:18, 94:22.
David 67:17, 86:21,
  86:25, 101:8,
  127:12.
days 56:25, 57:1,
  67:9, 148:11.
De-escalation
  203:13.
deal 30:11, 127:1,
  207:4, 209:21.
dealership 49:2,
  49:6, 50:7,
  146:14, 154:24,
  155:6.
dealing 26:12,

114:4, 150:10,
209:2.
dealings 29:6,
113:22, 113:24.
deals 31:4.
dealt 42:13, 114:1,
114:2, 138:21.
Deanna 132:17.
death 63:16.
debt 152:15.
December 54:8,
153:3.
decide 20:11,
164:21.
decision 10:13,
173:5.
decline 20:12, 54:4,
54:7, 54:10,
54:15, 54:18,
54:20.
declined 54:22.
dedicated 205:21.
deep 205:18.
Defendant 1:29,
1:35, 22:11,
97:14, 193:5.
Defendants 1:12,
63:22, 64:6.
Defense 17:14,
182:25.
definitely 182:6,
195:1.
delayed 21:17.
deliver 160:15.
delivery 79:18,
79:23, 80:3.
deny 23:3.
denying 20:21,
41:15.
Department 3:3, 3:5,
3:18, 5:5, 5:18,
7:18, 9:8, 20:2,
21:1, 26:3, 26:15,
28:3, 32:12,
41:24.
depends 119:21.
depicted 189:15,
202:15.
describe 29:20,
142:3, 185:11,

193:2, 205:14.
described 199:3.
description 49:23.
desk 169:9.
detail 26:7.
detailed 26:11.
details 26:14.
detain 38:25,
39:7.
detained 13:16,
13:23, 17:20,
18:4, 18:15,
18:18, 18:21,
36:3, 36:5, 38:18,
39:23, 69:21,
70:14, 70:16,
70:18, 83:13,
94:3, 148:9.
detained. 94:13.
detaining 85:10.
Detectives 5:19,
7:1, 8:16, 12:3,
12:8, 12:11,
28:18, 30:10,
31:13, 32:3,
33:19, 35:3,
37:12, 37:24,
39:3, 39:4, 39:6,
198:5, 198:13,
198:17.
Detention 19:19,
49:8, 74:3, 149:1,
192:8.
deter 20:14.
determined 42:10.
device 166:23.
different 21:9,
21:11, 23:24,
23:25, 26:14,
42:17, 52:13,
63:12, 103:25,
109:1, 132:15,
132:18, 132:22,
161:12, 170:22,
177:13.
differentiate
51:22.
differently
170:25.
Direct 2:23, 25:23,

27:22, 44:6,
84:15, 84:22,
117:17, 184:5,
188:17, 198:18,
200:5, 201:18,
211:7, 211:12,
211:20, 211:30,
211:34, 211:40.
directed 6:10,
21:25, 29:18,
136:23, 137:10,
139:16, 173:19.
directing 3:25,
27:13, 156:10,
199:15.
direction 131:20.
directly 162:17.
disburse 12:2.
disbursed 30:20.
discuss 24:15,
43:13, 102:21,
116:17, 181:19,
187:23, 198:17,
201:2, 207:19,
209:24.
discussed 48:13,
76:12, 174:10,
176:22, 176:25.
discussing 62:16,
100:1, 121:18,
126:20, 129:5.
discussion 75:12,
94:18, 126:21.
discussions 157:6,
197:17, 197:19.
dispatch 4:1, 4:24,
6:2, 27:18,
27:20.
disregard 154:13.
disrespect 61:13,
78:3, 134:23.
distribution 31:5.
DISTRICT 1:1, 1:2.
disturbed 7:10,
30:17, 30:18,
203:14, 205:9,
207:4.
do. 101:19.
doing 25:3, 29:14,
32:4, 48:10,

48:14, 101:13,
103:1, 111:19,
114:24, 137:17,
137:19, 138:6,
138:11, 138:12,
149:10, 159:5,
169:13, 184:8,
192:1, 192:2,
205:19, 208:20.
done 11:10, 25:5,
34:18, 35:1, 90:8,
90:9, 156:14,
162:18, 163:23.
door 29:21, 137:1,
137:6, 137:9,
138:2, 152:3,
160:9, 160:15.
doors 5:9, 28:22.
double 59:8.
dragging 174:1.
drawing 67:13.
drinking 64:17.
drinking. 63:18.
drinks 140:10,
140:12.
drive 11:17, 33:15,
50:13, 50:15,
51:21, 52:2,
55:15, 55:17,
55:18, 56:1,
69:24, 126:5,
139:25, 147:3,
190:16, 191:4.
driven 51:16, 51:17,
51:18, 146:24,
197:13.
driver 9:21, 9:22,
11:21, 12:6,
12:16, 15:2,
22:14, 31:14,
31:15, 31:20,
32:23, 33:16,
33:21, 34:9,
79:18, 79:23,
80:3, 128:18,
128:19.
drives 11:15.
Driving 8:13, 11:14,
33:13, 33:15,
55:25, 105:24,

106:3, 116:3,
126:7, 126:9,
126:10, 129:10,
135:18, 136:2,
136:5, 136:6,
142:1, 142:22,
147:15, 147:18,
159:20, 190:23,
193:11, 193:14,
197:10, 200:6,
200:10, 200:17.
drop 69:24.
dropped 92:7, 92:8,
142:25.
dropping 93:3,
93:9.
drove 50:16, 51:18,
52:4, 56:1, 56:4,
142:14, 143:6,
143:7, 190:14.
drug 65:2.
drugs 6:7, 6:24,
7:2, 7:4, 7:6,
7:10, 7:21, 7:23,
8:4, 8:20, 10:21,
11:17, 12:7,
12:11, 15:19,
15:21, 21:24,
22:7, 22:25,
29:17, 30:11,
30:12, 31:5, 33:8,
33:11, 34:6, 38:7,
65:4.
drunk 64:12, 64:15,
108:17.
dude 125:12,
125:13.
due 7:20, 7:24,
31:1, 194:13.
duffel 6:16, 6:23,
8:4, 22:2, 29:23,
29:25, 30:8.
duly 2:13, 25:13,
43:22, 183:19,
188:6, 201:11.
Dundalk 26:10,
26:12.
duration 15:25,
89:11, 91:12.
duress 20:19.

during 10:7, 21:2,
35:21, 127:10,
146:12, 159:1,
164:9, 164:24,
173:6, 173:7,
174:21, 192:10,
205:6.
duties 3:7, 26:7.
duty 3:16, 4:20,
26:22, 27:7.
.
.
< E >.
e-mail 167:20.
earlier 3:14,
106:17, 114:18,
120:4, 134:20,
199:4.
early 183:9, 204:5,
204:6.
edge 107:24.
edits 208:16.
either 56:25, 60:9,
69:16, 85:14,
91:24, 114:19,
125:2, 157:17.
elapsed 119:24.
electronic 46:5,
48:1, 48:2, 48:3,
48:6, 49:1, 52:15,
56:15.
Elementary 202:2,
202:5.
Elementary/middle
201:25.
emotionally 203:14,
205:9, 207:4.
employed 3:2, 26:2,
201:22.
employee 49:25,
50:3, 206:8.
employment 49:7,
154:23, 198:18,
199:10.
encounter 15:25.
encounters 132:5.
end 96:18, 119:2,
140:22, 167:18,
206:25, 208:8,
208:17.

ended 195:18.
ending 185:19,
   186:9, 186:12.
ends 119:19.
enemies 206:9.
engaged 11:7.
engine 158:21.
enhance 35:3.
Enjoy 43:14, 88:2,
   116:18, 116:23,
   181:20, 187:24,
   201:3, 207:20,
   210:1, 210:9.
enjoyed 117:4.
enough 84:24, 85:1,
   85:3, 208:22.
ensure 150:18.
enter 162:2.
entered 24:24,
   88:11, 117:2,
   183:13.
entire 17:23.
equally 21:1.
equipped 15:9,
   15:11.
especially 35:2.
Esquire 1:31, 1:33,
   1:37, 1:39.
essentially
   167:21.
establish 156:16.
established
   157:17.
estimate 46:2,
   194:5.
evening 56:16,
   78:19, 84:23,
   87:2, 91:1, 99:21,
   142:9, 150:24,
   151:1, 151:2.
event 7:3, 83:18,
   83:19, 83:21,
   130:15.
Eventually 7:13,
   8:1, 12:5, 33:22,
   67:8, 144:23.
everybody 76:8.
Everyone 25:1,
   57:21, 58:2,
   71:19, 113:5,

116:23, 117:4.
Everything 4:18,
   12:5, 19:25,
   20:13, 37:5,
   53:16, 80:19,
   100:16, 109:19,
   132:16, 154:4,
   156:25, 163:18,
   170:14, 209:24.
evidence 30:18,
   40:14, 40:16,
   40:22, 40:23,
   179:21, 180:10,
   180:11.
evidentiary 2:4.
Exactly 32:16,
   49:21, 112:13,
   113:3, 118:2,
   141:23, 144:2,
   158:14, 163:25,
   195:6.
Examination 2:23,
   25:23, 42:4, 44:6,
   167:16, 173:16,
   184:5, 188:17,
   201:18, 211:7,
   211:12, 211:16,
   211:20, 211:26,
   211:30, 211:34,
   211:40.
examined 2:13,
   25:13, 43:22,
   183:19, 188:6,
   201:11.
examiner 182:13.
example 162:24,
   163:3, 174:14.
except 119:10.
exception 157:19.
excerpt 89:8.
exchange 197:17.
exchanged 194:16.
excuse 47:12.
excused 17:1, 17:8,
   43:15, 88:5,
   181:21, 187:24,
   201:4, 207:20.
executed 15:23.
Exhibit 9:17, 32:17,
   62:3, 78:9, 78:18,

87:14, 89:9,
   121:2, 128:23,
   186:8, 189:15,
   190:19, 190:20,
   191:10, 202:13.
exhibits 208:7.
expect 182:18.
expected 164:18,
   164:23, 165:1,
   165:6, 165:10,
   165:19, 206:1.
expedite 8:17.
expertise 39:3.
explain 118:9,
   158:1, 160:7.
explained 170:10.
explains 158:3,
   158:6.
explanation 10:13.
express 47:9.
extensive 100:21.
extent 118:2,
   169:22.
extortion 45:25,
   68:6, 86:20.
extortion/murder
   104:20.
extra 150:17.
extras 75:8.
eye 10:24, 78:14,
   110:6.
eyes 8:3.
eyes. 63:16.
.
.
< F >.
F'ed 63:15.
F'ers 122:3.
F-l-e-m-i-n-g
   188:15.
face 58:3.
facilities 119:17.
Facility 149:1.
fact 18:16, 23:10,
   23:16, 47:10,
   48:13, 48:20,
   122:16, 147:9,
   154:10.
facts 40:15, 40:22,
   40:23.

fair 13:13, 15:22,
  36:7, 39:22,
  65:20, 147:3,
  147:9, 147:10,
  147:16, 161:13,
  171:1, 175:5,
  177:14, 208:22.
fall 198:2,
  198:13.
Fallstaff 46:17,
  145:21.
false 170:2.
familiar 46:14,
  58:7, 59:22,
  73:11, 149:25,
  190:14, 190:17.
family 57:12, 93:15,
  206:8.
fan 107:1.
far 18:18, 46:21,
  48:18, 63:11,
  119:12, 131:18,
  131:23, 147:2,
  162:2.
Fargo 98:7, 98:11,
  98:13.
fast 4:23, 103:21.
Fat 137:8, 138:3,
  138:4.
father 80:18,
  189:20, 189:22,
  190:1.
Fats 137:6, 137:11,
  137:13, 137:22,
  137:23.
favor 114:24, 115:3,
  191:18.
FCRR 1:46, 210:13.
Federal 1:47, 54:1,
  151:25, 161:11.
feel 82:12, 172:14,
  172:20.
feels 163:2.
felt 67:5, 126:14,
  147:16, 147:19,
  163:13, 164:8,
  179:16.
female 5:12, 21:22,
  29:1, 42:15.
few 6:2, 12:4, 15:7,

