**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MARYLAND**

**UNITED STATES OF AMERICA,**          )
                                       )
            Plaintiff,                 )
      vs.                              )
                                       )   **CRIMINAL NO.:** GJH-17-0667
**DAVON CARTER** and **CLIFTON**       )   **JURY TRIAL:**  Day Eleven
**MOSLEY,**                            )
            Defendants.                )
                                       )
_____)

**Transcript of Proceedings
Before the Honorable George J. Hazel
Monday, January 27th, 2020
Baltimore, Maryland**

**For the Plaintiff:**

      Sandra Wilkinson, AUSA

      Kim Oldham, AUSA

**For Defendant Davon Carter:**

      Gerald T. Zerkin, Esquire

      Christopher M. Davis, Esquire

**For Defendant Clifton Mosley:**

      Harry J. Trainor, Jr., Esquire

      Stephen B. Mercer, Esquire

_____

Christine T. Asif, RPR, FCRR
Federal Official Court Reporter
101 W. Lombard Street, 4th Floor
Baltimore, Maryland 21201

```
 1                  P R O C E E D I N G S

 2           THE COURT:  Good morning, everyone.  You may be

 3    seated.  You may be seated unless addressing the Court.  All

 4    right.  So we're here for a charge conference.  I have in

 5    front of me a copy of the joint proposed instructions that I

 6    received.  Let me say before I forget, I wrote myself a note,

 7    I didn't see anywhere a copy of the verdict form, I don't know

 8    if --

 9           MS. WILKINSON:  Oh, I sent it to your law clerk this

10    weekend, Your Honor, I have a copy for the Court now.

11           THE COURT:  Okay.  It hadn't gotten to me yet.

12    Okay.

13           MS. WILKINSON:  May approach?

14           THE COURT:  Sure, please.

15           MS. WILKINSON:  And I sent it to counsel, so I don't

16    think there's any issues.

17           THE COURT:  Are there any issues?

18           MS. WILKINSON:  I don't think so.

19           THE COURT:  Any issues with the verdict form?  If

20    there's not, I'll just look at it later.  If there is, we can

21    talk about it now.

22           MS. WILKINSON:  I broke it up by defendant, Your

23    Honor.  I did -- the first set is Mr. Carter and the second

24    part is Mr. Mosley, and then I just referred at the end the

25    fact that there's no Count 5, just so they wouldn't be
```

1      confused.

2                 THE COURT:  Okay.  Does counsel need time to look

3      over it, or have you looked over it?  Is there any objection

4      from the defense to the verdict form?

5                 MR. DAVIS:  No, Your Honor.

6                 MR. TRAINOR:  Not from Mr. Mosley.

7                 THE COURT:  Okay.  Then I'll assume it's fine.  I'll

8      read it later, but I'll assume it's fine then.  I'll let you

9      know if I see any issues.

10                All right.  As for the instructions, I'm just going

11     to flip through them and note where either I've made changes

12     or where there's been disagreement.  I mean, some of them are

13     just stylistic, I won't bother you with those.

14                So Jury Instruction No. 10, page 11, jury to

15     consider only the charges.  Defendant Mosley objects to, I

16     assume that's supposed to be reference to his prior

17     incarceration.  I guess -- I know there has been clear

18     reference to Mr. Carter's incarceration.  Just remind me, has

19     there been reference to Mr. Mosley's incarceration?

20                MS. WILKINSON:  I don't believe so, Your Honor.

21                MR. MERCER:  There has not been.

22                THE COURT:  All right.  So I guess different ways we

23     can handle it, we can say without singling out Mr. Carter, and

24     I'm just throwing these out as options, there's been evidence

25     received -- I'm looking at the second paragraph, there has

```
 1    been evidence received during the trial that at least one of

 2    the defendants had been incarcerated at certain times, without

 3    singling anyone out.  Or that a defendant.

 4            MR. TRAINOR:  That at least one, please.

 5            THE COURT:  Fair enough, that a defendant.  I see

 6    Mr. Mosley's counsel nodding his head.

 7            MR. TRAINOR:  Yes.

 8            THE COURT:  Let me just read through the rest of it

 9    to make it consistent with that, has been incarcerated at a

10    certain time, the fact that at times a defendant may have been

11    incarcerated.

12            Now, in terms of the last sentence in the second

13    paragraph, the evidence of incarceration was admitted for a

14    much more limited purpose.  I flagged that.  I'm not sure that

15    we admitted it for a purpose.  I mean, frankly, we admitted it

16    because of mistake, and then when I offered to have it

17    stricken, Mr. Davis decided to run with it.

18            So I don't know, this isn't a situation where I

19    allowed it in for motive or something, so I feel like the next

20    two sentences should come out because those sentences suggest

21    that I let it in for some 404(b) purpose, which is not

22    accurate.  Any disagreement with that?

23            MR. ZERKIN:  Which two sentences, Your Honor?

24            THE COURT:  "The evidence of incarceration was

25    admitted for a much more limited purpose.  Specifically any
```

1    evidence" -- those two sentences --

2              MR. ZERKIN:  Okay.

3              THE COURT:  -- then it would pick up, and I think

4    this is fair, in addition, and I would just put, "The evidence

5    was offered to provide context and background for evidence

6    discussed in trial."  I think that's accurate.

7              I would be inclined to then scratch the next

8    sentence, this other crimes evidence, and then pick back up

9    with "you may not consider it."  So to say it again, I would

10   be scratching the last sentence of paragraph 2, the first

11   sentence of paragraph 3, and then the third sentence of

12   paragraph 3, and leave the rest in.

13             MR. ZERKIN:  Agreed.

14             THE COURT:  All right.  Government -- I'm sorry.

15             MR. MERCER:  The second sentence at the top, I think

16   is also --

17             THE COURT:  I mean, you object to, "The defendants

18   are not charged with committing any crime other than the

19   offenses contained in the evidence"?

20             MR. MERCER:  No, the second sentence, "You have

21   heard evidence of other acts allegedly committed by the

22   defendants."  I'm not sure that they heard any evidence of

23   other acts committed by Mr. Mosley.

24             THE COURT:  That's fair, the first paragraph needs

25   to be edited too.

1          MS. WILKINSON:  Your Honor, maybe just go from

2    "contained in the indictment," down to the first sentence.

3          THE COURT:  Yes, strike the rest of the paragraph

4    after the first sentence.

5          MS. WILKINSON:  Yes, it's repetitive anyway, and

6    just go down to "there has been evidence received in the

7    trial."

8          THE COURT:  Agreed.  Agreed.  So the only thing I'll

9    leave in from the first paragraph is the first sentence.

10         All right.  Are we good on Instruction 10?

11         MS. WILKINSON:  Yes, sir.

12         MR. ZERKIN:  Yes, sir.

13         THE COURT:  All right.  Instruction No. 11,

14   presumption of innocence and burden of proof.  I see the

15   defendants request the addition of reasonable doubt, but the

16   4th Circuit's been clear, I'm going to assume this is being

17   preserved for the record, given the experience of counsel.

18   You've been around for a while, I'm sure you know the 4th

19   Circuit does not allow me to give that instruction, but the

20   issue is obviously preserved for the record.  So I'll deny

21   that request.

22         Instruction No. 12, specific investigative

23   techniques not required, the government wants me to add to

24   that, there is no requirement that a gun in a shooting case be

25   recovered and tested.  I guess -- and I'll hear from the

1   government on this, I guess my concern with that, I mean,

2   recovering a gun isn't a law enforcement technique.  You're

3   basically just asking me to instruct them on a piece of

4   evidence that you don't have, as if -- like if you didn't have

5   an eyewitness.  I mean -- so I'm not inclined to give that

6   instruction, although I'll hear from you, if you want to try

7   to --

8           MS. WILKINSON:  No, sir, that's fine.

9           THE COURT:  Okay.  That's Instruction 12.

10          MR. TRAINOR:  Is that the entire instruction?

11          THE COURT:  No, no, I'm giving the instruction --

12  I'm sorry, if you want to object to the entire instruction,

13  I'll hear from you.  I thought you were just objecting to that

14  sentence.  I tend to think I will give the instruction, but

15  just not that sentence, that there is no legal requirement

16  that a gun in a shooting case be recovered.

17          MS. WILKINSON:  Otherwise, it's just the *Sand*

18  pattern instruction.

19          THE COURT:  Correct.  All right.  Moving on from

20  Instruction 12.  Let's see, what's next?  Instruction 14, I

21  just always like to point out, it's true here, it's true in

22  Greenbelt, this courtroom doesn't have windows, so I just

23  always change "the blinds were drawn" to "does not have

24  windows."  Same thing in Greenbelt, I look around and that

25  instruction actually just doesn't fit.

1      15.   You know, I do this all the time when it's like

2   this, I change "beating your wife" to "cheating on your

3   taxes."  I mean, I -- in 2020, I think we should all -- yes, I

4   mean, that's just -- I don't think we need to go there.

5   Cheating on your taxes makes the same point, so I always do

6   that for that instruction.

7         Instruction No. 16, have there been judicially

8   noticed facts?

9         MS. WILKINSON:  No, I don't think so, Your Honor.

10        THE COURT:  I just don't want to add in something.

11        MR. ZERKIN:  No.

12        THE COURT:  Instruction 19 is now moot, I believe,

13  attorney testimony.

14        MS. WILKINSON:  I just noticed in Jury

15  Instruction 17, we might have to modify it because of the

16  recordings between Mr. Carter and Mr. Hightower, because there

17  was other recordings -- there were recordings while he was

18  incarcerated, but the jury doesn't know that for the first

19  three, and we're actually going to play one five-minute snip

20  from the last one today.  Maybe we should just say -- let me

21  just read it for a second.

22        THE COURT:  I don't see why it doesn't still fit.

23        MS. WILKINSON:  Some of the recordings were made

24  while one of the parties to the call was incarcerated.

25  Because the first three calls, the Court will recall, 2013 and

1    '14 were while Mr. Carter was incarcerated --

2            THE COURT:  I'm sorry, read the part you were just

3    referring to, I don't see that.

4            MS. WILKINSON:  The recordings were made while one

5    of the parties to the call was incarcerated.

6            THE COURT:  Right.

7            MS. WILKINSON:  But it was Mr. Carter who was

8    incarcerated, and the jury didn't hear that on the 2013, '14

9    calls.

10           THE COURT:  Right.  But this doesn't identify a

11   particular call.  I mean, there are some calls where

12   Mr. Hightower is incarcerated, and they're aware that

13   Mr. Hightower was incarcerated.

14           MS. WILKINSON:  Okay.  I was just suggesting maybe

15   we should say "some" of the recordings were made while one of

16   the parties to call --

17           THE COURT:  I take your point.

18           MS. WILKINSON:  I'm just being conservative, that's

19   all, for the defendant.

20           THE COURT:  I take your point, that they might

21   assume that all of the recorded calls were jail calls, I take

22   your point.

23           MR. ZERKIN:  And the first sentence, Your Honor,

24   should be changed to plural, I think, tape recordings.

25           MS. WILKINSON:  Yes, sir.

1          THE COURT:  Sure.  All right.  That makes sense, so

2     the government has offered evidence in the form of tape

3     recordings of conversations with the defendants and/or alleged

4     co-conspirators, some recordings were made.  Okay.  That's 17.

5          I should say, as I'm going through them, if you see

6     something else, please do interrupt me.

7          Instruction 19, I think now is moot, since

8     Mr. Bardos did not testify.  Any disagreement with that?

9          MS. WILKINSON:  Yes, sir, that's correct.

10          THE COURT:  Instruction 24, I'm inclined to give it,

11    if Mr. Carter wants to make further argument for why I

12    shouldn't.

13          MR. ZERKIN:  Let me just --

14          THE COURT:  Sure.  Instruction 24, uncalled

15    witnesses equally available.  And I would edit it because I

16    will give this instruction before closings, and I would say,

17    one or more of the attorneys may refer to their absence,

18    because maybe you're not planning to argue that.  It's only if

19    someone's going to argue that.

20          MS. WILKINSON:  I believe one of the attorneys

21    argued it already with Mr. Hightower in their opening

22    statements, so --

23          MR. DAVIS:  Well, Your Honor, since it's not a focal

24    point of the case that's been put in here, I would object to

25    the instruction as a whole, because if people were referring

1    to people that weren't here, I think it would be necessary --

2    well, necessary, I think it would be more appropriate.  But I

3    think there's -- there's a burden shifting going on with this

4    instruction, particularly if it's not an issue in the case,

5    and I would ask that it not be given under these

6    circumstances.

7            THE COURT:  Any brief response from the government?

8            MS. WILKINSON:  No, Your Honor, I do think that the

9    jury has heard some evidence of names of people who haven't

10   been called, and I suspect they'll hear some more in closing

11   argument, and I think it's appropriate to put in the *Sand*

12   pattern instruction here.

13           THE COURT:  All right.  I'm going to give the

14   instruction.  I am going to edit it to say, "One or more of

15   the attorneys may refer to their absence."  And to Mr. Davis's

16   concern, the last sentence makes it clear to the jury that I'm

17   not shifting the burden.  So the issue is preserved for the

18   record, of course, but I will give it as edited.

19           Jury Instruction No. 25 and 26, the defense wants me

20   to combine them, but I'll hear from you if you want me to --

21   it seems like you were at least reserving the possibility of

22   arguing that I shouldn't give them, so I want to hear from you

23   if that's true.  I am inclined to give them, but I can word it

24   so that it all becomes one instruction, if that's your

25   preference.  And that's the consciousness of guilt

1    instructions.  And while you're thinking about that, I mean,

2    what I can do to combine them --

3         MR. ZERKIN:  Your Honor, our concern would be that

4    giving it twice, in essence, is inappropriate.

5         THE COURT:  So what I could do -- you have -- this

6    is Instruction 25 with 26 sort of mixed in, "You have heard

7    testimony that a defendant made certain statements outside the

8    courtroom to law enforcement authorities in which a defendant

9    claimed that his conduct was consistent with innocence, not

10   guilt.  You have also heard testimony that the defendant made

11   statements outside the courtroom to law enforcement officials

12   in which the defendant claimed he was not present at the scene

13   of the crime when it was committed."

14        "The government claims that these statements in

15   which a defendant exonerated or exculpated himself and his

16   claimed alibi statements are false.  If you find that a

17   defendant gave a false statement in order to divert suspicion

18   from himself, or to mislead investigating authorities that he

19   was not present at the scene of the crime" -- and then

20   continue on from there, then it's one instruction.

21        MR. MERCER:  Well --

22        THE COURT:  I'll hear from you.

23        MR. MERCER:  On behalf of Mr. Mosley, I mean, we

24   object to both Jury Instruction No. 25 and No. 6 as a whole.

25        THE COURT:  26.

1          MR. TRAINOR:  You said 6.

2          MR. MERCER:  Did I say 25 and 26?

3          THE COURT:  I assume that's what you meant.

4          MR. MERCER:  Right.  I'm sorry if I misspoke.  I

5   think this instruction, in the context of the evidence here,

6   is not warranted, and is both unnecessary and creates

7   potential to confuse and mislead the jury.  You know,

8   Mr. Mosley did speak with law enforcement during his voluntary

9   interview.  He also appeared before the grand jury, but it's

10  not clear to me that the statement to the grand jury is

11  covered because he specifically covered statements to law

12  enforcement.

13          So if we're just talking about the statement of

14  Mr. Mosley to law enforcement, which there was a recording of,

15  you know, the government is going to contend that he made --

16  either minimized the extent of his relationship with

17  Mr. Carter, and you know, that's going to be contested,

18  particularly in light of all the other evidence, all of which,

19  I think tended to show that Mr. Mosley does not have a close

20  relationship with Mr. Carter.

21          Then this instruction goes on to say that, "You may

22  infer that the defendant believed he was guilty."  Well, you

23  know, guilty of what?  You know, distributing marijuana,

24  murder?  I think there's other instructions that cover

25  inferences from the evidence.  And you know, this is not a

 1    case where, you know, Mr. Mosley locked in on an alibi to law

 2    enforcement like, I was dropping off -- you know, a concrete

 3    alibi, you know, dropping off my daughter to Ms. Blanding.  So

 4    it's not that sort of concrete alibi that the government is

 5    saying, well, we've proven that's false.

 6          And since he lied to law enforcement, specifically

 7    about where he was at the time of the murder, you can infer

 8    that he committed the murder, although that's not enough.  You

 9    know, here, it's more the sort of general sort of second- or

10    third-level fact, well, you know, you weren't telling us the

11    truth about your relationship with Mr. Carter, but that's very

12    much in dispute.  And so this seems to overemphasize the

13    government's argument that he's not being truthful.  But also

14    that you -- I think unduly focuses the jury on this inference,

15    that they've already been instructed, you know, they can make

16    inferences based on common sense that are logical -- logically

17    drawn from the evidence.

18          I just think this has the real potential to confuse

19    and mislead and is unnecessary, particularly in a case where

20    he didn't give a concrete alibi to law enforcement.  So we

21    would object to the Court giving 25 and 26.

22          THE COURT:  I'll note -- and I want to hear from

23    Ms. Wilkinson in a moment, but I will note that as currently

24    drafted, it says "a defendant."  And Mr. Carter certainly made

25    statements about what he was doing that morning to law

1    enforcement.  And so that might be a sufficient response, but

2    I'll hear from Ms. Wilkinson, specifically as to Mr. Mosley.

3              MS. WILKINSON:  Your Honor, a couple things.  The

4    government intends this to apply to both defendants, so if we

5    need to modify the way -- it's just hard to write it, you

6    know, to include the plurality of it in both, but the

7    government intends it to apply to both.

8              Number one, we can amend it to say "to law

9    enforcement authorities or to others," because I think it

10   equally applies here in both parts.  "You have heard testimony

11   that a defendant" -- we'll say "both defendants," but I don't

12   want to combine them in one, so "a defendant made certain

13   statements outside the courtroom to law enforcement or to

14   others in which a defendant claimed that his conduct was

15   consistent with innocence and not with guilt."

16             The government will argue more than just the fact

17   that Mr. Mosley lied about his relation- -- minimized, however

18   you want to use it, lied about his relationship with

19   Mr. Carter.  But there are statements that he made that are

20   completely false in his grand jury testimony, which is also to

21   law enforcement authorities, because they're advised we can

22   use it in our investigation in any way against you or any

23   other person, and that he made with regard to his possible

24   activities that morning that he was hustling as opposed to

25   being there to murder -- or to pick up Mr. Carter after he

1    murdered Ms. Ashburne.

2           THE COURT:  He said in the grand jury that he was

3    hustling that morning?

4           MS. WILKINSON:  That he must have been hustling --

5    words to the effect, that if he was there -- that's the

6    inference that he wanted the law enforcement officer to

7    believe.  And yes, he did not tell anybody what he told

8    Ms. Melvin, which is that he's picking up his daughter,

9    because that's demonstrably and provably false by the cell

10   site as well as the testimony that came in through the trial.

11          And I think that equally applies here.  I don't see

12   any reason why we wouldn't add "to law enforcement authorities

13   or to others, in which a defendant claimed that his conduct

14   was consistent with innocence and not with guilt."  Because I

15   think the instruction equally applies, whether or not you tell

16   a law enforcement officer or whether you tell a person, and

17   that admission comes out both ways, applies equally here, and

18   I think that would probably avoid the confusion that

19   Mr. Mercer is concerned about.

20          THE COURT:  And I see you out of my peripheral

21   vision.  Mr. Mercer is standing as I'm reading this.

22          MR. MERCER:  Sorry, I didn't want to interrupt the

23   Court from its review of the instruction.

24          THE COURT:  That's all right.

25          MR. MERCER:  But you know, hearing the government

1    now wants to broaden it beyond just a statement to law

2    enforcement, but to include a purported statement to a

3    girlfriend, which we vigorously dispute ever was made, but

4    certainly to instruct the jury that, you know, if they believe

5    beyond a reasonable doubt there was this statement by

6    Mr. Mosley to Ms. Melvin, that the jury can infer that he

7    committed a murder --

8              THE COURT:  That's not what it says, it says, "You

9    may not, however, infer on the basis of this alone that a

10   defendant is, in fact, guilty of the crime."

11             MR. MERCER:  Well, what I'm focused on is what I

12   think the government will focus on in the argument, which is

13   that, "You may, but are not required to infer that the

14   defendant believed he was guilty."  And you know --

15             THE COURT:  But then the very next sentence is the

16   one I read, "You may not, however, infer on the basis of this

17   alone that a defendant is, in fact, guilty of the crime

18   charged."

19             MR. MERCER:  Understood, but it's a cornerstone in

20   the government's argument.  And I think that, you know, just

21   the instruction before about inferences -- at Jury

22   Instruction No. 23, talks about the process of drawing

23   inferences from the evidence.  And now, we have this sort of

24   special instruction at No. 25 and No. 26, which suggests a

25   different treatment for this statement by Mr. Mosley to his

1    girlfriend, which I think, under the circumstances here, is

2    not warranted or justified and is unnecessary in light of the

3    Instruction No. 23, that is being given about the methodology

4    and the process for the jury, you know, to draw.

5             THE COURT:  All right.  I am going to give the

6    instruction.  It's over strenuous objection, that's preserved

7    for the record.  I'm inclined, and I'll hear if anyone has

8    strong views on this, to say, "You have heard testimony that

9    one or both defendants made certain statements."  I could just

10   say "outside the courtroom," rather than listing the places

11   they made them, "in which a defendant claimed any" --

12   understanding I'm giving the instruction, any specific

13   heartburn over those edits?

14            MR. DAVIS:  Your Honor, on behalf of Mr. Carter, we

15   would object just in general to the instruction dealing

16   with an alibi.

17            THE COURT:  Done.

18            MR. DAVIS:  And do you have a copy of what you're

19   reading so we can look at that as you're --

20            THE COURT:  I thought you did.  I mean, I literally

21   just pulled this from what was filed.  It was filed on the

22   docket.

23            MR. DAVIS:  So I didn't hear the instruction --

24            THE COURT:  I haven't changed anything since it was

25   sent to me.

```
 1            MR. DAVIS:  I didn't realize that, I didn't hear the
 2    words, "The government claims that this alibi was false," I
 3    didn't hear you say that.  But that's in there; correct?
 4            THE COURT:  Yes.
 5            MR. DAVIS:  And 26.
 6            THE COURT:  Yeah, but I would be combining 25 and
 7    26, but yes.
 8            MR. DAVIS:  Well, I would object to that too.
 9            THE COURT:  Understood.  But having overruled that
10    objection, I'm now just asking what your feeling is on a
11    proposed modification, "You have heard testimony that one or
12    both defendants," would be one change I would suggest, and
13    then what is your specific feeling of me removing "to law
14    enforcement authorities" so that it's broader, they've heard
15    statements outside the courtroom, rather than listing the
16    specific places where they made the statements?
17            MR. DAVIS:  I would have no objection to that, but
18    my initial objection --
19            THE COURT:  Understanding that you object overall.
20            MR. ZERKIN:  Your Honor, I'm wondering about in that
21    initial statement, whether it's -- because here it says "made
22    statements," "you've heard" -- so the Court is determining and
23    telling them that "you have heard statements," "statements
24    made," and I would suggest that it says "may have made
25    statements."  The Court shouldn't be deciding the fact,
```

1    instructing them --

2              THE COURT:   That's fine.   That's fine.   I'm not

3    arguing.   "You have heard testimony that one or both

4    defendants may have made," I agree with that, that's fine.

5    Now, it's just going to take me a minute to write this all up

6    here.

7              All right.   So it would read as follows, with

8    objections being preserved for the record:   "You have heard

9    testimony that one or both defendants may have made certain

10   statements outside the courtroom in which a defendant claimed

11   that his conduct was consistent with innocence and not with

12   guilt.   Defendants may have also made statements outside the

13   courtroom to law enforcement officials in which that defendant

14   claimed he was not present at the scene of the crime when it

15   was committed."

16             "The government claims that these statements, in

17   which a defendant exonerated or exculpated himself or provided

18   an alibi statement, are false.   If you find that a defendant

19   gave a false statement in order to divert suspicion from

20   himself or provided a false alibi, you may, but are not

21   required to infer that the defendant believed he was guilty."

22             The rest of it remains the same.   Understanding I'm

23   overruling defendants' general objection, any specific

24   objection to my wording?

25             MS. WILKINSON:   Just one, Your Honor, I believe it

1    should be parallel when you state that the defendant made

2    certain statements outside the courtroom, get rid of "to law

3    enforcement authorities," both with regard to the false

4    exculpatory and the alibi.

5             THE COURT:  Correct.

6             MS. WILKINSON:  So it should be parallel.

7             THE COURT:  Correct.

8             MR. DAVIS:  Just so the record is clear on the alibi

9    objection, Your Honor, I view an alibi being something of the

10   nature of, I was at Mickey's Bar with Joe and John.

11            THE COURT:  Didn't he say he dropped off the car and

12   went to Myrtle Beach?

13            MR. DAVIS:  Yeah, but that's not -- that's kind

14   of -- it was not, I was at the bar, I was at the movies with

15   this person or that, it's not really an alibi.  Given Your

16   Honor's ruling, the fact that the United States is claiming

17   it's false, I think, is fair, given Your Honor's ruling.  I

18   would object in general, but the word "alibi" creates

19   something that I don't think is particularly appropriate in

20   this case, based on his statement.

21            THE COURT:  So I don't know -- I forget which

22   defense counsel suggested it, but I think the "may have" is

23   the answer to that.  So the government may argue that

24   Mr. Carter gave an alibi, it's an alibi and it's a false

25   alibi, and per instruction, you can make inferences.  And you

1      can argue in response to that, Mr. Carter wasn't giving an

2      alibi, he was just saying where his car was.  So I think the

3      "may have," whoever suggested it, solves that problem.  So

4      that's 25 and 26.

5              Jury Instruction No. 28, what's the example, I was

6      trying to think of one, guilty knowledge from failure to keep

7      records?  I guess that question is directed at the

8      government.

9              MS. WILKINSON:  I'm trying to remember why I had it

10     in here.

11             THE COURT:  Sure.

12             MS. WILKINSON:  Your Honor, I'll withdraw my request

13     on this one.

14             THE COURT:  All right.  I was trying to think of

15     something and I couldn't.

16             Jury Instruction No. 33, there wasn't an objection,

17     has there been instruction of informal immunity of government

18     witnesses?

19             MS. WILKINSON:  No.

20             THE COURT:  Defense, I don't know who suggested the

21     instruction.

22             MS. WILKINSON:  I had it in there just in case we

23     called other witnesses or whatever, Your Honor, but -- because

24     it's a pattern instruction.

25             THE COURT:  Sure.

1          MS. WILKINSON:  But there wasn't any plea

2    agreements, no cooperators, no informal immunity.

3          THE COURT:  All right.  Any disagreement with that,

4    taking 33 out?

5          MR. ZERKIN:  No, Your Honor.

6          MR. DAVIS:  Wait, Your Honor, I think that --

7          THE COURT:  Wait a minute --

8          MR. DAVIS:  Shells from New York, he testified and

9    he testified that he was selling kilogram weights of

10   marijuana, and I think the -- I mean, he didn't say that he

11   was -- they promised not to prosecute him, but he was sitting

12   there openly admitting to distributing large quantities of

13   marijuana for weeks and weeks.  And I think that this

14   instruction is appropriate, maybe modified, but I think it's

15   appropriate.

16         MS. WILKINSON:  Not at all, Your Honor, we did not

17   make any promises to Mr. Grant for his testimony whatsoever.

18   And if counsel wanted to explore it, they could have.  But

19   there was absolutely no promise made to Mr. Grant for his

20   testimony in this case.

21         THE COURT:  I can't -- as I sit here now, I can't

22   remember, and I thought about it as I was reading it whenever

23   I was reading these, I can't remember any witness who was

24   promised anything.

25         MR. DAVIS:  I don't think anyone testified to it.

1     If Your Honor's inclined to take it out, I can just argue it

2     then.

3              THE COURT:  It seemed the government used the stick,

4     not the carrot, to get its witnesses in the trial.  So this

5     instruction goes to the carrot, which I don't think was really

6     an issue here.

7              Question 30 -- excuse me, Instruction 35, I'm always

8     adverse to the word "felony," that's one issue.  But beyond

9     that, I've noticed that when the witnesses have been

10    questioned, they've just been asked, have you been previously

11    convicted of a crime.  I don't know if they've actually been

12    specifically asked whether or not it was a felony or not.

13             MS. WILKINSON:  We didn't.

14             THE COURT:  Yes, so I'm inclined to just take out

15    "punishable by more than one year."

16             MS. WILKINSON:  Sure.

17             THE COURT:  And then take out the word "convicted

18    felon," and then just "has been convicted of crimes."

19             MR. DAVIS:  No objection.

20             THE COURT:  All right.  Instruction 36, you know, I

21    see what defense is saying here, and I actually think I agree,

22    taking out the word "necessarily."  I think if I leave in the

23    word "necessarily," I mean, I've never thought about it like

24    this before until I read this, it suggests that I'm almost

25    suggesting to them that they can, but they don't have to.  And

1    the instruction should just be that a law enforcement

2    official -- testimony by a law enforcement official does not

3    mean it's deserving of more or less consideration, without the

4    word "necessarily."  So I tend to agree with defense on that

5    and would strike "necessarily" and would strike "try to."

6              I'll hear from anyone who has strong views on it.

7              MS. WILKINSON:  Well, upon reflection, I have no

8    objection to the change in the first paragraph, Your Honor,

9    but I don't recall any time during the trial where defense

10   attorney tried to attack the credibility of a law enforcement

11   witness on the grounds that it was colored by a personal

12   professional interest in the outcome of the case.  I don't

13   think that was the strategy of counsel at all here.  And I

14   don't think the second paragraph is applicable here.

15             THE COURT:  All right.  I'll hear from defense

16   counsel on that.

17             MR. DAVIS:  I -- well, I guess I'll go first.

18   Mr. Carter, on a small scale, it wasn't a major point, but I

19   believe that the patrol officer that took a statement from

20   Mr. Carter -- or testified during trial that she took a

21   statement from him, and then I contrasted it with the

22   videotaped statement that he gave a few hours later that was

23   completely different, that wasn't a -- I mean, I didn't say --

24   I didn't approach it as if she fabricated it, but I think

25   that's a sufficient contradiction to leave this instruction in

1    there.

2              THE COURT:  All right.  I'll leave it in.  It also

3    leaves room for the possibility that it might come up in

4    closings, so I'll leave that in.

5              Instruction 38, there wasn't an objection to it, the

6    one thing I just wondered on my own, was there -- this isn't

7    an eyewitness ID case in the typical sense, in terms of

8    someone coming in and saying, yes, I saw him or I saw her,

9    which is what Instruction 38 really goes to.  And I was

10   worried that it might be confusing, particularly, did the

11   witness have the ability to see the offender at the time of

12   the offense.  No one who was present at the time of the

13   offense identifies them.  I know there was attempts to get him

14   to identify the video.

15             MS. WILKINSON:  Well, there were three witnesses who

16   testified that his -- that he looked like the person in the

17   video, Mr. Bailey, and so it could be modified in that

18   regard.

19             THE COURT:  Yes, that was based on their prior

20   knowledge of him --

21             MS. WILKINSON:  Right.

22             THE COURT:  -- and looking at the video.

23             MS. WILKINSON:  And looking at the video, certainly.

24   Ms. Lee did, Mr. Bailey did, and even Ms. Lawson, even though

25   she wasn't 100 percent sure, clearly the inference was that it

1    looked like him too.

2         THE COURT:  That's fine.  I can leave it in.  There

3    wasn't an objection to it, I just raised it, so I can leave it

4    in.

5         MR. DAVIS:  Your Honor, reflecting on this, I didn't

6    initially review these, but reflecting on this, there really

7    wasn't an identification in the sense of, did you see the man

8    at the scene.  Having friends view a video and ask if it looks

9    like Mr. Carter, it looks like Mr. Carter isn't an

10   identification, and they waffled each and every one of them on

11   whether it looked like Mr. Carter.  I don't think there has

12   been identification.

13        THE COURT:  So at the very least, I would scratch --

14        MS. WILKINSON:  At the time of the offense.

15        THE COURT:  I would scratch two things, and I'll

16   read it more carefully to see if there's anything else

17   similar.  In the second paragraph -- well, I don't know, it's

18   value -- I'm thinking about it now, its value depends on the

19   opportunity the witness had to observe the offender at the

20   time of the offense.  One could say that their observation of

21   the offender at the time of the offense is watching the video.

22        MR. DAVIS:  But nobody gave an --

23        THE COURT:  Right.  So like the witness's -- the

24   witness has knowledge of what Mr. Carter looks like and is

25   seeing the offender at the time of the offense on the video,

1    and then the argument to the contrary is, well, you know, what

2    can you really tell from the video?

3            MR. DAVIS:  Can we modify -- if we're going to leave

4    this in here, can we modify this in some way, manner, or form

5    to reflect that individuals that knew Mr. Carter viewed the

6    videotape from the crime scene?

7            THE COURT:  I can make the second sentence -- so the

8    first sentence is, "One of the most important issues in this

9    case is the identification of the defendant as the perpetrator

10   of the crime."  Here -- I'm just trying to phrase it in a way

11   that fits these facts.

12           The government provided evidence -- I don't know, I

13   can -- I think it's fair to insert a sentence in there, I'm

14   just trying to think how to phrase it, addressing what

15   specifically happened here.

16           MS. WILKINSON:  I mean, I think the jury's going to

17   remember the evidence, Your Honor, and *Sand* is always so

18   careful about not particularizing any particular piece of

19   evidence here.  They know that it's from the videotape, there

20   wasn't an eyewitness otherwise.  And I think that --

21           THE COURT:  How about, "Here, the government

22   attempted to have individuals identify one of the defendants

23   based on a video," just so they know specifically what we're

24   referring to?

25           MR. DAVIS:  That would put it in the context.

1          MS. WILKINSON:  I do not like "attempted to," Your

2     Honor, it feels like you're characterizing our efforts to

3     prove beyond a reasonable doubt.  The verb is not particularly

4     neutral here, and so let me think about it.

5          Ms. Oldham is suggesting perhaps on the third

6     paragraph, Your Honor, where it says, "Did the witness have

7     the ability to see the offender at the time of the offense, or

8     in this case, the video" --

9          THE COURT:  "Its value depends on the opportunity

10    the witness had to observe the offender at the time of the

11    offense, or in this case, by viewing a video of the events."

12         MS. WILKINSON:  I think that's fair.

13         MR. DAVIS:  The sentence in the third paragraph, "is

14    his or her recollection accurate," I just don't think that is

15    appropriate.

16         MS. WILKINSON:  I think the judge is saying do it in

17    the second paragraph before that all happens.

18         THE COURT:  Well, what we could do, we could take

19    out "is his recollection accurate" because it's not a

20    recollection issue when you're talking about the video.

21         MS. WILKINSON:  Exactly.

22         THE COURT:  That's fine.

23         MR. DAVIS:  And characterizing it as an

24    identification, I mean, that's -- these aren't

25    identifications.

1          THE COURT:  It is an identification.  If I show you

2    a picture of myself, and you say, that's George Hazel, that's

3    an identification.

4          MR. DAVIS:  That's an identification.

5          MS. WILKINSON:  Or that it looks like George

6    Hazel.

7          THE COURT:  Or that it looks like George Hazel.

8          MS. WILKINSON:  That's an identification.

9          MR. DAVIS:  I don't know that "it looks like" is an

10   identification.

11         THE COURT:  That's for you to argue.  I'm not --

12         MR. DAVIS:  My workload is increasing as we go over

13   these jury instructions.

14         THE COURT:  All right.  I'll note for the record, I

15   raised this all, so this is all my fault for however much time

16   we spent on this.

17         "Its value depends on the" -- so in the second

18   paragraph, "Its value depends on the opportunity the witness

19   had to observe the offender at the time of the offense, or in

20   this case" --

21         MR. DAVIS:  I think we could just take that sentence

22   out, because it really doesn't -- and fashion something to

23   indicate they were shown a videotape from the crime scene.

24   The ability -- I mean, they're sitting there looking at the

25   video, that's not an issue, it's not at issue.

1          MS. WILKINSON:  I'm okay with taking the second

2     sentence out and just going right into, "You have heard the

3     arguments of counsel on the subject," or "You will hear the

4     arguments of counsel on the subject."

5          "Identification testimony is an expression of belief

6     on the part of the witness.  You" -- and just get rid of that

7     second sentence, without characterizing the value, or not, of

8     it.  The jury is well aware of what the evidence on the video

9     is.

10         THE COURT:  And then do I take out the question,

11    "Did the witness have the ability to see the offender at the

12    time of the offense?"

13         MR. DAVIS:  I don't think that's applicable here

14    either.  I think what is applicable is, it -- "has the

15    witness's identification of the defendant as the offender been

16    influenced in any way," as the identification being unfairly

17    suggested by events that occurred since the time of the

18    offense, I think that's the only thing that's applicable to

19    bringing people down and having them view the surveillance

20    video and comment on whether it looks like Mr. Carter.

21         MS. WILKINSON:  How about if we say, did the witness

22    have -- I think "the ability to see the offender at a prior

23    time or on" -- you know what I mean, the thing is the

24    knowledge of the -- the witness's knowledge of the offender.

25    It's not like an anonymous eyewitness identification.  Here,

1    one of the factors, did the witness have the ability to see

2    the offender at a prior time --

3              THE COURT:  All right.  I'm going to give that some

4    more thought.  For now, I'm just scratching, "its value" --

5              MS. WILKINSON:  Very well.

6              THE COURT:  I'm scratching, did the witness have the

7    ability; I'm scratching, is his recollection accurate; and I'm

8    making a note to myself at the next time I have five minutes

9    alone, to see if I can come up with a sentence that --

10             MR. DAVIS:  I think some type of instruction is

11   appropriate, but I just -- I'm just leery of the traditional

12   identification.

13             THE COURT:  No, that's -- again, that's why I

14   flagged it, because when I read it, I was like, I don't know

15   that that really applies here.  I'll give that some more

16   thought.

17             MR. DAVIS:  And it was hard for us to anticipate

18   this in advance until the evidence actually came in.

19             THE COURT:  That's fine, that's why I have the

20   charge conference at the end.  That's fine.

21             I don't think there was that much more.  Once we got

22   into the substantive instructions, I think it looks like you

23   all mostly agreed.

24             MR. DAVIS:  Your Honor, do we have an expert

25   instruction in here?

```
 1                    MR. ZERKIN:  Yeah, there is.

 2                    THE COURT:  Yes, I remember seeing one.

 3                    MR. ZERKIN:  It's 39.

 4                    THE COURT:  I'm only flagging the ones where there

 5       was disagreement.  I think there was one more toward the end.

 6                    The last one was Instruction 82, I certainly have no

 7       problem with adding in the language, "if a defendant is

 8       convicted."

 9                    MS. WILKINSON:  Yeah, I put it in there, Your

10       Honor.

11                    THE COURT:  Okay.

12                    MS. WILKINSON:  Your Honor, not to go back or beat a

13       dead horse, but would the Court consider something when you

14       say, "You have heard the arguments of counsel on the subject.

15       I will not repeat them here" --

16                    THE COURT:  I'm sorry, which horse are we beating?

17       Which instruction?

18                    MS. WILKINSON:  I'm sorry, Judge, the one we were

19       just talking about, Instruction 38, on identification.

20                    THE COURT:  Okay.

21                    MS. WILKINSON:  I'm just suggesting one question

22       that would balance the rest of the questions, which is simply,

23       did the witness know the offender, period.  I mean, it's just

24       one factor to consider, did the witness know the offender, or

25       have the opportunity to observe the offender on a prior
```

1    occasion, and then the rest is, has the witness been

2    influenced in any way.

3         THE COURT:  I feel like if I do that, then I

4    definitely need to -- because that question's obviously

5    slanted, given the facts.

6         MS. WILKINSON:  Right.  And then the rest of the

7    ones are slanted the other way, is my only suggestion.  You

8    know how *Sand* tries to balance them.

9         THE COURT:  No, no, no.

10        MS. WILKINSON:  I'm just looking for one balance

11   that has both types of questions for them to consider, you

12   know, both ways to consider the evidence in light of both

13   parties.

14        MR. DAVIS:  I'm going to reserve until Your Honor

15   actually presents us with the instruction that you intend to

16   give.

17        THE COURT:  Yes, because the other thing, just to

18   give you some of the things that I'm thinking about, I can

19   formulate another question that goes to the quality of the

20   video, was the means by which the witness was able to view the

21   alleged perpetrator of sufficient -- you know, I don't know.

22   I'll try to come up with something.  I'll try to come up with

23   something, but that's where I'm going, because this isn't an

24   issue where they obviously -- all the witnesses knew them

25   well.

1              All right.  But that's all I have.  Was there

2      anything else that anybody wanted to add that I hadn't

3      discussed?

4              MS. WILKINSON:  No, sir.

5              MR. DAVIS:  Nothing from Mr. Carter.

6              MR. MERCER:  Nothing from Mr. Mosley.

7              THE COURT:  All right.  So we'll go back and work

8      these up while we wait for the jury to come in.  They were

9      supposed to come back at 10:30.  They're been relatively

10     prompt, so hopefully, we'll be back together soon.

11             MS. WILKINSON:  There was one issue that came up

12     over the weekend, Your Honor, there were sealed filings, so I

13     don't know if the Court had been able to see them.

14             THE COURT:  Sorry, I might have missed that.

15             MS. WILKINSON:  I will capsulize them, although they

16     were motions in limine filed by Mr. Carter's attorneys, there

17     were two motions in limine filed, really on the same issue,

18     which was -- and they were both filed under seal, I don't

19     know -- I see other people in the courtroom, I don't know if

20     the Court wants us to address that.

21             THE COURT:  We can do it one of two ways.  If

22     they're filed under seal, I can just go back and look at them,

23     and then we can come back and talk about it after I come out

24     after the break.  That might be the easiest way.

25             MS. WILKINSON:  That's perfect.  And so -- and to

1   that -- that's one issue that the Court has to consider.  And

2   the other one, and it's with regard to a witness that's going

3   to be called today, Your Honor, and the other issue was the

4   Arriell Lee grand jury testimony.  And I would like to be

5   heard, if I could, Your Honor, on admission of the recorded

6   version of what counsel agreed -- the agreed part that counsel

7   at the bench wanted as her grand jury testimony, that would be

8   put in in written form.

9           We now have obtained the oral form of the same

10  excerpt.  There are two parts that are at dispute, both with

11  regard to the government included in the grand jury audio, the

12  rights to the witness, which the government --

13          THE COURT:  This was Mr. Hightower's -- the mother

14  of Mr. Hightower's child?

15          MS. WILKINSON:  No, that's Ms. Washington.  This was

16  the woman that saw the gun, Mr. Carter's gun.

17          THE COURT:  Mr. Carter -- okay.

18          MS. WILKINSON:  So if the Court will recall, when

19  Ms. Lee testified, there was much back and forth about her

20  testimony and whether or not the line of questioning had

21  been -- in terms of the techniques used by the government, in

22  terms --

23          THE COURT:  I remember that now.

24          MS. WILKINSON:  -- of harassing and all that sort of

25  thing.  And we came to the bench and counsel, I believe,

1     agreed to the written excerpts of certain parts of her

2     testimony, the government simply wants to admit the audio part

3     of the same transcript, which is her saying it live, of

4     course.  I believe Mr. Davis's objection is to -- is not to

5     that, not to us playing the audio or admitting the audio, but

6     to the advice of rights that are provided to the witness at

7     the beginning, which the government contends is not hearsay,

8     because it's not offered to prove the truth of the matter

9     asserted.

10          We're trying to get the testimony in as a prior

11    consistent statement of the defendant -- I mean, of a

12    declarant, and to rehabilitate the declarant's credibility

13    when attacked on another ground, which is -- they're attacking

14    it on another ground, which is that she was forced in some

15    ways to say the things that she did, and I'm referring here to

16    Rule 801(d)(1)(B), Your Honor.  So we would ask that we be

17    able to play both the advice of rights and then go into the

18    excerpt that counsel doesn't object to.

19          And then there's one last question that Mr. Davis

20    wanted me to redact and it had to do with whether or not she

21    had ever seen him in a brimmed hat before and showing it, and

22    that little last question that we would put in, in addition to

23    the whole excerpt that we're already agreeing to, if that's

24    artful enough.  It's really -- have I said it right,

25    Mr. Davis?

1          MR. DAVIS:  I don't know -- honestly, I remember up

2     at the bench talking about this, did we address audio at the

3     bench that day?

4          MS. WILKINSON:  No.

5          MR. DAVIS:  I don't think I objected to the witness

6     being impeached because I think there was some waffling back

7     and forth on whether -- I can't remember, what was the point?

8          MS. WILKINSON:  There wasn't -- it's not that,

9     Mr. Davis at the bench -- my recollection is that, if we were

10    going to put in excerpts of the grand jury written testimony,

11    because we were offering it as a prior consistent statement,

12    Mr. Davis wanted the whole part of it in, which the government

13    didn't object to, so that written part was coming in no matter

14    what.

15         We want to put in the audio part of it.  And I

16    believe that the objection comes -- not that we're offering

17    the audio that we agreed upon, the part of the colloquy that

18    we agreed upon, but the advice of rights, and then the last

19    question in that part.

20         THE COURT:  All right.

21         MR. DAVIS:  I don't think it was a prior consistent

22    statement.  I think the government was impeaching Ms. Lee with

23    her grand jury testimony, that's --

24         THE COURT:  But wouldn't it come in either way?

25         MR. DAVIS:  Not really, because she wasn't agreeing

```
 1    with them when she was sitting in here.  She said that she

 2    didn't see a gun, when she was testifying, so the government

 3    brought up the transcript, and I think I commented on this at

 4    the bench, that they're impeaching her, and they're entitled

 5    to do that, but what they've done here is, they've taken a

 6    clip of the grand jury testimony and audio, and it's not being

 7    used for impeachment, it's not being used for consistent

 8    statements because it wasn't a consistent statement.  It's

 9    used to demonstrate the witness's demeanor to try to undercut

10    my questioning dealing with what occurred in the pre-grand

11    jury interview.

12              THE COURT:  Let me ask this, I just want to be clear

13    what we're arguing over and what we're not, are you all in

14    agreement as to substantively what parts are coming in and

15    it's just a matter of the form?

16              MR. DAVIS:  Yes.  It's the -- yes, but -- well,

17    actually, no, because there's about five minutes before that,

18    you know, it's hard to explain how to tie your shoes.  But the

19    tape starts with the grand jury --

20              THE COURT:  So I got that the advice of rights,

21    based on what Ms. Wilkinson is saying --

22              MR. DAVIS:  It's about five minutes of the preamble

23    to the actual questioning.

24              THE COURT:  I get that you're objecting to that on

25    the substance.
```

1          MR. DAVIS:  There's no evidentiary -- for one, they

2    hear it in audiotape, so what's the point?

3          THE COURT:  We'll get to that in a second.  I'm just

4    trying to make a list of everything I need to rule on here.

5          MR. DAVIS:  Beginning when Ms. Wilkinson asks, did

6    you see it -- have you ever seen Mr. Carter with a gun, the

7    witness says yes, that's different than what the witness

8    testified.  The witness testified she had never seen

9    Mr. Carter with a gun.  And that is --

10         THE COURT:  So you're saying that's --

11         MR. DAVIS:  That's impeachment, and she's entitled

12   to move that into evidence.  Now we have an audio --

13         THE COURT:  So you saying she is entitled.

14         MR. DAVIS:  Certainly.

15         THE COURT:  So you're not disagreeing with that

16   substance.

17         MR. DAVIS:  I'm not disagreeing with that.

18         THE COURT:  Okay.

19         MR. DAVIS:  That's why at the bench I agreed that

20   they're entitled to do that.  This isn't a prior consistent

21   statement, though.  I mean, they're literally impeaching

22   her.

23         THE COURT:  Okay.  But what difference does it make,

24   for purposes of my ruling here?

25         MR. DAVIS:  Well, what difference it makes is they

1    have a clip of the audio, and it's got about five minutes

2    before that with them advising her of their rights and going

3    through, making it look like they're -- you know what they do

4    with every witness.  That's not appropriate, there's no reason

5    for that to come in.

6             THE COURT:  Okay.

7             MR. DAVIS:  So what I've done is, is -- I think I --

8    did I edit that tape for you, or no?

9             MS. WILKINSON:  You did.

10            MR. DAVIS:  I did.  I believe I edited the tape to

11   reflect just what I've represented to the Court, that comes

12   in.  There's one other thing that came in, what was it that --

13            THE COURT:  You said something about the brimmed

14   hat, or Ms. Wilkinson did.

15            MR. DAVIS:  I took that out because this --

16            THE COURT:  You're objecting to that.

17            MR. DAVIS:  There's no reason for that to come in.

18   There's no reason for them to hear that in the grand jury.

19            THE COURT:  And then what -- so I understand

20   substantively what you're agreeing.  Now, what I'll call

21   stylistically, what is the difference between whether or

22   not -- usually we don't have audio when we're dealing with

23   impeachment, here we do, what's --

24            MR. DAVIS:  It's being done to show her demeanor in

25   the grand jury.

1          THE COURT:  Sure, but what's --

2          MR. DAVIS:  Is that appropriate?

3          THE COURT:  But what's the difference between --

4    legally, between her being able to put in a writing versus the

5    audio, other than that here it's the rare example where she

6    has the audio?

7          MR. DAVIS:  I don't think it's appropriate for them

8    to bring in the audio.  The grand jury is a controlled

9    process.  I mean, they've -- they had the witness before they

10   put them in.  They get what they need, then they put the

11   witness in the grand jury.  What conceivable evidence value is

12   it what the witness's demeanor was during the grand jury?  It

13   has nothing to do with anything in this case.

14         I didn't question the witnesses about them being in

15   the grand jury.  My questioning all went to how they were

16   treated, brought down, how they were questioned before they

17   went into the grand jury.  To bring in the grand jury, this

18   controlled process that's completely controlled by the

19   prosecution, and then to demonstrate the witness's demeanor in

20   there after the government has had them for several hours, I

21   think that's unfair.  I don't think that's appropriate, and

22   there's no evidentiary basis for it to come in.

23         And the five-minute preamble where they're getting

24   all their rights, what value is that?  It's kind of -- I don't

25   know, it's kind of bootstrapping, if we're really fair.

1          MR. ZERKIN:  It's vouching.

2          MR. DAVIS:  Well, vouching for their tactics.

3          THE COURT:  So as -- I'm sorry, I didn't mean to

4    interrupt you.

5          MR. DAVIS:  The "tactics" probably is a bit of an

6    aggressive word.  It's validating their procedure and making

7    an argument that we were fair to them.  I didn't even address

8    that with these witnesses, though.  And to use the grand jury

9    for that is kind of offensive.  The grand jury are secret

10   proceedings, to come in and play to demonstrate --

11         THE COURT:  Well, but what's -- I don't want to go

12   around and around.  Mr. Trainor looked like he wanted to say

13   something, or say something through Mr. Davis.

14         MR. TRAINOR:  Court's indulgence.

15         MR. DAVIS:  Nothing, Your Honor.

16         THE COURT:  All right.  A couple issues, as to the

17   difference between using the audio and the written statement,

18   I see no legal distinction there.  Usually we don't have

19   audio, I think that's really the only reason why we're here.

20   To the extent that there might be some aspect of demeanor you

21   can pick up from listening to the audio, I mean, if anything,

22   it just increases its relevance, but it comes in as

23   impeachment or for prior consistent statement regardless of

24   whether it's audio or the written version.  So I make no

25   distinction there.

1          If there's audio that Ms. Wilkinson wants to use as

2     opposed to the written transcripts, the Court's making no

3     distinction, and so she can use the audio if she chooses.  As

4     to the advice of rights, I -- that's not hearsay and it is

5     relevant.  As I indicated in our conversations, I guess it was

6     on Thursday, you know, I allowed the defense to make the point

7     that -- you know, or make the suggestion that, you know, the

8     government -- and I'm just characterizing the argument, you

9     know, used heavy-handed tactics to get their witnesses in

10    here, and the government has every right to try to rebut that.

11         And one of the ways the government is seeking to

12    rebut that notion is by showing all the times that these

13    witnesses were provided their rights.  And so it's relevant,

14    it's not hearsay, it's not being used for the truth of the

15    matter.  It's just being used to show that these witnesses

16    were provided with that information.  And so --

17         MR. DAVIS:  But, Your Honor, that wasn't -- I'm

18    sorry.

19         THE COURT:  No, you can -- if it isn't something you

20    haven't already argued and you want to make your record,

21    that's fine.  I've made my ruling.

22         MR. DAVIS:  I guess just to put it on the record,

23    the advice of rights is not relevant because it wasn't

24    contested during the questioning of the witnesses, and to

25    allow the United States to vouch for their witnesses and vouch

1    that they --

2            THE COURT:   It's not vouching, it's simply providing

3    the rights -- it's letting the jury know -- you have tried to

4    create the impression, which some of the witnesses sua sponte,

5    if the word sua sponte can apply to the witness --

6            MR. DAVIS:   It can apply to these witnesses, I

7    think --

8            THE COURT:   It's usually meant to refer to what a

9    judge does, but some of these witnesses sua sponte tried to

10   put out there, you know, they were dragged out of a car, or

11   they got arrested, and then you continued to go down that

12   road, and I allowed you to go down that road.   I continue to

13   think it's a relevant inquiry, so I'm not disagreeing with

14   what I did there.

15           To respond to that, I again find that it is relevant

16   for the government to then say, look, here are all the times

17   when we let them know what their rights were.   I think it's as

18   relevant as what you did.   And so I'm allowing that, I

19   understand your continuing objection on that.

20           MR. DAVIS:   And did we deal with the brimmed hat

21   part?

22           THE COURT:   The brimmed hat, I guess I'm still

23   unclear on.

24           MS. WILKINSON:   To me, again, Your Honor -- so it

25   go -- it completes the statement -- first of all --

1          THE COURT:  Just remind me what she said on the

2     stand and what she said in the grand jury.

3          MS. WILKINSON:  May I put it up here?

4          THE COURT:  Please.

5          MR. DAVIS:  I can play that segment.

6          MS. WILKINSON:  Your Honor, again, I appreciate the

7     Court's ruling, I don't agree with Mr. Davis what Ms. Lee's

8     testimony was.  She certainly was more difficult in court when

9     she had to look at Mr. Carter in the eye here, but I think

10    that the -- I think this is where Mr. Davis wants to stop,

11    "Did you make one comment about the brimmed hat, the brimmed

12    hat yet -- that you had never seen him wear a brimmed hat?"

13    "Yes, it sure looks like this."  "Were you referring to

14    Mr. Carter?"  "Yes."  "But the brimmed hat was not familiar to

15    you?"  "Right."

16          Again, Your Honor, we are putting this in to show a

17    prior consistent statement by the defendant after -- the whole

18    area of cross-examination was to show --

19          THE COURT:  I'm sorry, leave that up there for a

20    minute.

21          MS. WILKINSON:  Oh, I'm sorry.  I just want to get

22    my rule in front of me so I make sure I state it right, that

23    it was consistent with Ms. Lee's testimony, and it's offered

24    to rehabilitate her credibility as a witness when she was

25    attacked on another ground.  And she was attacked, and above

1    that, to rebut an express or implied charge that she recently

2    fabricated or acted from a recent improper influence or motive

3    in so testifying.

4              THE COURT:  So the question is then, what did she

5    say on the stand?  Remind me specifically what she said on the

6    stand.

7              MS. WILKINSON:  That's exactly what she said on the

8    stand.

9              THE COURT:  Did she say -- here's what I'm trying

10   to -- I can go back and listen to it myself, but did she

11   acknowledge saying that in the grand jury, or did she actually

12   say on the stand that that looks like him?

13             MS. WILKINSON:  She said in front of the jury that

14   that looks like him, that she said it -- well --

15             THE COURT:  Those are two different things.

16             MS. WILKINSON:  -- we're mincing words here.  Well,

17   I agree with you, Your Honor, but at the end of the day, she

18   said, if I said it -- I don't have the transcript in front of

19   me either, but with a number of these witnesses, once they

20   have to come in and face Mr. Carter, she said she acknowledged

21   that she said, "It sure looks like him."

22             Now, did she say, "It sure looks like him"?  I'd

23   have to go back and look at the actual transcript to see how

24   it came out.  The Court will recall, she was a very reluctant,

25   hostile witness to the government, and she was receptive to

1    the notion that somehow when you subpoena someone to the grand

2    jury, that that's harassment.

3             And the government is simply making the point that

4    this was a prior consistent statement after they tried to

5    attack her credibility of what she told the government,

6    because of the quote, unquote "tactics" they contend were used

7    in the course of a very legitimate grand jury investigation

8    where the government's using its subpoena power to require

9    witnesses to come in and tell what they know.

10            THE COURT:  All right.  Are you planning to do

11   anything with this this morning?  We've already --

12            MS. WILKINSON:  I was going to play it.

13            THE COURT:  You were going to play it again this

14   morning.

15            MS. WILKINSON:  I was going to play it.  I'm

16   offering it as a prior consistent statement, yes, I was going

17   to play the part about the rights through my witness.

18            THE COURT:  I get playing the part about the rights,

19   were you planning to play this part about "it sure looks like

20   him" today?

21            MS. WILKINSON:  Yes, I was going to play the clip,

22   yes.

23            MR. DAVIS:  Your Honor, this is entirely

24   inappropriate.  I mean, there are no prior consistent

25   statements.  This witness testified no when she identified

Mr. Carter from the video, and then she was impeached with the transcript.

THE COURT:  My recollection is that the most you got her to say in court was that she acknowledged that she had said it in the grand jury.

MS. WILKINSON:  And that she told --

THE COURT:  I don't remember her saying on the stand -- and that's why I'm willing to go back and listen to it, but it will take me more than five minutes, because I have to find it.

MR. DAVIS:  I have it here -- oh, from her testimony in the courtroom?

THE COURT:  In court.  I can see what she said in the grand jury.

MR. DAVIS:  I agree with Your Honor, I distinctly -- this was kind of important to us, whether Mr. Carter had a gun or not, it's not something --

THE COURT:  No, no, we're off the gun, we're talking about the brimmed hat at this point.

MR. DAVIS:  The brimmed hat, she just said that she hadn't seen him with that, and that's the same that's in the grand jury.  How is that a prior consistent statement?  Her credibility hasn't been attacked.  I mean, how --

THE COURT:  Her credibility has been attacked, but what I'm not sure of --

1        MR. DAVIS:  By the government.

2        THE COURT:  Sure -- well --

3        MR. DAVIS:  And now they're claiming that a

4    statement that she gave before that's identical to what she

5    said in the courtroom, they should be able to play it for the

6    jury.

7        MS. WILKINSON:  But there's no requirement in prior

8    consistent statement that it has to be attacked by the

9    opposing party.  I'm looking at Rule 801.  That's why it is --

10        THE COURT:  To me, that's not the question.  To me,

11    the question is, "It sure looks like him."  "You're referring

12    to Mr. Carter?"  "Yes."

13        She's asking the grand jury, "And when you made the

14    comment, 'it sure looks like him,' are you referring to

15    Mr. Carter?"  She's referring to -- oh, it's further up, did

16    you use the phrase.

17        MS. WILKINSON:  Right.

18        THE COURT:  And I just -- again, the most I remember

19    her saying in court was acknowledging that she had said that

20    before in the grand jury.  I don't remember her saying on the

21    stand, yes, that does look like him.  I remember her saying

22    yes, I acknowledge I said that in the grand jury, and so that

23    wouldn't be a prior consistent --

24        MS. WILKINSON:  And I hear you, Your Honor, and I

25    don't have a transcript, and I don't believe Mr. Davis does

1    either, but I'm fairly certain she said that she was under

2    oath and told the truth to the grand jury when she

3    testified.

4              MR. DAVIS:  I don't have that.

5              THE COURT:  Sure, even if she did, that's fine.

6    It's still -- she never testified -- in order for it to be a

7    prior consistent statement, she had to have said it on the

8    stand, and I don't remember her saying on the stand that it

9    looks like him on the video.  I just don't.  I'll go back and

10   listen, but --

11             MS. WILKINSON:  I would love to as well, Your Honor,

12   because it is an important point, and it does go to the heart

13   of what the defense was trying to do and the impression

14   they're trying to leave.  And I hear the Court, and perhaps

15   all's I can play is the rights part at this point, and then

16   the part pertaining to the gun because we're all clear about

17   that.

18             But Mr. Davis, when he sent me his redactions, was

19   only with regard to the brimmed hat comment and was not with

20   regard to the part about where she says that it sure looks

21   like him.  So I did not expect that objection, because at the

22   bench, we had agreed to the part of the transcript that was

23   coming in.  And perhaps we're not going to get to this right

24   now, and I hear the Court, maybe we should wait until the

25   break, but I had intended to play it through our last

1    witness.

2           THE COURT:  All right.  So I guess the final point

3    is, if I need -- I want to go listen to it.  If I need to

4    listen to it now, then I'll have to tell the jury it will be a

5    little while longer.  If you think we can get to, say,

6    12:00 o'clock with other evidence, then I'll do it at that

7    break.

8           MS. WILKINSON:  We may be able to, Your Honor, it

9    will depend on the Court's ruling on the motion in limine that

10   counsel had about the one witness that --

11          THE COURT:  I do have to go read that, that's fair.

12   Okay.  So let me go take a break.  Let me read the motion in

13   limine.

14          MR. DAVIS:  We've been going on so long, I'm

15   confused as to what we're arguing about now.  Your Honor's

16   ruled that the advice of rights comes in.

17          THE COURT:  Yes.  Done.

18          MR. DAVIS:  I got that.  Now we're in impeachment,

19   obviously the witness did not say that she recognized

20   Mr. Carter, and then she was impeached with the grand jury, I

21   got that, that's coming in.

22          THE COURT:  Well, no, that's -- I take Ms. Wilkinson

23   to be saying that she did say on the witness stand at some

24   point that that's him in the video.

25          MR. DAVIS:  Well, my recollection is similar to what

```
 1    Your Honor --
 2            THE COURT:  And that's why I want to go listen to
 3    it, it's possible I'm wrong.
 4            MR. DAVIS:  So we're not even dealing with the
 5    brimmed hat, the brimmed hat is gone.  Am I correct?
 6            MS. WILKINSON:  No, I think that's --
 7            THE COURT:  That's all part of it, it's all part of
 8    the same conversation, "And your comment was you had never
 9    seen" --
10            MR. DAVIS:  Well --
11            THE COURT:  -- "Mr. Carter wear a brimmed hat?"
12    "Yes."  The next thing is, "When you made the comment, 'it
13    sure looks like him,' you were referring to Mr. Carter?"
14    "Yes."
15            So I'm taking those together, and I'm going to go
16    listen to what she said.
17            MR. DAVIS:  No one's attacking the witness's
18    credibility on the brimmed hat statement, so I do not think it
19    comes in as a consistent statement.  And the problem I'm
20    having with the impeachment is, if I impeach a witness, I show
21    them the grand jury, I point out the lines in the transcript,
22    I redact the transcript, I move it into evidence.  Here, the
23    government wants to come back five days later and play an
24    audiotape of the impeachment.  I don't think that's
25    appropriate.  I never have had the opportunity to do that.
```

1     Where in -- has Your Honor ever seen it?  I've never seen

2     it.

3                THE COURT:  This would be a first.  That doesn't

4     mean that it's not okay.

5                MR. DAVIS:  Ms. Wilkinson and I have been practicing

6     for over 35 years.  I don't know -- I've tried a number of

7     cases with her, this is the first time I've seen this.

8                THE COURT:  Look, I've been wondering if maybe it's

9     a recent development.

10               MR. DAVIS:  I couldn't walk upstairs and knock on

11    the grand jury's door --

12               MS. WILKINSON:  I'll tell you, the recent

13    development is that I've never been attacked the way that

14    Mr. Davis has allowed witnesses to suggest that there's some

15    kind of harassment of wit- -- and it's been an ongoing tactic.

16    And I'm just harkening back to the grand jury investigation

17    that I know wasn't like that.  And so I'm just trying to rebut

18    it.

19               And I have -- there is precedent for using the audio

20    grand jury testimony.  I learned the technique from

21    Ms. Johnston, who used it in a prior murder case before.  And

22    I will say, Your Honor, that with regard to -- just to narrow

23    down what the Court has to do, Mr. Davis already agreed at the

24    bench that up until the part where it says, "When we tried to

25    narrow down the picture, was it too blurry?"  "Yes."  From

1      that part up, we agreed at the bench that was the excerpt.

2              I had added the part in from ten to 19 just to

3      finish out the subject matter we were talking about, and

4      that's the only area I believe that the Court has to rule on.

5      And number two, that the Court has to rule on whether we can

6      replay the audio, not just the advice of rights.  I think

7      those are the only two issues on this matter that the Court

8      has to decide.

9              MR. DAVIS:  And just to clarify things, I want the

10     United States to understand that I didn't personally attack

11     them with anything.  I had a series of witnesses who answered

12     questions exactly the same.  I don't know what happened.  It's

13     not me personally attacking the government and their tactics.

14     The witnesses -- I elicit testimony, I don't put words in

15     their mouth, I don't have a carrot on the stick, I just ask

16     the questions.

17             It's for the jury to decide -- so if Ms. Wilkinson

18     or Ms. Oldham are at all offended by my questioning, I

19     apologize, but it wasn't a personal attack on anyone.  It's

20     the perception of the witnesses that's important here.

21             THE COURT:  So let me just say, if in a four-week

22     trial of this magnitude, it's taken until the fourth week for

23     us to have to acknowledge or say that something's not

24     personal, we've actually done pretty well.

25             MS. WILKINSON:  And I know it's not personal, but

1    I'm just saying, it's something we're trying to rebut.

2         MR. DAVIS:  Perhaps we should have gotten better

3    during the trial.

4         THE COURT:  I'm going to get these instructions

5    started.  I'm going to -- just replaying all the things I need

6    to do.  I'm going to read the motion that was filed.  I might

7    have said this before, if not, it might be too late to say it,

8    certainly if it's after hours over the weekend, just send it

9    to my direct e-mail, Judge_Hazel, you can address it to the

10   Court directly.

11        MR. ZERKIN:  I think you actually told us that, and

12   we should have done it.

13        THE COURT:  Yes, because over the weekend, I don't

14   make my staff check their e-mail over the weekend.  I check my

15   e-mail over the weekend, so just direct it to me personally.

16        MR. DAVIS:  That's my fault.

17        MS. WILKINSON:  To our defense, it is a very short

18   little motion.

19        THE COURT:  That's fine, I'll look at it.

20        MS. WILKINSON:  It won't take the Court long to look

21   at it.

22        THE COURT:  I'll go look at it.

23        MR. DAVIS:  Again, I hate to keep harping on this,

24   but I agreed to impeachment, I didn't agree to everything

25   else.  I thought this was going to be the normal impeachment

1    process where things were going to be redacted and moved in as

2    an exhibit.

3            THE COURT:  I assume the jury is here.  Tell them

4    we'll need 15 more minutes, then we should be ready to go.

5    All right.   I'll see what I can accomplish in those 15

6    minutes.

7            (A recess was taken.)

8            THE COURT:  All right.  You may be seated.  All

9    right.  First on the -- well, just tell you what I was

10   listening to in the back.  Couple things, I went through as

11   much of it as I could without taking up an inordinate amount

12   of time.

13           One thing just to put on the record in terms of the

14   issue of the audio, counsel -- defense counsel did elicit from

15   Ms. Lee that the questioning in the grand jury was aggressive.

16   That's actually -- that's testimony that was elicited from

17   Ms. Lee, that the questioning in grand jury was quote,

18   "aggressive."

19           MR. DAVIS:  Probably the only witness that I

20   elicited it that from then, because I didn't recall it.

21           THE COURT:  It's there.  And so for that reason, I

22   certainly think it's fair for the testimony to come in -- the

23   audio to come in for those portions, not the entire audio, but

24   for those portions that we've identified.

25           As to the issue of her, what we're referring to as

1    identification of him, from the video, what's interesting --

2    my recollection was correct, like she doesn't -- she never

3    said from the stand "that looks like him."  Ms. Wilkinson

4    tried to get her to say that she said it in the grand jury.

5    She wouldn't even acknowledge that she said it in the grand

6    jury.  She had to be impeached with it.

7            Now, the question is then raised, does it just come

8    in as impeachment as opposed to coming in as a prior

9    consistent statement?  Why wouldn't it just come in as

10   impeachment?  And I'm looking to see if there's disagreement

11   on it.  So it would come in, but it would come in as

12   impeachment.

13           All right.  Seeing no disagreement with that.  So

14   that's how that would come in.

15           I think I already ruled on the advice of rights

16   issue, so I'm not sure what else there is to address on that.

17   Looking around, seeing nothing.

18           MS. WILKINSON:  Not from the government.

19           THE COURT:  Okay.  And so I did read the motions in

20   limine.  If you want to address it at the bench, we can

21   address it at the bench.  Someone had indicated before that

22   you didn't want to do that in public.

23           MS. WILKINSON:  Only because defense counsel had

24   filed the two motions under seal, Your Honor, and because we

25   have people in the courtroom.  I'll defer to the Court and

1    counsel.  I filed my response under seal because they filed

2    their motion --

3              MR. DAVIS:  Well, Your Honor, we filed those under

4    seal just because the media tends to come in, and I don't know

5    if we have anyone from the media, I just wanted to prevent

6    anything showing up in the papers before the jury retires.

7              THE COURT:  I'm leaving it up to you.  You filed it

8    under seal.  If you want to address it in at the bench, we can

9    address it at the bench.  If not, we'll address it in open

10   court.

11             MR. ZERKIN:  Open court is fine, Your Honor.

12             THE COURT:  Okay.  So I guess, as I understand,

13   it's -- I guess there are two witnesses, the one from last

14   week and the one from this week, and I'm just trying to

15   refresh my own mind because I did two things back there.  I

16   guess the one -- well, let me just hear from the government as

17   to your basis for the -- I think they're different, as I

18   understand them, the witness who testified last week and the

19   one who's going to testify this morning.

20             MS. WILKINSON:  Well, the witness that testified

21   last week, I believe the remedy counsel is seeking that we not

22   argue that point.

23             THE COURT:  Right.

24             MS. WILKINSON:  And we're not going to do that.

25             THE COURT:  Okay.

```
 1            MS. WILKINSON:  So to the extent that moots the

 2    issue, we're certainly not going to argue the point that I

 3    made in my motion in limine, which is that that's somehow a

 4    reason to convict this defendant, because the children were

 5    affected by Ms. Ashburne's death.  We're certainly not going

 6    to argue that in opening, close, or rebuttal, and to that

 7    extent, I think that's the only remedy counsel is seeking.

 8            As to the second issue, the government absolutely --

 9            THE COURT:  Well, let me back up, though.  I mean,

10    what about the point that there was no one else who would want

11    to do her harm?  I thought that was also part of why the

12    government -- are you still planning to at least argue that

13    much?

14            MS. WILKINSON:  Oh, and that goes into my second

15    part.  I mean, there are parts of -- I was referring to the

16    one last -- I think last sentence --

17            THE COURT:  I get you.

18            MS. WILKINSON:  -- the defendant -- witness

19    stated.

20            THE COURT:  About the children.

21            MS. WILKINSON:  About the children, everything up

22    until that point, we are absolutely going to argue.  That's

23    the reason why we called the witness.

24            THE COURT:  Right.

25            MS. WILKINSON:  We've called one witness that worked
```

with Ms. Ashburne and one family member that we're going to
testify today.  And it is absolutely for the purpose to show
that there's no information to believe that anybody wanted to
do her any harm from the people that worked with her and then
the family that knew her.  And we've tried to do it in the
most conservative way, I believe because of the nature of the
government's allegations here, that we could have gone much
further.

          But here we intend to ask the witness -- Ms. Oldham
is actually going to do the questioning of the sister because
she had immediate communications with Ms. Ashburne directly
before her murder.  And generally, her knowledge of her
personal and business life and that she -- there's no disputes
in her life that she knew about or any person, a disgruntled
employee, a disgruntled colleague, a disgruntled boyfriend.

          THE COURT:  Were you also using her to establish the
timeline of the murder?

          MS. WILKINSON:  Absolutely, Your Honor, because she
also talked to her right before she left, and it was the last
person to talk with her besides -- you know, as she left with
her mother that morning, so the relevance of the witness is
readily apparent in that regard.

          THE COURT:  All right.  Well, I'll hear from
defense, but if -- assuming there's no -- I don't want to use
this in a way that sounds pejorative, but no flourishes, that

1    it really is limited to the timeline, this is the last time

2    anyone spoke to her, you know, 7:15, et cetera, and the idea

3    that there is no one that this witness was aware of that

4    wanted to do her harm, to the extent the government's theory

5    is that this was a mistaken hit rather than she had some other

6    enemy, those seem like relevant notions.  But I'll hear from

7    the defense, if you have further points on that.

8              MR. ZERKIN:  Yes, Your Honor, only -- so that

9    broadens her testimony somewhat.  The description that I

10   included was the entirety of the e-mail said nothing about her

11   testifying about no one -- you know, didn't have any enemies

12   or any of that.  So they're going to -- I don't know what else

13   they're going to expand, but they're expanding that.  And I

14   agree with the Court, that is relevant to the government's

15   case and that's not problematic.

16             My biggest problem is -- and that -- I don't know

17   how that makes the conversation -- I guess getting to 7:15,

18   it's not -- it gets to approximately.  It's cumulative and

19   it's not the best evidence of it, but I don't think it's

20   objectionable on that grounds.  Biggest problem with her

21   testimony is that she's going to say that she gets a telephone

22   call from her mother, who is hysterical, and that's the point

23   that I think is really problematic.

24             THE COURT:  All right.  The government -- the

25   government shouldn't elicit that the caller was hysterical.  I

1    don't see that as being relevant to anything here.

2         MS. WILKINSON:  To the extent the mother -- and I'll

3    defer to Ms. Oldham about this in terms of what the -- maybe

4    the word "hysterical" wouldn't come in, but to the extent her

5    mother said something to her, it's clearly an excited

6    utterance and maybe not the characterization of it as

7    hysterical, but her mother did just witness the murder of her

8    daughter, and I believe she said she just got shot.

9         So we don't have to -- "hysterical" is a -- you

10   know, I don't know if it's a pejorative term or not, but there

11   is an excited utterance exception to what the mother said.

12        THE COURT:  I don't know if that's the objection, I

13   don't hear him objecting to receiving -- to the information

14   coming in that she calls and says Ms. Ashburne's been shot.

15   And so we don't have to deal with whether it's an excited

16   utterance, and so you don't have to establish that's an

17   excited utterance because there's not an objection on that

18   point.

19        And so since there's no reason to establish that she

20   was hysterical or crying, it really does just go to sympathy.

21   I just don't see any basis for the government to elicit her

22   emotional state.  And you can instruct the witness as to that,

23   if necessary, that she should just convey that that

24   information was provided, that whoever it was called and said

25   Ms. Ashburne's been shot, without going into she was crying

1    and she was hysterical.

2              MS. WILKINSON:  Very well.  Acknowledged, Your

3    Honor.

4              MR. ZERKIN:  Thank you, Judge.

5              THE COURT:  All right.  Anything else?

6              MS. WILKINSON:  No, sir.

7              MR. ZERKIN:  No.

8              THE COURT:  All right.  We can get the jury

9    finally.

10             MS. OLDHAM:  Your Honor, may I just step out briefly

11   just to instruct the witness?

12             THE COURT:  Sure.  Please.

13             (Jury entered the courtroom.)

14             THE COURT:  All right.  You may all be seated.  Good

15   morning, ladies and gentlemen.

16             JURORS:  Good morning.

17             THE COURT:  How was your weekend?

18             JURORS:  Good.  How are you?

19             THE COURT:  My weekend was great.  Thank you for

20   asking.  Sorry for the delay.  I know you were here on time,

21   and I appreciate that, as always.  We have been here since

22   9:30 working through some issues.  Took a little longer than I

23   expected.  I think, as I indicated to you, as we get closer to

24   the end, there are just different things I have to discuss

25   with counsel.  So I do appreciate your patience.

```
 1              I believe we are ready for the government's next

 2    witness.

 3              MS. WILKINSON:  Thank you, Your Honor.  At this

 4    time, the government would move the admission of

 5    Stipulation No. 7 and permission to read it now for the jury,

 6    Your Honor.

 7              THE COURT:  Very well.

 8              MS. WILKINSON:  Ladies and gentlemen, the United

 9    States of America, and the defendants, by and through counsel,

10    do hereby stipulate and agree to the following:  Wanda

11    Ashburne is the mother of Latrina Ashburne.  In May of 2016,

12    Wanda and Latrina Ashburne lived together at 291 --

13              THE COURT:  I'm sorry, do you want the witness in

14    the room as you're doing this?

15              MS. WILKINSON:  Oh, no.  Next -- sorry.  Thank you,

16    Your Honor.

17               Wanda and Latrina Ashburne lived together at 2919

18    Rosalind Avenue.  Latrina was the oldest of Wanda Ashburne's

19    three daughters.  On May 27th, 2016, at approximately

20    9:27 a.m., Sandra Forsythe, a Baltimore City homicide

21    detective, interviewed Wanda Ashburne.  Mrs. Ashburne's

22    brother, Pastor Christian Hall, was present during the

23    interview.

24              Ms. Ashburne did not know that her daughter had died

25    from her injuries at the interview, but was advised by
```

1    Detective Forsythe at the conclusion of the interview.

2    Ms. Ashburne stated that she was outside sweeping the walkway

3    of her home, waiting for her daughter to come down so the two

4    could leave together for work.  Latrina Ashburne worked for an

5    elementary/middle school in downtown Baltimore.  After Latrina

6    came down and went to the car, Ms. Ashburne stated that she

7    was about to put the keys in the front door to lock it, and

8    Latrina was at the car when Mrs. Ashburne, quote, "turned

9    around and we both saw the guy coming up the street."

10           Mrs. Ashburne stated the man ran to her, and she was

11   trying to run, but right there on the spot, she fell and he

12   shot her.  "And he shot her once and she was screaming a

13   little.  I didn't hear her voice no more, and I was, you know,

14   calling for help and everything."

15           Mrs. Ashburne stated she saw the man run down the

16   way he came and went through a path after the homes.

17   Mrs. Ashburne stated that the shooter had on a black hoodie,

18   and "you know, they always cover their face so they won't get

19   seen, they won't get noticed, and he had his hand in his

20   pocket and he was walking like he didn't do nothing.  And when

21   he got closer, he ran to her and hurried up and shot her and

22   ran back."

23           Mrs. Ashburne stated that she could not see the face

24   because the man had the hood on, and he had it covered because

25   he had his head down.  Ms. Ashburne stated that he was light

1    skinned and had a beard.  Mrs. Ashburne stated that the man

2    did not say anything to Latrina Ashburne.  Mrs. Ashburne

3    stated that the shooter looked like her son's height.  The man

4    was not taller than Pastor Hall, who is 6 foot.  Mrs. Ashburne

5    stated, "He looked about a little inch taller than

6    Mrs. Ashburne."  Mrs. Ashburne stated that her height is 5

7    foot 4.  After being cautioned not to guess about the height,

8    Mrs. Ashburne agreed that the man was between 5 foot 4 and 6

9    foot.

10         Mrs. Ashburne described the man as a good size, but

11   not as big as her brother Pastor Hall, who stated he weighed

12   275 pounds.  Mrs. Ashburne stated she could not say what type

13   of pants the man had on, because she just saw the jacket, the

14   hoodie jacket on him.  The jacket was a zip-up hoodie, a zip

15   up with the hoodie over him.  Mrs. Ashburne stated that the

16   man did not have white pants on, but had to have on jean pants

17   or some dark-looking pants.

18         Detective Forsythe asked if Latrina Ashburne had any

19   issues with anyone, to which Mrs. Ashburne responded, "She's a

20   minister, she don't deal with nobody," and that she was an

21   introvert.  Mrs. Ashburne stated, "It happened so fast, that

22   he shot her once and ran through.  It just happened so quickly

23   because I thought he was going to shoot me after he shoot her,

24   but he ran because we both was screaming, and then she wasn't

25   screaming no more."  When asked the time of the incident,

1    Mrs. Ashburne stated, "We leave 7:00 o'clock in the morning."

2    Mrs. Ashburne did not know her daughter Latrina to have any

3    enemies or a reason to kill her.

4            On June 21st, 2016, Detective Sandra Forsythe asked

5    Detective Joseph Chin to conduct a double-blind photo array

6    with Wanda Ashburne.  A video of the interaction between

7    Detective Chin and Ms. Ashburne is marked Government

8    Exhibit V-20 and began at 1:36:40 and concluded at 1:49:50.

9            A double-blind array is conducted by showing a

10   witness an array of six photographs in hard copy form,

11   including a photograph of a suspect and five photographs of

12   other persons not suspected of the offense, and who each fit

13   the description the witness has given of the person involved

14   in the crime.  The procedure is called double blind because

15   neither the witness nor the detective know which of the

16   photographs is of the potential suspect.

17           After June 21st, 2016, the photo arrays that were

18   shown to and signed by Wanda Ashburne were inadvertently

19   misplaced.  Copies of the arrays are not in the homicide case

20   file that was originally maintained by Detective Forsythe.

21   Sergeant Jones participated in a search for the originals

22   within the Evidence Control Unit of the Baltimore City Police

23   Department, but the originals were not filed under the

24   assigned criminal case number, that is, CC number 5160511970,

25   and therefore, could not be located.

1          The parties stipulate and agree that there were two

2   photo arrays shown to Wanda Ashburne, one array contained six

3   photographs, and one of those photographs was of Davon Carter.

4   The other array contained six photographs and one of those

5   photographs was of Michael Fleming, who was the registered

6   owner of the Audi S6.  Mrs. Ashburne was unable to identify

7   the shooter.

8          That would be Stipulation No. 7, Your Honor, and the

9   admission of V-20.

10          THE COURT:  All right.  Very well.  Government's

11   next witness.

12          MS. OLDHAM:  Your Honor, the government's next

13   witness is Melody Payton.

14          THE COURT:  Very well.

15          THE CLERK:  Ma'am, if you would please come

16   forward, and if you would just stand in front of the witness

17   box, face me and raise your right hand to be placed under

18   oath.

19                  MELODY PAYTON,

20   called as a witness, being first duly sworn, was examined and

21   testified as follows:

22          THE WITNESS:  Yes.

23          THE CLERK:  Please have a seat in the witness box,

24   ma'am, and watch your step.  And if you could pull that

25   microphone close to you, state your first and last name and

Direct Examination - Payton  (By Ms. Oldham)

 1    spell your first and last name for the record.

 2              THE WITNESS:  Melody Payton.

 3              THE CLERK:  If you could spell your first name.

 4              THE WITNESS:  M-e-l-o-d-y.

 5              THE CLERK:  And your last name, ma'am.

 6              THE WITNESS:  P-a-y-t-o-n.

 7                        DIRECT EXAMINATION

 8    BY MS. OLDHAM:

 9    Q.  Good morning, Ms. Payton.

10    A.  Good morning.

11    Q.  Ms. Payton, is Payton your married name?

12    A.  Yes.

13    Q.  Okay.  And are you the sister of Latrina Ashburne?

14    A.  Yes.

15    Q.  Ms. Payton, I'm going to show you on the monitor next to

16    you what's been introduced as Government's Exhibit A-27, is

17    that your sister, Ms. Ashburne?

18    A.  Yes.

19    Q.  Okay.  Can you tell us what your sister did for a

20    living?

21    A.  She was a teacher's aid.

22    Q.  And do you know what school, where she was a teacher's

23    aid?

24    A.  Francis Scott Key.

25    Q.  And other than working as a teacher's aid for Francis

Direct Examination - Payton  (By Ms. Oldham)

1    Scott Key, did she work for any other schools?

2    A.  No, she worked in ministry.

3    Q.  Okay.  And tell us about her work in ministry.

4    A.  She was an assistant pastor and elder of her church,

5    Kingdom Restoration, where she worked with the youth, mainly.

6    She did a lot of volunteer work for shelters, and also feeding

7    the homeless every Saturday down off North Avenue under the

8    bridge.

9    Q.  Okay.  Let me go back to her work at the school.  Do you

10   know if that was full time?

11   A.  Yes.

12   Q.  And so tell us when she would work as an elder or

13   assistant pastor at the church, how often was she

14   participating in that?

15   A.  All the time, that was -- her life pretty much was the

16   church.

17   Q.  And you mentioned homeless shelters, tell us what she

18   would do or how often she would do that.

19   A.  Once a week, once or twice a week.  During the week, she

20   would go to -- there's a men's shelter that's off of Lafayette

21   that she would go and she would cook meals or she would go and

22   cook for them or she would go and provide them with socks and

23   deodorants, and then she would go down North Avenue and

24   prepare meals and take it there or same thing, make bags and

25   take it to them.

1    THE COURT:  All right.  Ms. Oldham, this isn't a

2    victim impact statement, let's move on.

3    MS. OLDHAM:  Thank you, Your Honor.

4    Q.  (BY MS. OLDHAM)  Ms. Payton, other than her work at the

5    school, her work at the church, and what you described, were

6    there other activities that she was involved in in her life?

7    A.  No, just work and church.

8    Q.  And were you aware whether or not she had any enemies?

9    A.  No.

10   Q.  Did your sister Latrina have a boyfriend?

11   A.  No.

12   Q.  Were you aware --

13   A.  Church was her boyfriend.

14   Q.  Were you aware of any ex-boyfriends that she had?

15   A.  No.

16   Q.  In May of 2016, Ms. Payton, where was Ms. Ashburne

17   living?

18   A.  She was living at home with my mom.

19   Q.  And was that the 2919 Rosalind Avenue address?

20   A.  Yes.

21   Q.  How long did she live there?

22   A.  They had been there, I want to say, over 15 years.

23   Q.  And did you have a chance to speak to Latrina Ashburne on

24   the morning of May 27th, 2016?

25   A.  I did.

Direct Examination - Payton  (By Ms. Oldham)

1   Q.  Can you tell us when that occurred?

2   A.  6:30 in the morning, I had called.  I was headed out to

3   work, I was driving to work, and I called to talk to my

4   mother.  And my mom was doing Trina's hair, Latrina's hair,

5   and I ended up -- because we were on speakerphone, I ended up

6   talking to Trina instead of my mom.

7   Q.  Okay.  About how long did you speak with your sister

8   Latrina?

9   A.  My entire ride to work, till about 7:00 o'clock, till

10  about 7:00 -- it may have been 5 after.  I had to be to work

11  at 7:15, and I talked to her my entire drive down to my job.

12  Q.  And did there come a point in time where you wrapped up

13  the conversation and ended the phone call because you were

14  arriving at work?

15  A.  I just arrived on to my parking lot, and so I told her

16  that I had to go.  And she said to me, well, you're making me

17  late too, so I'll talk to you later.

18  Q.  And did there come a point in time after that, Ms. Payton,

19  that you received a phone call from your mom, just yes or

20  no?

21  A.  Yes.

22  Q.  Okay.  And at that point, did your mom notify you that

23  Latrina had been shot?

24  A.  Yes.

25  Q.  And do you recall if you were still in your car at that

Direct Examination - Payton  (By Ms. Oldham)

1    time, or if you had gotten out of your car to go into work?

2    A.  I was just putting my car into park.

3    Q.  Lastly, Ms. Payton, do you know whether or not your sister

4    Latrina wore a particular uniform to work?

5    A.  She did.

6    Q.  And --

7    A.  She wore khaki pants and sometimes her shirt -- the colors

8    changed.

9    Q.  And was it a particular shirt that she needed for work?

10   A.  Yeah, I believe the -- she had on a polo shirt, she

11   usually wore a polo shirt.  It was -- sometimes it was brown,

12   I believe she had a blue one, and it had her company logo on

13   it, Regeneration Project.

14   Q.  Did your sister have a car?

15   A.  She did.

16   Q.  Is that how she would get to work in the morning?

17   A.  Yes.

18   Q.  Okay.  I'm going to show you what's been introduced as

19   A-11.  Do you recognize the car in A-11?

20   A.  Yes.

21   Q.  Is that the car that your sister Latrina drove to work?

22   A.  Yes.

23   Q.  And did she also drive your mother to work as well?

24   A.  Yes.

25   Q.  And lastly, Ms. Payton, when you were speaking to your

Direct Examination - Payton  (By Ms. Oldham)

1   sister that morning on the phone, did everything seem okay

2   with her?

3   A.  Yes.

4   Q.  Was any particular topics covered, or just chitchatting?

5   A.  We were just talking about family, we were talking just

6   about different things.  I called every morning, pretty much

7   we would talk to either her or my mom, because I had such a

8   long drive.  So that morning we were just talking about

9   family.

10  Q.  All right.

11          MS. OLDHAM:  Thank you, Ms. Payton.  Nothing further

12  Your Honor.

13          THE COURT:  Cross.

14          MR. ZERKIN:  No questions, Your Honor.

15          MR. TRAINOR:  We have no questions.

16          THE COURT:  All right.  Ma'am, thank you for your

17  testimony.  You are excused.

18          Next government witness.

19          MS. OLDHAM:  Next witness is Dr. Ali.

20          MR. ZERKIN:  Your Honor, may we approach before the

21  next witness?

22          THE COURT:  You may.

23          (Bench conference on the record.)

24          MR. ZERKIN:  Your Honor, I don't know what else to

25  do other than move for a mistrial.  That was done in the face

1    of the discussion, making it clear that this was not supposed

2    to be victim impact in the face of our motion, which made it

3    clear that we could not object.  I appreciate the Court's

4    attempting to intervene, but that was all put on knowing that

5    the victim impact testimony was inappropriate.  And the

6    government did it any way.

7            MS. OLDHAM:  On the contrary, Your Honor, the

8    question that was asked of Ms. Payton was essentially the

9    activities that Ms. Ashburne was engaged in.  I mean, her

10   lifestyle was one that was dedication to work, school, and the

11   community, and that's a relevant fact for the jury to hear.  I

12   certainly wasn't expecting her to go on into as much detail --

13   Your Honor had indicated to the government that we should move

14   on, but certainly the question was simply, what other

15   activities other than work did she engage in.

16           THE COURT:  Right.  Short of a mistrial, is there

17   any further instruction that you would seek?

18           MR. ZERKIN:  No, because that just emphasizes it in

19   order to give the jury an instruction, so I don't think we can

20   do one now.  I will try to consider one for the purposes of

21   the Court's ultimate instructions.

22           THE COURT:  I think there is an instruction that

23   goes to sympathy.  I don't know if it's in the current

24   instructions or not, I don't remember seeing it.

25           MR. ZERKIN:  I don't think it is.

1            THE COURT:  So I think that would -- I think that

2     would be sufficient, you know, it -- the testimony did start

3     to go down a path that felt more like victim impact statement.

4     I'd have to go back and parse to see if it's the question or

5     the answer, but it got there.  And that's when I gave the

6     instruction that I did, which I think also, and this was my

7     intent in saying it, because I frankly felt like the

8     government was probably moving on anyway, I think it's a

9     subtle way of instructing the jury that victim impact

10    statement isn't what we're here for.

11            I agree that another lengthier instruction would

12    just highlight it more.  I think it's resolved by adding in

13    the instruction on sympathy that's in the *Sand*, but obviously

14    your request for mistrial is on the record, but I deny that

15    request.

16            MR. ZERKIN:  Thank you, Judge, I appreciate it.

17            MR. DAVIS:  Your Honor, I had one witness, and if

18    we're going to get him on before the lunch break, with my

19    client's permission, I'm going to walk out and talk to him for

20    a minute.  I haven't seen him yet.

21            MS. WILKINSON:  We have one more witness after --

22            MR. DAVIS:  Then we're fine.

23            THE COURT:  Okay.

24            (The following proceedings were had in open court.)

25            THE COURT:  All right.  Next government witness.

1             MS. OLDHAM:  Dr. Ali, Your Honor.

2             THE COURT:  Dr. Ali, if you would please come

3    forward.  And sir, if you would please just stand at the side

4    of the witness box, face me and raise your right hand to be

5    placed under oath.

6                         ZABIULLAH ALI,

7    called as a witness, being first duly sworn, was examined and

8    testified as follows:

9             THE WITNESS:  I do.

10            THE CLERK:  Thank you, sir.  Have a seat in the

11   witness box and watch your step.  And sir, if you would please

12   speak directly into the microphone, state your first and last

13   name and spell your first and last name.

14            THE WITNESS:  Zabiullah Ali, the first name is

15   spelled Z-a-b-i-u-l-l-a-h, the last name is spelled A-l-i.

16            THE CLERK:  Thank you.

17                      DIRECT EXAMINATION

18   BY MS. OLDHAM:

19   Q.  Good morning, Dr. Ali.

20   A.  Good morning.

21   Q.  Dr. Ali, can you tell us how are you employed, please.

22   A.  I'm one of the assistant medical examiner for the State of

23   Maryland.

24   Q.  And can you explain what the Office of the Medical

25   Examiner does?

Direct Examination - Ali  (By Ms. Oldham)

1   A.  Mainly performing autopsies on all unnatural suspicious

2   death and try to determine the cause and manner of death.

3   Q.  And is that your primary responsibility as an assistant

4   medical examiner?

5   A.  Yes.

6   Q.  Conducting autopsies?

7   A.  Correct.

8   Q.  And how long have you been employed as an assistant

9   medical examiner for the Office of the Chief Medical

10  Examiner?

11  A.  For about 17 and a half years.

12  Q.  Did you say seven and a half?

13  A.  17 and a half.

14  Q.  17 and a half.  Thank you.

15      And if you could, please tell us just briefly your

16  educational background.

17  A.  I received my medical degree in Germany, and I was trained

18  in pathology.  I did my residency in pathology at the

19  University of Mississippi in Jackson, Mississippi, and then I

20  was trained in forensic pathology in Baltimore.

21  Q.  And what teaching positions do you hold in addition to

22  your duties?

23  A.  My teaching, I teach students -- most of science students

24  from the University of Maryland.  I'm teaching forensic

25  pathology at the University of Towson.

Direct Examination - Ali  (By Ms. Oldham)

1    Q.   And your professional memberships.

2    A.   I'm a member of the American Association of Medical

3    Examiners.

4    Q.   And I take it you're licensed to practice in Maryland.

5    A.   Correct.

6    Q.   And how about opportunities to lecture nationally or

7    internationally?

8    A.   I have the opportunity to lecture and have presentation,

9    national and international.

10   Q.   And are you board certified?

11   A.   Yes.

12   Q.   Okay.  And can you tell us what it means to be board

13   certified?

14   A.   Well, board certification means that you fulfilled all the

15   requirement to practice medicine without any supervision.

16   Q.   And in what areas are you board certified?

17   A.   I'm a -- board certified in pathology and in forensic

18   pathology.

19   Q.   And can you define for us what forensic pathology is and

20   also, generally, pathology?

21   A.   Forensic pathology is a branch of medicine which is merely

22   involved with identification and interpretation of injuries to

23   the human body.

24   Q.   That's forensic pathology?

25   A.   Correct.

Direct Examination - Ali  (By Ms. Oldham)

1   Q.  Okay.  And then just overall, what's pathology?

2   A.  Pathology is a branch of medicine which is involved in

3   identification, diagnosis of human diseases based on body

4   fluid and tissue examination.

5   Q.  And have you testified previously in court, state and

6   federal, as an expert in the area of forensic pathology?

7   A.  Yes.

8   Q.  Approximately how many times?

9   A.  Approximately 220 times.

10          MS. OLDHAM:  Your Honor, at this time, I would move

11  Dr. Ali to be recognized as an expert in the area of forensic

12  pathology.

13          THE COURT:  Any objection or request for voir dire?

14          MR. DAVIS:  No objection for Mr. Carter.

15          MR. TRAINOR:  No objection, Your Honor.

16          THE COURT:  All right.  I will qualify this witness

17  in those areas as an expert.  You may continue.

18          MS. OLDHAM:  Thank you.

19  Q.  (BY MS. OLDHAM)  Dr. Ali, can you explain to us what an

20  autopsy is?

21  A.  An autopsy is a medical examination.  It has two parts,

22  the first part is the so-called external examination, where I

23  examine a decedent from outside, such as height, weight,

24  clothing, or any type of injuries as can see from outside.

25  And the second part is the internal examination where I

Direct Examination - Ali  (By Ms. Oldham)

1    examine the decedent internally, looking for any type of

2    injury or disease processes.

3    Q.   And did you perform the autopsy on the body of Latrina

4    Ashburne?

5    A.   Yes, I did.

6    Q.   When was this autopsy conducted?

7    A.   The autopsy was conducted on May 28, 2016.

8    Q.   In the morning?

9    A.   Yes.

10   Q.   And how did the Office of the Chief Medical Examiner come

11   to receive the body of Latrina Ashburne?

12   A.   Based on the nature of the incident.

13   Q.   And was her body transported from Sinai Hospital?

14   A.   That's correct, yes.

15   Q.   And as you are -- you're the primary assistant medical

16   examiner performing the autopsy?

17   A.   Yes.

18   Q.   Do you have anyone assisting you at the time?

19   A.   The autopsy technicians.

20   Q.   Technicians?

21   A.   Correct.

22   Q.   And are your findings documented in a report?

23   A.   Yes.

24   Q.   If you could, Dr. Ali, explain the condition of Latrina

25   Ashburne's body as she came to you prior to you starting the

Direct Examination - Ali  (By Ms. Oldham)

1    autopsy.

2    A.   Yeah, Ms. Ashburne was transported to our facility from

3    Sinai Hospital.  She had evidence of therapy or emergency

4    therapy, which was done in the hospital, including a breathing

5    tube and a chest tube in the left side of the chest to drain

6    the blood from the chest cavity.

7    Q.   And that's your evidence of treatment on the body prior to

8    her coming to the Office of the Chief Medical Examiner?

9    A.   Yes.

10   Q.   Tell us, what's the first thing that you do then at the

11   start of the autopsy?

12   A.   The first step is to take a picture of the so-called "as

13   is," document the condition we see the decedent without

14   performing any examination or removing anything from the

15   body.

16   Q.   Okay.  And just for purposes of identification, I'm

17   showing you what's been marked as Government's Exhibit A-29.

18   For purposes of identification of the body of Latrina

19   Ashburne, what do you recognize that photograph to be?

20   A.   This is the identification band with the autopsy number.

21   Q.   And is that band placed on the body by your staff?

22   A.   Correct.

23   Q.   Okay.

24        MS. OLDHAM:  And, Your Honor, if I could approach

25   the witness so as not to publish the next exhibit.

Direct Examination - Ali  (By Ms. Oldham)

1           THE COURT:  Sure.

2           MS. OLDHAM:  It's A-30.  The government will be

3    moving it into evidence, just not showing it on the screen,

4    Your Honor.

5           THE COURT:  Just make sure your microphone is on.

6    Q.  (BY MS. OLDHAM)  Dr. Ali, I'm showing you what's been

7    marked for introduction as Government's A-30, can you tell us

8    what that photo is?

9    A.  This is the so-called identification picture.

10   Q.  Of Latrina Ashburne?

11   A.  Yes.

12          MS. OLDHAM:  And Your Honor, the government would be

13   moving in A-30.

14          MR. DAVIS:  I would object, Your Honor.

15          THE COURT:  Basis.

16          MR. DAVIS:  Relevancy.

17          THE COURT:  Overruled.

18   Q.  (BY MS. OLDHAM)  So tell us, did you know during the

19   external examination, Dr. Ali, after you note the evidence of

20   medical treatment, just the general physical description and

21   condition of the body of Latrina Ashburne?

22   A.  Yeah, Ms. Asburne was received from the hospital and she

23   had an injury to the left side of the chest.

24   Q.  And I'm sorry, she had what?

25   A.  Injury to the left side of the chest.

Direct Examination - Ali  (By Ms. Oldham)

1    Q.  Injury to the left side of the chest.  And how about just

2    the general physical characteristics of her body, do you take

3    her height and weight?

4    A.  Yes, her height was 5 feet 4 inches, and she weighed 217

5    pounds.

6    Q.  In addition to the evidence of injury to her chest, when

7    you conducted the external observations of her body, did you

8    note anything else, abrasions or cuts or anything like that?

9    A.  Yes, she had two abrasions or scrapes on both knees.

10   Q.  And are abrasions or scrapes on the knees consistent with

11   falling?

12   A.  That's correct, yes.

13   Q.  After making the external observations -- well, with

14   respect to the wound to her chest, can you give us a little

15   bit more detail about specifically what you observed?

16   A.  I don't understand that question correctly.

17   Q.  Tell us more about what you observed as far as the wound

18   to her chest.

19   A.  The wound was located at the left side of the chest.  In

20   addition to that, she also had an injury to the left portion

21   of her left arm.

22   Q.  Showing you Government's Exhibit A-30A, Dr. Ali, if you

23   can just take a look at that exhibit and tell me if you

24   recognize it.

25   A.  Yes, I do.

Direct Examination - Ali  (By Ms. Oldham)

1   Q.  What do you recognize A-30A to be?

2   A.  This is a picture showing the left side of the chest, a

3   portion of the left arm, and the axilla region, or the region

4   of the axilla.  And there are two defects on the skin, which

5   one is on the left portion of the left arm and one on the left

6   side of the chest.

7   Q.  So when you say "defects," are you referring to these two

8   areas right here?

9   A.  That's correct, yes.

10  Q.  And just so it's clear, when you describe your initial

11  observation of a chest wound and to the left side of the

12  chest, this is the injury that you're referring to that's

13  depicted here in A-30A?

14  A.  Yes.

15  Q.  Okay.  And this is the only other photograph that I'm

16  going to show you, Dr. Ali, is this just a more closer image

17  of those two defects that you described?

18  A.  Yes.

19  Q.  Tell us what you noted about them.

20  A.  On the left portion of the arm, it's a graze wound caused

21  by a bullet.  The bullet caused a graze wound to the

22  midportion of the left arm before entering the left chest

23  cavity.

24  Q.  Okay.  Are you referring to -- let's just start -- I'll

25  use your word, "defect," the top one here, the larger of the

Direct Examination - Ali  (By Ms. Oldham)

 1   two, is that what you're referring to as --

 2   A.  Yeah, this is a graze wound caused by the bullet.

 3   Q.  So the graze wound?

 4   A.  Correct.

 5   Q.  And this one here?

 6   A.  This is the gunshot entrance wound.

 7   Q.  And this area that's depicted as a close up, is that under

 8   the arm, the armpit area?

 9   A.  Yes.

10   Q.  Is that a fair characterization or description?

11   A.  That's correct, yes.

12   Q.  Okay.  Any other observations that you made externally of

13   these two wounds?

14   A.  Yeah, externally, around the gunshot entrance wound, the

15   skin is darker, discolored, which is a bruise or a

16   contusion.

17   Q.  A bruise or a contusion?

18   A.  Yes.

19   Q.  Okay.  How about any evidence of gunpowder or stippling?

20   A.  There was no evidence of any gunpowder stippling on the

21   skin.

22   Q.  And when you have seen gunpowder or stippling around the

23   skin, what does that usually indicate to you?

24   A.  If you see evidence of gunpowder stippling or soot, it

25   indicates that the gun was in close proximity to the skin when

1    it was discharged.

2    Q.  And that was not present here?

3    A.  Correct.

4    Q.  After conducting your external examination of the body of

5    Latrina Ashburne, what did you do next?

6    A.  The next step of the examination, I'm taking pictures, I

7    examine Ms. Ashburne internally, examine all of the organs and

8    the injuries caused by the bullet.

9    Q.  Tell us what you learned from the internal examination.

10   A.  The internal examination showed that Ms. Ashburne had

11   injury to the left lung, she had an injury to the aorta, which

12   is the largest blood vessel in the body, and she also had a

13   injury to the vein -- or in the lung and also to the spine.

14   Q.  Now, out of those three areas that you mentioned, were you

15   able to determine the wound path or the order in which the

16   bullet struck those areas?

17   A.  Yes.

18   Q.  Okay.  And can you explain that to us?

19   A.  Yeah, the bullet injured first the lung, the lower lobe of

20   the left lung, and then it injured the aorta, and then it

21   rested in the lung, in the left lung, and then the spine.

22   Q.  And were you able to recover a bullet?

23   A.  Yes.

24   Q.  And where was it recovered from?

25   A.  The bullet was recovered from the left lung.

Direct Examination - Ali  (By Ms. Oldham)

1   Q.  It was actually recovered from the left lung?

2   A.  Yes.

3   Q.  Okay.  And upon its recovery, was it intact?

4   A.  That's correct, yes.

5   Q.  What was done with the bullet once it was recovered?

6   A.  I placed the bullet in an evidence envelope, sealed it,

7   and handed it over to the police agency.

8   Q.  Okay.  And was that from the Baltimore City Police, do you

9   remember?

10  A.  Yes.

11  Q.  Okay.  So from your observations and what you just

12  described, can you tell us a directional wound path?  I know

13  you gave us the areas that were hit, but what was the

14  direction?

15  A.  Yeah, the bullet traveled from left to right, front to

16  back, and downward.

17  Q.  Dr. Ali, I'm showing you what's been admitted as A-32, can

18  you take a look at A-32 and tell me if you recognize that?

19  A.  Yes, I do.

20  Q.  What do you recognize that to be?

21  A.  This is the bullet I recovered from the left lung.

22  Q.  And based on your examination, both external and internal

23  of Latrina Ashburne, were you able to determine the manner of

24  death?

25  A.  Yes, the manner of death was homicide.

Cross-examination - Ali  (By Mr. Davis)

1    Q.  And were you able to determine the cause of death?

2    A.  Yes, the cause of death was gunshot wound to left chest.

3    Q.  Gunshot wound to the chest?

4    A.  Yes.

5    Q.  Thank you.

6              MS. OLDHAM:  Court's indulgence.

7              THE COURT:  Sure.

8              MS. OLDHAM:  For the record, Your Honor, the exhibit

9    number for this last photograph shown to Dr. Ali is A-30C.

10             THE COURT:  Very well.

11             MS. OLDHAM:   No further questions, Your Honor.

12             THE COURT:  Cross.

13             MR. DAVIS:  Very briefly.

14             THE COURT:  Mr. Davis.

15                        CROSS-EXAMINATION

16   BY MR. DAVIS:

17   Q.  Dr. Ali, you testified that the trajectory of the bullet

18   was left to right and downward?

19   A.  That's correct, yes.

20   Q.  Was it possible to determine the degree of the downward

21   angle of the bullet?

22   A.  No, sir, we don't determine the degree of downward

23   angulation.

24   Q.  Does a downward trajectory, does that indicate that the

25   individual that launched the projectile at the victim, does

Cross-examination - Ali  (By Mr. Davis)

1  that indicate that that weapon was held higher than the

2  victim?

3  A.   There are many possibilities.   When I exam and determine

4  the trajectory of the bullet in the body, when a decedent is

5  face up on the table, it does not say anything about the

6  position of the body of the victim at the time of shooting or

7  where the shooter was.

8  Q.   So if I were standing -- if my left hand is the victim and

9  my right hand is the weapon, if I were standing straight and I

10 shoot into the victim, is it your testimony that doesn't

11 impact the trajectory into the body?

12 A.   If you are standing straight, the bullet typically would

13 go front to back without any deviation, but if the victim is

14 slightly bent forward, then you have a different trajectory.

15 Q.   And I'm moving my hands, I have my left hand flat, and

16 then I have my right hand slightly above, above the victim, if

17 I shoot into the victim and the victim is looking down, that

18 would be a downward trajectory; correct?

19 A.   That would be, yes.

20 Q.   But if I were the same height, if I were directly across,

21 that would be straight in; correct, there would be no downward

22 trajectory?

23 A.   That's correct, yes.

24 Q.   And if the individual were less than 5 foot 3 and shot the

25 victim, it would most likely result in an upward trajectory?

1    A.   That's correct, yes.

2    Q.   I have no -- oh, you did note the height of the victim;

3    correct?

4    A.   Correct.

5    Q.   And the victim's height was, I believe you said 5 foot 4

6    inches?

7    A.   Yes, that's correct.

8              MR. DAVIS:   Thank you, Doctor.

9              MR. TRAINOR:   Mr. Mosley has no questions, Your

10   Honor.

11             THE COURT:   All right.   Redirect, Ms. Oldham.

12                      REDIRECT EXAMINATION

13   BY MS. OLDHAM:

14   Q.   Just one question.   Dr. Ali, does the direction of the

15   travel of the bullet, is it affected by whether or not the

16   victim is moving at the time?

17   A.   It is, yes, it would affect.

18   Q.   I'm sorry, I cut you off.

19   A.   Yeah, when I explained before, when I determined the

20   trajectory, it's when the decedent is face up on the table.

21   It does not tell me anything about the position of the victim

22   or the shooter at the time of incident.

23             MS. OLDHAM:   Okay.   Nothing further.

24             THE COURT:   All right.   Sir, thank you for your

25   testimony.   Don't discuss your testimony with anyone until the

Redirect Examination - Ali  (By Ms. Oldham)

1    trial is complete.  You are excused.  Enjoy the rest of your

2    day.

3                THE WITNESS:  Thanks, Your Honor.

4                THE COURT:  Next government witness.

5                MS. WILKINSON:  Your Honor, I am briefly going to

6    play Government's Exhibit X-13, the clip from Ms. Lee's grand

7    jury testimony.

8                THE COURT:  All right.  Very well.  I see a witness

9    coming this way.

10               MS. WILKINSON:  Oh, before -- yes, I'm sorry, thank

11   you, Your Honor.  Revolving door.

12               X-13A, for the record, December -- Tuesday,

13   December 5th, 2017.

14               (Audio played.)

15               MS. WILKINSON:  That would be Government's

16   Exhibit X-13 and 13A.  Now we would call Special Agent Summer

17   Meunier, Your Honor.

18               THE COURT:  Very well.

19               THE CLERK:  Ma'am, if you would please come forward.

20   And if you would just stand in front of the witness box, face

21   me and raise your right hand to be placed under oath.

22                    SPECIAL AGENT SUMMER MEUNIER,

23   called as a witness, being first duly sworn, was examined and

24   testified as follows:

25               THE WITNESS:  Yes.

1          THE CLERK:  You may have a seat in the witness box

2     and watch your step.  And if you would, please speak directly

3     into the microphone, state your first and last name and spell

4     your first and last name.

5          THE WITNESS:  Summer Meunier, S-u-m-m-e-r, last name

6     Meunier, M-e-u-n-i-e-r.

7          THE CLERK:  Thank you.

8                    DIRECT EXAMINATION

9     BY MS. WILKINSON:

10    Q.  Good afternoon, Agent Meunier.  How are you?

11    A.  Good.

12    Q.  And how are you employed?

13    A.  I'm a special agent with Health and Human Services, Office

14    of Inspector General.

15    Q.  And are you a colleague of Special Agent Holiday and Agent

16    Fuchs?

17    A.  Yes, I am.

18    Q.  How long have you been working with HHS?

19    A.  Approximately three and a half years.

20    Q.  Before that, do you have law enforcement experience?

21    A.  No.

22    Q.  And did you work as an analyst?

23    A.  Yes.

24    Q.  And what kind of analyst work did you do?

25    A.  It was with Department of Interior, Office of Inspector

1    General in support of investigative activities.

2    Q.  Now, when you're -- are you currently assigned to the

3    Washington metropolitan area?

4    A.  Yes.

5    Q.  And as part of your duties and responsibilities,

6    particularly as a newer agent at HHS, are you called upon to

7    support other agents' investigations, particularly when

8    they're in trial?

9    A.  Yes.

10   Q.  And were you called upon to do that in connection with the

11   proceedings here today?

12   A.  Yes.

13   Q.  And the first thing I want to ask you is, in connection

14   with your kind of support role, I wanted to show you

15   Government's Exhibit -- let me pull all these up here so I'm

16   not running back and forth.

17        C-28, and do you generally recognize this as a business

18   records certification from Wells Fargo Bank?

19   A.  Yes.

20   Q.  And this particular series of documents, does it pertain

21   to the defendant Davon Carter?

22   A.  Yes.

23   Q.  And for the record, are we looking at the first page of

24   the -- actually, after the first page and the second page of

25   the exhibit, can you just read the address for the record?

1    A.   Yes, 8409 Arbor Station Way, Apartment K, Parkville,

2    Maryland 21234.

3    Q.   And if I turn the second page, does this appear to be the

4    statements of a particular account number and in the name of

5    Mr. Carter for a particular time period?

6    A.   Yes.

7    Q.   And go ahead and just read it, not the account number but

8    the time period that we're looking at, for the record.

9    A.   The time period is May 7th, 2016 through June 7th, 2016.

10   Q.   And we're looking at page 3 of 6 of that particular

11   document?

12   A.   Yes.

13   Q.   Can you see it up there?

14   A.   Yes.

15   Q.   And down below, are there several cash deposits that are

16   recorded on the Wells Fargo document?

17   A.   Yes.

18   Q.   And I'm going to draw your attention to a particular date,

19   May 27th of 2016, I'm going to point to it right here with my

20   pen, and does it reflect a cash deposit into Mr. Carter's

21   account on that date?

22   A.   Yes.

23   Q.   And what was the amount of the cash deposit?

24   A.   $520.

25   Q.   And according to the records of Wells Fargo, where was the

Direct Examination - Meunier  (By Ms. Wilkinson)

1    deposit made?

2    A.   The record says it was made -- the deposit was made at

3    2520 Pennsylvania Avenue, Baltimore, Maryland.

4    Q.   And if we go down below, was there also a cash deposit

5    made on June 2nd of 2016?

6    A.   Yes.

7    Q.   And does it indicate -- does it indicate the amount of

8    that deposit as well?

9    A.   Yes.

10   Q.   And what is that?

11   A.   $1,100.

12   Q.   Now, if I turn to the next page, is there a further

13   business records declaration of the Wells Fargo Bank?

14   A.   Yes.

15   Q.   Okay.  And does it indicate the time of the transaction

16   you just told the jury about that happened in Baltimore on

17   May 27th, 2016?

18   A.   Yes.

19   Q.   And according to the records of Wells Fargo, what time was

20   that deposit made in Baltimore, Maryland?

21   A.   At 11:28:38.

22   Q.   A.m.?

23   A.   I --

24   Q.   It's not in military; correct?

25   A.   Yes, I assume it's a.m.

Q.  Now, if we turn to the next page, does it have information about the $1,100 cash deposit on June 2nd in terms of the branch that the money was deposited in?

A.  Yes.

Q.  And for the record, what would that be?

A.  It was at Perry Hall Branch, 8851 Belair Road, Baltimore, Maryland, 21236.

MS. WILKINSON:  For the record, Your Honor, reading Stipulation No. 5 between the parties, and then I'll ask the witness a few questions.

Ladies and gentlemen, the parties agree and stipulate that the attached e-mail chain was sent and received, as indicated in the e-mail headings that I'm about to show you.  The witness list attached to both e-mails from employees of the U.S. Attorney's Office, USAMD, was directed only to the attention of counsel of record for defendants Harry Crawford, Elma Myles, and Matthew Hightower, and applied only in that case.

Mr. Bardos represented during the May 4th, 2016 detention hearing that he did not receive the witness list provided in the June 26, 2015 e-mail due to a technological glitch and had not provided it to his client, who was Mr. Hightower.  After the e-mail sent on May 4, 2016, Mr. Bardos represented to the Court on May 6th, I now have the list of witnesses and I imparted to him the list of witnesses,

1    referring again to Mr. Hightower.

2    Q.  (BY MS. WILKINSON)  From that, Agent Meunier, I'm going to

3    show you Government's Exhibit H-12, which is the attached

4    e-mail chain, and does it indicate an e-mail from an employee

5    of the U.S. Attorney's Office on June 26th, 2015?

6    A.  Yes.

7    Q.  And was it directed to various attorneys, including

8    Mr. Bardos?

9    A.  Yes.

10   Q.  And the subject matter, did it pertain to the Crawford

11   case?

12   A.  Yes.

13   Q.  And down below, were there three documents that were

14   attached to that particular e-mail, one entitled Attachment

15   A?

16   A.  Yes.

17   Q.  If I turn to the next page, was this the government's list

18   of witnesses, the Attachment A to the e-mail?

19   A.  Yes.

20   Q.  Okay.  And if I go down below, does it reflect the name of

21   a witness, Lisa Edmonds?

22   A.  Yes.

23   Q.  Do you see that there?

24   A.  Yes.

25   Q.  And Belinda Turner?

Direct Examination - Meunier  (By Ms. Wilkinson)

1    A.  Yes.

2    Q.  Now, if I go back to the second page of Government's

3    Exhibit H-12, does it indicate another e-mail from an employee

4    of the U.S. Attorney's Office to Rich?

5    A.  Yes.

6    Q.  And again, does it have the same Crawford Attachment A to

7    it?

8    A.  Yes.

9    Q.  And the date of this particular e-mail?

10   A.  Is May 4th, 2016.

11   Q.  And if I go to the last page of the document, does it

12   indicate, in fact, that Mr. Bardos had opened and read the

13   e-mail on May 4, 2016 at 6:29 p.m.?

14   A.  Yes.

15   Q.  Now, as part of the Hightower-Crawford case, I'm going to

16   show you Government's Exhibit H-5, and just for the record,

17   what type of document is this?

18   A.  This is an order setting conditions of release.

19   Q.  And what defendant did it pertain to?

20   A.  Matthew Hightower.

21   Q.  And does it have a date that it was filed up here in the

22   top right-hand corner, Agent Meunier?

23   A.  Yes, June 17th, 2015.

24   Q.  And is it -- down below -- I'm going to turn to the second

25   page, does it instruct the -- Mr. Hightower in terms of the

Direct Examination - Meunier  (By Ms. Wilkinson)

1    order setting conditions of release, if you could just read

2    subparagraph K.

3    A.   Sure.  Avoid all contact, directly or indirectly, with any

4    person who is or may become a victim or potential witness in

5    the investigation or prosecution, including but not limited

6    to:  Co-defendants and witnesses identified by AUSA.

7    Q.   And this particular order of release, was it signed by the

8    defendant, Matthew Hightower?

9    A.   Yes.

10   Q.   And down below, the magistrate judge, Judge Coulson?

11   A.   Yes.

12   Q.   And if we look in the heading here, does it indicate what

13   day it was filed in the public record?

14   A.   Yes, June 18th, 2015.

15   Q.   Thank you.  I'm going to show you what's been marked as

16   Government's Exhibit P-31.  And do you recognize this

17   document?

18   A.   Yes.

19   Q.   And does it appear to be a Cellebrite for an Apple

20   iPhone?

21   A.   Yes.

22   Q.   And does it indicate the examiner is Agent Wilde, who

23   previously testified in this case, do you see that there

24   below?

25   A.   Yes.

Direct Examination - Meunier  (By Ms. Wilkinson)

1   Q.  Okay.  And if I go down below, does it indicate the phone

2   number for which this Cellebrite was obtained?

3   A.  Yes.

4   Q.  And can you read that for the record?

5   A.  Yes, 1(443) 935-0723.

6   Q.  And does it indicate the last activation time being around

7   the time where Mr. Carter was arrested in December 2017?

8   A.  The last activation time is December 10th, 2017.

9   Q.  And does it have Mr. Carter's Apple ID above here on the

10  extraction report?

11  A.  Yes, it says DDCarter8080@iCloud.com.

12  Q.  Now, within this, there's one page that's marked I want to

13  just draw your attention to, does it have a reference to a man

14  by the name of Black Tony?

15  A.  Yes.

16  Q.  As a contact that was created?

17  A.  Yes.

18  Q.  And does it have a phone number for Black Tony?

19  A.  Yes.

20  Q.  Can you just read it now for the record?

21  A.  Yes, 1(443) 687-4737.

22  Q.  And would this be the phone number for Antonio Vines, a

23  witness that previously testified in this case?

24  A.  Yes.

25  Q.  Showing you Government's Exhibit P-2 and referring

1  specifically to page 125 of 137, is that phone number you just

2  read for Black Tony, the phone number that's indicated here,

3  June 1st, ending in 4737?

4  A.  Yes.

5  Q.  So if I put in here Antonio Vines, would that be

6  consistent with Mr. Vines's testimony?

7  A.  Yes.

8  Q.  Agent Meunier, in connection with your assistance in the

9  trial proceedings, were you asked to look at the -- an exhibit

10  that was introduced at the trial of Matthew Hightower?

11  A.  Yes.

12  Q.  And I'm going to show you Government's Exhibit R-26, does

13  this appear to be a redacted copy of the exhibit list from

14  that trial?

15  A.  Yes.

16  Q.  And I'll just show you the heading here above, does it

17  have the same case number that we previously looked at with

18  regard to Mr. Hightower's order of release?

19  A.  Yes.

20  Q.  And the date that this exhibit list was filed in the court

21  record?

22  A.  September 22nd, 2016.

23  Q.  And does it indicate which -- which exhibit had been --

24  again, of course it's redacted, but above, which exhibit was

25  introduced at that trial on September 14th, 2016?

Direct Examination - Meunier  (By Ms. Wilkinson)

1    A.  Yes, a jail call on June 10th, 2013.

2    Q.  Did you have occasion to listen to that -- an excerpt of

3    that call in preparation for your testimony?

4    A.  Yes.

5    Q.  And is the snip about five minutes long?

6    A.  Yes.

7    Q.  If I could ask Agent Holiday -- well, let me ask you, did

8    you look at a transcript that was used at the trial of Matthew

9    Hightower and confirm that is what you heard on the tape as

10   well?

11   A.  Yes.

12          MS. WILKINSON:  And as an aid to the jury, can I ask

13   Agent Holiday to hand out a copy, and to the Court as well.

14   Q.  (BY MS. WILKINSON)  Do you have a copy up there, Agent

15   Meunier?

16   A.  Yes.

17          MS. WILKINSON:  Your Honor, one second.

18          (Pause in the proceedings.)

19          MS. WILKINSON:  Your Honor, I'm going to go to

20   another area while I confirm with Mr. Davis.  We might be able

21   to come back to it after we take a break.

22   Q.  (BY MS. WILKINSON)  I'll come back to that area, Agent

23   Meunier.

24       Now, Agent, in connection with your support role here for

25   the trial, were you asked to review the video compilation of

1   the area surrounding 2919 Rosalind Avenue from the day of

2   May 27th, 2016?

3   A.  Yes.

4   Q.  And did you review that video compilation?

5   A.  Yes.

6   Q.  And in connection with that, were you asked to perform any

7   specific task related to the area that surrounds that -- the

8   area where Ms. Ashburne was shot?

9   A.  Yes.

10  Q.  And can you tell the jury specifically what you were to do

11  and what you did do?

12  A.  Yes.  I was asked to review the compilation of security

13  footage, and I was asked to go to those sites to capture the

14  perspective -- a few different perspectives, one of what it's

15  to drive the area, and then another of what it would be to

16  walk from the perspective of the 911 caller as well as the

17  perspective of the alleged shooter.

18  Q.  Now, from those three perspectives, in terms of the actual

19  video compilation that you reviewed, was that footage from the

20  vantage point of a camera angle?

21  A.  On the --

22  Q.  On the building.

23  A.  -- compilation, yes.

24  Q.  And so the -- how were you going to capture a different

25  angle for purposes of showing the jury the area around 2919

Direct Examination - Meunier  (By Ms. Wilkinson)

1    Rosalind Avenue?

2    A.   I used a GoPro to make a video, and I held it on the

3    vehicle, put it on the rearview to show, that way you can tell

4    what it looks like if you were walking down the street or if

5    you were driving those streets in your car.

6    Q.   So the angle or perspective that you had in your GoPro is

7    different from that -- from the camera angles that were in the

8    video compilation?

9    A.   Yes.

10   Q.   And so if you were driving, we'll talk about that in a

11   moment, but if you were driving, you put it up on the rearview

12   mirror area of the car?

13   A.   Yes.

14   Q.   And if you were walking, you held it?

15   A.   Yes.

16   Q.   And from -- have you reviewed that video clip in

17   preparation for your testimony today?

18   A.   Yes.

19   Q.   And I'm going to go ahead and play one part of this.

20        MS. WILKINSON:  This one, Ms. Lesser.  There we go.

21   And before I ask you play it, let's wait until it comes up.

22   Q.   (BY MS. WILKINSON)  Okay.  So we're looking at a screen,

23   just for the record, what does it say?

24   A.   "Down Rosalind."

25        MS. WILKINSON:  Unfortunately, I have to wear this,

Direct Examination - Meunier  (By Ms. Wilkinson)

1    and I don't have anywhere to put it on my suit, Your Honor, so

2    I have to carry it.  I'm wearing a dress today.  Just to make

3    sure you hear me.

4         I'm going to put the map up here so we can make sure

5    we know the area that we are depicting.  Let me put it as

6    close to you as I can.  Be mindful of the audio, I have to do

7    it as well, so I'm going to try to do it both.  And if you

8    need the microphone, let me know.  And actually, it might help

9    if you have it.

10        Camille, do you have a standalone microphone

11   somewhere?

12             THE COURT:  The handheld.

13             MS. WILKINSON:  The handheld.

14        Be careful, it's loud, so if you need that, let me

15   know.

16   Q.  (BY MS. WILKINSON)  So when we're looking up on the screen

17   where it says "Down Rosalind" -- and you can step down, if

18   it's too close for you.  I know it's a little awkward back

19   here.

20        Tell the jury, when we're looking at "Down Rosalind,"

21   what area you were meant to depict in the video we're about to

22   see.

23   A.  When we're looking down, it would be down towards Nurton,

24   which is this street right here.

25   Q.  So where did you start your journey in the car and where

Direct Examination - Meunier  (By Ms. Wilkinson)

1    did you end it?

2    A.  We started at Laurel and Rosalind, and we went down -- I

3    think we went all the way to Nurton.

4    Q.  Okay.  And so you went all the way to the end of the --

5    Rosalind Avenue?

6    A.  Yes.

7    Q.  And depicted this area in here?

8    A.  Correct.

9    Q.  Okay.  You can go ahead and have a seat, and I'm probably

10   going to have you do this, so be mindful of the microphone.

11       But let's first show you the area going down Rosalind.

12   And is that the first clip you see in the video compilation,

13   of the car coming down Rosalind?

14   A.  In this one, yes.

15   Q.  And in the main video compilation, the one the jury

16   already heard?

17   A.  The -- with the security cameras?

18   Q.  Yes, from the security cameras.

19   A.  I believe it starts -- the first one starts closer to

20   where it says camera 9, right, and camera 1.

21   Q.  When you first capture the car coming down Rosalind?

22   A.  Yes.

23           MS. WILKINSON:  And just for the record, Your Honor,

24   this is Government's Exhibit V-21.

25   Q.  (BY MS. WILKINSON)  And turn your attention to the

1    monitor, Agent Meunier, and I'm going to go ahead and play it.

2    And feel free to narrate what we're looking at here.

3              (Video played.)

4    A.  Okay.  This is driving down Rosalind.

5    Q.  (BY MS. WILKINSON)  Is it a residential area?

6    A.  Yes.  Yes, these are all townhouses.  Then on the right --

7              MS. WILKINSON:  Stop it there for a second,

8    Ms. Lesser.

9    Q.  (BY MS. WILKINSON)  First of all, do you recall the speed

10   at which you were traveling?

11   A.  Yes, I did not exceed 25 miles an hour.

12   Q.  And was that the speed limit as posted in the area, Agent

13   Meunier?

14   A.  I believe so.

15   Q.  And were there also speed bumps at times?

16   A.  Yes.

17   Q.  And would you follow those as well, slow down when those

18   happened?

19   A.  Yes.

20             MS. WILKINSON:  Is there a way to play this slightly

21   slower?  I'm going to go to playback, just so we can narrate.

22   So if you could slow down for a second, go back just a moment,

23   okay, come on down.  You can go ahead and push play, and stop

24   right there.

25             (Video played.)

1  Q.  (BY MS. WILKINSON)  Now, what are we looking at on the

2  left and right area as we're coming down Rosalind?

3  A.  We are looking at townhouses on the left and right, on the

4  right side is passing by the victim's home.

5  Q.  And on the left side, were there any particular area that

6  you were depicting as well?

7  A.  On the left side, there is also a video, there will be a

8  video, of walking from the 911 caller's perspective, and that

9  starts on the left side.

10  Q.  And will we capture the home of the 911 caller on the left

11  as well?

12  A.  Yes.

13  Q.  Okay.  So we're going to go ahead and go straight down.

14      MS. WILKINSON:  Much better, thank you, Ms. Lesser.

15  A.  So on the right, side you'll see the victim's home.

16      MS. WILKINSON:  Okay.  You can continue.

17      (Video played.)

18      MS. WILKINSON:  Stop right there for a second,

19  Ms. Lesser.

20  Q.  (BY MS. WILKINSON)  What are we coming up on here now,

21  Agent Meunier?

22  A.  On the right side, you'll see a path that goes behind the

23  row of townhouses that we just drove by.  And then you can

24  see, it's a little hill, but there's a path that's worn and

25  you can tell people walked.  There will be more townhouses on

1    the left, and if you keep walking, it will connect to another

2    street.  So you can't drive to connect, the street's called

3    Virginia, you have to go through this footpath and kind of

4    past another set of townhouses.

5    Q.  Okay.  And did you do some footage with your handheld

6    GoPro to show that to the jury as well?

7    A.  Yes.

8    Q.  So we're going to continue -- and I should -- it's

9    probably clear for the record, but down on the left of the

10   screen that we're looking at, is that actually the dashboard

11   of your car?

12   A.  Yes, at the very bottom of the screen.  Yes.

13            MS. WILKINSON:  You can continue.

14            (Video played.)

15            MS. WILKINSON:  You can stop right there.

16   Q.  (BY MS. WILKINSON)  What intersection are we coming upon

17   as you go down Rosalind -- and if you could show the jury on a

18   larger map as well, Agent, and I should make clear for the

19   record, V-3A.

20   A.  So what you just saw was the car going down Rosalind, past

21   the witness's house, past the victim's house, and now we're at

22   the intersection of Rosalind and Nurton Street, so it's right

23   here.

24   Q.  So the area that you're indicating is to the left of

25   camera 3, as you're about to hit a stop sign right here at the

1    end of Rosalind Avenue.

2         And just to make clear, this is the cross street

3    Nurton?

4    A.  Yes.

5    Q.  And is this -- from the video footage, is this where the

6    car is depicted at around 6:16 a.m. that morning?

7    A.  Yes.

8              MS. WILKINSON:  Okay.  You can continue to play it,

9    Ms. Lesser, I think that's just about at the end.

10             (Video played.)

11   Q.  (BY MS. WILKINSON)  And like the car in the video, you

12   take a left up Nurton?

13   A.  Yes.

14   Q.  And what intersection are you coming upon now?

15   A.  This next intersection will be Nurton and Woodland.  So

16   now we're driving up right here.  (Indicating).

17   Q.  And now which way is the car going?

18   A.  Now it's going on Woodland, so we've come up here, now

19   we're going back this way.

20   Q.  And again, are you following the route of that first clip

21   of the video footage?

22   A.  Yes.

23             (Video played.)

24             MS. WILKINSON:  Stop it right there.

25   Q.  (BY MS. WILKINSON)  Now, why -- according to the video

Direct Examination - Meunier  (By Ms. Wilkinson)

1    footage, is that the last time we see the car because of the

2    angle of camera 11 and 10 that captured the car coming up

3    Woodland?

4    A.  Correct.

5    Q.  And so you stopped the video there?

6    A.  Yes, because you can't see any further on the security.

7    Q.  Is the next clip that you see on the video compilation,

8    that the jury has already seen, of the car coming down

9    Woodland and taking the reverse trip?

10   A.  Yes.

11   Q.  And is that where you depict up Rosalind?

12   A.  Yes.

13   Q.  Okay.  So we're going to go ahead and play this clip.

14            (Video played.)

15            MS. WILKINSON:  You can stop it there for a second.

16   Q.  (BY MS. WILKINSON)  Are we literally going up Rosalind

17   Avenue at this point?

18   A.  Yes, it's the opposite direction we just drove.

19   Q.  And again, if you can point to -- for the jury, so they

20   know exactly where we're --

21   A.  Going back up this way.

22   Q.  So if you were to drive up Rosalind, this is what it would

23   look like?

24   A.  Correct, yes.

25            MS. WILKINSON:  Go ahead, Ms. Lesser.

1              (Video played.)

2              MS. WILKINSON You can stop it right there.

3     Q.  (BY MS. WILKINSON)  What area are we passing here now,

4     Agent Meunier?

5     A.  Now we're going back past the victim's house and the 911

6     caller's house from the opposite direction, so this time it's

7     another block up, the victim's house would be on the left and

8     the 911 caller's house would be on the right.

9     Q.  Okay.  Are we at or near where the cut was that you

10    previously described, on the bottom left-hand corner --

11    A.  Yes.

12    Q.  -- of 1 minute 53 seconds into Government's

13    Exhibit V-21?

14    A.  Yes, the path I described earlier is that dark area with

15    all the trees.  When you're in front of it, there is a visible

16    footpath that you can walk up.

17              MS. WILKINSON:  You can go ahead, Ms. Lesser.

18              (Video played.)

19              MS. WILKINSON:  Stop right there.

20    Q.  (BY MS. WILKINSON)  Are we about to pass the victim's

21    house on the left?

22    A.  Yes.

23    Q.  And the 911 caller up ahead on the right?

24    A.  Yes, it's a little further on the right, yes.

25              MS. WILKINSON:  You can continue, Ms. Lesser.

1              (Video played.)

2    Q.  (BY MS. WILKINSON)  And this stop sign here is at the

3    intersection of what?

4    A.  That is the intersection of Laurel Avenue and Rosalind

5    Avenue, so we drove back up and now we're here.

6    Q.  Now, just for the record, and so -- for the jury to see,

7    if you were to take a left on Laurel Avenue -- and go ahead

8    and follow with your finger -- if you were to take a left,

9    would the next intersection be Virginia Avenue?

10   A.  Yes.

11   Q.  Now, at some point during your recording of the area

12   surrounding the crime scene, Agent Meunier, did you stop at

13   the corner of Laurel and Rosalind Avenue and determine -- in

14   your car?

15   A.  Yes.

16   Q.  And what area -- where did you stop?

17   A.  About right here, on this corner.

18   Q.  Okay.  And I'm going to -- with your finger, just point

19   that you were on the bottom right-hand of the intersection of

20   Rosalind and Laurel Avenue.

21       And as you were stopped there, did you turn to the left

22   and determine whether or not from that advantage point you

23   could see Ms. Ashburne's house?

24   A.  Yes, from that advantage point, you could see

25   Ms. Ashburne's house.

1   Q.  And describe your observations in that regard.

2   A.  You were able to see down the road, you could see the

3   house, there was not -- there was no obstructions, like no

4   trees.  And it's not a busy road, so we could see pretty

5   clearly.

6   Q.  Great.  Okay.  So we're going to go now to the next clip.

7            MS. WILKINSON:  Finish this one up, if you would,

8   Ms. Lesser.

9            (Video played.)

10            MS. WILKINSON:  Okay.  If you could stop right here.

11  Q.  (BY MS. WILKINSON)  Now, on this particular clip, Agent

12  Meunier, what are you depicting here?

13  A.  So this is the footpath, as described before.  So now we

14  are -- I believe it's this area, it's kind of hard to see

15  unless you're there.

16  Q.  Right.  You mean because it's an aerial photograph and the

17  trees are covering it?

18  A.  Yes, so the house -- that building that you see, that's

19  the row of houses on Rosalind where the victim's house is.

20  Q.  Okay.  So let me just go ahead to Government's

21  Exhibit V-3A.  And if the victim's house -- the crime scene is

22  right here and this is the first row of houses, would this be

23  the cut right here where all the trees are between the two

24  rows of the houses?

25  A.  Yes, about right there.

1    Q.  Okay.  Terrific.  And at this point, are you holding the
2    GoPro?
3    A.  Yes.
4    Q.  Okay.  And where are -- what -- from what perspective are
5    you looking at?  In other words, is the structure that we're
6    seeing on the left-hand side of the screen at 2:21 of
7    Government's Exhibit V-21, is that the side of the road where
8    Ms. Ashburne lives, or where the 911 caller lived?
9    A.  This house, this is the side where Ms. Ashburne lives.
10   Q.  Is that depicting the edge of the row of homes that her
11   home is within?
12   A.  Yes.
13            MS. WILKINSON:  Okay.  You can go ahead, Ms. Lesser.
14            (Video played.)
15   Q.  (BY MS. WILKINSON)  Are we looking at Rosalind Avenue
16   there?
17   A.  Yes.
18   Q.  Just to be clear, Agent Meunier, you're actually holding
19   the camera, you're the one holding it and walking and filming
20   at the same time?
21   A.  That's correct.
22   Q.  I should be clear too, Agent Meunier, you did this in
23   2020, not back in 2016; correct?
24   A.  Correct.
25   Q.  Is that angle depicting Ms. Ashburne's home?

Direct Examination - Meunier  (By Ms. Wilkinson)

1    A.  Yes.

2             (Video played.)

3             MS. WILKINSON:  You can stop here for a second.

4    Q.  (BY MS. WILKINSON)  What do you mean to depict by 911

5    caller?

6    A.  This would be the view on foot of the perspective of the

7    911 caller, so now we're on the other side of the street.

8             MS. WILKINSON:  You can go ahead, Ms. Lesser.

9             (Video played.)

10            MS. WILKINSON:  Stop for one second.

11   Q.  (BY MS. WILKINSON)  Is that your car?

12   A.  Yes.

13   Q.  Meaning a government car?

14   A.  Yes.

15   Q.  And as you're getting out of the driver's seat, are you in

16   front of Ms. Murray's home, the 911 caller?

17   A.  Yes.

18            (Video played.)

19   Q.  (BY MS. WILKINSON)  Again, are you depicting where

20   Ms. Ashburne lived?

21   A.  Yes.

22   Q.  And are we looking down Rosalind?

23   A.  Yes.

24            MS. WILKINSON:  And this is at 4:59 on Government's

25   Exhibit V-21.

1              (Video played.)

2              MS. WILKINSON:  Just for the record, I have it on

3    the slow speed again, just so we can see the area.

4              You can speed it up one more level, if you want to,

5    since we're watching her walk.  Did that work?  I don't think

6    that worked.

7    Q.  (BY MS. WILKINSON)  Now what are we looking at here, Agent

8    Meunier?

9    A.  This is the footpath, again, that connects Rosalind up

10   through -- so if you keep walking, the next street you'll hit

11   will be Virginia.

12   Q.  Meaning behind the row of houses?

13   A.  Behind this row of houses that you see on the screen

14   now.

15             MS. WILKINSON:  Okay.  Stop here.

16   Q.  (BY MS. WILKINSON)  So now what angle are we looking at?

17   A.  This is based off the surveillance videos, this is one of

18   the angles from the shooter's perspective that they took.

19   Q.  Leaving the area?

20   A.  Leaving the area, yes.

21             MS. WILKINSON:  Okay.  Go ahead.  And we are

22   starting at 6:17.

23             (Video played.)

24             MS. WILKINSON:  Okay.  Stop there for one second,

25   Ms. Lesser.

1    Q.  (BY MS. WILKINSON)  Agent Meunier, can you show, using

2    Government's Exhibit V-3A, where approximately you're standing

3    at this point?

4    A.  Yes, so we came up through the footpath, and now we're

5    about right here, there's another row of houses.

6    Q.  And do you see a sidewalk on V-3A that you're also

7    depicting on video 21 that you prepared?

8    A.  Yes, there's the sidewalk.

9    Q.  So you're looking right below the row of homes that you're

10   now in back of; is that correct?

11   A.  Yes.

12   Q.  And as you look ahead, what area are we heading towards?

13   A.  This is a parking lot that we're walking towards.

14   Q.  And for the record, what camera?

15   A.  Camera 8.

16   Q.  And what street off of?

17   A.  Virginia Avenue.

18   Q.  Okay.  You can go ahead and have a seat, and then we can

19   watch.

20          MS. WILKINSON:  You can go ahead and start playing,

21   Ms. Lesser.

22          (Video played.)

23   Q.  (BY MS. WILKINSON)  Is that the parking area off of

24   Virginia Avenue straight ahead?

25   A.  Yes.

Direct Examination - Meunier  (By Ms. Wilkinson)

1    Q.  Okay.  At 8:04, for the record.

2        And why did you turn off the sidewalk?

3    A.  In the surveillance -- the security footage, it shows that

4    he goes up the hill through the grass and about this

5    direction.

6    Q.  And we're still looking at that parking lot, Virginia

7    Avenue?

8    A.  Yes.

9    Q.  And the street ahead of us on the right, what is that?

10   A.  That would be Lanier.

11   Q.  Going right, is that Virginia Avenue?

12   A.  That's Virginia, I'm sorry, Virginia.

13   Q.  Now what road are we heading towards?

14   A.  Now we are heading towards Lanier.

15              (Video played.)

16              MS. WILKINSON:  Go ahead and stop for a second,

17   Ms. Lesser.

18   Q.  (BY MS. WILKINSON)  If you could, using the map V-3A,

19   Agent Meunier, indicate the way that you're walking at this

20   point.

21   A.  Okay.  So I came down the sidewalk, cut the grass here a

22   little bit, went down this road, and then --

23   Q.  Meaning the parking lot?

24   A.  The parking lot, yes, where camera 8 has surveillance

25   video.  And now we're about to go through this green grass

Direct Examination - Meunier   (By Ms. Wilkinson)

1   here.

2   Q.   Meaning the green area directly above Virginia Avenue,

3   getting ready to turn down Lanier Avenue?

4   A.   Yes.

5   Q.   And why did you take that route?

6   A.   According to the surveillance footage, that's the way the

7   person came.

8   Q.   And are camera 8 and camera 6 picking up various angles of

9   the man walking or running?

10   A.   Yes.

11   Q.   And that's the area that you followed, but you're holding

12   the GoPro?

13   A.   Correct, yes.

14   Q.   You can go ahead and have a seat.

15        MS. WILKINSON:   You can continue playing,

16   Ms. Lesser.

17        (Video played.)

18   Q.   (BY MS. WILKINSON)   So this is Virginia Avenue in the

19   closest foreground and then the right you'd take on Lanier?

20   A.   Yes.

21   Q.   And at what point do you stop the video?

22   A.   A little further, when I get closer to these cars.

23   Q.   And why do you stop it?

24   A.   That's where the security footage ended.

25        (Video played.)

1          MS. WILKINSON:  Okay.  And if we could stop here.

2    Q.  (BY MS. WILKINSON)  Now, the next series, camera 9 and 5,

3    if you could explain to the jury --

4          MS. WILKINSON:  And, Your Honor, tell me if any time

5    you want to -- whatever time you want to stop.

6          THE COURT:  I was thinking if this is a convenient

7    time --

8          MS. WILKINSON:  Of course.

9          THE COURT:  -- now would be a good time to do it.

10         Ladies and gentlemen, let's take our lunch break

11   now.  I ask that you be in the jury room at 2:00 o'clock ready

12   to go forward from there.  Please remember not to discuss the

13   case with anyone, including among yourselves.  And I'll see

14   you in an hour.  Enjoy your lunch.

15         (Jury left the courtroom.)

16         THE COURT:  See you all in an hour.

17         MS. WILKINSON:  Thank you, Your Honor.

18         (A recess was taken.)

19         THE COURT:  All right.  So I took a shot at the ID

20   testimony instruction, I'll hear from either side.  Have you

21   had a chance to look at it?

22         MS. WILKINSON:  I'm all right with it, Your Honor.

23         MR. DAVIS:  We're all right with it also, Your

24   Honor.

25         THE COURT:  Okay.

1          MR. TRAINOR:  Makes it unanimous.

2          THE COURT:  All right.  Well, good on me, I figured

3    I would upset somebody.  So got everybody happy, that's great.

4          All right.  Anything else before we bring the jury

5    back out?

6          MS. WILKINSON:  No, sir.

7          THE COURT:  Oh, I know, I wanted to ask, is this the

8    government's last witness?

9          MS. WILKINSON:  Yes.

10         THE COURT:  All right.  And how much longer do you

11   have with this witness?

12         MS. WILKINSON:  20 minutes.

13         THE COURT:  Okay.  And Mr. Carter, do you have --

14   I'm speaking to Mr. Carter's counsel of course, do you have a

15   witness ready to go?

16         MR. DAVIS:  We have a witness ready to go.  As a

17   matter of fact, if you wanted us to do MJOAs, we could

18   probably do those now.

19         THE COURT:  I prefer to -- I mean, it can be

20   awkward.  We'll send them back out in 30 minutes, but I prefer

21   once everything is done.

22         So you do have a witness ready to go.

23         MR. DAVIS:  I do have one.

24         THE COURT:  And how long is your case, now that

25   we're here?

1          MR. DAVIS:  If he takes five minutes, I would be

2    surprised.

3          THE COURT:  That's your only witness.

4          MR. DAVIS:  That's my only witness.

5          THE COURT:  All right.  Counsel for Mr. Mosley.

6          MR. TRAINOR:  We will not be long, Your Honor.

7          THE COURT:  Is that zero minutes, is that an hour?

8          MR. TRAINOR:  Right now it looks like zero.

9          THE COURT:  Interesting.  Okay.  All right.  Get the

10   jury.

11          (Jury entered the courtroom.)

12          THE COURT:  All right.  You may all be seated.  Good

13   afternoon, ladies and gentlemen, hopefully you enjoyed your

14   lunch.  We are ready to continue.

15          Ms. Wilkinson.

16          MS. WILKINSON:  Thank you, Your Honor.

17   Q.  (BY MS. WILKINSON)  Agent Meunier, when we broke, you were

18   at minute 10 of a 13-minute, 54-second video clip that you had

19   assisted in preparing.  And we are at camera 9 and 5 angle.

20          And I was just going to have you indicate on Government's

21   Exhibit V-3A for the jury where cameras 9 and 5 are.

22   A.  Those are down here where you see Nurton, camera 9, camera

23   5.

24   Q.  And for the record, obviously, indicating on Government

25   Exhibit V-3A, cam 9 and cam 5.

1          MS. WILKINSON:  And if Ms. Lesser, you go ahead and

2    start the video clip here.

3          (Video played.)

4          MS. WILKINSON:  And I'm just going to stop to give

5    us all a little perspective.  Can you stop right here for one

6    second.

7    Q.  (BY MS. WILKINSON)  What street are we coming down here?

8    A.  This is Woodland.

9    Q.  Woodland?

10   A.  Yes.

11   Q.  And we are about to -- what direction are you about to

12   take?

13   A.  We're about to go left on to Nurton.

14   Q.  On to Nurton, and so are you coming from Greenspring

15   Avenue?

16   A.  Yes, that's correct.

17          MS. WILKINSON:  You can go ahead.

18          (Video played.)

19   Q.  (BY MS. WILKINSON)  And as we take this in left on to

20   Nurton, are we going to pass that entrance to Rosalind here on

21   the right?

22   A.  Yes, that on the right is the entrance to Rosalind

23   Avenue.

24          (Video played.)

25          MS. WILKINSON:  I'll just have Ms. Lesser stop

1    there.

2    Q.  (BY MS. WILKINSON)  Are we about to pass the entrance to

3    Rosalind there on the right?

4    A.  Yes, that's the entrance to Rosalind on your right there,

5    yes.

6              MS. WILKINSON:  Go ahead and keep playing,

7    Ms. Lesser.

8              (Video played.)

9    Q.  (BY MS. WILKINSON)  Now, as we go down this area of

10   Nurton, and as reflected on V-3A, is this a dead end, so to

11   speak, there's not a through street?

12   A.  Correct, this is not a through street, we will hit a dead

13   end.

14   Q.  And again, are you following one of the clips from the

15   video compilation the jury has already seen?

16   A.  Yes, this is the area that camera 9 and cam 5 show.

17   Q.  Are we coming up on that dead end?

18   A.  Yes, the dumpster, you cannot go any further.

19   Q.  Making a three-point turn here; is that correct?

20   A.  Yes.

21   Q.  And are we about to head back down Nurton where Rosalind

22   would now be on the left?

23   A.  Yes.

24   Q.  The way that you came in?

25   A.  Yes, that's correct.

1    Q.   And as we come down --

2            (Video played.)

3            MS. WILKINSON:  Stop right there, Ms. Lesser.

4    Q.   (BY MS. WILKINSON)  On the bottom right, we just are about

5    to pass it where the telephone pole is on the far right-hand,

6    do you recognize that area down there?

7    A.   Yes.

8    Q.   And what is that?

9    A.   There is a leasing office down there where another camera

10   is.

11   Q.   And do you show that at a subsequent clip on the video?

12   A.   Yes.

13   Q.   And just to show the jury, when you're coming down Nurton,

14   and again, had you just made that three-point turn here around

15   camera 5 and 9?

16   A.   Yes.

17   Q.   And where is the leasing office as you're coming back up

18   Nurton?

19   A.   It is right here by camera 1.

20   Q.   And could you actually see that parking lot as you're

21   coming down Nurton?

22   A.   Yes, you look down over it.

23   Q.   Okay.  Go ahead and have a seat.

24           MS. WILKINSON:  Okay.  You can continue playing,

25   Ms. Lesser.

1              (Video played.)

2  Q.  (BY MS. WILKINSON)  Are we passing Rosalind on the left

3  there?

4  A.  Yes, that is Rosalind on the left.

5  Q.  And the intersection we're coming back up on?

6  A.  Will be Nurton and Woodland.

7  Q.  And as we're about to approach this light, is this

8  Greenspring Avenue?

9  A.  Yes.

10              (Video played.)

11              MS. WILKINSON:  And go ahead and stop for a moment.

12  Q.  (BY MS. WILKINSON)  This clip now obviously speaks for

13  itself, leasing office, is this the clip you just referred

14  to?

15  A.  Yes.

16  Q.  Okay.  We're going to go ahead and play it, and I'm going

17  to ask you some questions in a moment.

18              (Video played.)

19              MS. WILKINSON:  Okay.  Can you stop right there,

20  Ms. Lesser.

21  Q.  (BY MS. WILKINSON)  Now, your vehicle, as it has the GoPro

22  attached, what direction are you coming up in now?

23  A.  We are driving up Greenspring Avenue.

24  Q.  Okay.  If we could go over here to the map, V-3A, just

25  indicate with your fingers where we're coming up.

1    A.   Up Greenspring right here.

2    Q.   And can you give the jury some perspective now where that

3    leasing office is, and are you about to go into it?

4    A.   Yes, so the leasing office entrance will be here.

5    Q.   And again, is that clip depicted on the video compilation

6    from the security camera angles as well?

7    A.   Yes.

8    Q.   And what security camera angle does the leasing office

9    depict?

10   A.   That's camera 1.

11   Q.   And as indicated on V-3A.

12        Okay.  So as you're coming up this way, do you take a

13   left in that leasing parking lot?

14   A.   Yes.

15   Q.   And did a car that appeared to be the Audi also turn into

16   that leasing office around 7:55 that morning?

17   A.   Yes.

18            MS. WILKINSON:  You can go ahead.

19            (Video played.)

20   Q.   (BY MS. WILKINSON)  Is that the left you're turning into

21   right here?

22   A.   Yes.

23   Q.   And straight ahead --

24            (Video played.)

25            MS. WILKINSON:  If you stop for a second,

1    Ms. Lesser.

2    Q.  (BY MS. WILKINSON)  There appears to be like a hill and

3    some houses in the background there, what are we looking at

4    there?

5    A.  That is Nurton at the top of the hill.

6    Q.  That's Nurton?

7    A.  Yes.

8              MS. WILKINSON:  Okay.  Go ahead, Ms. Lesser.

9              (Video played.)

10   Q.  (BY MS. WILKINSON)  And again, is this a dead-end parking

11   lot?

12   A.  Yes.

13   Q.  What direction are you heading now, Agent Meunier?

14   A.  Now we're going back towards Greenspring Avenue.

15   Q.  And heading toward where?

16   A.  Towards -- if you go left on Greenspring, the next would

17   be a left on Woodland.

18   Q.  And is that what you did?

19   A.  I believe so, in this video.

20   Q.  And you see Woodland street sign right up there on the

21   right?

22   A.  Yes.

23   Q.  And again, are you following the path that appears on the

24   security camera compilation?

25   A.  Yes.

1    Q.  And we're on the left on what road?

2    A.  On Nurton.

3    Q.  And again, are you heading into that back parking lot

4    where there's no exit?

5    A.  Yes.

6    Q.  Passing Rosalind on the right?

7    A.  Yes.

8    Q.  At 13:28 on the video.

9              (Video played.)

10   Q.  (BY MS. WILKINSON)  Okay.  Now, in addition to the -- kind

11   of the GoPro video that we just looked at with the jury, did

12   you also prepare a clip as to what it looks like up Rosalind

13   if you were just standing still?

14   A.  I believe so, yes.

15   Q.  Okay.  And I'm going to go ahead and play the second clip

16   on V-21.

17             (Video played.)

18   Q.  (BY MS. WILKINSON)  And what are we looking at here?  And

19   I'll stop it right at two seconds into the image.

20   A.  Oh, yes, this is Rosalind Avenue.

21   Q.  So what street are you standing on as you look up Rosalind

22   Avenue?

23   A.  On Nurton.

24             MS. WILKINSON:  Okay.  You can keep playing it.

25             (Video played.)

1    Q.  (BY MS. WILKINSON)  And what street are we looking up?

2    A.  This is Nurton down towards Woodland, is the cross

3    street.

4    Q.  And this image you're walking?

5    A.  Yes, walking up Nurton with Rosalind on the left.

6    Q.  And what are you depicting now as you swing your camera to

7    the right?

8    A.  That is the leasing office where camera 1 is located.

9    Q.  And just showing the area and the proximity to Nurton

10   Avenue there?

11   A.  Yes.

12   Q.  Now, in addition to the video, I'm going to put up on the

13   screen Government's Exhibit A-6.  That's so glary, but do you

14   recognize the image depicted in Government's Exhibit A-6?

15   A.  Yes.

16   Q.  And what are we looking at straight ahead there?

17   A.  That is the victim's residence.

18   Q.  And would that be the house to the right, 2919 Rosalind

19   Avenue?

20   A.  Yes.

21   Q.  And the house to the left, 2917?

22   A.  Yes.

23   Q.  Now, showing you Government's Exhibit V-9, is this just a

24   Google map blowup of three of the areas the jury has heard

25   about in connection with this case, Agent Meunier, is that

1    what this is?

2    A.  Yes.

3    Q.  Okay.  And just for the record, the area that's indicated

4    on the top right-hand part of Government's Exhibit V-9?

5    A.  This is 8409 Arbor Station Way.

6    Q.  And then over on the top left-hand corner, go ahead and

7    for the record --

8    A.  Is 4 Harness Court.

9    Q.  And then down below?

10   A.  2919 Rosalind Avenue.

11   Q.  And does this show the major arteries that are in the area

12   of the three locations you just indicated?

13   A.  Yes.

14   Q.  And if we go down here over to right just below the 4

15   Harness Court, is that Park Heights Avenue on Route 29?

16   A.  Yes.

17   Q.  Now, before the break, we had a little technical

18   difficulty on the final jail call, I believe it's a

19   five-minute snip.  And this was an exhibit from the

20   prosecution of Matthew Hightower in 2016, Agent Meunier?

21   A.  Yes.

22   Q.  And do you have a copy of the transcript in front of you,

23   and I believe the jury does too?

24   A.  Yes.

25   Q.  And was this a recorded conversation between Davon Carter

1   and Matthew Hightower, June 10th, 2013 at 7:53 p.m.?

2   A.  Yes.

3           MS. WILKINSON:  I'm going to go ahead and ask

4   Ms. Lesser to go ahead and play it.

5           (Audio played.)

6   Q.  (BY MS. WILKINSON) Agent Meunier, do you see the reference

7   to Empire the movie there?

8   A.  Yes.

9   Q.  Did you look up the description of Empire movie on

10  Google?

11  A.  Yes.

12  Q.  And what is the one sentence blurb that it gives about the

13  movie?

14  A.  According to IMDb, which is a movie website, Empire is

15  about a successful South Bronx drug dealer who turns his back

16  on his roots and gives money to a Wall Street broker to invest

17  for him.

18  Q.  Showing you Government's Exhibit A-31, is this a -- is

19  this the physical exhibit of the shirt that was taken off of

20  Ms. Ashburne as she was being treated prior to her death on

21  May 27th?

22  A.  Yes.

23  Q.  And did I ask you to display it with the evidence

24  container from Baltimore Police Department so the jury could

25  see the logo on the top left-hand --

1    A.   Yes.

2    Q.   -- portion of it?

3         And what does it say?

4    A.   It says -- the logo is saying The Regeneration Project.

5              MS. WILKINSON:  One second, Your Honor, check one

6    more thing.

7    Q.  (BY MS. WILKINSON)  Agent Holiday, has reminded me that

8    the exhibit of the jail call that was introduced at trial,

9    just for the record, is Government's Exhibit R-26, do I have

10   that right, Agent?

11             MS. WILKINSON:  R-26B, sorry, Your Honor.

12             THE COURT:  Very well.

13             MS. WILKINSON:  Thank you, Agent Holiday.  For the

14   record, R-26B.

15             MS. WILKINSON:  Your Honor, this is all I have of

16   the witness.  I just need to introduce Government's

17   Exhibit P-1, which was Agent Wilde's Power Point that I

18   neglected to do before as well.

19             THE COURT:  Very well.  Cross.

20             MR. DAVIS:  Very briefly, Your Honor.

21                           CROSS-EXAMINATION

22   BY MR. DAVIS:

23   Q.   Agent, the jail call we were listening to, who was in jail

24   at the time, do you know?

25   A.   I'm not 100 percent certain.

1    Q.  And how long have you been in this case, do you recall the

2    first date you got involved in this case?

3    A.  The first date, I believe I helped out about a year ago

4    with a task.

5    Q.  Now, this is -- the date of that jail call we listened to

6    was June --

7    A.  It says June 10th, 2013.

8    Q.  2013, and do you know if Mr. Hightower was in jail then?

9    A.  I do not know.

10            MR. DAVIS:  I believe that the United States just

11   turned around and said they would stipulate to the fact that

12   Mr. Carter was incarcerated during that time period and

13   Mr. Hightower was out.

14            THE COURT:  Very well.

15   Q.  (BY MR. DAVIS)  Agent, I'm going to show you -- you

16   identified some bank records, did you pull these bank records,

17   or were they provided to you to review?

18   A.  They were provided to me.

19            THE COURT:  Ma'am, you no longer have to use the

20   handheld if you have the regular mike there, whatever's

21   easier.

22   Q.  (BY MR. DAVIS)  And we're talking about Government

23   Exhibit C-28, and I'm going to put that up on the screen, just

24   so you know where we are.

25       Okay.  We look at those bank records, and on 5/27,

Cross-examination - Meunier  (By Mr. Davis)

1   there's a cash deposit of $520; correct?

2   A.  Yes.

3   Q.  And I think that that -- there's a sheet in C-28 that --

4   well, references that, the cash deposit.

5       Bear with me for one moment.

6       Well, let's go back to that, so there was a cash deposit

7   on 5/27.  Now, we look down here, and Ms. Wilkinson asked you

8   if there was a cash deposit made on 6/2, and you indicated

9   yes.

10  A.  Yes, there's a deposit made in the branch.

11  Q.  But the question was, was there a cash deposit made on

12  6/2, and you answered yes, do you know from looking at this

13  document whether this is a cash deposit or a --

14  A.  No, you do not know.  I misspoke.

15  Q.  But we do know that money was spent, though; correct, as

16  we look at this statement?  We look at Enterprise Rent-A-Car,

17  some money was given to Enterprise Rent-A-Car on June 3rd;

18  some money was given to Mickey's Citgo on 6/6; somebody paid

19  for parking in Ocean City on 6/6.

20      But beyond that, that's what we know; correct?

21  A.  Yes.

22  Q.  There isn't anything beyond -- thank you, Agent.

23          THE COURT:  Questions from Mr. Mosley's counsel.

24          MR. TRAINOR:  We have no questions.

25          THE COURT:  Redirect.

1          MS. WILKINSON:  No questions, sir.

2          THE COURT:  All right.  Ma'am, thank you for you

3     testimony.  You're excused.  Please don't discuss your

4     testimony until the trial has been complete.  Enjoy the rest

5     of your day.

6          THE WITNESS:  Thank you.

7          MS. WILKINSON:  Can we approach, Your Honor?

8          THE COURT:  You may.

9          (Bench conference on the record.)

10         MS. WILKINSON:  Your Honor, subject to linking up

11    all of our exhibits, we would rest at this time.  I didn't

12    know if the Court wanted me to do it on the record now.

13         THE COURT:  Yes, I was going to ask you if you had

14    anymore witnesses, and you can announce that you rest at that

15    time.  What I'm going to do is, I'll send the jury out,

16    probably for 25 minutes.  We'll do MJOA, assuming I don't

17    grant it, we'll then ask the defendants whether or not they're

18    planning to testify on the record outside of the presence of

19    the jury.

20         I'll go back, just check the edits.  I just got a

21    clean draft of the jury instructions, I just need to check the

22    edits to make sure they're in, then we will come back.  My

23    thinking is we'll do your quick witness and then just go into

24    instructions and that's how we'll end the day.

25         MR. DAVIS:  How long do you think we'll be, because

1    I want to tell this witness how long he's going to be sitting

2    out there?  Do you estimate we'll be a half hour?

3              THE COURT:  At the most, it shouldn't be longer than

4    that.

5              MR. DAVIS:  Okay.  Because he's been sitting

6    there.

7              THE COURT:  It shouldn't be longer than a half hour.

8    I just need time to check the edits.

9              MS. WILKINSON:  Welcome to our world.

10             THE COURT:  Right, exactly.  They have one witness

11   they have to take care of.

12             MS. WILKINSON:  Your Honor, the only thing, I just

13   want to make sure, so we have -- Agent Holiday has been very

14   vigilant in keeping up with Ms. Smith, but she's not here

15   today, and she wanted to go through the exhibits one more

16   time.

17             THE COURT:  Subject to checking the exhibits.

18             MS. WILKINSON:  Subject to checking all the exhibits

19   and redactions and that sort of thing.  We just want to make

20   sure -- everything with counsel.

21             THE COURT:  Sure.  Okay.

22             MS. WILKINSON:  Thank you, Your Honor.

23             (The following proceedings were had in open court.)

24             THE COURT:  All right.  Ms. Wilkinson, does the

25   government have another witness?

1          MS. WILKINSON:  No, Your Honor, and at this time,

2     subject to checking our exhibits with Madame Clerk, we would

3     rest our case.

4          THE COURT:  All right.  Very well.  All right.

5     Ladies and gentlemen, I'm going to give you about a 25-minute

6     break, because there's some matters I need to discuss with

7     counsel, and then we will continue from there.  So I'm going

8     to ask that you be back in the jury room at 3:00 o'clock ready

9     to go forward from there.  Thank you so much.

10          (Jury left the courtroom.)

11          THE COURT:  All right.  You can be seated unless

12     addressing the Court.  I'll hear from Mr. Carter, if

13     Mr. Carter has a motion.

14          MR. DAVIS:  Your Honor, at this time, we'd make a --

15     first of all, we'd renew all the motions that we made pretrial

16     and during trial, based on the evidence that has been

17     presented here to date so far.

18          Secondly, we'd move for a judgment of acquittal,

19     based on sufficiency.  There's no identification here, there's

20     no forensic evidence --

21          THE COURT:  Slow down a little.

22          MR. DAVIS:  There's no identification here, there's

23     no forensic evidence, there's no confession, there's no direct

24     evidence that Mr. Carter's involved in this witness killing.

25     And we would submit, based on that record, that no reasonable

1    juror would conclude beyond a reasonable doubt that he is

2    guilty.

3           THE COURT:  I'll hear from Mr. Mosley.

4           MR. TRAINOR:  Thank you, Your Honor.  We would move

5    for judgment of acquittal under Rule 29, as to the con- --

6    we'll adopt the argument made by Mr. Carter's counsel, and

7    note on the two conspiracy counts, that the evidence is

8    insufficient to establish the existence of an agreement, and

9    that Mr. Mosley was a member of the charged conspiracy.

10          And on the two substantive counts, that there is

11   insufficient evidence to show that he participated in a

12   retaliation or tampering scheme, or knowingly and willfully

13   aided and abetted such a scheme.  We'll submit on Count 10.

14          THE COURT:  All right.  Very well.  I'll hear from

15   the government.

16          MS. WILKINSON:  Yes, Your Honor.  In a light most

17   favorable to the government, the government would indicate to

18   the Court that the evidence in this case -- there is direct

19   evidence and there is forensic evidence.  It's in the form of

20   a video camera that captured Mr. Carter's car arriving minutes

21   after the shooter shot Ms. Ashburne directly, resulting in her

22   death.

23          From that piece of direct forensic evidence, the

24   government's investigation flowed.  And the evidence that's

25   before this jury right now is that there were only two men in

contact with one another the morning of May 27th, 2016.

Mr. Carter on the 7626 number, a phone he had just gotten two days earlier and for which he locked in Mr. Mosley, and Mr. Mosley on the 1533 number, a number that he tries to deny in the course of his statement to law enforcement six months later, but subsequently admits that it is his.

On that morning, and in the evening -- and even into the night before, Your Honor, the contact between Mr. Carter and Mosley is direct evidence of their communications with one another.  If the -- and if the jury believes Ms. Melvin, which for purposes of MJOA, this court must accept, Mr. Mosley was looking up Maryland Judiciary Case Search, and Ms. Edmonds testified that she had court that morning and lived literally two feet from the door of Ms. Ashburne at that time.

The morning comes and both men chillingly leave their apartment around the same time, cell site capturing Mr. Carter last at about 6:15 in the morning.  And then of course, Mr. Mosley's expanding into 7:20 at the time of the homicide.  The government's theory is that upon arriving, Mr. Mosley, then in the silver Audi, was casing Ms. Ashburne's -- Ms. Edmonds's house, driving by Rosalind, a street which he had no other business to be into, a quiet residential street that is, although close to Wiley, certainly not near Wiley, and by all indications, had nothing to do with drug trafficking, comes down that road and then goes off

camera for about 20 minutes.

In that 20 minutes, the government contends is when Mr. Carter arrived and that they at some point park the Audi, get into the Pontiac, and Mr. Carter arrives to that cut where he tragically mistakes Ms. Ashburne coming out from her house that morning, the evidence so clear about how that mistake could have happened in this case.  And indeed, from the advantage point of the shooter, walks up and shoots her, there's no robbery, there's no carjacking, there's no confrontation between him and Ms. Ashburne, and in a minute she is dead -- or shot.  And he goes back up the cut, only to miss by eight seconds the person, who we now contend is Mr. Mosley, arriving to pick him up on Virginia Avenue.

What happens after that is also direct evidence, because the two of them now want Mr. Carter, most likely, in the Audi that he would take to Myrtle Beach, while Mr. Mosley in the Pontiac spends that time going down exactly that same route, looking for each other down that Nurton Avenue.  And the Court will recall, first we see the Pontiac going by there, no apparent reason to be back there, waits for the emergency equipment, and heads off, and then we see the Audi eventually arriving, and we would contend, also showing a search for, perhaps each other, as they are afraid to use the phones at this point.

Subsequently, there is a phone contact between the

1    two of them.  And Mr. Carter heads back to 8409 where he picks

2    up his 2399 phone, evidence -- the government contends that

3    there's evidence that both men were aware of Mr. Hightower's

4    predicament was caused by a cell site ping as a result of

5    their own -- his own girlfriend calling him at an inopportune

6    time, as he shot Mr. Wutoh.

7            Here, Mr. Carter so clearly picks up his 2399 phone,

8    where eventually, about an hour and a half later, he heads for

9    Myrtle Beach, clearly leaving the inference, when he is

10   interviewed on June 1st, that he had left for Myrtle Beach

11   almost immediately upon dropping the car off.  And the

12   evidence is powerful and direct and forensic that he was not.

13           In the meantime, we see that Mr. Mosley heads back

14   to Wiley Avenue.  The evidence that flows from that --

15   circumstances, Your Honor, and I think the Court will recall,

16   one of the enhanced images that got put up on the screen where

17   the silence in the courtroom was palpable, as it so clearly

18   looks very similar to Mr. Carter as he's wearing that brimmed

19   Oriole hat in his phone that we capture a few months later, or

20   a few months before.

21           So the image not only looks like him, but it

22   connects to the fact that it was his car and his motive, or

23   his best friend's motive at the time of the murder.  The

24   government moved on from that after the first week of trial

25   and the second week of trial, showing Mr. Hightower's

1    obsession with Ms. Edmonds, the numerous communications that

2    we heard about his concern, and his statements that he

3    certainly was of the view that she was -- or at least told

4    people that she was lying, maybe that provides even a stronger

5    motive for her murder, and the fact that he did not want her

6    to be able to testify against him.

7            THE COURT:  Two quick things.  One, slow down just a

8    little.

9            MS. WILKINSON:  I'm sorry.

10           THE COURT:  And two, you don't have to preview your

11   entire closing.

12           MS. WILKINSON:  Okay.  With that, Your Honor, I

13   think I've probably said enough, and the government contends

14   that, in the light most favorable, there's clearly enough

15   evidence of a conspiratorial agreement with the phone contacts

16   and the circumstantial evidence, and that Mr. Carter was the

17   shooter.  Mr. Mosley assisted him, being the person who

18   provided the getaway car and the car that Mr. Carter would use

19   to go to Myrtle Beach.

20           I won't address the drugs because the defendants

21   didn't -- they both conceded to their involvement in the

22   drugs.  And with that, I'll submit.

23           THE COURT:  All right.  Since it was your motion,

24   I'll give you the opportunity, if you want a very brief

25   rebuttal.

1          MR. DAVIS:  Just on the conspiracy charge, I

2     neglected to mention that I don't think there was any evidence

3     of Mr. Carter being in a conspiracy -- well, I take that back,

4     I think Shells, the New York man, did say that Carter said

5     that he was taking over, so I guess there is evidence on that.

6          THE COURT:  Okay.

7          MR. TRAINOR:  We'll submit at this point, Your

8     Honor.

9          THE COURT:  All right.  This is before me at this

10    point for a Rule 29, motion for a judgment of acquittal.  It

11    says, after the government closes its evidence, the Court, on

12    defendant's motion, must enter a judgment of acquittal of any

13    offense for which the evidence is insufficient to sustain a

14    conviction.

15          The arguments that have been put forward, both by

16    counsel for Mr. Carter and counsel for Mr. Mosley, all go to

17    the weight of the evidence.  This is certainly a case, as

18    indicated by Ms. Wilkinson's -- I referred to it as a closing

19    argument preview, you know, where there's some dots that have

20    to be connected.  But you know, ultimately, I think at this

21    stage, when the Court considers all the evidence that it has

22    heard over the last three weeks plus, if all the evidence is

23    accepted, which at this stage, I have to, I do find that there

24    is enough evidence to sustain a conviction.

25          I want to be clear, that's not a indication -- and I

```
 1    say this in every case, it's not an indication how the Court
 2    would vote.  I have no opinion on that.  The ultimate
 3    determination is for the jury to make, but I do find that
 4    there is sufficient evidence to sustain a conviction, if all
 5    the evidence is viewed in a light favorable to the government.
 6    So the motions will be denied.
 7            Also for the record, since it was mentioned by
 8    Mr. Davis, any pretrial motions that I denied remain denied,
 9    any that I granted remain granted.  I haven't heard any
10    evidence that causes me to wish to reconsider any of those
11    motions.
12            So I'm going to go back now, and I just need to
13    quickly check to make sure all the edits got in properly.  And
14    so I'll -- I plan to be back out at 3:00.  We'll have your
15    witness, which you say is five minutes.
16            MR. DAVIS:  I'll just bring him into the
17    courtroom.
18            THE COURT:  That's fine.  And it seems like you're
19    stressed out by having to arrange this one witness.
20            MR. DAVIS:  I mean, I -- this is why I'm a defense
21    attorney, Your Honor.
22            THE COURT:  I mean, goodness, that's fine, you can
23    do that.
24            MR. TRAINOR:  He does it without any help.
25            THE COURT:  Fair enough.  He doesn't have --
```

1          MR. DAVIS:  There are 40 people working --

2          THE COURT:  He doesn't have agents or paralegals

3     over there, I understand that.

4          All right.  So I'm going to do that, and then when

5     we come out, we'll have your witness, and I'll do

6     instructions.

7          All right.  See you in a little bit.

8          (A recess was taken.)

9          THE COURT:  One thing I meant to do before we bring

10    the jury back in, so I'll do it right now, is advise the

11    defendants of their right to testify.  I usually wait until

12    all the evidence, or at least the defense is ready to rest,

13    but I presume that both are ready to make their decisions

14    now.

15         MR. TRAINOR:  They are.

16         THE COURT:  All right.  So Mr. Carter and

17    Mr. Mosley, I'm going to instruct you both, so I do need your

18    attention.  First, I want to make sure you each realize that

19    you have an absolute right to testify in your defense, that it

20    is your decision and your decision alone whether or not you

21    want to take the witness stand.

22         I want to make sure you understand that if you

23    choose to testify, your lawyers will get to ask you questions,

24    you'll have to answer those questions, and then after, that

25    the government counsel would be permitted to cross-examine you

1     and ask you questions as well.

2          You should understand that if you were to take the

3     stand, that if you have certain convictions, they might be

4     able to ask you about those convictions.

5          Do you understand your right to testify, Mr. Carter?

6          DEFENDANT CARTER:  Yes.

7          THE COURT:  Mr. Mosley, do you understand your right

8     to testify?

9          DEFENDANT MOSLEY:  Yes.

10          THE COURT:  All right.  You don't have to stand, you

11     can remain seated as long as you speak into a microphone.

12          You also have an absolutely right to not testify,

13     both of you do.  No one can force you to testify.  If you

14     decide that you're not going to testify, I will, in fact,

15     instruct the jury, as I already have, that they cannot hold

16     that against you.

17          Do you understand, Mr. Carter, your right not to

18     testify?

19          DEFENDANT CARTER:  Yes.

20          THE COURT:  Do you understand your right not to

21     testify, Mr. Mosley?

22          DEFENDANT MOSLEY:  Yes.

23          THE COURT:  All right.  Mr. Carter, have you

24     discussed with your counsel your decision as to whether or not

25     you wish to testify in this case?

1          DEFENDANT CARTER:  Yes.

2          THE COURT:  And have you made a decision?

3          DEFENDANT CARTER:  Yes.

4          THE COURT:  Are you going to testify?

5          DEFENDANT CARTER:  No.

6          THE COURT:  All right.  Mr. Mosley, have you

7    discussed with your counsel whether or not you're going to

8    take the stand in this case?

9          DEFENDANT MOSLEY:  Yes.

10          THE COURT:  All right.  Have you made a decision?

11          DEFENDANT MOSLEY:  Yes.

12          THE COURT:  Are you going to testify?

13          DEFENDANT MOSLEY:  No.

14          THE COURT:  All right.  Very well.

15          All right.  Anything else before we get the jury

16    back?

17          MS. WILKINSON:  No, sir.

18          MR. DAVIS:  No, sir.

19          THE COURT:  All right.  We'll hear your witness, and

20    then I'll go right into instructions.  Unless, of course, it

21    inspires a rebuttal case from the government.

22          MS. WILKINSON:  No, sir, I don't think it will.

23          (Jury entered the courtroom.)

24          THE COURT:  All right.  Good afternoon, everyone,

25    you may be seated.  Ladies and gentlemen, as you heard, the

1    government rested its case.  I'll ask Mr. Carter, or

2    Mr. Carter's counsel, to be more precise, whether Mr. Carter

3    wishes to call a witness.

4             MR. DAVIS:  Yes, Your Honor.  At this time, we'd

5    call Charles Broussard to the stand.

6             THE COURT:  Very well.

7             THE CLERK:  Sir, if you would come forward.  Sir,

8    please face me and raise your right hand to be placed under

9    oath.

10                      CHARLES BROUSSARD,

11   called as a witness, being first duly sworn, was examined and

12   testified as follows:

13            THE WITNESS:  I do.

14            THE CLERK:  Thank you, sir, you may have -- sit into

15   the witness box.  And sir, if you would please speak directly

16   into the microphone, state your first and last name -- I'm

17   sorry, go ahead, and you can spell your first and last name.

18            THE WITNESS:  Charles Broussard, that's

19   C-h-a-r-l-e-s, B-r-o-u-s-s-a-r-d.

20            THE CLERK:  Thank you, sir.

21                      DIRECT EXAMINATION

22   BY MR. DAVIS:

23   Q.  Good afternoon, Mr. Broussard.  Mr. Broussard, are you

24   employed?

25   A.  Yes, sir.

Direct Examination - Broussard  (By Mr. Davis)

1    Q.  And where is it that are employed?

2    A.  Advanced Autoparts, store 5106.

3    Q.  How long have you been employed at Advance Autoparts store

4    5106?

5    A.  About ten years.

6    Q.  Where is store 1056?

7    A.  5106.

8    Q.  5106.

9    A.  2401 Frederick Avenue.

10   Q.  Let me show you what's been marked Defendant's

11   Exhibit No. 5, can you take a minute to look at that.

12   A.  Yes, sir.

13   Q.  What is that?

14   A.  That is a customer transaction history report.

15   Q.  And who is the customer?

16   A.  The name is Davon Carter.

17   Q.  And is that reflected on that transaction report?

18   A.  Yes, sir.

19   Q.  And what date was this customer transaction report

20   generated?

21   A.  May 2nd, 2018.

22   Q.  And is that in the upper right-hand corner of Defendant's

23   Exhibit No. 5?

24   A.  Yes, sir.

25   Q.  And what date was the purchase made by Mr. Carter on --

1    what date was that made, the purchase?

2    A.  May 25th, 2016.

3    Q.  And directing your attention to the SKU number on the

4    left-hand portion of that exhibit, what is that?

5    A.  Are you asking for the number, or are you asking for the

6    definition?

7    Q.  The definition for the SKU.

8    A.  That would be the part identification number.

9    Q.  And looking to the right of the SKU number, what is it

10   that was purchased?

11   A.  A set of brake pads.

12   Q.  Now, directing your attention to page 2 of Defendant's

13   Exhibit No. 5, do you recognize that?

14   A.  Yes, sir.

15   Q.  And what is that?

16   A.  That's a buyer's guide for a set of brake pads matching

17   that SKU number.

18   Q.  Explain to us what a buyer's guide is, from your

19   standpoint.

20   A.  The buyer's guide tells us what vehicle they fit.

21   Q.  And is that electronic?

22   A.  Yes, sir.

23   Q.  And how do you utilize the buyer's guide in an SKU

24   number?

25   A.  I don't understand the question.

Direct Examination - Broussard   (By Mr. Davis)

1   Q.  Well, how do you identify the part using the buyer's

2   guide?

3   A.  We can either enter the SKU number or the part number.

4   Q.  And when you entered the SKU number for that part, were

5   you able to determine whether the brake pads were for the

6   front of the vehicle, or the back of the vehicle?

7   A.  We did determine they were for the front.

8   Q.  And is that reflected on the second page of Defendant's

9   Exhibit No. 5?

10  A.  Yes, sir.

11  Q.  Now, there's a reference to selected vehicle, 2008 Pontiac

12  Grand Prix, could you explain how that got there?

13  A.   When Mr. Molling --

14  Q.  Yes, Mr. Miller.

15  A.  Yes, when Mr. Miller came in, he asked me about an '08

16  Pontiac, which was the wrong vehicle.  But when we entered the

17  SKU number in, we could see what vehicle they do fit.

18  Q.  And what vehicle do those brake pads fit?

19  A.  They can either fit an Oldsmobile Alero from' 99 to '04,

20  or a Pontiac Grand Am from '99 to '05.

21  Q.  And you're able to determine that from the buyer's guide

22  after entering the SKU number; correct?

23  A.  Yes, sir.

24       MR. DAVIS:  I have no further questions.  Thank

25  you.

1       THE COURT:  Any questions from Mr. Mosley's counsel?

2       MR. TRAINOR:  No.

3       THE COURT:  Cross.

4                    CROSS-EXAMINATION

5   BY MS. WILKINSON:

6   Q.  Good afternoon, Mr. Broussard.  The document that

7   Mr. Davis just put on the screen, Defense Exhibit No. 5, I'm

8   going to show you -- well, first of all, the SKU number for

9   the record ends in 20043; correct?

10  A.  Yes, ma'am.

11  Q.  I'm going to show you Government's Exhibit R-19, and does

12  this appear to be a -- let's get it not blurry -- does this

13  appear to be a business certification from Advanced Autoparts

14  from a woman named Amanda Akers dated 2/2/18?

15  A.  I don't know who that would be.

16  Q.  It's just a business -- I'm just asking you to read it for

17  the record, does it say executed on 2/2/18?

18  A.  Yes, ma'am.

19  Q.  Is it fair to say that Advanced Autoparts, your store is

20  one of a number of stores?

21  A.  Yes, ma'am.

22  Q.  So it's like a chain store, so to speak?

23  A.  I guess you could say that.

24  Q.  So there's more than one Advanced Auto?

25  A.  Yes, ma'am.

1   Q.   So there is some headquarters somewhere of some Advanced

2   Auto?

3   A.   Yes, ma'am.

4   Q.   And I'm going to put up the second screen here of the

5   document provided to the government by Advanced Auto, and does

6   it just appear to be -- we'll look at the information,

7   5520043, is that the same SKU number that was on the receipt

8   that Mr. Davis showed you?

9   A.   Yes, ma'am.

10  Q.   And brake pad, gold ceramic, is that the same description

11  that's under the SKU description here?

12  A.   Yes, ma'am.

13  Q.   And over here, does it have the accurate date of 5/25/16,

14  as indicated in the document that Mr. Davis just showed you?

15  A.   Yes, ma'am, it does.

16  Q.   And the other two purchases made that day on Defense 5 was

17  the brake lubricant, and I guess a bottle of Mountain Blast

18  20?

19  A.   Yes, ma'am.

20  Q.   And is that the same record that has been provided to the

21  government as well, showing the two other purchases;

22  correct?

23  A.   Yes, ma'am.

24  Q.   Now, is it fair to say that based on both the government's

25  record of the receipt and the defense record of the receipt,

1  that Mr. Carter purchased brake pads, gold ceramic, on

2  5/25/16, that's what the receipt shows?

3  A.  Yes, ma'am.

4  Q.  And some brake lubricant?

5  A.  Yes, ma'am.

6  Q.  And some Mountain Blast drink?

7  A.  Yes, ma'am.

8  Q.  Does it say anywhere on Defense Exhibit 5 that those

9  brakes were installed?

10  A.  No, ma'am.

11  Q.  Does it say anywhere on Defense Exhibit 5 or Government's

12  Exhibit R-19 that service was provided to a particular Grand

13  Am?

14  A.  No, ma'am.

15  Q.  Is there anywhere on the record that shows if, in fact, a

16  person at Advanced Auto installed those items on Mr. Carter's

17  car?

18  A.  We would not.

19  Q.  So the only thing that you're here to show us is that the

20  brakes were purchased on 5/25/16?

21  A.  Yes, ma'am.

22  Q.  Okay.

23          MS. WILKINSON:  Nothing further, Your Honor.

24          THE COURT:  All right.  Redirect.

25          MR. DAVIS:  No, Your Honor.

1          THE COURT:  Sir, thank you for your testimony.

2     Please don't discuss your testimony with anyone until the

3     trial's been completed.  Enjoy the rest of your day.  And you

4     are excused.

5          THE WITNESS:  Thank you.

6          THE COURT:  Does Mr. Carter wish to call another

7     witness?

8          MR. DAVIS:  No, Your Honor, that would be it.

9          THE COURT:  Does Mr. Mosley wish to call any

10    witnesses?

11         MR. TRAINOR:  No, Your Honor.

12         THE COURT:  All right.  Very well.  Does the

13    government wish to put on a rebuttal case?

14         MS. WILKINSON:  No, sir.

15         THE COURT:  Very well.  All right.  So ladies and

16    gentlemen, that then concludes the evidence in this case.

17         MR. DAVIS:  Your Honor, may we approach for one

18    second?

19         THE COURT:  Maybe it doesn't.  Sure.

20         (Bench conference on the record.)

21         MR. DAVIS:  Being married to an appellate lawyer, I

22    want to renew my motion for judgment of acquittal.

23         THE COURT:  Sure.

24         MR. DAVIS:  Otherwise, I will not be able to go home

25    at the end of the week.

1          THE COURT:  That's fair.  Are you submitting on your

2  prior arguments?

3          MR. DAVIS:  I am.

4          THE COURT:  I assume Mr. Mosley is doing the same.

5          MR. TRAINOR:  Yes, Your Honor.

6          THE COURT:  And the government will -- for the

7  reasons previously stated, I will deny the motion.

8          MS. WILKINSON:  Thank you.

9          MR. DAVIS:  Thank you.

10          (The following proceedings were had in open court.)

11          THE COURT:  All right.  So that was -- that does

12  conclude the evidence in this case.  Ladies and gentlemen, now

13  what remains is for me to provide you my instructions on the

14  law in this case, and then tomorrow morning we'll start fresh

15  with the government.  I am going to go slowly.  I am mindful

16  of the time.  I'm hoping I get through it by or around 5:00.

17  I might go a little past 5:00 to try to get it done, but if it

18  gets late, I'll just finish in the morning.

19          The one thing I always try to remember to tell

20  juries when I start is that you will get copies of these

21  instructions when it's time to deliberate.  So if it helps you

22  to take notes while I'm talking, by all means, and you should

23  obviously pay attention, but if it helps you take notes, feel

24  free, but you shouldn't feel like you have to take dictation,

25  because you will actually get copies of these instructions

1    when you begin your deliberations.

2            So ladies and gentlemen, you are about to enter into

3    your final duty, which is to decide the fact issues in this

4    case.  Before you do that, I will instruct you on the law.

5    You must pay close attention to me.  I will go as slowly as I

6    can and be as clear as possible.

7            I told you at the very start of the trial that your

8    principal function during the taking of testimony would be to

9    listen carefully and observe each witness who testified.  It

10   has been obvious to me and to counsel that you have faithfully

11   discharged this duty.  Your interest never waned, and it is

12   evident that you followed the testimony with close attention.

13           Please give me that same careful attention now as I

14   give you my instructions on the law.

15           You have now heard all of the evidence in the case

16   and you will soon hear the final arguments of the lawyers for

17   the parties.

18           My duty at this point is to instruct you as to the

19   law.  It is your duty to accept these instructions of law and

20   apply them to the facts as you determine them, just as it has

21   been my duty to preside over the trial and decide what

22   testimony and evidence is relevant under the law for your

23   consideration.

24           On these legal matters, you must take the law as I

25   give it to you.  If any attorney has stated or will state a

1   legal principle different from any that I state to you in my

2   instructions, it is my instructions that you should follow.

3          You should not single out any instruction as alone

4   stating the law, but you should consider my instructions as a

5   whole when you retire to deliberate in the jury room.

6          You should not be concerned about the wisdom of any

7   rule that I state.  Regardless of any opinion that you may

8   have as to what the law may be -- or ought to be -- it would

9   violate your sworn duty to base a verdict upon any other view

10  of the law than that which I give to you.

11         Your final role is to pass upon and decide the fact

12  issues that are in the case.  You, the members of the jury,

13  are the sole and exclusive judges of the facts.  You pass upon

14  the weight of the evidence; you determine the credibility of

15  the witnesses; you resolve such conflicts as there may be in

16  the testimony, and you draw whatever reasonable inferences you

17  decide to draw from the facts as you have determined them.

18         I shall later discuss with you how to pass upon the

19  credibility, or believability, of the witnesses.

20         In determining the facts, you must rely upon your

21  own recollection of the evidence.  What the lawyers have said

22  in their opening statements, what they'll say in their closing

23  arguments, in their objections, or in their questions is not

24  evidence.  In this connection, you should bear in mind that a

25  question put to a witness is never evidence.  It is only the

1    answer which is evidence.  Nor is anything I may have said

2    during the trial or may say during these instructions with

3    respect to a fact matter to be taken in substitution for your

4    own independent recollection.  What I say is not evidence.

5              The evidence before you consists of the answers

6    given by witnesses, the testimony they gave as you recall it,

7    and the exhibits that were received in evidence.

8              The evidence does not include questions.  Only the

9    answers are evidence.  But you may not consider any answer

10   that I directed you to disregard or that I directed struck

11   from the record.  Do not consider such answers.

12             You may also consider the stipulations of the

13   parties as evidence.

14             Since you are the sole and exclusive judges of the

15   facts, I do not mean to indicate any opinion as to the facts

16   or what your verdict should be.  The rulings I have made

17   during the trial are not any indication of my views of what

18   your decision should be as to whether or not the guilt of each

19   defendant has been proven beyond a reasonable doubt.

20             I ask you to draw no inference from the fact that

21   upon occasion I may have asked questions of certain witnesses.

22   These questions were only intended for clarification or to

23   expedite matters and certainly were not intended to suggest

24   any opinions on my part as to the verdict you should render or

25   whether any of the witnesses may have been more credible than

Court's Instructions to the Jury

1   any other witness.  You are expressly to understand that I

2   have no opinion as to the verdict you should render in this

3   case.

4          As to the facts, ladies and gentlemen, you are the

5   exclusive judges.  You are to perform the duty of finding the

6   facts without bias or prejudice as to any party.

7          In determining the facts, the jury is reminded that

8   before each member was accepted and sworn to act as a juror,

9   he or she was asked questions concerning competency,

10  qualifications, fairness, and freedom from prejudice and bias.

11  On the faith of those answers, the jury was accepted by the

12  parties.  Therefore, those answers are as binding on each of

13  the jurors now as they were then, and should remain so, until

14  the jury is discharged from consideration of this case.

15         You are to perform the duty of finding the facts

16  without bias or prejudice as to any party.  You are to perform

17  your final duty in an attitude of complete fairness and

18  impartiality.

19         This case is important to the government, for the

20  enforcement of criminal laws is a matter of prime concern to

21  the community.  Equally, it is important to the defendants,

22  who are charged with serious crimes.

23         The fact that the prosecution is brought in the name

24  of the United States of America entitles the government to no

25  greater consideration than that accorded to any other party to

1    a litigation.  By the same token, it is entitled to no less

2    consideration.  All parties, whether government or

3    individuals, stand as equals at the bar of justice.

4          It is the duty of the attorney for each side of a

5    case to object when the other side offers testimony or other

6    evidence which the attorney believes is not properly

7    admissible.  Counsel also have the right and duty to ask me to

8    make rulings of law and to request conferences at the sidebar

9    out of the hearing of the jury.  All those questions of law

10   must be decided by me.  You should not show any prejudice

11   against an attorney or his client because the attorney

12   objected to the admissibility of evidence, or asked for a

13   conference out of the hearing of the jury, or asked me for a

14   ruling on the law.

15         As I have already indicated, my rulings on the

16   admissibility of evidence do not indicate any opinion about

17   the weight or effect of such evidence.  You are the sole

18   judges of the credibility of all witnesses and the weight and

19   effect of all evidence.

20         Your verdict must be based solely upon the evidence

21   developed at trial or the lack of evidence.

22         It would be improper for you to consider, in

23   reaching your decision as to whether the government sustained

24   its burden of proof, any personal feelings you may have about

25   the defendants' race, religion, national origin, sex, or age.

1    All persons are entitled to the presumption of innocence and

2    the government has the burden of proof, as I will discuss.

3            It would be equally improper for you to allow any

4    feelings you might have about the nature of the crime charged

5    to interfere with your decision-making process.

6            To repeat, your verdict must be based exclusively

7    upon the evidence, or the lack of evidence in the case.

8            Under your oath as jurors, you are not to be swayed

9    by sympathy.  You are to be guided solely by the evidence in

10   the case, and the crucial, hard-core question that you must

11   ask yourselves as you sift through the evidence is:  Has the

12   government proven the guilt of each defendant beyond a

13   reasonable doubt?

14           It is for you alone to decide whether the government

15   has proven that each defendant is guilty of the crimes charged

16   solely on the basis of the evidence and subject to the law as

17   I charge you.  It must be clear to you that once you let fear

18   or prejudice, or bias or sympathy, interfere with your

19   thinking, there is a risk that you will not arrive at a true

20   and just verdict.

21           If you have a reasonable doubt as to a defendant's

22   guilt, you should not hesitate for any reason to find a

23   verdict of acquittal.  But on the other hand, if you should

24   find the government has met its burden of proving a

25   defendant's guilt beyond a reasonable doubt, you should not

1    hesitate because of sympathy or any other reason to render a

2    verdict of guilty.

3           You are about to be asked to decide whether or not

4    the government has proven beyond a reasonable doubt the guilt

5    of these two defendants.  You are not being asked whether any

6    other person has been proven guilty.  Your verdict should be

7    based solely upon the evidence or lack of evidence as to these

8    defendants, in accordance with my instructions and without

9    regard to whether the guilt of other people has or has not

10   been proven.

11          You must not draw any inference, favorable or

12   unfavorable, towards the government or the defendants on trial

13   from the fact that certain persons were not named as

14   defendants in the indictment or that certain persons were

15   named as co-conspirators but not indicted.  The circumstances

16   that these persons were not indicted must play no part in your

17   deliberations.

18          Whether a person should be named as a co-conspirator

19   or indicted as a defendant is a matter within the sole

20   discretion of the United States Attorney and the grand jury.

21   Therefore, you may not consider it in any way in reaching your

22   verdict as to the defendants who are on trial.

23          The defendants are not charged with committing any

24   crime other than the offenses contained in the indictment.

25          There has been evidence received during the trial

1    that a defendant has been incarcerated at certain times.  The

2    fact that at times a defendant may have been incarcerated may

3    not be considered by you as evidence of guilt in this case.

4    That evidence was offered to provide context and background

5    for events discussed in trial.  Specifically, you may not

6    consider it as evidence that a defendant is of bad character

7    or has a propensity to commit crime or to conclude that

8    because a defendant was previously incarcerated he must have

9    also committed the acts charged in the indictment.

10         Although the defendants have been indicted, you must

11   remember that an indictment is only an accusation.  It is not

12   evidence.  The defendants have pled not guilty to that

13   indictment.

14         As a result of the defendants' pleas of not guilty,

15   the burden is on the prosecution to prove guilt beyond a

16   reasonable doubt.  This burden never shifts to a defendant for

17   the simple reason that the law never imposes upon a defendant

18   in a criminal case the burden or duty of calling any witness

19   or producing any evidence.

20         The law presumes each defendant to be innocent of

21   all the charges against him.  I therefore instruct you that

22   each defendant is to be presumed by you to be innocent

23   throughout your deliberations, until such time, if ever, you

24   as a jury are satisfied that the government has proven him

25   guilty beyond a reasonable doubt.

1      The defendants began the trial here with a clean

2  slate.  This presumption of innocence alone is sufficient to

3  acquit a defendant unless you as jurors are unanimously

4  convinced beyond a reasonable doubt of his guilt, after a

5  careful and impartial consideration of all of the evidence in

6  this case.  If the government fails to sustain its burden, you

7  must find a defendant not guilty.

8      This presumption was with each defendant when the

9  trial began and remains with them even now as I speak to you

10  and will continue with the defendants into your deliberations

11  unless and until you are convinced that the government has

12  proven his guilt beyond a reasonable doubt.

13      During the trial you have heard testimony of

14  witnesses and argument by counsel that the government did not

15  utilize specific investigative techniques.  You may consider

16  these facts in deciding whether the government has met its

17  burden of proof, because as I told you, you should look to all

18  of the evidence or lack of evidence in deciding whether a

19  defendant is guilty.  However, you are also instructed that

20  there is no legal requirement that the government use any

21  specific investigative techniques to prove its case.  Law

22  enforcement techniques are not your concern.

23      Your concern, as I have said, is to determine

24  whether or not, on the evidence or lack of evidence, each

25  defendant's guilt has been proved beyond a reasonable doubt.

1          The fact that one party called more witnesses and

2     introduced more evidence than the other does not mean that you

3     should necessarily find the facts in favor of the side

4     offering the most witnesses.  By the same token, you do not

5     have to accept the testimony of any witness who has not been

6     contradicted or impeached, if you find the witness not to be

7     credible.  You also have to decide which witnesses to believe

8     and which facts are true.  To do this, you must look at all

9     the evidence, drawing upon your own common sense and personal

10    experience.  After examining all the evidence, you may decide

11    that the party calling the most witnesses has not persuaded

12    you because you do not believe its witnesses, or because you

13    believe the fewer witnesses called by the other side.

14         In a moment, I will discuss the criteria for

15    evaluating credibility; for the moment, however, you should

16    keep in mind that the burden of proof is always on the

17    government and the defendants are not required to call any

18    witnesses or offer any evidence, since they are presumed to be

19    innocent.

20         In deciding whether or not the government has met

21    its burden of proof, you may consider both direct evidence and

22    circumstantial evidence.

23         Direct evidence is evidence that proves a disputed

24    fact directly.  For example, when a witness testifies to what

25    he or she saw, heard, or observed, that is called direct

evidence.

Circumstantial evidence is evidence that tends to prove a disputed fact by proof of other facts. To give a simple example, suppose that when you came into the courthouse today, the sun was shining and it was a nice day, but the courtroom does not have windows, and so you cannot look outside. Then later, as you were sitting here, someone walked in with a dripping wet umbrella, and soon after, somebody else walked in with a dripping wet raincoat. Now, on our assumed facts, you cannot look outside the courtroom and you cannot see whether or not it is raining. So you have no direct evidence of that fact. But on the combination of the facts about the umbrellas and the raincoat, it would be reasonable for you to infer that it had begun to rain.

That is all there is to circumstantial evidence. Using your reason and experience, you infer from established facts the existence or nonexistence of some other fact. Please note, however, that it is not a matter of speculation or guess; it is a matter of logical inference.

The law makes no distinction between direct and circumstantial evidence. Circumstantial evidence is of no less value than direct evidence, and you may consider either or both, and may give them such weight, as you conclude, is warranted.

Let me emphasize again that a lawyer's questions are

1    not evidence.  At times, a lawyer on cross-examination may

2    have incorporated into a question a statement which assumed

3    certain facts to be true and asked the witness if the

4    statement was true.  If the witness denies the truth of a

5    statement and there is no evidence in the record providing

6    that the assumed fact is true, then you may not consider the

7    fact to be true simply because it was contained in the

8    lawyer's question.

9           The famous example of this is the lawyer's question

10   of a witness; when did you stop cheating on your taxes?  You

11   would not be permitted to consider as true the assumed fact

12   that he had ever cheated on his taxes, unless the witness

13   himself indicated he had, or unless there is some other

14   evidence in the record that he had cheated on his taxes.

15          In short, questions are not evidence; answers are.

16          The evidence in this case consists of the sworn

17   testimony of the witnesses, the exhibits received in evidence,

18   and stipulations.  Exhibits which have been marked for

19   identification but not received into evidence may not be

20   considered by you as evidence.  Only those exhibits received

21   into evidence may be considered as evidence.

22          Similarly, you are to disregard any testimony which

23   I have ordered to be stricken.  As I indicated before, only

24   the witnesses answers are evidence, and you are not to

25   consider a question as evidence.  Similarly, statements by

1   counsel are not evidence.

2          A stipulation is an agreement among the parties that

3   a certain fact is true.  You should regard such agreed facts

4   as true.

5          You should consider the evidence in light of your

6   common sense and experience, and you may draw reasonable

7   inferences from the evidence.

8          Anything you may have seen or heard about this case

9   outside the courtroom is not evidence and must be entirely

10   disregarded.

11          The government has offered evidence in the form of

12   tape recordings of conversations with defendants and/or

13   alleged co-conspirators.  Some recordings were made while the

14   parties to the call were incarcerated, where the phone system

15   notifies conversation participants that the calls are being

16   recorded.  The use of this procedure to gather evidence is

17   perfectly lawful, and the government is entitled to use the

18   tape recordings in this case.

19          The government has been permitted to hand out a

20   typed document, which it prepared containing the government's

21   interpretation of what appears on certain tape and audio

22   recordings, which have been received as evidence.  Those were

23   given to you as an aid or a guide to assist you in listening

24   to the tapes.  However, they are not in and of themselves

25   evidence.  Therefore, when the tapes were played, I advised

1    you to listen carefully to the tapes themselves.  You alone

2    should make your own interpretation of what appears on the

3    tapes based on what you heard.  If you think you heard

4    something differently than appeared on the transcript, then

5    what you heard is controlling.

6            Let me say again that you, the jury, are the sole

7    judges of the facts.

8            The government has presented exhibits in the form of

9    charts and summaries.  For example, the government offered

10   summaries of certain telephone numbers and contacts.  I

11   decided to admit these charts and summaries in place of the

12   underlying documents that they represent in order to save time

13   and avoid unnecessary inconvenience.  You should consider

14   these charts and summaries as you would any other evidence.

15           It is for you to decide whether the charts,

16   schedules, or summaries correctly present the information

17   contained in the testimony and in the exhibits on which they

18   were based.  You are entitled to consider the charts,

19   schedules, and summaries if you find that they are of

20   assistance to you in analyzing the evidence and understanding

21   the evidence.

22           There has been evidence that each defendant made

23   certain statements in which the government claims they

24   admitted certain facts charged in the indictment.

25           In deciding what weight to give each defendant's

statements, you should first examine with great care whether

each statement was made and whether, in fact, it was

voluntarily and understandingly made.  I instruct you that you

are to give the statements such weight as you feel they

deserve in light of all the evidence.

You are cautioned that the evidence of one

defendant's statements to the authorities after his arrest or

when interviewed about his own conduct may not be considered

or discussed by you in any way with respect to the other

defendant that's on trial.  In other words, you are only to

consider statements of a defendant to authorities as evidence

against the defendant who made the statement.

The defendants chose not to testify in this case.

Under our constitution, a defendant has no obligation to

testify or to present any evidence, because it is the

government's burden to prove a defendant guilty beyond a

reasonable doubt.  A defendant is never required to prove he

is innocent.

Therefore, you must not attach any significance to

the fact that a given defendant did not testify.  No adverse

inference against either defendant may be drawn by you because

he did not take the witness stand, and you may not consider it

in any way in your deliberations in the jury room.

During the trial you have heard the attorneys use

the term "inference," and in their arguments they have asked

1   you to infer, on the basis of your reason, experience, and

2   common sense, from one or more established facts, the

3   existence of some other fact.

4          An inference is not a suspicion or a guess.  It is a

5   reasoned, logical decision to conclude that a disputed fact

6   exists on the basis of another fact which you know exists.

7          There are times when different inferences may be

8   drawn from facts, whether proved by direct or circumstantial

9   evidence.  The government asks you to draw one set of

10  inferences, while the defense asks you to draw another.  It is

11  for you, and you alone, to decide what inferences you will

12  draw.

13         The process of drawing inferences from facts in

14  evidence is not a matter of guesswork or speculation.  An

15  inference is a deduction or conclusion which you, the jury,

16  are permitted to draw, but not required to draw, from the

17  facts which have been established by either direct or

18  circumstantial evidence.  In drawing inferences, you should

19  exercise your common sense.

20         So while you are considering the evidence presented

21  to you, you are permitted to draw, from the facts which you

22  find to be proven, such reasonable inferences as would be

23  justified in light of your experience.

24         Here again, let me remind you that, whether based

25  upon direct or circumstantial evidence, or upon the logical,

1    reasonable inferences drawn from such evidence, you must be

2    satisfied of the guilt of the defendant beyond a reasonable

3    doubt before you may convict.

4          You may not infer that the defendant is guilty of

5    participating in criminal conduct merely from the fact that he

6    associated with other people who were guilty of wrongdoing.

7          There are several persons whose names you have heard

8    during the course of the trial but who did not appear here to

9    testify, and one or more of the attorneys may refer to their

10   absence from the trial.  I instruct you that each party had an

11   equal opportunity or lack of opportunity to call any of these

12   witnesses.  Therefore, you should not draw any inference or

13   reach any conclusions as to what they would have testified to

14   had they been called.  Their absence should not affect your

15   judgment in any way.

16         You should, however, remember my instruction that

17   the law does not impose on a defendant in a criminal case the

18   burden or duty of calling any witnesses or producing any

19   evidence.

20         You have heard testimony that one or both defendants

21   may have made certain statements outside the courtroom in

22   which a defendant claimed that his conduct was consistent with

23   innocence and not with guilt.  One or both defendants may have

24   also made statements outside the courtroom in which that

25   defendant claimed he was not present at the scene of the crime

1   when it was committed.  The government claims that these

2   statements in which a defendant exonerated or exculpated

3   himself or provided an alibi are false.

4          If you find that a defendant gave a false statement

5   in order to divert suspicion from himself or provided a false

6   alibi, you may, but are not required, to infer that the

7   defendant believed that he was guilty.  You may not, however,

8   infer on the basis of this alone, that a defendant is, in

9   fact, guilty of the crime for which he is charged.

10          Whether the evidence as to a defendant's statement

11  shows that the defendant believed that he was guilty, and the

12  significance, if any, to be attached to any such evidence, are

13  matters for you, the jury, to decide.

14          Willful intent or guilty knowledge may be inferred

15  from the secretive or irregular manner in which a transaction

16  is carried out.

17          It must be clear to you by now that the government

18  and the defendants are asking you to draw very different

19  conclusions about various factual issues in the case.

20  Deciding these issues will involve making judgments about the

21  testimony of the witnesses you have listened to and observed.

22  In making these judgments, you should carefully scrutinize all

23  of the testimony of each witness, the circumstances under

24  which each witness testified, and any other matter in evidence

25  that may help you to decide the truth and the importance of

1    each witness's testimony.

2          Your decision whether or not to believe a witness

3    may depend on how that witness impressed you.  How did the

4    witness appear?  Was the witness candid, frank, and

5    forthright; or, did the witness seem to be evasive or suspect

6    in some way?  How did the way the witness testified on direct

7    examination compare with how the witness testified on

8    cross-examination?  Was the witness consistent, or

9    contradictory?  Did the witness appear to know what he or she

10   was talking about?  Did the witness strike you as someone who

11   was trying to report his or her knowledge accurately?  These

12   are examples of the kinds of common sense questions you should

13   ask yourselves in deciding whether a witness is, or is not,

14   truthful.

15         How much you choose to believe a witness may also be

16   influenced by the witness's bias.  Does the witness have a

17   relationship with the government or either defendant that may

18   affect how he or she testified?  Does the witness have some

19   incentive, loyalty, or motive that might cause him or her to

20   shade the truth?  Does the witness have some bias, prejudice,

21   or hostility that may cause the witness to give you something

22   other than a completely accurate account of the facts he or

23   she testified to?

24         You should also consider whether a witness had an

25   opportunity to observe the facts he or she testified about.

1    Also, you should consider whether the witness's recollection

2    of the facts stands up in light of the other evidence in the

3    case.

4            In other words, what you must try to do in deciding

5    credibility is to size up a person just as you would in any

6    important matter when you are trying to decide if a person is

7    truthful, straight forward, and accurate in his or her

8    recollection.

9            In connection with your evaluation of the

10   credibility of the witnesses, you should specifically consider

11   evidence of resentment or anger which some government

12   witnesses may have towards either defendant.

13           Evidence that a witness is biased, prejudiced, or

14   hostile toward a defendant requires you to view that witness's

15   testimony with caution, to weigh it with care, and subject it

16   to close and searching scrutiny.

17           In evaluating credibility of the witnesses, you

18   should take into account any evidence that the witness who

19   testified may benefit in some way from the outcome of this

20   case.  Such an interest in the outcome creates a motive to

21   testify falsely and may sway the witness to testify in a way

22   that advances his or her own interests.  Therefore, if you

23   find that any witness whose testimony you are considering may

24   have an interest in the outcome of the trial, then you should

25   bear that factor in mind when evaluating the credibility of

1    his or her testimony and accept it with great care.

2            This is not to suggest that every witness who has an

3    interest in the outcome of a case will testify falsely.  It is

4    for you to decide to what extent, if at all, the witness'

5    interest has affected or colored his or her testimony.

6            The government has called as witnesses people who

7    are named by the prosecution as co-conspirators but who were

8    not charged as defendants.

9            For this reason, you should exercise caution in

10   evaluating their testimony and scrutinize it with great care.

11   You should consider whether they have an interest in the case

12   and whether they have a motive to testify falsely.  In other

13   words, ask yourselves whether they have a stake in the outcome

14   of this trial.  As I have indicated, their testimony may be

15   accepted by you if you believe it to be true, and it is up to

16   you, the jury, to decide what weight, if any, to give to the

17   testimony of any unindicted co-conspirators.

18           There has been evidence introduced at the trial that

19   the government called as witnesses, persons who were using or

20   addicted to drugs when the events observed took place or who

21   is now using drugs.  I instruct you that there is nothing

22   improper about calling such a witness to testify about events

23   within his or her personal knowledge.

24           On the other hand, this testimony must be examined

25   with greater scrutiny than the testimony of any other witness.

Court's Instructions to the Jury

1   The testimony of a witness who was using drugs at the time of

2   the events he is testifying about, or who is using drugs, or

3   who is an addict at the time of his testimony may be less

4   believable because of the effect the drugs may have on his

5   ability to perceive or relate the events in question.

6          If you decide to accept his or her testimony, after

7   considering it in light of all the evidence in this case, then

8   you may give it whatever weight, if any, you find it deserves.

9          You have heard the testimony of a witness who was

10  previously convicted of a crime.  This prior conviction was

11  put into evidence for you to consider in evaluating the

12  witness' credibility.  You may consider the fact that the

13  witness who testified has been convicted of one or more crimes

14  in deciding how much of his testimony to accept and what

15  weight, if any, it should be given.

16         You have heard the testimony of law enforcement

17  officials.  The fact that a witness may be employed by the

18  federal government as a law enforcement official does not mean

19  that his or her testimony is deserving of more or less

20  consideration or greater or lesser weight than that of an

21  ordinary witness.

22         At the same time, it is quite legitimate for defense

23  counsel to attack the credibility of a law enforcement witness

24  on the grounds that his testimony may be colored by personal

25  or professional interest in the outcome of the case.

1      It is your decision, after reviewing all of the

2   evidence, whether to accept the testimony of the law

3   enforcement witness and to give that testimony whatever

4   weight, if any, you find it deserves.

5      You have heard evidence that a witness made a

6   statement on an earlier occasion which an attorney argues is

7   inconsistent with the witness' trial testimony.  Evidence of a

8   prior inconsistent statement is not to be considered by you as

9   affirmative evidence bearing on the defendants' guilt.

10  Evidence of the prior inconsistent statement was placed before

11  you for the more limited purpose of helping you decide whether

12  to believe the trial testimony of the witness who contradicted

13  him or herself.  If you find that the witness made an earlier

14  statement that conflicts with his trial testimony, you may

15  consider that fact in deciding how much of her trial

16  testimony, if any, to believe.

17      In making this determination, you may consider

18  whether the witness purposely made a false statement or

19  whether it was an innocent mistake; whether the inconsistency

20  concerns an important fact, or whether it had to do with a

21  small detail; whether the witness had an explanation for the

22  inconsistency, and whether that explanation appealed to your

23  common sense.

24      It is exclusively your duty, based upon all the

25  evidence and your own good judgment, to determine whether the

1    prior statement was inconsistent, and if so, how much, if any,

2    weight to be given to the inconsistent statement in

3    determining whether to believe all or part of the witness's

4    testimony.

5            One of the most important issues in this case is the

6    identification of the defendant as the perpetrator of the

7    crime.  The government has the burden of proving identity

8    beyond a reasonable doubt.  It is not essential that a

9    particular witness, him or herself, be free from doubt as to

10   the correctness of an identification of the defendant.

11   However, you, the jury, must be satisfied beyond a reasonable

12   doubt of the accuracy of the identification of the defendant

13   before you may convict him.  If you are not convinced beyond a

14   reasonable doubt that a defendant was the person who committed

15   the crime, you must find that defendant not guilty.

16           Identification testimony is an expression of belief

17   on the part of that witness.

18           You will hear the arguments of counsel on this

19   subject, and I will not preview them all here now.  I will

20   only suggest to you that you should consider the following

21   matters:  Did the witness know the defendant?  Was the witness

22   provided with a sufficiently clear image by which he or she

23   could identify the perpetrator?  Has the witness's

24   identification of the defendant as the offender been

25   influenced in any way?  Has his or her identification been

1    unfairly suggested by events that occurred since the time of

2    the offense?  In addition, you should consider the credibility

3    of the identification witnesses just as you would any other

4    witness.

5            Let me repeat, the burden is on the prosecution to

6    prove every element of the crime charged, including the

7    identity of the defendant as the offender.  Therefore, if,

8    after examining all of the evidence, you find that a crime was

9    committed, but you have a reasonable doubt about whether it

10   was the defendant who committed that crime, you must find that

11   defendant not guilty.

12           In this case I have permitted certain witnesses to

13   express their opinions about matters that are in issue.  A

14   witness may be permitted to testify to an opinion on those

15   matters about which he or she has special knowledge, skill,

16   experience, and training.  Such testimony is presented to you

17   on the theory that someone who is experienced and

18   knowledgeable in the field can assist you in understanding the

19   evidence or in reaching an independent basis on -- excuse me,

20   an independent decision on the facts.

21           In weighing this opinion testimony, you may consider

22   the witness's qualifications, his or her opinions, the reasons

23   for testifying, as well as all of the other considerations

24   that ordinarily apply when you are deciding whether or not to

25   believe a witness's testimony.  You may give the opinion

1   testimony whatever weight, if any, you find it deserves in

2   light of all the evidence in this case.  You should not,

3   however, accept opinion testimony merely because I allowed the

4   witness to testify concerning his or her opinion.  Nor should

5   you substitute it for your own reason, judgment, and common

6   sense.  The determination of the facts in this case rests

7   solely with you.

8            The two defendants here are charged with various

9   crimes about which I will instruct you shortly.  Each charge

10  is called a count.  The defendant Davon Carter is charged in

11  Counts 1 through 4 relating to the murder of Latrina Ashburne

12  and 6 through 9 relating to narcotics.

13           The defendant Clifton Mosley is charged in Counts 1

14  through 4 relating to the murder of Latrina Ashburne and in

15  Count 10 relating to narcotics.

16           I will instruct you about each of these crimes

17  shortly.  You will not be furnished with the indictment

18  itself, because an indictment is merely a statement of charges

19  and is not itself evidence.  I will read the charges in the

20  indictment to you in a moment.

21           The defendants have denied that they are guilty of

22  these charges.

23           The indictment names two defendants, Davon Carter,

24  and Clifton Mosley, who are on trial together.  In reaching a

25  verdict, however, you must bear in mind that guilt is

1    individual.  Your verdict as to each defendant must be

2    determined separately with respect to him, solely on the

3    evidence or lack of evidence, presented against him without

4    regard to the guilt or innocence of anyone else.

5              In addition, some of the evidence in this case was

6    limited to one defendant.  Let me emphasize that any evidence

7    admitted solely against one defendant may be considered only

8    as against that defendant and may not in any respect enter

9    into your deliberations on the other defendant.

10             The indictment contains a total of nine counts.

11   Each count charges a defendant with a different crime.

12             There are two defendants on trial before you.  You

13   must, as a matter of law, consider each count of the

14   indictment and each defendant's involvement in that count

15   separately, and you must return a separate verdict on each

16   defendant for each count in which he is charged.

17             In reaching a verdict, bear in mind that guilt is

18   personal and individual.  Your verdict of guilty or not guilty

19   must be based solely upon the evidence about each defendant.

20   The case against each defendant, on each count, stands or

21   falls upon the proof or lack of proof against that defendant

22   alone, and your verdict as to any defendant on any count

23   should not control your decision as to any other defendant or

24   any other count.  No other considerations are proper.

25             It has been said that a crime consists of two

1      principal parts, a criminal intent and a criminal act.

2           Let me talk for a moment about criminal intent.  For

3      the crime charged in this case, the government must show

4      beyond a reasonable doubt that, with regard to the criminal

5      act charge, each defendant knowingly, willfully, and

6      intentionally sought to do the illegal act charged.

7           A person acts knowingly if he acts intentionally and

8      voluntarily, and not because of ignorance, mistake, accident,

9      or carelessness.

10          "Willfully" means to act with knowledge that one's

11     conduct is unlawful and with the intent to do something the

12     law forbids; that is to say, with a bad purpose to disobey or

13     disregard the law.  A defendant's conduct was not "willful" if

14     it was due to negligence, inadvertence, or mistake.

15          "Intentionally" means to act deliberately and

16     purposefully.  That is, defendant's acts must have been the

17     product of a defendant's conscious objective rather than the

18     product of a mistake or accident.

19          Whether a defendant acted knowingly, willfully, and

20     intentionally may be proven by the defendant's conduct and by

21     all of the facts and circumstances surrounding the case.

22          Later, I will also instruct you on the definition of

23     "malice," which the government must prove in connection with

24     the murder charges in this case.

25          As a general matter, knowledge, intent, willfulness,

and malice involve the state of a person's mind.  Medical

science has not yet devised an instrument which can record

what was in one's mind in the distant past.  Rarely is direct

proof available to establish the state of one's mind.  Thus,

these elements may be inferred from what the defendant says or

does; his words, his actions, and his conduct, as of the time

of the occurrence of certain events.

The intent with which an act is done is often more

clearly and conclusively shown by the act itself, or by a

series of acts, than by words or explanations of the act

uttered long after its occurrence.  Accordingly, intent,

knowledge, and malice are usually established by surrounding

facts and circumstances as of the time the acts in question

occurred, or the events took place, and the reasonable

inferences to be drawn from them.

You may also consider the natural and probable

results of any acts that the defendant knowingly did or did

not do, and whether it is reasonable to conclude that the

defendant intended those results.  This, of course, is all for

you to decide.

You will note that the indictment charges that the

offenses were committed "on or about" a certain date or date

range.  It does not matter if the indictment charges that a

specific act occurred on or about a certain date or any

certain date range, and the evidence indicates that, in fact,

1    it was on another date or date range.  The law only requires a

2    substantial similarity between the dates or date range alleged

3    in the indictment and the date or date range established by

4    the evidence.

5            Both defendants are charged in Count 1 with

6    conspiracy to violate Title 18, United States Code, Section

7    1513, and in Count 3 with conspiracy to violate Title 18,

8    United States Code, Section 1512.  I will explain the

9    difference between a conspiracy charge and a "substantive"

10   crime in a moment.

11           The relevant statute as to Count 1, in Section

12   1513(f), which makes it a crime to conspire with another

13   person to kill or attempt to kill another person with intent

14   to retaliate against any person for providing to a law

15   enforcement officer any information relating to the commission

16   or possible commission of a federal offense.  God bless you.

17           Count 1 of the indictment reads:  On a date prior to

18   May 27, 2016, the actual date being unknown to the grand jury,

19   continuing through, on, or about May 27th, 2016, in the

20   District of Maryland, the defendants, Davon Carter and Clifton

21   Mosley, did knowingly, willfully, and unlawfully conspire and

22   agree with others known and unknown to the grand jury to

23   commit any offense under Title 18, Section 1513; to wit, to

24   kill and attempt to kill another person, with malice

25   aforethought, willfully, deliberately, maliciously, and with

premeditation, and with the intent to retaliate against any

person for providing to a law enforcement officer information

relating to the commission and possible commission of a

federal offense.

Section 1513 is commonly referred to as the "witness

retaliation" statute.

The relevant statute as to Count 3 is Section

1512(k), which makes it a crime to conspire with another

person to:  Kill or attempt to kill another person with intent

to prevent the attendance or testimony of any person in an

initial proceeding.

Section 1512 is commonly referred to as the "witness

tampering" statute.

Count 3 of the indictment reads:  On a date prior to

May 27, 2016, the actual date being unknown to the grand jury,

continuing through, on, or about May 27, 2016, in the District

of Maryland, the defendants, Davon Carter and Clifton Mosley,

did knowingly, willfully, and unlawfully conspire and agree

with others known and unknown to the grand jury to commit any

offense under Title 18, Section 1512; to wit, to kill and

attempt to kill another person with malice aforethought,

willfully, deliberately, maliciously, and with premeditation

and with intent to prevent the attendance and testimony of any

person in an official proceeding.

The difference between the conspiracy charged in

1 Count 1 and the conspiracy charged in Count 3 is the object,

2 or purpose, of the conspiracy charged.  The object of the

3 conspiracy charged in Count 1 is to retaliate against a

4 witness, here the intended target, for having provided

5 information.  The object of the conspiracy charged in Count 3

6 is witness tampering, that is, to prevent the testimony or

7 attendance of the witness at a court proceeding.

8   The witness tampering and witness retaliation

9 statutes are designed to protect persons who are victims of

10 federal crimes, persons who may be called to testify or give

11 evidence in a federal proceeding, either civil or criminal,

12 and persons who have information about federal crimes.  The

13 integrity of the federal system of justice depends upon the

14 cooperation of such victims and potential witnesses.  If

15 persons with information do not come forward, produce

16 evidence, and appear when summoned, the criminal justice

17 system will be significantly impaired.  This statute was

18 devised to make it unlawful for anyone to tamper with, or

19 retaliate against, such a witness in the manner described by

20 the statute.

21   In this case the defendants are accused of having

22 been a member of a conspiracy to violate certain federal laws.

23 A conspiracy is a kind of criminal partnership, a combination

24 or agreement of two or more persons to join together to

25 accomplish some unlawful purpose.

The crime of conspiracy to violate a federal law is an independent offense.  It is separate and distinct from the actual violation of any specific federal laws, which the law refers to as "substantive crimes."

Indeed, you may find the defendants guilty of the crime of conspiracy to commit an offense against the United States even though the substantive crime, which was the object of the conspiracy, was not actually committed.

Congress has deemed it appropriate to make conspiracy, standing alone, a separate crime even if the conspiracy is not successful.  This is because collective criminal activity poses a greater threat to the public's safety and welfare than individual conduct, and increases the likelihood of success of a particular criminal venture.

In order to satisfy its burden of proof as to Count 1 and Count 3, the government must establish each of the following two essential elements beyond a reasonable doubt:

First, that two or more persons entered the unlawful agreement charged in Count 1 and/or Count 3 of the indictment starting on a date prior to May 27th, 2016, the exact date unknown to the grand jury, through, on, or about May 27th, 2016; and second, that each defendant knowingly and willfully became a member of the conspiracy charged in Count 1 and/or Count 3.

The fifth element which the government must prove

1    beyond a reasonable doubt to establish the offense of

2    conspiracy in Count 1 and Count 3 is that two or more persons

3    entered the unlawful agreement charged in the indictment.

4            In order for the government to satisfy this element,

5    you need not find that the alleged members of the conspiracy

6    met together and entered into any express or formal agreement.

7    Similarly, you need not find that the alleged conspirators

8    stated, in words or writing, what the scheme was, its object

9    or purpose, or every precise detail of the scheme or the means

10   by which its object or purpose was to be accomplished.  What

11   the government must prove is that there was a mutual

12   understanding, either spoken or unspoken, between two or more

13   people to cooperate with each other to accomplish an unlawful

14   act.

15           You may, of course, find that the existence of an

16   agreement to disobey or disregard the law has been established

17   by direct proof.  However, since conspiracy, by its very

18   nature, is characterized by secrecy, you may also infer its

19   existence from the circumstances of this case and the conduct

20   of the parties involved.

21           In a real very sense then, in the context of

22   conspiracy cases, actions often speak louder than words.  In

23   this regard, you may, in determining whether an agreement

24   existed here, consider the actions and statements of all of

25   those you find to be participants as proof that a common

1  design existed on the part of the persons charged to act

2  together to accomplish an unlawful purpose.

3      The second element which the government must prove

4  beyond a reasonable doubt to establish the offense of

5  conspiracy is that the defendant knowingly, willfully, and

6  voluntarily became a member of the conspiracy.

7      If you are satisfied that the conspiracy charged in

8  the indictment existed, you must next ask yourselves who the

9  members of that conspiracy were.  In deciding whether the

10 defendant whom you are considering was, in fact, a member of

11 the conspiracy, you should consider whether the defendant

12 knowingly and willfully joined the conspiracy.  Did he

13 participate in it with knowledge of its unlawful purpose and

14 with the specific intention of furthering its business or

15 objective as an associate or worker.

16     In that regard, it has been said that in order for a

17 defendant to be deemed a participant in a conspiracy, he must

18 have had a stake in the venture or its outcome.  You are

19 instructed that, while proof of a financial interest in the

20 outcome of a scheme is not essential, if you find the

21 defendant had such an interest, that is, a factor which you

22 may consider in determining whether or not the defendant was a

23 member of the conspiracy charged in the indictment.

24     As I mentioned a moment ago, before the defendant

25 can be found to have been a conspirator, you must first find

1    that he knowingly joined in the unlawful agreement or plan.

2    The key question, therefore, is whether the defendant joined

3    the conspiracy with an awareness of at least some of the basic

4    aims and purposes of the unlawful agreement.

5         It is important for you note that the defendant's

6    participation in the conspiracy must be established by

7    independent evidence of his own acts or statements, as well as

8    those of the other alleged co-conspirators, and the reasonable

9    inferences which may be drawn from them.

10        The defendant's knowledge is a matter of inference

11   from the facts proved.  In that connection, I instruct you

12   that to become a member of the conspiracy, the defendant need

13   not have known the identities of each and every member, nor

14   need he have been apprised of all their activities.  Moreover,

15   the defendant need not have been fully informed as to all of

16   the details, or the scope of the conspiracy, in order to

17   justify an inference of knowledge on his part.  Furthermore,

18   the defendant need not have joined in all of the conspiracy's

19   unlawful objectives.

20        The extent of a defendant's participation has no

21   bearing on the issue of a defendant's guilt.  A conspirator's

22   liability is not measured by the extent or duration of his

23   participation.  Indeed, each member may perform separate and

24   distinct acts and may perform them at different times.  Some

25   conspirators play major roles, while others play minor roles

1    in the scheme.  An equal role is not what the law requires.

2    In fact, even a single act may be sufficient to draw the

3    defendant within the ambit of a conspiracy.

4         I want to caution you, however, that the defendant's

5    mere presence at the scene of the alleged crime does not, by

6    itself, make him a member of the conspiracy.  Similarly, mere

7    association with one or more members of the conspiracy does

8    not automatically make the defendant a member.  A person may

9    know, or be friendly with, a criminal, without being a

10   criminal himself.  Mere similarity of conduct or the fact they

11   may have assembled together and discussed common aims and

12   interests does not necessarily establish membership in the

13   conspiracy.

14        I also want to caution you that mere knowledge or

15   acquiescence, without participation, in the unlawful plan, is

16   not sufficient.  Moreover, the fact that the acts of a

17   defendant, without knowledge, merely happen to further the

18   purposes or objectives of the conspiracy, does not make the

19   defendant a member.  More is required under the law.  What is

20   necessary is that the defendant must have participated with

21   knowledge of at least some of the purposes or objectives of

22   the conspiracy and with the intention of aiding in the

23   accomplishment of those unlawful ends.

24        In sum, the defendant, with an understanding of the

25   unlawful character of the conspiracy, must have intentionally

1   engaged, advised, or assisted in it for the purpose of

2   furthering the illegal undertaking.  He thereby becomes a

3   knowing and willing participant in the unlawful agreement,

4   that is to say, a conspirator.

5          Both defendants are charged with retaliating against

6   a witness in an official federal proceeding.  Specifically,

7   Count 2 of the indictment charges the substantive offense of

8   violating Title 18, United States Code, Section 1513, witness

9   retaliation murder.  I just read the conspiracy language of

10  Section 1513.

11         I will repeat the pertinent part of Section 1513

12  regarding the substantive offense charged in Count 2:  Whoever

13  kills or attempts to kill another person with intent to

14  retaliate against any person for providing to a law

15  enforcement officer any information relating to the commission

16  or possible commission of a federal offense shall be guilty of

17  a crime.

18         The indictment reads:  On or about May 27, 2016, in

19  the District of Maryland, the defendants, Davon Carter and

20  Clifton Mosley, with malice aforethought, did unlawfully kill,

21  and aid and abet the killing of Latrina Ashburne, willfully,

22  deliberately, maliciously, and with premeditation, by gunshot,

23  and did so with intent to retaliate against a person for

24  providing to a law enforcement officer information relating to

25  the commission and possible commission of a federal offense.

1           The relevant statute on this subject is 18 U.S.C.

2     1513(b).  It provides:  Whoever knowingly engages in any

3     conduct and thereby causes bodily injury to another person or

4     damages the tangible property of another person, or threatens

5     to do so, with intent to retaliate against any person for any

6     information relating to the commission or possible commission

7     of a federal offense, shall be guilty of a crime.

8           In order to prove the defendant guilty of

9     retaliating against a witness in an official federal

10    proceeding, the government must prove each of the following

11    elements beyond a reasonable doubt.

12          First, that the defendant knowingly killed, or aided

13    and abetted, the killing of Latrina Ashburne by gunshot.

14          Second, that the defendant acted willfully,

15    deliberately, maliciously, and with premeditation.

16          Third, that the defendant acted with the intent to

17    retaliate against another person for providing to a law

18    enforcement officer information relating to the commission or

19    possible commission of a federal offense.

20          The first element the government must prove beyond a

21    reasonable doubt is that the defendant killed and aided --

22    excuse me, the first element the government must prove beyond

23    a reasonable doubt is that the defendant killed and aided and

24    abetted the killing of Latrina Ashburne by gunshot.  In this

25    regard, it is the government's burden to prove that the

1   defendant's conduct was the direct cause of Ms. Ashburne's

2   death.   This simply means that the government must prove that

3   the defendant inflicted an injury or injuries upon the

4   deceased by gunshot from which the deceased died.

5        The government must also prove beyond a reasonable

6   doubt that the defendant acted with malice aforethought.

7        Malice is the state of mind that would cause a

8   person to act without regard to the life of another.

9        To satisfy this element, the defendant must have

10  acted consciously, with the intent to kill another person.

11       However, the government need not prove a subjective

12  intent to kill on the part of the defendant.   It would be

13  sufficient to satisfy this element if it proved reckless and

14  wanton conduct on the part of the defendant that grossly

15  deviated from a reasonable standard of care, such that he was

16  aware of the serious risk of death.

17       In order to establish this element, the government

18  must prove that the defendant acted willfully, with a bad or

19  evil purpose to break the law.   However, the government need

20  not prove spite, malevolence, hatred, or ill will toward the

21  victim.

22       With regard to the killing of Ms. Ashburne, the

23  government must prove beyond a reasonable doubt that the

24  defendant acted with premeditation.   An act is done with

25  premeditation if it is done upon planning or deliberation.   In

1    order to satisfy this element, the government must prove that

2    defendant killed the victim only after thinking the matter

3    over, deliberating whether to act before committing the crime.

4    There is no requirement that the government prove that the

5    defendant deliberated for any particular period of time in

6    order to show premeditation.  The amount of time needed for

7    premeditation of a killing depends on the person and the

8    circumstances.  It is sufficient to satisfy this element if

9    you find that before he acted, the defendant had a period of

10   time to become fully aware of what he intended to do and to

11   think it over before he acted.

12        The first element the government must prove beyond a

13   reasonable doubt is that the defendant knowingly engaged in

14   the conduct alleged in the indictment, that is, the defendant

15   knowingly killed, or aided and abetted, the killing of

16   Ms. Ashburne.  I previously defined "knowingly" for you.

17        Excuse me, that should have read, the second element

18   the government must prove.

19        The third element the government must prove beyond a

20   reasonable doubt is that the defendants acted with the intent

21   to retaliate against a witness for information given relating

22   to the commission of a federal offense to a law enforcement

23   officer.

24        A law enforcement officer means an officer or

25   employee of the federal government authorized to prevent,

1    investigate, or prosecute offenses or serving as a probation

2    officer.  You are instructed that a special agent of the

3    Department of Health and Human Services is a law enforcement

4    officer.  In this regard, the government must also prove that

5    the defendant knew that the witness, here, the alleged

6    intended target, was cooperating with a federal law

7    enforcement officer.

8            In order to satisfy this element, it is not

9    necessary for the government to prove that the defendant knew

10   he was breaking any particular law.

11           Count 4 of the indictment charges the substantive

12   offense of violating Title 18, United States Code, Section

13   1512, witness tampering murder, which provides:  Whoever kills

14   or attempts to kill another person with intent to retaliate

15   against any person for providing to a law enforcement officer

16   any information relating to the commission or possible

17   commission of a federal offense shall be guilty of a crime.

18           The indictment reads:  On or about May 27, 2016, in

19   the District of Maryland, the defendants, Davon Carter and

20   Clifton Mosley, with malice aforethought, did unknowingly --

21   excuse me, unlawfully kill, and aid and abet the killing of

22   Latrina Ashburne, willfully, deliberately, maliciously, and

23   with premeditation, by gunshot, and did so with intent to

24   prevent the attendance and testimony of any person in an

25   official proceeding.

Court's Instructions to the Jury

1    In order to prove the defendants guilty of Count 4,

2    the government must prove each of the following elements

3    beyond a reasonable doubt:

4    First, that the defendant unlawfully killed, or

5    aided and abetted the killing, of Latrina Ashburne;

6    Second, the defendant acted willfully, deliberately,

7    maliciously, and with premeditation;

8    Fourth, the defendant killed, or aided and abetted

9    the killing, of Latrina Ashburne with the intent to prevent

10   another person from testifying in an official proceeding.

11   The first element the government must prove beyond a

12   reasonable doubt is that the defendant killed, or aided and

13   abetted the killing, of Latrina Ashburne; and the second is

14   that the defendant did so willfully, deliberately,

15   maliciously, and with premeditation.

16   I previously instructed you on the definition of

17   these elements with respect to Count 2, and so I refer you to

18   those jury instructions now.

19   The third element the government must prove beyond a

20   reasonable doubt is that the defendant killed, or aided and

21   abetted, the killing of Latrina Ashburne, with the intent to

22   prevent another person from testifying in an official

23   proceeding.

24   An official proceeding means a proceeding before a

25   court, judge, or federal agency.  The proceeding may be civil

1    or criminal.  You are instructed that the federal criminal

2    trial against Matthew Hightower is an official proceeding.

3         The law does not require that the federal proceeding

4    be pending at the time of the killing, as long as the

5    proceeding was foreseeable, such that the defendant knew that

6    his actions were likely to affect the proceeding.  In

7    addition, the government does not have to prove that the

8    defendant knew that the proceeding would be in federal court.

9         The indictment also charges the defendants with

10   aiding and abetting the offenses charged in Counts 2 and 4 of

11   the indictment.

12        The aiding and abetting statute, Section 2(a) of

13   Title 18 of the United States Code, provides that; "whoever

14   commits an offense against the United States or aids or abets

15   or counsels, commands, or induces, or procures its commission,

16   is punishable as a principal."

17        Under the aiding and abetting statute, it is

18   necessary for the government to show -- excuse me, it is not

19   necessary for the government to show that a defendant himself

20   physically committed the crime with which he is charged in

21   order for government to sustain its burden of proof.  A person

22   who aids or abets another to commit an offense is just as

23   guilty of that offense as if he had committed it himself.

24        Accordingly, you may find the defendant guilty of

25   the offense charged if you find beyond a reasonable doubt that

the government has proven that another person actually

committed the offense with which the defendant is charged, and

that the defendant aided or abetted that person in the

commission of the offense.

As you can see, the first requirement is that you

find that another person has committed the crime charged.

Obviously, no one can be convicted of aiding or abetting the

criminal acts of another if no crime was committed by the

other person in the first place.  But if you do find that a

crime was committed, then you must consider whether the

defendant aided or abetted the commission of that crime.

In order to aid or abet another to commit a crime,

it is necessary that the defendant knowingly associated

himself in some way with the crime, and that he participated

in the crime by doing some act to help make the crime succeed.

To establish that defendant knowingly associated

himself with the crime, the government must establish that the

defendant knew and intended that a witness would be retaliated

against for providing information regarding the commission of

a federal offense, as to Counts 1 and 2, and/or that a witness

be prevented from attending or giving testimony at a

proceeding, as to Counts 3 and 4.

To establish that the defendant participated in the

commission of the crime, the government must prove that

defendant engaged in some affirmative conduct or overt act for

1      the specific purpose of bringing about that crime.

2              The mere presence of a defendant where a crime is

3      being committed, even coupled with knowledge by the defendant

4      that a crime is being committed, or merely associating with

5      others who were committing a crime is not sufficient to

6      establish aiding and abetting.  One who has no knowledge that

7      a crime is being committed or is about to be committed but

8      inadvertently does something that aids in the commission of

9      that crime is not an aider and abettor.  An aider and abettor

10     must know that the crime is being committed and act in a way

11     that is intended to bring about the success of the criminal

12     venture.

13             To determine whether a defendant aided or abetted

14     the commission of the crime with which he is charged, ask

15     yourself these questions:  Did he participate in the crime

16     charged as something he wished to bring about?  Did he

17     knowingly associate himself with the criminal venture?  Did he

18     seek, by his actions, to make the criminal venture succeed?

19             If he did, then the defendant is an aider and

20     abettor, and therefore, guilty of the offense.  If, on the

21     other hand, your answer to any one of those questions is "no,"

22     then the defendant is not an aider and abettor and you must

23     find him not guilty.

24             There is another method by which you may evaluate

25     the possible guilt of each defendant for Counts 2 and 4 of the

1    indictment even if you do not find that the government has

2    satisfied its burden of proof with respect to each element of

3    that crime.

4         If, in light of my instructions, you find, beyond a

5    reasonable doubt, that the defendant was a member of the

6    conspiracy charged in Count 1 and/or 3 of the indictment, and

7    thus, guilty on the conspiracy count, then you may also, but

8    you're not required to, find him guilty of substantive crimes

9    charged in Count 2 and/or 4, provided you find, beyond a

10   reasonable doubt, each of the following elements:

11        First, that the crime charged in the substantive

12   count was committed;

13        Second, that the person or persons you find actually

14   committed the crime were members of the conspiracy you found

15   to have existed;

16        Third, that the substantive crime was committed

17   pursuant to the common plan and understanding you found to

18   exist among the conspirators;

19        Fourth, that the defendant was a member of that

20   conspiracy at the time the substantive crime was committed;

21        Fifth, that the defendant could have reasonably

22   foreseen that the substantive crime might be committed by his

23   co-conspirators.

24        If you find all five of these elements to exist

25   beyond a reasonable doubt, then you may find a defendant

1  guilty of the substantive crime in Count 2 and/or 4, even

2  though he did not personally participate in the acts

3  constituting the substantive crime or did not have actual

4  knowledge of it.

5         The reason for this rule is simply that a

6  co-conspirator who commits a crime pursuant to a conspiracy is

7  deemed to be the agent of the other conspirators.  Therefore,

8  all of the co-conspirators must bear criminal responsibility

9  for the commission of the crimes committed by its members.

10         If, however, you are not satisfied as to the

11  existence of any of these elements, then you may not find the

12  defendant guilty of the substantive crime, unless the

13  government proves, beyond a reasonable doubt, that the

14  defendant personally committed, or aided and abetted, the

15  commission of that crime.

16         Count 6 of the indictment charges the defendant,

17  Davon Carter, as follows:  That on or about June 1st, 2016, in

18  the District of Maryland, the defendant, Davon Carter,

19  knowingly, intentionally, and unlawfully distributed and

20  possessed with intent to distribute a quantity of a mixture

21  and substance containing a detectable amount of marijuana, a

22  Schedule 1 controlled substance.

23         Count 10 of the indictment charges the defendant,

24  Clifton Mosley, as follows:  That beginning on a date unknown

25  to the grand jury, but at least as of December 2015, and

continuing through, in, or about December 2016, in the

District of Maryland, the defendant, Clifton Mosley,

knowingly, intentionally, and unlawfully distributed and

possessed with the intent to distribute a quantity of a

mixture and substance containing a detectable amount of

marijuana, a Schedule 1 controlled substance.

The statute makes it a crime for any person

knowingly or intentionally to manufacture, distribute, or

dispense, or possess with intent to manufacture, distribute,

or dispense, a controlled substance.

In order to prove the respective charge against the

charged defendant, the government must establish beyond a

reasonable doubt each of the following three elements of the

crime:

First, that the defendant possessed narcotic drugs;

Second, that the defendant knew that he possessed

narcotic drugs;

And third, the defendant possessed the narcotic

drugs with the intent to distribute them;

Or, first, that the defendant distributed narcotic

drugs; and second, that the defendant knew that he distributed

narcotic drugs.

To prove the defendant guilty of possession with

intent to distribute marijuana, the first element the

government must prove beyond a reasonable doubt is that the

1    charged defendant possessed marijuana.

2            To establish this element, the government must prove

3    that the material that the defendant is charged with

4    possessing is, in fact, marijuana.  The government may prove

5    this through either direct evidence or through circumstantial

6    evidence.  An example of direct evidence is the testimony of a

7    chemist who has done a chemical analysis of the material.

8    Circumstantial evidence would be evidence from which you could

9    infer that the material was marijuana, such as testimony

10   concerning the names used by the defendant to refer to the

11   material or testimony about the material's appearance.

12   Whether the government relies on direct or circumstantial

13   evidence to prove that the material in issue was marijuana, it

14   must prove so beyond a reasonable doubt.

15           As I have instructed you, to prove a defendant

16   guilty of possession of drugs with the intent to distribute,

17   the government must prove beyond a reasonable doubt that the

18   defendant "possessed" the drugs.  The legal concept of

19   possession may differ from the every day usage of the term, so

20   I will explain it in some detail.

21           Actual possession is what most of us think of as

22   possession; that is, having physical custody or control of an

23   object.  For example, if you find the defendant had the drugs

24   on his person, you may find that he had possession of the

25   drugs.  However, a person need not have actual physical

1    custody of an object in order to be in legal possession of it.

2    If an individual has the ability and intent to exercise

3    substantial control over an object that he does not have in

4    his physical custody, then he is in possession of that item.

5    An example of this from every day experience would be a

6    person's possession of items he keeps in the safe deposit box

7    of his bank.  Although the person does not have physical

8    custody of those items, he exercises substantial control over

9    them and so has legal possession of them.

10            The law also recognizes that possession may be sole

11    or joint.  If one person alone possesses something, that is

12    sole possession.  However, it is possible that more than one

13    person may have the power and intention to exercise control

14    over the drugs.  This is called joint possession.  If you find

15    the defendant had such power and intention, then he possessed

16    the drugs under the element, even if he possessed the drugs

17    jointly with another.

18            Possession of drugs cannot be found solely on the

19    ground that the defendant was near or close to the drugs.  Nor

20    can it be found simply because the defendant was present at a

21    scene where drugs were involved, or solely because the

22    defendant associated with a person who did control the drugs

23    or the property where they were found.  However, these factors

24    may be considered by you in connection with all other evidence

25    in making your decision whether the defendant possessed the

1    drugs.

2         A defendant may own or have control over the place

3    where the narcotics are found, such as an apartment or a

4    vehicle.  When the defendant is the sole person having such

5    ownership or control, this control is significant evidence of

6    the defendant's control over the drugs themselves, and thus,

7    of his possession of the drugs.  You should note, however,

8    that the defendant's sole ownership or control of a residence

9    or vehicle does not necessarily mean that the defendant had

10   control and possession of the drugs found in it.

11        A defendant may also share ownership or control of

12   the place where drugs are found.  In this event, the drugs may

13   be possessed by only one person, or by some of the people who

14   control the place, or by all of them.  However, standing

15   alone, the fact that a particular defendant had joint

16   ownership or control over the place where the drugs were

17   found, is not sufficient evidence to find that the defendant

18   possessed the drugs found there.  In order to find that a

19   particular defendant possessed drugs because of his joint

20   ownership or control over the place where they were found, you

21   must find beyond a reasonable doubt that the defendant knew

22   about the presence of the drugs and intended to exercise

23   control over them.

24        The government must also prove beyond a reasonable

25   doubt, as to distribution or possession with intent to

distribute drugs, that each defendant knew that he possessed

narcotics.

         To establish this element, the government must prove

that the defendant knew that he possessed narcotics and that

his possession was not due to carelessness, negligence, or

mistake.  If you find that the defendant did not know that he

had narcotics in his possession, or that he didn't know that

what he possessed was, in fact, narcotics, then you must find

the defendant not guilty.

         Although the government must prove that the

defendant knew that he possessed the narcotics, the government

does not have to prove that the defendant knew the exact

nature of the drugs in his possession.  It is enough that the

government proves that the defendant knew that he possessed

some kind of narcotic.

         Your decision whether the defendant knew the

materials he possessed were narcotics involves a decision

about the state of the defendant's mind.  It is obviously

impossible to prove directly the operation of the defendant's

mind.  But a wise and intelligent consideration of all of the

facts and circumstances shown by the evidence and the exhibits

in the case may enable you to infer what the defendant's state

of mind was.

         In our every day affairs, we are continuously called

upon to decide from the actions of others what their state of

mind is.   Experience has taught us that, frequently, actions
speak louder and more clearly than spoken or written words.
Therefore, you may well rely, in part, on circumstantial
evidence in determining the defendant's state of mind.

For example, if the defendant was the sole occupant
of a residence or a vehicle, it is reasonable to conclude that
the defendant knew about items in the residence or vehicle.
The defendant's behavior may also indicate knowledge.
Nervousness in the presence of the drugs or flight from a site
at which authorities have identified drugs may indicate that
the defendant knew that the materials in question were
narcotics.   Also, the possession of a large quantity of drugs
may indicate that the defendant knew what he had in his
possession.   These examples are neither exhaustive nor
conclusive.   It is up to you, based on all the evidence, to
determine whether the defendant knew that he possessed
narcotics.

To prove possession with intent to distribute drugs,
the government must prove beyond a reasonable doubt that the
defendant either distributed the narcotics or intended to
distribute them.   In order to prove the defendant guilty, the
government must prove one of these circumstances beyond a
reasonable doubt.   It need not prove both.

The word "distribute" means to deliver a narcotic.
"Deliver" is defined as the actual, constructive, or attempted

transfer of a narcotic.  Simply stated, the words "distribute"
and "deliver" mean to pass on or to hand over to another, or
to cause to be passed on or handed over to another, or the try
to pass on or hand over to another, narcotics.  Distribution
does not require a sale.  Activities in furtherance of the
ultimate sale, such as vouching for the quality of the drugs,
negotiating for or receiving the price, and supplying or
delivering the drugs may constitute distribution.  In short,
distribution requires a concrete involvement in the transfer
of the drugs.

        As an alternative to proving the defendant actually
distributed the drugs, to satisfy the third element, the
government may prove that the defendant possessed narcotics
with the intent to distribute them.  To prove the third
element in this way, the government must prove beyond a
reasonable doubt that the defendant had control over the drugs
with the state of mind or purpose to transfer them to another
person.

        The same considerations that apply to your
determination whether the defendant knew he possessed
narcotics apply to your decision concerning the defendant's
intention to distribute them.  Since you cannot read the
defendant's mind, you must make inferences from his behavior.
However, you may not convict the defendant unless these
inferences convince you beyond a reasonable doubt that the

1    defendant intended to distribute the narcotics.

2           When I say that you must find the defendant intended

3    to distribute the narcotics, this does not mean that you must

4    find that the defendant intended personally to distribute or

5    deliver the drugs.  It is sufficient if you find the defendant

6    intended to cause or assist the distribution of the narcotics.

7           Basically, what you are determining is whether the

8    drugs in the defendant's possession were for his personal use

9    or for the purpose of distribution.  Often it is possible to

10   make this determination from the quantity of drugs found in

11   the defendant's possession.

12          The possession of a large quantity of narcotics does

13   not necessarily mean that the defendant intended to distribute

14   them.  On the other hand, a defendant may have intended to

15   distribute narcotics even if he did not possess large amounts

16   of them.  Other physical evidence, such as paraphernalia for

17   the packaging or processing of drugs, can show such an intent.

18   There might also be evidence of a plan to distribute.  You

19   should make your decision whether the defendant intended to

20   distribute the narcotics in his possession from all of the

21   evidence presented.

22          The indictment charges the defendant with the

23   unlawful use of a communication facility to facilitate a

24   violation of the narcotics laws.  The indictment reads as

25   follows as to Count 7:  On or about May 8th, 2016, at

1    approximately 2:47 p.m., in the District of Maryland and

2    elsewhere, the defendant, Davon Carter, did knowingly and

3    intentionally use any communication facility, to wit, cellular

4    telephone number (443) 761-5150, in facilitating the

5    commission of any act and acts constituting a felony under

6    Title 21, United States Code, Section 841 and 846.

7         The indictment reads as follows as to Count 8:  That

8    on or about May 31st, 2016, at approximately 10:23 a.m., in

9    the District of Maryland and elsewhere, the defendant, Davon

10   Carter, did knowingly and intentionally use any communication

11   facility, to wit, cellular telephone number (443) 761-5150, in

12   facilitating the commission of any act and acts constituting a

13   felony under Title 21, United States Code, Section 841 and

14   846.

15        The indictment charges the defendant with two

16   violations of Section 843(b) of Title 21 of the United States

17   Code, which provides that:  It shall be unlawful for any

18   person, knowingly or intentionally, to use any communication

19   facility in committing or in causing or facilitating the

20   commission of any act or acts constituting a felony under the

21   narcotics laws.

22        In order to prove this charge against the defendant,

23   the government must establish beyond a reasonable doubt each

24   of the following elements of the offense;

25        First, that the defendant used the telephone as

1    charged in the indictment;

2            Second, that the defendant used the telephone in the

3    process of committing or to facilitate the commission of the

4    offense charged in Count 7 and 8 of the indictment;

5            And third, the defendant did so knowingly and

6    intentionally.

7            The first element the government must prove beyond a

8    reasonable doubt is that the defendant used the telephone as

9    charged in the indictment.

10           A communication facility is any device that is or

11   can be used to transmit writing, signs, signals, or pictures

12   of any kind.  This includes the mail, telephone, telegraph,

13   radio, computers, or any other kind of wire or wireless

14   communication.

15           Use occurs when a defendant either personally uses

16   the telephone or instructs someone else to use one.  In

17   addition, for the purpose of this element, both the caller or

18   sender and the recipient of the call or transmission use the

19   telephone.

20           The second element the government must prove beyond

21   a reasonable doubt is that the defendant used the telephone in

22   the process of committing or to facilitate the commission of a

23   felony under Title 21, United States Code, Section 841 and

24   846.

25           To facilitate the commission of a crime means to use

a telephone in a way that aids or assists the commission of

that crime.  It is sufficient to satisfy this element if you

find that the defendant's use of the telephone facilitated

either his own or another person's commission of the offense.

To satisfy this element, the government must prove

that the defendant committed the offense of a felony under

Title 21, United States Code, Section 841, and that the use of

the telephone made the commission of that crime easier or less

difficult.  The elements of those offenses are as I previously

described.

The final element the government must prove beyond a

reasonable doubt is that the defendant used the telephone or

communications facility knowingly and intentionally.

That is, the government must prove that the

defendant knew that he was using the telephone to further the

commission of the crime and intended to further the crime by

use of the telephone.

Count 9 of the indictment charges the defendant,

Davon Carter, with conspiring with others known and unknown to

distribute and possess with intent to distribute narcotics.

Count 9 reads as follows:  That beginning at some time prior

to May 4, 2016, and continuing until on or about June 1, 2016,

in the District of Maryland and elsewhere, the defendant,

Davon Carter, did knowingly and intentionally combine,

conspire, confederate, and agree with others known and unknown

1    to the grand jury to distribute and possess with intent to

2    distribute a mixture and substance containing marijuana, a

3    Schedule 1 controlled substance.  The pertinent statute is 21

4    U.S.C., Section 846, which prohibits any person from

5    conspiring to distribute and possessing with intent to

6    distribute marijuana.

7            There are two elements; first, that two or more

8    persons entered into an unlawful agreement charged in Count 9

9    starting on a date at some time prior to May 4th, 2016, and

10   continuing until on or about June 1, 2016; and second, that

11   the defendant, Carter, knowingly and willfully became a member

12   of the conspiracy charged; that is, to distribute and possess

13   with intent to distribute marijuana.

14           I have previously instructed you on the definition

15   of conspiracy and membership in a conspiracy.

16           Finally for this evening, the question of possible

17   punishment of the defendants is of no concern to the jury and

18   should not, in any sense, enter into or influence your

19   deliberation.  The duty of imposing sentence, if necessary,

20   rests exclusively with me.  Your function is to weigh the

21   evidence in the case and to determine whether or not the

22   defendant is guilty beyond a reasonable doubt, solely upon the

23   basis of such evidence.  Under your oath as jurors, you cannot

24   allow a consideration of the punishment which may be imposed

25   upon the defendant, if a defendant is convicted, to influence

1   your verdict in any way, or in any sense, enter into your

2   deliberations.

3            If I could have counsel approach.

4            (Bench conference on the record.)

5            THE COURT:  All right.  So Instruction 79,

6   communication with the Court, I always give after closings.

7   There are one or two similar instructions that I didn't see in

8   here.  I'm going to check some of my older instructions to see

9   if I can find it, but they're along the lines of instructions

10  on deliberations, so I'll find it and e-mail it around so

11  you'll have it.  But they're all of a sort with this one, and

12  I give them after closings.

13           Anything -- I caught a couple typos as I went, I'll

14  clean that up before I send them back.  Anything else?

15  Anything I messed up, any objections that haven't already been

16  ruled on?

17           MS. WILKINSON:  Nothing you messed up, but I messed

18  up something, Your Honor, and I noticed it in connection with

19  Jury Instruction No. 47.  In the beginning of the instruction,

20  the Court instructs about what the statute is, which is

21  whoever kills or intends to kill another person, and that's

22  from Section 15(3)(a) (sic).  And then the Court read the

23  indictment, then there's a straggle statute here, which has

24  nothing to do with this case, and I don't know how I kept it

25  in here, and the Court read it.  I think probably the remedy

1    is just to not include it because you did read the relevant

2    statute, and I'm not sure the jury will notice that it's gone.

3    But the second statute, 1513(b), is not the statute charged,

4    it's 1513(a), which the Court read above.  I think it must

5    have been in a go-by and I didn't notice it.

6                THE COURT:  I didn't notice it either.

7                MS. WILKINSON:  And I think that -- I apologize for

8    that, Your Honor.  I think that's probably the best remedy

9    because you did read the appropriate -- so this is the actual

10   statute.

11               THE COURT:  I read one they don't have to

12   consider.

13               MS. WILKINSON:  You read one they didn't have -- I

14   put in the instruction form that the jury doesn't have to

15   consider.  So this is the statute and this is just -- this

16   probably in a go-by and I didn't notice it.  I apologize for

17   that, Your Honor.

18               MR. DAVIS:  I think we'd cause more confusion by

19   doing anything at this point.  I think just taking it out, at

20   least on behalf of Mr. Carter, is --

21               MR. TRAINOR:  Your Honor, my concern is that I

22   noticed some jurors taking notes and --

23               MS. WILKINSON:  If the counsel wants to, I think the

24   Court can say the whole 1513 was read, instead of just the

25   provision having to do with section (a) here.  Section (b) is

1   another crime, and it was included as if -- you know, the

2   whole statute, but it's really just --

3              THE COURT:  I didn't provide elements or go through

4   it in that nature, I just read the statute and I read

5   something that, you know, they don't need to know about.  But

6   I don't know, I tend to agree with the notion that if I try to

7   go back and correct it, it might add to the confusion.

8              MR. DAVIS:  They're going to refer to the

9   instructions back there, an issue as complex as this, I mean,

10  this is statute, they're going to look at the law, I wouldn't

11  think, but --

12             MR. TRAINOR:  Well, certainly if it generates a

13  question, we can deal with it then.

14             THE COURT:  Well, of course.

15             MR. TRAINOR:  So beyond that, we want to object to

16  correcting it on the written materials that go into the

17  jury --

18             THE COURT:  Will do, will do.  I have a handful of

19  edits.  I always catch little things as I go, I didn't catch

20  that one, unfortunately, but -- okay.

21             MS. WILKINSON:  Thank you, Your Honor.  I'm sorry

22  about that.

23             THE COURT:  That stuff happens.  Anything else?

24             MR. TRAINOR:  Not at the moment.

25             THE COURT:  Then I'll excuse them right at 5:00

1    o'clock.

2              (The following proceedings were had in open court.)

3              THE COURT:  All right.  Well, we timed that out

4    perfectly, it is exactly 5:00 o'clock now.  So ladies and

5    gentlemen, I am going to dismiss you for the evening.  When

6    you come back in the morning, we'll go straight into closing

7    arguments.

8              I will instruct you, however, again, to not discuss

9    the case with anyone, including even among yourselves.

10   Everything you learn about this case needs to be learned in

11   this courtroom.  I thank you for the time and consideration

12   you have given thus far, and I look forward to seeing you

13   tomorrow at 9:30.  Please enjoy your -- I thought I got the

14   time wrong or something.  I will see you at 9:30, and enjoy

15   your evening.

16             (Jury left the courtroom.)

17             THE COURT:  All right.  Who's giving the closing

18   argument?

19             MS. WILKINSON:  Ms. Oldham.

20             THE COURT:  Do you have a sense of how long?

21             MS. OLDHAM:  Your Honor, I would estimate between an

22   hour to 90 minutes.

23             THE COURT:  All right.  Do you have an estimate --

24   is it Mr. Davis, or --

25             MR. ZERKIN:  Yes, Mr. Davis.

1          MR. DAVIS:  Hour max, probably a little less.

2          THE COURT:  Mr. Mercer.

3          MR. MERCER:  Approximately -- I didn't hear the

4     government's estimate.

5          THE COURT:  Government's estimate was in the range

6     of 90 minutes.

7          MR. MERCER:  60 to 90 minutes.

8          THE COURT:  All right.  And I know it's often hard

9     to estimate rebuttal, but I don't know if you have a sense as

10    you're starting out.

11         MS. WILKINSON:  45 minutes, Your Honor, half hour.

12    45 minutes.

13         THE COURT:  Just helps to plan the day.  In a four

14    week trial, I certainly am not holding you all to the one-hour

15    limit in the rule.  That all sounds reasonable.

16         All right.  Anything else we need to address

17    tonight?

18         MS. WILKINSON:  No, I don't think so.  Thank you,

19    Judge.

20         THE COURT:  All right.  I'll see you all in the

21    morning.

22         (The proceedings were concluded.)

23         I, Christine Asif, RPR, FCRR, do hereby certify that
      the foregoing is a correct transcript from the stenographic
24    record of proceedings in the above-entitled matter.

25              _____/s/_____
                Christine T. Asif, Official Court Reporter

```
 1                              INDEX
 2  Witness Name                                        Page
 3  Melody Payton
 4      Direct Examination By Ms. Oldham.......................... 70
 5  Zabiullah Ali
 6      Direct Examination By Ms. Oldham.......................... 78
 7      Cross-examination By Mr. Davis ........................... 90
 8      Redirect Examination By Ms. Oldham ....................... 92
 9  Special Agent Summer Meunier
10      Direct Examination By Ms. Wilkinson ...................... 94
11      Cross-examination By Mr. Davis ........................... 136
12  Charles Broussard
13      Direct Examination By Mr. Davis .......................... 152
14      Cross-examination By Ms. Wilkinson ....................... 156
15  Court's Instructions to the Jury ......................... 160
16
17
18
19
20
21
22
23
24
25
```

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

< Dates >
"may 19:24, 21:22,
    22:3.
2/2/18 156:14,
    156:17.
5/25/16 157:13,
    158:2, 158:20.
December 2015
    208:25.
December 2016
    209:1.
December 2017
    102:7.
December 5th, 2017
    93:13.
January 27th, 2020
    1:19.
June 1, 2016 219:22,
    220:10.
June 17th, 2015
    100:23.
June 18th, 2015
    101:14.
June 1st 103:3,
    145:10.
June 1st, 2016
    208:17.
June 21st, 2016
    68:4, 68:17.
June 26, 2015
    98:21.
June 26th, 2015
    99:5.
June 2nd 97:5,
    98:2.
June 3rd 138:17.
June 7th, 2016
    96:9.
May 25th, 2016
    154:2.
May 27, 2016 190:18,
    191:15, 191:16,
    198:18, 202:18.
May 27th 96:19,
    135:21.
May 27th, 2016
    65:19, 72:24,
    97:17, 105:2,
    143:1, 190:19,
    193:20, 193:21.

May 28, 2016 82:7.
May 2nd, 2018
    153:21.
May 31st, 2016
    217:8.
May 4, 2016 98:23,
    100:13, 219:22.
May 4th, 2016 98:19,
    100:10, 220:9.
May 6th 98:24.
May 7th, 2016
    96:9.
May 8th, 2016
    216:25.
September 14th, 2016
    103:25.
September 22nd, 2016
    103:22.
"one 11:14, 28:8.
$1,100 97:11,
    98:2.
$520 96:24, 138:1.
'04 155:19.
'05 155:20.
'08 155:15.
'14 9:1, 9:8.
'99 155:20.
.
.
< 1 >.
1 108:20, 114:12,
    128:19, 130:10,
    133:8, 186:11,
    186:13, 190:5,
    190:11, 190:17,
    192:1, 192:3,
    193:16, 193:19,
    193:23, 194:2,
    205:20, 207:6,
    208:22, 209:6,
    220:3.
1(443 102:5,
    102:21.
10 3:14, 6:10,
    113:2, 125:18,
    142:13, 186:15,
    208:23.
100 26:25, 136:25.
101 1:48.
1056 153:6.

10:23 217:8.
10:30. 35:9.
10th 102:8, 104:1,
    135:1, 137:7.
11 3:14, 6:13,
    113:2.
11:28:38 97:21.
12 6:22.
12. 7:9, 7:20.
125 103:1.
12:00 52:6.
13-minute 125:18.
136 226:21.
137 103:1.
13:28 132:8.
13A 93:16.
14 7:20.
15 57:4, 57:5,
    72:22.
15(3)(a 221:22.
15. 8:1.
1512 191:12, 191:20,
    202:13.
1512(k 191:8.
1512. 190:8.
1513 190:7, 190:23,
    191:5, 198:8,
    198:11, 222:24.
1513(a 222:4.
1513(b 199:2,
    222:3.
1513(f 190:12.
1513. 198:10.
152 226:25.
1533 143:4.
156 226:27.
16 8:7.
160 226:29.
17 8:15, 79:11,
    79:13, 79:14.
17. 10:4.
18 190:6, 190:7,
    190:23, 191:20,
    198:8, 199:1,
    202:12, 204:13.
19 8:12, 10:7,
    55:2.
1:36:40 68:8.
1:49:50. 68:8.
.

```
.
< 2 >.
2 5:10, 154:12,
  198:7, 203:17,
  204:10, 205:20,
  206:25, 207:9,
  208:1.
2(a 204:12.
20 124:12, 144:1,
  144:2, 157:18.
20043 156:9.
2008 155:11.
2013 8:25, 9:8,
  104:1, 135:1,
  137:7, 137:8.
2016 65:11, 72:16,
  96:19, 97:5,
  117:23, 134:20.
2017 102:8.
2020 8:3, 117:23.
21 120:7, 217:6,
  217:13, 217:16,
  218:23, 219:7,
  220:3.
21201 1:49.
21234 96:2.
21236 98:7.
217 85:4.
220 81:9.
23 17:22, 18:3.
2399 145:2, 145:7.
24 10:10, 10:14.
2401 153:9.
25 11:19, 12:6,
  12:24, 13:2,
  14:21, 17:24,
  19:6, 22:4,
  109:11, 139:16.
25-minute 141:5.
2520 97:3.
26 11:19, 12:6,
  13:2, 14:21,
  17:24, 19:5,
  19:7.
26. 12:25, 22:4.
275 67:12.
28 22:5.
29 134:15, 142:5,
  147:10.
291 65:12.

2917 133:21.
2919 65:17, 72:19,
  105:1, 105:25,
  133:18, 134:10.
2: 198:12.
2:00 123:11.
2:21 117:6.
2:47 217:1.
.
.
< 3 >.
3 5:11, 5:12, 91:24,
  96:10, 111:25,
  190:7, 191:7,
  191:14, 192:1,
  192:5, 193:16,
  193:19, 194:2,
  205:22, 207:6.
3. 193:24.
30 24:7, 124:20.
33 22:16, 23:4.
35 24:7, 54:6.
36 24:20.
38 26:5, 26:9,
  33:19.
39 33:3.
3:00 141:8.
3:00. 148:14.
.
.
< 4 >.
4 67:8, 85:4, 92:5,
  134:8, 134:14,
  186:11, 186:14,
  202:11, 203:1,
  204:10, 206:25,
  207:9, 208:1.
4. 67:7, 205:22.
40 149:1.
404(b 4:21.
443 217:4, 217:11.
45 225:11, 225:12.
47. 221:19.
4737 103:3.
4:59 118:24.
4th 1:48, 6:16,
  6:18.
.
.
< 5 >.

5 2:25, 67:6, 67:8,
  73:10, 85:4,
  91:24, 92:5, 98:9,
  123:2, 125:19,
  125:21, 125:23,
  127:16, 128:15,
  153:11, 153:23,
  154:13, 155:9,
  156:7, 157:16,
  158:8, 158:11.
5. 125:25.
5/27 137:25.
5/27. 138:7.
5106 153:2, 153:4,
  153:7.
5106. 153:8.
5160511970 68:24.
53 114:12.
54-second 125:18.
5520043 157:7.
5:00 160:17, 223:25,
  224:4.
5:00. 160:16.
.
.
< 6 >.
6 12:24, 13:1, 67:4,
  67:8, 96:10,
  122:8, 186:12,
  208:16.
6/2 138:8, 138:12.
6/6 138:18.
6/6. 138:19.
60 225:7.
687-4737 102:21.
6:15 143:17.
6:16 112:6.
6:17. 119:22.
6:29 100:13.
6:30 73:2.
.
.
< 7 >.
7 65:5, 69:8,
  218:4.
70 226:7.
761-5150 217:4,
  217:11.
7626 143:2.
78 226:11.
```

79 221:5.
7: 216:25.
7:00 68:1, 73:9,
  73:10.
7:15 62:2, 62:17,
  73:11.
7:20 143:18.
7:53 135:1.
7:55 130:16.
.
.
< 8 >.
8 120:15, 121:24,
  122:8, 218:4.
801(d)(1)(b 37:16.
801. 50:9.
82 33:6.
8409 96:1, 134:5,
  145:1.
841 217:6, 217:13,
  218:23, 219:7.
843(b 217:16.
846 220:4.
846. 217:6, 217:14,
  218:24.
8851 98:6.
8: 217:7.
8:04 121:1.
.
.
< 9 >.
9 108:20, 123:2,
  125:19, 125:21,
  125:22, 125:25,
  127:16, 128:15,
  186:12, 219:18,
  219:21, 220:8.
90 224:22, 225:6,
  225:7, 226:13.
911 105:16, 110:8,
  110:10, 114:5,
  114:8, 114:23,
  117:8, 118:4,
  118:7, 118:16.
92 226:15.
935-0723 102:5.
94 226:19.
99 155:19.
9:27 65:20.
9:30 64:22,

224:14.
9:30. 224:13.
_____/s/_____
  _____ 225:27.
.
.
< A >.
A-11 74:19.
A-27 70:16.
A-29 83:17.
A-30 84:2, 84:7,
  84:13.
A-30A 85:22, 86:1,
  86:13.
A-30C 90:9.
A-31 135:18.
A-32 89:17, 89:18.
A-6 133:13,
  133:14.
A-l-i 78:15.
A.m. 65:20, 97:22,
  97:25, 112:6,
  217:8.
abet 198:21, 202:21,
  205:12.
abets 204:14,
  204:22.
abetted 142:13,
  199:13, 199:24,
  201:15, 203:5,
  203:8, 203:13,
  203:21, 205:3,
  205:11, 206:13,
  208:14.
abetting 204:10,
  204:12, 204:17,
  205:7, 206:6.
abettor 206:9,
  206:20, 206:22.
ability 26:11, 29:7,
  30:24, 31:11,
  31:22, 32:1, 32:7,
  182:5, 211:2.
able 34:20, 35:13,
  37:17, 42:4, 50:5,
  52:8, 88:15,
  88:22, 89:23,
  90:1, 104:20,
  116:2, 146:6,
  150:4, 155:5,

155:21, 159:24.
above 46:25, 91:16,
  102:9, 103:16,
  103:24, 122:2,
  222:4.
above-entitled
  225:25.
abrasions 85:8,
  85:9, 85:10.
absence 10:17,
  177:10, 177:14.
absence. 11:15.
absolute 149:19.
Absolutely 23:19,
  60:8, 60:22, 61:2,
  61:18, 150:12.
accept 143:11,
  161:19, 170:5,
  181:1, 182:6,
  182:14, 183:2,
  186:3.
accepted 147:23,
  164:8, 164:11,
  181:15.
accident 188:8,
  188:18.
accomplish 57:5,
  192:25, 194:13,
  195:2.
accomplished
  194:10.
accomplishment
  197:23.
accordance 167:8.
accorded 164:25.
According 96:25,
  97:19, 112:25,
  122:6, 135:14.
Accordingly 189:11,
  204:24.
account 96:4, 96:7,
  96:21, 179:22,
  180:18.
accuracy 184:12.
accurate 4:22, 5:6,
  29:14, 29:19,
  32:7, 157:13,
  179:22, 180:7.
accurately 179:11.
accusation 168:11.

accused 192:21.
acknowledge 47:11,
    50:22, 55:23,
    58:5.
Acknowledged 47:20,
    49:4, 64:2.
acknowledging
    50:19.
acquiescence
    197:15.
acquit 169:3.
acquittal 141:18,
    142:5, 147:10,
    147:12, 159:22,
    166:23.
across 91:20.
act 164:8, 188:1,
    188:5, 188:6,
    188:10, 188:15,
    189:8, 189:9,
    189:10, 189:24,
    194:14, 195:1,
    197:2, 200:8,
    200:24, 201:3,
    205:15, 205:25,
    206:10, 217:5,
    217:12, 217:20.
acted 47:2, 188:19,
    199:14, 199:16,
    200:6, 200:10,
    200:18, 200:24,
    201:9, 201:11,
    201:20, 203:6.
actions 189:6,
    194:22, 194:24,
    204:6, 206:18,
    213:25, 214:1.
activation 102:6,
    102:8.
Activities 15:24,
    72:6, 76:9, 76:15,
    95:1, 196:14,
    215:5.
activity 193:12.
acts 5:21, 5:23,
    168:9, 188:7,
    188:16, 189:10,
    189:13, 189:17,
    196:7, 196:24,
    197:16, 205:8,

208:2, 217:5,
    217:12, 217:20.
Actual 39:23, 47:23,
    105:18, 190:18,
    191:15, 193:3,
    208:3, 210:21,
    210:25, 214:25,
    222:9.
actually 7:25, 8:19,
    24:11, 24:21,
    32:18, 34:15,
    39:17, 47:11,
    55:24, 56:11,
    57:16, 61:10,
    89:1, 95:24,
    107:8, 111:10,
    117:18, 128:20,
    160:25, 193:8,
    205:1, 207:13,
    215:11.
add 6:23, 8:10,
    16:12, 35:2,
    223:7.
added 55:2.
addict 182:3.
addicted 181:20.
adding 33:7,
    77:12.
addition 5:4, 6:15,
    37:22, 79:21,
    85:6, 85:20,
    132:10, 133:12,
    185:2, 187:5,
    204:7, 218:17.
address 35:20, 38:2,
    43:7, 56:9, 58:16,
    58:20, 58:21,
    59:8, 59:9, 72:19,
    95:25, 146:20,
    225:16.
addressing 2:3,
    28:14, 141:12.
admissibility
    165:12, 165:16.
admissible 165:7.
admission 16:17,
    36:5, 65:4,
    69:9.
admit 37:2,
    174:11.

admits 143:6.
admitted 4:13, 4:15,
    4:25, 89:17,
    174:24, 187:7.
admitting 23:12,
    37:5.
adopt 142:6.
Advance 32:18,
    153:3.
Advanced 153:2,
    156:13, 156:19,
    156:24, 157:1,
    157:5, 158:16.
advances 180:22.
advantage 115:22,
    115:24, 144:8.
adverse 24:8,
    175:20.
advice 37:6, 37:17,
    38:18, 39:20,
    44:4, 44:23,
    52:16, 55:6,
    58:15.
advise 149:10.
advised 15:21,
    65:25, 173:25,
    198:1.
advising 41:2.
aerial 116:16.
affairs 213:24.
affect 92:17,
    177:14, 179:18,
    204:6.
affected 60:5,
    92:15, 181:5.
affirmative 183:9,
    205:25.
aforethought 190:25,
    191:21, 198:20,
    200:6, 202:20.
afraid 144:23.
afternoon 94:10,
    125:13, 151:24,
    152:23, 156:6.
age 165:25.
agency 89:7,
    203:25.
agents 95:7,
    149:2.
aggressive 43:6,

57:15.
aggressive. 57:18.
ago 137:3, 195:24.
agree 20:4, 24:21,
    25:4, 46:7, 47:17,
    49:15, 56:24,
    62:14, 65:10,
    69:1, 77:11,
    98:11, 190:22,
    191:18, 219:25,
    223:6.
Agreed 5:13, 6:8,
    32:23, 36:6, 37:1,
    38:17, 38:18,
    40:19, 51:22,
    54:23, 55:1,
    56:24, 67:8,
    173:3.
agreeing 37:23,
    38:25, 41:20.
agreement 39:14,
    142:8, 146:15,
    173:2, 192:24,
    193:19, 194:3,
    194:6, 194:16,
    194:23, 196:1,
    196:4, 198:3,
    220:8.
agreements 23:2.
aid 70:21, 70:23,
    70:25, 104:12,
    173:23, 198:21,
    202:21, 205:12.
aided 142:13,
    199:12, 199:21,
    199:23, 201:15,
    203:5, 203:8,
    203:12, 203:20,
    205:3, 205:11,
    206:13, 208:14.
aider 206:9, 206:19,
    206:22.
aiding 197:22,
    204:10, 204:12,
    204:17, 205:7,
    206:6.
aids 204:14, 204:22,
    206:8, 219:1.
aims 196:4,
    197:11.

Akers 156:14.
Alero 155:19.
Ali 75:19, 78:1,
    78:2, 78:6, 78:14,
    78:19, 78:21,
    81:11, 81:19,
    82:24, 84:6,
    84:19, 85:22,
    86:16, 89:17,
    90:9, 90:17,
    92:14, 226:9.
alibi 12:16, 14:1,
    14:3, 14:4, 14:20,
    18:16, 19:2,
    20:18, 20:20,
    21:4, 21:8, 21:9,
    21:15, 21:18,
    21:24, 21:25,
    22:2, 178:3,
    178:6.
allegations 61:7.
alleged 10:3, 34:21,
    105:17, 173:13,
    190:2, 194:5,
    194:7, 196:8,
    197:5, 201:14,
    202:5.
allegedly 5:21.
allow 6:19, 44:25,
    166:3, 220:24.
allowed 4:19, 44:6,
    45:12, 54:14,
    186:3.
allowing 45:18.
almost 24:24,
    145:11.
alone 17:9, 17:17,
    32:9, 149:20,
    162:3, 166:14,
    169:2, 174:1,
    176:11, 178:8,
    187:22, 193:10,
    211:11, 212:15.
already 10:21,
    14:15, 37:23,
    44:20, 48:11,
    54:23, 58:15,
    108:16, 113:8,
    127:15, 150:15,
    165:15, 221:15.

alternative
    215:11.
Although 7:6, 14:8,
    35:15, 143:23,
    168:10, 211:7,
    213:10.
Amanda 156:14.
ambit 197:3.
amend 15:8.
America 1:5, 65:9,
    164:24.
American 80:2.
among 123:13, 173:2,
    207:18, 224:9.
amount 57:11, 96:23,
    97:7, 201:6,
    208:21, 209:5.
amounts 216:15.
analysis 210:7.
analyst 94:22,
    94:24.
analyzing 174:20.
and/or 10:3, 173:12,
    193:19, 193:23,
    205:20, 207:6,
    207:9, 208:1.
anger 180:11.
angle 90:21, 105:20,
    105:25, 106:6,
    113:2, 117:25,
    119:16, 125:19,
    130:8.
angles 106:7,
    119:18, 122:8,
    130:6.
angulation 90:23.
announce 139:14.
anonymous 31:25.
answer 21:23, 77:5,
    149:24, 163:1,
    163:9, 206:21.
answered 55:11,
    138:12.
answers 163:5,
    163:9, 163:11,
    164:11, 164:12,
    172:15, 172:24.
anticipate 32:17.
Antonio 102:22,
    103:5.

anybody 16:7, 35:2,
61:3.
anyway 6:5, 77:8.
aorta 88:11,
88:20.
Apartment 96:1,
143:16, 212:3.
apologize 55:19,
222:7, 222:16.
apparent 61:22,
144:20.
appealed 183:22.
appear 96:3, 101:19,
103:13, 156:12,
156:13, 157:6,
177:8, 179:4,
179:9, 192:16.
appearance 210:11.
appeared 13:9,
130:15, 174:4.
appears 131:2,
131:23, 173:21,
174:2.
appellate 159:21.
Apple 101:19,
102:9.
applicable 25:14,
31:13, 31:14,
31:18.
applied 98:17.
applies 15:10,
16:11, 16:15,
16:17, 32:15.
apply 15:4, 15:7,
45:5, 45:6,
161:20, 185:24,
215:19, 215:21.
appreciate 46:6,
64:21, 64:25,
76:3, 77:16.
apprised 196:14.
approach 2:13,
25:24, 75:20,
83:24, 129:7,
139:7, 159:17,
221:3.
appropriate 11:2,
11:11, 21:19,
23:14, 23:15,
29:15, 32:11,

41:4, 42:2, 42:7,
42:21, 53:25,
193:9, 222:9.
Approximately 62:18,
65:19, 81:8, 81:9,
94:19, 120:2,
217:1, 217:8,
225:3.
Arbor 96:1, 134:5.
areas 80:16, 81:17,
86:8, 88:14,
88:16, 89:13,
133:24.
argue 10:18, 10:19,
15:16, 21:23,
22:1, 24:1, 30:11,
59:22, 60:2, 60:6,
60:12, 60:22.
argued 10:21,
44:20.
argues 183:6.
arguing 11:22, 20:3,
39:13, 52:15.
argument 10:11,
11:11, 14:13,
17:12, 17:20,
28:1, 43:7, 44:8,
142:6, 147:19,
169:14, 224:18.
arguments 31:3,
31:4, 33:14,
147:15, 160:2,
161:16, 162:23,
175:25, 184:18,
224:7.
arm 85:21, 86:3,
86:5, 86:20,
86:22, 87:8.
armpit 87:8.
around 6:18, 7:24,
43:12, 58:17,
66:9, 87:14,
87:22, 102:6,
105:25, 112:6,
128:14, 130:16,
137:11, 143:16,
160:16, 221:10.
arrange 148:19.
array 68:5, 68:9,
68:10, 69:2,

69:4.
arrays 68:17, 68:19,
69:2.
arrest 175:7.
arrested 45:11,
102:7.
Arriell 36:4.
arrive 166:19.
arrived 73:15,
144:3.
arrives 144:4.
arriving 73:14,
142:20, 143:19,
144:13, 144:22.
arteries 134:11.
artful 37:24.
Asburne 84:22.
Ashburne. 67:6.
Asif 1:46, 225:23,
225:28.
asks 40:5, 176:9,
176:10.
aspect 43:20.
assembled 197:11.
asserted 37:9.
assigned 68:24,
95:2.
assist 173:23,
185:18, 216:6.
assistance 103:8,
174:20.
assistant 71:4,
71:13, 78:22,
79:3, 79:8,
82:15.
assisted 125:19,
146:17, 198:1.
assisting 82:18.
assists 219:1.
associate 195:15,
206:17.
associated 177:6,
205:13, 205:16,
211:22.
associating 206:4.
Association 80:2,
197:7.
assume 3:7, 3:8,
3:16, 6:16, 9:21,
13:3, 57:3, 97:25,

160:4.
assumed 171:9,
  172:2, 172:6,
  172:11.
assuming 61:24,
  139:16.
attach 175:19.
attached 98:12,
  98:14, 99:3,
  99:14, 129:22,
  178:12.
Attachment 99:14,
  99:18, 100:6.
attack 25:10, 48:5,
  55:10, 55:19,
  182:23.
attacked 37:13,
  46:25, 49:23,
  49:24, 50:8,
  54:13.
attacking 37:13,
  53:17, 55:13.
attempt 190:13,
  190:24, 191:9,
  191:21.
attempted 28:22,
  29:1, 214:25.
attempting 76:4.
attempts 26:13,
  198:13, 202:14.
attendance 191:10,
  191:23, 192:7,
  202:24.
attending 205:21.
attention 96:18,
  98:16, 102:13,
  108:25, 149:18,
  154:3, 154:12,
  160:23, 161:5,
  161:12, 161:13.
attitude 164:17.
Attorney 8:13,
  25:10, 98:15,
  99:5, 100:4,
  148:21, 161:25,
  165:4, 165:6,
  165:11, 167:20,
  183:6.
attorneys 10:17,
  10:20, 11:15,

35:16, 99:7,
  175:24, 177:9.
Audi 69:6, 130:15,
  143:20, 144:3,
  144:16, 144:21.
Audio 36:11, 37:2,
  37:5, 38:2, 38:15,
  38:17, 39:6,
  40:12, 41:1,
  41:22, 42:5, 42:6,
  42:8, 43:17,
  43:19, 43:21,
  43:24, 44:1, 44:3,
  54:19, 55:6,
  57:14, 57:23,
  93:14, 107:6,
  135:5, 173:21.
audiotape 40:2,
  53:24.
AUSA 1:25, 1:27,
  101:6.
authorities 12:8,
  12:18, 15:9,
  15:21, 16:12,
  19:14, 21:3,
  175:7, 175:11,
  214:10.
authorized 201:25.
Auto 156:24, 157:2,
  157:5, 158:16.
automatically
  197:8.
Autoparts 153:2,
  153:3, 156:13,
  156:19.
autopsies 79:1,
  79:6.
autopsy 81:20,
  81:21, 82:3, 82:6,
  82:7, 82:16,
  82:19, 83:1,
  83:11, 83:20.
available 10:15,
  189:4.
Avoid 16:18, 101:3,
  174:13.
aware 9:12, 31:8,
  62:3, 72:8, 72:12,
  72:14, 145:3,
  200:16, 201:10.

awareness 196:3.
awkward 107:18,
  124:20.
axilla 86:3, 86:4.
.
.
< B >.
B-r-o-u-s-s-a-r-d
  152:19.
B. 1:39.
back. 66:22.
background 5:5,
  79:16, 131:3,
  168:4.
bad 168:6, 188:12,
  200:18.
bags 71:24.
Bailey 26:17,
  26:24.
balance 33:22, 34:8,
  34:10.
Baltimore 1:20,
  1:49, 65:20, 66:5,
  68:22, 79:20,
  89:8, 97:3, 97:16,
  97:20, 98:6,
  135:24.
band 83:20, 83:21.
Bank 95:18, 97:13,
  137:16, 137:25,
  211:7.
Bar 21:10, 21:14,
  165:3.
Bardos 10:8, 98:19,
  98:24, 99:8,
  100:12.
base 162:9.
Based 14:16, 21:20,
  26:19, 28:23,
  39:21, 81:3,
  82:12, 89:22,
  119:17, 141:16,
  141:19, 141:25,
  157:24, 165:20,
  166:6, 167:7,
  174:3, 174:18,
  176:24, 183:24,
  187:19, 214:15.
basic 196:3.
Basically 7:3,

216:7.
Basis 17:9, 17:16,
  42:22, 59:17,
  63:21, 84:15,
  166:16, 176:1,
  176:6, 178:8,
  185:19, 220:23.
Beach 21:12, 144:16,
  145:9, 145:10,
  146:19.
Bear 138:5, 162:24,
  180:25, 186:25,
  187:17, 208:8.
beard 67:1.
bearing 183:9,
  196:21.
beat 33:12.
beating 8:2,
  33:16.
became 193:23,
  195:6, 220:11.
become 101:4,
  196:12, 201:10.
becomes 11:24,
  198:2.
began 68:8, 169:1,
  169:9.
begin 161:1.
Beginning 37:7,
  40:5, 208:24,
  219:21, 221:19.
begun 171:14.
behalf 12:23, 18:14,
  222:20.
behavior 214:8,
  215:23.
Behind 110:22,
  119:12, 119:13.
Belair 98:6.
belief 31:5,
  184:16.
believability
  162:19.
believable 182:4.
believed 13:22,
  17:14, 20:21,
  178:7, 178:11.
believes 143:10,
  165:6.
Belinda 99:25.

below 96:15, 97:4,
  99:13, 99:20,
  100:24, 101:10,
  101:24, 102:1,
  120:9, 134:9,
  134:14.
Bench 36:7, 36:25,
  38:2, 38:3, 38:9,
  39:4, 40:19,
  51:22, 54:24,
  55:1, 58:20,
  58:21, 59:8, 59:9,
  75:23, 139:9,
  159:20, 221:4.
benefit 180:19.
bent 91:14.
besides 61:20.
best 62:19, 145:23,
  222:8.
better 56:2,
  110:14.
bias 164:6, 164:10,
  164:16, 166:18,
  179:16, 179:20.
biased 180:13.
big 67:11.
Biggest 62:16,
  62:20.
binding 164:12.
bit 43:5, 85:15,
  121:22, 149:7.
Black 66:17, 102:14,
  102:18, 103:2.
Blanding 14:3.
Blast 157:17,
  158:6.
bless 190:16.
blind 68:14.
blinds 7:23.
block 114:7.
blood 83:6, 88:12.
blowup 133:24.
blue 74:12.
blurb 135:12.
blurry 54:25,
  156:12.
board 80:10, 80:12,
  80:14, 80:16,
  80:17.
bodily 199:3.

body 80:23, 81:3,
  82:3, 82:11,
  82:13, 82:25,
  83:7, 83:15,
  83:18, 83:21,
  84:21, 85:2, 85:7,
  88:4, 88:12, 91:4,
  91:6, 91:11.
bootstrapping
  42:25.
bother 3:13.
bottle 157:17.
bottom 111:12,
  114:10, 115:19,
  128:4.
box 69:17, 69:23,
  78:4, 78:11,
  93:20, 94:1,
  152:15, 211:6.
boyfriend 61:15,
  72:10, 72:13.
brake 154:11,
  154:16, 155:5,
  155:18, 157:10,
  157:17, 158:1,
  158:4.
brakes 158:9,
  158:10.
Branch 80:21, 81:2,
  98:3, 98:6,
  138:10.
break 35:24, 51:25,
  52:7, 52:12,
  77:18, 104:21,
  123:10, 134:17,
  141:6, 200:19.
breaking 202:10.
breathing 83:4.
bridge 71:8.
brief 11:7,
  146:24.
briefly 64:10,
  79:15, 90:13,
  93:5, 136:20.
brimmed 37:21,
  41:13, 45:20,
  45:22, 46:11,
  46:12, 46:14,
  49:19, 49:20,
  51:19, 53:5,

53:11, 53:18,
145:18.
bring 42:8, 42:17,
124:4, 148:16,
149:9, 206:11,
206:16.
bringing 31:19,
206:1.
broaden 17:1.
broadens 62:9.
broader 19:14.
broke 2:22,
125:17.
broker 135:16.
Bronx 135:15.
brother 65:22,
67:11.
brought 39:3, 42:16,
164:23.
Broussard 152:5,
152:10, 152:18,
152:23, 156:6,
226:23.
brown 74:11.
bruise 87:15,
87:17.
building 105:22,
116:18.
bullet 86:21, 87:2,
88:8, 88:16,
88:19, 88:22,
88:25, 89:5, 89:6,
89:15, 89:21,
90:17, 90:21,
91:4, 91:12,
92:15.
bumps 109:15.
burden 6:14, 11:3,
11:17, 165:24,
166:2, 166:24,
168:15, 168:16,
168:18, 169:6,
169:17, 170:16,
170:21, 175:16,
177:18, 184:7,
185:5, 193:15,
199:25, 204:21,
207:2.
business 61:13,
95:17, 97:13,

143:22, 156:13,
156:16, 195:14.
busy 116:4.
buyer 154:16,
154:18, 154:20,
154:23, 155:1,
155:21.
.
.
< C >.
C-28 95:17, 137:23,
138:3.
C-h-a-r-l-e-s
152:19.
call 8:24, 9:5,
9:11, 9:16, 41:20,
62:22, 73:13,
73:19, 93:16,
104:1, 104:3,
134:18, 136:8,
136:23, 137:5,
152:3, 152:5,
159:6, 159:9,
170:17, 173:14,
177:11, 218:18.
called 11:10, 22:23,
36:3, 60:23,
60:25, 63:24,
68:14, 69:20,
73:2, 73:3, 75:6,
78:7, 93:23, 95:6,
95:10, 111:2,
152:11, 170:1,
170:13, 170:25,
177:14, 181:6,
181:19, 186:10,
192:10, 211:14,
213:24.
caller 62:25,
105:16, 110:8,
110:10, 114:6,
114:8, 114:23,
117:8, 118:5,
118:7, 118:16,
218:11.
calling 66:14,
145:5, 168:18,
170:11, 177:18,
181:22.
calls 8:25, 9:9,

9:11, 9:21, 63:14,
173:15.
cam 125:25,
127:16.
Camera 105:20,
106:7, 108:20,
111:25, 113:2,
117:19, 120:14,
120:15, 121:24,
122:8, 123:2,
125:19, 125:22,
127:16, 128:9,
128:15, 128:19,
130:6, 130:8,
130:10, 131:24,
133:6, 133:8,
142:20, 144:1.
cameras 108:17,
108:18, 125:21.
Camille 107:10.
candid 179:4.
capsulize 35:15.
capture 105:13,
105:24, 108:21,
110:10, 145:19.
captured 113:2,
142:20.
capturing 143:16.
care 140:11, 175:1,
180:15, 181:1,
181:10, 200:15.
careful 28:18,
107:14, 161:13,
169:5.
carefully 27:16,
161:9, 174:1,
178:22.
carelessness 188:9,
213:5.
carjacking 144:9.
carried 178:16.
carrot 24:4, 24:5,
55:15.
carry 107:2.
cars 122:22.
cases 54:7,
194:22.
cash 96:15, 96:20,
96:23, 97:4, 98:2,
138:1, 138:4,

138:6, 138:8,
138:11, 138:13.
casing 143:20.
catch 223:19.
caught 221:13.
cause 79:2, 90:1,
90:2, 179:19,
179:21, 200:1,
200:7, 215:3,
216:6, 222:18.
caused 86:20, 86:21,
87:2, 88:8,
145:4.
causes 148:10,
199:3.
causing 217:19.
caution 180:15,
181:9, 197:4,
197:14.
cautioned 67:7,
175:6.
cavity 83:6,
86:23.
CC 68:24.
cell 16:9, 143:16,
145:4.
Cellebrite 101:19,
102:2.
cellular 217:3,
217:11.
ceramic 157:10,
158:1.
certain 4:2, 4:10,
12:7, 15:12, 18:9,
20:9, 21:2, 37:1,
51:1, 136:25,
150:3, 163:21,
167:13, 167:14,
168:1, 172:3,
173:3, 173:21,
174:10, 174:23,
174:24, 177:21,
185:12, 189:7,
189:22, 189:24,
189:25, 192:22.
Certainly 14:24,
17:4, 26:23, 33:6,
40:14, 46:8, 56:8,
57:22, 60:2, 60:5,
76:12, 76:14,

143:23, 146:3,
147:17, 163:23,
223:12, 225:14.
certification 80:14,
95:18, 156:13.
certified 80:10,
80:13, 80:16,
80:17.
certify 225:23.
cetera 62:2.
chain 98:12, 99:4,
156:22.
chance 72:23,
123:21.
change 7:23, 8:2,
19:12, 25:8.
changed 9:24, 18:24,
74:8.
changes 3:11.
character 168:6,
197:25.
characteristics
85:2.
characterization
63:6, 87:10.
characterized
194:18.
characterizing 29:2,
29:23, 31:7,
44:8.
charge 2:4, 32:20,
47:1, 147:1,
166:17, 186:9,
188:5, 190:9,
209:11, 217:22.
charged. 17:18.
charges 3:15,
168:21, 186:18,
186:19, 186:22,
187:11, 188:24,
189:21, 189:23,
198:7, 202:11,
204:9, 208:16,
208:23, 216:22,
217:15, 219:18.
Charles 152:5,
152:10, 152:18,
226:23.
charts 174:9,
174:11, 174:14,

174:15, 174:18.
cheated 172:12,
172:14.
Cheating 8:2, 8:5,
172:10.
check 56:14, 136:5,
139:20, 139:21,
140:8, 148:13,
221:8.
checking 140:17,
140:18, 141:2.
chemical 210:7.
chemist 210:7.
chest 83:5, 83:6,
84:23, 84:25,
85:1, 85:6, 85:14,
85:18, 85:19,
86:2, 86:6, 86:11,
86:12, 86:22,
90:2, 90:3.
Chief 79:9, 82:10,
83:8.
child 36:14.
children 60:4,
60:20, 60:21.
chillingly 143:15.
Chin 68:5, 68:7.
chitchatting 75:4.
choose 149:23,
179:15.
chooses 44:3.
chose 175:13.
Christian 65:22.
Christine 1:46,
225:23, 225:28.
Christopher 1:33.
Church 71:4, 71:13,
71:16, 72:5, 72:7,
72:13.
Circuit 6:16,
6:19.
circumstances 11:6,
18:1, 145:15,
167:15, 178:23,
188:21, 189:13,
194:19, 201:8,
213:21, 214:22.
Circumstantial
146:16, 170:22,
171:2, 171:15,

171:21, 176:8,
176:18, 176:25,
210:5, 210:8,
210:12, 214:3.
Citgo 138:18.
City 65:20, 68:22,
89:8, 138:19.
civil 192:11,
203:25.
claimed 12:9, 12:12,
12:16, 15:14,
16:13, 18:11,
20:10, 20:14,
177:22, 177:25.
claiming 21:16,
50:3.
claims 12:14, 19:2,
20:16, 174:23,
178:1.
clarification
163:22.
clarify 55:9.
clean 139:21, 169:1,
221:14.
clear 3:17, 6:16,
11:16, 13:10,
21:8, 39:12,
51:16, 76:1, 76:3,
86:10, 111:9,
111:18, 112:2,
117:18, 117:22,
144:6, 147:25,
161:6, 166:17,
178:17, 184:22.
clearly 26:25, 63:5,
116:5, 145:7,
145:9, 145:17,
146:14, 189:9,
214:2.
CLERK 2:9, 69:15,
69:23, 70:3, 70:5,
78:10, 78:16,
93:19, 94:1, 94:7,
141:2, 152:7,
152:14, 152:20.
client 77:19, 98:22,
165:11.
Clifton 1:10, 1:35,
186:13, 186:24,
190:20, 191:17,

198:20, 202:20,
208:24, 209:2.
clip 39:6, 41:1,
48:21, 93:6,
106:16, 108:12,
112:20, 113:7,
113:13, 116:6,
116:11, 125:18,
126:2, 128:11,
129:12, 129:13,
130:5, 132:12,
132:15.
clips 127:14.
close 13:19, 60:6,
69:25, 87:7,
87:25, 107:6,
107:18, 143:23,
161:5, 161:12,
180:16, 211:19.
closer 64:23, 66:21,
86:16, 108:19,
122:22.
closes 147:11.
closest 122:19.
closing 11:10,
146:11, 147:18,
162:22, 224:6,
224:17.
closings 10:16,
26:4, 221:6,
221:12.
clothing 81:24.
co-conspirator
167:18, 208:6.
co-conspirators
10:4, 167:15,
173:13, 181:7,
181:17, 196:8,
207:23, 208:8.
Co-defendants
101:6.
Code 190:6, 190:8,
198:8, 202:12,
204:13, 217:6,
217:13, 217:17,
218:23, 219:7.
colleague 61:15,
94:15.
collective 193:11.
colloquy 38:17.

colored 25:11,
181:5, 182:24.
colors 74:7.
combination 171:12,
192:23.
combine 11:20, 12:2,
15:12, 219:24.
combining 19:6.
comes 16:17, 38:16,
41:11, 43:22,
52:16, 53:19,
106:21, 143:15,
143:25.
coming 26:8, 38:13,
39:14, 51:23,
52:21, 58:8,
63:14, 66:9, 83:8,
93:9, 108:13,
108:21, 110:2,
110:20, 111:16,
112:14, 113:2,
113:8, 126:7,
126:14, 127:17,
128:13, 128:17,
128:21, 129:5,
129:22, 129:25,
130:12, 144:5.
commands 204:15.
comment 31:20,
46:11, 50:14,
51:19, 53:8,
53:12.
commented 39:3.
commit 168:7,
190:23, 191:19,
193:6, 204:22,
205:12.
commits 204:14,
208:6.
committed 5:21,
5:23, 14:8, 17:7,
168:9, 178:1,
184:14, 185:9,
185:10, 189:22,
193:8, 204:20,
204:23, 205:2,
205:6, 205:8,
205:10, 206:3,
206:4, 206:7,
206:10, 207:12,

207:14, 207:16,
207:20, 207:22,
208:9, 208:14,
219:6.
committed. 12:13,
20:15.
committing 5:18,
167:23, 201:3,
206:5, 217:19,
218:3, 218:22.
common 14:16, 170:9,
173:6, 176:2,
176:19, 179:12,
183:23, 186:5,
194:25, 197:11,
207:17.
commonly 191:5,
191:12.
communication
216:23, 217:3,
217:10, 217:18,
218:10, 218:14,
221:6.
communications
61:11, 143:9,
146:1, 219:13.
community 76:11,
164:21.
company 74:12.
compare 179:7.
competency 164:9.
compilation 104:25,
105:4, 105:12,
105:19, 105:23,
106:8, 108:12,
108:15, 113:7,
127:15, 130:5,
131:24.
complete 93:1,
139:4, 164:17.
completed 159:3.
completely 15:20,
25:23, 42:18,
179:22.
completes 45:25.
complex 223:9.
computers 218:13.
con- 142:5.
conceded 146:21.
conceivable 42:11.

concept 210:18.
concern 7:1, 11:16,
12:3, 146:2,
164:20, 169:22,
169:23, 220:17,
222:21.
concerned 16:19,
162:6.
concerning 164:9,
186:4, 210:10,
215:21.
concerns 183:20.
conclude 142:1,
160:12, 168:7,
171:23, 176:5,
189:18, 214:6.
concluded 68:8.
concluded. 225:22.
concludes 159:16.
conclusion 66:1,
176:15.
conclusions 177:13,
178:19.
conclusive 214:15.
conclusively
189:9.
concrete 14:2, 14:4,
14:20, 215:9.
condition 82:24,
83:13, 84:21.
conditions 100:18,
101:1.
conduct 12:9, 15:14,
16:13, 20:11,
68:5, 175:8,
177:5, 177:22,
188:11, 188:13,
188:20, 189:6,
193:13, 194:19,
197:10, 199:3,
200:1, 200:14,
201:14, 205:25.
conducted 68:9,
82:6, 82:7,
85:7.
Conducting 79:6,
88:4.
confederate
219:25.
conference 2:4,

32:20, 75:23,
139:9, 159:20,
165:13, 221:4.
conferences 165:8.
confession 141:23.
confirm 104:9,
104:20.
conflicts 162:15,
183:14.
confrontation
144:10.
confuse 13:7,
14:18.
confused 3:1,
52:15.
confusing 26:10.
confusion 16:18,
222:18, 223:7.
Congress 193:9.
connect 111:1,
111:2.
connected 147:20.
connection 95:10,
95:13, 103:8,
104:24, 105:6,
133:25, 162:24,
180:9, 188:23,
196:11, 211:24,
221:18.
connects 119:9,
145:22.
conscious 188:17.
consciously
200:10.
consciousness
11:25.
conservative 9:18,
61:6.
consideration 25:3,
161:23, 164:14,
164:25, 165:2,
169:5, 182:20,
213:20, 220:24,
224:11.
considerations
185:23, 187:24,
215:19.
considered 168:3,
172:20, 172:21,
175:8, 183:8,

187:7, 211:24.
considering 176:20,
  180:23, 182:7,
  195:10.
considers 147:21.
consistent 4:9,
  12:9, 15:15,
  16:14, 20:11,
  37:11, 38:11,
  38:21, 39:7, 39:8,
  40:20, 43:23,
  46:17, 46:23,
  48:4, 48:16,
  48:24, 49:22,
  50:8, 50:23, 51:7,
  53:19, 58:9,
  85:10, 103:6,
  177:22, 179:8.
consists 163:5,
  172:16, 187:25.
conspirator 195:25,
  196:21, 198:4.
conspiratorial
  146:15.
conspirators 194:7,
  196:25, 207:18,
  208:7.
conspire 190:12,
  190:21, 191:8,
  191:18, 219:25.
conspiring 219:19,
  220:5.
constitute 215:8.
constituting 208:3,
  217:5, 217:12,
  217:20.
constitution
  175:14.
constructive
  214:25.
contact 101:3,
  102:16, 143:1,
  143:8, 144:25.
contacts 146:15,
  174:10.
contained 5:19, 6:2,
  69:2, 69:4,
  167:24, 172:7,
  174:17.
container 135:24.

containing 173:20,
  208:21, 209:5,
  220:2.
contains 187:10.
contend 13:15, 48:6,
  144:12, 144:22.
contends 37:7,
  144:2, 145:2,
  146:13.
contested 13:17,
  44:24.
context 5:5, 13:5,
  28:25, 168:4,
  194:21.
continue 12:20,
  45:12, 81:17,
  110:16, 111:8,
  111:13, 112:8,
  114:25, 122:15,
  125:14, 128:24,
  141:7, 169:10.
continued 45:11.
continuing 45:19,
  190:19, 191:16,
  209:1, 219:22,
  220:10.
continuously
  213:24.
contradicted 170:6,
  183:12.
contradiction
  25:25.
contradictory
  179:9.
contrary 28:1,
  76:7.
contrasted 25:21.
Control 68:22,
  187:23, 210:22,
  211:3, 211:8,
  211:13, 211:22,
  212:2, 212:5,
  212:6, 212:8,
  212:10, 212:11,
  212:14, 212:16,
  212:20, 212:23,
  215:16.
controlled 42:8,
  42:18, 208:22,
  209:6, 209:10,

220:3.
controlling 174:5.
contusion 87:16,
  87:17.
convenient 123:6.
conversation 53:8,
  62:17, 73:13,
  134:25, 173:15.
conversations 10:3,
  44:5, 173:12.
convey 63:23.
convict 60:4, 177:3,
  184:13, 215:24.
convicted 24:11,
  24:17, 24:18,
  182:10, 182:13,
  205:7, 220:25.
convicted. 33:8.
conviction 147:14,
  147:24, 148:4,
  182:10.
convictions 150:3,
  150:4.
convince 215:25.
convinced 169:4,
  169:11, 184:13.
cook 71:21, 71:22.
cooperate 194:13.
cooperating 202:6.
cooperation
  192:14.
cooperators 23:2.
Copies 68:19,
  160:20, 160:25.
copy 2:5, 2:7, 2:10,
  18:18, 68:10,
  103:13, 104:13,
  104:14, 134:22.
corner 100:22,
  114:10, 115:13,
  115:17, 134:6,
  153:22.
cornerstone 17:19.
correcting 223:16.
correctly 85:16,
  174:16.
correctness
  184:10.
Coulson 101:10.
counsels 204:15.

Counts 142:7,
142:10, 186:11,
186:13, 187:10,
204:10, 205:20,
205:22, 206:25.
Couple 15:3, 43:16,
57:10, 221:13.
coupled 206:3.
course 11:18, 37:4,
48:7, 103:24,
123:8, 124:14,
143:5, 143:18,
151:20, 177:8,
189:19, 194:15,
223:14.
court. 77:24,
140:23, 160:10,
224:2.
courthouse 171:4.
courtroom 7:22,
12:8, 12:11,
15:13, 18:10,
19:15, 20:10,
20:13, 21:2,
35:19, 49:12,
50:5, 58:25,
145:17, 148:17,
171:6, 171:10,
173:9, 177:21,
177:24, 224:11.
courtroom. 64:13,
123:15, 125:11,
141:10, 151:23,
224:16.
cover 13:24,
66:18.
covered 13:11,
66:24, 75:4.
covering 116:17.
Crawford 98:17,
99:10, 100:6.
create 45:4.
created 102:16.
creates 13:6, 21:18,
180:20.
credibility 25:10,
37:12, 46:24,
48:5, 49:23,
49:24, 53:18,
162:14, 162:19,

165:18, 170:15,
180:5, 180:10,
180:17, 180:25,
182:12, 182:23,
185:2.
credible 163:25,
170:7.
crime. 17:10,
28:10.
crimes 5:8, 164:22,
166:15, 182:13,
186:9, 186:16,
192:10, 192:12,
207:8, 208:9.
crimes. 24:18,
193:4.
CRIMINAL 1:9, 68:24,
164:20, 168:18,
177:5, 177:17,
188:1, 188:2,
188:4, 192:11,
192:16, 192:23,
193:12, 193:14,
197:9, 197:10,
204:1, 205:8,
206:11, 206:17,
206:18, 208:8.
criteria 170:14.
Cross 75:13, 90:12,
112:2, 133:2,
136:19, 156:3.
Cross-examination
46:18, 90:15,
136:21, 156:4,
172:1, 179:8,
226:13, 226:21,
226:27.
cross-examine
149:25.
crucial 166:10.
crying 63:20,
63:25.
cumulative 62:18.
current 76:23.
currently 14:23,
95:2.
custody 210:22,
211:1, 211:4,
211:8.
customer 153:14,

153:15, 153:19.
cut 92:18, 114:9,
116:23, 121:21,
144:4, 144:11.
cuts 85:8.
.
.
< D >.
damages 199:4.
dark 114:14.
dark-looking
67:17.
darker 87:15.
dashboard 111:10.
date 96:18, 96:21,
100:9, 100:21,
103:20, 137:2,
137:3, 137:5,
141:17, 153:19,
153:25, 154:1,
157:13, 189:22,
189:24, 189:25,
190:1, 190:2,
190:3, 190:17,
190:18, 191:14,
191:15, 193:20,
208:24, 220:9.
dated 156:14.
dates 190:2.
daughter 14:3, 16:8,
63:8, 65:24, 66:3,
68:2.
daughters 65:19.
Davon 1:10, 1:29,
69:3, 95:21,
134:25, 153:16,
186:10, 186:23,
190:20, 191:17,
198:19, 202:19,
208:17, 208:18,
217:2, 217:9,
219:19, 219:24.
Day 1:10, 38:3,
47:17, 93:2,
101:13, 105:1,
139:5, 139:24,
157:16, 159:3,
171:5, 210:19,
211:5, 213:24,
225:13.

days 53:23, 143:3.
Ddcarter8080@icloud.
  com 102:11.
dead 33:13, 127:10,
  127:12, 127:17,
  144:11.
dead-end 131:10.
deal 45:20, 63:15,
  67:20, 223:13.
dealer 135:15.
dealing 18:15,
  39:10, 41:22,
  53:4.
death 60:5, 79:2,
  89:24, 89:25,
  90:1, 90:2,
  135:20, 142:22,
  200:2, 200:16.
deceased 200:4.
decedent 81:23,
  82:1, 83:13, 91:4,
  92:20.
December 93:12,
  102:8.
decide 55:8, 55:17,
  150:14, 161:3,
  161:21, 162:11,
  162:17, 166:14,
  167:3, 170:7,
  170:10, 174:15,
  176:11, 178:13,
  178:25, 180:6,
  181:4, 181:16,
  182:6, 183:11,
  189:20, 213:25.
decided 4:17,
  165:10, 174:11.
Deciding 19:25,
  169:16, 169:18,
  170:20, 174:25,
  178:20, 179:13,
  180:4, 182:14,
  183:15, 185:24,
  195:9.
decision 149:20,
  150:24, 151:2,
  151:10, 163:18,
  165:23, 176:5,
  179:2, 183:1,
  185:20, 187:23,

  211:25, 213:16,
  213:17, 215:21,
  216:19.
decision-making
  166:5.
decisions 149:13.
declarant 37:12.
declaration 97:13.
dedication 76:10.
deduction 176:15.
deemed 193:9,
  195:17, 208:7.
defect 86:25.
defects 86:4, 86:7,
  86:17.
defendant. 14:24.
defendants. 5:22.
Defense 3:4, 11:19,
  21:22, 22:20,
  24:21, 25:4, 25:9,
  25:15, 44:6,
  51:13, 56:17,
  57:14, 58:23,
  61:24, 62:7,
  148:20, 149:12,
  149:19, 156:7,
  157:16, 157:25,
  158:8, 158:11,
  176:10, 182:22.
defer 58:25, 63:3.
define 80:19.
defined 201:16,
  214:25.
definitely 34:4.
definition 154:6,
  154:7, 188:22,
  203:16, 220:14.
degree 79:17, 90:20,
  90:22.
delay 64:20.
deliberate 160:21,
  162:5.
deliberated 201:5.
deliberately 188:15,
  190:25, 191:22,
  198:22, 199:15,
  202:22, 203:6,
  203:14.
deliberating
  201:3.

deliberation 200:25,
  220:19.
deliberations 161:1,
  167:17, 168:23,
  169:10, 175:23,
  187:9, 221:2,
  221:10.
Deliver 214:24,
  214:25, 215:2,
  216:5.
delivering 215:8.
demeanor 39:9,
  41:24, 42:12,
  42:19, 43:20.
demonstrably 16:9.
demonstrate 39:9,
  42:19, 43:10.
denied 148:6, 148:8,
  186:21.
denies 172:4.
deny 6:20, 77:14,
  143:4, 160:7.
deodorants 71:23.
Department 68:23,
  94:25, 135:24,
  202:3.
depend 52:9,
  179:3.
depends 27:18, 29:9,
  30:17, 30:18,
  192:13, 201:7.
depict 107:21,
  113:11, 118:4,
  130:9.
depicted 86:13,
  87:7, 108:7,
  112:6, 130:5,
  133:14.
depicting 107:5,
  110:6, 116:12,
  117:10, 117:25,
  118:19, 120:7,
  133:6.
deposit 96:20,
  96:23, 97:1, 97:2,
  97:4, 97:8, 97:20,
  98:2, 138:1,
  138:4, 138:6,
  138:8, 138:10,
  138:11, 138:13,

211:6.
deposited 98:3.
deposits 96:15.
describe 86:10,
    116:1.
described 67:10,
    72:5, 86:17,
    89:12, 114:10,
    114:14, 116:13,
    192:19, 219:10.
description 62:9,
    68:13, 84:20,
    87:10, 135:9,
    157:10, 157:11.
deserve 175:5.
deserves 182:8,
    183:4, 186:1.
deserving 25:3,
    182:19.
design 195:1.
designed 192:9.
detail 76:12, 85:15,
    183:21, 194:9,
    210:20.
details 196:16.
detectable 208:21,
    209:5.
Detective 65:21,
    66:1, 67:18, 68:4,
    68:5, 68:7, 68:15,
    68:20.
detention 98:20.
determination 148:3,
    183:17, 186:6,
    215:20, 216:10.
determine 79:2,
    88:15, 89:23,
    90:1, 90:20,
    90:22, 91:3,
    115:13, 115:22,
    155:5, 155:7,
    155:21, 161:20,
    162:14, 169:23,
    183:25, 206:13,
    214:16, 220:21.
determined 92:19,
    162:17, 187:2.
determining 19:22,
    162:20, 164:7,
    184:3, 194:23,

195:22, 214:4,
    216:7.
developed 165:21.
development 54:9,
    54:13.
deviated 200:15.
deviation 91:13.
device 218:10.
devised 189:2,
    192:18.
diagnosis 81:3.
dictation 160:24.
died 65:24, 200:4.
differ 210:19.
difference 40:23,
    40:25, 41:21,
    42:3, 43:17,
    190:9, 191:25.
different 3:22,
    17:25, 25:23,
    40:7, 47:15,
    59:17, 64:24,
    75:6, 91:14,
    105:14, 105:24,
    106:7, 162:1,
    176:7, 178:18,
    187:11, 196:24.
differently 174:4.
difficult 46:8,
    219:9.
difficulty 134:18.
dire 81:13.
directed 22:7,
    98:15, 99:7,
    163:10.
directing 154:3,
    154:12.
direction 89:14,
    92:14, 113:18,
    114:6, 121:5,
    126:11, 129:22,
    131:13.
directional 89:12.
directly 56:10,
    61:11, 78:12,
    91:20, 94:2,
    101:3, 122:2,
    142:21, 152:15,
    170:24, 213:19.
disagreeing 40:15,

40:17, 45:13.
disagreement 3:12,
    4:22, 10:8, 23:3,
    33:5, 58:10,
    58:13.
discharged 88:1,
    161:11, 164:14.
discolored 87:15.
discretion 167:20.
discuss 64:24,
    92:25, 123:12,
    139:3, 141:6,
    159:2, 162:18,
    166:2, 170:14,
    224:8.
discussed 5:6, 35:3,
    150:24, 151:7,
    168:5, 175:9,
    197:11.
discussion 76:1.
disease 82:2.
diseases 81:3.
disgruntled 61:14,
    61:15.
dismiss 224:5.
disobey 188:12,
    194:16.
dispense 209:9,
    209:10.
display 135:23.
dispute 14:12, 17:3,
    36:10.
disputed 170:23,
    171:3, 176:5.
disputes 61:13.
disregard 163:10,
    172:22, 188:13,
    194:16.
disregarded
    173:10.
distant 189:3.
distinct 193:2,
    196:24.
distinction 43:18,
    43:25, 44:3,
    171:20.
distinctly 49:15.
distribute 208:20,
    209:4, 209:8,
    209:9, 209:19,

209:24, 210:16,
213:1, 214:18,
214:21, 214:24,
215:1, 215:14,
215:22, 216:1,
216:3, 216:4,
216:13, 216:15,
216:18, 216:20,
219:20, 220:1,
220:2, 220:5,
220:6, 220:12,
220:13.
distributed 208:19,
209:3, 209:20,
209:21, 214:20,
215:12.
distributing 13:23,
23:12.
Distribution 212:25,
215:4, 215:8,
215:9, 216:6,
216:9.
District 1:1, 1:2,
190:20, 191:16,
198:19, 202:19,
208:18, 209:2,
217:1, 217:9,
219:23.
divert 12:17, 20:19,
178:5.
docket 18:22.
Doctor 92:8.
document 83:13,
96:11, 96:16,
100:11, 100:17,
101:17, 138:13,
156:6, 157:5,
157:14, 173:20.
documented 82:22.
documents 95:20,
99:13, 174:12.
doing 14:25, 65:14,
73:4, 160:4,
205:15, 222:19.
Done 18:17, 39:5,
41:7, 41:24,
52:17, 55:24,
56:12, 75:25,
83:4, 89:5,
124:21, 160:17,

189:8, 200:24,
200:25, 210:7.
door 54:11, 66:7,
93:11, 143:14.
dots 147:19.
double 68:14.
double-blind 68:5,
68:9.
downtown 66:5.
downward 89:16,
90:18, 90:20,
90:22, 90:24,
91:18, 91:21.
draft 139:21.
drafted 14:24.
dragged 45:10.
drain 83:5.
draw 18:4, 96:18,
102:13, 162:16,
162:17, 163:20,
167:11, 173:6,
176:9, 176:10,
176:12, 176:16,
176:21, 177:12,
178:18, 197:2.
drawing 17:22,
170:9, 176:13,
176:18.
drawn 7:23, 14:17,
175:21, 176:8,
177:1, 189:15,
196:9.
dress 107:2.
drink 158:6.
dripping 171:8,
171:9.
drive 73:11, 74:23,
75:8, 105:15,
111:2, 113:22.
driver 118:15.
driving 73:3, 106:5,
106:10, 106:11,
109:4, 112:16,
129:23, 143:21.
dropped 21:11.
dropping 14:2, 14:3,
145:11.
drove 74:21, 110:23,
113:18, 115:5.
drug 135:15,

143:25.
due 98:21, 188:14,
213:5.
duly 69:20, 78:7,
93:23, 152:11.
dumpster 127:18.
duration 196:22.
During 4:1, 13:8,
25:9, 25:20,
42:12, 44:24,
56:3, 65:22,
71:19, 84:18,
98:19, 115:11,
137:12, 141:16,
161:8, 163:2,
163:17, 167:25,
169:13, 175:24,
177:8.
duties 79:22,
95:5.
duty 161:3, 161:11,
161:18, 161:19,
161:21, 162:9,
164:5, 164:15,
164:17, 165:4,
165:7, 168:18,
177:18, 183:24,
220:19.
.
.
< E >.
e-mail 56:9, 56:14,
56:15, 62:10,
98:12, 98:13,
98:21, 98:23,
99:4, 99:14,
99:18, 100:3,
100:9, 100:13,
221:10.
e-mails 98:14.
earlier 114:14,
143:3, 183:6,
183:13.
easier 137:21,
219:8.
easiest 35:24.
edge 117:10.
edit 10:15, 11:14,
41:8.
edited 5:25, 11:18,

41:10.
edits 18:13, 139:20, 139:22, 140:8, 148:13, 223:19.
Edmonds 99:21, 143:12, 143:21, 146:1.
educational 79:16.
effect 16:5, 165:17, 165:19, 182:4.
efforts 29:2.
eight 144:12.
either 3:11, 13:16, 31:14, 38:24, 47:19, 51:1, 75:7, 123:20, 155:3, 155:19, 171:22, 175:21, 176:17, 179:17, 180:12, 192:11, 194:12, 210:5, 214:20, 218:15, 219:4, 222:6.
elder 71:4, 71:12.
electronic 154:21.
element 185:6, 193:25, 194:4, 195:3, 199:20, 199:22, 200:9, 200:13, 200:17, 201:1, 201:8, 201:12, 201:17, 201:19, 202:8, 203:11, 203:19, 207:2, 209:24, 210:2, 211:16, 213:3, 215:12, 215:15, 218:7, 218:17, 218:20, 219:2, 219:5, 219:11.
elementary/middle 66:5.
elements 189:5, 193:17, 199:11, 203:2, 203:17, 207:10, 207:24, 208:11, 209:13, 217:24, 219:9, 220:7, 223:3.

Eleven 1:10.
elicit 55:14, 57:14, 62:25, 63:21.
elicited 57:16, 57:20.
Elma 98:17.
elsewhere 217:2, 217:9, 219:23.
emergency 83:3, 144:21.
emotional 63:22.
emphasize 171:25, 187:6.
emphasizes 76:18.
Empire 135:7, 135:9, 135:14.
employed 78:21, 79:8, 94:12, 152:24, 153:1, 153:3, 182:17.
employee 61:15, 99:4, 100:3, 201:25.
employees 98:15.
enable 213:22.
end 2:24, 32:20, 33:5, 47:17, 64:24, 108:1, 108:4, 112:1, 112:9, 127:10, 127:13, 127:17, 139:24, 159:25.
ended 73:5, 73:13, 122:24.
ending 103:3.
ends 156:9, 197:23.
enemies 62:11, 68:3, 72:8.
enemy 62:6.
engage 76:15.
engaged 76:9, 198:1, 201:13, 205:25.
engages 199:2.
enhanced 145:16.
Enjoy 93:1, 123:14, 139:4, 159:3, 224:13, 224:14.
enjoyed 125:13.
enough 4:5, 14:8,

37:24, 146:13, 146:14, 147:24, 148:25, 213:13.
enter 147:12, 155:3, 161:2, 187:8, 220:18, 221:1.
entered 64:13, 125:11, 151:23, 155:4, 155:16, 193:18, 194:3, 194:6, 220:8.
entering 86:22, 155:22.
Enterprise 138:16, 138:17.
entire 7:10, 7:12, 57:23, 73:9, 73:11, 146:11.
entirely 48:23, 173:9.
entirety 62:10.
entitled 39:4, 40:11, 40:13, 40:20, 99:14, 165:1, 166:1, 173:17, 174:18.
entitles 164:24.
entrance 87:6, 87:14, 126:20, 126:22, 127:2, 127:4, 130:4.
envelope 89:6.
equal 177:11, 197:1.
Equally 10:15, 15:10, 16:11, 16:15, 16:17, 164:21, 166:3.
equals 165:3.
equipment 144:21.
Esquire 1:31, 1:33, 1:37, 1:39.
essence 12:4.
essential 184:8, 193:17, 195:20.
essentially 76:8.
establish 61:16, 63:16, 63:19, 142:8, 189:4, 193:16, 194:1,

195:4, 197:12,
200:17, 205:16,
205:17, 205:23,
206:6, 209:12,
210:2, 213:3,
217:23.
established 171:16,
176:2, 176:17,
189:12, 190:3,
194:16, 196:6.
estimate 140:2,
224:21, 224:23,
225:4, 225:5,
225:9.
et 62:2.
evaluate 206:24.
evaluating 170:15,
180:17, 180:25,
181:10, 182:11.
evaluation 180:9.
evasive 179:5.
evening 143:7,
220:16, 224:5,
224:15.
event 212:12.
events 31:17, 168:5,
181:20, 181:22,
182:2, 182:5,
185:1, 189:7,
189:14.
events. 29:11.
eventually 144:22,
145:8.
everybody 124:3.
everyone 2:2,
151:24.
Everything 40:4,
56:24, 60:21,
75:1, 124:21,
140:20, 224:10.
everything. 66:14.
evident 161:12.
evidentiary 40:1,
42:22.
evil 200:19.
ex-boyfriends
72:14.
exact 193:20,
213:12.
Exactly 29:21, 47:7,

55:12, 113:20,
140:10, 144:17,
224:4.
exam 91:3.
Examination 70:7,
78:17, 81:4,
81:21, 81:22,
81:25, 83:14,
84:19, 88:4, 88:6,
88:9, 88:10,
89:22, 92:12,
94:8, 152:21,
179:7, 226:7,
226:11, 226:15,
226:19, 226:25.
examine 81:23, 82:1,
88:7, 175:1.
examined 69:20,
78:7, 93:23,
152:11, 181:24.
Examiner 78:22,
78:25, 79:4, 79:9,
79:10, 82:10,
82:16, 83:8,
101:22.
Examiners 80:3.
examining 170:10,
185:8.
example 22:5, 42:5,
170:24, 171:4,
172:9, 174:9,
210:6, 210:23,
211:5, 214:5.
examples 179:12,
214:14.
exceed 109:11.
exception 63:11.
excerpt 36:10,
37:18, 37:23,
55:1, 104:2.
excerpts 37:1,
38:10.
excited 63:5, 63:11,
63:15, 63:17.
exclusive 162:13,
163:14, 164:5.
exclusively 166:6,
183:24, 220:20.
exculpated 12:15,
20:17, 178:2.

exculpatory 21:4.
Excuse 24:7, 185:19,
199:22, 201:17,
202:21, 204:18,
223:25.
excused 75:17, 93:1,
139:3, 159:4.
executed 156:17.
exercise 176:19,
181:9, 211:2,
211:13, 212:22.
exercises 211:8.
exhaustive 214:14.
Exhibits 139:11,
140:15, 140:17,
140:18, 141:2,
163:7, 172:17,
172:18, 172:20,
174:8, 174:17,
213:21.
exist 207:18,
207:24.
existed 194:24,
195:1, 195:8,
207:15.
existence 142:8,
171:17, 176:3,
194:15, 194:19,
208:11.
exists 176:6.
exit 132:4.
exonerated 12:15,
20:17, 178:2.
expand 62:13.
expanding 62:13,
143:18.
expect 51:21.
expected 64:23.
expecting 76:12.
expedite 163:23.
Experience 6:17,
94:20, 170:10,
171:16, 173:6,
176:1, 176:23,
185:16, 211:5,
214:1.
experienced
185:17.
expert 32:24, 81:6,
81:11, 81:17.

Explain 39:18,
   78:24, 81:19,
   82:24, 88:18,
   123:3, 154:18,
   155:12, 190:8,
   210:20.
explained 92:19.
explanation 183:21,
   183:22.
explanations
   189:10.
explore 23:18.
express 47:1,
   185:13, 194:6.
expression 31:5,
   184:16.
expressly 164:1.
extent 13:16, 43:20,
   60:1, 60:7, 62:4,
   63:2, 63:4, 181:4,
   196:20, 196:22.
external 81:22,
   84:19, 85:7,
   85:13, 88:4,
   89:22.
externally 87:12,
   87:14.
extraction 102:10.
eye 46:9.
eyewitness 7:5,
   26:7, 28:20,
   31:25.
.
.
< F >.
fabricated 25:24,
   47:2.
face 47:20, 66:18,
   66:23, 69:17,
   75:25, 76:2, 78:4,
   91:5, 92:20,
   93:20, 152:8.
facilitate 216:23,
   218:3, 218:22,
   218:25.
facilitated 219:3.
facilitating 217:4,
   217:12, 217:19.
facility 83:2,
   216:23, 217:3,

217:11, 217:19,
   218:10, 219:13.
factor 33:24,
   180:25, 195:21.
factors 32:1,
   211:23.
factual 178:19.
fails 169:6.
failure 22:6.
Fair 4:5, 5:4, 5:24,
   21:17, 28:13,
   29:12, 42:25,
   43:7, 52:11,
   57:22, 87:10,
   148:25, 156:19,
   157:24, 160:1.
fairly 51:1.
fairness 164:10,
   164:17.
faith 164:11.
faithfully 161:10.
falling 85:11.
falls 187:21.
false 12:16, 12:17,
   14:5, 15:20, 16:9,
   19:2, 20:18,
   20:19, 20:20,
   21:3, 21:17,
   21:24, 178:3,
   178:4, 178:5,
   183:18.
falsely 180:21,
   181:3, 181:12.
familiar 46:14.
family 61:1, 61:5,
   75:5, 75:9.
famous 172:9.
far 85:17, 128:5,
   141:17, 224:12.
Fargo 95:18, 96:16,
   96:25, 97:13,
   97:19.
fashion 30:22.
fast 67:21.
fault 30:15,
   56:16.
favor 170:3.
favorable 142:17,
   146:14, 148:5,
   167:11.

FCRR 1:46, 225:23.
fear 166:17.
Federal 1:47, 81:6,
   182:18, 190:16,
   191:4, 192:10,
   192:11, 192:12,
   192:13, 192:22,
   193:1, 193:3,
   198:6, 198:16,
   198:25, 199:7,
   199:9, 199:19,
   201:22, 201:25,
   202:6, 202:17,
   203:25, 204:1,
   204:3, 204:8,
   205:20.
feeding 71:6.
feel 4:19, 34:3,
   109:2, 160:23,
   160:24, 175:4.
feeling 19:10,
   19:13.
feelings 165:24,
   166:4.
feels 29:2.
feet 85:4, 143:14.
fell 66:11.
felon 24:18.
felony 24:8, 24:12,
   217:5, 217:13,
   217:20, 218:23,
   219:6.
felt 77:3, 77:7.
few 25:22, 98:10,
   105:14, 145:19,
   145:20.
fewer 170:13.
field 185:18.
Fifth 193:25,
   207:21.
figured 124:2.
file 68:20.
filed 18:21, 35:16,
   35:17, 35:18,
   35:22, 56:6,
   58:24, 59:1, 59:3,
   59:7, 68:23,
   100:21, 101:13,
   103:20.
filings 35:12.

filming 117:19.
final 52:2, 134:18,
  161:3, 161:16,
  162:11, 164:17,
  219:11.
Finally 64:9,
  220:16.
financial 195:19.
finding 164:5,
  164:15.
findings 82:22.
fine 3:7, 3:8, 7:8,
  20:2, 20:4, 27:2,
  29:22, 32:19,
  32:20, 44:21,
  51:5, 56:19,
  59:11, 77:22,
  148:18, 148:22.
finger 115:8,
  115:18.
fingers 129:25.
Finish 55:3, 116:7,
  160:18.
fit 7:25, 8:22,
  68:12, 154:20,
  155:17, 155:18,
  155:19.
fits 28:11.
five 32:8, 39:17,
  39:22, 41:1, 49:9,
  53:23, 68:11,
  104:5, 125:1,
  148:15, 207:24.
five-minute 8:19,
  42:23, 134:19.
flagged 4:14,
  32:14.
flagging 33:4.
flat 91:15.
Fleming 69:5.
flight 214:9.
flip 3:11.
Floor 1:48.
flourishes 61:25.
flowed 142:24.
flows 145:14.
fluid 81:4.
focal 10:23.
focus 17:12.
focused 17:11.

focuses 14:14.
follow 109:17,
  115:8, 162:2.
followed 122:11,
  161:12.
following 65:10,
  77:24, 112:20,
  127:14, 131:23,
  140:23, 160:10,
  184:20, 193:17,
  199:10, 203:2,
  207:10, 209:13,
  217:24, 224:2.
follows 20:7, 69:21,
  78:8, 93:24,
  152:12, 208:17,
  208:24, 216:25,
  217:7, 219:21.
foot 67:4, 67:7,
  67:8, 67:9, 91:24,
  92:5, 118:6.
footage 105:13,
  105:19, 111:5,
  112:5, 112:21,
  113:1, 121:3,
  122:6, 122:24.
footpath 111:3,
  114:16, 116:13,
  119:9, 120:4.
forbids 188:12.
force 150:13.
forced 37:14.
foregoing 225:24.
foreground 122:19.
Forensic 79:20,
  79:24, 80:17,
  80:19, 80:21,
  80:24, 81:6,
  81:11, 141:20,
  141:23, 142:19,
  142:23, 145:12.
foreseeable 204:5.
foreseen 207:22.
forget 2:6, 21:21.
form 2:7, 2:19, 3:4,
  10:2, 28:4, 36:8,
  36:9, 39:15,
  68:10, 142:19,
  173:11, 174:8,
  222:14.

formal 194:6.
formulate 34:19.
Forsythe 65:20,
  66:1, 67:18, 68:4,
  68:20.
forth 36:19, 38:7,
  95:16.
forthright 179:5.
forward 69:16, 78:3,
  91:14, 93:19,
  123:12, 141:9,
  147:15, 152:7,
  180:7, 192:15,
  224:12.
found 195:25,
  207:14, 207:17,
  211:18, 211:20,
  211:23, 212:3,
  212:10, 212:12,
  212:17, 212:18,
  212:20, 216:10.
four 225:13.
four-week 55:21.
Fourth 55:22, 203:8,
  207:19.
Francis 70:24,
  70:25.
frank 179:4.
frankly 4:15,
  77:7.
Frederick 153:9.
free 109:2, 160:24,
  184:9.
freedom 164:10.
frequently 214:1.
fresh 160:14.
friend 145:23.
friendly 197:9.
friends 27:8.
front 2:5, 46:22,
  47:13, 47:18,
  66:7, 69:16,
  89:15, 91:13,
  93:20, 114:15,
  118:16, 134:22,
  155:6, 155:7.
Fuchs 94:16.
fulfilled 80:14.
full 71:10.
fully 196:15,

201:10.
function 161:8,
  220:20.
furnished 186:17.
furtherance 215:5.
furthering 195:14,
  198:2.
.
.
< G >.
gather 173:16.
gave 12:17, 20:19,
  21:24, 25:22,
  27:22, 50:4, 77:5,
  89:13, 163:6,
  178:4.
General 14:9, 18:15,
  20:23, 21:18,
  84:20, 85:2,
  94:14, 95:1,
  188:25.
generally 61:12,
  80:20, 95:17.
generated 153:20.
generates 223:12.
gentlemen 64:15,
  65:8, 98:11,
  123:10, 125:13,
  141:5, 151:25,
  159:16, 160:12,
  161:2, 164:4,
  224:5.
George 1:18, 30:2,
  30:5, 30:7.
Gerald 1:31.
Germany 79:17.
getaway 146:18.
gets 62:18, 62:21,
  160:18.
getting 42:23,
  62:17, 118:15,
  122:3.
girlfriend 17:3,
  18:1, 145:5.
Given 6:17, 11:5,
  18:3, 21:15,
  21:17, 34:5,
  68:13, 138:17,
  138:18, 163:6,
  173:23, 175:20,

182:15, 184:2,
  201:21, 224:12.
gives 135:12,
  135:16.
giving 7:11, 12:4,
  14:21, 18:12,
  22:1, 205:21,
  224:17.
GJH-17-0667 1:9.
glary 133:13.
glitch 98:22.
go-by 222:5,
  222:16.
God 190:16.
gold 157:10,
  158:1.
goodness 148:22.
Google 133:24,
  135:10.
Gopro 106:2, 106:6,
  111:6, 117:2,
  122:12, 129:21,
  132:11.
gotten 2:11, 56:2,
  74:1, 143:2.
Grant 23:17, 23:19,
  139:17.
granted 148:9.
grass 121:4, 121:21,
  121:25.
graze 86:20, 86:21,
  87:2, 87:3.
Great 64:19, 116:6,
  124:3, 175:1,
  181:1, 181:10.
greater 164:25,
  181:25, 182:20,
  193:12.
green 121:25,
  122:2.
Greenbelt 7:22,
  7:24.
Greenspring 126:14,
  129:8, 129:23,
  130:1, 131:14,
  131:16.
grossly 200:14.
ground 37:13, 37:14,
  46:25, 211:19.
grounds 25:11,

62:20, 182:24.
guess 3:17, 3:22,
  6:25, 7:1, 22:7,
  25:17, 44:5,
  44:22, 45:22,
  52:2, 59:12,
  59:13, 59:16,
  62:17, 67:7,
  147:5, 156:23,
  157:17, 171:19,
  176:4.
guesswork 176:14.
guide 154:16,
  154:18, 154:20,
  154:23, 155:2,
  155:21, 173:23.
guided 166:9.
guilt 11:25, 12:10,
  20:12, 163:18,
  166:12, 166:22,
  166:25, 167:4,
  167:9, 168:3,
  168:15, 169:4,
  169:12, 169:25,
  177:2, 177:23,
  183:9, 186:25,
  187:4, 187:17,
  196:21, 206:25.
guilt. 15:15,
  16:14.
guilty. 13:22,
  17:14, 20:21.
gun 6:24, 7:2, 7:16,
  36:16, 39:2, 40:6,
  40:9, 49:16,
  49:18, 51:16,
  87:25.
gunpowder 87:19,
  87:20, 87:22,
  87:24.
Gunshot 87:6, 87:14,
  90:2, 90:3,
  198:22, 199:13,
  199:24, 200:4,
  202:23.
guy 66:9.
.
.
< H >.
H-12 99:3, 100:3.

H-5 100:16.
hair 73:4.
half 79:11, 79:12,
   79:13, 79:14,
   94:19, 140:2,
   140:7, 145:8,
   225:11.
Hall 65:22, 67:4,
   67:11, 98:6.
hand 66:19, 69:17,
   78:4, 91:8, 91:9,
   91:15, 91:16,
   93:21, 104:13,
   152:8, 166:23,
   173:19, 181:24,
   206:21, 215:2,
   215:4, 216:14.
handed 89:7,
   215:3.
handful 223:18.
handheld 107:12,
   107:13, 111:5,
   137:20.
handle 3:23.
hands 91:15.
happen 197:17.
happened 28:15,
   55:12, 67:21,
   67:22, 97:16,
   109:18, 144:7.
happens 29:17,
   144:14, 223:23.
happy 124:3.
harassing 36:24.
harassment 48:2,
   54:15.
hard 15:5, 32:17,
   39:18, 68:10,
   116:14, 225:8.
hard-core 166:10.
harkening 54:16.
harm 60:11, 61:4,
   62:4.
Harness 134:8,
   134:15.
harping 56:23.
Harry 1:37, 98:17.
hat 37:21, 41:14,
   45:20, 45:22,
   46:11, 46:12,

46:14, 49:19,
   49:20, 51:19,
   53:5, 53:11,
   53:18, 145:19.
hate 56:23.
hatred 200:20.
Hazel 1:18, 30:2,
   30:6, 30:7.
head 4:6, 66:25,
   127:21.
headed 73:2.
heading 101:12,
   103:16, 120:12,
   121:13, 121:14,
   131:13, 131:15,
   132:3.
headings 98:13.
headquarters
   157:1.
heads 144:21, 145:1,
   145:8, 145:13.
Health 94:13,
   202:3.
hearing 16:25,
   98:20, 165:9,
   165:13.
hearsay 37:7, 44:4,
   44:14.
heart 51:12.
heartburn 18:13.
heavy-handed 44:9.
height 67:3, 67:6,
   67:7, 81:23, 85:3,
   85:4, 91:20, 92:2,
   92:5.
Heights 134:15.
held 91:1, 106:2,
   106:14.
help 66:14, 107:8,
   148:24, 178:25,
   205:15.
helped 137:3.
helping 183:11.
helps 160:21,
   160:23, 225:13.
hereby 65:10,
   225:23.
herself 183:13,
   184:9.
hesitate 166:22,

167:1.
HHS 94:18, 95:6.
higher 91:1.
highlight 77:12.
Hightower 8:16,
   9:12, 9:13, 10:21,
   36:13, 36:14,
   98:17, 98:23,
   99:1, 100:20,
   100:25, 101:8,
   103:10, 103:18,
   104:9, 134:20,
   135:1, 137:8,
   137:13, 145:3,
   145:25, 204:2.
Hightower-crawford
   100:15.
hill 110:24, 121:4,
   131:2, 131:5.
him. 47:21, 50:11,
   58:3.
history 153:14.
hit 62:5, 89:13,
   111:25, 119:10,
   127:12.
hold 79:21,
   150:15.
holding 117:1,
   117:18, 117:19,
   122:11, 225:14.
Holiday 94:15,
   104:7, 104:13,
   136:7, 136:13,
   140:13.
home 66:3, 72:18,
   110:4, 110:10,
   110:15, 117:11,
   117:25, 118:16,
   159:24.
homeless 71:7,
   71:17.
homes 66:16, 117:10,
   120:9.
homicide 65:20,
   68:19, 89:25,
   143:19.
honestly 38:1.
Honorable 1:18.
hood 66:24.
hoodie 66:17, 67:14,

67:15.
hopefully 35:10,
  125:13.
hoping 160:16.
horse 33:13,
  33:16.
Hospital 82:13,
  83:3, 83:4,
  84:22.
hostile 47:25,
  180:14.
hostility 179:21.
Hour 109:11, 123:14,
  123:16, 125:7,
  140:2, 140:7,
  145:8, 224:22,
  225:1, 225:11.
hours 25:22, 42:20,
  56:8.
house 111:21, 114:5,
  114:6, 114:7,
  114:8, 114:21,
  115:23, 115:25,
  116:3, 116:18,
  116:19, 116:21,
  117:9, 133:18,
  133:21, 143:21,
  144:5.
houses 116:19,
  116:22, 116:24,
  119:12, 119:13,
  120:5, 131:3.
Human 80:23, 81:3,
  94:13, 202:3.
hurried 66:21.
hustling 15:24,
  16:3, 16:4.
hysterical 62:22,
  62:25, 63:4, 63:7,
  63:9, 63:20,
  64:1.

.
.
< I >.
ID 26:7, 102:9,
  123:19.
idea 62:2.
identical 50:4.
identifications
  29:25.

identified 48:25,
  57:24, 101:6,
  137:16, 214:10.
identifies 26:13.
identify 9:10,
  26:14, 28:22,
  69:6, 155:1,
  184:23.
identities 196:13.
identity 184:7,
  185:7.
ignorance 188:8.
ill 200:20.
illegal 188:6,
  198:2.
image 86:16, 132:19,
  133:4, 133:14,
  145:21, 184:22.
images 145:16.
Imdb 135:14.
immediate 61:11.
immediately
  145:11.
immunity 22:17,
  23:2.
impact 72:2, 76:2,
  76:5, 77:3, 77:9,
  91:11.
impaired 192:17.
imparted 98:25.
impartial 169:5.
impartiality
  164:18.
impeach 53:20.
impeached 38:6,
  49:1, 52:20, 58:6,
  170:6.
impeaching 38:22,
  39:4, 40:21.
impeachment 39:7,
  40:11, 41:23,
  43:23, 52:18,
  53:20, 53:24,
  56:24, 56:25,
  58:8, 58:10,
  58:12.
implied 47:1.
importance 178:25.
important 28:8,
  49:16, 51:12,

55:20, 164:19,
  164:21, 180:6,
  183:20, 184:5,
  196:5.
impose 177:17.
imposed 220:24.
imposes 168:17.
imposing 220:19.
impossible 213:19.
impressed 179:3.
impression 45:4,
  51:13.
improper 47:2,
  165:22, 166:3,
  181:22.
in. 5:12, 26:2,
  26:4, 27:2, 35:8,
  41:5, 41:12,
  41:17, 42:10,
  42:22, 51:23,
  52:21, 58:14,
  76:9.
inadvertence
  188:14.
inadvertently 68:18,
  206:8.
inappropriate 12:4,
  48:24, 76:5.
incarcerated 4:2,
  4:9, 4:11, 8:18,
  8:24, 9:1, 9:5,
  9:8, 9:12, 9:13,
  137:12, 168:1,
  168:2, 168:8,
  173:14.
incarceration 3:17,
  3:18, 3:19, 4:13,
  4:24.
incentive 179:19.
inch 67:5.
inches 85:4, 92:6.
incident 67:25,
  82:12, 92:22.
inclined 5:7, 7:5,
  10:10, 11:23,
  18:7, 24:1,
  24:14.
include 15:6, 17:2,
  163:8, 222:1.
included 36:11,

62:10, 223:1.
includes 218:12.
including 68:11,
    83:4, 99:7, 101:5,
    123:13, 185:6,
    224:9.
inconsistency
    183:19, 183:22.
inconsistent 183:7,
    183:8, 183:10,
    184:1, 184:2.
inconvenience
    174:13.
incorporated
    172:2.
increases 43:22,
    193:13.
increasing 30:12.
independent 163:4,
    185:19, 185:20,
    193:2, 196:7.
INDEX 226:1.
indicate 30:23,
    87:23, 90:24,
    91:1, 97:7, 97:15,
    99:4, 100:3,
    100:12, 101:12,
    101:22, 102:1,
    102:6, 103:23,
    121:19, 125:20,
    129:25, 142:17,
    163:15, 165:16,
    214:8, 214:10,
    214:13.
indicated 44:5,
    58:21, 64:23,
    76:13, 98:13,
    103:2, 130:11,
    134:3, 134:12,
    138:8, 147:18,
    157:14, 165:15,
    172:13, 172:23,
    181:14.
indicates 87:25,
    189:25.
Indicating 111:24,
    112:16, 125:24.
indication 147:25,
    148:1, 163:17.
indications

143:24.
indicted 167:15,
    167:16, 167:19,
    168:10.
indirectly 101:3.
individual 90:25,
    91:24, 187:1,
    187:18, 193:13,
    211:2.
individuals 28:5,
    28:22, 165:3.
induces 204:15.
indulgence 43:14,
    90:6.
infer 13:22, 14:7,
    17:6, 17:9, 17:13,
    17:16, 20:21,
    171:14, 171:16,
    176:1, 177:4,
    178:6, 178:8,
    194:18, 210:9,
    213:22.
inference 14:14,
    16:6, 26:25,
    145:9, 163:20,
    167:11, 171:19,
    175:21, 175:25,
    176:4, 176:15,
    177:12, 196:10,
    196:17.
inferences 13:25,
    14:16, 17:21,
    17:23, 21:25,
    162:16, 173:7,
    176:7, 176:10,
    176:11, 176:13,
    176:18, 176:22,
    177:1, 189:15,
    196:9, 215:23,
    215:25.
inferred 178:14,
    189:5.
inflicted 200:3.
influence 47:2,
    220:18, 220:25.
influenced 31:16,
    34:2, 179:16,
    184:25.
informal 22:17,
    23:2.

information 44:16,
    61:3, 63:13,
    63:24, 98:1,
    157:6, 174:16,
    190:15, 191:2,
    192:5, 192:12,
    192:15, 198:15,
    198:24, 199:6,
    199:18, 201:21,
    202:16, 205:19.
informed 196:15.
initial 19:18,
    19:21, 86:10,
    191:11.
initially 27:6.
injured 88:19,
    88:20.
injuries 65:25,
    80:22, 81:24,
    88:8, 200:3.
Injury 82:2, 84:23,
    84:25, 85:1, 85:6,
    85:20, 86:12,
    88:11, 88:13,
    199:3, 200:3.
innocence 6:14,
    12:9, 15:15,
    16:14, 20:11,
    166:1, 169:2,
    177:23, 187:4.
innocent 168:20,
    168:22, 170:19,
    175:18, 183:19.
inopportune 145:5.
inordinate 57:11.
inquiry 45:13.
insert 28:13.
Inspector 94:14,
    94:25.
inspires 151:21.
installed 158:9,
    158:16.
instead 73:6,
    222:24.
instruct 7:3, 17:4,
    63:22, 64:11,
    100:25, 149:17,
    150:15, 161:4,
    161:18, 168:21,
    175:3, 177:10,

181:21, 186:9,
186:16, 188:22,
196:11, 224:8.
instructed 14:15,
169:19, 195:19,
202:2, 203:16,
204:1, 210:15,
220:14.
instructing 20:1,
77:9.
Instructions 2:5,
3:10, 12:1, 13:24,
30:13, 32:22,
56:4, 76:21,
76:24, 139:21,
139:24, 149:6,
151:20, 160:13,
160:21, 160:25,
161:14, 161:19,
162:2, 162:4,
163:2, 167:8,
203:18, 207:4,
221:7, 221:8,
221:9, 223:9,
226:29.
instructs 218:16,
221:20.
instrument 189:2.
insufficient 142:8,
142:11, 147:13.
intact 89:3.
integrity 192:13.
intelligent
213:20.
intend 34:15,
61:9.
intended 51:25,
163:22, 163:23,
189:19, 192:4,
201:10, 202:6,
205:18, 206:11,
212:22, 214:20,
216:1, 216:2,
216:4, 216:6,
216:13, 216:14,
216:19, 219:16.
intends 15:4, 15:7,
221:21.
intention 195:14,
197:22, 211:13,

211:15, 215:22.
Intentionally 188:6,
188:7, 188:15,
188:20, 197:25,
208:19, 209:3,
209:8, 217:3,
217:10, 217:18,
218:6, 219:13,
219:24.
interaction 68:6.
interest 25:12,
161:11, 180:20,
180:24, 181:3,
181:5, 181:11,
182:25, 195:19,
195:21.
Interesting 58:1,
125:9.
interests 180:22,
197:12.
interfere 166:5,
166:18.
Interior 94:25.
internal 81:25,
88:9, 88:10,
89:22.
internally 82:1,
88:7.
international
80:9.
internationally
80:7.
interpretation
80:22, 173:21,
174:2.
interrupt 10:6,
16:22, 43:4.
intersection 111:16,
111:22, 112:14,
112:15, 115:3,
115:4, 115:9,
115:19, 129:5.
intervene 76:4.
interview 13:9,
39:11, 65:23,
65:25, 66:1.
interviewed 65:21,
145:10, 175:8.
introduce 136:16.
introduced 70:16,

74:18, 103:10,
103:25, 136:8,
170:2, 181:18.
introduction 84:7.
introvert 67:21.
invest 135:16.
investigate 202:1.
investigating
12:18.
investigation 15:22,
48:7, 54:16,
101:5, 142:24.
investigations
95:7.
investigative 6:22,
95:1, 169:15,
169:21.
involve 178:20,
189:1.
involved 68:13,
72:6, 80:22, 81:2,
137:2, 141:24,
194:20, 211:21.
involvement 146:21,
187:14, 215:9.
involves 213:17.
iphone 101:20.
irregular 178:15.
issue 6:20, 11:4,
11:17, 24:6, 24:8,
29:20, 30:25,
34:24, 35:11,
35:17, 36:1, 36:3,
57:14, 57:25,
58:16, 60:2, 60:8,
185:13, 196:21,
210:13, 223:9.
issues 2:16, 2:17,
2:19, 3:9, 28:8,
43:16, 55:7,
64:22, 67:19,
161:3, 162:12,
178:19, 178:20,
184:5.
it. 5:9.
item 211:4.
items 158:16, 211:6,
211:8, 214:7.
itself 129:13,
186:18, 186:19,

189:9, 197:6.
.
.
< J >.
J. 1:18, 1:37.
jacket 67:13,
  67:14.
Jackson 79:19.
jail 9:21, 104:1,
  134:18, 136:8,
  136:23, 137:5,
  137:8.
jean 67:16.
job 73:11.
Joe 21:10.
John 21:10.
Johnston 54:21.
join 192:24.
joined 195:12,
  196:1, 196:2,
  196:18.
joint 2:5, 211:11,
  211:14, 212:15,
  212:19.
jointly 211:17.
Jones 68:21.
Joseph 68:5.
journey 107:25.
Jr 1:37.
Judge 29:16, 33:18,
  45:9, 64:4, 77:16,
  101:10, 203:25,
  225:19.
Judge_hazel 56:9.
judges 162:13,
  163:14, 164:5,
  165:18, 174:7.
judgment 141:18,
  142:5, 147:10,
  147:12, 159:22,
  177:15, 183:25,
  186:5.
judgments 178:20,
  178:22.
judicially 8:7.
Judiciary 143:12.
June 104:1, 135:1,
  137:6, 137:7.
juries 160:20.
juror 142:1,

164:8.
JURORS 64:16, 64:18,
  164:13, 166:8,
  169:3, 220:23,
  222:22.
justice 165:3,
  192:13, 192:16.
justified 18:2,
  176:23.
justify 196:17.
.
.
< K >.
K. 101:2.
keep 22:6, 56:23,
  111:1, 119:10,
  127:6, 132:24,
  170:16.
keeping 140:14.
keeps 211:6.
kept 221:24.
Key 70:24, 71:1,
  196:2.
keys 66:7.
khaki 74:7.
Kill 68:3, 190:13,
  190:24, 191:9,
  191:20, 191:21,
  198:13, 198:20,
  200:10, 200:12,
  202:14, 202:21,
  221:21.
killed 199:12,
  199:21, 199:23,
  201:2, 201:15,
  203:4, 203:8,
  203:12, 203:20.
killing 141:24,
  198:21, 199:13,
  199:24, 200:22,
  201:7, 201:15,
  202:21, 203:5,
  203:9, 203:13,
  203:21, 204:4.
kills 198:13,
  202:13, 221:21.
kilogram 23:9.
Kim 1:27.
kind 21:13, 42:24,
  42:25, 43:9,

49:16, 54:15,
  94:24, 95:14,
  111:3, 116:14,
  132:10, 192:23,
  213:15, 218:12,
  218:13.
kinds 179:12.
Kingdom 71:5.
knees 85:9, 85:10.
knock 54:10.
knowing 76:4,
  198:3.
knowingly 142:12,
  188:5, 188:7,
  188:19, 189:17,
  190:21, 191:18,
  193:22, 195:5,
  195:12, 196:1,
  199:2, 199:12,
  201:13, 201:15,
  201:16, 205:13,
  205:16, 206:17,
  208:19, 209:3,
  209:8, 217:2,
  217:10, 217:18,
  218:5, 219:13,
  219:24, 220:11.
knowledge 22:6,
  26:20, 27:24,
  31:24, 61:12,
  178:14, 179:11,
  181:23, 185:15,
  188:10, 188:25,
  189:12, 195:13,
  196:10, 196:17,
  197:14, 197:17,
  197:21, 206:3,
  206:6, 208:4,
  214:8.
knowledgeable
  185:18.
known 190:22,
  191:19, 196:13,
  219:19, 219:25.
.
.
< L >.
lack 165:21, 166:7,
  167:7, 169:18,
  169:24, 177:11,

187:3, 187:21.
Ladies 64:15, 65:8,
    98:11, 123:10,
    125:13, 141:5,
    151:25, 159:15,
    160:12, 161:2,
    164:4, 224:4.
Lafayette 71:20.
language 33:7,
    198:9.
Lanier 121:10,
    121:14, 122:3,
    122:19.
large 23:12, 214:12,
    216:12, 216:15.
larger 86:25,
    111:18.
largest 88:12.
Lastly 74:3,
    74:25.
late 56:7, 73:17,
    160:18.
Later 2:20, 3:8,
    25:22, 53:23,
    73:17, 143:6,
    145:8, 145:19,
    162:18, 171:7,
    188:22.
launched 90:25.
Laurel 108:2, 115:4,
    115:7, 115:13,
    115:20.
lawful 173:17.
laws 164:20, 192:22,
    193:3, 216:24,
    217:21.
Lawson 26:24.
lawyer 159:21,
    171:25, 172:1,
    172:8, 172:9.
lawyers 149:23,
    161:16, 162:21.
learn 224:10.
learned 54:20, 88:9,
    224:10.
leasing 128:9,
    128:17, 129:13,
    130:3, 130:4,
    130:8, 130:13,
    130:16, 133:8.

least 4:1, 4:4,
    11:21, 27:13,
    60:12, 146:3,
    149:12, 196:3,
    197:21, 208:25,
    222:20.
leave 5:12, 6:9,
    24:22, 25:25,
    26:2, 26:4, 27:2,
    27:3, 28:3, 46:19,
    51:14, 66:4, 68:1,
    143:15.
leaves 26:3.
Leaving 59:7,
    119:19, 119:20,
    145:9.
lecture 80:6,
    80:8.
Lee 26:24, 36:4,
    36:19, 38:22,
    46:7, 46:23,
    57:15, 57:17,
    93:6.
leery 32:11.
left-hand 114:10,
    117:6, 134:6,
    135:25, 154:4.
legal 7:15, 43:18,
    161:24, 162:1,
    169:20, 210:18,
    211:1, 211:9.
legally 42:4.
legitimate 48:7,
    182:22.
lengthier 77:11.
less 25:3, 91:24,
    165:1, 171:22,
    182:3, 182:19,
    219:8, 225:1.
Lesser 106:20,
    109:8, 110:14,
    110:19, 112:9,
    113:25, 114:17,
    114:25, 116:8,
    117:13, 118:8,
    119:25, 120:21,
    121:17, 122:16,
    126:1, 126:25,
    127:7, 128:3,
    128:25, 129:20,

131:1, 131:8,
    135:4, 182:20.
letting 45:3.
level 119:4.
liability 196:22.
licensed 80:4.
lied 14:6, 15:17,
    15:18.
life 61:13, 61:14,
    71:15, 72:6,
    200:8.
lifestyle 76:10.
light 13:18, 18:2,
    34:12, 66:25,
    129:7, 142:16,
    146:14, 148:5,
    173:5, 175:5,
    176:23, 180:2,
    182:7, 186:2,
    207:4.
likelihood 193:14.
likely 91:25,
    144:15, 204:6.
limine 35:16, 35:17,
    52:9, 52:13,
    58:20, 60:3.
limit 109:12,
    225:15.
limited 4:14, 4:25,
    62:1, 101:5,
    183:11, 187:6.
line 36:20.
lines 53:21,
    221:9.
linking 139:10.
Lisa 99:21.
list 40:4, 98:14,
    98:20, 98:25,
    99:17, 103:13,
    103:20.
listen 47:10, 49:8,
    51:10, 52:3, 52:4,
    53:2, 53:16,
    104:2, 161:9,
    174:1.
listened 137:5,
    178:21.
listening 43:21,
    57:10, 136:23,
    173:23.

listing 18:10,
 19:15.
literally 18:20,
 40:21, 113:16,
 143:13.
litigation 165:1.
little 37:22, 52:5,
 56:18, 64:22,
 66:13, 67:5,
 85:14, 107:18,
 110:24, 114:24,
 121:22, 122:22,
 126:5, 134:17,
 141:21, 146:8,
 149:7, 160:17,
 223:19, 225:1.
live 37:3, 72:21.
lived 65:12, 65:17,
 117:8, 118:20,
 143:13.
lives 117:8,
 117:9.
living 70:20, 72:17,
 72:18.
lobe 88:19.
located 68:25,
 85:19, 133:8.
locations 134:12.
lock 66:7.
locked 14:1,
 143:3.
logical 14:16,
 171:19, 176:5,
 176:25.
logically 14:16.
logo 74:12, 135:25,
 136:4.
Lombard 1:48.
long 52:14, 56:20,
 72:21, 73:7, 75:8,
 79:8, 94:18,
 104:5, 124:24,
 125:6, 137:1,
 139:25, 140:1,
 150:11, 153:3,
 189:11, 204:4,
 224:20.
longer 52:5, 64:22,
 124:10, 137:19,
 140:3, 140:7.

looked 3:3, 26:16,
 27:1, 27:11,
 43:12, 67:3, 67:5,
 103:17, 132:11.
looks 27:8, 27:9,
 27:24, 30:5, 30:7,
 30:9, 31:20,
 32:22, 46:13,
 47:12, 47:14,
 47:21, 47:22,
 48:19, 50:11,
 50:14, 51:9,
 51:20, 53:13,
 58:3, 106:4,
 125:8, 132:12,
 145:18, 145:21.
lot 71:6, 73:15,
 120:13, 121:6,
 121:23, 121:24,
 128:20, 130:13,
 131:11, 132:3.
loud 107:14.
louder 194:22,
 214:2.
love 51:11.
lower 88:19.
loyalty 179:19.
lubricant 157:17,
 158:4.
lunch 77:18, 123:10,
 123:14, 125:14.
lung 88:11, 88:13,
 88:19, 88:20,
 88:21, 88:25,
 89:1, 89:21.
lying 146:4.
.
.
< M >.
M-e-l-o-d-y 70:4.
M-e-u-n-i-e-r
 94:6.
M. 1:33.
Ma'am 69:15, 69:24,
 70:5, 75:16,
 93:19, 137:19,
 139:2, 156:10,
 156:18, 156:21,
 156:25, 157:3,
 157:9, 157:12,

157:15, 157:19,
 157:23, 158:3,
 158:5, 158:7,
 158:10, 158:14,
 158:21.
Madame 141:2.
magistrate 101:10.
magnitude 55:22.
mail 218:12.
main 108:15.
Mainly 71:5, 79:1.
maintained 68:20.
major 25:18, 134:11,
 196:25.
malevolence
 200:20.
Malice 188:23,
 189:1, 189:12,
 190:24, 191:21,
 198:20, 200:6,
 200:7, 202:20.
maliciously 190:25,
 191:22, 198:22,
 199:15, 202:22,
 203:7, 203:15.
man 27:7, 66:10,
 66:15, 66:24,
 67:1, 67:3, 67:8,
 67:10, 67:13,
 67:16, 102:13,
 122:9, 147:4.
manner 28:4, 79:2,
 89:23, 89:25,
 178:15, 192:19.
manufacture 209:8,
 209:9.
map 107:4, 111:18,
 121:18, 129:24,
 133:24.
marijuana 13:23,
 23:10, 23:13,
 208:21, 209:6,
 209:24, 210:1,
 210:4, 210:9,
 210:13, 220:2,
 220:6, 220:13.
marked 68:7, 83:17,
 84:7, 101:15,
 102:12, 153:10,
 172:18.

married 70:11,
  159:21.
Maryland 1:2, 1:20,
  1:49, 78:23,
  79:24, 80:4, 96:2,
  97:3, 97:20, 98:7,
  143:12, 190:20,
  191:17, 198:19,
  202:19, 208:18,
  209:2, 217:1,
  217:9, 219:23.
matching 154:16.
material 210:3,
  210:7, 210:9,
  210:11, 210:13.
materials 213:17,
  214:11, 223:16.
matter 37:8, 38:13,
  39:15, 44:15,
  55:3, 55:7, 99:10,
  124:17, 163:3,
  164:20, 167:19,
  171:18, 171:19,
  176:14, 178:24,
  180:6, 187:13,
  188:25, 189:23,
  196:10, 201:2,
  225:25.
matters 141:6,
  161:24, 163:23,
  178:13, 184:21,
  185:13, 185:15.
Matthew 98:17,
  100:20, 101:8,
  103:10, 104:8,
  134:20, 135:1,
  204:2.
max 225:1.
meals 71:21,
  71:24.
Meaning 118:13,
  119:12, 121:23,
  122:2.
means 34:20, 80:12,
  80:14, 160:22,
  188:10, 188:15,
  194:9, 200:2,
  201:24, 203:24,
  214:24, 218:25.
meant 13:3, 45:8,

107:21, 149:9.
meantime 145:13.
measured 196:22.
media 59:4, 59:5.
Medical 78:22,
  78:24, 79:4, 79:9,
  79:17, 80:2,
  81:21, 82:10,
  82:15, 83:8,
  84:20, 189:1.
medicine 80:15,
  80:21, 81:2.
Melody 69:13, 69:19,
  70:2, 226:5.
Melvin 16:8, 17:6,
  143:10.
member 61:1, 80:2,
  142:9, 164:8,
  192:22, 193:23,
  195:6, 195:10,
  195:23, 196:12,
  196:13, 196:23,
  197:6, 197:8,
  197:19, 207:5,
  207:19, 220:11.
members 162:12,
  194:5, 195:9,
  197:7, 207:14,
  208:9.
membership 197:12,
  220:15.
memberships 80:1.
men 71:20, 142:25,
  143:15, 145:3.
mention 147:2.
mentioned 71:17,
  88:14, 148:7,
  195:24.
MERCER 1:39, 3:21,
  5:15, 5:20, 12:21,
  12:23, 13:2, 13:4,
  16:19, 16:21,
  16:22, 16:25,
  17:11, 17:19,
  35:6, 225:2,
  225:3, 225:7.
Mere 197:5, 197:6,
  197:10, 197:14,
  206:2.
merely 80:21, 177:5,

186:3, 186:18,
  197:17, 206:4.
messed 221:15,
  221:17.
met 166:24, 169:16,
  170:20, 194:6.
method 206:24.
methodology 18:3.
metropolitan 95:3.
Meunier 93:17,
  93:22, 94:5, 94:6,
  94:10, 99:2,
  100:22, 103:8,
  104:15, 104:23,
  109:1, 109:13,
  110:21, 114:4,
  115:12, 116:12,
  117:18, 117:22,
  119:8, 120:1,
  121:19, 125:17,
  131:13, 133:25,
  134:20, 135:6,
  226:17.
Michael 69:5.
Mickey 21:10,
  138:18.
microphone 69:25,
  78:12, 84:5, 94:3,
  107:8, 107:10,
  108:10, 150:11,
  152:16.
midportion 86:22.
mike 137:20.
miles 109:11.
military 97:24.
Miller 155:14,
  155:15.
mincing 47:16.
mind 59:15, 162:24,
  170:16, 180:25,
  186:25, 187:17,
  189:1, 189:3,
  189:4, 200:7,
  213:18, 213:20,
  213:23, 214:1,
  214:4, 215:17,
  215:23.
mindful 107:6,
  108:10, 160:15.
minimized 13:16,

15:17.
minister 67:20.
ministry 71:2,
   71:3.
minor 196:25.
minute 20:5, 23:7,
   46:20, 77:20,
   114:12, 125:18,
   144:10, 153:11.
minutes 32:8, 39:17,
   39:22, 41:1, 49:9,
   57:4, 57:6, 104:5,
   124:12, 124:20,
   125:1, 125:7,
   139:16, 142:20,
   144:1, 144:2,
   148:15, 224:22,
   225:6, 225:7,
   225:11, 225:12.
mirror 106:12.
mislead 12:18, 13:7,
   14:19.
misplaced 68:19.
missed 35:14.
Mississippi 79:19.
misspoke 13:4,
   138:14.
mistake 4:16, 144:6,
   183:19, 188:8,
   188:14, 188:18,
   213:6.
mistaken 62:5.
mistakes 144:5.
mistrial 75:25,
   76:16, 77:14.
mixed 12:6.
mixture 208:20,
   209:5, 220:2.
MJOA 139:16,
   143:11.
Mjoas 124:17.
modification
   19:11.
modified 23:14,
   26:17.
modify 8:15, 15:5,
   28:3, 28:4.
Molling 155:13.
mom 72:18, 73:4,
   73:6, 73:19,

73:22, 75:7.
moment 14:23,
   106:11, 109:22,
   129:11, 129:17,
   138:5, 170:14,
   170:15, 186:20,
   188:2, 190:10,
   195:24, 223:24.
Monday 1:19.
money 98:3, 135:16,
   138:15, 138:17,
   138:18.
monitor 70:15,
   109:1.
months 143:5,
   145:19, 145:20.
moot 8:12, 10:7.
moots 60:1.
more. 67:25.
morning. 68:1.
mostly 32:23.
mother 36:13, 61:21,
   62:22, 63:2, 63:5,
   63:7, 63:11,
   65:11, 73:4,
   74:23.
motion 52:9, 52:12,
   56:6, 56:18, 59:2,
   60:3, 76:2,
   141:13, 146:23,
   147:10, 147:12,
   159:22, 160:7.
motions 35:16,
   35:17, 58:19,
   58:24, 141:15,
   148:6, 148:8,
   148:11.
motive 4:19, 47:2,
   145:22, 145:23,
   146:5, 179:19,
   180:20, 181:12.
Mountain 157:17,
   158:6.
mouth 55:15.
move 40:12, 53:22,
   65:4, 72:2, 75:25,
   76:13, 81:10,
   141:18, 142:4.
moved 57:1,
   145:24.

movie 135:7, 135:9,
   135:13, 135:14.
movies 21:14.
Moving 7:19, 77:8,
   84:3, 84:13,
   91:15, 92:16.
murder 13:24, 14:7,
   14:8, 15:25, 17:7,
   54:21, 61:12,
   61:17, 63:7,
   145:23, 146:5,
   186:11, 186:14,
   188:24, 198:9,
   202:13.
murdered 16:1.
Murray 118:16.
mutual 194:11.
Myles 98:17.
Myrtle 21:12,
   144:16, 145:9,
   145:10, 146:19.
myself 2:6, 30:2,
   32:8, 47:10.
.
.
< N >.
Name 69:25, 70:1,
   70:3, 70:5, 70:11,
   78:13, 78:14,
   78:15, 94:3, 94:4,
   94:5, 96:4, 99:20,
   102:14, 152:16,
   152:17, 153:16,
   164:23, 226:3.
named 156:14,
   167:13, 167:15,
   167:18, 181:7.
names 11:9, 177:7,
   186:23, 210:10.
narcotic 209:15,
   209:17, 209:18,
   209:20, 209:22,
   213:15, 214:24,
   215:1.
narcotics 186:12,
   186:15, 212:3,
   213:2, 213:4,
   213:7, 213:8,
   213:11, 213:17,
   214:12, 214:17,

214:20, 215:4,
215:13, 215:21,
216:1, 216:3,
216:6, 216:12,
216:15, 216:20,
216:24, 217:21,
219:20.
narrate 109:2,
109:21.
narrow 54:22,
54:25.
national 80:9,
165:25.
nationally 80:6.
natural 189:16.
nature 21:10, 61:6,
82:12, 166:4,
194:18, 213:13,
223:4.
near 114:9, 143:24,
211:19.
necessarily 24:23,
25:5, 170:3,
197:12, 212:9,
216:13.
necessarily. 24:22,
25:4.
necessary 11:1,
11:2, 63:23,
197:20, 202:9,
204:18, 204:19,
205:13, 220:19.
need 3:2, 8:4, 15:5,
34:4, 40:4, 42:10,
52:3, 56:5, 57:4,
107:8, 107:14,
136:16, 139:21,
140:8, 141:6,
148:12, 149:17,
194:5, 194:7,
196:12, 196:14,
196:15, 196:18,
200:11, 200:19,
210:25, 214:23,
223:5, 225:16.
needed 74:9,
201:6.
needs 5:24,
224:10.
neglected 136:18,

147:2.
negligence 188:14,
213:5.
negotiating 215:7.
neither 68:15,
214:14.
Nervousness 214:9.
neutral 29:4.
New 23:8, 147:4.
newer 95:6.
Next 4:19, 5:7,
7:20, 17:15, 32:8,
53:12, 65:1,
65:15, 69:11,
69:12, 70:15,
75:18, 75:19,
75:21, 77:25,
83:25, 88:5, 88:6,
93:4, 97:12, 98:1,
99:17, 112:15,
113:7, 115:9,
116:6, 119:10,
123:2, 131:16,
195:8.
nice 171:5.
night 143:8.
nine 187:10.
No. 1:9, 3:14, 6:13,
6:22, 8:7, 11:19,
12:24, 17:22,
17:24, 18:3, 22:5,
22:16, 34:9, 65:5,
65:15, 69:8, 98:9,
153:11, 153:23,
154:13, 155:9,
156:7, 221:19.
nobody 27:22,
67:20.
nodding 4:6.
nonexistence
171:17.
Nor 68:15, 163:1,
186:4, 196:13,
211:19, 214:14.
normal 56:25.
North 71:7, 71:23.
NORTHERN 1:2.
note 2:6, 3:11,
14:22, 14:23,
30:14, 32:8,

84:19, 85:8, 92:2,
142:7, 171:18,
189:21, 196:5,
212:7.
noted 86:19.
notes 160:22,
160:23, 222:22.
Nothing 35:5, 35:6,
42:13, 43:15,
58:17, 62:10,
66:20, 75:11,
92:23, 143:24,
158:23, 181:21,
221:17, 221:24.
notice 222:2, 222:5,
222:6, 222:16.
noticed 8:8, 8:14,
24:9, 66:19,
221:18, 222:22.
notifies 173:15.
notify 73:22.
notion 44:12, 48:1,
223:6.
notions 62:6.
numbers 174:10.
numerous 146:1.
Nurton 107:23,
108:3, 111:22,
112:3, 112:12,
112:15, 125:22,
126:13, 126:14,
126:20, 127:10,
127:21, 128:13,
128:18, 128:21,
129:6, 131:5,
131:6, 132:2,
132:23, 133:2,
133:5, 133:9,
144:18.
.
.
< O >.
o'clock 52:6, 68:1,
73:9, 123:11,
141:8, 224:1,
224:4.
oath 51:2, 69:18,
78:5, 93:21,
152:9, 166:8,
220:23.

object 5:17, 7:12,
  10:24, 12:24,
  14:21, 18:15,
  19:8, 19:19,
  21:18, 37:18,
  38:13, 76:3,
  84:14, 165:5,
  192:1, 192:2,
  192:5, 193:7,
  194:8, 194:10,
  210:23, 211:1,
  211:3, 223:15.
objected 38:5,
  165:12.
objecting 7:13,
  39:24, 41:16,
  63:13.
objection 3:3, 18:6,
  19:10, 19:17,
  19:18, 20:23,
  20:24, 21:9,
  22:16, 24:19,
  25:8, 26:5, 27:3,
  37:4, 38:16,
  45:19, 51:21,
  63:12, 63:17,
  81:13, 81:14,
  81:15.
objectionable
  62:20.
objections 20:8,
  162:23, 221:15.
objective 188:17,
  195:15.
objectives 196:19,
  197:18, 197:21.
objects 3:15.
obligation 175:14.
observation 27:20,
  86:11.
observations 85:7,
  85:13, 87:12,
  89:11, 116:1.
observe 27:19,
  29:10, 30:19,
  33:25, 161:9,
  179:25.
observed 85:15,
  85:17, 170:25,
  178:21, 181:20.

obsession 146:1.
obstructions
  116:3.
obtained 36:9,
  102:2.
obvious 161:10.
Obviously 6:20,
  34:4, 34:24,
  52:19, 77:13,
  125:24, 129:12,
  160:23, 205:7,
  213:18.
occasion 34:1,
  104:2, 163:21,
  183:6.
occupant 214:5.
occurred 31:17,
  39:10, 73:1,
  185:1, 189:14,
  189:24.
occurrence 189:7,
  189:11.
occurs 218:15.
Ocean 138:19.
offended 55:18.
offender 26:11,
  27:19, 27:21,
  27:25, 29:7,
  29:10, 30:19,
  31:11, 31:15,
  31:22, 31:24,
  32:2, 33:23,
  33:24, 33:25,
  184:24, 185:7.
offenses 5:19,
  167:24, 189:22,
  202:1, 204:10,
  219:9.
offensive 43:9.
offer 170:18.
offered 4:16, 5:5,
  10:2, 37:8, 46:23,
  168:4, 173:11,
  174:9.
offering 38:11,
  38:16, 48:16,
  170:4.
offers 165:5.
Office 78:24, 79:9,
  82:10, 83:8,

94:13, 94:25,
  98:15, 99:5,
  100:4, 128:9,
  128:17, 129:13,
  130:3, 130:4,
  130:8, 130:16,
  133:8.
officer 16:6, 16:16,
  25:19, 190:15,
  191:2, 198:15,
  198:24, 199:18,
  201:23, 201:24,
  202:2, 202:4,
  202:7, 202:15.
Official 1:47, 25:2,
  182:18, 191:24,
  198:6, 199:9,
  202:25, 203:10,
  203:22, 203:24,
  204:2, 225:28.
officials 12:11,
  20:13, 182:17.
Often 71:13, 71:18,
  189:8, 194:22,
  216:9, 225:8.
older 221:8.
oldest 65:18.
Oldsmobile 155:19.
Once 32:21, 47:19,
  66:12, 67:22,
  71:19, 89:5,
  124:21, 166:17.
one-hour 225:14.
one. 218:16.
ones 33:4, 34:7.
ongoing 54:15.
Open 59:9, 59:11,
  77:24, 140:23,
  160:10, 224:2.
opened 100:12.
opening 10:21, 60:6,
  162:22.
openly 23:12.
operation 213:19.
opinion 148:2,
  162:7, 163:15,
  164:2, 165:16,
  185:14, 185:21,
  185:25, 186:3,
  186:4.

opinions 163:24,
  185:13, 185:22.
opportunities
  80:6.
opportunity 27:19,
  29:9, 30:18,
  33:25, 53:25,
  80:8, 146:24,
  177:11, 179:25.
opposed 15:24, 44:2,
  58:8.
opposing 50:9.
opposite 113:18,
  114:6.
options 3:24.
oral 36:9.
order 12:17, 20:19,
  51:6, 76:19,
  88:15, 100:18,
  101:1, 101:7,
  103:18, 174:12,
  178:5, 193:15,
  194:4, 195:16,
  196:16, 199:8,
  200:17, 201:1,
  201:6, 202:8,
  203:1, 204:21,
  205:12, 209:11,
  211:1, 212:18,
  214:21, 217:22.
ordered 172:23.
ordinarily 185:24.
ordinary 182:21.
organs 88:7.
origin 165:25.
originally 68:20.
originals 68:21,
  68:23.
Oriole 145:19.
others 15:9, 15:14,
  16:13, 190:22,
  191:19, 196:25,
  206:5, 213:25,
  219:19, 219:25.
Otherwise 7:17,
  28:20, 159:24.
ought 162:8.
outcome 25:12,
  180:19, 180:20,
  180:24, 181:3,

  181:13, 182:25,
  195:18, 195:20.
outside 12:7, 12:11,
  15:13, 18:10,
  19:15, 20:10,
  20:12, 21:2, 66:2,
  81:23, 81:24,
  139:18, 171:7,
  171:10, 173:9,
  177:21, 177:24.
overall 19:19,
  81:1.
overemphasize
  14:12.
Overruled 19:9,
  84:17.
overruling 20:23.
overt 205:25.
own 26:6, 59:15,
  145:5, 162:21,
  163:4, 170:9,
  174:2, 175:8,
  180:22, 183:25,
  186:5, 196:7,
  212:2, 219:4.
owner 69:6.
ownership 212:5,
  212:8, 212:11,
  212:16, 212:20.
.
.
< P >.
P-1 136:17.
P-2 102:25.
P-31 101:16.
P-a-y-t-o-n 70:6.
p.m. 100:13, 135:1,
  217:1.
packaging 216:17.
pad 157:10.
pads 154:11, 154:16,
  155:5, 155:18,
  158:1.
Page 3:14, 95:23,
  95:24, 96:3,
  96:10, 97:12,
  98:1, 99:17,
  100:2, 100:11,
  100:25, 102:12,
  103:1, 154:12,

  155:8, 226:3.
paid 138:18.
palpable 145:17.
pants 67:13, 67:16,
  67:17, 74:7.
papers 59:6.
paragraph 3:25,
  4:13, 5:10, 5:11,
  5:12, 5:24, 6:3,
  6:9, 25:8, 25:14,
  27:17, 29:6,
  29:13, 29:17,
  30:18.
paralegals 149:2.
parallel 21:1,
  21:6.
paraphernalia
  216:16.
Park 74:2, 134:15,
  144:3.
parking 73:15,
  120:13, 120:23,
  121:6, 121:23,
  121:24, 128:20,
  130:13, 131:10,
  132:3, 138:19.
Parkville 96:1.
parse 77:4.
participant 195:17,
  198:3.
participants 173:15,
  194:25.
participate 195:13,
  206:15, 208:2.
participated 68:21,
  142:11, 197:20,
  205:14, 205:23.
participating 71:14,
  177:5.
participation 196:6,
  196:20, 196:23,
  197:15.
particular 9:11,
  28:18, 74:4, 74:9,
  75:4, 95:20, 96:4,
  96:5, 96:10,
  96:18, 99:14,
  100:9, 101:7,
  110:5, 116:11,
  158:12, 184:9,

193:14, 201:5,
202:10, 212:15,
212:19.
particularizing
28:18.
particularly 11:4,
13:18, 14:19,
21:19, 26:10,
29:3, 95:6,
95:7.
parties 8:24, 9:5,
9:16, 34:13, 69:1,
98:9, 98:11,
161:17, 163:13,
164:12, 165:2,
173:2, 173:14,
194:20.
partnership
192:23.
parts 15:10, 36:10,
37:1, 39:14,
60:15, 81:21,
188:1.
party 50:9, 164:6,
164:16, 164:25,
170:1, 170:11,
177:10.
pass 114:20, 126:20,
127:2, 128:5,
162:11, 162:13,
162:18, 215:2,
215:4.
passed 215:3.
Passing 110:4,
114:3, 129:2,
132:6.
past 111:4, 111:20,
111:21, 114:5,
160:17, 189:3.
Pastor 65:22, 67:4,
67:11, 71:4,
71:13.
path 66:16, 77:3,
88:15, 89:12,
110:22, 110:24,
114:14, 131:23.
Pathology 79:18,
79:20, 79:25,
80:17, 80:18,
80:19, 80:20,

80:21, 80:24,
81:1, 81:2, 81:6,
81:12.
patience 64:25.
patrol 25:19.
pattern 7:18, 11:12,
22:24.
Pause 104:18.
pay 160:23, 161:5.
Payton 69:13, 69:19,
70:2, 70:9, 70:11,
70:15, 72:4,
72:16, 73:18,
74:3, 74:25,
75:11, 76:8,
226:5.
pejorative 61:25,
63:10.
pen 96:20.
pending 204:4.
Pennsylvania 97:3.
people 10:25, 11:1,
11:9, 31:19,
35:19, 58:25,
61:4, 110:25,
146:4, 149:1,
167:9, 177:6,
181:6, 194:13,
212:13.
per 21:25.
perceive 182:5.
percent 26:25,
136:25.
perception 55:20.
perfect 35:25.
perfectly 173:17,
224:4.
perform 82:3, 105:6,
164:5, 164:15,
164:16, 196:23,
196:24.
performing 79:1,
82:16, 83:14.
Perhaps 29:5, 51:14,
51:23, 56:2,
144:23.
period 33:23, 96:5,
96:8, 96:9,
137:12, 201:5,
201:9.

peripheral 16:20.
permission 65:5,
77:19.
permitted 149:25,
172:11, 173:19,
176:16, 176:21,
185:12, 185:14.
perpetrator 28:9,
34:21, 184:6,
184:23.
Perry 98:6.
personal 25:11,
55:19, 55:24,
55:25, 61:13,
165:24, 170:9,
181:23, 182:24,
187:18, 216:8.
personally 55:10,
55:13, 56:15,
208:2, 208:14,
216:4, 218:15.
persons 68:12,
166:1, 167:13,
167:14, 167:16,
177:7, 181:19,
192:9, 192:10,
192:12, 192:15,
192:24, 193:18,
194:2, 195:1,
207:13, 220:8.
perspective 105:14,
105:16, 105:17,
106:6, 110:8,
117:4, 118:6,
119:18, 126:5,
130:2.
perspectives 105:14,
105:18.
persuaded 170:11.
pertain 95:20,
99:10, 100:19.
pertaining 51:16.
pertinent 198:11,
220:3.
phone 73:13, 73:19,
75:1, 102:1,
102:18, 102:22,
103:1, 103:2,
143:2, 144:25,
145:2, 145:7,

145:19, 146:15, 173:14.
phones 144:24.
photo 68:5, 68:17, 69:2, 84:8.
photograph 68:11, 83:19, 86:15, 90:9, 116:16.
photographs 68:10, 68:11, 68:16, 69:3, 69:4, 69:5.
phrase 28:10, 28:14, 50:16.
physical 84:20, 85:2, 135:19, 210:22, 210:25, 211:4, 211:7, 216:16.
physically 204:20.
pick 5:3, 5:8, 15:25, 43:21, 144:13.
picking 16:8, 122:8.
picks 145:1, 145:7.
picture 30:2, 54:25, 83:12, 84:9, 86:2.
pictures 88:6, 218:11.
piece 7:3, 28:18, 142:23.
ping 145:4.
place 174:11, 181:20, 189:14, 205:9, 212:2, 212:12, 212:14, 212:16, 212:20.
placed 69:17, 78:5, 83:21, 89:6, 93:21, 152:8, 183:10.
places 18:10, 19:16.
Plaintiff 1:7, 1:23.
plan 148:14, 196:1, 197:15, 207:17,

216:18, 225:13.
planning 10:18, 48:10, 48:19, 60:12, 139:18, 200:25.
play 8:19, 37:17, 43:10, 46:5, 48:12, 48:13, 48:15, 48:17, 48:19, 48:21, 50:5, 51:15, 51:25, 53:23, 93:6, 106:19, 106:21, 109:1, 109:20, 109:23, 112:8, 113:13, 129:16, 132:15, 135:4, 167:16, 196:25.
playback 109:21.
played 173:25.
playing 37:5, 48:18, 120:20, 122:15, 127:6, 128:24, 132:24.
plea 23:1.
pleas 168:14.
Please 2:14, 4:4, 10:6, 46:4, 64:12, 69:15, 69:23, 78:2, 78:3, 78:11, 78:21, 79:15, 93:19, 94:2, 123:12, 139:3, 152:8, 152:15, 159:2, 161:13, 171:18, 224:13.
pled 168:12.
plural 9:24.
plurality 15:6.
plus 147:22.
pocket 66:20.
point. 63:18, 121:20, 144:24, 222:19.
points 62:7.
pole 128:5.
Police 68:22, 89:7, 89:8, 135:24.
polo 74:10, 74:11.

Pontiac 144:4, 144:17, 144:19, 155:11, 155:16, 155:20.
portion 85:20, 86:3, 86:5, 86:20, 136:2, 154:4.
portions 57:23, 57:24.
poses 193:12.
position 91:6, 92:21.
positions 79:21.
possess 209:9, 216:15, 219:20, 220:1, 220:12.
possessed 208:20, 209:4, 209:15, 209:16, 209:18, 210:1, 210:18, 211:15, 211:16, 211:25, 212:13, 212:18, 212:19, 213:1, 213:4, 213:8, 213:11, 213:14, 213:17, 214:16, 215:13, 215:20.
possesses 211:11.
possessing 210:4, 220:5.
Possession 209:23, 210:16, 210:19, 210:21, 210:22, 210:24, 211:1, 211:4, 211:6, 211:9, 211:10, 211:12, 211:14, 211:18, 212:7, 212:10, 212:25, 213:5, 213:7, 213:13, 214:12, 214:14, 214:18, 216:8, 216:11, 216:12, 216:20.
possibilities 91:3.
possibility 11:21, 26:3.
possible 15:23,

53:3, 90:20,
161:6, 190:16,
191:3, 198:16,
198:25, 199:6,
199:19, 202:16,
206:25, 211:12,
216:9, 220:16.
posted 109:12.
potential 13:7,
14:18, 68:16,
101:4, 192:14.
pounds 67:12,
85:5.
Power 48:8, 136:17,
211:13, 211:15.
powerful 145:12.
practice 80:4,
80:15.
practicing 54:5.
pre-grand 39:10.
preamble 39:22,
42:23.
precedent 54:19.
precise 152:2,
194:9.
predicament 145:4.
prefer 124:19,
124:20.
preference 11:25.
prejudice 164:6,
164:10, 164:16,
165:10, 166:18,
179:20.
prejudiced 180:13.
premeditation 191:1,
191:22, 198:22,
199:15, 200:24,
200:25, 201:6,
201:7, 202:23,
203:7, 203:15.
preparation 104:3,
106:17.
prepare 71:24,
132:12.
prepared 120:7,
173:20.
preparing 125:19.
presence 139:18,
197:5, 206:2,
212:22, 214:9.

present 12:12,
12:19, 20:14,
26:12, 65:22,
88:2, 174:16,
175:15, 177:25,
211:20.
presentation 80:8.
presented 141:17,
174:8, 176:20,
185:16, 187:3,
216:21.
presents 34:15.
preserved 6:17,
6:20, 11:17, 18:6,
20:8.
preside 161:21.
presume 149:13.
presumed 168:22,
170:18.
presumes 168:20.
presumption 6:14,
166:1, 169:2,
169:8.
pretrial 141:15,
148:8.
pretty 55:24, 71:15,
75:6, 116:4.
prevent 59:5,
191:10, 191:23,
192:6, 201:25,
202:24, 203:9,
203:22.
prevented 205:21.
preview 146:10,
147:19, 184:19.
previously 24:10,
81:5, 101:23,
102:23, 103:17,
114:10, 160:7,
168:8, 182:10,
201:16, 203:16,
219:9, 220:14.
price 215:7.
primary 79:3,
82:15.
prime 164:20.
principal 161:8,
188:1.
principal. 204:16.
principle 162:1.

Prix 155:12.
probable 189:16.
Probably 16:18,
43:5, 57:19, 77:8,
108:9, 111:9,
124:18, 139:16,
146:13, 221:25,
222:8, 222:16,
225:1.
probation 202:1.
problem 22:3, 33:7,
53:19, 62:16,
62:20.
problematic 62:15,
62:23.
procedure 43:6,
68:14, 173:16.
proceeding 191:11,
191:24, 192:7,
192:11, 198:6,
199:10, 202:25,
203:10, 203:23,
203:24, 203:25,
204:2, 204:3,
204:5, 204:6,
204:8, 205:22.
Proceedings 1:17,
43:10, 77:24,
95:11, 103:9,
140:23, 160:10,
224:2, 225:22,
225:25.
proceedings.
104:18.
process 17:22, 18:4,
42:9, 42:18, 57:1,
166:5, 176:13,
218:3, 218:22.
processes 82:2.
processing 216:17.
procures 204:15.
produce 192:15.
producing 168:19,
177:18.
product 188:17,
188:18.
professional 25:12,
80:1, 182:25.
prohibits 220:4.
Project 74:13,

136:4.
projectile 90:25.
promise 23:19.
promised 23:11,
  23:24.
promises 23:17.
prompt 35:10.
proof 6:14, 165:24,
  166:2, 169:17,
  170:16, 170:21,
  171:3, 187:21,
  189:4, 193:15,
  194:17, 194:25,
  195:19, 204:21,
  207:2.
propensity 168:7.
proper 187:24.
properly 148:13,
  165:6.
property 199:4,
  211:23.
proposed 2:5,
  19:11.
prosecute 23:11,
  202:1.
prosecution 42:19,
  101:5, 134:20,
  164:23, 168:15,
  181:7, 185:5.
protect 192:9.
provably 16:9.
proved 169:25,
  176:8, 196:11,
  200:13.
proven 14:5, 163:19,
  166:12, 166:15,
  167:4, 167:6,
  167:10, 168:24,
  169:12, 176:22,
  188:20, 205:1.
proves 170:23,
  208:13, 213:14.
provide 5:5, 71:22,
  160:13, 168:4,
  223:3.
provided 20:17,
  20:20, 28:12,
  37:6, 44:13,
  44:16, 63:24,
  98:21, 98:22,

137:17, 137:18,
  146:18, 157:5,
  157:20, 158:12,
  178:3, 178:5,
  184:22, 192:4,
  207:9.
provides 146:4,
  199:2, 202:13,
  204:13, 217:17.
providing 45:2,
  172:5, 190:14,
  191:2, 198:14,
  198:24, 199:17,
  202:15, 205:19.
proving 166:24,
  184:7, 215:11.
provision 222:25.
proximity 87:25,
  133:9.
public 58:22,
  101:13, 193:12.
publish 83:25.
pull 69:24, 95:15,
  137:16.
pulled 18:21.
punishable 24:15,
  204:16.
punishment 220:17,
  220:24.
purchase 153:25,
  154:1.
purchased 154:10,
  158:1, 158:20.
purchases 157:16,
  157:21.
purported 17:2.
purpose 4:14, 4:15,
  4:21, 4:25, 61:2,
  183:11, 188:12,
  192:2, 192:25,
  194:9, 194:10,
  195:2, 195:13,
  198:1, 200:19,
  206:1, 215:17,
  216:9, 218:17.
purposefully
  188:16.
purposely 183:18.
purposes 40:24,
  76:20, 83:16,

83:18, 105:25,
  143:11, 196:4,
  197:18, 197:21.
pursuant 207:17,
  208:6.
push 109:23.
putting 46:16,
  74:2.
.
.
.
< Q >.
qualifications
  164:10, 185:22.
qualify 81:16.
quality 34:19,
  215:6.
quantities 23:12.
quantity 208:20,
  209:4, 214:12,
  216:10, 216:12.
questioned 24:10,
  42:16.
questioning 36:20,
  39:10, 39:23,
  42:15, 44:24,
  55:18, 57:15,
  57:17, 61:10.
Questions 33:22,
  34:11, 55:12,
  55:16, 75:14,
  75:15, 90:11,
  92:9, 98:10,
  129:17, 138:23,
  138:24, 139:1,
  149:23, 149:24,
  150:1, 155:24,
  156:1, 162:23,
  163:8, 163:21,
  163:22, 164:9,
  165:9, 171:25,
  172:15, 179:12,
  206:15, 206:21.
quick 139:23,
  146:7.
quickly 67:22,
  148:13.
quiet 143:22.
quite 182:22.
quote 48:6, 57:17,
  66:8.

.
.
< R >.
R-19 156:11,
158:12.
R-26 103:12,
136:9.
R-26B 136:11,
136:14.
race 165:25.
radio 218:13.
rain 171:14.
raincoat 171:9,
171:13.
raining 171:11.
raise 69:17, 78:4,
93:21, 152:8.
raised 27:3, 30:15,
58:7.
ran 66:10, 66:21,
66:22, 67:22,
67:24.
range 189:23,
189:25, 190:1,
190:2, 190:3,
225:5.
rare 42:5.
Rarely 189:3.
rather 18:10, 19:15,
62:5, 188:17.
reach 177:13.
reaching 165:23,
167:21, 185:19,
186:24, 187:17.
readily 61:22.
reading 16:21,
18:19, 23:22,
23:23, 98:8.
reads 190:17,
191:14, 198:18,
202:18, 216:24,
217:7, 219:21.
ready 57:4, 65:1,
122:3, 123:11,
124:15, 124:16,
124:22, 125:14,
141:8, 149:12,
149:13.
real 14:18,
194:21.

realize 19:1,
149:18.
really 21:15, 24:5,
26:9, 27:6, 28:2,
30:22, 32:15,
35:17, 37:24,
38:25, 42:25,
43:19, 62:1,
62:23, 63:20,
223:2.
rearview 106:3,
106:11.
reason 16:12, 41:4,
41:17, 41:18,
43:19, 57:21,
60:4, 60:23,
63:19, 68:3,
144:20, 166:22,
167:1, 168:17,
171:16, 176:1,
181:9, 186:5,
208:5.
reasonably 207:21.
reasoned 176:5.
reasons 160:7,
185:22.
rebut 44:10, 44:12,
47:1, 54:17,
56:1.
rebuttal 60:6,
146:25, 151:21,
159:13, 225:9.
recall 8:25, 25:9,
36:18, 47:24,
57:20, 73:25,
109:9, 137:1,
144:19, 145:15,
163:6.
receipt 157:7,
157:25, 158:2.
receive 82:11,
98:20.
received 2:6, 3:25,
4:1, 6:6, 73:19,
79:17, 84:22,
98:13, 163:7,
167:25, 172:17,
172:19, 172:20,
173:22.
receiving 63:13,

215:7.
recent 47:2, 54:9,
54:12.
recently 47:1.
receptive 47:25.
recess 57:7, 123:18,
149:8.
recipient 218:18.
reckless 200:13.
recognize 74:19,
83:19, 85:24,
86:1, 89:18,
89:20, 95:17,
101:16, 128:6,
133:14, 154:13.
recognized 52:19,
81:11.
recognizes 211:10.
recollection 29:14,
29:19, 29:20,
32:7, 38:9, 49:3,
52:25, 58:2,
162:21, 163:4,
180:1, 180:8.
reconsider 148:10.
record. 75:23,
139:9, 159:20,
221:4.
recorded 9:21, 36:5,
96:16, 134:25,
173:16.
recording 13:14,
115:11.
recordings 8:16,
8:17, 8:23, 9:4,
9:15, 9:24, 10:3,
10:4, 173:12,
173:13, 173:18,
173:22.
records 22:7, 95:18,
96:25, 97:13,
97:19, 137:16,
137:25.
recover 88:22.
recovered 6:25,
7:16, 88:24,
88:25, 89:1, 89:5,
89:21.
recovering 7:2.
recovery 89:3.

redact 37:20,
  53:22.
redacted 57:1,
  103:13, 103:24.
redactions 51:18,
  140:19.
Redirect 92:11,
  92:12, 138:25,
  158:24, 226:15.
refer 10:17, 11:15,
  45:8, 177:9,
  203:17, 210:10,
  223:8.
reference 3:16,
  3:18, 3:19,
  102:13, 135:6,
  155:11.
references 138:4.
referred 2:24,
  129:13, 147:18,
  191:5, 191:12.
referring 9:3,
  10:25, 28:24,
  37:15, 46:13,
  50:11, 50:14,
  50:15, 53:13,
  57:25, 60:15,
  86:7, 86:12,
  86:24, 87:1, 99:1,
  102:25.
refers 193:4.
reflect 28:5, 41:11,
  96:20, 99:20.
reflected 127:10,
  153:17, 155:8.
reflecting 27:5,
  27:6.
reflection 25:7.
refresh 59:15.
regard 15:23, 21:3,
  26:18, 36:2,
  36:11, 51:19,
  51:20, 54:22,
  61:22, 103:18,
  116:1, 167:9,
  173:3, 187:4,
  188:4, 194:23,
  195:16, 199:25,
  200:8, 200:22,
  202:4.

regarding 198:12,
  205:19.
Regardless 43:23,
  162:7.
Regeneration 74:13,
  136:4.
region 86:3.
registered 69:5.
regular 137:20.
rehabilitate 37:12,
  46:24.
relate 182:5.
related 105:7.
relating 186:11,
  186:12, 186:14,
  186:15, 190:15,
  191:3, 198:15,
  198:24, 199:6,
  199:18, 201:21,
  202:16.
relation- 15:17.
relationship 13:16,
  13:20, 14:11,
  15:18, 179:17.
relatively 35:9.
release 100:18,
  101:1, 101:7,
  103:18.
relevance 43:22,
  61:21.
Relevancy 84:16.
relevant 44:5,
  44:13, 44:23,
  45:13, 45:15,
  45:18, 62:6,
  62:14, 63:1,
  76:11, 161:22,
  190:11, 191:7,
  199:1, 222:1.
relies 210:12.
religion 165:25.
reluctant 47:24.
rely 162:20,
  214:3.
remain 148:8, 148:9,
  150:11, 164:13.
remains 20:22,
  160:13, 169:9.
remedy 59:21, 60:7,
  221:25, 222:8.

remember 22:9,
  23:22, 23:23,
  28:17, 33:2,
  36:23, 38:1, 38:7,
  49:7, 50:18,
  50:20, 50:21,
  51:8, 76:24, 89:9,
  123:12, 160:19,
  168:11, 177:16.
Remind 3:18, 46:1,
  47:5, 176:24.
reminded 136:7,
  164:7.
removing 19:13,
  83:14.
render 163:24,
  164:2, 167:1.
renew 141:15,
  159:22.
Rent-a-car 138:16,
  138:17.
repeat 33:15, 166:6,
  185:5, 198:11.
repetitive 6:5.
replay 55:6.
replaying 56:5.
report 82:22,
  102:10, 153:14,
  153:17, 153:19,
  179:11.
Reporter 1:47,
  225:28.
represent 174:12.
represented 41:11,
  98:19, 98:24.
request 6:15, 6:21,
  22:12, 77:14,
  77:15, 81:13,
  165:8.
require 48:8, 204:3,
  215:5.
required 6:23,
  17:13, 20:21,
  170:17, 175:17,
  176:16, 178:6,
  197:19, 207:8.
requirement 6:24,
  7:15, 50:7, 80:15,
  169:20, 201:4,
  205:5.

requires 180:14,
  190:1, 197:1,
  215:9.
resentment 180:11.
reserve 34:14.
reserving 11:21.
residence 133:17,
  212:8, 214:6,
  214:7.
residency 79:18.
residential 109:5,
  143:23.
resolve 162:15.
resolved 77:12.
respect 85:14,
  163:3, 175:9,
  187:2, 187:8,
  203:17, 207:2.
respective 209:11.
respond 45:15.
responded 67:19.
response 11:7, 15:1,
  22:1, 59:1.
responsibilities
  95:5.
responsibility 79:3,
  208:8.
rest 4:8, 5:12, 6:3,
  20:22, 33:22,
  34:1, 34:6, 93:1,
  139:4, 139:11,
  139:14, 141:3,
  149:12, 159:3.
rested 88:21,
  152:1.
Restoration 71:5.
rests 186:6,
  220:20.
result 91:25, 145:4,
  168:14.
resulting 142:21.
results 189:17,
  189:19.
retaliate 190:14,
  191:1, 192:3,
  192:19, 198:14,
  198:23, 199:5,
  199:17, 201:21,
  202:14.
retaliated 205:18.

retaliating 198:5,
  199:9.
retaliation 142:12,
  191:6, 192:8,
  198:9.
retire 162:5.
retires 59:6.
return 187:15.
reverse 113:9.
review 16:23, 27:6,
  104:25, 105:4,
  105:12, 137:17.
reviewed 105:19,
  106:16.
reviewing 183:1.
Revolving 93:11.
Rich 100:4.
rid 21:2, 31:6.
ride 73:9.
right-hand 100:22,
  115:19, 128:5,
  134:4, 153:22.
Right. 46:15.
rights 36:12, 37:6,
  37:17, 38:18,
  39:20, 41:2,
  42:24, 44:4,
  44:13, 44:23,
  45:3, 45:17,
  48:17, 48:18,
  51:15, 52:16,
  55:6, 58:15.
risk 166:19,
  200:16.
Road 45:12, 98:6,
  116:2, 116:4,
  117:7, 121:13,
  121:22, 132:1,
  143:25.
robbery 144:9.
role 95:14, 104:24,
  162:11, 197:1.
roles 196:25.
room 26:3, 65:14,
  123:11, 141:8,
  162:5, 175:23.
roots 135:16.
Rosalind. 106:24.
Route 112:20, 122:5,
  134:15, 144:18.

row 110:23, 116:19,
  116:22, 117:10,
  119:12, 119:13,
  120:5, 120:9.
rows 116:24.
RPR 1:46, 225:23.
Rule 37:16, 40:4,
  46:22, 50:9, 55:4,
  55:5, 142:5,
  147:10, 162:7,
  208:5, 225:15.
ruled 52:16, 58:15,
  221:16.
ruling 21:16, 21:17,
  40:24, 44:21,
  46:7, 52:9,
  165:14.
rulings 163:16,
  165:8, 165:15.
run 4:17, 66:11,
  66:15.
running 95:16,
  122:9.
.
.
.
< S >.
S-u-m-m-e-r 94:5.
S6 69:6.
safe 211:6.
safety 193:13.
sale 215:5, 215:6.
Sand 7:17, 11:11,
  28:17, 34:8,
  77:13.
Sandra 1:25, 65:20,
  68:4.
satisfied 168:24,
  177:2, 184:11,
  195:7, 207:2,
  208:10.
satisfy 193:15,
  194:4, 200:9,
  200:13, 201:1,
  201:8, 202:8,
  215:12, 219:2,
  219:5.
Saturday 71:7.
save 174:12.
saw 26:8, 36:16,
  66:9, 66:15,

67:13, 111:20,
170:25.
saying 14:5, 22:2,
24:21, 26:8,
29:16, 37:3,
39:21, 40:10,
40:13, 47:11,
49:7, 50:19,
50:20, 50:21,
51:8, 52:23, 56:1,
77:7, 136:4.
says 14:24, 17:8,
19:21, 19:24,
29:6, 40:7, 51:20,
54:24, 63:14,
97:2, 102:11,
107:17, 108:20,
136:4, 137:7,
147:11, 189:5.
scale 25:18.
scene 12:12, 12:19,
20:14, 27:8, 28:6,
30:23, 115:12,
116:21, 177:25,
197:5, 211:21.
Schedule 208:22,
209:6, 220:3.
schedules 174:16,
174:19.
scheme 142:12,
142:13, 194:8,
194:9, 195:20,
197:1.
school 66:5, 70:22,
71:9, 72:5,
76:10.
schools 71:1.
science 79:23,
189:2.
scope 196:16.
Scott 70:24, 71:1.
scrapes 85:9,
85:10.
scratch 5:7, 27:13,
27:15.
scratching 5:10,
32:4, 32:6,
32:7.
screaming 66:12,
67:24, 67:25.

screen 84:3, 106:22,
107:16, 111:10,
111:12, 117:6,
119:13, 133:13,
137:23, 145:16,
156:7, 157:4.
scrutinize 178:22,
181:10.
scrutiny 180:16,
181:25.
seal 35:18, 35:22,
58:24, 59:1, 59:4,
59:8.
sealed 35:12,
89:6.
Search 68:21,
143:12, 144:23.
searching 180:16.
seat 69:23, 78:10,
94:1, 108:9,
118:15, 120:18,
122:14, 128:23.
seated 2:3, 57:8,
64:14, 125:12,
141:11, 150:11,
151:25.
second- 14:9.
Secondly 141:18.
seconds 114:12,
132:19, 144:12.
secrecy 194:18.
secret 43:9.
secretive 178:15.
Section 190:6,
190:8, 190:11,
190:23, 191:5,
191:7, 191:12,
191:20, 198:8,
198:10, 198:11,
202:12, 204:12,
217:6, 217:13,
217:16, 218:23,
219:7, 220:4,
221:22, 222:25.
security 105:12,
108:17, 108:18,
113:6, 121:3,
122:24, 130:6,
130:8, 131:24.
Seeing 27:25, 33:2,

58:13, 58:17,
76:24, 117:6,
224:12.
seek 76:17,
206:18.
seeking 44:11,
59:21, 60:7.
seem 62:6, 75:1,
179:5.
seemed 24:3.
seems 11:21, 14:12,
148:18.
seen 37:21, 40:6,
40:8, 46:12,
49:21, 53:9, 54:1,
54:7, 66:19,
77:20, 87:22,
113:8, 127:15,
173:8.
segment 46:5.
selected 155:11.
selling 23:9.
send 56:8, 124:20,
139:15, 221:14.
sender 218:18.
sense 10:1, 14:16,
26:7, 27:7, 170:9,
173:6, 176:2,
176:19, 179:12,
183:23, 186:6,
194:21, 220:18,
221:1, 224:20,
225:9.
sent 2:9, 2:15,
18:25, 51:18,
98:12, 98:23.
sentence 4:12, 5:8,
5:10, 5:11, 5:15,
5:20, 6:2, 6:4,
6:9, 7:14, 7:15,
9:23, 11:16,
17:15, 28:7, 28:8,
28:13, 29:13,
30:21, 31:2, 31:7,
32:9, 60:16,
135:12, 220:19.
sentences 4:20,
4:23, 5:1.
separate 187:15,
193:2, 193:10,

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

196:23.
separately 187:2,
  187:15.
Sergeant 68:21.
series 55:11, 95:20,
  123:2, 189:10.
serious 164:22,
  200:16.
service 158:12.
Services 94:13,
  202:3.
serving 202:1.
set 2:23, 111:4,
  154:11, 154:16,
  176:9.
setting 100:18,
  101:1.
seven 79:12.
several 42:20,
  96:15, 177:7.
sex 165:25.
shade 179:20.
shall 162:18,
  198:16, 199:7,
  202:17, 217:17.
share 212:11.
sheet 138:3.
Shells 23:8,
  147:4.
shelter 71:20.
shelters 71:6,
  71:17.
shifting 11:3,
  11:17.
shifts 168:16.
shining 171:5.
shirt 74:7, 74:9,
  74:10, 74:11,
  135:19.
shoes 39:18.
shoot 67:23, 91:10,
  91:17.
shooter 66:17, 67:3,
  69:7, 91:7, 92:22,
  105:17, 119:18,
  142:21, 144:8,
  146:17.
shooting 6:24, 7:16,
  91:6.
shoots 144:8.

Short 56:17, 76:16,
  172:15, 215:8.
shortly 186:9,
  186:17.
shot 63:8, 63:14,
  63:25, 66:12,
  66:21, 67:22,
  73:23, 91:24,
  105:8, 123:19,
  142:21, 144:11,
  145:6.
shouldn't 10:12,
  11:22, 19:25,
  62:25, 140:3,
  140:7, 160:24.
showed 88:10, 157:8,
  157:14.
Showing 37:21,
  44:12, 59:6, 68:9,
  83:17, 84:3, 84:6,
  85:22, 86:2,
  89:17, 102:25,
  105:25, 133:9,
  133:23, 135:18,
  144:22, 145:25,
  157:21.
shown 30:23, 68:18,
  69:2, 90:9, 189:9,
  213:21.
shows 121:3, 158:2,
  158:15, 178:11.
sic 221:22.
side 78:3, 83:5,
  84:23, 84:25,
  85:1, 85:19, 86:2,
  86:6, 86:11,
  110:4, 110:5,
  110:7, 110:9,
  110:15, 110:22,
  117:6, 117:7,
  117:9, 118:7,
  123:20, 165:4,
  165:5, 170:3,
  170:13.
sidebar 165:8.
sidewalk 120:6,
  120:8, 121:2,
  121:21.
sift 166:11.
sign 111:25, 115:2,

131:20.
signals 218:11.
signed 68:18,
  101:7.
significance 175:19,
  178:12.
significant 212:5.
significantly
  192:17.
signs 218:11.
silence 145:17.
silver 143:20.
similar 27:17,
  52:25, 145:18,
  221:7.
similarity 190:2,
  197:10.
Similarly 172:22,
  172:25, 194:7,
  197:6.
simple 168:17,
  171:4.
Simply 33:22, 37:2,
  45:2, 48:3, 76:14,
  172:7, 200:2,
  208:5, 211:20,
  215:1.
Sinai 82:13, 83:3.
single 162:3,
  197:2.
singling 3:23,
  4:3.
sister 61:10, 70:13,
  70:17, 70:19,
  72:10, 73:7, 74:3,
  74:14, 74:21,
  75:1.
sit 23:21, 152:14.
site 16:10, 143:16,
  145:4, 214:9.
sites 105:13.
sitting 23:11,
  30:24, 39:1,
  140:1, 140:5,
  171:7.
situation 4:18.
six 68:10, 69:2,
  69:4, 143:5.
size 67:10, 180:5.
skill 185:15.

skin 86:4, 87:15,
  87:21, 87:23,
  87:25.
skinned 67:1.
SKU 154:3, 154:7,
  154:9, 154:17,
  154:23, 155:3,
  155:4, 155:17,
  155:22, 156:8,
  157:7, 157:11.
slanted 34:5,
  34:7.
slate 169:2.
slightly 91:14,
  91:16, 109:20.
Slow 109:17, 109:22,
  119:3, 141:21,
  146:7.
slower 109:21.
slowly 160:15,
  161:5.
small 25:18,
  183:21.
Smith 140:14.
snip 8:19, 104:5,
  134:19.
so-called 81:22,
  83:12, 84:9.
socks 71:22.
sole 162:13, 163:14,
  165:17, 167:19,
  174:6, 211:10,
  211:12, 212:4,
  212:8, 214:5.
solely 165:20,
  166:9, 166:16,
  167:7, 186:7,
  187:2, 187:7,
  187:19, 211:18,
  211:21, 220:22.
solves 22:3.
somebody 124:3,
  138:18, 171:8.
somehow 48:1,
  60:3.
Someone 10:19, 26:8,
  48:1, 58:21,
  171:7, 179:10,
  185:17, 218:16.
sometimes 74:7,

74:11.
somewhat 62:9.
somewhere 107:11,
  157:1.
son 67:3.
soon 35:10, 161:16,
  171:8.
soot 87:24.
Sorry 5:14, 7:12,
  9:2, 13:4, 16:22,
  33:16, 33:18,
  35:14, 43:3,
  44:18, 46:19,
  46:21, 64:20,
  65:13, 65:15,
  84:24, 92:18,
  93:10, 121:12,
  136:11, 146:9,
  152:17, 223:21.
sort 12:6, 14:4,
  14:9, 17:23,
  36:24, 140:19,
  221:11.
sought 188:6.
sounds 61:25,
  225:15.
South 135:15.
speakerphone 73:5.
speaking 74:25,
  124:14.
speaks 129:12.
Special 17:24,
  93:16, 93:22,
  94:13, 94:15,
  185:15, 202:2,
  226:17.
specific 6:22,
  18:12, 19:13,
  19:16, 20:23,
  105:7, 169:15,
  169:21, 189:24,
  193:3, 195:14,
  206:1.
Specifically 4:25,
  13:11, 14:6, 15:2,
  24:12, 28:15,
  28:23, 47:5,
  85:15, 103:1,
  105:10, 168:5,
  180:10, 198:6.

speculation 171:18,
  176:14.
speed 109:9, 109:12,
  109:15, 119:3,
  119:4.
spell 70:1, 70:3,
  78:13, 94:3,
  152:17.
spelled 78:15.
spends 144:17.
spent 30:16,
  138:15.
spine 88:13,
  88:21.
spite 200:20.
spoke 62:2.
spoken 194:12,
  214:2.
sponte 45:4, 45:5,
  45:9.
spot 66:11.
staff 56:14,
  83:21.
stage 147:21,
  147:23.
stake 181:13,
  195:18.
stand 46:2, 47:5,
  47:6, 47:8, 47:12,
  49:8, 50:21, 51:8,
  52:23, 58:3,
  69:16, 78:3,
  93:20, 149:21,
  150:3, 150:10,
  151:8, 152:5,
  165:3, 175:22.
standalone 107:10.
standard 200:15.
standing 16:21,
  91:8, 91:9, 91:12,
  120:2, 132:13,
  132:21, 193:10,
  212:14.
standpoint 154:19.
stands 180:2,
  187:20.
start 77:2, 83:11,
  86:24, 107:25,
  120:20, 126:2,
  160:14, 160:20,

161:7.
started 56:5,
  108:2.
starting 82:25,
  119:22, 193:20,
  220:9, 225:10.
starts 39:19,
  108:19, 110:9.
State 21:1, 46:22,
  63:22, 69:25,
  78:12, 78:22,
  81:5, 94:3,
  152:16, 161:25,
  162:1, 162:7,
  189:1, 189:4,
  200:7, 213:18,
  213:22, 213:25,
  214:4, 215:17.
stated 60:19, 66:2,
  66:6, 66:10,
  66:15, 66:17,
  66:23, 66:25,
  67:1, 67:3, 67:5,
  67:6, 67:11,
  67:12, 67:15,
  67:21, 68:1,
  160:7, 161:25,
  194:8, 215:1.
statements. 18:9,
  19:25.
States 1:1, 1:5,
  21:16, 44:25,
  55:10, 65:9,
  137:10, 164:24,
  167:20, 190:6,
  190:8, 193:7,
  198:8, 202:12,
  204:13, 204:14,
  217:6, 217:13,
  217:16, 218:23,
  219:7.
stating 162:4.
Station 96:1,
  134:5.
statute 190:11,
  191:6, 191:7,
  191:13, 192:17,
  192:20, 199:1,
  204:12, 204:17,
  209:7, 220:3,

221:20, 221:23,
  222:2, 222:3,
  222:10, 222:15,
  223:2, 223:4,
  223:10.
statutes 192:9.
stenographic
  225:24.
step 64:10, 69:24,
  78:11, 83:12,
  88:6, 94:2,
  107:17.
Stephen 1:39.
stick 24:3, 55:15.
stippling 87:19,
  87:20, 87:22,
  87:24.
stipulate 65:10,
  69:1, 98:12,
  137:11.
Stipulation 65:5,
  69:8, 98:9,
  173:2.
stipulations 163:12,
  172:18.
stopped 113:5,
  115:21.
store 153:2, 153:3,
  153:6, 156:19,
  156:22.
stores 156:20.
straggle 221:23.
straight 91:9,
  91:12, 91:21,
  110:13, 120:24,
  130:23, 133:16,
  180:7, 224:6.
strategy 25:13.
Street 1:48, 106:4,
  107:24, 111:2,
  111:22, 112:2,
  118:7, 119:10,
  120:16, 121:9,
  126:7, 127:11,
  127:12, 131:20,
  132:21, 133:1,
  133:3, 135:16,
  143:22, 143:23.
street. 66:9.
streets 106:5.

strenuous 18:6.
stressed 148:19.
stricken 4:17,
  172:23.
strike 6:3, 25:5,
  179:10.
strong 18:8, 25:6.
stronger 146:4.
struck 88:16,
  163:10.
structure 117:5.
students 79:23.
stuff 223:23.
stylistic 3:13.
stylistically
  41:21.
sua 45:4, 45:5,
  45:9.
Subject 31:3, 33:14,
  55:3, 99:10,
  139:10, 140:17,
  140:18, 141:2,
  166:16, 180:15,
  184:19, 199:1.
subject. 31:4.
subjective 200:11.
submit 141:25,
  142:13, 146:22,
  147:7.
submitting 160:1.
subparagraph
  101:2.
subpoena 48:1,
  48:8.
subsequent 128:11.
Subsequently 143:6,
  144:25.
substance 39:25,
  40:16, 208:21,
  208:22, 209:5,
  209:6, 209:10,
  220:2, 220:3.
substantial 190:2,
  211:3, 211:8.
substantive 32:22,
  142:10, 190:9,
  193:4, 193:7,
  198:7, 198:12,
  202:11, 207:8,
  207:11, 207:16,

207:20, 207:22,
208:1, 208:3,
208:12.
substantively 39:14,
41:20.
substitute 186:5.
substitution
163:3.
subtle 77:9.
succeed 205:15,
206:18.
success 193:14,
206:11.
successful 135:15,
193:11.
sufficiency
141:19.
sufficient 15:1,
25:25, 34:21,
77:2, 148:4,
169:2, 197:2,
197:16, 200:13,
201:8, 206:5,
212:17, 216:5,
219:2.
sufficiently
184:22.
suggest 4:20, 19:12,
19:24, 54:14,
163:23, 181:2,
184:20.
suggested 21:22,
22:3, 22:20,
31:17, 185:1.
suggesting 9:14,
24:25, 29:5,
33:21.
suggestion 34:7,
44:7.
suggests 17:24,
24:24.
suit 107:1.
sum 197:24.
summaries 174:9,
174:10, 174:11,
174:14, 174:16,
174:19.
Summer 93:16, 93:22,
94:5, 226:17.
summoned 192:16.

sun 171:5.
supervision 80:15.
supplying 215:7.
support 95:1, 95:7,
95:14, 104:24.
suppose 171:4.
supposed 3:16, 35:9,
76:1.
surprised 125:2.
surrounding 105:1,
115:12, 188:21,
189:12.
surrounds 105:7.
surveillance 31:19,
119:17, 121:3,
121:24, 122:6.
suspect 11:10,
68:11, 68:16,
179:5.
suspected 68:12.
suspicion 12:17,
20:19, 176:4,
178:5.
suspicious 79:1.
sustain 147:13,
147:24, 148:4,
169:6, 204:21.
sustained 165:23.
sway 180:21.
swayed 166:8.
sweeping 66:2.
swing 133:6.
sworn 69:20, 78:7,
93:23, 152:11,
162:9, 164:8,
172:16.
sympathy 63:20,
76:23, 77:13,
166:9, 166:18,
167:1.
system 173:14,
192:13, 192:17.
.
.
< T >.
T. 1:31, 1:46,
225:28.
table 91:5, 92:20.
tactic 54:15.
tactics 43:2, 43:5,

44:9, 48:6,
55:13.
taken. 57:7, 123:18,
149:8.
talked 61:19,
73:11.
talks 17:22.
taller 67:4, 67:5.
tamper 192:18.
tampering 142:12,
191:13, 192:6,
192:8, 202:13.
tangible 199:4.
tape 9:24, 10:2,
39:19, 41:8,
41:10, 104:9,
173:12, 173:18,
173:21.
tapes 173:24,
173:25, 174:1,
174:3.
target 192:4,
202:6.
task 105:7, 137:4.
taught 214:1.
taxes 8:5, 172:10,
172:12, 172:14.
taxes. 8:3.
teach 79:23.
teacher 70:21,
70:22, 70:25.
teaching 79:21,
79:23, 79:24.
technical 134:17.
Technicians 82:19,
82:20.
technique 7:2,
54:20.
techniques 6:23,
36:21, 169:15,
169:21, 169:22.
technological
98:21.
telegraph 218:12.
telephone 62:21,
128:5, 174:10,
217:4, 217:11,
217:25, 218:2,
218:8, 218:12,
218:16, 218:19,

218:21, 219:1,
219:3, 219:8,
219:12, 219:15,
219:17.
tells 154:20.
ten 55:2, 153:5.
tend 7:14, 25:4,
223:6.
tended 13:19.
tends 59:4, 171:2.
term 63:10, 175:25,
210:19.
terms 4:12, 26:7,
36:21, 36:22,
57:13, 63:3, 98:2,
100:25, 105:18.
Terrific 117:1.
tested 6:25.
testifies 170:24.
testify 10:8, 59:19,
61:2, 139:18,
146:6, 149:11,
149:19, 149:23,
150:5, 150:8,
150:12, 150:13,
150:14, 150:18,
150:21, 150:25,
151:4, 151:12,
175:13, 175:15,
175:20, 177:9,
180:21, 181:3,
181:12, 181:22,
185:14, 186:4,
192:10.
testifying 39:2,
47:3, 62:11,
182:2, 185:23,
203:10, 203:22.
Thanks 93:3.
themselves 173:24,
174:1, 212:6.
theory 62:4, 143:19,
185:17.
therapy 83:3,
83:4.
thereby 198:2,
199:3.
they'll 11:10,
162:22.
they've 14:15,

19:14, 24:10,
24:11, 39:5,
42:9.
thinking 12:1,
27:18, 34:18,
123:6, 139:23,
166:19, 201:2.
Third 5:11, 29:5,
29:13, 199:16,
201:19, 203:19,
207:16, 209:18,
215:12, 215:14,
218:5.
third-level 14:10.
this. 46:13.
though 26:24, 40:21,
43:8, 60:9,
138:15, 193:7,
208:2.
threat 193:12.
threatens 199:4.
three 8:19, 8:25,
26:15, 65:19,
88:14, 94:19,
99:13, 105:18,
133:24, 134:12,
147:22, 209:13.
three-point 127:19,
128:14.
throughout 168:23.
throwing 3:24.
Thursday 44:6.
tie 39:18.
till 73:9.
timed 224:3.
timeline 61:17,
62:1.
tissue 81:4.
Title 190:6, 190:7,
190:23, 191:20,
198:8, 202:12,
204:13, 217:6,
217:13, 217:16,
218:23, 219:7.
to. 25:5.
today 8:20, 36:3,
48:20, 61:2,
95:11, 106:17,
107:2, 140:15,
171:5.

together 35:10,
53:15, 65:12,
65:17, 66:4,
186:24, 192:24,
194:6, 195:2,
197:11.
token 165:1,
170:4.
tomorrow 160:14,
224:13.
tonight 225:17.
Tony 102:14, 102:18,
103:2.
Took 25:19, 25:20,
41:15, 64:22,
119:18, 123:19,
181:20, 189:14.
top 5:15, 86:25,
100:22, 131:5,
134:4, 134:6,
135:25.
topics 75:4.
total 187:10.
toward 33:5, 131:15,
180:14, 200:20.
Towards 107:23,
120:12, 120:13,
121:13, 121:14,
131:14, 131:16,
133:2, 167:12,
180:12.
townhouses 109:6,
110:3, 110:23,
110:25, 111:4.
Towson 79:25.
traditional 32:11.
trafficking
143:25.
tragically 144:5.
trained 79:17,
79:20.
training 185:16.
TRAINOR 1:37, 3:6,
4:4, 4:7, 7:10,
13:1, 43:12,
43:14, 75:15,
81:15, 92:9,
124:1, 125:6,
125:8, 138:24,
142:4, 147:7,

148:24, 149:15,
156:2, 159:11,
160:5, 222:21,
223:12, 223:15,
223:24.
trajectory 90:17,
90:24, 91:4,
91:11, 91:14,
91:18, 91:22,
91:25, 92:20.
transaction 97:15,
153:14, 153:17,
153:19, 178:15.
Transcript 1:17,
37:3, 39:3, 47:18,
47:23, 49:2,
50:25, 51:22,
53:21, 53:22,
104:8, 134:22,
174:4, 225:24.
transcripts 44:2.
transfer 215:1,
215:9, 215:17.
transmission
218:18.
transmit 218:11.
transported 82:13,
83:2.
travel 92:15.
traveled 89:15.
traveling 109:10.
treated 42:16,
135:20.
treatment 17:25,
83:7, 84:20.
trees 114:15, 116:4,
116:17, 116:23.
trial. 5:6, 6:7.
tried 25:10, 45:3,
45:9, 48:4, 54:6,
54:24, 58:4,
61:5.
tries 34:8, 143:4.
Trina 73:4, 73:6.
trip 113:9.
true 7:21, 11:23,
166:19, 170:8,
172:3, 172:4,
172:6, 172:7,
172:11, 173:3,

173:4, 181:15.
truth 14:11, 37:8,
44:14, 51:2,
172:4, 178:25,
179:20.
truthful 14:13,
179:14, 180:7.
try 7:6, 25:5,
34:22, 39:9,
44:10, 76:20,
79:2, 107:7,
160:17, 160:19,
180:4, 215:3,
223:6.
trying 22:6, 22:9,
22:14, 28:10,
28:14, 37:10,
40:4, 47:9, 51:13,
51:14, 54:17,
56:1, 59:14,
66:11, 179:11,
180:6.
tube 83:5.
Tuesday 93:12.
turn 96:3, 97:12,
98:1, 99:17,
100:24, 108:25,
115:21, 121:2,
122:3, 127:19,
128:14, 130:15.
turned 66:8,
137:11.
Turner 99:25.
turning 130:20.
turns 135:15.
twice 12:4, 71:19.
type 32:10, 67:12,
81:24, 82:1,
100:17.
typed 173:20.
types 34:11.
typical 26:7.
typically 91:12.
typos 221:13.
.
.
< U >.
ultimate 76:21,
148:2, 215:6.
ultimately 147:20.

umbrella 171:8.
umbrellas 171:13.
unable 69:6.
unanimous 124:1.
unanimously 169:3.
uncalled 10:14.
unclear 45:23.
undercut 39:9.
underlying 174:12.
understand 41:19,
45:19, 55:10,
59:12, 59:18,
85:16, 149:3,
149:22, 150:2,
150:5, 150:7,
150:17, 150:20,
154:25, 164:1.
Understanding 18:12,
19:19, 20:22,
174:20, 185:18,
194:12, 197:24,
207:17.
understandingly
175:3.
Understood 17:19,
19:9.
undertaking 198:2.
unduly 14:14.
unfair 42:21.
unfairly 31:16,
185:1.
unfavorable
167:12.
Unfortunately
106:25, 223:20.
uniform 74:4.
unindicted 181:17.
Unit 68:22.
United 1:1, 1:5,
21:16, 44:25,
55:10, 65:8,
137:10, 164:24,
167:20, 190:6,
190:8, 193:6,
198:8, 202:12,
204:13, 204:14,
217:6, 217:13,
217:16, 218:23,
219:7.
University 79:19,

79:24, 79:25.
unknowingly
    202:20.
unknown 190:18,
    190:22, 191:15,
    191:19, 193:21,
    208:24, 219:19,
    219:25.
unlawful 188:11,
    192:18, 192:25,
    193:18, 194:3,
    194:13, 195:2,
    195:13, 196:1,
    196:4, 196:19,
    197:15, 197:23,
    197:25, 198:3,
    216:23, 217:17,
    220:8.
unlawfully 190:21,
    191:18, 198:20,
    202:21, 203:4,
    208:19, 209:3.
Unless 2:3, 116:15,
    141:11, 151:20,
    169:3, 169:11,
    172:12, 172:13,
    208:12, 215:24.
unnatural 79:1.
unnecessary 13:6,
    14:19, 18:2,
    174:13.
unquote 48:6.
unspoken 194:12.
until 24:24, 32:18,
    34:14, 51:24,
    54:24, 55:22,
    60:22, 92:25,
    106:21, 139:4,
    149:11, 159:2,
    164:13, 168:23,
    169:11, 219:22,
    220:10.
upper 153:22.
upset 124:3.
upstairs 54:10.
upward 91:25.
usage 210:19.
USAMD 98:15.
uses 218:15.
Using 43:17, 48:8,

54:19, 61:16,
    120:1, 121:18,
    155:1, 171:16,
    181:19, 181:21,
    182:1, 182:2,
    219:15.
utilize 154:23,
    169:15.
utterance 63:6,
    63:11, 63:16,
    63:17.
uttered 189:11.
.
.
< V >.
V-20 68:8, 69:9.
V-21 108:24, 114:13,
    117:7, 118:25,
    132:16.
V-3A 111:19, 116:21,
    120:2, 120:6,
    121:18, 125:21,
    125:25, 127:10,
    129:24, 130:11.
V-9 133:23, 134:4.
validating 43:6.
value 27:18, 29:9,
    30:17, 30:18,
    31:7, 32:4, 42:11,
    42:24, 171:22.
vantage 105:20.
various 99:7, 122:8,
    178:19, 186:8.
vehicle 106:3,
    129:21, 154:20,
    155:6, 155:11,
    155:16, 155:17,
    155:18, 212:4,
    212:9, 214:6,
    214:7.
vein 88:13.
venture 193:14,
    195:18, 206:12,
    206:17, 206:18.
verb 29:3.
verdict 2:7, 2:19,
    3:4, 162:9,
    163:16, 163:24,
    164:2, 165:20,
    166:6, 166:20,

166:23, 167:2,
    167:6, 167:22,
    186:25, 187:1,
    187:15, 187:17,
    187:18, 187:22,
    221:1.
version 36:6,
    43:24.
versus 42:4.
vessel 88:12.
victim 72:2, 76:2,
    76:5, 77:3, 77:9,
    90:25, 91:2, 91:6,
    91:8, 91:10,
    91:13, 91:16,
    91:17, 91:25,
    92:2, 92:5, 92:16,
    92:21, 101:4,
    110:4, 110:15,
    111:21, 114:5,
    114:7, 114:20,
    116:19, 116:21,
    133:17, 200:21,
    201:2.
victims 192:9,
    192:14.
videos 119:17.
videotape 28:6,
    28:19, 30:23.
videotaped 25:22.
view 21:9, 27:8,
    31:19, 34:20,
    118:6, 146:3,
    162:9, 180:14.
viewed 28:5,
    148:5.
viewing 29:11.
views 18:8, 25:6,
    163:17.
vigilant 140:14.
vigorously 17:3.
Vines 102:22, 103:5,
    103:6.
violate 162:9,
    190:6, 190:7,
    192:22, 193:1.
violating 198:8,
    202:12.
violation 193:3,
    216:24.

violations 217:16.
Virginia 111:3,
   115:9, 119:11,
   120:17, 120:24,
   121:6, 121:11,
   121:12, 122:2,
   122:18, 144:13.
visible 114:15.
vision 16:21.
voice 66:13.
voir 81:13.
voluntarily 175:3,
   188:8, 195:6.
voluntary 13:8.
volunteer 71:6.
vote 148:2.
vouch 44:25.
vouching 43:1, 43:2,
   45:2, 215:6.
vs 1:8.
.

.
< W >.
W. 1:48.
waffled 27:10.
waffling 38:6.
Wait 23:6, 23:7,
   35:8, 51:24,
   106:21, 149:11.
waiting 66:3.
waits 144:20.
walk 54:10, 77:19,
   105:16, 114:16,
   119:5.
walked 110:25,
   171:7, 171:9.
walking 66:20,
   106:4, 106:14,
   110:8, 111:1,
   117:19, 119:10,
   120:13, 121:19,
   122:9, 133:4,
   133:5.
walks 144:8.
walkway 66:2.
Wall 135:16.
Wanda 65:10, 65:12,
   65:17, 65:18,
   65:21, 68:6,
   68:18, 69:2.

waned 161:11.
wanted 16:6, 23:18,
   35:2, 36:7, 37:20,
   38:12, 43:12,
   59:5, 61:3, 62:4,
   95:14, 124:7,
   124:17, 139:12,
   140:15.
wanton 200:14.
wants 6:23, 10:11,
   11:19, 17:1,
   35:20, 37:2, 44:1,
   46:10, 53:23,
   222:23.
warranted 13:6,
   18:2, 171:24.
Washington 36:15,
   95:3.
watch 69:24, 78:11,
   94:2, 120:19.
watching 27:21,
   119:5.
ways 3:22, 16:17,
   34:12, 35:21,
   37:15, 44:11.
weapon 91:1, 91:9.
wear 46:12, 53:11,
   106:25.
wearing 107:2,
   145:18.
website 135:14.
week 55:22, 59:14,
   59:18, 59:21,
   71:19, 145:24,
   145:25, 159:25,
   225:14.
weekend 2:10, 35:12,
   56:8, 56:13,
   56:14, 56:15,
   64:17, 64:19.
weeks 23:13,
   147:22.
weigh 180:15,
   220:20.
weighed 67:11,
   85:4.
weighing 185:21.
weight 81:23, 85:3,
   147:17, 162:14,
   165:17, 165:18,

171:23, 174:25,
   175:4, 181:16,
   182:8, 182:15,
   182:20, 183:4,
   184:2, 186:1.
weights 23:9.
Welcome 140:9.
welfare 193:13.
Wells 95:18, 96:16,
   96:25, 97:13,
   97:19.
wet 171:8, 171:9.
whatever 22:23,
   123:5, 137:20,
   162:16, 182:8,
   183:3, 186:1.
whatsoever 23:17.
whenever 23:22.
white 67:16.
Whoever 22:3, 63:24,
   198:12, 199:2,
   202:13, 204:13,
   221:21.
whole 10:25, 12:24,
   37:23, 38:12,
   46:17, 162:5,
   222:24, 223:2.
whom 195:10.
wife 8:2.
Wilde 101:22,
   136:17.
Wiley 143:23,
   143:24, 145:14.
Willful 178:14,
   188:13.
Willfully 142:12,
   188:5, 188:10,
   188:19, 190:21,
   190:25, 191:18,
   191:22, 193:22,
   195:5, 195:12,
   198:21, 199:14,
   200:18, 202:22,
   203:6, 203:14,
   220:11.
willfulness
   188:25.
willing 49:8,
   198:3.
windows 7:22,

171:6.
windows. 7:24.
wire 218:13.
wireless 218:13.
wisdom 162:6.
wise 213:20.
wish 148:10, 150:25,
   159:6, 159:9,
   159:13.
wished 206:16.
wishes 152:3.
wit 190:23, 191:20,
   217:3, 217:11.
wit- 54:15.
withdraw 22:12.
within 68:22,
   102:12, 117:11,
   167:19, 181:23,
   197:3.
without 3:23, 4:2,
   25:3, 31:7, 57:11,
   63:25, 80:15,
   83:13, 91:13,
   148:24, 164:6,
   164:16, 167:8,
   187:3, 197:9,
   197:15, 197:17,
   200:8.
woman 36:16,
   156:14.
wondered 26:6.
wondering 19:20,
   54:8.
Woodland 112:15,
   112:18, 113:3,
   113:9, 126:8,
   126:9, 129:6,
   131:17, 131:20,
   133:2.
word 11:23, 21:18,
   24:8, 24:17,
   24:22, 24:23,
   25:4, 43:6, 45:5,
   63:4, 86:25,
   214:24.
wording 20:24.
words 16:5, 19:2,
   47:16, 55:14,
   117:5, 175:10,
   180:4, 181:13,

189:6, 189:10,
   194:8, 194:22,
   214:2, 215:1.
wore 74:4, 74:7,
   74:11.
work 35:7, 66:4,
   71:1, 71:3, 71:6,
   71:9, 71:12, 72:4,
   72:5, 72:7, 73:3,
   73:9, 73:10,
   73:14, 74:1, 74:4,
   74:9, 74:16,
   74:21, 74:23,
   76:10, 76:15,
   94:22, 94:24,
   119:5.
worked 60:25, 61:4,
   66:4, 71:2, 71:5,
   119:6.
worker 195:15.
working 64:22,
   70:25, 94:18,
   149:1.
workload 30:12.
world 140:9.
worn 110:24.
worried 26:10.
wound 85:14, 85:17,
   85:19, 86:11,
   86:20, 86:21,
   87:2, 87:3, 87:6,
   87:14, 88:15,
   89:12, 90:2,
   90:3.
wounds 87:13.
wrapped 73:12.
write 15:5, 20:5.
writing 42:4, 194:8,
   218:11.
written 36:8, 37:1,
   38:10, 38:13,
   43:17, 43:24,
   44:2, 214:2,
   223:16.
wrongdoing 177:6.
wrote 2:6.
Wutoh 145:6.
.
.
< X >.

X-13 93:6, 93:16.
X-13A 93:12.
.
.
< Y >.
year 137:3.
year. 24:15.
years 54:6, 72:22,
   79:11, 94:19,
   153:5.
Yes. 46:14, 50:12,
   53:12, 53:14,
   54:25.
York 23:8, 147:4.
yourself 206:15.
yourselves 123:13,
   166:11, 179:13,
   181:13, 195:8,
   224:9.
youth 71:5.
.
.
< Z >.
Z-a-b-i-u-l-l-a-h
   78:15.
Zabiullah 78:6,
   78:14, 226:9.
ZERKIN 1:31, 4:23,
   5:2, 5:13, 6:12,
   8:11, 9:23, 10:13,
   12:3, 19:20, 23:5,
   33:1, 33:3, 43:1,
   56:11, 59:11,
   62:8, 64:4, 64:7,
   75:14, 75:20,
   75:24, 76:18,
   76:25, 77:16,
   224:25.
zero 125:7, 125:8.
zip 67:14.
zip-up 67:14.