39:24, 41:9,
  42:24, 52:22,
  57:6, 57:8, 127:9,
  147:9, 150:1,
  159:24.
field 3:9.
Fifth 19:2, 166:2.
fight 108:17.
figure 39:1,
  125:17.
file 34:12.
filed 153:7, 154:2,
  154:3.
filled 6:19, 22:3.
final 120:20.
find 15:21, 20:5,
  23:17, 23:18,
  48:20, 49:7,
  53:19, 67:25,
  80:5, 103:7,
  108:13, 108:18,
  113:5, 114:5,
  121:2, 130:2,
  130:18, 131:1,
  131:2, 145:1,
  149:23.
finding 83:19,
  119:13, 132:8,
  207:5, 207:8.
findings 23:16.
fine 61:7, 78:11,
  208:14, 208:18,
  209:7.
fingerprint
  102:21.
Finish 21:14, 57:5,
  83:5, 99:6,
  114:10, 116:10,
  164:21, 178:25,
  183:9, 198:9.
finished 12:13.
finishes 144:11.
fixed 158:6.
Fleming 145:19,
  188:2, 188:5,
  188:14, 188:19,
  188:21, 189:13,
  190:4, 191:1,
  191:9, 193:9,
  198:1, 199:11,

200:2, 211:32.
fleshed 163:1.
flip 60:22, 113:19,
  126:3, 127:16,
  129:5, 129:7,
  129:8, 129:9.
Floor 1:48.
flop 126:3, 127:16,
  129:5, 129:7,
  129:9.
flop. 129:8.
flowed 19:19.
flows 19:25.
follow 78:22.
following 41:7,
  86:18, 158:17,
  164:6, 174:7,
  181:2, 209:10.
follows 2:14, 25:14,
  43:23, 183:20,
  188:7, 201:12.
football 186:22.
force 11:4.
foregoing 210:14.
forged 153:12.
forget 111:5.
forgive 62:6.
forgot 181:9.
formal 169:12,
  174:23.
formed 23:6, 23:7.
Forsythe 5:15,
  21:22, 29:3, 29:5,
  29:12, 30:14,
  37:14, 37:25.
forth 5:21.
forward 103:21,
  182:2.
found 14:2, 19:23,
  20:9, 20:24, 23:8,
  29:17, 48:24,
  79:20, 79:25,
  80:1, 80:3, 81:9,
  127:5, 127:13,
  144:23, 153:13,
  159:19.
Four 177:5,
  184:18.
frame 34:19, 45:24,
  119:18, 120:5,

133:2, 150:12,
185:21, 190:10.
Francis 201:25,
202:1, 202:24,
204:10.
fraud 46:6, 48:21,
55:4, 81:12,
81:14, 81:20.
fraudulently 153:12,
154:5, 154:15.
free 10:14, 13:13,
18:16, 23:1,
36:20, 68:22.
Friday 198:18,
198:22, 199:16,
204:4, 205:23,
206:13, 207:11.
Fridays 199:2.
friend 11:13, 33:10,
33:15, 41:3,
97:18, 97:19,
128:8, 136:12,
190:12, 192:22.
friends 58:12,
63:24, 64:2,
64:25, 147:2,
156:4, 156:6,
185:11.
friendship 47:17.
front 2:19, 13:10,
36:16, 36:18,
44:3, 63:8, 94:14,
143:10, 152:21,
169:10, 174:22,
175:11, 178:22,
191:6.
frustrated 126:17.
full 2:19, 25:18,
44:3, 59:18,
183:23, 188:10,
188:12, 201:15,
203:25, 204:1.
full-time 204:2.
fully 162:25.
fun 110:13, 110:17,
110:22.
funds 117:19,
117:21.
furtherance
157:17.

fussing 156:9.
.
.
< G >.
game 186:22.
garage 85:1, 85:4,
143:25, 144:23,
151:16.
garage. 84:24.
Gateway 114:7,
132:7, 132:8.
gather 37:24.
gathered 165:18.
gave 16:12, 22:4,
29:14, 39:24,
41:2, 138:15,
149:9, 151:4,
151:7, 152:11,
192:6, 194:17,
194:18, 195:4,
196:25.
geared 173:17.
general 32:2,
157:19, 183:7.
generally 3:7, 28:2,
66:17.
generated 14:24.
generous 147:2.
gentleman 97:13,
123:4.
gentlemen 25:1,
87:25, 88:13,
116:14, 117:4,
120:21, 181:24,
193:1, 209:11,
209:16.
geographic 3:20.
George 1:18, 143:20,
144:4, 151:16,
152:2, 152:6,
152:22.
Gerald 1:31.
gets 79:22, 129:1.
getting 62:13,
112:5, 126:16,
127:19, 128:20,
134:25, 142:10,
142:19, 166:1,
167:18, 191:16,
191:22.

girlfriend 11:15,
33:13, 47:5, 47:6,
47:12, 98:22.
Given 12:7, 19:8,
23:23, 32:11,
120:5, 153:10,
202:4.
gives 6:2.
giving 98:14,
135:10.
GJH-17-0667 1:9.
glad 85:17, 87:4.
Glyndon 189:8,
189:9.
God 131:18.
gotta 85:18, 87:7.
gotten 42:7, 133:12,
144:4.
grab 125:18.
grade 202:10,
202:11, 205:8,
205:11, 205:12.
graders 205:9.
grades 205:7.
grandmother 152:21,
152:23, 153:24.
gray 51:9, 204:17.
Greenmount 185:10.
grow 185:6.
guarding 12:9.
guess 2:5, 24:7,
73:21, 99:18,
103:15, 118:19,
119:20, 128:8,
138:25, 152:3,
180:9, 180:12.
gunshot 26:22.
guy 90:11, 98:23,
101:8.
guys 114:6, 119:11,
144:25, 167:25,
168:2.
gym 203:9.
.
.
< H >.
H-a-y-s 2:22,
25:21.
habit 32:10.
hair 90:8, 90:9.

half 45:19, 76:15,
    82:10, 208:18.
hand 2:11, 25:11,
    43:20, 183:17,
    188:4, 201:9.
handcuffed 13:2,
    13:10, 13:23,
    31:17, 39:20,
    167:10.
handcuffs 18:22,
    19:1, 31:16,
    31:18, 69:2,
    69:4.
hands 13:10, 36:17,
    38:19, 39:21.
hang 122:10, 122:12,
    185:8, 186:18,
    186:20.
happen 53:2, 79:11,
    114:21, 126:24,
    141:20, 164:18,
    164:25, 165:7.
happened 4:19, 7:3,
    8:3, 11:10, 12:15,
    15:24, 18:17,
    20:5, 42:23, 43:1,
    80:1, 80:20,
    85:17, 86:13,
    87:4, 91:2, 93:4,
    94:12, 101:14,
    132:6, 152:10,
    166:12, 169:18,
    180:15, 196:24.
happening 134:3.
happens 31:11,
    122:8.
happy 148:2,
    165:13.
harassed 102:5,
    160:18, 160:20,
    163:10.
harassing 76:16,
    161:17.
harassment 160:22,
    161:16, 162:8,
    162:20, 164:8.
hard 166:1.
hardly 173:17.
Harford 3:24.
Harry 1:37, 145:9.

hatch 29:21.
Hays 2:9, 2:12,
    2:22, 2:25, 18:18,
    19:17, 21:11,
    21:17, 22:12,
    25:12, 25:21,
    25:25, 35:11,
    41:8, 41:25, 42:6,
    211:5.
Hazel 1:18.
he'll 107:6.
head 111:4.
Health 46:5, 48:21,
    55:4, 79:23,
    81:20, 189:6.
hear 2:5, 17:15,
    46:23, 49:11,
    63:6, 75:13, 80:9,
    82:1, 83:3, 86:14,
    90:14, 95:12,
    108:9, 108:15,
    112:4, 113:18,
    120:15, 121:4,
    137:25, 140:14,
    140:16, 164:20,
    196:17.
heard 68:8, 75:15,
    83:4, 83:11, 95:5,
    112:6, 121:23,
    128:16, 134:8,
    134:20, 134:21,
    137:14, 149:4,
    158:24.
hearings 55:2,
    56:23, 57:9,
    57:17, 57:18,
    66:18, 67:10,
    70:10, 127:7,
    127:10.
hearsay 153:14,
    154:13, 157:8.
heart 93:22,
    93:23.
heat 106:4.
heavy 65:7, 66:4,
    66:11, 66:21,
    155:8.
Heights 46:18,
    46:19, 46:20,
    58:23, 93:11,

93:12, 93:22,
    93:23.
Heiss 209:2.
held 23:4, 23:5,
    26:8.
Hello 145:11.
help 8:16, 62:20,
    62:22, 62:25,
    63:2, 63:10,
    113:8, 135:10,
    135:20, 135:21,
    155:4.
helper 155:11.
helping 62:17.
helps 25:7.
hereby 9:25,
    210:13.
herself 197:5.
Hiding 139:12,
    139:13, 139:14.
high 26:12.
highlighted
    199:15.
him. 92:9, 137:2,
    137:25.
hire 147:24, 149:16,
    155:16, 172:16.
hit 11:2.
Hold 38:6, 86:3,
    106:3, 114:20,
    116:2, 142:8,
    150:17, 150:20,
    153:17, 157:13,
    161:22, 178:23,
    182:17, 202:24.
holding 116:5.
Holiday 75:8, 78:9,
    78:16, 84:10,
    105:13, 105:14,
    167:19.
homicide 5:25, 8:19,
    14:1, 19:15, 22:5,
    28:4, 42:25,
    161:10.
honest 179:13.
honestly 78:1,
    134:23.
Honorable 1:18.
hope 86:12, 98:18.
hopefully 117:4,

183:5, 210:8.
hour 116:15, 116:18,
 116:24, 208:19.
hours 20:25, 39:25,
 41:2, 41:9, 42:24,
 100:15, 151:4,
 177:5.
house 47:20, 47:22,
 48:22, 48:25,
 51:19, 58:16,
 69:6, 69:9, 70:2,
 90:13, 92:7,
 93:25, 94:22,
 131:14, 137:18,
 143:7, 143:24,
 152:22, 155:18,
 160:17, 163:6,
 186:19, 186:21.
housed 119:21.
humiliating
 167:11.
humor 108:20.
hung 167:21.
hurt 81:2, 81:8,
 81:19.
.
.
< I >.
i-n-e-s 184:3.
idea 34:17, 55:24,
 159:8, 159:19.
identified 14:19,
 14:21, 193:5.
identify 192:25.
IDH 84:24, 84:25,
 85:3.
immediately 154:1.
impact 24:3.
impacted 164:3.
impacts 164:3.
impaired 23:21.
impeaching 180:3.
impeachment
 180:20.
implement 189:1.
implemented 41:23.
important 34:23,
 60:12, 80:14.
impossible 19:9.
impounded 133:7.

impression 173:25.
improper 19:18.
in-the-line-of-duty
 3:13.
in. 166:7.
inappropriate
 163:23.
incarceration 45:15,
 85:22.
incident 7:22, 38:5,
 41:22.
inclined 208:9.
include 7:24,
 18:22.
included 3:8,
 155:8.
incorrect 179:16.
independent 19:17.
INDEX 211:1.
indicated 6:8, 13:6,
 14:3, 14:9, 22:4,
 22:24, 23:12,
 37:2, 164:7,
 172:24.
indication 17:19,
 23:18, 23:20,
 23:22.
indicted 67:16,
 67:24, 86:20.
individual 6:18,
 8:12, 15:2, 35:13,
 35:17, 35:22,
 35:25, 117:19,
 184:19, 189:17,
 195:8.
individuals
 117:18.
indulgence 91:8,
 155:13, 199:7,
 199:8, 199:21.
influence 10:21,
 22:23.
information 6:4,
 8:14, 8:16, 11:23,
 12:6, 16:12,
 22:13, 29:15,
 32:1, 32:2, 33:18,
 33:21, 34:9,
 34:19, 35:5,
 37:25, 38:8, 42:7,

43:3, 53:9, 78:25,
 94:22, 101:6,
 162:5, 171:11,
 185:18, 194:14,
 196:1, 198:6,
 198:14.
informed 152:1.
initial 5:24, 30:13,
 56:2, 68:13.
initially 38:1.
initiated 5:13.
inmate 119:3, 119:7,
 119:23, 120:11,
 120:22, 121:8,
 122:15, 127:20,
 127:21.
inmates 122:14.
inquire 163:4,
 176:13.
inquiring 163:18,
 163:19.
inquiry 19:12,
 163:8, 164:2.
inside 6:11, 7:12,
 29:25, 109:2,
 203:14, 203:16,
 205:19.
insinuation 162:7.
instance 72:16,
 106:19, 111:10,
 160:12.
instances 82:9.
instead 117:16.
instruct 116:20.
instructed 88:4.
instruction 116:17,
 162:21, 180:20,
 209:24.
instructions
 208:17.
insured 113:7,
 114:6.
intend 162:3.
interact 15:20,
 206:5.
interacted 35:16.
interaction 12:8,
 12:18, 15:7, 20:4,
 20:5, 20:13,
 33:16, 35:15,

42:20, 43:8,
52:20, 52:23.
interactions 11:20,
12:1, 205:14.
interest 22:5,
63:10, 66:20,
103:19.
interesting 21:8.
interests 168:9,
176:7.
interim 30:22.
internet-based
123:12.
interrupt 49:24,
109:3.
intervention 207:2,
207:7.
interview 20:10,
39:24, 40:7,
40:11, 40:13,
41:2, 41:21,
42:23, 144:1,
144:9, 144:13,
164:9, 164:24,
164:25, 165:21,
166:16, 166:20,
166:23.
interviewed 10:14,
41:9, 144:16,
144:17, 161:2,
161:6, 161:8,
161:9, 161:10,
161:14, 163:14,
166:10, 166:18,
168:5, 168:13,
198:2, 198:13.
interviewing 161:16,
198:6.
interviews 20:3,
39:7, 160:25,
161:5, 161:15,
166:3.
introduced 59:15,
184:22, 190:18.
introducing
180:10.
introduction
59:18.
inventory 146:19.
invested 147:12.

investigate 7:25,
35:4, 37:7.
investigated 34:23,
127:11.
investigating
39:4.
investigation 5:25,
6:9, 8:18, 8:23,
13:25, 28:4,
29:15, 29:16,
31:24, 31:25,
39:8, 42:25,
67:18, 76:13,
76:17, 100:23,
100:25, 101:13,
101:18, 102:2,
102:4, 162:10,
168:16, 169:20,
175:16, 175:17,
175:21.
investigations
34:25.
investigative 3:11,
26:12.
investigators
54:18.
involuntary 19:4,
23:19.
involve 80:15.
involved 7:19, 8:22,
34:25, 45:10,
47:8, 65:16, 80:8,
86:23, 86:24,
94:17, 146:1,
146:4, 146:5,
162:11.
involving 49:20,
55:2, 67:18,
85:21, 94:18.
irrelevant 20:12.
issue 18:3, 23:10,
23:25, 24:3,
24:19, 30:11,
102:21, 174:25,
208:11.
issues 162:25,
209:19, 209:22.
it. 111:4, 116:3,
159:23.
.

.
< J >.
J-21 120:21.
J-21A 120:21.
J-25 102:12,
102:14.
J-4 74:17.
J-5 78:9, 78:18.
J-5A 78:9.
J-6 87:15.
J-7 95:18.
J-8 105:17.
J-8A 105:17.
J-9 111:23.
J. 1:18, 1:37.
jackets 29:8.
jail 60:8, 62:12,
68:12, 68:23,
73:6, 80:9, 88:19,
95:18, 100:17,
105:17, 107:20,
110:16, 119:12,
120:6, 121:3,
122:2, 122:11,
135:12, 148:18,
148:24, 149:14,
176:11, 176:14,
176:16, 177:8,
177:12, 194:6,
194:8.
job 48:4, 48:6,
48:9, 49:23,
109:17, 109:19,
109:20, 111:12,
160:16, 167:8.
Joey 128:7,
128:18.
jog 110:20,
137:20.
joke 109:2.
jokes 109:1.
jotting 21:14.
Jr 1:37.
Judge 3:16, 83:19,
210:10.
June 27:7.
jurisdiction 7:1,
37:6, 37:7, 38:23,
39:1, 39:6,
39:10.

JURORS 25:2.
justified 23:4.
.
.
< K >.
keep 8:3, 9:9,
  14:19, 25:7,
  32:13, 32:17,
  60:11, 78:14,
  150:20.
keeping 144:6.
kept 4:18.
Key 201:25, 202:1,
  202:24, 204:10.
keys 141:25, 142:2,
  143:5, 151:8.
khaki 204:17.
kicked 152:3.
kids 72:18, 105:7,
  189:1, 203:2,
  203:6, 203:9,
  203:12, 205:10,
  205:13, 207:2,
  207:4.
kills 18:17.
Kim 1:27.
kind 5:1, 7:22,
  8:15, 12:9, 15:19,
  18:17, 28:15,
  29:24, 30:1, 39:2,
  48:14, 49:18,
  51:1, 52:11,
  53:14, 58:21,
  61:4, 62:6, 75:15,
  85:17, 87:4,
  142:19, 147:20,
  162:7, 206:22.
knock 137:1, 137:5,
  137:9, 138:2,
  160:9, 160:15.
knowing 29:9.
knowledge 36:21,
  42:24, 43:8,
  48:16, 48:17,
  49:4, 50:20,
  153:18, 154:18,
  156:3, 156:8,
  156:16, 156:19,
  158:18, 159:14,
  162:11, 177:21,

  193:13, 193:15.
known 145:14, 185:1,
  190:7, 202:21.
knows 58:9, 59:24,
  60:1, 153:19,
  156:20.
.
.
< L >.
Ladies 25:1, 87:25,
  88:13, 116:14,
  117:4, 120:21,
  181:24, 209:11,
  209:15.
lady 101:7.
laptops 27:19.
large 6:9, 6:16,
  6:17, 7:20, 7:23,
  8:20, 14:1, 22:1,
  22:2, 29:16,
  29:23, 29:24,
  31:1, 31:5.
last 2:22, 21:5,
  25:21, 44:18,
  61:10, 61:14,
  61:15, 68:21,
  68:22, 69:1, 69:3,
  74:2, 102:12,
  116:9, 125:14,
  125:16, 125:22,
  128:12, 151:10,
  167:13, 178:22,
  184:2.
lasted 45:3.
late 78:12, 140:15,
  181:1, 183:4,
  209:21.
Later 20:25, 23:24,
  39:25, 41:2, 41:9,
  42:24, 56:16,
  67:9, 68:19,
  78:11, 78:19,
  80:9, 81:21,
  138:7, 142:8,
  209:3.
Latrina 101:16,
  102:3.
law 10:6.
Lawson. 132:17.
lawyer 10:6, 10:7,

  10:9, 62:9, 62:10,
  62:17, 63:1, 63:4,
  63:5, 63:7, 66:19,
  147:24, 147:25,
  155:16.
leading 198:8,
  200:5.
learn 6:6, 209:25.
learned 21:24, 68:2,
  76:23, 94:23,
  95:10, 95:12,
  209:25.
learning 48:8.
least 22:21, 23:7,
  45:5, 45:20, 54:1,
  99:20, 146:8,
  150:6, 162:1,
  183:8, 185:2,
  185:5.
leave 12:2, 26:16,
  34:4, 65:9,
  173:24, 181:4,
  204:7.
leaving 93:9.
Lee 162:4.
left 7:12, 12:15,
  14:6, 15:6, 22:7,
  34:4, 39:3, 43:2,
  88:3, 90:13, 92:6,
  94:21, 116:19,
  153:1, 182:3,
  182:5, 209:6,
  210:3.
legally 139:25.
length 19:5.
lengthen 165:21.
lengthy 18:5,
  120:20, 166:10.
Lesser 74:12, 74:24,
  75:2, 75:18,
  75:20, 79:7,
  103:24, 108:6,
  110:23, 111:1,
  114:13, 120:19,
  127:25, 137:3.
letter 103:16,
  103:17.
letters 70:23,
  70:25, 138:17.
letting 101:6,

147:3, 179:17,
209:21.
Level 189:1.
license 124:15,
125:8, 139:24,
139:25.
license-plate
139:11.
lie 114:16.
lied 136:5.
lies 63:15.
life 59:10, 80:16,
148:8, 167:11.
light 15:19,
158:22.
limiting 180:19.
Line 26:22, 91:18,
94:5, 118:13,
119:4, 119:8,
162:1, 163:7,
164:2, 172:4,
173:3, 179:1,
181:13, 199:15.
lines 6:3, 195:22.
listed 62:15,
186:10.
listen 74:10, 75:17,
77:2, 78:5,
121:13, 171:25.
listened 90:1,
106:23.
listening 78:5,
78:6, 82:11,
82:12, 88:19,
140:3, 157:11,
157:14, 176:16,
177:8, 180:14.
literally 20:15,
33:17.
little 6:4, 10:2,
29:15, 94:8, 98:3,
101:15, 107:24,
109:2, 118:22,
128:2, 129:1,
136:11, 137:20,
142:8, 169:12,
209:21.
little. 138:1.
live 44:12, 46:10,
47:4, 69:17, 70:4,

93:10, 131:13,
131:15.
lived 46:11, 46:13,
47:2, 47:15,
69:25, 92:6,
131:11, 153:24.
lives 69:8, 69:10,
93:17, 137:19,
140:25, 142:15,
143:13, 150:2.
living 46:8, 145:18,
188:23.
load 155:4.
loan 147:19.
loaning 147:22.
located 189:7.
location 199:3.
locations 143:23.
lock 163:4.
locked 7:9, 30:16,
70:19, 70:21,
79:22, 96:21,
126:6, 133:4,
133:12, 134:8,
134:9, 134:22,
134:24, 135:23,
138:14, 147:6,
147:11, 147:23,
148:9, 150:7,
155:1.
log 98:10.
Lombard 1:48.
Long 3:4, 11:7,
13:1, 13:16,
17:19, 20:7, 26:4,
33:16, 36:22,
38:19, 39:22,
45:3, 45:14,
55:22, 79:13,
135:23, 150:10,
165:23, 165:24,
165:25, 184:17,
185:1, 185:11,
189:3, 190:7,
193:16, 194:6,
202:1, 202:21,
208:3.
longer 20:3, 142:8,
165:23.
look 10:24, 31:8,

62:5, 63:16,
63:17, 63:18,
64:8, 64:18, 90:8,
90:17, 97:2,
170:22, 184:23,
186:8, 189:14,
196:16, 196:18,
202:13.
looked 6:18.
looking 66:10, 99:3,
99:5, 107:5,
111:7, 111:9,
111:14, 111:17,
170:20.
Looks 64:16,
183:15.
lot 5:4, 5:19, 5:20,
5:21, 7:8, 28:18,
29:22, 37:24,
48:17, 59:1,
71:19, 71:20,
91:17, 109:7,
109:10, 109:16,
110:21, 142:14,
143:9, 144:19,
147:15, 147:18,
156:9, 161:14,
183:3, 196:13,
196:22, 205:10.
lots 58:1.
loud 158:21,
166:1.
love 65:10, 65:15,
65:17, 65:23.
loved 68:23,
207:6.
loves 65:9.
low 193:3.
loyal 148:10.
lunch 116:15,
116:18, 116:23,
117:5, 203:8.
lying 135:25.
.
.
< M >.
M-i-c-h-a-e-l
188:14.
M-u-t-o-l-o
201:16.

M. 1:33.
mad 85:14.
mail 121:18.
mail. 121:22.
Main 189:8.
Mainly 186:4.
major 127:3,
   183:3.
man 15:18, 33:8,
   42:17, 44:14,
   58:5, 68:22,
   68:23, 86:24.
manager 203:15.
manned 203:16.
manufactured 90:12,
   94:21.
marijuana 6:10,
   6:17, 6:21, 14:2,
   19:25, 20:9,
   21:10, 22:2, 22:4,
   23:8, 29:25, 30:6,
   31:1, 37:4, 37:5,
   37:9, 39:10, 41:3,
   41:10, 41:16,
   43:6, 159:9,
   159:19.
Marines 184:16.
mark 9:16, 32:17,
   199:8.
marked 4:13, 28:9,
   185:17, 202:13.
market 52:5.
married 59:13.
Maryland 1:2, 1:20,
   1:49, 44:11,
   196:7.
Mat 143:20.
match 154:6.
material 109:17,
   109:18.
math 202:11,
   207:25.
Matt 69:24, 70:12,
   112:22, 112:23,
   114:24, 115:10,
   201:16.
matter 14:25, 158:2,
   210:15.
Meaning 63:22,
   70:18, 176:2,

181:4, 181:8.
means 60:22, 85:3,
   95:8, 118:4,
   141:23, 200:11,
   208:1.
meant 140:1,
   163:22.
meantime 157:24.
mechanic 143:18,
   187:4.
medical 26:16,
   48:10, 48:11,
   48:14, 79:16,
   182:12.
Medicare 81:11,
   81:13.
meet 5:24, 54:4,
   54:18, 64:2,
   132:4, 136:23,
   136:25, 149:3,
   194:1, 194:6,
   195:13, 196:3,
   196:8, 196:11,
   204:11.
meeting 92:23,
   92:25, 93:1,
   131:22, 131:25,
   132:1, 132:2,
   132:3, 195:5,
   195:18, 196:6.
meetings 204:13.
member 93:15.
Memorial 205:23.
memorialize 16:10,
   34:11, 34:19.
memory 9:7, 67:14,
   92:10, 92:23,
   102:3, 107:13,
   110:20, 137:21.
mentioned 51:24,
   52:1, 67:20,
   76:17, 154:22.
mentioning 86:9.
mentions 76:21.
Mercer 1:39.
merged 118:4.
message 62:13,
   63:14, 65:19,
   66:7, 66:10,
   118:16.

messages 62:17,
   66:15, 84:17,
   196:19.
messaging 123:13.
met 53:4, 59:19,
   60:4, 60:5, 60:8,
   60:16, 64:22,
   77:5, 112:8,
   131:17, 131:19,
   132:3, 133:16,
   136:17, 136:21,
   145:12, 193:25,
   194:3, 194:4,
   194:8, 195:7,
   195:15, 195:16,
   196:7, 196:14.
Michael 188:2,
   188:5, 188:14,
   191:9, 211:32.
Michelle 105:8,
   112:17, 114:15,
   114:25, 145:18,
   190:4.
microphone 2:18,
   44:2, 185:4,
   189:25.
Middle 69:16,
   110:16, 193:1,
   202:2, 202:5,
   205:7.
midst 6:8.
midway 207:1.
Mihok 181:7.
Mike 112:15, 112:16,
   112:17, 112:19,
   112:22, 113:2,
   113:3, 113:4,
   114:1, 179:10.
military 184:13,
   184:15.
Mills 189:12, 196:7,
   199:4.
mind 66:5, 66:25,
   67:1, 67:4, 144:5,
   149:12, 157:18,
   182:21.
mind. 65:7, 66:12,
   66:21.
mine 11:17,
   179:12.

minivan 197:8, 197:10.
minute 84:16, 89:11, 89:13, 89:22, 91:12.
minutes 18:15, 18:22, 19:2, 20:4, 20:6, 88:8, 119:21, 183:2, 204:6.
Miranda 8:22, 9:6, 9:9, 9:11, 11:8, 20:20, 21:1, 22:14, 22:15, 22:18, 22:20, 23:12, 23:17, 23:18, 24:2, 24:4, 32:7, 32:13, 32:22, 32:25.
Mirandize 9:4.
Mirandized 9:1, 20:18.
misconduct 108:22.
missed 18:14.
missing 154:19.
misspoke 179:16, 181:5.
mistake 121:22.
mistaken 197:14.
misunderstanding 170:17.
misunderstood 61:4.
mom 205:16.
moment 21:13, 59:20, 75:16, 155:13, 173:13, 209:13.
moments 159:24.
Monday 182:12, 182:14, 182:23, 182:25, 183:4, 199:2, 204:4, 208:4, 208:11, 209:17, 209:20, 210:2.
money. 112:6.
monitor 48:2, 180:18, 189:14.
monitored 77:11, 77:18, 77:21.

monitoring 46:5, 48:1, 48:3, 48:6, 49:1, 52:15, 56:15, 135:19, 135:20, 192:8.
month 114:9, 133:2, 150:6, 150:7, 150:9.
moral 67:6, 82:15, 127:4.
morning 2:3, 2:10, 2:25, 3:1, 3:25, 4:17, 25:1, 25:5, 25:10, 25:25, 26:1, 42:21, 43:19, 44:8, 74:22, 80:19, 87:16, 87:18, 120:4, 153:24, 176:12, 182:23, 198:21, 204:24, 206:2.
mother 47:10, 47:18, 58:16, 72:18, 91:15, 105:7, 190:2.
motion 2:4, 17:15, 21:6, 21:15, 23:3.
motions 2:6.
motor 153:13.
Move 40:22, 111:11, 152:24, 153:14, 154:1, 167:12.
moved 51:19, 52:3, 52:6, 143:13, 144:2, 144:4, 144:20, 153:25.
moving 143:14.
multiple 96:15, 126:9.
murder 45:25, 67:16, 67:18, 67:25, 68:6, 81:14, 81:21, 82:19, 85:22, 86:9, 86:11, 86:12, 86:20, 86:21, 86:24, 94:18, 100:23, 101:13,

102:2, 106:16, 127:11, 162:8, 169:20, 171:12, 175:17, 177:23, 198:2, 198:15.
murdered 80:18, 207:6.
Muslim 125:12, 125:13.
muted 121:22.
Mutolo 201:7, 201:10, 201:16, 201:20, 201:22, 202:12, 211:38.
MVA 154:4, 154:8.
Myself 135:2, 157:20, 158:10, 181:7, 191:9.
.
.
< N >.
named 11:13, 33:10, 63:25, 64:2, 76:21, 84:18, 86:24, 98:1, 100:23, 101:8, 101:16, 102:3, 137:22, 151:16, 184:20.
Narcotics 7:18, 7:24, 12:3, 12:10, 14:6, 22:8, 31:4, 31:9, 33:22, 34:25, 38:4, 38:6, 38:10, 38:20, 39:3, 39:18, 42:16.
nature 31:2, 34:21, 49:20, 51:21, 52:23, 53:12, 55:9, 55:21, 72:12, 72:21, 72:22, 75:12, 81:20, 100:24, 102:4, 106:14, 115:1, 127:6, 133:17, 171:7, 178:12.
natures 57:7.
near 13:9, 36:6,

46:17, 69:25,
95:3, 95:4,
131:17, 138:8.
necessarily 158:5.
need 62:9, 62:10,
116:11, 152:25,
172:14, 173:9.
needed 6:5, 17:2,
48:25, 113:12,
126:6, 147:4,
148:5, 205:6,
209:19.
needs 24:15, 180:4,
209:25.
neighborhood 5:2,
28:16, 185:8,
185:9.
neighbors 3:23.
neither 163:21.
nephew 189:20,
189:22, 190:1,
190:2.
New 56:24, 64:8,
64:10, 64:18,
64:20, 64:22,
64:25, 65:3,
183:15.
Next 11:10, 25:9,
27:3, 29:13,
30:15, 31:12,
31:22, 43:17,
58:6, 59:3, 63:14,
64:8, 65:5, 83:7,
83:12, 84:13,
87:18, 98:6,
102:8, 142:7,
150:24, 188:1,
193:1, 201:6.
niceties 174:4.
nicknames 186:1.
nieces 189:20,
189:22, 190:1,
190:2.
night 48:22, 80:20,
85:10, 85:21,
89:3, 90:13,
92:12, 92:14,
92:24, 94:21,
100:5, 102:23,
149:23.

nightfall 142:10,
142:13, 142:18.
No. 1:9, 9:17,
40:19, 54:10,
61:16, 95:18,
102:5, 136:6,
153:25, 172:9,
196:13.
nobody 7:10,
180:14.
noise 122:12,
158:21.
None 79:6, 134:17,
134:22.
Nonresponsive
151:20.
noon 88:1.
Nope 206:12.
North 185:10.
NORTHERN 1:2.
nose 30:3.
note 21:8, 35:22.
notes 21:14.
Nothing 12:10,
16:24, 20:14,
35:6, 43:11, 78:7,
82:7, 82:16,
101:6, 108:21,
118:14, 122:10,
159:22, 181:17,
192:2, 199:22,
210:6.
notice 54:13,
183:8.
noticed 206:20.
notified 38:2, 38:5,
160:6.
notify 7:23,
167:7.
notion 18:25,
174:2.
now. 132:18.
numbers 3:22, 95:23,
96:1, 97:2, 97:6,
97:8, 121:10,
132:15, 138:15,
138:17, 194:16.
.
.
< O >.

o'clock 24:6, 88:5,
88:6, 116:11,
116:12, 116:16,
116:21, 182:2,
206:19.
oath 88:15, 117:7,
169:25, 174:10.
object 168:22.
Objection 26:20,
39:12, 40:2,
85:23, 86:4,
151:20, 154:13,
156:15, 156:19,
156:24, 157:7,
157:8, 157:25,
158:15, 159:10,
164:19, 165:2,
165:8, 165:15,
167:12, 173:12,
174:3, 174:4,
179:2, 193:6,
198:8.
obligations
174:10.
observations 6:20,
8:12, 9:2, 30:3,
30:14, 31:15.
observe 6:13,
37:16.
observed 28:14,
57:19.
obtained 33:21,
34:9, 199:13.
obvious 202:4.
Obviously 6:21,
7:21, 16:15,
18:15, 30:16,
182:17.
occasion 49:16,
55:6, 55:7, 56:14,
68:23, 110:10,
110:11, 166:4.
occasionally 117:12,
119:2.
occasions 47:20,
47:25, 50:6, 54:1,
55:12, 58:17,
70:25, 160:4,
161:12, 166:8,
166:18, 166:19,

204:25.
occur 195:5.
occurred 3:14, 37:6,
    41:22, 194:20,
    196:6, 198:3,
    198:15.
occurs 157:16.
odor 6:21, 22:4.
offense 22:12.
offered 191:20.
office 204:14.
officers 5:4, 7:8,
    21:23, 22:3, 22:5,
    28:18, 29:8,
    30:17, 31:20,
    38:24.
Official 1:47,
    210:19.
offline 199:12.
often 45:18, 46:1,
    46:3, 71:1, 73:20,
    193:19.
old 44:8, 184:9,
    188:21.
older 185:7.
oldest 190:8,
    190:9.
Oldham 1:27, 182:6,
    182:24, 184:6,
    185:6, 187:16,
    188:1, 188:18,
    190:2, 193:4,
    193:9, 198:11,
    198:12, 199:7,
    199:10, 199:21,
    200:25, 201:7,
    201:19, 206:18,
    207:13, 209:5,
    209:14, 211:30,
    211:34, 211:40.
on-duty 21:18.
Once 10:16, 11:10,
    19:24, 20:9, 23:6,
    23:7, 23:8, 29:12,
    43:2, 72:17, 92:7,
    120:4, 120:10,
    193:20, 194:8,
    194:25, 196:19.
one. 64:8.
ones 129:13, 134:18,

134:19.
online 199:13.
open 5:9, 6:16,
    28:22, 29:21,
    29:24, 41:7,
    86:18, 127:11,
    158:17, 164:6,
    174:7, 181:2,
    209:10.
operated 3:9.
operator 73:10.
opportunity 14:24,
    172:15, 206:4.
opposed 81:20.
order 102:11,
    102:12, 102:13,
    102:14, 105:17,
    155:16, 175:12,
    175:20.
otherwise 19:3,
    54:19, 133:19.
outcome 65:8, 65:25,
    66:12, 66:22.
outcome. 66:1,
    66:23.
outline 102:10.
Outside 12:1, 17:12,
    31:2, 39:6, 72:20,
    92:20, 94:12,
    115:4, 141:2,
    196:13, 206:11.
overall 162:19.
overborne 23:20.
overrule 41:5,
    41:6.
Overruled 26:21,
    40:5, 85:25,
    151:23, 159:11,
    168:24, 174:3,
    174:4, 198:9.
owe 140:16,
    140:19.
owed 152:13.
owes 140:20.
Owings 189:12,
    196:7, 199:4.
own 10:15, 49:25,
    52:9, 113:15,
    119:3, 154:17,
    162:10.

owner 152:8.
owns 21:9.
.
.
< P >.
P-2 62:3, 89:9,
    118:16, 186:8.
p.m. 78:19, 89:22,
    102:16, 120:23,
    199:19.
packaged 30:1.
packet 84:10.
Page 62:2, 91:18,
    94:5, 101:10,
    104:3, 118:15,
    172:4, 173:3,
    178:22, 179:1,
    186:7, 211:3.
paid 113:12, 114:9,
    127:3, 148:21,
    148:22, 195:22,
    204:21.
pants 204:17.
paper 111:14,
    114:6.
papers 154:3.
paperwork 113:6,
    132:8, 172:17.
para-educator
    204:19, 204:22.
paraprofessional
    202:25, 203:1,
    204:3, 205:8.
Pardon 49:14, 59:25,
    99:15.
Park 46:18, 46:19,
    46:20, 58:23,
    93:11, 93:12,
    93:22, 93:23,
    125:9, 126:23,
    135:21, 139:3,
    139:4, 139:6,
    139:8, 139:14,
    147:22.
parked 28:21, 126:6,
    149:23, 152:21,
    153:23, 154:18.
parking 5:8, 135:3,
    142:14, 142:15,
    142:16, 143:9,

144:19, 196:13,
196:22.
Parkville 3:21, 4:5,
4:6, 26:10,
27:9.
Parkway 3:23.
part 8:23, 10:15,
30:19, 37:3,
95:20, 98:6,
101:20, 103:25,
111:2, 121:18,
128:12, 137:3,
162:16, 203:22,
204:19.
particular 5:11,
28:25, 32:21,
34:18, 38:3,
91:14, 156:11,
158:13, 177:9,
187:2, 204:15,
205:4.
particularly
59:17.
partner 4:9,
28:11.
party 118:4.
pass 8:16, 74:14,
120:7, 142:15,
142:16, 143:9,
144:19.
passed 29:15.
passenger 56:8.
passing 59:2.
password 135:10.
patrol 3:9, 3:12,
3:17, 11:25, 12:9,
12:14, 20:6,
20:13, 26:9,
26:15, 27:11,
27:19, 31:7.
pay 57:21, 58:2,
113:1, 113:8,
117:22, 119:9,
135:22, 192:5,
195:3, 197:15.
Paying 82:6, 82:7,
119:6.
payment 193:21.
payments 192:3,
192:5, 192:11,

192:16, 192:20.
Payton 208:5.
pending 66:25, 67:2,
77:24, 102:7.
people 5:20, 5:21,
38:25, 39:7, 57:9,
57:24, 58:1, 58:2,
71:19, 79:11,
91:13, 108:20,
109:1, 118:11,
125:18, 126:9,
126:10, 137:13,
147:15, 147:18,
147:19, 152:3,
163:5, 169:10,
171:17, 172:6,
174:1, 174:22,
186:4, 197:4.
per 7:21, 8:21,
32:7, 58:14.
perceived 165:17.
percent 203:10,
205:22.
Perfect 206:8.
perhaps 89:5, 92:23,
133:20.
period 3:12, 18:5,
71:24, 150:10,
166:10, 192:10.
perjury 170:2.
permit 140:2.
permitted 120:11,
120:14, 120:16,
173:21, 173:24.
Perring 3:23.
person 5:17, 8:7,
9:19, 9:21, 22:17,
52:24, 52:25,
63:10, 66:24,
73:25, 84:17,
92:1, 92:5,
104:17, 105:10,
115:6, 115:7,
117:17, 117:23,
122:16, 149:3,
153:11, 162:9,
176:7, 189:15,
193:13, 200:6,
200:10.
personal 11:23,

33:18, 59:10,
118:12, 118:13,
135:3, 154:18,
156:7, 158:18,
167:23.
personally 13:20,
22:7, 37:15,
41:18, 52:21,
58:3.
perspective 163:9,
164:22, 165:16.
pertained 56:24,
198:7, 198:14.
pertaining 101:7.
PH-1 184:23.
PH-3 189:15.
pharmaceutical
48:19.
phone. 99:11,
121:24.
phones 121:11.
phrase 95:3.
phrased 18:23, 19:8,
165:3, 165:4,
165:11.
physical 45:8,
96:20.
physically 7:11,
141:19, 196:3,
196:11.
pick 34:18, 114:22,
194:9.
picked 130:3,
130:11, 130:19,
142:14, 142:17.
picking 106:18,
109:17, 130:10,
142:9.
picture 208:23,
209:8.
Pikesville 4:4,
46:22, 46:24,
46:25.
Pimlico 92:17.
ping 95:3, 95:4,
95:8.
place 14:15, 23:9,
48:10, 117:23,
118:3, 118:6,
118:19, 118:23,

154:23, 168:20,
204:10.
placed 16:12, 23:10,
117:12, 118:24,
169:25.
placing 117:15.
plain 5:6, 28:19.
Plaintiff 1:7,
1:23.
planned 92:23.
planning 92:25,
182:16.
plans 189:1.
plastic 6:19, 22:2,
30:1, 32:12.
plate 124:15.
plates 125:8,
139:7.
Play 74:9, 75:16,
82:4, 84:13, 98:2,
103:7, 103:20,
107:12, 108:3,
108:4, 110:19,
120:20, 124:8,
128:1, 137:3,
137:20, 162:13,
163:17, 186:22.
played 100:17,
125:8, 159:24,
176:16.
Playing 74:18,
78:17, 84:4,
163:14.
plead 166:2.
Please 2:10, 2:20,
25:10, 25:18,
43:13, 43:20,
88:1, 94:9, 101:9,
101:15, 102:6,
108:10, 116:16,
116:18, 175:18,
181:19, 183:16,
183:22, 183:25,
184:9, 187:23,
188:10, 200:8,
201:2, 201:8,
201:14, 207:19,
210:1.
plenty 49:13,
67:12.

plugged 166:22.
Plus 109:11, 109:13,
109:16, 130:14,
152:11.
pocket 32:14.
point. 20:16, 23:11,
24:1, 87:24,
116:15, 156:16,
181:25.
pointed 131:20.
points 162:12,
173:20.
policy 7:22.
polo 204:17.
poorly 18:24.
portion 103:23.
position 126:22,
202:24.
positions 149:6.
possession 7:2, 7:4,
7:10, 21:10, 22:6,
22:9, 30:12,
123:10, 135:7,
142:4, 153:10,
158:20.
possible 5:25, 8:19,
28:4, 35:2,
35:5.
possibly 31:4,
34:22, 98:1.
post 3:22.
potential 162:23.
powerful 30:5.
Pratt 189:6.
Pre-k 202:9,
202:10.
precaution 8:25.
precinct 3:21,
26:10.
precinct-level
26:13.
precise 40:24,
41:1.
precisely 163:19.
preinterview 163:19,
173:19.
preparation 35:18,
54:5, 171:3.
prepared 62:11.
preparing 17:23.

present 53:2, 53:4,
53:7, 83:24.
present. 2:2, 211:6,
211:11.
presume 17:2.
pretty 148:9,
205:16.
prevent 115:4.
previously 171:2,
174:11.
Pride 203:18,
203:19.
Primarily 22:4,
26:15, 135:12,
193:14, 200:6,
200:10.
printed 199:12.
Prior 10:9, 13:4,
13:16, 15:11,
29:6, 34:15,
36:25, 40:11,
41:22, 45:20,
48:3, 48:6, 54:19,
60:2, 79:20,
79:22, 126:18,
127:15, 158:19,
164:14, 170:20,
194:5, 194:6.
prison 45:21,
122:20, 123:9.
private 101:5,
144:25.
privy 12:15.
prob- 134:1.
probable 20:8, 23:5,
23:6, 23:9.
Probably 35:1,
45:19, 56:5,
71:13, 82:10,
100:4, 108:16,
110:21, 116:8,
134:4, 140:24,
157:10, 182:18,
185:2, 185:5,
186:17, 190:10,
193:20.
problem 168:4.
problems 147:12,
158:19.
proceeding 173:8,

176:10.
Proceedings 1:17,
  41:7, 55:10, 57:7,
  60:10, 66:25,
  67:2, 67:5, 67:23,
  79:19, 80:1,
  86:18, 101:18,
  105:1, 127:2,
  150:11, 158:17,
  164:6, 173:6,
  174:7, 174:22,
  181:2, 209:10,
  210:11, 210:15.
process 8:17, 62:7,
  73:21, 73:22,
  84:6, 162:9,
  162:22, 163:24,
  164:9, 164:24,
  164:25, 165:21,
  168:12.
program 15:12,
  41:23, 203:15,
  203:17, 203:20.
progressed 168:16.
projection 183:6.
prompt 25:7.
promptly 43:3.
proper 19:20,
  117:21, 179:20.
properly 20:17,
  21:3.
property 29:22,
  126:16, 147:20.
prosecution 20:12.
prosecutor 169:9,
  181:7.
prosecutors 54:5.
protect 176:7.
provide 9:24, 33:22,
  53:10, 75:9, 97:8,
  172:16, 179:21.
provided 15:5,
  23:12, 23:17,
  103:12, 170:3,
  170:5, 170:19,
  171:1, 174:17.
providing 11:8,
  22:20, 32:22.
public 189:2.
pull 59:3, 82:23,

205:19.
pulled 22:17,
  154:4.
pulling 28:24.
punch 199:20.
punishment 82:2.
purpose 27:25,
  30:25, 92:22,
  109:12, 109:15,
  155:4.
purposes 9:17,
  17:23, 75:22,
  182:16.
pursuant 20:20,
  21:1, 101:19,
  176:2.
put 23:10, 36:8,
  62:2, 75:22,
  75:25, 76:2,
  106:19, 116:3,
  118:15, 119:13,
  128:22, 139:3,
  139:4, 139:8,
  142:15, 143:8,
  143:24, 147:20,
  163:9, 166:11,
  170:7, 173:23,
  175:22, 191:14,
  195:24, 208:16.
puts 19:1.
putting 36:17,
  75:12, 130:4,
  130:20.
.
.
< Q >.
quantity 6:17, 14:1,
  31:1.
questioned 164:8,
  164:14, 177:12,
  177:13.
questioning 10:7,
  10:9, 18:19,
  19:15, 35:23,
  43:5, 161:19,
  162:1, 162:17,
  162:19, 163:22.
queued 62:4.
quick 11:22.
quickly 86:5.

quote 191:23.
quotes 191:16.
.
.
< R >.
R-23 185:18.
R-24 199:9.
R-3 191:10.
R-3A 190:25,
  191:6.
R-3B 190:25.
radio 6:1, 27:18.
raid 5:6, 28:19,
  29:8.
raise 2:10, 25:10,
  43:20, 183:16,
  188:4, 201:8.
raised 5:9, 6:11,
  22:1, 44:10,
  149:16.
randomly 59:1.
Raphael 120:22,
  120:24, 121:5,
  123:4, 127:21.
rarely 72:15.
rate 191:14.
rather 147:24,
  150:23.
reached 195:20,
  195:22.
react 207:5.
read 8:21, 9:6,
  9:10, 9:18, 9:20,
  9:21, 10:2, 10:13,
  10:16, 14:20,
  22:13, 22:17,
  32:7, 32:14,
  32:15, 179:5,
  179:7, 179:20,
  179:22, 180:5.
reading 40:12,
  168:23, 172:21,
  179:25, 180:7,
  180:21.
reads 180:13.
ready 2:8, 25:9,
  142:19, 182:2.
real 57:16, 107:5,
  107:8, 107:17,
  111:6, 111:16,

136:15, 208:11.
rear 6:10.
reason 11:14, 18:18,
   22:11, 23:13,
   33:12, 72:5,
   117:15, 118:6,
   119:16, 119:22,
   139:13, 156:12,
   156:17, 158:13,
   162:25, 179:25,
   198:5, 198:12,
   205:20.
reason. 62:12.
reasonable 19:23,
   172:15.
reasons 23:5.
rebut 174:2.
receive 119:2,
   123:13.
received 27:18,
   48:23, 104:21,
   121:7, 160:12,
   175:12.
recently 59:18,
   119:11, 167:22.
recess 24:22, 88:9,
   116:25, 183:12,
   203:9.
recitation 23:15.
recognize 8:18,
   12:16, 15:6, 29:5,
   29:9, 35:13,
   44:14, 74:10,
   75:3, 185:18,
   189:14, 190:19,
   190:25, 191:6,
   199:10.
recognized 29:25,
   57:22.
recollection 9:7,
   32:9, 32:22,
   34:15, 35:19,
   35:22, 55:9,
   68:20, 71:14,
   89:6, 90:3, 90:18,
   98:21, 99:12,
   99:25, 100:8,
   103:8, 104:6,
   106:11, 176:19,
   181:15.

recollections 87:3,
   176:13.
record 14:18, 14:20,
   17:18, 19:17,
   23:13, 42:7, 74:9,
   74:18, 78:17,
   84:4, 102:15,
   111:23, 120:21,
   154:12, 170:18,
   173:23, 179:5,
   179:21, 180:6,
   183:23, 188:10,
   188:13, 193:4,
   201:15, 210:15.
record. 40:9, 86:6,
   157:4, 161:23,
   173:15, 179:8,
   207:24.
recorded 73:7,
   73:10, 74:6,
   77:12, 77:18,
   79:9, 174:22.
recording 73:10,
   120:14, 122:6,
   122:9, 123:9,
   125:7, 162:3.
recordings 122:11.
records 89:5,
   99:20.
recover 149:21.
recovered 6:7,
   21:24, 153:8,
   153:10.
recovering 3:13,
   21:18.
Redirect 16:22,
   42:3, 42:4,
   167:15, 167:16,
   168:23, 173:16,
   178:17, 200:24,
   211:16, 211:26.
reduce 41:13, 41:15,
   41:19.
refer 28:19, 61:12,
   62:5, 88:25,
   90:17, 104:2,
   186:5.
reference 5:25,
   8:19, 13:25, 28:4,
   37:4, 39:8, 43:6,

86:21, 101:3.
referencing 86:9.
referred 22:1.
referring 14:19,
   61:3, 63:20, 66:2,
   76:8, 78:23, 81:3,
   81:19, 88:22,
   92:3, 97:10,
   97:17, 98:11,
   104:13, 105:19,
   106:24, 107:17,
   110:7, 110:14,
   115:23, 116:4,
   121:25, 123:3,
   124:21, 125:23,
   126:8, 140:18,
   140:19, 162:20,
   192:21.
reflect 14:18.
refresh 34:14,
   35:19, 89:5, 90:2,
   92:10, 92:23,
   98:21, 99:12,
   99:25, 100:7,
   102:3, 104:6,
   107:12, 176:19,
   181:15.
refreshing 35:21.
regard 120:2,
   176:1.
regarding 17:25,
   19:12, 66:25,
   154:14, 160:23,
   176:13.
regards 133:15,
   134:3.
registered 191:8,
   191:13.
registration
   191:11.
regular 45:21,
   155:9.
Reisterstown 189:10,
   189:11, 189:12.
relate 34:8, 94:22,
   107:7.
related 34:8, 46:5,
   109:20, 190:11.
relation 100:22,
   134:11, 194:5.

relationship 44:20,
44:22, 44:23,
45:5, 45:8, 45:9,
47:11, 47:17,
82:20, 82:22,
103:4, 103:5.
relay 32:2, 33:19,
53:9.
relayed 12:6, 34:24,
38:8, 41:18,
43:3.
release 55:2,
134:12, 209:16.
released 55:13,
56:14, 133:12,
208:2.
relevance 162:6,
162:20, 178:3,
178:11.
relevant 162:10,
162:23, 163:7,
164:2.
relieved 12:12,
43:3.
reluctant 150:16.
remain 10:1, 10:4,
170:6.
remembered 42:11,
100:17.
remind 88:14, 117:6,
171:10, 172:13,
209:1.
reminded 174:9.
remove 7:11, 7:13.
removing 113:23.
repairs 156:14.
repeat 48:5, 94:19,
159:17, 174:20,
200:8.
repeated 209:23.
repeating 180:15.
rephrase 165:3.
report 8:17, 15:1,
16:10, 16:13,
34:11, 34:20,
42:8, 153:6,
153:7, 154:2,
154:3, 206:1,
206:13.
reported 154:19,

206:21.
Reporter 1:47,
170:15, 210:19.
reports 14:24,
35:19.
represent 145:10,
168:9.
represented 168:7,
168:12, 176:4.
request 6:3, 10:8.
required 175:21.
requiring 175:12.
resided 143:16.
resolve 21:15.
resolved 24:19.
resource 203:8.
respond 4:1, 4:3,
10:17, 27:14,
66:12, 171:20.
responded 14:9,
172:25, 179:11.
responding 163:11.
response 15:14,
82:12, 134:15,
179:12.
responsibilities
3:7, 26:8.
responsibility 7:6,
8:5.
rest 43:15, 77:2,
181:20, 187:24,
207:21, 210:1.
restaurant 196:11.
result 19:4, 20:7,
21:2, 30:13.
retaining 63:11.
rethink 182:20.
retired 184:11.
return 150:16,
191:25, 192:2.
review 14:24, 17:23,
34:14, 35:18,
67:9.
reviewed 15:1,
42:10.
Richard 52:19.
riding 56:21.
right. 111:8,
111:17.
rights 8:21, 9:6,

9:9, 9:10, 9:24,
10:13, 10:14,
11:8, 19:3, 22:14,
23:18, 24:4, 32:7,
32:13, 32:15,
168:25, 169:3,
169:24, 170:3,
174:10, 174:23,
181:11.
rims 130:11,
155:8.
Road 3:24, 28:16,
92:17.
rode 106:1, 143:1.
role 203:11.
roles 7:5.
Romantic 44:22,
44:23, 45:8,
45:10.
romantically 47:8,
65:16, 80:8,
146:1, 146:5.
room 88:1, 101:5,
116:16, 144:25,
152:1, 161:3,
161:11, 166:21.
round 5:2, 140:23.
routinely 39:6.
RPR 1:46, 210:13.
rule 157:20,
183:7.
rules 120:12,
122:20, 157:12.
ruling 159:15,
163:22, 174:5.
.
.
< S >.
sales 49:20.
Sampson 162:3.
Sandra 1:25,
167:24.
scared 65:9.
scenario 62:11.
scene 12:3, 12:4,
12:10, 12:12,
14:4, 15:10,
28:15, 30:16,
34:1, 35:11,
35:14, 36:2,

37:11, 38:4, 38:9,
38:10, 43:2.
schedule 25:8,
198:18, 198:24,
198:25, 199:2,
199:11, 204:2,
208:5, 208:12.
scheduling 209:12.
school 69:15, 69:16,
142:7, 150:19,
197:8, 201:24,
202:5, 202:6,
203:14, 203:15,
203:16, 203:23,
203:24, 204:10,
204:16, 204:24,
205:7, 205:24,
206:5, 206:9,
206:11, 207:4,
207:8.
schools 189:2.
schoolteacher
201:23.
Scott 201:25, 202:1,
202:24, 204:10.
screen 84:16,
118:15, 184:23.
se 58:14.
search 23:7.
searched 144:24.
seat 2:16, 25:16,
43:25, 183:22,
188:9, 201:14.
seated 2:3, 9:5,
13:6, 13:7, 13:8,
13:24, 15:6,
18:15, 22:14,
24:25, 31:17,
36:6, 36:7, 36:22,
37:22, 38:18,
39:21, 88:12,
117:3, 183:14,
192:25.
second 75:1, 77:9,
81:25, 82:24,
91:8, 101:9,
102:11, 103:24,
125:11, 129:16,
142:17, 171:24,
174:9, 175:3,

205:12.
seconds 89:11,
89:13, 89:23,
108:6, 108:10,
124:10.
secretive 81:3.
sedan 51:3.
seeing 57:17, 92:14,
105:11, 105:13,
109:12, 109:15,
110:3, 137:21,
204:24.
seek 175:2.
Seen 58:14, 109:3,
109:4, 136:10,
136:18, 138:1,
146:24, 147:9,
154:10, 154:11,
154:20, 193:20.
seized 7:7, 114:7,
143:11, 159:1,
159:3, 159:7,
159:23.
self-determination
23:21.
self-incrimination
170:9.
sell 50:5, 155:15.
selling 146:16,
146:17.
sending 62:9.
senior 143:13.
sense 134:17,
134:23, 194:7.
sensitive 81:18,
122:11.
sent 64:10, 64:17,
66:11.
sentence 86:15.
separated 84:6.
September 45:25,
82:19.
sequential 102:14,
105:17.
series 199:8.
serious 8:18,
108:21.
serve 168:1.
served 168:17.
service 27:14, 31:2,

167:20.
services 3:11,
26:13, 27:17.
set 130:11, 198:24,
198:25, 199:2,
205:4.
setting 174:23.
Seven 202:3.
Several 79:3, 79:5,
102:5, 125:9,
144:16, 161:9.
severity 34:22.
sexually 45:10.
Shantay 142:24,
142:25.
She'll 17:3, 179:25,
180:8, 180:25.
sheet 199:12,
199:13.
Sheppard 189:6.
shift 12:13,
12:14.
shifted 81:17.
shirt 193:3,
204:17.
shit 121:17, 121:22,
122:4.
shooting 3:14,
21:18, 162:11.
shop 130:3, 130:19,
152:3, 152:8,
152:23, 156:13,
158:8.
shopping-style
30:2.
short 3:11, 33:20.
shorten 165:21.
shortly 43:9.
shouldn't 77:14.
show 9:11, 9:19,
32:18, 65:5, 89:8,
131:11, 131:14,
162:4, 180:1,
185:17, 190:18,
199:6, 202:12,
206:23.
showed 68:2, 82:14,
130:14.
Showing 107:1,
131:16, 184:22,

186:7, 190:25,
191:10.
shows 89:9.
shy 202:22.
side 51:20, 52:3,
52:6, 58:23,
147:21, 152:24,
197:24, 197:25.
sidewalk 13:9.
sign 5:7, 54:14.
significant 80:16,
80:17.
silent 10:1, 10:4,
170:6.
silver 51:23, 51:24,
52:4, 113:10,
125:2, 141:6,
141:11, 143:4,
150:14, 177:22,
177:24, 178:6.
similar 120:1.
simply 54:15,
135:20, 162:8,
174:21, 179:15.
single 91:15,
152:25.
sit 14:23, 182:22.
sits 19:1.
sitting 9:2, 36:11,
55:24, 58:2, 58:5,
68:3, 69:22,
139:9, 139:10,
141:2, 144:18,
169:9.
Situated 151:6.
situation 132:6.
sixth 205:9.
skip 73:11.
slang 197:6.
sleepy 4:17.
Slip 113:21.
slip. 113:20.
Slow 10:2, 94:8,
101:15, 128:2,
172:19, 172:21.
small 79:16, 152:1,
161:11, 166:21.
smell 6:20, 20:9,
30:5.
smelled 19:24, 23:6,

23:8.
snatched 144:17.
social 123:12,
207:3.
socialize 59:7.
socialized 60:13.
sold 65:4.
solid 157:10.
Solomon 171:2.
Somebody 9:10,
32:15, 81:1, 81:2,
81:7, 81:8, 81:19,
91:19, 98:22,
102:25, 128:8,
132:14, 151:16,
173:8, 174:25.
somehow 18:23, 19:2,
20:6.
Someone 18:21,
22:25, 48:24,
59:3, 64:15, 70:1,
76:23, 95:9,
119:22, 126:15,
126:16, 135:18,
147:20, 154:5,
154:8, 160:9,
160:14, 160:15,
167:7, 197:13,
207:5, 208:12.
something. 138:4.
sometime 119:20,
168:17.
Sometimes 49:17,
55:20, 65:21,
65:23, 73:11,
108:20, 108:25,
117:18, 122:11,
122:18, 147:5,
148:18, 158:21,
204:13.
somewhat 120:20,
176:21.
somewhere 69:25,
131:17, 175:20,
195:21.
son 80:18, 134:1,
134:2, 152:21,
152:23, 153:24.
sort 59:8, 138:21,
146:19, 148:22,

200:5, 204:11,
205:5.
sorts 186:20.
Sounds 64:12, 64:15,
85:5, 99:14,
99:16, 110:9,
118:21, 126:12,
182:22, 208:18.
speaking 8:21,
10:25, 15:3,
37:16, 42:14,
45:16, 73:4,
179:9, 185:3.
SPECIAL 84:10.
specialist 188:24,
188:25.
specific 32:9,
32:22, 194:3.
Specifically 3:21,
14:17, 27:13,
32:13, 32:15,
36:9, 37:23, 38:7,
39:2, 193:10.
speechless 90:7.
Spell 2:19, 25:18,
44:3, 183:23,
183:25, 188:10,
188:12, 201:15.
spent 157:10.
spoke 12:5, 29:1,
31:13, 37:18,
37:20, 42:23,
46:3, 57:22, 58:4,
66:24, 67:4,
71:25, 72:16,
72:17, 82:8, 82:9,
89:2, 92:8, 94:12,
100:8, 135:12,
144:4.
spoken 55:23, 67:17,
79:2, 122:14.
spot 5:8.
spread 29:24,
147:13.
spring 186:15.
stack 84:9.
staff 206:5, 206:7,
208:15.
stand 14:22, 19:6,
43:20, 79:6,

80:21, 105:13,
174:2, 177:5,
188:4.
standing 9:3, 82:8,
92:20.
stands 80:22,
180:13.
Start 40:12, 72:12,
74:17, 104:3,
153:22, 165:25,
199:16, 204:12,
208:4, 209:21.
started 78:11,
78:12, 79:19,
81:15, 127:5,
149:13, 150:11.
starts 89:22.
State 2:19, 25:18,
44:3, 47:11,
66:25, 67:1, 67:4,
157:18, 167:24,
183:23, 188:10,
188:12, 201:15.
stated 127:10.
statement 10:12,
14:10, 14:12,
15:22, 16:7,
18:11, 18:23,
19:3, 19:4, 20:20,
20:24, 21:8,
23:23, 23:24,
24:5, 41:13,
41:15, 41:20,
134:20, 167:13,
170:2, 177:9.
statements 21:16.
STATES 1:1, 1:5,
76:15.
stating 180:20.
Station 4:3, 5:1,
5:4, 12:1, 21:20,
27:24, 28:13,
28:15, 28:18,
36:6.
stay 85:18, 87:7,
143:11, 143:15,
144:3.
stayed 48:22,
142:16, 143:12,
144:3.

stenographic
210:14.
step 17:11, 17:12,
43:19, 188:3,
209:5.
Stephen 1:39.
steps 62:25.
stick 83:16.
sticker 121:2.
stole 153:11.
stolen 153:1, 153:2,
153:3, 153:21,
153:23, 154:2,
154:19.
stood 18:3.
Stop 10:10, 17:25,
18:8, 18:21, 19:1,
19:12, 19:14,
19:19, 19:24,
20:7, 20:15, 21:3,
21:21, 23:4, 75:1,
75:20, 77:8,
81:24, 99:9,
110:25, 112:1,
114:13, 160:16,
173:7.
stopped 8:8, 8:9,
8:10, 19:24,
82:22.
stopping 177:8.
stops 34:17, 35:1.
stories 133:10,
133:11, 133:14,
133:24, 134:4,
134:5, 134:10,
134:17.
stories. 134:7.
story 21:11.
straight 139:21.
strange 206:22.
Street 1:48, 5:2,
51:20, 60:19,
93:13, 93:16,
93:24, 112:24,
114:23, 115:9,
115:20, 131:18,
131:19, 131:21,
133:11, 133:14,
139:9.
streets 52:7,

139:6.
stressed 66:18.
stressed. 85:15.
strict 205:18.
strike 67:15,
153:15, 167:12.
strong 6:21, 22:4,
30:5, 87:8.
strong. 85:18.
students 203:13,
203:22, 205:3,
205:5, 205:15.
stuff 48:18, 80:1,
80:22, 90:12,
94:21, 113:7,
113:23, 115:4,
115:9, 115:19,
132:7, 155:15,
203:9.
stylistic 180:17.
subjects 39:7.
subpoena 54:9,
54:13, 101:19,
104:21, 160:13,
167:4, 167:6,
167:20, 168:1,
168:17, 168:18,
175:19, 175:24,
176:2.
subpoenaed 97:19,
101:1, 101:12,
167:2, 167:4,
169:19.
subscriber 185:18.
subsequently 34:11,
196:3.
substantive
180:11.
suggest 163:22.
suited 7:25.
supervisor 7:21,
7:23, 14:3,
22:8.
supervisors 12:4,
30:23, 31:3,
31:12, 38:5.
supplier 65:2.
supplies 48:10,
48:14.
support 55:23,

57:10, 57:20,
67:6, 68:2, 82:15,
82:18, 127:4.
supportive 78:3,
78:7, 82:10.
supposed 84:8,
85:16, 87:3, 94:6,
94:7, 96:1,
110:21, 112:8,
112:14, 112:18,
112:19, 114:22,
114:24, 115:10,
115:11, 133:10,
133:23, 134:6,
134:8, 134:16,
134:21, 134:22,
156:13.
supposedly 114:22.
suppress 2:5,
21:16.
suppressed 24:5.
Supreme 22:19.
surprise 183:3.
surrounding 171:8.
suspect 20:14.
suspicion 19:23.
sustain 154:12,
157:24, 165:2.
Sustained 39:14,
158:15, 158:16,
165:3, 165:9,
165:10, 167:13.
SUV 5:8, 7:11, 7:12,
7:14, 21:21, 22:8,
28:21, 28:22,
29:17, 29:18,
39:25, 51:4,
51:5.
switched 153:11.
sworn 2:13, 25:13,
43:22, 183:19,
188:6, 201:11.
synopsis 27:21,
29:14.
System 6:2, 27:20,
123:9, 189:6.
.
.
< T >.
T-a-b-i-t-h-a 2:22,

25:21.
T. 1:31, 1:46,
210:18.
Tabitha 2:9, 2:12,
2:21, 21:17,
25:12, 25:20,
211:5.
tactical 5:7,
28:20.
tag 128:23.
tagged 139:11.
Tags 11:16, 33:14,
112:25, 124:13,
124:14, 124:15,
124:16, 124:22,
124:23, 126:5,
127:19, 154:14.
tailgate 5:9, 6:11,
22:1, 28:23,
29:21.
taken. 24:22, 88:9,
116:25, 183:12.
taker 27:22.
talked 5:17, 35:14,
45:18, 66:19,
67:3, 72:15,
77:24, 78:4, 79:4,
90:20, 95:14,
106:20, 118:11,
126:22, 133:24,
135:14, 144:21,
144:22, 146:20.
tape 40:14, 40:16,
103:3.
taped 39:24, 41:2.
Taylor 7:17, 12:6,
12:11, 14:4, 14:6,
14:8, 14:12,
14:15, 14:17,
15:1, 18:7, 19:24,
33:25, 38:3, 38:7,
42:6, 42:14,
42:15, 42:17,
42:21, 43:2.
Taylors 42:13.
teach 201:24,
202:10.
Teacher 202:1,
203:3, 203:4,
203:11, 203:19.

teachers 203:2,
204:11.
team 3:10, 26:11,
26:13, 207:2,
207:7.
telephone 74:18,
96:11, 158:23,
158:24, 185:24.
temporarily 3:10.
Ten 1:10, 108:5,
108:10.
terms 6:20, 9:2,
24:2, 31:16,
162:18, 162:19,
162:22, 163:14.
territory 3:20.
Terry 18:21, 19:1,
19:12, 19:13,
20:7.
testified 2:14,
16:1, 16:8, 18:7,
19:18, 21:19,
21:23, 22:12,
25:14, 43:23,
53:25, 74:5,
105:6, 149:22,
169:4, 169:5,
171:2, 183:20,
188:7, 201:12.
testify 101:2,
104:22.
testifying 21:12,
34:15, 91:3.
text 62:9, 62:13,
62:17, 63:19,
65:5, 65:19,
66:15, 84:17,
87:9, 118:16,
196:19.
texted 66:7.
texts 64:7.
there. 131:15.
therein 3:23.
thinking 35:16,
131:10.
third 152:19,
182:7.
third-party 71:2,
118:13.
thorough 35:2.

thoroughly 20:18.
though 14:18, 40:14,
  80:4, 90:7,
  108:17, 116:2,
  120:20, 126:14,
  128:21, 174:16.
thousands 35:1.
Three 45:19, 50:19,
  50:22, 51:16,
  53:23, 53:25,
  54:3, 89:11,
  89:23, 100:15,
  135:16, 146:20,
  162:1, 177:5,
  207:25.
three-way 71:6,
  71:8, 73:1, 73:2,
  117:12, 117:16,
  118:3, 118:6,
  118:20, 118:23,
  118:24, 119:15,
  120:12, 122:4,
  122:6, 122:8,
  122:13, 122:15,
  122:17, 122:19,
  133:17.
three-week 130:13.
thrive 205:10.
throughout 168:12,
  204:25.
throw 72:18,
  114:18.
throwing 115:4,
  174:1.
Thursday 1:19.
Ticknor 168:7,
  168:9, 168:12.
tired 157:20,
  163:5.
tires 155:9, 158:6,
  158:9.
title 27:21, 49:23,
  153:12, 154:6.
titled 28:2.
today 4:18, 12:16,
  14:23, 22:17,
  25:1, 32:19,
  34:15, 35:18,
  54:6, 61:12,
  101:12, 101:17,

117:5, 167:2,
  169:8, 169:14,
  169:19, 170:20,
  171:4, 175:11,
  176:2, 177:5,
  182:8, 182:10,
  182:22, 192:23,
  209:14, 209:16,
  209:20.
together 47:13,
  47:14, 48:8,
  58:11, 58:12,
  58:13, 58:14,
  58:15, 58:20,
  58:25, 59:1, 59:2,
  59:5, 59:8, 109:4,
  109:12, 109:25,
  110:2, 110:6,
  110:10, 130:25,
  143:1, 145:15,
  145:22, 146:1,
  185:6, 204:12.
tone 33:9, 162:4.
tonight 168:1.
Tony 11:14, 21:11,
  33:10, 41:17,
  186:4, 186:5,
  186:10, 186:12.
took 7:10, 12:11,
  21:10, 21:17,
  22:9, 64:5, 70:3,
  143:17, 143:24,
  148:10, 149:6,
  152:11, 154:3,
  192:19, 193:10.
totally 21:11.
touch 11:2, 132:14,
  137:23, 195:24.
tough 195:25.
tow 128:9, 128:14,
  128:15, 128:16,
  128:17, 128:18,
  128:19, 143:17.
towards 173:17.
towed 128:20,
  144:4.
townhomes 5:3,
  28:17.
Towson 131:23,
  189:8.

trade 187:2.
traffic 34:17,
  35:1.
training 3:9.
Trainor 1:37, 16:21,
  42:2, 145:5,
  145:6, 145:8,
  145:9, 152:5,
  153:20, 154:17,
  155:13, 155:15,
  155:22, 187:21,
  193:7, 198:8,
  199:23, 199:24,
  200:1, 200:20,
  207:16, 208:20,
  208:23, 211:22,
  211:36.
Transcript 1:17,
  75:6, 78:9, 90:17,
  95:18, 102:14,
  104:1, 105:17,
  107:23, 124:6,
  168:20, 170:24,
  171:1, 180:13,
  210:14.
transcripts 74:13,
  84:5.
transition 189:2.
transpired 81:16.
travel 28:12, 203:2,
  203:6, 203:12.
traveled 205:9,
  205:13.
traveling 4:8,
  28:11, 203:22.
TRIAL 1:10, 17:2,
  17:23, 21:2,
  43:14, 48:17,
  68:10, 76:24,
  81:15, 81:17,
  83:20, 104:20,
  105:1, 127:13,
  171:12, 181:20,
  187:24, 201:3,
  207:20.
tries 122:16.
trouble 191:22.
Troy 42:17.
truck 30:8, 51:3,
  125:3, 128:9,

128:14, 128:18,
128:19, 128:24,
129:7, 129:20,
129:21, 130:4,
130:6, 132:23,
132:24, 156:10,
158:19, 159:1,
159:2, 159:7,
159:9, 159:20,
159:22, 178:9.
trucks 128:15.
true 23:25, 53:25,
69:7, 72:1,
152:5.
trunk 130:7, 130:9,
130:20, 130:22.
trust 148:1.
trusted 98:17.
truth 133:14,
158:2.
truthful 170:7,
175:22.
try 62:22, 78:3,
98:10, 102:22,
128:2, 182:8.
Tuesday 182:19,
183:5.
turn 38:5, 74:12,
78:8, 102:10,
105:16, 108:2,
189:13.
turned 97:5, 97:6.
Turning 95:18.
turns 19:3.
Twice 47:22, 47:23,
47:24, 91:7,
161:7, 166:15,
166:17, 193:20.
Two 42:13, 45:19,
47:25, 52:13,
54:1, 56:23,
58:17, 76:15,
95:23, 100:19,
111:10, 116:6,
124:4, 129:12,
129:17, 130:24,
133:17, 160:3,
161:11, 166:18,
166:19, 176:18,
182:7, 186:8,

193:1, 195:1,
202:22, 208:19.
type 51:10, 51:12,
81:7, 123:12,
166:22, 197:7,
204:2.
typed 27:22.
.
.
< U >.
ultimately 20:11,
38:8.
uncle 142:15, 143:7,
143:13, 143:16,
143:24, 151:13.
underneath 10:12.
understand 10:19,
19:12, 22:23,
63:20, 64:19,
75:24, 95:4,
101:18, 122:4,
138:13, 145:12,
172:22, 174:5,
175:15, 175:19.
understanding
198:12.
understood 10:13,
27:25.
uniform 4:11, 28:7,
32:14, 204:15,
204:19.
unit 3:11, 7:18,
7:24, 22:8, 26:13,
31:4, 38:6,
161:10, 206:8.
unit. 125:19.
UNITED 1:1, 1:5.
units 26:14, 35:3.
unless 24:8, 170:7,
175:22, 183:3,
208:11.
unload 166:25.
unrelated 26:24.
Until 17:8, 20:2,
30:19, 43:14,
45:5, 45:16,
45:17, 54:23,
67:21, 67:23,
76:17, 78:13,
83:20, 88:5,

101:23, 119:11,
143:11, 144:6,
144:10, 181:20,
187:23, 201:3,
207:20, 208:25.
unzipped 29:23.
upset 126:15.
usage 193:23.
uses 95:2.
using 61:14, 91:19,
120:22, 121:7,
123:2, 123:6,
162:8.
.
.
< V >.
van 13:9, 36:6.
Vanessa 84:18,
114:15.
various 138:13.
vehicles 41:10,
125:10, 135:21,
149:7, 149:19.
vest 5:7.
vests 5:7, 28:19,
28:20.
via 167:20.
Victor 184:3.
video 73:9, 177:22,
177:25, 182:13,
208:6.
videotape 21:9,
41:9.
view 149:13,
160:22.
viewpoint 161:13.
VIN 154:4.
Vines 183:18,
183:24, 184:3,
184:7, 184:9,
184:19, 185:14,
186:7, 187:2,
187:12, 187:17,
211:28.
violating 19:2.
vis-a-vis 6:23,
30:7.
visit 49:16, 73:17,
73:20, 73:24,
102:19, 102:22,

103:17.
visited 74:2,
  148:11.
visiting 148:11.
visitor 73:22.
voice 79:12, 121:17,
  121:22.
voices 75:3.
voluntarily 24:4,
  166:3.
voluntary 10:14,
  19:4, 20:20,
  24:2.
volunteered 115:12,
  115:18, 191:14.
vs 1:8.
.
.
< W >.
W-y-l-i-e 93:20.
W. 1:48.
wait 20:2, 24:8,
  24:13, 24:14,
  24:18, 54:23,
  103:16, 120:7,
  144:10.
waiting 103:16.
waive 10:14.
waived 23:18,
  24:4.
waiver 23:19,
  24:2.
walked 20:14,
  197:4.
Wallace 120:22,
  120:24, 121:5,
  121:8, 127:21.
wanted 7:2, 8:14,
  16:5, 22:6, 30:10,
  31:3, 32:1, 53:9,
  54:9, 63:7, 84:15,
  87:20, 95:23,
  97:25, 126:4,
  141:17, 142:8,
  143:14, 147:24,
  149:14, 150:17,
  150:18, 166:6,
  167:25, 168:3,
  174:24, 174:25.
wants 24:1, 24:9,

97:8.
warning 22:20.
warnings 22:18,
  32:22, 32:25.
watch 105:1.
ways 163:20.
wear 204:17.
wearing 28:19, 29:8,
  193:2, 204:20.
week 157:10.
weekend 210:1,
  210:5, 210:9.
weeks 45:19.
weird 20:1.
Welcome 88:8, 88:13,
  103:20, 117:4,
  145:4, 181:23.
Wells 98:7, 98:11,
  98:13.
west 58:23.
Whatever 22:11,
  24:1, 70:10,
  111:7, 111:16,
  137:24, 137:25,
  138:8, 149:15,
  178:3, 178:4,
  208:7.
wheels 130:12,
  155:8.
wherever 149:19.
whether 3:16, 20:11,
  23:2, 24:2, 40:5,
  40:10, 49:25,
  56:25, 57:18,
  63:6, 65:2, 67:15,
  83:12, 89:2,
  95:14, 98:21,
  100:5, 100:8,
  117:11, 120:11,
  133:14, 154:14,
  162:13, 174:21,
  180:22, 194:20,
  198:5.
whip 108:16.
White 193:3.
whole 19:11, 19:13,
  19:16, 32:8,
  103:20, 164:20,
  171:8, 173:16.
whom 140:5, 189:5.

Wild 196:7, 196:8.
Will 10:5, 10:11,
  17:12, 23:20,
  24:5, 27:20, 75:1,
  88:1, 102:12,
  107:12, 116:20,
  117:6, 122:3,
  122:10, 122:12,
  162:21, 164:4,
  172:15, 180:19,
  182:16, 182:22,
  183:2, 183:6,
  208:15, 210:2.
Wings 196:7,
  196:8.
within 7:1, 7:3,
  26:14, 28:5, 37:6,
  37:8, 95:9, 150:6,
  150:7, 150:9,
  203:23, 203:24,
  206:9.
Without 18:22, 40:6,
  139:10, 183:8.
witnesses 53:19,
  83:4, 162:1,
  163:11, 163:12,
  171:17, 172:5,
  173:4, 182:4,
  182:7, 208:1,
  208:12.
woman 76:21, 100:23,
  101:16, 102:3,
  169:20, 171:12.
wondering 18:3.
word 21:5, 112:6,
  113:18, 129:7,
  138:25.
worded 170:25.
wording 170:22.
words 72:2, 92:22,
  117:22, 123:9,
  169:9, 170:6,
  173:7.
wore 204:15,
  204:23.
work 4:10, 9:19,
  35:3, 49:2, 49:18,
  105:4, 130:10,
  130:11, 145:16,
  164:14, 187:6,

187:8, 189:5,
189:8, 194:12,
199:17, 203:2,
204:21, 206:1,
206:13, 209:19.
worked 3:9, 3:21,
  26:9, 48:8, 48:10,
  48:13, 48:18,
  49:10, 76:23,
  76:24, 79:15,
  109:13, 148:20,
  187:10, 198:21,
  202:22, 203:13,
  204:21, 204:23,
  205:7.
worker 207:3.
working 3:4, 26:14,
  27:9, 49:12,
  145:15, 145:22,
  145:25, 146:3,
  146:13, 199:3,
  209:12.
works 118:2, 119:12,
  119:14.
world 171:18,
  172:6.
worried 65:7, 65:24,
  65:25, 66:12,
  66:18, 66:22,
  66:23.
worry 183:10.
worst 62:11.
wound 26:22,
  142:9.
wrap 178:25,
  179:3.
wrapped 210:8.
write 16:7, 16:14,
  41:18, 41:20,
  65:19, 70:22,
  70:25, 85:16,
  86:2.
writes 85:13.
writing 4:18, 8:17,
  41:13, 41:17,
  41:19, 85:24.
written 15:22,
  32:13.
wrong. 64:9.
wrote 138:17.

Wutoh 67:17, 67:18,
  68:6, 86:21,
  86:25, 101:8,
  127:12.
Wylie 93:17, 93:18,
  93:19, 93:21,
  141:4, 141:21,
  141:24, 142:18,
  149:22, 149:23.
.
.
< X >.
X5 146:21, 152:19.
Xbox 186:25.
.
.
< Y >.
Yeah. 125:16.
year 34:18, 74:4,
  153:4, 198:3,
  205:12.
years 3:6, 3:8,
  15:7, 26:6, 26:8,
  53:24, 53:25,
  54:3, 76:15,
  184:18, 185:2,
  185:5, 189:4,
  190:9, 202:3,
  202:22, 202:23.
yes-or-no 54:15.
Yes. 172:23,
  173:9.
Yesterday 24:21,
  88:21, 91:15,
  106:10, 106:25,
  110:13, 110:17,
  171:5.
yesterday. 111:7,
  111:17.
York 64:8, 64:10,
  64:18, 64:20,
  64:23, 64:25,
  65:3.
yourself 6:13,
  135:1, 174:15,
  185:11, 190:12,
  196:9.
yourselves 116:18.
.
.

< Z >.
ZERKIN 1:31, 24:12,
  187:19.
Ziploc 6:18.
zipper 6:16.